FILED
2023 Jul-12 PM 02:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT "C"

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CHARLES GOODRICH and ALEXANDRA GOODRICH,

Plaintiffs,

CIVIL ACTION NUMBER

VS. 2:22-cv-21-MHH

PACIFIC INDEMNITY COMPANY,

Defendant.

VIDEOTAPED DEPOSITION
OF
JEREMY ELLIOTT

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the videotaped deposition of:

JEREMY ELLIOTT,

may be taken before Carol J. Reyer, a Certified Stenographic Court Reporter and Notary Public for the State of Alabama at Large, at the Law Firm of Norman, Wood, Kendrick & Turner, Ridge Park Place, 1130

22nd Street South, Suite 3000, Birmingham, Alabama, on the 30th day of November, 2022, commencing at approximately 10:19 a.m.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form, foundation or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that the notice of filing of the deposition by the Certified Stenographic Court Reporter is waived.

A P P E A R A N C E S

FOR THE PLAINTIFFS:

CHARLES A. DAUPHIN, Esquire
DAUPHIN PARIS, LLC
P.O.Box 1727
Hoover, Alabama 35236

FOR THE DEFENDANT:

ALYCEN A. MOSS, Esquire
COZEN O'CONNOR
The Promenade, Suite 400
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309

ALSO PRESENT: THADDEUS BROOKS, Videographer

ALEXANDRA GOODRICH

EXAMINATION INDEX

JEREMY ELLIOTT

BY MR. DAUPHIN 8

- - - - - - - - - - - - - - - - - - - - - - -

EXHIBIT INDEX

PLAINTIFF'S

| | |
|---|---|
| Exhibit 5 | 14 |
| Exhibit 10 | 19 |
| Exhibit 8 | 28 |
| Exhibit 98 | 34 |
| Exhibit 12 | 37 |
| Exhibit 96 | 55 |
| Exhibit 21 | 68 |
| Exhibit 22 | 69 |
| Exhibit 23 | 71 |
| Exhibit 26 | 73 |
| Exhibit 100 | 82 |
| Exhibit 101 | 82 |
| Exhibit 7 | 94 |
| Exhibit 13 | 104 |
| Exhibit 99 | 136 |
| Exhibit 36 | 169 |
| Exhibit 2 | 171 |

EXHIBITS - CONT'D


| | |
|---|---|
| Exhibit 73 | 175 |
| Exhibit 86 | 181 |
| Exhibit 44 | 182 |
| Exhibit 43 | 185 |
| Exhibit 82 | 195 |
| Exhibit 29 | 197 |
| Exhibit 31 | 198 |
| Exhibit 1 | 207 |
| Exhibit 63 | 233 |
| Exhibit 64 | 238 |
| Exhibit 61 | 254 |
| Exhibit 25 | 274 |

I, CAROL J. REYER, a Certified Stenographic Court Reporter and Notary Public for the State of Alabama at Large, certify that on this date, as provided by the Federal Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me at the Law Firm of Norman, Wood, Kendrick & Turner, Ridge Park Place, 1130 22nd Street South, Suite 3000, Birmingham, Alabama, on the 30th day of November, 2022, commencing at approximately 10:19 a.m., JEREMY ELLIOTT, witness in the above cause, for oral examination, whereupon the following proceedings were had:

THE VIDEOGRAPHER: We're now on the record. Today's date is November 30th, 2022. The time is 10:19 a.m., and we're here for the deposition of Mr. Jeremy Elliott in Civil Action No. 2:22-CV-21-MHH. The deposition is taking place here in Birmingham, Alabama, in the matter of Goodrich and Goodrich vs. Pacific Indemnity Company.

Would all attorneys please identify themselves for the record and whom they represent? And the court reporter can swear in the witness. We'll start to my right.

MR. DAUPHIN: Chuck Dauphin. Represent Charles and Alexandra Goodrich. And my partner, Diane Paris, is here as well as the plaintiff, Alexandra Goodrich.

MS. MOSS: And my name is Alycen Moss. I'm with Cozen O'Connor. I represent Defendant Pacific Indemnity Company, and I also represent the witness, Jeremy Elliott.

THE VIDEOGRAPHER: All right. Please swear him in, please.

JEREMY ELLIOTT,

having first been duly sworn, testified as follows:

THE COURT REPORTER: Usual stipulations other than read and sign?

MS. MOSS: We'll read and sign, yes.

EXAMINATION:

BY MR. DAUPHIN:

Q. Is it all right if I call you Jeremy?

A. Yes.

Q. You can call me Chuck because we've dealt back and forth on this claim.

A. Yes, sir. Yes, sir.

Q. Okay. Thank you.

What was your position with Chubb in November of 2019?

A. I was a field adjuster.

Q. Okay. I've seen the term "senior general adjuster" or something like that. Is that --

A. That might have been an internal title, yeah. Just field -- yeah, senior general adjuster, yes, sir.

Q. Okay. And what were your responsibilities in that role?

A. I handled losses.

Q. And I saw something you were -- handled large losses or assigned the large

losses?
A. Yes, sir.
Q. Explain that designation or that division of labor or your responsibilities compared to other agents.
A. Just in general when claims, you know, got to be a larger dollar amount or technical claims in nature, they would transfer them to the department that I worked in.
Q. Okay. What was the name of the department you worked in?
A. I was just in the claims department, property claims.
Q. And how was this claim assigned to you?
A. Through normal procedures.
Q. And what's that normal procedure, is what I'm trying to get to?
A. Yeah, the claim would have been reported. Most likely, either the insured reported it or the agent reported it to the Chubb claims center, and then they would

assign the claim to an adjuster.
Q. What other adjusters worked in the area of Birmingham?
A. Honestly, that's a broad question because there's -- do you mean like insurance adjusters like myself?
Q. I'm sorry. With Chubb, not the total number in the universe.
A. Yeah, I was going to say, yeah, that's kind of a broad question. I couldn't -- for Chubb, at the time I think it was just me and maybe one other person, Tim Blake out of the Birmingham office.
Q. Okay.
A. He's in a position above me. I'm not sure if he's even a claims adjuster. More maybe in management.
Q. Who did you report to?
A. Wally Haessig.
Q. In Dallas?
A. Yes, sir, Dallas.
Q. What was your role with the Goodrich claim?

A. The claim was assigned to me to inspect the loss and determine the loss.
Q. What authority did you have to settle the claim? That's not a very good question. Was there a monetary limit as to how far you could go in settling a claim?
A. Every adjuster has a reserve authority, and mine at the time, I believe, was 1 million, $1 million.
Q. And if the payment was going to -- were to be greater than 1 million, did you have to report to Mr. Haessig?
A. Yes, sir.
Q. And 1 million, would that apply to dwelling and contents?
A. Yes. Once it exceeds that threshold, yeah.
Q. Okay. So in the Goodrich case, it was pretty clear that that was going to be exceeded early on?
A. Yes, uh-huh.
Q. And how did you get Mr. Haessig involved?

A. Oh, he's involved from the beginning automatically.

Q. Okay.

A. He assigned the claim to me.

Q. All right. So he was involved from the beginning?

A. Yes, sir. Not on the handling of the claim. Just, you know, he -- that's who I report to, my supervisor, so I have to send him the photos back. And I made contact with the insureds, went and looked at the loss. It's a significant -- significant fire.

Q. Right.

A. Things like that. I mean, that's his involvement with it because, like I say, he sits in Dallas, so ...

Q. Now, in late April or early May of 2020, he had asked for a global settlement offer, which the Goodriches provided, and then shortly thereafter, Ms. Moss got involved. Were you still involved at that time?

A. Yes, sir.

Q. And did your participation change any after that time?

A. No.

Q. There's a May 5th, 2020, letter, which is the first correspondence from Ms. Moss.

A. Okay.

Q. Did you play a role in the positions expressed in that letter?

A. Do you have a letter I could see it maybe?

Q. Sure. Absolutely.

A. I mean, it's a lot of emails. I mean, there are letters --

Q. Some I may --

A. I'd have to really see it, to be honest with you.

Q. Some I may let you look at. Others I may ask you about before I show you.

A. Sure.

Q. But we'll show you, certainly show you exhibits.

A. Sure.

Q. If you'll turn to -- I need the other book.

A. Is that not in here?

Q. No.

A. Okay.

Q. And if you would just look at the exhibits that we address.

A. Yes, sir.

Q. And we can probably take this one back for a while.

(Plaintiff's Exhibit No. 5 premarked for identification and attached hereto.)

A. So Exhibit 5 you have the sticker on, you want my opinion on?

Q. Were you involved in coming up with the positions of Chubb expressed in that letter?

A. This is May of 2020.

Q. May 15th of 2020.

A. The only reason I'm asking the date is because I left -- I left them a year later in May of 2021. So I want to make sure I get

my dates right.
So most likely, yes, I would have provided information to the attorney. She would have drafted this letter and sent it back to us because we just -- we just get her opinion on the legal issue of it.
Q. And what information -- tell me how procedurally you provided her information. I mean, how would you get her information? Did y'all talk? Did y'all email? Or what?
A. A combination of the two, for sure.
Q. Okay. And did you review that letter before it went out?
A. Yes.
Q. And did Mr. Haessig review that letter before it went out?
A. That, I would assume yes, again, because he's my supervisor. And, again, this -- if this is a settlement offer above the million dollars --
Q. I'm sorry.
A. -- which is my authority, I wouldn't be able to -- I couldn't send this letter out

without someone else approving it.

Q. I don't think that letter is a settlement offer.

A. Well, I thought that's what you were referring to a moment ago. I'm sorry.

Q. No. I was just saying -- I was just trying to put us in the right time frame. They had asked us for a settlement offer.

A. Okay.

Q. And we made it, and then Ms. Moss got involved.

A. Right.

Q. And I didn't know if your role changed any after her involvement --

A. No.

Q. -- or not.

A. My role was the same until I vacated the position.

Q. Okay. And when I say your role was the same, what do you recall doing with Ms. Moss in the preparation of this letter?

MS. MOSS: I'm going to object on the grounds that it's attorney-client

privileged and instruct him not to answer.

MR. DAUPHIN: Well, without --

MS. MOSS: I've let him answer a lot of your questions that I think verge on that privilege, but I'm not going to let him talk about the things that we discussed or things that we were doing to -- as it relates to the letter. So I'll instruct him not to answer.

Q. (BY MR. DAUPHIN:) Did you agree with everything she put in the letter?

A. Under the advice of counsel, I'm going to --

MS. MOSS: This is a different question. You can answer -- you can answer that question.

A. Okay. So repeat the question. I'm sorry.

Q. Did you agree with everything in the letter? Take your time and look through it.

A. Yeah, I was going to say it's a -- it looks like it's quite an extensive letter.

Just a cursory review of the letter, it looks like we summarized what we thought

that we owed you for each, each feature in the policy. She's got a conclusion summary that just says, you know, this is the additional amount that we would -- we would pay you, is what it looks like.

Q. How did you work with her on the claim? Was it just through emails, or did you go to Atlanta, or did she come to Birmingham? Any visits like that?

MS. MOSS: So --

A. Like I said a minute ago, emails -- emails and phone calls. You asked me that a moment ago.

MS. MOSS: Yeah, asked and answered, and I think you're also starting to border again on attorney-client communications.

MR. DAUPHIN: Well, I haven't asked him about any communications yet that I know of, but we're going to get there, no doubt.

Q. (BY MR. DAUPHIN:) And you left -- when did you leave Chubb?

A. The end of May 2021.

Q. Okay.

A. Yes, sir. I was there during this letter period. That's why I was looking at the date, trying to make sure. That's why I was like let me see the letter. You know, I just wanted to make sure it was a letter when I was actually employed there.

(Plaintiff's Exhibit No. 10 premarked for identification and attached hereto.)

Q. (BY MR. DAUPHIN:) Just flip over briefly to Exhibit 10. That's a letter dated May 19th of 2021.

A. Okay.

Q. Were you involved in that letter? I'm just trying to get the parameters of your involvement.

A. Again, yes, I would have been involved in preparation of the letters.

Q. I know, but I thought you left in May of 2021. This is a year later.

A. Oh.

Q. The dates get confusing.

A. Oh, I thought you said it was a week

later.
Q. No.
A. I'm sorry. You said a year later.
Q. Yeah, it's a year later. I'm just trying to --
A. I can't recall on that. I couldn't 100 percent tell you on this letter, this follow-up letter a year later because this was about right around the time that I was leaving them.
Q. All right.
A. I could have been under two weeks' notice at that time. I mean, I don't know what to tell you on that.
Q. Sure.
A. The first letter I was 100 percent employed there and had no intention of leaving the company, and my involvement would have been heavy with the letter.
Q. All right. And there are, like, three letters between May of 2020 and May of 2021, and were you involved in the interim letters?

A. Yes, sir.
Q. Okay. And would Wally have been involved in the interim letters?
A. Yes, sir.
Q. Okay. Who is Mr. Rudoshko, Jerry Rudoshko? I may be mispronouncing it.
A. He's an adjuster with Chubb.
Q. Okay. Did you work with him on this claim at all?
A. No.
Q. To your knowledge, what role, if any, did he play on the claim?
A. He would have had to come in after me, if that's what -- I mean, is he involved in the claim? Is that --
Q. I don't know. I'm trying to find out. He had some involvement, and I think it may have been after you left. I'm just asking you if you had any --
A. Well, now, that could be -- right.
Q. Did you have any involvement with Mr. Rudoshko?
A. Not that -- not that I remember.

Q. Okay. And did you work with anybody other than Ms. Moss at her law firm?
A. As in what capacity?
Q. In drafting these letters.
A. My supervisor, Wally.
Q. I'm sorry. At Ms. Moss' law firm.
A. I don't -- no, I don't believe so.
Q. Okay.
A. I think all of my communication would be strictly with the attorney and my supervisor.
Q. Okay.
A. And, again, it's just for coverage -- you know, it's just for attorney opinion.
Q. And why did you leave Chubb?
A. Just another opportunity.
Q. I hope a better one.
MS. MOSS: Object to the form and the commentary. Move to strike.
Q. Do you know who Mr. Haessig reported to?
A. Corey Everett.
Q. Okay. Who is Mr. Everett?

A. He was my previous supervisor. He took a promotion, and then Wally promoted him to his position as a supervisor.
Q. I'm sorry. I lost that.
A. Okay.
Q. You reported to Mr. Haessig?
A. Yes, sir.
Q. And Wally reports to Mr. --
A. Everett.
Q. -- Everett?
A. Yeah, Corey Everett.
Q. Okay. H-e-v-e-r-e-t?
A. E-v-e-r.
Q. Oh, I'm sorry. I see that now.
A. That's okay. E-v-e-r-e-t-t.
Q. That's close enough.
What is his -- do you know the title of his position?
A. I don't know.
MS. MOSS: If you can't remember, that's fine.
A. I can't remember. I believe he's -- he's a claim supervisor, yeah. The GA

supervisor, which would be Wally, reported to him, but I don't know his actual title.

Q. All right. And what's the last thing you remember about working on the case?

A. The last thing on working on your claim?

Q. Right. When you say "your," it's the Goodriches' claim.

A. We were just at an impasse regarding odor removal and that they decided to bulldoze the house.

Q. Okay.

A. That's, that's my -- that's my memory, the last thing I remember about the claim. If that's the question you're asking me.

Q. It is.

You were present when the statement under oath was taken -- I'm sorry, examination under oath of Mrs. Goodrich? You were with Ms. Moss; is that correct?

A. I don't -- I don't believe so.

Q. I thought you were on the phone

call, did a phone call. I don't know how you joined.

A. I don't recall that.

Q. Okay. I was going to ask if you took any notes of that meeting or anything like that that you can recall?

A. I don't recall being at that meeting.

Q. Okay. And it was a phone conference where Alli submitted to an examination under oath?

A. Uh-huh.

Q. And you do not recall that?

A. I don't. To my memory, I don't believe I was there.

Q. All right.

A. Was it a video call that I was on?

Q. I think so. I think it was a Zoom meeting.

A. Again, that would be two or three years ago. I mean, I don't remember it.

Q. And if you don't remember it, you don't remember any of the details of it,

correct?

A. Correct.

Q. And you don't recall ever making any notes about it; is that right?

A. No, sir.

Q. Okay. Are you familiar with the masterpiece homeowners policy that was issued with the -- to the Goodriches generally?

A. Yes.

Q. And what's the definition of replacement cost?

A. I'd have to refer to the policy for the actual verbiage.

Q. Right. What's your general understanding?

A. The actual cost that you incur to put something back the way it was prior to the loss.

Q. Okay. Well, if you have a ten-year-old Broyhill sofa and it's lost in a fire --

A. Yes, sir.

Q. -- do you look at its value at the

time of loss or what the cost would be to replace a Broyhill sofa?

A. It would be the current replacement cost for like kind and quality.

Q. Okay. When we talk about like kind and quality, we're not talking about a ten-year-old sofa that's been subjected to five kids, are we?

A. No. I would -- I would still believe if you had a ten-year-old leather sofa that was damaged from a fire we would owe you to replace the ten-year-old leather sofa if you replaced it.

Q. All right. Would you go to a used sofa market?

A. No.

Q. Okay. That's what I was getting at.

A. Oh. No.

Q. All right. You don't buy used furniture to replace --

A. Yeah, my point with that is if you had a ten-year-old TV that was $1,000 ten years ago and today it costs 1,100, we'd pay

you 1,100 to replace the exact item.

Q. Okay. The same example of the sofa?

A. Yeah. The same quality, yes, sir.

Q. Okay. Now, are you aware that Chubb on a lot of the contents, high-value contents paid only the original invoice amount?

A. Am I aware of that?

Q. Correct.

A. We would have issued a check based on what was presented, what was documented.

(Plaintiff's Exhibit No. 8 premarked for identification and attached hereto.)

Q. (BY MR. DAUPHIN:) Look at Exhibit 8, please, sir.

A. All right.

Q. And if you would look at the first page, do you see under Contents?

A. Yes, sir.

Q. And if you come to the bottom of that page to the paragraph Contents Inventory, and it states they reviewed the inventory at length and Mrs. Goodrich's EUO

and there's minimal backup documentation for the replacement items.

A. Okay.

Q. We're willing to consider the invoices of Iris & Company that were submitted as backup documentation for the original cost. That indicates to me that Chubb is willing to pay the original cost.

A. Okay.

Q. Do you know why Chubb paid -- agreed to pay -- strike that.

Do you know why Chubb paid the original cost and not the replacement cost?

A. It looks like that's the documentation they submitted.

Q. Are you aware that they submitted the replacement cost from Iris and -- or Thorpe & Company with a sworn affidavit from Ms. Thorpe?

A. In addition to this document that you're talking about here?

Q. Yeah, or before this document. But, yeah, they submitted the affidavit of

Ms. Thorpe.
A. I'd have to see the document. I mean, if there was something submitted. It just says right here we're paying you based on the submitted documents.
Q. Okay.
A. I mean, this -- you're not telling me in this that they went and replaced these items. You're just saying that they sent an invoice that this is what these items cost. It looks like you were paid back for the cost of the items. You're not saying you didn't replace them.
Q. That's not what the policy calls for, is it? The policy calls for replacing the replacement cost of the items?
A. If you replace the item, right.
Q. What does that have -- whether or not you replace it, what does that have to do with the payment of the loss?
A. Well, if we get the language, it should say it's minus depreciation, as you mentioned a moment ago. If it was ten years

old, it would be actual cash value.

Q. The policy doesn't say that.

MS. MOSS: Well, why don't you let him look at the policy because there's all different Chubb policies.

MR. DAUPHIN: I appreciate the guidance, but I can handle it.

MS. MOSS: Well, I'm just saying there's different Chubb policies. So if you want him to speak as to the specific policy, then let him look at it.

MR. DAUPHIN: Well, he was involved in this claim, and that's what I'm asking him about.

MS. MOSS: Well, he's been gone for a year.

THE WITNESS: This letter appears that you submitted a document that said you lost $656,000 in contents, and they issued payment for that.

Q. (BY MR. DAUPHIN:) And you think that's all there was to it?

A. That's what you submitted.

Q. Do you know whether or not they submitted -- they submitted something else?
A. Like I said, if you want to show it to me, I'm more than happy to look at it.
Q. But you don't have any recollection of that today?
A. There was multiple items, again, submitted. I mean, I tried to look at everything that was submitted and issued payment when I got it.
Q. Did you look at the lost contents submitted by Mrs. Goodrich?
MS. MOSS: Asked and answered. I mean, he --
A. That's what I'm saying. What are you referring to? If you'll show me what document, I'll look at it and try to answer the question.
Q. Well, I'm just asking you -- like I said earlier, some I'll show it to you and some --
A. Sure, sure.
Q. -- I'll want your memory before I

show them to you.
A. Right, that's fine.
Q. Do you remember her showing you a contents spreadsheet which had all of her lost contents on it?
A. If you're referring to the one that was sent to Enservio and provided back to her, yes.  I mean, when we get documents --
Q. No, I'm talking about -- I'm talking about the spreadsheet she prepared and submitted in support of her claim, her loss claim?
A. If you would show it to me, I'll be more than happy to answer.  I don't know what document you're referring --
Q. You don't have any --
A. I don't have memory of what you're referring to, is what I'm saying.
Q. Okay.  Do you recall investigating it or looking at it or doing any investigation based on what she presented?
A. Again, the inventory that was submitted to me I forwarded to a company

called Enservio. It's our third-party vendor.

Q. And we got a report back from Enservio?

A. Right. If that's the report you're talking about, then, yes, I did review that.

Q. And that's not what I'm -- I'm talking about the spreadsheet with invoices and objection to Enservio report that Alli forwarded to you.

A. Okay. If she forwarded it to me, again, if I can see the document, I can tell you if I reviewed it. And if I did review it, I would have forwarded it to Enservio to make any adjustments to the original.

(Plaintiff's Exhibit No. 98 premarked for identification and attached hereto.)

Q. (BY MR. DAUPHIN:) Okay. And if you'll look at Exhibit 98.

A. 98.

Q. And now we're going to get into this other book, I believe.

A. Do I need this? Are we going to circle back to that?
Q. Yeah, don't throw it away too far.
A. Thank you.
Q. It's a little hard to see, but do you remember -- do you normally get spreadsheets like that on loss content claims?
A. Yeah, we see -- we see a lot of spreadsheets on contents, yes, sir.
Q. Okay. Does this look pretty detailed?
A. It is very detailed.
Q. And do you recall seeing it now that you've looked at it?
A. Like I say, I looked at a lot of documents, and this is several years ago. I could have looked at this during the review, sure.
Q. Okay. And in this -- I'm sorry for the little print. But it has a column Original Cost and Replacement Cost.
A. Okay.

Q. And do you see that?
A. Yes, sir.
Q. And do you recall an affidavit from -- that said -- from Alli's decorator that said these replacement costs are what I would charge?
A. I don't recall the affidavit, but if it's in here and I can look at it. I mean, if it was forwarded to me, it would be attached to the claim file.
Q. Okay. Do you get affidavits from vendors that these are the costs I would charge normally?
A. From vendors, typically, no. This might be the first one I've had in five years.
Q. So it stood out that a vendor said these are the charges I would charge, right?
A. Yes.
Q. Okay. If you would look at -- now we've got to go back to that other book. I'm sorry.
A. Sure.

(Plaintiff's Exhibit No. 12 premarked for identification and attached hereto.)

Q. (BY MR. DAUPHIN:) If you'll look at Exhibit 12.

A. 12.

Q. Now, I think this was given to Ms. Moss. Do you recall ever having seen this? And take your time. Take a minute to read it.

A. Like I say, there's so many documents, it's hard --

Q. Take a minute --

A. -- for me to say whether I saw it or not, I mean, two years ago.

Q. Well, take a minute and read the affidavit.

A. Uh-huh. So Ms. Thorpe is saying that she's worked with Mrs. Goodrich over the years and that she was assisting her in finding new furniture and interior furnishings lost from the fire, and these are the prices that Iris would charge for each

item listed.
Q. And it's referencing the items on the spreadsheet.
A. Okay. The one that I just looked at over here?
Q. Correct.
A. Exhibit 98. All right.
Q. The replacement cost.
A. Okay.
Q. And this affidavit is more documentation than you normally get on a contents claim, isn't it?
A. Yes, sir.
Q. What other additional documentation would you want other than the vendor's sworn affidavit saying these are the charges I would -- these replacement costs are the charges that I would charge?
A. Typically, the invoice where you actually replace the item.
Q. Okay. And if the items weren't replaced at this time?
A. Then in a lot of policies it says

you get paid the actual cash value.
Q. All right. I want you to assume for me that in this policy it's not an actual cash value policy.
A. Okay.
Q. That you only did the replacement cost.
A. If the policy language says that --
Q. Right.
A. -- then this document would be very critical because it would say this is what it would cost to go one-for-one. Right. You're right.
Q. Have you ever had a replacement cost policy where information beyond what the vendor said the charge would be, that you would go beyond that?
MS. MOSS: Object to the form.
A. I'm confused on the question.
Q. All right. The vendor's -- the prices that the vendor would have charged to buy it, whatever phrase you want to use, okay, in this case Thorpe & Company, all

right --
A. Uh-huh.
Q. -- would you ever request what their charges -- I mean, what they paid to get the item?
MS. MOSS: Object to the form.
A. We do on construction costs many times.
Q. And I'm just talking about -- I'm just --
A. And I would think it would be relative on this as well.
Q. Well, how?
MS. MOSS: Do you want to -- it doesn't matter what he's going to do on another claim. I mean, we're here about this claim.
Q. How do you think it would be relevant --
MS. MOSS: So that's my objection.
Q. -- on a contents claim?
A. If someone asked for what you paid for the item?

Q. No, what the vendor paid. Excuse me.
A. Well, it would establish what the replacement cost is.
Q. I'm sorry. Let me back up. I don't want to be too confusing.
I say Thorpe & Company. Iris Thorpe is her name. It should be Iris & Company. I apologize for that. Iris & Company says this will be what I'm going to charge Alli for this product, for -- this is the replacement cost, okay.
A. All right.
Q. So do you ever ask Iris & Company what their cost to obtain the item was?
MS. MOSS: Object to the form.
A. I mean, you could. I mean, that's what I was saying a moment ago. You're just trying to establish a replacement cost, I mean, what an item -- what the cost is, I mean.
Q. Right. Well, the cost of the vendor who sells the item is irrelevant. Let's say

you've got a $10,000 chair and the vendor pays to buy that chair $2,000 but charges $10,000.

A. Uh-huh.

Q. And the evidence is that that 10,000 is the reasonable cost. What difference does it make what the vendor paid to get it?

MS. MOSS: Object to the form. Asked and answered.

A. Again, for that particular vendor, if they paid 2,000. But if someone else is selling it for 5, that doesn't actually mean that's the replacement cost, is what you're --

Q. We're not talking about selling it. We're talking about the vendor buying, the vendor's cost to obtain the document. I agree the vendor is selling it for 10,000. What another vendor may be selling it for is certainly relevant.

A. Yeah, and I thought that's what you're -- where you're going with this. Because if someone is selling something for 5

and you decide to buy it from someone for 10, that would be clearly your option to do that, but the policy would only owe you for the replacement, which is the 5.

Q. Absolutely. It's a comparison of the cost?

A. Right, right.

Q. But I'm going a step behind that and saying have you ever had a situation where you asked for the vendor's cost in acquiring the product before the vendor was going to sell it to the insured?

MS. MOSS: Object to the form. I think it has no relevance what he would have done in another claim.

Q. Go ahead.

A. I mean, I think it's reasonable to request, to ask for the cost.

Q. How is it -- what cost?

A. You just asked me --

Q. The vendor's cost?

A. -- would we ask the vendor for their cost plus a markup. Yeah, I thought that was

reasonable if someone asked that question.
Q. Have you ever done that before?
A. Yes.
MS. MOSS: Object to the form.
Q. And what file have you done that on?
MS. MOSS: Object to the form. I'm going to instruct you not to answer.
A. I would say that I wouldn't be able to provide. I don't know that.
Q. It's not part of your regular adjusting duties to go and get the vendor's costs, are there -- is it?
MS. MOSS: Object to the form.
A. Again, it would just be on the claims where it was necessary to try to establish a replacement cost. That's all we're trying to do, is advance a claim.
Q. You would agree in this case where you've got the original invoice, you've got the replacement cost, and the vendor saying this is the reasonable replacement cost, that that's sufficient documentation, wouldn't you?

MS. MOSS: I object to the extent it mischaracterizes the evidence. But if that was all submitted, you can answer the question.

Q. You can answer the question one way or the other, but go ahead. I object to her putting limitations.

A. So you have an -- so you've provided an invoice --

Q. Correct.

A. -- is what you're stating to me, which shows what you paid for it?

Q. Yes.

A. And you're stating you should be paid back that invoice, if I'm -- if I'm hearing you correctly?

Q. No, no, no. No, no. It's the original invoice. I mean, you do this for a living, don't you, or you did?

A. Yes, sir.

Q. And for how many years did you do it?

A. Yeah, well, 18 years.

Q. Okay.
A. 18 years.
Q. I don't understand your difficulty in understanding, but --
A. That's fine.
Q. -- if you don't understand my question, I'll ask it again.
A. That's fine.
MS. MOSS: Well, I don't really understand your question.
Q. Here's the -- Alli pays $10,000 for a chair.
A. Okay.
Q. It burns. She has the original invoice, okay. Her vendor interior decorator, Ms. Thorpe, says it will cost $12,000 to replace that $10,000 chair you bought.
A. Okay.
Q. Alli puts on here replacement cost 10,000. Iris says in her sworn statement -- I'm sorry. She put on her replacement cost 12,000. Iris says in a sworn statement that

is what I would charge her to replace this chair.

A. Okay. So we would pay her the 10,000. She'd go out and replace the chair, submit the invoice, and we'd give her the other 2,000, what she actually incurred.

Q. So you would pay 12,000?

A. If she incurred it, sure.

Q. Okay.

A. Because she was made whole by being -- she provided an invoice for 10,000 and she was paid 10,000.

Q. No, it was the original invoice that she bought two years ago.

A. That's fine.

Q. But the chair has gone up in value and it costs $12,000 --

A. Right.

Q. -- to buy it now.

A. So she would go replace the $12,000 chair, submit the $12,000 invoice, and she'd get the additional $2,000.

Q. Why does she have to submit that,

show where she bought it in order to get paid on it?

A. It's a -- well, did she replace the item?

Q. In my example, no.

A. Then why would she be entitled to the additional money above what she originally paid?

Q. Because she lost an item.

A. But she was made whole. She was paid exactly what she paid for the item.

Q. But she can't go out and buy that item for $12,000.

A. But if she did go replace the item, she would get that additional money.

Q. And your testimony is that she could only get that item -- she would only get the 12,000 if she went out and bought the item again?

A. If she would have -- if she would have incurred 12,000 to replace the chair, then, yes, she would have been paid the replacement cost for the chair.

Q. Okay. And let's assume she didn't want to buy that chair but wanted to save some money going forward and was going to buy a $5,000 chair?

A. She'd already been paid the 10,000 on the invoice that you told me she submitted.

Q. Correct.

But that $10,000 chair was actually -- to replace it would have been $12,000.

A. Uh-huh.

Q. So why wouldn't you pay her the $12,000?

MS. MOSS: Object to the form. Asked and answered. I think we've been through this multiple times.

A. As I say, I thought I just answered that question because your example was if she bought a $5,000 chair, we wouldn't ask for the 5,000 back that we paid her the 10 whole -- and made her whole.

Q. Well, my question is: In that

situation where the original cost was $10,000 --
A. Right.
Q. -- the cost to replace it is 12 --
A. Correct.
Q. -- and another chair costs 5?
A. All right.
Q. So why wouldn't Chubb owe the $12,000?
A. She didn't replace the $12,000 chair in your example. She went and bought a $5,000 chair and she was paid 10,000 for it.
Q. All right. So your testimony is that in order to get the replacement cost you'd have to actually replace the item?
A. Yes.
Q. Assume that under the language of the policy she's entitled to the replacement cost value even if she doesn't replace the item, okay.
A. Assuming -- assuming she's entitled to it, okay.
Q. Right.

So in our previous example, she would be entitled to the $12,000?

MS. MOSS: Object to the form.

Q. Is that true?

A. Again, that's your estimate from Iris. That's not for like kind and quality. I mean, there could be -- other vendors are selling the same chair for 8,000, which would be a direct replacement cost.

Q. And assume there's no evidence of any other vendors that would sell it for $8,000?

A. In that example --

MS. MOSS: Object to the form.

Q. Yes.

A. Yeah, in that example, you would owe the $12,000 if someone else didn't have the like kind and quality of the exact chair that you already paid the 10,000 for. I mean, in your example.

Q. Yes.

A. Yes. But you noted in your example that you didn't buy a $10,000 chair, you

bought a $5,000 chair.
Q. But not -- not an exact replacement of like kind and quality. Just one that I wanted to have to make $7,000.
A. Well, and that would be -- again, that's the insured's decision on that, yeah.
Q. Right. That doesn't have anything to do with what the insurance company owes the insured?
A. Right.
Q. Do you know what Chubb paid in this case?
A. If you have a statement of loss, I can look at it. I don't know what the final numbers were.
Q. Do you know if Chubb did an investigation to see if there were other sellers of some of these loss contents?
A. I wouldn't -- I'm not aware of any of that.
Q. Okay. Did you take any items and look to see what the -- well, let me strike that.

Outside of the Enservio report, okay, did you look at any items submitted by Alli to determine what the replacement cost may be?

A. I think we did make some contact with the antique restorer.

Q. Okay.

A. Because when I got there, you know, I asked Alli, I said, "You're familiar with this individual?" And she said she knew her and that they were going to come pick these items up. And I think we contacted with her a couple of times, basically, I mean, to my memory.

Q. Do you -- do you remember anybody else?

A. I mean, in, in the interim -- at the beginning of the claim, yes, there might have been. I don't know of anybody right off. I mean, we -- my goal at the beginning is to try to assist people because, you know, right after a fire people are asking questions, hey, where can we take this or where can we

take that, and I'm sure we would have gave them some, some options.

Q. And I think --

A. Or tried to.

Q. What I'm talking about is Exhibit 98. After you received that -- that is that spreadsheet we were looking at. If you want to look at it again, by all means do.

A. Okay.

Q. After you received that, did you conduct any investigation as to what the replacement cost might be on any of those items?

A. Like I said, we -- I would have sent this to Enservio to update the original inventory.

Q. Okay. And there are some comments in here about Enservio's prices, and would you have --

A. In this spreadsheet?

Q. Right.

Would you have sent this to Enservio for them to look at?

A. Well, I would have sent this document to them if you would have forwarded it to me saying you had a dispute with the price.

Q. Okay. Do you recall that that would -- that we did have disputes with Enservio's pricing?

A. Yes, yeah. Yeah, I remember that clearly.

(Plaintiff's Exhibit No. 96 Premarked for identification and attached hereto.)

Q. (BY MR. DAUPHIN:) I mean, look at Exhibit 96, please.

A. That's in the same -- same book, okay.

Q. Is there a picture there?

A. Of a window curtain.

Q. This was a replacement cost on -- that Enservio said was a replacement item of like kind and quality on an $8,000 curtain, and they had it listed at $250. Did you send that -- do you recall sending that?

A. Did I send you this picture or this item?

Q. No. Did you -- the spreadsheet makes note of that. Not the picture, but it questions Enservio's pricing on that. Do you recall Enservio ever doing anything like that?

A. Yeah. Yeah, that happens at times. There's mistakes made, clearly.

Q. Did you see Enservio responding to that?

A. I would have -- like I said, they probably would have updated their spreadsheet based on something. But, you know, if you had pointed out this item, hey, this is an incorrect item. It looks like it's $35 to me. I can't really see it. But, obviously, someone would have made a mistake. Yeah, they could have made a mistake, and then we would have came back to the insured and the insured said, hey, this is -- there's no way we have this type of curtain, and we said, okay, well, just update us on that and we'll

revise our -- we'll revise our spreadsheet.
Q. Would you look at the -- I think it's Exhibit 89. That is an inspection report that Chubb provided to the Goodriches on their home.
A. Okay.
Q. And toward the back of that are several pictures of the interior of the Goodriches' house.
A. Okay. I'm on the photos.
Q. Okay. Would you look through those and just look at the curtains shown in that brochure or that report?
A. Yep, I see them.
Q. Those are not $250 curtains, are they?
MS. MOSS: Object to the form.
A. Well, I couldn't establish the value by just looking at the picture. But they're not the ones that are in the photo that you showed me a moment ago. They're clearly not those photos -- I mean, not those curtains.
Q. They're clearly more expensive

curtains?

MS. MOSS: Object to the form.

A. Well, I have a very similar curtain in my house, I mean, just to be honest with you, that are $200 a panel. So, I mean.

Q. Sure. I'm not saying -- it's not that. I'm asking Enservio -- what Enservio did. Do you know if they --

A. Well, they gave you a price for a curtain, just a random curtain, and obviously it was wrong, and it was sent back to make a correction.

Q. And we brought that out, and did you send it back to Enservio?

A. Yes, yeah.

Q. You would have?

A. Yes, sir.

Q. There would be a record of that?

A. Yeah, there should be an email where -- if you sent that document to me, saying, hey, we don't agree with this, we would have sent it back to them to, you know, make an adjustment.

Q. Looking at Exhibit 98, the spreadsheet --
A. Okay.
Q. -- it's full of comments on the side, isn't it?
A. And this is your spreadsheet, though. This isn't Enservio's, right?
Q. Right.
A. This is yours, okay.
Q. We requested -- we requested some of Enservio's costs.
A. Okay.
Q. I mean, you asked Alli to do that, and she did it.
A. Okay.
Q. And I'm trying to find out what happened after she did it.
A. Yeah, so after she gave this document to me, it should have been forwarded to Enservio to update their inventory with the replacement cost.
Q. I haven't seen any evidence that it was done. That's why I'm curious. It should

have been done that way, right?
MS. MOSS: Object to the form.
A. Yeah, and I don't see -- I don't see a date on this, so I don't know when this was presented, this spreadsheet that you're showing me here.
Q. It was after the Enservio reports.
A. So, I mean, I'm not sure if it was -- I guess that's what I'm saying. I'm not -- the affidavit that you gave me says 2020, so I'm assuming that these are around the same --
Q. That's the --
A. -- around the same time.
Q. Yeah, they're both '20, correct.
MS. MOSS: Don't make any assumptions. If you know the answer, answer.
THE WITNESS: Okay.
MS. MOSS: If you don't know or don't remember the answer, then say that.
Q. (BY MR. DAUPHIN:) Let's look at -- hold on just a second.
Do you recall, other than Enservio,

doing any investigation as to the replacement cost on items in -- on the spreadsheet?

MS. MOSS: I'm sorry. Can you repeat that?

MR. DAUPHIN: Do you -- yes.

Q. (BY MR. DAUPHIN:) Do you recall doing any investigation of the replacement cost on the items on the spreadsheet other than Enservio?

A. On a few of the items, it looks like -- just jumping out at me, like there's a rug, a couple of different rugs listed on here, and when the initial vendor showed up, we always tell them, hey, take the rugs to a rug specialist in that market. So here it would have been whoever is in the Mountain Brook area. So that would have been an outside source we would have probably referred to.

The antique restorer. Then other claims in Mountain Brook, I think it's called Henhouse, sometimes we'd refer to that. But that would have been the outside -- if you're

asking me for a comparison, yeah, we would use some local outside for comparison.

Q. Do you recall having done that in this case?

A. Yes. That's what I was saying, we did that. Because I had a conversation right up front with Mrs. Goodrich that she knew those vendors.

Q. Okay. And where is a record of the vendors you contacted?

A. Probably the phone -- I mean, I would have made a phone call to them, I mean.

Q. All right. Is there anything in the claim file that shows what the replacement cost would have been?

A. I'm not sure on that. If there's an email or something, I mean. If you want to send me a document and ask me if I sent it to the vendor, I mean, I can tell you if it was mine or something.

Q. Well, what's your general practice if you contact a vendor about a replacement cost? What do you do?

A. Sometimes you call them on the phone and say, hey, I wanted to follow up with you on this particular item, can you give me a proposal, a replacement cost estimate or a repair estimate, whatever, and then will you email that document to us.

Q. And do you keep that document?

A. Yes. Oh, yeah. Everything --

Q. It would be in the claim file somewhere?

A. I try to get it and stick it right in the claim file if somebody sent me something.

Q. So if there had been -- if you had done that on this case --

A. If they would have gave me something.

Q. -- and if you had gotten a replacement cost, it would be in the claim file somewhere?

A. If they provided something. Some vendors say -- they work directly with the insured, and they never send us anything.

They cut us out of the -- they just cut us out. We'll work directly with Mrs. Goodrich. There's no need, you know, for me to be involved with her wanting a table refinished or a chair reupholstered or whatever. That's between her and the vendor.

Q. I'm just talking about the items on this spreadsheet.

A. Well, no, you're asking me would we talk -- would we get other people involved. Yeah, we do that on every claim.

Q. And if there was a record where you got another replacement cost, it would be in the claim file?

A. It should be in the claim file if they sent me something, yes, sir. Yeah.

Q. And if there's nothing there, you didn't receive anything?

A. If there's nothing there, they probably didn't send it to me, and they could have sent it to Mrs. Goodrich.

Q. Okay.

A. I mean, you know, again, I'm --

Q. Sure.
A. -- in good faith trying to do everything to help our insured. You know, put them in touch with people that can help them restore something or replace something or whatever.
Q. Now, are you familiar with Asia Rug in Mountain Brook?
A. Just -- just by name. I mean, I --
Q. Okay. What's your understanding that Asia Rug does?
A. They're just a rug vendor in the Mountain Brook area, and I know a lot of the Chubb clients that I've handled claims with used -- purchased rugs there.
Q. When you say they're "a rug vendor," what do you mean?
A. They sell different types of rugs. I don't know what else -- know what all they sell. I've never even been in the store.
Q. They don't sell anything, do they?
A. I don't know. I've never been in the store.

Q. All right. They just repair rugs, don't they?
A. I've never been in the store.
Q. So why would you rely on them if you don't even know if they're a vendor?
A. That was a recommendation from the emergency service vendor that was on-site.
Q. That would -- so wait a minute. From who?
A. The vendor that you hired told me they were going to take the rugs to a rug company, and I said which -- "Who would that be?" They said, "Someone here in Mountain Brook." They gave me a couple of different names. I said, "Do that and get a report and submit it back to the file."
Q. So when you say the vendor you hired, are you talking about Brookstone?
A. Uh-huh, yeah.
Q. So the Goodriches --
A. Because they were moving all of your contents for you when I got there.
Q. Right. So the Goodriches hired

Brookstone, no doubt about that?
A. They were there when I got on-site. I didn't hire them, so ...
Q. You didn't hire them?
A. I didn't hire them, so I would assume -- I would assume if someone was in my house boxing up items that I hired them because Mrs. Goodrich was there and her husband was there and, shortly after, you were there. So I do remember that.
Q. All right. I wasn't there until like -- the first time we met was sometime in December, so, but that's all right.
A. Oh, I thought -- I thought you were there at the initial walk-through, and I just remember meeting you a couple of different times.
Q. Yeah, but it was the second -- it was on down. Anyway --
A. Maybe it made an impression on me.
Q. Let's get -- let's get back to Asia. Hang on one second. You actually asked Enservio to ask Mr. Arrant to go to Asia and

get the price, didn't you? Do you recall
that?
A. I asked Brookstone to go to --
Q. You asked Enservio to ask Brookstone
to get an appraisal on the rugs?
A. Why would I ask Enservio to get
Brookstone to get an appraisal?
Q. I have no earthly idea, so I'm
asking you. It seemed weird to me.
A. As I said, I don't think that would
have been asked that way.
MR. DAUPHIN: Okay. Let's take --
we've been going an hour, so let's take a
15-minute break -- or a five-minute break.
THE VIDEOGRAPHER: It's 11:15.
We're going off the record.
(Whereupon, the deposition was
recessed from approximately 11:15 a.m. to
approximately 11:29 a.m.)
THE VIDEOGRAPHER: It's 11:29.
We're back on the record.
(Plaintiff's Exhibit No. 21
Premarked for identification and

attached hereto.)

Q. (BY MR. DAUPHIN:) Mr. Elliott, would you turn and look at Exhibit 21, please? It's in the --

A. Sure. Starting with "Will you send a link?"

Q. I think this is an email from you to Alli. Yeah, right after that.

A. Okay.

Q. And in that, you're attaching the Enservio content inventory with replacement cost?

A. Yes.

Q. And that's on January 10th; is that correct?

A. Yes.

(Plaintiff's Exhibit No. 22 Premarked for identification and attached hereto.)

Q. (BY MR. DAUPHIN:) All right. Will you look at Exhibit 22, please?

A. Okay. Is that the same?

Q. The first page. We're going to go

to the bottom of it, though.
A. Oh, okay.
Q. It's actually Page 2 of that exhibit.
A. Okay.
Q. And that's a message from Alli to you where she says she needs to follow -- outline the steps I need to follow to submit claims for loss of personal items; is that correct?
A. Yes.
Q. She's wanting to know how to do it?
A. Yes.
Q. Okay.
MS. MOSS: Okay. So I think I have the wrong one. mine is the exact same.
MR. DAUPHIN: It's the second page. There are two pages to it.
MS. MOSS: Oh. Sorry.
MR. DAUPHIN: I mean, however you want to do it. I had them attached, but it doesn't matter.

(Plaintiff's Exhibit No. 23
premarked for identification and
attached hereto.)
Q. (BY MR. DAUPHIN:) And then if you'll look at Exhibit 23.
A. 23, okay.
Q. And in that one, is Alli asking for a link to the pictures of the articles in the Enservio report?
A. Okay.
Q. Is that correct?
A. "Jeremy, please respond with a link to the pictures."
Q. Okay. And do you recall whether you were able to do that?
A. Well, the top email says it's me, an email to Enservio.
Q. Well, I'm just asking -- we'll go through these emails.
A. I offered a copy of the -- a copy -- I asked them for a copy of the photos.
Q. And do you recall that he was unable to do that?

A. That, I don't recall. I mean, this is just an email saying that she asked me for it, and I sent it to the vendor and said, hey, send us a copy of the photos.
Q. Right.
A. Yeah.
Q. And they weren't able to do that, were they?
A. Again, based on this email, I couldn't tell you. This is just saying can you send it to us.
Q. And you don't know whether they did or didn't, right?
A. Not based on this email.
Q. Not based on that email, but from your experience in handling this claim, do you recall whether they were able to send you pictures or not?
A. They typically send you an inventory with the link to the items, and I would assume she had that with the inventory.
Q. Okay. And if they didn't do it in this case, there was -- something was wrong?

A. Yes. If she didn't get it, there's some type of mistake there. She should have got the inventory with the photos, yes, sir.
Q. That way you could match up --
A. Sure. Yeah, yeah.
Q. -- their cost to the picture? It's very difficult to do --
A. It doesn't do any benefit if you don't know what item you're talking about.
(Plaintiff's Exhibit No. 26 premarked for identification and attached hereto.)
Q. (BY MR. DAUPHIN:) Okay. Let's look at Exhibit 26.
A. 26. Okay.
Q. And just read the second one on that. It's an email from Alli to you.
A. Okay. The second page?
Q. Yes. And the second paragraph. If you would read that. She said regarding Enservio's valuations. If you would just read that.
A. "I cannot tell from Enservio's list

and pictures what several items are."
Q. Okay. And she was unable to match the cost that -- Enservio's with the pictures. Do you recall that?
A. Yes.
Q. Okay. And that never was resolved, and, in fact, there were subsequent emails where Enservio said we -- that this is the way we do it, we can't do it any other way?
A. Enservio sent that communication?
Q. Yes.
A. I mean, is that something that I need to look at that's in here?
Q. No. I'm just asking if you recall any of it.
A. Oh, I don't recall that.
Q. Okay.
A. That they don't -- that they couldn't make an adjustment to their inventory, I don't.
Q. All right. Enservio would want pictures of the items they were valuating?
A. Sure, 100 percent.

Q. All right. Now, if you would also look at exhibit -- which is 26, and it's in that same email we were just looking at. She says thank you for the check reflecting 50 percent of Maglia's furniture repair, payment for the total loss of some items per Enservio, and, quote, the value of the two rugs allegedly based upon an appraisal by Asia Rugs.

And there's a difference in an appraisal and a cost, a replacement cost of an item, isn't there?

A. Yes.

Q. And all Asia Rug sent in was the appraisals, wasn't it?

A. Yes.

Q. And that's not the replacement cost, is it?

A. It was just an estimate to what it would cost to replace that item.

Q. Is an appraisal an estimate of what you could sell the item for, possibly?

MS. MOSS: Object to the form.

A. To me, it was just a starting point to say this is what we believe the rug is worth. And that's -- that was the intent of getting the appraisal on it, you know, just to --

Q. Of course. And what the rug is worth is not the replacement cost, is it?

A. Based on the appraisal, you're saying?

Q. No. I'm just saying --

A. You're saying you couldn't replace it for the appraisal or -- I mean, what's your --

Q. Exactly. What evidence is there that you could replace it for the appraised cost?

MS. MOSS: Object to the form.

A. That would be just the information they provided.

Q. All right. And Chubb owes the replacement cost and not the appraisal, don't they?

A. Yes. Replacement cost is policy.

Q. Okay. And in the next paragraph, Alli states, "Regarding the replacement value for the two rugs looked at by Asia Rugs" -- I'm in the middle of the second paragraph.

A. Yeah, I'm reading. I'm following you, yes, sir.

Q. All right. "The valuation from Asia Rugs is not a 'replacement value,' which our policy calls for." Did you ever investigate or find a replacement value other than the appraisal that Asia Rug gave you?

A. Not for those -- not for those items.

Q. Why didn't you?

A. Mrs. Goodrich indicated she'd provide us the invoice for the items.

Q. Her original invoices?

A. Uh-huh.

Q. And she did.

A. Okay.

Q. And so why did Chubb only pay the Asia Rug appraisal?

A. I'm not sure what the difference in

the invoice and the appraisal was. I mean, are they the same amount or not? I mean --

Q. Well, the original invoice is more than the appraisal.

A. Then they would owe her the replacement cost for that.

Q. Okay.

A. I'm agreeing with what you're saying.

Q. All right.

MS. MOSS: 25?

MR. DAUPHIN: Yeah.

MS. MOSS: No, I don't have 25.

MS. PARIS: I'm not sure if we've addressed it.

THE COURT REPORTER: You have not.

MS. PARIS: Okay. Thank you.

THE WITNESS: Am I looking at 25 now?

MR. DAUPHIN: No, we're not.

MS. PARIS: I'm sorry. That's my error.

Q. (BY MR. DAUPHIN:) All right. Let me

just clear this up real quick while we're on this issue. There are several references in these -- well, that's all right.

You don't recall anything about the examination under oath, so you would not know anything about the specific items referenced in that?

A. No, sir, I don't recall that.

Q. All right. From your training with -- I keep saying Chubb. Do you -- while you were with Chubb, were you adjusting claims for different Chubb entities, or were you just for Pacific?

A. Different, different entities.

Q. Okay. Did you have much experience with fire claims prior to this one?

A. Yes.

Q. And just describe what experience you've had, please.

A. You mean, like, how many fires do I look at or?

Q. How big, where, the size of the losses, all of that type of stuff.

A. Fire losses anywhere from your claim. I handled claims in total fire losses of $50 million. I mean, all over the map values, claims. 1 million, 2 million, 5 million, 10 million, 20 million.

Q. And you've been shipped all over the country to handle those?

A. To handle wildfire claims in California.

Q. Okay.

A. And fire losses in probably 20 different states. I mean, I don't know the actual number, but ...

Q. Right. But you've got a vast experience in handling fires?

A. I've been to a lot of fires, yes, sir.

Q. Okay. And from your training with Chubb, do you have -- what's your understanding of what good faith is?

MS. MOSS: I'm going to object to the extent it calls him to testify as to a legal matter or legal interpretation of a

term of art. I mean, you can testify as to your layman's opinion as an adjuster.

MR. DAUPHIN: Now, I object. Please do not tell him what he can and cannot testify. You can object and tell him not to answer, but you are not entitled to instruct the witness as to what he can or cannot do, please.

MS. MOSS: Well, I am entitled to tell him what part of that question he can answer. He can answer as he could in his role as a general adjuster.

MR. DAUPHIN: Well, that's what I asked him.

MS. MOSS: He is not going to answer it as far as it's a term of art, a term of legal art that is defined legally.

MR. DAUPHIN: I asked him what his understanding was.

MS. MOSS: So I'm clarifying, but he can answer in that capacity.

MR. DAUPHIN: Well, what's confusing about your understanding? That's all I want,

is what his understanding is.

MS. MOSS: Well, the term "good faith" is a legal term of art. So that broadens -- using that term broadens your question, and I am making it clear he can testify as to what his understanding as a general adjuster is, but he cannot testify -- he will -- he is not testifying as relates to a legal term of art.

Q. (BY MR. DAUPHIN:) I just want your understanding of the term "good faith."

A. In general, we try to do the best thing right by the policy and by the insured.

(Plaintiff's Exhibit No. 100 and Plaintiff's Exhibit No. 101 premarked for identification and attached hereto.)

Q. (BY MR. DAUPHIN:) If you would look at Exhibit 1-oh -- Exhibit 100 to 101.

A. Okay.

Q. And can you tell me what this is, please?

A. 101. It's an introductory letter,

just letting them know that the claim had been assigned to me and that we would like to schedule an appointment with them on November the 19th to do a site inspection and tells what we're going to do at the meeting.

Q. And if you would look at the second page.

A. Uh-huh.

Q. The sentence that says "at the conclusion." You state, "At the conclusion of your claim, my goal is to clearly outline how I determined the settlement proposal for your claimed damages."

A. Uh-huh.

Q. Is that a reasonable position to take with the insured?

A. Sure.

Q. The insured should be entitled to know how you determine the settlement proposal that's being offered; is that correct?

A. Yes.

Q. And would part of your understanding

of good faith include at least this part of it?

A. Explaining the settlement process?

Q. Right.

A. Yes.

Q. And not the process, but the proposal that's being made?

A. Yes.

Q. Okay. And in all the fires that you handled, were a lot of them residential fires in homes?

A. Yes.

Q. And, obviously, for well-to-do people?

A. High net worth.

Q. All right. And it's still emotional for those people, isn't it, when they lose their home --

A. Yes.

Q. -- and they're looking for their loss?

And you're dealing with emotional issues?

A. It can be.
Q. Okay. It was in this case?
A. That's up for interpretation.
Q. Okay. Did you think that there was a lot of emotion with Charles and Alli over the loss of their home?
A. To be honest with you, I didn't -- I didn't get that.
Q. Okay.
A. Are you talking about the initial walk-through or subsequent?
Q. I'm talking about the loss of their home at any time. I mean, certainly it's an emotional --
A. Obviously, they were upset.
Q. Right.
A. But within an hour, it was basically relayed to me that it was just an object and they could tear it down and build a new one. I mean --
Q. Who told you that?
A. Mrs. Goodrich.
Q. Okay. And she wasn't worried about

it? It was just her home that she had built for two years and she would just build a new one and for you not to worry about it?

A. She didn't tell me not to worry about it. I'm just -- you asked me a question about her emotion. I'm just stating what --

Q. And she said she wasn't worried about it because she could just build her a new one?

A. She never used the words she wasn't worried about it. I didn't say that. I'm just -- you asked me about her emotion at the loss.

Q. And where did this conversation take place?

A. At the property, during the inspection.

Q. Which inspection?

A. The very first inspection.

Q. Okay. And how many days after the fire was that?

A. This welcome letter says --

Q. The fire happened on November 19th.
A. Well, this letter says the inspection would be the -- well, it was created on the 19th at 11:50. It says the inspection was on Tuesday, the 19th.
Q. Okay. And who all was there that you recall?
A. Myself, Mr. and Mrs. Goodrich. Brookstone was there doing some board-up or pack-out or something like that. And I met two guys in the driveway, contractors. I believe they were with Marbury, and I can't remember the other gentleman's name. They -- they said they were with -- they were contractors.
Q. Okay. And --
A. For some reason, I thought you were at that inspection. I mean, again, it's been three years ago, but you relayed that you wasn't at that inspection, but I thought that you were there and -- maybe you were at a follow-up inspection. There was an inspection with Mr. Long. Maybe on the first

inspection you wasn't there and Mr. Long wasn't there, but ...

Q. Who is Mr. Long?

A. The architect.

Q. Oh.

A. He came.

Q. And so tell me as best you can recall what Alli said about -- you said about after an hour she wasn't worried about it -- not worried, but she wasn't upset about it?

A. No. She was -- I think one of her neighbors had came over and spoke with her and said, hey, you know, I'm sorry your house is on fire, and they were standing on the porch and having their conversation, and I was talking with the vendors. And, you know, we're sorry about your loss, can we help you.

And, you know, there was empathy about what was going on and -- but from her emotional state, what I was saying was she wasn't crying. She wasn't, you know, in distraught. And basically -- I don't know -- maybe an hour into the walk-through, she

said, "Based on what you're seeing, do you think this is a tear-down? We could just tear this house down." I said, "I'm not seeing that." You know, I've been here an hour.

Q. So, okay.

A. I mean, that was --

Q. She was asking you if the house was a tear-down?

A. Uh-huh.

Q. And --

A. As if there wasn't really any attachment to the house, you know. And she said, "We just finished this house six months ago," you know. And I said, "Ma'am, I hate that." You know, I'm empathetic. They're going through a loss, and I feel for someone that's suffered a loss like that. We talked about the loss and talked about the housekeepers that were there, and we talked about this.

Q. Did you talk about the possibility of the smoke odor or odor of smoke coming

back on down years from now?
A. We hadn't got -- no, sir. We hadn't got into any of that. We were just -- we were just walking around the house with the vendors, and she was focused on having someone to come get her antiques out of the house. And Brookstone was trying to -- I think they -- if they hadn't done a board-up, they were doing a board-up. And there was security questions, can we hire someone to come and, you know, stop someone from getting in our -- in our home and things like that.
Q. And did she relate to you that the fire chief had told her that it was a tear-down?
A. She might have.
Q. And that she was concerned, very concerned about chemicals in the house from the fire and smoke in the house that would be there for years? Did she express that to you?
A. No, sir, I don't remember that part of the conversation.

Q. Okay. Later on you had -- certainly, certainly you remember conversations about the smoke odor, don't you?

A. Yes, later on there was a lot of conversation about smoke odor.

Q. Okay. And that was a major concern of hers, wasn't it?

A. It was, yes, sir.

Q. And you're not saying she wasn't concerned about repair and smoke odors that first -- the night after the fire? She may have been at that time; you just don't recall?

A. Yeah, she -- she could have -- she could have been concerned with smoke odor. It wasn't relayed to me. I just had the impression that, hey, we're fortunate no one was in the house, no one got injured, it's just a home. If we have to replace the home, we can replace the home. And I thought that was, you know, a unique take because it does happen. You can -- you can replace the

house. It's not -- it's not an end-all. You know, you're still standing here alive, and your children are fine, and --

Q. That's why you have insurance, to help with the replacement, doesn't it?

A. Right, right. And that was, that was my answer to -- or response to your question about the emotion.

Q. And you told her that you didn't have enough information to decide whether it was a tear-down or not?

A. Yes. I mean, I'd been at the property maybe an hour or something like that.

Q. Did you later tell her that there was -- that Chubb would not pay for a tear-down?

A. No. I never remember --

Q. You don't remember telling her that it was going to be a repair and not a tear-down?

A. Well, her contractor gave me a repair estimate, so I was --

Q. Well, what did you -- but Chubb makes the decision as to whether to pay for repair or tear-down, doesn't it?
A. Yes, but --
Q. And what decision was made in this case?
A. That the house was repairable. I mean, that was -- that was indicated from the beginning from her -- from the vendor that was on-site and from her own contractor.
Q. Well, he submitted the repair estimate because you had said the house was going to be repaired and not torn down.
MS. MOSS: Object to the form.
A. I didn't force them to write any repair estimate. They -- they presented a repair estimate.
Q. Didn't you ask for the repair estimate?
A. Of course we would ask for one. We created one ourselves.
Q. So you -- so you asked Alli for a repair estimate?

A. Yes.
Q. And that's what she gave you?
A. Right.
Q. Okay. So the house wasn't going to be torn down; it was going to be repaired, wasn't it?
A. Correct. Yes, sir.
Q. Okay.
(Plaintiff's Exhibit No. 7 premarked for identification and attached hereto.)
Q. (BY MR. DAUPHIN:) If you'll look at Exhibit 7, please.
A. 7.
Q. And if you would look at Page 4, and under Paragraph 5 they're talking about the smoke remediation of fire, and the letter states, "Pacific is only obligated to pay for actual repairs, not repairs that may have hypothetically been necessary." Do you see that?
A. Under the Slade Remediation?
Q. Correct.

A. Yeah, I see it.
Q. So it's no doubt we're talking about repairs; is that correct?
A. Yes.
Q. Okay. One second. Pacific -- or Chubb was never going to pay for the tear-down -- I'm sorry, for the rebuild, were they?
MS. MOSS: Object to the form.
A. They -- they presented a repair estimate and issued a payment.
Q. On the repair estimate?
A. Yes, sir.
Q. Okay.
A. But that was your question, right, they wasn't going to pay for a repair?
Q. No, they weren't going to pay for a tear-down, but you answered it sufficiently.
A. Okay.
Q. All right. Let's look at Paragraph B of that June 1st letter. We're talking still on Exhibit 7. Page 3.
MS. MOSS: June 26th letter?

MR. DAUPHIN: I'm sorry. June 26th letter, yes.
Q. (BY MR. DAUPHIN:) Paragraph B, Response to June 1st Letter, do you see that?
A. Yes.
Q. And if you look at the paragraph -- the second paragraph, does Pacific state right in the middle, "Here, the house can be repaired, but the insureds have chosen to demolish and replace the entire house. The insureds can certainly make that choice, but they are not entitled to be paid additional moneys under the policy due to their voluntary decision to go over and above what is necessary to repair the home."
A. Yes, I see that.
Q. Okay. And did you agree with that?
A. Yes.
Q. And that was the position of Chubb on this claim?
A. Yes.
Q. When did you tell Alli that the house would not be a tear-down?

A. I don't know that I made that statement per se as to say we do have a repair estimate to repair it versus tearing it down.

Q. Do you recall her asking that you tear it down? When I say "you," Chubb.

A. Do I recall her asking me?

Q. Yeah.

MS. MOSS: Well, not Chubb; him. He's here in his personal capacity, so you can ask him a question, but not Chubb.

A. Do I recall her asking me if she could tear the home down; is that the question?

Q. Yeah, let's get real, folks.

A. Well, I thought that's what you just asked me.

Q. I said -- I said -- it doesn't matter what I said. We'll start over again.

A. Okay.

Q. Didn't she ask you that Chubb pay for the tear-down?

A. She never presented that to me that

I know -- that I'm aware of.
Q. Okay. You have a stellar education, don't you?
A. I don't know that I'd call it stellar, but I do have -- I have a degree.
Q. You graduated with honors and had an English major and a minor in technology management, didn't you?
A. I don't know where you got all that information from.
Q. Did you go to Troy? Is there another Jeremy Elliott out there?
A. I graduated from Troy.
Q. Okay.
A. I do have a bachelor's of technology management and a master's in business administration.
Q. Okay. Did you get honors with an English major? You don't have an English major?
A. I don't have an English major.
Q. Did you ever go to Japan?
A. I did go to Japan.

Q. Okay. Spent six months focusing on tech management, six semesters focusing on tech management?
A. Yes, sir.
Q. All right. Were you under National Merit consideration in 1999?
A. I'm not sure where you're getting this information from.
Q. You know, were you in the debate society?
A. At what university? I mean, where --
Q. I don't know. I'm asking you.
A. Okay.
Q. Do what?
A. I don't know where that information is from, but that's -- but I wasn't.
Q. You were not --
A. I don't recall that information there, no.
Q. Okay.
A. I don't recall being on the debate or National Honor Society. I don't recall

that.

Q. All right. It came up.

A. I'm not -- I'm not sure on that.

Q. You didn't ever put on social media -- well, it's got six semesters and Japan. You did do that?

A. I did, yeah.

Q. In tech management?

A. Absolutely.

Q. All right.

A. I was in the Air Force, and I spent four years over there.

Q. Okay.

A. I mean, it could have been -- it could have been a program I was in over there. I did a lot of things when I was over there. That's 20 years ago.

Q. How were you trained by Chubb?

A. Trained as in we do continuing education. You know, I'm licensed in the state of Alabama, and we do continuing education. You get additional licenses for other states.

Q. I mean, did you -- when you first went with Chubb, did you do any formal training on fire loss?

A. You go through some initial, initial training. And then, like I said, part of your continuing education, you go out and do -- see actual fire burns and so forth.

Q. Does Chubb perform any employee evaluations for its adjusters like you?

A. Yes. You mean, like, related to my position and my --

Q. And your performance as a --

A. Yes.

Q. -- general adjuster?

A. Yes.

Q. Okay. And what factors do they base their review on?

MS. MOSS: Object to the form.

A. They -- they just have a list of measures, basically. I don't have the list in front of me.

Q. Right.

A. I don't actually remember the whole

list, but, you know, it's contacting someone, making timely contact, doing an inspection, attaching the photos to the file and the narrative of the loss, presenting an estimate, coverage evaluation. I mean, there's a list of items that they're looking for in their best practices, they call it.

Q. And what is coverage evaluation? What does that mean?

A. Is the loss covered, is it not covered. Sometimes, you know, if someone had a flood loss and the policy doesn't cover flood, then you can make that determination.

Q. Okay.

A. Whereas in this case it's a fire loss and fire is covered.

Q. And I think you had some company out west to send someone in to determine the cause of the fire or if it was covered. Do you recall that?

A. I'm not sure where they would have came -- I mean, where they're based at. I mean, it's a cause and origin investigator,

someone to assist in determining what caused the fire, where it originated. That's on every fire loss.

Q. All right. And, I mean, you didn't bring anybody in from Alabama, did you?

A. Again, I thought there -- it was a local investigator. I mean, if I had -- if you want to show me the information, I can -- I'll be more than happy to look at it.

Q. Whatever is in the claim file, you would agree that that was it?

A. Yeah, whoever was hired, I mean, you know, from -- we wouldn't bring someone from out west, though. I mean --

Q. Well, the company was out west, wasn't it?

A. They -- I mean, they could be based in California, but we wouldn't have flown an -- flown an investigator from California to look at your fire. We just could have got out of Birmingham, you know.

Q. Well, I know, but I think he came from Georgia. I was wondering why you

brought someone from Georgia in to Birmingham
to look at the fire.
A. Sometimes, availability. You know,
you call four people and three of them are at
an active fire, and the guy says I can be
there tomorrow. You know, there's no
preference in who would come. It's just
someone to come and do the inspection.
Q. Sure.
The guy from Enservio, where was he
from?
A. I think they're based out of
Massachusetts.
(Plaintiff's Exhibit No. 13
premarked for identification and
attached hereto.)
Q. (BY MR. DAUPHIN:) Look at Exhibit
13, the Best Practices Manual. Can you tell
me what that is, please, sir?
A. Yeah, it's best -- best practices
guidelines.
Q. And what role does that play in your
performance as an adjuster?

A. It's a guide on how you should handle a claim.

Q. Okay. And do you refer to that?

A. You do from time to time.

Q. And have you referred to it from time to time?

A. Yes, sir.

Q. How do you report what happens in a claim? In other words, I've been shown what's represented to be a claims file.

A. Uh-huh.

Q. How is that made up or what makes up the claim file?

A. Several file notes, emails. Once you start issuing payments, you have statements of loss. Initially, you're going to have your photos and your loss review.

Q. What's the loss review?

A. Went to the loss today, Monday, January the 1st. Met the insured. Fire loss, spoke with the insured. The fire occurred on the second floor. You know, just a description of what -- who was there, what

you saw, and then you attach photos to it so someone who's not there can see that.

Q. And that ought to be in the claims file?

A. Uh-huh.

Q. Are payments in the claims file?

A. Yes.

Q. Is there an explanation as to the basis for the payments in the claim file?

A. Yes.

Q. What -- what does that look like?

A. It could just be a one-sentence note or a paragraph note received invoice from the insured for moving expense, $3,000, verified it. You know, you might sometimes call the mover. Have you completed this work? Yes, we completed the work. Here's the invoice. And then you just have a note in there where you're issuing the check.

Q. Okay. Do you request a check?

A. Yes.

Q. And how does that work?

A. At the time, you had to --

basically, you would send an email to someone else, and they would -- in the service center, and they would -- you would tell them what -- to issue the check under what feature and for what amount.

Q. And how do they know where to send the check to?

A. It goes to the insured's mailing address that's on the policy.

Q. Okay. Well, in this case where the house has burned and nobody's lived there, does the check still go there?

A. It still goes there.

Q. All right. And if a request is made that the check is sent somewhere else, does that check -- is that information entered on the file?

A. Typically, we enter it in the file, and sometimes we -- sometimes it wouldn't be entered in the file. You could actually just go in there and update it yourself.

Q. Okay. And if the company sends three checks to Charles Goodrich's office,

you would expect the rest of the checks to go
there as well, wouldn't you?
A. You would typically think that, but, again, mistakes happen.
Q. Well, how would a check be sent to another address if the insured has asked that it goes to Charles' office?
A. Sometimes when a check is created, someone -- maybe they're just not looking in there because, if I remember right, there used to be like a little box you had to check. And if someone overlooked it, they could send it to the original mailing address.
Q. What department at Chubb handles that?
A. They have a service center, a couple of different service centers, like, one in the west and one in the east, they called it. I think it was Arizona and Virginia.
Q. Okay. And so where do the checks come from?
A. They print them right there.

Q. All right.
A. Yeah.
Q. And where is the one -- in the Goodrich case, where did the checks come from?
A. It could have came from either office, that's what I'm saying. Because sometimes, like, if you get a call from an insured at the end of day that says, hey, we didn't get this check, and if you just happened to be working at your desk, because of the time difference, you might call a different service center because maybe the one on the east is already closed because of the time.
Q. How do I determine which checks came from which office?
A. That would be a treasury thing. I wouldn't be able to -- I don't know that.
Q. Okay. In the treasury department?
A. I guess the internal treasury. I mean, just whoever cuts the -- whoever cuts the checks could tell you that information.

I don't know. I just make the request for the check to the service center, and someone would print the check and stick it in an envelope and mail it to the insured.

Q. So you make entries into the claim file?

A. Uh-huh, for the payment that you're asking about.

Q. All right. And I want to get off the payment for now.

A. Okay.

Q. Do you make entries into the claim file for everything that you do on the claim?

A. For the most part.

Q. For the most part?

A. Yes, sir, for the most part.

Q. You're not -- you may not --

A. You might make a phone call and not put a note in the file because you called them and said, "Hey, I just wanted to remind you that we're dropping you a check in the mail today. You'll have it in the next three days."

Q. And do you make any entries in a program other than the claim file?

A. Like the Xactimate software. They use Symbility, actually. Are you talking about that? You asked me about the inspection photos earlier. That's the only other entry system they used.

Q. I'm talking about that you would use right now as the adjuster.

A. No. I mean, they just had a claims -- they just had a claim file system, and they had one that you created estimates and stuck the photos in. That's all they had.

Q. All right. And what correspondence did you have with the underwriting department, generally speaking, on a claim file?

A. You'd notify them on -- you'd notify them on fires or things like that. Like, they would get a -- they would get an email notice that there's been a fire.

Q. And do you know why you do that on

fires and not otherwise?

A. Well, they might get it on all losses. I just know for a fact that they -- on significant losses that -- because anything over 500,000, they were getting a notice on it, was my understanding.

Q. Okay. And what is US Claims?

A. That's that service center I was mentioning to you earlier.

Q. Okay.

A. The people that issue the checks and stuff, they're just data entry, people that do data entry and issue the checks and attach emails to claim files and things like that. Administrative work.

Q. Okay. And do both branches work on the same claim file?

A. Yes.

MR. DAUPHIN: Have we ordered lunch yet? Let's take a break and do that.

THE VIDEOGRAPHER: All right. It is 12:12. We're off the record.

(Whereupon, the deposition was

recessed from approximately 12:12 p.m. to approximately 12:30 p.m.)

THE VIDEOGRAPHER: It is 12:30. We're back on the record.

Q. (BY MR. DAUPHIN:) Do you recall a conversation right before Thanksgiving in 2019 where Alli called you about a contents advance because she's having trouble -- or she needed extra living expenses to buy clothes or anything like that?

A. Clothing, I don't recall anything about clothing. I mean, it would be reasonable that someone would ask you that, though, so it very well could have happened, but ...

Q. Okay. Do you remember telling her that you would send an advance of $5,000?

MS. MOSS: Well, he just testified that he doesn't remember the conversation.

MR. DAUPHIN: Well, I thought if I mentioned the number it might refresh his recollection.

Q. (BY MR. DAUPHIN:) Go ahead.

A. 5,000 would seem -- wouldn't seem like a very adequate advance, to be honest with you. But if there's a record of it, yeah, I must have said it.
Q. Well, I'm just asking if you recall.
A. I don't remember saying it, though, I mean.
Q. Okay.
MS. MOSS: Just answer his question.
A. Yeah, I don't remember the conversation, but if she would have asked me for that, I would have surely gave her an advance if she would have asked me that. I just don't remember the request.
MS. MOSS: Just answer the question.
Q. When -- I think this may have been at the second walk-through. Was the second walk-through shortly after the first one with Andrew Arrant from Brookstone and Alli? I think it was December 2nd. Do you recall a second meeting about a week -- two weeks after the fire?
A. Yeah. I mean, we had reinspections.

Q. All right. And do you remember Alli asking you for Chubb to do a tear-down and you stating, telling Alli you just want a new home?

A. I don't remember that, saying that.

Q. Or something to that effect, if not those exact words?

A. No. I mean, if the insured made that statement, I might have just listened to the statement, but I wouldn't have told her that's not going to happen or what your response was a moment ago. I'm not sure.

Q. And then there was a meeting that I attended and you were there and Alli and Hank Long, the architect, and Bradley and Marbury and Iris and Jay Tankersley all had a big meeting at the house?

A. Yes.

Q. And I think you had called that meeting?

A. Yes.

Q. All right.

A. We were trying to coordinate

everyone there to talk about the scope of work.

Q. And did you have a verbal altercation with Marbury and Bradley before the meeting started?

A. I don't know about verbal altercation. There was some -- I thought they were at the first meeting that we -- and I asked him for his information, and he spoke with me and told me it's none of your business, you need to talk to the insured.

Q. Okay.

A. I mean --

Q. Is that the only --

A. I mean, that was how the conversation started, and I said, "Well, I'm just the adjuster here to try to get information, you know, of who all is involved."

Q. Right.

What else do you recall about that conversation?

A. Mrs. Goodrich came out, and I

said -- I said, "I'm not sure really what's going on." I said, "These guys are" -- you know, "I'm trying to find out who they are, and they were kind of aggressive about giving me his information, for whatever reason."

Q. Okay.

A. I mean, that was -- it was short and sweet. And then after that, it was -- I don't even think they went in the building. I think after that they were just like just let us know if you need anything, and that was kind of it.

Q. Why didn't you ask Alli who they were?

A. She wasn't there. That's what I'm saying. No, she came out. I had pulled in the driveway, and he asked me who I was, and I gave him my business card, and I said, "Who are you?"

Q. Okay. So he asked you who you were?

A. Yeah, yeah. And I gave him my business card and told him I was with the insurance company there.

Q. Anything else you remember about that conversation?

A. No. Like I say, it was short and -- a short conversation. And then Mrs. Goodrich came out, and I introduced myself to her and handed her my business card. I thought that was the very first meeting, though.

Q. No, I'm talking about the meeting that I attended.

A. Yeah.

Q. Do you recall discussing and Marbury and --

A. I'm just saying the only conversation I ever had with them in the driveway was that as you just mentioned.

Q. Okay.

A. They were more concerned, like, who I was. And I was, like, "Well, here's who I am. Here's my credentials. You know, who are you guys?" And they wouldn't give me their business card or nothing.

Q. But they were at the meeting?

A. Yeah, they were in the driveway.

They said -- you know, and then Mrs. Goodrich came up.

Q. All right. But I'm --

A. And she said, "Oh, these are my contractors," and she introduced me to them. Because they wouldn't -- they wouldn't identify themselves.

Q. And I want to make sure that regardless of where that conversation -- you think that conversation happened -- the -- strike all of that, okay. Let me start over.

You think that conversation happened at the first time you met at the house?

A. Whenever the first time I met those guys.

Q. Okay.

A. I thought it was at the first inspection, but, again, I can't remember the exact date. But I do remember the conversation with those -- with those two guys in the driveway.

Q. And regardless of that conversation, they were at the meeting in December that I

attended and Long and Iris and all of those people. Do you remember them being at that meeting?
A. Yes.
Q. Okay. And what was the purpose of that meeting?
A. It was a follow-up because the debris removal, you know, the company you hired, Brookstone, had been there for -- if you're saying early December, so they had been there several weeks.
Q. And I just want to clarify because we, you and I, spent two or three months discussing the claim. You keep saying that I hired or me.
A. Yeah, I didn't personally hire them ever.
Q. Right.
And it was the Goodriches that hired them?
A. Well, the Goodriches, yes.
Q. Correct.
A. So the Goodriches hired them. They

were there, and we were following up on what they had done over the last few weeks. So we just wanted to have a reinspection to make sure that everybody was on track with, you know, what was -- what was getting done and what needed to be done.

Q. And was there -- was there discussion as to what -- as to what needed to be done? What was said about what needed to be done?

A. They were still taking out -- they were still taking out flooring and drywall at that point, I believe.

Q. Okay.

A. And there was just some -- we went in the attic space, and I just remember whether it was you or Mr. Long saying there was some potential concerns with the spray foam. Mr. Long opinioned something about he was handling a fire loss that had spray foam or something like that, and there was some discussion about that.

Q. Was there any discussion about

whether or not there would be smoke damage or fire damage in other parts of the roof that you couldn't access from the attic?

A. Yeah, potential. And, again, everything at that time was just, hey, we're just trying to figure out what's going on. Because I think we're two weeks into the loss at that point, and the holidays had happened, and, you know, there hadn't really been a lot of time.

Q. Did you use the phrase, "We'll peel back the onion and we'll see what's there when we start cleaning up"?

A. I'm not sure that I would have said "peel back the onion," but ...

Q. Okay.

A. I don't typically use that expression, so I'm not sure if I would have said that.

Q. At that meeting, did you explain the process of smoke remediation as far as cleaning and sealing the remaining studs and wood inside the house?

A. There could have been a discussion on that, uh-huh.
Q. I call it the smoke remediation process, and I'm talking about cleaning and spraying, sealing. Tell me what you refer to that process as.
A. Removing odor. I mean, the steps that it takes to make sure that you don't have an odor in there.
Q. All right. And that -- what are those steps, generally?
A. Well, in general, remove the source. So if you've got damaged framing, you would remove the damaged framing. And if you had something -- you know, insulation or something, you might have to remove the insulation at times. You know, it's just --
Q. And do you come back and seal the remaining timbers --
A. Yes.
Q. -- and paint those?
A. Uh-huh.
Q. Okay. And do you involve a soda

blasting -- is one step a soda blasting component?
A. Could be, could be.
Q. All right. But that is a --
A. It's not a requirement. Soda blasting is not a requirement to encapsulate something.
Q. Correct. It's a separate process?
A. A separate process. Sometimes some people consider it a duplication of work to soda blast something and then encapsulate it.
Q. My question is: That process we just talked about, which we'll call the odor removal process --
A. Odor removal.
Q. -- is a process that's used in the repair of burned houses?
A. When required, yes. Yes.
Q. And when required, it's an inherent, basic part of the repair process?
A. Yeah, when required.
Q. And it was required on the repair of the Goodrich case -- Goodrich house, excuse

me?
A. The encapsulation of odor?
Q. The odor process.
A. Odor removal?
Q. Right.
A. If there's some odor removal, yes.
Q. Okay. Now, are you aware that Chubb refused to pay the cost of the odor removal process because the Goodriches tore down the house and rebuilt it?
A. Yes, I am.
MS. MOSS: Object to the form.
Q. And were you involved in that decision-making to make that decision?
A. It would be above my authority level, I mean.
Q. Were you involved in that -- were you involved in any discussions about that?
A. Yes.
Q. And tell me what those discussions were.
A. Is there a requirement to do additional odor removal in the building.

Q. Okay. About -- were you there -- did you opine about whether or not Chubb ought to pay that as a cost of repair?
A. Yes.
Q. And what did the people say about whether or not Chubb would pay it?
A. What people, I mean?
Q. Whoever you were talking to that made this decision.
A. Oh.
Q. Well, first of all, who else was involved in making the decision to deny the cost of repair?
A. Well, it would be my supervisor, again, because it exceeded my authority at that point.
Q. Sure.
A. And, you know, I'd have to make any coverage evaluation or question on what repair we're going to make. I'd have to bounce that off of my super- -- you know, I'd just take it to them.
Q. Okay. Do you remember any

conversations with Wally about it?
A. Yes.
Q. And what did he say?
A. We would hire an expert like we -- and have them write us a scope of work.
Q. Okay. What I'm talking about is the cost for odor removal, that process, okay. That is a cost of repair, isn't it?
A. Yes.
Q. And are you aware that Chubb declined to pay that cost of repair -- cost of odor removal?
MS. MOSS: Object to the form.
THE WITNESS: So do I answer?
MS. MOSS: You can answer.
A. Am I aware that they declined to pay you for smoke removal?
Q. Correct.
A. Yes, I'm aware of that.
Q. All right. And what was the reason they declined to pay it?
A. My understanding was you didn't incur it. You didn't -- you didn't actually

do any smoke removal.
Q. Okay. Has that -- have you declined cost of odor removal or smoke removal process on that same basis in other cases?
A. That the work wasn't done?
Q. Right.
A. Yes.
Q. Okay. And do you know a Paul Drayer?
A. Yes.
Q. Okay. And he had a fire claim in Mountain Brook?
A. Yes.
Q. And he had a fire damaged house and decided to tear it down?
A. Yes.
Q. And did Chubb decline the cost of the odor removal or smoke removal that would have been used on his house on the basis that it was not done, he tore the house down?
MS. MOSS: So I'm going to object to him testifying about other claims. This is something that you've filed a motion on.

We've argued in front of the judge. The judge has not made any ruling as to whether or not discovery on other claims is permitted. And as such, I don't think you're entitled to be asking him about other claims here today. So I'm going to instruct him not to answer questions about another claim.

MR. DAUPHIN: Are you sure you want to do that? We're going to be back on that, and she has not -- you have not filed a motion for protective order or anything else on those. And it is a claim he was involved with and he dealt with, and I'm certainly entitled to know about it.

MS. MOSS: I don't think you're entitled to know about other claims at all.

MR. DAUPHIN: So you're going to tell him not to --

MS. MOSS: And that's the argument I've made.

MR. DAUPHIN: All right. Well, I know, and you're instructing him not to answer?

MS. MOSS: Yes.

THE WITNESS: I know you're instructing me not to answer, but I don't remember, to be honest with you. I really don't remember anyway.

MS. MOSS: Okay.

THE WITNESS: I mean, I don't even have any recollection of that, so I couldn't answer it even if she told me I could answer. I don't, I don't --

Q. (BY MR. DAUPHIN:) You do know he had a fire?

A. I know he had a fire, and that's what I said.

Q. And you do know he tore down his house and rebuilt his entire house?

A. Yes, but I don't know about the smoke remediation question you asked me.

Q. Well, you do know that Chubb did not pay for the tear-down replacement, but paid only the repair replacement, don't you?

MS. MOSS: I have the same objection. You're not entitled to ask for

information about other insureds. He said he doesn't remember anything about the claim.

MR. DAUPHIN: Are you telling him not to answer?

MS. MOSS: He already said he doesn't remember anything about the claim over my objection.

MR. DAUPHIN: Alycen, I'm going to keep -- I'm going to keep asking him unless you instruct him not to answer.

MS. MOSS: I'm instructing him not to answer questions about other claims.

MR. DAUPHIN: Including the question that I just asked him?

MS. MOSS: What was the question?

MR. DAUPHIN: Would you please read that back?

(Whereupon, the requested portion of the record was read back by the Court Reporter.)

MR. DAUPHIN: Let me rephrase that.

MS. MOSS: Okay. Go ahead. You can rephrase it. Go ahead.

Q. (BY MR. DAUPHIN:) In the Drayer case, do you know that Chubb refused to pay the tear-down cost and paid only the repair cost?

MS. MOSS: And I'm -- I've got the same objection, and I'm going to instruct him not to answer.

Q. I just want to make certain. Have you denied the cost of smoke odor in other cases where there was a tear-down?

MS. MOSS: I'm going to give him -- same objection and same instruction.

Q. Okay. So you're being instructed not to answer.

MR. DAUPHIN: I've just got to have it on the record. Are you instructing him not to answer?

MS. MOSS: That is what I just said.

MR. DAUPHIN: Okay.

Q. (BY MR. DAUPHIN:) Do you know Jay Tankersley?

A. He was a building consultant that we had hired for this claim, for the Goodrich

claim. I keep saying "you." I'm sorry.
Q. And you hired him through J.S. Held?
A. Yes, sir.
Q. And did you know him other than someone at J.S. Held recommended him?
A. No. He's just a building consultant for J.S. Held.
Q. Okay. And did you independently look at his qualifications?
A. Yeah, they send us their CV they call it, I guess.
Q. Okay. And where does he primarily construct houses?
A. Where does he construct houses? He's a consultant. I mean, he's -- I don't know that he's --
Q. You don't know if he's an actual home builder or not?
A. Right.
Q. Okay.
A. I mean, I don't have his CV or his information. If you want me to look at it, I can read it for you.

Q. All right. But J.S. Held would have
-- would have sent you a CV?
A. Yes, or you could have looked it up
online just, you know, to make sure they're
qualified in the work that you're hiring them
to do.
Q. It is important to make sure that
he's qualified?
A. For sure.
Q. And what qualifications would you
expect to see in a general contractor for
expensive homes to have?
A. Just to be familiar with the
different types of finishes and the level of
quality, whether it's paint, cabinets,
flooring, trim.
Q. You would have expected him to have
some experience in building wealthy homes?
A. Yes.
Q. Homes for wealthy people?
A. Yes, or to be able to look at the
estimate and evaluate it.
Q. Well, if you've never built a

million-dollar home, it's hard to see how -- what he knows about a $3 million home, isn't it?

MS. MOSS: Object to the form.

A. But some of them would know if there's a difference in appliances, for example. I mean, you could look at a refrigerator that's 4 foot by 2 foot versus looking at a sub-zero.

Q. Right.

A. Clearly, you could tell there's a difference in quality and cost and -- I mean.

Q. He just may not have the experience in expensive finishes --

MS. MOSS: Object to the form.

Q. -- and cabinets and that sort of thing?

A. And that's subjective because, again, you know, I can't speak on his qualifications of what he had seen before the loss or not, or hadn't seen. But I know he could verify something. You know, you could -- you could present something, and he could

verify if it's -- if it's reasonable.
Q. And a lot of that would -- certainly, his prior experience would be a factor, right?
A. To some degree, yes.
(Plaintiff's Exhibit No. 99 premarked for identification And attached hereto.)
Q. (BY MR. DAUPHIN:) Let's just do it this way. Look at, I think it's Exhibit 99.
A. 99.
Q. And also in comparison with this, look at Exhibit 100. Do you know what Exhibit 100 is?
A. 100 is a side-by-side comparison between J.S. Held and TCC.
Q. And who prepared this?
A. It says J.S. Held in the top right corner.
Q. Okay. When we were discussing the reasons for not paying the odor removal cost, you said that that was above your pay grade and that that was Wally's decision. Do you

have any knowledge as to what this breakdown means in how the payment of any claim based on this breakdown was made?

A. You're referring to Exhibit 100?

Q. Correct.

A. So what this is showing you, it's just an itemized -- these were the items that there seemed to be a difference in what our estimate indicated the replacement cost would be versus what TCC had presented, and then on the right is just a note saying, hey, we reviewed this cost or this cost is -- you know.

Q. Okay.

A. Uh-huh.

Q. Let's look at Exhibit 99.

A. Okay.

Q. And what is that?

A. It's from J.S. Held. It says for discussion purposes. It has TCC's number and a breakdown of different items. He's made some adjustments to the replacement cost, it looks like, on wood mantel, garage door, so

forth.
Q. Just walk me through that, please. Where it says "wood mantels disputed 50 percent, adjusted 5,000," what does that mean?
A. He was indicating that their number was -- it looks like he believes their number is 5,000 too high.
Q. TCC's number?
A. Yes.
Q. Do you know how he got to that number?
A. Not based on this document. I don't see anything on this.
Q. Okay. All right.
A. It's just -- it says for discussion, hey, here's some -- here's 10, 12 items that there's a difference on. And then the next one, it actually had some opinions on the next sheet that you referred to, the 100.
Q. Okay. So are wood mantels on 100?
A. Yep, they are. So it says --
Q. All right. Let me pull it up. I

lost it somehow or another. So go down to wood mantels, and that's Line 5. And J.S. Held has zero. How do you coordinate that with the 50 percent on Exhibit 99?

A. Well, it looks, according to the notes, that they've actually been removed and stored at Brookstone. So maybe on the initial report because I'm not sure -- this one here, I don't know what the date of it is. I don't know how old this second document is.

Q. I don't either.

A. So, I mean, if the second document is June of 2020, obviously there's seven months apart. I mean, I don't know -- you know, for reference, I would like to know when the side-by-side is because then I could speak to -- because it could have been on the first one on this --

Q. Well, let's don't talk about what could have been. What do you see in the document?

A. Yeah. Well, what I'm seeing on

11-19, it says that there was a $5,000 price difference. But then on this other one, again, it doesn't have the date on it, but it says they just removed the wood mantel because apparently they thought it could be reinstalled. So they've removed it and it's being stored for reinstallation. So he just -- instead of it being 5,000, now it's the whole amount because --

Q. Do you know that?

A. Sir?

Q. Do you know that?

A. I don't know that, but reading this, that's what I'm getting out of it.

Q. Okay.

MS. MOSS: Okay. Testify to what you know. I don't want you to guess or speculate.

THE WITNESS: Well, I know this one says there was a $5,000 deduction, and this one says there's a $10,000 deduction.

MS. MOSS: If you don't know why, then don't speculate.

THE WITNESS: I don't -- I don't know why other than what the note says.

Q. (BY MR. DAUPHIN:) So you said this one had --

A. The 99, yeah.

Q. Exhibit 99 had a --

A. $5,000 disputed, it says, for the wood mantel. And then the second document, again, I'm not sure of the date, but it has a $10,000 difference. The word is "difference." It says difference versus disputed on this sheet.

Q. Oh, okay.

MS. MOSS: And just for reference, when you're referring to the second document, you're referring to Plaintiff's Exhibit 100?

THE WITNESS: Yeah, Exhibit 100 says 10,000.

Q. (BY MR. DAUPHIN:) When it says plumbing -- I'm looking at Exhibit 99. I'm sorry.

A. Okay.

Q. It's plumbing 4 percent. What's

that mean?
A. It looks as if he's disputing --
MS. MOSS: Not looks. If you know, testify.
A. He's disputing --
MS. MOSS: If you don't, say that.
A. He's disputing 4 percent.
Q. On plumbing?
A. Yes.
Q. In a $3 million house. Do you know what plumbing on 4 percent he's disputing?
A. Not based on this document, no, sir.
Q. So would you expect there to be some document that explains what 4 percent of the plumbing he thinks is not -- when we say it's disputed, do you interpret that as being that's not part of the repair, so I'm going to get $4,700 off?
A. It appears that he -- not appears. The disputed amount is 4 percent, and looking at the document, he believes that TCC was $4,720 high.
Q. All right. Is that -- okay. So is

he thinking 4 percent of the plumbing can be used again?

MS. MOSS: He can't testify as to what this guy thinks.

A. I don't -- I don't have anything telling me how he arrived at the 4 percent.

Q. Did you discuss -- did you discuss that with J.S. Held?

A. I would have discussed that and said what is the difference, yes. And that's -- I would have asked him for the second document, which is the side-by-side, to kind of explain where the differences in the scopes were, which is Document 100.

Q. All right. Well, if you look at plumbing on Document 100, "Notes cost differences. RFI. Please provide itemized list of fixtures from supplier."

A. Okay.

Q. What does that mean?

A. So he sent a request for information to TCC, asking for an itemized list of the fixtures.

Q. Okay. Now --
A. And, again, he's just trying to, you know, reach an agreement on what it's going to cost to replace the plumbing in this discussion.
Q. Okay. And Exhibit 100 has at the top "For discussion purposes only;" is that correct?
A. Yes.
Q. And Exhibit 99 has that same --
A. Yes.
Q. -- disclaimer?
A. Yes.
Q. Do you know if the payment from Chubb was based on these documents?
A. I don't -- I don't see that.
Q. You don't know one way or the other?
A. Yeah, I don't know that.
Q. Okay. If we would look on Exhibit 100, Line 8, indoor -- I'm sorry. Yeah, Line 8, HVAC, what is that?
A. The heating and cooling system for the house.

Q. Okay. And on Line 10 on Exhibit 99, he's got 50 percent. What does that mean?
A. On Exhibit 99?
Q. Correct.
A. Line 10? Did you say Line 10?
Q. Correct, HVAC. Trying to talk about the same thing.
A. Okay.
MS. MOSS: Can we take a quick break?
MR. DAUPHIN: Sure.
THE VIDEOGRAPHER: All right. It is 1:00 o'clock. We're going off the record.
(Whereupon, the deposition was recessed from approximately 1:00 p.m. to approximately 1:01 p.m.)
THE VIDEOGRAPHER: It's 1:01. We're back on the record.
Q. (BY MR. DAUPHIN:) Do you know the basis upon which Chubb paid the $1.4 million in reconstruction cost?
A. That would be the J.S. Held repair estimate.

Q. Okay. And who would be best able to say J.S. Held came up with this 1.4 million or we're going to pay this 1.4 million based on these charges or this analysis?

A. Who would be best to say that?

Q. Right.

A. Me, the adjuster.

Q. Okay. And you're going to be able to tell us how we got to the 1.4 million that was paid?

A. Based on the J.S. Held proposal.

MR. DAUPHIN: Okay. Let's take a break and I'll find that, and we'll go into that right after lunch.

THE WITNESS: Perfect.

THE VIDEOGRAPHER: All right. It is 1:02, and we're off the record.

(Whereupon, the deposition was recessed from approximately 1:02 p.m. to approximately 1:37 p.m.)

THE VIDEOGRAPHER: It is 1:37. We're back on the record.

Q. (BY MR. DAUPHIN:) We were looking at

Exhibits 99 and 100 to determine the bid differences, and now I'm asking you to look at Exhibit 7. And just a minute. Give my computer just a second to catch up. And during our break, I asked you to, with your lawyer's permission, to look at Page 3 of her letter of June 26th, starting with the Paragraph No. 1 on that -- that's numbered wood mantels, plumbing, doors, door hardware, carpentry, et cetera. Have you had a chance to review that paragraph?

A. Yes.

Q. All right. And in that, it says the bid differences from these various articles arise from a disagreement between Pacific and the Goodriches regarding whether these items need to be replaced.

A. Yes.

Q. And was that your understanding?

A. Yes, sir.

Q. And the Goodriches' estimate was based on the value to remove and replace the items, while Pacific's original estimate was

based on the value to detach, clean, and reset the items so that they could be used in the same manner as before the loss?

A. Yes.

Q. And then on the next page, it says J.S. Held, after its calculations, increased everything by 15 percent. Do you see that?

A. In reaching their valuation, they calculated the average price adjustment upwards 15 percent. Yes, I read that.

Q. All right. Do you understand that to explain the differences on the woods and the mantels and the cabinets that we talked about, the panels and beams?

A. Uh-huh, on those items.

Q. Now, do you know who, if anybody, J.S. Held consulted to make the determination that the cabinets could be reused?

A. We had a vendor come out and remove the cabinetry.

Q. Do you know --

A. They had opinion on that.

Q. Did they have an opinion as to which

cabinets could be used -- were used?
A. Yes.
MR. DAUPHIN: I'm sorry?
MS. MOSS: I was just saying I need 9. I have 7, which you just gave me. I just need No. 9. That's okay.
MR. DAUPHIN: And we're on video. Let's wait a minute and y'all get it worked out.
MS. MOSS: Go ahead. I can wait.
Q. (BY MR. DAUPHIN:) All right. We're talking about the wood mantels, plumbing, doors, hardware, cabinetry, HVAC, and beams?
A. Yes, sir.
Q. So we're talking about a dispute basically as to whether it could be reused or not?
A. Yes, sir.
Q. All right. And your person who opined on that was? Was it Paul Davis Restoration or?
A. It looks like Wentzell Cabinets.
Q. Wentzell Cabinets?

A. Yeah.
Q. And how did y'all get in touch with Wentzell Cabinets?
A. Brookstone sent an email to me saying that they didn't feel comfortable removing the cabinetry, damaging the cabinets. Asked us if we had an alternative source. I said, you know, we could call SERVPRO or PDR and see who they have. So we called PDR, or Paul Davis Restoration.
Q. Right.
A. And they said, "We don't take off cabinets. We hire a cabinetmaker."
Q. Okay.
A. And they're the one who provided this Wentzell cabinetry.
Q. And Wentzell --
A. Went to the house and took down the cabinets.
Q. -- removed the cabinets?
A. Yes, sir.
Q. And Wentzell is also the one who said they could be reused?

A. Yes, sir.
Q. Are they -- are they the same quality after they've been taken down and put back?
A. It's the exact cabinet, the same cabinet.
Q. And the cabinet --
A. We're talking about the exact -- yeah, one-for-one the same cabinet.
Q. So were the cabinets injured by -- damaged by all the water?
MS. MOSS: Object to the form.
A. I don't see an evaluation saying there was any damage to the cabinets. My understanding was the cabinets initially were assembled offsite, transported to the house, attached to the walls, and then refinished on-site at the house from the original cabinetmaker.
Q. Would it change your opinion any if they were not assembled offsite?
A. No.
Q. But they were kept in the

atmospheric same condition as when they were installed -- until the moment they were installed at the house?

A. If they were -- if they were kept in the same atmospheric?

Q. Some sort of --

A. Climate control, you mean?

Q. Something other than climate control that this cabinet builder keeps his cabinets in until they are put up.

A. I'd be curious -- yeah, I mean, I'd like to hear the method that you're referring to. I mean, my general knowledge of cabinets is when someone makes a cabinet, they -- you know, obviously, you want to keep it climate controlled. You wouldn't make a cabinet and then set it out in the elements.

Q. There's a whole range of cabinets, aren't there, quality of cabinets?

A. Yes, sir.

Q. And you understand that what the Goodriches had was the top of the top of the top in cabinetmaking in Birmingham, Alabama?

A. Again, I'm not sure if the cabinetmaker that made them, I'm not sure if he's the top of the top of the top. I just -- I know that he's the person that made the cabinets.

Q. Did you look into MDM Design to see how good they were?

A. I'm sure I looked at their website briefly just to see that they're a cabinetmaker in Birmingham. But as far as their quality of work, I mean, there's no dispute that they were quality. But, you know, could the cabinets be reused was the question you posed me. Yes, they could -- they could be reused.

Q. Well, the fact that the cabinets could be reused was a determination that Chubb made?

A. Yeah, it was.

Q. And they decided that because they could be reused they wouldn't pay the replacement cost for the cabinets?

A. That's correct.

Q. They would pay a discounted replacement cost?

A. Yeah.

MS. MOSS: Object to the form.

Q. Go ahead.

MS. MOSS: That's --

A. We had someone's opinion on the cabinets, which was a cabinetmaker, and they said you could take the cabinets down, you could reinstall cabinets, and make any repairs to them on-site. That was the opinion that was provided to us.

Q. And what do you know about Wentzell Cabinets, his opinion or his expertise?

MS. MOSS: Asked and answered.

MR. DAUPHIN: I don't think so. Go ahead.

A. A quality cabinetmaker in the Birmingham area.

Q. What makes you think he's a quality cabinetmaker?

A. That was what -- the way it came to me when I asked, you know, what his

qualifications was. He makes cabinets for a living, outstanding product. He can come take them down and there won't be any damage to them.

Q. That's what PDR said?

A. Yes, sir.

Q. Have you looked at the cabinets after he took them down?

A. Yes, I did.

Q. Did you look at -- he didn't -- he destroyed some cabinets when he took them down, didn't he?

MS. MOSS: Object to the form.

A. Not -- not the cabinets that I was aware of because my understanding was -- I wasn't at the removal appointment.

Q. Right.

A. But midway through the removal of the cabinets, my understanding was yourself and Mrs. Goodrich showed up and stopped him from doing any additional work.

Q. And you don't -- you didn't get to see the damages on that day, did you?

MS. MOSS: Object to the form.
Q. The damage to the cabinets?
A. Like I say, I wasn't there. I wasn't there to inspect anything.
Q. I understand. And did you ask Wentzell what damage was done to cabinets that day that he was taking down?
MS. MOSS: Object to the form. Assumes facts not in evidence.
THE WITNESS: Do I answer or not answer?
MS. MOSS: You can answer it, yeah.
A. Yeah, I mean, again, I wasn't there when they took them down, but I did inspect them when they were moved offsite. And then that's when I, you know, asked you would you like you or your people, would they like to come and look at them to determine if we can reuse them or not. I mean, at that point it doesn't matter to me if you reuse them or you don't reuse them. I just want -- they were taken down for an inspection to ensue, and that just never happened.

Q. There was a lot of questions or asking over and over again insistence from Chubb that Alli and her builders and her cabinetmaker all go look at these cabinets after they were taken down.

A. Sure.

Q. And why did you want them to do that?

A. Well, if we've looked at something, our opinion is you could reuse it. It gives the insured an opportunity to look at it and dispute, you know, well, wait a minute, what about this or what about that. Ultimately, it could change our opinion. But that's why we give you an opportunity to come inspect it yourself.

Q. And you got two or three emails from me about the quality of the cabinets and why these cabinets could not be reused to be of the same quality, didn't you?

A. Probably did. But, again, we always offer an opportunity to reinspect the cabinets.

Q. Well, they weren't just offers.
Y'all were wanting us to come out and meet with y'all all the time, weren't you?
MS. MOSS: Object to the form.
A. Again, we offered you an opportunity to come inspect the cabinets after they were removed to provide your opinion of the cabinetry.
Q. I guess I get back to the issue on the plumbing. Do you know -- do you understand what that is?
A. Like I said, I didn't have a description on that comparison you showed me about the 4 percent.
Q. Yeah, okay.
A. I don't know if that was in cost or material or what it was.
Q. Was that 4 percent can be reused?
A. I don't believe it was 4 percent can be reused. But, again, I can't speculate. I don't know if the 4 percent -- how he came to that conclusion it was 4 percent.
Q. Okay. You know that the HVAC system

was destroyed and could not be reused?
MS. MOSS: Object to the form.
A. I'm not an expert on mechanical systems. We'd hire a vendor to provide a report and make that determination.
Q. And how did they determine that 50 percent of it could be reused at this time in June of 2020?
A. And then is this -- is this on a spreadsheet you want me to look at, the 50 percent, or what are you --
Q. No. I thought the HVAC was 50 percent. Look at either Exhibit 100 or Exhibit 99. Let me make sure I'm right on that.
A. Okay. 100?
Q. Or 99.
A. I just want to make sure I'm looking at the same item that you're looking at.
Q. Look at both of them.
A. 100 and 99, okay.
Q. And I'm looking at Exhibit 99, Line 10 again, HVAC, 50 percent, $43,000 [sic].

A. Line --
Q. 10.
A. -- 10. HVAC, a 50 percent disputed amount.
Q. And so half of the air-conditioning stuff could be reused?
A. Again, I can't tell you if that's cost or system. I just -- just disputed is 50 percent. That's all I can -- based on this document, all I can tell you is he's disputing 50 percent of their, their bid.
Q. And on -- while we're there, No. 11, and we're looking at Exhibit 99, beams, 90 percent. He's saying 90 percent of them could be reused?
A. And, again, I would dispute that it's 90 percent of the cost. I didn't see any physical damage to the beams when I was at that property.
Q. Okay. Doors, 50 percent. I'm on Line 7. What doors is he talking about?
A. Doors throughout the residence, I believe.

Q. Okay. Do you know how he came up with 50 percent?

A. We were -- our inspection said that the doors were solid hardwood doors versus a hollow door. You could reuse the door, refinish the door, but --

Q. Did it -- I'm sorry. Go ahead.

A. Yeah, but TCC's estimate was just, you know, take the door down and replace the door.

Q. So was your --

A. So there was a cost difference, is what we were negotiating or disputing.

Q. Y'all were going with the cost of taking them down, painting them, cleaning them up, and putting them back up?

A. Yeah, take solid hardwood down, refinish it, you know, paint it, retrim it, whatever you need to do to reinstall the door.

Q. That's not a replacement cost, is it?

A. Well, that's a repair, because we

were still working under a repair estimate at this point.

Q. So even under a repair estimate, you should pay for the replacement cost?

A. We would.

Q. Okay. And there's no doubt that on the -- strike that. That's okay.

Now, if we would look at the -- go back to that same letter, Exhibit 7.

A. Okay. I have Exhibit 7.

Q. Okay. Just one minute. I lost it.

A. Still on Page 3 of 7?

Q. Just one second.

If we would look at Paragraph B.

A. Paragraph B.

Q. The paragraph starts "The bulk of your letter"?

A. "The bulk of your June 1st"?

Q. Right. If you would come down to, "As you correctly note, when a covered loss occurs, the policy requires Pacific to pay for the lesser of the amount required at the time of loss to repair, replace, or rebuild

the damaged structure," and that structure is referencing to the house; is that correct?

A. That is correct.

Q. Okay. And that repair -- do you know whether or not the repair of the house is based on a -- also uses a replacement cost basis?

A. Can you repeat that? I'm sorry.

Q. Yeah. The policy has an extended -- under dwelling has extended replacement cost?

A. Yes.

Q. And that replacement cost in a repair situation is not just reusing what's damaged?

A. Correct.

Q. Okay. It's replacing what's damaged with items of like quality, isn't it?

MS. MOSS: Object to the form. I mean, if you want him to talk about something in the policy, let's show him the policy so he's not just speaking off the top of his head.

MR. DAUPHIN: Oh, Alycen, I can ask

him however I want to ask him, but go ahead.
MS. MOSS: Well, I mean, you're getting answers that --
MR. DAUPHIN: Alycen, why don't you just -- if you want to leave today.
MS. MOSS: -- he doesn't know.
MR. DAUPHIN: You have objections as to form.
Q. (BY MR. DAUPHIN:) Go ahead.
A. So the question -- again, I'm sorry, I lost --
Q. In a repair of the house --
A. Right.
Q. -- is it still replacement cost for the items?
A. For the items that you repair, correct.
Q. Right, okay.
A. Yes.
Q. That's good enough.
A. 100 percent agree with you.
Q. If you tear something down, clean it up and reuse it, that's not replacement cost,

is it?
A. But you're not talking about replacing something; you're talking about repairing something.
Q. My question was simply if you take something down, clean it, and put it back up to reuse, that's not replacement cost, is it?
MS. MOSS: Object to the form.
A. I don't have the exact coverage in front of me, but you have the option to repair or replace something. And if it can be repaired, you would repair it, which would --
Q. My question is: If you take something down, clean it and put it back to reuse, that's not replacement cost, is it?
MS. MOSS: Object to the form. He just answered your question.
A. When you're repairing it, you're giving them the replacement back. I mean, I think they're the same.
Q. You think if you repair something -- replacement, as we've gone through earlier,

means you get something new?
A. It's one-for-one, uh-huh.
Q. Right?
A. Right.
Q. So if you take something that's used and damaged and try to repair it, that's not the equivalent of a replacement item, is it?
MS. MOSS: Object to the form. Asked and answered.
A. The cabinets could be repaired. I mean, if that's the question. I mean, I'm --
Q. Okay. They're not going to be as good as they were once they're repaired, were they -- can they? Strike that. That was awful.
Once you repair them, they're not as good as they were before they were damaged, are they?
MS. MOSS: Asked and answered.
A. I don't know why they wouldn't be. I would think -- I would assume they would be, I mean.
Q. All right. The -- let's move on.

Did you ever tell Alli in one of the earlier meetings for her not to be concerned about whether or not she was going -- whether or not the policy would pay her for her lost contents because what you had seen she was well below the policy limits?

A. That -- that could have been a conversation that was had.

Q. And why would you tell her that?

A. Based on the limited amount of contents that was in the house during the walk-through.

Q. Well, why would you tell her that? I mean, what would spur you to say that?

A. She might have -- she might have asked me that question. She might have asked me are we adequately covered for our contents, and my response might have been based on the limited number of contents I'm seeing in the house, I believe you're adequately covered. I mean, it could have --

Q. That's if she were to ask that?

A. She could have asked that.

Q. And, of course, she bought the items herself, didn't she? She had a pretty good idea of what they were costwise, weren't they?

A. And she also knew what her coverage was.

Q. And so that's what I mean. Why would she be asking you that?

A. I don't know. That would be a question to ask Alli.

Q. I have.

A. But you asked me if she asked me that question.

Q. No, I asked you did you tell her.

A. Oh. If she asked me that question, I might have said that based on the walk-through, that based on the limited number of contents I'm seeing in here, yes.

Q. And if she had not asked you about it, would you have volunteered that information? Just told her don't worry, you've got plenty of coverage for your loss contents based on what I see?

A. I don't know why I'd make that statement. I mean, is that an email that I sent that says that or -- I'm just --

MS. MOSS: Answer the question that he's asked.

(Plaintiff's Exhibit No. 36 premarked for identification and attached hereto.)

Q. (BY MR. DAUPHIN:) Let's look at Exhibit 36, please.

A. Okay. 36.

Q. And in this email, this is from you to me; is that correct?

A. The one at the top, the email at the top --

Q. Yes.

A. -- or the one at the bottom?

Q. At the top.

A. The one at the top is an email from me to you.

Q. Okay.

A. And to several other people.

Q. You were talking about contents; is

that right?
A. Yes, in the email. Yeah, in the email, yes.
Q. And at the conclusion, it says, "Based on the inventory presented, walk-through and known details, the damaged contents fall well within the available limits"?
A. Yes, it does say that.
Q. And why did you say that?
A. Because it's talking about the inventory.
Q. And talking about -- but the coverage amount is not referenced except by you in the last sentence, isn't it?
A. Yes.
Q. Okay. And you just wanted to put out there that based on what I've seen, you're well within the available limits?
A. Right, because I believe the -- yes, based on the Enservio inventory.
Q. All right. Based solely on the Enservio inventory?

A. Yes, that's what it looks like right there. Well, not solely on that, but just, again, based on my walk-through and the limited contents I saw in the house, what was presented. This is just talking about issuing a check based on the inventory, and then I further say, "Based on the inventory presented, the walk-through and the known details, the damaged contents fall within your limits."

Q. Well, you knew that there was extensive smoke in the house after -- during the fire, didn't you?

A. Well, from any fire loss there could be extensive smoke.

Q. And in this house, the Goodriches' house, you thought there was extensive smoke?

A. Not that couldn't be treated.

(Plaintiff's Exhibit No. 2 premarked for identification and attached hereto.)

Q. (BY MR. DAUPHIN:) Well, let's look at Exhibit 2.

A. Exhibit 2.

Q. And this is a report from Enservio, and I'm looking on page -- the first page of that. Can you read underneath where it says "Inventory Capture" on the left?

A. Okay.

Q. And I'm going to read it. You can follow me along and make sure I read it correctly. That may be a little easier.

"New fire loss - started in second story and spread to the attic (there are not many contents in the attic). However, there are four bedrooms and four baths. Adjuster does not think (given the smoke throughout the home) that it" -- "that it is worth trying to restore anything." Is that what Enservio reported?

A. Yep, that's in a note from, I'm assuming, Enservio. Whoever CXE is.

Q. And you told the guy from Enservio that, didn't you?

A. Again, I don't remember having a conversation.

Q. You don't dispute telling him that, do you?

A. I don't remember having a conversation.

Q. Okay. You don't dispute telling him that, do you? You just don't --

MS. MOSS: Asked and answered.

A. I am disputing that. I don't remember having a conversation. Yeah, I am disputing that.

Q. All right.

A. I mean, I'm not sure -- I don't even know who this Nancy --

Q. Vreeland?

A. -- Vreeland or -- I don't know who this individual is. I mean, I'm assuming they work for Enservio.

Q. Well, you chose Enservio, didn't you?

A. Yes, sir.

Q. This is Enservio's work product.

A. Okay.

Q. So do you have a reason to doubt --

to doubt Enservio's work product?

A. No. I was just simply stating when they say the adjuster, they're not saying Jeremy Elliott. They're just saying the adjuster. I don't know who they're referring to.

Q. Was there another -- was there another adjuster on the scene?

A. Very well could have. Someone -- someone could have set the claim up. Not on the scene, but someone else could have set the claim up and done that.

Q. I thought you contacted Enservio?

A. I did contact Enservio.

Q. Okay. And at the meeting we've talked about earlier with Alli and Hank Long and Iris and Marbury and me and Jay Tankersley, was there discussion as to whether the house would be taken down to the studs?

A. The impacted areas, yes.

Q. All right. And was that the entire house would be, quote, taken down to the

studs, close quote?
A. There was some communication that followed after that, but at that -- at that meeting, it was the second floor and the third floor.
(Plaintiff's Exhibit No. 73 premarked for identification and attached hereto.)
Q. (BY MR. DAUPHIN:) Okay. Let's go to Exhibit 73.
A. Actually, this one only goes to 70.
Q. That would be the second half.
A. All right. 73, okay.
Q. And this is a document provided by Chubb. Can you tell me what it is?
A. It's an email from Emma Palk to a Julie Doss and Dorthea Johnson.
Q. I think it's Julie Morris. It may be hard to read there.
Okay. And who is Ms. Palk?
A. I don't know.
Q. Isn't she --
A. It says she's an underwriter on the

subject line.

Q. And isn't she the underwriter who was in charge of Alabama claims at that time?

A. I don't believe she was head of Alabama claims. She's an underwriter. She wouldn't be head of the claims department.

Q. For underwriting, she had the -- I've been told today that underwriters had certain states assigned to them and Ms. Palk was the underwriter for Alabama.

MS. MOSS: Did that --

A. Well, you said head of claims, though. You said she was the head of claims.

Q. I misspoke.

A. Yeah. She wasn't head of the claims department.

MS. MOSS: I object to the form because I don't think that that accurately characterizes the testimony.

Q. So you don't know Ms. Palk?

A. No, I don't know Ms. Palk.

Q. All right. In her email she says, "I just spoke to the claims adjuster. He

advised" -- well, first of all, let's go to the subject line. It has "LARGE LOSS: Charles Goodrich policy." It's dated December 13th.
A. Uh-huh.
Q. "I just spoke to the claims adjuster. He advised that they are demo'ing the house" -- or "the home down the studs besides the basement." Did you tell her that?
A. Again, I don't remember having a conversation with Ms. Palk.
Q. Okay.
A. So it would be -- it would be a lot cleaner if it would have said the adjuster, Jeremy Elliott. But, again, I'm --
Q. Well, on December 13th, you were the only adjuster on the Goodrich claim, weren't you?
A. Technically, I mean, meeting -- meeting Mrs. Goodrich, yes. But I mean --
Q. Well, December 13th is almost a month after the fire?

A. That's right. But what I'm saying is I don't know what Ms. Palk, who she was referring to in this. I mean, it could have just been her normal speak to say, hey, I've talked to the adjuster, and a lot of times it's not the actual adjuster myself. I mean, she may not have personally spoke with me, is what I'm saying.
Q. Well, okay.
A. But if there's an email from me and Ms. Palk saying that, then I would have said that. But I don't see that in this email, is what I'm saying.
Q. So you deny telling Ms. Palk that they were going to demo the home down to the studs?
A. Based on this email right here, yes. Again, I don't remember having a conversation with her.
Q. I'm sorry. My question was: Do you deny telling Ms. Palk they are demo'ing that home down to the studs?
MS. MOSS: I object to the form.

This is asked and answered. He's already said he does not remember having a conversation with her.

A. I don't remember having a conversation with her.

Q. Okay. There's a difference in I don't remember that that happened and that didn't happen. And my question is: Are you saying that didn't happen, or are you just saying I don't remember?

A. I don't remember.

MS. MOSS: Asked and answered.

Q. So it could have happened and you just don't remember it?

MS. MOSS: Asked and answered.

A. I don't remember.

Q. Okay. Did you ultimately make the decision to take the house down to the studs?

A. I believe ultimately, yes. Through multiple reinspections, that's --

Q. And what, what did you base that on?

A. We had other experts come out, and we'd find additional damage, and we would

just continue to expand the scope.
Q. And if the house is heavily smoked throughout the house, wouldn't you expect that smoke to go behind the sheetrock and affect the insulation and wood framing behind the sheetrock throughout the house?
A. It could, yes.
Q. Did you ever -- did you ever test in the master bedroom to see if there was any smoke behind the walls?
A. That would have been up to the vendor to do that, the demolition vendor.
Q. And did you ever tell him to do that?
A. Yeah, we asked him to test and tell us what area of the house needed to be demolished.
Q. So you're saying the areas that needed to be demolished was based on the vendor?
A. Well, we were working with them on the scope as we were going through. If they would find something additional, they would

present it to me.

(Plaintiff's Exhibit No. 86 premarked for identification and attached hereto.)

Q. (BY MR. DAUPHIN:) If you'll look at Exhibit 86, please.

A. Okay.

Q. And let's start at the bottom of that email from Andrew Arrant to you.

A. Uh-huh. Uh-huh.

Q. And who is Andrew Arrant?

A. He's with Brookstone Companies.

Q. Okay. And in that email, does he say that -- we're talking about smoke in a master bedroom and living room, kitchen hallway. And does he say, "I did inspect the areas myself and do see some smoke residue, but I won't move forward until you can see it and approve it"?

A. Yes.

Q. Okay. And did you respond at the top of that page: "Thank you for the update." "I am not agreeing to expanding the

scope until I get the IH report, which will be reviewed by our IH"?
A. Yes, I did.
Q. What's IH mean?
A. The industrial hygienist.
Q. And who was that?
A. I don't recall who it was.
Q. Okay.
A. I thought it was -- there were several. There were a couple that couldn't do it and they backed out or whatever, and I think ultimately it ended up with J.S. Held.
(Plaintiff's Exhibit No. 44 premarked for identification and attached hereto.)
Q. (BY MR. DAUPHIN:) And let's look at Exhibit 44, please.
A. 44. Okay.
Q. This is an email from me to you and Alli; is that correct --
A. Yes.
Q. -- down at the bottom of the page?
A. Yes.

Q. And I state in the second sentence, "Alli and I left the meeting with the understanding that all of the insides of the house (walls and ceilings) would be removed. The language used was that the house would be taken down to its studs. It appears, however, the demolition team has left untouched Charles' office and the master bedroom. If you plan to take everything down" -- "If your plan to take everything down to the studs has changed, please let me know what your new plan is and reasons for the change." Do you remember getting that email?

A. Yes.

Q. And my language in the email is "taken down to the studs," which is the same language in Ms. Palk's memo, isn't it?

A. Yes, it is.

Q. Okay. And does that help refresh your recollection as to whether you said -- told everybody to take it down to the studs?

MS. MOSS: Chuck, this same question

has been asked and answered multiple times. I'm going to hold you to the seven hours on this deposition. So if you want to keep -- if you want to continue to ask the same questions over and over, that's fine.

Q. Go ahead, Jeremy.

A. I just don't remember having the conversation. Like I said, I mean, that's just a general statement. You had said earlier that a lot of people say that we're going to take things down to the studs. I mean, I don't remember having that conversation with Ms. Palk.

Q. Well, that's the whole house, isn't it, taken down to the studs, not just part of it? Is that correct?

A. Yeah. The term, "taken to the studs," does that mean --

Q. Yeah.

A. -- the whole house?

Q. In this situation, it did, didn't it?

A. It could, yes, sir.

(Plaintiff's Exhibit No. 43 premarked for identification and attached hereto.)

Q. (BY MR. DAUPHIN:) If you'll look at Exhibit 43.

A. 43?

Q. Correct.

A. Let me go back to that one. Is this the same email?

Q. I think at the top it's a little different. No, I'm sorry. Hang on just a second.

A. So, yeah, that's the same email as the previous one.

Q. It is. Give me just a second.

If you'll look at Exhibit 44.

A. Okay.

Q. And the very first email, it's an email from you to me?

A. Uh-huh.

Q. And you state, "The demolition process continues, and we have determined the master bathroom and closet areas did not

sustain physical damage and no need to be demolished."

A. Okay.

Q. And that's on December 24th; is that correct?

A. Uh-huh. That was at that time.

Q. It was 11 days after the memo from Ms. Palk, isn't it? Hers was December 13th.

A. Again, I don't have any recollection of that conversation with Ms. Palk you keep referring to, but --

Q. Well, I'll refer to the business records that Chubb has given me.

A. Okay. But, I mean, I don't remember having a conversation with Ms. Palk.

Q. I understand.

My question is: This is 11 days after her memo, isn't it?

A. What memo was her exhibit and I'll look at that one more time?

Q. Well, if you don't know, that's okay. Let me ask you this.

A. Well, I mean, I just want to get the

date right.

MS. MOSS: He's just moving on.

Q. Well, I'm asking you another question.

A. Okay.

Q. How did you determine the master bedroom and closet area had not sustained any physical damage?

A. That was based on the vendor that was on-site. When we had the walk-through, we said, "Hey, what's going on with this wall? Can you clean this wall? Does this wall need to come out?" Initially, they thought they were going to be able to clean it. If we fast-forward from December to sometime in the future, we ultimately did remove those walls.

Q. So you're saying that you based this statement on the vendors?

A. In the early part of the investigation --

Q. On Brookstone?

A. No. On my walk-through with the

vendors and their expertise because I'm not doing the work, so I have to ask them to --
Q. Did you hear my question?
A. You said that I was basing this on the vendor.
Q. Right, on the vendor's statement that there was no physical damage or not.
A. Well, what my experience showed me is there wasn't any damage to the drywall at that time.
Q. I simply asked you what you based the physical damage on, and you testified two minutes ago you based it on what the vendor told you?
A. I said what me and the vendor did on the walk-through. I didn't specifically --
Q. Okay. So you based it just on what you said, what you saw; is that it?
A. No. I'm answering the same way I answered it a moment ago. Me and the vendor did a walk-through and determined at that time there wasn't any damage to that drywall in those areas.

Q. Did you look behind the drywall?
A. No, sir.
Q. Why not?
A. Because the drywall was still attached to the wall.
Q. To the studs? Don't you know from all of your smoke investigations that the odds are if you've got a lot of smoke in the house it's going to get behind the drywall, into the insulation?
A. You could -- it could.
Q. And you never tested for that, did you?
MS. MOSS: Object to the form.
Q. Did you?
A. At this point in the investigation, we had not, and that's why my email says we are waiting on the industrial hygienist report.
Q. In this email, you do not state the industrial hygienist, do you? This is in -- on December 24th.
A. Okay. All right. So I'm looking at

the wrong exhibit, then.
Q. All right. Who was the industrial hygienist that told you there was damage behind the wall?
A. J.S. Held wrote a protocol or a report stating where there was additional demolition required.
Q. J.S. Held did?
A. I thought that's who our industrial hygienist is.
Q. I don't know. I'm asking you.
MS. MOSS: If you don't know, then just say you don't know.
A. I don't know.
Q. You know that J.S. Held never wrote that report, don't you?
A. No, I don't know that.
Q. You know J.S. Held had nothing to do whatsoever with cleaning up the house, don't you?
A. Yes, I do know that. They didn't clean the house.
Q. All right. They had nothing to do

going through the house to determine whether any additional cleanup was needed or not, did they?

MS. MOSS: Object to the form. Calls for speculation.

A. Again, J.S. Held just wrote the report for the hygienist. They didn't do any of the work. I mean, that was -- the work was being done by Brookstone.

Q. So you're saying J.S. Held wrote a report for a hygienist and you don't know who the hygienist is?

MS. MOSS: Object to the form.

Q. And you don't have a report from J.S. Held? Mr. Elliott, you're just throwing out there to confuse things and then you're going to say I don't know, and you're just carrying us down this little trail; is that right? Because you do know that J.S. Held had nothing to do with the cleanup; is that right?

MS. MOSS: Object to the form. You're harassing the witness. If you have a

question to ask him --
MR. DAUPHIN: That's not --
MS. MOSS: -- that hasn't been asked before --
MR. DAUPHIN: Alycen, I can assure you that is not harassment.
MS. MOSS: -- then go ahead and ask him a question.
MR. DAUPHIN: I did.
MS. MOSS: But you're asking him the same thing over and over.
MR. DAUPHIN: Not if he's going to be evasive. He's going to have further, more direct questioning.
Q. (BY MR. DAUPHIN:) Go ahead.
MS. MOSS: Why don't you ask a question that is not argumentative --
MR. DAUPHIN: I did.
MS. MOSS: -- and harassing.
MR. DAUPHIN: I can ask the questions I want to ask. Thank you.
Q. (BY MR. DAUPHIN:) Go ahead. Answer the question.

A. What I answered to the question was the industrial hygienist --
Q. Who you don't know who it was?
A. Not in this email. It doesn't say in this email.
Q. Are there any -- you don't have any knowledge of who the industrial hygienist was, do you?
MS. MOSS: Object to the form. That's not what his testimony reflects.
A. I don't have any memory of it because it's three years ago, yeah.
Q. Okay. You do know that you didn't hire J.S. Held as an industrial hygienist, did you?
MS. MOSS: Object to the form.
A. You just asked me that question. I mean, what do you mean? Did I not hire them as an industrial hygienist, what do you mean?
Q. Did you?
A. We did hire them as an industrial hygienist.
Q. Okay. You're sure of that?

A. I'm sure we hired them as an industrial hygienist, yes.

Q. Okay. And you're pointing to something. What are you pointing to?

A. The email that you referred me to here in this exhibit.

Q. And that's J.S. Held?

A. It doesn't say it's J.S. Held, but it says I am pending the industrial hygienist report that's Exhibit 6 right here, it says.

Q. And you're telling us under oath that you know that that was J.S. Held?

A. Yes.

Q. Okay. And was it the report from J.S. Held that made you decide to tear down the -- all of the interior walls?

A. That was a combination of speaking with the vendor that was doing the demolition and experience.

Q. What experience?

A. That there was additional damage and we needed to take the drywall off to further assess it.

Q. Did that cause a delay in anything?
A. The additional drywall removal?
Q. Yeah.
A. Yes, it could, but it needed to be done, so ...
Q. Well, all right. Then look again at Exhibit 86.
A. All right.
Q. That is January 24th.
A. Okay.
Q. And we're, what, six weeks after the fire?
A. Okay.
Q. And you still had -- you're still now just considering whether to take down all of the drywall?
A. Yes, as we get new information, we're expanding the scope.
Q. Okay. And that's six weeks later?
A. Yes.
(Plaintiff's Exhibit No. 82 premarked for identification and attached hereto.)

Q. (BY MR. DAUPHIN:) Would you look at Exhibit 82, please?
A. Okay.
Q. And what is that? I'm sorry. We may want to start at the bottom of Page 1. Well, actually, let's go down to the second page of this document, Exhibit 82, and is that -- we'll start reading the emails backwards. Which is that an email from -- or from -- whatever. From Bradley Moncrief with TCC to Alli and me?
A. Uh-huh.
Q. And does that talk about additional burn damage?
A. Uh-huh, the exterior of the house.
Q. Right.
And it will require a little more roofing to replace the decking, et cetera?
A. Yeah. He also says in his words, "We want to peel the onion."
Q. Continue to, right? I don't guess he got that from you, did he?
A. No, sir.

Q. Okay. How do you know he didn't?
A. Because I didn't say that.
Q. Okay. And then there's an email from me to you, passing along Bradley's email?
A. Yes.
Q. And in it, I say, "I'll ask TCC to provide an estimate for repair"?
A. Yes.
Q. Okay. And you say "Thank You"?
A. Uh-huh. And attached is your communication to the email or to the claim file.
Q. And that's called exterior framing work?
A. Yes.
Q. And what was your understanding that needed to be done or the nature of the job?
A. He just indicated they were going to remove some cornice on the left side of the gable.
(Plaintiff's Exhibit No. 29 premarked for identification and

attached hereto.)

Q. (BY MR. DAUPHIN:) All right. If you'll look at Exhibit 29.

A. This thing is coming apart.

Q. Sorry about that.

A. All right. 29?

Q. Correct.

A. Okay.

Q. And is this an email from Andrew Arrant to you?

A. Uh-huh.

Q. It says, "Here is the TCC estimate for the demo and the replacement for the items that will need to be replaced"; is that correct?

A. Framing demo and repair work.

Q. And does that call it an estimate?

A. Yes.

(Plaintiff's Exhibit No. 31 premarked for identification and attached hereto.)

Q. (BY MR. DAUPHIN:) And look at Exhibit 31.

A. 31.
Q. If you'll look at Exhibit 103.
A. 103, okay. Well, I don't have anything. I don't have anything unless I'm missing something here. 102.
Q. You don't have 103?
A. 103 is -- mine is blank.
Q. Well, let me ask you this: Do you know the difference -- is there a difference in an estimate and a proposal from the subcontractor?
A. They're really one and the same to me.
Q. Okay. So assume that in response to Andrew's email saying attached is the estimate you state I have received the TCC framing proposal.
A. Uh-huh.
Q. Is that the same to you?
A. Yes, sir.
Q. So proposal just means estimate?
A. Uh-huh.
Q. So if TCC did the work and it

exceeded their estimate, should it still be paid?

A. Well, the initial amount would be. The initial proposal; is that what you're saying?

Q. No. I'm talking about you said they're one and the same, an estimate and a proposal.

A. Well, it would be an invoice when they finalize the work, where it's not going to be a proposal anymore or an estimate.

Q. What are you talking about? Do you even know?

A. Well, you said --

MS. MOSS: Object to the form.

Q. Nobody's talking about final invoices.

A. Well, that's what you asked me.

Q. No, I did not.

MS. MOSS: That is exactly what you're asking.

MR. DAUPHIN: No, it's not.

Q. (BY MR. DAUPHIN:) Let me ask you

this.

A. Can I have her repeat the question?

Q. No.

Is there a difference in estimate and proposal?

A. I think they're one and the same in this instance.

Q. All right. So if you received --

MS. MOSS: And that's asked and answered anyway.

Q. And so the estimate for the initial work is not the -- an offer that says we will do this work for this amount, is it?

A. Right, it's an estimate.

Q. And the proposal is an estimate?

A. Exactly, it's an estimate from TCC.

Q. Right.

And if the work needs to be done and the work costs more than the initial estimate, doesn't Chubb owe the full price of the repair?

A. Well --

MS. MOSS: Asked and answered.

A. -- I would ask them for an estimate for what they're trying to do. Give me an estimate for the work that you're planning on doing, and they gave me an estimate. We reviewed it, and we paid it.

Q. You didn't pay the estimate?

A. We did pay that estimate that you referred to --

Q. That's all you paid, was the estimate, wasn't it?

MS. MOSS: Object to the form. That's not even right.

Q. That's all -- that's all Chubb paid, was the estimate, wasn't it?

MS. MOSS: Object to the form. Assumes facts not in evidence and is specifically misleading the witness.

Q. Go ahead.

A. Based on the TCC estimate right here, and if I can see the estimate and see the statement of loss, I can tell you if it was paid. But this demo estimate was paid. I know it was paid.

Q. All right. How much was the invoice for the work?
A. 30-something thousand dollars.
Q. It was 42,000 or 43,000, wasn't it?
A. That, again, I don't know.
Q. And --
A. Show it to me and I'll look at it.
Q. You don't recall that?
A. I do not recall.
Q. You don't recall that the invoice was more than the estimate and Chubb only paid the estimate?
MS. MOSS: Object to the form.
A. No, I don't recall that.
Q. And you don't recall anything saying, well, we paid the proposal?
MS. MOSS: Object to the form.
Q. Aren't you just playing with words where you call something an estimate and you deem it a proposal and so, therefore, Chubb only pays the proposal and doesn't pay the final invoice?
A. No, sir.

Q. You're not doing that?
A. No, sir.
MS. MOSS: Chuck, this is craziness. He's already testified to this. I'm not sure -- you seem to just be going in circles.
Q. And if the final invoice showed additional work because of revised smoke damage, Chubb didn't pay that either, did they?
MS. MOSS: Object to the form.
A. Again, I don't know if there was a supplement to that invoice. I just know what -- the original estimate here, and it was paid.
Q. As opposed to the work that was actually done, you only paid the original estimate?
MS. MOSS: Object to the form. You have asked this question about five or six times.
MR. DAUPHIN: Alycen, we'll get on if you'll be a little -- object to the form and move on.

MS. MOSS: Then stop asking the same question.

MR. DAUPHIN: Alycen, I'm not going to listen to you.

Let's go ahead and read back my question.

MS. MOSS: I'm about to tell him not to answer if you continue to ask this question over and over.

MR. DAUPHIN: That is -- that is your prerogative. You can do that on any question I ask.

Please read it back.

MS. MOSS: I know, and I'm telling you I'm about to do it if you continue to ask the same question.

MR. DAUPHIN: Please read back the question.

(Whereupon, the requested portion of the record was read back by the Court Reporter.)

THE WITNESS: Again, without seeing the statement of loss, yes, we paid the

original estimate.

Q. (BY MR. DAUPHIN:) And refused to pay the additional costs; is that correct?

MS. MOSS: Object to the form. Asked and answered.

A. I didn't refuse to pay any additional costs. I mean, I don't see an additional estimate here. If there's something you want to send -- I mean, I'd like to look at anything you want me to look at.

Q. I'm just asking you -- I'm just asking you what you know. I've given you a lot about it, but you don't know?

A. Well, it's been three years, sir. I don't --

MS. MOSS: There's no question pending.

THE WITNESS: Can we take a bathroom break right now?

MS. MOSS: Yeah. Can we take a break?

MR. DAUPHIN: Sure.

THE WITNESS: I need to go to the restroom. I'm sorry.

THE VIDEOGRAPHER: All right. It is 2:07. We're going off the record -- I'm sorry. 2:37. We're going off the record.

(Whereupon, the deposition was recessed from approximately 2:37 p.m. to approximately 2:48 p.m.)

THE VIDEOGRAPHER: It is 2:48. We're back on the record.

(Plaintiff's Exhibit No. 1 premarked for identification and attached hereto.)

Q. (BY MR. DAUPHIN:) If you'll look at Exhibit 1.

A. Exhibit 1. Okay.

Q. And is that a policy provision that talks about additional living expenses?

A. Yes. At the bottom there, yes, I see that.

Q. And do you call them actual living expenses or additional living expenses?

A. Actually, we refer to them both ways

in just communications a lot of times, but the policy says additional living expense there.

Q. Well, I think actually if you'll read the policy it has additional living expenses, and underneath it, it shows extra living expenses --

A. Right.

Q. -- so that extra living expenses may be a part of additional living expenses?

A. On the next page, yes, sir.

Q. But if I use the word "ALE," I'm talking about extra living expenses or I'm talking about extra living expenses, I'm talking about additional. In other words, I'm using them interchangeably.

A. Okay.

Q. Is that in accordance with your understanding of what they are? I mean, tell me what the difference is, if any, that you understand.

A. Yeah, the extra living expense just tells you when you can't live in your house

we'll pay for the extra expenses that you incur. I mean, it has the definition there for it.

Q. And is that also generally sometimes referred to as an additional living expense?

A. Yes, sir, sometimes.

Q. Okay. You suppose. You don't know?

A. I said sometimes, yes, sir.

Q. Oh, sometimes.

A. I didn't say suppose, no, sir.

Q. All right. And I am on the -- under what is called Extra Living Expenses on the policy. If a covered loss makes your house a permanent structure uninhabitable. The Goodrich house was uninhabitable, wasn't it?

A. Yes.

MR. DAUPHIN: It's just habit, Alycen.

Q. We cover the reasonable increase in --

MS. MOSS: Excuse me?

Q. We cover the reasonable increase in your normal living expenses that is necessary

to maintain your household's usual standard of living. Is that the guide which governs whether or not expenses incurred -- normal living expenses incurred are paid under the policy?

A. Yes. This has the definition there, yes.

Q. This is -- this is the key language?

A. Yes, this talks about the coverage.

Q. All right. And it's reasonable increase in normal living expenses? That's one part of it, isn't it?

A. Yes.

Q. And it's necessary to maintain your household's usual standard of living; is that correct?

A. Yes.

Q. And what was the Goodriches' usual standard of living?

A. I don't know. They lived in a house in Mountain Brook. I mean, I don't -- I mean.

Q. Okay. Their usual -- I mean,

Pacific markets these policies to wealthy people, don't they?

MS. MOSS: Object to the form. You can answer if you know.

A. I wouldn't know on marketing, who they market and who they don't.

Q. The claims you adjusted for Pacific were high-end claims, weren't they?

A. Yes, sir.

Q. And most of those people had a higher standard of living than most of us?

A. Yes, sir.

Q. Okay. Now, after the fire, the Goodriches didn't have any furniture, did they?

MS. MOSS: Object to the form.

A. The items, like I say, they were being packed out to be cleaned, and some items were damaged. You know, total loss items as well. I mean, it was a combination of stuff. There was a bunch of people involved.

Q. And Alli emailed you and told you,

"Look, I'm trying to find furniture to put in my rental house"?
A. Yes.
Q. "And I can't find any"?
A. Yeah.
Q. I've been to -- whatever.
A. Yeah, she just said there wasn't anything -- any quality or I can't remember exact wording, but something that -- she wasn't comfortable, comfortable in renting something.
Q. Right. In renting something?
A. You know, like rental furniture or something. She said, "I'm not comfortable in doing any of that. Could we go out and purchase some things?"
Q. Yeah.
A. We had a conversation about that.
Q. And you said okay?
A. Yes, sir, I did.
Q. And then she said, "I can't find a place to buy it that can deliver it right now. We're talking three or four months on

down the road to get it," didn't she?
A. To buy things for her rental home?
Q. Yeah.
A. If that was the time period that was presented, I mean, possibly. But the conversation was, yeah, you can go out and purchase things under your coverage.
Q. And she went and bought it at Restoration Hardware?
A. Yes, among -- among other places, I believe, yes.
Q. And Chubb paid for that?
A. We did, yes.
Q. And you approved for that?
A. We did, yes.
Q. Okay. And she also bought some from Iris & Company.
A. Okay.
Q. Did you approve those?
A. Yes.
Q. Should have approved?
A. Yes.
Q. I don't think they -- I don't think

they were approved. I don't know why they weren't. That's what I'm trying to figure out.

A. Well, I guess --

MS. MOSS: Do you know what he's talking about?

A. Well, I don't know what items he's referring --

MR. DAUPHIN: Come on, Alycen.

A. I don't know what items you're referring to.

MR. DAUPHIN: That's cheating.

A. I mean, I don't know what items you're referring to, but yes, the conversation was we're getting a rental home and we need some furniture. And my discussion with Mrs. Goodrich was you can go out and buy some items to furnish that home temporarily, you're welcome to do that, but --

Q. And what you furnish it with, you should be in a -- that meets your household's usual standard of living?

A. Yeah, well, we didn't discuss the verbiage in the coverage, but she just said, hey, I want to go out and buy some replacement beds or couches or chairs or something for my children or --

Q. And you said fine?

A. Yes, sir. I did, yes, sir.

Q. Okay. If they didn't -- if you didn't pay for a sofa from Iris & Company, do you know why?

A. That -- that, I don't know why. Unless it was a direct replacement for one -- you know, I had a sofa from Iris that was totaled and I'm buying a new one that's going to take me a year to get it because that was -- there was some discussion around that as well is that some of these items that I got from Iris will take me a year to get them. And in the short term, I'd like to just go buy something at Restoration Hardware, you know, just to have a sofa, but my long-term sofa is going to be the one from Iris because that's who I buy all of my stuff from.

Q. And Iris & Company also had less expensive but smaller furniture in stock that Alli could use in her rental house, couldn't she?

A. That, I wouldn't --

Q. You don't know?

A. I'm not aware of that.

Q. If Iris did --

A. If they did, yes. Yes, sir.

Q. -- then it should have been paid?

A. If she wanted to use that -- just, you know, going out and buying some temporary furniture, sure.

Q. Okay. And what about rugs for the floor, should those -- she bought some of those which weren't paid for by Chubb for the rental houses.

A. Again, if she normally would have a rug on the floor and she needed a rug and she wanted to go buy one, that was -- you know, these are extra expenses that she's incurring here, not replacement of contents. Then you could do that.

Q. All right. What about window treatments?

A. Most -- most of the rental properties have window treatments in them.

Q. What has that got to do with anything?

A. Well, you're asking me about buying window treatments. I mean, are you asking to replace the ones that were damaged in the fire loss or --

Q. No. I'm talking about buying window treatments just for the rental houses while they were in there.

A. That's the first that I would have seen someone wanting to buy rental -- I mean, putting window treatments in a rental house.

Q. Okay. How about window blinds? Do you make a difference -- a distinction between treatments and blinds?

A. I mean, I could -- I would 100 percent agree with you if someone said, hey, I just want to put a window shade or something simple to keep sunlight out or

whatever, sure, sure.
Q. Well, why would you agree to window blinds but not window treatments if that was your usual standard of living?
A. I mean, again, it's an extra expense. This isn't a permanent something we're doing here. This is temporary renting a house.
Q. We're talking about window treatments.
A. Right.
Q. And we've established that blinds are okay, right?
A. Yeah, if you wanted to -- yeah. If she needed to go get a window blind or a shade or something to block the window, sure.
Q. Well, what if I want more expensive window treatments to accomplish the same purpose and these window treatments are in my usual standard of living? Why isn't that paid under the policy?
A. Well, using the definition usual standard of living, I mean, the way you're

explaining it, you should be able to go out and purchase those items.

Q. As long as they're within your usual standard of living?

A. Yes.

Q. Okay. And Alli had the inside of her -- the two rental houses painted and submitted that as a cost of living -- additional living expense --

A. Uh-huh.

Q. -- and it was denied. If her usual standard of living is to live in houses that are freshly painted, why wouldn't that be an additional living expense?

A. In this instance, I don't -- you're making repair to a property that you're just temporarily living in. I don't know why you would go in and paint it. I mean, that's -- wouldn't that be the landlord's responsibility --

Q. Well, I don't think it's the --

A. -- to make those improvements?

Q. -- landlord's responsibility because

I was the landlord.
But if it's her usual standard of living and she has a practice of living in houses that are freshly painted, why wouldn't that be an additional cost of living?
A. At that time, we didn't deem it an extra living expense.
Q. All right. And I'm asking you today, what was the basis for your decision to say it wasn't a living expense?
A. I've never paid for anyone to paint a house before.
Q. All right. Did you go by and look at the Wimbledon house?
A. No, sir.
Q. Did you go back by and look at the Fairway Drive house?
A. No. No, sir. Mrs. Goodrich found both of those properties. We offer up a service, and they said they had contacts, they didn't need our assistance, and they located the properties themselves.
Q. Did you try to find any other rental

properties in Mountain Brook at that time?
A. We just do a comparison.
Q. Of what?
A. Cost, monthly cost just to make sure, you know. If an average rental cost is 4,000 and she's renting something for 4,000, then that's --
Q. Okay. And do you have records of the average rental cost?
A. I don't have it unless there's any in the claim file.
Q. If it's not in the claim file, you didn't record it; is that correct?
A. It may not have been recorded, right. I might have just verified it online and said that's reasonable what she submitted. Because what she submitted, we paid.
Q. Well, the rent went up the second year at Wimbledon and you didn't pay the additional rent. Why didn't you pay that?
A. Again, I'm not familiar -- I can't tell you on that.

MS. MOSS: Object to the form.
A. I couldn't tell you that.
Q. Did you do any checking as to the -- well, let me ask you this: What does the normal rental or usual rental value or average rental value have to do with whether or not you're going to pay the rent?
A. Well, it just gives you a comparison.
Q. As to whether it's reasonable?
A. Just a comparison if it's normal, uh-huh, for the market.
Q. Regardless of her household's usual standard of living?
A. Well, I mean, it's based on Mountain Brook. I mean, you know, if she was going to rent a house in Mountain Brook and it's $5,000, is that normal? Yeah, it seems to be normal. All the other rentals in Mountain Brook are 5,000. It's just for comparison purposes. It's not to make a selection for her. She was -- she was paid, I believe, for the rent. What I got, I paid it.

Q. At one time did you pay a utility bill that she had incurred either at Fairway or Wimbledon?
A. I don't -- I don't recall, but ...
Q. Okay. Do you recall later you or Ms. Moss pointing out that utility bills are not additional living expenses because you would have utilities at the Dell Road house?
MS. MOSS: Object to the form. Mischaracterizes evidence.
A. If she had an additional expense for a utility over here that she didn't have before, it's an additional expense. We would have paid it.
Q. Okay.
A. I think that discussion revolved around there was a point where there was no utility at Dell Road.
Q. Right. Go ahead.
A. Yeah, there was no utility at Dell Road. You were only having -- incurring utilities at the rental. But when you turn the ones back on at Dell, because the house

was de-energized for a while from the fire department for whatever reason.

Q. Okay.

A. I mean, so you're not incurring anything additional. You're normally paying 100 a month at Dell, and now you're paying 100 a month over here. You haven't incurred any additional costs. That was -- like, that might have been a discussion for one month. I believe after that she submitted utility bills and we paid the additional amount.

Q. Okay. Did Chubb have any objection to paying rent on a house that a business I formed purchased and then rented to Alli and Charles?

MS. MOSS: That it what, purchased?

MR. DAUPHIN: Yes.

MS. MOSS: I didn't hear.

MR. DAUPHIN: That a company -- that a company I formed purchased and then rented to Alli and Charles.

MS. MOSS: Oh, a company you formed.

A. Do we have any objection with it?

Q. Right. Is there any problem with that?
A. No.
Q. Okay.
A. Shouldn't be a problem with that.
Q. How did you determine the initial cutoff of ALEs?
A. It was a combination of speaking with the contractor on the original repair period or the original build. I talked with him and I said, "Hey, gee whiz, when you guys came out here, how long did it take you, you know, to prep the site and put the form up and build the house?" He said, "15, 16 months, something like that." And I said, "Well, since you're not going to tear it down and rebuild it, what would you estimate that would be?" "Oh, it's probably going to be a year or it's probably going to be three months less." Just basic conversation. Nothing --
Q. And that was all before COVID, wasn't it?

A. I'm sorry. What?
Q. That was all before COVID hit, wasn't it?
A. Well, I don't know actually when COVID hit.
Q. COVID hit in March and April of 2020?
A. Well, I don't -- I'm not sure when we obtained TCC's actual estimate.
Q. February of 2019 -- February of 2020. February 12th.
A. Their repair estimate was in February of 2020?
Q. Yes, yes.
A. For the whole building?
Q. Yes.
MS. MOSS: Object to the form.
Q. That would have been before COVID, right?
MS. MOSS: I don't think that's right.
A. Again, I'm not sure on that --
MR. DAUPHIN: You're wrong.

A. -- on the COVID question. I'm not sure about -- I'm not sure about when COVID happened.

Q. Well, assume that COVID really hit in March and April of --

A. Okay.

Q. -- 2019 and the TCC estimate for repair --

A. 2020, you're saying?

Q. I'm sorry. 2020.

A. Okay.

Q. And the repair estimate was February of 2020.

A. See, I thought their estimate came in in, like, May or June.

Q. I know, and you're mistaken.

A. Okay.

MS. MOSS: He's testifying as to what he thinks.

MR. DAUPHIN: I understand.

MS. MOSS: And I think that you're mistaken, so don't try to change his testimony by telling him he's wrong.

MR. DAUPHIN: Let me ask -- you're the only one I said was wrong, I think. I just said he was mistaken. There's a difference in saying you're wrong and mistaken.

MS. MOSS: The same difference.

MR. DAUPHIN: No.

Q. (BY MR. DAUPHIN:) So when did you talk with TCC?

A. On and off, like I said, we had different conversations with them over the first few months of the claim.

Q. You did?

A. Yes.

Q. Who all did you talk with?

A. The two guys, Marbury, or the other guy. One of them -- one of them kind of overruled the other guy. I can't remember. Like I said, I only met these guys a few times.

Q. Right.

A. And they would -- they would include me on a few emails, and then they quit

including me on emails, and then they would -- you know, so, I mean, I only -- I only talked with them a few times.

Q. Exactly.

Didn't they tell you that they would rather you have the conversations that -- have those conversations with the Goodriches as opposed to them?

A. In the driveway when we were talking about what -- you know, I said what did y'all see in the house, yeah.

Q. I'm talking about after that. You don't recall that; is that correct?

A. Yes, that's correct.

Q. Okay. There was a -- I think it was an AT&T charge or something.

A. Uh-huh.

Q. At Dell Road, they had to -- they had to pay AT&T, like, $1500 to come in and take everything out.

A. Okay.

Q. And at that time, they got AT&T to stipulate that they would pay around $1500 --

A. Okay.

Q. -- to put it back in when it was -- I'm sorry, it was ADT, not AT&T. ADT, the alarm service.

A. Alarm service.

Q. I was corrected.

A. Okay. At the Dell property?

Q. No. This is the Dell Road property we're talking about.

A. That's what I just said, at the Dell property, the Dell Road property.

Q. Oh, okay. And Chubb paid the money it cost to have it taken out, but the stipulated cost to have it put back in Chubb refused to pay. Now, why was that?

MS. MOSS: Object to the form.

A. Was there a security system reinstalled there or --

Q. Yes. When they took it out --

A. Uh-huh. And they paid that -- they paid the take-out charge, you're saying?

Q. Right. And Alli had ADT stipulate, okay, we'll come back and put it in for this

amount.

A. Okay.

Q. And Chubb did not pay that amount for reinstalling it.

MS. MOSS: Object to the form.

Q. Do you know why?

A. I'm not -- I'm not -- when did they reinstall it?

Q. When the house was repaired.

A. Yeah. When was that? What I'm asking is when did they install the -- so it gives me an opportunity to be able to tell you if I knew about it because if it was done, like, after I didn't work there, I couldn't -- you know, is what I'm saying.

Q. It was after you, but I think --

A. Oh, okay. Well, I couldn't answer because I --

Q. Well, no, I think we had the documents from ADT that I will reinstall it for this amount. In other words, there was a document.

A. Okay.

Q. So why didn't -- why didn't Chubb go ahead and pay the amount to reinstall it?

A. They were probably waiting on them to send an invoice.

MS. MOSS: Not probably.

THE WITNESS: Okay.

MS. MOSS: If you know, answer. If you don't, don't answer.

A. We didn't have an invoice where it had been reinstalled.

Q. Okay. As far as you know?

A. Right, during my time. That's right.

Q. Now, TVs. Would the cost to install cables and the TVs and Internet and all that stuff at the rental house be an additional living expense?

A. I would say yes.

Q. Okay. Would the cost of TVs, if they were not going to be used at Dell Road, be additional living expenses? They're not going to be used at Dell Road because of sizewise, you know, and they had -- they had

big TVs.

A. So they were just a temporary item?

Q. Yes.

A. Uh-huh. If it's a temporary item, then, yes, I would agree with you it's temporary.

Q. Okay.

(Plaintiff's Exhibit No. 63 premarked for identification and attached hereto.)

Q. (BY MR. DAUPHIN:) Would you look at Exhibit 63?

A. Let's see which book is this. Okay. 63.

Q. Okay. This is a -- yeah. This is a letter I wrote to Mr. Haessig about my interactions with you.

A. Okay.

Q. And I assume you've seen this before?

A. At that time, I did, yes, sir.

Q. Okay. Take your time and go through it, and as you go through it, tell me what

you disagree with in this letter.

A. Okay. Do you want me as I'm reading through the letter to point something out?

Q. Yes. I think that would be easier. Whatever -- however you want to do it.

A. Okay, yeah. So, like, in the second paragraph, you know, your comment is Mr. Elliott asked if the Goodriches were satisfied with Brookstone and stated that Brookstone worked at the pleasure of the insureds, which I probably wouldn't use that phrase, but that's fine.

I replied that the Goodriches had no reference point to know whether or not Brookstone was performing a satisfactory job. I mean, again, that would be your opinion or the Goodriches' opinion. It's their house, right. So if they didn't -- if they wasn't satisfied with them, that -- that would be their opinion. Or if they were happy with them, that would be their choice.

Later developed reservations about them. Hired Cliff Zlotnik. Visited the

site. Met with Brookstone. Goodriches then agreed to retain Brookstone. Yeah, March 18th. I'm not sure what the rest of the email says. It just -- it's an excerpt. It just says Mr. Elliott says let me know if you anticipate presenting something different. I'm assuming that's about soda blasting that's in the previous paragraph. I think that's what you're meaning in that. And it does say that when they found smoke in the walls we agreed to go ahead and demolish those walls.

That's correct, we did talk about mold. Most policies have standard mold coverage in the state of Alabama of 10,000. This policy actually had an endorsement, and I overlooked the endorsement. And I later sent you an email, I believe, on that, stating that I made an error in coverage and that you were correct in that it's 300,000. I made an admission of that. I don't know if it says that in this. Framers discovered additional damage.

There's an excerpt in the second paragraph on, I guess, the third page that says that you had a conversation with Andrew Arrant regarding soda blasting, that you were suspicious that me and him were negotiating the claim behind your back or behind -- or behind my back without notifying me or the Goodriches. That's simply not true. We had discussions all the time about the scope, but we wasn't negotiating anything behind anyone's back.

A couple of pointed demands. He shared those emails with you. And, again, with scope, you know, we trust but verify, so I asked him why are we soda blasting the first floor, you know, and he reduced it -- simply from that email, he reduced it from the first, second, and third to the second and third.

I wasn't aware if he didn't send you an email because I knew that you and Andrew were also sending emails back and forth to each other without me on them, so I assumed

he had forwarded that to you.

But this email says the next day --

Q. What page are you on?

A. I'm just -- the next paragraph, the third paragraph on Page 3.

Q. Okay.

A. It just says that the next day that they had revised their estimate, and then I sent the estimate to you. You stated let me know. And to your point, there might have been an email. There's nothing in the email, but Mr. Elliott offered nothing to support his objection. I just had a conversation with Andrew and said why are we doing the first, second, and third floor. I mean, just a phone call. And he just sent me an email back and said, yeah, you're right. You know, let's do the second and third floor. We'll revisit and reinspect like we've been doing the first three months. And, ultimately, at the end, if we have to do the first floor, we'll do the first floor, but we've got to at least do the second and third.

I mean, yeah. I mean, the scope was ever expanding because at this point, as you can see, just based on your email -- I mean, your letter, they were at the point of just doing soda blasting. I mean, what I'm reading, and this would be March.

Yeah, and I'm going to disagree with we were trying to gain an advantage for Chubb, having sought a secret commitment. I don't know why I would send an email to someone asking them to make a reduction in the scope if I wanted it a secret. I don't -- again, I disagree with that. There wasn't any secret or, your word, suspicious dealings, yeah.

So you asked for -- (sotto voce). I'm not sure how it would be bad faith by asking for a reduction in scope that you don't agree with. That's ...

(Plaintiff's Exhibit No. 64 premarked for identification and attached hereto.)

Q. (BY MR. DAUPHIN:) Let's look at

Exhibit 64 then, please.
A. Sure.
Q. Is there anything else you disagree with in that letter? I'm not rushing you.
A. No. Just -- again, I'm just reading along. You asked for someone else to handle the claim. That's pretty much it. And you cc'd me on the email.
You said go to 64?
Q. Right. And these are a series of emails. Let's start at the bottom and work forward.
A. Okay.
Q. Page 5 or 4.
A. Okay.
Q. This should be an email from Andrew to you --
A. Yes.
Q. -- dated March 16th.
A. Is 5 just his name? Because that's what mine is, it's just his name.
Q. Yes.
A. Okay. And then the same on 4,

basically just his name. 3 is the start of the actual email, if that's -- if I'm looking at it right.

Q. Correct. We're on the same page.

A. Okay.

Q. And basically he says to you here's the final for the demo and the estimate for the structure cleaning. The structure clean estimate is based off of the protocol written. What do you understand the structure clean to mean?

A. Like I said, it's based on protocol.

Q. And where did that protocol come from?

A. Reading the email, I can't tell you, but -- I can't tell you just from this email on the protocol.

Q. Do you know outside the email that it came from Mr. Zlotnik?

A. It should have been a combination of our hygienist and Mr. Zlotnik.

Q. And your hygienist is still J.S. Held?

A. Yes.
Q. Just also while we're on it, the final for the demo, that's that estimate proposal for the work around the porch, isn't it?
A. No. I think he's referring to his -- his demo, not TCC's.
Q. Okay.
A. I mean, I don't see anything in there saying he's referring to TCC, so I'm assuming he means here's the final for Brookstone, right. He'd be speaking for Brookstone.
Q. I don't -- I didn't -- I don't see it that way. I don't think that's the case. But I'm asking you what you thought.
A. I would assume --
Q. Anyway --
A. -- since the email came from Brookstone telling me here's the final estimate for structure cleaning that it's Brookstone's estimate. I don't see how they could speak for TCC.

Q. Okay. Well, earlier he had submitted TCC's estimate to you.

A. But it said in the statement here's TCC's estimate. So he clearly identified the two. In this one, he's not saying this is the final, you know, for TCC.

Q. Let's get back to the soda blasting or structure cleaning.

A. Sure. Yes, sir.

Q. And Alli or Charles nor I are copied on that email; is that right, Andrew's email to you?

A. That's correct. That's Andrew's email to me.

Q. All right.

A. At 5:20 on March 16th.

Q. And then you asked him why are we soda blasting --

A. The next afternoon, yes.

Q. -- the entire main level?

A. Uh-huh. Just for clarity, why are we -- why are we doing that.

Q. Okay.

A. I agree with the second level, I agree with the attic, but the main level and the basement should be cleaned and sealed because that's what he told me on-site.

Q. Okay.

A. Of course, if there's any fire damage, that should be soda blasted or replaced in general versus blasting it. I thought TCC was replacing all of the damaged framing on the second level anyway.

Q. We'll get to TCC.

A. I'd request their estimate. And then he said, okay, well, I'll remove it. I mean, that's ...

Q. Let's just talk about what you're asking for here, okay.

A. Okay.

Q. He has sent you an email and in it has given you an estimate for the structure clean, which is based off the protocol written, and that's -- that's not copied to the Goodriches.

A. Okay.

Q. Then you send an email back saying why are we doing the entire main level?
A. Right.
Q. Is that correct?
A. Yes, sir.
Q. Okay. And that's not copied to the Goodriches either, is it?
A. No, sir.
Q. All right. And then he says, "I can move the square footage from 57,000 to 45,000."
A. That's right.
Q. "And I will send over a revised estimate."
A. Okay.
Q. And the Goodriches aren't copied on that either?
A. No, they're not copied on that.
Q. So y'all are revising the scope of the soda blasting before you even tell the Goodriches about the soda blasting, correct?
A. Well, my question to him was why are we doing the work, and then his response was

I'll reduce the estimate. I never said in my email I need you to take it from X to Y. I just said why are we doing it. I just asked a simple question.

Q. And he says this is what I can do, right?

A. He sends it back and says, well, I'm going to move the square footage.

Q. He says I can move it, doesn't he?

A. Yeah, I can move the square footage.

Q. And did you agree to that?

A. Well, my email back to him was just what my previous question was, well, I just don't see why we're blasting everything, and call me if we need to walk through it.

Q. Okay.

A. I mean, it's -- I mean, I ask questions all day long in my job. Why are we doing this or why are we doing that.

Q. But you're reducing the scope, aren't you?

A. He reduced the scope. I just asked the question why we were doing it.

Q. Okay. And, well, you state on March 18th, "Andrew, I just see why we're soda blasting everything." Is that -- is that line missing the word "don't"?

A. Yeah. Yeah.

Q. Okay. "The intent of soda blasting is to remove tar, mold and damage and save the material. Why are we blasting the main level?"

A. Yeah.

Q. Okay. So you are asking him specifics about the main level and why you shouldn't think it would be blasted?

A. Sure. Yes, sir.

Q. And none of that --

A. I'm sorry to interrupt you, sir.

Q. And none of that is told to the insured, right?

A. Yeah, at this point, we're just swapping emails back and forth over a couple of days here. Why are we doing this, why are we doing that.

Q. And you don't tell your insured that

you're trying to reduce the scope of the cleanup, do you?

A. Well, again, at this point, I'm just trying to figure out what his scope is. He's the one doing the work, so just asking him questions.

Q. And why didn't you copy Alli and Charles on it?

A. They were copied once he defined the scope.

Q. Why didn't you copy your insureds on conversations with their contractor?

A. Because we were -- we didn't have their contractor on any of the emails. What do you mean?

Q. Well, Brookstone is their cleanup contractor.

A. That's who was on the email, Andrew with Brookstone.

Q. But why didn't you copy the insureds on your correspondence with Andrew? You do throughout the history of this claim except for these emails.

A. That would be a question you could ask Andrew. He started the email chain to me.

Q. Okay. And you never copied the Goodriches, did you? But then you sent an email asking Andrew are you going to submit something else on the scope of the soda blasting, didn't you?

A. Which exhibit are you on, sir?

Q. Well, I'm just asking -- let's go back to this one, 64.

A. 64?

Q. Yeah. First of all, just reference that.

A. Okay.

Q. Give me just a second. Let me find it.

MR. DAUPHIN: I tell you what, let's take a five-minute break, and I may be an hour when we get back.

MS. MOSS: Okay.

MR. DAUPHIN: Give me five minutes.

THE VIDEOGRAPHER: It is 3:29.

We're going off the record.
(Whereupon, the deposition was recessed from approximately 3:29 p.m. to approximately 3:45 p.m.)
THE VIDEOGRAPHER: It's 3:45. We're back on the record.
Q. (BY MR. DAUPHIN:) Shortly after these emails about the scope of the soda blasting, the Goodriches terminated Brookstone. Do you remember that?
A. Yes, sir.
Q. And do you remember calling me when I had emailed you about there being some water in the basement of the house?
A. Yes.
Q. And you called me and suggested that I use Brookstone to clean it up?
A. Yes, I did.
Q. Why did you do that?
A. They were familiar with the house.
Q. And what difference does it matter to you whether Brookstone cleans it up or somebody else?

A. Oh, it doesn't matter. You can hire whoever you want.
Q. Right.
A. I believe I said that to you then. But they were -- I think they still had equipment on-site, too.
Q. And do you know whether they did or didn't? Had you been --
A. I don't know if they were -- if they did that work for you or not. I'm not sure who you used to do that work.
Q. Well, you know it wasn't Brookstone, don't you?
A. I don't -- again, I'm not sure who you used.
Q. Do you know what work was done?
A. In the basement?
Q. In response to your call to me about the water in the basement, yes.
A. Oh, yeah. You said you were angry about it.
Q. I was angry about the emails?
A. No, about me recommending

Brookstone. I thought that's what you were asking me.

Q. I asked you why you were recommending Brookstone, correct?

A. Yes.

Q. And you said because they had done work before?

A. Right.

Q. And you knew that I fired them because of the emails?

A. Yeah. But, again, I thought you fired them because you didn't want them doing any of the other work, not -- not just -- you didn't want them to get some water out of your basement. That was a misunderstanding.

Q. Well, in our conversation, you were certainly told that my belief was that Brookstone and you were negotiating the scope of the soda blasting without informing the Goodriches.

A. Okay.

Q. Is that correct?

A. Yeah, in the letter that you sent,

yes, sir.

Q. And in my conversation?

A. I don't -- I don't recall that conversation.

Q. And you do agree that you negotiated with Brookstone over the scope of the odor removing process without informing the Goodriches?

A. Yeah, they --

MS. MOSS: Object to the form.

A. I did send him an email again, asking him about his scope, but I didn't negotiate his scope with him. I mean, we just read those emails, and it clearly says in there I just asked him why -- why we were doing what we were doing.

Q. And by that simple suggestion, he reduced the scope; isn't that correct?

A. That's what the next email that he sent back said, he would make a reduction in his scope.

Q. Now, after that email, did you send another email out to everybody saying,

Andrew, do you have something new to give me on the scope or something to that effect?

A. I could have.

Q. And in that second email, you didn't make any reference to the emails you and Andrew had exchanged without copying anybody, did you? Didn't you?

A. Possibly not.

Q. In your email -- that's all right. That's good enough.

Okay. After you knew that they had terminated Andrew and you were sending -- you sent me an email about the water in the basement that included -- you copied Andrew on it, didn't you?

A. I don't recall that.

Q. All right. But you --

A. Like I said, if you want to show me the email, I can tell you who all was on the email.

Q. I know Andrew was, and I was just curious why you would say copy him since he was off the job?

A. Yeah. So you know he was on the email, then?
Q. Yeah.
A. I didn't know that. I mean, I'd have to see the email. I send a lot of emails out.
Q. All right. The -- okay. Let me move on to something else here just a second.
(Plaintiff's Exhibit No. 61 premarked for identification and attached hereto.)
Q. (BY MR. DAUPHIN:) Would you look at Exhibit 61, please?
A. It's a -- it says "Price List" at the top, Price List valuation [sic]?
Q. Correct. Do you see March 20th is the date of it?
A. Uh-huh.
Q. What is this?
A. The price list says it's from Blake Beard, Brookstone. It's our -- it's a labor log showing employees, the day they were there, the rate, and the number of hours.

It's got a -- yeah.

Q. And why is this given to Chubb?

A. When we get an invoice, we go through and we look at it and make sure that they're not overcharging.

Q. Okay. How do you determine which charges go to contents and which charges go to dwelling coverages?

A. Normally, a vendor will send you an invoice for just the pack-out or just the -- you know, which would be just the contents, and then they'll give you an invoice for, for the dwelling.

Q. And had you asked Brookstone to do that?

A. Yes, we asked them to separate these items.

Q. And if you would just look through the first few pages, there's a lot it says about cleaning, and then there's stuff about moving cabinets. Moving cabinets to different locations would not be contents, would it?

A. That would be part of the building, right.

Q. The dwelling coverage?

A. The dwelling, the dwelling. Building coverage, dwelling coverage.

Q. Explain to me, please, how it works when you state internally these amounts go to dwelling coverage and these amounts go to contents coverage? How do you do that?

A. Again, the vendor -- the vendor who's doing the work is saying we had this person moving these contents and cleaning these contents. In this description here, he's telling you where they did their labor, and we would take that and that would be applied to that portion of the claim.

Q. And how do you do that physically? What do you do?

A. How do you physically apply the payment to the claim?

Q. Internally, what records do you create?

A. Yeah, this document right here, it's

a labor document with the hours for what they're doing. I mean --

Q. I understand that. What I'm trying to figure out, internally, how do you actually enter the information that goes in the contents or dwelling coverage?

A. To make the payment?

Q. No. Just to record it in your files.

A. I mean, just make a file note, basically an email. You know, reviewed -- reviewed Brookstone or discussed with Brookstone packing bill or moving bill, yeah.

Q. And let's say 10,000 of this went to contents and 37,000 went to dwelling. How do you enter that into the database at Chubb?

A. It should be in a claim file note.

Q. Okay. That says blank coverage contents and blank coverage dwelling?

A. Yeah, we'll review this emergency services or packing invoice. Whatever -- whatever you're reviewing, you would list that in there.

Q. Okay. And then you would state so much contents and so much dwelling?

A. You could, yes, sir.

Q. Would you if their -- if this invoice goes to both, would you break it out?

A. Yes.

Q. And if you --

A. You should properly break it out.

Q. If you broke it out, would it appear in the claim file?

A. It should.

Q. And if it's not in the claim file, is it likely that you didn't break it out?

A. It -- it could have -- again, it could have been, but the settlement check would ultimately reflect that.

Q. Right.

A. Because the check would show what coverage the payment was issued under.

Q. And once you put it in the claim file, where does that information go from there?

A. It stays in the claim file.

Q. All right. Well, does any other program or any other person at Chubb pick up this information or write the check?

A. No. The adjuster would write the check.

Q. Well, you request the check, correct?

A. Request the check.

Q. All right.

A. Yeah, the adjuster would request it because, again, it's -- the check is actually being printed -- you asked me that earlier, but in another -- in another state, you know, on a machine and it's -- no one -- I don't personally have a checkbook, you know.

Q. So how could I trace the payments which were contributed to the dwelling coverage and the payments that were contributed to the contents coverage?

A. You should have a statement of loss that breaks that out.

Q. Okay. And if I wanted to look at the support behind the statement of loss,

what do I look for?
A. You could ask for a copy of the canceled check.
Q. Okay. And the information -- what I'm looking for is the backup information whereby I can look and say, well, these are dwellings and these are -- these are coverage payments.
A. And I believe -- I mean, again, I haven't looked at a Chubb check in a couple of years, but I believe it says on the check actually what it was issued for.
Q. I know, but let's say 10,000 was issued for contents.
A. Uh-huh.
Q. Where can I go and find where that 10,000 is, what it's based upon?
A. There should be a settlement letter to go with the check.
Q. A settlement letter to the insured?
A. If the check was issued to the insured, yes.
Q. Okay. And --

A. Because sometimes we issue checks to vendors. You know, because if a vendor does the work, we would issue a check to the vendor.

Q. Is there an invoice which correlates with that $10,000 designation?

A. Sometimes. Sometimes there's an advance. You know, you issue an advance. They say we think we're going to spend 100,000 on the work, will y'all give us 25 so we can, you know, get our equipment mobilized. And we might just have a check and people go the check doesn't add up to anything, you know, and, like, it's just an advance.

Q. In situations where there's not an advance --

A. Uh-huh.

Q. -- should I be able in our example of a $10,000 contents check find an invoice which backs up that contents check?

A. No. Well, wait a minute. I'm sorry. Should you find an invoice to match

the $10,000; is that what you're asking me, right?

Q. Correct, or proof of invoices that match that $10,000.

A. Yes. I don't know that there was any $10,000 in expenses on this claim, but, yeah, if there was a -- if you had a bill from Brookstone, we'll say, for $10,000 --

Q. Well, we've got one.

A. -- then there would be a check that was issued to them maybe in the full amount. Sometimes, again, it could have been an advance.

Q. Well, let's just use this as an example. That may be the best way. We have this in front of us, this invoice of 47,000.

A. Okay.

Q. Assume 10,000 of that was for contents. Whatever it was, can I take this invoice and see what's contents on it and it should add up to the $10,000 in our hypothetical?

A. Yes, you should be able to.

Q. All right.
A. You know, if you're telling me this says content cleaning three hours, content, if you're saying if you could add all of that up does it equal a check amount?
Q. Yes.
A. It should. You would assume it should.
Q. Well, that's what I'm trying to back up and see.
A. Okay.
Q. So I could always look for an invoice and some sort of description as to whether it's contents or dwelling and then see what checks were issued under contents and dwelling?
A. Yeah.
Q. And if you wanted to do that, what's the easiest way to do it? What would I ask for?
A. The statement of loss.
Q. Okay. And then the invoices behind it?

A. If you wanted the invoice behind it, yes.

Q. Yeah, if I wanted to back up and see what --

A. Most people don't care about a vendor's invoice because you're asking me about Brookstone's invoice -- I think you're asking me about Brookstone's invoice. But they would just say, you know, Brookstone packed all of your house out, they moved it over here, they sent an invoice in to the carrier, and the carrier wrote them a check. And to try to provide benefit to the insured, we go in there and say, okay, we don't want to just claim it all as building or all as content. We try to split the money up to help the insured.

Q. When you have a contents claim where you're going to max out your coverage at your dwelling, you have unlimited coverage basically, and you are dumping claims into contents, did you do that? Did you intentionally put dwelling claims under

contents coverage because you knew contents coverage was going to max out?
A. No.
MS. MOSS: Object to the form.
Q. Did not do that?
A. No. No.
Q. Did you ever put dwelling expenses under the contents column and have to go back and check -- and change it?
A. I don't believe so.
Q. Did you ever say that you were going to do that and not do that?
A. That I was going to make a dwelling payment under the content coverage?
Q. Yes. Did you ever do that?
A. Again, I don't recall saying that, but ...
Q. Well, did you ever say I did that and I'm going to go back and change it and correct it?
A. Oh. No, we've made mistakes and issued a check and someone said, hey, you issued that check under the content coverage

and it should have been under the dwelling, and we internally moved the money.

Q. Yes.

A. That -- that happens on claims.

Q. And is there a record of that?

A. Again, that would be an internal note in the file that someone said, hey, you made a mistake, you need to move this money. I mean, because it happens. We make mistakes on issuing payments sometimes.

Q. And I just want to make sure when that happens how I can find out that that was corrected and the mistake was clarified. I'm not --

A. Yeah, ultimately, the statement of loss or a copy of the checks should show you where -- you know, what you were paid at under each -- what amount you were paid under each feature.

Q. Okay. So I need the statement of loss and all the checks and compare those? Would that help me?

A. Statement of loss, yes, it would.

Q. And get all the checks that were paid?
A. Yes, it would.
Q. And the checks are going to denote whether it's contents or dwelling?
A. If it's labeled on the check, you know, what it was paid for.
Q. Okay.
A. Again, I don't get a copy of the checks. The checks don't ever come to Jeremy Elliott. They go to the insured, right, so ...
Q. But you request those checks, don't you?
A. Please issue a check for $10,000 to --
Q. And do you indicate whether it's contents?
A. -- the Goodrich family or something, and then they would get a check, and I would say what it was for.
Q. Do you indicates whether it's contents?

A. Yes, we would indicate what the payments was for. Yes, yes.
Q. All right. And that's going to be on the check, usually?
A. Yes, usually like in a memo line or something. Again, I don't see -- I don't physically see the checks, so. You know, a few a year.
Q. And on additional living expenses, if some are charged as contents which should have gone to dwelling, does that ever happen?
A. So I'm sure it happens, but you're --
Q. Well, let's say this example, that a bill for a $5,000 sofa came in and you thought that it was replacement and contents, and it turned out that, no, this was just temporary with an ALE. Would you go back and -- ALE payments, of course, are under the -- are not under the dwelling?
A. They're under the ALE coverage, right.
Q. Okay. Would you go in and make that

change?

A. You should if you've made an incorrect payment, yes.

Q. Okay. And I can look at the same records we just discussed to verify the change was made?

A. Well, the statement of loss at the end is supposed to have, you know, it itemized of here's everything you've submitted and here's what's been paid against it, and you should be able to reconcile the two. It's --

Q. Okay.

A. But as far as what does it say on the check, I can't tell you if the check says this is for content or this is for ALE or this is for dwelling. That's -- again, that's back to the statement of loss. It shows what was paid and where it was paid.

Q. Let's look at Exhibit 36. I don't think I covered this.

A. You said 36, correct?

Q. Correct. It's in the first group.

A. Yeah, I've got 36 marked in my book.
Q. Okay.
A. Okay.
Q. And this is a letter -- an email from you to me, correct, February 20th?
A. Again, we're on 36?
Q. Correct.
A. Well, the initial email is from you to me.
Q. Okay.
A. I don't -- I don't see the rest of the email, but the bottom says it's from you to me.
Q. Well, I'm looking at the top in your response.
A. Okay. All right.
Q. And you start out, "Mr. Dauphin, to date, we have undisputed settlement on the Enservio content inventory."
A. Right.
Q. What does that mean?
A. That just means we got an inventory back with an amount on there and we didn't

disagree with it, and we issue a check for that amount pending, you know, your review. And if you dispute it and say we don't agree with it, we think it should be, you know, this amount. So as soon as we get it, we try to issue payments. As things come in, we try to get payment out the door right away, just until you provide something else.

Q. And there was no agreement by the Goodriches, was there?

A. Well, again, it doesn't say it's an agreement. It just says it's undisputed.

Q. What do you mean by "undisputed"? That's what I was trying to get at.

A. That's what I just said. We -- it's what came back in the inventory. The inventory says these items cost this much to replace. We go ahead and issue a check for that amount.

Q. The question is: What do you mean by "undisputed"? What's -- what is undisputed?

A. Again, the inventory says this is

the replacement cost for these items. We don't dispute it. We --

Q. When you say "we don't dispute it," who are you talking about?

A. Chubb Insurance Company that I work for. They didn't dispute it, and they said, hey, Enservio says you owe them X. We go ahead and issue X in payment. We don't -- and then the insured has an opportunity to come back and provide evidence --

Q. So you're not saying that this --

A. -- disputing it and saying otherwise.

Q. -- that this is payment on the items, and the Goodriches and Chubb don't dispute it?

A. No, I don't see anything in there that says this is full and final settlement or anything. It just says this is an undisputed supplement.

Q. Okay. And it is disputed between you and Goodriches, isn't it?

A. Well, this says it's undisputed,

though. I mean --
Q. My question is: It was disputed between Chubb and the Goodriches, wasn't it?
A. Maybe after this email, but not this email. You're referring to this email. I'm answering this email right now.
Q. Okay. Let's move off of this email.
A. Okay.
Q. The Enservio charges were disputed by the Goodriches?
A. Yes, they were.
Q. They were -- the Goodriches never approved any specific Enservio pricing, did they?
A. I mean, I can't speak to the relevance of every single item on the list. It was a huge inventory. I mean, there were certain items they agreed with and items they didn't agree with. That happens on every claim.
Q. All right. Let's see.
A. I mean, we all saw the curtains earlier, and no one agreed with those.

Q. That's right.

(Plaintiff's Exhibit No. 25 premarked for identification and attached hereto.)

Q. (BY MR. DAUPHIN:) Let's go to Exhibit 25.

A. 25. Okay. I'm on Exhibit 25.

Q. And do you see an email at the bottom of Page 1 from Alli to you?

A. Yes, sir.

Q. And does she say greatly -- "Enservio greatly undervalued the replacement cost of many of the items"?

A. Yes, sir.

Q. Okay.

A. And this is where she had requested the pictures, and we had several emails we discussed earlier that --

Q. And that was in January, wasn't it?

A. Yes, sir. This was -- I mean, I think we just barely got the inventory in at that point. The claim was not even 60 days old.

Q. And she looked at it right away and said there's something wrong with it, didn't she?

A. Yeah, she said I don't agree with this pricing. I said that's fine. Just --

Q. So if your insured doesn't agree with it, why do you say that -- whatever the phrase was?

A. Undisputed?

Q. Yeah.

A. Yeah. Again, we were just issuing it as just an advance, undisputed.

Q. Aren't you playing word games similar to estimate and proposal --

MS. MOSS: Object.

MR. DAUPHIN: I'm not through with my question.

Q. (BY MR. DAUPHIN:) Like estimate and proposal and appraisal and replacement, don't you just intentionally confuse words?

MS. MOSS: I object to the form of the question. It's argumentative. You're harassing the witness. If you have a

question to ask him that is not argumentative, ask him.

MR. DAUPHIN: I think it's a great question.

Q. (BY MR. DAUPHIN:) Go ahead.

MS. MOSS: Well, it is objectionable.

A. No, I'm not.

Q. Okay. At one of the first meetings, did you tell Alli words to the effect that Chubb would pay them a large amount of money and they could do with the money whatever they wished?

MS. MOSS: Object to the form.

A. I don't recall saying that.

Q. Anything like that?

A. We would just randomly pay someone a large amount of money for what? I mean --

Q. The fire loss at the house.

A. Well, I wouldn't -- I wouldn't make that statement.

Q. Okay. At that first meeting -- in the first two or three meetings at the house

where the groups of people were there, you had more experience in handling fire losses and repairing houses damaged by fire than anybody else, didn't you?

MS. MOSS: Object to the form.

A. I can't speak to other people's experience.

Q. Well, who else do you think had near the experience you did?

MS. MOSS: Object to the form. He just said he can't speak to other people's experience. So I'm not sure --

MR. DAUPHIN: Come on, Alycen. Just --

MS. MOSS: -- how he can respond to that question.

MR. DAUPHIN: You know, sometime you're going to be taking depositions, and I'm going to do the same thing you do. If you're professional, I'll be professional. If you're going to do all of these speaking objections, I promise you I'm going to do them. So you're just sowing your own thing.

MS. MOSS: I will not be asking questions over and over again.

Q. (BY MR. DAUPHIN:) Well, can you answer the question?

A. Which -- which inspection do you want to refer to?

Q. Well --

A. I mean, because you said multiple inspections, so just give me an example of what inspection.

Q. The question I -- the inspection where I was there and Alli and Iris and everybody.

A. Uh-huh. Well, it was explained to me that Mr. Long was an expert in fire restoration.

Q. You said Hank Long was an expert in fire? Who said that?

A. He basically said that upstairs himself, that he was handling fire losses in Montgomery. He said he was doing one currently, I think, at the loss.

Q. And so that -- you thought that

meant that he had much more -- much more experience than you?

A. No, I didn't say --

Q. Well, let me ask you this: If, in fact, he had had experience in other towns, his experience could be significant in repairing Alli's house, couldn't it?

A. Yes, if he had other experience. He did indicate that he had other experience.

Q. And so it would be worth paying him for that experience on Alli's house?

A. Yes.

MR. DAUPHIN: Let me check with them. I think that's all I've got.

THE VIDEOGRAPHER: Do you want to go off the record?

MR. DAUPHIN: I guess so. Should we?

THE VIDEOGRAPHER: All right. It's 4:15. We're off the record.

(Whereupon, the deposition was recessed from approximately 4:15 p.m. to approximately 4:17 p.m.)

THE VIDEOGRAPHER: It is 4:17.
We're back on the record.

MR. DAUPHIN: And that's all of my
questions for Mr. Elliott.

THE VIDEOGRAPHER: All right.

MS. MOSS: And I think I said this,
but we'll read and sign. Thank you.

THE VIDEOGRAPHER: All right. It is
4:17 and the deposition comes to an end.

(Whereupon, the deposition was
concluded at approximately 4:17 p.m.)

FURTHER DEPONENT SAITH NOT

C E R T I F I C A T E

STATE OF ALABAMA )
COUNTY OF JEFFERSON )

I hereby certify that the above and foregoing proceeding was taken down by me by stenographic means, and that the content herein was produced in transcript form by computer aid under my supervision, and that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings, Page 1 through 280, occurring on said date at said time.

I further certify that I am neither of counsel nor of kin to the parties to the action, nor am I in anywise interested in the result of said case.

Signed the 14th day of December, 2022.

Carol J. Reyer, CCR
Comm. Expires: 9-15-2026
License No.: ACCR#: 333
License Expires: 9-30-2023

To: ALYCEN A. MOSS, Esq.
Re: Signature of Deponent Jeremy Elliott
Date Errata due back at our offices: 30 days

Greetings:
This deposition has been requested for read and sign by the deponent. It is the deponent's responsibility to review the transcript, noting any changes or corrections on the attached PDF Errata. The deponent may fill out the Errata electronically or print and fill out manually.

Once the Errata is signed by the deponent and notarized, please mail it to the offices of Veritext (below).

When the signed Errata is returned to us, we will seal and forward to the taking attorney to file with the original transcript. We will also send copies of the Errata to all ordering parties.

If the signed Errata is not returned within the time above, the original transcript may be filed with the court without the signature of the deponent.

Please Email the completed errata/witness cert page to CS-SOUTHEAST@VERITEXT.COM
or mail to
Veritext Production Facility
2031 Shady Crest Drive
Hoover, AL 35216
205-397-2397

ERRATA for ASSIGNMENT #5586369

I, the undersigned, do hereby certify that I have read the transcript of my testimony, and that

___ There are no changes noted.

___ The following changes are noted:

Pursuant to Civil Procedure, Rule 30. ALA. CODE § 5-30(e) (2017). Rule 30(e) states any changes in form or substance which you desire to make to your testimony shall be entered upon the deposition with a statement of the reasons given for making them. To assist you in making any such corrections, please use the form below. If additional pages are necessary, please furnish same and attach.

Page _____ Line ______ Change ____________________________

__________________________________________________________

Reason for change ________________________________________

Page _____ Line ______ Change ____________________________

__________________________________________________________

Reason for change ________________________________________

Page _____ Line ______ Change ____________________________

__________________________________________________________

Reason for change ________________________________________

Page _____ Line ______ Change ____________________________

__________________________________________________________

Reason for change ________________________________________

Page _____ Line ______ Change ____________________________

Page _____ Line ______ Change __________________________

_________________________________________________________

Reason for change ______________________________________

Page _____ Line ______ Change __________________________

_________________________________________________________

Reason for change ______________________________________

Page _____ Line ______ Change __________________________

_________________________________________________________

Reason for change ______________________________________

Page _____ Line ______ Change __________________________

_________________________________________________________

Reason for change ______________________________________

Page _____ Line ______ Change __________________________

_________________________________________________________

Reason for change ______________________________________

_____________________________________

DEPONENT'S SIGNATURE

Sworn to and subscribed before me this ___ day of

_________________, _______.

__________________________________

NOTARY PUBLIC / My Commission Expires:_____________

**&**

**&** 1:23 6:7 29:5 29:18 39:23 41:7 41:8,9,14 213:17 215:9 216:1

**1**

**1** 5:9 11:9,9,11,14 80:4 82:19 147:8 196:5 207:11,15 207:16 274:9 281:11
**1,000** 27:22
**1,100** 27:23 28:1
**1.4** 145:20 146:2 146:3,9
**10** 4:8 19:7,11 43:1 49:21 80:5 138:17 145:1,5,5 159:23 160:2,3
**10,000** 42:1,3,5 42:18 46:11,17 46:21 47:4,11,12 49:5,9 50:2,12 51:19,23 140:21 141:10,18 235:15 257:14 260:13,17 261:6,20 262:1,4 262:6,8,18,21 267:15
**100** 4:17 20:7,16 74:23 82:14,19 136:13,14,15 137:4 138:20,21 141:16,17 143:14 143:16 144:6,20 147:1 159:13,16 159:21 164:21 217:20 224:6,7
**100,000** 261:10
**101** 4:18 82:15,19 82:23
**102** 199:5
**103** 199:2,3,6,7
**104** 4:20
**10:19** 2:3 6:11,18
**10th** 69:14
**11** 160:12 186:7 186:17
**11-19** 140:1
**1130** 1:23 6:8
**11:15** 68:15,18
**11:29** 68:19,20
**11:50** 87:4
**12** 4:11 37:1,5,6 50:4 138:17
**12,000** 46:17,23 47:7,17,20,21 48:13,18,21 49:11,14 50:9,10 51:2,17
**1230** 3:10
**12:12** 112:22 113:1
**12:30** 113:2,3
**12th** 226:11
**13** 4:20 104:14,18
**136** 4:21
**13th** 177:4,17,22 186:8
**14** 4:7
**14th** 281:17
**15** 68:14 148:7,10 225:14
**1500** 229:19,23
**15th** 14:20
**16** 225:14
**169** 4:22
**16th** 239:19 242:16
**171** 4:23
**1727** 3:5
**175** 5:2
**18** 45:23 46:2
**181** 5:3
**182** 5:4
**18313** 281:20
**185** 5:5
**18th** 235:3 246:2
**19** 4:8
**195** 5:6
**197** 5:7
**198** 5:8
**1999** 99:6
**19th** 19:12 83:4 87:1,4,5
**1:00** 145:13,15
**1:01** 145:16,17
**1:02** 146:17,19
**1:37** 146:20,21
**1st** 95:21 96:4 105:20 162:18

**2**

**2** 4:23 70:3 80:4 135:8 171:19,23 172:1
**2,000** 42:2,11 47:6,22
**20** 60:15 80:5,11 100:17
**200** 58:5
**2017** 283:7
**2019** 8:11 113:7 226:10 227:7
**2020** 12:18 13:4 14:19,20 20:21 60:11 139:14 159:8 226:7,11 226:13 227:9,10 227:13
**2021** 14:23 18:22 19:12,20 20:22
**2022** 2:2 6:10,17 281:18
**2031** 282:21
**205-397-2397** 282:23
**207** 5:9
**20th** 254:16 270:5
**21** 1:6 4:13 6:20 68:22 69:3
**22** 4:14 69:17,21
**22nd** 2:1 6:8
**23** 4:15 71:1,5,6
**233** 5:10
**238** 5:11
**24th** 186:4 189:22 195:9
**25** 5:13 78:11,13 78:18 261:10 274:2,6,7,7
**250** 55:22 57:15
**254** 5:12
**26** 4:16 73:10,14 73:15 75:2
**26th** 95:23 96:1 147:7

**274** 5:13
**28** 4:9
**280** 281:11
**29** 5:7 197:22 198:3,6
**2:07** 207:4
**2:22** 1:6 6:20
**2:37** 207:5,7
**2:48** 207:8,9
**2nd** 114:20

**3**

**3** 95:22 135:2 142:10 147:6 162:12 237:5 240:1
**3,000** 106:14
**30** 203:3 282:3 283:6,7
**300,000** 235:20
**3000** 2:1 6:9
**30309** 3:10
**30th** 2:2 6:10,17
**31** 5:8 198:19,23 199:1
**333** 281:22
**34** 4:10
**35** 56:16
**35216** 282:22
**35236** 3:5
**36** 4:22 169:6,10 169:11 269:20,22 270:1,6
**37** 4:11
**37,000** 257:15
**3:29** 248:23 249:3
**3:45** 249:4,5

**4**

**4** 94:15 135:8 141:23 142:7,11 142:14,20 143:1 143:6 158:14,18 158:19,21,22 239:14,23
**4,000** 221:6,6
**4,700** 142:18
**4,720** 142:22
**400** 3:9
**42,000** 203:4
**43** 5:5 185:1,5,6
**43,000** 159:23 203:4
**44** 5:4 182:13,17 182:18 185:16
**45,000** 244:11
**47,000** 262:16
**4:15** 279:20,22
**4:17** 279:23 280:1,9,11

**5**

**5** 4:7 14:11,14 42:12,23 43:4 50:6 80:4 94:16 139:2 239:14,20
**5,000** 49:4,20,21 50:12 52:1 113:17 114:1 138:4,8 140:1,8 140:20 141:7 222:18,20 268:15
**5-30** 283:6
**50** 75:4 80:3 138:3 139:4 145:2 159:6,10 159:12,23 160:3 160:9,11,20 161:2
**500,000** 112:5
**55** 4:12
**5586369** 283:1
**57,000** 244:10
**5:20** 242:16
**5th** 13:4

**6**

**6** 194:10
**60** 274:22
**61** 5:12 254:9,13
**63** 5:10 233:8,12 233:14
**64** 5:11 238:20 239:1,9 248:11 248:12
**656,000** 31:19
**68** 4:13
**69** 4:14

**7**

**7** 4:19 94:9,13,14 95:22 147:3 149:5 160:21 162:9,10,12
**7,000** 52:4
**70** 175:11
**71** 4:15
**73** 4:16 5:2 175:6 175:10,13

**8**

**8** 4:3,9 28:11,14 144:20,21
**8,000** 51:8,12 55:21
**82** 4:17,18 5:6 195:21 196:2,7
**86** 5:3 181:2,6 195:7
**89** 57:3

**9**

**9** 149:5,6
**9-15-2026** 281:21
**9-30-2023** 281:22
**90** 160:13,14,17
**94** 4:19
**96** 4:12 55:10,14
**98** 4:10 34:16,20 34:21 38:7 54:6 59:1
**99** 4:21 136:6,10 136:11 137:16 139:4 141:5,6,20 144:10 145:1,3 147:1 159:14,17 159:21,22 160:13

**a**

**a.m.** 2:3 6:11,18 68:18,19
**ability** 281:10
**able** 15:23 44:8 71:15 72:7,17 109:19 134:21 146:1,8 187:14 219:1 231:12 261:19 262:23 269:11
**absolutely** 13:12 43:5 100:9
**access** 122:3
**accomplish** 218:18

**accr** 281:22
**accurately** 176:18
**acquiring** 43:10
**action** 1:5 6:20 281:15
**active** 104:5
**actual** 24:2 26:13 26:16 31:1 39:1,3 80:13 94:19 101:7 133:17 178:6 207:21 226:9 240:2
**add** 261:13 262:21 263:4
**addition** 29:20
**additional** 18:4 38:14 47:22 48:7 48:15 96:12 100:22 125:23 155:21 179:23 180:23 190:6 191:2 194:21 195:2 196:13 204:7 206:3,7,8 207:18,22 208:2 208:5,10,15 209:5 219:9,14 220:5 221:21 223:7,11,13 224:5,8,11 232:16,21 235:23 268:9 283:9
**address** 14:7 107:9 108:6,14
**addressed** 78:15
**adequate** 114:2
**adequately** 167:17,21
**adjusted** 138:4 211:7
**adjuster** 8:12,14 8:18 10:1,16 11:7 21:7 81:2,12 82:7 101:14 104:23 111:9 116:17 146:7 172:13 174:3,5,8 176:23 177:7,15,18 178:5,6 259:4,10
**adjusters** 10:2,6 101:9
**adjusting** 44:11 79:11
**adjustment** 58:23 74:19 148:9
**adjustments** 34:15 137:22
**administration** 98:17
**administrative** 112:15
**admission** 235:21
**adt** 230:3,3,22 231:20
**advance** 44:17 113:8,17 114:2 114:13 261:8,8 261:15,17 262:13 275:12
**advantage** 238:8
**advice** 17:11
**advised** 177:1,7
**affect** 180:5
**affidavit** 29:18,23 36:3,7 37:17 38:10,16 60:10
**affidavits** 36:11
**afternoon** 242:19
**agent** 9:22
**agents** 9:5
**aggressive** 117:4
**ago** 16:5 18:11,13 25:21 27:23 30:23 35:17 37:15 41:18 47:14 57:21 87:19 89:15 100:17 115:12 188:13,20 193:12
**agree** 17:9,18 42:18 44:18 58:21 96:17 103:11 164:21 217:21 218:2 233:5 238:19 243:1,2 245:11 252:5 271:3 273:19 275:4,6
**agreed** 1:15 2:5 2:14 29:10 235:2 235:11 273:18,23
**agreeing** 78:8 181:23
**agreement** 144:3 271:9,12
**ahead** 43:16 45:6 113:23 131:22,23 149:10 154:5,17 161:7 164:1,9 184:6 192:7,15 192:22 202:18 205:5 223:19 232:2 235:11 271:18 272:8 276:5
**aid** 281:8
**air** 100:11 160:5
**al** 282:22
**ala** 283:6
**alabama** 1:1,21 2:2 3:5 6:3,9,21 100:21 103:5 152:23 176:3,5 176:10 235:15 281:2
**alarm** 230:4,5
**ale** 208:12 268:18 268:19,21 269:16
**ales** 225:7
**alexandra** 1:3 3:13 7:6,8
**alive** 92:2
**allegedly** 75:8
**alli** 25:10 34:9 41:10 46:11,20 53:3,9 59:13 69:8 70:6 71:7 73:17 77:2 85:5 88:8 93:22 96:22 113:7 114:19 115:1,3,14 117:13 157:3 167:1 168:10 174:16 182:20 183:2 196:11 211:23 216:3 219:6 224:14,21 230:22 242:10 247:7 274:9

276:10 278:12
**alli's** 36:4 279:7 279:11
**altercation** 116:4 116:7
**alternative** 150:7
**alycen** 3:8 7:9 131:8 163:23 164:4 192:5 204:21 205:3 209:18 214:9 277:13 282:1
**amount** 9:7 18:4 28:6 78:2 107:5 140:9 142:20 160:4 162:22 167:10 170:14 200:3 201:13 224:11 231:1,3 231:21 232:2 262:11 263:5 266:18 270:23 271:2,5,19 276:11,18
**amounts** 256:7,8
**analysis** 146:4
**andrew** 114:19 181:9,11 198:9 236:3,21 237:14 239:16 246:2 247:18,21 248:2 248:6 253:1,6,12 253:14,21
**andrew's** 199:15 242:11,13
**angry** 250:20,22
**answer** 17:1,3,8 17:14,14 32:17 33:14 44:7 45:3,5 60:17,17,20 81:6 81:11,11,15,21 92:7 114:9,15 127:14,15 129:7 129:23 130:3,9,9 131:4,10,12 132:7,14,17 156:10,11,12 169:4 192:22 205:8 211:4 231:17 232:7,8 278:4
**answered** 18:14 32:13 42:9 49:16 49:18 95:18 154:15 165:18 166:9,19 173:7 179:1,12,15 184:1 188:20 193:1 201:10,23 206:5
**answering** 188:19 273:6
**answers** 164:3
**anticipate** 235:6
**antique** 53:6 61:20
**antiques** 90:6
**anybody** 22:1 53:15,19 103:5 148:16 253:6 277:4
**anymore** 200:11
**anyone's** 236:11
**anyway** 67:19 130:5 201:10 241:18 243:10
**anywise** 281:15
**apart** 139:15 198:4
**apologize** 41:9
**apparently** 140:5
**appear** 258:9
**appears** 31:17 142:19,19 183:6
**appliances** 135:6
**applied** 256:16
**apply** 11:14 256:19
**appointment** 83:3 155:16
**appraisal** 68:5,7 75:8,11,21 76:4,8 76:12,21 77:11 77:22 78:1,4 275:19
**appraisals** 75:15
**appraised** 76:15
**appreciate** 31:6
**approve** 181:19 213:19
**approved** 213:14 213:21 214:1 273:13
**approving** 16:1
**approximately** 2:3 6:11 68:18,19 113:1,2 145:15 145:16 146:19,20 207:7,8 249:3,4 279:22,23 280:11
**april** 12:17 226:6 227:5
**architect** 88:4 115:15
**area** 10:3 61:17 65:13 154:19 180:16 187:7
**areas** 174:21 180:18 181:17 185:23 188:23
**argued** 129:1
**argument** 129:19
**argumentative** 192:17 275:22 276:2
**arizona** 108:20
**arrant** 67:23 114:19 181:9,11 198:10 236:4
**arrived** 143:6
**art** 81:1,16,17 82:3,9
**articles** 71:8 147:14
**asia** 65:7,11 67:21,23 75:9,14 77:3,7,11,22
**asked** 12:18 16:8 18:12,14,17 32:13 40:22 42:9 43:10,20 44:1 49:16 53:9 59:13 67:22 68:3,4,11 71:21 72:2 81:14 81:18 86:5,13 93:22 97:17 108:6 111:5 114:11,13 116:9 117:17,20 130:18 131:14 143:11 147:5 150:7 154:15,23 156:16

166:9,19 167:16 167:16,23 168:12 168:12,14,15,19 169:5 173:7 179:1,12,15 180:15 184:1 188:11 192:3 193:17 200:18 201:9,23 204:19 206:5 234:8 236:15 238:16 239:6 242:17 245:3,22 251:3 252:15 255:14,16 259:12
**asking** 14:21 21:19 24:15 31:13 32:19 53:22 58:7 62:1 64:9 68:9 71:7,18 74:14 89:8 97:5,7 97:12 99:13 110:8 114:5 115:2 129:5 131:9 143:22 147:2 157:2 168:8 187:3 190:11 192:10 200:21 205:1 206:12,13 217:7 217:8 220:8 231:11 238:11,18 241:16 243:16 246:11 247:5 248:6,10 251:2 252:12 262:1 264:6,8 278:1
**assembled** 151:16,21
**assess** 194:23
**assign** 2:9 10:1
**assigned** 8:23 9:15 11:1 12:4 83:2 176:9
**assignment** 283:1
**assist** 53:21 103:1 283:8
**assistance** 220:21
**assisting** 37:20
**assume** 15:17 39:2 49:1 50:17 51:10 67:6,6 72:21 166:21 199:14 227:4 233:19 241:17 262:18 263:7
**assumed** 236:23
**assumes** 156:9 202:16
**assuming** 50:21 50:21 60:11 172:19 173:16 235:7 241:11
**assumptions** 60:17
**assure** 192:5
**at&t** 229:16,19 229:22 230:3
**atlanta** 3:10 18:8
**atmospheric** 152:1,5
**attach** 106:1 112:13 283:9
**attached** 14:13 19:9 28:13 34:18 36:10 37:3 55:12 69:1,19 70:21 71:3 73:12 82:17 94:11 104:16 136:8 151:17 169:8 171:21 175:8 181:4 182:15 185:3 189:5 195:23 197:11 198:1,21 199:15 207:13 233:10 238:22 254:11 274:4 282:7
**attaching** 69:10 102:3
**attachment** 89:13
**attended** 115:14 118:9 120:1
**attic** 121:16 122:3 172:11,12 243:2
**attorney** 15:3 16:23 18:16 22:10,14 282:12
**attorneys** 7:1
**authority** 11:3,8 15:22 125:15 126:15
**automatically** 12:2
**availability** 104:3
**available** 170:7 170:19
**average** 148:9 221:5,9 222:6
**aware** 28:4,7 29:16 52:19 98:1 125:7 127:10,16 127:19 155:15 216:7 236:20
**awful** 166:15

**b**

**b** 95:21 96:3 162:14,15
**bachelor's** 98:15
**back** 8:7 12:10 14:10 15:5 26:17 30:11 33:7 34:3 35:2 36:21 41:5 45:15 49:21 56:20 57:7 58:11 58:14,22 66:16 67:21 68:21 90:1 113:4 122:12,15 123:18 129:9 131:17,19 145:18 146:22 151:4 158:9 161:16 162:9 165:6,15 165:20 185:8 205:5,13,17,20 207:10 220:16 223:23 230:2,14 230:23 236:6,7 236:11,22 237:17 242:7 244:1 245:7,12 246:20 248:11,20 249:6 252:20 263:9 264:3 265:8,19 268:18 269:18 270:23 271:16 272:10 280:2 282:3

**backed** 182:11
**backs** 261:21
**backup** 29:1,6 260:5
**backwards** 196:9
**bad** 238:17
**barely** 274:21
**base** 101:16 179:21
**based** 28:9 30:4 33:21 56:14 72:9 72:14,15 75:8 76:8 89:1 102:22 103:17 104:12 137:2 138:13 142:12 144:15 146:3,11 147:22 148:1 160:9 163:6 167:10,19 168:16,17,23 170:5,18,21,22 171:3,6,7 178:17 180:19 187:9,18 188:11,13,17 202:19 222:15 238:3 240:9,12 243:20 260:17
**basement** 177:9 243:3 249:14 250:17,19 251:15 253:14
**basic** 124:20 225:20
**basically** 53:13 85:17 88:22 101:20 107:1 149:16 240:1,6 257:11 264:21
278:19
**basing** 188:4
**basis** 106:9 128:4 128:19 145:20 163:7 220:9
**bathroom** 185:23 206:19
**baths** 172:13
**beams** 148:14 149:13 160:13,18
**beard** 254:21
**bedroom** 180:9 181:15 183:9 187:7
**bedrooms** 172:13
**beds** 215:4
**beginning** 12:1,6 53:18,20 93:9
**belief** 251:17
**believe** 11:8 22:7 23:22 24:22 25:15 27:10 34:23 76:2 87:12 121:13 158:19 160:23 167:20 170:20 176:4 179:19 213:11 222:22 224:10 235:18 250:4 260:9,11 265:10
**believes** 138:7 142:21
**benefit** 73:8 264:13
**best** 82:12 88:7 102:7 104:18,20 104:20 146:1,5 262:15 281:9
**better** 22:17
**beyond** 39:15,17
**bid** 147:1,14 160:11
**big** 79:22 115:16 233:1
**bill** 223:2 257:13 257:13 262:7 268:15
**bills** 223:6 224:11
**birmingham** 2:1 6:9,21 10:3,13 18:9 103:21 104:1 152:23 153:10 154:19
**blake** 10:13 254:20
**blank** 199:7 257:18,19
**blast** 124:11
**blasted** 243:7 246:13
**blasting** 124:1,1 124:6 235:7 236:4,15 238:5 242:7,18 243:8 244:20,21 245:14 246:3,6,8 248:8 249:9 251:19
**blind** 218:15
**blinds** 217:17,19 218:3,12
**block** 218:16
**board** 87:9 90:8,9
**book** 14:2 34:23 36:21 55:15 233:13 270:1
**border** 18:15
**bottom** 28:20 70:1 169:17 181:8 182:22 196:5 207:19 239:11 270:12 274:9
**bought** 46:18 47:14 48:1,18 49:20 50:11 52:1 168:1 213:8,16 216:15
**bounce** 126:21
**box** 108:11
**boxing** 67:7
**bradley** 115:15 116:4 196:10
**bradley's** 197:4
**branches** 112:16
**break** 68:14,14 112:20 145:10 146:13 147:5 206:20,22 248:19 258:5,8,13
**breakdown** 137:1 137:3,21
**breaks** 259:21
**briefly** 19:11 153:9
**bring** 103:5,13
**broad** 10:4,10
**broadens** 82:4,4
**brochure** 57:13
**broke** 258:9
**brook** 61:17,21 65:8,13 66:14 128:12 210:21 221:1 222:16,17

222:20
**brooks** 3:12
**brookstone** 66:18 67:1 68:3,4,7 87:9 90:7 114:19 120:9 139:7 150:4 181:12 187:22 191:9 234:9,10,15 235:1,2 241:12 241:13,20 247:16 247:19 249:10,17 249:22 250:12 251:1,4,18 252:6 254:21 255:14 257:12,13 262:8 264:9
**brookstone's** 241:22 264:7,8
**brought** 58:13 104:1
**broyhill** 26:20 27:2
**build** 85:19 86:2 86:9 225:10,14
**builder** 133:18 152:9
**builders** 157:3
**building** 117:9 125:23 132:22 133:6 134:18 226:15 256:1,5 264:15
**built** 86:1 134:23
**bulk** 162:16,18
**bulldoze** 24:11
**bunch** 211:21
**burn** 196:14
**burned** 107:11 124:17
**burns** 46:14 101:7
**business** 98:16 116:11 117:18,22 118:6,21 186:12 224:13
**buy** 27:19 39:22 42:2 43:1 47:19 48:12 49:2,3 51:23 113:9 212:22 213:2 214:18 215:3,20 215:23 216:20 217:15
**buying** 42:16 215:14 216:12 217:7,11

**c**

**c** 3:1 281:1,1
**cabinet** 151:5,6,7 151:9 152:9,14 152:16
**cabinetmaker** 150:13 151:19 153:2,10 154:8 154:18,21 157:4
**cabinetmaking** 152:23
**cabinetry** 148:20 149:13 150:6,16 158:8
**cabinets** 134:15 135:16 148:13,18 149:1,22,23 150:3,7,13,19,20 151:10,14,15 152:9,13,18,19 153:5,13,16,22 154:8,9,10,14 155:1,7,11,14,19 156:2,6 157:4,18 157:19,23 158:6 166:10 255:21,21
**cables** 232:15
**calculated** 148:9
**calculations** 148:6
**california** 80:9 103:18,19
**call** 8:3,6 25:1,1 25:17 62:12 63:1 98:4 102:7 104:4 106:15 109:8,12 110:18 123:3 124:13 133:11 150:8 198:17 203:19 207:21 237:16 245:15 250:18
**called** 34:1 61:21 108:19 110:19 113:7 115:19 150:10 197:14 209:12 249:16
**calling** 249:12
**calls** 18:12 30:14 30:15 77:9 80:22 191:5
**canceled** 260:3
**capacity** 22:3 81:21 97:10
**capture** 172:5
**card** 117:18,22 118:6,21
**care** 264:5
**carol** 1:19 6:1 281:21
**carpentry** 147:10
**carrier** 264:12,12
**carrying** 191:18
**case** 11:18 24:4 39:23 44:18 52:12 62:4 63:15 72:23 85:2 93:6 102:15 107:10 109:4 124:23 132:2 241:15 281:16
**cases** 128:4 132:10
**cash** 31:1 39:1,4
**catch** 147:4
**cause** 6:12 102:19 102:23 195:1
**caused** 103:1
**cc'd** 239:8
**ccr** 281:21
**ceilings** 183:4
**center** 9:23 107:3 108:17 109:13 110:2 112:8
**centers** 108:18
**cert** 282:18
**certain** 132:8 176:9 273:18
**certainly** 13:21 42:20 85:13 91:2 91:2 96:11 129:13 136:3

251:17
**certified** 1:20 2:15 6:1
**certify** 6:3 281:4 281:13 283:2
**cetera** 147:10 196:18
**chain** 248:2
**chair** 42:1,2 46:12,17 47:2,4 47:16,21 48:21 48:23 49:2,4,9,20 50:6,10,12 51:8 51:18,23 52:1 64:5
**chairs** 215:4
**chance** 147:10
**change** 13:1 151:20 157:14 183:13 227:22 265:9,19 269:1,6 283:11,13,14,16 283:17,19,20,22 283:23 284:1,3,4 284:6,7,9,10,12 284:13,15
**changed** 16:14 183:11
**changes** 282:7 283:4,5,7
**characterizes** 176:19
**charge** 36:6,13 36:18 37:23 38:18 39:16 41:10 47:1 176:3 229:16 230:21
**charged** 39:21 268:10
**charges** 36:18 38:16,18 40:4 42:2 146:4 255:7 255:7 273:9
**charles** 1:3 3:4 7:6 85:5 107:23 108:7 177:3 183:8 224:15,21 242:10 247:8
**cheating** 214:12
**check** 28:9 75:4 106:19,20 107:4 107:7,12,15,16 108:5,8,12 109:10 110:2,3 110:21 171:6 258:15,18 259:3 259:5,6,8,11 260:3,10,11,19 260:21 261:3,12 261:13,20,21 262:10 263:5 264:12 265:9,22 265:23 267:6,15 267:20 268:4 269:15,15 271:1 271:18 279:13
**checkbook** 259:15
**checking** 222:3
**checks** 107:23 108:1,21 109:4 109:16,23 112:11 112:13 261:1 263:15 266:16,21 267:1,4,10,10,13
268:7
**chemicals** 90:18
**chief** 90:14
**children** 92:3 215:5
**choice** 96:11 234:21
**chose** 173:18
**chosen** 96:9
**chubb** 8:10 9:23 10:7,11 14:17 18:21 21:7 22:15 28:4 29:8,10,12 31:5,9 50:8 52:11 52:16 57:4 65:14 76:20 77:21 79:10,11,12 80:19 92:16 93:1 95:6 96:19 97:6,9 97:11,21 100:18 101:2,8 108:15 115:2 125:7 126:2,6 127:10 128:17 130:19 132:2 144:15 145:20 153:18 157:3 175:15 186:13 201:20 202:13 203:11,20 204:8 213:12 216:16 224:12 230:12,14 231:3 232:1 238:9 255:2 257:16 259:2 260:10 272:5,15 273:3 276:11
**chuck** 7:5 8:6 183:23 204:3
**circle** 35:2
**circles** 204:5
**civil** 1:5 6:5,19 283:6
**claim** 8:7 9:15,20 10:1,23 11:1,4,6 12:4,8 18:7 21:9 21:12,15 23:23 24:6,8,15 31:13 33:11,12 36:10 38:12 40:16,17 40:21 43:15 44:17 53:18 62:14 63:9,12,19 64:11,14,15 72:16 80:2 83:1 83:11 96:20 103:10 105:2,9 105:13 106:9 110:5,12,13 111:2,11,17 112:14,17 120:14 128:11 129:7,12 131:2,6 132:23 133:1 137:2 174:10,12 177:18 197:12 221:11,12 228:12 236:6 239:7 247:22 256:16,20 257:17 258:10,12,20,23 262:6 264:15,18 273:20 274:22
**claimed** 83:13
**claims** 9:6,8,13 9:14,23 10:16

35:8 44:15 61:21 65:14 70:9 79:12 79:16 80:2,4,8 105:10 106:3,6 111:11 112:7 128:22 129:3,5 129:16 131:12 176:3,5,6,12,13 176:15,23 177:6 211:7,8 264:21 264:23 266:4
**clarified** 266:13
**clarify** 120:12
**clarifying** 81:20
**clarity** 242:21
**clean** 148:1 164:22 165:6,15 187:12,14 190:22 240:8,11 243:20 249:17
**cleaned** 211:18 243:3
**cleaner** 177:15
**cleaning** 122:13 122:22 123:4 161:15 190:19 240:8 241:21 242:8 255:20 256:12 263:3
**cleans** 249:22
**cleanup** 191:2,20 247:2,16
**clear** 11:19 79:1 82:5
**clearly** 43:2 55:9 56:9 57:21,23 83:11 135:11 242:4 252:14
**client** 16:23 18:16
**clients** 65:14
**cliff** 234:23
**climate** 152:7,8 152:15
**close** 23:16 175:1
**closed** 109:14
**closet** 185:23 187:7
**clothes** 113:10
**clothing** 113:11 113:12
**code** 283:6
**column** 35:21 265:8
**combination** 15:11 194:17 211:20 225:8 240:20
**come** 18:8 21:13 28:20 53:11 90:6 90:11 104:7,8 108:22 109:4 123:18 148:19 155:2 156:18 157:15 158:2,6 162:19 179:22 187:13 214:9 229:19 230:23 240:13 267:10 271:6 272:10 277:13
**comes** 280:9
**comfortable** 150:5 212:10,10 212:14
**coming** 14:16 89:23 198:4
**comm** 281:21
**commencing** 2:3 6:10
**comment** 234:7
**commentary** 22:19
**comments** 54:17 59:4
**commission** 284:23
**commitment** 238:9
**communication** 22:9 74:10 175:2 197:12
**communications** 18:16,18 208:1
**companies** 181:12
**company** 1:7 6:23 7:11 20:18 29:5,18 33:23 39:23 41:7,8,9,14 52:8 66:12 102:17 103:15 107:22 117:23 120:8 213:17 215:9 216:1 224:19,20,22 272:5
**compare** 266:21
**compared** 9:5
**comparison** 43:5 62:1,2 136:12,15 158:13 221:2 222:9,11,20
**completed** 106:16 106:17 282:18
**component** 124:2
**computer** 147:4 281:8
**concern** 91:7
**concerned** 90:17 90:18 91:11,16 118:17 167:2
**concerns** 121:18
**concluded** 280:11
**conclusion** 18:2 83:10,10 158:22 170:4
**condition** 152:1
**conditioning** 160:5
**conduct** 54:11
**conference** 25:9
**confuse** 191:16 275:20
**confused** 39:19
**confusing** 19:22 41:6 81:22
**consider** 29:4 124:10
**consideration** 99:6
**considering** 195:15
**construct** 133:13 133:14
**construction** 40:7
**consultant** 132:22 133:6,15
**consulted** 148:17
**cont'd** 5:1
**contact** 12:10 53:5 62:22 102:2 174:14

**contacted** 53:12 62:10 174:13
**contacting** 102:1
**contacts** 220:20
**content** 35:7 69:11 263:3,3 264:16 265:14,23 269:16 270:19 281:6
**contents** 11:15 28:5,5,18,21 31:19 32:11 33:4 33:5 35:10 38:12 40:21 52:18 66:22 113:7 167:5,11,18,19 168:18,23 169:23 170:7 171:4,9 172:12 216:22 255:7,11,22 256:9,12,13 257:6,15,19 258:2 259:19 260:14 261:20,21 262:19,20 263:14 263:15 264:18,22 265:1,1,8 267:5 267:18,23 268:10 268:16
**continue** 180:1 184:4 196:21 205:8,15
**continues** 185:22
**continuing** 100:19,21 101:6
**contractor** 92:22 93:10 134:11 225:9 247:12,14 247:17
**contractors** 87:11,15 119:5
**contributed** 259:17,19
**control** 152:7,8
**controlled** 152:16
**conversation** 62:6 86:15 88:15 90:23 91:6 113:6 113:19 114:11 116:16,22 118:2 118:4,14 119:9 119:10,12,20,22 167:8 172:23 173:4,9 177:12 178:18 179:3,5 184:8,13 186:10 186:15 212:18 213:6 214:15 225:20 236:3 237:13 251:16 252:2,4
**conversations** 91:3 127:1 228:11 229:6,7 247:12
**cooling** 144:22
**coordinate** 115:23 139:3
**copied** 242:10 243:21 244:6,16 244:18 247:9 248:4 253:14
**copies** 282:13
**copy** 71:20,20,21 72:4 247:7,11,20 253:22 260:2 266:16 267:9
**copying** 253:6
**corey** 22:22 23:11
**corner** 136:19
**cornice** 197:20
**correct** 24:21 26:1,2 28:8 38:6 45:10 49:8 50:5 60:15 69:15 70:10 71:11 83:21 94:7,23 95:3 120:22 124:8 127:18 137:5 144:8 145:4,6 153:23 163:2,3,15 164:17 169:13 182:20 184:16 185:7 186:5 198:7,15 206:3 210:16 221:13 229:13,14 235:13 235:20 240:4 242:13 244:4,21 251:4,22 252:18 254:16 259:7 262:3 265:20 269:22,23 270:5 270:7 281:10
**corrected** 230:6 266:13
**correction** 58:12
**corrections** 282:7 283:9
**correctly** 45:16 162:20 172:9
**correlates** 261:5
**correspondence** 13:5 111:15 247:21
**cost** 26:11,16 27:1,4 29:7,8,13 29:13,17 30:10 30:11,16 35:22 35:22 38:8 39:7 39:12,14 41:4,12 41:15,19,20,22 42:6,13,17 43:6 43:10,18,19,21 43:23 44:16,20 44:21 46:16,20 46:22 48:23 50:1 50:4,14,19 51:9 53:3 54:12 55:19 59:21 61:2,8 62:15,23 63:4,19 64:13 69:12 73:6 74:3 75:11,11,17 75:20 76:7,16,21 76:23 78:6 125:8 126:3,13 127:7,8 127:11,11 128:3 128:17 132:3,4,9 135:12 136:21 137:9,12,12,22 143:16 144:4 145:21 153:22 154:2 158:16 160:8,17 161:12 161:14,21 162:4 163:6,10,12 164:14,23 165:7 165:16 219:8 220:5 221:4,4,5,9 230:13,14 232:14

232:19 271:17 272:1 274:13
**costs** 27:23 36:5 36:12 38:17 40:7 44:12 47:17 50:6 59:11 201:19 206:3,7 224:8
**costwise** 168:3
**couches** 215:4
**counsel** 1:17 2:6 2:8 6:6 17:11 281:14
**country** 80:7
**county** 281:3
**couple** 53:13 61:12 66:14 67:16 108:17 182:10 236:12 246:20 260:10
**course** 76:6 93:20 168:1 243:6 268:19
**court** 1:1,20 2:16 6:2 7:3,20 78:16 131:19 205:20 282:16
**cover** 102:12 209:19,22
**coverage** 22:13 102:5,8 126:19 165:9 168:5,22 170:14 210:9 213:7 215:2 235:15,19 256:3 256:5,5,8,9 257:6 257:18,19 258:19 259:18,19 260:7 264:19,20 265:1 265:2,14,23 268:21
**coverages** 255:8
**covered** 102:10 102:11,16,19 162:20 167:17,21 209:13 269:21
**covid** 225:22 226:2,5,6,18 227:1,2,4
**cozen** 3:9 7:10
**craziness** 204:3
**create** 256:22
**created** 87:4 93:21 108:8 111:12
**credentials** 118:19
**crest** 282:21
**critical** 39:11
**crying** 88:21
**cs** 282:18
**curious** 59:23 152:11 253:22
**current** 27:3
**currently** 278:22
**cursory** 17:22
**curtain** 55:18,21 56:22 58:3,10,10
**curtains** 57:12,15 57:22 58:1 273:22
**cut** 64:1,1
**cutoff** 225:7
**cuts** 109:22,22
**cv** 1:6 6:20 133:10,21 134:2
**cxe** 172:19

**d**

**dallas** 10:20,21 12:16
**damage** 122:1,2 151:14 155:3 156:2,6 160:18 179:23 186:1 187:8 188:7,9,12 188:22 190:3 194:21 196:14 204:8 235:23 243:7 246:7
**damaged** 27:11 123:13,14 128:14 151:11 163:1,14 163:16 166:6,17 170:6 171:9 211:19 217:9 243:9 277:3
**damages** 83:13 155:23
**damaging** 150:6
**data** 112:12,13
**database** 257:16
**date** 6:4,17 14:21 19:3 60:4 119:19 139:9 140:3 141:9 187:1 254:17 270:18 281:12 282:3
**dated** 19:11 177:3 239:19
**dates** 15:1 19:22
**dauphin** 3:4,4 4:3 7:5,5 8:2 17:2,9 18:17,20 19:10 28:14 31:6,12,21 34:19 37:4 55:13 60:21 61:5,6 68:12 69:2,20 70:17,20 71:4 73:13 78:12,20 78:23 81:3,13,18 81:22 82:10,18 94:12 96:1,3 104:17 112:19 113:5,20,23 129:8,17,21 130:11 131:3,8 131:13,16,21 132:1,15,19,20 136:9 141:3,19 145:11,19 146:12 146:23 149:3,7 149:11 154:16 163:23 164:4,7,9 169:9 171:22 175:9 181:5 182:16 185:4 192:2,5,9,12,15 192:18,20,22 196:1 198:2,22 200:22,23 204:21 205:3,10,17 206:2,23 207:14 209:17 214:9,12 224:17,19 226:23 227:20 228:1,7,8 233:11 238:23 248:18,22 249:7 254:12 270:17 274:5 275:16,18 276:3,5 277:13 277:17 278:3

279:13,17 280:3
**davis** 149:20 150:10
**day** 2:2 6:10 109:9 155:23 156:7 237:2,7 245:18 254:22 281:17 284:19
**days** 86:21 110:23 186:7,17 246:21 274:22 282:3
**de** 224:1
**dealing** 84:22
**dealings** 238:15
**dealt** 8:7 129:13
**debate** 99:9,22
**debris** 120:8
**december** 67:13 114:20 119:23 120:10 177:4,17 177:22 186:4,8 187:15 189:22 281:17
**decide** 43:1 92:10 194:15
**decided** 24:10 128:15 153:20
**decision** 52:6 93:2,5 96:14 125:14,14 126:9 126:12 136:23 179:18 220:9
**decking** 196:18
**decline** 128:17
**declined** 127:11 127:16,21 128:2
**decorator** 36:4 46:16
**deduction** 140:20 140:21
**deem** 203:20 220:6
**defendant** 1:8 3:7 7:11
**defined** 81:17 247:9
**definition** 26:10 209:2 210:6 218:22
**degree** 98:5 136:5
**delay** 195:1
**deliver** 212:22
**dell** 223:8,18,20 223:23 224:6 229:18 230:7,8 230:10,11 232:20 232:22
**demands** 236:12
**demo** 178:15 198:13,16 202:22 240:7 241:3,7
**demo'ing** 177:7 178:21
**demolish** 96:10 235:11
**demolished** 180:17,19 186:2
**demolition** 180:12 183:7 185:21 190:7 194:18
**denied** 132:9 219:11
**denote** 267:4
**deny** 126:12 178:14,21
**department** 9:9 9:12,13 108:15 109:20 111:17 176:6,16 224:2
**deponent** 280:13 282:2,6,7,10,16
**deponent's** 282:6 284:18
**deposition** 1:10 1:17 2:11,15 6:19 6:20 68:17 112:23 145:14 146:18 184:3 207:6 249:2 279:21 280:9,10 282:6 283:8
**depositions** 277:18
**depreciation** 30:22
**describe** 79:18
**description** 105:23 158:13 256:13 263:13
**design** 153:6
**designation** 9:3 261:6
**desire** 283:7
**desk** 109:11
**destroyed** 155:11 159:1
**detach** 148:1
**detailed** 35:12,13
**details** 25:23 170:6 171:9
**determination** 102:13 148:17 153:17 159:5
**determine** 11:2 53:3 83:19 102:18 109:16 147:1 156:18 159:6 187:6 191:1 225:6 255:6
**determined** 83:12 185:22 188:21
**determining** 103:1
**developed** 234:22
**diane** 7:7
**difference** 42:6 75:10 77:23 109:12 135:6,12 137:8 138:18 140:2 141:10,11 141:11 143:10 161:12 179:6 199:9,9 201:4 208:20 217:18 228:4,6 249:21
**differences** 143:13,17 147:2 147:14 148:12
**different** 17:13 31:5,9 61:12 65:18 66:14 67:16 79:12,14 79:14 80:12 108:18 109:13 134:14 137:21 185:11 228:11 235:6 255:22

**difficult** 73:7
**difficulty** 46:3
**direct** 51:9 192:14 215:12
**directly** 63:22 64:2
**disagree** 234:1 238:7,13 239:3 271:1
**disagreement** 147:15
**disclaimer** 144:12
**discounted** 154:1
**discovered** 235:22
**discovery** 129:3
**discuss** 143:7,7 215:1
**discussed** 17:6 143:9 257:12 269:5 274:18
**discussing** 118:11 120:14 136:20
**discussion** 121:8 121:22,23 123:1 137:20 138:16 144:5,7 174:18 214:17 215:16 223:16 224:9
**discussions** 125:18,20 236:9
**dispute** 55:3 149:15 153:12 157:12 160:16 173:1,5 271:3 272:2,3,6,16
**disputed** 138:3 141:7,12 142:16 142:20 160:3,8 272:21 273:2,9
**disputes** 55:6
**disputing** 142:2,5 142:7,11 160:11 161:13 173:8,10 272:12
**distinction** 217:18
**distraught** 88:22
**district** 1:1,1
**division** 1:2 9:4
**document** 29:20 29:22 30:2 31:18 32:17 33:15 34:12 39:10 42:17 55:2 58:20 59:19 62:18 63:6 63:7 138:13 139:11,13,22 141:8,15 142:12 142:14,21 143:11 143:14,16 160:10 175:14 196:7 231:22 256:23 257:1
**documentation** 29:1,6,15 38:11 38:14 44:22
**documented** 28:10
**documents** 30:5 33:8 35:17 37:12 144:15 231:20
**doing** 16:20 17:7 33:20 56:6 61:1,7 87:9 90:9 102:2 155:21 188:2 194:18 202:4 204:1 212:15 218:7 237:14,19 238:5 242:22 244:2,23 245:3 245:19,19,23 246:21,22 247:5 251:12 252:16,16 256:11 257:2 278:21
**dollar** 9:7 135:1
**dollars** 15:20 203:3
**door** 137:23 147:9 161:5,5,6,9 161:10,20 271:7
**doors** 147:9 149:13 160:20,21 160:22 161:4,4
**dorthea** 175:17
**doss** 175:17
**doubt** 18:19 67:1 95:2 162:6 173:23 174:1
**drafted** 15:4
**drafting** 22:4
**drayer** 128:9 132:1
**drive** 220:17 282:21
**driveway** 87:11 117:17 118:15,23 119:21 229:9
**dropping** 110:21
**drywall** 121:12 188:9,22 189:1,4 189:9 194:22 195:2,16
**due** 96:13 282:3
**duly** 7:17
**dumping** 264:21
**duplication** 124:10
**duties** 44:11
**dwelling** 11:15 163:10 255:8,13 256:3,4,4,5,8 257:6,15,19 258:2 259:17 263:14,16 264:20 264:23 265:7,13 266:1 267:5 268:11,20 269:17
**dwellings** 260:7

**e**

**e** 3:1,1 23:12,12 23:12,13,13,15 23:15,15 281:1,1 283:6,7
**earlier** 32:20 111:6 112:9 165:23 167:2 174:16 184:10 242:1 259:12 273:23 274:18
**early** 11:20 12:17 120:10 187:20
**earthly** 68:8
**easier** 172:9 234:4
**easiest** 263:19
**east** 108:19 109:14

**education** 98:2 100:20,22 101:6
**effect** 115:6 253:2 276:10
**either** 9:21 109:6 139:12 159:13 204:8 223:2 244:7,17
**electronically** 282:8
**elements** 152:17
**elliott** 1:12,18 4:2 6:11,19 7:12,16 69:2 98:12 174:4 177:16 191:15 234:8 235:5 237:12 267:11 280:4 282:2
**email** 15:10 58:19 62:17 63:6 69:7 71:16,17 72:2,9 72:14,15 73:17 75:3 107:1 111:21 150:4 169:2,12,14,19 170:2,3 175:16 176:22 178:10,12 178:17 181:9,13 182:19 183:14,16 185:9,13,18,19 189:17,20 193:4 193:5 194:5 196:9 197:3,5,12 198:9 199:15 235:4,18 236:17 236:21 237:2,11 237:11,16 238:3 238:10 239:8,16 240:2,15,16,18 241:19 242:11,11 242:14 243:18 244:1 245:2,12 247:18 248:2,6 252:11,19,22,23 253:4,9,13,19,20 254:2,5 257:11 270:4,8,12 273:4 273:5,5,6,7 274:8 282:18
**emailed** 211:23 249:13
**emails** 13:13 18:7 18:11,12 71:19 74:7 105:14 112:14 157:17 196:8 228:23 229:1 236:13,22 239:11 246:20 247:14,23 249:8 250:22 251:10 252:14 253:5 254:6 274:17
**emergency** 66:7 257:20
**emma** 175:16
**emotion** 85:5 86:6,13 92:8
**emotional** 84:16 84:22 85:14 88:20
**empathetic** 89:16
**empathy** 88:18
**employed** 19:6 20:17
**employee** 101:8
**employees** 254:22
**encapsulate** 124:6,11
**encapsulation** 125:2
**ended** 182:12
**endorsement** 235:16,17
**energized** 224:1
**english** 98:7,19 98:19,21
**enservio** 33:7 34:1,4,9,14 53:1 54:15,22 55:20 56:6,10 58:7,7,14 59:20 60:7,23 61:9 67:23 68:4,6 69:11 71:9,17 74:8,10,21 75:7 104:10 170:21,23 172:2,17,19,20 173:17,18 174:13 174:14 270:19 272:7 273:9,13 274:12
**enservio's** 54:18 55:7 56:5 59:7,11 73:21,23 74:3 173:21 174:1
**ensue** 156:22
**enter** 107:18 257:5,16
**entered** 107:16 107:20 283:8
**entire** 96:10 130:16 174:22 242:20 244:2
**entities** 79:12,14
**entitled** 48:6 50:18,21 51:2 81:6,9 83:18 96:12 129:5,14 129:16 130:23
**entries** 110:5,12 111:1
**entry** 111:7 112:12,13
**envelope** 110:4
**equal** 263:5
**equipment** 250:6 261:11
**equivalent** 166:7
**errata** 282:3,7,8 282:10,12,13,15 282:18 283:1
**error** 78:22 235:19
**esq** 282:1
**esquire** 3:4,8
**establish** 41:3,19 44:16 57:18
**established** 218:12
**estimate** 51:5 63:4,5 75:19,21 92:23 93:12,16 93:17,19,23 95:11,12 97:3 102:5 134:22 137:9 145:23 147:21,23 161:8 162:1,3 197:8 198:12,17 199:10 199:16,21 200:1 200:7,11 201:4

201:11,14,15,16 201:20 202:1,3,4 202:6,7,10,14,19 202:20,22 203:11 203:12,19 204:13 204:17 206:1,8 225:17 226:9,12 227:7,12,14 237:8,9 240:7,9 241:3,21,22 242:2,4 243:12 243:19 244:14 245:1 275:14,18
**estimates** 111:12
**et** 147:10 196:18
**euo** 28:23
**evaluate** 134:22
**evaluation** 102:5 102:8 126:19 151:13
**evaluations** 101:9
**evasive** 192:13
**everett** 22:22,23 23:9,10,11
**everybody** 121:4 183:22 252:23 278:13
**evidence** 2:11 42:5 45:2 51:10 59:22 76:14 156:9 202:16 223:10 272:10
**exact** 28:1 51:18 52:2 70:16 115:7 119:19 151:5,8 165:9 212:9
**exactly** 48:11 76:14 200:20
201:16 229:4
**examination** 4:1 6:13 8:1 24:20 25:10 79:5
**example** 28:2 48:5 49:19 50:11 51:1,13,16,20,22 135:7 261:19 262:15 268:14 278:9
**exceeded** 11:20 126:15 200:1
**exceeds** 11:16
**excerpt** 235:4 236:1
**exchanged** 253:6
**excuse** 41:1 124:23 209:21
**exhibit** 4:5,7,8,9 4:10,11,12,13,14 4:15,16,17,18,19 4:20,21,22,23 5:2 5:3,4,5,6,7,8,9,10 5:11,12,13 14:11 14:14 19:7,11 28:11,14 34:16 34:20 37:1,5 38:7 54:5 55:10,14 57:3 59:1 68:22 69:3,17,21 70:4 71:1,5 73:10,14 75:2 82:14,15,19 82:19 94:9,13 95:22 104:14,17 136:6,10,13,14 137:4,16 139:4 141:6,16,17,20 144:6,10,19
145:1,3 147:3 159:13,14,22 160:13 162:9,10 169:6,10 171:19 171:23 172:1 175:6,10 181:2,6 182:13,17 185:1 185:5,16 186:19 190:1 194:6,10 195:7,21 196:2,7 197:22 198:3,19 198:23 199:2 207:11,15,16 233:8,12 238:20 239:1 248:9 254:9,13 269:20 274:2,6,7
**exhibits** 5:1 13:22 14:7 147:1
**expand** 180:1
**expanding** 181:23 195:18 238:2
**expect** 108:1 134:11 142:13 180:3
**expected** 134:17
**expense** 106:14 208:2,22 209:5 218:6 219:9,14 220:7,10 223:11 223:13 232:17
**expenses** 113:9 207:18,22,22 208:6,7,9,10,13 208:14 209:1,12 209:23 210:3,4 210:11 216:21
223:7 232:21 262:6 265:7 268:9
**expensive** 57:23 134:12 135:14 216:2 218:17
**experience** 72:16 79:15,18 80:15 134:18 135:13 136:3 188:8 194:19,20 277:2 277:7,9,12 279:2 279:5,6,8,9,11
**expert** 127:4 159:3 278:15,17
**expertise** 154:14 188:1
**experts** 179:22
**expires** 281:21,22 284:23
**explain** 9:3 122:20 143:12 148:12 256:6
**explained** 278:14
**explaining** 84:3 219:1
**explains** 142:14
**explanation** 106:8
**express** 90:20
**expressed** 13:9 14:17
**expression** 122:18
**extended** 163:9 163:10
**extensive** 17:21 171:12,15,17

**extent** 45:1 80:22
**exterior** 196:15 197:14
**extra** 113:9 208:6 208:9,13,14,22 209:1,12 216:21 218:5 220:7

**f**

**f** 281:1
**facility** 282:20
**fact** 74:7 112:3 153:16 279:5
**factor** 136:4
**factors** 101:16
**facts** 156:9 202:16
**fairway** 220:17 223:2
**faith** 65:2 80:20 82:3,11 84:1 238:17
**fall** 170:7 171:9
**familiar** 26:6 53:9 65:7 134:13 221:22 249:20
**family** 267:19
**far** 11:6 35:3 81:16 122:21 153:10 232:11 269:14
**fast** 187:15
**feature** 18:1 107:4 266:19
**february** 226:10 226:10,11,13 227:12 270:5
**federal** 6:4
**feel** 89:17 150:5
**field** 8:12,17
**figure** 122:6 214:2 247:4 257:4
**file** 36:10 44:5 62:14 63:9,12,20 64:14,15 66:16 102:3 103:10 105:10,13,14 106:4,6,9 107:17 107:18,20 110:6 110:13,19 111:2 111:11,18 112:17 197:13 221:11,12 257:10,17 258:10 258:12,21,23 266:7 282:12
**filed** 128:23 129:10 282:15
**files** 112:14 257:9
**filing** 2:14
**fill** 282:7,8
**final** 52:14 200:16 203:22 204:6 240:7 241:3,11,20 242:6 272:18
**finalize** 200:10
**find** 21:16 59:16 77:10 117:3 146:13 179:23 180:23 212:1,4 212:21 220:23 248:16 260:16 261:20,23 266:12
**finding** 37:21
**fine** 23:21 33:2 46:5,8 47:15 92:3 184:5 215:6 234:12 275:5
**finished** 89:14
**finishes** 134:14 135:14
**fire** 12:12 26:21 27:11 37:22 53:22 79:16 80:1 80:2,11 86:22 87:1 88:14 90:14 90:19 91:12 94:17 101:3,7 102:15,16,19 103:2,3,20 104:2 104:5 105:20,21 111:22 114:22 121:20 122:2 128:11,14 130:12 130:13 171:13,14 172:10 177:23 195:12 211:13 217:10 224:1 243:6 276:19 277:2,3 278:15 278:18,20
**fired** 251:9,12
**fires** 79:20 80:15 80:16 84:9,10 111:20 112:1
**firm** 1:22 6:7 22:2,6
**first** 7:17 13:5 20:16 28:17 36:15 67:12 69:23 86:20 87:23 91:12 101:1 114:18 116:8 118:7 119:13,14,17 126:11 139:19 172:3 177:1 185:18 217:14 228:12 236:16,18 237:15,20,21,22 248:13 255:19 269:23 276:9,22 276:23
**five** 27:8 36:15 68:14 204:19 248:19,22
**fixtures** 143:18 143:23
**flip** 19:10
**flood** 102:12,13
**floor** 105:22 175:4,5 216:15 216:19 236:16 237:15,18,21,22
**flooring** 121:12 134:16
**flown** 103:18,19
**foam** 121:19,20
**focused** 90:5
**focusing** 99:1,2
**folks** 97:15
**follow** 20:8 63:2 70:7,8 87:22 120:7 172:8
**followed** 175:3
**following** 6:13 77:5 121:1 283:5
**follows** 7:18

**foot** 135:8,8
**footage** 244:10 245:8,10
**force** 93:15 100:11
**foregoing** 6:5 281:5,9
**form** 2:7 22:18 39:18 40:6 41:16 42:8 43:13 44:4,6 44:13 49:15 51:3 51:14 57:17 58:2 60:2 75:23 76:17 93:14 95:9 101:18 125:12 127:13 135:4,15 151:12 154:4 155:13 156:1,8 158:4 159:2 163:18 164:8 165:8,17 166:8 176:17 178:23 189:14 191:4,13 191:22 193:9,16 200:15 202:11,15 203:13,17 204:10 204:18,22 206:4 211:3,16 222:1 223:9 225:13 226:17 230:16 231:5 252:10 265:4 275:21 276:14 277:5,10 281:7 283:7,9
**formal** 101:2
**formed** 224:14,20 224:22
**forth** 8:7 101:7 138:1 236:22 246:20
**fortunate** 91:18
**forward** 49:3 181:18 187:15 239:12 282:12
**forwarded** 33:23 34:10,11,14 36:9 55:2 59:19 237:1
**found** 220:18 235:10
**foundation** 2:7
**four** 100:12 104:4 172:13,13 212:23
**frame** 16:7
**framers** 235:22
**framing** 123:13 123:14 180:5 197:14 198:16 199:17 243:10
**freshly** 219:13 220:4
**front** 62:7 101:21 129:1 165:10 262:16
**full** 59:4 201:20 262:11 272:18
**furnish** 214:18,21 283:9
**furnishings** 37:22
**furniture** 27:20 37:21 75:5 211:14 212:1,13 214:16 216:2,13
**further** 2:4,13 171:7 192:13 194:22 280:13
**future** 187:16

**g**

**ga** 23:23
**gable** 197:21
**gain** 238:8
**games** 275:13
**garage** 137:23
**gee** 225:11
**general** 8:14,18 9:6 26:14 62:21 81:12 82:7,12 101:14 123:12 134:11 152:13 184:9 243:8
**generally** 26:8 111:17 123:11 209:4
**gentleman's** 87:13
**georgia** 3:10 103:23 104:1
**getting** 27:17 76:4 90:11 99:7 112:5 121:5 140:14 164:3 183:13 214:15
**give** 47:5 63:3 118:20 132:11 147:3 157:15 185:15 202:2 248:16,22 253:1 255:12 261:10 278:9
**given** 37:7 172:14 186:13 206:13 243:19 255:2 281:13
**gives** 157:10 222:8 231:12 283:8
**giving** 117:4 165:20
**global** 12:18
**go** 11:6 18:8 27:14 36:21 39:12,17 43:16 44:11 45:6 47:4 47:20 48:12,14 67:23 68:3 69:23 71:18 96:14 98:11,22,23 101:4,6 107:12 107:21 108:1 113:23 131:22,23 139:1 146:13 149:10 154:5,16 157:4 161:7 162:8 164:1,9 175:9 177:1 180:4 184:6 185:8 192:7,15 192:22 196:6 202:18 205:5 207:1 212:15 213:6 214:18 215:3,19 216:20 218:15 219:1,18 220:13,16 223:19 232:1 233:22,23 235:11 239:9 248:10 255:3,7,7 256:7,8 258:21 260:16,19 261:13 264:14 265:8,19 267:11 268:18,23

271:18 272:7 274:5 276:5 279:15
**goal** 53:20 83:11
**goes** 107:8,13 108:7 175:11 257:5 258:5
**going** 10:9 11:10 11:19 16:22 17:5 17:12,20 18:19 25:4 34:22 35:1 40:15 41:10 42:22 43:8,11 44:7 49:3,3 53:11 66:11 68:13,16 69:23 80:21 81:15 83:5 88:19 89:17 92:20 93:13 94:4,5 95:6 95:16,17 105:16 115:11 117:2 122:6 126:20 128:21 129:6,9 129:17 131:8,9 132:6,11 142:17 144:3 145:13 146:3,8 161:14 166:12 167:3 172:7 178:15 180:22 184:2,11 187:11,14 189:9 191:1,17 192:12 192:13 197:19 200:10 204:5 205:3 207:4,5 215:14,22 216:12 222:7,16 225:16 225:18,19 232:20 232:22 238:7 245:8 248:6 249:1 261:9 264:19 265:2,11 265:13,19 267:4 268:3 277:18,19 277:21,22
**good** 11:4 65:2 80:20 82:2,11 84:1 153:7 164:20 166:13,17 168:2 253:10
**goodrich** 1:3,3 3:13 6:22,22 7:6 7:8 10:22 11:18 24:20 32:12 37:19 62:7 64:2 64:21 67:8 77:15 85:22 87:8 109:4 116:23 118:4 119:1 124:23,23 132:23 155:20 177:3,18,21 209:15 214:17 220:18 267:19
**goodrich's** 28:23 107:23
**goodriches** 12:19 24:8 26:8 57:4,9 66:20,23 120:19 120:21,23 125:9 147:16,21 152:22 171:16 210:18 211:14 229:7 234:8,13,17 235:1 236:8 243:22 244:7,16 244:21 248:5 249:9 251:20 252:8 271:10 272:15,22 273:3 273:10,12
**gotten** 63:18
**governs** 210:2
**grade** 136:22
**graduated** 98:6 98:13
**great** 276:3
**greater** 11:11
**greatly** 274:11,12
**greetings** 282:5
**grounds** 2:10 16:23
**group** 269:23
**groups** 277:1
**guess** 60:9 109:21 133:11 140:17 158:9 196:21 214:4 236:2 279:17
**guidance** 31:7
**guide** 105:1 210:2
**guidelines** 104:21
**guy** 104:5,10 143:4 172:20 228:17,18
**guys** 87:11 117:2 118:20 119:15,21 225:11 228:16,19

**h**

**h** 23:12
**habit** 209:17
**haessig** 10:19 11:12,22 15:15 22:20 23:6
233:16
**half** 160:5 175:12
**hallway** 181:16
**handed** 118:6
**handle** 31:7 80:7 80:8 105:2 239:6
**handled** 8:21,23 65:14 80:2 84:10
**handles** 108:15
**handling** 12:7 72:16 80:15 121:20 277:2 278:20
**hang** 67:22 185:11
**hank** 115:14 174:16 278:17
**happen** 91:23 108:4 115:11 179:8,9 268:11
**happened** 59:17 87:1 109:11 113:14 119:10,12 122:8 156:23 179:7,13 227:3
**happens** 56:8 105:8 266:4,9,12 268:12 273:19
**happy** 32:4 33:14 103:9 234:20
**harassing** 191:23 192:19 275:23
**harassment** 192:6
**hard** 35:5 37:12 135:1 175:19
**hardware** 147:9 149:13 213:9

215:20
**hardwood** 161:4 161:17
**hate** 89:15
**head** 163:22 176:4,6,12,13,15
**hear** 152:12 188:3 224:18
**hearing** 45:16
**heating** 144:22
**heavily** 180:2
**heavy** 20:19
**held** 133:2,5,7 134:1 136:16,18 137:19 139:3 143:8 145:22 146:2,11 148:6 148:17 182:12 190:5,8,15,18 191:6,10,15,19 193:14 194:7,8 194:12,15 240:23
**help** 65:3,4 88:17 92:5 183:20 264:17 266:22
**henhouse** 61:22
**hereto** 14:13 19:9 28:13 34:18 37:3 55:12 69:1,19 71:3 73:12 82:17 94:11 104:16 136:8 169:8 171:21 175:8 181:4 182:15 185:3 195:23 198:1,21 207:13 233:10 238:22 254:11 274:4
**hey** 53:23 56:15 56:21 58:21 61:14 63:2 72:4 88:13 91:18 109:9 110:20 122:5 137:11 138:17 178:4 187:11 215:3 217:21 225:11 265:22 266:7 272:7
**high** 28:5 84:15 138:8 142:22 211:8
**higher** 211:11
**hire** 67:3,4,5 90:10 120:16 127:4 150:13 159:4 193:14,18 193:21 250:1
**hired** 66:10,18,23 67:7 103:12 120:9,15,19,23 132:23 133:2 194:1 234:23
**hiring** 134:5
**history** 247:22
**hit** 226:2,5,6 227:4
**hold** 60:22 184:2
**holidays** 122:8
**hollow** 161:5
**home** 57:5 84:18 85:6,13 86:1 90:12 91:20,20 91:21 96:15 97:13 115:4 133:18 135:1,2 172:15 177:8 178:15,22 213:2 214:16,19
**homeowners** 26:7
**homes** 84:11 134:12,18,20
**honest** 13:17 58:4 85:7 114:2 130:4
**honestly** 10:4
**honor** 99:23
**honors** 98:6,18
**hoover** 3:5 282:22
**hope** 22:17
**hour** 68:13 85:17 88:9,23 89:5 92:13 248:20
**hours** 184:2 254:23 257:1 263:3
**house** 24:11 57:9 58:4 67:7 88:13 89:3,8,13,14 90:4 90:7,18,19 91:19 92:1 93:7,12 94:4 96:8,10,23 107:11 115:17 119:13 122:23 124:23 125:10 128:14,19,20 130:16,16 142:10 144:23 150:18 151:16,18 152:3 163:2,5 164:12 167:11,20 171:4 171:12,16,17 174:19,23 177:8 179:18 180:2,3,6 180:16 183:4,5 184:14,20 189:9 190:19,22 191:1 196:15 208:23 209:13,15 210:20 212:2 216:3 217:16 218:8 220:12,14,17 222:17 223:8,23 224:13 225:14 229:11 231:9 232:16 234:17 249:14,20 264:10 276:19,23 279:7 279:11
**household's** 210:1,15 214:22 222:13
**housekeepers** 89:20
**houses** 124:17 133:13,14 216:17 217:12 219:7,12 220:4 277:3
**huge** 273:17
**huh** 11:21 25:12 37:18 40:2 42:4 49:12 66:19 77:18 83:8,14 89:10 105:11 106:5 110:7 123:2,22 137:15 148:15 166:2 177:5 181:10,10 185:20 186:6 196:12,15 197:11 198:11 199:18,22

219:10 222:12 229:17 230:20 233:4 242:21 254:18 260:15 261:18 278:14
**husband** 67:9
**hvac** 144:21 145:6 149:13 158:23 159:12,23 160:3
**hygienist** 182:5 189:18,21 190:3 190:10 191:7,11 191:12 193:2,7 193:14,19,22 194:2,9 240:21 240:22
**hypothetical** 262:22
**hypothetically** 94:20

**i**

**idea** 68:8 168:3
**identification** 14:12 19:8 28:12 34:17 37:2 55:11 68:23 69:18 71:2 73:11 82:16 94:10 104:15 136:7 169:7 171:20 175:7 181:3 182:14 185:2 195:22 197:23 198:20 207:12 233:9 238:21 254:10 274:3
**identified** 242:4
**identify** 7:1 119:7
**ih** 182:1,2,4
**impacted** 174:21
**impasse** 24:9
**important** 134:7
**impression** 67:20 91:18
**improvements** 219:22
**include** 84:1 228:22
**included** 253:14
**including** 131:13 229:1
**incorrect** 56:16 269:3
**increase** 209:19 209:22 210:11
**increased** 148:6
**incur** 26:16 127:23 209:2
**incurred** 47:6,8 48:21 210:3,4 223:2 224:7
**incurring** 216:21 223:21 224:4
**indemnity** 1:7 6:23 7:11
**independently** 133:8
**index** 4:1,5
**indicate** 267:17 268:1 279:9
**indicated** 77:15 93:8 137:9 197:19
**indicates** 29:7 267:22
**indicating** 138:6
**individual** 53:10 173:16
**indoor** 144:20
**industrial** 182:5 189:18,21 190:2 190:9 193:2,7,14 193:19,21 194:2 194:9
**information** 15:3 15:7,8,9 39:15 76:18 92:10 98:10 99:8,16,19 103:8 107:16 109:23 116:9,18 117:5 131:1 133:22 143:21 168:21 195:17 257:5 258:21 259:3 260:4,5
**informing** 251:19 252:7
**inherent** 124:19
**initial** 61:13 67:15 85:10 101:4,4 139:8 200:3,4 201:11 201:19 225:6 270:8
**initially** 105:16 151:15 187:13
**injured** 91:19 151:10
**inside** 122:23 219:6
**insides** 183:3
**insistence** 157:2
**inspect** 11:2 156:4,14 157:15 158:6 181:16
**inspection** 57:3 83:4 86:18,19,20 87:3,5,18,20,22 87:23 88:1 102:2 104:8 111:6 119:18 156:22 161:3 278:5,10 278:11
**inspections** 278:9
**install** 231:11 232:14
**installed** 152:2,3
**instance** 201:7 219:15
**instruct** 17:1,8 44:7 81:6 129:6 131:10 132:6
**instructed** 132:13
**instructing** 129:22 130:3 131:11 132:16
**instruction** 132:12
**insulation** 123:15 123:17 180:5 189:10
**insurance** 10:5 52:8 92:4 117:23 272:5
**insured** 9:21 43:12 52:9 56:20 56:21 63:23 65:3 82:13 83:16,18

105:20,21 106:14 108:6 109:9 110:4 115:8 116:11 157:11 246:18,23 260:20 260:22 264:13,17 267:11 272:9 275:6
**insured's** 52:6 107:8
**insureds** 12:11 96:9,11 131:1 234:11 247:11,20
**intent** 76:3 246:6
**intention** 20:17
**intentionally** 264:23 275:20
**interactions** 233:17
**interchangeably** 208:16
**interested** 281:15
**interim** 20:22 21:3 53:17
**interior** 37:21 46:15 57:8 194:16
**internal** 8:16 109:21 266:6
**internally** 256:7 256:21 257:4 266:2
**internet** 232:15
**interpret** 142:16
**interpretation** 80:23 85:3
**interrupt** 246:16
**introduced** 118:5 119:5
**introductory** 82:23
**inventory** 28:22 28:23 33:22 54:16 59:20 69:11 72:19,21 73:3 74:20 170:5 170:12,21,23 171:6,7 172:5 270:19,22 271:16 271:17,23 273:17 274:21
**investigate** 77:9
**investigating** 33:19
**investigation** 33:21 52:17 54:11 61:1,7 187:21 189:16
**investigations** 189:7
**investigator** 102:23 103:7,19
**invoice** 28:6 30:10 38:19 44:19 45:9,15,18 46:15 47:5,11,13 47:21 49:6 77:16 78:1,3 106:13,17 200:9 203:1,10 203:22 204:6,12 232:4,9 255:3,10 255:12 257:21 258:5 261:5,20 261:23 262:16,20 263:13 264:1,6,7 264:8,11
**invoices** 29:5 34:8 77:17 200:17 262:3 263:22
**involve** 123:23
**involved** 11:23 12:1,5,21,21 14:16 16:11 19:14,18 20:22 21:3,14 31:12 64:4,10 116:19 125:13,17,18 126:12 129:12 211:22
**involvement** 12:15 16:14 19:16 20:18 21:17,21
**iris** 29:5,17 37:23 41:7,8,9,14 46:21 46:23 51:6 115:16 120:1 174:17 213:17 215:9,13,18,22 216:1,8 278:12
**irrelevant** 41:23
**issue** 15:6 79:2 107:4 112:11,13 158:9 261:1,3,8 267:15 271:1,6 271:18 272:8
**issued** 26:7 28:9 31:19 32:9 95:11 258:19 260:12,14 260:21 262:11 263:15 265:22,23
**issues** 84:23
**issuing** 105:15 106:19 171:6 266:10 275:11
**item** 28:1 30:17 38:1,20 40:5,23 41:15,20,23 48:4 48:9,11,13,14,17 48:18 50:15,20 55:20 56:2,15,16 63:3 73:9 75:12 75:20,22 159:19 166:7 233:2,4 273:16
**itemized** 137:7 143:17,22 269:9
**items** 29:2 30:9 30:10,12,16 32:7 38:2,21 52:21 53:2,12 54:13 61:2,8,10 64:7 67:7 70:9 72:20 74:1,22 75:6 77:13,16 79:6 102:6 137:7,21 138:17 147:16,23 148:2,15 163:17 164:15,16 168:1 198:14 211:17,19 211:20 214:7,10 214:13,18 215:17 219:2 255:17 271:17 272:1,15 273:18,18 274:13

**j**

**j** 1:19 6:1 281:21

**j.s.** 133:2,5,7 134:1 136:16,18 137:19 139:2 143:8 145:22 146:2,11 148:6 148:17 182:12 190:5,8,15,18 191:6,10,15,19 193:14 194:7,8 194:12,15 240:22
**january** 69:14 105:20 195:9 274:19
**japan** 98:22,23 100:6
**jay** 115:16 132:20 174:17
**jefferson** 281:3
**jeremy** 1:12,18 4:2 6:11,19 7:12 7:16 8:4 71:12 98:12 174:4 177:16 184:6 267:11 282:2
**jerry** 21:5
**job** 197:18 234:15 245:18 253:23
**johnson** 175:17
**joined** 25:2
**judge** 129:1,2
**julie** 175:17,18
**jumping** 61:11
**june** 95:21,23 96:1,4 139:14 147:7 159:8 162:18 227:15

**k**

**keep** 63:7 79:10 120:14 131:9,9 133:1 152:15 184:3 186:10 217:23
**keeps** 152:9
**kendrick** 1:23 6:7
**kept** 151:23 152:4
**key** 210:8
**kids** 27:8
**kin** 281:14
**kind** 10:10 27:4,5 51:6,18 52:3 55:21 117:4,12 143:12 228:17
**kitchen** 181:15
**knew** 53:10 62:7 168:5 171:11 231:13 236:21 251:9 253:11 265:1
**know** 9:7 12:8 16:13 18:3,18 19:4,19 20:13 21:16 22:14,20 23:17,19 24:2 25:1 29:10,12 32:1 33:14 44:9 52:11,14,16 53:8 53:19,21 56:14 58:8,22 60:4,17 60:19 64:3,23 65:3,13,19,19,22 66:5 70:12 72:12 73:9 76:4 79:5 80:12 83:1,19 88:13,16,18,21 88:22 89:4,13,15 89:16 90:11 91:22 92:2 97:1 98:1,4,9 99:9,13 99:16 100:20 102:1,11 103:13 103:21,22 104:3 104:6 105:22 106:15 107:6 109:19 110:1 111:23 112:3 116:6,18 117:3 117:11 118:19 119:1 120:8 121:5 122:9 123:15,17 126:18 126:21 128:8 129:14,16,22 130:2,11,13,15 130:17,19 132:2 132:20 133:4,16 133:17 134:4 135:5,19,21,22 136:13 137:13 138:11 139:9,10 139:15,16,16 140:10,12,13,17 140:19,22 141:2 142:3,10 144:3 144:14,17,18 145:19 148:16,21 150:8 152:15 153:4,13 154:13 154:23 156:16 157:12 158:10,16 158:21,23 161:1 161:9,18 163:5 164:6 166:20 168:9 169:1 173:13,15 174:5 175:21 176:20,21 178:2 183:12 186:21 189:6 190:11,12,13,14 190:15,17,18,21 191:11,17,19 193:3,13 194:12 197:1 199:9 200:13 202:23 203:5 204:11,12 205:14 206:13,14 209:7 210:20 211:4,5,19 212:13 214:1,5,7 214:10,13 215:10 215:11,13,21 216:6,12,20 219:17 221:5 222:16 225:13 226:4 227:16 229:2,10 231:6 231:15 232:7,11 232:23 234:7,14 235:5,21 236:14 236:16 237:10,17 238:10 240:18 242:6 250:7,9,12 250:16 253:21 254:1,4 255:11 257:11 259:13,15 260:13 261:2,8 261:11,14 262:5 263:2 264:9 266:17 267:7 268:7 269:8

271:2,4 277:17
**knowledge** 21:11 137:1 152:13 193:7
**known** 170:6 171:8
**knows** 135:2

**l**

**l** 1:14
**labeled** 267:6
**labor** 9:4 254:21 256:14 257:1
**landlord** 220:1
**landlord's** 219:19 219:23
**language** 30:21 39:8 50:17 183:5 183:16,18 210:8
**large** 1:22 6:3 8:23,23 177:2 276:11,18
**larger** 9:7
**late** 12:17
**law** 1:22 6:7 22:2 22:6
**lawyer's** 147:6
**layman's** 81:2
**leading** 2:8
**leather** 27:10,12
**leave** 18:21 22:15 164:5
**leaving** 20:10,18
**left** 14:22,22 18:20 19:19 21:18 172:5 183:2,7 197:20
**legal** 15:6 80:23 80:23 81:17 82:3 82:9
**legally** 81:17
**length** 28:23
**lesser** 162:22
**letter** 13:4,9,10 14:18 15:4,13,16 15:23 16:2,21 17:8,10,19,21,22 19:2,4,5,11,14 20:7,8,16,19 31:17 82:23 86:23 87:2 94:17 95:21,23 96:2,4 147:7 162:9,17 233:16 234:1,3 238:4 239:4 251:23 260:18,20 270:4
**letters** 13:14 19:18 20:21,23 21:3 22:4
**letting** 83:1
**level** 125:16 134:14 242:20 243:1,2,10 244:2 246:9,12
**license** 281:22,22
**licensed** 100:20
**licenses** 100:22
**limit** 11:5
**limitations** 45:7
**limited** 167:10,19 168:17 171:4
**limits** 167:6 170:8,19 171:10
**line** 139:2 144:20 144:20 145:1,5,5 159:22 160:1,21 176:1 177:2 246:4 268:5 283:11,14,17,20 283:23 284:1,4,7 284:10,13
**link** 69:6 71:8,12 72:20
**list** 73:23 101:19 101:20 102:1,6 143:18,22 254:14 254:15,20 257:22 273:16
**listed** 38:1 55:22 61:12
**listen** 205:4
**listened** 115:9
**little** 35:5,21 108:11 172:9 185:10 191:18 196:17 204:22
**live** 208:23 219:12
**lived** 107:11 210:20
**living** 45:19 113:9 155:2 181:15 207:18,21 207:22 208:2,5,7 208:9,10,13,14 208:22 209:5,12 209:23 210:2,4 210:11,15,19 211:11 214:23 218:4,20,23 219:4,8,9,12,14
219:17 220:3,3,5 220:7,10 222:14 223:7 232:17,21 268:9
**llc** 3:4
**local** 62:2 103:7
**located** 220:22
**locations** 255:22
**log** 254:22
**long** 87:23 88:1,3 115:15 120:1 121:17,19 174:16 215:21 219:3 225:12 245:18 278:15,17
**look** 13:18 14:6 17:19 26:23 28:14,17 31:4,11 32:4,8,11,17 34:20 35:11 36:8 36:20 37:4 52:14 52:22 53:2 54:8 54:23 55:13 57:2 57:11,12 60:21 69:3,21 71:5 73:13 74:13 75:2 79:21 82:18 83:6 94:12,15 95:20 96:6 103:9,20 104:2,17 106:11 133:9,22 134:21 135:7 136:10,13 137:16 143:15 144:19 147:2,6 153:6 155:10 156:18 157:4,11 159:10,13,20 162:8,14 169:9

171:22 181:5 182:16 185:4,16 186:20 189:1 195:6 196:1 198:3,22 199:2 203:7 206:10,10 207:14 212:1 220:13,16 233:11 238:23 254:12 255:4,18 259:22 260:1,6 263:12 269:4,20
**looked** 12:11 35:15,16,18 38:4 77:3 134:3 153:8 155:7 157:9 260:10 275:1
**looking** 19:2 33:20 54:7 57:19 59:1 75:3 78:18 84:20 102:6 108:9 135:9 141:20 142:20 146:23 159:18,19 159:22 160:13 172:3 189:23 240:2 260:5 270:14
**looks** 17:21,23 18:5 29:14 30:11 56:16 61:10 137:23 138:7 139:5 142:2,3 149:22 171:1
**lose** 84:17
**loss** 11:2,2 12:11 26:18 27:1 30:20 33:11 35:7 52:13 52:18 70:9 75:6 84:21 85:6,12 86:14 88:17 89:17,18,19 101:3 102:4,10 102:12,16 103:3 105:16,17,18,19 105:21 121:20 122:7 135:21 148:3 162:20,23 168:22 171:14 172:10 177:2 202:21 205:23 209:13 211:19 217:10 259:20,23 263:21 266:16,21 266:23 269:7,18 276:19 278:22
**losses** 8:21,23 9:1 79:23 80:1,2,11 112:3,4 277:2 278:20
**lost** 23:4 26:20 31:19 32:11 33:5 37:22 48:9 139:1 162:11 164:11 167:4
**lot** 13:13 17:3 28:5 35:9,16 38:23 65:13 80:16 84:10 85:5 91:5 100:16 122:9 136:2 157:1 177:14 178:5 184:10 189:8 206:14 208:1 254:5 255:19
**lunch** 112:19 146:14

**m**

**ma'am** 89:15
**machine** 259:14
**maglia's** 75:5
**mail** 110:4,22 282:10,19
**mailing** 107:8 108:13
**main** 242:20 243:2 244:2 246:8,12
**maintain** 210:1 210:14
**major** 91:7 98:7 98:19,20,21
**making** 26:3 82:5 102:2 125:14 126:12 219:16 283:8,8
**management** 10:17 98:8,16 99:2,3 100:8
**manner** 148:3
**mantel** 137:23 140:4 141:8
**mantels** 138:3,21 139:2 147:9 148:13 149:12
**manual** 104:18
**manually** 282:8
**map** 80:3
**marbury** 87:12 115:15 116:4 118:12 174:17 228:16
**march** 226:6 227:5 235:2 238:6 239:19 242:16 246:1 254:16
**marked** 270:1
**market** 27:15 61:15 211:6 222:12
**marketing** 211:5
**markets** 211:1
**markup** 43:23
**massachusetts** 104:13
**master** 180:9 181:15 183:8 185:23 187:6
**master's** 98:16
**masterpiece** 26:7
**match** 73:4 74:2 261:23 262:4
**material** 158:17 246:8
**matter** 6:22 40:15 70:22 80:23 97:19 156:20 249:21 250:1
**max** 264:19 265:2
**mdm** 153:6
**mean** 10:5 12:14 13:13,14 15:9 20:13 21:14 25:21 30:3,7 32:8 32:14 33:8 36:8 37:15 40:4,16 41:17,17,20,21 42:12 43:17

45:18 51:7,19 53:13,17,20 55:13 57:22 58:4 58:5 59:13 60:8 62:11,12,17,19 64:23 65:9,17 70:20 72:1 74:12 76:12 78:1,2 79:20 80:3,12 81:1 85:13,20 87:18 89:7 92:12 93:8 99:11 100:14 101:1,10 102:5,9,22,23 103:4,7,12,14,17 109:22 111:10 113:12 114:7,23 115:8 116:13,15 117:7 123:7 125:16 126:7 130:7 133:15,21 135:7,12 138:5 139:13,15 142:1 143:20 145:2 152:7,11,13 153:11 156:13,19 163:19 164:2 165:20 166:11,11 166:22 167:14,21 168:7 169:2 173:12,16 177:20 177:21 178:3,6 182:4 184:8,12 184:18 186:14,23 191:8 193:18,18 193:19 206:7,9 208:19 209:2 210:21,22,23 211:20 213:5 214:13 217:8,15 217:20 218:5,23 219:18 222:15,16 224:4 229:2 234:16 237:15 238:1,1,3,5 240:11 241:9 243:14 245:17,17 247:15 252:13 254:4 257:2,10 260:9 266:9 270:21 271:13,20 273:1,15,17,22 274:20 276:18 278:8

**meaning** 235:9

**means** 54:8 137:2 166:1 199:21 241:11 270:22 281:6

**meant** 279:1

**measures** 101:20

**mechanical** 159:3

**media** 100:5

**meet** 158:2

**meeting** 25:5,8,19 67:16 83:5 114:21 115:13,17 115:20 116:5,8 118:7,8,22 119:23 120:3,6 122:20 174:15 175:4 177:20,21 183:2 276:22

**meetings** 167:2 276:9,23

**meets** 214:22

**memo** 183:18 186:7,18,19 268:5

**memory** 24:14 25:14 32:23 33:17 53:14 193:11

**mentioned** 30:23 113:21 118:15

**mentioning** 112:9

**merit** 99:6

**message** 70:6

**met** 67:12 87:10 105:20 119:13,14 228:19 235:1

**method** 152:12

**mhh** 1:6 6:20

**middle** 77:4 96:8

**midway** 155:18

**million** 11:9,9,11 11:14 15:20 80:3 80:4,4,5,5,5 135:1,2 142:10 145:20 146:2,3,9

**mine** 11:8 62:20 70:16 199:7 239:21

**minimal** 29:1

**minor** 98:7

**minus** 30:22

**minute** 18:11 37:9,13,16 66:8 68:14,14 147:3 149:8 157:12 162:11 248:19 261:22

**minutes** 188:13 248:22

**mischaracterizes** 45:2 223:10

**misleading** 202:17

**mispronouncing** 21:6

**missing** 199:5 246:4

**misspoke** 176:14

**mistake** 56:18,19 73:2 266:8,13

**mistaken** 227:16 227:22 228:3,5

**mistakes** 56:9 108:4 265:21 266:9

**misunderstandi...** 251:15

**mobilized** 261:12

**mold** 235:14,14 246:7

**moment** 16:5 18:13 30:23 41:18 57:21 115:12 152:2 188:20

**moncrief** 196:10

**monday** 105:19

**monetary** 11:5

**money** 48:7,15 49:3 230:12 264:16 266:2,8 276:11,12,18

**moneys** 96:13

**montgomery** 278:21

**month** 177:23 224:6,7,9
**monthly** 221:4
**months** 89:14 99:1 120:13 139:15 212:23 225:15,20 228:12 237:20
**morris** 175:18
**moss** 3:8 7:9,10 7:22 12:20 13:6 16:10,21,22 17:3 17:13 18:10,14 22:2,6,18 23:20 24:21 31:3,8,15 32:13 37:8 39:18 40:6,14,20 41:16 42:8 43:13 44:4,6 44:13 45:1 46:9 49:15 51:3,14 57:17 58:2 60:2 60:16,19 61:3 70:15,19 75:23 76:17 78:11,13 80:21 81:9,15,20 82:2 93:14 95:9 95:23 97:9 101:18 113:18 114:9,15 125:12 127:13,15 128:21 129:15,19 130:1 130:6,22 131:5 131:11,15,22 132:5,11,18 135:4,15 140:16 140:22 141:14 142:3,6 143:3 145:9 149:4,10 151:12 154:4,6 154:15 155:13 156:1,8,12 158:4 159:2 163:18 164:2,6 165:8,17 166:8,19 169:4 173:7 176:11,17 178:23 179:12,15 183:23 187:2 189:14 190:12 191:4,13,22 192:3,7,10,16,19 193:9,16 200:15 200:20 201:9,23 202:11,15 203:13 203:17 204:3,10 204:18 205:1,7 205:14 206:4,17 206:21 209:21 211:3,16 214:5 222:1 223:6,9 224:16,18,22 226:17,20 227:18 227:21 228:6 230:16 231:5 232:5,7 248:21 252:10 265:4 275:15,21 276:6 276:14 277:5,10 277:15 278:1 280:6 282:1
**motion** 128:23 129:11
**mountain** 61:16 61:21 65:8,13 66:13 128:12 210:21 221:1 222:15,17,19
**move** 22:19 166:23 181:18 204:23 244:10 245:8,9,10 254:8 266:8 273:7
**moved** 156:15 264:10 266:2
**mover** 106:16
**moving** 66:21 106:14 187:2 255:21,21 256:12 257:13
**multiple** 32:7 49:17 179:20 184:1 278:8

**n**

**n** 1:14 3:1
**n.e.** 3:10
**name** 7:9 9:11 41:8 65:9 87:13 239:20,21 240:1
**names** 66:15
**nancy** 173:13
**narrative** 102:4
**national** 99:5,23
**nature** 9:8 197:18
**near** 277:8
**necessary** 2:5 44:15 94:20 96:15 209:23 210:14 283:9
**need** 14:1 35:1 64:3 70:8 74:13 116:11 117:11 147:17 149:4,6 161:19 186:1 187:13 198:14 207:1 214:16 220:21 245:2,15 266:8,20
**needed** 113:9 121:6,8,9 180:16 180:19 191:2 194:22 195:4 197:18 216:19 218:15
**needs** 70:7 201:18
**negotiate** 252:13
**negotiated** 252:5
**negotiating** 161:13 236:5,10 251:18
**neighbors** 88:12
**neither** 281:13
**net** 84:15
**never** 63:23 65:20,22 66:3 74:6 86:11 92:18 95:6 97:23 134:23 156:23 189:12 190:15 220:11 245:1 248:4 273:12
**new** 37:21 85:19 86:2,10 115:3 166:1 172:10 183:12 195:17 215:14 253:1
**night** 91:12
**nobody's** 107:11 200:16
**normal** 9:17,18 178:4 209:23 210:3,11 222:5

222:11,18,19
**normally** 35:6 36:13 38:11 216:18 224:5 255:9
**norman** 1:22 6:7
**northern** 1:1
**notarized** 282:10
**notary** 1:21 6:2 284:23
**note** 56:4 106:12 106:13,18 110:19 137:11 141:2 162:20 172:18 257:10,17 266:7
**noted** 51:22 283:4,5
**notes** 25:5 26:4 105:14 139:6 143:16
**notice** 2:14 20:13 111:22 112:6
**notify** 111:19,19
**notifying** 236:7
**noting** 282:7
**november** 2:2 6:10,17 8:11 83:3 87:1
**number** 1:5 10:8 80:13 113:21 137:20 138:6,7,9 138:12 167:19 168:18 254:23
**numbered** 147:8
**numbers** 52:15

**o**

**o** 1:14
**o'clock** 145:13
**o'connor** 3:9 7:10
**oath** 24:19,20 25:11 79:5 194:11
**object** 16:22 22:18 39:18 40:6 41:16 42:8 43:13 44:4,6,13 45:1,6 49:15 51:3,14 57:17 58:2 60:2 75:23 76:17 80:21 81:3,5 85:18 93:14 95:9 101:18 125:12 127:13 128:21 135:4,15 151:12 154:4 155:13 156:1,8 158:4 159:2 163:18 165:8,17 166:8 176:17 178:23 189:14 191:4,13 191:22 193:9,16 200:15 202:11,15 203:13,17 204:10 204:18,22 206:4 211:3,16 222:1 223:9 226:17 230:16 231:5 252:10 265:4 275:15,21 276:14 277:5,10
**objection** 34:9 40:20 130:23 131:7 132:6,12 224:12,23 237:13
**objectionable** 276:7
**objections** 2:6,9 164:7 277:22
**obligated** 94:18
**obtain** 41:15 42:17
**obtained** 226:9
**obviously** 56:17 58:10 84:13 85:15 139:14 152:15
**occurred** 105:22
**occurring** 281:11
**occurs** 162:21
**odds** 189:8
**odor** 24:10 89:23 89:23 91:3,6,16 123:7,9 124:13 124:15 125:2,3,4 125:6,8,23 127:7 127:12 128:3,18 132:9 136:21 252:6
**odors** 91:11
**offer** 12:19 15:19 16:3,8 157:22 201:12 220:19
**offered** 2:11 71:20 83:20 158:5 237:12
**offers** 158:1
**office** 10:13 107:23 108:7 109:7,17 183:8
**offices** 282:3,10
**offsite** 151:16,21 156:15
**oh** 12:1 19:21,23 23:14 27:18 63:8 67:14 70:2,19 74:16 82:19 88:5 119:4 126:10 141:13 163:23 168:15 209:9 224:22 225:18 230:12 231:17 250:1,20 265:21
**okay** 8:9,13,19 9:11 10:14 11:18 12:3 13:7 14:5 15:12 16:9,19 17:16 18:23 19:13 21:2,5,8 22:1,8,12,23 23:5 23:12,15 24:12 25:4,9 26:6,19 27:5,17 28:2,4 29:3,9 30:6 33:19 34:11,19 35:11 35:20,23 36:11 36:20 38:4,9,21 39:5,23 41:12 46:1,13,15,19 47:3,9 49:1 50:20 50:22 52:21 53:2 53:7 54:9,17 55:5 55:16 56:23 57:6 57:10,11 59:3,9 59:12,15 60:18 62:9 64:22 65:10 68:12 69:9,22 70:2,5,14,15 71:6 71:10,14 72:22

73:13,15,18 74:2
74:6,17 77:1,20
78:7,17 79:15
80:10,18 82:20
84:9 85:2,4,9,23
86:21 87:6,16
89:6 91:1,7 94:4
94:8 95:5,14,19
96:17 97:20 98:2
98:14,18 99:1,14
99:21 100:13
101:16 102:14
105:3 106:20
107:10,22 108:21
109:20 110:11
112:7,10,16
113:16 114:8
116:12 117:6,20
118:16 119:11,16
120:5 121:14
122:16 123:23
125:7 126:1,23
127:6,7 128:2,8
128:11 130:6
131:22 132:13,19
133:8,12,20
136:20 137:14,17
138:15,21 140:15
140:16 141:13,22
142:23 143:19
144:1,6,19 145:1
145:8 146:1,8,12
149:6 150:14
158:15,23 159:16
159:21 160:20
161:1 162:6,7,10
162:11 163:4,16
164:18 166:12
169:11,21 170:17
172:6 173:5,22
174:15 175:9,13
175:20 177:13
178:9 179:6,17
181:7,13,21
182:8,18 183:20
185:17 186:3,14
186:22 187:5
188:17 189:23
193:13,23 194:3
194:14 195:10,13
195:19 196:3
197:1,3,10 198:8
199:3,14 207:16
208:17 209:7
210:23 211:13
212:19 213:16,18
215:8 216:14
217:17 218:13
219:6 221:8
223:5,15 224:3
224:12 225:4
227:6,11,17
229:15,21 230:1
230:7,12,23
231:2,17,23
232:6,11,19
233:7,13,15,18
233:22 234:2,6
237:6 239:13,15
239:23 240:5
241:8 242:1,23
243:5,13,16,17
243:23 244:6,15
245:16 246:1,6
246:11 248:4,15
248:21 251:21
253:11 254:7
255:6 257:18
258:1 259:22
260:4,23 262:17
263:11,22 264:14
266:20 267:8
268:23 269:4,13
270:2,3,10,16
272:21 273:7,8
274:7,15 276:9
276:22

**old** 26:20 27:7,10 27:12,22 31:1 139:10 274:23

**once** 11:16 105:14 166:13,16 247:9 258:20 282:10

**ones** 57:20 217:9 223:23

**onion** 122:12,15 196:20

**online** 134:4 221:15

**opine** 126:2

**opined** 149:20

**opinion** 14:15 15:6 22:14 81:2 148:22,23 151:20 154:7,12,14 157:10,14 158:7 234:16,17,20

**opinioned** 121:19

**opinions** 138:19

**opportunity** 22:16 157:11,15 157:22 158:5 231:12 272:9

**opposed** 204:15 229:8

**option** 43:2 165:10

**options** 54:2

**oral** 6:12

**order** 48:1 50:14 129:11

**ordered** 112:19

**ordering** 282:13

**origin** 102:23

**original** 28:6 29:7,8,13 34:15 35:22 44:19 45:18 46:14 47:13 50:1 54:15 77:17 78:3 108:13 147:23 151:18 204:13,16 206:1 225:9,10 282:13,15

**originally** 48:8

**originated** 103:2

**ought** 106:3 126:3

**outline** 70:8 83:11

**outside** 53:1 61:18,23 62:2 240:18

**outstanding** 155:2

**overcharging** 255:5

**overlooked** 108:12 235:17

**overruled** 228:18

**owe** 27:12 43:3 50:8 51:16 78:5 201:20 272:7
**owed** 18:1
**owes** 52:8 76:20

**p**

**p** 1:14 3:1,1
**p.m.** 113:1,2 145:15,16 146:19 146:20 207:7,8 249:3,4 279:22 279:23 280:11
**p.o.box** 3:5
**pacific** 1:7 6:23 7:11 79:13 94:18 95:5 96:7 147:15 162:21 211:1,7
**pacific's** 147:23
**pack** 87:10 255:10
**packed** 211:18 264:10
**packing** 257:13 257:21
**page** 28:18,21 69:23 70:3,17 73:18 83:7 94:15 95:22 147:6 148:5 162:12 172:3,3 181:22 182:22 196:5,7 208:11 236:2 237:3,5 239:14 240:4 274:9 281:11 282:18 283:11,14,17,20 283:23 284:1,4,7 284:10,13
**pages** 70:18 255:19 283:9
**paid** 28:6 29:10 29:12 30:11 39:1 40:4,22 41:1 42:7 42:11 45:12,15 47:12 48:1,8,11 48:11,22 49:5,21 50:12 51:19 52:11 96:12 130:20 132:3 145:20 146:10 200:2 202:5,9,13 202:22,22,23 203:12,16 204:14 204:16 205:23 210:4 213:12 216:10,16 218:21 220:11 221:18 222:22,23 223:14 224:11 230:12,20 230:21 266:17,18 267:2,7 269:10 269:19,19
**paint** 123:21 134:15 161:18 219:18 220:11
**painted** 219:7,13 220:4
**painting** 161:15
**palk** 175:16,20 176:9,20,21 177:12 178:2,11 178:14,21 184:13 186:8,10,15
**palk's** 183:18
**panel** 58:5
**panels** 148:14
**paragraph** 28:21 73:19 77:1,4 94:16 95:20 96:3 96:6,7 106:13 147:8,11 162:14 162:15,16 234:7 235:8 236:2 237:4,5
**parameters** 19:15
**paris** 3:4 7:7 78:14,17,21
**park** 1:23 6:8
**part** 44:10 81:10 83:23 84:1 90:22 101:5 110:14,15 110:16 124:20 142:17 184:15 187:20 208:10 210:12 256:1
**participation** 13:1
**particular** 42:10 63:3
**parties** 1:16 2:9 281:14 282:13
**partner** 7:7
**parts** 122:2
**party** 34:1
**passing** 197:4
**paul** 128:8 149:20 150:10
**pay** 18:5 27:23 29:8,11 47:3,7 49:13 77:21 92:16 93:2 94:18 95:6,16,17 97:21 125:8 126:3,6 127:11,16,21 130:20 132:2 136:22 146:3 153:21 154:1 162:4,21 167:4 202:6,7 203:21 204:8 206:2,6 209:1 215:9 221:20,21 222:7 223:1 229:19,23 230:15 231:3 232:2 276:11,17
**paying** 30:4 136:21 224:5,6 224:13 279:10
**payment** 11:10 30:20 31:20 32:10 75:5 95:11 110:7,10 137:2 144:14 256:20 257:7 258:19 265:14 269:3 271:7 272:8,14
**payments** 105:15 106:6,9 259:16 259:18 260:8 266:10 268:2,19 271:6
**pays** 42:2 46:11 203:21
**pdf** 282:7
**pdr** 150:9,10 155:5
**peachtree** 3:10
**peel** 122:11,15 196:20

**pending** 194:9 206:18 271:2
**people** 53:21,22 64:10 65:4 84:14 84:17 104:4 112:11,12 120:2 124:10 126:5,7 134:20 156:17 169:22 184:10 211:2,10,21 261:13 264:5 277:1
**people's** 277:6,11
**percent** 20:7,16 74:23 75:5 138:4 139:4 141:23 142:7,11,14,20 143:1,6 145:2 148:7,10 158:14 158:18,19,21,22 159:7,11,13,23 160:3,9,11,14,14 160:17,20 161:2 164:21 217:21
**perfect** 146:15
**perform** 101:8
**performance** 101:12 104:23
**performing** 234:15
**period** 19:2 213:4 225:10
**permanent** 209:14 218:6
**permission** 147:6
**permitted** 129:4
**person** 10:12 149:19 153:4 256:12 259:2
**personal** 70:9 97:10
**personally** 120:16 178:7 259:15
**phone** 18:12 24:23 25:1,9 62:11,12 63:1 110:18 237:16
**photo** 57:20
**photos** 12:10 57:10,22 71:21 72:4 73:3 102:3 105:17 106:1 111:6,13
**phrase** 39:22 122:11 234:12 275:8
**physical** 160:18 186:1 187:8 188:7,12
**physically** 256:17 256:19 268:7
**pick** 53:11 259:2
**picture** 55:17 56:1,4 57:19 73:6
**pictures** 57:8 71:8,13 72:18 74:1,3,22 274:17
**place** 1:23 6:8,21 86:16 212:22
**places** 213:10
**plaintiff** 7:8
**plaintiff's** 4:6 14:11 19:7 28:11 34:16 37:1 55:10 68:22 69:17 71:1 73:10 82:14,15 94:9 104:14 136:6 141:16 169:6 171:19 175:6 181:2 182:13 185:1 195:21 197:22 198:19 207:11 233:8 238:20 254:9 274:2
**plaintiffs** 1:4 3:3
**plan** 183:9,10,12
**planning** 202:3
**play** 13:8 21:12 104:22
**playing** 203:18 275:13
**please** 7:1,14,14 28:15 55:14 69:3 69:21 71:12 79:19 81:3,8 82:22 94:13 104:19 131:16 138:2 143:17 169:10 181:6 182:17 183:11 196:2 205:13,17 239:1 254:13 256:6 267:15 282:10,18 283:9 283:9
**pleasure** 234:10
**plenty** 168:22
**plumbing** 141:20 141:23 142:8,11 142:15 143:1,16 144:4 147:9 149:12 158:10
**plus** 43:23
**point** 27:21 76:1 121:13 122:8 126:16 156:19 162:2 189:16 223:17 234:3,14 237:10 238:2,4 246:19 247:3 274:22
**pointed** 56:15 236:12
**pointing** 194:3,4 223:6
**policies** 31:5,9 38:23 211:1 235:14
**policy** 18:2 26:7 26:12 30:14,15 31:2,4,10 39:3,4 39:8,15 43:3 50:18 76:23 77:9 82:13 96:13 102:12 107:9 162:21 163:9,20 163:20 167:4,6 177:3 207:17 208:2,5 209:13 210:5 218:21 235:16
**porch** 88:15 241:4
**portion** 131:18 205:19 256:16
**posed** 153:14
**position** 8:10 10:15 16:18 23:3 23:18 83:15 96:19 101:11

**positions** 13:8 14:17
**possibility** 89:22
**possibly** 75:22 213:5 253:8
**potential** 121:18 122:4
**practice** 62:21 220:3
**practices** 102:7 104:18,20
**preference** 104:7
**premarked** 14:12 19:8 28:12 34:17 37:2 55:11 68:23 69:18 71:2 73:11 82:16 94:10 104:15 136:7 169:7 171:20 175:7 181:3 182:14 185:2 195:22 197:23 198:20 207:12 233:9 238:21 254:10 274:3
**prep** 225:13
**preparation** 16:21 19:18
**prepared** 33:10 136:17
**prerogative** 205:11
**present** 3:12 24:18 135:23 181:1
**presented** 28:10 33:21 60:5 93:16 95:10 97:23 137:10 170:5 171:5,8 213:5
**presenting** 102:4 235:6
**pretty** 11:19 35:11 168:2 239:7
**previous** 23:1 51:1 185:14 235:8 245:13
**price** 55:4 58:9 68:1 140:1 148:9 201:20 254:14,15 254:20
**prices** 37:23 39:21 54:18
**pricing** 55:7 56:5 273:13 275:5
**primarily** 133:12
**print** 35:21 108:23 110:3 282:8
**printed** 259:12
**prior** 2:12 26:17 79:16 136:3
**privilege** 17:5
**privileged** 17:1
**probably** 14:9 56:13 61:18 62:11 64:20 80:11 157:21 225:18,19 232:3 232:5 234:11
**problem** 225:1,5
**procedurally** 15:8
**procedure** 6:5 9:18 283:6
**procedures** 9:17
**proceeding** 281:5
**proceedings** 6:14 281:11
**process** 84:3,6 122:21 123:4,6 124:8,9,12,14,16 124:20 125:3,9 127:7 128:3 185:22 252:7
**produced** 281:7
**product** 41:11 43:11 155:2 173:21 174:1
**production** 282:20
**professional** 277:20,20
**program** 100:15 111:2 259:2
**promenade** 3:9
**promise** 277:22
**promoted** 23:2
**promotion** 23:2
**proof** 262:3
**properly** 258:8
**properties** 217:4 220:19,22 221:1
**property** 9:14 86:17 92:13 160:19 219:16 230:7,8,11,11
**proposal** 63:4 83:12,20 84:7 146:11 199:10,17 199:21 200:4,8 200:11 201:5,15 203:16,20,21 241:4 275:14,19
**protective** 129:11
**protocol** 190:5 240:9,12,13,17 243:20
**provide** 44:9 77:16 143:17 158:7 159:4 197:8 264:13 271:8 272:10
**provided** 6:4 12:19 15:3,8 33:7 45:8 47:11 57:4 63:21 76:19 150:15 154:12 175:14
**provision** 207:17
**public** 1:21 6:2 284:23
**pull** 138:23
**pulled** 117:16
**purchase** 212:16 213:7 219:2
**purchased** 65:15 224:14,16,20
**purpose** 120:5 218:19
**purposes** 137:20 144:7 222:21
**pursuant** 283:6
**put** 16:7 17:10 26:17 46:22 65:4 100:4 110:19 151:3 152:10 165:6,15 170:17 212:1 217:22 225:13 230:2,14 230:23 258:20

264:23 265:7
**puts** 46:20
**putting** 45:7 161:16 217:16

**q**

**qualifications** 133:9 134:10 135:20 155:1
**qualified** 134:5,8
**quality** 27:4,6 28:3 51:6,18 52:3 55:21 134:15 135:12 151:3 152:19 153:11,12 154:18,20 157:18 157:20 163:17 212:8
**question** 10:4,10 11:5 17:14,15,16 24:15 32:18 39:19 44:1 45:4,5 46:7,10 49:19,23 81:10 82:5 86:6 92:8 95:15 97:11 97:14 114:9,15 124:12 126:19 130:18 131:13,15 153:14 164:10 165:5,14,18 166:11 167:16 168:10,13,15 169:4 178:20 179:8 183:23 186:17 187:4 188:3 192:1,8,17 192:23 193:1,17 201:2 204:19 205:2,6,9,12,16 205:18 206:17 227:1 244:22 245:4,13,23 248:1 271:20 273:2 275:17,22 276:1,4 277:16 278:4,11
**questioning** 192:14
**questions** 2:7,8 17:4 53:22 56:5 90:10 129:7 131:12 157:1 184:5 192:21 245:18 247:6 278:2 280:4
**quick** 79:1 145:9
**quit** 228:23
**quite** 17:21
**quote** 75:7 174:23 175:1

**r**

**r** 3:1 23:12,13,15 281:1
**random** 58:10
**randomly** 276:17
**range** 152:18
**rate** 254:23
**reach** 144:3
**reaching** 148:8
**read** 7:21,22 37:10,16 73:16 73:20,22 131:16 131:19 133:23 148:10 172:4,7,8 175:19 205:5,13 205:17,20 208:5 252:14 280:7 282:6 283:2
**reading** 77:5 140:13 196:8 234:2 238:6 239:5 240:15
**real** 79:1 97:15
**really** 13:16 46:9 56:17 89:12 117:1 122:9 130:4 199:12 227:4
**reason** 14:21 87:17 117:5 127:20 173:23 224:2 283:13,16 283:19,22 284:3 284:6,9,12,15
**reasonable** 42:6 43:17 44:1,21 83:15 113:13 136:1 209:19,22 210:10 221:16 222:10
**reasons** 136:21 183:12 283:8
**rebuild** 95:7 162:23 225:17
**rebuilt** 125:10 130:16
**recall** 16:20 20:6 25:3,6,7,13 26:3 33:19 35:14 36:3 36:7 37:8 55:5,23 56:6 60:23 61:6 62:3 68:1 71:14 71:22 72:1,17 74:4,14,16 79:4,8 87:7 88:8 91:14 97:5,7,12 99:19 99:22,23 102:20 113:5,11 114:5 114:20 116:21 118:11 182:7 203:8,9,10,14,15 223:4,5 229:13 252:3 253:16 265:16 276:15
**receive** 64:18
**received** 54:6,10 106:13 199:16 201:8
**recessed** 68:18 113:1 145:15 146:19 207:7 249:3 279:22
**recollection** 32:5 113:22 130:8 183:21 186:9
**recommendation** 66:6
**recommended** 133:5
**recommending** 250:23 251:4
**reconcile** 269:11
**reconstruction** 145:21
**record** 6:17 7:2 58:18 62:9 64:12 68:16,21 112:22 113:4 114:3 131:19 132:16 145:13,18 146:17 146:22 205:20

207:4,5,10 221:13 249:1,6 257:8 266:5 279:16,20 280:2
**recorded** 221:14
**records** 186:13 221:8 256:21 269:5
**reduce** 245:1 247:1
**reduced** 236:16 236:17 245:22 252:18
**reducing** 245:20
**reduction** 238:11 238:18 252:20
**refer** 26:12 61:22 105:3 123:5 186:12 207:23 278:6
**reference** 139:16 141:14 234:14 248:13 253:5
**referenced** 79:6 170:14
**references** 79:2
**referencing** 38:2 163:2
**referred** 61:19 105:5 138:20 194:5 202:8 209:5
**referring** 16:5 32:16 33:6,15,18 137:4 141:15,16 152:12 174:5 178:3 186:11 214:8,11,14
241:6,10 273:5
**refinish** 161:6,18
**refinished** 64:4 151:17
**reflect** 258:16
**reflecting** 75:4
**reflects** 193:10
**refresh** 113:21 183:20
**refrigerator** 135:8
**refuse** 206:6
**refused** 125:8 132:2 206:2 230:15
**regarding** 24:9 73:20 77:2 147:16 236:4
**regardless** 119:9 119:22 222:13
**regular** 44:10
**reinspect** 157:22 237:19
**reinspection** 121:3
**reinspections** 114:23 179:20
**reinstall** 154:10 161:19 231:8,20 232:2
**reinstallation** 140:7
**reinstalled** 140:6 230:18 232:10
**reinstalling** 231:4
**relate** 90:13
**related** 101:10
**relates** 17:7 82:8
**relative** 40:12
**relayed** 85:18 87:19 91:17
**relevance** 43:14 273:16
**relevant** 40:19 42:20
**rely** 66:4
**remaining** 122:22 123:19
**remediation** 94:17,22 122:21 123:3 130:18
**remember** 21:23 23:20,22 24:4,14 25:21,22,23 33:3 35:6 53:15 55:8 60:20 67:10,16 87:13 90:22 91:2 92:18,19 101:23 108:10 113:16,19 114:6,10,14 115:1,5 118:1 119:18,19 120:2 121:16 126:23 130:4,5 131:2,6 172:22 173:3,9 177:11 178:18 179:2,4,7,10,11 179:14,16 183:13 184:7,12 186:14 212:8 228:18 249:10,12
**remind** 110:20
**removal** 24:10 120:8 124:14,15 125:4,6,8,23
127:7,12,17 128:1,3,3,18,18 136:21 155:16,18 195:2
**remove** 123:12 123:14,16 147:22 148:19 187:17 197:20 243:13 246:7
**removed** 139:6 140:4,6 150:20 158:7 183:4
**removing** 123:7 150:6 252:7
**rent** 221:19,21 222:7,17,23 224:13
**rental** 212:2,13 213:2 214:15 216:3,17 217:3 217:12,15,16 219:7 220:23 221:5,9 222:5,5,6 223:22 232:16
**rentals** 222:19
**rented** 224:14,20
**renting** 212:10,12 218:7 221:6
**repair** 63:5 66:1 75:5 91:11 92:20 92:23 93:3,11,16 93:17,18,23 95:10,12,16 96:15 97:3,3 124:17,20,22 126:3,13,20 127:8,11 130:21 132:3 142:17

145:22 161:23 162:1,3,23 163:4 163:5,13 164:12 164:16 165:11,12 165:22 166:6,16 197:8 198:16 201:21 219:16 225:9 226:12 227:8,12
**repairable** 93:7
**repaired** 93:13 94:5 96:9 165:12 166:10,13 231:9
**repairing** 165:4 165:19 277:3 279:7
**repairs** 94:19,19 95:3 154:11
**repeat** 17:16 61:4 163:8 201:2
**rephrase** 131:21 131:23
**replace** 27:2,12 27:20 28:1 30:13 30:17,19 38:20 46:17 47:1,4,20 48:3,14,21 49:10 50:4,10,15,19 65:5 75:20 76:11 76:15 91:20,21 91:23 96:10 144:4 147:22 161:9 162:23 165:11 196:18 217:9 271:18
**replaced** 27:13 30:8 38:22 147:17 198:14 243:8
**replacement** 26:11 27:3 29:2 29:13,17 30:16 35:22 36:5 38:8 38:17 39:6,14 41:4,11,19 42:13 43:4 44:16,20,21 46:20,22 48:23 50:14,18 51:9 52:2 53:3 54:12 55:19,20 59:21 61:1,7 62:14,22 63:4,19 64:13 69:11 75:11,17 76:7,21,23 77:2,8 77:10 78:6 92:5 130:20,21 137:9 137:22 153:22 154:2 161:21 162:4 163:6,10 163:12 164:14,23 165:7,16,20,23 166:7 198:13 215:4,12 216:22 268:16 272:1 274:12 275:19
**replacing** 30:15 163:16 165:3 243:9
**replied** 234:13
**report** 10:18 11:12 12:9 34:3,5 34:9 53:1 57:4,13 66:15 71:9 105:8 139:8 159:5 172:2 182:1 189:19 190:6,16 191:7,11,14 194:10,14
**reported** 9:21,22 9:22 22:20 23:6 24:1 172:17
**reporter** 1:20 2:16 6:2 7:3,20 78:16 131:20 205:21
**reports** 23:8 60:7
**represent** 7:3,6 7:10,12
**represented** 105:10
**represents** 281:9
**request** 40:3 43:18 106:20 107:14 110:1 114:14 143:21 243:12 259:6,8 259:10 267:13
**requested** 59:10 59:10 131:18 205:19 274:16 282:6
**require** 196:17
**required** 124:18 124:19,21,22 162:22 190:7
**requirement** 124:5,6 125:22
**requires** 162:21
**reservations** 234:22
**reserve** 11:7
**reset** 148:2
**residence** 160:22
**residential** 84:10
**residue** 181:17
**resolved** 74:6
**respective** 1:16
**respond** 71:12 181:21 277:15
**responding** 56:10
**response** 92:7 96:4 115:12 167:18 199:14 244:23 250:18 270:15
**responsibilities** 8:20 9:4
**responsibility** 219:20,23 282:6
**rest** 108:1 235:3 270:11
**restoration** 149:21 150:10 213:9 215:20 278:16
**restore** 65:5 172:16
**restorer** 53:6 61:20
**restroom** 207:2
**result** 281:16
**retain** 235:2
**retrim** 161:18
**returned** 282:12 282:15
**reupholstered** 64:5
**reuse** 156:19,20 156:21 157:10 161:5 164:23 165:7,16

**reused** 148:18 149:16 150:23 153:13,15,17,21 157:19 158:18,20 159:1,7 160:6,15
**reusing** 163:13
**review** 15:12,15 17:22 34:6,13 35:18 101:17 105:17,18 147:11 257:20 271:2 282:7
**reviewed** 28:22 34:13 137:12 182:2 202:5 257:11,12
**reviewing** 257:22
**revise** 57:1,1
**revised** 204:7 237:8 244:13
**revising** 244:19
**revisit** 237:19
**revolved** 223:16
**reyer** 1:19 6:1 281:21
**rfi** 143:17
**ridge** 1:23 6:8
**right** 7:4,13 8:3 12:5,13 15:1 16:7 16:12 20:9,11,20 21:20 24:3,7 25:16 26:4,14 27:14,19 28:16 30:4,17 33:2 34:5 36:18 38:7 39:2,9 39:12,13,20 40:1 41:13,22 43:7,7 47:18 50:3,7,13 50:23 52:7,10 53:19,21 54:21 59:7,8 60:1 62:6 62:13 63:11 66:1 66:23 67:11,13 69:8,20 72:5,13 74:21 75:1 76:20 77:7 78:10,23 79:3,9 80:14 82:13 84:4,16 85:16 92:6,6 94:3 95:15,20 96:8 99:5 100:2,10 101:22 103:4 107:14 108:10,23 109:1 110:9 111:9,15 112:21 113:6 115:1,22 116:20 119:3 120:18 123:10 124:4 125:5 127:20 128:6 129:21 133:19 134:1 135:10 136:4,18 137:11 138:15,23 142:23 143:15 145:12 146:6,14,16 147:13 148:11 149:11,19 150:11 155:17 159:14 162:19 164:13,18 166:3,4,23 170:1 170:20,22 171:1 173:11 174:22 175:13 176:22 178:1,17 187:1 188:6 189:23 190:2,23 191:19 191:21 194:10 195:6,8 196:16 196:21 198:2,6 201:8,14,17 202:12,19 203:1 206:20 207:3 208:8 209:11 210:10 212:12,22 217:1 218:11,13 220:8,13 221:15 223:19 225:1 226:19,21 228:21 230:22 232:12,13 234:18 237:17 239:10 240:3 241:12 242:11,15 244:3,9,12 245:6 246:18 250:3 251:8 253:9,17 254:7 256:2,23 258:17 259:1,9 262:2 263:1 267:12 268:3,22 270:16,20 271:7 273:6,21 274:1 275:1 279:19 280:5,8
**road** 213:1 223:8 223:18,21 229:18 230:8,11 232:20 232:22
**role** 8:20 10:22 13:8 16:13,17,19 21:11 81:12 104:22
**roof** 122:2
**roofing** 196:18
**room** 181:15
**rudoshko** 21:5,6 21:22
**rug** 61:12,15 65:7 65:11,12,16 66:11 75:14 76:2 76:6 77:11,22 216:19,19
**rugs** 61:12,14 65:15,18 66:1,11 68:5 75:8,9 77:3 77:3,8 216:14
**rule** 283:6,7
**rules** 6:5
**ruling** 129:2
**rushing** 239:4

**s**

**s** 1:14,14 3:1
**saith** 280:13
**satisfactory** 234:15
**satisfied** 234:9,19
**save** 49:2 246:7
**saw** 8:22 37:14 106:1 171:4 188:18 273:22
**saying** 16:6 30:9 30:12 31:8 32:15 33:18 37:18 38:16 41:18 43:9 44:20 55:3 58:6 58:21 60:9 62:5 72:2,10 76:9,10 76:11 78:9 79:10 88:20 91:10 109:7 114:6

115:5 117:16 118:13 120:10,14 121:17 133:1 137:11 149:4 150:5 151:13 160:14 174:3,4 178:1,8,11,13 179:9,10 180:18 187:18 191:10 199:15 200:5 203:16 227:9 228:4 230:21 231:15 241:10 242:5 244:1 252:23 256:11 263:4 265:16 272:11,12 276:15

**says** 18:3 30:4 38:23 39:8 41:9 46:16,21,23 60:10 70:7 71:16 75:4 83:9 86:23 87:2,4 104:5 109:9 136:18 137:19 138:3,16 138:22 140:1,4 140:20,21 141:2 141:7,11,17,19 147:13 148:5 169:3 170:4 172:4 175:23 176:22 189:17 194:9,10 196:19 198:12 201:12 208:2 235:4,5,5 235:22 236:3 237:2,7 240:6 244:9 245:5,7,9 252:14 254:14,20 255:19 257:18 260:11 263:3 269:15 270:12 271:12,17,23 272:7,18,19,23

**scene** 174:8,11

**schedule** 83:3

**scope** 116:1 127:5 180:1,22 182:1 195:18 236:9,14 238:1,12,18 244:19 245:20,22 247:1,4,10 248:7 249:8 251:18 252:6,12,13,18 252:21 253:2

**scopes** 143:13

**se** 97:2

**seal** 123:18 282:12

**sealed** 243:3

**sealing** 122:22 123:5

**second** 60:22 67:18,22 70:17 73:16,18,19 77:4 83:6 95:5 96:7 105:22 114:17,17 114:21 139:10,13 141:8,15 143:11 147:4 162:13 172:10 175:4,12 183:1 185:12,15 196:6 221:19 234:6 236:1,18 236:18 237:15,18 237:23 243:1,10 248:16 253:4 254:8

**secret** 238:9,12 238:14

**security** 90:10 230:17

**see** 13:10,16 19:4 23:14 28:18 30:2 34:12 35:5,9,9 36:1 52:17,22 56:10,17 57:14 60:3,3 94:20 95:1 96:4,16 101:7 106:2 122:12 134:11 135:1 138:14 139:21 144:16 148:7 150:9 151:13 153:6,9 155:23 160:17 168:23 178:12 180:9 181:17,18 202:20 202:20 206:7 207:20 227:14 229:11 233:13 238:3 241:9,14 241:22 245:14 246:2 254:5,16 262:20 263:10,15 264:3 268:6,7 270:11 272:17 273:21 274:8

**seeing** 35:14 89:1 89:4 139:23 167:20 168:18 205:22

**seen** 8:13 37:8 59:22 135:20,21 167:5 170:18 217:15 233:19

**selection** 222:21

**sell** 43:12 51:11 65:18,20,21 75:22

**sellers** 52:18

**selling** 42:12,15 42:18,19,23 51:8

**sells** 41:23

**semesters** 99:2 100:5

**send** 12:9 15:23 55:22 56:1 58:14 62:18 63:23 64:20 69:5 72:4 72:11,17,19 102:18 107:1,6 108:13 113:17 133:10 206:9 232:4 236:20 238:10 244:1,13 252:11,22 254:5 255:9 282:13

**sending** 55:23 236:22 253:12

**sends** 107:22 245:7

**senior** 8:13,17

**sent** 15:4 30:9 33:7 54:14,22 55:1 58:11,20,22 62:18 63:12 64:16,21 72:3 74:10 75:14 107:15 108:5 134:2 143:21 150:4 169:3

235:18 237:9,16 243:18 248:5 251:23 252:20 253:13 264:11
**sentence** 83:9 106:12 170:15 183:1
**separate** 124:8,9 255:16
**series** 239:10
**service** 66:7 107:2 108:17,18 109:13 110:2 112:8 220:20 230:4,5
**services** 257:21
**servpro** 150:9
**set** 152:17 174:10 174:11
**settle** 11:4
**settlement** 12:18 15:19 16:3,8 83:12,19 84:3 258:15 260:18,20 270:18 272:18
**settling** 11:6
**seven** 139:14 184:2
**shade** 217:22 218:16
**shady** 282:21
**shared** 236:13
**she'd** 47:4,21 49:5 77:15
**sheet** 138:20 141:12
**sheetrock** 180:4,6
**shipped** 80:6
**short** 117:7 118:3 118:4 215:19
**shortly** 12:20 67:9 114:18 249:7
**show** 13:19,21,21 32:3,16,20 33:1 33:13 48:1 103:8 163:20 203:7 253:18 258:18 266:16
**showed** 57:21 61:13 155:20 158:13 188:8 204:6
**showing** 33:3 60:6 137:6 254:22
**shown** 57:12 105:9
**shows** 45:12 62:14 208:6 269:19
**sic** 159:23 254:15
**side** 59:5 136:15 136:15 139:17,17 143:12,12 197:20
**sign** 7:21,22 280:7 282:6
**signature** 281:20 282:2,16 284:18
**signed** 281:17 282:10,12,15
**significant** 12:12 12:12 112:4 279:6
**similar** 58:3 275:14
**simple** 217:23 245:4 252:17
**simply** 165:5 174:2 188:11 236:8,17
**single** 273:16
**sir** 8:8,8,18 9:2 10:21 11:13 12:7 12:23 14:8 19:1 21:1,4 23:7 26:5 26:22 28:3,15,19 35:10 36:2 38:13 45:20 58:17 64:16 73:3 77:6 79:8 80:17 90:2 90:22 91:9 94:7 95:13 99:4 104:19 105:7 110:16 133:3 140:11 142:12 147:20 149:14,18 150:21 151:1 152:20 155:6 173:20 184:23 189:2 196:23 199:20 203:23 204:2 206:15 208:11 209:6,8 209:10 211:9,12 212:20 215:7,7 216:9 220:15,18 233:21 242:9 244:5,8 246:14 246:16 248:9 249:11 252:1 258:3 274:10,14
274:20
**site** 66:7 67:2 83:4 93:10 151:18 154:11 187:10 225:13 235:1 243:4 250:6
**sits** 12:16
**situation** 43:9 50:1 163:13 184:21
**situations** 261:16
**six** 89:14 99:1,2 100:5 195:11,19 204:19
**size** 79:22
**sizewise** 232:23
**slade** 94:22
**smaller** 216:2
**smoke** 89:23,23 90:19 91:3,6,11 91:16 94:17 122:1,21 123:3 127:17 128:1,3 128:18 130:18 132:9 171:12,15 171:17 172:14 180:4,10 181:14 181:17 189:7,8 204:7 235:10
**smoked** 180:2
**social** 100:4
**society** 99:10,23
**soda** 123:23 124:1,5,11 235:7 236:4,15 238:5 242:7,18 243:7 244:20,21 246:2

246:6 248:7 249:8 251:19
**sofa** 26:20 27:2,7 27:11,13,15 28:2 215:9,13,21,22 268:15
**software** 111:3
**solely** 170:22 171:2
**solid** 161:4,17
**somebody** 63:12 249:23
**someone's** 154:7
**soon** 271:5
**sorry** 10:7 15:21 16:5 17:17 20:3 22:6 23:4,14 24:19 35:20 36:22 41:5 46:22 61:3 70:19 78:21 88:13,17 95:7 96:1 133:1 141:21 144:20 149:3 161:7 163:8 164:10 178:20 185:11 196:4 198:5 207:2,5 226:1 227:10 230:3 246:16 261:23
**sort** 135:16 152:6 263:13
**sotto** 238:16
**sought** 238:9
**source** 61:18 123:12 150:8
**south** 2:1 6:9
**southeast** 282:18
**southern** 1:2
**sowing** 277:23
**space** 121:16
**speak** 31:10 135:19 139:18 178:4 241:23 273:15 277:6,11
**speaking** 111:17 163:21 194:17 225:8 241:12 277:21
**specialist** 61:15
**specific** 31:10 79:6 273:13
**specifically** 188:16 202:17
**specifics** 246:12
**speculate** 140:18 140:23 158:20
**speculation** 191:5
**spend** 261:9
**spent** 99:1 100:11 120:13
**split** 264:16
**spoke** 88:12 105:21 116:9 176:23 177:6 178:7
**spray** 121:18,20
**spraying** 123:5
**spread** 172:11
**spreadsheet** 33:4 33:10 34:8 38:3 54:7,20 56:3,13 57:1 59:2,6 60:5 61:2,8 64:8 159:10
**spreadsheets** 35:7,10
**spur** 167:14
**square** 244:10 245:8,10
**standard** 210:1 210:15,19 211:11 214:23 218:4,20 218:23 219:4,12 220:2 222:14 235:14
**standing** 88:14 92:2
**start** 7:4 97:19 105:15 119:11 122:13 181:8 196:5,8 239:11 240:1 270:17
**started** 116:5,16 172:10 248:2
**starting** 18:15 69:5 76:1 147:7
**starts** 162:16
**state** 1:21 6:3 83:10 88:20 96:7 100:21 183:1 185:21 189:20 199:16 235:15 246:1 256:7 258:1 259:13 281:2
**stated** 234:9 237:9
**statement** 24:18 46:21,23 52:13 97:2 115:9,10 169:2 184:9 187:19 188:6 202:21 205:23 242:3 259:20,23 263:21 266:15,20 266:23 269:7,18 276:21 283:8
**statements** 105:16
**states** 1:1 28:22 77:2 80:12 94:18 100:23 176:9 283:7
**stating** 45:11,14 86:6 115:3 174:2 190:6 235:19
**stays** 258:23
**stellar** 98:2,5
**stenographic** 1:20 2:15 6:2 281:6
**step** 43:8 124:1
**steps** 70:8 123:7 123:11
**stick** 63:11 110:3
**sticker** 14:14
**stipulate** 229:23 230:22
**stipulated** 1:15 2:4,13 230:14
**stipulation** 6:6
**stipulations** 7:21
**stock** 216:2
**stood** 36:17
**stop** 90:11 205:1
**stopped** 155:20
**store** 65:20,23 66:3
**stored** 139:7 140:7

**story** 172:11
**street** 2:1 3:10 6:8
**strictly** 22:10
**strike** 22:19 29:11 52:22 119:11 162:7 166:14
**structure** 163:1,1 209:14 240:8,8 240:11 241:21 242:8 243:19
**stuck** 111:13
**studs** 122:22 174:20 175:1 177:8 178:16,22 179:18 183:6,11 183:17,22 184:11 184:15,18 189:6
**stuff** 79:23 112:12 160:6 211:21 215:23 232:16 255:20
**sub** 135:9
**subcontractor** 199:11
**subject** 176:1 177:2
**subjected** 27:7
**subjective** 135:18
**submit** 47:5,21 47:23 66:16 70:8 248:6
**submitted** 25:10 29:6,15,16,23 30:3,5 31:18,23 32:2,2,8,9,12 33:11,23 45:3 49:7 53:2 93:11 219:8 221:17,17 224:10 242:2 269:10
**subscribed** 284:19
**subsequent** 74:7 85:11
**substance** 283:7
**suffered** 89:18
**sufficient** 44:22
**sufficiently** 95:18
**suggested** 249:16
**suggestion** 252:17
**suite** 2:1 3:9 6:9
**summarized** 17:23
**summary** 18:2
**sunlight** 217:23
**super** 126:21
**supervision** 281:8
**supervisor** 12:9 15:18 22:5,11 23:1,3,23 24:1 126:14
**supplement** 204:12 272:20
**supplier** 143:18
**support** 33:11 237:12 259:23
**suppose** 209:7,10
**supposed** 269:8
**sure** 10:16 13:12 13:20,23 14:23 15:11 19:3,5 20:15 32:22,22 35:19 36:23 47:8 54:1 58:6 60:8 62:16 65:1 69:5 73:5 74:23 77:23 78:14 83:17 99:7 100:3 102:21 104:9 115:12 117:1 119:8 121:4 122:14,18 123:8 126:17 129:8 134:4,7,9 139:8 141:9 145:11 153:1,2,8 157:6 159:14,18 172:8 173:12 193:23 194:1 204:5 206:23 216:13 218:1,1 218:16 221:5 226:8,22 227:2,2 235:3 238:17 239:2 242:9 246:14 250:10,14 255:4 266:11 268:12 277:12
**surely** 114:12
**suspicious** 236:5 238:14
**sustain** 186:1
**sustained** 187:7
**swapping** 246:20
**swear** 7:3,14
**sweet** 117:8
**sworn** 7:17 29:18 38:15 46:21,23 284:19
**symbility** 111:4
**system** 111:7,11 144:22 158:23 160:8 230:17
**systems** 159:4

**t**

**t** 1:14,14 23:12,15 23:15 281:1,1
**table** 64:4
**take** 14:9 17:19 37:9,9,13,16 52:21 53:23 54:1 61:14 66:11 68:12,13 83:16 86:15 91:22 112:20 126:22 145:9 146:12 150:12 154:9 155:3 161:9,17 165:5,14 166:5 179:18 183:9,10 183:22 184:11 194:22 195:15 206:19,21 215:15 215:18 225:12 229:20 230:21 233:22 245:2 248:19 256:15 262:19
**taken** 1:19 24:19 151:3 156:22 157:5 174:19,23 183:6,17 184:15 184:17 230:13 281:5
**takes** 123:8
**talk** 15:10 17:5 27:5 64:10 89:22

116:1,11 139:20 145:6 163:19 196:13 228:9,15 235:13 243:15
**talked** 89:18,19 89:20 124:13 148:13 174:16 178:5 225:10 229:3
**talking** 27:6 29:21 33:9,9 34:6 34:8 40:9 42:15 42:16 54:5 64:7 66:18 73:9 85:10 85:12 88:16 94:16 95:2,21 111:4,8 118:8 123:4 126:8 127:6 149:12,15 151:8 160:21 165:2,3 169:23 170:11,13 171:5 181:14 200:6,12 200:16 208:13,14 208:15 212:23 214:6 217:11 218:9 229:9,12 230:9 272:4
**talks** 207:18 210:9
**tankersley** 115:16 132:21 174:18
**tar** 246:7
**tcc** 136:16 137:10 142:21 143:22 196:11 197:7 198:12 199:16,23 201:16 202:19 227:7 228:9 241:10,23 242:6 243:9,11
**tcc's** 137:20 138:9 161:8 226:9 241:7 242:2,4
**team** 183:7
**tear** 85:19 89:2,3 89:9 90:15 92:11 92:17,21 93:3 95:7,18 96:23 97:6,13,22 115:2 128:15 130:20 132:3,10 164:22 194:15 225:16
**tearing** 97:3
**tech** 99:2,3 100:8
**technical** 9:8
**technically** 177:20
**technology** 98:7 98:15
**tell** 15:7 20:7,14 34:12 61:14 62:19 72:10 73:23 81:4,5,10 82:21 86:4 88:7 92:15 96:22 104:18 107:3 109:23 123:5 125:20 129:18 135:11 146:9 160:7,10 167:1,9 167:13 168:14 175:15 177:9 180:13,15 202:21 205:7 208:19 221:23 222:2 229:5 231:12 233:23 240:15,16 244:20 246:23 248:18 253:19 269:15 276:10
**telling** 30:7 92:19 113:16 115:3 131:3 143:6 173:1,5 178:14 178:21 194:11 205:14 227:23 241:20 256:14 263:2
**tells** 83:4 208:23
**temporarily** 214:19 219:17
**temporary** 216:12 218:7 233:2,4,6 268:18
**ten** 26:20 27:7,10 27:12,22,22 30:23
**term** 8:13 81:1,16 81:16 82:2,3,4,9 82:11 184:17 215:19,21
**terminated** 249:9 253:12
**test** 180:8,15
**tested** 189:12
**testified** 7:17 113:18 188:12 204:4
**testify** 80:22 81:1 81:5 82:6,7 140:16 142:4 143:3
**testifying** 82:8 128:22 227:18
**testimony** 48:16 50:13 176:19 193:10 227:23 283:2,7
**thaddeus** 3:12
**thank** 8:9 35:4 75:4 78:17 181:22 192:21 197:10 280:7
**thanksgiving** 113:6
**thereto** 2:12
**thing** 24:4,5,14 82:13 109:18 135:17 145:7 192:11 198:4 277:19,23
**things** 12:14 17:6 17:6 90:12 100:16 111:20 112:14 184:11 191:16 212:16 213:2,7 271:6
**think** 10:11 16:2 17:4 18:15 21:17 22:9 25:18,18 31:21 37:7 40:11 40:18 43:14,17 49:16 53:5,12 54:3 57:2 61:21 68:10 69:7 70:15 85:4 88:11 89:2 90:8 102:17 103:22 104:12 108:3,20 114:16

114:20 115:19 117:9,10 119:10 119:12 122:7 129:4,15 136:10 154:16,20 165:21 165:22 166:21 172:14 175:18 176:18 182:12 185:10 201:6 208:4 213:23,23 219:21 223:16 226:20 227:21 228:2 229:15 231:16,19 234:4 235:8 241:6,15 246:13 250:5 261:9 264:7 269:21 271:4 274:21 276:3 277:8 278:22 279:14 280:6
**thinking** 143:1
**thinks** 142:15 143:4 227:19
**third** 34:1 175:5 236:2,18,19 237:5,15,18,23
**thorpe** 29:18,19 30:1 37:18 39:23 41:7,7 46:16
**thought** 16:4 17:23 19:19,23 24:23 42:21 43:23 49:18 67:14,14 87:17 87:20 91:21 97:16 103:6 113:20 116:7 118:6 119:17 140:5 159:12 171:17 174:13 182:9 187:14 190:9 227:14 241:16 243:9 251:1,11 268:16 278:23
**thousand** 203:3
**three** 20:21 25:20 87:19 104:4 107:23 110:22 120:13 157:17 193:12 206:15 212:23 225:19 237:20 263:3 276:23
**threshold** 11:17
**throw** 35:3
**throwing** 191:15
**tim** 10:12
**timbers** 123:19
**time** 2:10,11 6:18 10:11 11:8 12:22 13:2 16:7 17:19 20:9,13 27:1 37:9 38:22 60:14 67:12 85:13 91:13 105:4,4,6,6 106:23 109:12,15 119:13,14 122:5 122:10 158:3 159:7 162:23 176:3 186:6,20 188:10,22 213:4 220:6 221:1 223:1 229:22 232:12 233:21,22 236:9 281:12 282:15
**timely** 102:2
**times** 40:8 49:17 53:13 56:8 67:17 123:17 178:5 184:1 204:20 208:1 228:20 229:3
**title** 8:17 23:17 24:2
**today** 27:23 32:6 105:19 110:22 129:6 164:5 176:8 220:9
**today's** 6:17
**told** 49:6 66:10 85:21 90:14 92:9 115:10 116:10 117:22 130:9 168:21 172:20 176:8 183:22 188:14 190:3 211:23 243:4 246:17 251:17
**tomorrow** 104:6
**top** 71:16 136:18 144:7 152:22,22 152:23 153:3,3,3 163:21 169:14,15 169:18,19 181:22 185:10 254:15 270:14
**tore** 125:9 128:20 130:15
**torn** 93:13 94:5
**total** 10:8 75:6 80:2 211:19
**totaled** 215:14
**touch** 65:4 150:2
**towns** 279:5
**trace** 259:16
**track** 121:4
**trail** 191:18
**trained** 100:18,19
**training** 79:9 80:18 101:3,5
**transcript** 281:7 281:10 282:7,13 282:15 283:2
**transfer** 9:9
**transported** 151:16
**treasury** 109:18 109:20,21
**treated** 171:18
**treatments** 217:2 217:4,8,12,16,19 218:3,10,18,19
**trial** 2:10
**tried** 32:8 54:4
**trim** 134:16
**trouble** 113:8
**troy** 98:11,13
**true** 51:4 236:8 281:10
**trust** 236:14
**try** 32:17 44:15 53:21 63:11 82:12 116:17 166:6 220:23 227:22 264:13,16 271:5,6
**trying** 9:19 16:7 19:3,15 20:5 21:16 41:19

44:17 59:16 65:2 90:7 115:23 117:3 122:6 144:2 145:6 172:16 202:2 212:1 214:2 238:8 247:1,4 257:3 263:9 271:14
**tuesday** 87:5
**turn** 14:1 69:3 223:22
**turned** 268:17
**turner** 1:23 6:8
**tv** 27:22
**tvs** 232:14,15,19 233:1
**two** 15:11 20:12 25:20 37:15 47:14 70:18 75:7 77:3 86:2 87:11 114:21 119:20 120:13 122:7 157:17 188:12 219:7 228:16 242:5 269:12 276:23
**type** 56:22 73:2 79:23
**types** 65:18 134:14
**typically** 36:14 38:19 72:19 107:18 108:3 122:17

**u**

**u** 1:14
**uh** 11:21 25:12 37:18 40:2 42:4 49:12 66:19 77:18 83:8,14 89:10 105:11 106:5 110:7 123:2,22 137:15 148:15 166:2 177:5 181:10,10 185:20 186:6 196:12,15 197:11 198:11 199:18,22 219:10 222:12 229:17 230:20 233:4 242:21 254:18 260:15 261:18 278:14
**ultimately** 157:13 179:17,19 182:12 187:16 237:20 258:16 266:15
**unable** 71:22 74:2
**underneath** 172:4 208:6
**undersigned** 283:2
**understand** 46:3 46:6,10 148:11 152:21 156:5 158:11 186:16 208:21 227:20 240:10 257:3
**understanding** 26:15 46:4 65:10 80:20 81:19,23 82:1,6,11 83:23 112:6 127:22 147:19 151:15 155:15,19 183:3 197:17 208:19
**undervalued** 274:12
**underwriter** 175:23 176:2,5 176:10
**underwriters** 176:8
**underwriting** 111:16 176:7
**undisputed** 270:18 271:12,13 271:21,22 272:20 272:23 275:9,12
**uninhabitable** 209:14,15
**unique** 91:22
**united** 1:1
**universe** 10:8
**university** 99:11
**unlimited** 264:20
**untouched** 183:8
**update** 54:15 56:23 59:20 107:21 181:23
**updated** 56:13
**upset** 85:15 88:10
**upstairs** 278:19
**upwards** 148:10
**use** 39:22 62:2 111:4,8 122:11 122:17 208:12 216:3,11 234:11 249:17 262:14 283:9
**uses** 163:6
**usual** 7:20 210:1 210:15,18,23 214:23 218:4,20 218:22 219:3,11 220:2 222:5,13
**usually** 268:4,5
**utilities** 223:8,22
**utility** 223:1,6,12 223:18,20 224:10

**v**

**v** 23:12,13,15
**vacated** 16:17
**valuating** 74:22
**valuation** 77:7 148:8 254:15
**valuations** 73:21
**value** 26:23 28:5 31:1 39:1,4 47:16 50:19 57:18 75:7 77:2,8,10 147:22 148:1 222:5,6
**values** 80:4
**various** 147:14
**vast** 80:14
**vendor** 34:2 36:17 39:16,21 41:1,22 42:1,7,10 42:16,18,19 43:11,22 44:20 46:15 61:13 62:19,22 64:6 65:12,16 66:5,7 66:10,17 72:3 93:9 148:19 159:4 180:12,12

180:20 187:9 188:5,13,15,20 194:18 255:9 256:10,10 261:2 261:4
**vendor's** 38:15 39:20 42:17 43:10,21 44:11 188:6 264:6
**vendors** 36:12,14 51:7,11 62:8,10 63:22 88:16 90:5 187:19 188:1 261:2
**verbal** 116:3,6
**verbiage** 26:13 215:2
**verge** 17:4
**verified** 106:14 221:15
**verify** 135:22 136:1 236:14 269:5
**veritext** 282:10 282:20
**veritext.com** 282:18
**versus** 97:3 135:8 137:10 141:11 161:4 243:8
**video** 25:17 149:7
**videographer** 3:12 6:16 7:13 68:15,20 112:21 113:3 145:12,17 146:16,21 207:3 207:9 248:23 249:5 279:15,19 280:1,5,8
**videotaped** 1:10 1:17
**virginia** 108:20
**visited** 234:23
**visits** 18:9
**voce** 238:16
**voluntary** 96:14
**volunteered** 168:20
**vreeland** 173:14 173:15
**vs** 1:6 6:22

**w**

**wait** 66:8 149:8 149:10 157:12 261:22
**waiting** 189:18 232:3
**waived** 2:16
**walk** 67:15 85:11 88:23 114:17,18 138:2 167:12 168:17 170:6 171:3,8 187:10 187:23 188:16,21 245:15
**walking** 90:4
**wall** 187:12,12,13 189:5 190:4
**walls** 151:17 180:10 183:4 187:17 194:16 235:11,12
**wally** 10:19 21:2 22:5 23:2,8 24:1 127:1
**wally's** 136:23
**want** 14:15,23 31:10 32:3,23 38:15 39:2,22 40:14 41:6 49:2 54:7 62:17 70:21 74:21 81:23 82:10 103:8 110:9 115:3 119:8 120:12 129:8 132:8 133:22 140:17 152:15 156:21 157:7 159:10,18 163:19 164:1,5 184:3,4 186:23 192:21 196:5,20 206:9,10 215:3 217:22 218:17 234:2,5 250:2 251:12,14 253:18 264:14 266:11 278:6 279:15
**wanted** 19:5 49:2 52:4 63:2 110:20 121:3 170:17 216:11,20 218:14 238:12 259:22 263:18 264:1,3
**wanting** 64:4 70:12 158:2 217:15
**water** 151:11 249:14 250:19 251:14 253:13
**way** 26:17 45:5 56:21 60:1 68:11 73:4 74:9,9 136:10 144:17 154:22 188:19 218:23 241:15 262:15 263:19
**ways** 207:23
**we've** 8:6 36:21 49:16 68:13 78:14 129:1 157:9 165:23 174:15 218:12 237:19,22 262:9 265:21
**wealthy** 134:18 134:20 211:1
**website** 153:8
**week** 19:23 114:21
**weeks** 20:12 114:21 120:11 121:2 122:7 195:11,19
**weird** 68:9
**welcome** 86:23 214:19
**went** 12:11 15:13 15:16 30:8 48:18 50:11 101:2 105:19 117:9 121:15 150:18 213:8 221:19 257:14,15
**wentzell** 149:22 149:23 150:3,16 150:17,22 154:13 156:6
**west** 102:18 103:14,15 108:19

**whatsoever** 190:19
**whiz** 225:11
**wildfire** 80:8
**willing** 29:4,8
**wimbledon** 220:14 221:20 223:3
**window** 55:18 217:1,4,8,11,16 217:17,22 218:2 218:3,9,15,16,18 218:19
**wished** 276:13
**witness** 6:12 7:4 7:12 31:17 60:18 78:18 81:7 127:14 130:2,7 140:19 141:1,17 146:15 156:10 191:23 202:17 205:22 206:19 207:1 232:6 275:23 282:18
**wondering** 103:23
**wood** 1:22 6:7 122:23 137:23 138:3,21 139:2 140:4 141:8 147:9 149:12 180:5
**woods** 148:12
**word** 141:10 208:12 238:14 246:4 275:13
**wording** 212:9
**words** 86:11 105:9 115:7 196:19 203:18 208:15 231:21 275:20 276:10
**work** 18:6 21:8 22:1 63:22 64:2 106:16,17,22 112:15,16 116:2 124:10 127:5 128:5 134:5 153:11 155:21 173:17,21 174:1 188:2 191:8,8 197:15 198:16 199:23 200:10 201:12,13,18,19 202:3 203:2 204:7,15 231:14 239:11 241:4 244:23 247:5 250:10,11,16 251:7,13 256:11 261:3,10 272:5
**worked** 9:9,12 10:2 37:19 149:8 234:10
**working** 24:4,5 109:11 162:1 180:21
**works** 256:6
**worried** 85:23 86:8,12 88:9,10
**worry** 86:3,4 168:21
**worth** 76:3,7 84:15 172:15 279:10
**write** 93:15 127:5 259:3,4
**written** 240:10 243:21
**wrong** 58:11 70:16 72:23 190:1 226:23 227:23 228:2,4 275:2
**wrote** 190:5,15 191:6,10 233:16 264:12

**x**

**x** 245:2 272:7,8
**xactimate** 111:3

**y**

**y** 245:2
**y'all** 15:10,10 149:8 150:2 158:2,3 161:14 229:10 244:19 261:10
**yeah** 8:17,17 9:20 10:9,9 11:17 17:20 18:14 20:4 23:11,23 27:21 28:3 29:22,23 35:3,9 42:21 43:23 45:23 51:16 52:6 55:8,8 56:8,8,18 58:15 58:19 59:18 60:3 60:15 62:1 63:8 64:11,16 66:19 67:18 69:8 72:6 73:5,5 77:5 78:12 91:15 95:1 97:8 97:15 100:7 103:12 104:20 109:2 114:4,10 114:23 117:21,21 118:10,23 120:16 122:4 124:21 133:10 139:23 141:5,17 144:18 144:20 150:1 151:9 152:11 153:19 154:3 156:12,13 158:15 161:8,17 163:9 170:2 173:9 176:15 180:15 184:17,19 185:13 193:12 195:3 196:19 206:21 208:22 212:5,7 212:17 213:3,6 215:1 218:14,14 222:18 223:20 229:11 231:10 233:15 234:6 235:2 237:17 238:1,7,15 245:10 246:5,5 246:10,19 248:13 250:20 251:11,23 252:9 254:1,3 255:1 256:23 257:13,20 259:10 262:7 263:17 264:3 266:15 270:1 275:4,10 275:11
**year** 14:22 19:20 20:3,4,8 26:20

27:7,10,12,22 31:16 215:15,18 221:20 225:19 268:8
**years** 25:21 27:23 30:23 35:17 36:16 37:15,20 45:21,23 46:2 47:14 86:2 87:19 90:1,20 100:12 100:17 193:12 206:15 260:11
**yep** 57:14 138:22 172:18

**z**

**zero** 135:9 139:3
**zlotnik** 234:23 240:19,21
**zoom** 25:18

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

PLAINTIFF'S EXHIBIT

PENGAD 800-631-6989

## Extra Coverages
(continued)

### Homeowner assessments
We cover your share of an assessment charged against you by your homeowners association. But the assessment must be a result of an occurrence that would be covered under:
- this policy to property owned collectively by all homeowners; or
- personal liability coverage if personal liability coverage is shown in the Coverage Summary or under any other personal insurance policy issued by a direct or indirect subsidiary of Chubb Limited providing you with personal liability coverage.

We will pay homeowner assessments resulting from loss caused by earthquake only if earthquake coverage is shown in your Coverage Summary for that location. But your earthquake special deductible applicable to the amount of coverage for your house, as described in your Coverage Summary, applies to your share of the assessment. If there is a loss caused by earthquake and earthquake coverage is not shown in your Coverage Summary for that location, we do insure homeowner assessments resulting from ensuing covered loss due to fire, explosion, theft or glass breakage unless an exclusion applies.

We will pay up to $50,000, or any greater amount shown in the Coverage Summary, for any one occurrence, regardless of the number of assessments. But we will not pay more than $5,000, or any greater amount shown in the Coverage Summary, in any one occurrence for assessments that result from a deductible in your homeowners association's insurance.

Unless an earthquake special deductible applies as stated above, there is no deductible for this coverage.

### Other permanent structures
This coverage is in effect only if an amount of coverage greater than zero is shown in the Coverage Summary for Other permanent structures.

We cover other permanent structures on the grounds of your house. For each occurrence, we will pay up to the amount of coverage shown in the Coverage Summary for "other permanent structures" at this location. The same payment basis applies to other permanent structures as to the house itself unless stated otherwise in the Coverage Summary.

### Additional living expenses
As described below, under certain conditions when your house or other permanent structure cannot be lived in because of a covered loss to your house or other permanent structure or, if applicable, its contents, we provide coverage for additional living expenses which consists of extra living expenses, loss of fair rental value and forced evacuation expenses. The maximum amount we will pay for all additional living expenses combined for each occurrence is 30% of the amount of house coverage as shown in your Coverage Summary for the location at which the loss occurs. The amount of coverage for additional living expenses will not be affected by any increase in the amount of house coverage caused by the application of extended replacement cost payment basis as provided in this policy. There is no deductible for this coverage.

"Contents" means personal property you, a family member, or a domestic employee owns or possesses covered by us.



© Chubb.2016 All rights reserved. Form no. 0800001

## _Extra Coverages_
(continued)

**Extra living expenses.** If a covered loss makes your house or other permanent structure uninhabitable, we cover the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living, including the boarding of domestic animals not primarily owned or kept for business use. We will pay for the boarding of your domestic animals displaced from an other permanent structure even when you have not been displaced by the covered loss. We cover these increases to your normal living expenses for a period of time commencing with the date of loss and ending with the earliest of the following:

- the reasonable amount of time required to restore your house or other permanent structure to a habitable condition;
- the shortest amount of time required to settle elsewhere if you or members of your household permanently relocate;
- the reasonable amount of time required to restore the house or other permanent structure to the condition it was in prior to the covered loss if you are newly constructing your house or other permanent structure or constructing additions, alterations, or renovations to your house or other permanent structure at the time of a covered loss, but we will only cover the increase in your normal living expenses incurred by you; or
- up to two years from the date of loss, or a later date if agreed to by us.

However, you must inform us of your decision whether you intend to repair, replace, or rebuild the house or other permanent structure, or to permanently relocate, within 180 days from the date of loss, or a later date if agreed to by us. If you do not inform us of your decision by this date, the extra living expenses will cease in 30 days.

This period of time is not limited by the expiration of this policy.

**Fair rental value.** If a covered loss makes a part of your house or other permanent structure which you usually rent to others uninhabitable, we cover its fair rental value during the period of time it is usually rented for the reasonable amount of time required to restore it to a habitable condition. We will cover the fair rental value for a period of time commencing with the date of loss and ending with the earliest of the following:

- the reasonable amount of time required to restore your house or other permanent structure to a habitable condition; or
- up to two years from the date of loss, or a later date if agreed to by us.

However, you must inform us of your decision whether you intend to repair, replace, or rebuild the house or other permanent structure, within 180 days from the date of loss, or a later date if agreed to by us. If you do not inform us of your decision by this date, the coverage for fair rental value will cease in 30 days.

This period of time is not limited by the expiration of this policy.


© Chubb.2016. All rights reserved. Form no. 0800001

## Extra Coverages
(continued)

**Forced evacuation expenses.** If you evacuate your house or other permanent structure due to a reasonable threat of a loss covered under this policy, or you are forced to evacuate by a civil authority as a direct result of a covered peril, we cover the reasonable increase in your normal living expenses incurred by you that is necessary to maintain your household's usual standard of living, including the boarding of domestic animals not primarily owned or kept for business use. We also cover any loss in fair rental value if your house or other permanent structure is usually held for rental, but we do not cover any loss of rents due to cancellation of a lease or agreement. However, if we determine after the threat of loss is over that there is no covered loss to your house or other permanent structure that makes it uninhabitable, this extra coverage will cease, unless a civil authority prohibits you from use of your house or other permanent structure due to a peril covered under this policy.

We cover these forced evacuation expenses for up to 30 consecutive days, even if the policy period ends during that time.

### Land
Whenever there is a covered loss to your house or other permanent structure and the related repair, replacement, or rebuilding requires excavation, replacement or stabilization of land under or around your house or other permanent structure, we will pay the necessary cost for the excavation, replacement, or stabilization of the land. The amount of coverage is 10% of the amount of the covered loss to your house or other permanent structure, but not less than $10,000.

### Landscaping
We cover trees, shrubs, plants, and lawns, which are on the grounds of your house and other permanent structures, against certain kinds of perils. These are fire, lightning, explosion, civil disturbance, vandalism, malicious mischief, theft, and loss caused by a vehicle or aircraft.

We will pay:
- up to a total of 5% of the amount of coverage for the house at which the loss occurs, unless a greater percentage is shown in the Coverage Summary, but
- not more than $10,000 for any one tree, shrub, or plant, unless a greater amount is shown in the Coverage Summary.

If your payment basis is extended replacement cost, the 5% is applied to the increased amount of coverage.

This extra coverage does not apply to naturally occurring or native grown vegetation, including but not limited to brush, woodlands, forests, grasslands, wetlands or mangroves. We also do not cover vineyards, sod farms, tree farms, orchards, and crops grown or used primarily for business purposes.

This extra coverage applies only if you begin to repair or replace the lost or damaged property within 180 days of the date of loss, or a later date if agreed to by us.


© Chubb.2016. All rights reserved. Form no. 0800001

| Type | Text | Protected | Created By | Created Date |
|---|---|---|---|---|
| Filter by Type | | Select a Pro | Filter by Created By | |
| Appraisal | Common Vendors:<br><br>Clothing - boutique stores, Macys, Gap, Target<br>Appliances - building contractor was used<br>Electronics - HD Innovations (local vendor), Best Buy<br>Housewares - private decorators, Williams Sonoma Macys, Restoration Hardware, Target<br>Furniture - private decorators, Restoration Hardware, Macys | ☐ | Matthew Schillig | 11/27/2019 10:36 AM CST |
| Inventory Capture | 11-20-2019 Per CXE - New Fire Loss - started in 2nd story and spread to attic (there are not many contents in the attic) however there are 4 bedrooms and 4 baths. Adjuster does not think (given the smoke throughout the home) that it is worth trying to restore anything<br>Please capture all items as presented.<br>...<br>No safety restrictions<br>C&O will be complete tomorrow - if the one room is still off limits when we go out please treat as BFS.<br>No other vendors to coordinate with - Pack out is already underway and will be completed by the time we get out there. | ☐ | Nancy Vreeland | 11/20/2019 7:37 PM CST |
| Transcription | Ages:<br><br>Clothing - under 1 yr<br>Appliances - under 1 yr<br>Electronics - under 1 yr<br>Housewares - under 1 yr<br>Furniture - under 1 yr | ☐ | Matthew Schillig | 11/27/2019 10:34 AM CS |

+ Add Note

| | Note | Note Type | Linked To | Show On Report | Protected | Created By | Created On |
|---|---|---|---|---|---|---|---|
| 🗑 | Special instructions for Inventory capture. No Contents limit and deductible provided. No scheduled items. Onsite. Request provided and clear. No judgement call needed. | Internal Comments | | ☐ | ☐ | Nancy Vreeland | 11/20/2019 7:41 PM CST |
| 🗑 | 53 potentially restorable lines | Internal Comments | | ☐ | ☐ | William Dorsett | 12/27/2019 8:31 AM CST |

| | Note | Note Type | Linked To | Show On Report | Protected | Created By | Created On |
|---|---|---|---|---|---|---|---|
| 🗑 | Goodrich, Charles non-sal list 7 Page 5 | Internal Comments | 1011 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| 🗑 | Goodrich, Charles non-sal list 7 Page 7 | Internal Comments | 1026 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| 🗑 | Goodrich, Charles non-sal list 8 Page 1 | Internal Comments | 1041 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| 🗑 | Goodrich, Charles non-sal list 8 Page 3 | Internal Comments | 1056 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| 🗑 | Caroline, Custom Curtain line. Not sure if it needs to go to Select? Line 140- Hope all is well. Thanks | Internal Comments | 140 | ☐ | ☐ | Steve Leone | 12/20/2019 11:03 AM CST |
| 🗑 | Based on the information provided, we have valued the claimed item as pinch pleat side panels, lined - interlined and fabricated out of a hand painted silk fabric, 208"W x 94"L. We have estimated 8 yards of fabric at $225.00 per yard ($1,8000.00) labor $850.00 totaling $2,650.00. Research includes fabrics from Lee Jofa and bespoke work room pricing. | Internal Comments | 140 | ☐ | ☐ | Caroline Donnell | 12/20/2019 12:17 PM CST |
| 🗑 | Target referred as Common Vendor | Internal Comments | 228 | ☐ | ☐ | Shieldon Brina | 12/19/2019 10:57 PM CST |
| 🗑 | Target referred as Common Vendor | Internal Comments | 229 | ☐ | ☐ | Shieldon Brina | 12/19/2019 10:57 PM CST |
| 🗑 | Target referred as Common Vendor | Internal Comments | 231 | ☐ | ☐ | Shieldon Brina | 12/19/2019 10:57 PM CST |
| 🗑 | Target referred as Common Vendor | Internal Comments | 232 | ☐ | ☐ | Shieldon Brina | 12/19/2019 10:57 PM CST |
| 🗑 | Target referred as Common Vendor | Internal Comments | 233 | ☐ | ☐ | Shieldon Brina | 12/19/2019 10:57 PM CST |
| 🗑 | Reviewed this via expert triage with Ryan P. We think this can be priced via specialist queue. Rejecting for Select. Thanks! | Internal Comments | 294 | ☐ | ☐ | Jeffrey Lizotte | 12/20/2019 9:41 AM CST |
| 🗑 | Art Deco Style Brass Framed Mirror: $225.00; https://www.liveauctioneers.com/item/36051281_art-deco-style-brass-framed-mirror | Internal Comments | 294 | ☐ | ☐ | Ryan Paveza | 12/22/2019 11:16 AM CST |
| 🗑 | BELLE EPOQUE ANTIQUED PANEL MIRROR $1,445.00; | Internal Comments | 294 | ☐ | ☐ | Ryan Paveza | 12/22/2019 11:25 AM CST |

PENGAD 800-631-6989
PLAINTIFF'S EXHIBIT
2

| | | | | | | |
|---|---|---|---|---|---|---|
| https://www.restorationhardware.com/catalog/product/p productId=prod2460681 | | | | | | |
| RTR REVIEWED | Internal Comment: | 294 | ☐ | ☐ | Ryan Paveza | 12/22/2019 11:26 AM CST |
| Target is on common vendor | Internal Comment: | 297 | ☐ | ☐ | Beverly Usana | 12/19/2019 10:47 PM CST |
| Target is on common vendor | Internal Comment: | 300 | ☐ | ☐ | Beverly Usana | 12/19/2019 10:47 PM CST |
| Target is on common vendor | Internal Comment: | 302 | ☐ | ☐ | Beverly Usana | 12/19/2019 10:47 PM CST |
| Target is on common vendor | Internal Comment: | 306 | ☐ | ☐ | Beverly Usana | 12/19/2019 10:47 PM CST |
| Target is on common vendor | Internal Comment: | 310 | ☐ | ☐ | Beverly Usana | 12/19/2019 10:47 PM CST |
| Item Price over threshold $1000 | Internal Comment: | 347 | ☐ | ☐ | Rodalyn Siena A | 12/19/2019 11:45 PM CST |
| Called MOORE & GILES at 1 (800) 737-0169 spoke to Janet.She told me they never made a double rifle case. Only a single gun case. LKQ is as description stated. Double Rifle Case. | Internal Comment: | 347 | ☐ | ☐ | Richard MacLeo | 12/20/2019 10:48 AM CST |
| Master Bedroom | Internal Comment: | 370 | ☐ | ☐ | Froilan Araneta | 12/19/2019 1:24 PM CST |
| Master Bathroom | Internal Comment: | 377 | ☐ | ☐ | Froilan Araneta | 12/19/2019 1:24 PM CST |
| Master Closet | Internal Comment: | 393 | ☐ | ☐ | Froilan Araneta | 12/19/2019 1:24 PM CST |
| Living Room | Internal Comment: | 395 | ☐ | ☐ | Froilan Araneta | 12/19/2019 1:24 PM CST |
| Already reached the genval price threshold. | Internal Comment: | 395 | ☐ | ☐ | Skarlet Petallar | 12/19/2019 11:30 PM CST |
| Charles Bar | Internal Comment: | 399 | ☐ | ☐ | Froilan Araneta | 12/19/2019 1:24 PM CST |
| Office Closet | Internal Comment: | 415 | ☐ | ☐ | Froilan Araneta | 12/19/2019 1:24 PM CST |
| Family Room | Internal Comment: | 432 | ☐ | ☐ | Froilan Araneta | 12/19/2019 1:24 PM CST |
| Target is one of the common vendors | Internal Comment: | 434 | ☐ | ☐ | Beverly Usana | 12/20/2019 12:34 AM CST |
| Foyer | Internal Comment: | 435 | ☐ | ☐ | Froilan Araneta | 12/19/2019 1:24 PM CST |
| Dining | Internal Comment: | 436 | ☐ | ☐ | Froilan Araneta | 12/19/2019 1:24 PM CST |
| Foyer Closet | Internal Comment: | 438 | ☐ | ☐ | Froilan Araneta | 12/19/2019 1:24 PM CST |
| Target is one of the common vendors | Internal Comment: | 438 | ☐ | ☐ | Beverly Usana | 12/20/2019 12:34 AM CST |
| Target is one of the common vendors | Internal Comment: | 441 | ☐ | ☐ | Beverly Usana | 12/20/2019 12:34 AM CST |
| Target is one of the common vendors | Internal Comment: | 446 | ☐ | ☐ | Beverly Usana | 12/20/2019 12:34 AM CST |
| Kitchen | Internal Comment: | 454 | ☐ | ☐ | Froilan Araneta | 12/19/2019 1:24 PM CST |
| Unable to price from original vendor | Internal Comment: | 464 | ☐ | ☐ | Ma Cristel Cruz | 12/19/2019 11:17 PM CST |
| Unable to price from original vendor | Internal Comment: | 465 | ☐ | ☐ | Ma Cristel Cruz | 12/19/2019 11:19 PM CST |
| Item exceeds valuation threshold. | Internal Comment: | 483 | ☐ | ☐ | Aldrin Fontanilla | 12/20/2019 12:09 AM CST |
| The Photos submitted indicate this is a 48" Wide Dual Fuel range; these have Gas Cooktop Elements paired with an Electric Oven & a Digital Display Read-out not available on Wolf Gas-Only models | Alerts | 483 | ☐ | ☐ | Robert Lowell | 12/20/2019 11:18 AM CST |
| Specialist Reviewed RTR Error | Internal Comment: | 483 | ☐ | ☐ | Robert Lowell | 12/20/2019 11:24 AM CST |
| Price quoted is MSRP. Wolf appliances are sold only through local authorized dealers. | Internal Comment: | 483 | ☐ | ☐ | Robert Lowell | 12/20/2019 11:24 AM CST |
| Item exceeds valuation threshold. | Internal Comment: | 484 | ☐ | ☐ | Aldrin Fontanilla | 12/20/2019 12:09 AM CST |
| Specialist Reviewed RTR Error | Internal Comment: | 484 | ☐ | ☐ | Robert Lowell | 12/20/2019 11:24 AM CST |
| Price quoted is MSRP. Sub-Zero appliances are sold only through local authorized dealers. | Internal Comment: | 484 | ☐ | ☐ | Robert Lowell | 12/20/2019 11:24 AM CST |
| Mudroom | Internal Comment: | 487 | ☐ | ☐ | Froilan Araneta | 12/19/2019 1:24 PM CST |
| Pantry | Internal Comment: | 489 | ☐ | ☐ | Froilan Araneta | 12/19/2019 1:24 PM CST |
| Laundry Room | Internal Comment: | 497 | ☐ | ☐ | Froilan Araneta | 12/19/2019 1:24 PM CST |
| Page 1 | Internal Comment: | 532 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Brand Match | Internal Comment: | 539 | ☐ | ☐ | Michael P. Conv: | 12/27/2019 5:18 PM CST |
| Kindly Convert The Price Into USD | Internal Comment: | 545 | ☐ | ☐ | Michael P. Conv: | 12/27/2019 5:25 PM CST |
| Page 3 | Internal Comment: | 547 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Page 5 | Internal Comment: | 562 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Brand Match | Internal Comment: | 563 | ☐ | ☐ | Michael P. Conv: | 12/27/2019 5:40 PM CST |
| Page 7 | Internal Comment: | 577 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Possible that this costume is for girls based on the description of item | Internal Comment: | 577 | ☐ | ☐ | Rodrigo Lapasto | 12/27/2019 6:13 PM CST |
| Possible that this costume is for girls based on the description of item | Internal Comment: | 579 | ☐ | ☐ | Rodrigo Lapasto | 12/27/2019 5:56 PM CST |
| Possible that this costume is for girls based on previous items | Internal Comment: | 581 | ☐ | ☐ | Rodrigo Lapasto | 12/27/2019 6:11 PM CST |
| Possible that this costume is for girls based on The Other Items | Internal Comment: | 586 | ☐ | ☐ | Rodrigo Lapasto | 12/27/2019 6:14 PM CST |

| | | | | | | |
|---|---|---|---|---|---|---|
| Page 9 | Internal Comments | 591 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Possible that this costume is for girls based on other items | Internal Comments | 592 | ☐ | ☐ | Rodrigo Lapasto | 12/27/2019 6:29 PM CST |
| Need More Info | Internal Comments | 594 | ☐ | ☐ | Rodrigo Lapasto | 12/27/2019 6:36 PM CST |
| Possible that this costume is for girls based on other items | Internal Comments | 597 | ☐ | ☐ | Rodrigo Lapasto | 12/27/2019 6:48 PM CST |
| Goodrich, Charles non-sal list 2 ,Page 1 | Internal Comments | 606 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Goodrich, Charles non-sal list 2, Page 3 | Internal Comments | 621 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Brand available on this Vendor only. | Internal Comments | 631 | ☐ | ☐ | Rodalyn Siena A | 12/27/2019 5:34 PM CST |
| Brand available on this Vendor Only | Internal Comments | 633 | ☐ | ☐ | Rodalyn Siena A | 12/27/2019 5:30 PM CST |
| Goodrich, Charles non-sal list 2, Page 5 | Internal Comments | 636 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Brand Available only on this Vendor | Internal Comments | 639 | ☐ | ☐ | Rodalyn Siena A | 12/27/2019 5:19 PM CST |
| Goodrich, Charles non-sal list 2, Page 7 | Internal Comments | 651 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Goodrich, Charles non-sal list 2, Page 9 | Internal Comments | 666 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Brand can only be found in this vendor. | Internal Comments | 672 | ☐ | ☐ | Skarlet Petallar | 12/27/2019 6:13 PM CST |
| Brand can only be found in this vendor. | Internal Comments | 675 | ☐ | ☐ | Skarlet Petallar | 12/27/2019 6:13 PM CST |
| Brand can only be found in this vendor. | Internal Comments | 677 | ☐ | ☐ | Skarlet Petallar | 12/27/2019 6:13 PM CST |
| Goodrich, Charles non-sal list 3, Page 1 | Internal Comments | 681 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Brand can only be found in this vendor. | Internal Comments | 687 | ☐ | ☐ | Skarlet Petallar | 12/27/2019 6:13 PM CST |
| Goodrich, Charles non-sal list 3, Page 3 | Internal Comments | 696 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Brand can only be found in this vendor. | Internal Comments | 697 | ☐ | ☐ | Skarlet Petallar | 12/27/2019 6:13 PM CST |
| Goodrich, Charles non-sal list 3, Page 3 | Internal Comments | 696 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Brand can only be found in this vendor. | Internal Comments | 697 | ☐ | ☐ | Skarlet Petallar | 12/27/2019 6:13 PM CST |
| Goodrich, Charles non-sal list 3, Page 5 | Internal Comments | 711 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Brand item is available only in this vendor. | Internal Comments | 713 | ☐ | ☐ | Janelyn Gutierre | 12/27/2019 5:31 PM CST |
| Brand item is available only in this vendor. | Internal Comments | 725 | ☐ | ☐ | Janelyn Gutierre | 12/27/2019 5:31 PM CST |
| Goodrich, Charles non-sal list 3, Page 7 | Internal Comments | 726 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Original Brand outdated. Priced with best LKQ | Internal Comments | 736 | ☐ | ☐ | Shieldon Brina | 12/27/2019 5:36 PM CST |
| Original Brand outdated. Priced with best LKQ | Internal Comments | 740 | ☐ | ☐ | Shieldon Brina | 12/27/2019 5:40 PM CST |
| Goodrich, Charles non-sal list 3, Page 9 | Internal Comments | 741 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Original Brand outdated. Priced with best LKQ | Internal Comments | 747 | ☐ | ☐ | Shieldon Brina | 12/27/2019 5:48 PM CST |
| Original Brand outdated. Priced with best LKQ | Internal Comments | 750 | ☐ | ☐ | Shieldon Brina | 12/27/2019 5:54 PM CST |
| Original Brand outdated. Priced with best LKQ | Internal Comments | 753 | ☐ | ☐ | Shieldon Brina | 12/27/2019 5:54 PM CST |
| Goodrich, Charles non-sal list 4 Page 1 | Internal Comments | 756 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Goodrich, Charles non-sal list 4 Page 3 | Internal Comments | 771 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Goodrich, Charles non-sal list 4 Page 5 | Internal Comments | 786 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Goodrich, Charles non-sal list 4 Page 7 | Internal Comments | 801 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Goodrich, Charles non-sal list 4 Page 9 | Internal Comments | 816 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Vendor noted: brand exclusive to store | Internal Comments | 823 | ☐ | ☐ | Kate Viola | 12/28/2019 5:16 PM CST |
| Vendor noted: brand exclusive to store | Internal Comments | 824 | ☐ | ☐ | Kate Viola | 12/28/2019 5:16 PM CST |
| Vendor noted: brand exclusive to store | Internal Comments | 826 | ☐ | ☐ | Kate Viola | 12/28/2019 5:17 PM CST |
| Goodrich, Charles non-sal list 5 Page 1 | Internal Comments | 831 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Vendor noted: brand exclusive to store | Internal Comments | 844 | ☐ | ☐ | Kate Viola | 12/28/2019 5:18 PM CST |
| Vendor noted: brand exclusive to store | Internal Comments | 845 | ☐ | ☐ | Kate Viola | 12/28/2019 5:18 PM CST |
| Goodrich, Charles non-sal list 5 Page 3 | Internal Comments | 846 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Vendor noted: brand exclusive to store | Internal Comments | 847 | ☐ | ☐ | Kate Viola | 12/28/2019 5:19 PM CST |
| Vendor noted: brand exclusive to store | Internal Comments | 848 | ☐ | ☐ | Kate Viola | 12/28/2019 5:19 PM CST |
| Vendor noted: brand exclusive to store | Internal Comments | 849 | ☐ | ☐ | Kate Viola | 12/28/2019 5:19 PM CST |
| Vendor noted: brand exclusive to store | Internal Comments | 850 | ☐ | ☐ | Kate Viola | 12/28/2019 5:19 PM CST |
| Vendor noted: brand exclusive to store | Internal Comments | 854 | ☐ | ☐ | Kate Viola | 12/28/2019 5:20 PM CST |
| Vendor noted: brand exclusive to store | Internal Comments | 856 | ☐ | ☐ | Kate Viola | 12/28/2019 5:20 PM CST |
| Vendor noted: brand exclusive to store | Internal Comments | 858 | ☐ | ☐ | Kate Viola | 12/28/2019 5:20 PM CST |
| Brand item is available only in this vendor. | Internal Comments | 860 | ☐ | ☐ | Janelyn Gutierre | 12/27/2019 6:21 PM CST |

| | | | | | | |
|---|---|---|---|---|---|---|
| Goodrich, Charles non-sal list 5 Page 5 | Internal Comments | 861 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Brand item is available only in this vendor | Internal Comments | 862 | ☐ | ☐ | Janelyn Gutierre | 12/27/2019 6:20 PM CST |
| Brand item is available only in this vendor | Internal Comments | 863 | ☐ | ☐ | Janelyn Gutierre | 12/27/2019 6:20 PM CST |
| Brand item is available only in this vendor | Internal Comments | 864 | ☐ | ☐ | Janelyn Gutierre | 12/27/2019 6:21 PM CST |
| Brand item is available only in this vendor | Internal Comments | 867 | ☐ | ☐ | Janelyn Gutierre | 12/27/2019 6:20 PM CST |
| Brand item is available only in this vendor | Internal Comments | 868 | ☐ | ☐ | Janelyn Gutierre | 12/27/2019 6:21 PM CST |
| Brand item is available only in this vendor | Internal Comments | 872 | ☐ | ☐ | Janelyn Gutierre | 12/27/2019 6:21 PM CST |
| Brand item is available only in this vendor | Internal Comments | 873 | ☐ | ☐ | Janelyn Gutierre | 12/27/2019 6:21 PM CST |
| Goodrich, Charles non-sal list 5 Page 7 | Internal Comments | 876 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Brand item is available only in this vendor | Internal Comments | 876 | ☐ | ☐ | Janelyn Gutierre | 12/27/2019 6:21 PM CST |
| Brand item is available only in this vendor | Internal Comments | 882 | ☐ | ☐ | Janelyn Gutierre | 12/27/2019 6:20 PM CST |
| Brand item is available only in this vendor | Internal Comments | 868 | ☐ | ☐ | Janelyn Gutierre | 12/27/2019 6:21 PM CST |
| Brand item is available only in this vendor | Internal Comments | 872 | ☐ | ☐ | Janelyn Gutierre | 12/27/2019 6:21 PM CST |
| Brand item is available only in this vendor | Internal Comments | 873 | ☐ | ☐ | Janelyn Gutierre | 12/27/2019 6:21 PM CST |
| Goodrich, Charles non-sal list 5 Page 7 | Internal Comments | 876 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Brand item is available only in this vendor | Internal Comments | 876 | ☐ | ☐ | Janelyn Gutierre | 12/27/2019 6:21 PM CST |
| Brand item is available only in this vendor | Internal Comments | 882 | ☐ | ☐ | Janelyn Gutierre | 12/27/2019 6:20 PM CST |
| Brand item is available only in this vendor | Internal Comments | 887 | ☐ | ☐ | Janelyn Gutierre | 12/27/2019 6:20 PM CST |
| Brand item is available only in this vendor | Internal Comments | 889 | ☐ | ☐ | Janelyn Gutierre | 12/27/2019 6:20 PM CST |
| Brand item is available only in this vendor | Internal Comments | 890 | ☐ | ☐ | Janelyn Gutierre | 12/27/2019 6:21 PM CST |
| Goodrich, Charles non-sal list 5 Page 9 | Internal Comments | 891 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Vendor noted: brand exclusive to store | Internal Comments | 899 | ☐ | ☐ | Kate Viola | 12/28/2019 5:20 PM CST |
| Vendor noted: brand exclusive to store | Internal Comments | 899 | ☐ | ☐ | Kate Viola | 12/28/2019 5:20 PM CST |
| Vendor noted: brand exclusive to store | Internal Comments | 904 | ☐ | ☐ | Kate Viola | 12/28/2019 5:21 PM CST |
| Goodrich, Charles non-sal list 6 Page 1 | Internal Comments | 905 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Goodrich, Charles non-sal list 6 Page 3 | Internal Comments | 921 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Goodrich, Charles non-sal list 6 Page 5 | Internal Comments | 936 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| The model given doesn't have available set | Internal Comments | 95 | ☐ | ☐ | John Nelson Mol | 12/19/2019 10:09 PM CST |
| Goodrich, Charles non-sal list 6 Page 7 | Internal Comments | 951 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Brand's name | Internal Comments | 962 | ☐ | ☐ | Jude Rey Solis | 12/27/2019 6:11 PM CST |
| Goodrich, Charles non-sal list 6 Page 9 | Internal Comments | 966 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Brand is exclusively available at Target | Internal Comments | 966 | ☐ | ☐ | Jude Rey Solis | 12/27/2019 6:21 PM CST |
| Brand is exclusively available at Target | Internal Comments | 969 | ☐ | ☐ | Jude Rey Solis | 12/27/2019 6:21 PM CST |
| Brand is exclusively available at Target | Internal Comments | 973 | ☐ | ☐ | Jude Rey Solis | 12/27/2019 6:21 PM CST |
| Goodrich, Charles non-sal list 7 Page 1 | Internal Comments | 981 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |
| Brand is exclusively available at Target | Internal Comments | 984 | ☐ | ☐ | Jude Rey Solis | 12/27/2019 6:21 PM CST |
| Brand is exclusively available at Target | Internal Comments | 987 | ☐ | ☐ | Jude Rey Solis | 12/27/2019 6:21 PM CST |
| Brand is exclusively available at Target | Internal Comments | 988 | ☐ | ☐ | Jude Rey Solis | 12/27/2019 6:21 PM CST |
| Brand is exclusively available at Target | Internal Comments | 989 | ☐ | ☐ | Jude Rey Solis | 12/27/2019 6:21 PM CST |
| Brand is exclusively available at Target | Internal Comments | 993 | ☐ | ☐ | Jude Rey Solis | 12/27/2019 6:21 PM CST |
| Goodrich, Charles non-sal list 7 Page 3 | Internal Comments | 996 | ☐ | ☐ | Israel Javier | 12/26/2019 4:50 PM CST |

| | | | | |
|---|---|---|---|---|
| Change | Status | **Claim status changed**<br>**Old Value:** Closed<br>**New Value:** Reopen | Eric Myers | 01/16/2020 1:31 PM CST |
| Change | Status | **Claim status changed**<br>**Old Value:** Closed<br>**New Value:** Closed | Eric Myers | 01/14/2020 12:03 PM CST |
| Add | Delivery | **Delivery sent**<br>**Type:** Final<br>**To:** [[Adjuster]]<br>**Time & Expenses :** False<br>**Hold for Finance Review :** False | Eric Myers | 01/14/2020 12:03 PM CST |
| Change | Status | **Claim status changed**<br>**Old Value:** Reopen<br>**New Value:** Closed | Eric Myers | 01/14/2020 12:03 PM CST |

| | | | | |
|---|---|---|---|---|
| Add | Delivery | **Delivery sent**<br>**Type:** Final<br>**To:** [[Adjuster]]<br>**Time & Expenses :** False<br>**Hold for Finance Review :** False | Eric Myers | 01/14/2020 12:03 PM CST |
| Change | Status | **Claim status changed**<br>**Old Value:** Reopen<br>**New Value:** Closed | Eric Myers | 01/14/2020 12:02 PM CST |
| Add | Delivery | **Delivery sent**<br>**Type:** Final<br>**To:** [[Adjuster]]<br>**Time & Expenses :** False<br>**Hold for Finance Review :** False | Eric Myers | 01/14/2020 12:02 PM CST |
| Change | Status | **Claim status changed**<br>**Old Value:** Closed<br>**New Value:** Reopen | Eric Myers | 01/14/2020 11:59 AM CST |
| Add | Emails | **Email sent**<br>**From:** emyers@enservio.com<br>**To:** jelliott@chubb.com<br>**Subject:** Claim Complete - Claim#:040519056755 - Insured:Goodrich - Carrier:Chubb | William Dorsett | 12/31/2019 4:48 PM CST |

**From:** emyers@enservio.com
**To:** jelliott@chubb.com
**CC:** uspropertyclaims@chubb.com
**BCC:** billing@enservio.com
**Subject:** Claim Complete - Claim#:040519056755 - Insured:Goodrich - Carrier:Chubb

Dear Jeremy,

Enservio is pleased to inform you that your claim: 040519056755, has been completed.

**Please note, there are 53 lines marked as potentially restorable; due to carrier rules, they have been changed to display/exclude.**

We truly appreciate your business and the opportunity to serve you and your policyholders. Should you have any questions, please contact us toll free at 888-567-7557.

Have a new assignment that we can help you with? Please Click Here to submit an additional claim.

Best Regards,
Enservio

Phone: 888.567.7557
Fax: 877.776.7567
Email: customercare@enservio.com

FinalCVR_31_12_2019_164743.xls

| | | | | |
|---|---|---|---|---|
| Change | Status | **Claim status changed**<br>**Old Value:** Open<br>**New Value:** Closed | William Dorsett | 12/31/2019 4:48 PM CST |
| Add | Delivery | **Delivery sent**<br>**Type:** Final<br>**To:** [[Adjuster]]<br>**Time & Expenses :** True<br>**Hold for Finance Review :** False | William Dorsett | 12/31/2019 4:48 PM CST |
| Change | UserTask | **Issue:** EOM<br>**Owner:** Abigail MacNeill<br>**Next Action Date:**<br>**Status:** Resolved | William Dorsett | 12/31/2019 4:46 PM CST |
| Change | UserTask | **Issue:** DELIVERY PREP<br>**Owner:** William Dorsett<br>**Next Action Date:** 12/31/2019<br>**Status:** Resolved | William Dorsett | 12/31/2019 4:46 PM CST |
| Change | UserTask | **Issue:** ADJUSTER UPDATE<br>**Owner:** Eric Myers<br>**Next Action Date:** 01/14/2020<br>**Status:** Resolved | William Dorsett | 12/31/2019 4:46 PM CST |
| Change | UserTask | **Issue:** BILLING NOTES<br>**Owner:** Unassigned<br>**Next Action Date:**<br>**Status:** Resolved | William Dorsett | 12/31/2019 4:46 PM CST |

| | | | | |
|---|---|---|---|---|
| Change | UserTask | **Issue:** Assigned Lines<br>**Owner:** William Dorsett<br>**Next Action Date:**<br>**Status:** Resolved | William Dorsett | 12/31/2019 4:31 PM CST |
| Change | UserTask | **Issue:** Assigned Lines<br>**Owner:** William Dorsett<br>**Next Action Date:**<br>**Status:** Resolved | William Dorsett | 12/31/2019 3:51 PM CST |
| Add | Task Notes | **Note for Issue:** EOM PROJECTED | Jonathan Place | 12/31/2019 3:39 PM CST |
| Add | UserTask | **Issue:** EOM<br>**Owner:** Abigail MacNeill<br>**Next Action Date:**<br>**Status:** Open | Jonathan Place | 12/31/2019 3:39 PM CST |
| Change | UserTask | **Issue:** PEER REVIEW<br>**Owner:** William Dorsett<br>**Next Action Date:** 12/31/2019<br>**Status:** Resolved | William Dorsett | 12/31/2019 1:10 PM CST |
| Change | UserTask | **Issue:** RTR<br>**Owner:** Unassigned<br>**Next Action Date:**<br>**Status:** Resolved | William Dorsett | 12/31/2019 9:29 AM CST |
| Change | UserTask | **Issue:** PEER REVIEW<br>**Owner:** William Dorsett<br>**Next Action Date changed:**<br>**Old:** 12/27/2019<br>**New:** 12/31/2019<br>**Status:** Open | William Dorsett | 12/31/2019 8:53 AM CST |
| Add | UserTask | **Issue:** RTR<br>**Owner:** Unassigned<br>**Next Action Date:**<br>**Status:** Open | William Dorsett | 12/31/2019 8:52 AM CST |
| Change | UserTask | **Issue:** DELIVERY PREP<br>**Owner:** William Dorsett<br>**Next Action Date changed:**<br>**Old:** 12/30/2019<br>**New:** 12/31/2019<br>**Status:** Open | William Dorsett | 12/31/2019 8:36 AM CST |
| Add | Task Notes | **Note for Issue:** DELIVERY PREP active | William Dorsett | 12/31/2019 8:36 AM CST |
| Change | UserTask | **Issue:** DELIVERY PREP<br>**Owner:** William Dorsett<br>**Next Action Date changed:**<br>**Old:** 12/27/2019<br>**New:** 12/30/2019<br>**Status:** Open | William Dorsett | 12/30/2019 9:59 AM CST |
| Change | UserTask | **Issue:** ADJUSTER UPDATE<br>**Owner:** Eric Myers<br>**Next Action Date changed:**<br>**Old:** 01/03/2020<br>**New:** 01/14/2020<br>**Status:** Open | Eric Myers | 12/30/2019 8:45 AM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Kate Viola<br>**Next Action Date:**<br>**Status:** Resolved | Kate Viola | 12/28/2019 5:21 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Kate Viola<br>**Next Action Date:**<br>**Status:** Resolved | Kate Viola | 12/28/2019 5:21 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Kate Viola<br>**Next Action Date:**<br>**Status:** Resolved | Kate Viola | 12/28/2019 5:21 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Rodrigo Lapastora<br>**Next Action Date:**<br>**Status:** Resolved | Rodrigo Lapastora | 12/27/2019 6:56 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Myra Fernandez<br>**Next Action Date:**<br>**Status:** Resolved | Myra Fernandez | 12/27/2019 6:44 PM CST |

| | | | | |
|---|---|---|---|---|
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Marilyn Ignacio<br>**Next Action Date:**<br>**Status:** Resolved | Marilyn Ignacio | 12/27/2019 6:42 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Jude Rey Solis<br>**Next Action Date:**<br>**Status:** Resolved | Jude Rey Solis | 12/27/2019 6:23 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Janelyn Gutierrez<br>**Next Action Date:**<br>**Status:** Resolved | Janelyn Gutierrez | 12/27/2019 6:21 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** John Richard Punzalan<br>**Next Action Date:**<br>**Status:** Resolved | John Richard Punzalan | 12/27/2019 6:21 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Skarlet Petallar<br>**Next Action Date:**<br>**Status:** Resolved | Skarlet Petallar | 12/27/2019 6:15 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Peter Paul George Mendoza<br>**Next Action Date:**<br>**Status:** Resolved | Peter Paul George Mendoz | 12/27/2019 6:11 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Rodalyn Siena Abalayan<br>**Next Action Date:**<br>**Status:** Resolved | Rodalyn Siena Abalayan | 12/27/2019 6:09 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Shieldon Brina<br>**Next Action Date:**<br>**Status:** Resolved | Shieldon Brina | 12/27/2019 5:57 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Michael P. Convalecer<br>**Next Action Date:**<br>**Status:** Resolved | Michael P. Convalecer | 12/27/2019 5:45 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Jovert Leovido<br>**Next Action Date:**<br>**Status:** Resolved | Jovert Leovido | 12/27/2019 5:45 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner changed**<br>**Old:** Romualdo Anca<br>**New:** John Richard Punzalan<br>**Next Action Date:**<br>**Status:** Open | Romualdo Anca | 12/27/2019 5:36 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Janelyn Gutierrez<br>**Next Action Date:**<br>**Status:** Resolved | Janelyn Gutierrez | 12/27/2019 5:32 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner changed**<br>**Old:** Romualdo Anca<br>**New:** Rodrigo Lapastora<br>**Next Action Date:**<br>**Status:** Open | Romualdo Anca | 12/27/2019 5:11 PM CST |
| Change | UserTask | **Issue:** Assigned Lines<br>**Owner:** Lauren Ericson<br>**Next Action Date:**<br>**Status:** Resolved | Lauren Casolo | 12/27/2019 1:05 PM CST |

| | | | | |
|---|---|---|---|---|
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Rosemary Kress<br>**Next Action Date:**<br>**Status:** Resolved | Rosemary Kress | 12/27/2019 10:27 AM CST |
| Change | UserTask | **Issue:** PEER REVIEW<br>**Owner changed**<br>**Old:** Erin Hollenbank<br>**New:** William Dorsett<br>**Next Action Date:** 12/27/2019<br>**Status:** Open | Erin Hollenbank | 12/27/2019 10:12 AM CST |
| Add | Task Notes | **Note for Issue:** PEER REVIEW<br>repriced for custom framing | Erin Hollenbank | 12/27/2019 10:12 AM CST |
| Change | UserTask | **Issue:** Assigned Lines<br>**Owner:** Erin Hollenbank<br>**Next Action Date:**<br>**Status:** Resolved | Erin Hollenbank | 12/27/2019 10:12 AM CST |
| Change | UserTask | **Issue:** PEER REVIEW<br>**Owner changed**<br>**Old:** Erin Kuhn<br>**New:** Erin Hollenbank<br>**Next Action Date changed:**<br>**Old:**<br>**New:** 12/27/2019<br>**Status:** Open | Erin Kuhn | 12/27/2019 9:40 AM CST |
| Add | Task Notes | **Note for Issue:** PEER REVIEW<br>Hi Erin, could you review these custom frame lines? See note below. Thanks! | Erin Kuhn | 12/27/2019 9:40 AM CST |
| Change | UserTask | **Issue:** Assigned Lines<br>**Owner:** Sadie Howe<br>**Next Action Date:**<br>**Status:** Resolved | Sadie Howe | 12/27/2019 9:37 AM CST |
| Add | Task Notes | **Note for Issue:** DELIVERY PREP<br>STOPPED _ 0.25 _Task Progress Percentage_ Progress Note_ Changes made during triage _Next Action 12/27/2019 | William Dorsett | 12/27/2019 8:40 AM CST |
| Add | UserTask | **Issue:** DELIVERY PREP<br>**Owner:** William Dorsett<br>**Next Action Date:** 12/27/2019<br>**Status:** Open | William Dorsett | 12/27/2019 8:40 AM CST |
| Change | UserTask | **Issue:** TRIAGE - VALUATION<br>**Owner:** William Dorsett<br>**Next Action Date:** 12/27/2019<br>**Status:** Resolved | William Dorsett | 12/27/2019 8:39 AM CST |
| Add | AutoRoute | **Queue Assignments:**<br>General Valuation : 395 | William Dorsett | 12/27/2019 8:36 AM CST |
| Add | Internal Comments | 53 potentially restorable lines. | William Dorsett | 12/27/2019 8:31 AM CST |
| Add | Task Notes | **Note for Issue:** PEER REVIEW<br>items appraised by gen val. all custom frames appraised from big box retailers. i do not feel like these would be LKQ's for custom frames. | William Dorsett | 12/27/2019 8:26 AM CST |
| Add | UserTask | **Issue:** PEER REVIEW<br>**Owner:** Erin Kuhn<br>**Next Action Date:**<br>**Status:** Open | William Dorsett | 12/27/2019 8:26 AM CST |
| Add | Task Notes | **Note for Issue:** TRIAGE - VALUATION<br>active | William Dorsett | 12/27/2019 8:22 AM CST |
| Add | Task Notes | **Note for Issue:** TRIAGE - VALUATION<br>READY_needs expert triage_many items marked "custom" | Jonathan Place | 12/27/2019 7:01 AM CST |
| Change | UserTask | **Issue:** TRANSCRIPTION REQUEST<br>**Owner:** Israel Javier<br>**Next Action Date:**<br>**Status:** Resolved | Israel Javier | 12/26/2019 4:56 PM CST |
| Add | Task Notes | **Note for Issue:** TRIAGE - VALUATION<br>READY _ Criteria 1: CCM Triage _Criteria 2: _Additional Notes: Triage-Val task created due to we enter the sizes together with the description but those small,medium,large sizes was disregarded, Additional inventory start at line 532 and ended at line 1066. Please kindly check | Israel Javier | 12/26/2019 4:56 PM CST |
| Add | UserTask | **Issue:** TRIAGE - VALUATION<br>**Owner:** William Dorsett<br>**Next Action Date:** 12/27/2019<br>**Status:** Open | Israel Javier | 12/26/2019 4:56 PM CST |

| | | | | |
|---|---|---|---|---|
| Change | UserTask | **Issue:** TRANSCRIPTION REQUEST<br>**Owner changed**<br>**Old:** John Benedict Tayco<br>**New:** Israel Javier<br>**Next Action Date:**<br>**Status:** Open | Rodulfo Angeles | 12/26/2019 4:16 PM CST |
| Change | UserTask | **Issue:** TRANSCRIPTION REQUEST<br>**Owner changed**<br>**Old:** Nikki Cris Vergara<br>**New:** John Benedict Tayco<br>**Next Action Date:**<br>**Status:** Open | Rodulfo Angeles | 12/26/2019 2:57 PM CST |
| Change | UserTask | **Issue:** TRIAGE - SETUP<br>**Owner:** William Dorsett<br>**Next Action Date:** 12/26/2019<br>**Status:** Resolved | William Dorsett | 12/26/2019 2:52 PM CST |
| Add | Task Notes | **Note for Issue:** TRANSCRIPTION REQUEST<br>please transcribe files labeled as additional inventory. Thanks! be aware, each pdf has a blank page in between each inventory page. | William Dorsett | 12/26/2019 2:50 PM CST |
| Add | UserTask | **Issue:** TRANSCRIPTION REQUEST<br>**Owner:** Unassigned<br>**Next Action Date:**<br>**Status:** Open | William Dorsett | 12/26/2019 2:50 PM CST |
| Change | UserTask | **Issue:** TRIAGE - SETUP<br>**Owner:** Anthony Gudiel<br>**Next Action Date:**<br>**Status:** Resolved | Anthony Gudiel | 12/26/2019 2:34 PM CST |
| Change | UserTask | **Issue:** TRIAGE - SETUP<br>**New:** Anthony Gudiel<br>**Next Action Date:**<br>**Status:** Open | Anthony Gudiel | 12/26/2019 1:55 PM CST |
| Change | UserTask | **Issue:** TRIAGE - SETUP<br>**New:** Anthony Gudiel<br>**Next Action Date:**<br>**Status:** Open | Anthony Gudiel | 12/26/2019 1:55 PM CST |
| Change | UserTask | **Issue:** TRIAGE - SETUP<br>**Owner changed**<br>**Old:** Unassigned<br>**New:** Anthony Gudiel<br>**Next Action Date:**<br>**Status:** Open | Anthony Gudiel | 12/26/2019 1:55 PM CST |
| Add | UserTask | **Issue:** TRIAGE - SETUP<br>**Owner:** Unassigned<br>**Next Action Date:**<br>**Status:** Open | Sydney Burke | 12/26/2019 1:13 PM CST |
| Add | Task Notes | **Note for Issue:** TRIAGE - SETUP<br>READY _ Criteria 1: CCM Triage _Criteria 2: Unknown _Additional Notes: Please review inventories and determine which items should be included for valuation." | Sydney Burke | 12/26/2019 1:13 PM CST |
| Add | UserTask | **Issue:** TRIAGE - SETUP<br>**Owner:** William Dorsett<br>**Next Action Date:** 12/26/2019<br>**Status:** Open | Sydney Burke | 12/26/2019 1:13 PM CST |
| Change | UserTask | **Issue:** REPLICON<br>**Owner:** Matthew Schillig<br>**Next Action Date:** 12/24/2019<br>**Status:** Resolved | Matthew Schillig | 12/25/2019 10:44 PM CST |
| Add | Task Notes | **Note for Issue:** REPLICON<br>Time has been entered and Expense have been entered and submitted into Replicon. Office time: 5.5 Onsite time: 16 Travel time: 5.5 | Matthew Schillig | 12/25/2019 10:44 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Ryan Paveza<br>**Next Action Date:**<br>**Status:** Resolved | Ryan Paveza | 12/22/2019 11:26 AM CST |

| | | | | |
|---|---|---|---|---|
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Rosemary Kress<br>**Next Action Date:**<br>**Status:** Resolved | Rosemary Kress | 12/20/2019 4:09 PM CST |
| Change | UserTask | **Issue:** Assigned Lines<br>**Owner:** Caroline Donnellan<br>**Next Action Date:**<br>**Status:** Resolved | Caroline Donnellan | 12/20/2019 12:20 PM CST |
| Change | UserTask | **Issue:** PEER REVIEW<br>**Owner:** Caroline Donnellan<br>**Next Action Date:** 12/20/2019<br>**Status:** Resolved | Caroline Donnellan | 12/20/2019 12:20 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Robert Lowell<br>**Next Action Date:**<br>**Status:** Resolved | Robert Lowell | 12/20/2019 11:25 AM CST |
| Add | Task Notes | **Note for Issue:** PEER REVIEW<br>Caroline, Line 140 custom curtains. - Thanks- Steve | Steve Leone | 12/20/2019 11:07 AM CST |
| Add | UserTask | **Issue:** PEER REVIEW<br>**Owner:** Caroline Donnellan<br>**Next Action Date:** 12/20/2019<br>**Status:** Open | Steve Leone | 12/20/2019 11:06 AM CST |
| Change | UserTask | **Issue:** Assigned Lines<br>**Owner:** Richard MacLeod<br>**Next Action Date:**<br>**Status:** Resolved | Richard MacLeod | 12/20/2019 10:49 AM CST |
| Change | Blocker | **Issue:** SELECT VALUATION<br>**Owner:** Jeffrey Lizotte<br>**Next Action Date:** 12/20/2019<br>**Status:** Resolved | Jeffrey Lizotte | 12/20/2019 9:41 AM CST |
| Add | Task Notes | **Note for Issue:** SELECT VALUATION<br>Expert triage complete. Per Ryan: "Hi Jeff - I think this could stay at the Specialist/queue level. Thank you!" | Jeffrey Lizotte | 12/20/2019 9:39 AM CST |
| Change | UserTask | **Issue:** EXPERT TRIAGE<br>**Owner:** Jeffrey Lizotte<br>**Next Action Date:** 12/20/2019<br>**Status:** Resolved | Jeffrey Lizotte | 12/20/2019 9:39 AM CST |
| Change | UserTask | **Issue:** EXPERT TRIAGE<br>**Owner changed**<br>**Old:** Ryan Paveza<br>**New:** Jeffrey Lizotte<br>**Next Action Date:** 12/20/2019<br>**Status:** Open | Ryan Paveza | 12/20/2019 9:29 AM CST |
| Add | Task Notes | **Note for Issue:** EXPERT TRIAGE<br>Hi Jeff - I think this could stay at the Specialist/queue level. Thank you! | Ryan Paveza | 12/20/2019 9:29 AM CST |
| Change | UserTask | **Issue:** ADJUSTER UPDATE<br>**Owner:** Eric Myers<br>**Next Action Date changed:**<br>**Old:**<br>**New:** 01/03/2020<br>**Status:** Open | Eric Myers | 12/20/2019 9:07 AM CST |
| Add | UserTask | **Issue:** LINE FEE BILLING<br>**Owner:** Jeffrey Lizotte<br>**Next Action Date:**<br>**Status:** Open | Jeffrey Lizotte | 12/20/2019 8:46 AM CST |
| Add | Task Notes | **Note for Issue:** Assigned Lines<br>BLOCKED - In triage phase, pending expert triage with Ryan. | Jeffrey Lizotte | 12/20/2019 8:46 AM CST |

| | | | | |
|---|---|---|---|---|
| Add | Task Notes | **Note for Issue:** SELECT VALUATION<br>BLOCKED - In triage phase, pending expert triage with Ryan. | Jeffrey Lizotte | 12/20/2019 8:46 AM CST |
| Add | Task Notes | **Note for Issue:** SELECT VALUATION<br>Triage: 1 line so far – antique mirror, this is labelled for Select perhaps by the SOS. | Jeffrey Lizotte | 12/20/2019 8:45 AM CST |
| Add | Task Notes | **Note for Issue:** EXPERT TRIAGE<br>Please see line 294 and let me know if it requires Select research or not. Thanks! | Jeffrey Lizotte | 12/20/2019 8:45 AM CST |
| Add | UserTask | **Issue:** EXPERT TRIAGE<br>**Owner:** Ryan Paveza<br>**Next Action Date:** 12/20/2019<br>**Status:** Open | Jeffrey Lizotte | 12/20/2019 8:45 AM CST |
| Add | Blocker | **Issue:** SELECT VALUATION<br>**Owner:** Jeffrey Lizotte<br>**Next Action Date:** 12/20/2019<br>**Status:** Open | Jeffrey Lizotte | 12/20/2019 8:41 AM CST |
| Change | UserTask | **Issue:** Queue Assignment<br>**Owner changed**<br>**Old:** Unassigned<br>**New:** Jeffrey Lizotte<br>**Next Action Date:**<br>**Status:** Open | Jeffrey Lizotte | 12/20/2019 8:39 AM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Aldrin Fontanilla<br>**Next Action Date:**<br>**Status:** Resolved | Aldrin Fontanilla | 12/20/2019 12:58 AM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Beverly Usana<br>**Next Action Date:**<br>**Status:** Resolved | Beverly Usana | 12/20/2019 12:58 AM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Ma. Charlyn Talosig<br>**Next Action Date:**<br>**Status:** Resolved | Ma. Charlyn Talosig | 12/19/2019 11:59 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Rodalyn Siena Abalayan<br>**Next Action Date:**<br>**Status:** Resolved | Rodalyn Siena Abalayan | 12/19/2019 11:57 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Jhanine Baruela<br>**Next Action Date:**<br>**Status:** Resolved | Jhanine Baruela | 12/19/2019 11:52 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Michael P. Convalecer<br>**Next Action Date:**<br>**Status:** Resolved | Michael P. Convalecer | 12/19/2019 11:49 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Ma Cristel Cruz<br>**Next Action Date:**<br>**Status:** Resolved | Ma Cristel Cruz | 12/19/2019 11:48 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Jude Rey Solis<br>**Next Action Date:**<br>**Status:** Resolved | Jude Rey Solis | 12/19/2019 11:42 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Myra Fernandez<br>**Next Action Date:**<br>**Status:** Resolved | Myra Fernandez | 12/19/2019 11:42 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Skarlet Petallar<br>**Next Action Date:**<br>**Status:** Resolved | Skarlet Petallar | 12/19/2019 11:40 PM CST |

| | | | | |
|---|---|---|---|---|
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** John Nelson Molina<br>**Next Action Date:**<br>**Status:** Resolved | John Nelson Molina | 12/19/2019 11:38 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Kristel Trasporte<br>**Next Action Date:**<br>**Status:** Resolved | Kristel Trasporte | 12/19/2019 11:38 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Francesca Beza<br>**Next Action Date:**<br>**Status:** Resolved | Francesca Beza | 12/19/2019 11:35 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Shieldon Brina<br>**Next Action Date:**<br>**Status:** Resolved | Shieldon Brina | 12/19/2019 11:29 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Jhanine Baruela<br>**Next Action Date:**<br>**Status:** Resolved | Jhanine Baruela | 12/19/2019 11:26 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner changed**<br>**Old:** Romualdo Anca<br>**New:** Jhanine Baruela<br>**Next Action Date:**<br>**Status:** Open | Romualdo Anca | 12/19/2019 10:58 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner:** Beverly Usana<br>**Next Action Date:**<br>**Status:** Resolved | Beverly Usana | 12/19/2019 10:49 PM CST |
| Change | UserTask | **Issue:** Pulled Lines<br>**Owner changed**<br>**Old:** Romualdo Anca<br>**New:** Jhanine Baruela<br>**Next Action Date:**<br>**Status:** Open | Romualdo Anca | 12/19/2019 10:17 PM CST |
| Add | AutoRoute | **Queue Assignments:**<br>General Valuation : 120 | Michael P. Convalecer | 12/19/2019 10:11 PM CST |
| Change | UserTask | **Issue:** ALKQ<br>**Owner:** Rica Bianca Doloiras<br>**Next Action Date:**<br>**Status:** Resolved | Rica Bianca Doloiras | 12/19/2019 9:39 PM CST |
| Change | UserTask | **Issue:** ALKQ<br>**Owner changed**<br>**Old:** Unassigned<br>**New:** Rica Bianca Doloiras<br>**Next Action Date:**<br>**Status:** Open | Romualdo Anca | 12/19/2019 7:27 PM CST |
| Change | UserTask | **Issue:** PHOTO ATTACHMENT<br>**Owner:** Maricar Ocampo<br>**Next Action Date:**<br>**Status:** Resolved | Maricar Ocampo | 12/19/2019 2:45 PM CST |
| Add | Task Notes | **Note for Issue:** PHOTO ATTACHMENT<br>photo attachment complete | Maricar Ocampo | 12/19/2019 2:45 PM CST |
| Add | Task Notes | **Note for Issue:** ADJUSTER UPDATE<br>Triage complete 12/19/2019 | Maricar Ocampo | 12/19/2019 2:45 PM CST |
| Add | UserTask | **Issue:** ADJUSTER UPDATE<br>**Owner:** Eric Myers<br>**Next Action Date:**<br>**Status:** Open | Maricar Ocampo | 12/19/2019 2:44 PM CST |
| Change | UserTask | **Issue:** PERFORM<br>**Owner:** Matthew Schillig<br>**Next Action Date:** 05/25/2020<br>**Status:** Resolved | Maricar Ocampo | 12/19/2019 2:42 PM CST |
| Change | User Assignments | **Claim Owner changed**<br>**Old Value:** Albert Roman<br>**New Value:** William Dorsett | Maricar Ocampo | 12/19/2019 2:42 PM CST |

| | | | | | |
|---|---|---|---|---|---|
| − | Add | Emails | **Email sent**<br>**From:** ccsi.mocampo@gmail.com<br>**To:** wdorsett@enservio.com<br>**Subject:** Maricar Ocampo has reassigned Claim: 040519056755 to you for review. | Maricar Ocampo | 12/19/2019 2:42 PM CST |

**From:** ccsi.mocampo@gmail.com
**To:** wdorsett@enservio.com
**CC:** ccsi.mocampo@gmail.com
**BCC:**
**Subject:** Maricar Ocampo has reassigned Claim: 040519056755 to you for review.

---

Claim Number: 040519056755

Insured's Name: Charles & Alixandra Goodrich
Created Date: 11/20/2019 7:36:42 PM

The above claim is awaiting for your review.

| | | | | | |
|---|---|---|---|---|---|
| + | Add | Emails | **Email sent**<br>**From:** noreply@enservio.com<br>**To:** aroman@enservio.com<br>**Subject:** Maricar Ocampo has reassigned a Claim: 040519056755 to William Dorsett | Maricar Ocampo | 12/19/2019 2:42 PM CST |
| | Add | Task Notes | **Note for Issue:** ALKQ<br>214 ALKQ_ 0 PRC | Maricar Ocampo | 12/19/2019 2:39 PM CST |
| | Add | UserTask | **Issue:** ALKQ<br>**Owner:** Unassigned<br>**Next Action Date:**<br>**Status:** Open | Maricar Ocampo | 12/19/2019 2:39 PM CST |
| | Change | UserTask | **Issue:** PHOTO ATTACHMENT<br>**Owner changed**<br>**Old:** Unassigned<br>**New:** Maricar Ocampo<br>**Next Action Date:**<br>**Status:** Open | Maricar Ocampo | 12/19/2019 1:58 PM CST |
| | Change | UserTask | **Issue:** TRANSCRIPTION REQUEST<br>**Owner:** Froilan Araneta<br>**Next Action Date:**<br>**Status:** Resolved | Froilan Araneta | 12/19/2019 1:26 PM CST |
| | Add | Task Notes | **Note for Issue:** PHOTO ATTACHMENT<br>Please Perform Photo Attachment and Triage. | Froilan Araneta | 12/19/2019 1:26 PM CST |
| | Add | UserTask | **Issue:** PHOTO ATTACHMENT<br>**Owner:** Unassigned<br>**Next Action Date:**<br>**Status:** Open | Froilan Araneta | 12/19/2019 1:26 PM CST |
| | Change | UserTask | **Issue:** TRANSCRIPTION REQUEST<br>**Owner changed**<br>**Old:** Raul Gringo Villalobos<br>**New:** Froilan Araneta<br>**Next Action Date:**<br>**Status:** Open | Rodulfo Angeles | 12/19/2019 1:11 PM CST |
| | Change | UserTask | **Issue:** TRANSCRIPTION REQUEST<br>**Owner changed**<br>**Old:** Gilmer Tulalian<br>**New:** Raul Gringo Villalobos<br>**Next Action Date:**<br>**Status:** Open | Romualdo Anca | 12/19/2019 6:36 AM CST |
| | Add | Task Notes | **Note for Issue:** TRANSCRIPTION REQUEST<br>Transcription request: uploaded to file is a zipped VF Inventory file which contains 22 files with an approximate length of 1hr 55mins long. Condition on all items is "Good" unless otherwise noted. Also if any lines do not have ages please reference the | Matthew Schillig | 12/18/2019 1:21 PM CST |

| | | | | |
|---|---|---|---|---|
| | | any lines do not have ages please reference the Transcription Special Instructions note with my list of Common Ages to use/add any missing ages other than those listed as New or Allowance. | | |
| Add | UserTask | **Issue:** TRANSCRIPTION REQUEST<br>**Owner:** Unassigned<br>**Next Action Date:**<br>**Status:** Open | Matthew Schillig | 12/18/2019 1:20 PM CST |
| Change | UserTask | **Issue:** UPLOAD ATTACHMENTS<br>**Owner:** Matthew Schillig<br>**Next Action Date:** 12/24/2019<br>**Status:** Resolved | Matthew Schillig | 12/18/2019 1:18 PM CST |
| Add | Task Notes | **Note for Issue:** UPLOAD ATTACHMENTS<br>all attachments are uploaded to file | Matthew Schillig | 12/18/2019 1:18 PM CST |
| Add | Task Notes | **Note for Issue:** PERFORM<br>CXE and adjuster advised I move forward with what inventory I have and should I receive any further inventory or details from insured I will address them in a Supplemental report. | Matthew Schillig | 12/18/2019 1:17 PM CST |
| Change | Blocker | **Issue:** INSURED OR PA LIST<br>**Owner:** Matthew Schillig<br>**Next Action Date:** 12/27/2019<br>**Status:** Resolved | Matthew Schillig | 12/18/2019 1:17 PM CST |
| Add | Task Notes | **Note for Issue:** INSURED OR PA LIST<br>Matthew Schillig Insured or PA List- Insured working on discarded list. Inventory is progressing normally. Our last contact with POC was: 12/16/2019 Onsite Complete pending BFS. Need to receive BFS List The Next Follow Up Is: 12/27/2019 % of Inventory Completed 70% Estimated Blocker Completion Date 12/27/2019 Blocker was created after the insured and I could not finish the BFS list. She is working on it and also obtaining receipts/invoices from vendors for custom contents. | Matthew Schillig | 12/17/2019 8:27 AM CST |
| Change | Blocker | **Issue:** INSURED OR PA LIST<br>**Owner:** Matthew Schillig<br>**Next Action Date changed:**<br>**Old:** 12/18/2019<br>**New:** 12/27/2019<br>**Status:** Open | Matthew Schillig | 12/17/2019 8:20 AM CST |
| Change | UserTask | **Issue:** REPLICON<br>**Owner:** Matthew Schillig<br>**Next Action Date changed:**<br>**Old:** 12/16/2019<br>**New:** 12/24/2019<br>**Status:** Open | Matthew Schillig | 12/17/2019 8:20 AM CST |
| Change | UserTask | **Issue:** UPLOAD ATTACHMENTS<br>**Owner:** Matthew Schillig<br>**Next Action Date changed:**<br>**Old:** 12/16/2019<br>**New:** 12/24/2019<br>**Status:** Open | Matthew Schillig | 12/17/2019 8:20 AM CST |
| Add | Task Notes | **Note for Issue:** PERFORM<br>I had emails with insured, as follows: Alexandra Goodrich Sun 12/15/2019 10:23 PM Hi Matt, Yes, but still tracking a few down. We're at Disney World with the girls, but I will get back with you soon! -Ali Schillig, Matthew (Enservio) Sun 12/15/2019 10:17 PM Hi Ali, I hate to pester you with this but did your vendors send their purchase paperwork to you last week? No rush, just let me know when they do so. Thanks much and have a great week Matt | Matthew Schillig | 12/17/2019 8:20 AM CST |
| Add | Task Notes | **Note for Issue:** PERFORM<br>Called insured, she is still working on the BFS list and says will deliver it next week. | Matthew Schillig | 12/13/2019 7:09 AM CST |

| | | | | |
|---|---|---|---|---|
| Change | Blocker | **Issue:** INSURED OR PA LIST<br>**Owner:** Matthew Schillig<br>**Next Action Date changed:**<br>**Old:** 12/12/2019<br>**New:** 12/18/2019<br>**Status:** Open | Matthew Schillig | 12/13/2019 7:08 AM CST |
| Add | Task Notes | **Note for Issue:** INSURED OR PA LIST<br>Matthew Schillig Insured or PA List- Insured working on discarded list. Inventory is progressing normally. Our last contact with POC was: 12/11/2019 Onsite Complete pending BFS. Need to receive BFS List. The Next Follow Up Is: Matthew Schillig Insured or PA List- Insured working on discarded list. Inventory is progressing normally. Our last contact with POC was: 12/6/2019 Onsite Complete pending BFS. Need to receive BFS List. The Next Follow Up Is: 12/1/9 2019 % of Inventory Completed 70% Estimated Blocker Completion Date 12/6/2019 Blocker was created after the insured and I could | Matthew Schillig | 12/12/2019 11:48 PM CST |
| | | Blocker was created after the insured and I could not finish the BFS list. She and I will work on it over the next week or so via phone and email to finish it. % of Inventory Completed 70% Estimated Blocker Completion Date 12/20/2019 Blocker was created after the insured and I could not finish the BFS list. She and I will work on it over the next week or so via phone and email to finish it. | | |
| Add | Task Notes | **Note for Issue:** INSURED OR PA LIST<br>Matthew Schillig Insured or PA List- Insured working on discarded list. Inventory is progressing normally. Our last contact with POC was: 12/6/2019 Onsite Complete pending BFS. Need to receive BFS List. The Next Follow Up Is: Matthew Schillig Insured or PA List- Insured working on discarded list. Inventory is progressing normally. Our last contact with POC was: 12/6/2019 Onsite Complete pending BFS. Need to receive BFS List. The Next Follow Up Is: 12/1/9 2019 % of Inventory Completed 70% | Matthew Schillig | 12/12/2019 11:46 PM CST |
| | | Estimated Blocker Completion Date 12/6/2019 Blocker was created after the insured and I could not finish the BFS list. She and I will work on it over the next week or so via phone and email to finish it. % of Inventory Completed 70% Estimated Blocker Completion Date 12/20/2019 Blocker was created after the insured and I could not finish the BFS list. She and I will work on it over the next week or so via phone and email to finish it. | | |
| Add | Task Notes | **Note for Issue:** INSURED OR PA LIST<br>Matthew Schillig Insured or PA List- Insured working on discarded list. Inventory is progressing normally. Our last contact with POC was: 12/6/2019 Onsite Complete pending BFS. Need to receive BFS List. The Next Follow Up Is: 12/11/2019 % of Inventory Completed 70% Estimated Blocker Completion Date 12/6/2019 Blocker was created after the insured and I could not finish the BFS list. She and I will work on | Matthew Schillig | 12/12/2019 11:44 PM CST |
| | | I could not finish the BFS list. She and I will work on it over the next week or so via phone and email to finish it. | | |
| Change | UserTask | **Issue:** ADJUSTER UPDATE<br>**Owner:** William Dorsett<br>**Next Action Date:** 12/12/2019<br>**Status:** Resolved | Matthew Schillig | 12/12/2019 11:43 PM CST |
| Add | Task Notes | **Note for Issue:** PERFORM<br>I emailed the insured about the BFS list, no response yet. | Matthew Schillig | 12/06/2019 3:10 PM CST |
| Change | UserTask | **Issue:** UPLOAD ATTACHMENTS<br>**Owner:** Matthew Schillig<br>**Next Action Date changed:**<br>**Old:** 12/10/2019<br>**New:** 12/16/2019<br>**Status:** Open | Matthew Schillig | 12/06/2019 3:09 PM CST |

| | | | | |
|---|---|---|---|---|
| Change | UserTask | **Issue:** REPLICON<br>**Owner:** Matthew Schillig<br>**Next Action Date changed:**<br>**Old:** 12/10/2019<br>**New:** 12/16/2019<br>**Status:** Open | Matthew Schillig | 12/06/2019 3:09 PM CST |
| Change | Blocker | **Issue:** INSURED OR PA LIST<br>**Owner:** Matthew Schillig<br>**Next Action Date changed:**<br>**Old:** 12/06/2019<br>**New:** 12/12/2019<br>**Status:** Open | Matthew Schillig | 12/06/2019 3:09 PM CST |
| Add | Task Notes | **Note for Issue:** INSURED OR PA LIST<br>Matthew Schillig Insured or PA List- Insured working on discarded list. Inventory is progressing normally. Our last contact with POC was: 12/6/2019 Onsite Complete pending BFS. Need to receive BFS List The Next Follow Up Is: 12/11/2019 % of Inventory Completed 70% Estimated Blocker Completion Date<br>Completed 70% Estimated Blocker Completion Date 12/6/2019 Blocker was created after the insured and I could not finish the BFS list. She and I will work on it over the next week or so via phone and email to finish it. | Matthew Schillig | 12/06/2019 3:09 PM CST |
| Change | UserTask | **Issue:** ADJUSTER UPDATE<br>**Owner:** William Dorsett<br>**Next Action Date changed:**<br>**Old:** 12/05/2019<br>**New:** 12/12/2019<br>**Status:** Open | William Dorsett | 12/05/2019 2:49 PM CST |
| Change | UserTask | **Issue:** ADJUSTER UPDATE<br>**Owner changed**<br>**Old:** Eric Myers<br>**New:** William Dorsett<br>**Next Action Date changed:**<br>**Old:** 12/17/2019<br>**New:** 12/05/2019<br>**Status:** Open | Eric Myers | 11/27/2019 12:51 PM CST |
| Add | Task Notes | **Note for Issue:** ADJUSTER UPDATE<br>ocr delivered | Eric Myers | 11/27/2019 12:51 PM CST |
| Change | UserTask | **Issue:** OCR DELIVERY<br>**Owner:** Eric Myers<br>**Next Action Date:** 12/02/2019<br>**Status:** Resolved | Eric Myers | 11/27/2019 12:51 PM CST |
| Change | UserTask | **Issue:** UPLOAD ATTACHMENTS<br>**Owner:** Matthew Schillig<br>**Next Action Date changed:**<br>**Old:** 12/03/2019<br>**New:** 12/10/2019<br>**Status:** Open | Matthew Schillig | 11/27/2019 10:42 AM CST |
| Change | UserTask | **Issue:** REPLICON<br>**Owner:** Matthew Schillig<br>**Next Action Date changed:**<br>**Old:** 12/02/2019<br>**New:** 12/10/2019<br>**Status:** Open | Matthew Schillig | 11/27/2019 10:42 AM CST |
| Add | Task Notes | **Note for Issue:** INSURED OR PA LIST<br>Matthew Schillig Insured or PA List- Insured working on discarded list. Inventory is progressing normally. Our last contact with POC was: 11/27/2019 Onsite Complete pending BFS. Need to receive BFS List. The Next Follow Up Is: 12/5/2019 % of Inventory Completed 70% Estimated Blocker Completion Date 12/6/2019 Blocker was created after the insured and I could not finish the BFS list. She and I will work on it over the next week or so via phone and email to finish it. | Matthew Schillig | 11/27/2019 10:42 AM CST |

| | | | | |
|---|---|---|---|---|
| Add | Blocker | **Issue:** INSURED OR PA LIST<br>**Owner:** Matthew Schillig<br>**Next Action Date:** 12/06/2019<br>**Status:** Open | Matthew Schillig | 11/27/2019 10:42 AM CST |
| Add | Task Notes | **Note for Issue:** OCR DELIVERY<br>OCR is complete and uploaded to file | Matthew Schillig | 11/27/2019 10:37 AM CST |
| Add | UserTask | **Issue:** OCR DELIVERY<br>**Owner:** Eric Myers<br>**Next Action Date:** 12/02/2019<br>**Status:** Open | Matthew Schillig | 11/27/2019 10:37 AM CST |
| Change | UserTask | **Issue:** OCR CREATION<br>**Owner:** Matthew Schillig<br>**Next Action Date:** 12/03/2019<br>**Status:** Resolved | Matthew Schillig | 11/27/2019 10:37 AM CST |
| Add | Task Notes | **Note for Issue:** OCR CREATION<br>OCR is complete and uploaded to file | Matthew Schillig | 11/27/2019 10:37 AM CST |
| Add | Special Instructions | ***Type:*** Appraisal<br>***Value:*** Common Vendors:<br><br>Clothing - boutique stores, Macys, Gap, Target<br>Appliances - building contractor was used<br>Electronics - HD Innovations (local vendor), Best Buy<br>Housewares - private decorators, Williams Sonoma, Macys, Restoration Hardware, Target<br>Furniture - private decorators, Restoration Hardware, Macys | Matthew Schillig | 11/27/2019 10:36 AM CST |
| Add | Special Instructions | ***Type:*** Transcription<br>***Value:*** Ages:<br><br>Clothing - under 1 yr<br>Appliances - under 1 yr<br>Electronics - under 1 yr<br><br>Electronics - under 1 yr<br>Housewares - under 1 yr<br>Furniture - under 1 yr | Matthew Schillig | 11/27/2019 10:34 AM CST |
| Add | Task Notes | **Note for Issue:** PERFORM<br>On November 25, 2019 we arrived to the loss located at 3305 Dell Road, Mountain Brook, Alabama and found the insured, Ms. Goodrich, at the loss. Also onsite was a demo crew from resto Brookstone Restoration working. This loss is a 5 bedroom, 6 bathroom, 3-story house which was just constructed about 2 months ago. A fire occurred in an upstairs bedroom and spread to the adjacent rooms, filling much of the house with smoke and soot. It was extinguished by a local fire department and no one was injured during the fire. The insured couple and their three minor daughters have lived at the house for 1 month as it was newly constructed and most all contents were new/excellent condition. We performed a walkthrough with the insured<br><br>We performed a walkthrough with the insured through the house gathering common vendors, and found a robust packout has been made of about 90% of the contents. Several rooms were empty except for rug pads and items moved into them by the resto company. In the large unfinished basement, which was used for storage, there was no soot but fire fighters' water flooded most of the area. Contents included many cardboard boxes of holiday decorations, clothing, housewares, textiles, sporting equipment and the like. It was evident where the water had reached due to water lines left on the contents and boxes. We found water still in some of the soaked boxes/contents. Later, we walked through the basement with Josh who is the project manager for Brookstone and he confirmed that the water did not reach the furthest area of the basement, and area which contained just boxed contents so we will not inventory this area. Also in the basement was an English horse saddle which | Matthew Schillig | 11/27/2019 10:20 AM CST |

| | | | | |
|---|---|---|---|---|
| | | the basement was an English horse saddle which had mold on it and a womens set of golf clubs, both of which we inventoried as "potentially restorable". Mold was also seen/photographed by us in many of the other boxes of contents. A 5pc dinette set, twin bed, and a clothing wardrobe had small water line marks on their legs but otherwise they were not damaged – we inventoried these as "potentially restorable" as well. Ms. Insured pointed out a few boxes of contents that she was going to donate anyway so we will not inventory these contents for our list. On the main level, light soot was found in most of the rooms except for the Master Closets which we will not inventory. The Master Bathrooms had light soot so we inventoried those areas, mainly toiletries, cosmetics and the like. Other rooms with soot included the Dining, Family Room, Living Room, Foyer, Foyer Closet, Charles Bar, Office Closet, Laundry (but not in the cabinets), Kitchen, Pantry. In the kitchen a packout was made but left behind were many small kitchen electronic appliances as well as the major appliances. We inventoried the small kitchen appliances per Brookstone who advised to do so, as well as the refrigerator which still had rotten food in it. The stove/range, a high-end Wolf unit, was inventoried as "Potentially Restorable" as it would need to be cleaned only and was not damaged per our observations. There is a Mudroom but only a custom bench pad was in the open. Other items were left in the closed storage cabinets and since there was no soot inside them we did not inventory them at all. This situation was the same in the Laundry room. Everything that was on the countertops and in the open we inventoried as the soot was covering them but in the cabinets there was no evidence of soot. The clothes washer and dryer set had soot on the outside and inside. The units also had water poured on them through the ceiling and showed water damage so we inventoried as non-salvageable. When appropriate we would photograph the amount of soot on the countertops or inside the cabinets to show the amount of the substance. In the Master Closet, men's side, all of Mr. Insured's clothing were present. Later, we called the textile packout company CRDN and spoke with Erica. She stated that Mr. Insured advised not to pack his clothes out as he felt they were not d | | |
| Add | Task Notes | **Note for Issue:** PERFORM<br>On 11/22/19 I called the insured to confirm our appointment on Monday and left them a voicemail message introducing ourselves and asking should anything have changed with our 11am appt. on 11/25 them please call us. We did not receive a call back. | Matthew Schillig | 11/24/2019 10:48 PM CST |
| Change | User Assignments | **Claim Owner changed**<br>**Old Value:** Brannon Melton<br>**New Value:** Albert Roman | Brannon Melton | 11/21/2019 2:05 PM CST |
| + Add | Emails | **Email sent**<br>**From:** bmelton@enservio.com<br>**To:** aroman@enservio.com<br>**Subject:** Brannon Melton has reassigned Claim: 040519056755 to you for review. | Brannon Melton | 11/21/2019 2:05 PM CST |
| Add | UserTask | **Issue:** REPLICON<br>**Owner:** Matthew Schillig<br>**Next Action Date:** 12/02/2019<br>**Status:** Open | Brannon Melton | 11/21/2019 2:05 PM CST |

| | | | | |
|---|---|---|---|---|
| Add | UserTask | **Issue:** OCR CREATION<br>**Owner:** Matthew Schillig<br>**Next Action Date:** 12/03/2019<br>**Status:** Open | Brannon Melton | 11/21/2019 2:04 PM CST |
| Change | UserTask | **Issue:** PERFORM<br>**Owner:** Matthew Schillig<br>**Next Action Date changed:**<br>**Old:** 12/03/2019<br>**New:** 05/25/2020<br>**Status:** Open | Brannon Melton | 11/21/2019 2:04 PM CST |
| Add | UserTask | **Issue:** UPLOAD ATTACHMENTS<br>**Owner:** Matthew Schillig<br>**Next Action Date:** 12/03/2019<br>**Status:** Open | Brannon Melton | 11/21/2019 2:04 PM CST |
| Change | UserTask | **Issue:** PERFORM<br>**Owner changed**<br>**Old:** Unassigned<br>**New:** Matthew Schillig<br>**Next Action Date changed:**<br>**Old:**<br>**New:** 12/03/2019<br>**Status:** Open | Brannon Melton | 11/21/2019 2:04 PM CST |
| Change | UserTask | **Issue:** SCHEDULE INVENTORY CREATION<br>**Owner:** Brannon Melton<br>**Next Action Date:** 11/22/2019<br>**Status:** Resolved | Brannon Melton | 11/21/2019 2:01 PM CST |
| Add | Task Notes | **Note for Issue:** SCHEDULE INVENTORY CREATION<br>I have confirmed this appointment for 11/25 at 11:00 AM .Total loss to a 5 bed/6 bath 8,000 5 occupant 2 story home with an unfinished basement - Fire started in 2nd story and spread to attic (there are not many contents in the attic) however there are 4 bedrooms and 4 baths. Adjuster does not think (given the smoke throughout the home) that it is worth trying to restore anything - Please capture all items as presented.This claim is scheduled for 3 days. | Brannon Melton | 11/21/2019 2:01 PM CST |
| Change | UserTask | **Issue:** ADJUSTER UPDATE<br>**Owner:** Eric Myers<br>**Next Action Date changed:**<br>**Old:** 11/27/2019<br>**New:** 12/17/2019<br>**Status:** Open | Eric Myers | 11/21/2019 1:22 PM CST |
| Change | UserTask | **Issue:** SCHEDULE INVENTORY CREATION<br>**Owner:** Brannon Melton<br>**Next Action Date changed:**<br>**Old:** 11/21/2019<br>**New:** 11/22/2019<br>**Status:** Open | Brannon Melton | 11/21/2019 1:00 PM CST |
| Add | Task Notes | **Note for Issue:** SCHEDULE INVENTORY CREATION<br>11/21 FIRST ATTEMP - LVM - N/A 11/22 | Brannon Melton | 11/21/2019 1:00 PM CST |
| Change | User Assignments | **Claim Owner changed**<br>**Old Value:** Nancy Vreeland<br>**New Value:** Brannon Melton | Nancy Vreeland | 11/20/2019 7:41 PM CST |
| Add | Emails | **Email sent**<br>**From:** nvreeland@enservio.com<br>**To:** bmelton@enservio.com<br>**Subject:** Nancy Vreeland has reassigned Claim: 040519056755 to you for review. | Nancy Vreeland | 11/20/2019 7:41 PM CST |
| Add | Internal Comments | Special instructions for Inventory capture. No Contents limit and deductible provided. No scheduled items. Onsite. Request provided and clear. No judgement call needed. | Nancy Vreeland | 11/20/2019 7:41 PM CST |
| Add | UserTask | **Issue:** PERFORM<br>**Owner:** Unassigned<br>**Next Action Date:**<br>**Status:** Open | Nancy Vreeland | 11/20/2019 7:40 PM CST |
| Add | UserTask | **Issue:** BILLING NOTES<br>**Owner:** Unassigned<br>**Next Action Date:**<br>**Status:** Open | Nancy Vreeland | 11/20/2019 7:40 PM CST |

| | | | | |
|---|---|---|---|---|
| Add | UserTask | **Issue:** ADJUSTER UPDATE<br>**Owner:** Eric Myers<br>**Next Action Date:** 11/27/2019<br>**Status:** Open | Nancy Vreeland | 11/20/2019 7:40 PM CST |
| Add | UserTask | **Issue:** SCHEDULE INVENTORY CREATION<br>**Owner:** Brannon Melton<br>**Next Action Date:** 11/21/2019<br>**Status:** Open | Nancy Vreeland | 11/20/2019 7:39 PM CST |
| Add | Emails | **Email sent**<br>**From:** emyers@enservio.com<br>**To:** USPRopertyclaims@chubb.com<br>**Subject:** Claim#:040519056755 - Insured:Goodrich - Carrier:Chubb | Nancy Vreeland | 11/20/2019 7:38 PM CST |

**From:** emyers@enservio.com
**To:** USPRopertyclaims@chubb.com
**CC:**
**BCC:**
**Subject:** Claim#:040519056755 - Insured:Goodrich - Carrier:Chubb

Dear Jeremy Elliott,

Thank you for choosing Enservio, the market leader in contents inventory creation, valuation and replacement. It's our pleasure to serve you.

This message confirms we've received your claim: 040519056755, and have begun working on it.

Also, for your convenience, we've implemented a web-based claim submission/service request form at http://www.enservio.com/submit-claim. It's a quick and easy way for you to assign new claims to us.

We truly appreciate your business and strive to exceed customer expectations - don't hesitate to let us know how we can do that for you!

Regards,

**Enservio**
Phone: 888.567.7557
Fax: 877.776.7567
Email: customer-care@enservio.com

These services are governed by the terms and conditions located at http://www.enservio.com/services-agreement unless the party requesting such services has an existing contract with Enservio, in which case, the terms of the existing contract shall govern.

| | | | | |
|---|---|---|---|---|
| Add | Delivery | **Delivery sent**<br>**Type:** OcrOnly<br>**To:** USPRopertyclaims@chubb.com | Nancy Vreeland | 11/20/2019 7:38 PM CST |
| Add | Special Instructions | ***Type:*** Inventory Capture<br>***Value:*** 11-20-2019 Per CXE - New Fire Loss - started in 2nd story and spread to attic (there are not many contents in the attic) however there are 4 bedrooms and 4 baths. Adjuster does not think (given the smoke throughout the home) that it is worth trying to restore anything<br>Please capture all items as presented.<br><br>No safety restrictions<br>C&O will be complete tomorrow - if the one room is still off limits when we go out please treat as BFS.<br>No other vendors to coordinate with - Pack out is already underway and will be completed by the time we get out there. | Nancy Vreeland | 11/20/2019 7:37 PM CST |
| Add | User Assignments | **Services Claim Owner added**<br>**Value:** William Dorsett | Nancy Vreeland | 11/20/2019 7:36 PM CST |
| Add | User Assignments | **Adjuster Owner added**<br>**Value:** Eric Myers | Nancy Vreeland | 11/20/2019 7:36 PM CST |
| Add | Status | **Claim Status:** Open | Nancy Vreeland | 11/20/2019 7:36 PM CST |

COZEN O'CONNOR

**Alycen A. Moss**
Direct Phone 404-572-2052
Direct Fax 877-728-1396
amoss@cozen.com

PLAINTIFF'S EXHIBIT 5

May 15, 2020

**VIA E-MAIL**

Charles A. Dauphin
Dauphin Paris, LLC
300 Vestavia Pkwy, Ste. 3200
Vestavia Hills, AL 35216

**Re: Insureds: Alexandra Goodrich and Charles Goodrich**
**Claim No.: 040519056755**

Dear Chuck:

As you know, Cozen O'Connor has been retained to represent Pacific Indemnity Insurance Company ("Pacific") with regard to the above-referenced claim. Your correspondence and documentation have been forwarded to me, and I have reviewed in detail. This letter responds to yours and sets forth the status of the items that remain outstanding on the claim.

In total, Pacific has paid $2,016,883.15 on the Goodriches' claim. It has issued payments totaling $1,438,806.50 on the dwelling, payments totaling $298,642.16 on contents (either directly to the Goodriches or to vendors), payments totaling $15,000 under the dwelling mold coverage, payments totaling $147,633.68 under the debris removal feature, and payments totaling $116,800.81 for Additional Living Expenses ("ALE"). While Pacific will certainly pay additional monies on covered items under the terms of the insurance policy at issue, it is not willing to pay for items that are not covered under the policy or duplicates.

Furthermore, I want to make sure I understand your relationship with the insureds and involvement in this claim. It is my understanding that you are the father of the insured, Alexandra Goodrich, and you are also representing Alexandra and Charles Goodrich as their attorney. Additionally, I understand that you bought the Wimbleton home, so you are currently the owner of the rental home that your daughter and her family are living in, and you are seeking rental payments and also seeking to be paid for upgrades to the home. Given the timing, it appears that you bought specifically for your daughter and her family to live in. I am concerned there could be an inherent conflict of interest with your involvement as the "landlord" of the home, and in particular, your request that Pacific pay for improvements to be made on the fixtures of the home.

With that being said, the following responds to your May 4, 2020 letter and the issues raised therein in the order they are discussed in your letter.

A. **Reconstruction and Clean-up (Dwelling) in the Amount of $2,310,548.34**

The Goodriches have submitted the following expenses with respect to the "reconstruction and clean up" of the dwelling:

1. **Reconstruction Estimate (Totaling $1,879,262.79):** Pacific has already paid $1,400,000 for the reconstruction of the dwelling, and it is willing to pay an additional $124,765.84 to total $1,524,765.84. Pacific disagrees with the remaining scope of the insureds' estimate and believes it is overly broad. The following sets forth the disputed issues and adjustments being made (which I believe you have a copy of):

**Bid Difference**

| Line # | Item/Area | Description | TCC | Disputed | Adjusted | Recommended |
|---|---|---|---|---|---|---|
| 1 | Repairs | Original cost | $1,566,052.23 | | | |
| 2 | | Wood mantles | | 50% | $ 5,000.00 | $ - |
| 3 | | Garage Doors | | 100% | $ 3,990.00 | $ - |
| 4 | | Plumbing | | 4% | $ 4,720.21 | $ - |
| 5 | | Generator | | 100% | $ 18,400.00 | $ - |
| 6 | | Builders Risk | | 100% | $ 6,100.00 | $ - |
| 7 | | Doors | | 50% | $ 12,587.50 | $ - |
| 8 | | Door Hardware | | 50% | $ 28,298.00 | $ - |
| 9 | | Cabinetry | - | 37% | $ 97,813.32 | $ - |
| 10 | | HVAC | | 50% | $ 48,391.00 | |
| 11 | | Beams | | 90% | $ 70,114.00 | |
| | | | - | | | $ - |
| 13 | **Subtotal** | | **$1,566,052.23** | | **$ 295,414.03** | **$ 1,270,638.20** |
| 14 | O and P | Calculated at 20% | | | | $ 254,127.64 |
| 15 | **Subtotal** | | | | | |
| 16 | Contingency | | | | | $ - |
| 17 | **Total Repair Budget** | | **$ 1,879,262.79** | | | **$ 1,524,765.84** |

In short, it is my understanding that the mantles, doors, hardware, cabinetry, beams were not damaged and did not need to be replaced. Rather, they could simply be reset. The generator was outside and not damaged, so it does not need to be replaced. Also, the general contractor is typically responsible for its builders risk insurance, and it should not be passing that expense on to the insureds.

2. **Henry Sprott Long & Associates Architects oversight fee (Unclear on total):** You list the oversight fee for Hank Long as $46,981.57 in your listing of projected costs, and then you mention an additional $56,354.84 (2.5%) in the paragraph below. Are these duplicate charges? Pacific will not be paying 2 oversight charges to the architect. Please confirm Hank Long's exact charge.

3. **Slade LLC's remediation bid (Totaling $311,939.80):** I understand this expense is to remediate smoke in the home. First, can you please advise whether the insureds are rebuilding the house or whether they are going to demolish it and start from scratch. If they are demolishing the home, there is no reason to perform smoke remediation. Second, Pacific has gotten several bids for this remediation, and they are half of Slade's bid. Slade's bid does not seem reasonable or customary for the industry in this area.

4. **Remaining balance owed Cliff Zlotnik (Totaling $5,338.41):** As opposed to hiring a local or regional industrial hygienist, I understand that you retained Mr. Zlotnik and incurred expenses in flying him in from Pennsylvania. Jeremy Elliott approved up to $15,000 in expenses for an industrial hygienist, which is more than reasonable and customary. The Goodriches have been paid this $15,000, and Pacific will not be paid additional monies. To the extent there is an outstanding balance, that is the insureds' responsibility.

5. **Estimate to repair the septic field (Totaling $18,000.00):** I understand that Brookstone Restoration may have parked on top of the septic field, and that is why you believe it is damaged. To the extent the septic field was damaged by actions of Brookstone Restoration, the insureds will need to address directly with Brookstone Restoration. Putting this aside, have the insureds performed any tests to determine whether the septic field is, in fact, damaged?

**B. Contents in the Amount of $1,265,086.29**

The Goodriches' contents coverage is $1,500,000. The Policy provides as follows with regard to the insured's duties after a loss:

> Prepare an inventory. You must prepare an inventory of damaged personal property, describing the property in full. It should show in detail the amount insured under this policy and actual amount of the loss. Attach bills, receipts, and other documents to support your inventory.

Policy Terms, Page Y-4.

Additionally, the Policy states as follows with regard to the payment of losses for contents:

> **Payment basis**
>
> Your Coverage Summary indicates the payment basis for contents.
>
> **Replacement cost.** If the payment basis is replacement cost, we will pay the full cost to replace the contents without deduction for depreciation, or the amount required to repair the damage, whichever is less, up to the amount of coverage.
>
> However, for contents which are obsolete or unusable for the purpose for which they were originally intended because of their age or condition, the payment basis will be actual cash value.
>
> **Actual cash value.** If the payment basis is actual cash value, we will pay the cost to replace the contents less depreciation, or the amount required to repair the damage, whichever is less, up to the amount of coverage.

---

> **Pairs, sets, and parts**. For a covered loss to a pair or set, or to part of a larger unit, we will pay whichever is least: the cost to repair the damaged property to its condition before the loss; the cost to replace it; or the cost to make up the difference between its market value before and after the loss.
>
> However, if you agree to surrender the undamaged article(s) of the pair, set, or parts to us and we agree to accept, we will pay you the full replacement cost of the entire pair, set, or parts.

The following discusses the items in your letter:

1. **Inventory submitted by Iris & Co. (Totaling $1,225,307.66):** I have reviewed the invoice submitted by Iris & Co., but it contains no backup documentation, such as receipts. Additionally, we need to understand which contents items these are replacing. Please provide this information, and we can consider.

2. **Magali Somers Maus Estimate #1 (Remaining balance of $23,825.00) + Magali Somers Maus Estimate # 2 (in the amount of $15,000.00):** Magali's estimate to restore the antiques was $100,000, and Pacific agreed to pay this amount. Pacific has paid $75,000, and it will pay the remaining balance of $23,825. We do not appear to have Estimate # 2. Can you please submit and we will review.

3. **HD Innovations Estimate (Totaling $36,451.48):** Please provide an itemized invoice with regard to this estimate.

**C. <u>Landscape in the Amount of $150,000</u>**

The policy limit on landscaping is $150,000, and the Policy states as follows:

> **Landscaping**
>
> We cover trees, shrubs, plants, and lawns, which are on the grounds of your house and other permanent structures, against certain kinds of perils. These are fire, lightning, explosion, civil disturbance, vandalism, malicious mischief, theft, and loss caused by a vehicle or aircraft.
>
> ...
>
> This extra coverage does not apply to naturally occurring or native grown vegetation, including but not limited to brush, woodlands, forests, grasslands, wetlands or mangroves. We also do not cover vineyards, sod farms, tree farms, orchards, and crops grown or used primarily for business purposes.

> This extra coverage applies only if you begin to repair or replace the lost or damaged property within 180 days of the date of loss, or a later date if agreed to by us.

The insureds' landscaping costs were included in the TCC estimate above (a $50,000 line item + 20%). This appears to be a duplicate charge and will not be paid.

**D. Additional Living Expenses Totaling $291,483.90 Through August 2021**

"Extra Coverages" are addressed on page B-5 of the Policy, which provides as follows with regard to Extra living expenses:

> **Extra living expenses.** If a covered loss makes your house or other permanent structure uninhabitable, we cover the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living, including the boarding of domestic animals not primarily owned or kept for business use. We will pay for the boarding of your domestic animals displaced from another permanent structure even when you have not been displaced by the covered loss. We cover these increases to your normal living expenses for a period of time commencing with the date of loss and ending with the earliest of the following:
>
> - the reasonable amount of time required to restore your house or other permanent structure to a habitable condition;
> - the shortest amount of time required to settle elsewhere if you or members of your household permanently relocate;
> - the reasonable amount of time required to restore the house or other permanent structure to the condition it was in prior to the covered loss if you are newly constructing your house or other permanent structure or constructing additions, alterations, or renovations to your house or other permanent structure at the time of a covered loss, but we will only cover the increase in your normal living expenses incurred by you; or
> - up to two years from the date of loss, or a later date if agreed to by us.

Policy, p. B-5 (Emphasis added).

Thus, an insured is only entitled to be reimbursed for extra living expenses if there is an increase in his/her normal living expenses due to the loss. Furthermore, the additional living expenses must be actually incurred by the Goodriches. The Policy does not pay for a regular living expense that they would have paid on a normal, everyday basis. Furthermore, the policy does not pay for expenses that would typically be incurred by someone else, such as a landlord.

The following addresses each of the items listed in your Statement of Additional Living Expenses through March 31, 2020 in the order in which you have them in the letter:

---

1. **March Additional Living Expenses (Totaling $61,961.83)**

   a. Window treatments and hardware purchased for use at the Fairway Drive rental (totaling 5,918.90): I understand the Goodriches installed new curtains in their rental home. This expense is not considered to be a "reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living;" thus, it is not payable. Do these window treatments replace any from their Dell Road home? If so, please advise which ones.

   b. Media invoice from HD Innovations (totaling $4,820.04): I understand this was for labor to remove existing TVs (7) and audio visual gear from Dell Road and store for inspection, as well as the purchase of new TVs (4) and labor to install and set up TVs (3) at rental. Again, this is not considered to be a reasonable increase in the insureds' normal living expenses. Do the TVs replace any of the TVs from their Dell Road home? If so, please advise which ones.

   c. TCC invoice for interior painting of the Fairway rental (totaling $14,100): Again, this is not an extra living expense per the terms of the policy. If the Goodriches felt that the Fairway rental needed to be painted before moving in, then they should have discussed with the landlord. If the landlord did not agree, then the Goodriches would be expected to do this at their own expense.

   d. Valet Moving (Move from Fairway Drive rental to Wimbleton Drive (totaling $4,042.75); February expenses for receiving, storing and transporting (totaling $3,162) + March expenses for receiving, storing and transporting (totaling $4,388): Pacific is not willing to pay for the insureds to move from the Fairway Drive rental to Wimbleton Drive. The insureds chose the rental, and it was their choice to move to the Wimbleton Drive home after you bought it. With regard to the storage invoices, can you please provide additional information advising exactly what is being stored?

   e. Install security system at Wimbleton Drive (totaling $2,747.80): This is not an extra living expense per the terms of the policy. If the Goodriches felt that the Wimbleton rental needed to have a security system installed, then they should have discussed with you, as their landlord and owner of the home. This is considered to be a fixture that will stay with the house; therefore, it is your responsibility (as the owner of the home) to install in your rental home. If you were not willing to do this, then the Goodriches could have installed at their own expense or found another rental that was more suitable.

   f. Greenlight Electric to install lighting at Wimbleton Drive (totaling $1,630): Again, this is not an extra living expense per the terms of the policy. If the Goodriches felt that the Wimbleton rental needed to have lighting installed, then they should have discussed with you, as their landlord and owner of the home. This is considered to be a fixture that will stay with the house; therefore, it is your responsibility (as the owner of the home) to install in your rental home. If you

were not willing to do this, then the Goodriches could have installed at their own expense or found another rental that was more suitable.

g. Iris & Company (totaling $20,394.20): I understand these are expenses for blackout shades, rugs, window hardware, and labor to measure and install. The blackout shades, window hardware, and labor to measure and install are not extra living expenses per the terms of the policy. As is discussed above, these are fixtures that will stay with the house; therefore, it is your responsibility (as the owner of the home) to install in your rental home. If you were not willing to do this, then the Goodriches could have installed at their own expense or found another rental that was more suitable. As for the rugs, do they replace rugs that were at the Dell Road home? If so, please advise which ones.

h. Greenlight Electric (totaling $1,630), BWWB (totaling $32.31), Spectrum (totaling $538), Mr. Buggs (totaling $85), and Alabama Power (totaling $152.58): The Greenlight Electric charge is duplicative of the expense listed above and is not payable for the reasons stated. Can you please provide invoices for utilities at the Dell Road home for the 3 months prior to the loss. Also, please advise us whether the insureds are currently paying power, cable, water and pest expenses at the Dell Rd house?

2. **April Additional Living Expenses (Totaling $39,008.07):** We do not appear to have any documentation regarding additional living expenses for April. Please submit, and we will review.

3. **Monthly Expenses (Utilities, Landscaping, Pest Control, Valet Moving inventory management, etc.) (Totaling $56,000.00)**: These expenses appear to be duplicates of those included with the March and April expenses and will not be paid twice.

4. **Rental Expense – Wimbleton (January 1, 2021 - August 31, 2021) (Totaling $36,000):** It is my understanding that you bought the Wimbleton home in January 2020. I'm assuming that you bought specifically for your daughter and her family to live in. So any rent that you are claiming as additional living expenses is rent the insureds are paying to you. Putting this aside, at this time, Pacific is not willing to pay for rental expense into 2021.

5. **Rental Expense - Storage Units (May 2020 - August 2021) (Totaling $57,600.00)** – At this time, Pacific is not willing to pay for rental expense into 2021.

6. **Moving Expense - Wimbleton & Storage Units to Dell Road (Totaling $18,500.00)** – Pacific will pay for moving expenses back to Dell Road when this expense is incurred.

7. **ADT Security System Replacement (Totaling $2,414.00):** This expense appears to be a duplicate of those included with the March expenses. As is stated above, it is not payable.

8. **Cost of Additional Furniture (Totaling $20,000.00)**: What is the additional furniture? We have not been provided information on this.

**E. <u>Proof of Loss and Examination Under Oath</u>**

The insureds' obligations following a loss are outlined in the Property Conditions, Your duties after a loss, which provides as follows:

> **Proof of loss.** You must submit to us your signed, sworn proof of loss providing all information and documentation we request such as the cause of loss, inventories, receipts, repair estimates and other similar records.
>
> **Examination under oath.** We have the right to examine separately under oath as often as we may reasonably require you, family members and any other members of your household and have them subscribe the same. We may also ask you to give us a signed description of the circumstances surrounding a loss and your interest in it, and to produce all records and documents we request and permit us to make copies.

Per the above-referenced Policy provision, the Policy requires the insureds to submit a sworn proof of loss. I have enclosed a proof of loss. Please have the insureds complete, sign under oath, and return to me.

Additionally, I would like to take the examination under oath of Mr. and Mrs. Goodrich to discuss this claim. Can you please provide me with some dates that they are available in June? I am hopeful that the social distancing guidelines will be lifted by then so that we can do it in person.

**F. <u>Conclusion</u>**

In sum, at this time, Pacific plans to pay an additional $124,765.84 on the dwelling, plus $23,825 for the remaining balance on Estimate # 1 from Magali Somers Maus, totaling **$148,590.84**. As for the other expenses discussed above, we look forward to receiving the information requested and working towards a resolution of this claim.

Pacific's investigation is ongoing, and nothing that has been done, or will be done, by or for Pacific should be construed as a waiver of Pacific's rights or defenses. Pacific reserves all of its rights under the Policy and the law. You should not construe any statements or actions by Pacific or its representatives as a waiver of its rights unless a specific waiver is communicated to you in writing.

If you have any questions, please do not hesitate to contact me.

---

Yours very truly,

COZEN O'CONNOR

Alycen Moss

By: Alycen A. Moss

AAM
Enclosure

COZEN O'CONNOR

June 26, 2020

**Alycen A. Moss**
Direct Phone 404-572-2052
Direct Fax 877-728-1396
amoss@cozen.com

**VIA E-MAIL**

Charles A. Dauphin
Dauphin Paris, LLC
300 Vestavia Pkwy, Ste. 3200
Vestavia Hills, AL 35216

**Re: Insureds: Alexandra Goodrich and Charles Goodrich**
**Claim No.: 040519056755**

Dear Chuck:

I write in response to your May 18, 2020, June 1, 2020, and June 9, 2020 correspondence with regard to the above-referenced claim.

**A. Response to May 18, 2020 Email**

Your May 18, 2020 email requests an additional payment in the amount of $100,969.90 for additional living expenses ("ALE") incurred by the Goodriches. My May 15, 2020 letter addressed most of the items listed in your May 18 submission, so I refer you to that letter for our coverage position on those items. In this letter, I set forth our position and questions with regard to the items not previously addressed.

As I've previously said, the Policy does not cover all living expenses, but only covers "extra" or additional living expenses. *See* Policy, p. B-5. Thus, an insured is only entitled to be reimbursed for extra living expenses if there is an increase in his/her normal living expenses due to the loss. Furthermore, the additional living expenses must be actually incurred by the Goodriches. The Policy does not pay for a regular living expense that they would have paid on a normal, everyday basis. Furthermore, the policy does not pay for expenses that would typically be incurred by someone else, such as a landlord.

The following addresses each of the new, previously unaddressed, items listed in your Statement of Additional Living Expenses through April 2020:

1. <u>4/3/2020 Monthly Security Bill From ADT Security Services ($73.58)</u>: Are the insureds paying for security at the Dell Road house? If so, please provide proof of payment for security at the Dell Road home since the loss.

2. <u>4/9/2020 Monthly Water Bill ($48.37)</u>: We've previously asked that the insureds provide invoices for utilities at the Dell Road home for the 3 months prior to the loss, and reiterate that request again. Also, please provide the insureds' invoices for any water bills that they have paid at the Dell Road home since the loss.

PLAINTIFF'S EXHIBIT 7

3. <u>4/15/2020 TCC invoice for interior painting of the Wimbleton rental ($12,700)</u>: This is not an extra living expense per the terms of the Policy. If the insureds felt the rental needed to be painted, they should have asked you – as their landlord – to paint. If you did not agree, then the insureds could have rented elsewhere or painted at their own expense.

4. <u>4/18/2020 Monthly Cable/Internet Bill ($184.66)</u>: We've previously asked that the insureds provide invoices for cable at the Dell Road home for the 3 months prior to the loss, and reiterate that request again. Also, please provide the insureds' invoices for any cable/internet bills that they have paid at the Dell Road home since the loss.

5. <u>4/18/2020 Monthly Power Bill ($213.57)</u>: We've previously asked that the insureds provide invoices for utilities at the Dell Road home for the 3 months prior to the loss, and reiterate that request again. Also, please provide the insureds' invoices for any power bills that they have paid at the Dell Road home since the loss.

6. <u>4/23/2020 Valet Moving Storage Unit Rental ($3,600.00)</u>: Please provide additional information advising exactly what is being stored.

7. <u>4/24/2020 Labor to Alter, Deliver, and Install Window Treatments at the Wimbleton rental ($4,773.50)</u>: It is our understanding that the Goodriches installed four custom pleated drapery panels, custom shades for the master bedroom, custom shades for the master bathroom, a window seat cover, and an insert for the window seat in their rental home. This expense is not a "reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living;" thus, it is not payable. Moreover, these are not extra living expenses per the terms of the policy because they are fixtures that will stay with the house; therefore, it is your responsibility (as the owner of the home) to install in your rental home. If you were not willing to do this, then the Goodriches could have installed at their own expense or found another rental that was more suitable. Do these window treatments replace any from their Dell Road home? If so, please advise which ones.

8. <u>4/24/2020 Labor to Alter, Deliver, and Install Window Treatments at the Wimbleton rental ($8,010.20)</u>: It is our understanding that the Goodriches installed sheer panels for the dining room, drapery panels with lining and interlining for the living room, sheer drapery panels with contrast trim for the bedroom, and custom shades for the kitchen in their rental home. As I said above, this expense is not a "reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living;" thus, it is not payable. Moreover, these are not extra living expenses per the terms of the policy because they are fixtures that will stay with the house; therefore, it is your responsibility (as the owner of the home) to install in your rental home. If you were not willing to do this, then the Goodriches could have installed at their own expense or found another rental that was more suitable. Do these window treatments replace any from their Dell Road home? If so, please advise which ones.

9. <u>4/29/2020 Monthly Gas Bills for February, March, and April 2020 (totaling $274.19)</u>: We've previously asked that the insureds please provide invoices for utilities at the Dell Road home for the 3 months prior to the loss, and reiterate that request again. Also,

please provide the insureds' invoices for any gas bills that they have paid at the Dell Road home since the loss.

10. 4/30/2020 Installation of Carpet and Rug Pads ($9,130.00): We understand this is for padding and installation of seagrass carpet for the basement and stairs in the Wimbleton rental. This expense is not a "reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living;" thus, it is not payable. Moreover, these are not extra living expenses per the terms of the policy because they are fixtures that will stay with the house; therefore, it is your responsibility (as the owner of the home) to install in your rental home. If you were not willing to do this, then the Goodriches could have installed at their own expense or found another rental that was more suitable.

**B. Response to June 1, 2020 Letter**

Your June 1, 2020 letter addresses a number of issues regarding the dwelling, contents, and ALE portions of the Goodriches' claim. As to contents, we are still awaiting documentation to support the Goodriches' claims. When we receive the requested documentation, we will evaluate the scope of coverage for the Goodriches' contents. As to ALE, we are still awaiting responses to our prior requests for information. In this regard, I reiterate that the policy covers additional/extra living expenses only for the time reasonably necessary to make repairs, and does not cover future, un-incurred expenses.

The bulk of your June 1, 2020 letter addresses the dwelling portion of the Goodriches' claim. As you correctly note, when a covered loss occurs, the policy requires Pacific to pay for the lesser of the amount required at the time of loss to repair, replace, or rebuild the damaged structure. Here, the house can be repaired, but the insureds have chosen to demolish and replace the entire house. The insureds can certainly make that choice, but they are not entitled to be paid additional monies under the policy due to their voluntary decision to go over and above what is necessary to repair the home.

The insureds are requesting payment for work and/or repairs that are unnecessary if the Goodriches are tearing down the house, as well as costs associated with tearing down and rebuilding the house. Pacific is not obligated under to pay for both the cost to repair and the cost to rebuild, and it is not obligated to pay for repairs and/or other work that are unnecessary given the fact that the house is being demolished.

The following addresses the specific items you reference in your June 1, 2020 letter:

1. Wood Mantles, Plumbing, Doors, Door Hardware, Cabinetry, HVAC, and Beams:

The bid differences for the wood mantles, plumbing, doors, door hardware, cabinetry, HVAC, and beams arise from a disagreement between Pacific and the Goodriches regarding whether these items need to be replaced. The Goodriches' estimate was based on the value to remove and replace the items, while Pacific's original estimate was based on the value to detach, clean, and reset the items so that they could be used in the same manner as before the loss. JS Held, a consulting firm with significant construction expertise, inspected the loss and

---

concluded that the items were not damaged and did not need to be replaced. Rather, each item could be reused after cleaning and, in some cases, repainting and/or refinishing. In reaching its valuation for these items, JS Held calculated the average prices of the items adjusted upwards by 15% to account for potential market conditions that could serve to enhance their value.

While Pacific continues to maintain this position, it revised the original JS Held estimate upwards three times in an effort to settle the claim and satisfy the Goodriches. Thus, Pacific's latest estimate represents the halfway point between its assessment of the true value of the loss and the Goodriches' assessment of the value to fully replace all items affected by the loss. Pacific continues to maintain that all items could be fully reused, but has offered a higher percentage of the true repair cost in the spirit of good-faith compromise. Accordingly, Pacific's estimate already represents numbers that are significantly higher than the true value of the loss.

In addition to the inflated value of these items, we note that some items, such as the door, are in storage, indicating that the Goodriches do not intend to replace them. Pacific will not pay to fully replace items that the Goodriches can, and intend to, reuse.

2. Generator: You concede that you do not know whether the generator was damaged. Pacific is not obligated to pay for potential damage, only actual damage.

3. Builder's Risk: Builder's risk insurance, as its name implies, is insurance purchased by a builder, not a homeowner. Pacific is not obligated to pay for the insurance of the contractor hired to rebuild the Goodriches' home.

4. Architect's Fee: You assert that the Goodriches have not asked that the architect's fee be paid twice. However, you list the oversight fee for Hank Long as $46,981.57 in your listing of projected costs, and then you mention an additional $56,354.84 as Hank Long's "architectural oversight fee." If this is not a duplicate charge, please explain the difference between these two items.

5. Slade LLC Remediation Fee: You concede that the Goodriches' decision to tear down the house "negates the need for the remediation work to have been performed by Slade LLC." Pacific is only obligated to pay for actual repairs, not repairs that may have hypothetically been necessary had the insureds taken a different course of action. Because there is no actual need for remediation work, Pacific is not obligated to pay for it.

6. Cliff Zlotnik: You correctly note that I have made Pacific's position clear on the balance owed to Cliff Zlotnik in my previous letter.

7. Septic Field: You concede that you do not know whether the septic field has been damaged. Pacific is not obligated to pay for potential damage, only actual damage. If you would like to further pursue this claim, Pacific would like to inspect the septic field to determine the nature and scope of any alleged damage.

Although Pacific maintains it is not liable for any payments beyond its original estimate, it is prepared to offer the Goodriches $1,600,000, in exchange for a release of the dwelling portion

of their claim. This settlement offer represents an increase for replacement of all the interior doors and hardware, cabinets, countertops, and other disputed items. However, Pacific will not pay for the tear-down and rebuilding of the Goodriches' house. Moreover, Pacific emphasizes that its coverage position remains unchanged; it simply makes this offer in a good faith effort to work with the insureds towards a resolution of the claim.

**C. Response to June 9, 2020 Email**

Your June 9, 2020 email seeks additional living expenses for May 2020, as well as additional furniture. The following addresses each item:

1. <u>$46.99 May Bill for Security System at Wimbleton rental home</u>: It does not appear that the Goodriches are currently paying for security at their Dell Road home. As noted above, the policy only covers extra living expenses if there is an increase in normal living expenses due to the loss. The Policy does not pay for a regular living expense that the Goodriches would have paid on a normal, everyday basis. If you contend that the current security bill exceeds what the Goodriches would have paid for security at their Dell Road home, please submit security invoices for the Dell Road home from the date of loss. Also, as we've previously requested, please submit invoices for three months prior to the loss.

2. <u>$171.34 May Bill for Power at Wimbleton rental home</u>: We've previously asked that the insureds provide invoices for utilities at the Dell Road home for the three months prior to the loss, and reiterate that request again. Please also provide the insureds' invoices for any power bills that they have paid at the Dell Road home since the loss.

3. <u>$53.53 May Bill for Sewer and Water at Wimbleton rental home</u>: We've previously asked that the insureds provide invoices for utilities at the Dell Road home for the three months prior to the loss, and reiterate that request again. Please also provide the insureds' invoices for any sewer and water bills that they have paid at the Dell Road home since the loss.

4. <u>$184.66 May Bill for Cable/Internet/Phone at Wimbleton rental home</u>: It is our understanding that the Goodriches are not currently paying for cable, internet, or phone service at their Dell Road home. As noted above, the policy only covers extra living expenses if there is an increase in normal living expenses due to the loss. The Policy does not pay for a regular living expense that they would have paid on a normal, everyday basis. If you contend that the current bills for cable, internet, and/or phone service exceed what the Goodriches would have paid for these services at their Dell Road home, please submit invoices for these services at the Dell Road home for three months prior to the loss.

5. <u>$3,600.00 May Bill for Storage</u>: The storage units appear to contain furniture from the Dell Road home and replacement furniture for the same items. Pacific will not pay for storage of both old and new furniture items if only one is needed. In addition, it is unclear why some of those furniture items are too large to be used in the Wimbleton home. For example, why can't the Goodriches use their silverware,

---

Keurig coffee pod maker, microwave, and dining room chairs in the Wimbleton home instead of paying to store them?

6. $37.98 May Bill for Gas: We've previously asked that the insureds provide invoices for utilities at the Dell Road home for the three months prior to the loss, and reiterate that request again. Please also provide the insureds' invoices for any gas bills that they have paid at the Dell Road home since the loss.

7. $12,894.20 for Additional Furniture: The Goodriches seek $12,894.20 for an additional $5,764.00 Fargo sofa and $5,608.00 Heyburn chair. However, the Policy covers normal living expenses, not luxury furniture to remodel rental homes. The average cost of a sofa is approximately $1,500, and the average cost of a club chair is below $1,000. Does this replace furniture that was damaged as a result of the loss? If so, please specifically advise what these items replace.

We have received the spread sheet of purported utility charges at Dell Road for the three months preceding the loss, but this is insufficient. It does not show what was actually charged and paid for each month, and it does not show when each payment was made. Please provide the invoices for utilities at the Dell Road home for three months prior to the loss and for each month since the loss.

**D. Response to My May 15 Letter and EUOs**

We are still awaiting your complete response to my prior letter, as well as the insureds' sworn proof of loss per the policy requirements as outlined in my previous letter. Additionally, please let us know whether the Goodriches are available for in-person examinations under oath on August 4, 5, or 6, 2020.

We remind you that Pacific's investigation is ongoing, and nothing that has been done, or will be done, by or for Pacific should be construed as a waiver of Pacific's rights or defenses. Pacific reserves all of its rights under the Policy and the law. You should not construe any statements or actions by Pacific or its representatives as a waiver of its rights unless a specific waiver is communicated to you in writing.

If you have any questions, please do not hesitate to contact me.

Yours very truly,

COZEN O'CONNOR

Alycen Moss

By: Alycen A. Moss

AAM

COZEN O'CONNOR

November 6, 2020

**Alycen A. Moss**
Direct Phone 404-572-2052
Direct Fax 877-728-1396
amoss@cozen.com

**VIA E-MAIL**

Charles A. Dauphin
Dauphin Paris, LLC
300 Vestavia Pkwy, Ste. 3200
Vestavia Hills, AL 35216

**Re: Insureds: Alexandra Goodrich and Charles Goodrich**
**Claim No.: 040519056755**

Dear Chuck:

Pacific Indemnity Insurance Company ("Pacific") has carefully considered the information provided, testimony from the Examinations Under Oath ("EUO"), and pertinent policy provisions, and it has determined it will pay the following pursuant to the terms of the Policy.

**A. Contents**

The insureds' Amended Sworn Statement in Proof of Loss with respect to contents states that "the Gross Amount claimed for lost contents is $1,576,501.91,which includes the amount that has already been paid under the Contents coverage." Pacific has made payments totaling $298,642.16 on contents (either directly to the Goodriches or to vendors). The coverage for contents is $1,500,000, yet the Goodriches are requesting that they be paid $1,507,500. I'm not sure how they reached this amount, but regardless, we do not feel the Goodriches have met their obligations under the Policy. As we have previously discussed, the Policy provides as follows with regard to the insured's duties after a loss:

> Prepare an inventory. You must prepare an inventory of damaged personal property, describing the property in full. It should show in detail the amount insured under this policy and actual amount of the loss. Attach bills, receipts, and other documents to support your inventory.

Policy Terms, Page Y-4.

In an effort to work with the Goodriches, Pacific is willing to pay the following:

1. Contents Inventory: We reviewed the inventory at length in Mrs. Goodrich's EUO, and there is minimal backup documentation for the replacement items. We are willing to consider the invoices of Iris & Co. that were submitted as backup documentation for the original cost and will pay that amount which totals $656,070.66. We have



PLAINTIFF'S EXHIBIT

added 10% in tax to total $65,607.06.[1] The total amount Pacific will pay on contents is $721,677.72.

2. Magali Somers Maus: Pacific is willing to pay the remaining balance of $23,825 on Estimate #1, as well as Estimate # 2 in the amount of $15,000.00, totaling $38,825.

3. TVs from HD Innovations (on Invoice # 1617): Mr. Goodrich testified that these TVs will replace TVs in the Dell Road home. Based on this testimony, Pacific will pay for the TVs totaling $4,231.04.

Thus, Pacific will pay an additional **$764,733.76** under the Contents coverage.

## B. Additional Living Expenses

Pacific has previously made payments totaling $116,800.81 for Additional Living Expenses ("ALE"). "Extra Coverages" are addressed on page B-5 of the Policy, which provides as follows with regard to Extra living expenses:

> **Extra living expenses.** If a covered loss makes your house or other permanent structure uninhabitable, we cover the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living ... .

Policy, p. B-5 (Emphasis added).

Thus, an insured is only entitled to be reimbursed for extra living expenses if there is an increase in his/her normal living expenses due to the loss. Furthermore, the additional living expenses must be actually incurred by the Goodriches. The Policy does not pay for a regular living expense that they would have paid on a normal, everyday basis. Furthermore, the policy does not pay for expenses that would typically be incurred by someone else, such as a landlord.

With this in mind, and based on the testimony of Mr. and Mrs. Goodrich, Pacific is willing to pay the following additional living expenses:

1. Valet Moving: Pacific will pay a total of $24,461.00 representing the following expenses related to Valet Moving:

   a. $4,042.75 (Invoice # 013120.01 dated 2/4/2020): Move from the Fairway Drive rental to Wimbleton Drive;

   b. $3,162.00 (Invoice # 022820.01 dated 2/28/2020): Move items from Magali shop, and VM storage to Wimbleton Drive

   c. $3,120.00 (Invoice # 030420.21 dated 3/4/2020): February/March expenses for receiving, storing and transporting

[1] Mrs. Goodrich testified that tax could be 9-10%, and we have calculated using the rate of 10%.

   d. $4,388.25 (Invoice # 032420.05 dated 3/24/2020): Storage and expense from transport and movement of furniture from VM storage to Magali workshop, rental house and Julio's Upholstery

   e. $3,600.00 (Invoice # 050120.24 dated 5/5/2020): May expense for storage

   f. $3,748.00 (Invoice # 060720.01 dated 6/7/2020): April and May expenses for transporting furniture

   g. $2,400.00 (Invoice # 060720.20 dated 6/7/2020): June expense for storage

2. Birmingham Water Works: Pacific will pay $449.92 for the following invoices:

   a. 12/27/2019 invoice in the amount of $84.44 for Fairway Drive

   b. 1/29/2020 invoice in the amount of $108.75 for Fairway Drive

   c. 1/31/2020 invoice in the amount of $5.43 for Fairway Drive (final bill)

   d. 1/31/2020 invoice in the amount of $113.88 for Wimbleton Drive (which included establishment fee of $43 and surety deposit of $60)

   e. 3/2/2020 invoice in the amount of $30.36 for Wimbleton Drive

   f. 4/24/2020 invoice in the amount of $53.53 for Wimbleton Drive

   g. 5/26/2020 invoice in the amount of $53.53 for Wimbleton Drive

3. Mr. Buggs Pest Control: Based on Mrs. Goodrich's testimony, the Goodriches were paying for pest control at Dell Road through June 2020. Based on this testimony, Pacific will pay the following invoices that have been submitted totaling $255:

   a. 12/12/2019 invoice in the amount of $85 for Fairway Drive

   b. 4/2/2020 invoice in the amount of $85 for Wimbleton Drive

   c. 6/1/2020 invoice in the amount of $85 for Wimbleton Drive

4. Alabama Power: Based on Mrs. Goodrich's testimony, the Goodriches are currently paying for power at Dell Road. Based on this testimony, Pacific will pay the following invoices that have been submitted totaling $1,193.61:

   a. 12/2/2019-12/12/2019 invoice totaling $90.81 for Fairway Drive

   b. 12/12/2019-1/13/2020 invoice totaling $192.26 for Fairway Drive

   c. 1/13/2020-1/31/2020 invoice totaling $109.20 for Fairway Drive

d. Opening bill totaling $40.00 for Wimbleton Drive

e. 1/15/2020-2/13/2020 invoice totaling $109.91 for Wimbleton Drive

f. 2/13/2020-3/16/2020 invoice totaling $150.58 for Wimbleton Drive

g. 4/14/2020-5/14/2020 invoice totaling $171.34 for Wimbleton Drive

h. 5/14/2020-6/15/2020 invoice totaling $329.51 for Wimbleton Drive

5. Spire: Based on Mrs. Goodrich's testimony, the Goodriches are currently paying $8/month for their gas meter, but otherwise, they are not paying for gas at Dell Road. Based on this testimony, Pacific will pay $80 (10 months x $8/month).

6. Landscape/yard work: Based on Mrs. Goodrich's testimony that the Goodriches are currently paying for landscape/yard work at the Dell Road house, Pacific will pay the following totaling $1,948.98:

   a. Blackjack Horticulture Invoice # 6321 dated 12/24/19 in the amount of $316.99 for landscape management at the Fairway Drive house in December 2019

   b. Blackjack Horticulture Invoice # 6490 dated 1/25/2020 in the amount of $316.99 for landscape management at the Fairway Drive house in January 2020

   c. Lopez Landscaping Invoice # 1142 dated 4/26/2020 in the amount of $1,000 for April and May lawn service at Wimbleton Drive

   d. Lopez Landscaping Invoice # 1143 dated 4/26/2020 in the amount of $315 for mulch at Wimbleton Drive

In sum, the Goodriches are being paid **$28,388.51** for their additional living expenses.

## C. Proof of Loss

Thank you for the submission of the first Proof of Loss, as well as the Amended Proof of Loss. The policy provides as follows with regard to a proof of loss:

> **Proof of loss.** You must submit to us your signed, sworn proof of loss providing all information and documentation we request such as the cause of loss, inventories, receipts, repair estimates and other similar records.

We are unable to accept or reject the Proof of Loss and/or Amended Proof of Loss because it is inconsistent with the documentation that has been submitted in support.

**D. Conclusion**

In sum, at this time, Pacific plans to pay the following under separate cover:

| Coverage | Description of Payment | Amount |
|---|---|---|
| Contents | Inventory | $721,677.72 |
| | Magali Somers Maus | $38,825.00 |
| | TVs from HD Innovations | $4,231.04 |
| ALE | Valet Moving | 24,461.00 |
| | Birmingham Water Works | $449.92 |
| | Mr. Buggs Pest Control | $255.00 |
| | Alabama Power | $1,193.61 |
| | Spire (gas) | $80.00 |
| | Landscape | $1,948.98 |
| **TOTAL** | | **$793,122.27** |

Pacific's investigation is ongoing, and nothing that has been done, or will be done, by or for Pacific should be construed as a waiver of Pacific's rights or defenses. Pacific reserves all of its rights under the Policy and the law. You should not construe any statements or actions by Pacific or its representatives as a waiver of its rights unless a specific waiver is communicated to you in writing.

If you have any questions, please do not hesitate to contact me.

Yours very truly,

COZEN O'CONNOR

Alycen Moss

By: Alycen A. Moss

AAM
Enclosure

COZEN O'CONNOR

**Alycen A. Moss**
Direct Phone 404-572-2052
Direct Fax 877-728-1396
amoss@cozen.com

**Amy Dessel Katz**
Direct Phone 404-909-7367
adkatz@cozen.com

May 19, 2021

**VIA EMAIL**

Charles A. Dauphin
Dauphin Paris, LLC
300 Vestavia Pkwy, Ste. 3200
Vestavia Hills, AL 35216

| | | |
|---|---|---|
| **Re:** | **Insureds:** | **Alexandra Goodrich and Charles Goodrich** |
| | **Policy No.:** | **001494547801** |
| | **Policy Period:** | **June 18, 2019 to June 18, 2020** |
| | **Claim No.:** | **040519056755** |
| | **Date of Loss:** | **11/18/2019** |
| | **Location:** | **3305 Dell Road<br>Mountain Brook, AL 35223** |

Dear Chuck:

As you know, Cozen O'Connor has been retained to represent Pacific Indemnity Insurance Company ("Pacific") with regard to the above-referenced claim. Please allow this correspondence to respond to your March 19, 2021 letter. The following discusses the remaining items in your claim.

**A. Dwelling**

You claim Pacific owes an additional $1,024,496.27 with regard to the dwelling. In support of that number, you sent the following spreadsheet:

| Amount | Notes |
|---|---|
| $44,780.02 | TCC - Demo |
| $20,338.41 | Cliff Zlotnik - Professional Services |
| $311,939.89 | Slade LLC - Remediation Bid |
| $2,009,647.43 | TCC - Reconstruction Estimate |
| $50,241.19 | Henry Sprott Long & Associates Architects - Project Administration Fee |
| $25,800.00 | Iris & Co. - Professional Services for Reconstruction |
| $13,141.83 | HD Innovations - Audio/Video Estimate (Dwelling Expenses Highlighted) |
| $2,414.00 | ADT - Quote to Replace Security System |
| $2,478,302.77 | TOTAL |
| | |
| -$38,806.50 | LESS Check #4708941 dated 01/29/2020 |
| -$15,000.00 | LESS Check #4773672 dated 03/02/2020 |
| -$1,400,000.00 | LESS Check #4853904 dated 04/13/2020 |
| | |
| **$1,024,496.27** | **Remaining balance due** |

PLAINTIFF'S EXHIBIT 10
PENGAD 800-631-6989

The following addresses each of these items:

1. Demo Costs ($44,780.02): As you know, Pacific has already paid for the demo costs. It will not pay for this duplicative cost.

2. Cliff Zlotnik ($20,338.41): As we have previously explained on multiple occasions, Pacific will not pay the remaining balance due from the Goodriches to Mr. Zlotnik. As opposed to hiring a local or regional industrial hygienist, the insureds retained Mr. Zlotnik and incurred expenses in flying him in from Pennsylvania. Jeremy Elliott approved up to $15,000.00 in expenses for an industrial hygienist, which is more than reasonable and customary. This amount has been paid, and any additional, outstanding balance due to Mr. Zlotnik or any other industrial hygienist is the insureds' responsibility.

3. Slade LLC's Remediation Bid ($311,939.80): As we have said previously, there is no need to perform smoke remediation because the insureds demolished and reconstructed the Property. As such, Pacific will not pay this item.

4. TCC Reconstruction Estimate: Although it does not appear the mantles, doors, hardware, cabinetry, and beams were damaged, in a good faith effort to resolve this matter, Pacific is willing to pay to replace these items. Pacific will also pay for the builder's risk insurance given the EUO testimony, although this expense is not typically not passed on to the homeowner. Based on TCC's estimate of these costs, Pacific will pay the insureds $268,303.82 for these items.

5. Henry Sprott Long & Associates Architect's Oversight Fee: It is our understanding that TCC will be doing the oversight, so it is unclear why the architect needs to do this as well.

6. Invoice from Iris & Co. for $25,800.00: This invoice is not a dwelling expense and is discussed below under extra living expenses.

7. HD Innovations Estimate ($36,451.48): This invoice is not a dwelling expense and is discussed below under contents.

8. ADT Quote to replace security system in rental house (2,414.00): As we've previously stated, this is not payable under the terms of the Policy.

In sum, Pacific is willing to pay an additional **$268,303.82** under the Dwelling coverage.

**B. Contents**

1. Iris & Co. Decorator Services: On March 19, 2021, you provided an Estimate of ]Costs for Reconstruction Services for Iris & Co. in the amount of $25,800.00. Pacific has reviewed this document and has determined that it is payable. As such, Pacific will remit payment for this expense under the Dwelling section of the Policy in the amount of **$25,800.00**.

---

2. Furniture at Wimbleton House: You have submitted multiple invoices for furniture that was bought for the Wimbleton rental house as follows:

   - July 21, 2020 invoice from Iris & Co. with the following items: a sofa and fabric ($5,764.00); two club chairs and fabric ($5,608.00); shaggy rug ($2,449.00); shipping ($473.00); and sales tax ($1,243.89), totaling $15,537.89. $14,486.20 was subtracted from that amount for deposits received, leaving a balance of $1,051.69.

   - October 20, 2020 invoice from Iris & Co. with the following items: fabric for master headboard ($2,528.00); king-size Louis XVI ($4,190.00); daybed ($5,385.00); installation of art and mirrors ($350.00); shipping ($559.00); and sales tax ($1,089.27), totaling $16,629.27. $7,863.00 was subtracted from that amount for deposits received, leaving a balance of $6,238.27.

   - September 27, 2020 receipt from Frontgate for two (2) étagères and two tension-mount shower rods, for a total of $1,865.97.

   - November 10, 2020 invoice from Iris & Co. with the following items: labor to reupholster six (6) chair seats for kitchen ($2,142.50); labor to custom-make shower curtain ($275.00); delivery fee ($120.00); cane twin headboards ($4,512.00.00); shipping ($250.00); and sales tax ($430.83), totaling $7,730.33. $2,933.00 was subtracted from that amount for deposits received, leaving a balance of $4,797.33.

   - December 8, 2020 invoice from Iris & Co. for hourly consultation charges on the Wimbleton home.

Please advise whether any of these items replace items at the home.

3. Magali Somers Maus Estimates ($23,825.00; $15,000.00): These have has been paid previously.

4. HD Innovations Estimate ($36,451.48): Pacific has paid of $4,231.00 of this invoice already. On May 15, 2020, we requested that the insureds provide an itemized invoice with regard to this estimate. On March 19, 2021, you resubmitted the HD Innovations estimate, dated February 18, 2020, in the amount of $36,451.48, but have still not provided additional information on these items.

**C. Landscape**

On March 19, 2021, you provided an executed Sworn Statement in Proof of Loss on behalf of the insureds, setting forth a claim for $150,000.00 for the Landscaping. In support of this claim, you submitted a bid prepared by Southern Scape in the amount of $161,351.00. The bid was dated December 4, 2020, and identified the property for which it was prepared only as "Goodrich Residence, Birmingham, AL."

As we said in the May 15, 2020 letter, the insureds' landscaping costs were included in the TCC estimate, so this appears to be a duplicate charge. Moreover, it is unclear how the fire damaged the landscaping to the extent claimed. Please advise as to the meaning of "disturbed areas." Please also advise as to the need for adjustment of irrigation and/or an irrigation allowance. Irrigation is located underground, and as such should not have been affected by the loss.

Finally, it is unclear from the Southern Scape estimate what property is being landscaped. Can you please confirm what property needs the landscaping work?

**D. <u>Additional Living Expenses</u>**

Pacific has paid the monthly rental expense for the Wimbleton home through December 31, 2020, and it is agreeable to paying an additional 6 months of rental expense through June 30, 2021, in the amount of **$27,000.00**.

As a reminder, Pacific only covers extra living expenses for the following time period:

> We cover these increases to your normal living expenses for a period of time commencing with the date of loss and ending with the earliest of the following:
> - the reasonable amount of time required to restore your house or other permanent structure to a habitable condition;
> - the shortest amount of time required to settle elsewhere if you or members of your household permanently relocate;
> - the reasonable amount of time required to restore the house or other permanent structure to the condition it was in prior to the covered loss if you are newly constructing your house or other permanent structure or constructing additions, alterations, or renovations to your house or other permanent structure at the time of a covered loss, but we will only cover the increase in your normal living expenses incurred by you; or
> - up to two years from the date of loss, or a later date if agreed to by us.

Mr. and Mrs. Goodrich testified that it took about a year and a half to build the house on Dell Road originally; thus, this would be "the reasonable amount of time required to restore the house or other permanent structure to the condition it was in prior to the covered loss if you are newly constructing your house." The fire occurred on November, 18, 2019; thus, it would reasonably be expected that the house would be reconstructed no later than June 2021.

With that being said, Pacific will only pay extra living expenses through June 30, 2021. The following items are payable from your submissions:

1. <u>Valet Moving:</u> Pacific will pay a total of **$28,314.50** representing storage expenses related to Valet Moving:

---

$ 3,200.00 - portion of July 6, 2020 invoice for storage;
$ 2,400.00 - portion of August 2, 2020 invoice for storage;
$ 2,400.00 - portion of September 10, 2020 invoice for storage;
$ 3,886.50 - October 13, 2020 invoice;
$ 3,200.00 - portion of October 25, 2020 invoice for storage;
$ 3,200.00 - December 13, 2020 invoice;
$ 3,200.00 - January 3, 2021 invoice;
$ 3,200.00 - February 7, 2021 invoice; and
$ 3,628.00 - March 2, 2021 invoice.

The following invoices appear to be charges for the delivery and assembly of items such as a headboard, assorted furniture, and three beds, for the rental property. Pacific will also pay for these items:

$ 997.00 - July 6, 2020 invoice, exclusive of $3,200.00 for storage;
$ 1,507.00 - August 2, 2020 invoice, exclusive of $2,400.00 for storage;
$ 758.50 - September 10, 2020 invoice, exclusive of $2,400.00 for storage; and
$ 1,098.50 - October 25, 2020 invoice, exclusive of $3,200.00 for storage.

2. Birmingham Water Works: Pacific will pay **$538.84** for the following invoices:

$ 49.97 - June 23, 2020 invoice;
$ 49.97 - July 24, 2020 invoice;
$ 49.97 - August 25, 2020 invoice;
$ 103.50 - September 24, 2020 invoice;
$ 46.42 - October 23, 2020 invoice;
$ 57.09 - November 25, 2020 invoice;
$ 57.09 - December 29, 2020 invoice;
$ 57.09 - January 27, 2021 invoice; and
$ 67.74 - February 25, 2021 invoice.

3. Alabama Power: Pacific will pay a total of **$1,862.93** for the following invoices:

$ 281.02 - July 30, 2020 invoice;
$ 291.24 - August 28, 2020 invoice;
$ 340.93 - September 27, 2020 invoice;
$ 192.93 - October 29, 2020 invoice;
$ 180.38 - November 27, 2020 invoice;
$ 156.38 - December 28, 2020 invoice;
$ 144.51 - January 30, 2021 invoice;
$ 127.30 - February 27, 2021 invoice; and
$ 148.24 - March 29, 2021 invoice.

4. Fidel Lopez Landscaping: Pacific will pay a total of **$3,500.00** for the following invoices:

$ 500.00 - June 29, 2020 invoice;

$ 500.00 - August 2, 2020 invoice;
$ 500.00 - September 2, 2020 invoice;
$ 500.00 - October 4, 2020 invoice;
$ 500.00 - November 5, 2020 invoice;
$ 500.00 - November 30, 2020 invoice; and
$ 500.00 - January 2, 2021 invoice.

5. Spire: Pacific will pay a total of **$8.00**, for the invoice dated June 19, 2020. As set forth in prior letters, this amount is based on Mrs. Goodrich's testimony that the Goodriches are paying $8.00 per month for their gas meter, but are otherwise not paying for gas at Dell Road.

As you know, the insureds are only entitled to be reimbursed for extra living expenses if there is an increase in their normal living expenses due to the loss. Furthermore, the additional living expenses must be actually incurred by the Goodriches. The Policy does not pay for a regular living expense that they would have paid on a normal, everyday basis. Also, the Policy does not pay for expenses that would typically be incurred by someone else, such as a landlord. With that said, the following items are not covered under the Policy as additional living expenses, and as such will not be paid by Pacific:

1. ADT Security Services: Per your July 20, 2020 letter, the Goodriches are not paying for security at Dell Road. Therefore, the following invoices for ADT Security Services expenses are not payable as extra living expenses under the Policy:
   $ 73.58 - April 3, 2020 invoice; and
   $ 46.99 - June 1, 2020 invoice.

2. Interior Decorating and Renovation at Rental Property: As we previously advised, these expenses are not covered as extra living expenses. To the extent that any of these invoices include items that are intended to replace items damaged as a result of the loss, please advise us as to which items they are intended to replace. Otherwise, the following invoices are not payable:

   $ 4,773.50 - April 24, 2020 invoice for moving window treatments;
   $ 8,010.20 - April 24, 2020 invoice for moving window treatments;
   $ 9,130.00 - April 30, 2020 invoice for carpet and rug pad installation;
   $ 53,429.05 - June 30, 2020 invoice for renovation of Wimbleton house;
   $ 2,768.43 - August 3, 2020 invoice for televisions and installation at Wimbleton house; and
   $ 339.66 - September 21, 2020 invoice for television installation at Wimbleton house.

**E. Conclusion**

In sum, at this time, Pacific plans to pay the following:

| | | |
|---|---|---|
| $ 268,303.82 | Dwelling | TCC |
| $ 25,800.00 | Contents | Iris & Co. |

| | | |
|---|---|---|
| $ 27,000.00 | ALE | Rent, January 2021 to June 2021 |
| $ 538.84 | ALE | Water, July 2020 to March 2021 |
| $ 8.00 | ALE | Gas, July 2020 |
| $ 1,862.93 | ALE | Power, July 2020 to March 2021 |
| $ 3,500.00 | ALE | Landscaping, July 2020 to January 2021 |
| $ 28,314.50 | ALE | Storage, July 2020 to March 2021 |
| **$ 355,328.09** | **Total** | |

As for the other expenses discussed above, we look forward to receiving the information requested and working towards a resolution of this claim.

Pacific's investigation is ongoing, and nothing that has been done, or will be done, by or for Pacific should be construed as a waiver of Pacific's rights or defenses. Pacific reserves all of its rights under the Policy and the law. You should not construe any statements or actions by Pacific or its representatives as a waiver of its rights unless a specific waiver is communicated to you in writing.

If you have any questions, please do not hesitate to contact me.

Yours very truly,

COZEN O'CONNOR

Alycen Moss

By: Alycen A. Moss

AAM
Enclosure

Case 2:22-cv-00021-MHH Document 29-9 Filed 04/26/22 Page 1 of 2

FILED
2022 Apr-26 PM 01:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

**STATE OF ALABAMA }**

**JEFFERSON COUNTY }**

**AFFIDAVIT OF IRIS THORPE**

Before me, Donna Hampton, a Notary Public in and for the County and State aforesaid, personally appeared Iris Thorpe, who is known to me and being by me first duly sworn, deposes and says:

My name is Iris Thorpe. I am the owner of Iris & Co., an interior design firm in Mountain Brook, Alabama. I have worked with Ali Goodrich for over 10 years and assisted her in her interior designs in several houses, including her house at Dell Road. Over the years, Ali has purchased numerous pieces of furniture and other interior furnishings from Iris & Co.

After the fire at the Goodrich home, Ali asked me to assist her in finding replacement items for the furniture and interior furnishings she lost due to the fire. This affidavit confirms the effort I undertook at Ali's request as set forth in my letter of to her, which I understand Ali provided to her insurance company.

The prices provided Ali, and included by Ali in her contents spread sheet, are the prices Iris & Co would charge for each item it listed. The prices and related costs given Ali are the replacement costs for the items listed.

Iris Thorpe
Iris Thorpe
Owner, Iris & Co.

8-25-20
Date

PLAINTIFF'S EXHIBIT 12
PENGAD 800-631-6989

Case 2:22-cv-00021-MHH Document 29-9 Filed 04/26/22 Page 2 of 2

Sworn to before me and subscribed in my presence this 25th day of August, 2020.

Notary Public

My Commission Expires: 2/24/24

PLAINTIFF'S EXHIBIT 21

Will you please send a link to access pictures?

Sent from my iPhone

On Jan 10, 2020, at 12:27 PM, Elliott, Jeremy E <jelliott@chubb.com> wrote:

Mr. & Mrs. Goodrich, I have attached the Enservio content inventory with replacement cost totaling $141,963.30. This inventory also includes 53 lines marked as potentially restorable. We typically request the insured utilize their own preferred vendors for restoring items and can make recommendations if needed. Once you determine whom will make those repairs, please submit the proposal for review prior to the start of any work. Brookstone has indicated they have resources to assist should you require.

Additionally, at the initial inspection, there were several items that you requested a local vendor, Maglia Malis pick up for restoration. I am pending that inventory with repair estimate for review, discussion and resolution.

Please review the attached Enservio inventory and contact me directly with any questions.

Thank You

Jeremy Elliott,MBA
Senior General Adjuster, Claims

1400 Urban Center Drive, Suite 450, Vestavia Hills, Alabama 35242, USA
O 205-470-8370 F 205-968-5496
E jelliott@chubb.com

*For more information on your Claim experience with Chubb, visit us here:* Chubb Claim Guidance

*Welcome to Chubb Claims. Life is about to get easier.*

I strive to take care of all inquiries and questions directly with you. If you need to speak with my supervisor, please contact Wally Haessig at (214) 460-1779 or via e-mail at whaessig@chubb.com.

**From:** Alexandra Goodrich [mailto:aligoodrich@gmail.com]
**Sent:** Friday, January 10, 2020 11:42 AM
**To:** Elliott, Jeremy E <jelliott@chubb.com>
**Cc:** <charles@timberlineholdings.com> <charles@timberlineholdings.com>; Chuck Dauphin <cdauphin@dauphinparis.com>
**Subject:** [EXTERNAL] Claims for Loss of Personal Items

PLAINTIFF'S EXHIBIT 22

PENGAD 800-631-6989

Will you please send a link to access pictures?

Sent from my iPhone

On Jan 10, 2020, at 12:27 PM, Elliott, Jeremy E <jelliott@chubb.com> wrote:

Mr. & Mrs. Goodrich, I have attached the Enservio content inventory with replacement cost totaling $141,963.30. This inventory also includes 53 lines marked as potentially restorable. We typically request the insured utilize their own preferred vendors for restoring items and can make recommendations if needed. Once you determine whom will make those repairs, please submit the proposal for review prior to the start of any work. Brookstone has indicated they have resources to assist should you require.

Additionally, at the initial inspection, there were several items that you requested a local vendor, Maglia Malis pick up for restoration. I am pending that inventory with repair estimate for review, discussion and resolution.

Please review the attached Enservio inventory and contact me directly with any questions.

Thank You

Jeremy Elliott,MBA
Senior General Adjuster, Claims

1400 Urban Center Drive, Suite 450, Vestavia Hills, Alabama 35242, USA
O 205-470-8370 F 205-968-5496
E jelliott@chubb.com

*For more information on your Claim experience with Chubb, visit us here:* Chubb Claim Guidance

*Welcome to Chubb Claims. Life is about to get easier.*

I strive to take care of all inquiries and questions directly with you. If you need to speak with my supervisor, please contact Wally Haessig at (214) 460-1779 or via e-mail at whaessig@chubb.com.

**From:** Alexandra Goodrich [mailto:aligoodrich@gmail.com]
**Sent:** Friday, January 10, 2020 11:42 AM
**To:** Elliott, Jeremy E <jelliott@chubb.com>
**Cc:** <charles@timberlineholdings.com> <charles@timberlineholdings.com>; Chuck Dauphin <cdauphin@dauphinparis.com>
**Subject:** [EXTERNAL] Claims for Loss of Personal Items

Jeremy,

Please outline the steps I need to follow to submit claims for loss of personal items, furniture, contents, etc. Many of the items that were lost were custom and require a long lead time--even up to a year--for them to be made. Therefore, we need to start receiving reimbursements for the lost items so we can place orders to replace them.

Ali

---

This email (including any attachments) is intended for the designated recipient(s) only, and may be confidential, non-public, proprietary, and/or protected by the attorney-client or other privilege. Unauthorized reading, distribution, copying or other use of this communication is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) should not be deemed a waiver of any privilege or protection. If you are not the intended recipient or if you believe that you have received this email in error, please notify the sender immediately and delete all copies from your computer system without reading, saving, printing, forwarding or using it in any manner. Although it has been checked for viruses and other malicious software ("malware"), we do not warrant, represent or guarantee in any way that this communication is free of malware or potentially damaging defects. All liability for any actual or alleged loss, damage, or injury arising out of or resulting in any way from the receipt, opening or use of this email is expressly disclaimed.
<Goodrich- Enservio Report.xls>

PLAINTIFF'S EXHIBIT 23

PENGAD 800-631-6989

From: Elliott, Jeremy E
To: Alexandra Goodrich; Eric Myers
Cc: <charles@timberlineholdings.com>; Chuck Dauphin; US Property Claims
Subject: RE: PACIFIC INDEMNITY COMPANY- claim #040519056755- Claims for Loss of Personal Items
Date: Tuesday, January 14, 2020 10:23:15 AM

Eric, can you please forward a photo inventory of the contents to the insured. I did not receive a photo inventory with the summary.

Thank You

Jeremy Elliott,MBA
Senior General Adjuster, Claims

1400 Urban Center Drive, Suite 450, Vestavia Hills, Alabama 35242, USA
O 205-470-8370 F 205-968-5496
E jelliott@chubb.com

*For more information on your Claim experience with Chubb, visit us here:* Chubb Claim Guidance

*Welcome to Chubb Claims. Life is about to get easier.*

I strive to take care of all inquiries and questions directly with you. If you need to speak with my supervisor, please contact Wally Haessig at (214) 460-1779 or via e-mail at whaessig@chubb.com.

**From:** Alexandra Goodrich [mailto:aligoodrich@gmail.com]
**Sent:** Tuesday, January 14, 2020 10:00 AM
**To:** Elliott, Jeremy E <jelliott@chubb.com>
**Cc:** <charles@timberlineholdings.com> <charles@timberlineholdings.com>; Chuck Dauphin <cdauphin@dauphinparis.com>; US Property Claims <uspropertyclaims@Chubb.com>
**Subject:** [EXTERNAL] Fwd: PACIFIC INDEMNITY COMPANY- claim #040519056755- Claims for Loss of Personal Items

Jeremy,

Please respond with the link to pictures. I need them in order to review Enservio's contents inventory.

---------- Forwarded message ---------
From: **Alexandra Goodrich** <aligoodrich@gmail.com>
Date: Fri, Jan 10, 2020 at 12:40 PM
Subject: Re: PACIFIC INDEMNITY COMPANY- claim #040519056755- Claims for Loss of Personal Items
To: Elliott, Jeremy E <jelliott@chubb.com>
Cc: <charles@timberlineholdings.com> <charles@timberlineholdings.com>, Chuck Dauphin <cdauphin@dauphinparis.com>, US Property Claims <uspropertyclaims@chubb.com>

| | |
|---|---|
| From: | Elliott, Jeremy E |
| To: | Alexandra Goodrich; Eric Myers; Joni Holman; US Property Claims |
| Cc: | Charles; Chuck Dauphin |
| Subject: | Re: PACIFIC INDEMNITY COMPANY claim 040519056755- Goodrich |
| Date: | Thursday, January 16, 2020 12:19:30 PM |

Mr. Goodrich, please provide documented support regarding any content items you believe have been valued incorrectly for our review. Enservio can make changes as necessary once we receive support for any disputed items.

My email was in reference to your contractor repair estimate for the dwelling repairs. At our walk thru on 11-21-19. TCC advised they would provide their proposal within a few weeks. I requested this proposal again prior to Christmas and have not received as of yet. Once we receive your contractor proposal we can complete our review and contact with any questions regarding the scope or pricing.

Should you have questions, please contact me directly. I look forward to your content and dwelling support.

Thank You

Jeremy Elliott,MBA
Senior General Adjuster, Claims

1400 Urban Center Drive, Suite 450, Vestavia Hills, Alabama 35242, USA
O 205-470-8370 F 205-968-5496
E jelliott@chubb.com

PLAINTIFF'S EXHIBIT 25
PENGAD 800-631-6989

*For more information on your Claim experience with Chubb, visit us here:* Chubb Claim Guidance

*Welcome to Chubb Claims. Life is about to get easier.*

I strive to take care of all inquiries and questions directly with you. If you need to speak with my supervisor, please contact Wally Haessig at (214) 460-1779 or via e-mail at whaessig@chubb.com.

**From:** Alexandra Goodrich [mailto:aligoodrich@gmail.com]
**Sent:** Thursday, January 16, 2020 10:08 AM
**To:** Elliott, Jeremy E <jelliott@chubb.com>
**Cc:** Charles <charles@timberlineholdings.com>; Chuck Dauphin <cdauphin@dauphinparis.com>
**Subject:** [EXTERNAL] Re: PACIFIC INDEMNITY COMPANY claim 040519056755- Goodrich

Jeremy,

Enservio greatly undervalued the replacement cost of many of the items. I need the pictures so that I can match my receipts/estimates to the correct line items.

Sent from my iPhone

On Jan 15, 2020, at 4:20 PM, Elliott, Jeremy E <jelliott@chubb.com> wrote:

Mr. & Mrs. Goodrich, I am following up on the status of the TCC Construction repair estimate. We are attempting to get a copy of the itemized proposal for our review and issuance of settlement. Could you assist us in getting a copy of this proposal? Should you have any questions, please contact me immediately.

Thank You

Jeremy Elliott,MBA
Senior General Adjuster, Claims

1400 Urban Center Drive, Suite 450, Vestavia Hills, Alabama 35242, USA
O 205-470-8370 F 205-968-5496
E jelliott@chubb.com

*For more information on your Claim experience with Chubb, visit us here:* Chubb Claim Guidance

*Welcome to Chubb Claims. Life is about to get easier.*

I strive to take care of all inquiries and questions directly with you.. If you need to speak with my supervisor, please contact Wally Haessig at (214) 460-1779 or via e-mail at whaessig@chubb.com.

**From:** Jay Tankersley [mailto:jtankersley@jsheld.com]
**Sent:** Wednesday, January 15, 2020 3:37 PM
**To:** Elliott, Jeremy E <jelliott@chubb.com>
**Subject:** [EXTERNAL] Goodrich

Good afternoon,

Sorry I missed your call earlier. I have email the contractor/
Bradley Moncrief yesterday and today with no response yet.
Do you have is contact info.

Thank you,

PLAINTIFF'S EXHIBIT 26
PENGAD 800-631-6989

| | |
|---|---|
| From: | Elliott, Jeremy E |
| To: | Alexandra Goodrich; Myers, Eric [Enservio] |
| Cc: | <charles@timberlineholdings.com>; Chuck Dauphin; US Property Claims; Joni Holman |
| Subject: | RE: claim 040519056755- Goodrich - Contents - Check #4679684 |
| Date: | Tuesday, January 21, 2020 11:44:13 AM |

Mrs. Goodrich, as discussed previously, the Enservio inventory is the list of content items presented for inclusion in your fire loss. Replacement cost values are then assigned based on like kind and quality. If you believe an item is priced incorrectly, please note which item/s and provide support for our update. As you mentioned, you will contact your decorator and submit invoices for the items you believe are priced incorrectly. At that time, I will work with Enservio to make updates and issue supplement payment on the total loss items.

Per the Maglia Maus submission it requested 50% advance payment. I issued $53,500 which is slightly more than 50% pending the final invoice. Once the repairs are complete, please submit this invoice for supplement payment.

Should you have questions regarding any specific content item, please email myself and Eric Meyers (Enservio) the support for inclusion of the valuation process. I appreciate your assistance in completing this process.

Thank You

Jeremy Elliott,MBA
Senior General Adjuster, Claims

1400 Urban Center Drive, Suite 450, Vestavia Hills, Alabama 35242, USA
O 205-470-8370 F 205-968-5496
E jelliott@chubb.com

*For more information on your Claim experience with Chubb, visit us here:* Chubb Claim Guidance

*Welcome to Chubb Claims. Life is about to get easier.*

I strive to take care of all inquiries and questions directly with you. If you need to speak with my supervisor, please contact Wally Haessig at (214) 460-1779 or via e-mail at whaessig@chubb.com.

**From:** Alexandra Goodrich [mailto:aligoodrich@gmail.com]
**Sent:** Tuesday, January 21, 2020 7:22 AM
**To:** Elliott, Jeremy E <jelliott@chubb.com>
**Cc:** <charles@timberlineholdings.com> <charles@timberlineholdings.com>; Chuck Dauphin <cdauphin@dauphinparis.com>; US Property Claims <uspropertyclaims@Chubb.com>; Joni Holman <Joni.Holman@usi.com>
**Subject:** [EXTERNAL] Check #4679684

Jeremy,

Thank you for the check reflecting 50% of Magali's furniture repair expense payment, payment for the total loss of some items per Enservio, and the value of two rugs allegedly based upon an appraisal by Asia Rugs. The portion of the payment for 50% of Magali's repair expense is fine, although the payment is slightly more than 50% of her invoice. This, of course, can be resolved upon the final payment of her costs.

The basis for the balance of the check makes no sense. Regarding Enservio's valuations, I cannot tell from Enservio's list and pictures what several of the items are. When I get the opportunity, I will forward you a list of items I know were lost with replacement values for comparison. Regarding the replacement value for the two rugs looked at by Asia Rugs, the valuation from Asia Rugs is not a "replacement value," which our policy calls for. Please forward me the valuation from Asia Rugs. I have my original invoices for the two rugs and will obtain a replacement value from the store where I purchased them.

In the meantime, we are going to deposit the check with the express understanding that it is only a partial payment. The cashing of the check is not an expression that I agree to the cost information you provided. That information does not reference the replacement value on all of the items and if if some of the costs are intended to be a replacement value, the items are way undervalued.

---

This email (including any attachments) is intended for the designated recipient(s) only, and may be confidential, non-public, proprietary, and/or protected by the attorney-client or other privilege. Unauthorized reading, distribution, copying or other use of this communication is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) should not be deemed a waiver of any privilege or protection. If you are not the intended recipient or if you believe that you have received this email in error, please notify the sender immediately and delete all copies from your computer system without reading, saving, printing, forwarding or using it in any manner. Although it has been checked for viruses and other malicious software ("malware"), we do not warrant, represent or guarantee in any way that this communication is free of malware or potentially damaging defects. All liability for any actual or alleged loss, damage, or injury arising out of or resulting in any way from the receipt, opening or use of this email is expressly disclaimed.

Welcome to Chubb Claims. Life is about to get easier.

I strive to take care of all inquiries and questions directly with you. If you need to speak with my supervisor, please contact Wally Haessig at (214) 460-1779 or via e-mail at whaessig@chubb.com

**From:** Andrew Arrant [mailto:aarrant@brookstonecompanies.com]
**Sent:** Monday, January 27, 2020 5:47 PM
**To:** Elliott, Jeremy E <jelliott@chubb.com>
**Cc:** Alexandra Goodrich <aligoodrich@gmail.com>; Bradley Moncrief <bradley@tcccontractors.com>; Chuck Dauphin <cdauphin@dauphinparis.com>; Charles Goodrich <charlesgoodrich@hotmail.com>
**Subject:** [EXTERNAL] Fwd: Goodrich-Dell Road Framing Demo/Repairs

Jeremy,

Here is TCC estimate for the demo and replacement for the items that will need to be replaced.

Thanks,
Andrew

Begin forwarded message:

**From:** Alexandra Goodrich <aligoodrich@gmail.com>
**Subject: Goodrich-Dell Road Framing Demo/Repairs**
**Date:** January 27, 2020 at 4:01:13 PM CST
**To:** Andrew Arrant <aarrant@brookstonecompanies.com>
**Cc:** Marbury McCullough <marbury@tcccontractors.com>, Bradley Moncrief <bradley@tcccontractors.com>, Chuck Dauphin <cdauphin@dauphinparis.com>, Charles Goodrich <charlesgoodrich@hotmail.com>

Andrew, I've attached the estimate from TCC for the framing demo and repair work. Please include this in your proposal to Chubb. Thanks--

PLAINTIFF'S EXHIBIT 29
PENGAD 800-631-6989

Andrew Arrant
Director of Emergency Services

O: 205.436.2680
M: 205.427.2043
aarrant@brookstonecompanies.com

4000 Farr Road
Bessemer, Al 35022

[illegible]

RestoringLives
RestoringProperty

I appreciate all your work and communication during this process. Should you have questions, please contact me directly.

Thank You

Jeremy Elliott,MBA
Senior General Adjuster, Claims

1400 Urban Center Drive, Suite 450, Vestavia Hills, Alabama 35242, USA
O 205-470-8370 F 205-968-5496
E jelliott@chubb.com

*For more information on your Claim experience with Chubb, visit us here:* Chubb Claim Guidance

*Welcome to Chubb Claims. Life is about to get easier.*

I strive to take care of all inquiries and questions directly with you. If you need to speak with my supervisor, please contact Wally Haessig at (214) 460-1779 or via e-mail at whaessig@chubb.com.

**From:** Andrew Arrant [mailto:aarrant@brookstonecompanies.com]
**Sent:** Monday, January 27, 2020 5:47 PM
**To:** Elliott, Jeremy E <jelliott@chubb.com>
**Cc:** Alexandra Goodrich <aligoodrich@gmail.com>; Bradley Moncrief <bradley@tcccontractors.com>; Chuck Dauphin <cdauphin@dauphinparis.com>; Charles Goodrich <charlesgoodrich@hotmail.com>
**Subject:** [EXTERNAL] Fwd: Goodrich-Dell Road Framing Demo/Repairs

Jeremy,

Here is TCC estimate for the demo and replacement for the items that will need to be replaced.

Thanks,
Andrew

PLAINTIFF'S EXHIBIT 31
PENGAD 800-631-6989

Begin forwarded message:

**From:** Alexandra Goodrich <aligoodrich@gmail.com>
**Subject: Goodrich-Dell Road Framing Demo/Repairs**
**Date:** January 27, 2020 at 4:01:13 PM CST
**To:** Andrew Arrant <aarrant@brookstonecompanies.com>
**Cc:** Marbury McCullough <marbury@tcccontractors.com>, Bradley Moncrief <bradley@tcccontractors.com>, Chuck Dauphin <cdauphin@dauphinparis.com>, Charles Goodrich <charlesgoodrich@hotmail.com>

Andrew, I've attached the estimate from TCC for the framing demo and repair work. Please include this in your proposal to Chubb. Thanks--

Andrew Arrant
Director of Emergency Services

D: 205.436.2680
M: 205.427.2043
aarrant@brookstonecompanies.com

4000 Farr Road
Bessemer, Al 35022

Restoring[illegible]
Restoring[illegible]

[illegible]

This email (including any attachments) is intended for the designated recipient(s) only, and may be confidential, non-public, proprietary, and/or protected by the attorney-client or other privilege. Unauthorized reading, distribution, copying or other use of this communication is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) should not be deemed a waiver of any privilege or protection. If you are not the intended recipient or if you believe that you have received this email in error, please notify the sender immediately and delete all copies from your computer system without reading, saving, printing, forwarding or using it in any manner. Although it has been checked for viruses and other malicious software ("malware"), we do not warrant, represent or guarantee in any way that this communication is free of malware or potentially damaging defects. All liability for any actual or alleged loss, damage, or injury arising out of or resulting in any way from the receipt, opening or use of this email is expressly disclaimed.

**From:** Elliott, Jeremy E <jelliott@chubb.com>
**Sent:** Thursday, February 20, 2020 3:41 PM
**To:** Chuck Dauphin <cdauphin@dauphinparis.com>; Joni Holman <Joni.Holman@usi.com>; Andrew Arrant <aarrant@brookstonecompanies.com>; US Property Claims <uspropertyclaims@Chubb.com>
**Cc:** 'Alexandra Goodrich' <aligoodrich@gmail.com>; Charles Goodrich <charles@timberlineholdings.com>; Diane Paris <diane@dauphinparis.com>
**Subject:** RE: Goodrich claim 040519056755- House Fire - Dell Road

Mr. Dauphin, to date we have issued undisputed settlement on the Enservio content inventory and advance payment on the antique repairs presented by the insured.

My understanding is some of the contents removed and cleaned by Brookstone Restoration may potentially be claimed as a total loss as well? I am pending that inventory with replacement cost values for review and resolution.

If there are other contents that need to be presented, please do so for my review, discussion and resolution. Based on the inventory presented, walk thru and known details the damaged contents fall well within the available limits.

I look forward to additional documentation for review.

Thank You

Jeremy Elliott,MBA
Senior General Adjuster, Claims

1400 Urban Center Drive, Suite 450, Vestavia Hills, Alabama 35242, USA
O 205-470-8370 F 205-968-5496
E jelliott@chubb.com

*For more information on your Claim experience with Chubb, visit us here:* Chubb Claim Guidance

*Welcome to Chubb Claims. Life is about to get easier.*

I strive to take care of all inquiries and questions directly with you. If you need to speak with my supervisor, please contact Wally Haessig at (214) 460-1779 or via e-mail at whaessig@chubb.com.

**From:** Chuck Dauphin [mailto:cdauphin@dauphinparis.com]
**Sent:** Wednesday, February 19, 2020 9:43 AM
**To:** Elliott, Jeremy E <jelliott@chubb.com>
**Cc:** 'Alexandra Goodrich' <aligoodrich@gmail.com>; Charles Goodrich <charles@timberlineholdings.com>; Diane Paris <diane@dauphinparis.com>
**Subject:** [EXTERNAL] RE: Goodrich House Fire - Dell Road

PLAINTIFF'S EXHIBIT 36
PENGAD 800-631-6989

From: Elliott, Jeremy E
To: Chuck Dauphin; Alexandra Goodrich
Cc: <charles@timberlineholdings.com>; US Property Claims
Subject: RE: PACIFIC INDEMNITY COMPANY- claim 040519056755- Check Status- Action Plan
Date: Tuesday, December 24, 2019 9:21:54 AM

---

Mr. Dauphin, the demolition process continues and we have determined the master bathroom and closet areas did not sustain physical damage and no need to be demolished. However, the adjacent rooms walls are being demolished which will allow access and sealing of any framing in these areas. The removal process continues and we can have a follow up inspection first week of new year at home if you would like to confirm the process.

Please contact me directly with any questions.

Thank You

PLAINTIFF'S EXHIBIT 43
PENGAD 800-631-6989

Jeremy Elliott,MBA
Senior General Adjuster, Claims

1400 Urban Center Drive, Suite 450, Vestavia Hills, Alabama 35242, USA
O 205-470-8370 F 205-968-5496
E jelliott@chubb.com

*For more information on your Claim experience with Chubb, visit us here:* Chubb Claim Guidance

*Welcome to Chubb Claims. Life is about to get easier.*

I strive to take care of all inquiries and questions directly with you. If you need to speak with my supervisor, please contact Wally Haessig at (214) 460-1779 or via e-mail at whaessig@chubb.com.

**From:** Chuck Dauphin [mailto:cdauphin@dauphinparis.com]
**Sent:** Tuesday, December 24, 2019 8:11 AM
**To:** Alexandra Goodrich <aligoodrich@gmail.com>; Elliott, Jeremy E <jelliott@chubb.com>
**Cc:** <charles@timberlineholdings.com> <charles@timberlineholdings.com>
**Subject:** [EXTERNAL] RE: PACIFIC INDEMNITY COMPANY- claim 040519056755- Check Status- Action Plan

Jeremy - It was good to visit with you at the Goodrich house a couple of weeks ago. Ali and I left the meeting with the understanding that all of the insides of the house (walls and ceilings) would be removed. The language used was that the house would be taken down to its studs. It appears, however, that the demolition team has left untouched Charles' office and the master bedroom. If your plan to take everything down to the studs has changed, please let us know what your new plan is and the reasons for the change.

Thanks, Chuck

From: Elliott, Jeremy E
To: Chuck Dauphin; Alexandra Goodrich
Cc: <charles@timberlineholdings.com>; US Property Claims
Subject: RE: PACIFIC INDEMNITY COMPANY- claim 040519056755- Check Status- Action Plan
Date: Tuesday, December 24, 2019 9:21:54 AM

Mr. Dauphin, the demolition process continues and we have determined the master bathroom and closet areas did not sustain physical damage and no need to be demolished. However, the adjacent rooms walls are being demolished which will allow access and sealing of any framing in these areas. The removal process continues and we can have a follow up inspection first week of new year at home if you would like to confirm the process.

Please contact me directly with any questions.

PLAINTIFF'S EXHIBIT 44
PENGAD 800-631-6989

Thank You

Jeremy Elliott,MBA
Senior General Adjuster, Claims

1400 Urban Center Drive, Suite 450, Vestavia Hills, Alabama 35242, USA
O 205-470-8370 F 205-968-5496
E jelliott@chubb.com

*For more information on your Claim experience with Chubb, visit us here:* Chubb Claim Guidance

*Welcome to Chubb Claims. Life is about to get easier.*

I strive to take care of all inquiries and questions directly with you. If you need to speak with my supervisor, please contact Wally Haessig at (214) 460-1779 or via e-mail at whaessig@chubb.com

**From:** Chuck Dauphin [mailto:cdauphin@dauphinparis.com]
**Sent:** Tuesday, December 24, 2019 8:11 AM
**To:** Alexandra Goodrich <aligoodrich@gmail.com>; Elliott, Jeremy E <jelliott@chubb.com>
**Cc:** <charles@timberlineholdings.com> <charles@timberlineholdings.com>
**Subject:** [EXTERNAL] RE: PACIFIC INDEMNITY COMPANY- claim 040519056755- Check Status- Action Plan

Jeremy - It was good to visit with you at the Goodrich house a couple of weeks ago. Ali and I left the meeting with the understanding that all of the insides of the house (walls and ceilings) would be removed. The language used was that the house would be taken down to its studs. It appears, however, that the demolition team has left untouched Charles' office and the master bedroom. If your plan to take everything down to the studs has changed, please let us know what your new plan is and the reasons for the change.

Thanks, Chuck

Charles A. Dauphin
Dauphin Paris LLC
300 Vestavia Parkway
Suite 3700
Vestavia Hills, AL 35216
cdauphin@dauphinparis.com
205-518-6821

**From:** Alexandra Goodrich <aligoodrich@gmail.com>
**Sent:** Tuesday, December 10, 2019 8:18 PM
**To:** Elliott, Jeremy E <jelliott@chubb.com>
**Cc:** <charles@timberlineholdings.com> <charles@timberlineholdings.com>
**Subject:** Re: PACIFIC INDEMNITY COMPANY- claim 040519056755- Check Status- Action Plan

Thank you, we did receive both checks today! The check for additional living expenses did not include reimbursement for our other November expenses--the ADT cancellation charges, veterinary bills, and moving expenses--that I requested on 12/1. I'm attaching those invoices/receipts again. The Valet Moving bill, in particular, is a large one that I need to pay promptly.

Going forward, I will continue to send you a list of additional living expenses on the first of each month for the month prior. That works well for us since we're putting most of the expenses on a credit card, but let me know if you prefer a different method.

On Tue, Dec 10, 2019 at 10:43 AM Elliott, Jeremy E <jelliott@chubb.com> wrote:

> Alexandra, the checks were issued on December 6th and processed on December 9th
>
> One check was issued for the lease amount of $25,280 and a second check was issued totaling $32,200.50 for the temporary content items.
>
> Both should arrive today at 3320 Dell Road, Mountain Brook.
>
> Please have your contractor contact me to discuss meeting on site either Thursday or Friday this week to confirm the scope and action plan moving forward.
>
> Thank You
>
> Jeremy Elliott,MBA
> Senior General Adjuster, Claims
>
> 1400 Urban Center Drive, Suite 450, Vestavia Hills, Alabama 35242, USA
> O 205-470-8370 F 205-968-5496
> E jelliott@chubb.com

# Price List Variation Usage Report

## Brookstone Restoration



**Received Date:**
11/18/2019

**Completed Date:**
3/20/2020

**Operator:**

**Estimator:**
BLAKE — Blake Beard

**Checkpoint price list:**
ALBI8X_NOV19 — Birmingham, AL

**Estimate price list:**
ALBI8X_NOV19 — Birmingham, AL
Restoration/Service/Remodel

**Claim Number:**
040519056755

| | |
|---|---|
| **Price List Item Total** | **47,177.45** |
| **Estimate Line Item Total** | **47,177.45** |
| **Line Item Deviation Total** | **0.00** |

* Totals may be different due to rounding.

PLAINTIFF'S EXHIBIT 61
PENGAD 800-631-6989

Brookstone Building Company LLC Dba Brookstone Res

## Hours By Job

Between: 01/01/50 And 01/01/2100

Date: 23-Mar-20
Time: 12:23 PM

| Job | Employee | Selector | Date | Description | Rate | Total Time |
|---|---|---|---|---|---|---|
| **B2567PO** | **Chrales Goodrich Alexandra Goodri** | | | | | |
| | Category: CON | | | | | |
| | Beard Blake | 1 | 11/19/19 | | Regular | 3.77 |
| | Beard Blake | 1 | 11/19/19 | | Regular | 4.15 |
| | Hester Billie | 1 | 11/19/19 | | Regular | 7.68 |
| | Taylor Kyrin | 1 | 11/19/19 | | Regular | 5.4 |
| | Taylor Kyrin | 1 | 11/19/19 | | Regular | 2.38 |
| | Weaver Billie | 1 | 11/19/19 | | Regular | 7.68 |
| | Beard Blake | 1 | 11/20/19 | | Regular | 8.13 |
| | Hester Billie | 1 | 11/20/19 | | Regular | 6.97 |
| | Taylor Kyrin | 1 | 11/20/19 | | Regular | 7.98 |
| | Weaver Billie | 1 | 11/20/19 | | Regular | 7.43 |
| | Foster Jordan | 1 | 11/27/19 | | Regular | 4.25 |
| | Spencer Tasheka | 1 | 12/10/19 | | Regular | 3 |
| | Weaver Billie | 1 | 12/10/19 | | Regular | 3.05 |
| | Spencer Tasheka | 1 | 12/11/19 | | Regular | 0.6 |
| | Spencer Tasheka | 1 | 12/11/19 | | Regular | 2.72 |
| | Weaver Billie | 1 | 12/11/19 | | Regular | 1.62 |
| | Weaver Billie | 1 | 12/11/19 | | Regular | 2.73 |
| | Weaver Billie | 1 | 12/26/19 | | Regular | 2.92 |
| | Weaver Billie | 1 | 12/26/19 | | Regular | 4.02 |
| | Weaver Billie | 1 | 01/02/20 | | Regular | 2.72 |
| | Weaver Billie | 1 | 01/03/20 | | Regular | 3.77 |
| | Weaver Billie | 1 | 01/03/20 | | Regular | 4.03 |
| | Beard Blake | 1 | 01/06/20 | | Regular | 2.02 |
| | Beard Blake | 1 | 01/06/20 | | Regular | 4.42 |
| | Johnson Curtis | 1 | 01/06/20 | | Regular | 3 |
| | Johnson Curtis | 1 | 01/06/20 | | Regular | 3.5 |
| | Weaver Billie | 1 | 01/06/20 | | Regular | 3.7 |
| | Weaver Billie | 1 | 01/06/20 | | Regular | 4.05 |
| | Weaver Billie | 1 | 01/07/20 | | Regular | 3.85 |
| | Weaver Billie | 1 | 01/07/20 | | Regular | 3.85 |
| | Weaver Billie | 1 | 01/08/20 | | Regular | 4.1 |
| | Weaver Billie | 1 | 01/08/20 | | Regular | 2.72 |
| | Beard Blake | 1 | 01/20/20 | | Regular | 3.97 |
| | Beard Blake | 1 | 01/20/20 | changed by SH | Regular | 4 |
| | Johnson Curtis | 1 | 01/20/20 | | Regular | 3.7 |
| | Johnson Curtis | 1 | 01/20/20 | | Regular | 4 |
| | Beard Blake | 1 | 01/21/20 | | Regular | 0.75 |
| | Beard Blake | 1 | 01/21/20 | | Regular | 3.25 |
| | Beard Blake | 1 | 01/21/20 | | Regular | 4 |
| | Johnson Curtis | 1 | 01/21/20 | changed by SH | Regular | 3.72 |
| | Beard Blake | 1 | 01/22/20 | | Regular | 0.75 |
| | Beard Blake | 1 | 01/22/20 | | Regular | 7.25 |
| | Beard Blake | 1 | 01/24/20 | | Regular | 3.97 |
| | Beard Blake | 1 | 01/24/20 | | Regular | 4.13 |
| | Beard Blake | 1 | 01/24/20 | | Overtime | 0.43 |

Brookstone Building Company LLC Dba Brookstone Res

Date: 23-Mar-20
Time 12:23 PM

# Hours By Job

Between: 01/01/50 And 01/01/2100

| Job | Employee | Selector | Date | Description | Rate | Total Time |
|---|---|---|---|---|---|---|
| | Johnson Curtis | 1 | 01/24/20 | | Regular | 3.7 |
| | Johnson Curtis | 1 | 01/24/20 | | Regular | 4 |
| | Beard Blake | 1 | 01/27/20 | | Regular | 3.6 |
| | Beard Blake | 1 | 01/27/20 | | Regular | 3.98 |
| | Johnson Curtis | 1 | 01/27/20 | | Regular | 3.98 |
| | Johnson Curtis | 1 | 01/27/20 | | Regular | 4 |
| | Beard Blake | 1 | 01/28/20 | | Regular | 3.8 |
| | Beard Blake | 1 | 01/29/20 | | Regular | 2.27 |
| | Beard Blake | 1 | 01/29/20 | | Regular | 1.4 |
| | Beard Blake | 1 | 01/29/20 | | Regular | 3.87 |
| | Johnson Curtis | 1 | 01/29/20 | building vaults | Regular | 2 |
| | Johnson Curtis | 1 | 01/29/20 | cleaning contents and building vaults | Regular | 4 |
| | Beard Blake | 1 | 01/31/20 | | Regular | 4.25 |
| | Beard Blake | 1 | 02/04/20 | | Regular | 3.75 |
| | Beard Blake | 1 | 02/04/20 | | Regular | 3.9 |
| | Beard Blake | 1 | 02/05/20 | | Regular | 3.83 |
| | Beard Blake | 1 | 02/05/20 | | Regular | 4.08 |
| | Beard Blake | 1 | 02/06/20 | | Regular | 3.75 |
| | Beard Blake | 1 | 02/06/20 | | Regular | 3.67 |
| | Johnson Curtis | 1 | 02/06/20 | contents cleaning | Regular | 3.75 |
| | Johnson Curtis | 1 | 02/06/20 | contents cleaning | Regular | 3.67 |
| | Beard Blake | 1 | 02/12/20 | moving items to Anniston | Regular | 3.67 |
| | Beard Blake | 1 | 02/12/20 | Moving items to Anniston | Regular | 3.67 |
| | Beard Blake | 1 | 02/24/20 | Move back | Regular | 0.95 |
| | Beard Blake | 1 | 02/24/20 | Move back | Regular | 3.4 |
| | Beard Blake | 1 | 02/27/20 | Walk thru with adjuster | Regular | 3 |
| | Beard Blake | 1 | 02/27/20 | Goodrich walk thru with adjuster | Regular | 3.08 |
| | Beard Blake | 1 | 03/06/20 | move back | Overtime | 4.15 |
| | Beard Blake | 1 | 03/09/20 | | Regular | 1.82 |
| | Beard Blake | 1 | 03/09/20 | | Regular | 4.52 |
| | Beard Blake | 1 | 03/13/20 | | Overtime | 3.5 |
| | Beard Blake | 1 | 03/13/20 | | Overtime | 4.25 |
| | **Totals For: CON** | | | | | **287.39** |
| | **Category: Labor** | | | | | |
| | Foster Jordan | 1 | 11/19/19 | | Regular | 8 |
| | Foster Jordan | 1 | 11/20/19 | | Regular | 8 |
| | Spencer Tasheka | 1 | 12/26/19 | | Regular | 0.1 |
| | Spencer Tasheka | 1 | 12/26/19 | | Regular | 0.02 |
| | Dunn Donny | 1 | 01/06/20 | | Regular | 4.02 |
| | Dunn Donny | 1 | 01/06/20 | | Regular | 4.07 |
| | Goldsmith Tyrell | 1 | 01/06/20 | | Regular | 6.5 |
| | Spencer Tasheka | 1 | 01/06/20 | | Regular | 3.22 |
| | Spencer Tasheka | 1 | 01/06/20 | | Regular | 4.23 |

Brookstone Building Company LLC Dba Brookstone Res

## Hours By Job

Between: 01/01/50 And 01/01/2100

Date: 23-Mar-20
Time: 12:23 PM

| Job | Employee | Selector | Date | Description | Rate | Total Time |
|---|---|---|---|---|---|---|
| | Spencer Tasheka | 1 | 01/07/20 | | Regular | 3.83 |
| | Spencer Tasheka | 1 | 01/07/20 | | Regular | 4.25 |
| | Spencer Tasheka | 1 | 01/08/20 | | Regular | 3.98 |
| | Spencer Tasheka | 1 | 01/08/20 | | Regular | 2.72 |
| | Dunn Donny | 1 | 01/20/20 | | Regular | 3.72 |
| | Dunn Donny | 1 | 01/20/20 | | Regular | 4.03 |
| | Glover Corey | 1 | 01/20/20 | | Regular | 4 |
| | Glover Corey | 1 | 01/20/20 | | Regular | 3.67 |
| | Spencer Tasheka | 1 | 01/20/20 | | Regular | 3.7 |
| | Spencer Tasheka | 1 | 01/20/20 | | Regular | 3.67 |
| | Glover Corey | 1 | 01/21/20 | | Regular | 3.75 |
| | Spencer Tasheka | 1 | 01/21/20 | | Regular | 3.6 |
| | Spencer Tasheka | 1 | 01/21/20 | | Regular | 3.2 |
| | Washington Olivia | 1 | 01/21/20 | | Regular | 3.6 |
| | Washington Olivia | 1 | 01/21/20 | | Regular | 3.5 |
| | Spencer Tasheka | 1 | 01/22/20 | | Regular | 2.32 |
| | Dunn Donny | 1 | 01/24/20 | | Regular | 3.65 |
| | Dunn Donny | 1 | 01/24/20 | | Regular | 3.55 |
| | Glover Corey | 1 | 01/24/20 | | Regular | 4 |
| | Glover Corey | 1 | 01/24/20 | | Regular | 3.67 |
| | Spencer Tasheka | 1 | 01/24/20 | | Regular | 3.15 |
| | Spencer Tasheka | 1 | 01/24/20 | | Regular | 2.23 |
| | Spencer Tasheka | 1 | 01/24/20 | | Overtime | 0.97 |
| | Washington Olivia | 1 | 01/24/20 | | Regular | 4 |
| | Washington Olivia | 1 | 01/24/20 | | Regular | 3.75 |
| | Dunn Donny | 1 | 01/27/20 | | Regular | 2.38 |
| | Dunn Donny | 1 | 01/27/20 | | Regular | 1.73 |
| | Glover Corey | 1 | 01/27/20 | | Regular | 3.68 |
| | Glover Corey | 1 | 01/27/20 | | Regular | 4.08 |
| | Spencer Tasheka | 1 | 01/27/20 | cleaning contents | Regular | 3.67 |
| | Spencer Tasheka | 1 | 01/27/20 | cleaning contents | Regular | 4.37 |
| | Washington Olivia | 1 | 01/27/20 | | Regular | 3.68 |
| | Washington Olivia | 1 | 01/27/20 | | Regular | 4.35 |
| | Dunn Donny | 1 | 01/28/20 | | Regular | 3.9 |
| | Glover Corey | 1 | 01/28/20 | loading vaults | Regular | 4 |
| | Spencer Tasheka | 1 | 01/28/20 | cleaning contents | Regular | 0.7 |
| | Spencer Tasheka | 1 | 01/28/20 | cleaning contents | Regular | 3.58 |
| | Washington Olivia | 1 | 01/28/20 | | Regular | 3.58 |
| | Washington Olivia | 1 | 01/28/20 | | Regular | 0.75 |
| | Dunn Donny | 1 | 01/29/20 | cleaning contents | Regular | 3.73 |
| | Dunn Donny | 1 | 01/29/20 | cleaning contents | Regular | 4.03 |
| | Glover Corey | 1 | 01/29/20 | cleaning contents | Regular | 3.75 |
| | Glover Corey | 1 | 01/29/20 | cleaning contents | Regular | 2 |
| | Spencer Tasheka | 1 | 01/29/20 | cleaning contents | Regular | 3.73 |

Brookstone Building Company LLC Dba Brookstone Res

# Hours By Job

Between: 01/01/50 And 01/01/2100

Date 23-Mar-20
Time 12:23 PM

| Job | Employee | Selector | Date | Description | Rate | Total Time |
|---|---|---|---|---|---|---|
| | Spencer Tasheka | 1 | 01/29/20 | cleaning contents | Regular | 3.23 |
| | Washington Olivia | 1 | 01/29/20 | | Regular | 3.75 |
| | Washington Olivia | 1 | 01/29/20 | | Regular | 3.23 |
| | Washington Olivia | 1 | 01/29/20 | | Regular | 0.55 |
| | Spencer Tasheka | 1 | 01/31/20 | cleaning beams | Regular | 4.2 |
| | Washington Olivia | 1 | 01/31/20 | | Regular | 3.88 |
| | Dunn Donny | 1 | 02/04/20 | cleaning contents | Regular | 1.87 |
| | Lassic Jardarion | 1 | 02/04/20 | cleaning contents | Regular | 3 |
| | Washington Olivia | 1 | 02/04/20 | cleaning contents | Regular | 3.68 |
| | Washington Olivia | 1 | 02/04/20 | cleaning contents | Regular | 4.08 |
| | Spencer Tasheka | 1 | 02/04/20 | cleaning contents | Regular | 3.67 |
| | Spencer Tasheka | 1 | 02/04/20 | cleaning contents | Regular | 4.3 |
| | Campbell Dylan | 1 | 02/06/20 | | Regular | 5.67 |
| | Campbell Dylan | 1 | 02/06/20 | | Regular | 4 |
| | Dunn Donny | 1 | 02/06/20 | contents cleaning | Regular | 2.17 |
| | Dunn Donny | 1 | 02/06/20 | contents cleaning | Regular | 3.75 |
| | Glover Corey | 1 | 02/06/20 | | Regular | 3.75 |
| | Glover Corey | 1 | 02/06/20 | | Regular | 3.67 |
| | Washington Olivia | 1 | 02/06/20 | contents cleaning | Regular | 3.75 |
| | Washington Olivia | 1 | 02/06/20 | contents cleaning | Regular | 3.65 |
| | Decker Phillip | 1 | 02/06/20 | | Regular | 4 |
| | Decker Phillip | 1 | 02/06/20 | | Regular | 5.5 |
| | Spencer Tasheka | 1 | 02/06/20 | | Regular | 3.77 |
| | Spencer Tasheka | 1 | 02/06/20 | | Regular | 3.02 |
| | Glover Corey | 1 | 02/10/20 | Automatic Clockout - Overlong Timecard | Regular | 3.25 |
| | Glover Corey | 1 | 02/12/20 | Move cabinets to Anniston | Regular | 6.25 |
| | Glover Corey | 1 | 02/12/20 | Wrapping cabinets | Regular | 1 |
| | O'Neal Henry | 1 | 02/12/20 | moving items to Anniston | Regular | 6.17 |
| | Glover Corey | 1 | 02/13/20 | | Regular | 3.75 |
| | Lassic Jardarion | 1 | 02/13/20 | | Regular | 2 |
| | Lassic Jardarion | 1 | 02/13/20 | | Regular | 2 |
| | Lassic Jardarion | 1 | 02/13/20 | | Regular | 3.53 |
| | Beard Blake | 1 | 02/17/20 | Missed hrs from 2/13 | Regular | 3 |
| | Glover Corey | 1 | 02/24/20 | Automatic Clockout - Overlong Timecard no lunch; | Regular | 7.75 |

Brookstone Building Company LLC Dba Brookstone Res

# Hours By Job

Between: 01/01/50 And 01/01/2100

Date: 23-Mar-20
Time: 12:23 PM

| Job | Employee | Selector | Date | Description | Rate | Total Time |
|---|---|---|---|---|---|---|
| | | | | move back | | |
| | Lassic Jardarion | 1 | 02/24/20 | move back; no lunch | Regular | 7.58 |
| | O'Neal Henry | 1 | 02/24/20 | No lunch; move back | Regular | 7.58 |
| | Lassic Jardarion | 1 | 02/27/20 | getting contents ready for adjuster visit | Regular | 1.27 |
| | Glover Corey | 1 | 02/28/20 | returning furniture Automatic Clockout - Overlong Timecard | Regular | 3.5 |
| | Lassic Jardarion | 1 | 02/28/20 | 30 minute lunch. Returning furniture. Automatic Clockout - Overlong Timecard | Regular | 3.25 |
| | Glover Corey | 1 | 03/06/20 | Picking up wood. No lunch | Regular | 3.75 |
| | Harrison Alex | 1 | 03/06/20 | Pick up wood. No lunch | Regular | 3.75 |
| | Glover Corey | 1 | 03/09/20 | Dropping off beams | Regular | 3.12 |
| | Glover Corey | 1 | 03/09/20 | 30 minute lunch. Dropping off beams | Regular | 3.15 |
| | Harrison Alex | 1 | 03/09/20 | dropping off beams | Regular | 3.12 |
| | Harrison Alex | 1 | 03/09/20 | dropping off beams. 30 minute lunch | Regular | 3 |
| | Lassic Jardarion | 1 | 03/09/20 | delivering beams | Regular | 3.5 |
| | Lassic Jardarion | 1 | 03/09/20 | delivering beams. 30 minute lunch | Regular | 4 |
| | Harrison Alex | 1 | 03/13/20 | | Regular | 1.5 |
| | Harrison Alex | 1 | 03/13/20 | | Overtime | 2.5 |
| | Harrison Alex | 1 | 03/13/20 | | Overtime | 4 |
| | **Totals For: Labor** | | | | | **369.77** |
| | **Category: WTR** | | | | | |
| | Wippert David | 1 | 01/24/20 | | Regular | 3.25 |
| | Wippert David | 1 | 01/24/20 | | Regular | 2.98 |
| | Wippert David | 1 | 01/28/20 | | Regular | 2.65 |
| | **Totals For: WTR** | | | | | **8.88** |
| | | | | | **Total: B2567PO** | **666.04** |
| | **Grand Total:** | | | | | **666.04** |

*Printed by: Admin*

Goodrich Inventory List.pdf

BROOKSTONE
RESTORATION

# Content Items List With Images

## Goodrich / 00000000

| | |
|---|---|
| Prepared for: | |
| Prepared on: | Dec 18, 2019 |
| Prepared by: | Blake Beard |
| Carrier: | |
| Loss Type: | Fire |

Inside This Report


Dining Room
Bar Area
Bar area closet
Kitchen
Living Room
Office
Great room bar area
Master Bedroom Closet
Great Room
Basement


POWERED BY iCod

## Goodrich Charles

## 00000000

## 19-2019

### Room: Dining Room

**#1** 1 K0M3SR3W Cleanable






**#2** 1 25030858 (SMALL BOX_3861146 {K0JKGGYN}) Cleanable





**#3** 2 25030859 (MEDIUM BOX_3865477 {K0FRHP29}) Cleanable







**#4** 1 25030862 (SMALL BOX_3865480 {K1QXLHX7}) Cleanable




**Total Line Items In Dining Room Location: 4**

©2019 Brookstone Restoration

## Goodrich Charles 00000000

### Room: Bar Area

**#5** 1 25030860 (MEDIUM BOX_3865478 {K0AVN38N}) Cleanable



**#6** 1 25030861 (SMALL BOX_3865479 {K1R00SZK}) Cleanable



**Total Line Items In Bar Area Location: 2**

### Room: Bar area closet

**#7** 3 25030906 (MEDIUM BOX_3865504 {KBFQCQZQ}) Cleanable



©2019 Brookstone Restoration Brookstone Restoration Confidential

## Goodrich Charles

**00000000**

**#8** 2 25030907 (MEDIUM BOX_3865505 {KC87P871}) Cleanable



**#9** 3 25030908 (MEDIUM BOX_3865506 {KCW0U04K}) Cleanable



**#10** 1 25071944 Cleanable



**Total Line Items In Bar area closet Location: 4**

## Goodrich Charles

**00000000**

### Room: Kitchen

**#11** 1 K1QUVEF7 Cleanable




**#12** 1 K1NUQ94F Cleanable




**#13** 1 K19G24NM Cleanable




**#14** 1 K17L01WP Cleanable




## Goodrich Charles

**00000000**

**#15** 1 K0ZUKHDB Cleanable





**#16** 1 K2AGSE8N Cleanable




**#17** 1 K3P6JCPV Cleanable




**#18** 1 K3PWUN8Y Cleanable




## Goodrich Charles

**00000000**

**#19** 1 K3VNKF0K — Cleanable




**#20** 1 K45JG1US — Cleanable





**#21** 1 K46D4X6D — Cleanable






**#22** 1 K4DJQ508 — Cleanable




## Goodrich Charles

**00000000**

**#23** 1 25030883 (MEDIUM BOX_3865485 {K5C7F3P3}) Cleanable





**#24** 1 K58LG33Y Cleanable





**#25** 1 K4ZXNPY0 Cleanable




**#26** 1 K4SBN17Q Cleanable




**#27** 1 25030909 Cleanable

## Goodrich Charles

**00000000**

**#28** 2 25071942 (MEDIUM BOX_3865507 {KL52294H}) Cleanable





**#29** 2 25071943 (MEDIUM BOX_3877461 {KKLE37LC}) Cleanable



**#30** 1 25071945 (SMALL BOX_3877462 {KE3F5BPE}) Cleanable




**Total Line Items In Kitchen Location: 20**

### Room: Living Room

**#31** 1 K61GVU3U Cleanable



**Total Line Items In Living Room Location: 1**

©2019 Brookstone Restoration

## Goodrich Charles — 00000000

**Room: Office**

**#32** 2 25030887 (MEDIUM BOX_3865487 {K7ZH06HK}) Cleanable



**#33** 2 25030888 (MEDIUM BOX_3865488 {K7A77L3Q}) Cleanable



**#34** 2 25030890 (MEDIUM BOX_3865489 {K77L20SE}) Cleanable



**#35** 1 25030891 (SMALL BOX_3865491 {K74FJ0DQ}) Cleanable



## Goodrich Charles

**00000000**

**#36** 1 25030892 (MEDIUM BOX_3865492 {K73HFYAX}) Cleanable




**#37** 1 25030893 (SMALL BOX_3865493 {K7299BCD}) Cleanable




**#38** 1 25030894 (MEDIUM BOX_3865494 {K6KEK96L}) Cleanable



**#39** 1 25030895 (MEDIUM BOX_3865494 {K6KEK96L}) Cleanable



## Goodrich Charles

**00000000**

**#40** 2 25030896 (MEDIUM BOX_3865495 {K6BK5069}) Cleanable




**#41** 1 25030897 (MEDIUM BOX_3865496 {K6A033XQ}) Cleanable




**#42** 1 25030899 (SMALL BOX_3865497 {K68VQU92}) Cleanable




**#43** 1 25030900 (MEDIUM BOX_3865498 {KB9RFE2J}) Cleanable




©2019 Brookstone Restoration

## Goodrich Charles

**00000000**

**#44** 1 25030901 (SMALL BOX_3865499 {KB8UQ02P}) Cleanable



**#45** 1 25030902 (MEDIUM BOX_3865500 {KAZFAPER}) Cleanable





**Total Line Items In Office Location: 14**

### Room: Great room bar area

**#46** 1 25030903 (MEDIUM BOX_3865501 {K95BUUM5}) Cleanable



**#47** 1 25030905 (SMALL BOX_3865502 {K9UED77J}) Cleanable



## Goodrich Charles

**00000000**

**#48** 1 GLASSES 25071952 (MEDIUM CLEANING BOX_3877469 {K9YAYF9M}) Cleanable



**#49** 1 BOOKS 25071957 (SMALL CLEANING BOX_3877474 {KAP3XHUP}) Cleanable



**Total Line Items In Great room bar area Location: 4**

## Goodrich Charles

**00000000**

### Room: Great Room

**#50** 1 25030877 (MEDIUM BOX_3865481 {K4EKKLXR}) Cleanable



**#51** 1 25030878 (SMALL BOX_3865483 {K4HUMBC2}) Cleanable



**#52** 1 25030880 (MEDIUM BOX_3865484 {K4Q0F3KA}) Cleanable



**Total Line Items In Great Room Location: 3**

## 11-20-2019

### Room: Kitchen

**#53** 1 25071946 (SMALL BOX_3877463 {KERF7KVB}) Cleanable





©2019 Brookstone Restoration

## Goodrich Charles

**00000000**

**#54** 1 25071947 (SMALL BOX_3877464 {KEY9E0UG}) Cleanable




**#55** 1 25071948 (SMALL BOX_3877465 {KJKQDVAR}) Cleanable



**#56** 4 25071949 (SMALL BOX_3877466 {KKL6L91G}) Cleanable






**Total Line Items In Kitchen Location: 4**

## Goodrich Charles

**00000000**

### Room: Master Bedroom Closet

**#57** 1 SMALL BOX- BOOKS 25071960 Cleanable








**#58** 1 SMALL BOX- BOOKS 25071962 Cleanable





**#59** 1 SMALL BOX- BOOKS 25071964 Cleanable






## Goodrich Charles

**00000000**

**#60** 1 SMALL BOX- BOOKS 25071969 Cleanable



**#61** 1 SMALL BOX- BOOKS 25071971 Cleanable



**#62** 1 SMALL BOX- BOOKS 25071999 Cleanable



**Total Line Items In Master Bedroom Closet Location: 6**

### Room: Great Room

**#63** 1 25071950 (MEDIUM BOX_3877467 {KK26CCQA}) Cleanable



©2019 Brookstone Restoration

BROOKSTONE RESTORATION

## Goodrich Charles

**00000000**

**#64** 1 25071951 (MEDIUM BOX_3877468 {KK95XAND}) Cleanable







**#65** 1 25071953 (MEDIUM BOX_3877470 {KFE005RU}) Cleanable



**#66** 1 25071954 (MEDIUM BOX_3877471 {KFV9K3J5}) Cleanable



**#67** 1 25071955 (MEDIUM BOX_3877472 {KFQ4RYH0}) Cleanable



## Goodrich Charles

**00000000**

**#68** 1 25071956 (MEDIUM BOX_3877473 {KFKQK8MX}) Cleanable



**#69** 1 25071958 (MEDIUM BOX_3877475 {KFG51JG1}) Cleanable



**#70** 1 25071959 (MEDIUM BOX_3877476 {KFFVJGNN}) Cleanable



**#71** 1 25071961 (MEDIUM BOX_3877477 {KGZB8AAR}) Cleanable





**Total Line Items In Great Room Location: 9**

### Room: Basement

**#72** 1 TUBS 25072000 Cleanable





























**Total Line Items In Basement Location: 1**

**Total Line Items Per Job: 72**




O_2019_7.jpg




N_2019_8.jpg




S_2019_7.jpg




E_2019_7.jpg

3792218082.JPG




W_2019_7.jpg

CONFIDENTIAL

Redacted

**From:** Palk, Emma E
**Sent:** Friday, December 13, 2019 5:11 PM
**To:** Morris, Julie A; Johnson, Dorthea L
**Subject:** FW: LARGE LOSS: Charles Goodrich, Policy #1494547801, DOL 11/18/2019 *** FIRE - Curtain Placed Over Wall Light ***

Hello,

I just spoke to the claims adjuster – he advised they are demoing the home down the studs besides the basement. The basement is unfinished so they will vacuum and wipe it down. He believes the debris removal will take another 3-4 weeks (approx. mid-January). He advised they may be able to start rebuilding mid-February the earliest. He believes the re-build period would be approx. 10-12 months.

Thanks,

Emma

CHUBB

**Emma E. Palk**
Portfolio Underwriter, Personal Risk Services

202 Halls Mill Road, Whitehouse Station, NJ 08889, USA
O 816-292-4641
E Emma.Palk@Chubb.com

Chubb. Insured.™

Download our Chubb Mobile app and access auto ID cards, pay your bill, get catastrophe services and alerts, manage a claim, and more!
Get the "Chubb Mobile" app on the App Store or Play Store today!

***FREQUENTLY CONTACTED CHUBB DEPTS:***

Masterpiece
- *Agency Services: (866) 324-8222 agencysupport@chubb.com*
- *Masterpiece Processing: (800) 248-2275 masterpiece@chubb.com*
- *Masterpiece Billing: (800) 682-4822 : billing@chubb.com*
- *Non-Masterpiece Processing: (800) 248 -2275 nonmasterpiece@chubb.com*
- *Inspection Scheduling Department – (866) 444-0360*
- *Change of Producer: (800) 248-2275 BrokerofRecord@chubb.com*
- *Alarm Certificates - Please send to: : UWSupport@chubb.com*
- *Good Student Documentation - Please send to: : masterpiece@chubb.com*

PLAINTIFF'S EXHIBIT 73
PENGAD 800-631-6989

ACE
- *PLS Quote Requests: (800) 444-6161 plquotes@chubb.com*
- *PLS Endorsement Requests: (800) 444-6161 plendorsements@chubb.com*
- *PLS Biling Ctr: (800) 444-6161*

**From:** Palk, Emma E
**Sent:** Friday, December 13, 2019 4:47 PM

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

**File notes and Attachment for Claim Number: 040519056755**

**File Note Title:** Genl Cor - General correspondence
**reate Date:** 3/26/2020 2:32 PM
**Author:** ATTACHINGBOT1 EPAM
**File Note Text:**
From: jelliott@chubb.com.
Sent: 03/26/2020 01:10.
To: [US Property Claims uspropertyclaims@Chubb.com].
CC: []
Subject: claim 040519056755- FW: Goodrich House Fire - Dell Road FW: Fire damage framing .

Copied body: Exterior framing work

Thank You
[Chubb Logo]

Jeremy Elliott,MBA
Senior General Adjuster, Claims

1400 Urban Center Drive, Suite 450, Vestavia Hills, Alabama 35242, USA
O 205-470-8370 F 205-968-5496
E jelliott@chubb.commailto:jelliott@chubb.com

For more information on your Claim experience with Chubb, visit us here: Chubb Claim
uidancehttps://www2.chubb.com/us-en/claims/report-a-claim.aspx#claims_guidance

[Chubb Insured]

Welcome to Chubb Claims. Life is about to get easier.https://www2.chubb.com/us-en/claims/

I strive to take care of all inquiries and questions directly with you. If you need to speak with my supervisor, please contact Wally Haessig at (214) 460-1779 or via e-mail at whaessig@chubb.commailto:whaessig@chubb.com.

From: Chuck Dauphin [mailto:cdauphin@dauphinparis.com]
Sent: Thursday, March 19, 2020 10:09 AM
To: Elliott, Jeremy E jelliott@chubb.com
Cc: Ali Goodrich aligoodrich@gmail.com; Charles Goodrich charles@timberlineholdings.com
Subject: [EXTERNAL] Goodrich House Fire - Dell Road FW: Fire damage framing

Jeremy - see below. While everyone knew this was a possibility, we were hoping otherwise. Once the extent of the damage is determined, I'll ask TCC to provide an estimate for repair and to advise if the structural engineer or architect need to view the damage.

Regards, Chuck
Charles A. Dauphin
Dauphn Paris, LLC

PLAINTIFF'S EXHIBIT 82
PENGAD 800-631-6989

300 Vestavia Pkwy, Ste. 3200
Vestavia Hills, AL 35216
205-518-6821

onfidentiality Notice - The information contained in this e-mail and any attachments to it may be legally privileged and include confidential information. If you are not the intended recipient, be aware that any disclosure, distribution or copying of this e-mail or its attachments is prohibited. If you have received this e-mail in error, please notify the sender immediately of that fact by return e-mail and permanently delete the e-mail and any attachments to it. Thank you.

From: Bradley Moncrief bradley@tcccontractors.commailto:bradley@tcccontractors.com
Sent: Thursday, March 19, 2020 9:16 AM
To: Ali Goodrich aligoodrich@gmail.commailto:aligoodrich@gmail.com
Cc: Chuck Dauphin cdauphin@dauphinparis.commailto:cdauphin@dauphinparis.com; Marbury McCullough marbury@tcccontractors.commailto:marbury@tcccontractors.com
Subject: Fire damage framing

Hey Ali/Chuck, when we removed the cornice on the left side main gable we found some more burn damage. See photos. We will continue to "peal the onion" to find where the burn damage stops. This will require removing a little more roofing so we can replace the rafter/decking. Will update later.

[cid:DA55D0DE-B9E2-477F-A999-7107BC468414][cid:663D53EF-F962-447C-A225-A26E3111CB77]
[cid:C572CC08-8A67-4CA1-A12B-A626D3208E48][cid:EF5B2200-FA29-45BC-ACF9-5D08D109CB3F]
id:BC558466-E1F2-4A30-B518-BB305C99FA3C][cid:2390AC15-649F-4094-B81B-30EC9B9FB949]
Thanks,

Bradley Moncrief

Claim id: A1CE75BDAEA6C0F8.
Start time: 03/26/2020 01:32 PM EST
End time: 03/26/2020 01:32 PM EST

---

**From:** Elliott, Jeremy E
**To:** Andrew Arrant; Joni Holman
**Cc:** Chuck Dauphin; US Property Claims
**Subject:** RE: Charles Goodrich- claim 040519056755
**Date:** Friday, January 24, 2020 2:28:32 PM

Andrew, thank you for the update. Once we have the report we can determine steps moving forward. I am not agreeing to expanding the scope until I get the IH report which will be reviewed by our IH. If necessary, we can complete a walk thru with the report in hand for our IH and the insured vendor to confirm the protocol. I await the report for our review.

Thank You

**Jeremy Elliott,MBA**
Senior General Adjuster, Claims

1400 Urban Center Drive, Suite 450, Vestavia Hills, Alabama 35242, USA
O 205-470-8370 F 205-968-5496
E jelliott@chubb.com

*For more information on your Claim experience with Chubb, visit us here:* Chubb Claim Guidance

*Welcome to Chubb Claims. Life is about to get easier.*

I strive to take care of all inquiries and questions directly with you. If you need to speak with my supervisor, please contact Wally Haessig at (214) 460-1779 or via e-mail at whaessig@chubb.com.

**From:** Andrew Arrant [mailto:aarrant@brookstonecompanies.com]
**Sent:** Friday, January 24, 2020 2:25 PM
**To:** Elliott, Jeremy E <jelliott@chubb.com>
**Subject:** [EXTERNAL] Goodrich

Jermey,

Mrs. Goodrich called me this morning to discuss what other things we will be demoing after Cliff (the consultant) found smoke in the master bedroom, living room and kitchen hallway. She wanted us to go ahead and start the demo of these areas. I did inspect the areas myself and do see some smoke residue but I won't move forward until you can see it and approve it. So at this point, I am also waiting for the report to come back to finish the structure clean estimate as well.

Thanks,
Andrew

PENGAD 800-631-6989 PLAINTIFF'S EXHIBIT 86

ALL ITEMS MARKED 20% OFF UNTIL JAN 1 · FREE SHIPPING ON ORDERS OVER $100 · ADDITIONAL 20% DISCOUNT ON DONNA SHARP

Home · Curtains



Prestige

# Carolina Country Priscilla Ruffled Curtains

Carolina-Val-Whi

**Sale$34.99** ~~$65.00~~ FREE SHIPPING ON ORDERS OVER $100

* Available Sizes:
100W x 45L | 100W x 63L | 100W x 72L | 100W x 84L | 200W x 63L | 200W x 72L | 200W x 84L | 200W x 95L | 300W x 84L | 400W x 84L | Swag Valance 135W x 39L | Swag Valance 135W x 63L | Tier 90W x 36L | Tier 90W x 45L | Valance 90W x 14L

* Available Colors: Natural | White

ADD TO CART

**DETAILS & DIMENSIONS**

## Carolina Country Priscilla Ruffled Curtains

**Available in Colors:** White and Natural

- Includes Curtain Pair and Two Pre-Tied Bow Tiebacks
- 50/50 Polyester Cotton Construction
- Machine Washable
- Valance Measures 90W x 14L
- 3-to-1 Ruffling Ratio
- 3" Rod Pocket and a 3 3/4" Header
- Stated lengths do not include the 3 3/4" header

**Availability**
Ships in 24 Hours

**SHIPPING & RETURNS**

+ Add to Wishlist · Share

## CUSTOMERS WHO VIEWED THIS PRODUCT ALSO VIEWED



**Classic Wide Ruffle Priscilla Curtains** — Sale $19.99 | ~~$69.00~~



**Priscilla Ruffled Curtain Pair** — Sale $15.99 | ~~$40.00~~



**Panache Complete Window Set** — Sale $19.99 | ~~$27.00~~



**Cape Cod White Ruffled Curtains** — Sale $31.99 | ~~$38.00~~



**English Ivy Lace Curtain Collection**



**Logan Gingham Check Curtain & Valance Collection**



**Abbey Rose Lace Curtain** — Sale $11.99 | ~~$16.00~~



**Fairfield Curtain Set** — Sale $19.99 | ~~$28.00~~



**Dogwood Lace Curtain** — Sale $29.99 | ~~$35.00~~



**Claire Complete Window Set** — Sale $22.99 | ~~$30.00~~

"Pleasantly surprised!"

PHYLLIS W. · OK, United States

APPROVED



PLAINTIFF'S EXHIBIT 96
PENGAD 800-631-6989

| Room | Description | Original Cost | Replacement Cost | Sales Tax | Shipping/ Freight | TOTAL | Reference | Notes |
|---|---|---|---|---|---|---|---|---|
| Living Room | Knole Sofa * | $9,290.00 | $12,450.00 | $1,245.00 | $715.00 | $14,410.00 | Iris & Co. Invoice #421 | See Magali Somers Maus' letter regarding upholstered furniture. The Knole sofa is Item #20 in Brookstone Restoration's inventory list. (The bolster pillows are among the items pictured as Item #21.) Chubb may pick up this item from Brookstone once the claim on this item has been paid. |
| Living Room | Fabric for Knole Sofa | $4,400.00 | $6,300.00 | $630.00 | $160.00 | $7,090.00 | Iris & Co. Invoice #421 | |
| Living Room | Trim for Knole Sofa | $520.00 | $1,274.00 | $127.40 | $54.00 | $1,455.40 | Iris & Co. Invoice #421 | |
| Living Room | Two Cords for Knole Sofa | $660.00 | $1,040.00 | $104.00 | $145.00 | $1,289.00 | Iris & Co. Invoice #426 | |
| Living Room | Two Wing Chairs * | $9,520.00 | $11,500.00 | $1,150.00 | $690.00 | $13,340.00 | Iris & Co. Invoice #421 | See Magali Somers Maus' letter regarding upholstered furniture. One of the wing chairs is Item #19 in Brookstone Restoration's inventory list. The other wing chair is among the items pictured as Item #21. Chubb may pick up these items from Brookstone once the claim on these items has been paid. |
| Living Room | Fabric for Wing Chairs | $2,502.00 | $7,200.00 | $720.00 | $145.00 | $8,065.00 | Iris & Co. Invoice #421 | |
| Living Room | Fabric for Murphy Bed | | $1,200.00 | $120.00 | $45.00 | $1,365.00 | | |
| Living Room | Labor to Upholster Murphy Bed * ** | | $1,218.00 | $121.80 | $0.00 | $1,339.80 | | See Magali Somers Maus' letter regarding upholstered furniture. The antique Murphy bed is Item #8 in Magali Somers Maus' first proposal and estimate. |
| Living Room | Cost of New Materials for Murphy Bed | | $595.00 | $59.50 | $75.00 | $729.50 | | |
| Living Room | Fabric for Window Treatments | $17,670.00 | $19,932.20 | $1,993.22 | $86.00 | $22,011.42 | Iris & Co. Invoice #552 | The living room custom window treatments appear to be Item #601 ($150.35) in Enservio's report. |
| Living Room | Labor to Make Window Treatments * ** *** | $2,088.00 | $2,401.20 | $240.12 | $0.00 | $2,641.32 | Iris & Co. Invoice #585 | |
| Living Room | Cost of Lining and Bump for Window Treatments | $1,040.00 | $1,196.00 | $119.60 | $0.00 | $1,315.60 | Iris & Co. Invoice #585 | |
| Living Room | Rug * | $14,800.00 | $35,000.00 | $3,500.00 | $0.00 | $38,500.00 | Turkish Carpets Inc. Receipt | See Paige Albright Orientals' proposal for replacement cost. The Turkish Oushak rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Living Room | Labor to Cut, Deliver, and Install New Rug Pad - 12'9 x 17'3 | | $786.50 | $78.65 | $0.00 | $865.15 | | The rug pad appears to be Item #433 ($135.57) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Living Room | B. Viz Pillow (Blue Velvet) | $1,550.00 | $3,600.00 | $360.00 | $75.00 | $4,035.00 | Iris & Co. Invoice #111 | The pillow is among the items pictured as Item #21 in Brookstone Restoration's inventory list. This item is lost. |
| Living Room | B. Viz Pillow (Cream Velvet) | $350.00 | $425.00 | $42.50 | $55.00 | $522.50 | Iris & Co. Invoice #426 | The pillow was cleaned by CRDN, but a strong smoke odor is still present. Additionally, the antique velvet fabric is discolored and damaged. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Sunroom | Fabric for Daybed | $3,136.00 | $6,530.00 | $653.00 | $65.00 | $7,248.00 | Iris & Co. Invoice #84 | |
| Sunroom | Lining for Daybed | $54.00 | $275.00 | $27.50 | $0.00 | $302.50 | Iris & Co. Invoice #108 | |
| Sunroom | Labor to Upholster Daybed * ** | | $1,837.00 | $183.70 | $0.00 | $2,020.70 | | See Magali Somers Maus' letter regarding upholstered furniture. The antique daybed is Item #27 in Magali Somers Maus' first proposal and estimate. |
| Sunroom | Cost of Foam, Cotton, and Down for Daybed and Bolster Pillows | | $242.50 | $24.25 | $0.00 | $266.75 | | |
| Sunroom | Labor and Cost to Replace Foam and Cotton on Daybed | | $337.50 | $33.75 | $0.00 | $371.25 | | |
| Sunroom | Labor and Cost to Make Cushion for Daybed | | $1,162.50 | $116.25 | $0.00 | $1,278.75 | | |
| Sunroom | Labor to Make Two Custom Bolster Pillows for Daybed | | $337.50 | $33.75 | $0.00 | $371.25 | | |
| Sunroom | Bell Jar Light Fixture * | $510.00 | $675.00 | $67.50 | $55.00 | $797.50 | Iris & Co. Invoice #483 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace this light fixtures with a new one--which comes UL-wired--than to go through the process of having this light fixture rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Sunroom | Pair of Sconces * | $3,400.00 | $3,580.00 | $358.00 | $215.00 | $4,153.00 | Iris & Co. Invoice #421 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace these light fixtures with new ones--which come UL-wired--than to go through the process of having these light fixtures rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Sunroom | Labor to Cut, Deliver, and Install New Rug Pad - 6'2" x 10'0" | | $295.00 | $29.50 | $0.00 | $324.50 | | See payments to Dustin Cox as evidence that custom rug pads were purchased from him. This item is lost. |
| Dining Room | Fabric for Dining Chairs | $9,480.00 | $10,932.00 | $1,093.20 | $125.00 | $12,150.20 | Iris & Co. Invoice #569 | |
| Dining Room | Backing of Fabric for Dining Chairs | $850.00 | $918.00 | $91.80 | $250.00 | $1,259.80 | Iris & Co. Invoice #576 | |
| Dining Room | Labor to Upholster Chairs * ** | $4,820.00 | $6,840.00 | $684.00 | $0.00 | $7,524.00 | Iris & Co. Invoice #585 | See Magali Somers Maus' letter regarding upholstered furniture. The antique dining chairs are Item #31 in Magali Somers Maus' first proposal and estimate. |
| Dining Room | Cost of New Foam for Dining Chairs | | $2,692.00 | $269.20 | $0.00 | $2,961.20 | | |
| Dining Room | Fabric for Window Treatments | $19,068.00 | $22,196.80 | $2,219.68 | $190.00 | $24,606.48 | Iris & Co. Invoice #552 | The dining room custom window treatments appear to be Item #600 ($200.47) in Enservio's report. |
| Dining Room | Labor to Make Window Treatments * ** *** | $2,784.00 | $3,065.00 | $306.50 | $0.00 | $3,371.50 | Iris & Co. Invoice #585 | |
| Dining Room | Cost of Lining and Bump for Window Treatments | $1,390.00 | $1,598.00 | $159.80 | $0.00 | $1,757.80 | Iris & Co. Invoice #585 | |
| Dining Room | Rug * | $22,000.00 | $18,000.00 | $1,800.00 | $0.00 | $19,800.00 | Paige Albright Orientals Invoice #1957 | The Safira rug was taken by Brookstone Restoration to Asia Rug Company and appears to be Rug #1 ($8,000.00) in Asia Rug Company's appraisal. |
| Dining Room | Labor to Cut, Deliver, and Install New Rug Pad - 12'6" x 14'1" | $625.00 | $675.00 | $67.50 | $0.00 | $742.50 | Paige Albright Orientals Invoice #1957 | The rug pad appears to be Item #436 ($154.94) in Enservio's report. |
| Kitchen | Fabric for Kitchen Chairs and Mudroom Cushion Cover | $580.00 | $683.00 | $68.30 | $50.00 | $801.30 | Iris & Co. Invoice #569 | |
| Kitchen | Labor to Upholster Kitchen Chairs * ** | $1,260.00 | $1,386.00 | $138.60 | $0.00 | $1,524.60 | Iris & Co. Invoice #585 | See Magali Somers Maus' letter regarding upholstered furniture. The antique dining chairs are Item #30 in Magali Somers Maus' first proposal and estimate. |
| Kitchen | Cost of New Foam for Kitchen Chairs | $465.00 | $511.00 | $51.10 | $0.00 | $562.10 | Iris & Co. Invoice #585 | |
| Kitchen | Labor to Make New Wooden Seats for Kitchen Chairs | | $360.00 | $36.00 | $0.00 | $396.00 | | |
| Kitchen | Labor to Replace Caning on Seats of Kitchen Chairs | | $1,800.00 | $180.00 | $0.00 | $1,980.00 | | |
| Kitchen | Lantern Light Fixture * | $5,900.00 | $9,390.00 | $939.00 | $325.00 | $10,654.00 | Iris & Co. Invoice #253 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace this light fixture with a new one--which comes UL-wired--than to go through the process of having this light fixture rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Kitchen | Labor to Cut, Serge, Deliver, and Install Two Runners with New Rug Pads | | $1,157.75 | $115.78 | $0.00 | $1,273.53 | | The sisal runners appear to be Item #1066 ($525.36) in Enservio's report. The replacement cost of the sisal is included below. The rug pads appear to be Item #480 ($109.24) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Mudroom | Labor to Make Bench Cushion Cover * ** | $234.00 | $260.00 | $26.00 | $0.00 | $286.00 | Iris & Co. Invoice #585 | The cushion appears to be Item #487 ($96.69) in Enservio's report. |
| Mudroom | Labor to Make Insert for Bench Cushion | $140.00 | $160.00 | $16.00 | $0.00 | $176.00 | Iris & Co. Invoice #585 | |
| Mudroom | Rug * | | $5,500.00 | $550.00 | $0.00 | $6,050.00 | | See Claire Drummond's email confirming the purchase of the Oushak rug from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. The rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Mudroom | Labor to Cut, Deliver, and Install New Rug Pad - 9'8.5" x 2'4" | | $225.00 | $22.50 | $0.00 | $247.50 | | The rug pad appears to be Item #488 ($61.87) in Enservio's report. |
| Laundry Room | Rug * | | $2,800.00 | $280.00 | $0.00 | $3,080.00 | | See Claire Drummond's email confirming the purchase of the "foyer rug around 5x9" from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. This item is lost. |

PLAINTIFF'S EXHIBIT 78
PENGAD 800-631-6989

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Laundry Room | Labor to Cut, Deliver, and Install New Rug Pad - 5' x 8' | | $210.00 | $21.00 | $0.00 | $231.00 | | The rug pad appears to be Item #531 ($35.46) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Family Room | Sofa * | $2,588.00 | $8,920.00 | $892.00 | $520.10 | $10,332.10 | Iris & Co. Invoice #44 | See Magali Somers Maus' letter regarding upholstered furniture. The sofa is Item #17 in Brookstone Restoration's inventory list. Chubb may pick up this item from Brookstone once the claim on this item has been paid. |
| Family Room | Two Club Chairs * | $2,586.00 | $11,440.00 | $1,144.00 | $682.00 | $13,266.00 | Iris & Co. Invoice #51 | See Magali Somers Maus' letter regarding upholstered furniture. The club chairs are among the items pictured as Items #18 and #24 in Brookstone Restoration's inventory list. Chubb may pick up these items from Brookstone once the claim on these items has been paid. |
| Family Room | Two Bergere Chair Frames, Including Cost to Finish Frames * | $952.00 | $7,180.00 | $718.00 | $425.00 | $8,323.00 | Iris & Co. Invoice #39 | See Magali Somers Maus' letter regarding upholstered furniture. The Bergere chairs are Items #25 and #26 in Brookstone Restoration's inventory list. Chubb may pick up these items from Brookstone once the claim on these items has been paid. |
| Family Room | Fabric for Sofa, Club Chairs, Bergere Chairs, and Slipcover for Sofa (in Basement) | $26,268.00 | $34,992.00 | $3,499.20 | $225.00 | $38,716.20 | Iris & Co. Invoice #39, #44, #293 | |
| Family Room | Fabric for Pair of Painted French Stools | | $750.00 | $75.00 | $35.00 | $860.00 | | See Magali Somers Maus' letter regarding upholstered furniture. The antique painted French stools are Item #21 in Magali Somers Maus' first proposal and estimate. |
| Family Room | Labor to Upholster Pair of Painted French Stools * ** | | $425.00 | $42.50 | $0.00 | $467.50 | | |
| Family Room | Pair of Sconces * | $4,460.00 | $5,160.00 | $516.00 | $175.00 | $5,851.00 | Iris & Co. Invoice #265 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace these light fixtures with new ones--which come UL-wired--than to go through the process of having these light fixtures rewired with the necessary UL certification. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Family Room | Sisal for Rug | $3,410.00 | $4,100.00 | $410.00 | $155.00 | $4,665.00 | Iris & Co. Invoice #566 | This item is lost. |
| Family Room | Labor to Cut, Serge, Deliver, and Install Rug and New Rug Pad | $3,378.00 | $3,750.00 | $375.00 | $0.00 | $4,125.00 | | The rug pad appears to be Item #395 ($525.28) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Bar Hallway | Three Flush-Mount Brass Lights for Bar Hallway & Gallery * | $2,663.00 | $2,720.99 | $272.10 | $408.00 | $3,401.09 | Iris & Co. Invoice #566 | These items are lost. |
| Bar Hallway | Rug * | | $5,500.00 | $550.00 | $0.00 | $6,050.00 | | See Claire Drummond's email confirming the purchase of this vintage Oushak rug from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. The rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Bar Hallway | Labor to Make, Deliver, and Install New Rug Pad - 3'1" x 6'0" | | $210.00 | $21.00 | $0.00 | $231.00 | | See payments to Dustin Cox as evidence that custom rug pads were purchased from him. This item is lost. |
| Study | Fabric to Upholster Desk Chair | $3,760.00 | $3,900.00 | $390.00 | $75.00 | $4,365.00 | Iris & Co. Invoice #392 | See Magali Somers Maus' letter regarding upholstered furniture. The antique desk chair is Item #26 in Magali Somers Maus' first proposal and estimate. |
| Study | Labor to Upholster Desk Chair * ** | $150.00 | $175.00 | $17.50 | $0.00 | $192.50 | Iris & Co. Invoice #585 | |
| Study | Fabric for Two Antique Chairs | | $3,250.00 | $325.00 | $275.00 | $3,850.00 | Iris & Co. Invoice #392 | See Magali Somers Maus' letter regarding upholstered furniture. The antique chairs are Item #1 in Magali Somers Maus' first proposal and estimate. |
| Study | Labor to Upholster Antique Chairs * ** | | $1,781.50 | $178.15 | $0.00 | $1,959.65 | Iris & Co. Invoice #392 | |
| Study | Labor to Apply Nailheads on Antique Chairs | | $675.00 | $67.50 | $0.00 | $742.50 | | |
| Study | Cost of Nailheads | | $363.75 | $36.38 | $0.00 | $400.13 | | |
| Study | Cost of Foam | | $1,406.25 | $140.63 | $0.00 | $1,546.88 | | |
| Study | Bar Cart * | $2,356.90 | $5,890.00 | $589.00 | $325.00 | $6,804.00 | Iris & Co. Invoice #199 | The bar cart is among the items pictured as Item #32 in Brookstone Restoration's inventory list. The finish on the bar cart is now damaged, and two of the shelves are lost. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Study | Three Library Lights * | $1,979.55 | $2,179.00 | $217.90 | $326.85 | $2,723.75 | Iris & Co. Invoice #555 | These items are lost. |
| Study | Rug * | | $12,000.00 | $1,200.00 | $0.00 | $13,200.00 | | See Claire Drummond's email confirming the purchase of the vintage Oushak rug from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. The rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Study | Labor to Cut, Deliver, and Install New Rug Pad - 5'4" x 8'8" | | $300.00 | $30.00 | $0.00 | $330.00 | | The rug pad appears to be Item #414 ($28.85) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Master Bedroom | Fabric for Bedskirt, Chaise, and Window Treatments | $22,304.00 | $31,816.00 | $3,181.60 | $385.00 | $35,382.60 | Iris & Co. Invoice #84, #552, #555 | |
| Master Bedroom | Labor to Make Bedskirt * ** *** | $525.00 | $600.00 | $60.00 | $0.00 | $660.00 | Iris & Co. Invoice #585 | The bedskirt was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Master Bedroom | Labor to Upholster Chaise * ** | | $2,087.50 | $208.75 | $0.00 | $2,296.25 | | See Magali Somers Maus' letter regarding upholstered furniture. The antique chaise is Item #15 in Magali Somers Maus' first proposal and estimate. |
| Master Bedroom | Labor to Make Cushions for Chaise | | $1,531.25 | $153.13 | $0.00 | $1,684.38 | | |
| Master Bedroom | Cost of Foam and Cotton for Chaise | | $475.00 | $47.50 | $0.00 | $522.50 | | |
| Master Bedroom | Labor to Make Window Treatments * ** *** | $2,780.00 | $3,197.00 | $319.70 | $0.00 | $3,516.70 | Iris & Co. Invoice #585 | The master bedroom custom window treatments were cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim for this item has been paid. |
| Master Bedroom | Labor to Make Shades for Master Bathroom * ** *** | $650.00 | $740.00 | $74.00 | $0.00 | $814.00 | Iris & Co. Invoice #585 | The master bathroom custom shades were disposed of during debris removal. |
| Master Bedroom | Cost of Lining, Bump, and Interlining for Window Treatments and Shades | $1,619.00 | $1,860.00 | $186.00 | $0.00 | $2,046.00 | Iris & Co. Invoice #585 | |
| Master Bedroom | Fabric for Antique Bench | | $1,500.00 | $150.00 | $145.00 | $1,795.00 | | See Magali Somers Maus' letter regarding upholstered items. The antique bench is Item #12 in Magali Somers Maus' first proposal and estimate. |
| Master Bedroom | Labor to Upholster Antique Bench * ** | | $1,156.00 | $115.60 | $0.00 | $1,271.60 | | |
| Master Bedroom | Labor and Cost to Make Cushion for Bench | | $1,596.25 | $159.63 | $0.00 | $1,755.88 | | |
| Master Bedroom | Cost of Foam and Cotton for Bench | | $225.00 | $22.50 | $0.00 | $247.50 | | |
| Master Bedroom | Bed Linens from Leontine Linens | $7,710.00 | $7,710.00 | $771.00 | $100.00 | $8,581.00 | Iris & Co. Invoice #566 | Some of the bed linens were cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. The remaining bed linens are lost. |
| Master Bedroom | Pillows from Leontine Linens | $275.00 | $275.00 | $27.50 | $20.00 | $322.50 | | The pillows appear to be Items #373 ($61.04) and #393 ($228.74) in Enservio's report. See Leontine Linens estimate #16706 for replacement cost. |
| Master Bedroom | Chandelier * | $5,990.00 | $7,640.00 | $764.00 | $720.00 | $9,124.00 | Iris & Co. Invoice #454 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace this light fixture with a new one--which comes UL-wired--than to go through the process of having this light fixture rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Master Bedroom | Pair of Sconces * | $6,220.00 | $7,600.00 | $760.00 | $275.00 | $8,635.00 | Iris & Co. Invoice #310 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace these light fixtures with new ones--which come UL-wired--than to go through the process of having these light fixtures rewired with the necessary UL certification. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Master Bedroom | Rug * | | $16,000.00 | $1,600.00 | $0.00 | $17,600.00 | | See Claire Drummond's email confirming that the Oushak rug was purchased from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. The rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Master Bedroom | Labor to Cut, Deliver, and Install New Rug Pad - 13' x 17' | | $2,797.00 | $279.70 | $0.00 | $3,076.70 | | The rug pad appears to be Item #376 ($279.59) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Master Bedroom | Antique Mother of Pearl Tea Caddy | $2,500.00 | $7,000.00 | $700.00 | $0.00 | $7,700.00 | Robert Hill Antiques Invoice | This item is lost. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Powder Room | Pair of Sconces * | $7,700.00 | $9,000.00 | $900.00 | $325.00 | $10,225.00 | Iris & Co. Invoice #310 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace these light fixtures with new ones--which come UL-wired--than to go through the process of having these light fixtures rewired with the necessary UL certification. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Foyer | Library Light * | $440.00 | $496.00 | $49.60 | $99.20 | $644.80 | Iris & Co. Invoice #555 | This item is lost. |
| Foyer | Half-Round Wall Lanterns * | $3,159.95 | $22,720.00 | $2,272.00 | $2,750.00 | $27,742.00 | Iris & Co. Invoice #576 | These items are lost. |
| Foyer | Rug * | $6,500.00 | $7,500.00 | $750.00 | $0.00 | $8,250.00 | Paige Albright Orientals Invoice #1511 | See Paige Albright Orientals proposal for replacement cost. This item is lost. |
| Foyer | Labor to Make, Deliver, and Install New Rug Pad - 5'4" x 12'3" | | $290.00 | $29.00 | $0.00 | $319.00 | | The rug pad appears to be Item #435 ($46.54) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Upstairs Hallway | Pair of Antique Painted Bookcases * | $5,022.00 | $24,000.00 | $2,400.00 | $0.00 | $26,400.00 | Iris & Co. Invoice #227, #244 | The pair of antique bookcases appears to be Item #173 ($2,823.10) in Enservio's report. |
| Upstairs Hallway | Antique Louis XVI Bench * | $1,760.00 | $3,950.00 | $395.00 | $0.00 | $4,345.00 | The King's House Antiques Receipt | The antique caned bench is listed in Magali Somers Maus' first proposal and estimate. This item was irreparably damaged in the fire. |
| Upstairs Hallway | Fabric for Shower Curtain (Girls' Bathroom - Montevallo Road) | $1,280.00 | $2,560.00 | $256.00 | $65.00 | $2,881.00 | Iris & Co. Invoice #392 | |
| Upstairs Hallway | Labor to Make Shower Curtain * ** | $356.25 | $420.00 | $42.00 | $0.00 | $462.00 | Iris & Co. Invoice #421 | This item is lost. |
| Upstairs Hallway | Lining and Interlining for Shower Curtain | $317.30 | $364.90 | $36.49 | $0.00 | $401.39 | Iris & Co. Invoice #244 | |
| Upstairs Hallway | Labor to Make Shower Curtain (Caroline's Bathroom - Montevallo Road) * ** | $250.00 | $425.00 | $42.50 | $0.00 | $467.50 | Iris & Co. Invoice #392 | This item is lost. |
| Upstairs Hallway | Labor to Make, Serge, Deliver, and Install Runner with New Rug Pad | | $1,196.00 | $119.60 | $0.00 | $1,315.60 | | The replacement cost of the sisal for the runner is included below. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. These items are lost. |
| Guest Bedroom | Antique Regency Linen Press * | $9,500.00 | $22,000.00 | $2,200.00 | $0.00 | $24,200.00 | The King's House Antiques Receipt | This item was irreparably damaged in the fire and disposed of during debris removal. |
| Guest Bedroom | Antique Game Table * | | $9,500.00 | $950.00 | $0.00 | $10,450.00 | | The antique game table is Item #23 in Magali Somers Maus' first proposal and estimate. A strong smoke odor is still present after treatment. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Guest Bedroom | Pair of Antique Lamps | $2,079.00 | $5,800.00 | $580.00 | $0.00 | $6,380.00 | Henhouse Antiques Receipt | The pair of antiques lamps is Item #49 in Magali Somers Maus' first proposal and estimate. A strong smoke odor is still present after treatment. Chubb may pick up this item once the claim on this item has been paid. |
| Guest Bedroom | Headboard, Including Labor to Finish and Upholster * | $1,990.00 | $4,910.00 | $491.00 | $432.08 | $5,833.08 | Iris & Co. Invoice #39, #44, #585 | The headboard appears to be Item #154 ($2,178.91) in Enservio's report. |
| Guest Bedroom | Fabric for Headboard | $630.00 | $2,784.00 | $278.40 | $78.00 | $3,140.40 | Iris & Co. Invoice #44 | |
| Guest Bedroom | Mattress, Box Springs, and Frame * | $4,498.00 | $5,098.99 | $509.90 | $79.99 | $5,688.88 | Mattress Firm Receipts | The mattress and box springs appear to be Item #155 ($1,240.42) in Enservio's report. |
| Guest Bedroom | Bed Linens from Leontine Linens | | $5,670.00 | $567.00 | $100.00 | $6,337.00 | | See Leontine Linens Estimate #16708 for the replacement cost. These items are lost. |
| Guest Bedroom | Fabric for Bedskirt, Window Treatments, and Shower Curtain | $5,764.00 | $11,044.00 | $1,104.40 | $810.00 | $12,958.40 | Iris & Co. Invoice #39, #310, #585 | |
| Guest Bedroom | Backing of Fabric for Bedskirt | $306.00 | $356.00 | $35.60 | $48.00 | $439.60 | Iris & Co. Invoice #506 | |
| Guest Bedroom | Labor to Make Bedskirt * ** *** | $770.00 | $825.00 | $82.50 | $0.00 | $907.50 | Iris & Co. Invoice #585 | This item is lost. |
| Guest Bedroom | Lining for Bedskirt | $123.00 | $142.00 | $14.20 | $0.00 | $156.20 | Iris & Co. Invoice #506 | |
| Guest Bedroom | Labor to Make Window Treatments * ** *** | $1,350.00 | $1,370.00 | $137.00 | $0.00 | $1,507.00 | Iris & Co. Invoice #39, #312, #488, #585 | This item is lost. |
| Guest Bedroom | Labor to Make Shade for Guest Bedroom * ** *** | $450.00 | $515.00 | $51.50 | $0.00 | $566.50 | Iris & Co. Invoice #585 | This item is lost. |
| Guest Bedroom | Rug * | $6,577.00 | $7,535.00 | $753.50 | $125.00 | $8,413.50 | Iris & Co. Invoice #515 | This item is lost. |
| Guest Bedroom | Labor to Make, Serge, Deliver, and Install Rug and New Rug Pad | $1,249.00 | $2,627.00 | $262.70 | $0.00 | $2,889.70 | | See payments to Dustin Cox as evidence that custom rug pads were purchased from him. This item is lost. |
| Guest Bedroom | Labor to Make Shower Curtain * ** *** | $475.00 | $550.00 | $55.00 | $0.00 | $605.00 | Iris & Co. Invoice #585 | The shower curtain appears to be one of the items that is Item #1046 ($39.23) in Enservio's report. |
| Guest Bedroom | Labor to Make Shade for Guest Bathroom * ** *** | $320.00 | $370.00 | $37.00 | $0.00 | $407.00 | Iris & Co. Invoice #585 | This item is lost. |
| Guest Bedroom | Pair of Sconces for Bathroom * | $840.00 | $900.00 | $90.00 | $135.00 | $1,125.00 | Iris & Co. Invoice #576 | These items are lost. |
| Gillian's Bedroom | Daybed * | $3,390.00 | $5,990.00 | $599.00 | $325.00 | $6,914.00 | Iris & Co. Invoice #576 | This item is lost. |
| Gillian's Bedroom | Desk * | $579.99 | $1,499.00 | $149.90 | $315.00 | $1,963.90 | Ballard Designs Order | This item is lost. |
| Gillian's Bedroom | Chair for Desk * | | $2,339.00 | $233.90 | $0.00 | $2,572.90 | | This item is lost. |
| Gillian's Bedroom | Labor to Paint Desk and Chair * | $1,400.00 | $1,610.00 | $0.00 | $0.00 | $1,610.00 | Iris & Co. Invoice #566 | |
| Gillian's Bedroom | Bedside Table * | $1,260.00 | $1,330.00 | $133.00 | $150.00 | $1,613.00 | Iris &Co. Invoice #364 | This item is lost. |
| Gillian's Bedroom | Antique White Trumeau * | $4,600.00 | $5,750.00 | $575.00 | $0.00 | $6,325.00 | Iris & Co. Receipt | This item is lost. |
| Gillian's Bedroom | Fabric for Daybed, Bedskirt, Pillows, Window Treatments | $24,024.00 | $25,749.60 | $2,574.96 | $165.00 | $28,489.56 | Iris & Co. Invoice #576 | |
| Gillian's Bedroom | Fabric for Desk Chair, and Window Seat | $3,952.00 | $3,952.00 | $395.20 | $172.00 | $4,519.20 | Iris & Co. Invoice #576 | |
| Gillian's Bedroom | Fabric for Shower Curtain | $1,032.00 | $1,032.00 | $103.20 | $75.00 | $1,210.20 | Iris & Co. Invoice #576 | |
| Gillian's Bedroom | Trim for Desk Chair, Window Seat, and Shower Curtain | $794.00 | $794.00 | $79.40 | $34.00 | $907.40 | Iris & Co. Invoice #569 | |
| Gillian's Bedroom | Labor to Make Bedskirt * ** *** | $495.00 | $545.00 | $54.50 | $0.00 | $599.50 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Labor to Upholster Desk Chair * ** | $285.00 | $330.00 | $33.00 | $0.00 | $363.00 | Iris & Co. Invoice #585 | |
| Gillian's Bedroom | Labor to Modify Desk Chair to Accommodate Seat Cushion | $95.00 | $110.00 | $11.00 | $0.00 | $121.00 | Iris & Co. Invoice #585 | |
| Gillian's Bedroom | Labor to Make Cushion for Desk Chair | $235.00 | $270.00 | $27.00 | $0.00 | $297.00 | Iris & Co. Invoice #585 | |
| Gillian's Bedroom | Labor to Make Window Treatments - Longer Panels * ** *** | $1,875.00 | $2,065.00 | $206.50 | $0.00 | $2,271.50 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Labor to Make Window Treatments - Shorter Panels * ** *** | $480.00 | $525.00 | $52.50 | $0.00 | $577.50 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Labor to Make Window Treatments - Shades * ** *** | $530.00 | $590.00 | $59.00 | $0.00 | $649.00 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Lining and Bump for Window Treatments | $1,233.60 | $1,418.64 | $141.86 | $0.00 | $1,560.50 | Iris & Co. Invoice #585 | |
| Gillian's Bedroom | Labor and Cost to Make Window Seat Cushion * ** | $930.00 | $1,023.00 | $102.30 | $0.00 | $1,125.30 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Labor to Make Shower Curtain * ** *** | $535.00 | $600.00 | $60.00 | $125.00 | $785.00 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Bed Linens from Leontine Linens | $2,050.00 | $2,050.00 | $205.00 | $100.00 | $2,355.00 | Iris & Co. Invoice #559 | This item is lost. |
| Gillian's Bedroom | Pillow from Leontine Linens | $100.00 | $100.00 | $10.00 | $0.00 | $110.00 | | See Leontine Linens estimate #16706 for replacement cost. This item is lost. |
| Gillian's Bedroom | Mattress | $1,599.00 | $1,979.00 | $197.90 | $0.00 | $2,176.90 | Mattress Firm Receipts | This item is lost. |
| Gillian's Bedroom | Trundle and Mattress | $498.00 | $689.00 | $68.90 | $0.00 | $757.90 | Mattress Firm Receipts | These items are lost. |
| Gillian's Bedroom | Chandelier * | $3,390.00 | $5,780.00 | $578.00 | $315.00 | $6,673.00 | Iris & Co. Invoice #253 | This item is lost. |
| Gillian's Bedroom | Antique Gold Leaf Bow Sconces * | | $4,950.00 | $495.00 | $0.00 | $5,445.00 | | This item is lost. |
| Gillian's Bedroom | Pair of Sconces for Bathroom * | $799.80 | $856.00 | $85.60 | $64.20 | $1,005.80 | Iris & Co. Invoice #576 | These items are lost. |
| Gillian's Bedroom | Rug; Labor to Cut, Serge, Deliver, and Install New Rug and Rug Pad | $2,330.00 | $3,290.00 | $329.00 | $75.00 | $3,694.00 | Iris & Co. Invoice #566 | These items are lost. |
| Susie's Bedroom | Bed * | $1,536.00 | $1,536.00 | $153.60 | $199.00 | $1,888.60 | Restoration Hardware Receipts | This item is lost. |
| Susie's Bedroom | Alteration of Canopy | $295.00 | $315.00 | $31.50 | $0.00 | $346.50 | Iris & Co. Invoice #569 | |
| Susie's Bedroom | Two Chests * | $3,545.00 | $5,200.00 | $520.00 | $500.00 | $6,220.00 | Iris & Co. Invoice #253, #426 | The chests appear to be Item #172 ($869.82) in Enservio's report. |
| Susie's Bedroom | Labor to Paint Chests * | $930.00 | $1,070.00 | $0.00 | $0.00 | $1,070.00 | Iris & Co. Invoice #569 | |
| Susie's Bedroom | Dressing Table * | $950.00 | $1,500.00 | $150.00 | $150.00 | $1,800.00 | Iris & Co. Invoice #569 | This item is lost. |
| Susie's Bedroom | Single Antique Lamp | $301.60 | $1,600.00 | $160.00 | $0.00 | $1,760.00 | Iris & Co. Invoice #260 | This item is lost. |
| Susie's Bedroom | Fabric for Bed and Shower Curtain | $43,800.00 | $43,800.00 | $4,380.00 | $810.00 | $48,990.00 | Iris & Co. Invoice #576 | |
| Susie's Bedroom | Backing of Fabric for Bed and Shower Curtain | $1,320.00 | $1,425.60 | $142.56 | $293.00 | $1,861.16 | Iris & Co. Invoice #569 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Susie's Bedroom | Cost of Lining for Bed and Shower Curtain | $165.00 | $180.00 | $18.00 | $0.00 | $198.00 | Iris & Co. Invoice #585 | |
| Susie's Bedroom | Fabric for Canopies and Window Seat | $12,040.00 | $12,040.00 | $1,204.00 | $168.00 | $13,412.00 | Iris & Co. Invoice #576 | |
| Susie's Bedroom | Fabric for Window Treatments - Shades | $3,120.00 | $3,120.00 | $312.00 | $73.00 | $3,505.00 | Iris & Co. Invoice #576 | |
| Susie's Bedroom | Labor to Make Top of Bed Canopy * ** *** | $2,130.00 | $2,345.00 | $234.50 | $0.00 | $2,579.50 | Iris & Co. Invoice #585 | This item is lost. |
| Susie's Bedroom | Labor to Make Panels for Bed * ** *** | $3,168.00 | $3,485.00 | $348.50 | $0.00 | $3,833.50 | Iris & Co. Invoice #585 | This item is lost. |
| Susie's Bedroom | Labor to Make Bedskirt * ** *** | $775.00 | $850.00 | $85.00 | $0.00 | $935.00 | Iris & Co. Invoice #585 | The bedskirt appears to be Item #1062 ($43.59) in Enservio's report. |
| Susie's Bedroom | Silk Bow for Bed Canopy | $500.00 | $500.00 | $50.00 | $25.00 | $575.00 | Iris & Co. Invoice #555 | This item is lost. |
| Susie's Bedroom | Fabric for Pillows | $7,600.00 | $7,600.00 | $760.00 | $105.00 | $8,465.00 | Iris & Co. Invoice #576 | |
| Susie's Bedroom | Labor to Make Bolster Pillow * ** | $210.00 | $230.00 | $23.00 | $0.00 | $253.00 | Iris & Co. Invoice #585 | The custom bolster pillow appears to be Item #610 ($132.98) in Enservio's report. |
| Susie's Bedroom | Labor to Make Insert for Pillow | $225.00 | $247.00 | $24.70 | $0.00 | $271.70 | Iris & Co. Invoice #585 | |
| Susie's Bedroom | Bed Linens from Leontine Linens | $4,850.00 | $4,850.00 | $485.00 | $100.00 | $5,435.00 | Iris & Co. Invoice #559 | These items are lost. |
| Susie's Bedroom | Pillows from Leontine Linens | $100.00 | $100.00 | $10.00 | $0.00 | $110.00 | | See Leontine Linens estimate #16706 for replacement cost. This item is lost. |
| Susie's Bedroom | Labor to Make Window Treatments - Shade for Bedroom * ** *** | $1,340.00 | $1,475.00 | $147.50 | $0.00 | $1,622.50 | Iris & Co. Invoice #585 | This item is lost. |
| Susie's Bedroom | Labor to Make Window Seat Cushion * ** | $1,950.00 | $2,145.00 | $214.50 | $0.00 | $2,359.50 | Iris & Co. Invoice #585 | The window seat cushion appears to be Item #169 ($588.85) in Enservio's report. |
| Susie's Bedroom | Labor to Make Shower Curtain * ** *** | $420.00 | $465.00 | $46.50 | $0.00 | $511.50 | Iris & Co. Invoice #585 | The shower curtain appears to be Item #1047 ($39.23) in Enservio's report. |
| Susie's Bedroom | Labor to Make Window Treatments - Shade for Bathroom * ** *** | $178.00 | $195.00 | $19.50 | $0.00 | $214.50 | Iris & Co. Invoice #585 | This item is lost. |
| Susie's Bedroom | Pair of Sconces for Bathroom * | $799.00 | $856.00 | $85.60 | $64.20 | $1,005.80 | Iris & Co. Invoice #576 | This item is lost. |
| Susie's Bedroom | Rug; Labor to Cut, Serge, Deliver, and Install New Rug and Rug Pad | $2,875.00 | $3,726.50 | $372.65 | $45.00 | $4,144.15 | Iris & Co. Invoice #576 | The rug appears to be Item #319 ($47.63) in Enservio's report. The rug pad appears to be Item #318 ($21.80) in Enservio's report. |
| Caroline's Bedroom | Two Headboards * | $2,200.00 | $4,512.00 | $451.20 | $250.00 | $5,213.20 | Iris & Co. Invoice #138 | The headboards appear to be Item #175 ($979.91) in Enservio's report. |
| Caroline's Bedroom | Two Antique Benches * | $2,380.00 | $6,900.00 | $690.00 | $250.00 | $7,840.00 | Iris & Co. Invoice #260 | The antique benches appear to be Item #252 ($610.29) in Enservio's report. |
| Caroline's Bedroom | Labor to Upholster Antique Benches * ** | $425.00 | $530.00 | $53.00 | $0.00 | $583.00 | Iris & Co. Invoice #260 | See Magali Somers Maus' letter regarding upholstered furniture. |
| Caroline's Bedroom | Fabric for Canopies, Bedskirts, Window Seat, Window Treatments, and Shower Curtain | $14,760.00 | $15,890.00 | $1,589.00 | $250.00 | $17,729.00 | Iris & Co. Invoice #569 | |
| Caroline's Bedroom | Strike Off for Above Fabric | $250.00 | $250.00 | $0.00 | $25.00 | $275.00 | Iris & Co. Invoice #569 | |
| Caroline's Bedroom | Fabric for Canopies and Benches | $3,950.00 | $3,950.00 | $395.00 | $66.72 | $4,411.72 | Iris & Co. Invoice #569 | |
| Caroline's Bedroom | Cost of Lining and Interlining | $325.00 | $390.00 | $39.00 | $0.00 | $429.00 | Iris & Co. Invoice #585 | |
| Caroline's Bedroom | Labor to Make Canopies * ** *** | $900.00 | $990.00 | $99.00 | $0.00 | $1,089.00 | Iris & Co. Invoice #569 | This item is lost. |
| Caroline's Bedroom | Labor to Make Panels for Canopies * ** *** | $1,200.00 | $1,320.00 | $132.00 | $0.00 | $1,452.00 | Iris & Co. Invoice #569 | This item is lost. |
| Caroline's Bedroom | Labor to Make Bedskirts * ** *** | $1,500.00 | $1,650.00 | $165.00 | $0.00 | $1,815.00 | Iris & Co. Invoice #569 | The bedskirts appear to be Items #605 ($43.59) and #609 ($43.59) in Enservio's report. |
| Caroline's Bedroom | Labor to Make Window Treatments - Shade for Bedroom * ** *** | $935.00 | $1,075.00 | $107.50 | $0.00 | $1,182.50 | Iris & Co. Invoice #569 | This item is lost. |
| Caroline's Bedroom | Labor to Make Window Seat Cushion * ** | $1,818.00 | $1,990.00 | $199.00 | $0.00 | $2,189.00 | Iris & Co. Invoice #569 | The window seat cushion appears to be Item #168 ($391.43) in Enservio's report. |
| Caroline's Bedroom | Labor to Paint Desk and Chair * | $1,037.00 | $1,192.00 | $0.00 | $0.00 | $1,192.00 | Iris & Co. Invoice #566 | The antique desk is Item #4 in Magali Somers Maus' first proposal and estimate. The antique chair is Item #5 in Magali Somers Maus' first proposal and estimate. |
| Caroline's Bedroom | Labor to Upholster Desk Chair * ** | $54.00 | $60.00 | $6.00 | $0.00 | $66.00 | Iris & Co. Invoice #585 | See Magali Somers Maus' letter regarding upholstered furniture. The antique desk chair is Item #5 in Magali Somers Maus' first proposal and estimate. |
| Caroline's Bedroom | Labor to Make Shower Curtain * ** *** | $420.00 | $465.00 | $46.50 | $0.00 | $511.50 | Iris & Co. Invoice #585 | The shower curtain appears to be one of the items that is Item #1046 ($39.23) in Enservio's report. |
| Caroline's Bedroom | Labor to Make Window Treatments - Shade for Bathroom * ** *** | $266.00 | $295.00 | $29.50 | $0.00 | $324.50 | Iris & Co. Invoice #585 | This item is lost. |
| Caroline's Bedroom | Rug; Labor to Cut, Serge, Deliver and Install New Rug and Rug Pad | $2,875.00 | $3,726.50 | $372.65 | $45.00 | $4,144.15 | Iris & Co. Invoice #576 | The rug was taken by Brookstone Restoration to Asia Rug Company and appears to be Rug #2 ($1,000.00) in Asia Rug Company's appraisal. The rug pad is lost. |
| Caroline's Bedroom | Bed Linens from Leontine Linens | | $6,690.00 | $669.00 | $100.00 | $7,459.00 | | See Leontine Linens estimate #16711 for the replacement cost. These items are lost. |
| Caroline's Bedroom | French Blue Throw | $265.00 | $350.00 | $35.00 | $25.00 | $410.00 | Iris & Co. Invoice #253 | The throw was cleaned by CRDN, but there is still a strong smoke odor. Additionally, the color has faded and the texture has changed. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Caroline's Bedroom | Pair of Antique Lamps | $676.00 | $3,900.00 | $390.00 | $0.00 | $4,290.00 | Iris & Co. Invoice #260 | The pair of antique lamps appear to be Item #242 ($324.82) in Enservio's report. |
| Playroom | Sofa * | | $8,280.00 | $828.00 | $903.00 | $10,011.00 | | The sofa appears to be Item #170 ($1,088.91) in Enservio's report. |
| Playroom | Two Chairs * | | $10,980.00 | $1,098.00 | $659.00 | $12,737.00 | | The chairs appear to be Item #171 ($1,447.52) in Enservio's report. |
| Playroom | Large Antiqued Mirror * | $1,813.19 | $3,125.00 | $312.50 | $0.00 | $3,437.50 | Iris & Co. Invoice #260 | The mirror appears to be Item #294 ($1,962.00) in Enservio's report. |
| Playroom | Fabric for Sofa, Chairs, Bolster Pillows, Antique Round Bench, and Dressing Table | $5,188.00 | $10,480.00 | $1,048.00 | $62.00 | $11,590.00 | Iris & Co. Invoice #51, #244, #421 | |
| Playroom | Backing of Fabric for Sofa and Chairs | $317.00 | $348.00 | $34.80 | $76.00 | $458.80 | Iris & Co. Invoice #569 | |
| Playroom | Fabric for Trim on Bolster Pillows | $255.00 | $389.00 | $38.90 | $43.00 | $470.90 | Iris & Co. Invoice #51 | |
| Playroom | Labor to Make Bolster Pillows * ** | $254.40 | $318.00 | $31.80 | $0.00 | $349.80 | Iris & Co. Invoice #51 | |
| Playroom | Antique Iron Daybed * | | $3,500.00 | $350.00 | $0.00 | $3,850.00 | | The antique iron daybed is Item #99 in Magali Somers Maus' second proposal and estimate. A strong smoke odor is still present after treatment. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Playroom | Fabric for Daybed Cushion, Bolster, and Pillows | | $2,400.00 | $240.00 | $65.00 | $2,705.00 | | See Magali Somers Maus' letter regarding upholstered furniture. |
| Playroom | Labor to Make Cushion, Bolster, and Pillows for Daybed * ** | | $1,255.00 | $125.50 | $0.00 | $1,380.50 | | |
| Playroom | Cost of Materials for Cushion, Bolster, and Pillows for Daybed | | $1,440.50 | $144.05 | $0.00 | $1,584.55 | | |
| Attic | Antique Round Bench * | $595.00 | $950.00 | $95.00 | $0.00 | $1,045.00 | Iris & Co. Invoice #260 | The antique bench appears to be Item #162 ($163.50) in Enservio's report. |
| Attic | Labor to Upholster Round Bench * ** | $45.00 | $350.00 | $35.00 | $0.00 | $385.00 | Iris & Co. Invoice #260 | |
| Attic | Cost of New Materials for Round Bench | | $197.50 | $19.75 | $0.00 | $217.25 | | |
| Basement | Labor to Make Slipcover for Sofa * ** | $1,343.75 | $1,680.00 | $168.00 | $0.00 | $1,848.00 | Iris & Co. Invoice #320 | The sofa slipcovers appear to be Item #119 ($122.08) in Enservio's report. |
| Basement | Fabric for Club Chair Slipcovers | $4,550.00 | $7,320.00 | $732.00 | $125.00 | $8,177.00 | Iris & Co. Invoice #253, #320 | |
| Basement | Labor to Make Slipcovers for Club Chairs * ** | $1,343.75 | $1,670.00 | $167.00 | $0.00 | $1,837.00 | Iris & Co. Invoice #320 | The club chair slipcovers appear to be Item #120 ($712.86) in Enservio's report. |
| Basement | Pre-Wash Fabric for Slipcovers | $380.00 | $425.00 | $42.50 | $87.00 | $554.50 | Iris & Co. Invoice #320 | |
| Basement | Fabric for Bedskirts | | $7,600.00 | $760.00 | $145.00 | $8,505.00 | | |
| Basement | Labor to Make Bedskirts * ** | | $1,650.00 | $165.00 | $0.00 | $1,815.00 | | The bedskirts appear to be Item #122 ($53.41) in Enservio's report. |
| Basement | Fabric for Window Treatments (Living Room - Montevallo Road) | $21,420.00 | $23,436.00 | $2,343.60 | $90.00 | $25,869.60 | Iris & Co. Invoice #421 | |
| Basement | Labor to Make Window Treatments (Living Room - Montevallo Road) * ** | $3,325.00 | $3,657.50 | $365.75 | $0.00 | $4,023.25 | Iris & Co. Invoice #421 | The custom window treatments appear to be Item #121 ($283.40) in Enservio's report. |
| Basement | Lining and Interlining for Window Treatments (Living Room - Montevallo Road) | $2,502.00 | $3,100.00 | $310.00 | $0.00 | $3,410.00 | Iris & Co. Invoice #421 | |
| Basement | Fabric for Window Treatments (Dining Room - Montevallo Road) | $15,780.00 | $20,460.00 | $2,046.00 | $140.00 | $22,646.00 | Iris & Co. Invoice #39, #310 | |
| Basement | Labor to Make Window Treatments (Dining Room - Montevallo Road) * ** | $3,552.00 | $4,440.00 | $444.00 | $0.00 | $4,884.00 | Iris & Co. Invoice #39, #312, #497 | The custom window treatments sustained significant water damage due to the fire. A strong smoke odor was still present after cleaning. |
| Basement | Lining and Interlining for Window Treatments (Dining Room - Montevallo Road) | $561.86 | $653.00 | $65.30 | $0.00 | $718.30 | Iris & Co. Invoice #39, #312 | |
| Basement | Fabric for Window Treatments (Susie's Bedroom - Montevallo Road) | $5,130.00 | $6,412.50 | $641.25 | $61.00 | $7,114.75 | Iris & Co. Invoice #338 | |
| Basement | Labor to Make Window Treatments (Susie's Bedroom - Montevallo Road) * ** | $1,275.00 | $1,600.00 | $160.00 | $0.00 | $1,760.00 | Iris & Co. Invoice #421 | The window treatments appear to be one of two sets of window treatments included as Item #123 ($270.32) in Enservio's report. |
| Playroom | Labor to Make Custom Skirt for Dressing Table * ** | $415.00 | $520.00 | $52.00 | $0.00 | $572.00 | Iris & Co. Invoice #260 | The custom skirt sustained significant water damage due to the fire. A strong smoke odor was still present after cleaning. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Basement | Labor to Add Trim on Bumper Pads, Crib Skirt, and Baby Blanket * ** | $354.00 | $442.50 | $44.25 | $0.00 | $486.75 | Iris & Co. Invoice #108 | The bumper pads, crib skirt, and baby blanket appear to be Item #118 ($152.60) in Enservio's report. |
| Basement | Fabric for Window Treatments (Caroline's Bedroom - Montevallo Road) | $5,130.00 | $6,415.00 | $641.50 | $604.35 | $7,660.85 | Iris & Co. Invoice #388 | |
| Basement | Labor to Make Window Treatments (Caroline's Bedroom - Montevallo Road) * ** | $1,400.00 | $1,750.00 | $175.00 | $0.00 | $1,925.00 | Iris & Co. Invoice #388 | The window treatments appear to be one of two sets of window treatments included as Item #123 ($270.32) in Enservio's report. |
| Basement | Bed * | $1,149.00 | $1,236.00 | $123.60 | $199.00 | $1,558.60 | Restoration Hardware Receipts | The bed appears to be Item #344 ($0.00) in Enservio's report. It sustained significant water damage as a result of the fire. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Basement | Fabric for Four Chairs from Pub Table | | $815.00 | $81.50 | $28.00 | $924.50 | | See Magali Somers Maus' letter regarding upholstered furniture. The chairs are Item #76 in Magali Somers Maus' second proposal and estimate. |
| Basement | Labor to Upholster Four Chairs from Pub Table * ** | | $625.00 | $62.50 | $0.00 | $687.50 | | |
| Basement | Pair of Sconces * | $1,980.00 | $2,850.00 | $285.00 | $0.00 | $3,135.00 | Iris & Co. Invoice #44, #310 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace these light fixtures with new ones--which come UL-wired--than to go through the process of having these light fixtures rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Basement | Sisal for Rugs (Includes Kitchen and Upstairs Hallway Runners) | $15,644.00 | $18,648.48 | $1,864.85 | $377.00 | $20,890.33 | Iris & Co. Invoice #454, #515 | |
| Basement | Cost of New Rug Pads for Rugs in Basement | | $5,490.00 | $549.00 | $0.00 | $6,039.00 | | See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Basement | Labor to Cut, Serge, and Deliver New L-Shaped Rug & Rug Pad | | $1,755.00 | $175.50 | $0.00 | $1,930.50 | | The L-shaped rug appears to be Item #143 ($592.18) in Enservio's report. The L-shaped rug pad appears to be Item #144 ($42.51) in Enservio's report. |
| Basement | Labor to Cut, Serge, and Deliver New Rugs and Rug Pads - 13' x 11' | | $4,000.00 | $400.00 | $0.00 | $4,400.00 | | The rugs appear to be Item #145 ($2,182.18) in Enservio's report. The rug pads appear to be Item #148 ($521.02) in Enservio's report. |
| Basement | Labor to Cut, Serge, and Deliver New Rug + Rug Pad - 13' x 12' | | $2,095.00 | $209.50 | $0.00 | $2,304.50 | | The rug appears to be Item #146 ($1,190.28) in Enservio's report. The rug pad appears to be Item #147 ($260.51) in Enservio's report. |
| Outdoor Furniture | Sofa with Custom Cushions * | $3,725.00 | $4,850.00 | $485.00 | $281.00 | $5,616.00 | Iris & Co. Invoice #320 | See Magali Somers Maus' letter regarding upholstered furniture. The sofa has a very strong smoke odor. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Outdoor Furniture | Two Chairs with Custom cushions * | $3,230.00 | $3,890.00 | $389.00 | $269.00 | $4,548.00 | Iris & Co. Invoice #320 | See Magali Somers Maus' letter regarding upholstered furniture. The chairs have a very strong smoke odor. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Outdoor Furniture | Coffee Table * | $1,200.00 | $1,695.00 | $169.50 | $75.00 | $1,939.50 | Iris & Co. Invoice #320 | The coffee table has a very strong smoke odor. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Outdoor Furniture | Table and Six chairs * | $6,744.77 | $6,950.00 | $695.00 | $425.00 | $8,070.00 | Iris & Co. Invoice #421 | The table and chairs have a very strong smoke odor. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Outdoor Furniture | Fabric for Pillows | $450.00 | $475.00 | $47.50 | $28.00 | $550.50 | Iris & Co. Invoice #421 | |
| Outdoor Furniture | Wicker Outdoor Furniture * | $3,080.00 | $4,850.00 | $485.00 | $388.00 | $5,723.00 | Iris & Co. Invoice #327 | These items are lost. |
| Outdoor Furniture | Labor to Paint Wicker Furniture * ** | $1,250.00 | $1,550.00 | $155.00 | $0.00 | $1,705.00 | Iris & Co. Invoice #569 | |
| Exterior Lighting | Custom Lantern for Front Porch * | $11,720.00 | $14,900.00 | $1,490.00 | $1,100.00 | $17,490.00 | Iris & Co. Invoice #559 | This item is lost. |
| Exterior Lighting | Four Exterior Wall Lanterns * | $4,880.00 | $4,880.00 | $488.00 | $625.00 | $5,993.00 | Iris & Co. Invoice #559 | These items are lost. |
| Miscellaneous | Blackout Shades for All Bedrooms and Bathrooms | $9,486.00 | $9,486.00 | $948.60 | $150.00 | $10,584.60 | Iris & Co. Invoice #559 | These items are lost. |
| Miscellaneous | Labor to Measure and Install Blackout Shades | $440.00 | $440.00 | $0.00 | $0.00 | $440.00 | Iris & Co. Invoice #559 | |
| Miscellaneous | All Rods, Brackets, and Rings for Window Treatments | $6,559.00 | $8,573.72 | $857.37 | $87.00 | $9,518.09 | Iris & Co. Invoice #506, #559, $569 | These items are lost. |
| Miscellaneous | Lamp Shades - Large (10) | $1,540.00 | $3,000.00 | $300.00 | $0.00 | $3,300.00 | Invoice #159, #260 | A strong smoke odor is still present after cleaning. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Miscellaneous | Lamp Shades - Medium (5) | | $875.00 | $87.50 | $0.00 | $962.50 | Invoice #260 | Some of the lamp shades appear to be included as Item #177 ($87.09) in Enservio's report. A strong smoke odor is still present after cleaning the remaining lamp shades. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Miscellaneous | Lamp Shades - Small (15) | | $705.00 | $70.50 | $0.00 | $775.50 | Invoice #260 | A strong smoke odor is still present after cleaning. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Miscellaneous | Installation of Art | $625.00 | $625.00 | $62.50 | $0.00 | $687.50 | Invoice #569 | |
| Miscellaneous | Iris & Co. Inc. - Hourly Charges for Dell Road - 650 hours @ $200/hour | | $130,000.00 | $0.00 | $0.00 | $130,000.00 | Iris & Co. Letter | |
| | Receiving and Initial Storage Fees (* Items included in Receiving and Initial Storage Fees) | | $5,900.00 | $0.00 | $0.00 | $5,900.00 | | |
| | Delivery Fees (** Items Included in Delivery Fees) | | $7,500.00 | $750.00 | $0.00 | $8,250.00 | Misc. Iris & Co. Invoices | |
| | Installation Fees (*** Items Included in Installation Fees) | | $3,220.00 | $0.00 | $0.00 | $3,220.00 | Misc. Iris & Co. Invoices | |
| | TOTAL | | | | | $1,336,273.30 | | |

For Discussion Purposes Only

PLAINTIFF'S EXHIBIT 99
PENGAD 800-631-6989



**Project Name:** Charles Goodrich
**Address:** 3305 Dell Road Mountain Brook 35223
**JS Held Project:** 19110979

**Date of Loss:** 11/18/2019
**Loss Type:** Fire

Bid Difference

| Line # | Item/Area | Description | TCC | Disputed | Adjusted | Recommended |
|---|---|---|---|---|---|---|
| 1 | Repairs | Original cost | $1,566,052.23 | | | |
| 2 | | Wood mantles | | 50% | $ 5,000.00 | $ - |
| 3 | | Garage Doors | | 100% | $ 3,990.00 | $ - |
| 4 | | Plumbing | | 4% | $ 4,720.21 | $ - |
| 5 | | Generator | | 100% | $ 18,400.00 | $ - |
| 6 | | Builders Risk | | 100% | $ 6,100.00 | $ - |
| 7 | | Doors | | 50% | $ 12,587.50 | $ - |
| 8 | | Door Hardware | | 50% | $ 28,298.00 | $ - |
| 9 | | Cabinetry | - | 37% | $ 97,813.32 | $ - |
| 10 | | HVAC | | 50% | $ 48,391.00 | |
| 11 | | Beams | | 90% | $ 70,114.00 | |
| | | | - | | | $ - |
| 13 | **Subtotal** | | **$1,566,052.23** | | **$ 295,414.03** | **$ 1,270,638.20** |
| 14 | O and P | Calculated at 20% | | | | $ 254,127.64 |
| 15 | **Subtotal** | | | | | |
| 16 | Contingency | | | | | $ - |
| 17 | **Total Repair Budget** | | **$ 1,879,262.79** | | | **$ 1,524,765.84** |

| TE 01 | |
|---|---|

For Di ion Purposes Only

JS HELD

**Project Name: Charles Goodrich**

**Estimate Analysis Comparing TCC's Estimate and J.S. Held's Estimate**

| REF # | Category | J.S. Held | TCC | Difference | Other Structures | Notes on cost differences. |
|---|---|---|---|---|---|---|
| 2 | Landscape | | | $ - | $50,000 | Cost have not been reviewed but are being allocated under the correct coverage |
| 3 | Driveway | | | $ - | $14,152 | Cost have not been reviewed but are being allocated under the correct coverage |
| 4 | Beam Labor Installation | $ 2,500.00 | $ 5,300.00 | $ 2,800.00 | | Items have been removed and stored at Brookstone for reinstallation |
| 5 | Wood Mantles | $0 | $ 10,000.00 | $ 10,000.00 | | Mantles have been removed and stored with Brookstone |
| 6 | Garage doors | $0 | $ 3,990.00 | $ 3,990.00 | | No damage was noted during site inspection to garage |
| 7 | Plumbing | $ 58,385.25 | $ 141,724.21 | $ 83,338.96 | | RFI-Please provided itemized list of fixtures from supplier |
| 8 | HVAC | $ 47,698.00 | $ 96,089.00 | $ 48,391.00 | | Includes indoor units, thermostats, and ductwork |
| 10 | Generator | $0 | $ 18,400.00 | $ 18,400.00 | | No damage to Generator was observed |
| 11 | Builders Risk | $0 | $ 6,100.00 | $ 6,100.00 | | Builders Risk would not apply to project |
| 12 | Doors | $ 5,000.00 | $ 24,499.00 | $ 19,499.00 | | Doors were removed and stored. Allowance is for non salvageable doors |
| 13 | Door hardware | $ 5,000.00 | $ 43,000.00 | $ 38,000.00 | | Hardware was removed and stored. Allowance is for unsalvageable hardware |
| 14 | Interior Trim | $ 103,948.00 | $ 125,631.00 | $ 21,683.00 | | Detailed material list will help in determining the difference |
| 15 | Cabinetry | $ 75,936.00 | $ 271,561.82 | $ 195,625.82 | | Difference of scope remove and reset undamaged vs replace all cabinetry |
| 16 | Shower doors | $0 | $ 2,200.00 | $ 2,200.00 | | Shower doors have been removed cleaned and stored with Brookstone |
| 17 | Exterior Trim | $ 55,000.00 | $ 119,732.00 | $ 64,732.00 | | Detailed materials list will assist in determined the cost difference |
| **34** | **Line Item Total** | **$ 353,467.25** | **$ 868,227.03** | **$ 578,911.78** | **$64,152** | |
| 35 | Overhead | $35,346.73 | $ 86,822.70 | $ 57,891.18 | $6,415.20 | |
| 36 | Profit | $35,346.73 | $ 86,822.70 | $ 57,891.18 | $6,415.20 | |
| **37** | **Subtotal (w/O&P)** | **$ 424,160.71** | **$ 1,041,872.43** | **$ 694,694.14** | **$76,982.40** | |

PENGAD 800-631-6989
PLAINTIFF'S EXHIBIT 100

**File Note Title:**Genl Cor - General correspondence
**Create Date:**11/19/2019 12:46 PM
**Author:**ATTACHINGBOT1 EPAM
**File Note Text:**
From: jelliott@chubb.com.
Sent: 11/19/2019 11:50.
To: [charlesgoodrich@hotmail.com charlesgoodrich@hotmail.com].
CC: [US Property Claims uspropertyclaims@Chubb.com]
Subject: Pacific Indemnity Insurance Co- claim 040519056755.

Copied body:
RE: Claim Reference #:
040519056755
Writing Company
Pacific Indemnity Insurance

PENGAD 800-631-6989 PLAINTIFF'S EXHIBIT 101

Dear Charles & Alexandra,

Thank you for taking the time to discuss the unfortunate events surrounding your property damage claim to your home. I have included the details of our scheduled appointment below, but should you have any questions please feel free to contact me in the interim at 205-470-8370.

Date:
Tuesday , November, 19th
Time:
Noon

In advance of our meeting, I wanted to briefly explain the claim process to you. I have found that the more informed you are about the overall claim process, the better your claim experience.

On-Site Inspection:

When we meet at your home I will conduct a thorough inspection of the damages to your building to determine available coverage and the scope of your loss.

During this time, I will investigate the cause of your loss, take photographs, and measure/estimate the extent of the damage.

If any of your belongings were impacted, I will also conduct an inventory of those items.

Following the inspection, I will provide you a written estimate of the damages so that you can have an informed conversation with any contractor(s) you wish to engage for repairs. When a situation requires additional time for preparation of a comprehensive damage estimate, we will promptly advise you of same and keep you well informed throughout the process and associated time frame specific to your claim.

Once complete, we will review the information together, discuss next steps and determine if additional resources are needed to assess your claim.

I will follow up with you on a regular basis to provide you any status updates, answer questions you may have and, if needed, to obtain any outstanding documentation.

Throughout the process, should you need to send me any estimates, photographs, or other documents related to your claim you can do so using your preferred method of communication:.

Electronic Document Upload:
www.chubb.com/uploadclaimdoc
Email:
jelliott@chubb.commailto:jelliott@chubb.com
Fax:
205-968-5496
Regular Mail:
jelliott@chubb.commailto:jelliott@chubb.com

*Important - please be certain to include your name and the claim reference number in the subject line of any such submission.

This will ensure that your response and any documentation will be attached to the electronic claim file.

At the conclusion of your claim, my goal is to clearly outline how I determined the settlement proposal for your claimed damages.

To assist you, I have included additional information in the Chubb Claim Experience attachment below. Please feel free to review it at your convenience.

I welcome any questions you might have and aim to provide you with prompt and professional service throughout this process.

Sincerely,

Thank You
[Chubb Logo]

Jeremy Elliott,MBA
Senior General Adjuster, Claims

1400 Urban Center Drive, Suite 450, Vestavia Hills, Alabama 35242, USA
O 205-470-8370 F 205-968-5496
E jelliott@chubb.commailto:jelliott@chubb.com

For more information on your Claim experience with Chubb, visit us here: Chubb Claim

For more information on your Claim experience with Chubb, visit us here: Chubb Claim Guidancehttps://www2.chubb.com/us-en/claims/report-a-claim.aspx#claims_guidance

[Chubb Insured]

/elcome to Chubb Claims. Life is about to get easier.https://www2.chubb.com/us-en/claims/

I strive to take care of all inquiries and questions directly with you. If you need to speak with my supervisor, please contact Wally Haessig at (214) 460-1779 or via e-mail at whaessig@chubb.commailto:whaessig@chubb.com.

.

Claim id: A1CE75BDAEA6C0F8.
Start time: 11/19/2019 12:46 PM EST
End time: 11/19/2019 12:46 PM EST

---

November 19th, 2019

Charles Goodrich Alexandra Goodrich
3305 Dell Rd
Mountain Brook, AL 35223

| | | |
|---|---|---|
| Re: | Insured: | Charles Goodrich & Alexandra Goodrich |
| | Policy Number: | 001494547801 |
| | Claim Number: | 040519056755 |
| | Date of Loss: | 11/18/2019 |
| | Loss Location: | 3305 Dell Rd<br>Mountain Brook, AL 35223 |
| | Writing Company: | Pacific Indemnity Company |

Dear Mr. & Mrs. Goodrich, please be advised that the above captioned claim is being handled by me.

Please forward any additional information for me to review and consider including any additional amounts claimed under the policy. Kindly make note of this and direct all correspondence to the following:

Chubb Group of Insurance Companies
1400 Urban Center Drive, Suite 450
Birmingham, AL 35242

Should you have any questions or concerns regarding this matter, please contact me at, 205-470-8370.

Sincerely,

*Jeremy Elliott*

**Jeremy E. Elliott, MBA**
Pacific Indemnity Company
Sr. General Adjuster

Cc:
USI INSURANCE SERVICES LLC (AL)
1701 MCFARLAND BLVD N.

TUSCALOOSA, AL 35406-0000