FILED
2023 Jul-12 PM 02:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT "D" – Part 1

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CASE NUMBER: 2:22-CV-00021-SGC

CHARLES GOODRICH and
ALEXANDRA GOODRICH,
Plaintiffs,
vs.
PACIFIC INDEMNITY COMPANY,
Defendant.

S T I P U L A T I O N

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the deposition of ALEXANDRA GOODRICH may be taken before Michelle L. Parvin, Commissioner, at 3800 Colonnade Parkway, Suite 430, Birmingham, Alabama, 35243 on the 4th day of April, 2023.

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is waived,

the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of trial, or at the time said deposition is offered in evidence, or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that notice of filing of the deposition by the Commissioner is waived.

Job No. CS5804545

I N D E X


EXAMINATION BY: PAGE NUMBER:
Ms. Aquino 8

DEFENDANT'S EXHIBITS:
Exhibit 1 165
Emails
Exhibit 2 365
Chart
Exhibit 3 184
Bid from Southern Scape
Exhibit 4 365
Additional Living Expenses-Master List
Exhibit 5 223
Contents list
Exhibit 6 365
Sworn Statement in Proof of Loss to Chubb
Exhibit 7 278
Text messages
Exhibit 8 298
Expert Report of Dr. Mary-Catherine

McClain Riner
Exhibit 9 342
Text messages
Exhibit 10 345
Text messages
Exhibit 11 349
Email chain
Exhibit 12 351
Affidavit of Alexandra Goodrich
Exhibit 13 356
Outline of Chubb/Pacific's Bad Faith

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CASE NUMBER: 2:22-CV-00021-SGC

CHARLES GOODRICH and
ALEXANDRA GOODRICH,
Plaintiffs,
vs.
PACIFIC INDEMNITY COMPANY,
Defendant.

BEFORE:

Michelle L. Parvin, Certified Court Reporter

APPEARANCES:

DAUPHIN PARIS, L.L.C., by Mr. Charles A. Dauphin and Ms. Diane Paris, 300 Vestavia Parkway, Suite 3400, Birmingham, Alabama, 35216, appearing on behalf of the Plaintiffs.

COZEN O'CONNOR by Ms. Luciana

Aquino, 1230 Peachtree Street NE, Suite 400, Atlanta, Georgia, 30309, appearing on behalf of the Defendant.

Also Present:

Charles Goodrich

I, Michelle L. Parvin, a Court Reporter of Birmingham, Alabama, acting as Commissioner, certify that on this date, as provided by the Federal Rules of Civil Procedure of the United States District Court, and the foregoing stipulation of counsel, there came before me at 3800 Colonnade Parkway, Suite 430, Birmingham, Alabama, 35243, beginning at 10:08 a.m., ALEXANDRA GOODRICH, witness in the above cause, for oral examination, whereupon the following proceedings were had:

ALEXANDRA GOODRICH,

being first duly sworn, was examined and testified as follows:

THE COURT REPORTER: Okay. Usual stipulations?

MR. DAUPHIN: Yeah that's fine with me.

EXAMINATION BY MS. AQUINO:

Q. Good morning, Mrs. Goodrich. How are you doing?

A. Good.

Q. We have not met. My name is Lucy Aquino. I represent Pacific in this case. I understand that you had an examination under oath done in the past, and that was done by Ms. Moss, correct?

A. Yes.

Q. Okay. This is going to follow very similar format. I'm going to ask you a lot of questions. As you can see, we do have a court reporter. She's taking down everything that you're saying. To that extent, if you could, do your best to give me a verbal answer when I ask you a question. If you nod your head, I will understand what you're saying, but it is very difficult for them to take that down. So, if at any point I say is that a yes or is that a no, I'm not trying to be rude. I just want to make sure

that we have the record clear, okay?

A. Yes.

THE COURT REPORTER: I need to get you to speak up.

THE WITNESS: Okay.

Q. (BY MS. AQUINO) That was going to be the other one. We need to make sure that we can hear you, mostly her because she needs to be able to take down everything that we are saying.

I will do my best not to speak over you. In conversation, sometimes that happens, but I will try to be very vigilant not to do that. If I ask you a question, I will give you an opportunity to finish it. If at any point I interrupt you or you were not done with your answer, just let me know, and I will give you an opportunity to finish, okay?

A. Okay.

Q. Likewise, if you just give me an opportunity to finish my question before you start answering, that way, we're not speaking

over each other, okay?
A. Yeah.
Q. I promise you it is going to happen at some point, that I'm going to ask you a question that makes absolutely no sense to you. If that happens, please let me know. I can repeat it, rephrase it, whatever you need, okay? I want to make sure that you are clear on what I'm asking you.
A. (Witness nods head.)
Q. Like I said before, if you need to take a break at any point, let me know. We'll be here probably for a little while because we have a lot to cover with you. But it's not a marathon. So, if you need to take a break, just let me know.
A. Okay.
Q. The only caveat is if I have asked you a question, I'm going to ask you to answer that question before we go on break; is that fair?
A. That's fair.
Q. Okay.

MR. DAUPHIN: Unless I object.
Q. (BY MS. AQUINO) All right. And there's a lot that I'm just going to kind of go over from your prior examination under oath so that we don't have to repeat everything, okay?
A. Okay.
Q. I don't anticipate that your name has changed since then, so it's still Alexandra Goodrich?
A. Yes.
Q. And your maiden name is Dauphin?
A. Yes.
Q. Did I pronounce that correctly?
A. Dauphin.
Q. Okay. I guess I gave it the French --
A. Yes.
Q. -- pronunciation.
Okay. I have your date of birth as October 21st, 1981?
A. Yes.
Q. Okay. What is your current

address?
A. 3305 Dell Road. That's Mountain Brook, Alabama, 35223.
Q. And what county is that?
A. Jefferson.
Q. And I'm not the greatest at Alabama geography. Is that the same county as Birmingham?
A. Yes.
Q. Okay. Now, the 3305 Dell Road, that is the address for the fire that we're here to talk about, correct?
A. Yes.
Q. When did you move back into the Dell Road address?
A. The end of January 2022.
Q. And you've been living there continuously ever since?
A. Yes.
Q. Okay. My understanding is that you had built the 3305 Dell Road home about a year before the fire; is that right?
A. We moved in five months and one

day before the fire.
Q. So, that would have been about August of 2019?
A. We moved in in June --
Q. June. Okay.
A. -- of 2019.
Q. And at the time of the fire in 2019, did you have a mortgage on the property?
A. Yes.
Q. Okay. Is that still the same mortgage?
A. I don't know.
Q. Okay. Do you know if you had to make any changes or have to have any inspections done by your mortgage company after you rebuilt the home?
A. I don't know.
Q. Okay. Do you know who would know that?
A. Charles may know better.
Q. Okay. And just to make sure we're on the same page, your husband Charles,

correct?
A. Yes, my husband, Charles --
Q. Okay.
A. -- Goodrich.
Q. Is he the one that typically handles the finances?
A. As far as the mortgage goes, yes.
Q. Okay. Did anyone with your mortgage company ever come to take a look at the house after the fire?
A. I don't know.
Q. And you and Mr. Goodrich are still married, correct?
A. Correct. Yes.
Q. You have three children?
A. Yes.
Q. What are their current ages?
A. Fifteen, twelve, and eight.
Q. Okay. And they all live with you?
A. Yes.
Q. Where do they attend school?
A. The Altamont School and Mountain

Brook Elementary.

Q. Altamont School, is that K through 12 or --

A. The Altamont School is 5 through 12. It's a private school.

Q. And what are the names of your children that attend Altamont School?

A. Gillian, G-i-l-l-i-a-n, Goodrich.

Q. And is Gillian the fifteen-year-old?

A. Yes.

Q. Okay. Anyone else?

A. No.

Q. Okay. And then, what's the other school?

A. Mountain Brook Elementary.

Q. And who attends Mountain Brook?

A. Susie Goodrich. She's the twelve-year-old. And Caroline Goodrich is the eight-year-old.

Q. And is that a private school as well?

A. No, that's public school.

Q. Okay. Where is Altamont School located?

A. Birmingham.

Q. Were your children at the same school back in 2019?

A. Caroline had not started elementary school yet. She was in 4K.

Q. Okay.

A. But, yes, to the others.

Q. And where was she attending 4K in 2019?

A. She was at Canterbury day school at Canterbury United Methodist Church.

Q. And that's in Mountain Brook, you said?

A. That is, yes.

Q. Okay. And, again, I'm not very familiar with the area. How far --

A. Uh-huh.

Q. -- is Mountain Brook from here, from Birmingham, I should say?

A. From Birmingham. Minutes.

Q. Okay. Is it kind of like a sub

neighborhood of Birmingham?
A. It is, yes.
Q. Okay. We have a lot of those in Atlanta.
My understanding is that you attended two years of law school; is that right?
A. Yes.
Q. And you -- do you currently work outside the home?
A. No.
Q. And my understanding is that the last time that you worked was in 2007; is that correct?
A. I believe so.
Q. Okay. And what was that job in 2007?
A. The last job I had, I clerked for my dad's law firm.
Q. Okay. Was that while you were in law school?
A. I did do that during the summer. I think -- I'm trying to -- I was pregnant in

2007, and I can't recall how long I worked.
Q. Understood.
A. Yeah.
Q. When did you leave law school?
A. Summer of 2007.
Q. Okay. So, this would have been around the same time that you clerked?
A. Yes. I can't remember if I clerked that summer or not.
Q. Understood. That's fine. That was the last time that you worked outside the home?
A. Yes.
Q. Now, you had your examination under oath taken in August of 2020. And, at that point, we covered any prior lawsuits that you had had personally. Have you had any other lawsuits since August of 2020 besides the one we're here to talk about?
A. No.
Q. Since August of 2020, have you ever been arrested or had any incidents with the law?

A. No.
Q. Okay. I believe there was some discussion back in 2020 about businesses that you may own, and there were two. There was Parkinson & Goodrich, LLC, and Sweet Home Stables, LLC?
A. Yes.
Q. Are these still ongoing businesses for you?
A. Yes.
Q. And these are thoroughbred horses that you race, correct?
A. Breed, raise, sell.
Q. Race?
A. Raise. I don't ride them.
Q. Okay.
A. I leave that up to Allison. I own them.
Q. Understood. Any other businesses other than these two, you personally?
A. No. By myself, no.
Q. Do you have any others with any business partners?

A. I don't know what all Charles and I are involved in.

Q. Would that be something better to ask him?

A. Yes. Yes.

Q. Now, at the 3305 Dell Road address, I understand that you live there with your husband and your three children. Does anyone else live there?

A. No.

Q. Back in 2019 when this happened, did anyone else live there?

A. No.

Q. And it is a single family home, correct?

A. Yes.

Q. When was it completed the first time?

A. June 2019 minus lingering punch list items.

Q. Okay. Did you have to have a certificate of occupancy issued before you moved in?

A. I'm sure we -- I don't recall, but I'm sure we did.
Q. But you mentioned that you moved in in June of 2019 --
A. Uh-huh.
Q. -- as well, correct?
How long did it take the original home to be built?
MR. DAUPHIN: Object to the form. I don't know if you're talking about planning stages or beginning of the actual construction.
Q. (BY MS. AQUINO) Let's just do beginning of construction, from the moment that you broke ground until it was completed.
A. About a year and a half.
Q. A year and a half?
A. About.
Q. So, would it be fair to say you started in the beginning of 2018?
A. It was end of 2019. Whether it was -- I'm sorry. End of 2017.
Q. Okay.

A. Whether it was October, November, December, I don't recall when we actually started the construction.
Q. And who did the construction of your home the first time?
A. TCC.
Q. Were they also the ones responsible for designing the floor plans?
A. No.
Q. Who was that?
A. Hank Long of Hank Long -- or Sprott Long & Associates.
Q. Was this the first home that you built?
A. Yes.
Q. Okay. Other than the 3305 Dell Road, do you and your husband own any other property?
A. That is a better question for Charles.
Q. For Charles. Okay.
Now, the office where we are, I believe that has your name, Goodrich

Foundation, correct?
A. Yes.
Q. Is that something that you are involved in with this foundation?
A. No, no.
Q. Do you know what this foundation does?
A. Yes.
Q. What does it do?
A. Philanthropy.
Q. Okay. Like, what type of philanthropy?
A. Focuses on Alabama and the Black Belt, heavily focuses on education, the environment.
Q. Okay. Is it kind of like one of the foundations -- do you grant -- do you give grants to people? Is that kind of --
A. To other 501(c) companies.
Q. Understood.
A. Yes.
Q. Sorry about that. It is pollen season.

A. It is.
Q. And the universe hates me.
All right. So, my understanding is that the fire that we're here to talk about happened on November 18th of 2019; is that right?
A. Yes.
Q. Do you know how the fire started?
A. Yes.
Q. How did that start?
A. The housekeepers said that the curtain in my daughter's room caught on fire. It was draped over a sconce that they had turned on.
Q. And is this on the second floor?
A. Second floor, center of the upstairs, the front of the house.
Q. How many bedrooms did the house have initially, originally?
A. Five.
Q. Five bedrooms?
A. Yes.
Q. How many were on the second

floor?

A. Four.

Q. Was the master on the second floor as well?

A. No.

Q. The master was on the bottom floor?

A. Yes.

Q. How many bathrooms did it have?

A. Six and one half bath.

Q. How many of those were on the second floor?

A. Four.

Q. Were the bedrooms on the second floor, were those, like, suites? Did they also have the bathroom attached to them or were they separate?

A. Yes. They were suites.

Q. Am I correct that you were not home at the time that the fire started?

A. Correct.

Q. How long had you been gone?

A. Fifteen minutesish.

Q. Your children were also not home, correct?
A. Correct.
Q. That's good to hear.
A. Yeah.
Q. Were they with you?
A. I had two of them with me in the car.
Q. And your husband also was not home, correct?
A. Correct.
Q. Okay. Was it just one housekeeper or was it kind of like a team?
A. It was a team.
Q. Do you know who was involved in draping the sconce?
A. I don't.
Q. Okay. Was this a housekeeping service?
A. I don't -- yes. I don't -- I don't know if it was a business. It was Maria and her ladies.
Q. Understood. So, you contacted

Maria directly, and then, she would bring however many people she needed?

A. Yes.

Q. Understood. Do you know Maria's last name by chance?

A. Smith.

Q. Is she still your housekeeper?

A. No.

Q. How did you learn about the fire?

A. Maria called me and said my house was on fire, and then, ADT called.

Q. Okay. Do you know if Maria called 911 or the fire department?

A. I don't know.

Q. Do you know if ADT did?

A. ADT did.

Q. Understood. Okay.

A. As did two workmen on our street, across the street and next door.

Q. Did they work for you or did they work for somebody else?

A. Neighbors.

Q. They kind of just saw it and then

called 911?
A. Yes.
Q. How long did it take you to get back to the house?
A. Maybe fifteen minutes.
Q. What did you see when you got there?
A. Flames coming out all five front windows upstairs. The fire department was there.
Q. Okay. Was it the Mountain Brook Fire Department?
A. Yes.
Q. Had they started putting out the fire at that point or not yet?
A. Yes, I think so.
Q. Was there any police there?
A. I don't recall, but I don't -- I don't believe so.
Q. Did your husband come to the house as well?
A. Yes.
Q. How long did it take him to

arrive?

A. Fifteenish minutes.

Q. Okay. Did you speak with any of the firefighters at the scene?

A. Yes.

Q. And did they -- what did they tell you about their efforts?

A. I don't remember.

Q. Okay. Did you speak with anyone else other than your husband and your children and the firefighters at the scene?

A. Yes.

Q. And who was that?

A. Neighbors were there, Charles' mom. I take that back.

Q. Okay.

A. I don't remember if she came. His housekeeper came, though, Aretha.

Q. Whose housekeeper?

A. The Goodrichs' housekeeper. Charles' parents, at the time, lived down the street.

Q. Okay.

A. And I just --
Q. On Dell Road as well?
A. On Dell Road, yes.
And I just don't recall who I saw there and who I spoke to on the phone. I was --
Q. Not a problem.
A. -- crazy.
Q. What was the damage to the house from the fire itself? Not talking about any subsequent damage but actual fire damage.
A. Okay. The upstairs was burned. It had gone throughout the upstairs. The sheetrock was melting. It was black. There was a lot of char. The attic was damaged. It had less char but still smoke had gone everywhere. Downstairs, it had gotten into the HVAC system. So, it had gone just throughout the house. So, there was just smoke, like, residue and ash coating everything.
Q. How many -- were all four of the bedrooms upstairs damaged by the fire?

A. Yes.
Q. And all four of the bathrooms as well?
A. Or heat or smoke or -- yes.
Q. Fire-related damages?
A. Yes.
Q. Okay. And how about -- my understanding is that there was also some water damage to other areas of the house; is that right?
A. Yes.
Q. And what areas of the house sustained water damage?
A. I believe all four levels. Because they sprayed, and it all just went down.
Q. When you say four levels, do you mean the attic --
A. The attic, the second level, the main level, and the basement.
Q. Understood. Did the fire break through the roof?
A. I don't believe so. There was

damage, but I don't believe that, like, flames shot out through the roof.
Q. And I'm not holding you to any specific time frame, but do you know about how long it took them to put out the fire?
A. I don't.
Q. What time of day was this when it happened?
A. About 10:15. And then, I know that I was able to walk into the house in the afternoon.
Q. Okay.
A. So -- but when they declared the fire out, I don't remember.
Q. But at some point, they told you it's now safe to go back in?
A. Yes.
Q. Okay. And then, you -- were you the one who reported the claim to Pacific?
A. Charles did.
Q. And I believe he did that on the same day; is that right?
A. Yes.

Q. Did you speak with anyone at Pacific or your insurance agency's office about the incident, about the fire?
A. I did not the day of. I don't recall speaking with anyone.
Q. Okay. To report the claim?
A. To report the -- oh, yes. No, I did not speak with anyone to report the claim --
Q. Okay.
A. -- myself.
Q. Now, I saw some notes about mold developing in areas of the house. Where did you notice mold in the house?
A. All four levels.
Q. And when did you first notice that?
A. I don't recall. I would -- I don't recall.
Q. Okay. Where did you go the night of the fire itself on November 18th?
A. Charles' parents' house.
Q. Right down the street?

A. Yes.
Q. Okay. And what are his parents' names?
A. Mike and Gillian, G-i-l-l-i-a-n, Goodrich.
Q. Is that who your son's named after?
A. Daughter, yes.
Q. Oh, daughter. I'm so sorry.
How long did you stay with your husband's parents?
A. I don't recall.
Q. And my understanding is that Brookstone Restoration came out the same day of the fire to do an emergency board-up; is that right?
A. Yes.
Q. And they helped you pack up some of the contents; is that right?
A. Yes.
Q. Where were those contents taken?
A. Brookstone just took them.
Q. It's your understanding that they

took them to their storage facility?

A. Yes.

Q. Did you have any input as to what they were packing up?

A. Yes, some.

Q. Okay. And broadly, what did they pack up initially?

A. Initially, personal items that might be salvageable but not antiques or, like, finer furniture.

Q. And these were items that were on the fourth -- on the second floor or all throughout the house?

A. All throughout the house.

Q. And as far as the emergency board-up that they did, from your recollection, what did they do as far as that process goes?

A. They came out and put plywood boards over the windows on the main level --

Q. Okay.

A. -- so that nobody could come in that night.

Q. Okay. Did they put any tarps on the roof or anything like that?
A. I don't -- I don't recall.
Q. I saw some notes that you and your husband had an off duty police officer --
A. Yes.
Q. -- stay at the house.
Was it just for one night?
A. Yes.
Q. And was that the very first night?
A. Yes.
Q. And what was the name of that officer?
A. I don't recall.
Q. How did you get in touch with him or her?
A. Charles' brother was involved.
Q. And what's Charles' brother's name?
A. Mike Goodrich.
Q. Okay.

A. He's Mike, II.
Q. And was it a male officer or female officer?
A. Male.
Q. Okay. Did you have any type of security at the house on the following nights?
A. No.
Q. The way the house is located, is that any type of a gated community or just on the street?
A. No gated community.
Q. Okay. When did you first move into the first rental house, the one on Fairway Drive?
A. December 2019.
Q. Do you remember when in December?
A. I do not.
Q. And how did you find the Fairway Drive home?
A. I have a friend that's a real estate agent, and she heard that it would be coming available.

Q. And I saw her name somewhere. Is it Kelley? And what's her last name?
A. Caine.
Q. Caine. K or C?
A. C.
Q. Was this a house that she found for you or was it a house that she had listed? How did that come about?
A. The people that were currently in that rental house --
Q. Uh-huh.
A. -- were moving onto Dell Road.
They were about to move into a house they had purchased on Dell Road. And Kelley knew that. And I don't know her history with the house other than that's how she knew it was coming available.
Q. Okay. She gave you the information, and you contacted the landlord directly or did Kelley assist you with all of that?
A. I contacted the landlord. Or I think it was his daughter. I can't remember

exactly.

Q. Do you remember who you spoke with?

A. No. Sorry.

Q. You caught it before I did.

Was this the only property that Kelley gave you, any property information that she gave you?

A. Yes.

Q. Did you look for any other properties on your own outside of what Kelley --

A. Yes.

Q. -- gave you?

And where did you look?

A. We looked in Mountain Brook, and there just weren't any available.

Q. Did you look for any properties in Birmingham?

A. No.

Q. Why not?

A. The Mountain Brook Board of Education requires you to live in Mountain

Brook to attend their schools.
Q. Did you ever look to see if they have any exceptions in the event of an emergency?
A. No, we had been through this before when we were building Dell Road, and they said where you lay your head is where you go to school.
Q. Okay.
A. And we did not want to, like, alert them to any -- anything.
Q. And this is the Mountain Brook Elementary zone?
A. Yes.
Q. Okay. What sources did you use to look for residences?
A. I asked friends, people I knew, and I went online.
Q. To what websites?
A. I don't recall. Just Google search.
Q. And you couldn't find anything other than the home that Kelley recommended

to you?
A. The one that Kelley recommended to me is word of mouth. There's just not a big -- at the time anyway, there was not a real rental market in Mountain Brook.
Q. Did you ever look into, like, any type of -- what's the term to use -- corporate housing, like, long-term leases, long-term rentals, anything like that?
A. Of houses?
Q. Uh-huh.
A. I mean --
Q. Yes, ma'am.
A. No.
Q. Before you signed the lease at the Fairway Drive address, did you ever come in to do an inspection of the house?
A. I was in the house.
Q. It wasn't just you?
A. I walked through.
I don't recall if Charles came.
Q. How soon --
A. I don't remember.

Q. -- before you moved in did you do that inspection?
A. Weeks.
Q. Were the prior tenants still living at the house at the time of your inspection?
A. Yes.
Q. And at that point, you decided that you wanted to move forward with renting the house, and you entered into a lease; is that right?
A. Yes.
Q. Okay. My understanding is that it was a six-month lease?
A. Yes.
Q. How did you come up with a six-month lease?
A. The owner of the property suggested a six-month lease.
Q. Was there a possibility of doing a longer lease or --
A. Yes.
Q. Okay. But you started with six

to see how it went?
A. Yes. He didn't want to do month to month.
Q. And as far as the payment of the rent, how was that set up? Was that to be paid monthly or was it just a lump sum payment for the six-month lease?
A. Monthly.
Q. Okay. And how much was that monthly rent?
A. I believe it was thirty-five hundred.
Q. How many bedrooms was the Fairway Drive home?
A. Three.
Q. Okay. Is it three bathrooms as well?
A. Two.
Q. Two. What did you do to get the Fairway Drive house ready to move in?
A. We had the floors cleaned and sanitized and we painted the whole level interior. It was filthy.

Q. When you say the whole level, is it multiple --
A. It was a one-level house. I can't recall if there was a basement or a crawl space. There's an attic. We just painted the living level.
Q. Okay. And as far as the floors, was it carpet?
A. There was -- one room had carpet. The rest was hardwood or linoleum.
Q. Did you hire someone to clean the floors?
A. Yes.
Q. Who did you hire?
A. Mountainview Chem-Dry.
Q. Is that a company that you had used before?
A. Yes.
Q. And why did you have the floors cleaned?
A. They were filthy.
Q. The individuals that were living there before, did they have to do any type of

cleaning when they moved out before they returned the home?
A. I don't know.
Q. Did you ever ask the landlord to clean the floors before you moved in?
A. I don't remember.
Q. As far as the negotiation of the lease and dealings with the landlord at the Fairway Drive, was that something that you handled or was it Charles that handled it?
A. I did.
Q. Okay. And what about the painting; who painted the house?
A. TCC.
Q. The same company that built your home, correct?
A. Correct.
Q. Similar question. Did you ever ask the landlord to paint the house before you moved in?
A. I don't recall.
Q. Now, I saw some notes in the file that you had curtains and window treatments

installed at the Fairway Drive home; is that right?
A. Yes.
Q. Where did you purchase those?
A. Restoration Hardware.
Q. And then, there was some adjustments that had to be made for those to fit in the home; is that right?
A. We did not alter them for Fairway Drive.
Q. Okay. Any other work that you had done to the Fairway Drive either before you moved in or shortly after you moved in?
A. We had electricians hang some light fixtures and we had our AV company hang TVs and meet the cable company out there to set up the system --
Q. Okay.
A. -- the TV system with the cable.
Q. Like, when you say cable, like --
A. Charter.
Q. Charter?
A. Charter came out. Uh-huh. And

internet.
Q. Is it the same company for cable and internet?
A. Yes.
Q. And who was it that came out to do the -- I'm going to just call it the audiovisual installation?
A. HD Innovations.
Q. Is that a company you'd used before?
A. Yes.
Q. And what about the installation of the light fixtures; who did that?
A. I don't recall. I'd have to look at the invoices.
Q. What type of light fixtures are we talking about?
A. Hanging fixtures.
Q. Like, in what areas of the house?
A. The dining room, the bedrooms.
Q. Okay.
A. That's it.
Q. I just wanted to make sure you

were done.

All right. Were there any lights in the home itself before you moved in or no?

A. Yes.

Q. Okay. So, what was the issue with the lights that they needed to be replaced?

A. I do -- I can't recall. I can't recall specifically.

Q. My understanding is that you moved out of the Fairway Drive home in, I believe it was February of 2020; is that right?

A. January at some point.

Q. Okay. And why did you move out?

A. There were a lot of problems that made it basically unlivable for us.

Q. Tell me about that.

A. One of the bathrooms, the bathtub would not hold water. And then, the other bathroom, the shower wouldn't drain. The kitchen, whenever you used the disposal, like, everything came up and flooded the --

the area did not have outlet covers on all of the electrical outlets, I mean, including one by the girls' sink in the bathroom. The electrical was not up to code at all. They hadn't touched it so that they -- well, I'm speculating. But it was not up to code.

Q. How did you learn that it was not up to code?

A. When we had the electricians come hang light fixtures.

Q. HD Innovations is that who you're talking about?

A. No, the electricians. I can't remember. I'd have to look at the invoices to see. HD Innovations only did our audiovisual.

The electricians that came to hang the light fixtures, I was kind of -- I was asking them if could they add outlet plugs. And --

Q. Okay.

A. -- just in conversation --

Q. So, kind of --

A. -- they pointed out --
Q. -- just in passing, they --
A. Yes. And then, they showed me how it was kind of a bigger problem than just --
MR. DAUPHIN: Be sure you speak up.
THE WITNESS: Okay.
MR. DAUPHIN: You tail off --
THE WITNESS: Okay.
MR. DAUPHIN: -- at the end of your answers, so --
THE WITNESS: Okay.
A. Sorry about that.
Q. (BY MS. AQUINO) That's okay. She's the one that's going to yell at you.
A. Okay.
Q. I can hear you, so that's fine.
MR. DAUPHIN: Okay.
Q. (BY MS. AQUINO) Do you know when the Fairway Drive home was built? And I -- I don't need, like, a specific year. Just --
A. Right. I believe -- it was the

'40s or '50s --
Q. Okay.
A. -- but I don't recall exactly.
Q. All right. So, we talked about the plumbing -- I'm just going to call it the plumbing issues --
A. Uh-huh.
Q. -- with the bathrooms and kitchen.
The electrician told you that the electric was not to code and there were some issues with missing outlet covers. Anything else?
A. Other than it was just -- smelled bad. I mean, it was just dirty and smelled bad. And I cleaned it and painted over it but --
Q. I'm sorry. I lost my train of thought.
MR. DAUPHIN: Let's take three minutes and let me get a cup of coffee.
MS. AQUINO: Thank you. I apologize for that.

THE WITNESS: No.

(Whereupon, a brief recess was taken.)

MS. AQUINO: Back on the record, please.

Q. All right. So, as far as the issues with the Fairway Drive that you observed, did you ever discuss any of them with the landlord?

A. Yes.

Q. And what did they tell you?

A. It is what it is.

Q. Did they ever offer to repair any of them?

A. No, they called the -- I guess it was a plumber to address the kitchen sink.

Q. Did that fix it?

A. No, they just told me there was food in there.

Q. They, the plumbers?

A. The landlord's daughter.

Q. Okay. Told you that there was food in the sink and that's why it wasn't draining?
A. Yes.
Q. What about the bathrooms; did they ever do anything about them?
A. No, they did not.
Q. Did you ever ask if you could do any of the repairs and then submit it for reimbursement?
A. Yes.
Q. What did they say?
A. Yes.
Q. Did you ever do any repairs?
A. Yes.
Q. What repairs did you do?
A. I believe the master shower once. There was one repair they reimbursed me for.
Q. And did that repair fix any issues?
A. No.
Q. Who did you have come out to do the repairs?

A. I don't recall. I don't recall.
Q. But you said that the landlord did reimburse you for that repair?
A. Yes.
Q. Okay. Did you make any other repairs other than the one to the master shower?
MR. DAUPHIN: That she hadn't already talked about?
A. That I hadn't already talked about?
MR. DAUPHIN: Let me object to the form.
THE WITNESS: Okay.
MR. DAUPHIN: I don't know what all repairs encompasses.
Q. (BY MS. AQUINO) Well, did someone come out to do any repairs to the things that we've discussed, the plumbing issues, the electric issues, anything like that?
A. No.
Q. Okay. When you decided to move

out, how did that conversation go with the landlord?
A. I explained all the issues and told them we had found another rental and asked to be released from the lease.
Q. And did he agree?
A. Yes.
Q. Were there any penalties for terminating the lease early?
A. I did not get my safety deposit back.
Q. And how much was that?
A. I believe it was thirty-five hundred.
Q. So, kind of like one month's --
A. One month, yes.
Q. When did you first decide to move out of the Fairway Drive home?
A. I don't recall.
Q. But you said that you moved out sometime in January of 2020?
A. Yes.
Q. Was it towards the beginning of

January or more towards the end of January?
A. I don't recall. I don't recall.
Q. Okay. And what did you do to find another home before you moved out?
A. Same process, asked people we knew if anyone knew of a rental available. Nobody did. And my dad bought a house that we could rent. It was in Mountain Brook and in better condition.
Q. Okay. Did you ask Kelley again to help you find another home after the Fairway Drive?
A. I don't recall who all I asked.
Q. Now, as far as the -- you're talking about the Wimbleton Drive home, correct? Is that the --
A. Yes.
Q. -- one your father bought?
A. Yes.
Q. How did that conversation come about? Whose idea was it to buy that house?
A. His.
Q. Okay.

A. And just to be clear -- sorry -- it was an LLC and not just Dad's house.
Q. Okay. Are you a member of that LLC?
A. No.
Q. Do you know who the members of the LLC are?
A. Dad, Chuck Dauphin, and Diane, Diane Paris.
Q. Do you know when the home was bought?
A. I believe it was December of '19.
Q. Had he bought the home before you decided to move out of the Fairway Drive or did he buy the home so you could move out of the Fairway Drive?
A. They bought the home so that we could move out of Fairway Drive.
Q. And did you get any input on what home the LLC bought --
A. No.
Q. -- for you to move into?
A. No.

Q. Did you see the house before you moved into it?
A. Yes.
Q. Was it just you for that inspection?
A. I don't remember.
Q. And how many bedrooms is the Wimbleton house?
A. Four.
Q. How many bathrooms?
A. Three.
Q. And approximately when was that house built if you know?
A. I don't -- I don't remember.
Q. Okay. How far is the Wimbleton Drive house from Dell Road?
A. Seven minutes.
Q. Okay. Now, my understanding is that you entered into a twelve-month lease with your father's LLC for the rental of the Wimbleton house, correct?
A. Yes.
Q. And how much was that rent?

MR. DAUPHIN: Not enough.
A. I believe it was forty-five hundred, but if I look at the invoices, I can tell you for sure.
Q. (BY MS. AQUINO) And was that -- that was January of 2020 through January of 2021, correct, for the initial lease?
A. The 15th, I believe. It was a half month to half month.
Q. I'm sorry?
A. I think it was January 15th, 2020, through -- or to January 15th, 2021. Yes, I think that's right.
Q. Yeah, the years --
A. Yeah.
Q. -- have been running together.
A. Yeah.
Q. I understand. Someone said that 2020 was three years ago. I'm like, no, it wasn't. I'm like, yeah, it was, actually.
All right. And what did you do to get the Wimbleton house ready to move in?
A. We asked TCC to paint the

interior.

Q. And why did you paint the Wimbleton house?

A. We have always painted the houses that we move into. And we just painted them with familiar colors. And having a fresh coat of paint was our standard of living. And so, the girls had their usual bedroom colors and we had our usual house colors.

Q. Well, was there anything wrong with the paint for the house before you moved in?

A. No.

Q. Did you have any cleaning done to the Wimbleton house before you moved in?

A. Me personally?

Q. Or someone you hired.

A. Right. I don't recall if I had it cleaned or if the landlords did.

Q. Okay. As far as painting the house, did you ever discuss it with the landlords, whether to paint the house or not?

A. I don't recall.

Q. Did you have to ask permission to paint the house?
A. I don't recall.
Q. Any other work done to the house before you moved in?
A. Yes, they -- the landlords did some renovation work before we moved in.
Q. To what parts of the house?
A. They renovated the bathrooms on the main level, so the master bathroom and the girls' bathroom. And they refinished the floors. I believe that's all.
Q. Okay. As far as the renovations that were done to the bathrooms and the floor, did you have any input in those renovations?
A. No.
Q. What material was the flooring before? I'm sorry. Go ahead.
A. I'm sorry. It wasn't up to me to make the final decisions, but, I mean, I had input in that, you know --
Q. Like, thumbs up --

A. Yeah.
Q. -- I approve?
A. Yes, please. This would be great, you know. But I certainly couldn't, like, approve the final design or whatever. That wasn't --
Q. Were you already in the home when the renovations were going on or was that before you moved in?
A. That was before we moved in.
Q. So, once you moved in, everything had already been done?
A. On the main -- I mean, we tinkered with it while we moved in. But the -- on the main level, most of it had been done.
Q. Okay. I saw some emails where there were some new appliances installed. Was that also before you moved in?
A. I don't recall. I don't believe so, though.
Q. And you mentioned the renovations were to the bathrooms and the kitchen; did I

hear you right?

A. The bathrooms. The kitchen, that was later.

Q. Okay. Was that done while you were still living there?

A. Yes.

Q. What was the work done to the kitchen?

A. Some new appliances, some new countertops, new sink. I believe that's it.

Q. And was that also done by the landlords?

A. Sorry. Can I take a minute? I need to ask him a question.

MR. DAUPHIN: You have to answer the best you can.

THE WITNESS: The best I can?

Q. (BY MS. AQUINO) Just your knowledge whether or not it was done by the landlord. And I don't mean necessarily that they came in and did the work but something that they were responsible for.

A. I don't know how -- I'm sorry. I

don't know how to answer this. Charles and I paid for it.

Q. Okay. Why were you paying for renovations to a rental house?

A. We wanted the kitchen to be upgraded so it'd work better for us. The appliances were from the '80s, and the countertop -- we just wanted it to work better.

Q. Okay. What work did you and your husband have done to the house?

A. We upgraded the kitchen and we finished the basement level -- or, I'm sorry, we renovated the basement level.

Q. And who did that work for you?

A. TCC.

Q. Now, I know this is kind of a trickier situation because your landlord happens to be your father.

A. Uh-huh.

Q. Did you have to ask permission to do any of those renovations yourself?

A. I don't recall. I mean, we

discussed it. I don't -- permission, I don't know if -- a tough word.

Q. Kind of you talked about what you were doing and --

A. Yes. We were like, we want -- you know, we want to do these things so that -- at that point, we -- at some point, you know, we realized this was not -- we were not going to be moving back into our house quickly. And we needed the rental to function better for our family.

Q. And are these renovations something that you paid for yourself or did you submit any of those expenses?

A. We did not submit any of those expenses to Pacific or Chubb. Is that what you mean?

Q. Yes, ma'am.

A. Correct.

Q. Okay.

A. We submitted -- we did not submit, I don't believe, any renovation --

Q. Okay.

A. -- expenses for that.
Q. What were you thinking of?
A. I was thinking of, like, the carpet. That's more of a decorator expense.
Q. And when you say the carpet, you mean --
A. Uh-huh.
Q. -- cleaning the carpet?
A. No. I mean laying carpet.
Q. Okay. And was that done to the Wimbleton Drive?
A. Yes.
Q. Okay.
A. It was the stairs and the lower level --
Q. Okay.
A. -- that we renovated.
Q. And is this, like, wall-to-wall carpet that we're talking about?
A. Yes.
Q. Why did you install carpet at the Wimbleton house?
A. We -- standard of living. Clean

carpet.
Q. What was the flooring there before you moved in?
A. Carpet and tile.
Q. Okay.
A. I think carpet on tile maybe.
Q. And was that throughout the house?
A. That was the lower level. And upstairs was hardwood floors and tile in the bathrooms.
Q. And did you do any work to the upstairs as far as carpet goes?
A. No.
Q. Now, I believe you mentioned that there was some upgrades done by the landlord to the flooring. What were -- what were those upgrades?
A. They refinished the hardwood floors.
Q. Upstairs?
A. Upstairs. Uh-huh.
Q. Did you ever ask to have carpet

installed or replaced anywhere in the house?
A. No.
Q. Any other work that you or your husband did to the house itself?
A. We painted the exterior.
Q. And why did you paint the exterior?
A. We wanted to.
Q. What color did you paint it?
A. White.
Q. Okay. Was that also TCC?
A. Yes.
Q. Okay. Any other work?
A. Not that I recall.
Q. My understanding is that you had the window treatments from the Fairway Drive moved over to the Wimbleton house; is that right?
A. That's right.
Q. And did that require any adjustments?
A. Yes. At that point, we -- remember, we did not alter them for Fairway.

So, we -- but we did alter them for Wimbleton. So, there's only one.

Q. What type of alterations are we talking about?

A. So that they didn't -- the length and the width so that they, you know, covered the windows appropriately and they didn't pool in the floor.

Q. Were the windows at the Wimbleton house smaller than the ones at Fairway?

A. I don't recall. It would have been more based on ceiling height for the -- for the length. I don't recall exactly, but we've always had custom curtains to fit the windows. That's what we did.

Q. And who did the adjustment of the window treatments?

A. Iris Thorpe is our decorator and Maria Martinez is The Work Room. She's a --

Q. Like, the seamstress that she used?

A. Uh-huh.

Q. Does she work for Iris Thorpe or

is that someone that she kind of farms out work to?

A. She does not work for Iris solely.

Q. So, just someone that she uses --

A. Yes --

Q. -- on a regular --

A. -- The Work Room.

Q. Okay. What happened to the window treatments when you moved out of the Wimbleton house?

A. They -- we gave them away.

Q. Who did you give them away to?

A. I don't even know specifically. But we had -- yeah.

MR. DAUPHIN: Just what you remember.

THE WITNESS: Just what I remember.

A. Yeah. At some point, Alycen had told us --

THE COURT REPORTER: Can you speak up?

THE WITNESS: Yes. I'm sorry about that.

A. At some point, Alycen had told us to do away with the ALE stuff. And I don't remember what all that encompassed, but the window treatments were -- they're gone.

Q. (BY MS. AQUINO) They were donated?

A. They were donated --

Q. Okay.

A. -- somewhere.

Q. Nope. That's fine.

A. Yeah.

Q. I saw in some of the notes that you also had some lights installed at the Wimbleton house?

A. Yes.

Q. And what lights -- what kind of lights did you have installed?

A. Hanging -- oh, we had recessed lights. We also -- no, just recessed.

Q. And who did that installation?

A. I'm going to have to look at the

invoice. I don't recall off the top of my head.

Q. Why did you have recessed lights installed at the Wimbleton house?

A. Just needed more light.

Q. Did it have any lights installed already?

A. They did. They had just like a spot for a single hanging fixture.

Q. And which rooms did you have recessed lights installed in?

A. There was nothing in the living room. So, we had living room light -- recessed lights installed. And then, the bedrooms. I believe that's all.

Q. Did you ever ask the landlord to install additional lights before you moved in?

A. Before we moved in, no.

Q. Or while you were still living there?

A. I don't recall.

Q. Speak up a little bit.

A. Sorry. I don't recall --
Q. Okay.
A. -- whether I asked.
Q. Okay.
A. I'm sorry.
Q. And, again, was there any discussion with the landlord about what type of lights you were installing in the house --
A. I don't recall.
Q. -- before it was installed?
What happened to the lights after you moved out?
A. When we moved out, they were still in the ceilings.
Q. Okay. So, they stayed with the house?
A. Yes.
Q. Any other work that you did or had someone perform for you before you moved in to get the house ready?
A. Not that I recall.
Q. Did HD Innovations have to come out to the Wimbleton house as well?

A. Yes, they did.
Q. What work did they do?
A. They did the same thing they did at Fairway Drive, which was installing -- hanging the TVs and meet Charter to set up internet and cable and hook everything up.
Q. Okay. When did you move out of the Wimbleton house?
A. The end of January 2022.
Q. Okay. And you moved out of Wimbleton back into 3305 Dell Road?
A. Yes.
Q. Was there a new lease for January 2021 through January 2022?
A. Yes.
Q. Okay. Did anything change with the new lease?
A. The price, the monthly rent price.
Q. Okay. And how much was the new rent?
A. Fifty-five hundred, I believe.
Q. What was the reason for the

increase?

A. I mean, I think it was just keeping with the small market that there was but --

MS. PARIS: I need you to speak up, please.

THE WITNESS: Okay.

A. I think it was just in keeping with whatever small rental market that was in Mountain Brook at the time.

Q. (BY MS. AQUINO) Did you ever have a discussion with the landlords about the increase in rent?

A. Not that I recall.

Q. Okay. Did you have to pay a security deposit at Wimbleton?

A. Yes.

Q. And was that one month's rent as well?

A. I believe so.

Q. Did you get that security deposit back when you moved out?

A. Yes.

Q. To your knowledge, does your father and/or his LLC still own the house, the Wimbleton house?

A. No, they do not.

Q. Okay. When was the house sold?

A. Summer of 2022.

Q. So, we're going to talk about some of the issues that have been brought up in this lawsuit. And some of this is going to be an overlap to what has already been discussed in your examination under oath, but I'll try to minimize that as much as I can. It is a different process, so we do kind of have to go over some of the same things, okay?

MS. AQUINO: And, Chuck, were you able to bring your books over?

MR. DAUPHIN: Yeah. I only had one.

MS. AQUINO: Yeah, just one.

MR. DAUPHIN: Yeah.

MS. PARIS: Can we take just a short break?

MS. AQUINO: Yeah, that's fine.
We can go off the record.

(Whereupon, a brief recess was
taken.)

MS. AQUINO: We are back on the
record, please.

Q. All right. Ali -- is it okay if I call you Ali?

A. Yes.

Q. We talked a little bit about the house before we went on break and what happened after the fire. What I want to do next is I want to kind of talk about the issues that have been raised in this lawsuit that we need to discuss so we can get a better understanding of what our differences are, okay?

A. Okay.

Q. Now, like I said, you did have an examination under oath. You've seen this big gigantic book.

A. Yes.
Q. I will be referencing some of these exhibits as well. We're not going to rehash everything, but I kind of want to make sure that we understand everything that we need to talk about, okay?
All right. So, if you could do me a favor and -- let me get started here. Let me give you a page reference. Give me a second. What I want to start doing is I want to talk about the dwelling portion of the coverage, okay?
A. Okay.
Q. So, I'm going to be on Tab 1. And it's one, two -- so, we're going to go to -- this is fourteen or fifteen. I sort of lost count as I went through, but it looks like this (indicating).
A. Okay.
Q. And it starts with Alabama Outline of Coverage.
A. Okay.
MS. AQUINO: Did we find it?

MR. DAUPHIN: Yes. Yeah, don't wait on me.

Q. (BY MS. AQUINO) Okay. All right. If you can just take a moment -- have you reviewed this policy before, the Pacific policy?

A. Yes.

Q. When was the last time that you reviewed it?

A. I don't recall.

Q. Okay. Did you review specifically to prepare for your deposition today?

MR. DAUPHIN: I object to --

Go ahead.

A. I reviewed a lot of stuff to prepare for today.

Q. (BY MS. AQUINO) Okay.

A. Maybe.

Q. What did you review to prepare for your deposition today? What documents did you review? And I'm not trying to get into any conversations that you've had with

your attorneys. Those are privileged.
A. Right.
Q. What documents did you review?
MR. DAUPHIN: Well, wait.
A. I don't recall.
MR. DAUPHIN: To the extent -- do not disclose what documents reviewed that I asked you to review.
THE WITNESS: Oh, okay.
MR. DAUPHIN: If there's anything that you did on your own, you can answer that.
MS. AQUINO: Well, if there were documents that she reviewed to prepare for the deposition, I just need to know what the documents are, unless you prepared them specifically for her deposition.
MR. DAUPHIN: Well --
MS. AQUINO: So, if she reviewed pleadings, what pleadings did you review, things like that.
MR. DAUPHIN: And I think that's objectionable because what she reviewed in

part, I know, is what I told her to do, and that's attorney work product. That's what I deemed she might want to review for the deposition.

MS. AQUINO: To the extent that you told her to review -- that advice, yes. But the documents in and of themselves are not privileged.

MR. DAUPHIN: Well, rephrase your question to get around my objections, please.

MS. AQUINO: Okay.

Q. What documents did you review specifically to prepare for your deposition today?

MR. DAUPHIN: And to the extent that those are documents that I asked you to review, don't answer.

MS. AQUINO: I disagree with your interpretation of the law on that.

Q. But let's talk about -- let's start with the documents that you reviewed independently. We can come back to that later.

A. I don't recall which ones I reviewed independently.
Q. Okay. But you have reviewed the policy in the past, correct?
A. Yes.
Q. Okay. All right. So, if you could, take a moment just to make sure that you know what this page is and let me know when you're ready.
A. Okay.
Q. If you'd look at the top half of the page on the right where it says if you have any questions, please contact USI Insurance Services. Do you know who that is?
A. Our insurance agent at the time worked for USI.
Q. Okay. And who was your agent -- who did you deal with at USI?
A. Joni Holman.
Q. Is she -- do you know if she's still there?
A. I don't know.
Q. Is USI Insurance Services still

your insurance agent now?
A. No.
Q. Who do you have as your insurance agent now? And it could be either the agency or the agent specifically.
A. Hold on one second. His name is --
MS. PARIS: Can you please speak up?
THE WITNESS: Yeah, I'm trying to remember his name.
A. And I'll probably butcher the agency but Bates Fowlkes. This will be a better question for Charles.
Q. (BY MS. AQUINO) Okay. Folks is F-a -- F-o --
A. F-o --
Q. -- l-k-s?
A. F-o-w-l-k-e-s.
Q. Okay.
A. Stratton Fowlkes, that's our agent.
Q. Stratton?

A. Stratton.
Q. That's the first name?
A. Yes.
Q. Okay. Interesting first name. Do you have any idea how to spell Stratton?
A. S-t-r-a-t-t-o-n.
Q. Thank you. And how long have you been dealing with Mr. Stratton?
A. Since January of 2021.
Q. Okay.
A. 2. 20 -- 2022, since we moved back to Dell Road.
Q. Okay.
A. January 2022.
Q. Did he help you secure coverage --
A. For our homeowners insurance. Actually, I believe we did our -- this is a better question for Charles. I believe we did our auto insurance while we were still at Wimbleton with him but --
Q. Okay.
A. -- better for Charles.

Q. And he helped you place new homeowners coverage for the 3305?
A. Yes.
Q. Okay. Who is the insurance company that you're using for 3305 now for homeowners insurance?
A. Cincinnati.
Q. When you secured the policy with Pacific for 3305 back in June of 2019, did you have any conversations with Joni about the policy itself?
A. I did not.
Q. Was there any point where she explained the coverages to you or gave you a presentation about what the coverages entailed?
A. No.
Q. All right. So, if you go one page over from where you currently are. I think you have Page 2 at the very top. And if you go down to the middle box where it says house coverage; do you see that?
A. Yes.

Q. Okay. And do you see where it says amount of coverage, three million dollars; payment basis, extended replacement cost; roof repair payment basis, extended replacement cost; do you see that?

A. Yes.

Q. Okay. And then, there's other permanent structures right below that; do you see that?

A. Yes.

Q. Go down to the third box where it says contents coverage. Do you see that?

A. Yes.

Q. Okay. One point five million dollars, payment basis, replacement cost; do you see that?

A. Yes.

Q. Okay. And you've read these terms before, correct?

A. Yes.

Q. Okay. Now, on the bottom, it says deductible. There is a five-thousand-dollar deductible, correct?

A. Yes.
Q. Okay. And then, zero percent wind or hail deductible, correct?
A. Yes.
Q. Actually, as someone who's lived in Florida, that's always fascinating to me.
All right. What is your understanding -- and you can refer back to the policy. But I kind of want to see in your own terms. What is your understanding of what reconstruction extended replacement cost means?
A. One second.
Q. Sure.
MR. DAUPHIN: And I object to the form. You're conflating reconstruction and extended replacement cost. And what you've referenced to her to look at does not mention reconstruction cost. And I think that's confusing.
MS. AQUINO: I'm happy to rephrase the question. I may have misspoken.
Q. What is your understanding of

what extended replacement cost means?

MR. DAUPHIN: If you know. If you have an understanding.

Q. (BY MS. AQUINO) Yeah, I'm not trying to get you -- I'm not trying to trick you. I'm just trying -- what is your understanding of it if you have one? If you don't --

A. Right. I mean, whatever the policy says. I'm just going to read you from the -- I mean, my understanding is what the policy says.

Q. Do you -- without looking at it, as we're talking here, I'm not -- again, I'm not -- I understand what the policy says. What is your understanding of what that means?

A. My understanding of extended replacement cost?

Q. Yes, ma'am.

A. The reconstruction cost -- I mean, I'm sorry. It's what the policy says, which is up to fifty percent more than the

amount of coverage.

Q. Okay. That's fine. Like I said, I'm just trying to get your understanding. I'm not --

A. But, I mean --

Q. -- trying to trick you.

A. Right. I'm reading the policy to get my understanding.

Q. Okay. So, if -- let's do this: On that same page where you were -- give me one second. Let me find that part so I can direct you. So, on that Page 2 still under other permanent structures, there is a large paragraph that starts with an extended replacement cost means; do you see that?

A. Yes.

Q. If you could take a second, just read that and let me know when you're ready.

A. The whole paragraph?

Q. Just that paragraph, yes.

A. Okay.

(Witness complies.)

Okay.

Q. Did you read the whole block of text?
A. I did.
Q. Okay.
A. I skipped over the verified but --
Q. That's okay.
A. Yeah.
Q. I just wanted to make sure.
All right. And do you see where it says extended replacement cost means the reconstruction cost for your home or other permanent structure up to fifty percent more than the amount of coverage if the reconstruction cost is greater than the amount of coverage, correct?
A. Correct.
Q. Did I read that right?
A. Uh-huh.
Q. And then, at the very bottom, it says reconstruction cost. Do you see where that starts?
A. Yes.

Q. Okay. The reconstruction cost means the lesser of the amount required at the time of loss to repair, replace, or rebuild at the same location your house or any other permanent structure using like design and materials and workmanship of comparable kind and quality. Did I read that correct?
A. Yes.
Q. So, do you understand that the reconstruction cost pursuant to your policy is the amount required to either repair, replace, or rebuild the home?
A. The lesser of the amount required at the time of loss.
Q. For one or the other, correct?
A. Correct.
Q. Okay. As far as the original construction of 3305 Dell Road, how much did the house cost to build originally?
A. I believe it was two point five million. I would have to look back at the invoices, though, to be sure.

Q. And is that everything included, design fees, all of that, or is that just --
A. Just --
Q. -- the construction cost?
A. -- the construction.
Q. So, that's what TCC charged you to build the house?
A. Yes.
Q. Okay. Now, following the fire in November of 2019, you had TCC come out and give you an estimate on the house, correct, to --
A. An estimate for what?
Q. That was going to be my question. TCC came out to give you an estimate, correct?
A. Yes.
Q. Do you remember when they came out?
A. I don't remember. They came out multiple times.
Q. When was the first time that TCC came out --

A. I don't --
Q. -- to your house, to your recollection?
A. I don't recall positively. I do know they were there December 13th. Whether that was the first one, I'm not sure.
Q. Is that December 13th --
A. Of --
Q. -- of 2019?
A. -- 2019.
Uh-huh. So, at least they came out by then.
Q. And who did you deal with primarily at TCC?
A. Marbury McCullogh. M-a-r-b-u-r-y M-c-C-u-l-l-o-g-h.
Q. Appreciate that. Thank you.
A. No problem.
And Bradley, B-r-a-d-l-e-y, Moncrief, M-o-n-c-r-i-e-f.
Q. And were these the same individuals that you dealt with to build the house initially?

A. Yes.
Q. Okay. And you said that TCC came out on December 13th of 2019. Was either Mr. McCullogh or Mr. Moncrief there on December 13th?
A. Yes, they both were.
Q. Okay. Was anyone else at that meeting?
A. Yes.
Q. Who else was there?
A. Iris Thorpe, T-h-o-r-p-e, and Hank Long and my dad, Chuck Dauphin.
Q. Anyone else?
A. I believe that was -- a Jay Tankersley joined partway through the meeting. He is -- oh, I'm sorry. Yes. So, Jay Tankersley with J.S. Held and Jeremy Elliott, who was our adjuster at the time with Chubb/Pacific.
Q. And what was the purpose of the December 13th meeting?
A. To discuss what needed to be done to remediate our house.

Q. And at that time, what was the -- what was the conclusion at the meeting that was going to be done to the house?

A. Jeremy Elliott told all of us that the interior of the house would be taken down to the studs.

Q. Okay. And who was going to perform that work at that point?

A. Brookstone Restoration, I believe, is the full name. They were working on debris removal, demolition. There were some -- there was some work that they were not comfortable doing, and they did ask TCC to do some things. But, specifically, I would have to look at the invoice to see the specific work.

Q. Let me see if I can -- I think I understood you but just to make sure.

A. Uh-huh.

Q. Brookstone was uncomfortable doing some of the work, so Brookstone asked TCC to do the work or asked for guidance on how to do the work?

A. They asked TCC to perform the work.

Q. Okay.

A. And Jeremy Elliott approved that.

Q. During the December 13th meeting, were there any estimates prepared by either J.S. Held, Brookstone, TCC, anybody at that time?

A. Not that I'm aware of. Or I should say I don't recall if J.S. Held had prepared an estimate at that point.

Q. Okay.

A. I just don't recall. But TCC had not.

Q. At the point -- at the time of the December 13th meeting, had any work been done to the house other than the initial board-up?

A. They had begun the mostly debris removal and some demolition, definitely the upstairs. I don't recall how far -- how much progress they made with the rest of the house.

Q. Okay. And who was doing that work at that point? Was that Brookstone?
A. That was Brookstone. And I just don't recall the exact date that TCC did the work that was asked of them.
Q. Okay. So, you had a meeting on December 13th of 2019. What's the next development as far as the work done to the house that you can recall?
A. That I can recall, we had agreed, as I said before, to take the house down to the studs. And Jeremy Held did that.
Q. Okay. And I'll go back to that, but what do you -- when you say take down to the studs, what does that mean?
A. It means all of the sheetrock is gone and the tile. All the wall stuff, you take it down to the, like, lumber studs.
Q. And is that for both first floor and second floor or --
A. Yes.
Q. -- all four levels?
A. The -- well, the attic wasn't

finished. So, it would be the two main levels, main level and upper.

Q. Okay. Was there any discussion about any work that needed to be done to the basement at that point?

A. I don't recall specifically. We discussed that the entire house would have to be remediated. I mean, you know, soda blasted and painted, or sealed, I guess, and whatever the remediation process is --

Q. Okay.

A. -- after it was taken to the studs.

Q. And you mentioned the attic wasn't finished. Was there any discussion of any work that needed to be done to the attic?

A. Remediation work. Uh-huh.

Q. Okay.

A. And when I say remediation work, it's smoke and mold --

Q. Okay.

A. -- primarily.

Q. And who was supposed to be doing

that work at the time of the December 13th meeting?

A. At the time of the December 13th meeting, we -- Brookstone was on the job, but we had not selected who was going to do the remediation work. We just discussed that it would need to be done.

Q. Was there any discussion of specifics about that remediation work at that point or was this something that you needed to wait until the demolition had happened?

A. I don't recall. I recall Jeremy talking about peeling back the layers of an onion, you know, how -- the extent of their remediation, the scope of work would kind of be revealed as we went along.

Q. Okay.

A. Which was, you know, fair. It made sense at the time. But we did specifically discuss taking the house down to the studs --

Q. Okay.

A. -- so that all of that could be

remediated --
Q. Okay.
A. -- appropriately.
Q. And then, I believe you mentioned something to the effect of Jeremy halted that. What do you mean by that?
A. After that December 13th meeting, they did not finish taking the house down to the studs. And when we asked why, Brookstone said that -- or Brookstone -- well, I had discussions with Brookstone. There are emails where Jeremy said he had determined there was not damage to certain areas, and it actually would not be taken down to the studs.
Q. And what areas specifically?
A. Master -- the master suite, so master bathroom, closets, bedroom, and -- I can't remember if the -- Charles' study/office was included in that or not. But that work, it had not been --
Q. And were those on the --
A. -- taken down.

Q. -- bottom level?
A. Bottom level.
Q. Okay.
A. Main level.
Q. Was there any damage to the master bedroom?
A. Yes.
Q. What kind of damage did it have?
A. The -- behind the sheetrock, the walls were filled with smoke residue.
Q. Had any of the demolition happened to the master bedroom or bathroom at that point as of December 2019?
A. I don't recall specifically. They may have had the ceiling out, but I don't recall --
Q. When did you --
A. -- for sure.
Q. -- first learn that there was damage behind the walls?
A. Behind the walls? We hired an expert to come down and determine protocol for remediation. And we asked him to

determine if there was smoke behind the walls. And he cut a square and performed the test.

Q. Is that Mr. -- I'm not sure I pronounce his name correctly -- Zlotnik?

A. Yes.

Q. Okay. Did I butcher his name?

A. You did not.

Q. Okay.

A. Zlotnik, Z-l-o-t-n-i-k, I believe. Maybe a C.

Q. I think you did it right. Z-l-o-t-n-i-k is what I have.

A. Okay.

Q. And what about Charles' office; what kind of damage did it have?

A. It had smoke damage and the boards were warped. His office was cypress paneling, and it had warped.

Q. Was his office also on the main level?

A. Yes.

Q. And, again, I'm not holding you

to a specific time frame, but how much time passed between this December 13th meeting and when Mr. Zlotnik first discovered the damage to your master bedroom?

A. He came to Dell Road in either January or February of 2020.

Q. Okay. And once he discovered that there was damage to the master bedroom and bathroom and Charles' office, did you go back to Jeremy to talk about that?

A. Yes.

Q. And what happened?

A. We proceeded with taking down the walls to the studs in those areas.

Q. And who did that work?

A. Brookstone.

Q. Was the house taken down to the studs, the upper level and main level, at any point?

A. The upper level was.

Q. Okay. And when was that done?

A. I don't recall when they finished the upper level. Probably by March of 2020.

Q. And what about the main level?
A. Jeremy would not allow the master shower to be demoed.
Q. Did he tell you that?
A. Yes.
Q. And what was the reason he gave you?
A. I don't recall. He didn't think there was any damage. I don't recall specifically beyond that.
Q. What was the damage to the -- you said master shower?
A. (Witness nods head.)
Q. What was the damage --
A. I mean --
Q. -- to the master shower?
A. -- there was smoke behind the walls and smoke staining on the tiles.
And I don't recall how much the tiles were damaged, but the main issue was that there was smoke everywhere and behind all of those things.
THE COURT REPORTER: Behind?

THE WITNESS: Behind the areas.
Q. (BY MS. AQUINO) If you could go to Tab 2 for me, please. And go to the second page. This is an estimate that was prepared by TCC, correct?
A. Yes.
Q. Okay. And it's dated 2/12/2020; is that right?
A. Yes.
Q. Was this estimate prepared at your request?
A. Yes.
Q. Okay. And what was the purpose of this estimate?
A. Jeremy wanted an estimate for the repair --
Q. Okay.
A. -- of the house.
Q. As far as you know, what is -- what is covered under this estimate? And you don't have to go line by line, of course.
A. That's okay. Sure. At the time, this is what TCC estimated that it would cost

to repair the house, to reconstruct it, whatever. Reconstruction was due to, like, repairing. This does not include the remediation work, like, smoke remediation, soda blasting.

Q. Okay.

A. This does not include that. This is like the reconstruction portion of the repair.

Q. So, would this involve the taking down to the studs that we talked about?

A. No.

Q. Okay. Why not?

A. Brookstone was taking the house down to the studs as part of debris removal.

Q. Okay. What was the scope of the TCC estimate that they provided you in February of 2020?

A. This would be to reconstruct, assuming the house had been taken down to the studs --

Q. Okay.

A. -- as Jeremy said it would be,

and then, after the smoke remediation and mold remediation.

Q. So, this -- let me make sure I understand you correctly.

A. Uh-huh.

Q. The TCC estimate from February of 2020 assumes that the house had been taken down to the studs and was to redo everything that had been --

A. Yes.

Q. -- taken down?

A. Put it back the way it was from the studs after smoke remediation and any mold remediation that needed to be done.

Q. Okay. It doesn't actually include the demolition portion of it, correct? Is that what you said?

A. Correct.

Q. Okay.

A. Well, let me look at this. It does include some demo. Actually, I guess I should say the interior is from the studs back.

Q. And those --
A. I apologize.
Q. That's okay. And that was actually going to be my question. So, when you see under demolition, do you know what --
A. Yes.
Q. -- you're referring to?
Is this for the exterior?
A. Under this demolition right here, this -- so, it's -- the front porch had not been demoed at that point. Yeah, putting back windows and doors. So, demoing what they needed to to take out the windows and put it back. So -- I'm sorry. It says demo interiors, others. That's the Brookstone portion.
Q. Okay. And demo miscellaneous framing, it says below, that's something that they were doing; is that right? And by they, I mean --
A. Yes.
Q. -- TCC.
A. There was some discussion of how

to handle the charred framing. That was one of the things Brookstone wasn't comfortable handling. It would need -- the stuff that was charred would need to be put back, like, as soon as it was taken out for support reasons.

Q. Okay. And was that work going to be done by TCC at Brookstone's request or was that going to be done by Brookstone itself?

A. I don't recall exactly.

Q. Okay. As far as this estimate, does this assume that the house is going to be built as original or was there any changes to the design?

A. No, this is just to put it back the way it was --

Q. Okay.

A. -- the original design.

Q. As of December of 2019 when you had that meeting with TCC and Iris Thorpe and Hank and Jeremy and everybody else that you mentioned, what was your goal? Did you want the house repaired or did you want the house

rebuilt?
A. I asked Jeremy to demolish and rebuild the house, and he laughed. So, at that point, it was a repair.
Q. What do you mean he laughed?
A. And he laughed.
Q. Just out loud --
A. Yes.
Q. -- chuckled?
Okay. Did he -- did he respond --
A. He was like --
Q. -- in any way?
A. He -- yeah, I mean, he -- his mouth dropped (indicating), like, are you kidding.
Q. Did he say are you kidding?
A. No. That was my --
Q. Okay.
A. -- interpretation of his facial expression.
Q. Okay.
A. But --

Q. Was there any --
A. -- he laughed.
Q. -- explanation of why he made that face or did he not say anything?
A. I don't recall him saying anything more.
Q. Did you ever ask him, I want the house demolished and rebuilt?
A. That was --
Q. That was in response --
A. That was the --
Q. -- to that?
A. Yes.
Q. Okay.
A. Yes.
Q. When you -- let me figure out how to ask this question so it makes senses.
At the end of the December 2019 meeting, the December 13 meeting, were you in agreement with the plan to take the house down to the studs or did you still want it rebuilt entirely, demolished and rebuilt?
A. I was in agreement that we would

take the house down to the studs and repair it.

Q. Now, at some point, you did demolish the house, correct?

A. Yes.

Q. When was that done?

A. We decided in June 2020 to demolish the house.

Q. And why was that decision made?

A. Chubb had kind of gone silent with regards to the plans for remediation. And the house had -- it was, like, rotting, the mold, and it had sat there damp for six, seven months. And the cost to repair and the cost to rebuild were, we felt, very close. And we just were more comfortable tearing the house down and making sure there was no lingering smoke odor that would be there.

Q. And when you say the cost to repair --

A. Uh-huh.

Q. -- and cost to rebuild --

A. Uh-huh.

Q. -- was that provided by TCC?
A. Yes.
Q. When did TCC give you the estimate to rebuild the house from scratch?
A. I don't recall exactly.
Q. Was that at your request or is that something that they included as an option?
A. That was at our request.
Q. Did you send an estimate to Pacific, or Chubb, however you feel more comfortable.
A. We referenced it in a letter, my lawyer did, the amount that TCC had said --
Q. Okay. And what was the response?
THE COURT REPORTER: I didn't get your answer.
THE WITNESS: Oh, I'm sorry.
Just that we referenced it in a letter, the amount that TCC would charge to demolish and rebuild.
A. And what was the response --
Q. (BY MS. AQUINO) And what was the

response?

Yes.

A. -- to that?

A letter --

Q. Okay.

A. -- from Alycen Moss.

Q. Do you remember what the letter said? Not holding you to exact wording, of course.

A. No.

Q. Okay.

A. That -- and she discussed repair and rebuild.

Q. As of June of 2020 when you made the decision to demolish the house and rebuild, what work had been done at that point to the house?

MR. DAUPHIN: I'm sorry. What's that? What work?

Q. (BY MS. AQUINO) At the time of the June -- of June 2020 when --

MR. DAUPHIN: Okay.

Q. (BY MS. AQUINO) -- the decision

was made to demolish and rebuild, what work had been done to the house, if any?

A. Just some debris removal, and TCC had repaired whatever we talked about earlier, the -- I believe it was work done to the part of the roof porch area --

Q. Okay.

A. -- that Jeremy had approved and Brookstone had asked them to do.

Yeah, we had not -- we left the shower. We had not taken that out. So, it was mostly to the studs but not entirely.

Q. Okay. So, the actual demolition to the studs for the most part had been done. Had any repair work started?

A. Remediation, you mean?

Q. Actual rebuilding.

A. Rebuilding?

Q. Yeah.

A. When we tore it down?

Q. Before you -- when you made the decision to tear it down --

A. Right.

Q. -- what was the condition of the house at that point?

A. Taken down to the studs and most -- on most of the two floors and there had been no remediation. So, there was smoke and mold -- like, smoke residue and mold all over the house.

Q. Had any repair work been started at that point? And by repair work, I mean actual, like, construction work.

A. No.

Q. My understanding is that at some point, you terminated your relationship with Brookstone; is that right?

A. Yes.

Q. When was that?

A. I believe that was March 2020, maybe April 2020.

Q. Okay. And what was the reason you terminated your agreement with Brookstone?

A. We discovered that Jeremy Elliott and Andrew Arrant of Brookstone had been

exchanging emails without including Charles and me, reducing the scope of remediation work to be done on our house.

Q. And when you say remediation, do you mean smoke remediation?

A. Smoke remediation and mold remediation.

Q. To what areas of the house?

A. The entire house.

Q. Okay. So, were his emails that no remediation should happen?

A. That they scaled back the square footage and were eliminating certain areas that we had agreed upon remediating.

Q. Okay. Do you know why that was done?

A. I do not.

Q. Okay. How did you discover that that had happened?

A. Our lawyers obtained emails from Andrew Arrant that showed the discussions.

Q. Did you ever have a discussion with Andrew about those emails?

A. I don't recall.
Q. Did you have a discussion with Jeremy about that?
A. I was not communicating directly with Jeremy by that point.
Q. Okay. Do you know if your attorneys did?
A. Yes.
Q. And what was the result of that if you know?
A. The result of --
Q. The conversation with Jeremy.
A. -- the conversation with Jeremy?
I'm not sure how to answer that.
Q. And, again, I'm not looking for any advice or any discussions that you had with your attorney.
A. Right.
Q. Whatever Jeremy said is --
A. I don't recall exactly what he said because I was not a part of those conversations.
Q. Okay. So, after you terminated

the relationship with Brookstone, did you hire TCC to do the work?
A. No. We obtained another smoke and mold remediation bid from Slade, LLC.
Q. And how did you learn about Slade?
A. Google search.
Q. Had you ever had -- excuse me. Had you ever had any work done with Slade or by Slade?
A. No.
Q. Did you have any prior relationship with Slade or anyone at Slade?
A. No.
Q. And what did Slade do for you?
A. They came to Dell Road and prepared a remediation bid based upon the protocol that Cliff Zlotnik had laid out. So, they bid the same work that Brookstone was going to do.
Q. Okay. How did you find out about Mr. Zlotnik?
A. Google search.

Q. Okay. And what made you decide to go with Mr. Zlotnik as opposed to someone local?

A. He is an expert in smoke remediation. He literally wrote the, like, books on how to remediate smoke damage. And I don't -- couldn't find where anyone in Birmingham was an expert on that and had that sort of knowledge.

Q. Did you ever ask Mr. Zlotnik if he had any recommendations locally for smoke remediation experts?

A. He vetted Brookstone and said that they could carry out his protocol. He felt comfortable with them performing the work.

Q. And what about Slade; what was his position on Slade?

A. I don't recall.

Q. Did Mr. Zlotnik have any specific qualifications that you were looking for in a smoke remediation person?

A. Yes. We submitted his CV to

Jeremy. So, it's pages long.

Q. What stood out about his background to you that prompted you to hire him?

A. That he's an expert and that he wrote the manuals.

Q. Was there anything that he was able to provide or to do specifically that somebody like Brookstone or Slade wouldn't be able to do for you?

A. I mean, nobody at Brookstone is an expert in smoke remediation, and they don't offer any sort of guarantee that the work they perform will result in, like, a smoke free home forever.

Q. Is that something that it's your understanding that Mr. Zlotnik --

A. Yes.

Q. -- provides?

A. Mr. Zlotnik, if his protocol is followed, he offers a guarantee --

Q. Okay.

A. -- that there will be no smoke

odors in the future.

Q. Does he, himself, provide that?

A. Yes. Or his company.

Q. But he wouldn't be doing any of the work himself, correct?

A. He would coordinate with Brookstone and oversee, but he would not be down here doing the soda blasting and sealing.

Q. I saw some emails and notes that Mr. Zlotnik at some point came for an inspection of your house; is that right?

A. Yes.

Q. When was that done?

A. It was January or February of 2020.

Q. And that's when he -- you said that he cut out the hole and found the smoke behind the walls; is that right?

A. Yes.

Q. Okay. Was there anyone from Brookstone in attendance at that meeting with Zlotnik?

A. I don't recall. It was -- he was there one or two days, maybe three.
Q. And as far as --
A. I'm sorry. I need to amend.
Q. Okay.
A. Andrew did meet with Cliff at least one of the days. Andrew Arrant from --
Q. Okay.
A. -- Brookstone.
Q. And is Cliff Mr. Zlotnik's --
A. Yes.
Q. -- first name?
Thank you.
And after that meeting, what was -- what was Mr. Zlotnik's plan for the house?
A. I don't know specifically, but he did provide the protocol and he -- it was submitted to Jeremy. And he had gone over it with Brookstone.
Q. And is that something that, at that point, Brookstone was able to do?
A. Yes.

Q. And that was, you said, smoke and mold remediation, correct?
A. Correct.
Q. So, I'm trying to make sure that I understand kind of like how the timeline progressed. So, there was a meeting in December of 2019?
A. (Witness nods head.)
Q. There was a discussion about taking the house down to the studs and then rebuilding those parts of the house back to how it was originally, correct?
A. Correct.
Q. And then, in February of 2020, TCC kind of gave you an estimate for that, correct?
A. Correct.
Q. At that point, in February of 2020, did you approve this estimate for them to go ahead and do that or how did that go about?
A. We did not because we -- there's no formal approval of it because we needed to

do the remediation first.
Q. Okay.
A. We just didn't get there.
Q. So, in February when TCC gave you this estimate, you're still working with Zlotnik and Brookstone to come up with a remediation protocol, correct?
A. Correct.
Q. Was a remediation protocol ever developed with Brookstone to go along with this TCC estimate?
A. Yes, that's what we submitted to Jeremy, whatever Cliff came up with and went over with with Brookstone.
Q. And would that have been around February of 2020?
A. I believe so.
Q. Okay. And what happened after that?
A. That was when -- well, we had agreed upon the scope --
Q. Uh-huh.
A. -- what we saw, what Charles and

I and my lawyers saw, was that we had agreed upon the scope, and Cliff was going to oversee Brookstone performing the remediation so that we would have our smoke free, odor -- smoke odor free, you know, guarantee.

Q. Uh-huh.

A. And that's when we discovered that Jeremy had gone behind our backs and worked to reduce the scope of the remediation with Brookstone and did not include Charles or me in any of those discussions.

Q. Okay. So, you terminated Brookstone --

A. Brookstone.

Q. -- in March?

A. Yes. And then, we asked Slade, LLC, to submit a bid for the exact same scope of work that Brookstone initially bid on, the full smoke remediation, the protocol that Cliff had come up with.

Q. Okay. And then, what happened next?

A. Nothing. Silence.

Q. Okay. Was the Slade bid submitted to Chubb?
A. Yes.
Q. Okay. And no response?
A. The only response was that Jeremy said he wanted to get some of his own competitive bids that he would, of course, submit to us. And he never -- he did not submit them to us.
Q. Okay. So, between -- we're now, like --
A. May.
Q. -- around March?
May?
A. May.
Q. May. Okay. So, March and June -- I'm sorry. May and June --
A. Uh-huh.
Q. -- did anything happen to the house in that time?
A. No. It just sat there.
Q. At that point, was it still boarded over, was there tarp in it? What did

it look like at that point?
A. At that point, I don't recall exactly. I certainly submitted pictures. But it was moldy and there was still smoke residue everywhere. It had gotten really wet because -- I mean, it's just impossible to make a house like that, like, watertight --
Q. Uh-huh.
A. -- and airtight, so --
Q. Okay. And I saw some messages that there was some water damage from rain around February --
A. Yes.
Q. -- is that right?
A. Yes. I mean, they do the best they can. They put the plywood sheets up, they tarp it, but, I mean, it's just impossible to have it perfect --
Q. And the rains --
A. -- watertight.
Q. -- in February, what part of the house did that affect?
A. I'm sorry?

Q. The rains in February.
A. Oh, the rains in February? All four levels. It was pooling in the basement.
Q. Okay. Had there -- had any demolition work happened in the basement at that point, around April, May of 2020?
A. Demolition -- I don't -- it wasn't a finished basement, so I don't --
Q. It was kind of how it was originally?
A. Yes.
Q. Okay. So, June, you made the decision to tear down the house and rebuild it from scratch, correct?
A. Correct.
Q. Did you ever communicate that decision to Pacific or Chubb? I'm going to use the terms -- the terms interchangeably, but we're --
A. Okay.
Q. -- talking about the same company.
A. Yes. I don't recall. At some

point, they were aware, but I'm not sure how they became aware.

Q. And at that point, in June, the idea was for TCC to do the rebuilding of the house?

A. Yes.

Q. And was it going to be the same house that you originally built or were there any changes to it?

A. There was some modifications, but it was the same footprint.

Q. Okay. What were the modifications?

A. We moved a pantry door in the kitchen. We -- in the master, we kind of shifted some stuff in the -- in our bathrooms. And we added a laundry room upstairs in the playroom area. And we -- I mean, these are little things. We --

Q. Uh-huh.

A. -- shifted my daughter's nook.

She had a -- the reading nook in her room is where the fire started. So, we

changed some things around so it didn't look the same. And we eventually finished off the basement level --
Q. Okay.
A. -- this time.
Q. Same square footage, same number of rooms, same number of bathrooms?
A. No. We -- I guess we added the livable or the -- what do you call it -- HVAC square footage, air condition square footage when we finished the basement.
Q. Okay.
A. And we have another half bath down there but no additional bedrooms.
Q. Sorry. I'm starting to get a little hoarse.
Was there any redesign that had to be done to the floor plans of the house in order to be rebuilt with those changes?
A. We did ask our architect, Hank Long, to redraw portions of the house.
Q. And how much did he charge you for that redraw?

A. I don't recall.
Q. When did the rebuilding of the house actually start?
A. I believe we demolished the house in July, I believe, is when it was actually demolished --
Q. Okay.
A. -- at that point.
Q. And was that demolition also done by TCC?
A. Yes.
Q. And it was, I believe you said, completed in January of 2022?
A. Yes.
Q. Okay. Let me make sure I keep the years straight.
Your preference from the beginning was to rebuild the house, correct?
A. To repair and rebuild.
Q. Well, you mentioned that you had asked Jeremy earlier about demolishing the house and rebuilding. Was that your preference in the beginning?

A. Not in the beginning.
Q. Okay.
A. I mean, we went back and forth a little bit as -- I mean, we've never had a house fire. And I had to kind of understand things.
Q. Uh-huh.
A. The day of the fire, the fire chief said he was so sorry I lost my house and said, you know, that, typically, in Mountain Brook, a house that had suffered this significant fire damage would be demolished and rebuilt. And then, you know, we thought maybe we could repair it, you know.
Q. Uh-huh.
A. And I felt really comfortable repairing it if Cliff Zlotnik was going to come up with the protocol and oversee it.
Q. Okay. When the fire chief said that in Mountain Brook, they usually rebuilt, is there any --
A. Uh-huh.

Q. -- type of building code that you're aware that requires it to be rebuilt in --
A. I mean --
Q. -- Mountain Brook?
A. -- there is -- there is a building code.
I don't know the details of it.
Q. That's not something that he discussed with you; it was just --
A. No.
Q. -- kind of in passing?
A. Yeah.
Q. Okay.
A. And he was just very sorry I had just lost my house.
Q. I am sorry for the -- for the fire.
A. Thank you.
Q. I can't imagine what you went through, so I am sorry for that.
A. Thanks.
Q. What was the final cost to

rebuild the house from scratch?
A. We are still working on it.
Q. Do you have any, like, final invoices from TCC at this point? Have you received anything?
A. No, we've not paid the final bill yet. We're still --
Q. But do you have the final bill?
A. -- doing the punch list.
No, no, no. We're -- there's punch list items --
Q. Okay.
A. -- and things --
Q. An what is still missing?
THE COURT REPORTER: I can only get one at a time.
MS. AQUINO: I'm sorry.
A. I told you it was going to happen. I apologize.
Go ahead. I didn't mean to cut you off.
THE COURT REPORTER: What was the question? Let's go back to the question.

MS. AQUINO: I think she was still talking, and I think I cut her off.
THE COURT REPORTER: Okay.
Q. (BY MS. AQUINO) Did I cut you off?
A. I don't remember.
Q. I'll ask my question.
A. Okay.
Q. What is still missing as far as the punch list items go?
A. It's little things. And then, we have to repair the driveway. But, I mean, there -- Hank Long's punch list is incredibly detailed. So, it's, you know, six pages of --
Q. Uh-huh.
A. -- little things.
The one big thing remaining is we've got to repair the driveway.
Q. What's wrong with the driveway?
A. It's just -- it just has to be recoated. It just had all the trucks and all the debris was on it. And things got

damaged. The bricks that lined it and areas of the -- we have some concrete, and then, we have some pavement. Is that the same -- is concrete and asphalt -- those are different, right?
Q. I believe so.
A. I believe so, too.
Q. Don't quote me, but I believe so.
A. Same. Don't quote me on it but -- but, yeah. So, I think the concrete part, there's some damaged areas.
Q. Okay. Is it the original driveway or has the driveway been rebuilt since the fire?
A. It's the original driveway before the fire.
Q. And then, the other punch list items that you mentioned, are they in the home itself?
A. Yes.
Q. So, TCC has not submitted their final invoice to you for the rebuilding?
A. Correct.

Q. I saw some notes about the garage. Was the garage ever demolished?

A. No.

Q. So, is it the original garage?

A. Yes.

Q. Was there any work done to the garage following the fire?

A. Yes, we did smoke remediation in the garage.

Q. Okay. And who performed that?

A. TCC after coordinating with Cliff Zlotnik.

Q. When was that done?

A. I don't recall.

Q. Do you remember if it was in 2020, 2021, 2022?

A. I don't -- my best guess is it was 2021.

Q. Okay. So, before you moved back into the house?

A. Before we moved back in.

Q. Any other work done to the garage other than the smoke remediation?

A. I mean, just repainting and fixing anything that was damaged during debris removal and reconstruction.

Q. Did any garage doors or anything like that have to be replaced?

A. Just repaired. The garage door was repaired.

Q. And the smoke remediation you mentioned was done by Slade. Do you know how much that was?

A. It was not done by Slade. It was done by TCC, the garage.

Q. Oh, it was done by TCC?

A. Yes, after talking with Cliff.

Q. Gotcha. Misunderstood you. I apologize for that.

A. That's okay.

Q. Do you know how much that was?

A. Not without looking at the invoice.

Q. And was there a reason why you had TCC perform the smoke remediation and not Slade?

A. I -- just they were already on the job doing -- rebuilding the house. And I --
Q. Uh-huh.
A. -- just asked Bradley Moncrief if he could chat with Cliff and see if it was something they were comfortable doing themselves.
Q. Okay.
A. And so, they said yes.
Q. So, Zlotnik kind of gave TCC parameters for the smoke remediation and they followed those parameters?
A. Yes.
Q. Was there any mold in the garage or was it just smoke damage?
A. I think it was just smoke damage.
Q. Was there any remediation work done to any other areas of the property itself?
A. We did remediate the basement as well, and TCC did that, too.
Q. And what was the reason for the

remediation to the basement?
A. So, we did not demolish the basement level.
Q. Why not?
A. We knew we were keeping the same footprint and we were comfortable with Cliff's remediation protocol.
Q. Okay.
A. And we felt like that if it were followed, we would get rid of any smoke odors.
Q. So, there was -- was it smoke remediation or smoke and mold or just mold?
A. Smoke and mold.
Q. To the basement?
A. To the basement level. Uh-huh.
Q. And that was also done by TCC, you said?
A. Yes.
Q. And when was that done?
A. That was done before they started reconstruction, like, the main level.
Q. Uh-huh.

A. So, July, August 2020. So, after -- I'm sorry. After the house had been demolished --
Q. Uh-huh.
A. -- and they cleaned out the debris, then, they remediated, and then, they began reconstructing.
Q. Okay. What's the approximate square footage of the basement?
A. Oh, I don't know. I'm sorry.
Q. No. That's okay.
A. No, I'm not great with square footage.
Q. Do you know how much TCC charged you to do that smoke remediation to the basement?
A. I do not without looking at the invoice.
Q. Have you received that invoice yet?
A. I believe so.
Q. Do you know if you've submitted that invoice to Pacific for any discovery in

this lawsuit?
A. We did not submit any of the rebuilding invoices to Pacific or Chubb.
Q. Okay. And why is that?
A. Because Chubb chose to repair the house and not to demolish and, like, reconstruct.
Q. What do you mean by that?
A. The -- we asked Chubb to pay for the demolish and rebuild, and Chubb said, no, that it was a repair job. So, all of the invoices that we submitted were prepared as repair invoices --
Q. Okay.
A. -- to repair the house.
So, remediation and putting it back the way it was before the fire.
Q. Okay. My understanding is that one of the original invoices was for Slade was the smoke remediation was to the entire house, correct?
A. To remediate the entire house, the smoke and mold remediation, yes.

Q. The one -- the invoice prepared by Slade?
A. Yes.
Q. Okay. That was not done, correct, that smoke remediation to the entire house?
A. Correct.
Q. The only areas of the house that were remediated were the garage, which is separate, and then, the basement?
A. It's attached but --
Q. It is attached? Okay.
A. Yes.
Q. I wasn't sure if it was.
A. Okay.
Q. Okay. So, I'll rephrase. The only areas that were remediated were the garage and the basement, correct?
A. Correct.
Q. And that was not also done by Slade, correct?
A. Correct.
Q. And since the house has been

rebuilt, there will be no need for the smoke remediation to the house itself, correct?
A. Correct.
MS. AQUINO: It is 12:30. Do we want to take a break for lunch?
MR. DAUPHIN: Yeah. Let me check with Charles and see where we are.
MS. AQUINO: We can go off the record, please.

(Whereupon, a lunch recess was taken.)

MS. AQUINO: We are back on the record after a lunch break.
Q. All right. I want to talk to you about a couple of things that we initially discussed during your examination under oath. I believe there was some issue at that point that we talked about a generator for the house; do you recall that?
A. Yes. Can I interrupt you one second --

Q. Absolutely.
A. -- and go back?
I need to add something to my answer --
Q. Okay.
A. -- about remediation.
We remediated the slate tiles that were on the garage.
Q. Was it -- did you remove them from the garage --
A. Yes.
Q. -- to remediate them and put them back?
A. It was a process, yeah.
Q. Okay.
A. We removed them all. They were, like, remediated, hand cleaned one by one, and then, put back on.
Q. Was that also done by TCC?
A. Yes.
Q. Okay. And was that done 2021ish before you moved in?
A. Before we moved in at some point,

yes.

Q. Okay.

A. Thank you.

Q. No problem. Appreciate that.

And is this inside the garage or outside?

A. Outside. It's the roofing material.

Q. Okay. You mentioned the garage was connected to the house; is that right?

A. Yes.

Q. How was that handled when the house was demolished? What happened to that connection?

A. It -- so, it's connected to an exterior breezeway that runs alongside the kitchen on the main level. And, I mean, there was a little bit of brick that came off when they, you know, demolished part of it. But it was -- there was surprisingly little damage to the connection.

Q. Okay.

A. We just patched it and moved on.

Q. Okay. So, I want to talk to you about the generator.
A. Okay.
Q. I believe when we had your examination under oath, there was still some issue whether or not the generator had been damaged. Did you ever figure out if there was any damage to the generator?
A. There was no damage to the generator.
Q. Okay. So, no work needed to be done to the generator? It didn't have to be replaced or anything like that?
A. It was not replaced. We did make some changes. I don't -- I don't know if it was a repair job. We added some areas that would be covered if the power went off for the generator to, you know, run those areas, run electricity to those areas. But I don't -- I mean, we did not have to replace it.
Q. Okay. And no damage from the fire itself?

A. Not from the fire itself, no.
Q. Okay. And the areas that you added, did that mean they had to get, like, a bigger generator or was it just expanding the connections to that existing generator?
A. I think it was just, like, more switches, but I'm not positive.
Q. Okay. I believe, initially, there had been some questions about some parts of the house, like, the mantles, the doors, the hardware, cabinetry, beams, et cetera. What happened to those items? What ended up happening with those items? I know there was some discussion initially about those not being damaged, being able to be reused.
A. Okay. None of those were reused.
Q. Okay.
A. And they were taken out of the house. They were not in my possession, and I have no idea what happened to those items.
Q. Do you know who removed them from the house?

A. Those specific items, no, I don't know if it was Brookstone or if it was -- Jeremy brought in Paul Davis without our permission, I will add, to -- and Paul Davis removed some things from our house.

Q. And what did -- what was Paul Davis' scope of work?

A. I don't even know if I know the entirety of it.

Q. Okay.

A. But he definitely asked them to remove some cabinetry from our house and -- I just am not entirely sure of the entire scope.

Q. And is Paul Davis a company or is Paul Davis a person?

A. Paul Davis is a company. They do restoration remediation work like Brookstone. They're very similar to Brookstone.

Q. Did you have any issues with Paul Davis being involved?

A. I didn't know anything about the company. And we had Brookstone involved.

And we had -- we had employed Brookstone to do this work. So, yes, I had an issue with Jeremy bringing in someone that I did not employ or approve of.

Q. Okay. And did you bring that up to him?

A. Through our lawyers, yes.

Q. And what happened?

A. I don't know. I never saw those items again. I have no idea what happened.

Q. Were there any items that Paul Davis either removed or stored that you wanted to get back but weren't able to?

A. Well, we -- when they took the items -- this may not be answering your question. But when they took the items, we were still trying to determine what would be reused and all that. And I did not want them back because we determined we were not going to reuse them.

Q. Okay.

A. But, yeah, I don't know what happened to them and I did not give

permission for Paul Davis to take anything.
Q. The items that we talked about, the mantles, the doors, do you know if those were removed by Paul Davis or not sure?
A. I'm not sure who took those.
Q. Okay. But they were not reused, correct?
A. Correct.
Q. What was the damage to these items? Why could they not be reused?
A. Do you -- do you want me to go line by line? Do you want to ask me -- or just generally?
Q. Just generally. Like, the ones that we talked about, the mantles, the doors.
A. Okay. The mantles --
Q. We talked about that.
A. -- and doors, there was smoke residue, and so, staining and odor.
Q. Okay.
A. And it had -- so, when the fire happened, obviously, it was really hot. And they came in with the water. And it was

really wet. And then, it sat in an unair-conditioned environment, obviously, for six months. I'm sorry. Sorry. Six weeks --

Q. Okay.

A. -- you know, a couple of months.

And it warped, things cracked. It just -- they weren't going to be like they were prior to the fire.

Q. Okay. And what about the cabinetry; what was the damage to the cabinetry?

A. Same for the cabinetry.

Q. Okay.

A. Those were custom cabinets that were built, like, in an air-conditioned workshop and transported after we already had the HVAC system running in our house. So, once they were hit with, like, water and -- well, there's the smoke damage, too. Once they were hit with that, they just weren't going to be the same.

Q. Okay. I think the other item that I had on my list was the hardware and

beams. Do you know what those are referring to?

A. Same with the beams. Cliff found some mold behind the beams. There was -- where the beams were in the family room, at least -- I mean, water came through the ceiling and was all behind those beams. So, I don't know how far we got in that process, but I was pretty sure that you couldn't just wipe them down and put them back up. To my eye, they were warped while they were still installed.

And what was the other thing you asked me about?

Q. It just says hardware.

A. Hardware.

Q. Yeah.

A. Oh, yeah, yeah. It's unlacquered brass. So, it etches. All the dust particles and stuff --

Q. Uh-huh.

A. -- there were scratches along it and it had tarnished.

Q. And when we're talking about hardware, is this cabinetry hardware, door hardware? What are we referring to?
A. I don't know what y'all are referring to. It just says hardware in the --
Q. The ones that you mentioned.
A. Oh, the ones --
Q. Yeah.
A. They were cabinetry hardware and door hardware.
Q. Okay.
A. Interior and exterior.
Q. Okay. Now, I believe you mentioned that Hank Long -- that was your architect, right?
A. Yes.
Q. What did he do for the rebuilding of the house? What was his scope of work?
A. He drew the plans for our rebuild, and then, he oversaw TCC reconstructing the house.
Q. When you say --

A. Or rebuilding.
Q. -- oversaw, was he at the job site --
A. Uh-huh.
Q. -- on a daily basis?
A. No, not on a daily basis. But they do check in at certain steps. I know, like, after framing is one --
Q. Uh-huh.
A. -- a big one.
And so, he -- throughout the process. And then, they come at the end and do the punch list.
Q. Okay. That's the one that you were mentioning was, like, six pages long? That's what Hank Long put together for you?
A. Yes. He'll do the final punch list. And we don't pay TCC until Hank has approved the work on TCC's invoices. So, he -- and they check, you know, the accounting. He's very involved.
Q. And once he completes the punch list, you guys give it to TCC, is he the one

that's dealing with them to make sure the punch list items are addressed?

A. He -- he'll have -- he'll come do the final thumbs up.

Q. Okay.

A. We didn't get that far. And so, you know, we just didn't finish the punch list. We haven't yet. But, I mean, he comes and he does the list and then, you know, coordinate with Bradley on when they come and, you know, what they're doing. But Hank will have the final sign-off --

Q. Okay.

A. -- when the job is completed.

Q. And is that something that he did for the original building of the house --

A. Yes.

Q. -- also?

Now, there was a charge on the invoice that was submitted that says architecture oversight fee. Do you know what that means?

A. That's what he charges us. His

role is oversight of the job. So, he charges two point five percent of the contract price.

Q. For the construction?

A. TCC's, yes, contract price.

Q. Okay.

A. And that, you know, involves, like, if we have change orders that increase the cost of the house, then, you know, his -- obviously, the two and a half goes up if our contract price goes up. It's not like we lock it in the day we sign the initial contract.

Q. Okay. How was -- how was Hank brought onto the project initially? Is that something that TCC recommended he be brought on or did you guys find him?

A. Oh, we hired him.

Q. Okay. How did you learn about him?

A. He's a wonderful architect and he had done drawings for us before. And he had -- we've used him before in home renovations.

Q. Okay. And that's something that he -- so, he does the same thing for home renovations, he comes and oversees it?
A. He does, yes.
Q. How often was he at the job site for the rebuilding of the house?
A. I don't recall --
Q. Okay.
A. -- for sure.
Q. His name is Hank Long, correct?
A. Correct.
Q. Do you know who Henry Sprott Long is?
A. I believe he's Henry Sprott Long.
Q. Okay. He just goes by --
A. And then --
Q. -- Hank?
A. -- his dad was Sprott Long.
Yes.
Q. Okay.
A. And then, he has a son that's Henry Long.
Q. Got it. But the same company,

right? Henry Long --
A. Yes, Hank Long works at Sprott Long & Associates.
Q. Got it.
A. And that was the architecture firm his dad started --
Q. Gotcha.
A. -- Sprott Long.
Q. Okay.

(Whereupon, a discussion was held off the record.)

Q. (BY MS. AQUINO) I want to talk to you a little bit about the septic tank. I know that it was -- you had some discussions with Alycen during your examination under oath about whether there was damage to the septic tank and what was the damage. Did you guys ever figure out if there was any damage to the septic tank?
A. Yes, we figured out there was no damage to the septic tank.

Q. Was there any work done to the septic tank or septic field?
A. I'm sure we cleaned it, but I don't remember any repair work.
Q. Okay. Now, as far as Mr. Zlotnik, I know there was some discussion early on with Pacific about his fee and not being approved, and Pacific eventually paid fifteen thousand dollars towards his fee, correct?
A. Correct.
Q. And how much did his fee end up being?
A. About twenty thousand.
Q. Did he only come to the house that one visit in February or January of 2020?
A. He made one visit, yes.
Q. So, for the remediation of the basement and the garage, is that something that he just consulted over the phone?
A. Yes.
Q. Was there any guarantee given for

the remediation done to the garage and the basement?
A. Assuming TCC followed the protocol, yes.
Q. And who determines whether they follow the protocol or not?
A. I don't know. I have no reason to believe that TCC would not follow Cliff's protocol. But he did not come down here and check and I did not come -- I did not go check and say, show me exactly what you did, go down a checklist --
Q. So --
A. -- anything like that.
Q. And let me reask this because it maybe wasn't a great question. My understanding from what you've testified earlier is that Mr. Zlotnik would give a guarantee --
A. Uh-huh.
Q. -- that there would be no smoke odor provided that his parameters were followed by whoever was performing the work,

correct?
A. Correct.
Q. How was that determined and how do you get that guarantee?
A. I don't know. We didn't do obviously -- we did not remediate the house.
Q. Uh-huh.
A. It was just these specific areas. And they don't smell like smoke. We haven't had a problem, so --
Q. Okay. When you were consulting with him initially, did you guys ever get to that step above discussing what the guarantee entails and how you get that?
A. I don't recall because a lot of that was Dad discussing with him.
Q. Okay. The guarantee wouldn't come from him, correct? It would be from whoever performed the work?
A. It would be Cliff. Cliff is saying, if you follow my protocol, if there's any smoke odor in the future, you know, I'll redo it or -- that's my understanding of it.

Q. Give me one second. Let me -- I want to make sure we're on the same page because --

A. Okay.

Q. -- I believe there's something -- I'll mark this as Exhibit --

MS. AQUINO: Are we starting over? How have you and Alycen been doing it? Do you keep --

MR. DAUPHIN: The only ones we've used are the exhibits that I marked.

MS. AQUINO: Okay.

MR. DAUPHIN: So, we don't have any from --

MS. AQUINO: All right. So, we'll start this as Defendant's 1.

I only have three. I'm sorry. I did not know you were --

MS. PARIS: No, that's okay. We can share.

Q. (BY MS. AQUINO) And take a moment and just let me know when you're through.

(Whereupon, Defendant's Exhibit 1 was marked for identification and copy of same is attached hereto.)

A. All right. I've gotten the gist of it.

Q. (BY MS. AQUINO) Had you seen this email before?

A. Yes.

Q. And if I can direct you to the second page and the fourth paragraph down, which starts with my intent. The way it sounds from what this email says is that what Zlotnik was doing was coordinating with Brookstone so that Brookstone could guarantee the work, correct?

A. Yes.

Q. So, in this case, the work was performed by TCC following his protocols, correct?

A. Yes.

Q. Is it your understanding that TCC is giving you a guarantee that the work was

performed following his protocols and that there's no smoke?

A. No. This was from January 2020, and we had had conversations after that. So, my understanding was that Cliff would provide the guarantee.

Q. Okay.

A. That's my understanding of it.

Q. And that was what was represented to Pacific as well, was that Cliff was going to be providing a guarantee, but it doesn't sound like that was the case?

A. That -- I mean, that's my understanding of it.

Q. Okay. When did you learn that he wasn't going to be giving you a guarantee? Was this the first time that you learned, was in January of 2020, on January 14th of 2020?

A. My understanding of it was that Cliff was going to provide the guarantee. Like, we had had conversations after this.

Q. Uh-huh.

A. And so, my understanding has

always been that if Cliff's protocol is followed, I mean, he's guaranteeing that he's -- that it will be smoke free because this is his protocol. And if it's followed, he's on the hook. That's my understanding.

Q. Okay. When you got this email from him on January 14th of 2020, did it raise any red flags for you that he wasn't giving you a guarantee?

A. Not really. I mean, we -- because we were discussing. So, I was -- I was not overly concerned about this.

Q. Did you ever go back to him and say, my understanding was that you would be providing this guarantee and not whoever did the work was providing the guarantee?

A. I don't recall an exact discussion.

Q. Okay. Thank you, ma'am. Let me make sure I didn't write on it.

Okay. As we sit here today, is it your position that you are still owed amounts under the dwelling coverage of your

Pacific policy?
A. Yes.
Q. How much do you contend that you're still owed under that coverage, that portion of the coverage specifically?
A. Whatever we put in the proof of loss under dwelling.
Q. Okay. I actually have a more recent --
A. Do you want this back?
Q. No.
A. Okay.
Q. I just needed to give her one.
MS. AQUINO: And we only had one copy of this. Chuck, this is your responses to our interrogatories. And I'm looking specifically at Interrogatory Number 3, please.
MR. DAUPHIN: Hang on just a second. I'm trying to get --
Q. (BY MS. AQUINO) Bear with me one second. I just want to pull it up so I can --

A. Uh-huh.
Q. -- follow along.
MS. AQUINO: Can we go off the record for a second? It's going to take me just a little to find it.

(Whereupon, a discussion was held off the record.)

MS. AQUINO: Okay. We can go back on the record.
Q. So, what I've handed you as a copy of your interrogatory responses that were provided to us, now, my understanding is that these were prepared by your attorney, but have you seen these before?
A. Yes.
Q. Okay. Under Interrogatory Number 3, the question was: Please identify any and all amounts which you contend are owed under the policy and the reasons you believe there is coverage under the policy for those items. If you go down to the answer where there's

dwelling coverage, it's seven hundred and fifty-six thousand, one hundred and ninety-two dollars and forty-five cents, correct?

A. Correct.

Q. Is that the amount that you still contend you are owed under the dwelling coverage?

A. As long as we haven't amended these answers, then, yes.

Q. And how did you arrive at that figure?

A. We call them roadmaps. Do you -- are you aware of the roadmap that we submit in support of, like, our proof of loss? It --

Q. Yes.

A. -- goes line by line, the architect fee, the, you know, cost to rebuild, all that.

So, we added up the cost to remediate, the cost to repair the house, put it back the way it was before the fire. That

would be TCC's estimate.
Q. Okay.
A. Hank Long's architect fee based on TCC's estimate to repair. Without seeing that roadmap, I'm not sure I'm naming everything, but we added all of that up, the repair expense and --
Q. Let me actually see if I can pull it up because I want to make sure we're talking about the same thing. Bear with me one second.
A. Okay.

(Whereupon, a discussion was held off the record.)

MS. AQUINO: Okay. We can go back on the record.
Q. Are you able to follow along with --
A. Uh-huh.
Q. -- your dad?
So --

A. Uh-huh. Yeah. It's right here on this page --

Q. No, what he has on his computer. So, I can show you mine if you prefer, but it's the same document. It's the 29-4 Page 4 that was filed with plaintiff's motion for partial summary judgment. Is that what you were talking about as far as the roadmap? Is that what you called it?

A. Yes, that's what we call these little lists.

I'm confused, I'm not going to lie, because the --

MR. DAUPHIN: Well, why don't we just answer the questions.

THE WITNESS: Okay.

MR. DAUPHIN: Let's start there.

THE WITNESS: Okay.

A. What's your question?

Q. (BY MS. AQUINO) So, this is a document that you were talking about. And this document specifically has one million, twenty-four thousand, four hundred and

ninety-six dollars and twenty-seven cents as the remaining balance due; do you see that?

A. Yes.

Q. Now, in the discovery responses, the amount under dwelling was seven hundred and fifty-six thousand -- and I'm not going to go through all of the -- seven hundred and fifty-six thousand and some change.

A. Uh-huh.

Q. Do you know what is encompassed by this seven hundred and fifty-six thousand, one hundred and ninety-two identified in your discovery responses?

A. Not without my calculator.

Q. Okay. Can you give me an idea of what items are included in that?

A. Partial payments of TCC's demo costs. Just let me know if I need to elaborate on these. So, line item 1 --

Q. You said partial?

A. Partial. So, before you get to the remaining balance due where it says last check number, 470, Jeremy did send a check

for that thirty-eight thousand estimate.

Q. Okay.

A. And then, the forty-four thousand dollars was the total. So, Jeremy paid the estimate but not the actual cost of the work performed.

Q. So, from the TCC demo --

A. Uh-huh.

Q. -- about six thousand?

A. Five, six thousand, yes.

Q. Okay.

A. So, that should be in there. Five thousand roughly more for Cliff, the remediation expense, and --

Q. That's the three eleven nine thirty-nine eighty-nine; is that what you're talking about?

A. Yes.

Q. Okay.

A. The two million of TCC's reconstruction estimate minus the one point four million that I've credited --

Q. Okay.

A. -- at the bottom down there.
Q. So, that's about five hundred?
A. Yes.
Q. Okay.
A. Should include Hank's -- Hank Long's oversight fee or project administration fee.
MR. DAUPHIN: Do you want me to explain what I think the difference is or do you just want to go ahead?
MS. AQUINO: That's what I was trying to understand. So, if you know the answer --
MR. DAUPHIN: I think --
MS. AQUINO: -- I would -- I would like to understand it, yeah.
MR. DAUPHIN: I think, and we'll let -- this proof of loss was submitted in support of the claim.
MS. AQUINO: Okay.
MR. DAUPHIN: After this proof of loss, they paid an additional two hundred and something thousand dollars.

MS. AQUINO: Understood. So, that's --
THE WITNESS: Yes.
MS. AQUINO: -- the discrepancy?
THE WITNESS: Thank you.
MR. DAUPHIN: I believe it is.
MS. AQUINO: Okay. Thank you.
THE WITNESS: That's -- I'm glad you thought of that. I don't know if I was going to get there.
A. That is what happened.
Q. (BY MS. AQUINO) Okay.
A. Yes. So, everything here minus the additional amount that Pacific paid in, I believe, July of 2021 --
Q. Okay.
A. -- and --
Q. So, just to make sure we're on the same page --
A. Uh-huh.
Q. -- as we sit here today, as of April 2023, the dwelling amount that you contend is still due is what is listed in

Interrogatory Number 3?
A. Yes.
Q. Okay. Okay. Now, I want to move on a little bit to the contents claim.
A. Okay.
Q. We'll get to that section.
MS. AQUINO: And I appreciate that. Thank you, Chuck.
THE WITNESS: Yeah.
MR. DAUPHIN: I was trying to figure it out there for a while.
THE WITNESS: I was blanking for a minute.
Q. (BY MS. AQUINO) Actually, before we do this, let's talk about landscaping because I think that's going to be a little bit quicker.
A. Okay.
Q. You submitted a proof of loss for landscaping in the amount of one hundred and fifty thousand; is that right?
A. Yes.
Q. And that was based on -- what was

that based on?

A. That was based on estimates from a landscaping company chosen by our landscape architect that was overseeing everything, similar to how Hank would oversee a reconstruction project. Ben Page at Page Duke --

Q. That is the landscape architect?

A. That is the landscape architect.

-- his -- one of his assistants named Brittney Dingler -- she got married -- Brittney Dingler, she kind of -- she chose two companies to get landscaping from.

And it was just to put back the landscaping the way it was after the fire. The way it was prior to the fire. I'm sorry. I wasn't clear about that.

Q. I believe I have a copy of that estimate. All right.

MS. AQUINO: And this will be Defendant's 3 because I'll send you the other one.

A. Thank you.

Q. And what I just handed to you is an estimate by Southern Scape dated December 4th of 2020. Is this the estimate that you were referencing?

A. Yes.

Q. Now, there were other pages attached to this, but I kind of just want to talk a little bit about this very first page. There's an amount here for demo, mulch, and bed prep that's thirteen thousand, six hundred and seventy-four. Do you know what that entails?

A. Demo the dead plants, or plantings, all that stuff. Mulch and prepping, that's new fresh dirt, any labor that needs to be done to prepare for the replanting.

Q. Was there any -- was there any part of the landscaping that was damaged by the fire?

A. Yes.

Q. Where was that?

A. Mostly along the front of the

house.

Q. And what type -- I'm not looking for specific, like, tree names. But what kind of landscape did you have around the front or the areas that was damaged?

A. Sod and boxwoods were what were damaged.

Q. And that sustained fire damage, right?

A. Yes, they were singed.

Q. And then, there's some discussion throughout the claims process about some additional damage to other areas of the landscaping. Can you tell me a little bit about that?

A. Yes. Just from -- well, the -- they cut the water the day of the fire.

Q. Okay.

A. So, there was no irrigation. The debris removal trucks and the fire trucks just drove all through the yard. The irrigation system ran along our driveway in parts. And, I mean, these big trucks just

didn't stay on the driveway. So, it crushed portions of our irrigation system, the pipes and the -- I'm going to blank on the names. But it's like the little square things that direct the water to the various parts.

Q. Are you talking about a sprinkler?

A. No, like -- I'm sorry. I can't think of the name of it. It's part of the irrigation system --

Q. Okay.

A. -- but it, you know -- it's not the brain, but it -- you know, it helps -- the brain tells it when to have certain parts, like, come on and -- anyway, it had to be replaced, all those little --

Q. Okay.

A. -- boxes.

And, I mean, it crushed plants and sod, just tore up sod.

Q. The irrigation system that you mentioned, was there any damage to the irrigation system from the fire?

A. From the actual fire, no, I don't think so.
Q. Okay. When did you --
A. Not that I'm aware of.
Q. I'm sorry?
A. Not that I'm aware of.
Q. Okay. When did you notice damage to the irrigation system?
A. Immediately.
Q. The day --
A. The day --
Q. -- of the fire?
A. Once the trucks came up. At least by the time Brookstone had arrived with their debris removal trucks. They were -- I mean, they had so many trucks, they were just parking in the grass because they were out of driveway space.
Q. Okay. And what parts of the irrigation system -- I know you said it runs along the driveway, but what exactly runs along the driveway that was damaged by the trucks?

A. The pipes and --
Q. Okay.
A. -- then those square boxes.
Q. We'll just call it a square box.
A. Yeah. If you want me to Google it --
Q. That's okay.
A. -- and get the name, but it's not coming to me.
Q. Okay. And are these underground or are they kind of on top of --
A. They -- they're underground, but when the trucks were, you know, running off the driveway, it messed up the ground, and they weren't, you know, buried really far or anything. So, they ended up damaged.
Q. Okay. And when you say underground, you mean underground under the yard itself --
A. Yeah --
Q. -- not under the --
A. -- they'd be under --
Q. -- driveway, correct?

A. -- the sod.
Right, it would be under the sod. And then, when they drive through the sod and it, you know, moves it out of the way, and then, the trucks are, like, grinding on the pipe and the dirt. And it just crushed some pipes.
Q. Okay. And that is addressed in this estimate as well, right, by Southern Scape where it says irrigation? Is that what means, adjust irrigation as needed?
A. Yeah, that's to replace the irrigation system. I mean, there was so much damage overall that it did not make sense to go in there and start piecemeal trying to repair little bits.

(Whereupon, Defendant's Exhibit 3 was marked for identification and copy of same is attached hereto.)

Q. (BY MS. AQUINO) Now, the plants that are listed here, the install plant

material per plans, that is, total one twenty-two -- a hundred and twenty-two thousand, a hundred and seventy-seven dollars. What is -- what areas of landscaping is this intended to replace?

A. Every -- everything that was damaged.

Q. So, around the house?

A. Around the house and anything that lost -- that was lost because we couldn't get irrigation to it.

Q. Has the irrigation system been replaced?

A. Yes.

Q. And when was that done?

A. Summer of 2022.

Q. And who did the replacement of the irrigation system?

A. This time, we hired Peter Falkner of Falkner Gardens. And we also --

MR. DAUPHIN: Just answer the question. Go ahead.

A. Okay. We also -- we started --

we did some stuff with Landscape Services, Incorporated. And they did -- they hired -- oh, I don't know why I'm blanking on this guy's name. But Brandon Paracca. They hired him to do some irrigation around the house --

Q. (BY MS. AQUINO) Okay.

A. -- to repair -- I'm sorry.

Not to repair. I think we had some irrigation done around the house. We were just doing enough to get our CO at this point.

Q. Uh-huh.

A. Landscape Services could not fit us in their schedule --

Q. Okay.

A. -- in any reasonable time.

So, then, we moved to Peter Falkner. And then, he had Brandon Paracca finish what he had started with Landscape Services.

Q. Okay. So --

A. So, we had Brandon Paracca do the irrigation, but I honestly can't remember who

paid him and -- it could have been Landscape Services, Peter, and I would just have to go back and look.

Q. Okay. So, just make sure I'm understanding. So, the irrigation and the actual landscaping --

A. Yes.

Q. -- was done by June -- by summer of 2022, correct?

A. The irrigation was fully replaced, yes, by the end of summer 2022.

Q. The same with the landscaping, the actual plants had been replaced by summer of 2022?

A. Ish, yes. I don't remember when they installed the final ones. It may have gone into fall, but --

Q. Okay.

A. -- yeah.

Q. And that was done by Peter Falkner of --

A. Uh-huh.

Q. -- Falkner Gardens?

A. Yeah.
Q. And what was the other name, Paracca?
A. Brandon Paracca. P-a-r-a-c-c-a, I believe. He installed the irrigation and worked with Peter Falkner of Falkner Gardens and Landscape Services, Inc.
Q. Okay. Why did you decide to not move forward with Southern Scape?
A. Page Duke, the landscape architect --
Q. Uh-huh.
A. -- they split, and they're no longer --

(Whereupon, a discussion was held off the record.)

A. So, Page Duke split, and Ben Page was busy with other opportunities. So, we -- this is -- and this was an estimate that Ben Page's assistant, Brittney Dingler, had. I don't know Southern Scape.

Q. (BY MS. AQUINO) Okay.
A. So, we ended up going with Peter Falkner who's local and could do the install.
Q. Did Peter Falkner follow Page's landscape plans or did he come up with new landscape plans?
A. No, we have a new -- we have a new landscaping --
Q. Okay.
A. -- plan.
Q. And that was done by Peter Falkner?
A. Yes. He adopted and -- but there were a lot of changes.
Q. What changed, for example?
A. We laid sod to the street.
Q. Uh-huh. That's it?
A. We have, I mean, just some different plants.
Q. Okay. So, kind of a different look, but that was the main change, was the sod to the street?
A. Yeah. When -- yes.

Q. Do you know how much you spent for the replacement of the plants, the irrigation system, and all of that together?

A. I would have to add it up, but it's well over the estimate.

Q. Have you submitted those invoices to Pacific or in discovery?

A. No.

Q. Why not?

A. It wasn't a repair job. We just --

Q. What do you mean by that?

A. Well, we submitted the estimate to repair the landscape and put it back as it was. And this is a different design, different plan. So, we did not submit any of those costs.

Q. Are you -- do you intend to claim that as part of your damages from this claim, from this loss?

A. No, we already --

MR. DAUPHIN: Let me object --

A. I'm not sure.

MR. DAUPHIN: -- to the form.
THE WITNESS: Okay.
MR. DAUPHIN: This is confusing.
Q. (BY MS. AQUINO) Okay. Let me clarify it.
A. Okay.
Q. So, if you go back to your interrogatory responses, which are over here, I believe. Yeah. On Number 3, please.
A. Yes.
Q. Do you see where landscaping has one hundred and fifty thousand --
A. Yes.
Q. -- listed on there?
So, a hundred and fifty thousand is the limit of your landscaping coverage, correct?
A. Correct.
Q. Okay. What is that hundred and fifty thousand based on?
A. The estimate to repair (indicating) --
Q. Okay.

A. -- the landscaping.

Q. And you contend that the one hundred fifty thousand landscaping coverage is still due to you, correct?

A. Yes.

Q. Okay. Why have you not submitted the additional invoices to show that you have, in fact, replaced the items that were damaged and this is how much the loss was?

A. Because it's -- it wasn't -- we did an entirely different plan. I mean, we submitted what it would cost to put it back as it was.

Q. Was there any change to the irrigation system itself?

A. Yes.

Q. What was changed about the irrigation system?

A. It's -- I mean, it's different plants, it's a different layout, there's a lot more sod. It now runs -- covers a lot bigger area.

Q. Okay. You may recall that during

the claims process, there were some questions about this estimate and what was damaged and what was going to be replaced; do you remember that?

A. Will you ask me that again?

Q. Sure. When this estimate was first submitted, the Southern Scape estimate --

A. Yes.

Q. -- there were some questions that came up throughout the claims process about what this estimate was intended to replace or repair and what those items that were damaged were; do you remember that?

A. Yes.

Q. Okay. As the claims went on, none of those questions were addressed. So, what my question to you is, if you now have incurred those costs and to the certain extent from what we've discussed, it seems like those questions have been answered, why have you not submitted any of that documentation?

MR. DAUPHIN: I object to the form. The questions you've asked today were never asked in the claims process. We were asked to identify plants or which plants were missing or anything like that.

MS. AQUINO: Okay.

MR. DAUPHIN: It simply said it wasn't addressed. So, we object to the form and that's why we object to the form.

MS. AQUINO: Understood.

MR. DAUPHIN: And --

MS. AQUINO: Okay.

MR. DAUPHIN: -- the remainder of the question, go ahead.

MS. AQUINO: No problem.

Q. Why have you not submitted the actual expenses that you've incurred to repair or replace the plants, the irrigation system, any items that were damaged with respect to your landscaping plan?

A. Because that's not what we were -- it's not the same.

Q. And I understand that your

position is that there was changes made.
A. Right.
Q. But to the extent that you have those invoices, would you be willing to submit those so we can review them?
MR. DAUPHIN: That will be my call.
MS. AQUINO: Okay. Okay. We'll submit a supplement.
Q. But your position is that you have not submitted them because there were changes made to the irrigation system; is that it?
A. No, I haven't submitted them because it's a completely different job. We submitted the estimate to repair the landscaping to what it was the day of the fire, prior to the fire --
Q. Okay.
A. -- like, that morning.
And what we did was something completely different.
Q. The work, though, as outlined in

this estimate --
A. Uh-huh.
Q. -- by Southern Scape, this work was never done, correct?
A. As --
Q. Outlined here.
A. -- I said -- right.
And then, as, like, the plans from Page Duke dated 4/10 --
Q. Correct.
A. -- we did not do those plans.
We did something different.
Q. With a completely different company, correct?
A. Correct.
Q. Okay. And you have those invoices?
A. Uh-huh.
Q. Okay.
A. Yes.
Q. All right. If you go back to that interrogatory -- actually, before you put it away --

A. Uh-huh.
Q. -- I actually just want to keep that one up because we're going to reference it a couple more times.
A. Southern Scape?
Q. No, your --
A. Oh, the interrogatory.
Q. -- interrogatories.
A. Okay.
Q. Yeah. That, you can keep. I already gave her a copy of it.
A. Okay.
Q. Under that Interrogatory Number 3, if you go down to the very last line where it says ALE, two hundred forty-three thousand, four hundred dollars and fifty-six, cents. Is that the amount that you contend is still due to you under the additional living expenses of your policy?
A. Yes.
Q. And how did you come up with that figure?
A. I subtracted -- or I added up

everything that I had submitted for payment under ALE and subtracted the dollar amount that I received that was paid under ALE.

Q. What is included in this two hundred and forty-three thousand, four hundred dollars?

A. We'd need the roadmap to be specific.

Q. Is that the same document we were looking at earlier?

A. I'm not sure. It's similar looking, but it would have been --

Q. Okay. Let me see if I can pull that up.

A. -- ALE.

MR. DAUPHIN: I don't think that roadmap was filed in court because it's not part of the motion for partial summary judgment.

MS. AQUINO: Okay.

MR. DAUPHIN: So, it would just have to be connected to the proof of loss that was filed.

MS. AQUINO: Got it. So, give me one second.

We can go off the record for a minute.

(Whereupon, a brief recess was taken.)

Q. (BY MS. AQUINO) Ali, what you believe you're looking at is the additional living master list to -- we're going to attach this to the deposition as Exhibit 4. Have you had a chance to review this list?

A. Yes, I'm familiar with it.

Q. Okay. If you go all the way to the bottom of the list, it says that the total Pacific still owes under ALE, which is additional living expenses, is two hundred and forty-three thousand, four hundred dollars and fifty-six cents; do you see that?

A. Yes.

Q. Okay. And is that the amount that you contend you're still due as of

today?

A. Yes.

Q. Okay. As you go through this list, there is a number of highlighted items. Do you know what those are?

A. Those are the items that --

MR. DAUPHIN: No. The first -- well, she's coming up from -- make sure we -- there are lots of lines at different places. Make sure we know what we're talking about.

Q. (BY MS. AQUINO) So, let's start with Page 1. There is a highlighted list -- or a highlighted item on 12/9/2019 for five thousand, nine hundred and eighteen dollars and ninety cents.

A. That is highlighted because I submitted that expense under ALE, and Chubb/Pacific declined to pay that.

Q. Okay. So, that has not been paid at all?

A. Correct.

Q. All right. And then, go down to 12/17. There's HD Innovations, four

thousand, eight hundred and twenty?
A. Yes.
Q. Okay. Has that also not been paid at all?
A. Correct.
Q. And what was this for?
A. That was to remove the burned audiovisual equipment from Dell Road and for HD Innovations to come to Fairway, the rental -- the first rental, and install the TVs there. And how do you -- oh, it says install TVs. Yeah. And as I mentioned earlier, meet with the cable guy and internet, set up all of that system.
Q. Okay. So, this was from Dell Road to Fairway only, correct, this particular expense?
A. Yes, those two addresses.
Q. Okay. Going back to the one on 12/9 that says RH order number 9 --
A. Uh-huh.
Q. -- was this the -- this the window treatments that you installed at the

Fairway house and then took over to Wimbleton?

A. Yes.

Q. Okay. Then, if you go down to December 30, 2019, this is TCC, and it's fourteen thousand, one hundred. This is the interior paint at Fairway, correct?

A. Yes.

Q. And I believe Pacific indicated in the past that this expense is not covered, correct?

A. Yes.

Q. Okay.

MR. DAUPHIN: Object to the form. They said that was their position.

THE WITNESS: Yeah.

Q. (BY MS. AQUINO) That was kind of my question was -- yes. So, let me rephrase.

So, the fourteen thousand, one hundred for the interior paint at the Fairway Drive, Pacific told you that this expense was not covered, correct?

A. That that was their position,

yes.

Q. Okay. And why do you believe that that is covered under the additional living expenses?

A. It's in line with our standard of living. It was required to maintain our standard of living.

Q. Have you -- did you ever -- and I believe I may have asked you this. And if I did, I apologize. Did you ever ask the landlord at Fairway Drive to paint the house before you moved in?

A. I don't recall a conversation about that.

Q. Is there a reason you didn't ask them to paint?

A. If I didn't -- now, I did ask to paint the bathrooms. And he said, you know, we could do it at our expense. The landlord wasn't really open to fixing up the rental house.

Q. Did you ever discuss a discount on your lease based on their unwillingness to

do any repairs or improvements to the house?
A. No.
Q. Okay. Now, going down on this first page, there's a different highlight color, but it's 1/15/2020. And this is fifty-eight thousand, five hundred. What is that?
A. That is the amount Jeremy paid toward the lease agreement for Wimbleton Drive. He paid only through December 31st, 2021, although the lease --
Q. So, this says through --
A. Did I put that wrong? No. I'm sorry. That's what -- he paid -- the lease went through 1/14/2021, and Jeremy only paid through December 31st, 2020. At that time, Pacific was not willing to pay any ALEs beyond December 31st, 2020.
Q. So, out of this fifty-eight thousand, five hundred, how much is still due? Is this a partial payment next to it? So, how much is due under this number?
A. Minus half a month's rent. So,

forty-five hundred divided by two. Two two five -- two thousand, two hundred and fifty.

Q. Okay. So, just to make sure we're on the same page. So, you're not saying that fifty-eight thousand, five hundred is still due, correct?

A. Right. I said partial payment. If you scroll down to the bottom of --

Q. Page 4 --

A. -- it has all of the checks --

Q. -- or Page 5?

A. Yeah, go to Page 5, and I've listed all of the checks that I received. So, payment was credited is what I'm looking for.

Q. And do you know of these checks which one you are counting as the partial payment for that rent?

A. That one was for thirty-seven thousand. Oh.

THE WITNESS: Go back up, please.

MR. DAUPHIN: Do you want to use the mouse?

THE WITNESS: Yeah, I'm not sure how to --

A. So, he -- am I allowed to use a calculator or do you want me to just say I don't know?

Q. (BY MS. AQUINO) If you'd like to use a calculator, that's absolutely fine by me.

MR. DAUPHIN: Can I make a suggestion?

MS. AQUINO: Sure.

THE WITNESS: You may.

MR. DAUPHIN: They didn't pay the fifty-five hundred, but the rent went up. Is that part of it?

THE WITNESS: No, this is before --

MR. DAUPHIN: Okay.

THE WITNESS: -- that happened.

MR. DAUPHIN: Never mind.

A. I would have to look at the invoices, and I'm happy to pull up those PDFs if you want me to to figure this out right

here. I just -- off the top of my head --

Q. (BY MS. AQUINO) Okay.

A. -- I'm not sure.

MS. AQUINO: Chuck, what I would request is, if there are any clarifications that you can make to this list so we can kind of understand what we're looking at, I would appreciate it. That was one of the things that we asked in our interrogatories to outline what it encompassed. I don't believe we've seen this list before. And I would appreciate so we can understand --

MR. DAUPHIN: Sure.

MS. AQUINO: -- what's in there.

And we don't --

MR. DAUPHIN: Yeah. I mean, I don't think I have a problem.

MS. AQUINO: Okay. Because I don't -- I don't want to waste our time going line by line if it's something that we can get a supplemental amended with outlines of what we need so we know what's in there.

MR. DAUPHIN: I will be more than

glad to do that, provided if we need something from y'all as to what your position is and was, we have some reciprocity here without being told submit an interrogatory and I'll consider it. So, if you want to work --

MS. AQUINO: Depending on what you ask them, sure. I mean, I don't know what you would be asking --

MR. DAUPHIN: Well, I mean --

MS. AQUINO: -- with that question but --

MR. DAUPHIN: -- there's plenty in this roadblock already where we're trying to hasten things up and was trying to make -- said if y'all could do this, we'll move along.

Well, send me an interrogatory and I'll consider it. So, I can respond to you now, you know, submit an interrogatory, and I'll consider it.

MS. AQUINO: Okay.

MR. DAUPHIN: But, you know, I

don't mind providing it to you.

MS. AQUINO: I appreciate that.

MR. DAUPHIN: But I want some -- if I have some questions on what your position was, I want some reciprocity. I don't want to beat my head against the wall getting it.

MS. AQUINO: To the extent that that's something that I can provide, I'll do my best to do that.

MR. DAUPHIN: Well, to the extent that --

MS. AQUINO: I don't know -- I don't know what we're talking about, so I can't --

MR. DAUPHIN: Well, I know. We've got -- you know, I'm just telling you in past experience with Alycen, it's just like pulling teeth. So, if y'all want to cooperate a little bit, I'm more than willing to. So, we can -- we can go ahead.

MS. AQUINO: I will work with you. But, again --

MR. DAUPHIN: Uh-huh.

MS. AQUINO: -- without knowing what we're talking about, I can't say yea or nay because I don't know what we're talking about.

MR. DAUPHIN: Okay.

MS. AQUINO: If there's some conversation that you had with Alycen that I wasn't privy to and that's what you're referencing, I can't speak for her. But if it's something that I can assist, I'd be happy to.

MR. DAUPHIN: Okay.

MS. AQUINO: And if you would like me to submit an amended interrogatory, I can do that, too. Otherwise, we're going to sit here for a while going through this list, and I'd rather not do that.

MR. DAUPHIN: Okay.

MS. AQUINO: I appreciate that.

MR. DAUPHIN: I am submitting some interrogatories on how Pacific came up with specific payments they made on the

dwelling coverage.

MS. AQUINO: Okay.

MR. DAUPHIN: So, if y'all will get to those, which I'll have out -- I think I'll have them ready tomorrow, I would do the same thing on this.

MS. AQUINO: I will address those.

MR. DAUPHIN: Okay.

MS. AQUINO: All right.

Q. Let's keep going. Let me see if there's anything else that we need to discuss now.

While you were in the rental properties, both Fairway and Wimbleton, what utilities, if any, were you still paying at Dell Road?

A. It varied. We -- I'd have to look to see when things came back on, but we did start paying electrical, gas, water, power at Dell --

THE WITNESS: I believe those were the main four, right?

Q. Okay. I know you --
A. -- at some point --
Q. -- mentioned that -- I'm sorry.
Go ahead.
A. Go ahead.
Q. Okay. You mentioned that the water was turned off on the day of the fire, correct?
A. Yes.
Q. When was it turned back on?
A. I would have to look at the invoices to see when we started --
Q. Okay.
A. -- paying that again.
Q. And is it the same thing with the electricity? Was that at some point turned off and then turned back on?
A. Yes.
Q. Same power company?
A. Yes.
Q. And who is that?
A. Alabama Power.
Q. How about your water company?

A. Birmingham Water Works.
Q. Was gas the same thing, turned off at some point and then --
A. Uh-huh.
Q. -- turned back on?
A. Spire.
Q. S-p-i-r-e?
A. R-e. Uh-huh.
Q. Okay. What other utilities did you have at Dell Road? I'm trying to think. So, electricity, gas, water. Did you have trash service or anything like that --
A. No.
Q. -- that you had to pay?
Okay. You had ADT at Dell Road at some point, correct?
A. Correct.
Q. That was turned off?
A. Yes.
Q. And while you were still at the rental house, was ADT ever on at Dell Road?
A. No.
Q. Okay. So, it kind of resumed

when you moved back in?
A. Yes.
Q. Okay. How about landscaping; did you continue to pay landscaping at Dell Road?
A. Yes, we did.
Q. Throughout the entire time, the 2020, 2021?
A. Uh-huh. Yes.
Q. And who was doing your landscaping services at Dell Road?
A. Dell Road, we had Fidel Lopez and Blackjack Gardens.
Q. And what services were they doing at Dell Road while you guys were at that the rental houses?
A. They tried to keep plants alive. Anything that could be salvaged, we tried to do that. And then, just as best as possible, maintain a tidy appearance for the neighbors' sake.
Q. How often would -- did you use them interchangeably or was it both of them provided services?

A. We ended up discontinuing Blackjack Gardens and then just used Fidel Lopez.
Q. Okay.
A. They were doing the same jobs.
Q. When was the -- around what time did you discontinue using Blackjack?
A. I would have to look at the invoices. I don't remember.
Q. Okay. But at some point, that was replaced by Fidel?
A. Yes.
Q. Okay. How often were they coming out to Dell Road?
A. It's like, roughly, once a week during, like, spring, summer, fall, and then, every other week during winter.
Q. Is that every two weeks for winter?
A. Yes.
Q. How about cable and internet; was that still on at Dell Road while you were at the rental houses?

A. No.
Q. And your cable provider at Dell Road, is that also Charter?
A. AT&T.
Q. For both, cable and internet?
A. I believe so.
Q. Okay. Any other expenses as far as utilities that you had at Dell Road that continued while you were at the rental houses?
A. Not that I can recall.
Q. There's a charge here for Mr. Buggs, which, I believe, is pest control.
A. Oh, yes. Sorry about that.
Q. Did you continue having pest control come out to --
A. We --
Q. -- Dell Road?
A. -- did until the house was demolished.
Q. So, until around June --
A. June.
Q. -- of 2020?

A. Yes.
Q. And was that also Mr. Buggs at Dell Road?
A. Yes.
Q. Sorry.
A. You're fine.
Q. And then, you discontinued pest services at Dell Road until you moved back in?
A. Yes.
Q. Okay. How often did pest control services come out to Dell Road?
A. Seasonally. So, four times a year.
Q. Okay. And what services did they provide at Dell Road?
A. The pest control?
Q. Yes, ma'am.
A. They just sprayed the exterior for pests.
Q. So, this was exterior only?
A. Yes, unless they went inside and I didn't know. I wasn't there when they

came, so --
Q. Okay.
A. -- up to them.
It's eighty-five dollars regardless of what they do.
Q. Understood. All right. Let's see if there's anything else over here.
If you go to Page 2, at 5/20/20, there's one for -- a line that says BWWB. What is that?
A. That's Birmingham Water Works Board.
Q. Got you. Thank you.
Now, if you go all the way to Page 4 starting on 4/7/2021, there's several highlights going down all the way to the bottom of the page; do you see that?
A. Yes.
Q. My understanding is these were charges that were never submitted to Pacific; is that correct?
A. They were submitted to Pacific. They just were not paid.

Q. And so, all of these that are highlighted on Page 4, these are outstanding?
A. Yes. Let me amend my answer a bit about the utilities. Some at Dell, I mean, I paid, like, a nominal fee for a while for the account to stay current or something. But I would -- I need to look back at this list. I went -- I went over it all with Alycen, though.
Q. So, remember there was a discussion about, I believe it was your water. It was, like, an eight-dollar charge to keep it current. Is that what you're talking about?
A. Yes, or something. Some --
Q. And, like, if you go --
A. -- basic.
Q. -- to Page 2, on 2/11/20, there's a charge for five dollars and forty-three cents.
Is that kind of what you're talking about?
A. Yes.

Q. Actually, never mind. This says final rental at Fairway Drive. So, this is not it.
A. One of my ALE monthly roadmaps, I made a note. I'm sorry. It's not super relevant. I just wanted to make sure I was being as accurate as possible.
Q. To the extent that you had those charges, you said that these bills were, like, the nominal fee just to keep the account open?
A. (Witness nods head.)
Q. But it wasn't, like, regular utility bills for use of the water or gas --
A. Yeah.
Q. -- whatever it is?
A. Yeah. So, if it was still, like, the account was still open in our name but they obviously weren't using any water or gas, then --
Q. Okay.
A. -- yeah.
Q. And as far as the rental

property, were you responsible for all utilities at the Fairway house or were there any included with the lease?

A. Oh, no. There were not any included with the lease.

Q. So, all of water, gas --

A. Was --

Q. -- all of those were your expenses?

A. -- for the renters, yes.

Q. Same with Wimbleton, these were all the renter's expenses?

A. Yes.

Q. Okay. Am I correct in understanding that if you look at this list, the highlighted items are the items that are still due?

A. Yes.

Q. Okay. Thank you. And I see on this list that it does include your moving costs back to Dell Road towards the end of the list; do you see that?

A. Yes.

Q. Is that the final invoices for moving back to Dell Road?
A. Yes.
Q. Okay. Do you have any other invoices that you intend to submit under your additional living expenses coverage that are not outlined in this list, which ends on 3/11/2022?
A. I don't believe so.
Q. Okay. You did not submit the invoice for the move back to Dell Road, correct, to Pacific?
A. We did through the lawyer. Uh-huh.
Q. This one on February 10th of 2022, this was submitted to Pacific?
A. Yes.
Q. Okay.
A. As -- I believe so.
Q. ADT was your security company at Dell Road as well, correct?
A. Yes.
Q. Okay. All right. Now, I'm going

to talk about the contents coverage.
A. Okay.
Q. Let me go back to that.
MS. AQUINO: And, Chuck, I believe she might need your computer again.
MR. DAUPHIN: Do you have that blown-up copy of that was attached to Wally's deposition on the contents lists?
MS. AQUINO: I believe I do.
MR. DAUPHIN: That will be a lot easier.
MS. AQUINO: Is this what you're referencing (indicating)?
MR. DAUPHIN: Yes.
MS. AQUINO: I will give this to you and I will just pull up mine.
Yeah, this is it. I'm going to mark that as Exhibit 5, please. And it will be that copy (indicating).

(Whereupon, Defendant's Exhibit 5 was marked for identification and copy of same is attached hereto.)

Q. (BY MS. AQUINO) So, what I've handed you and we've marked as Defendant's Exhibit 5, this was used by your attorney at one of the depositions. I believe this was prepared by him. If you can take a look. Take some time to go through it. Just let me know when you're done.

A. I'm familiar with this.

Q. Okay. All right. Now, if you go back to the interrogatories that you had in front of you. Under, again, Interrogatory Number 3, if you go to contents, it says four hundred and seventy-one thousand, ninety-one dollars and forty-seven cents. Is that the amount that you contend you're still owed under the contents coverage of your policy?

A. Yes.

Q. Okay. And this exhibit that I just handed you, Exhibit 5, is that how you came up with that figure?

A. Not entirely.

Q. Okay. What else went into that calculation?

A. There's another roadmap that would be attached to the contents proof of loss, I believe.

Q. Let me pull that up.

MR. DAUPHIN: Is it easier for you to look at that?

(Whereupon, a discussion was held off the record.)

Q. (BY MS. AQUINO) I'm going to make this as big as I can, but let me know if this is what you're referencing. And this was filed as part of plaintiff's motion for summary judgment. Is that what you're referencing?

A. No. It's an itemized list similar to the roadmap for the dwelling --

Q. Uh-huh.

A. -- proof of loss that just listed the contents checks that have paid -- been paid and then -- it itemizes -- well, I mean, this is just one line on that roadmap.

And it also included Magali Somers' amount. She restored our antiques.

Q. Okay.

A. It included those expenses. It noted the payments that were made to CRDN that did textiles.

MS. AQUINO: Chuck, can you pull up 29-7, which was attached to your motion for summary judgment? Can you see if that's what she's referencing?

THE WITNESS: Do you know what I'm talking about?

MR. DAUPHIN: Yeah. That doesn't help me a lot. You're looking where you totaled everything up and then took off the payments that were made, and you got a grand total that showed what you were seeking?

THE WITNESS: Yes, it was, like, in chronological order --

MR. DAUPHIN: Right.

THE WITNESS: -- things that were paid and things that were submitted.

I can pull it up on my computer,

but that's not official.

MR. DAUPHIN: All right. Hang on. You say 29 dash 7?

MS. AQUINO: Uh-huh. That's what was attached to the contents proof of loss that was filed with the court.

MR. DAUPHIN: All right. I've got that. I don't think the roadmap -- there you go.

THE WITNESS: There it is.

MR. DAUPHIN: Yeah. 29 dash 7.

Q. (BY MS. AQUINO) Is that what you were referencing when you said the roadmap for the --

A. Yes.

Q. -- contents?

Okay.

A. Okay.

MS. AQUINO: So, I'll send this to you as well. This will be Exhibit 6.

Q. So, if we want to talk about it, is it easier for you to talk about that one or the 29 dash 7?

A. Well, this -- if you want to know how I got to this four hundred and seventy thousand that I believe is still owed, we can go through --

Q. Okay.

A. -- the roadmap.

Q. Perfect. So, let's do that. Give me one second and let me make it a little bit bigger on my end.

Okay. So, what we're looking at on Defendant's Exhibit 6, this was attached to plaintiff's proof of loss for the contents, correct?

A. Correct.

Q. And is this a spreadsheet that you prepared?

A. Yes.

Q. Okay. So, I know that there's been a lot of discussion about some of the items listed here and the costs and all of that. Is there any notation in this spreadsheet that the information comes -- where the information comes from as far as

what the replacement cost is?
A. No, all of that is in this contents inventory for the invoices that I submitted for Magali. But they had already been paid probably.
Q. So, let me ask you this: So, let's go to line Item --
A. Uh-huh.
Q. -- Number 1 to start with.
MR. DAUPHIN: Are we on the roadmap?
Q. (BY MS. AQUINO) We're on the roadmap --
A. Okay.
Q. -- on the 29-7.
So, it says, living room, there's a Knole sofa, and then, there's an asterisk next to it.
A. Yes. Okay. So, if you go all the way to the bottom of the contents inventory spreadsheet, the one asterisk means -- I'm sorry. It's right here. Right above the total, one asterisk means that the

items are included in receiving and initial storage fees. And then, two -- because I just kind of grouped those fees together at the bottom.

Q. Okay.

A. Like, this is what it's going to cost to, like, get -- and to receive and store these replacement furniture pieces. And then, some are subject to delivery fees, and then, some are subject to installation fees. So --

Q. So --

A. -- there you go.

Q. -- let me make sure that I'm following that.

So, if you go back to Item Number 1, and what I'm looking at is what was attached to your proof of loss.

A. Right.

Q. So, that was -- that is, I believe, what's on the computer.

MR. DAUPHIN: Well, what page of that? Are you looking at --

MS. AQUINO: The very first page.

MR. DAUPHIN: Okay. Well, hang on.

MS. AQUINO: So, 29-7, 1.

Q. Actually, let's start here, because this might make it a little bit easier. What is the differences between the spreadsheet that was filed as the exhibit to plaintiff's proof of loss, which is 29-7, Defendant's Exhibit 6, and the contents spreadsheet, which is Defendant's Exhibit 5, which you have in your hands?

A. The difference between the roadmap and this (indicating)?

Q. Uh-huh.

MR. DAUPHIN: Well, if I may because I --

MS. AQUINO: Okay.

MR. DAUPHIN: I don't think she's talking about just the roadmap. I think she's talking about this whole document --

Q. (BY MS. AQUINO) Yeah --

MR. DAUPHIN: -- 29-7.

Q. (BY MS. AQUINO) -- I'm talking about, like, what is the difference between these two documents?

MR. DAUPHIN: Not just the roadmap, which was the last page. Do you see what I'm getting at?

THE WITNESS: This --

MR. DAUPHIN: No, you need to --

THE WITNESS: -- contents?

MR. DAUPHIN: You need to reference what exhibit you're talking about.

Q. (BY MS. AQUINO) So, that's 5.

A. So --

Q. I mean, here.

A. 5, which is the contents inventory. So, Defendant's Exhibit 5, which is the contents inventory that I prepared, is line -- it's the contents claim that is the line item in the roadmap. Does that answer your question?

Q. I'm not sure I follow.

A. Okay. This whole document, the number, the total of this whole document --

Q. Okay.
A. -- is this line item right here (indicating), the one million three three six.
Q. Hold on. Let me -- let me find that.
MR. DAUPHIN: On the roadmap.
A. On the roadmap.
Q. (BY MS. AQUINO) I want to make sure that we're talking about the same thing, so bear with me one second.
A. Sure.
Q. So, Exhibit Number 5 is respective to the line item that says one million, three hundred and thirty-six thousand; is that what you're talking about?
A. Yes.
Q. Okay. So, what's in Defendant's Exhibit 5 is a breakdown of this total, correct?
A. Yes.
Q. Okay.
A. Correct.

Q. So, what is Defendant's Exhibit 6, which is what's on the computer? What is that document --

MR. DAUPHIN: I don't understand what all Defendant's Exhibit 6 is.

MS. AQUINO: It's that one. It's just I haven't printed it yet. I'm just going to email it to her.

MR. DAUPHIN: Are you talking about just the roadmap?

MS. AQUINO: Yes.

MR. DAUPHIN: Okay.

MS. AQUINO: 29-7, all ten pages of that.

MR. DAUPHIN: All right. Well, that's not just the roadmap. Okay. We're talking about Defendant's Exhibit 6, Ali. We're talking about all of this.

A. Is that -- that is my -- our sworn statement and proof of loss under contents.

MR. DAUPHIN: Correct.

Q. (BY MS. AQUINO) Correct. And

then, there is a spreadsheet that was attached to it as an exhibit, correct?

A. Which is this (indicating).

MR. DAUPHIN: Well --

THE WITNESS: Is it not?

Q. (BY MS. AQUINO) That's what I'm trying to understand.

A. Oh, it's not color coded. But is it the same?

MR. DAUPHIN: Other than --

THE WITNESS: Color coding for Wally's deposition.

MR. DAUPHIN: I think there are a few changes at the very bottom where you did some additional calculations.

THE WITNESS: Oh, okay.

MR. DAUPHIN: It's ninety-five percent -- ninety-nine percent the same.

A. Oh, yeah. Yes. Okay. So, the difference here is I added up the original cost --

MR. DAUPHIN: You need --

A. -- total.

MR. DAUPHIN: -- tell us what --
THE WITNESS: I'm sorry.
THE COURT REPORTER: I can only get one at a time.
A. Okay. So, Defendant's Exhibit 5 --
Q. (BY MS. AQUINO) Uh-huh.
A. -- differs from Defendant's Exhibit 6 in that I, for Defendant's Exhibit 5, have added up the original cost total.
So, it's in bold on Defendant's Exhibit 5. I added up that column. And it totals six hundred and fifty thousand, four hundred sixty-six. I also totaled the replacement cost column next to it. And that number is one million two oh three eight six four thirty-seven. And I totaled the total column, which is one million three three six two seven three three zero.
Q. Okay.
A. And then, I added a color key (indicating) to Defendant's Exhibit 5 that just -- everything blue is the replacement

cost is higher than the original cost and so forth for each color. And I also have a little box (indicating) where I did some math.

Q. Okay. So, that's what I want to talk about.

A. Okay.

Q. Let's talk about this box on Defendant's Exhibit 5, the red box.

A. I have an easier way to do that math.

MS. DAUPHIN: Well, wait a minute. She gets to do it the way --

THE WITNESS: Okay.

MR. DAUPHIN: -- she wants to.

A. Okay. I'm sorry. I just wanted to save us some time.

Q. (BY MS. AQUINO) And I believe this is something that you've done, correct? This spreadsheet, this is something that you --

A. Yes. Iris --

Q. -- produced?

A. -- helped with the spreadsheet.
Iris Thorpe, my decorator, we collaborated on the spreadsheet. But I did the pink box on the math --
Q. Okay.
A. -- yes.
Q. So, that pink box has total original amount column, and that is the six hundred and fifty thousand, four hundred that you talked about. That is what you added up based on the receipts that you had, correct?
A. Yes.
Q. Okay. So, the items that are outlined in Defendant's Exhibit 5, there are some items that don't have an original cost?
A. Yes.
Q. These items are not factored into the six hundred and fifty thousand and some change, correct?
A. Correct.
Q. Okay. So, the only items that were included in this total are the items for which there is a number listed under original

contents total cost in this list; is that right?

A. Yes.

Q. Okay. All of those items together, that totals the six hundred and fifty thousand, four hundred dollars and sixty-six cents --

A. Yes.

Q. -- right?

Okay. Now, the one million, two hundred and three thousand, eight hundred sixty-four thirty-seven, that is the total for all of the line items identified in this Defendant's Exhibit 5 based on the replacement cost that is listed on this spreadsheet, correct?

A. Yes.

Q. Okay. Now, the replacement costs that are listed on this spreadsheet, the source of the replacement cost, is that where it says reference? So, like, if you go a little bit to the right, each item has a reference column?

A. Yes. Oh, no. I'm sorry. The reference column, it's the invoice that backs up the original cost.
Q. Okay.
A. Sorry about that.
Q. And that's for every item?
A. If it's --
Q. If it has a reference?
A. Yes.
Q. Okay.
A. If it has a reference, it's to the original cost.
Q. Is there anything in Defendant's Exhibit 5 that lists the source of the replacement cost value?
A. Is there anything in Defendant's Exhibit 5 that references the replacement cost source --
Q. Yes, ma'am.
A. -- specifically?
I don't believe so.
Q. Do you recall throughout the claims process that there was some questions

about the sources of the replacement costs that were included in this spreadsheet?

A. Can you ask that again?

Q. Sure. Do you recall having discussions throughout the claims process where there were some questions asked about the sources of the replacement costs that were listed in this spreadsheet?

A. In general, yes.

Q. Okay. And were you ever asked to produce documents supporting the replacement costs that are listed in this spreadsheet?

A. Yes.

Q. What did you produce in response to those requests?

A. A letter -- an affidavit from my decorator --

Q. Okay.

A. -- swearing that these were the replacement costs that she would charge me to replace these items.

Q. And from what I've seen, you were then asked to go back and ask for information

based on how that number was determined, correct?

A. Alycen asked me to obtain her wholesale acquisition costs.

Q. Did you ever do that?

A. No.

Q. Why not?

A. That's not -- I don't have access to that information.

Q. Do you know where -- it's Iris Thorpe, right?

A. Uh-huh.

Q. Do you know where Iris sources her materials or her products?

A. As far -- I mean, I know that she talks to companies and representatives in showrooms.

Q. She doesn't actually -- she doesn't have any inventory herself, correct?

A. Correct.

Q. So, she goes to different stores and purchases an item and then resells it to you as a decorator; is that right?

A. Yes.
Q. So, to the extent that she is purchasing these items, she is paying an original cost to the person that she's purchasing from; is that right?
A. Yes.
Q. And then, she does whatever she needs to do -- there's markup, there's delivery, there's tax, whatever it is that she charges, and that's the final cost to you, correct?
A. Yes. Sometimes I pay a mover for a delivery fee and storage fee or The Workroom sometimes. And that goes through Iris.
Q. I'm sorry?
A. No, I was about to say The Workroom, but that's still billed to Iris. Sometimes I'll pay the mover separately but --
Q. From her --
A. From her -- like, I'll pay Valley Moving --

Q. Okay.

A. -- to move -- to deliver something, a sofa --

Q. Uh-huh.

A. -- instead of Iris.

Q. And is that from Iris'?

A. I mean, she'll order it. I'll purchase it through Iris & Company, but it'll be delivered to Valley Moving, and then, they'll bring it to me. And I pay Valley Moving. So, sometimes delivery is part of the Iris total replacement cost and sometimes it's an additional cost.

Q. So, Iris doesn't always charge for delivery because sometimes you arrange that separately; is that right?

A. Yes.

Q. Okay. When she gives you an invoice, for example, the invoice that you reference for this Knole sofa on Line 1 --

A. Uh-huh.

Q. -- there is an invoice number 421, does she tell you where she purchased

the sofa from?
A. It says Knole sofa --
Q. Is that all it says?
A. -- on the invoice.
Uh-huh.
Q. And does it have a total? We were doing good.
A. Go ahead.
Q. Okay. So, the invoice just has one line, for example, Knole sofa, total price, and then, I would imagine that there's, like, tax and delivery fee if applicable and a total; is that right?
A. Yes.
Q. So, as far as what Iris produces to you, there is no source information from where the Knole sofa came from, correct?
A. Correct.
Q. But, presumably, Iris would have that information somewhere, correct?
A. Yes.
Q. Did you ever ask her in connection with this claim to produce either

the source names where she sourced these products from or any information from when she arrived at these numbers?

A. I did not.

Q. Why not?

A. I had already incurred expenses, her hourly expenses in getting her help to determine these replacement costs. And I didn't -- I still don't believe that I needed to go back and incur more expenses to get information that's not relevant to the replacement cost.

Q. Did she ever tell you that she would charge you to give you that information?

A. Yes. It's an hourly rate for her time.

Q. Did she ever tell you how much she would charge you to do that --

A. Two hundred dollars an hour is her charge.

Q. Okay. Did she ever give you an estimate of how long she estimated it would

take her to produce those materials?
A. No, I didn't ask her to produce them.
Q. Okay. As far as the items that are outlined here, you have moved it back into the Dell Road house, correct?
A. All of these?
Q. No, no. I mean, you, yourself.
A. Oh, yes.
Q. Okay.
A. Was that a question?
Q. That was a question, yes.
A. Yeah.
Q. You have moved into the house, correct?
A. Yes.
Q. Okay. Do you have a list that identifies which of these items you have, in fact, replaced?
A. No, I do not have a specific list for that.
Q. Okay. Do you have the invoices for the items that you have replaced?

A. Yes.
Q. Okay. Have you produced those to Pacific or in discovery?
A. I'm not sure.
Q. Okay. Is there any way that you can identify which of these items -- and I'm not asking for you to do it right this second -- that you can identify which of these items have, in fact, been replaced?
A. Yes.
Q. Okay. I want to talk a little bit about -- where is that?
MR. DAUPHIN: Whenever you get to a stopping point, I'm going to need one more cup of coffee.
MS. AQUINO: Oh, that's fine. Can I ask you for one as well?
MR. DAUPHIN: Absolutely.
MS. AQUINO: We can take a break, then.

(Whereupon, a brief recess was taken.)

MS. AQUINO: Okay. We're back on the record

Q. Going back to Defendant's Exhibit 5, I believe you mentioned that there was a spot in here that you identified was outstanding from Magali's invoices. Is that on Defendant's Exhibit 5 or Defendant's Exhibit 6?

A. 6.

Q. 6. Okay. And can you point me to where that is on Defendant's Exhibit 6?

A. The last page. So, the Magali payments are noted on 1/14/20. There was -- that payment included fifty-three thousand, five hundred for Magali.

Q. Okay. I see where you're talking about.

A. Yeah.

Q. The line item that's negative two oh four four six three?

A. Yes.

Q. Okay.

A. So, out to the side, I noted part

of that is towards Magali.
Q. And that's the amount that was paid, correct?
A. Yes, that was paid.
Q. Okay.
A. Then, the remaining balance for that first estimate was paid, the twenty-three thousand, eight hundred twenty-five, and then, fifteen thousand.
Q. So, is --
A. Was that paid?
Q. Sorry. Go ahead. There's a line item that starts negative twenty-five thousand on 3/30/20 that says Magali advance number two; do you see that?
A. Oh, yeah. There it is. Okay.
Q. That amount was also paid, correct?
A. Yes.
Q. Is there any portion of Magali -- am I pronouncing her name right, Magali?
A. Yeah, she's Magali.
Q. -- Magali's invoices that are

still outstanding for which you have not been paid?

A. Looking at this, I don't know.

Q. I'm sorry. I didn't hear you.

A. Oh, looking at this right now, I don't know.

Q. Okay. Thank you.

MR. DAUPHIN: We can respond today.

THE WITNESS: Yeah.

Q. (BY MS. AQUINO) If you go on that same page that we were just looking at, four lines from the bottom, there is a nine thousand credit, Asia Rug appraisal. What does that mean?

A. I credited back that amount that was already paid. If you look at the two oh four four six three three oh on 1/14 --

Q. Uh-huh.

A. -- there is that nine thousand that was paid for Asia Rug.

Q. Uh-huh.

A. So, I credited that amount back.

Q. To?
A. To the amount -- so, we started this top line with the total amount of contents coverage available --
Q. Uh-huh.
A. -- and then, I started subtracting either payments or invoices I submitted or estimates I submitted.
And then, I credited that nine thousand for Asia Rug back because it had already been paid.
Q. Okay. And is that the same thing as the twenty-four thousand five oh one where it says credit Enservio report?
A. Yes. And for that, twenty-four thousand, five hundred and ten, I made notes on Defendant's Exhibit -- well, it's actually the one in Defendant's Exhibit 6 --
Q. Uh-huh.
A. -- in that contents inventory where I say this item appears to be, you know, line item number whatever in the Enservio report.

Q. Okay.

A. And so, I credited back those amounts that -- on those items that had been paid as part of that two hundred and four thousand that included Enservio's total loss contents valuation. Am I explaining that well?

Q. I think I follow you, but I want to make sure. So, if you go back to the one that says negative two oh four, the one on 1/14 --

A. Yes. Okay. So --

Q. Okay. Keep reading. There is one that says Enservio total loss contents, and there's one forty-one -- a hundred and forty-one thousand, nine hundred and sixty-three and thirty cents. What does that mean?

A. That -- okay. So, the check for two hundred and four thousand four six three included one hundred and forty-one thousand nine sixty-three thirty based on Enservio's total loss contents valuations.

Q. Okay.
A. It also included fifty-three thousand, five hundred dollars towards Magali's first estimates --
Q. Okay.
A. -- that I submitted.
And it also included nine thousand dollars that Asia Rug -- Asia Rug received two of our rugs and valued them -- appraised them at nine thousand dollars. And so, those three things were included in that check for two hundred and four thousand.
Q. Okay.
A. And so, when I created the contents inventory, if I had been paid anything towards the content items I listed --
Q. Uh-huh.
A. -- I noted what -- let me give you an example.
If you look at --
Q. And you're on Defendant's Exhibit 5?

A. I'm on Defendant's Exhibit 5. If you look at the last line where it says dining room, labor to cut, deliver, install new rug pad --
Q. The last line on Page 1?
A. The last line just of the dining room.
Q. Hold on. Let me find it.
A. It's like right above the kitchen.
Q. I'm just making sure I'm on the right page.
A. Sorry. On the first page of the contents inventory.
Q. Okay. What line are you looking at?
A. I'm looking at -- it's the last line of the dining room room.
Q. Okay.
A. It says labor to cut, deliver, and install new rug pad.
Q. I see that. Okay.
A. Okay. If you go over and you

look at the notes, I wrote, this rug pad appears to be Item Number 436 in Enservio's report. And I included that amount that Enservio estimated. And so, those amounts will add up to this twenty-four thousand, five hundred that I credit from the Enservio report.

Q. Okay. Then, that two -- excuse me. That twenty-four thousand, five hundred and one, that is not part of the one forty-one total Enservio loss under 1/14/20; is that right?

A. It is. It's what I've credited back. I'm sorry. I know what I did, so I know -- basically, I created my own contents claim of items that I had invoices for from Iris. I could prove, you know, what they cost and --

Q. Okay.

A. And so, if any of these -- I just did not look at Enservio's report when I made this.

Q. Okay.

A. So, then, after I made this, if there was any overlap -- for example, you know, this rug pad --
Q. Uh-huh.
A. -- in the dining room -- then, I made sure to see what I had been paid for those items based on the Enservio valuations.
Q. Okay.
A. And I subtracted it from the total number on this (indicating) so that I wasn't asking to be paid twice for any items. I made sure to credit what I'd already received towards the replacement cost.
Q. Okay. So, let's -- using the example that you just gave me because I want to make sure that we're talking about the same thing.
A. Okay.
Q. So, if you go to Defendant's Exhibit 5, there is an original cost for that item that is listed as six twenty-five. Is that the one you're looking at?
A. Yes.

Q. Okay. So, there's an original cost for six hundred and twenty-five dollars. Then, there's a replacement cost for six hundred and seventy-five dollars. What's the column after that? That is -- sales tax is sixty-seven fifty. Hold on a second. I lost my spot. And then, there's zero dollars after that. And then, there's a total of seven forty-two fifty, correct?

A. Yes.

Q. Now, next to that, it says paid Albright Orientals invoice. That is the invoice that references back to the six twenty-five original cost; is that right?

A. Yes.

Q. Okay. So, if we keep reading, then, there's your comment that says the rug appears to be Item 436 in Enservio's report, and then, there's an amount, one hundred fifty-four dollars and ninety-four cents?

A. Yes.

Q. Is the one hundred and fifty-four dollars and ninety-four cents, that is the

amount that you were paid for this item on the Enservio report?

A. Yes, as part of that one hundred and forty-one, I received a hundred and fifty-four ninety-four for this item.

Q. Okay. And every item that you've been able to identify from the Enservio report is kind of lumped together into that twenty-four thousand?

A. Well said, yes.

Q. Okay. And the twenty-four thousand fits into the one forty-one, correct?

A. It's added back at the end because I subtracted -- is that a fair way to explain it?

Q. So, what I'm trying to understand is --

A. Right.

Q. -- let's say -- let's use a round number.

Let's say you were paid a hundred dollars for items that were in the Enservio

report --
A. Okay.
Q. -- okay?
And then, you went back and you identified five of those items totaling twenty-five dollars --
A. Okay.
Q. -- okay?
There is seventy-five dollars technically unaccounted for out of that one hundred --
A. Yes.
Q. -- is that right?
A. Yes.
Q. How is that addressed in here, the items that were paid under the Enservio report but that are not part of the twenty-four thousand? Is there a way to identify that? Does that make sense?
A. It does. One hundred and forty-one thousand, roughly --
Q. Uh-huh.
A. -- minus twenty-four thousand,

five hundred and one ten.
So, the difference between the one forty-one and the twenty-four thousand would be items that are unaccounted for.
Q. Okay. That you were paid, but you don't know what you were paid for; is that --
A. Yes.
Q. -- what that means?
A. Yes.
Q. Okay. Understood.
A. They're not on this contents list (indicating).
Q. What do you mean they're not on this contents list?
A. They're not listed here (indicating). They're listed -- I may have complicated things. They're in Enservio's report.
Q. Okay.
A. They're not in my contents inventory.
Q. And when you say they're on the

Enservio report, do you mean the items themselves or the amounts in the Enservio report?

A. Have you seen Enservio's --

Q. I have.

A. -- report?

Okay. Yes, the items in there, a lot of those do not appear in my contents inventory.

Q. And why is that?

A. I don't -- I didn't know what they were talking about for a lot of items and I didn't go through to see if I had receipts for all of those. It was just -- a lot of them were small items that were just harder to, I guess, track.

Q. Okay. What I'm trying to understand --

A. Uh-huh.

Q. -- and I think that this is kind of -- we're talking about the same thing but in different terms, I think.

A. Okay.

Q. If you look at the Enservio report, the items that you've identified that are part of this twenty-four thousand, five hundred, those are items that were on the Enservio report and you were able to identify specifically which item that was; is that right?

A. Yes.

Q. Those items that you were specifically able to identify from the Enservio report are identified in Defendant's Exhibit 6, and there's a note about that credit; is that right?

A. Yes.

Q. Okay. The items that were on the Enservio report that you were not able to identify which ones you weren't paid for for whatever reason are not included in Defendant's Exhibit 6?

A. Yes.

Q. Okay. As far as the items that you are claiming as part of your contents loss, is everything that you are claiming

contained in Defendant's Exhibit 6 or would we have to look at Defendant's Exhibit 6 and the Enservio report and something else? How do we determine what exactly is being claimed?

A. You would look at the roadmap and -- so, the CRDN payments, the -- you would look at the Enservio loss contents, the Magali estimates, and the contents claim spreadsheets. So, if it's listed in this roadmap, it's part of the claim.

Q. I'm not sure that you understand my question. Let me --

A. Okay.

Q. Let me rephrase it.

What you're referencing as the roadmap, that is Exhibit 6, correct?

A. Yes.

Q. Okay. So, Exhibit 6 is ten pages, and then, there's -- the first nine pages are fairly similar to what is contained in Defendant's Exhibit 5, correct?

A. Yes.

Q. Okay. And then, there is an additional page that breaks down payments that you have received and how that breaks down, how these payments break down, correct?
A. Yes.
Q. So, as far as the contents claim, that specific line item that --
A. Okay.
Q. -- totals, one million, three hundred and thirty-six thousand --
A. Okay.
Q. -- that is outlined in the first nine pages of Exhibit 6 or Exhibit 5, whichever one we want to look at, are these items identified in the contents claim also identified in the Enservio report or no?
A. Sometimes.
Q. Is there any way to determine which ones are also listed on the Enservio report?
A. In my notes on the contents claim, which is Defendant's Exhibit 5 or --
Q. Okay.

A. -- the first several pages of 6, if I wrote this item appears to be number whatever in Enservio's report, then, it appears there.

If I did not make a note --

Q. Uh-huh.

A. -- then, the item does not appear in Enservio's report.

Q. Okay. So, any item that is not identified specifically in Defendant's Exhibit 5 with a note that says appears to be from Enservio report, we can disregard the rest of the Enservio report and focus on this as far as your claim goes? And this, I mean Exhibit 5 or 6.

MR. DAUPHIN: May I interject something?

MS. AQUINO: Sure.

MR. DAUPHIN: Okay. It's my understanding Exhibit 5 are the items in which she believes she has not been paid replacement cost on them.

MS. AQUINO: Okay.

MR. DAUPHIN: Now, on some of those items, she got paid something based on the Enservio report.

MS. AQUINO: And that's the twenty-four thousand?

MR. DAUPHIN: That's the twenty-four thousand.

MS. AQUINO: Got you.

MR. DAUPHIN: And those are marked by Enservio.

MS. AQUINO: Okay.

MR. DAUPHIN: The rest of them were not addressed by Enservio.

Q. (BY MS. AQUINO) Is that fair?

A. Yes.

Q. Okay. Understood. So, I think -- I think we're on the same page.

MS. AQUINO: Thank you for that.

Q. Give me one second. Let me just gather my thoughts.

A. Sure.

Q. So, going back to the Defendant's Exhibit 5, which is the one in your hand --

A. Uh-huh.
Q. -- if you go all the way to that pink slash red box at the very end --
A. Okay.
Q. -- the figures that are listed in this box which correspond to the amounts in your interrogatory responses, that amount is the figures that you've identified in this report for the replacement costs, correct?
A. You're talking about just this pink box (indicating)?
Q. Yes, ma'am.
A. No.
Q. Okay. I'm talking about the -- where you're -- where you see -- where is it? Actually, excuse me. That was my bad. Let me -- let me start over.
So, on the very final page of Defendant's Exhibit 5, there is a total. And that's the bolded one.
A. Okay.
Q. Okay. That number, that one million, two hundred and three thousand,

eight hundred and sixty-four thirty-seven -- do you see that?

A. Uh-huh.

Q. -- does that number include the items that you've identified from the Enservio report that you have been paid for?

A. The one million --

Q. Two oh three.

A. -- two oh three, does it include items that I've identified from the Enservio report?

Q. Yes, ma'am.

A. Yes.

Q. Okay. So, that is listed -- that fits in here, is that right, that number, the one million, two hundred and three thousand?

A. Yes.

Q. Okay.

A. It's the same thing. If there's a note out to the side of the line item that says this appears to be in Enservio's report, then, yes, it's included.

Q. So, the -- if you go back to the

pink box at the very end, there is a total original column, six hundred fifty thousand, four hundred and sixty-six, and there's tax on this amount, sixty-five thousand, forty-five dollars and seven cents, total seven fifteen four forty seventy-three; is that right? Do you see that?

A. Sorry. Say that again. I'm sorry. I started -- my eyes are crossing.

Q. That's okay.

A. I'm sorry.

Q. Pink box, first line, says total original column, six hundred and -- we're just going to do six hundred and fifty thousand and change.

A. Yes.

Q. Do you see that?

Then, tax on this amount, sixty-five thousand dollars and change?

A. Yes.

Q. Total is seven fifteen and change?

A. Yes.

Q. Then, there's a note on the bottom -- and I know it says Alycen, but I'm going to assume that that means Pacific paid?
A. Yes.
Q. Okay. Pacific paid seven twenty-one and change --
A. Yes.
Q. -- is that right?
A. Yes.
Q. And then, there's a difference of negative six thousand, two hundred and thirty-seven. What does that mean?
A. I was trying to figure out -- Alycen said in her letter that Pacific was paying the original cost for these items.
Q. Okay.
A. And I added it up. It was six fifty four hundred sixty-six. And the check was for seven hundred and twenty-one. And I was trying to figure out the difference, like, what -- what was off.
Q. So, that six thousand, two hundred and thirty-seven is the difference

between your total --
A. Uh-huh.
Q. -- two lines above and then the one that says Alycen slash Pacific paid?
A. Yes.
Q. Okay. Understood. And then, how did you come up with the number in your interrogatories, which is four seventy-one ninety-one? Which columns do I need to look at to get to that number?
A. To get to the four seventy-one ninety-one, that is not going to be as easy as looking at columns. It's --
MR. DAUPHIN: So, what are we looking at?
A. It's one point five million on the -- I'm looking at Defendant's Exhibit 6 --
Q. (BY MS. AQUINO) Okay.
A. -- the roadmap again.
Q. Let me get to that part. Hold on.
A. To get that number, I did one

point five million, which was the contents available. I added seven thousand, five hundred for the CPI. And then, I subtracted what I have been paid under contents.

Q. And what is the CPI that you have listed here?

A. It's consumer price index, increase.

Q. Okay. And that's the seventy-five hundred?

A. Yes.

Q. Okay.

A. It's in the policy.

So, I added those together. That's the total amount available for me. And then, I subtracted the payments I had received except for the two payments that are highlighted in blue that I've added back.

Q. And you're talking about the nine thousand sixty and forty-seven thousand one seventy-seven?

A. Yes.

Q. And why were these added back?

A. Jeremy says in email that he mistakenly deducted the nine thousand from our contents.
Q. Okay.
A. It should have been ALE. And then, the forty-seven thousand that was a check paid to -- jointly to Charles and me and Brookstone Restoration, we disputed payment of that under contents.
Q. As far as the forty-seven thousand one seventy-seven, do you think that that needs to go under what portion of your coverage?
A. It needs -- we need to see -- and I itemized invoices from Brookstone. They had submitted a -- I guess, for payment --
Q. Uh-huh.
A. -- under contents, but there were dwelling materials involved.
They had come to pick up and transport ALE furniture. It was all grouped together and deducted from contents. And it should have been spread out over contents,

ALE, maybe debris removal, and dwelling.

Q. And this is Brookstone's invoice that you're talking about that was all kind of lumped together?

A. Yes.

Q. Okay. So, when it says disputed check voided and shredded, that means you did not cash the check; is that right?

A. No, I tore it up, shredded it.

Q. Okay.

A. Took pictures to document it.

Q. Did you ever call Pacific and ask them to void a check or stop the check?

A. No.

Q. Okay. Did you ever contact Brookstone to ask for an itemized invoice or ask them to resubmit an itemized invoice?

A. I don't recall who asked for that.

Q. At some point, that was requested from Brookstone?

A. Yes. I -- either me or Dad or Jeremy.

Q. Okay. Do you know if that invoice was ever received, that itemized invoice?
A. It was -- no.
Q. You don't know or it was not received?
A. Oh, I'm sorry. I don't know.
Q. Okay. All right. So, let me -- now, Magali is the furniture restoration person; is that right?
A. Yes.
Q. Okay. And I don't mean specifically what each item was. What, in general, was she restoring?
A. Our antique furniture and artwork and just some pieces that had sentimental value.
Q. And as far as that restoration, was it kind of -- was it cleaning from the smoke remediation? What was she doing to those pieces?
A. Cleaning, repairing, getting rid of the smoke odors.

Q. Okay. Had you worked with Magali before?
A. Yes.
Q. And what had you used her in the past for?
A. Repairing furniture. Usually when I purchase an antique piece, I'll have her go over it to clean it and kind of annual or semi-annual maintenance of our antiques.
Q. Okay. How does she -- does she charge you hourly for her work?
A. Yeah, by the day pretty much.
Q. Like, this is what I did --
A. Yeah.
Q. -- this day total?
A. Yeah.
Q. It's not by piece does she work on?
A. For this, she did itemize it by piece --
Q. Okay.
A. -- in her estimates.
Q. And these are the estimates that

I believe you reference. There is an initial payment for her and then the two additional payments. These are based on her estimates, correct?

A. Correct.

Q. Is Magali still working on any restoration pieces for you?

A. No.

Q. When was the last time that she worked on any pieces for you related to this claim?

A. I'm not sure.

Q. Now, in your discovery production, I saw a couple of messages between you and Magali back and forth talking about the estimates; do you recall that?

A. Yes.

Q. And, actually, let me pull it up so I don't misquote you. Give me one second.

(Whereupon, Defendant's Exhibit 7 was marked for identification and copy of same is attached hereto.)

MS. AQUINO: Thank you.
Actually, I have a copy for him.
MR. DAUPHIN: Thank you.
MS. AQUINO: You're welcome.
Q. And just take a second to go through these.
A. Me take a second or --
Q. Yes, you.
A. Okay.
Q. I just want to make sure that --
A. Yeah.
Q. -- when I ask you questions, you --
A. Okay.
Q. -- familiarize yourself with it.
A. Okay.
Q. Now, these are -- these were produced to us as part of your discovery responses. And they are not identified, but this is a text exchange between you and Magali; is that right?
A. Yes.
Q. And it looks like from the very

top, it starts around March of 2020 and it kind of goes through -- this exhibit at least -- until March 20th of 2020; is that right?

A. Yes.

Q. If you could go to the very top of Page -- actually, starting at the bottom of Page 1, the text bubbles on the right, it says, I know. Next time, we'll pay more attention. That is -- that is you texting, correct?

A. Yes.

Q. Okay. And then, it goes on to say, but it's okay. There's plenty that we claim that we don't -- and then, it goes on to the second page -- have to replace. I think it will work out just fine. That's also you, correct?

A. Yes.

Q. And then, it goes on another text bubble, don't hold back on your estimates, though. My goal is to max out the policy between you and Iris so that I wouldn't have

to get into the nitty-gritty stuff. Do you see that?

A. Yes.

Q. Is that also you?

A. Yes.

Q. What do you mean when you say don't hold back on your estimates?

A. So, we knew that we were going to hit our contents coverage max. And she warned me that her estimates were going to be expensive. And I didn't want her to decide which items to restore. Like, that's my job to prioritize that. So, she didn't need to make it fit into, you know, a number. You know, like, well, I just wanted, you know, to do Charles' childhood desk. I wanted her to give me all of the info, and then, I would decide what to repair, what not to repair --

Q. So, all of the info --

A. -- that sort of thing.

Q. -- for all of the items that you have given her --

A. Yes.

Q. -- at that point?

Okay. And then, based on whatever estimates she provided, you would make a decision on what you needed restored or not?

A. Yes, I would prioritize.

Q. Okay. You mentioned that you knew you were going to max out on contents coverage. How did you know that?

A. Looking at my invoices and what we had gotten started on, like, obtaining the replacement cost for and just looking at the Enservio pictures, the amount of things I had, I knew that we were going to hit, like, the max.

Q. Okay. These are dated March of 2020. So, approximately, five months after the fire?

A. Okay.

Q. Is that right?

A. Yes.

Q. Okay. How quickly did you realize after the fire that you were going to

exceed your contents coverage?
A. Probably February. It took me a minute to figure out how to approach my contents inventory unless I figured that out.
Q. And was that based on what you had documents listed as far as the items that you had purchased originally or is that based on the replacement cost that Iris Thorpe had given you?
A. Based on replacement costs.
Q. From Iris Thorpe?
A. Yes.
Q. Okay.
A. That we were working on.
Q. How did you work with Iris to get replacement item costs? Did you send her a list of items and say, I want these items replaced?
A. We went through our invoices that I had from her --
Q. Okay.
A. -- and did we still have the items, had they been, you know, recovered,

which fabric charge was the current one, you know, the current fabric on each thing.

And then, once we had our list, she started her process for obtaining replacement costs.

Q. So, you sent her a list, maybe not the same one but similar to what we were talking about on Defendant's Exhibit 5, which --

A. Yes.

Q. -- the item and --

A. We collaborated on this spreadsheet --

Q. Okay.

A. -- the list of items.

Q. Uh-huh. And is Iris only involved in replacing the items that you originally purchased through her or is she involved in replacing items that you may have purchased somewhere else originally?

A. Probably both.

Q. Okay. Could you give me an example, if you can think of, of an item

that, like, you purchased somewhere else originally that Iris is helping you replace?

A. Well, the -- for example, the linen press that was in the guest bedroom that we lost, it was an antique piece. I paid for it. I paid the antique shop for it, but she was with me. She had picked it out, you know, all that. So, she would -- she would go with me or she would look for a replacement linen press, for example.

Q. Okay. I believe I saw that. Let me find it. Linen press. Of course, I can't find it. Oh, here we go. So, that is on Exhibit 5, second -- third page. And it's the very first line for guest bedroom. Do you see that?

A. Oh, I'm sorry. Yes, I do see that.

Q. Okay. So, this is something that there's an original cost listed of nine thousand, five hundred dollars. And then, there is a replacement cost of twenty-two thousand, sales tax is twenty-two hundred,

zero for delivery fee. Total is twenty-four thousand, two hundred; is that right?

A. Yes.

Q. And then, there's the King's House Antique receipt. That is for the ninety-five hundred that you originally paid, correct?

A. Correct.

Q. The twenty-two thousand, how did you come up with that number?

A. Iris looked -- she checked antique stores, and then, you know, if we didn't have anything locally, she would call some of her go-tos and see if they had it in their inventory. And then, she also checked First Dibs and Cherish, which are online, I guess, they're stores. Antique stores can list their inventory --

Q. Uh-huh.

A. -- on these websites.

And so, she was looking for a Regency linen press. And that was the one she found. It was the only one she found,

actually.

Q. Okay. And this item is -- I lost my train of thought. This twenty-two thousand replacement cost is a similar item that was originally purchased, but it was the one that she could find that --

A. Yes.

Q. -- fit the description?

A. Yes, that was similar to the one that we had and lost.

Q. Okay. Have you replaced the Regency linen press?

A. No.

Q. Why not?

A. That one sold, and we have not found another one that is similar.

Q. Do you still have Iris working on locating one for you?

A. Yeah.

Q. Okay. Other than the affidavit from Iris that was submitted prior to this lawsuit being filed, do you have any additional documentation that you've received

from Iris or from any sources that you used to purchase replacement items that show what the replacement cost of the item was?

A. Other than -- say that one more time.

Q. Sure.

A. Let me follow you.

MS. AQUINO: Can you read that question back?

(Whereupon, the desired portion of the testimony was read back by the court reporter.)

A. I would have submitted everything that I had with the -- we submitted a lot of PDFs, so pictures --

Q. Uh-huh.

A. -- of these items that Iris found.

It was submitted -- I mean, I see it's not part of the proof of loss, but it would have, I believe, been submitted at the

same time, the backup documentation.

Q. Okay. We talked a little bit about this, but you've replaced -- maybe not all, but you've replaced some of the items listed on this spreadsheet, correct?

A. Yes.

Q. Have you submitted any of the receipts for the items that you have replaced?

A. Oh, I have not submitted them to Chubb or Pacific.

Q. Why not?

A. I don't have to.

Q. What makes you say that?

A. I don't have to replace the items to be paid, the replacement cost for them.

Q. But what makes you say that you don't have to submit the invoice?

A. For what I paid to replace it?

Q. Yes, ma'am.

A. Because I don't. It's -- the policy --

Q. Why do you say that?

A. The policy doesn't specify that I have to submit invoices for my replacement cost.

Q. You understand that Pacific had questions about how the replacement costs were determined, correct?

A. Yes.

Q. And the invoice for what you replaced, that would show what that replacement cost was, correct?

A. Yes.

Q. So, why would you not produce documentation that shows what the replacement cost was?

A. Because I don't have to, and I submitted an affidavit from my decorator explaining her process and verifying what the replacement costs are.

Q. So, the only reason you have not submitted it is because you believe you don't have to?

A. Correct.

Q. Okay.

MR. DAUPHIN: Did Pacific ever ask for that?

MS. AQUINO: We're not going to get into that now, Chuck.

Q. There's an estimate -- bear with me a second. Let me find it. There was an estimate submitted initially. And let me get -- this is going to be in that book. Let me get you a tab number. I feel like we've killed a lot of trees. I thought it was in here, but I don't see it.

There was an estimate from HD Innovations that you and Alycen discussed during your examination under oath that the total was thirty-six thousand, four hundred and fifty-one; do you recall that?

A. There's been several from HD Innovations, so I would have to see it to know exactly what it is.

Q. Well, that's what I'm looking for. If I remember correctly, that was an estimate to reinstall audiovisual materials at Dell Road. So, give me one second and let

me pull that up. I'm pulling it up.
A. Huh?
Q. I'm pulling it up.
I'll mark this as Exhibit 8.
MS. AQUINO: And I will send this to you.
Chuck, if you can -- I just --
MR. DAUPHIN: Okay.
Q. (BY MS. AQUINO) Let me know, and I can scroll down when you're ready.
A. Yes.
Q. Yeah.
A. I'm familiar. I know which one you're talking about now.
Q. If you'd just skip to the bottom page. Do you see that?
A. Yes.
Q. Okay. My understanding is that this was the estimate to have audiovisual equipment installed back at Dell Road once you moved in; is that correct?
A. Yes. Let me see.
THE WITNESS: Do you have that

pulled up?

MR. DAUPHIN: No, I don't think so.

THE WITNESS: Okay. That might be the ones highlighted.

MS. AQUINO: Do you want me to send this to you, Chuck?

MR. DAUPHIN: No. Well, I don't know. I'm trying to find it. Hang on a second.

Q. (BY MS. AQUINO) And that was going to be my question. There are some items highlighted in this estimate. Do you know what the highlighting is for?

A. Yes.

Q. Okay. What is that for?

A. The highlighted items are -- it's part of the dwelling and it's --

THE WITNESS: Thank you.

A. So, it's the labor to, like, rewire the house, or prewire, I guess that's what they call it, put that back, and the programming labor. It's, like, speakers.

These are all items that would stay, like, in a dwelling. So, dwelling items.

What's not highlighted are what I consider to be contents items that we would take with us. And we never asked for payment on any of that.

Q. Okay. So, this is to -- this particular estimate that is dated 2/18/20, this is to install audiovisual equipment where?

A. Back at Dell Road --

Q. Okay.

A. -- under dwelling.

Q. So, let me see if I understand correctly. The total amount of the estimate is thirty-six thousand, four hundred and fifty-one forty-eight. The highlighted items you are submitting under the dwelling portion of your coverage; is that correct?

A. Yes.

Q. And what about the remaining items, the nonhighlighted items?

A. They are not relevant at all.

Q. They were not being submitted at all?
A. At all.
Q. Okay.
A. I never asked for any of that to be covered under any part.
Q. And when you submitted this estimate, did you explain what this highlighted information was?
A. In the roadmap, yes. It would have the total of just the highlighted items.
Q. And when you say the roadmap, do you mean the dwelling roadmap?
A. Dwelling, yes.
Q. Okay. What we've marked as Exhibit 4? I'm making sure --
A. I'm not sure what number it was.
THE WITNESS: Do you still have it pulled up?
Q. (BY MS. AQUINO) I can pull it up.
A. Okay.
Q. It's the 20-9-4. Is that what

you're talking about (indicating)?
A. Yes, the thirteen thousand --
Q. Okay.
A. -- that says dwelling expenses highlighted.
Uh-huh.
Q. So, the thirteen thousand, one hundred and forty-one comes out of that thirty-six thousand invoice, and that's the only portion of that invoice that you are claiming?
A. Yes.
Q. Okay. Has that --
A. I think it's an estimate.
Q. And that was going to be my question.
A. Yes.
Q. So, this estimate was prepared well before you moved into the house?
A. Just to put it back, yes --
Q. Okay.
A. -- the way it was.
Q. And this was to install the

system that you had in place at the time of the fire?
A. Yes.
Q. Okay. Have you brought HD Innovations or someone else back to the house to do the audiovisual since you've moved back --
A. Yes.
Q. -- or before you moved back?
Do you have that invoice?
A. Yes.
Q. Have you submitted that invoice?
A. No.
Q. Was there any change to the amount that you are claiming under the policy with respect to audiovisual equipment installation?
A. No.
Q. Okay.
MR. DAUPHIN: Do you not want those invoices?
MS. AQUINO: I would like them, yes.

THE WITNESS: That's for the rebuild. Okay. Okay.

MR. DAUPHIN: So, same thing with the contents.

THE WITNESS: Yeah.

Q. (BY MS. AQUINO) Okay. All right. We are going to switch gears a little bit. Do you want to take a break before we get started or are you good to go?

A. Up to you.

Q. Okay. Are you aware that you've submitted an expert report as part of your lawsuit?

A. Yes.

Q. Have you seen that report?

A. Yes.

(Whereupon, Defendant's Exhibit 8 was marked for identification and copy of same is attached hereto.)

A. Thank you.

Q. (BY MS. AQUINO) You're welcome.

Just take a second to familiarize yourself and let me know when you're ready.
A. I am familiar with this report.
Q. So, what I've marked as Defendant's Exhibit 8, that is a report that was prepared in connection with this lawsuit by a Dr. Mary-Catherine Riner; is that correct?
A. Yes.
Q. And this was submitted in support of your claim for outrage; is that correct?
MR. DAUPHIN: No.
MS. AQUINO: Is that correct?
MR. DAUPHIN: No, it's sort of the bad faith claim primarily.
MS. AQUINO: Okay.
Q. Is that your understanding as well, Ali?
A. Whatever the lawyer says.
MR. DAUPHIN: I mean, it applies to both but --
Q. (BY MS. AQUINO) Okay. Have you had a chance to review this report?

A. Yes.
Q. Did you review this report before it was served on us?
A. Yes.
Q. Okay. How did you get in touch with Dr. Riner?
A. My lawyer found her.
Q. Had you met with Dr. Riner before?
A. No.
Q. According to this report, you had two meetings with Dr. Riner over Zoom; is that right?
A. Yes.
Q. And it looks like -- let's see -- those meetings were on February 7th, 2023, and then, February 21 of '23? I'm on Page 4.
A. Okay.
Q. Is that right?
A. Yes.
Q. Is that the only times that you met with her?
A. Yes.

Q. How long were these meetings with Dr. Riner?
A. I don't remember.
Q. Would you say over an hour each time, less than an hour?
A. Less than to around.
Q. Okay. And that was around an hour each visit, correct?
A. Yes, I believe.
MR. DAUPHIN: Don't be reading that until she asks you a question about it. I don't want you reading that and answering questions at the same time unless it pertains to the report. Thank you.
Q. (BY MS. AQUINO) I just want to make sure that you hear my question.
A. Yes. Yes. I'm sorry. I was looking at the dates.
MR. DAUPHIN: I know.
Q. (BY MS. AQUINO) Now, there's some discussion in this report starting on Page 1 about gaslighting. What is gaslighting from your understanding?

A. I think she defines it well, type of emotional and psychological abuse.

Q. What do you -- what makes you believe that what you've experienced as part of this claims process constitutes gaslighting?

A. Say that again, please.

Q. What makes you believe that what you've experienced as part of the claims process constitutes gaslighting?

A. I'm sorry. One more time.

Q. Sure. Do you want me to rephrase it?

A. Maybe.

Q. Okay. You've identified behavior as in conduct in this report that I believe you had told Ms. Riner -- Dr. Riner, correct?

A. Uh-huh.

Q. Starting on Page 2, there's a list of instances that you've identified to her as gaslighting, correct?

A. Yes.

Q. What makes you --

A. Some examples.
MR. DAUPHIN: Let me --
A. Well --
MR. DAUPHIN: -- object to the form and note that it's the opinion -- it's the expert's opinion.
Q. (BY MS. AQUINO) Okay. So, the -- if you go -- turn to Page 2 for me, please. Under the heading that says Action of Pacific and Gaslighting; do you see that?
A. Yes.
Q. Right after the second paragraph, there's an indentation that starts with Elliott laughed; do you see that?
A. Yes.
Q. Is this information that you gave Dr. Riner?
A. Yes.
Q. Okay. So, these statements under a review of the record, for example, these are statements that you gave Dr. Riner of what you've experienced throughout the claims process, correct?

A. She had documents to review as well. These are not all things that I've stated to her.

Q. Do you know where this information came from?

A. Whatever documents she may have been provided, any discussions she may have had with the lawyers, and my conversations with her.

Q. Okay. So, when it mentions that there is a statement made to you, would that information have come from you? So, it says --

A. It could have.

Q. Paragraph 2 says, the statement to Alexandra by the fire adjuster. It goes on to say specifically that the new mortgage payment must not have been -- do you see that?

A. Yes, I see that.

Q. Is that information that you provided to her?

A. I don't know if I provided that

to her or if the lawyer did or if there were some communications that she reviewed and saw that.

Q. Okay. When you reviewed this report, were there any statements contained in this report that you disagree with?

A. No. I put -- just saw it when I read it.

Q. Okay. As far as the summary of what conduct was reported in here, does that seems like a fair and accurate representation of what you've experienced?

A. Yes.

Q. Based on this information and these instances and conduct outlined in this report, what leads you to believe that this conduct constitutes gaslighting?

A. Going back to that first paragraph, under gaslighting, I do -- Jeremy was very manipulative, and he did try to exert his control. And as it says, questioning my sense of reality and confusion, anxiety, self-doubt, distrust. I

had -- I felt like I had no idea what was going on, what was happening to my home or my things. Like, I didn't have any control over it even though, like, I should have. And it was my home and these were my things.

You know, when we had conversations, when we agreed in the meeting to take the house down to the studs, and then, Jeremy would come back and say, I never said that, you know. I started -- I started to worry, like, he did, right. I mean, there were other witnesses, but I still -- I was questioning reality.

Q. Okay. There is a sentence in this paragraph that you just referenced, the very first paragraph, that says, resulting in confusion, anxiety, self-doubt, distrust, and the urge to isolate. Are these feelings that you reported to Dr. Riner or is this her statement about --

A. I did report feeling all of those things.

Q. Okay. If you go a couple of

pages forward -- and I'll give you a page. Page 7 under other psychiatric symptoms, second paragraph.
A. Okay.
Q. There is a depression inventory that Dr. Riner had you complete; is that correct?
A. Yes.
Q. And she goes on to talk about statements that you endorsed on the questionnaire. And it says, fear of worse happening, being unable to relax, pounding heart rate, and loss of control; is that correct?
A. Yes.
Q. Is that what you reported to her?
A. Those were boxes that I would have checked on the questionnaire --
Q. Okay.
A. -- that I reported, yes, feeling those things.
Q. And when you were completing that questionnaire, is that something that she

sent to you ahead of time for to you complete, and then, you discussed during your meeting or were you doing it in the meeting with her?

A. No, I did that ahead of time.

Q. Okay. And then, you talked about it?

A. Yes.

Q. Okay. Had you ever had any psychiatric or psychological assessment prior to your meeting with Dr. Riner?

A. Yeah, I had -- I mean, I had a therapist that I saw for years.

Q. And what was that for?

A. Therapy.

Q. There was some mention in this report that you had dealt with obsessive compulsive disorder in the past; is that correct?

A. Yes. Uh-huh.

Q. Is that something that you reported to Dr. Riner?

A. Yes, I did tell her that.

Q. And were you diagnosed with OCD?
A. Yes.
Q. Is that by the therapist that you just mentioned?
A. And a psychiatrist, yes.
Q. And when was that?
A. I believe it was 2007.
Q. Okay. Had you been receiving ongoing psychiatric or psychological treatment for your OCD?
A. I haven't in a -- in a while.
Q. When was the last time that you received treatment for that?
A. I don't remember.
Q. She mentions in this report that you were at some point prescribed Zoloft for the OCD; is that right?
A. Yes.
Q. Is that something that you still take?
A. Yes.
Q. And who is the prescriber of that Zoloft?

A. I believe it's Rob Spiegel, my general practitioner.
Q. Spiegel?
A. Spiegel, S-p-i-e-g-e-l.
Q. And you said that that's your primary care physician?
A. Uh-huh. Yes.
Q. Do you currently have any prescriptions from a psychiatrist?
A. No, this is just a continuation of that first prescription.
Q. Now, my understanding is that OCD manifests in different ways for different people. How does your OCD manifest?
A. Obsessive.
Q. Okay. What does that entail for you?
A. Lists --
Q. Okay.
A. -- and obsessive thoughts.
I can't turn them off.
Q. And that's something that you've been dealing off and on since 2007?

A. My -- I mean, my whole life, yes.
Q. Okay. Have you noticed anything that triggers your OCD?
A. Yeah, feeling like a loss of control.
Q. Okay. Aside from this claims process that is discussed in this report, what have you experienced since 2007 that has triggered your OCD, that you've noticed an exacerbation of your OCD?
A. Not much. Right -- I would say the only thing is, right before I had my babies, I was, like, crazy cleaning the house. But other than that, there haven't really been anything -- there hasn't really been an event that's triggered, like, a major -- I don't even know what to call it -- episode of --
Q. Okay.
A. -- list making or something.
Q. You mentioned that you've been dealing with OCD your whole life.
A. Yes.

Q. What prompted you to seek treatment in 2007?

A. My husband.

Q. Okay. Just something that you were going through in your marriage?

A. No, no. Just, you need to see a therapist.

Q. Okay. That's fair enough.

A. What's going on? There's a lot going on in my mind.

Q. And was that the only therapist that you saw, was around 2007?

A. Yes, and she referred me to a psychiatrist for the, like, official diagnosis and prescription. And then, I saw him, like, once, and I continued to see her for therapy.

Q. Okay. Have you had to return to the psychiatrist at any point to have the dosage of your medication adjusted?

A. No, that is doable -- my primary care physician can do it, can adjust the dosage.

Q. Okay.
A. So, not necessary.
Q. Since you were first prescribed Zoloft, has your medication, the dosage been adjusted?
A. Yes.
Q. How many times?
A. I don't know how many times.
Q. When was the most recent time that it was --
A. I don't know.
Q. -- altered?
A. It's been a while.
Q. Since this fire happened in 2019, has there been any changes to your medication?
A. No.

(Whereupon, a discussion was held off the record.)

Q. (BY MS. AQUINO) You mentioned that your OCD manifests in an obsessive

behavior. Is there anything that you can do or that you have done in the past that relieves those obsessive feelings?

A. Yes, I can make lists.

Q. And that helps you --

A. (Witness nods head.)

Q. -- how?

A. I feel like I have control over things that are -- that feel out of control.

Q. Okay. When you were dealing with this claims process, what, if anything, did you notice change as far as your OCD is concerned?

A. I mean, a lot more lists. Like, very detailed lists of things. I kept very good notes of what was going on. It just helps me, you know, process.

Q. Okay. What other symptoms did you experience that you relate to the claims process itself?

A. Just as far as, like, the obsessive compulsive disorder?

Q. In general.

A. In general?
Q. Any type of psychological symptoms.
A. I was not sleeping nearly as well. I had -- I could not turn off the thoughts. I would just lie awake wondering what else I needed to do because I wasn't getting specifics back from Alycen about what more was needed and going over and over events in my head, going over these, you know, inventory lists, like, had I made a mistake, had I missed a word, is there anything I could have done differently, is there anything I could have done better, just constantly. It took -- I'm sorry.
Q. Take your time. And if you need to take a break, just let me know.
A. And I missed time with my kids because I was working so much on these things and wasn't spending time with my friends because they couldn't possibly understand, like, what I was going through. And I don't just mean the fire. I mean just the

frustration of trying and trying and trying and being powerless.

I could not call Alycen and try to explain, like, a spreadsheet to her. I couldn't call her and say, what more, you know, do I need to turn in so that you understand where -- and I -- you know, so that we can get our claim paid and close this and move on and rebuild our home and replace our things without worrying about when it would resolve, things like that.

Q. Okay. Take a second.

A. Huh?

Q. Take a second.

A. No, that's fine. I'm sorry. It's just --

Q. Do you need to take a break?

A. No, no, no. It's okay. I can keep going. It's just a lot.

Q. Okay. Are you okay?

A. Yes.

Q. Okay. Again, if you need to take a break, let me know, okay?

A. It's okay. I mean, I have to talk about this, you know.

Q. As far as -- there's some discussion in Dr. Riner's report about posttraumatic stress disorder. Do you recall discussing that with her?

A. A little bit.

Q. Okay. And there is a comment in here that she talks about how some of the things that you've endorsed support a diagnosis of PTSD. Do you recall her telling you that?

A. I remember reading this.

Q. Did at any point during your meetings with Dr. Riner, was there any discussion about what, if anything, the actual fire to your home, what impact that had on you psychologically?

A. Sorry. Did I -- did we discuss --

Q. Yes, ma'am.

A. -- what impact the fire itself had?

Q. Yes, ma'am.
A. I don't recall exactly all of our discussions.
Q. Okay. Do you feel that the fire to your home was a traumatic event in your life?
A. Yeah. I mean, it was sad.
Q. Okay. What were the traumatic events that you've experienced that led Dr. Riner to conclude that you have posttraumatic stress disorder?
MR. DAUPHIN: If you know.
A. I don't -- I don't know what she -- did she -- is there a paragraph you're looking at?
Q. (BY MS. AQUINO) Give me one second and let me find that for you. Starting on Page 10, there's a PTSD checklist. And it goes into Page 11.
A. No, I don't know what --
MR. DAUPHIN: Wait till you get a question.
THE WITNESS: I'm sorry. I

thought she had asked a question.

MR. DAUPHIN: And she may have. I just don't recall it.

Q. (BY MS. AQUINO) I have, but I'll repeat.

A. Uh-huh.

Q. When you were discussing the PTSD checklist and --

A. Uh-huh.

Q. -- the impact event scale that are discussed in Pages 10 and 11 with Dr. Riner, what events did you describe to her as a traumatic or traumatic events in general?

A. Okay. It was not the fire itself. It was my dealings with Jeremy and Alycen.

Q. So, from your discussions with Dr. Riner and from what I'm gathering, is it your position that the claims process was more traumatic than the fire to your home?

A. Absolutely. Much more traumatic.

Q. Okay. There is a mention in here about generalized anxiety disorder. Is that

something that you had ever been diagnosed with prior, anxiety in general?

A. It -- as it related to my obsessive compulsive disorder, I did discuss that with my therapist, general anxiety that comes from not having control.

Q. Okay. And is that something that the Zoloft also addressed for you --

A. Uh-huh.

Q. -- that anxiety feeling?

A. Yes.

Q. Okay. You mentioned that you had difficulty sleeping. Had you ever experienced insomnia in the past?

A. No.

Q. Have you ever been on any medications for insomnia or difficulty sleeping?

A. No.

Q. Are you on any medications for it now?

A. No.

Q. Okay. How often would you

experience -- let's say, starting beginning of 2020, how often would you experience difficulty sleeping?

A. I don't recall exactly, but there was always a lot. Whenever something happened with Jeremy, Brookstone, like, when they were -- I found out they were exchanging the emails reducing the scope of work, whenever something like that would happen or we'd get an email from Alycen, I would have a lot more trouble after that.

Q. When you say emails from Alycen --

A. Uh-huh.

Q. -- about the claim itself?

A. Yes, or --

Q. Okay.

A. -- probably letters --

Q. Okay.

A. -- just her responses.

Q. Understood.

A. Yeah.

Q. When you -- what you experienced

is that you wake up in the middle of the night or you have difficulty falling asleep or both?

A. Both.

Q. And you mentioned that you had, I think, intrusive thoughts is what you --

A. Uh-huh.

Q. -- what you called it?

A. Yeah.

Q. What kind of thoughts do you experience?

A. It's -- you can't turn them off. When I -- I can't turn them off when I'm trying to go to bed or sleep or just when they occur during the day. And it's -- it could be, you know, I cannot believe that Jeremy did this or I cannot believe that Alycen responded this way or, you know, what could I do to fix this to move things along to be more clear. Like, once I get upset or, you know, feel confused or something, I can't just let it go.

Q. Okay. So, for the most part,

your intrusive thoughts are about things that have happened or are they mostly about things that could happen or, like, worst-case scenario type things?

A. No, it's about -- it's about what's happened --

Q. Okay.

A. -- and how wrong it is or how -- what could I possibly do to fix it or change it.

Q. And how often would you experience that?

A. I mean, probably every day. This is a constant --

Q. Okay. Is that something that you --

A. -- thought for me.

Q. -- still deal with today?

A. Yes. I mean, this is ongoing. So, yes.

Q. Okay.

A. There's something every day to think about.

Q. Has it changed in intensity or frequency at all over the past couple of years?
A. I mean, probably not.
Q. Kind of -- as often --
A. Still going --
Q. -- as intense?
A. Yes. Yes. Still is upsetting.
Q. Have you discussed these psychological symptoms and these feelings with any of your doctors or medical providers?
A. I'm not sure.
Q. Have you sought any treatment for it specifically either with a psychologist, a psychiatrist, or clergy member, anything like that?
A. Just talked with Dr. Riner.
Q. Just with Dr. Riner?
A. Uh-huh.
Q. Okay. Had you ever -- have you considered calling your psychiatrist or your psychologist to discuss any of these

symptoms?
A. I met with her once after the fire. It was primarily for the girls. But we did have a little time before they came in that I chatted with her. And then, she's retired.
Q. What is her name?
A. Renee Peacock.
Q. Like the bird?
A. Yes.
Q. Okay. And is she here in Alabama?
A. Yes.
Q. Was your husband present during your meeting with Dr. Riner?
A. No.
Q. Neither one of the meetings?
A. No.
Q. I assume, but correct me if I'm wrong, that your children were also not present, correct?
A. Correct.
Q. When you were meeting with Dr.

Riner, did she ask you about any traumatic events in your life other than the fire and the claims process?

A. I don't recall discussing any other traumatic events. I don't have any.

Q. Have you experienced any other trauma in your life that you believe contributed to your PTSD?

A. No.

Q. Now, it mentions on Page 5 that you assumed responsibility for the reconstruction of the home while consulting with your husband on major decisions. Is that a fair description of what happened?

A. Yes.

Q. And why is it that you took the bulk of that job?

A. I've always handled renovations. And I handled the first construction. And he's just not that interested in it.

Q. Okay. Did you have any increase or exacerbation of your OCD symptoms while you were going through the process of

building the house originally?

A. No.

Q. I'm still on Page 5, on the very end of that paragraph, first paragraph, it says, this led to feeling violated, distrustful, and a sense of complex grief; do you see that?

A. Where are you again?

Q. Page 5 --

A. Okay.

Q. -- under the heading The Claims Process --

A. Uh-huh.

Q. -- that very first paragraph.

A. Okay.

Q. And I'm specifically talking about the last sentence but take a moment to go through this paragraph so you can kind of know where we are as far as context.

A. Okay. Uh-huh. Yes. I'm sorry. I'm familiar.

Q. Okay. What do you mean by a sense of complex grief? What does that mean?

MR. DAUPHIN: If you know.
A. I'm not sure exactly what she means by that other than I often had trouble putting it all into words.
Q. (BY MS. AQUINO) Did you ever describe it as grief or is that Dr. Riner's word?
A. I believe that was Dr. Riner's word.
Q. Okay. What about the other symptoms identified in this paragraph, the violated and distrustful, is that --
A. Yes.
Q. -- things that you described to her?
A. Yes.
Q. And what do you mean by violated?
A. Mainly, when -- that's how I felt when Jeremy had Paul Davis remove things, the cabinets and countertops and stuff, out of the house. And we had told him that, no, Paul Davis could not do any work. And he just did it anyway. And these are my things.

And I felt violated at that point.
Q. Okay.
A. That was my word.
Q. And was the stressful also something that you related to her or is that her word?
A. I did relay that to her.
Q. Okay. Do you disagree with her characterization of a sense of complex grief?
A. No, it is -- like I said, it is so hard to put all of those feelings into words sometimes, but I did feel a lot of grief and --
Q. Over what?
A. Over how I was treated --
Q. Okay.
A. -- by Jeremy and, I guess, Pacific/Chubb, in the greater sense, and Alycen.
I mean, I bought this insurance policy. And, you know, initially, Jeremy's like, don't worry, we're going to take care of you. This will be a simple process.

We'll explain, you know, everything as we go along. And then, you know, within a week, it was just like a switch had been flipped and his personality changed. And he was -- he was unkind and he was very aggressive, he was very angry, he was very volatile.

And, you know, when I -- he was moving things out of the house and, you know, he wouldn't let things remain in our possession. I felt like I couldn't trust him or the -- or the insurance company.

Q. Okay.

A. I felt --

Q. Go ahead.

A. -- totally isolated and helpless.

Q. Okay. Did you discuss any of these feelings or emotions with your husband at the time?

A. Yes.

Q. What did he say to you, if anything?

A. I mean, I don't recall exactly, but, I mean, what can -- there's nothing you

can -- he could do.

Q. Did he ever suggest that you seek help or therapy for any of those feelings or emotions?

A. I mean, no. He was experiencing them, too. I mean, he understood exactly what I was feeling because, I mean, yes, this is our home. We own these things, and they're taken. And he heard Jeremy say, it's a simple claims process. You know, Chubb will take care of you. I mean, he heard and experienced the same thing, so he was not like you need to go get help.

Q. Okay. While you were going through the claims process, did you at any point reach out to your agent for assistance?

A. I think I emailed her one time.

Q. Okay.

A. Charles was in contact with her more.

Q. And did she help you in any way?

A. No. She was zero help.

Q. Okay. Meaning, that she just --

what she did wasn't helpful or she just didn't respond?

A. She sometimes responded but did not do anything to help --

Q. Okay.

A. -- at all.

She said she doesn't really deal with this.

Q. Okay. I believe this was your first time going through any type of insurance claim process, correct?

A. Yes.

Q. And that's homeowners, auto, anything like that?

A. Yes.

Q. Okay.

A. As far as I know.

Q. If you go to Page 6, and that is the third bulk of the text but the second paragraph on that page. It starts with Alexandra.

A. Uh-huh.

Q. It says, reported experiences

have added layers of complex grief. Again, is that complex grief, her characterization?

A. It is hers, yes.

Q. Okay. And then, it goes on to say, continues to struggle with feeling powerless, helpless, and anguish overall. Are those things that you reported to her?

A. Yes.

Q. Okay. And she feels wrongfully blamed by Pacific despite consistently answering questions, submitting evidence, and addressing concerns. Is that also things that you reported to her?

A. Yes, and things that she could have gleaned from reviewing documents.

Q. Okay. Do you agree with this characterization?

A. Yes.

Q. And then, it continues to say, continues to have feelings of inadequacy and incompetency. Is that what you reported to her?

A. That is her characterization.

Q. What did you describe to her that you were experiencing that led to --

A. I would be speculating. I'm not sure.

Q. Okay. Do you have feelings of inadequacy?

A. I mean, I may have fears of it, just submitting backup documentation, submitting invoices, and being told it appeared to be incomplete or it just wasn't good enough.

Q. Is that also -- it goes on to say feelings of incompetency. Does that kind of follow your --

A. Yes, fears of it.

Q. Is that something that you've experienced in the past?

A. Not really.

Q. And under medical history, she mentions that you, at times, take Tylenol PM; do you see that?

A. Yes.

Q. Is that something that you do

still?

A. Yes.

Q. How often would you say you find yourself taking Tylenol PM?

A. Several times a week.

Q. And were you taking Tylenol PM prior to the fire in 2019?

A. No.

Q. It says at the very beginning of medical history, exercising two to four times a week. Is that something that you still do?

A. Uh-huh. Yes.

Q. What's your exercise of choice?

A. I do weight training, go to Pilates with a trainer, and then, I also run and do elliptical.

Q. Do you feel that those methods of exercise help relieve any of your anxiety, OCD, anything like that?

A. No, not specifically. It's just for health.

Q. Okay. You mentioned that you took your kids to see your therapist; is that

right?
A. Yes.
Q. Were they experiencing any symptoms from the fire?
A. No, it was preemptive.
Q. Just to make sure that they were --
A. Yeah.
Q. -- okay?
A. It was shortly after the fire. Just make sure we got ahead of anything that might be -- but, yeah, that could be upsetting them.
Q. Okay. Did they report any feelings to you with respect to the fire?
A. I mean, I think it scared everybody.
Q. I think you said that two of your children were with you when you --
A. Two --
Q. -- came back to the scene?
A. Two were with me --
Q. Who was that?

A. -- when we came back.
Susie and Caroline, my younger two.
Q. Okay. And so, they saw the fire itself?
A. Yeah. Uh-huh.
Q. Have they experienced any issues with, like, nightmares or fear of being in the house or anything like that?
A. No. Kids are amazingly resilient.
Q. They really are.
A. Uh-huh.
Q. Have you experienced any feelings with respect to the fire itself, of maybe being afraid of being home or thinking of what could have been different if you had been home, anything like that?
A. In the beginning, I definitely thought, you know, what if -- what if I had been home. But, no. I don't always lock the doors. I'll turn on the alarm but not lock the doors in case something happens and

somebody needs to get in and get our dogs out again.

Q. Okay. Is that something that you still do currently?

A. Yes.

Q. Okay. Do you think that those feelings and fears contribute to your anxiety and your nervousness?

A. No. It's just kind of a behavior change I've made so that I don't have to worry about it.

Q. Okay. You mentioned earlier that your in-laws live down the street from you. Do they still live down the street from you?

A. No, they've moved.

Q. Okay. Do you have kind of a support system near you that if you needed to call for help, you could?

A. Yes.

Q. Okay. On Page 7, she talks about -- the very end says clinical personality scales.

A. Okay.

Q. It says, compulsive. Individuals with this pattern are socially isolative --

THE COURT REPORTER: Slow down.

MS. AQUINO: Sorry.

THE COURT REPORTER: Start that over.

MS. AQUINO: Okay.

Q. It says, compulsive. Individuals with this pattern are socially isolative with minimal personal attachments and obligations.

Do you agree with this assessment?

A. I don't know if that's about me or if that's --

Q. And that was going to be my question because it's not clear if this is something that she has discussed with you and this is her conclusion about you or if she's just discussing these.

A. If it's just a definition or something. I would not characterize myself as having minimal personal attachments or being socially isolative all the time. I was

a lot more when I was dealing kind of with Jeremy's treatment and stuff like that. So, kind of throughout the claims process and during this lawsuit, I'm a bit more isolative. But me generally, I would not characterize myself that way.

Q. Okay. Did you report to Dr. Riner that you kind of isolated yourself during this claims process?

A. I did.

Q. Okay. And on the next one, it says EE turbulent type. Do you know what that means?

A. Just what -- I'm just reading it on the paper.

Q. Let me know when you're ready.

Are these behaviors listed under the EE turbulent type things that you reported to Dr. Riner?

A. Possibly. I did -- I was upset when Pacific went silent during the remediation bid process. When there would be lapses of time without communication, that

was -- that was upsetting and I did feel vulnerable and out of control.

Q. There's a comment that says that they are also prone to decompensation when under stress. Is that something that you reported to her?

A. I think that would be something that she determined.

Q. Okay. Do you believe that you are prone to decompensation when under stress?

A. Decompensation.

Q. And if you don't know what --

A. I don't know.

Q. -- that means, that's fine.

MR. DAUPHIN: I was going to object to the form because I didn't understand it.

MS. AQUINO: I didn't write this.

Q. That is not something that you told her; is that right?

A. I did not use the word "decompensation".

Q. Okay.

MS. AQUINO: All right. I think we are pretty much done. If we can take a quick break just so I can go through my notes. And, if anything, I'll have maybe five, ten questions max.

THE WITNESS: Okay.

MS. AQUINO: Thank you.

(Whereupon, a brief recess was taken.)

Q. (BY MS. AQUINO) I have a couple of questions for you about some of the documents that were produced.

A. Okay.

(Whereupon, Defendant's Exhibit 9 was marked for identification and copy of same is attached hereto.)

Q. (BY MS. AQUINO) Okay. What I've just handed to you we've marked as

Defendant's Exhibit 9. This is part of the text messages that were produced to us. Can you tell me who this is with? Who are you texting in this chain?

A. Andrew Arrant, A-r-r-a-n-t, of Brookstone.

Q. Okay. And like with text messages with Magali, you are on the right and his messages are on the left, correct?

A. Correct.

Q. Okay. If you go down to February 28th, the very last text box on the left, he's talking about conducting the rest of the demo and got approval to remove everything else out of the house. I assume he meant except, but it says expect --

A. Right.

Q. -- the shower tile.

So, this will allow us to open up everything. Just wanted to keep you updated. What is he talking about here?

A. I got -- it could be a number of things, and I'm not exactly sure what this

exact one's about.
Q. Okay.
A. The shower tile is the master bathroom shower, though. I do know that.
Q. Okay. And as far as the open everything up, is he talking about, do you know, like, the bottom floor or the house itself? What is that referencing?
A. I believe it's some part of the -- of the main level.
Q. Okay. And was this part of taking the house down to the studs that we talked about?
A. Yes.
Q. Is that what was happening around February of 2020?
A. Yes.
Q. Okay. You mentioned that -- I believe you terminated your relationship with Brookstone, was it in March of 2020?
A. I believe so.
Q. Okay. Were there any conversations that you had with Brookstone

prior to terminating the relationship or did you just say I don't want to work with you guys anymore?

A. Their -- I don't believe I had any.

Q. Okay.

A. But Dad, as our lawyer, may have.

Q. Okay. Do you know if your husband had any conversations with him?

A. He did not.

(Whereupon, Defendant's Exhibit 10 was marked for identification and copy of same is attached hereto.)

Q. (BY MS. AQUINO) I'm handing you what I've marked as Defendant's Exhibit 10. Take a second to review it. Can you tell me who these text messages are -- who are you texting in this chain?

A. I am on the right, and L'Tryce Slade is who I'm texting.

Q. And is he with Slade Remediation, or she?
A. She is, yes, Slade Remediation, or Slade, LLC.
Q. And when he says John and I, who is John, the very first line?
A. John is who L'Tryce was -- would have used for the mold remediation.
MR. DAUPHIN: You said John or Sean?
MS. AQUINO: John.
THE WITNESS: John.
MS. AQUINO: The very first line.
THE WITNESS: At the very top.
MR. DAUPHIN: Oh, okay.
THE WITNESS: Do you see it?
MR. DAUPHIN: I'm sorry. Got you. Thank you.
THE WITNESS: Okay.
Q. (BY MS. AQUINO) So, does John work for Slade Remediation?
A. No.
Q. Okay. And down to the bottom, on

March 30, it says, please be open-minded to Sean. Who is Sean?

A. Sean is who Slade would have contracted to do the smoke remediation portion of the remediation as opposed to the mold.

Q. Okay. So, did he come to meet you at the house, Sean?

A. He did, yes.

Q. Okay. And did he ever do any work for you guys?

A. No.

Q. Did Slade Remediation ever do any work for you guys?

A. No.

Q. I'm still on that March 30th exchange. On the right, you have a message that says, I was very impressed with Sean. It says, everything we've wanted from Chubb, we've eventually gotten by citing Cliff's expertise. When you say Cliff, are you talking about Zlotnik?

A. Yes.

Q. Okay. And what are you referencing here?
A. Well, that we agreed with Jeremy that we would be taking the house down to the studs. He backtracked on that and didn't do it. And the only -- or I won't say the only. How we eventually got the house taken down to the studs is we called Cliff, and Cliff did his testing and prepared a report and gave his professional opinion that the house needed to be taken down to the studs. And that is why Jeremy agreed to it.
Q. Okay.
A. And so, just to -- Sean would have looked at Cliff's protocol.
Q. Sean would have?
A. Yes.
Q. Okay. I have one more I need your assistance.
A. Okay.
Q. What was that one marked? Is that 10?
A. 10.

Q. Thank you.

(Whereupon, Defendant's Exhibit 11 was marked for identification and copy of same is attached hereto.)

Q. (BY MS. AQUINO) All right. I'll hand you what I've marked as Defendant's Exhibit 11. And it's two pages. This was part of your document production. Can you tell me what this is?

A. I cannot.

Q. Have you seen this email before?

A. I've not. I'm not on this chain.

MR. DAUPHIN: This has nothing to do with this case.

MS. AQUINO: Was this produced in error?

MR. DAUPHIN: Yeah.

MS. AQUINO: Okay. Got you. I will take that out.

The L'Tryce that's mentioned,

that is the same L'Tryce that we were talking about?
MR. DAUPHIN: Yes.
MS. AQUINO: Okay.
Q. There's been some documentation submitted as part of the claims that you are alleging in this lawsuit. Specifically, there was an affidavit that you completed. Do you recall that?
A. Yes.
Q. Okay. And this is the affidavit I'm talking about (indicating). I'll give you a copy --
A. Yes.
Q. -- if you need it.
I'm not making this as an exhibit but --
A. Okay.
Q. -- just in case you need to look at it.
Did you draft this affidavit?
A. No.
Q. This was drafted by your

attorneys and then presented to you?
A. Yes.
Q. Okay. Did you read it before you signed it?
A. Yes.
Q. And on the very -- actually, I'll go ahead and make this 12 just so we're not worried about who we're talking about.

(Whereupon, Defendant's Exhibit 12 was marked for identification and copy of same is attached hereto.)

Q. (BY MS. AQUINO) So, we've marked this as Defendant's Exhibit 12. And on the last page, Page 8, that is your signature, correct?
A. Yes.
Q. And this is dated April 19th, 2022; is that right?
A. Yes.
Q. There are some statements

contained in this affidavit -- and if you want to take a second to look through it, that's absolutely fine -- of discussions that you had with Pacific throughout the claims process. There's some quotes in here. Did these quotes come from you?

A. Can you -- do you have a specific one in mind?

Q. Sure. Let me find one. Page 3.

A. Okay.

Q. It says, Pacific refuses costs saying initially, and then, there's a quotation.

A. Oh, that's from Alycen's letter.

Q. Okay. Let's see. Now, I understand that you have presented amounts that you believe you are still owed under different portions of your coverage with Pacific; is that right?

A. Yes.

Q. What, if anything, do you believe Pacific did wrong in the claims process in assessing your claim?

A. It's laid out in our complaint.
Q. In your own words. I'm not looking for legal terminology.
A. I like that answer.
Q. Okay. I kind of need to understand from you what you believe was done incorrectly.
A. Everything or --
Q. Specifically or -- like I said, I'm not looking for legal terminology. I understand that that's something that your attorneys prepared that document and that there's legal claims outlined in there. But from your perspective, what was done wrong about the claims process?
MR. DAUPHIN: And we have in the answers to interrogatories provided --
MS. AQUINO: Okay.
MR. DAUPHIN: -- extensive lists, the bad acts and everything else.
I think it's a little unfair to ask her to recall all of those without letting her access those.

MS. AQUINO: I have the interrogatories over there if you'd like to point me to where you outlined that.

MR. DAUPHIN: It's specifically Interrogatory Number 14.

MS. AQUINO: Thank you.

MR. DAUPHIN: And we filed an amendment to that as well, or I sent it to y'all yesterday. We've got to sign it in front of a notary. We didn't have a notary yesterday.

Q. (BY MS. AQUINO) So, I'm going to read this for you. So, Interrogatory Number 14 says, please set forth in detail the basis for your claim that Pacific acted in bad faith as alleged in the amended complaint. The answer is, the first amended complaint sets forth in detail the basis for plaintiff's allegations that Pacific engaged in bad faith. The outline of acts of bad faith submitted as part of plaintiff's remediation statement provides additional information which serves as a basis for the

bad faith allegations.

Did I read -- you can -- you're more than welcome to review that. Did I read that correctly? I'm on 14.

A. You probably did.

Q. Okay.

A. You did.

Q. Is this what you're referring to as far as the outlines of bad faith acts (indicating)?

MR. DAUPHIN: Yeah.

A. Yes.

Q. (BY MS. AQUINO) Can you take a second to review that? And I know this is several pages but just take a moment.

A. Okay.

MR. DAUPHIN: Can we mark this as an exhibit?

MS. AQUINO: Yeah. We are on 14?

Q. Is that 13 was the last one I handed you?

A. I did not mark -- I think this was 12. It's not marked.

Q. Okay. So, 13 --
A. This is 13, yes.
Q. If you can just put that on there. Thank you.

(Whereupon, Defendant's Exhibit 13 was marked for identification and copy of same is attached hereto.)

Q. (BY MS. AQUINO) All right. So, we've marked Defendant's Exhibit 13 as a document titled Outline of Chubb/Pacific Bad Faith, correct?
A. Yes.
Q. Okay. You did not prepare this document, correct?
A. Correct.
Q. As you've had a chance to review this document, is there anything that you disagree with that is contained in this document?
A. No.

Q. Is there anything that you need to add to this document as far as specifically acts of alleged bad faith on the part of Pacific or Chubb?

MR. DAUPHIN: We've filed an amendment to that answer, which you should have a copy.

MS. AQUINO: I'm specifically talking about this outline.

MR. DAUPHIN: I know. The amendment to this answer has additional acts of bad faith which aren't in this one.

MS. AQUINO: Talking about the one that you sent out yesterday?

MR. DAUPHIN: Yeah.

MS. AQUINO: Let me pull that up.

Q. Okay. And I don't have this printed out because this was just sent yesterday. But the amended to your Interrogatory 14 response identifies an additional act of bad faith. It specifically says, Pacific stated that it was willing to pay an additional hundred and

twenty-four thousand dollars, seven hundred fifty -- a hundred and twenty-four thousand, seven hundred and fifty dollars for the dwelling claim but then not making such a payment. You have not received that payment?

A. Correct.

Q. And when was that statement that it was willing to pay that additional amount made?

A. I believe that was Alycen's May 2020 letter.

Q. Okay. Have you pointed out that this payment has not been made prior to filing this amended interrogatory response?

A. It was discussed at Wally Hasseig's deposition that I'm aware of.

Q. Okay. Did you review Wally's deposition transcript?

A. I was there.

Q. You were there?

A. Uh-huh.

Q. Okay. I was not, so do not know.

And --

MR. DAUPHIN: Have you reviewed his deposition transcript?
MS. AQUINO: Huh?
MR. DAUPHIN: Have you reviewed his --
MS. AQUINO: I have.
MR. DAUPHIN: -- deposition?
Okay.
THE WITNESS: That's a good one.
Q. (BY MS. AQUINO) What was -- from your recollection, what was the discussion about this hundred and twenty-four thousand payment?
A. Wally said that he believed Pacific or Chubb had not issued a check for that amount.
Q. Did he say why that had not happened?
A. I don't remember.
Q. Okay. Were you present for your husband's examination under oath?
A. No.
Q. Okay. When there is a statement

in this amended response that says Pacific using trick questions in the EUO with Charles Goodrich in an attempt to escape coverage, what is that referring to?

A. I've -- that specifically?

Q. Yes, ma'am.

A. Will you please read it one more time?

Q. Sure. And I can show this to you if you like if that's easier. I'm starting right here (indicating).

A. An example, she -- can I have a second? I'm sorry. Is that legal?

Q. Well, if you don't know the answer, that's fine. But this --

A. Okay.

Q. -- amended interrogatory response is made out for your signature; is that correct?

A. Okay. Yes. Okay. So, the example that I believe this is, she -- Alycen asked Charles if we had -- since we had demolished the house -- I mean, this is

loosely like -- if we -- since we had demolished the house, we didn't need the cost of remediation.

Q. Okay.

A. And that we -- he -- we weren't asking for it. I believe this is what this refers to. And he said, yes, that we weren't seeking coverage for the remediation cost.

Q. Okay. And what part of that would you characterize as a trick question?

A. Well, in the policy, under the policy, Pacific chose to repair rather than demolish and rebuild our house. And so, Pacific is responsible for remediation expenses, whether or not they're performed.

Q. I do have Charles' EUO. So, let's make sure we're talking about the same statement.

A. Okay.

Q. So, this interrogatory response references Pages 47 and 48. So, if you could take a look at that and let me know what statement you're looking at.

A. Yeah, it actually starts on Page 46. Do you agree with me that if you are demolishing the home, there is no need to be performing any kind of smoke remediation, right? Yes. Yes, you agree with me? Yes, yes. Okay. Yes. Okay. All right. So, that is not an amount that you guys are seeking, correct? Correct. Well, that's incorrect.

Q. Okay. So, you said that this starts on Page 46?

A. Yes.

Q. I'm just pulling it up as well so --

A. Yeah.

Q. -- because I gave you my copy.

Just give me one second.

MR. DAUPHIN: And that was your lawyer's error.

Q. (BY MS. AQUINO) Okay. So, starting with the question on Page 46, what part of that question would you say is a trick question, if any?

A. She's leading him -- so, he agrees that we're not doing the smoke remediation. So, she leads him into, so you're not seeking that amount, right? Correct? And he says, correct. It was confusing.
Q. Did he tell you it was confusing?
A. Subsequently, yes.
Q. What did -- what did he say about this question?
A. He got confused.
Q. Okay. Why is it that the interrogatory response is only verified by you and not your husband if this question pertains to his understanding?
A. A lawyer question.
MR. DAUPHIN: That's just the lawyer's error.
MS. AQUINO: Okay.
MR. DAUPHIN: We'll have him -- we'll have his signature added to it.
Q. (BY MS. AQUINO) The first part of that question that you were demolishing

the home and you were not performing any kind of remediation, that is true, correct? You did perform remediation to the home --

A. We did because --

Q. -- except for the basement?

A. Okay. And the garage. We did not remediate portions that were demolished.

Q. That portion is true, correct?

A. Do you agree with me that -- well, we did demolish the home and we did still do some smoke remediation.

Q. Was that only to the basement and the garage --

A. Yes.

Q. -- correct?

A. Uh-huh.

Q. Okay. Is there anything else -- because the interrogatory response mentions Pages 47 and 48. Are there any other questions on Pages 47 and 48 that you've identified as quote, unquote, "trick questions"?

A. That was the one.

Q. Okay. So, 46, 47?
A. Yes.
Q. Okay. I'm just letting you finish 48 before we --
A. Oh, yeah. Sorry.
Q. Nothing on 48 that you see?
A. No.
MR. DAUPHIN: That's what we were referencing.
A. Yes.
MS. AQUINO: Okay. All right. I believe that is all I have.
MR. DAUPHIN: Thank you very much.

(Whereupon, Defendant's Exhibit 2, Defendant's Exhibit 4, and Defendant's Exhibit 6 were marked for identification and copies of same are attached hereto.)

FURTHER DEPONENT SAITH NOT.

C E R T I F I C A T E

STATE OF ALABAMA )
JEFFERSON COUNTY )

I hereby certify that the above and foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing.

I further certify that I am neither of counsel, nor of kin to the parties to the action, nor am I an anywise interested in the result of said cause.



MICHELLE L. PARVIN
Certified Court Reporter
License Number 126
Commission expires 9/30/23
Notary Public expires 1/26/26

Case 2:22-cv-00021-MHH Document 101-4 Filed 07/12/23 Page 368 of 464




**&**

**&** 19:5 22:12 160:3 244:8

**0**

**00021** 1:5 5:5

**1**

**1** 3:7 78:14 164:16 165:1 173:19 200:12 229:9 230:17 231:4 244:20 255:5 280:8 301:22
**1/14** 251:18 253:11
**1/14/20** 249:13 256:11
**1/14/2021** 204:15
**1/15/2020** 204:5
**1/26/26** 366:23
**10** 4:4 318:18 319:11 345:13 345:18 348:22 348:23
**10:08** 7:9
**10:15** 32:9
**10th** 222:15
**11** 4:6 318:19 319:11 349:4 349:10
**12** 4:8 15:3,5 351:7,11,16 355:23
**12/17** 200:23
**12/9** 201:20
**12/9/2019** 200:13
**1230** 6:1
**126** 366:21
**12:30** 145:4
**13** 4:10 111:19 355:20 356:1,2 356:7,12
**13th** 93:5,7 94:3,5,21 96:5 96:16 97:7 99:1,3 100:7 103:2
**14** 354:5,14 355:4,19 357:20
**14th** 166:18 167:7
**15th** 59:8,11,12
**165** 3:7
**18332** 366:18
**184** 3:11
**18th** 24:5 33:21
**19** 57:12
**1981** 11:21
**19th** 351:20

**2**

**2** 3:9 84:11 85:20 89:12 105:3 218:8 219:18 302:19 303:8 304:15 365:17
**2/11/20** 219:18
**2/12/2020** 105:7
**2/18/20** 294:8
**20** 84:11
**20-9-4** 295:23
**2007** 17:13,17 18:1,5 309:7 310:23 311:8 312:2,12
**2017** 21:22
**2018** 21:20
**2019** 13:3,6,8 16:5,11 20:11 20:19 21:4,21 24:5 37:16 85:9 92:10 93:9,10 94:3 97:7 101:13 109:19 111:18 124:7 202:5 313:14 335:7
**2020** 18:15,18 18:21 19:3 48:12 55:21 59:6,12,19 103:6,23 106:18 107:7 112:7 114:14 114:21 116:17 116:18 122:16 124:14,19 125:16 129:6 138:16 142:1 161:17 166:3 166:18,18 167:7 179:3 204:16,18 214:7 216:23 280:1,3 282:17 321:2 344:16 344:20 358:11
**2021** 59:7,12 74:14 84:9 138:16,18 176:15 204:11 214:7
**2021ish** 146:21
**2022** 12:16 74:9,14 76:6 84:11,14 132:13 138:16 185:16 187:9 187:11,14 222:16 351:21
**2023** 1:20 176:22 300:16
**20th** 280:3
**21** 300:17
**21st** 11:21
**223** 3:15
**23** 300:17
**278** 3:20
**28th** 343:12
**29** 227:3,11,23
**29-4** 172:5
**29-7** 226:8 229:15 231:4,9 231:23 234:13

**298** 3:22
**2:22** 1:5 5:5

**3**

**3** 3:11 168:17 169:19 177:1 178:21 184:18 191:9 197:14 224:12 352:9
**3/11/2022** 222:8
**3/30/20** 250:14
**30** 202:5 347:1
**300** 5:19
**30309** 6:2
**30th** 347:16
**31st** 204:10,16 204:18
**3305** 12:2,10,21 20:6 22:16 74:11 85:2,5,9 91:19
**3400** 5:20
**342** 4:2
**345** 4:4
**349** 4:6
**351** 4:8
**35216** 5:21
**35223** 12:3
**35243** 1:20 7:9
**356** 4:10
**365** 3:9,13,17
**3800** 1:18 7:7

**4**

**4** 3:13 172:5 199:12 205:9 218:15 219:2 295:16 300:17 365:17
**4/10** 196:9
**4/7/2021** 218:15
**400** 6:1
**40s** 51:1
**421** 244:23
**430** 1:19 7:8
**436** 256:2 258:18
**46** 362:2,11,21 365:1
**47** 361:21 364:19,20 365:1
**470** 173:23
**48** 361:21 364:19,20 365:4,6
**4k** 16:7,10
**4th** 1:20 179:3

**5**

**5** 3:15 15:4 205:11,12 223:18,21 224:3,19 231:11 232:12 232:15,16 233:13,19 236:6,10,12,22 237:9 238:14 239:14 240:14 240:17 249:4,7 254:23 255:1 257:20 264:22 265:13,22 266:11,15,20 267:23 268:19 284:8 285:14 326:10 327:3,9
**5/20/20** 218:8
**501** 23:19
**50s** 51:1

**6**

**6** 3:17 227:20 228:11 231:10 234:2,5,17 236:9 249:8,9 249:10,11 252:18 263:12 263:19 264:1,2 264:17,19 265:13 266:1 266:15 272:18 332:18 365:18

**7**

**7** 3:20 227:3,11 227:23 278:21 307:2 338:20
**7th** 300:16

**8**

**8** 3:4,22 292:4 298:18 299:5 351:17
**80s** 64:7

**9**

**9** 4:2 201:20 342:18 343:1
**9/30/23** 366:22
**911** 27:13 28:1

**a**

**a.m.** 7:9
**able** 9:9 32:10 76:17 121:8,10 123:22 149:15 151:13 171:19 259:7 263:5,10 263:16
**above** 7:10 163:13 229:23 255:9 272:3 366:5
**absolutely** 10:5 146:1 206:7 248:18 319:21 352:3
**abuse** 302:2
**access** 242:8 353:23
**account** 219:6 220:11,18
**accounting** 156:21
**accurate** 220:7 305:11
**acquisition** 242:4

**act** 357:21
**acted** 354:15
**acting** 7:2
**action** 303:9 366:15
**acts** 353:20 354:20 355:9 357:3,11
**actual** 21:11 30:11 115:13 115:17 116:10 174:5 182:1 187:6,13 194:17 317:17
**actually** 22:2 59:20 84:18 87:5 100:14 107:15,21 108:4 132:3,5 168:8 171:8 177:14 196:22 197:2 220:1 231:5 242:18 252:17 268:16 278:18 279:2 280:7 287:1 351:6 362:1
**add** 49:19 146:3 150:4 190:4 256:5 357:2
**added** 130:17 131:8 148:16 149:3 170:21 171:6 197:23 235:20 236:10 236:12,21 238:10 259:14 271:17 273:2 273:14,18,23 333:1 363:21
**additional** 3:14 72:17 131:14 175:22 176:14 180:13 192:7 197:18 199:10 199:18 203:3 222:6 235:15 244:13 265:2 278:2 287:23 354:22 357:11 357:21,23 358:8
**address** 12:1,11 12:15 20:7 41:16 52:18 211:7
**addressed** 157:2 184:8 193:17 194:8 260:15 267:13 320:8
**addresses** 201:18
**addressing** 333:12
**adjust** 184:11 312:22
**adjusted** 312:20 313:5
**adjuster** 94:18 304:16
**adjustment** 69:16
**adjustments** 46:7 68:21
**administration** 175:7
**adopted** 189:13
**adt** 27:11,15,16 213:15,21 222:20
**advance** 250:14
**advice** 81:6 118:16
**affect** 128:22
**affidavit** 4:9 241:16 287:20 290:16 350:8 350:11,21 352:1
**afraid** 337:16
**afternoon** 32:11
**agency** 83:4,13
**agency's** 33:2
**agent** 37:22 82:15,17 83:1 83:4,5,22 331:16
**ages** 14:17
**aggressive** 330:5
**ago** 59:19
**agree** 55:6 333:16 339:11 362:2,5 364:9
**agreed** 1:14,22 2:6,14 97:10 117:14 125:21 126:1 306:7 348:3,12
**agreement** 111:20,23 116:20 204:9
**agrees** 363:2
**ahead** 61:19 79:15 124:20 135:20 175:10 185:22 194:14 209:21 212:4,5 245:8 250:12 308:1,5 330:14 336:11 351:7
**aided** 366:9
**air** 131:10 153:15
**airtight** 128:9
**alabama** 1:2,20 5:2,21 7:2,9 12:3,7 23:13 78:20 212:22 325:12 366:3
**alarm** 337:22
**albright** 258:12
**ale** 71:4 197:15 198:2,3,15 199:17 200:17 220:4 274:5,21

275:1
**alert** 40:11
**ales** 204:17
**alexandra** 1:8 1:17 4:9 5:8 7:10,14 11:10 304:16 332:21
**ali** 77:9,10 199:9 234:17 299:18
**alive** 214:16
**allegations** 354:19 355:1
**alleged** 354:16 357:3
**alleging** 350:7
**allison** 19:17
**allow** 104:2 343:19
**allowed** 206:3
**alongside** 147:16
**altamont** 14:23 15:2,4,7 16:1
**alter** 46:9 68:23 69:1
**alterations** 69:3
**altered** 313:12
**alycen** 70:20 71:3 114:6 160:17 164:8 209:18 210:8 219:9 242:3 271:2,14 272:4 291:13 315:8 316:3 319:16 321:10,13 322:18 329:19 360:21
**alycen's** 352:14 358:10
**amazingly** 337:10
**amend** 123:4 219:3
**amended** 170:9 207:21 210:15 354:16,17 357:19 358:14 360:1,17
**amendment** 354:8 357:6,11
**amount** 86:2 89:1 90:14,16 91:2,12,14 113:14,20 170:6 173:5 176:14,22 177:20 179:9 197:17 198:2 199:22 204:8 224:15 226:2 238:8 250:2,17 251:16,23 252:2,3 256:3 258:19 259:1 268:7 270:4,18 273:15 282:13 294:15 297:15 358:8 359:16 362:7 363:4
**amounts** 167:23 169:20 253:3 256:4 262:2 268:6 352:16
**andrew** 116:23 117:21,23 123:6,7 343:5
**angry** 330:6
**anguish** 333:6
**annual** 277:8,9
**answer** 8:18 9:17 10:20 63:15 64:1 80:11 81:17 113:17 118:14 146:4 169:23 172:15 175:13 185:21 219:3 232:19 353:4 354:17 357:6 357:11 360:15
**answered** 193:21
**answering** 9:23 151:15 301:12 333:11
**answers** 50:12 170:10 353:17 366:7
**anticipate** 11:8
**antique** 276:15 277:7 285:5,6 286:5,12,17
**antiques** 35:9 226:2 277:9
**anxiety** 305:23 306:17 319:23 320:2,5,10 335:18 338:7
**anybody** 96:7
**anymore** 345:3
**anyway** 41:4 181:15 328:23
**anywise** 366:15
**apologize** 51:23 108:2 135:19 139:16 203:10
**appear** 262:8 266:7
**appearance** 214:19
**appearances** 5:17
**appeared** 334:10
**appearing** 5:21 6:2
**appears** 252:21 256:2 258:18 266:2,4,11 269:21
**appliances** 62:18 63:9 64:7
**applicable** 245:13

**applies** 299:20
**appraisal** 251:14
**appraised** 254:10
**appreciate** 93:17 147:4 177:7 207:8,12 209:2 210:20
**approach** 283:3
**appropriately** 69:7 100:3
**approval** 124:23 343:14
**approve** 62:2,5 124:19 151:4
**approved** 96:4 115:8 156:19 161:8
**approximate** 142:8
**approximately** 58:12 282:17
**april** 1:20 116:18 129:6 176:22 351:20
**aquino** 3:4 6:1 8:1,7 9:6 11:2 21:13 50:15,20 51:22 52:6 54:17 59:5 63:18 71:7 75:11 76:16,20 77:1,7 78:23 79:3,18 80:13 80:19 81:5,11 81:18 83:15 87:21 88:4 105:2 113:23 114:20,23 135:17 136:1,4 145:4,8,14 160:14 164:7 164:12,15,21 165:7 168:14 168:21 169:3 169:10 171:17 172:20 175:11 175:15,20 176:1,4,7,12 177:7,14 178:20 184:22 186:6 189:1 191:4 194:6,10 194:12,15 195:8 198:20 199:1,9 200:11 202:17 206:6 206:11 207:2,4 207:14,18 208:7,11,22 209:2,8,13,22 210:2,7,14,20 211:2,7,10 223:4,9,12,15 224:1 225:11 226:7 227:4,12 227:19 229:12 231:1,4,18,22 232:1,12 233:9 234:6,11,13,23 235:6 236:7 237:18 248:16 248:19 249:1 251:11 266:18 266:23 267:4,8 267:11,14,18 272:19 279:1,4 288:8 291:3 292:5,9 293:6 293:11 295:20 297:22 298:6 298:23 299:13 299:16,22 301:15,20 303:7 313:22 318:16 319:4 328:5 339:4,7 341:19 342:2,8 342:13,22 345:17 346:11 346:13,20 349:8,18,21 350:4 351:15 353:18 354:1,6 354:12 355:13 355:19 356:11 357:8,13,16 359:3,6,10 362:20 363:19 363:22 365:11
**architect** 131:20 155:16 158:20 170:19 171:3 178:4,8 178:9 188:11
**architecture** 157:21 160:5
**area** 16:18 49:1 115:6 130:18 192:22
**areas** 31:9,12 33:13 47:19 100:13,16 103:14 105:1 117:8,13 137:1 137:11 140:19 144:8,17 148:16,18,19 149:2 163:8 180:5,13 185:4
**aretha** 29:18
**arrange** 244:15
**arrant** 116:23 117:21 123:7 343:5
**arrested** 18:22
**arrive** 29:1 170:11
**arrived** 182:14 246:3
**artwork** 276:15
**ash** 30:20
**asia** 251:14,21 252:10 254:8,8
**aside** 311:6
**asked** 10:19 40:17 55:5 56:5,13 59:23

73:3 80:8 81:16 95:21,22 96:1 97:5 100:9 101:23 110:2 115:9 126:16 132:21 140:5 143:9 150:11 154:14 194:2,3,4 203:9 207:9 241:6,10,23 242:3 275:18 294:5 295:5 319:1 360:22
**asking** 10:9 49:19 208:9 248:7 257:11 361:6
**asks** 301:11
**asleep** 322:2
**asphalt** 137:4
**assessing** 352:23
**assessment** 308:10 339:12
**assign** 2:10
**assist** 38:20 210:11
**assistance** 331:16 348:19
**assistant** 188:22
**assistants** 178:10
**associates** 22:12 160:3
**assume** 109:12 271:3 325:19 343:15
**assumed** 326:11
**assumes** 107:7
**assuming** 106:20 162:3
**asterisk** 229:17 229:21,23
**at&t** 216:4
**atlanta** 6:2 17:4
**attach** 199:12
**attached** 25:16 144:11,12 165:3 179:7 184:20 223:7 223:23 225:2 226:8 227:5 228:11 230:18 235:2 278:23 298:20 342:20 345:14 349:5 351:12 356:8 365:20
**attachments** 339:10,22
**attempt** 360:3
**attend** 14:22 15:7 40:1
**attendance** 122:22
**attended** 17:6
**attending** 16:10
**attends** 15:17
**attention** 280:10
**attic** 30:15 31:18,19 44:5 97:23 98:14,16
**attorney** 81:2 118:17 169:15 224:3
**attorneys** 80:1 118:7 351:1 353:12
**audiovisual** 47:7 49:16 201:8 291:22 292:19 294:9 297:6,16
**august** 13:3 18:15,18,21 142:1
**auto** 84:20 332:13
**av** 46:15
**available** 37:23 38:17 39:17 56:6 252:4 273:2,15
**awake** 315:6
**aware** 96:9 130:1,2 134:2 170:14 182:4,6 298:11 358:16

**b**

**b** 93:15,19
**babies** 311:13
**back** 12:14 16:5 19:3 20:11 28:4 29:15 32:16 52:6 55:11 65:9 74:11 75:22 77:7 81:22 84:12 85:9 87:8 91:22 97:13 99:13 103:10 107:12,23 108:12,14 109:4,15 117:12 124:11 133:3 135:23 138:19,21 143:17 145:14 146:2,13,18 151:13,19 154:10 167:13 168:10 169:11 170:23 171:18 178:14 187:3 190:14 191:7 192:12 196:21 201:19 205:21 211:19 212:10 212:17 213:5 214:1 217:8 219:7 221:21 222:2,11 223:3

224:10 230:16 241:23 246:10 247:5 249:1,3 251:16,23 252:10 253:2,9 256:14 258:13 259:14 260:4 267:22 269:23 273:18,23 278:15 280:21 281:7 288:9,12 292:20 293:22 294:11 296:20 297:5,7,9 305:18 306:9 315:8 336:21 337:1
**background** 121:3
**backs** 126:8 240:2
**backtracked** 348:5
**backup** 289:1 334:8
**bad** 4:11 51:15 51:16 268:16 299:15 353:20 354:15,20,20 355:1,9 356:13 357:3,12,21
**balance** 173:2 173:22 250:6
**based** 69:12 119:17 171:3 177:23 178:1,2 191:20 203:23 238:11 239:14 242:1 253:22 257:7 267:2 278:3 282:2 283:5,7,10 305:14
**basement** 31:20 44:4 64:13,14 98:5 129:3,5,8 131:3,11 140:21 141:1,3 141:15,16 142:9,16 144:10,18 161:20 162:2 364:5,12
**basic** 219:17
**basically** 48:17 256:15
**basis** 86:3,4,15 156:5,6 354:14 354:18,23
**bates** 83:13
**bath** 25:10 131:13
**bathroom** 25:16 48:21 49:3 61:10,11 100:18 101:12 103:9 344:4
**bathrooms** 25:9 31:2 43:16 48:19 51:8 53:5 58:10 61:9,14 62:23 63:2 67:11 130:17 131:7 203:18
**bathtub** 48:19
**beams** 149:11 154:1,3,4,5,7
**bear** 168:21 171:10 233:11 291:5
**beat** 209:6
**bed** 179:10 322:14
**bedroom** 60:8 100:18 101:6 101:12 103:4,8 285:4,15
**bedrooms** 24:18,21 25:14 30:23 43:13 47:20 58:7 72:15 131:14
**began** 142:7
**beginning** 7:9 21:11,14,20 55:23 132:18 132:23 133:1 321:1 335:9 337:19
**begun** 96:19
**behalf** 5:21 6:2
**behavior** 302:15 314:1 338:9
**behaviors** 340:17
**believe** 17:15 19:2 22:23 28:19 31:14,23 32:1,21 43:11 48:12 50:23 53:17 55:13 57:12 59:2,8 61:12 62:20 63:10 65:22 67:15 72:15 74:22 75:20 84:18,19 91:21 94:14 95:10 100:4 102:11 115:5 116:17 125:17 132:4,5 132:12 137:6,7 137:8 142:21 145:19 148:4 149:8 155:14 159:14 162:8 164:5 169:21 176:6,15 178:18 188:5 191:9 199:10 202:9 203:2,9 207:10 211:22 216:6,13 219:11 222:9 222:19 223:5,9 224:4 225:3 228:3 230:21

237:18 240:21 246:9 249:4 278:1 285:11 288:23 290:20 301:9 302:4,8 302:16 305:16 309:7 310:1 322:16,17 326:7 328:8 332:9 341:9 344:9,19,21 345:4 352:17 352:21 353:6 358:10 360:21 361:6 365:12
**believed** 359:14
**believes** 266:21
**belt** 23:14
**ben** 178:6 188:19,21
**best** 8:17 9:11 63:16,17 128:15 138:17 209:10 214:18
**better** 13:21 20:3 22:19 56:9 64:6,9 65:11 77:18 83:14 84:19,23 315:14
**beyond** 104:10 204:18
**bid** 3:12 119:4 119:17,19 126:17,18 127:1 340:22
**bids** 127:7
**big** 41:4 77:22 136:18 156:10 180:23 225:12
**bigger** 50:4 149:4 192:22 228:9
**bill** 135:6,8
**billed** 243:18
**bills** 220:9,14
**bird** 325:9
**birmingham** 1:19 5:20 7:2,8 12:8 16:3,21 16:22 17:1 39:19 120:8 213:1 218:11
**birth** 11:20
**bit** 72:23 77:12 133:4 147:18 160:15 177:4 177:17 179:8 180:14 209:20 219:4 228:9 231:6 239:22 248:12 289:2 298:8 317:7 340:4
**bits** 184:16
**black** 23:13 30:14
**blackjack** 214:12 215:2,7
**blamed** 333:10
**blank** 181:3
**blanking** 177:12 186:3
**blasted** 98:9
**blasting** 106:5 122:8
**block** 90:1
**blown** 223:7
**blue** 236:23 273:18
**board** 34:15 35:16 39:22 96:18 218:12
**boarded** 127:23
**boards** 35:20 102:18
**bold** 236:11
**bolded** 268:20
**book** 77:23 291:8
**books** 76:17 120:6
**bottom** 25:6 86:21 90:20 101:1,2 175:1 199:16 205:8 218:17 229:20 230:4 235:14 251:13 271:2 280:7 292:15 344:7 346:23
**bought** 56:7,18 57:11,13,17,20 329:20
**box** 85:21 86:11 183:4 237:3,8,9 238:4,7 268:3 268:6,11 270:1 270:12 343:12
**boxes** 181:18 183:3 307:17
**boxwoods** 180:6
**bradley** 93:19 140:5 157:10
**brain** 181:13 181:14
**brandon** 186:4 186:18,22 188:4
**brass** 154:19
**break** 10:12,16 10:20 31:21 76:23 77:13 145:5,15 248:19 265:4 298:8 315:17 316:17,23 342:4
**breakdown** 233:19
**breaks** 265:2,3
**breed** 19:13
**breezeway** 147:16
**brick** 147:18

**bricks** 137:1
**brief** 52:3 77:4 199:6 248:22 342:10
**bring** 27:1 76:17 151:5 244:10
**bringing** 151:3
**brittney** 178:11 178:12 188:22
**broadly** 35:6
**broke** 21:15
**brook** 12:3 15:1,16,17 16:14,20 28:11 39:16,22 40:1 40:12 41:5 56:8 75:10 133:11,21 134:5
**brookstone** 34:14,22 95:9 95:20,21 96:7 97:2,3 99:4 100:9,10,11 103:16 106:14 108:15 109:2,9 115:9 116:14 116:21,23 119:1,19 120:13 121:9 121:11 122:7 122:22 123:9 123:20,22 125:6,10,14 126:3,10,13,14 126:18 150:2 150:18,19,23 151:1 165:15 165:15 182:14 274:8,15 275:16,21 321:6 343:6 344:20,23
**brookstone's** 109:8 275:2
**brother** 36:19
**brother's** 36:20
**brought** 76:8 150:3 158:14 158:15 297:4
**bubble** 280:21
**bubbles** 280:8
**buggs** 216:13 217:2
**build** 91:20 92:7 93:22
**building** 40:6 134:1,7 157:16 327:1
**built** 12:21 21:8 22:14 45:15 50:21 58:13 109:13 130:8 153:15
**bulk** 326:17 332:19
**buried** 183:15
**burned** 30:12 201:7
**business** 19:23 26:21
**businesses** 19:3 19:9,19
**busy** 188:20
**butcher** 83:12 102:7
**buy** 56:21 57:15
**bwwb** 218:9

**c**

**c** 23:19 38:4,5 93:16,16,20 102:11 188:4,4 366:1,1
**cabinetry** 149:11 150:12 153:10,11,12 155:2,10
**cabinets** 153:14 328:20
**cable** 46:16,19 46:20 47:2 74:6 201:13 215:21 216:2,5
**caine** 38:3,4
**calculation** 224:23
**calculations** 235:15
**calculator** 173:14 206:4,7
**call** 47:6 51:5 77:10 131:9 170:13 172:10 183:4 195:7 275:12 286:13 293:22 311:17 316:3,5 338:18
**called** 27:10,11 27:13 28:1 52:17 172:9 322:8 348:8
**calling** 324:22
**canterbury** 16:12,13
**car** 26:8
**care** 310:6 312:22 329:22 331:11
**caroline** 15:19 16:6 337:2
**carpet** 44:8,9 66:4,5,8,9,19 66:21 67:1,4,6 67:13,23
**carry** 120:14
**case** 1:5 5:5 8:7 165:18 166:12 323:3 337:23 349:17 350:19
**cash** 275:8
**catherine** 3:23 299:7
**caught** 24:12 39:5
**cause** 7:11 366:16
**caveat** 10:18

**ceiling** 69:12 101:15 154:7
**ceilings** 73:14
**center** 24:16
**cents** 170:3 173:1 197:17 199:20 200:15 219:20 224:14 239:7 253:17 258:20,23 270:5
**certain** 100:13 117:13 156:7 181:14 193:19
**certainly** 62:4 128:3
**certificate** 20:22
**certified** 5:15 366:20
**certify** 7:3 366:5,13
**cetera** 149:12
**chain** 4:7 343:4 345:21 349:15
**chance** 27:5 199:13 299:23 356:19
**change** 74:16 158:7 173:8 189:21 192:14 238:19 270:15 270:19,22 271:6 297:14 314:12 323:9 338:10
**changed** 11:9 131:1 189:15 192:17 324:1 330:4
**changes** 13:15 109:13 130:9 131:19 148:15 189:14 195:1 195:12 235:14 313:15
**char** 30:15,16
**characterizati...** 329:9 333:2,17 333:23
**characterize** 339:21 340:6 361:10
**charge** 113:20 131:22 157:19 216:12 219:12 219:19 241:20 244:14 246:14 246:19,21 277:11 284:1
**charged** 92:6 142:14
**charges** 157:23 158:1 218:20 220:9 243:10
**charles** 1:7 5:7 5:19 6:6 13:21 13:23 14:2 20:1 22:20,21 29:14,21 32:20 33:22 36:19,20 41:21 45:10 64:1 83:14 84:19,23 100:19 102:15 103:9 117:1 125:23 126:10 145:7 274:7 281:16 331:19 360:2,22 361:16
**charred** 109:1 109:4
**chart** 3:10
**charter** 46:21 46:22,23 74:5 216:3
**chat** 140:6
**chatted** 325:5
**check** 145:6 156:7,20 162:10,11 173:23,23 253:19 254:12 271:18 274:7 275:7,8,13,13 359:15
**checked** 286:11 286:15 307:18
**checklist** 162:12 318:19 319:8
**checks** 205:10 205:13,16 225:21
**chem** 44:15
**cherish** 286:16
**chief** 133:9,20
**childhood** 281:16
**children** 14:15 15:7 16:4 20:8 26:1 29:11 325:20 336:19
**choice** 335:13
**chose** 143:5 178:12 361:12
**chosen** 178:3
**chronological** 226:19
**chubb** 3:19 4:11 65:16 94:19 112:10 113:11 127:2 129:17 143:3,5 143:9,10 200:18 289:11 329:18 331:10 347:19 356:13 357:4 359:15
**chuck** 57:8 76:16 94:12 168:15 177:8 207:4 223:4 226:7 291:4 292:7 293:7
**chuckled** 110:9
**church** 16:13
**cincinnati** 85:7

**citing** 347:20
**civil** 7:4
**claim** 32:19 33:6,9 175:19 177:4 190:18 190:19 232:18 245:23 256:16 264:9,11 265:6 265:15,22 266:14 278:11 280:15 299:11 299:15 316:8 321:15 332:11 352:23 354:15 358:4
**claimed** 264:5
**claiming** 263:22,23 296:11 297:15
**claims** 180:12 193:1,11,16 194:3 240:23 241:5 302:5,9 303:22 311:6 314:11,19 319:19 326:3 327:11 331:10 331:15 340:3,9 350:6 352:4,22 353:13,15
**clarifications** 207:5
**clarify** 191:5
**clean** 44:11 45:5 66:23 277:8
**cleaned** 43:21 44:20 51:16 60:19 142:5 146:17 161:3
**cleaning** 45:1 60:14 66:8 276:19,22 311:13
**clear** 9:1 10:9 57:1 178:17 322:20 339:16
**clergy** 324:16
**clerked** 17:18 18:7,9
**cliff** 119:18 123:6,10 125:13 126:2 126:20 133:18 138:11 139:14 140:6 154:3 163:20,20 166:5,10,20 174:13 347:21 348:8,8
**cliff's** 141:7 162:8 167:1 347:20 348:15
**clinical** 338:21
**close** 112:15 316:8
**closets** 100:18
**coat** 60:7
**coating** 30:20
**code** 49:4,6,8 51:11 134:1,7
**coded** 235:8
**coding** 235:11
**coffee** 51:21 248:15
**collaborated** 238:3 284:12
**colonnade** 1:19 7:8
**color** 68:9 204:5 235:8,11 236:21 237:2
**colors** 60:6,9,9
**column** 236:12 236:15,18 238:8 239:23 240:2 258:5 270:2,13
**columns** 272:9 272:13
**come** 14:9 28:20 35:22 38:8 41:16 42:16 49:9 53:22 54:18 56:20 73:22 81:22 92:10 101:22 125:6 126:20 133:19 156:12 157:3 157:10 161:15 162:9,10 163:18 181:15 189:5 197:21 201:9 216:16 217:12 272:7 274:20 286:10 304:12 306:9 347:7 352:6
**comes** 157:8 159:3 228:22 228:23 296:8 320:6
**comfortable** 95:13 109:2 112:16 113:12 120:15 133:17 140:7 141:6
**coming** 28:8 37:23 38:17 183:9 200:8 215:13
**comment** 258:17 317:8 341:3
**commission** 366:22
**commissioner** 1:18 2:15 7:3
**communicate** 129:16
**communicating** 118:4
**communication** 340:23
**communicati...** 305:2
**community** 37:10,12

**companies** 23:19 178:13 242:16
**company** 1:11 5:11 13:16 14:9 44:16 45:15 46:15,16 47:2,9 85:5 122:3 129:22 150:15,17,23 159:23 178:3 196:14 212:19 212:23 222:20 244:8 330:11
**comparable** 91:7
**competitive** 127:7
**complaint** 353:1 354:16 354:17
**complete** 307:6 308:2
**completed** 20:17 21:15 132:13 157:14 350:8
**completely** 195:15,22 196:13
**completes** 156:22
**completing** 307:22
**complex** 327:6 327:23 329:9 333:1,2
**compliance** 2:2
**complicated** 261:18
**complies** 89:22
**compulsive** 308:18 314:22 320:4 339:1,8
**computer** 172:3 223:5 226:23 230:21 234:2 366:9
**concerned** 167:12 314:13
**concerns** 333:12
**conclude** 318:10
**conclusion** 95:2 339:18
**concrete** 137:2 137:4,10
**condition** 56:9 116:1 131:10
**conditioned** 153:2,15
**conduct** 302:16 305:10,15,17
**conducting** 343:13
**conflating** 87:16
**confused** 172:12 322:21 363:11
**confusing** 87:20 191:3 363:6,7
**confusion** 305:23 306:17
**connected** 147:10,15 198:22
**connection** 147:14,21 245:23 299:6
**connections** 149:5
**consider** 208:5 208:19,21 294:4
**considered** 324:22
**consistently** 333:10
**constant** 323:14
**constantly** 315:15
**constitutes** 302:5,10 305:17
**construction** 21:12,14 22:3 22:4 91:19 92:4,5 116:10 158:3 326:19
**consulted** 161:21
**consulting** 163:11 326:12
**consumer** 273:7
**contact** 82:13 275:15 331:19
**contacted** 26:23 38:19,22
**contained** 264:1,21 305:5 352:1 356:21
**contend** 168:3 169:20 170:7 176:23 192:2 197:17 199:23 224:15
**content** 254:16
**contents** 3:16 34:19,21 86:12 177:4 223:1,8 224:12,16 225:2,21 227:5 227:16 228:13 229:3,20 231:10 232:9 232:15,17,18 234:21 239:1 252:4,20 253:6 253:14,23 254:15 255:14 256:15 261:12 261:15,21 262:8 263:22

264:8,9 265:6 265:15,21 273:1,4 274:3 274:9,18,22,23 281:9 282:8 283:1,4 294:4 298:4
**context** 327:19
**continuation** 310:10
**continue** 214:4 216:15
**continued** 216:9 312:16
**continues** 333:5,19,20
**continuously** 12:18
**contract** 158:2 158:4,10,12
**contracted** 347:4
**contribute** 338:7
**contributed** 326:8
**control** 216:13 216:16 217:11 217:17 305:21 306:3 307:13 311:5 314:8,9 320:6 341:2
**conversation** 9:12 49:22 55:1 56:20 118:12,13 203:13 210:8
**conversations** 79:23 85:10 118:22 166:4 166:21 304:8 306:7 344:23 345:9
**cooperate** 209:20
**coordinate** 122:6 157:10
**coordinating** 138:11 165:14
**copies** 365:19
**copy** 165:3 168:15 169:13 178:18 184:20 197:11 223:7 223:19,23 278:23 279:2 298:20 342:20 345:14 349:5 350:13 351:12 356:8 357:7 362:16
**corporate** 41:8
**correct** 8:10 12:12 14:1,13 14:14 17:14 19:12 20:15 21:6 23:1 25:19,21 26:2 26:3,10,11 45:16,17 56:16 58:21 59:7 65:19 82:4 86:19,23 87:3 90:16,17 91:8 91:16,17 92:11 92:16 105:5 107:17,18 112:4 122:5 124:2,3,12,13 124:16,17 125:7,8 129:14 129:15 132:18 137:23 143:21 144:5,7,18,19 144:21,22 145:2,3 152:7 152:8 159:10 159:11 161:10 161:11 163:1,2 163:18 165:16 165:20 170:4,5 183:23 187:9 191:17,18 192:4 196:4,10 196:14,15 200:21 201:5 201:16 202:7 202:11,22 205:6 212:8 213:16,17 218:21 221:14 222:12,21 228:13,14 233:20,23 234:22,23 235:2 237:19 238:11,19,20 239:16 242:2 242:19,20 243:11 245:17 245:18,20 247:6,15 250:3 250:18 258:9 259:13 264:17 264:22 265:4 268:9 278:4,5 280:11,18 286:7,8 289:5 290:6,10,22 292:21 294:19 299:8,11,13 301:8 302:17 302:21 303:23 307:7,14 308:19 325:19 325:21,22 332:11 343:9 343:10 351:18 356:14,17,18 358:6 360:19 362:8,8 363:5 363:5 364:2,8 364:15 366:10
**correctly** 11:14 102:5 107:4 291:21 294:15 355:4
**correspond** 268:6

**cost** 86:4,5,15 87:12,17,19 88:1,19,21 89:15 90:11,12 90:15,21 91:1 91:11,20 92:4 105:23 112:14 112:15,19,22 134:23 158:8 170:19,21,22 174:5 192:12 229:1 230:7 235:21 236:10 236:15 237:1,1 238:15 239:1 239:15,20 240:3,12,15,18 243:4,10 244:12,13 246:12 256:18 257:13,20 258:2,3,14 266:22 271:15 282:12 283:8 285:20,22 287:4 288:3 289:16 290:3 290:10,14 361:2,8
**costs** 173:18 190:17 193:19 221:21 228:20 239:18 241:1,7 241:12,20 242:4 246:8 268:9 283:10 283:16 284:5 290:5,18 352:11
**counsel** 1:16 2:7,9 7:7 366:14
**count** 78:17
**countertop** 64:8
**countertops** 63:10 328:20
**counting** 205:17
**county** 12:4,7 366:4
**couple** 145:17 153:5 197:4 278:14 306:23 324:2 342:13
**course** 105:21 114:9 127:7 285:12
**court** 1:1 2:3 5:1,16 7:1,6,18 8:15 9:3 70:22 104:23 113:16 135:15,22 136:3 198:17 227:6 236:3 288:13 339:3,5 366:20
**cover** 10:14
**coverage** 78:12 78:21 84:16 85:2,22 86:2 86:12 89:1 90:14,16 167:23 168:4,5 169:22 170:1,8 191:16 192:3 211:1 222:6 223:1 224:16 252:4 274:13 281:9 282:9 283:1 294:19 352:18 360:3 361:8
**coverages** 85:14,15
**covered** 18:16 69:6 105:20 148:17 202:10 202:22 203:3 295:6
**covers** 49:1 51:12 192:21
**cozen** 5:23
**cpi** 273:3,5
**cracked** 153:6
**crawl** 44:5
**crazy** 30:8 311:13
**crdn** 226:5 264:7
**created** 254:14 256:15
**credit** 251:14 252:14 256:6 257:12 263:13
**credited** 174:22 205:14 251:16 251:23 252:9 253:2 256:13
**crossing** 270:9
**crushed** 181:1 181:19 184:6
**cs5804545** 2:23
**cup** 51:21 248:15
**current** 11:23 14:17 219:6,13 284:1,2
**currently** 17:9 38:9 85:19 310:8 338:4
**curtain** 24:12
**curtains** 45:23 69:14
**custom** 69:14 153:14
**cut** 102:2 122:18 135:20 136:2,4 180:17 255:3,20
**cv** 1:5 5:5 120:23
**cypress** 102:18

**d**

**d** 3:1 93:19
**dad** 56:7 57:8 94:12 159:18 160:6 163:16 171:22 275:22 345:7

**dad's** 17:19 57:2
**daily** 156:5,6
**damage** 30:9 30:11,11 31:9 31:13 32:1 100:13 101:5,8 101:20 102:16 102:17 103:3,8 104:9,11,14 120:6 128:11 133:12 140:16 140:17 147:21 148:8,9,22 152:9 153:10 153:19 160:18 160:19,20,23 180:8,13 181:22 182:7 184:14
**damaged** 30:15 30:23 104:20 137:1,11 139:2 148:7 149:15 179:19 180:5,7 182:22 183:16 185:7 192:9 193:2,13 194:19
**damages** 31:5 190:19
**damp** 112:13
**dash** 227:3,11 227:23
**date** 7:3 11:20 97:4
**dated** 105:7 179:2 196:9 282:16 294:8 351:20
**dates** 301:18
**daughter** 34:8 34:9 38:23 52:23
**daughter's** 24:12 130:21
**dauphin** 5:18 5:19 7:20 11:1 11:12,15 21:9 50:6,9,11,19 51:20 54:8,12 54:15 57:8 59:1 63:15 70:16 76:18,21 79:1,14 80:4,6 80:10,18,22 81:9,15 87:15 88:2 94:12 114:18,22 145:6 164:10 164:13 168:19 172:14,17 175:8,14,17,21 176:6 177:10 185:21 190:22 191:1,3 194:1 194:7,11,13 195:6 198:16 198:21 200:7 202:14 205:22 206:9,13,18,20 207:13,16,23 208:10,13,23 209:3,11,16 210:1,6,13,19 210:21 211:3,9 223:6,10,14 225:5 226:13 226:20 227:2,7 227:11 229:10 230:22 231:2 231:16,19,23 232:4,8,10 233:7 234:4,9 234:12,15,22 235:4,10,13,17 235:22 236:1 237:12,15 248:13,18 251:8 266:16 266:19 267:1,6 267:9,12 272:14 279:3 291:1 292:8 293:2,8 297:20 298:3 299:12 299:14,20 301:10,19 303:2,4 318:12 318:21 319:2 328:1 341:16 346:9,15,17 349:16,20 350:3 353:16 353:19 354:4,7 355:11,17 357:5,10,15 359:1,4,7 362:18 363:17 363:20 365:8 365:13
**davis** 150:3,4,7 150:15,16,17 150:21 151:12 152:1,4 328:19 328:22
**day** 1:20 13:1 16:12 32:7,22 33:4 34:14 133:8 158:11 180:17 182:10 182:11 195:17 212:7 277:12 277:15 322:15 323:13,22
**days** 123:2,7
**dead** 179:13
**deal** 82:18 93:13 323:18 332:7
**dealing** 84:8 157:1 310:23 311:22 314:10 340:1
**dealings** 45:8 319:15
**dealt** 93:22 308:17

**debris** 95:11 96:19 106:15 115:3 136:23 139:3 142:6 180:20 182:15 275:1
**december** 22:2 37:16,17 57:12 93:5,7 94:3,5 94:21 96:5,16 97:7 99:1,3 100:7 101:13 103:2 109:19 111:18,19 124:7 179:2 202:5 204:10 204:16,18
**decide** 55:17 120:1 188:8 281:11,18
**decided** 42:8 54:23 57:14 112:7
**decision** 112:9 114:15,23 115:22 129:13 129:17 282:4
**decisions** 61:21 326:13
**declared** 32:13
**declined** 200:18
**decompensat...** 341:4,10,12,23
**decorator** 66:4 69:18 238:2 241:17 242:23 290:16
**deducted** 274:2 274:22
**deductible** 86:22,23 87:3
**deemed** 81:3
**defendant** 1:12 5:12 6:3
**defendant's** 3:6 164:16 165:1 178:21 184:18 223:21 224:2 228:11 231:10 231:11 232:16 233:18 234:1,5 234:17 236:5,8 236:9,11,22 237:9 238:14 239:14 240:13 240:16 249:3,7 249:7,11 252:17,18 254:22 255:1 257:19 263:11 263:19 264:1,2 264:22 265:22 266:10 267:22 268:19 272:17 278:21 284:8 298:18 299:5 342:18 343:1 345:12,18 349:3,9 351:10 351:16 356:6 356:12 365:16 365:17,18
**defines** 302:1
**definitely** 96:20 150:11 337:19
**definition** 339:20
**deliver** 244:2 255:3,20
**delivered** 244:9
**delivery** 230:9 243:9,13 244:11,15 245:12 286:1
**dell** 12:2,10,15 12:21 20:6 22:16 30:2,3 38:12,14 40:6 58:16 74:11 84:12 91:19 103:5 119:16 201:8,15 211:17,21 213:10,15,21 214:4,10,11,14 215:14,22 216:2,8,18 217:3,8,12,16 219:4 221:21 222:2,11,21 247:6 291:23 292:20 294:11
**demo** 107:21 108:14,17 173:17 174:7 179:9,13 343:14
**demoed** 104:3 108:11
**demoing** 108:12
**demolish** 110:2 112:4,8 113:21 114:15 115:1 141:2 143:6,10 361:13 364:10
**demolished** 111:8,22 132:4 132:6 133:13 138:2 142:3 147:13,19 216:20 360:23 361:2 364:7
**demolishing** 132:21 362:3 363:23
**demolition** 95:11 96:20 99:11 101:11 107:16 108:5,9 115:13 129:5,7 132:9
**department** 27:13 28:9,12
**depending** 208:7

**deponent** 365:22
**deposit** 55:10 75:16,21
**deposition** 1:16 1:23 2:1,11,15 79:12,21 80:15 80:17 81:4,13 199:12 223:8 235:12 358:16 358:18 359:2,7 366:6
**depositions** 2:4 224:4
**depression** 307:5
**describe** 319:12 328:6 334:1
**described** 328:14
**description** 287:8 326:14
**design** 62:5 91:6 92:2 109:14,18 190:15
**designing** 22:8
**desired** 288:11
**desk** 281:16
**despite** 333:10
**detail** 354:14 354:18
**detailed** 136:14 314:15
**details** 134:8
**determine** 101:22 102:1 151:17 246:8 264:4 265:18
**determined** 100:12 151:19 163:3 242:1 290:6 341:8
**determines** 162:5
**developed** 125:10
**developing** 33:13
**development** 97:8
**diagnosed** 309:1 320:1
**diagnosis** 312:15 317:11
**diane** 5:19 57:8 57:9
**dibs** 286:16
**difference** 175:9 231:13 232:2 235:20 261:2 271:10 271:20,23
**differences** 77:18 231:7
**different** 76:13 137:4 189:19 189:20 190:15 190:16 192:11 192:19,20 195:15,22 196:12,13 200:9 204:4 242:21 262:22 310:13,13 337:17 352:18
**differently** 315:13
**differs** 236:8
**difficult** 8:20
**difficulty** 320:13,17 321:3 322:2
**dingler** 178:11 178:12 188:22
**dining** 47:20 255:3,6,18 257:5
**direct** 89:12 165:10 181:5
**directly** 27:1 38:20 118:4
**dirt** 179:15 184:6
**dirty** 51:15
**disagree** 81:18 305:6 329:8 356:21
**disclose** 80:7
**discontinue** 215:7
**discontinued** 217:7
**discontinuing** 215:1
**discount** 203:22
**discover** 117:18
**discovered** 103:3,7 116:22 126:7
**discovery** 142:23 173:4 173:13 190:7 248:3 278:13 279:18
**discrepancy** 176:4
**discuss** 52:10 60:21 77:17 94:22 99:20 203:22 211:12 317:20 320:4 324:23 330:16
**discussed** 54:19 65:1 76:11 98:7 99:6 114:12 134:10 145:18 193:20 291:13 308:2 311:7 319:11 324:9 339:17 358:15
**discussing** 163:13,16 167:11 317:6 319:7 326:4

339:19
**discussion** 19:3 73:7 75:12 98:3,15 99:8 108:23 117:22 118:2 124:9 149:14 160:11 161:6 167:18 169:7 171:14 180:11 188:16 219:11 225:8 228:19 301:21 313:19 317:4 317:16 359:11
**discussions** 100:11 117:21 118:16 126:11 160:16 241:5 304:7 318:3 319:17 352:3
**disorder** 308:18 314:22 317:5 318:11 319:23 320:4
**disposal** 48:22
**disputed** 274:8 275:6
**disregard** 266:12
**district** 1:1,2 5:1,2 7:5
**distrust** 305:23 306:17
**distrustful** 327:6 328:12
**divided** 205:1
**division** 1:3 5:3
**doable** 312:21
**doctors** 324:11
**document** 172:5,21,22 198:9 231:21 232:22,23 234:3 275:11 349:11 353:12 356:13,17,20 356:22 357:2
**documentation** 193:23 287:23 289:1 290:13 334:8 350:5
**documents** 79:21 80:3,7 80:14,16 81:7 81:12,16,21 232:3 241:11 283:6 304:1,6 333:15 342:15
**dogs** 338:1
**doing** 8:4 42:20 65:4 78:10 95:13,21 97:1 98:23 108:19 122:4,8 135:9 140:2,7 157:11 164:8 165:14 186:10 214:9 214:13 215:5 245:7 276:20 308:3 363:2
**dollar** 86:23 198:2 219:12
**dollars** 86:3,15 161:9 170:3 173:1 174:4 175:23 185:4 197:16 198:6 199:20 200:14 218:4 219:19 224:14 239:6 246:20 254:3,8 254:10 258:2,4 258:7,20,23 259:23 260:6,9 270:5,19 285:21 358:1,3
**donated** 71:8,9
**door** 27:19 130:14 139:6 155:2,11
**doors** 108:12 139:4 149:11 152:3,15,18 337:22,23
**dosage** 312:20 312:23 313:4
**doubt** 305:23 306:17
**downstairs** 30:17
**dr** 3:23 299:7 300:6,8,12 301:2 302:17 303:17,21 306:19 307:6
308:11,22 317:4,15 318:9 319:11,18 324:18,19 325:15,23 328:6,8 340:7 340:19
**draft** 350:21
**drafted** 350:23
**drain** 48:21
**draining** 53:3
**draped** 24:13
**draping** 26:16
**drawings** 158:21
**drew** 155:20
**drive** 37:15,20 41:16 43:14,20 45:9 46:1,10 46:12 48:11 50:21 52:9 55:18 56:12,15 57:14,16,18 58:16 66:11 68:16 74:4 184:3 202:21 203:11 204:10 220:2
**driveway** 136:12,19,20 137:13,13,15 180:22 181:1 182:18,21,22 183:14,23

**dropped** 110:15
**drove** 180:21
**dry** 44:15
**due** 106:2 173:2,22 176:23 192:4 197:18 199:23 204:21,22 205:6 221:17
**duke** 178:7 188:10,19 196:9
**duly** 7:15
**dust** 154:19
**duty** 36:5
**dwelling** 78:11 167:23 168:7 170:1,7 173:5 176:22 211:1 225:18 274:19 275:1 293:18 294:2,2,13,18 295:13,14 296:4 358:4

**e**

**e** 3:1 83:19 93:19,20 94:11 213:7,8 310:4 310:4 366:1,1
**earlier** 115:5 132:21 162:18 198:10 201:13 338:12
**early** 55:9 161:7
**easier** 223:11 225:5 227:22 231:7 237:10 360:10
**easy** 272:12
**education** 23:14 39:23
**ee** 340:12,18
**effect** 2:2 100:5
**efforts** 29:7
**eight** 14:18 15:20 174:1 201:1 204:6,19 205:5 219:12 236:16 239:11 250:8 269:1 294:17
**eighteen** 200:14
**eighty** 174:16 218:4
**either** 46:12 83:4 91:12 94:3 96:6 103:5 151:12 245:23 252:7 275:22 324:15
**elaborate** 173:19
**electric** 51:11 54:20
**electrical** 49:2 49:4 211:20
**electrician** 51:10
**electricians** 46:14 49:9,13 49:17
**electricity** 148:19 212:16 213:11
**elementary** 15:1,16 16:7 40:13
**eleven** 174:15
**eliminating** 117:13
**elliott** 94:18 95:4 96:4 116:22 303:14
**elliptical** 335:16
**email** 4:7 165:8 165:13 167:6 234:8 274:1 321:10 349:14
**emailed** 331:17
**emails** 3:8 62:17 100:12 117:1,10,20,23 122:10 321:8 321:12
**emergency** 34:15 35:15 40:4
**emotional** 302:2
**emotions** 330:17 331:4
**employ** 151:4
**employed** 151:1
**encompassed** 71:5 173:10 207:10
**encompasses** 54:16
**ended** 149:13 183:16 189:2 215:1
**endorsed** 307:10 317:10
**ends** 222:7
**engaged** 354:19
**enservio** 252:14,23 253:14 256:4,6 256:11 257:7 259:2,7,23 260:16 262:1,2 263:1,5,11,16 264:3,8 265:16 265:19 266:12 266:13 267:3 267:10,13 269:6,10 282:13
**enservio's** 253:5,22 256:2 256:21 258:18 261:18 262:4 266:3,8 269:21

**entail** 310:16
**entailed** 85:16
**entails** 163:14 179:12
**entered** 42:10 58:19
**entire** 98:7 117:9 143:20 143:22 144:5 150:13 214:6
**entirely** 111:22 115:12 150:13 192:11 224:21
**entirety** 150:9
**environment** 23:15 153:2
**episode** 311:18
**equipment** 201:8 292:20 294:9 297:16
**error** 349:19 362:19 363:18
**escape** 360:3
**estate** 37:22
**estimate** 92:11 92:13,15 96:11 105:4,10,14,15 105:20 106:17 107:6 109:11 113:4,10 124:15,19 125:5,11 171:1 171:4 174:1,5 174:21 178:19 179:2,3 184:9 188:21 190:5 190:13 191:21 193:2,6,8,12 195:16 196:1 246:23 250:7 291:5,7,12,22 292:19 293:13 294:8,15 295:8 296:14,18
**estimated** 105:23 246:23 256:4
**estimates** 96:6 178:2 252:8 254:4 264:9 277:22,23 278:3,16 280:21 281:7 281:10 282:3
**et** 149:11
**etches** 154:19
**euo** 360:2 361:16
**event** 40:3 311:16 318:5 319:10
**events** 315:10 318:9 319:12 319:13 326:2,5
**eventually** 131:2 161:8 347:20 348:7
**everybody** 109:21 336:17
**evidence** 2:12 333:11
**exacerbation** 311:10 326:22
**exact** 97:4 114:8 126:17 167:17 344:1
**exactly** 39:1 51:3 69:13 109:10 113:5 118:20 128:3 162:11 182:21 264:4 291:19 318:2 321:4 328:2 330:22 331:6 343:23
**examination** 3:3 7:11 8:1,8 11:4 18:14 76:11 77:22 145:18 148:5 160:17 291:14 359:21
**examined** 7:15
**example** 189:15 244:19 245:10 254:20 257:2,15 284:23 285:3 285:10 303:20 360:12,21
**examples** 303:1
**exceed** 283:1
**except** 2:8 273:17 343:16 364:5
**exceptions** 40:3
**exchange** 279:20 347:17
**exchanging** 117:1 321:7
**excuse** 119:8 256:8 268:16
**exercise** 335:13 335:18
**exercising** 335:10
**exert** 305:21
**exhibit** 3:7,9,11 3:13,15,17,20 3:22 4:2,4,6,8 4:10 164:6 165:1 184:18 199:12 223:18 223:21 224:3 224:18,19 227:20 228:11 231:8,10,11 232:11,16 233:13,19 234:1,5,17 235:2 236:5,9 236:9,12,22 237:9 238:14 239:14 240:14 240:17 249:3,7 249:8,11 252:17,18 254:22 255:1 257:20 263:12

263:19 264:1,2 264:17,19,22 265:13,13,22 266:11,15,20 267:23 268:19 272:17 278:21 280:2 284:8 285:14 292:4 295:16 298:18 299:5 342:18 343:1 345:12 345:18 349:3 349:10 350:16 351:10,16 355:18 356:6 356:12 365:16 365:17,18
**exhibits** 3:6 78:3 164:11
**existing** 149:5
**expanding** 149:4
**expect** 343:16
**expense** 66:4 171:7 174:14 200:17 201:17 202:10,21 203:19
**expenses** 3:14 65:14,16 66:1 194:17 197:19 199:18 203:4 216:7 221:9,12 222:6 226:4 246:6,7,10 296:4 361:15
**expensive** 281:11
**experience** 209:18 314:19 321:1,2 322:11 323:12
**experienced** 302:4,9 303:22 305:12 311:8 318:9 320:14 321:23 326:6 331:12 334:17 337:7,14
**experiences** 332:23
**experiencing** 331:5 334:2 336:3
**expert** 3:23 101:22 120:4,8 121:5,12 298:12
**expert's** 303:6
**expertise** 347:21
**experts** 120:12
**expires** 366:22 366:23
**explain** 175:9 259:16 295:8 316:4 330:1
**explained** 55:3 85:14
**explaining** 253:6 290:17
**explanation** 111:3
**expression** 110:21
**extended** 86:3 86:4 87:11,17 88:1,18 89:14 90:11
**extensive** 353:19
**extent** 8:17 80:6 81:5,15 99:14 193:20 195:3 209:8,11 220:8 243:2
**exterior** 68:5,7 108:8 147:16 155:13 217:19 217:21
**eye** 154:11
**eyes** 270:9

**f**

**f** 83:16,16,17 83:19 93:20 366:1
**fabric** 284:1,2
**face** 111:4
**facial** 110:20
**facility** 35:1
**fact** 192:8 247:19 248:9
**factored** 238:17
**fair** 10:21,22 21:19 99:18 259:15 267:14 305:11 312:8 326:14
**fairly** 264:21
**fairway** 37:15 37:19 41:16 43:13,20 45:9 46:1,9,12 48:11 50:21 52:9 55:18 56:12 57:14,16 57:18 68:16,23 69:10 74:4 201:9,16 202:1 202:7,20 203:11 211:15 220:2 221:2
**faith** 4:11 299:15 354:16 354:20,21 355:1,9 356:14 357:3,12,21
**falkner** 185:19 185:20 186:18 187:21,23 188:6,6 189:3 189:4,12
**fall** 187:17 215:16
**falling** 322:2
**familiar** 16:18 60:6 199:14 224:8 292:13

299:3 327:21
**familiarize** 279:15 299:1
**family** 20:14 65:11 154:5
**far** 14:7 16:18 35:15,17 43:4 44:7 45:7 52:8 56:14 58:15 60:20 61:13 67:13 91:18 96:21 97:8 105:19 109:11 123:3 136:9 154:8 157:6 161:5 172:8 183:15 216:7 220:23 228:23 242:15 245:15 247:4 263:21 265:6 266:14 274:10 276:18 283:6 305:9 314:12,21 317:3 327:19 332:17 344:5 355:9 357:2
**farms** 70:1
**fascinating** 87:6
**father** 56:18 64:19 76:2
**father's** 58:20
**favor** 78:8
**fear** 307:11 337:8
**fears** 334:7,15 338:7
**february** 48:12 103:6 106:18 107:6 122:15 124:14,18 125:4,16 128:12,21 129:1,2 161:16 222:15 283:2 300:16,17 343:11 344:16
**federal** 7:4
**fee** 157:21 161:7,9,12 170:19 171:3 175:6,7 219:5 220:10 243:13 243:13 245:12 286:1
**feel** 113:11 291:9 314:8,9 318:4 322:21 329:12 335:17 341:1
**feeling** 306:21 307:20 311:4 320:10 327:5 331:7 333:5
**feelings** 306:18 314:3 324:10 329:11 330:17 331:3 333:20
334:5,13 336:15 337:14 338:7
**feels** 333:9
**fees** 92:2 230:2 230:3,9,11
**felt** 112:15 120:15 133:17 141:9 306:1 328:18 329:1 330:10,13
**female** 37:3
**fidel** 214:11 215:2,11
**field** 161:2
**fifteen** 14:18 15:10 25:23 28:5 78:16 161:9 250:9 270:6,21
**fifteenish** 29:2
**fifty** 74:22 88:23 90:13 170:2 173:6,8 173:11 177:21 191:12,15,20 192:3 197:16 199:20 204:6 204:19 205:2,5 206:14 236:13 238:9,18 239:6 249:14 254:2 258:6,9,20,22 259:5 270:2,14 271:18 291:16
294:17 358:2,3
**figure** 111:16 148:7 160:20 170:12 177:11 197:22 206:23 224:20 271:13 271:20 283:3
**figured** 160:22 283:4
**figures** 268:5,8
**file** 45:22
**filed** 172:6 198:17,23 225:14 227:6 231:8 287:22 354:7 357:5
**filing** 2:14 358:14
**filled** 101:10
**filthy** 43:23 44:21
**final** 61:21 62:5 134:23 135:3,6 135:8 137:22 156:17 157:4 157:12 187:16 220:2 222:1 243:10 268:18
**finances** 14:6
**find** 37:19 40:22 56:4,11 78:23 89:11 119:21 120:7 158:16 169:5 233:5 255:8

285:12,13 287:6 291:6 293:9 318:17 335:3 352:9
**fine** 7:20 18:10 50:18 71:12 77:1 89:2 206:7 217:6 248:16 280:17 316:15 341:15 352:3 360:15
**finer** 35:10
**finish** 9:15,18 9:22 100:8 157:7 186:19 365:4
**finished** 64:13 98:1,15 103:22 129:8 131:2,11
**fire** 12:11,22 13:1,7 14:10 24:4,8,12 25:20 27:9,11 27:13 28:9,12 28:15 30:10,11 30:23 31:5,21 32:5,14 33:3 33:21 34:15 77:14 92:9 130:23 133:5,8 133:8,12,20 134:18 137:14 137:16 138:7 143:17 148:23 149:1 152:21 153:8 170:23 178:15,16 179:20 180:8 180:17,20 181:23 182:1 182:12 195:18 195:18 212:7 282:18,23 297:2 304:16 313:14 315:23 317:17,22 318:4 319:14 319:20 325:3 326:2 335:7 336:4,10,15 337:4,15
**firefighters** 29:4,11
**firm** 17:19 160:6
**first** 7:15 20:17 22:5,13 33:16 36:11 37:13,14 55:17 84:2,4 92:22 93:6 97:19 101:19 103:3 123:12 125:1 166:17 179:8 193:7 200:7 201:10 204:4 231:1 250:7 254:4 255:13 264:20 265:12 266:1 270:12 285:15 286:16 305:18 306:16 310:11 313:3 326:19 327:4,14 332:10 346:6 346:13 354:17 363:22
**fit** 46:8 69:14 186:13 281:14 287:8
**fits** 259:12 269:15
**five** 12:23 24:20,21 28:8 43:11 55:13 59:2 74:22 86:14,23 91:21 158:2 170:3 174:10,13 175:2 200:13 204:6,20 205:1 205:2,5 206:14 218:4 219:19 235:17 249:15 250:9,13 252:13,16 254:3 256:6,9 257:21 258:2,4 258:14 260:5,6 260:9 261:1 263:3 270:4,5 270:19 272:16 273:1,2,10 282:17 285:21 286:6 342:6
**fix** 52:19 53:19 322:19 323:9
**fixing** 139:2 203:20
**fixture** 72:9
**fixtures** 46:15 47:13,16,18 49:10,18
**flags** 167:8
**flames** 28:8 32:2
**flipped** 330:3
**flooded** 48:23
**floor** 22:8 24:15,16 25:1 25:4,7,12,15 35:12 61:15 69:8 97:19,20 131:18 344:7
**flooring** 61:18 67:2,17
**floors** 43:21 44:7,12,19 45:5 61:12 67:10,20 116:4
**florida** 87:6
**focus** 266:13
**focuses** 23:13 23:14
**folks** 83:15
**follow** 8:12 162:6,8 163:21 169:2 171:19 189:4 232:21 253:8 288:7

334:14
**followed** 121:21 140:13 141:10 162:3 162:23 167:2,4
**following** 7:12 37:6 92:9 138:7 165:19 166:1 230:15
**follows** 7:16
**food** 52:21 53:2
**footage** 117:13 131:6,10,10 142:9,13
**footprint** 130:11 141:6
**force** 2:1
**foregoing** 7:6 366:6,10
**forever** 121:15
**form** 2:8 21:9 54:13 87:16 191:1 194:2,8 194:9 202:14 303:5 341:17
**formal** 124:23
**format** 8:13
**forth** 133:3 237:2 278:15 354:14,18
**forty** 59:2 170:3 174:3 197:15 198:5 199:19 205:1 219:19 224:14 253:15,16,21 256:11 258:9 259:4,12 260:21 261:3 270:5,6 273:20 274:6,10 294:17 296:8
**forward** 42:9 188:9 307:1
**found** 38:6 55:4 122:18 154:3 286:23 286:23 287:16 288:20 300:7 321:7
**foundation** 23:1,4,6
**foundations** 23:17
**four** 25:2,13 30:22 31:2,14 31:17 33:15 58:9 97:22 129:3 172:23 172:23 174:3 174:22 179:11 197:16 198:5 199:19 200:23 211:23 217:13 224:12 228:2 236:13,17 238:9 239:6,12 249:20,20 251:13,18,18 252:13,15 253:4,10,20,20 254:12 256:5,9 258:20,20,22 258:23 259:5,5 259:9,11 260:18,23 261:3 263:3 267:5,7 269:1 270:3,6 271:18 272:8,11 286:1 291:15 294:16 335:10 358:1,2 359:12
**fourteen** 78:16 202:6,19
**fourth** 35:12 165:11
**fowlkes** 83:13 83:21
**frame** 32:4 103:1
**framing** 108:18 109:1 156:8
**free** 121:15 126:4,5 167:3
**french** 11:17
**frequency** 324:2
**fresh** 60:6 179:15
**friend** 37:21
**friends** 40:17 315:20
**front** 24:17 28:8 108:10 179:23 180:5 224:11 354:10
**frustration** 316:1
**full** 2:2 95:10 126:19
**fully** 187:10
**function** 65:11
**furniture** 35:10 230:8 274:21 276:9,15 277:6
**further** 1:21 2:5,13 365:22 366:13
**future** 122:1 163:22

**g**

**g** 15:8 34:4 93:16 310:4
**garage** 138:2,2 138:4,7,9,22 139:4,6,12 140:15 144:9 144:18 146:8 146:10 147:5,9 161:20 162:1 364:6,13
**gardens** 185:20 187:23 188:6 214:12 215:2
**gas** 211:20 213:2,11 220:14,20 221:6

**gaslighting** 301:22,23 302:6,10,21 303:10 305:17 305:19
**gated** 37:10,12
**gather** 267:20
**gathering** 319:18
**gears** 298:7
**general** 241:9 276:14 310:2 314:23 315:1 319:13 320:2,5
**generalized** 319:23
**generally** 152:13,14 340:5
**generator** 145:20 148:2,6 148:8,10,12,18 149:4,5
**geography** 12:7
**georgia** 6:2
**getting** 209:7 232:6 246:7 276:22 315:8
**gigantic** 77:23
**gillian** 15:8,9 34:4
**girls** 49:3 60:8 61:11 325:3
**gist** 165:5
**give** 8:17 9:15 9:18,21 23:18 70:13 78:9,9 89:10 92:11,15 113:3 151:23 156:23 162:18 164:1 168:13 173:15 199:1 223:15 228:8 246:14,22 254:19 267:19 278:19 281:17 284:22 291:23 307:1 318:16 350:12 362:17
**given** 161:23 281:22 283:9 366:11
**gives** 244:18
**giving** 165:23 166:16 167:9
**glad** 176:8 208:1
**gleaned** 333:15
**go** 10:20 11:4 32:16 33:20 40:8 55:1 61:19 76:14 77:2 78:15 79:15 85:18,21 86:11 97:13 103:9 105:2,3 105:21 120:2 124:20,20 125:10 135:20 135:23 136:10 145:8 146:2 152:11 162:10 162:12 167:13 169:3,10,23 171:17 173:7 175:10 184:15 185:22 187:2 191:7 194:14 196:21 197:14 199:3,15 200:3 200:22 202:4 205:12,21 209:21 212:4,5 218:8,14 219:16 223:3 224:6,9,12 227:9 228:4 229:7,19 230:13,16 239:21 241:23 245:8 246:10 250:12 251:11 253:9 255:23 257:19 262:13 268:2 269:23 274:12 277:8 279:5 280:6 285:9,13 286:14 298:9 303:8 306:23 322:14,22 327:18 330:1 330:14 331:13 332:18 335:14 342:4 343:11 351:7
**goal** 109:22 280:22
**goes** 14:7 35:18 67:13 158:9,10 159:15 170:18 242:21 243:14 266:14 280:2 280:13,15,20 304:16 307:9 318:19 333:4 334:12
**going** 8:12,13 9:6 10:3,4,19 11:3 47:6 50:16 51:5 62:8 65:9 71:23 76:7,9 78:3,14,15 88:10 92:14 95:3,7 99:5 108:4 109:7,9 109:12 119:20 126:2 129:17 130:7 133:18 135:18 151:19 153:7,21 166:10,16,20 169:4 172:12 173:6 176:10 177:16 181:3 189:2 193:3 197:3 199:11 201:19 204:3

207:19 210:16 210:17 211:11 218:16 222:23 223:17 225:11 230:6 234:8 248:14 249:3 267:22 270:14 271:3 272:12 281:8,10 282:8 282:14,23 291:3,8 293:12 296:15 298:7 305:18 306:2 312:5,9,10 314:16 315:9 315:10,22 316:19 324:6 326:23 329:22 331:14 332:10 339:15 341:16 354:12
**good** 8:3,5 26:4 245:7 298:9 314:16 334:11 359:9
**goodrich** 1:7,8 1:17 4:9 5:7,8 6:6 7:10,14 8:3 11:10 14:4,12 15:8,18,19 19:5 22:23 34:5 36:22 360:3
**goodrichs** 29:20
**google** 40:20 119:7,23 183:5
**gotcha** 139:15 160:7
**gotten** 30:17 128:5 165:5 282:11 347:20
**grand** 226:16
**grant** 23:17
**grants** 23:18
**grass** 182:17
**great** 62:4 142:12 162:16
**greater** 90:15 329:18
**greatest** 12:6
**grief** 327:6,23 328:6 329:9,13 333:1,2
**grinding** 184:5
**gritty** 281:1
**ground** 21:15 183:14
**grounds** 2:10
**grouped** 230:3 274:21
**guarantee** 121:13,21 126:5 161:23 162:19 163:4 163:13,17 165:15,23 166:6,11,16,20 167:9,15,16
**guaranteeing** 167:2
**guess** 11:16 52:17 98:9 107:21 131:8 138:17 262:16 274:16 286:17 293:21 329:17
**guest** 285:4,15
**guidance** 95:22
**guy** 201:13
**guy's** 186:4
**guys** 156:23 158:16 160:20 163:12 214:14 345:3 347:11 347:14 362:7

**h**

**h** 93:16 94:11
**hail** 87:3
**half** 21:16,17 25:10 59:9,9 82:11 131:13 158:9 204:23
**halted** 100:5
**hand** 146:17 267:23 349:9
**handed** 169:12 179:1 224:2,19 342:23 355:21
**handing** 345:17
**handle** 109:1
**handled** 45:10 45:10 147:12 326:18,19
**handles** 14:6
**handling** 109:3
**hands** 231:12
**hang** 46:14,15 49:10,18 168:19 227:2 231:2 293:9
**hanging** 47:18 71:20 72:9 74:5
**hank** 22:11,11 94:12 109:21 131:20 136:13 155:15 156:16 156:18 157:11 158:13 159:10 159:17 160:2 171:3 175:5 178:5
**hank's** 175:5
**happen** 10:4 117:11 127:19 135:19 321:9 323:3
**happened** 20:11 24:5 32:8 70:9 73:11 77:14 99:11 101:12 103:12 117:19 125:18 126:21 129:5 147:13 149:12,21 151:8,10,23 152:22 176:11

206:19 313:14 321:6 323:2,6 326:14 359:18
**happening** 149:13 306:2 307:12 344:15
**happens** 9:13 10:6 64:19 337:23
**happy** 87:21 206:22 210:12
**hard** 329:11
**harder** 262:16
**hardware** 46:5 149:11 153:23 154:15,16 155:2,2,3,5,10 155:11
**hardwood** 44:10 67:10,19
**hasseig's** 358:16
**hasten** 208:15
**hates** 24:2
**hd** 47:8 49:11 49:15 73:22 200:23 201:9 291:12,17 297:4
**he'll** 156:17 157:3,3
**head** 8:19 10:10 40:7 72:2 104:13 124:8 207:1 209:6 220:12 314:6 315:10
**heading** 303:9 327:11
**health** 335:21
**hear** 9:8 26:4 50:18 63:1 251:4 301:16
**heard** 37:22 331:9,11
**hearing** 366:12
**heart** 307:13
**heat** 31:4
**heavily** 23:14
**height** 69:12
**held** 94:17 96:7 96:10 97:12 160:11 169:7 171:14 188:16 225:8 313:19
**help** 56:11 84:15 226:14 246:7 331:3,13 331:21,22 332:4 335:18 338:18
**helped** 34:18 85:1 238:1
**helpful** 332:1
**helping** 285:2
**helpless** 330:15 333:6
**helps** 181:13 314:5,17
**henry** 159:12 159:14,22 160:1
**hereto** 165:3 184:20 223:23 278:23 298:20 342:20 345:15 349:6 351:13 356:9 365:20
**higher** 237:1
**highlight** 204:4
**highlighted** 200:4,12,13,16 219:2 221:16 273:18 293:5 293:13,17 294:3,17 295:9 295:11 296:5
**highlighting** 293:14
**highlights** 218:16
**hire** 44:11,14 119:2 121:3
**hired** 60:17 101:21 158:17 185:19 186:2,4
**history** 38:16 334:19 335:10
**hit** 153:18,20 281:9 282:14
**hoarse** 131:16
**hold** 48:20 83:6 233:5 255:8 258:6 272:21 280:21 281:7
**holding** 32:3 102:23 114:8
**hole** 122:18
**holman** 82:19
**home** 12:21 13:17 17:10 18:12 19:5 20:14 21:8 22:5,13 25:20 26:1,10 37:20 40:23 43:14 45:2,16 46:1,8 48:3,11 50:21 55:18 56:4,11 56:15 57:10,13 57:15,17,20 62:7 90:12 91:13 121:15 137:19 158:22 159:2 306:2,5 316:9 317:17 318:5 319:20 326:12 331:8 337:16,18,21 362:3 364:1,3 364:10
**homeowners** 84:17 85:2,6 332:13
**honestly** 186:23
**hook** 74:6 167:5

**horses** 19:11
**hot** 152:22
**hour** 246:20 301:4,5,8
**hourly** 246:7 246:16 277:11
**house** 14:10 24:17,18 27:10 28:4,21 30:9 30:19 31:9,12 32:10 33:13,14 33:22 35:13,14 36:8 37:6,9,14 38:6,7,10,14,16 41:17,18 42:5 42:10 43:20 44:3 45:13,19 47:19 56:7,21 57:2 58:1,8,13 58:16,21 59:22 60:3,9,11,15,21 60:22 61:2,4,8 64:4,11 65:9 66:22 67:8 68:1,4,17 69:10 70:11 71:16 72:4 73:8,16,20,23 74:8 76:2,3,5 77:13 85:22 91:4,20 92:7 92:11 93:2,23 94:23 95:3,5 96:17,23 97:9 97:11 98:7 99:20 100:8 103:17 105:18 106:1,14,20 107:7 109:12 109:23,23 110:3 111:8,20 112:1,4,8,12,17 113:4 114:15 114:17 115:2 116:2,7 117:3 117:8,9 122:12 123:16 124:10 124:11 127:20 128:7,22 129:13 130:5,8 131:18,21 132:3,4,18,22 133:5,9,11 134:16 135:1 138:20 140:2 142:2 143:6,15 143:21,22 144:6,8,23 145:2,21 147:10,13 149:10,20,23 150:5,12 153:17 155:19 155:22 157:16 158:8 159:6 161:15 163:6 170:22 180:1 185:8,9 186:5 186:9 202:1 203:11,21 204:1 213:21 216:19 221:2 247:6,14 286:5 293:21 296:19 297:5 306:8 311:14 327:1 328:21 330:8 337:9 343:15 344:7,12 347:8 348:4,7,10 360:23 361:2 361:13
**housekeeper** 26:13 27:7 29:18,19,20
**housekeepers** 24:11
**housekeeping** 26:18
**houses** 41:10 60:4 214:15 215:23 216:10
**housing** 41:8
**huh** 16:19 21:5 38:11 41:11 46:23 51:7 64:20 66:7 67:22 69:22 90:19 93:11 95:19 98:17 107:5 112:21 112:23 125:22 126:6 127:18 128:8 130:20 133:7,16,23 136:16 140:4 141:16,23 142:4 154:21 156:4,9 162:20 163:7 166:22 169:1 171:21 172:1 173:9 174:8 176:20 186:12 187:22 188:12 189:17 196:2,18 197:1 201:21 210:1 213:4,8 214:8 222:14 225:19 227:4 229:8 231:15 236:7 242:12 244:4 244:21 245:5 251:19,22 252:5,19 254:18 257:4 260:22 262:19 266:6 268:1 269:3 272:2 274:17 284:16 286:19 288:18 292:2 296:6 302:18 308:20 310:7 316:13 319:6,9 320:9 321:14 322:7 324:20 327:13 327:20 332:22 335:12 337:6 337:13 358:21

359:3 364:16
**hundred** 43:12 55:14 59:3 74:22 170:1,2 172:23 173:5,7 173:11,12 175:2,22 177:20 179:11 185:2,3 191:12 191:15,19 192:3 197:15 197:16 198:5,6 199:18,19 200:14 201:1 202:6,20 204:6 204:20 205:1,2 205:6 206:14 224:13 228:2 233:15 236:13 236:14 238:9,9 238:18 239:5,6 239:11,11 246:20 249:15 250:8 252:16 253:4,15,16,20 253:21 254:3 254:12 256:6,9 258:2,4,19,22 259:3,4,22 260:11,20 261:1 263:4 265:10 268:23 269:1,16 270:2 270:3,13,14 271:11,18,19 271:23 273:3 273:10 285:21 285:23 286:2,6 291:15 294:16 296:8 357:23 358:1,2,3 359:12
**husband** 13:23 14:2 20:8 22:17 26:9 28:20 29:10 36:5 64:11 68:4 312:3 325:14 326:13 330:17 345:9 363:14
**husband's** 34:11 359:21
**hvac** 30:18 131:9 153:17

**i**

**idea** 56:21 84:5 130:4 149:21 151:10 173:15 306:1
**identification** 165:2 184:19 223:22 278:22 298:19 342:19 345:13 349:4 351:11 356:7 365:19
**identified** 173:12 239:13 249:5 260:5 263:2,11 265:15,16 266:10 268:8 269:5,10 279:19 302:15 302:20 328:11 364:21
**identifies** 247:18 357:20
**identify** 169:19 194:4 248:6,8 259:7 260:19 263:5,10,17
**ii** 37:1
**imagine** 134:20 245:11
**immediately** 182:9
**impact** 317:17 317:22 319:10
**impossible** 128:6,18
**impressed** 347:18
**improvements** 204:1
**inadequacy** 333:20 334:6
**incident** 33:3
**incidents** 18:22
**include** 106:3,7 107:16,21 126:10 175:5 221:20 269:4,9
**included** 92:1 100:20 113:7 173:16 198:4 221:3,5 226:1 226:4 230:1 238:22 241:2 249:14 253:5 253:21 254:2,7 254:11 256:3 263:18 269:22
**including** 49:2 117:1
**incompetency** 333:21 334:13
**incomplete** 334:10
**incorporated** 186:2
**incorrect** 362:9
**incorrectly** 353:7
**increase** 75:1 75:13 158:7 273:8 326:21
**incredibly** 136:13
**incur** 246:10
**incurred** 193:19 194:17 246:6
**indemnity** 1:11 5:11
**indentation** 303:13

**independently** 81:22 82:2
**index** 273:7
**indicated** 202:9
**indicating** 78:18 110:15 191:22 223:13 223:19 231:14 233:3 235:3 236:22 237:3 257:10 261:13 261:17 268:11 296:1 350:12 355:10 360:11
**individuals** 44:22 93:22 339:1,8
**info** 281:17,19
**information** 38:19 39:7 228:22,23 241:23 242:9 245:16,20 246:2,11,15 295:9 303:16 304:5,12,21 305:14 354:23
**initial** 59:7 96:17 158:11 230:1 278:1
**initially** 24:19 35:7,8 93:23 126:18 145:17 149:8,14 158:14 163:12 291:7 329:21 352:12
**innovations** 47:8 49:11,15 73:22 200:23 201:9 291:13 291:18 297:5
**input** 35:3 57:19 61:15,22
**inside** 147:5 217:22
**insomnia** 320:14,17
**inspection** 41:17 42:2,6 58:5 122:12
**inspections** 13:16
**install** 66:21 72:17 184:23 189:3 201:10 201:12 255:3 255:21 294:9 296:23
**installation** 47:7,12 71:22 230:10 297:17
**installed** 46:1 62:18 68:1 71:15,19 72:4 72:6,11,14 73:10 154:12 187:16 188:5 201:23 292:20
**installing** 73:8 74:4
**instances** 302:20 305:15
**insurance** 33:2 82:14,15,23 83:1,3 84:17 84:20 85:4,6 329:20 330:11 332:11
**intend** 190:18 222:5
**intended** 185:5 193:12
**intense** 324:7
**intensity** 324:1
**intent** 165:12
**interchangea...** 129:18 214:22
**interested** 326:20 366:15
**interesting** 84:4
**interior** 43:23 60:1 95:5 107:22 155:13 202:7,20
**interiors** 108:15
**interject** 266:16
**internet** 47:1,3 74:6 201:14 215:21 216:5
**interpretation** 81:19 110:20
**interrogatories** 168:16 197:8 207:9 210:22 224:10 272:8 353:17 354:2
**interrogatory** 168:17 169:13 169:18 177:1 191:8 196:22 197:7,13 208:4 208:18,20 210:15 224:11 268:7 354:5,13 357:20 358:14 360:17 361:20 363:13 364:18
**interrupt** 9:16 145:22
**intrusive** 322:6 323:1
**inventory** 229:3,21 232:16,17 242:19 252:20 254:15 255:14 261:22 262:9 283:4 286:15 286:18 307:5 315:11
**invoice** 72:1 95:15 137:22 139:20 142:18 142:19,23

144:1 157:20 222:11 240:2 244:19,19,22 245:4,9 258:12 258:13 275:2 275:16,17 276:2,3 289:18 290:8 296:9,10 297:10,12
**invoices** 47:15 49:14 59:3 91:23 135:4 143:3,12,13,19 156:19 190:6 192:7 195:4 196:17 206:22 212:12 215:9 222:1,5 229:3 247:22 249:6 250:23 252:7 256:16 274:15 282:10 283:19 290:2 297:21 334:9
**involve** 106:10
**involved** 20:2 23:4 26:15 36:19 150:21 150:23 156:21 274:19 284:17 284:19
**involves** 158:6
**iris** 69:18,23 70:3 94:11 109:20 237:22 238:2 242:10 242:13 243:15 243:18 244:5,6 244:8,12,14 245:15,19 256:17 280:23 283:8,11,15 284:16 285:2 286:11 287:17 287:21 288:1 288:19
**irrigation** 180:19,22 181:2,10,21,23 182:8,20 184:10,11,13 185:11,12,18 186:5,9,23 187:5,10 188:5 190:3 192:15 192:18 194:18 195:12
**ish** 187:15
**isolate** 306:18
**isolated** 330:15 340:8
**isolative** 339:2 339:9,23 340:5
**issue** 48:5 104:20 145:19 148:6 151:2
**issued** 20:22 359:15
**issues** 51:6,12 52:9 53:20 54:20,20 55:3 76:8 77:16 150:20 337:7
**it'd** 64:6
**it'll** 244:8
**item** 153:22 173:19 200:13 229:7 230:16 232:19 233:2 233:14 239:22 240:6 242:22 249:19 250:13 252:21,22 256:2 257:21 258:18 259:1,5 259:6 263:6 265:7 266:2,7 266:9 269:20 276:13 283:16 284:11,23 287:2,4 288:3
**itemize** 277:19
**itemized** 225:17 274:15 275:16,17 276:2
**itemizes** 225:22
**items** 20:20 35:8,11 135:11 136:10 137:18 149:12,13,21 150:1 151:10 151:11,15,16 152:2,10 157:2 169:22 173:16 192:8 193:13 194:19 200:4,6 221:16,16 228:20 230:1 238:13,15,17 238:21,22 239:4,13 241:21 243:3 247:4,18,23 248:6,9 253:3 254:16 256:16 257:7,11 259:23 260:5 260:16 261:4 262:1,7,12,15 263:2,4,9,15,21 265:15 266:20 267:2 269:5,10 271:15 281:12 281:21 283:6 283:17,17,23 284:15,17,19 288:2,19 289:4 289:8,15 293:13,17 294:1,2,4,17,22 294:22 295:11

**j**

**j.s.** 94:17 96:7 96:10
**january** 12:16 48:14 55:21 56:1,1 59:6,6 59:11,12 74:9 74:13,14 84:9

84:14 103:6 122:15 132:13 161:16 166:3 166:18,18 167:7
**jay** 94:14,17
**jefferson** 12:5 366:4
**jeremy** 94:17 95:4 96:4 97:12 99:12 100:5,12 103:10 104:2 105:15 106:23 109:21 110:2 115:8 116:22 118:3,5,12,13 118:19 121:1 123:19 125:13 126:8 127:5 132:21 150:3 151:3 173:23 174:4 204:8,15 274:1 275:23 305:19 306:9 319:15 321:6 322:17 328:19 329:17 331:9 348:3,12
**jeremy's** 329:21 340:2
**job** 2:23 17:16 17:18 99:4 140:2 143:11 148:16 156:2 157:14 158:1 159:5 190:10 195:15 281:12 326:17
**jobs** 215:5
**john** 346:5,6,7 346:9,11,12,20
**joined** 94:15
**jointly** 274:7
**joni** 82:19 85:10
**judgment** 172:7 198:19 225:15 226:9
**july** 132:5 142:1 176:15
**june** 13:4,5 20:19 21:4 85:9 112:7 114:14,21,21 127:17,17 129:12 130:3 187:8 216:21 216:22

**k**

**k** 15:2 38:4 83:18,19 102:10,13
**keep** 132:15 164:9 197:2,10 211:11 214:16 219:13 220:10 253:13 258:16 316:19 343:20
**keeping** 75:3,8 141:5
**kelley** 38:2,15 38:20 39:7,12 40:23 41:2 56:10
**kept** 314:15
**key** 236:21
**kidding** 110:16 110:17
**kids** 315:18 335:23 337:10
**killed** 291:10
**kin** 366:14
**kind** 11:3 16:23 23:16,18 26:13 27:23 49:18,23 50:4 55:15 64:17 65:3 70:1 71:18 76:13 77:15 78:4 87:9 91:7 99:15 101:8 102:16 112:10 124:5,15 129:9 130:15 133:5 134:12 140:11 178:12 179:7 180:4 183:11 189:20 202:17 207:6 213:23 219:21 230:3 259:8 262:20 275:3 276:19 277:8 280:2 322:10 324:5 327:18 334:13 338:9,16 340:1 340:3,8 353:5 362:4 364:1
**king's** 286:4
**kitchen** 48:22 51:9 52:18 62:23 63:2,8 64:5,12 130:15 147:17 255:10
**knew** 38:15,17 40:17 56:6,6 141:5 281:8 282:8,14
**knole** 229:17 244:20 245:2 245:10,17
**know** 9:17 10:6 10:12,16 13:13 13:14,18,19,19 13:21 14:11 20:1 21:10 23:6 24:8 26:15,21 27:4 27:12,14,15 32:4,9 38:15 45:3 50:20 54:15 57:6,10 58:13 61:22 62:4 63:23 64:1,17 65:2,6 65:8 69:6 70:14 80:15 81:1 82:8,8,14

82:20,22 88:2 89:18 93:5 98:8 99:14,18 105:19 108:5 117:15 118:6 118:10 123:17 126:5 133:10 133:13,15 134:8 136:14 139:9,18 142:10,14,22 147:19 148:15 148:18 149:13 149:22 150:2,8 150:8,22 151:9 151:22 152:3 153:5 154:1,8 155:4 156:7,20 157:7,9,11,21 158:6,8 159:12 160:16 161:6 162:7 163:5,22 164:18,22 170:19 173:10 173:18 175:12 176:9 179:11 181:12,13 182:20 183:13 183:15 184:4 186:3 188:23 190:1 200:5,10 203:18 205:16 206:5 207:22 208:8,20,23 209:13,14,16 209:17 210:4 212:1 217:23 224:7 225:12 226:11 228:1 228:18 242:10 242:13,15 251:3,6 252:22 256:14,15,17 257:3 261:6 262:11 271:2 276:1,5,7 280:9 281:14 281:15,15 282:9 283:23 284:2 285:8 286:12 291:19 292:9,13 293:9 293:14 299:2 301:19 304:4 304:23 306:6 306:10 311:17 313:8,11 314:17 315:11 315:17 316:6,7 316:23 317:2 318:12,13,20 322:16,18,21 327:19 328:1 329:21 330:1,2 330:7,8 331:10 332:17 337:20 339:13 340:12 340:16 341:13 341:14 344:4,7 345:8 355:14 357:10 358:22 360:14 361:22

**knowing** 210:2

**knowledge** 63:19 76:1 120:9

**l**

**l** 1:13,18 5:15 7:1 15:8,8 34:4 34:4 83:18,19 93:16,16,19 102:10,13 310:4 366:19

**l'tryce** 345:22 346:7 349:23 350:1

**l.l.c.** 5:18

**labor** 179:15 255:3,20 293:20,23

**ladies** 26:22

**laid** 119:18 189:16 353:1

**landlord** 38:19 38:22 45:4,8 45:19 52:11 54:2 55:2 63:20 64:18 67:16 72:16 73:7 203:11,19

**landlord's** 52:23

**landlords** 60:19,22 61:6 63:12 75:12

**landscape** 178:3,8,9 180:4 186:1,13 186:19 187:1 188:7,10 189:5 189:6 190:14

**landscaping** 177:15,20 178:3,13,15 179:19 180:14 185:5 187:6,12 189:8 191:11 191:16 192:1,3 194:20 195:17 214:3,4,10

**lapses** 340:23

**large** 89:13

**laughed** 110:3 110:5,6 111:2 303:14

**laundry** 130:17

**law** 17:6,19,21 18:4,23 81:19

**laws** 2:3 338:13

**lawsuit** 76:9 77:16 143:1 287:22 298:13 299:6 340:4 350:7

**lawsuits** 18:16 18:18

**lawyer** 113:14 222:13 299:19 300:7 305:1 345:7 363:16

**lawyer's** 362:19 363:18
**lawyers** 117:20 126:1 151:7 304:8
**lay** 40:7
**layers** 99:13 333:1
**laying** 66:9
**layout** 192:20
**leading** 2:8 363:1
**leads** 305:16 363:3
**learn** 27:9 49:7 101:19 119:5 158:18 166:15
**learned** 166:17
**lease** 41:15 42:10,14,17,19 42:21 43:7 45:8 55:5,9 58:19 59:7 74:13,17 203:23 204:9 204:11,14 221:3,5
**leases** 41:8
**leave** 18:4 19:17
**led** 318:9 327:5 334:2
**left** 115:10 343:9,12
**legal** 353:3,10 353:13 360:13
**length** 69:5,13
**lesser** 91:2,14
**letter** 113:13,20 114:4,7 241:16 271:14 352:14 358:11
**letters** 321:18
**letting** 353:23 365:3
**level** 31:19,20 35:20 43:22 44:1,3,6 61:10 62:15 64:13,14 66:15 67:9 98:2 101:1,2,4 102:21 103:18 103:18,20,23 104:1 131:3 141:3,16,22 147:17 344:10
**levels** 31:14,17 33:15 97:22 98:2 129:3
**license** 366:21
**lie** 172:13 315:6
**life** 311:1,22 318:6 326:2,7
**light** 46:15 47:13,16 49:10 49:18 72:5,13
**lights** 48:2,6 71:15,18,19,21 72:3,6,11,14,17 73:8,11
**likewise** 9:21
**limit** 191:16
**line** 105:21,21 152:12,12 170:18,18 173:19 197:14 203:5 207:20 207:20 218:9 225:23 229:7 232:18,19 233:2,14 239:13 244:20 245:10 249:19 250:12 252:3 252:22 255:2,5 255:6,15,18 265:7 269:20 270:12 285:15 346:6,13
**lined** 137:1
**linen** 285:4,10 285:12 286:22 287:12
**lines** 200:9 251:13 272:3
**lingering** 20:19 112:18
**linoleum** 44:10
**list** 3:14,16 20:20 135:9,11 136:10,13 137:17 153:23 156:13,18,23 157:2,8,9 199:11,13,16 200:4,12 207:6 207:11 210:17 219:8 221:15 221:20,22 222:7 225:17 239:1 247:17 247:20 261:12 261:15 283:17 284:3,6,15 286:18 302:20 311:20
**listed** 38:8 176:23 184:23 191:14 205:13 225:20 228:20 238:23 239:15 239:19 241:8 241:12 254:17 257:21 261:16 261:17 264:10 265:19 268:5 269:14 273:6 283:6 285:20 289:5 340:17
**lists** 172:11 223:8 240:14 310:18 314:4 314:14,15 315:11 353:19
**literally** 120:5
**little** 10:13 72:23 77:12 130:19 131:16

133:4 136:11 136:17 147:18 147:20 160:15 169:5 172:11 177:4,16 179:8 180:14 181:4 181:16 184:16 209:20 228:9 231:6 237:3 239:22 248:11 289:2 298:7 317:7 325:4 353:21

**livable** 131:9

**live** 14:19 20:7 20:9,12 39:23 338:13,14

**lived** 29:21 87:5

**living** 3:14 12:17 42:5 44:6,22 60:7 63:5 66:23 72:12,13,20 197:19 199:11 199:18 203:4,6 203:7 222:6 229:16

**llc** 19:5,6 57:2,4 57:7,20 58:20 76:2 119:4 126:17 346:4

**local** 120:3 189:3

**locally** 120:11 286:13

**located** 16:2 37:9

**locating** 287:18

**location** 91:4

**lock** 158:11 337:21,22

**long** 18:1 21:7 22:11,11,12 25:22 28:3,23 32:5 34:10 41:8,9 84:7 94:12 121:1 131:21 155:15 156:15,16 159:10,12,14 159:18,22 160:1,2,3,8 170:9 246:23 301:1

**long's** 136:13 171:3 175:6

**longer** 42:21 188:14

**look** 14:9 39:10 39:15,18 40:2 40:16 41:6 47:14 49:14 59:3 71:23 82:11 87:18 91:22 95:15 107:20 128:1 131:1 187:3 189:21 206:21 211:19 212:11 215:8 219:7 221:15 224:5 225:6 251:17 254:21 255:2 256:1,21 263:1 264:2,6,8 265:14 272:9 285:9 350:19 352:2 361:22

**looked** 39:16 286:11 348:15

**looking** 88:13 118:15 120:21 139:19 142:17 168:16 180:2 198:10,12 199:10 205:14 207:7 226:14 228:10 230:17 230:23 251:3,5 251:12 255:15 255:17 257:22 272:13,15,17 282:10,12 286:21 291:20 301:18 318:15 353:3,10 361:23

**looks** 78:17 279:23 300:15

**loosely** 361:1

**lopez** 214:11 215:3

**loss** 3:18 91:3 91:15 168:7 170:15 175:18 175:22 177:19 190:20 192:9 198:22 225:3 225:20 227:5 228:12 230:18 231:9 234:20 253:5,14,23 256:11 263:23 264:8 288:22 307:13 311:4

**lost** 51:18 78:17 133:9 134:16 185:10 185:10 258:6 285:5 287:2,10

**lot** 8:14 10:14 11:3 17:3 30:15 48:16 79:16 163:15 189:14 192:21 192:21 223:10 226:14 228:19 262:8,12,15 288:16 291:10 312:9 314:14 316:19 321:5 321:11 329:12 340:1

**lots** 200:9

**loud** 110:7

**lower** 66:14 67:9

**luciana** 5:23
**lucy** 8:6
**lumber** 97:18
**lump** 43:6
**lumped** 259:8 275:4
**lunch** 145:5,11 145:15

**m**

**m** 93:15,16,20
**ma'am** 41:13 65:18 88:20 167:19 217:18 240:19 268:12 269:12 289:20 317:21 318:1 360:6
**made** 2:7 46:7 48:17 96:22 99:19 111:3 112:9 114:14 115:1,21 120:1 129:12 161:18 195:1,12 210:23 220:5 226:5,16 252:16 256:21 257:1,6,12 304:11 315:11 338:10 358:9 358:13 360:18
**magali** 226:1 229:4 249:12 249:15 250:1 250:14,20,21 250:22 264:9 276:9 277:1 278:6,15 279:21 343:8
**magali's** 249:6 250:23 254:4
**maiden** 11:12
**main** 31:20 35:20 61:10 62:13,15 98:1 98:2 101:4 102:20 103:18 104:1,20 141:22 147:17 189:21 211:23 344:10
**maintain** 203:6 214:19
**maintenance** 277:9
**major** 311:17 326:13
**make** 2:10 8:23 9:7 10:8 13:15 13:22 47:23 54:5 61:21 78:4 82:7 90:9 95:18 107:3 124:4 128:7 132:15 148:14 157:1 164:2 167:20 171:9 176:18 184:14 187:4 200:8,10 205:3 206:9 207:6 208:15 220:6 225:12 228:8 230:14 231:6 233:9 253:9 257:16 260:19 266:5 279:10 281:14 282:4 301:16 314:4 336:6,11 351:7 361:17
**makes** 10:5 111:17 289:14 289:17 302:3,8 302:23
**making** 112:17 255:11 295:16 311:20 350:16 358:4
**male** 37:2,4
**manifest** 310:14
**manifests** 310:13 313:23
**manipulative** 305:20
**mantles** 149:10 152:3,15,16
**manuals** 121:6
**marathon** 10:15
**marbury** 93:15
**march** 103:23 116:17 126:15 127:13,16 280:1,3 282:16 344:20 347:1 347:16
**maria** 26:22 27:1,10,12 69:19
**maria's** 27:4
**mark** 164:6 223:18 292:4 355:17,22
**marked** 164:11 165:2 184:19 223:22 224:2 267:10 278:22 295:15 298:19 299:4 342:19 342:23 345:13 345:18 348:21 349:4,9 351:11 351:15 355:23 356:7,12 365:18
**market** 41:5 75:3,9
**markup** 243:8
**marriage** 312:5
**married** 14:13 178:11
**martinez** 69:19
**mary** 3:23 299:7
**master** 3:14 25:3,6 53:17 54:6 61:10 100:17,17,18 101:6,12 103:4

103:8 104:2,12 104:16 130:15 199:11 344:3
**material** 61:18 147:8 185:1
**materials** 91:6 242:14 247:1 274:19 291:22
**math** 237:4,11 238:4
**max** 280:22 281:9 282:8,15 342:6
**mcclain** 4:1
**mccullogh** 93:15 94:4
**mean** 31:18 41:12 49:2 51:15 61:21 62:13 63:20 64:23 65:17 66:6,9 75:2 88:9,11,22 89:5 97:15 98:8 100:6 104:15 108:20 110:5,14 115:16 116:9 117:5 121:11 128:6,15,17 130:19 133:3,4 134:4 135:20 136:12 139:1 143:8 147:17 148:20 149:3 154:6 157:8 166:13 167:2 167:10 180:23 181:19 182:16 183:18 184:13 189:18 190:12 192:11,19 207:16 208:8 208:10 219:5 225:22 232:14 242:15 244:7 247:8 251:15 253:18 261:14 262:1 266:14 271:12 276:12 281:6 288:21 295:13 299:20 306:11 308:12 311:1 314:14 315:23,23 317:1 318:7 323:13,19 324:4 327:22 327:23 328:17 329:20 330:22 330:23 331:5,6 331:7,11 334:7 336:16 360:23
**meaning** 331:23
**means** 87:12 88:1,17 89:15 90:11 91:2 97:16 157:22 184:11 229:22 229:23 261:9 271:3 275:7 328:3 340:13 341:15 366:8
**meant** 343:15
**medical** 324:11 334:19 335:10
**medication** 312:20 313:4 313:16
**medications** 320:17,20
**meet** 46:16 74:5 123:6 201:13 347:7
**meeting** 94:8 94:16,21 95:2 96:5,16 97:6 99:2,4 100:7 103:2 109:20 111:19,19 122:22 123:14 124:6 306:7 308:3,3,11 325:15,23
**meetings** 300:12,16 301:1 317:15 325:17
**melting** 30:14
**member** 57:3 324:16
**members** 57:6
**mention** 87:18 308:16 319:22
**mentioned** 21:3 62:22 67:15 98:14 100:4 109:22 132:20 137:18 139:9 147:9 155:7,15 181:22 201:12 212:3,6 249:4 282:7 309:4 311:21 313:22 320:12 322:5 335:22 338:12 344:18 349:23
**mentioning** 156:15
**mentions** 304:10 309:15 326:10 334:20 364:18
**message** 347:17
**messages** 3:21 4:3,5 128:10 278:14 343:2,8 343:9 345:20
**messed** 183:14
**met** 8:6 300:8 300:22 325:2
**methodist** 16:13
**methods** 335:17
**michelle** 1:18 5:15 7:1 366:19

**middle** 85:21 322:1
**mike** 34:4 36:22 37:1
**million** 86:2,14 91:22 172:22 174:20,22 233:3,15 236:16,18 239:10 265:9 268:23 269:7 269:16 272:16 273:1
**mind** 206:20 209:1 220:1 312:10 352:8
**minded** 347:1
**mine** 172:4 223:16
**minimal** 339:10 339:22
**minimize** 76:12
**minus** 20:19 174:21 176:13 204:23 260:23
**minute** 63:13 177:13 199:4 237:13 283:3
**minutes** 16:22 28:5 29:2 51:21 58:17
**minutesish** 25:23
**miscellaneous** 108:17
**misquote** 278:19
**missed** 315:12 315:18
**missing** 51:12 135:14 136:9 194:5
**misspoken** 87:22
**mistake** 315:12
**mistakenly** 274:2
**misunderstood** 139:15
**modifications** 130:10,13
**mold** 33:12,14 98:20 107:2,14 112:13 116:6,6 117:6 119:4 124:2 140:15 141:13,13,14 143:23 154:4 346:8 347:6
**moldy** 128:4
**mom** 29:15
**moment** 21:14 79:4 82:7 164:22 327:17 355:15
**moncrief** 93:20 94:4 140:5
**month** 42:14,17 42:19 43:2,3,7 55:16 58:19 59:9,9
**month's** 55:15 75:18 204:23
**monthly** 43:6,8 43:10 74:18 220:4
**months** 12:23 112:14 153:3,5 282:17
**morning** 8:3 195:20
**mortgage** 13:8 13:12,16 14:7 14:9 304:17
**moss** 8:10 114:6
**motion** 172:6 198:18 225:14 226:8
**mountain** 12:2 14:23 15:16,17 16:14,20 28:11 39:16,22,23 40:12 41:5 56:8 75:10 133:11,21 134:5
**mountainview** 44:15
**mouse** 205:23
**mouth** 41:3 110:15
**move** 12:14 37:13 38:13 42:9 43:20 48:15 54:23 55:17 57:14,15 57:18,22 59:22 60:5 74:7 177:3 188:9 208:16 222:11 244:2 316:9 322:19
**moved** 12:23 13:4 20:23 21:3 42:1 45:1 45:5,20 46:13 46:13 48:3,11 55:20 56:4 58:2 60:11,15 61:5,7 62:9,10 62:11,14,19 67:3 68:17 70:10 72:17,19 73:12,13,19 74:10 75:22 84:11 130:14 138:19,21 146:22,23 147:23 186:17 203:12 214:1 217:8 247:5,14 292:21 296:19 297:6,9 338:15
**mover** 243:12 243:19
**moves** 184:4
**moving** 38:12 65:9 221:20 222:2 243:23

244:9,11 330:8
**mulch** 179:9,14
**multiple** 44:2 92:21

**n**

**n** 1:13 3:1 15:8 34:4 84:6 93:20 102:10 102:13 343:5
**name** 8:6 11:8 11:12 22:23 27:5 36:14,21 38:1,2 83:6,11 84:2,4 95:10 102:5,7 123:12 159:10 181:9 183:8 186:4 188:2 220:18 250:21 325:7
**named** 34:6 178:11
**names** 15:6 34:3 180:3 181:3 246:1
**naming** 171:5
**nay** 210:4
**ne** 6:1
**near** 338:17
**nearly** 315:4
**necessarily** 63:20
**necessary** 2:6 313:2
**need** 9:3,7 10:8 10:11,15 50:22 63:14 75:5 77:17 78:6 80:15 99:7 109:3,4 123:4 145:1 146:3 173:18 198:7 207:22 208:1 211:12 219:7 223:5 232:8,10 235:22 248:14 272:9 274:14 281:13 312:6 315:16 316:6 316:17,22 331:13 348:18 350:15,19 353:5 357:1 361:2 362:3
**needed** 27:2 48:6 65:10 72:5 94:22 98:4,16 99:10 107:14 108:13 124:23 148:11 168:13 184:11 246:9 282:4 315:7,9 338:17 348:11
**needs** 9:9 179:16 243:8 274:12,14 338:1
**negative** 249:19 250:13 253:10 271:11
**negotiation** 45:7
**neighborhood** 17:1
**neighbors** 27:22 29:14 214:19
**neither** 325:17 366:14
**nervousness** 338:8
**never** 127:8 133:4 151:9 194:3 196:4 206:20 218:20 220:1 294:5 295:5 306:9
**new** 62:18 63:9 63:9,10 74:13 74:17,20 85:1 179:15 189:5,7 189:8 255:4,21 304:17
**night** 33:20 35:23 36:9,12 322:2
**nightmares** 337:8
**nights** 37:7
**nine** 174:15,16 174:16 200:14 235:18 251:13 251:20 252:9 253:16,22 254:7,10 264:20 265:13 273:19 274:2 285:20
**ninety** 170:3 173:1,12 200:15 224:13 235:17,18 258:20,23 259:5 272:9,12 286:6
**nitty** 281:1
**nod** 8:19
**nods** 10:10 104:13 124:8 220:12 314:6
**nominal** 219:5 220:10
**nonhighlighted** 294:22
**nook** 130:21,22
**nope** 71:12
**northern** 1:2 5:2
**notary** 354:10 354:10 366:23
**notation** 228:21
**note** 220:5 263:12 266:5 266:11 269:20 271:1 303:5
**noted** 226:5 249:13,23 254:19

**notes** 33:12 36:4 45:22 71:14 122:10 138:1 252:16 256:1 265:21 314:16 342:5
**notice** 2:14 33:14,16 182:7 314:12
**noticed** 311:2,9
**november** 22:1 24:5 33:21 92:10
**number** 1:5 3:3 5:5 131:6,7 168:17 169:18 173:23 177:1 191:9 197:13 200:4 201:20 204:22 224:12 229:9 230:16 232:23 233:13 236:16 238:23 242:1 244:22 250:15 252:22 256:2 257:10 259:21 266:2 268:22 269:4 269:15 272:7 272:10,23 281:14 286:10 291:9 295:17 343:22 354:5 354:13 366:21
**numbers** 246:3

**o**

**o** 1:13 83:16,17 83:19 84:6 93:16,20 94:11 102:10,13
**o'connor** 5:23
**oath** 8:9 11:5 18:15 76:11 77:22 145:18 148:5 160:18 291:14 359:21
**object** 11:1 21:9 54:12 79:14 87:15 190:22 194:1,8 194:9 202:14 303:4 341:17
**objectionable** 80:23
**objections** 2:7 2:10 81:10
**obligations** 339:10
**observed** 52:10
**obsessive** 308:17 310:15 310:20 313:23 314:3,22 320:4
**obtain** 242:3
**obtained** 117:20 119:3
**obtaining** 282:11 284:4
**obviously** 152:22 153:2 158:9 163:6 220:19
**occupancy** 20:22
**occur** 322:15
**ocd** 309:1,10,17 310:12,14 311:3,9,10,22 313:23 314:12 326:22 335:19
**october** 11:21 22:1
**odor** 112:18 126:4,5 152:19 162:22 163:22
**odors** 122:1 141:11 276:23
**offer** 52:15 121:13
**offered** 2:12
**offers** 121:21
**office** 22:22 33:2 100:20 102:15,18,20 103:9
**officer** 36:6,15 37:2,3
**official** 227:1 312:14
**oh** 33:7 34:9 71:20 80:9 94:16 113:18 129:2 139:13 142:10 154:18 155:8 158:17 186:3 197:7 201:11 205:20 216:14 221:4 235:8,16,19 236:16 240:1 247:9 248:16 249:20 250:16 251:5,17,18 252:13 253:10 269:8,9 276:7 285:13,17 289:10 346:15 352:14 365:5
**okay** 7:18 8:12 9:1,5,19,20 10:1,8,17,23 11:6,7,16,20,23 12:10,20 13:5 13:11,14,19,22 14:3,8,19 15:12,14 16:1 16:8,17,23 17:3,16,20 18:6 19:2,16 20:21 21:23 22:16,21 23:11 23:16 26:12,18 27:12,17 28:11 29:3,9,16,23 30:12 31:7 32:12,18 33:6 33:10,20 34:2 35:6,21 36:1

| | | | |
|---|---|---|---|
| 36:23 37:5,13 | 97:13 98:3,11 | 143:14,18 | 187:4,18 188:8 |
| 38:18 40:9,15 | 98:18,21 99:17 | 144:4,12,15,16 | 189:1,9,20 |
| 42:13,23 43:9 | 99:22 100:2 | 146:5,15,21 | 191:2,4,6,19,23 |
| 43:16 44:7 | 101:3 102:7,9 | 147:2,9,22 | 192:6,23 |
| 45:12 46:11,18 | 102:14 103:7 | 148:1,3,11,22 | 193:16 194:6 |
| 47:21 48:5,15 | 103:21 105:7 | 149:2,8,17,18 | 194:12 195:8,8 |
| 49:21 50:8,10 | 105:13,17,22 | 150:10 151:5 | 195:19 196:16 |
| 50:13,15,17,19 | 106:6,13,16,22 | 151:21 152:6 | 196:19 197:9 |
| 51:2 53:1 54:5 | 107:15,19 | 152:16,20 | 197:12 198:13 |
| 54:14,23 56:3 | 108:3,17 109:7 | 153:4,9,13,22 | 198:20 199:15 |
| 56:10,23 57:3 | 109:11,17 | 155:12,14 | 199:22 200:3 |
| 58:15,18 60:20 | 110:10,19,22 | 156:14 157:5 | 200:19 201:3 |
| 61:13 62:17 | 111:14 113:15 | 157:13 158:5 | 201:15,19 |
| 63:4 64:3,10 | 114:5,11,22 | 158:13,18 | 202:4,13 203:2 |
| 65:20,23 66:10 | 115:7,13 | 159:1,8,15,20 | 204:3 205:3 |
| 66:13,16 67:5 | 116:19 117:10 | 160:9 161:5 | 206:18 207:2 |
| 68:11,13 70:9 | 117:15,18 | 163:11,17 | 207:18 208:22 |
| 71:10 73:2,4 | 118:6,23 | 164:4,12,19 | 210:6,13,19 |
| 73:15 74:7,10 | 119:21 120:1 | 166:7,15 167:6 | 211:2,9 212:1 |
| 74:16,20 75:7 | 121:22 122:21 | 167:19,21 | 212:6,13 213:9 |
| 75:15 76:5,15 | 123:5,8 125:2 | 168:8,12 | 213:15,23 |
| 77:9,19,20 | 125:18 126:12 | 169:10,18 | 214:3 215:4,10 |
| 78:6,12,13,19 | 126:21 127:1,4 | 171:2,12,17 | 215:13 216:7 |
| 78:22 79:3,11 | 127:10,16 | 172:16,18 | 217:11,15 |
| 79:18 80:9 | 128:10 129:4 | 173:15 174:2 | 218:2 220:21 |
| 81:11 82:3,6 | 129:12,20 | 174:11,19,23 | 221:14,19 |
| 82:10,17 83:15 | 130:12 131:4 | 175:4,20 176:7 | 222:4,10,18,23 |
| 83:20 84:4,10 | 131:12 132:7 | 176:12,16 | 223:2 224:9,18 |
| 84:13,22 85:4 | 132:15 133:2 | 177:3,3,5,18 | 224:22 226:3 |
| 86:1,7,14,18,21 | 133:20 134:14 | 180:18 181:11 | 227:17,18 |
| 87:2 89:2,9,21 | 135:12 136:3,8 | 181:17 182:3,7 | 228:5,10,18 |
| 89:23 90:4,7 | 137:12 138:10 | 182:19 183:2,7 | 229:14,19 |
| 91:1,18 92:9 | 138:19 139:17 | 183:10,17 | 230:5 231:2,18 |
| 94:2,7 95:7 | 140:9 141:8 | 184:8 185:23 | 232:22 233:1 |
| 96:3,12 97:1,6 | 142:8,11 143:4 | 186:6,15,21 | 233:18,22 |

234:12,16
235:16,19
236:5,20 237:5
237:7,14,16
238:5,13,21
239:4,10,18
240:4,10
241:10,18
244:1,18 245:9
246:22 247:4
247:10,17,22
248:2,5,11
249:1,10,16,22
250:5,16 251:7
252:12 253:1
253:12,13,19
254:1,5,13
255:15,19,22
255:23 256:8
256:19,23
257:8,14,18
258:1,16 259:6
259:11 260:2,3
260:7,8 261:5
261:11,20
262:7,17,23
263:15,21
264:14,19
265:1,8,11,23
266:9,19,23
267:11,16
268:4,14,21,22
269:14,18
270:10 271:5
271:16 272:6
272:19 273:9
273:12 274:4
275:6,10,15
276:1,8,12
277:1,10,21
279:9,14,16
280:13,14
282:2,7,16,19
282:22 283:13
283:21 284:14
284:22 285:11
285:19 287:2
287:11,20
289:2 290:23
292:8,18 293:4
293:16 294:7
294:12 295:4
295:15,22
296:3,13,21
297:4,19 298:2
298:2,6,11
299:16,22
300:5,18 301:7
302:15 303:7
303:19 304:10
305:4,9 306:14
306:23 307:4
307:19 308:6,9
309:8 310:16
310:19 311:2,6
311:19 312:4,8
312:18 313:1
314:10,18
316:12,18,20
316:20,22,23
317:1,8 318:4
318:8 319:14
319:22 320:7
320:12,23
321:17,19
322:23 323:7
323:15,21
324:21 325:11
326:21 327:10
327:15,20,22
328:10 329:2,8
329:16 330:12
330:16 331:14
331:18,23
332:5,9,16
333:4,9,16
334:5 335:22
336:9,14 337:4
338:3,6,12,16
338:20,23
339:7 340:7,11
341:9 342:1,7
342:16,22
343:7,11 344:2
344:5,11,18,22
345:6,8 346:15
346:19,23
347:7,10 348:1
348:13,18,20
349:21 350:4
350:11,18
351:3 352:10
352:15 353:5
353:18 355:6
355:16 356:1
356:16 357:17
358:12,17,22
359:8,20,23
360:16,20,20
361:4,9,19
362:6,6,10,20
363:12,19
364:6,17 365:1
365:3,11

**old** 15:10,19,20

**once** 53:17 62:11 103:7 153:18,19 156:22 182:13 215:15 284:3 292:20 312:16 322:20 325:2

**one's** 344:1

**ones** 22:7 69:10 82:1 152:14 155:7,8 164:10 187:16 263:17 265:19 293:5

**ongoing** 19:8 309:9 323:19

**onion** 99:14

**online** 40:18 286:16

**open** 203:20 220:11,18 343:19 344:5 347:1

**opinion** 303:5,6 348:10

**opportunities** 188:20
**opportunity** 9:15,18,22
**opposed** 120:2 347:5
**option** 113:8
**oral** 7:11
**order** 131:19 201:20 226:19 244:7
**orders** 158:7
**orientals** 258:12
**original** 21:7 91:18 109:13 109:18 137:12 137:15 138:4 143:19 157:16 235:20 236:10 237:1 238:8,15 238:23 240:3 240:12 243:4 257:20 258:1 258:14 270:2 270:13 271:15 285:20
**originally** 24:19 91:20 124:12 129:10 130:8 283:7 284:18,20 285:2 286:6 287:5 327:1
**outlet** 49:1,19 51:12
**outlets** 49:2
**outline** 4:11 78:21 207:10 354:20 356:13 357:9
**outlined** 195:23 196:6 222:7 238:14 247:5 265:12 305:15 353:13 354:3
**outlines** 207:21 355:9
**outrage** 299:11
**outside** 17:10 18:11 39:11 147:6,7
**outstanding** 219:2 249:6 251:1
**overall** 184:14 333:6
**overlap** 76:10 257:2
**overly** 167:12
**oversaw** 155:21 156:2
**oversee** 122:7 126:3 133:19 178:5
**overseeing** 178:4
**oversees** 159:3
**oversight** 157:21 158:1 175:6
**owed** 167:22 168:4 169:20 170:7 224:15 228:3 352:17
**owes** 199:17
**own** 19:4,18 22:17 39:11 76:2 80:11 87:10 127:6 256:15 331:8 353:2
**owner** 42:18

**p**

**p** 1:13 94:11 188:4 213:7 310:4
**pacific** 1:11 5:11 8:7 32:19 33:2 65:16 79:5 85:9 94:19 113:11 129:17 142:23 143:3 161:7,8 166:10 168:1 176:14 190:7 199:17 200:18 202:9,21 204:17 210:22 218:20,22 222:12,16 248:3 271:3,5 271:14 272:4 275:12 289:11 290:4 291:1 303:10 329:18 333:10 340:21 352:4,11,19,22 354:15,19 356:13 357:4 357:22 359:15 360:1 361:12 361:14
**pacific's** 4:11
**pack** 34:18 35:7
**packing** 35:4
**pad** 255:4,21 256:1 257:3
**page** 3:3 13:23 78:9 82:8,12 85:19,20 89:10 89:12 105:4 164:2 165:11 172:2,5 176:19 178:6,6 179:8 188:10,19,19 196:9 200:12 204:4 205:4,9 205:11,12 218:8,15,17 219:2,18 230:22 231:1 232:5 249:12 251:12 255:5 255:12,13 265:2 267:17 268:18 280:7,8

280:16 285:14 292:16 300:17 301:22 302:19 303:8 307:1,2 318:18,19 326:10 327:3,9 332:18,20 338:20 351:17 351:17 352:9 362:1,11,21
**page's** 188:22 189:4
**pages** 121:1 136:14 156:15 179:6 234:13 264:20,21 265:13 266:1 307:1 319:11 349:10 355:15 361:21 364:19 364:20
**paid** 43:6 64:2 65:13 135:6 161:8 174:4 175:22 176:14 187:1 198:3 200:19 201:4 204:8,10,14,15 218:23 219:5 225:21,22 226:22 229:5 250:3,4,7,11,17 251:2,17,21 252:11 253:4 254:15 257:6 257:11 258:11 259:1,22 260:16 261:5,6 263:17 266:21 267:2 269:6 271:3,5 272:4 273:4 274:7 285:6,6 286:6 289:16,19 316:8
**paint** 45:19 59:23 60:2,7 60:11,22 61:2 68:6,9 202:7 202:20 203:11 203:16,18
**painted** 43:22 44:6 45:13 51:16 60:4,5 68:5 98:9
**painting** 45:13 60:20
**paneling** 102:19
**pantry** 130:14
**paper** 340:15
**paracca** 186:4 186:18,22 188:3,4
**paragraph** 89:14,19,20 165:11 303:12 304:15 305:19 306:15,16 307:3 318:14 327:4,4,14,18 328:11 332:20
**parameters** 140:12,13 162:22
**parents** 29:21 33:22 34:2,11
**paris** 5:18,19 57:9 75:5 76:22 83:8 164:19
**parking** 182:17
**parkinson** 19:5
**parkway** 1:19 5:20 7:8
**part** 81:1 89:11 106:15 115:6 115:14 118:21 128:21 137:11 147:19 179:19 181:9 190:19 198:18 206:15 225:14 244:11 249:23 253:4 256:10 259:3 260:17 263:3 263:22 264:11 272:21 279:18 288:22 293:18 295:6 298:12 302:4,9 322:23 343:1 344:9,11 349:11 350:6 354:21 357:4 361:9 362:22 363:22
**partial** 172:7 173:17,20,21 198:18 204:21 205:7,17
**particles** 154:20
**particular** 201:17 294:8
**parties** 1:15 2:9 366:14
**partners** 19:23
**parts** 61:8 124:11 149:10 180:23 181:5 181:15 182:19
**partway** 94:15
**parvin** 1:18 5:15 7:1 366:19
**passed** 103:2
**passing** 50:2 134:12
**past** 8:9 82:4 202:10 209:18 277:5 308:18 314:2 320:14 324:2 334:17
**patched** 147:23
**pattern** 339:2,9
**paul** 150:3,4,6 150:15,16,17 150:20 151:11 152:1,4 328:19 328:22

**pavement** 137:3
**pay** 75:15 143:9 156:18 200:18 204:17 206:13 213:14 214:4 243:12 243:19,22 244:10 280:9 357:23 358:8
**paying** 64:3 211:16,20 212:14 243:3 271:15
**payment** 43:4,7 86:3,4,15 198:1 204:21 205:7,14,18 249:14 274:9 274:16 278:2 294:5 304:18 358:5,5,13 359:13
**payments** 173:17 210:23 226:5,16 249:13 252:7 264:7 265:2,4 273:16,17 278:3
**pdfs** 206:22 288:17
**peachtree** 6:1
**peacock** 325:8
**peeling** 99:13
**penalties** 55:8
**people** 23:18 27:2 38:9 40:17 56:5 310:14
**percent** 87:2 88:23 90:13 158:2 235:18 235:18
**perfect** 128:18 228:7
**perform** 73:19 95:8 96:1 121:14 139:22 364:3
**performed** 102:2 138:10 163:19 165:19 166:1 174:6 361:15
**performing** 120:15 126:3 162:23 362:4 364:1
**permanent** 86:8 89:13 90:13 91:5
**permission** 61:1 64:21 65:1 150:4 152:1
**person** 120:22 150:16 243:4 276:10
**personal** 35:8 339:10,22
**personality** 330:4 338:22
**personally** 18:17 19:20 60:16
**perspective** 353:14
**pertains** 301:13 363:15
**pest** 216:13,15 217:7,11,17
**pests** 217:20
**peter** 185:19 186:17 187:2 187:20 188:6 189:2,4,11
**philanthropy** 23:10,12
**phone** 30:5 161:21
**physician** 310:6 312:22
**pick** 274:20
**picked** 285:7
**pictures** 128:3 275:11 282:13 288:17
**piece** 277:7,17 277:20 285:5
**piecemeal** 184:15
**pieces** 230:8 276:16,21 278:7,10
**pilates** 335:15
**pink** 238:4,7 268:3,11 270:1 270:12
**pipe** 184:6
**pipes** 181:2 183:1 184:7
**place** 85:1 297:1
**places** 200:9
**plaintiff's** 172:6 225:14 228:12 231:9 354:19,21
**plaintiffs** 1:9 5:9,22
**plan** 111:20 123:15 189:10 190:16 192:11 194:20
**planning** 21:10
**plans** 22:8 112:11 131:18 155:20 185:1 189:5,6 196:8 196:11
**plant** 184:23
**plantings** 179:14
**plants** 179:13 181:19 184:22 187:13 189:19 190:2 192:20 194:4,4,18

214:16
**playroom** 130:18
**pleadings** 80:20,20
**please** 10:6 52:7 62:3 75:6 77:8 81:10 82:13 83:8 105:3 145:9 168:18 169:19 191:9 205:21 223:18 302:7 303:9 347:1 354:14 360:7
**plenty** 208:13 280:14
**plugs** 49:20
**plumber** 52:18
**plumbers** 52:22
**plumbing** 51:5 51:6 54:19
**plywood** 35:19 128:16
**pm** 334:20 335:4,6
**point** 8:21 9:16 10:4,12 18:16 28:15 32:15 42:8 48:14 65:7,7 68:22 70:20 71:3 85:13 86:14 91:21 95:8 96:11,15 97:2 98:5 99:10 101:13 103:19 108:11 110:4 112:3 114:17 116:2,9,13 118:5 122:11 123:22 124:18 127:22 128:1,2 129:6 130:1,3 132:8 135:4 145:19 146:23 158:2 174:21 186:11 212:2 212:16 213:3 213:16 215:10 248:14 249:10 272:16 273:1 275:20 282:1 309:16 312:19 317:14 329:1 331:16 354:3
**pointed** 50:1 358:12
**police** 28:17 36:5
**policy** 79:5,6 82:4 85:8,11 87:9 88:10,12 88:15,22 89:7 91:11 168:1 169:21,22 197:19 224:16 273:13 280:22 289:22 290:1 297:15 329:21 361:11,12
**pollen** 23:22
**pool** 69:8
**pooling** 129:3
**porch** 108:10 115:6
**portion** 78:11 106:8 107:16 108:16 168:5 250:20 274:12 288:11 294:18 296:10 347:5 364:8
**portions** 131:21 181:2 352:18 364:7
**position** 120:18 167:22 195:1 195:10 202:15 202:23 208:2 209:5 319:19
**positive** 149:7
**positively** 93:4
**possession** 149:20 330:10
**possibility** 42:20
**possible** 214:18 220:7
**possibly** 315:21 323:9 340:20
**posttraumatic** 317:5 318:10
**pounding** 307:12
**power** 148:17 211:21 212:19 212:22
**powerless** 316:2 333:6
**practitioner** 310:2
**preemptive** 336:5
**prefer** 172:4
**preference** 132:17,23
**pregnant** 17:23
**prep** 179:10
**prepare** 79:12 79:17,20 80:14 81:13 179:16 356:16
**prepared** 80:16 96:6,11 105:5 105:10 119:17 143:12 144:1 169:15 224:5 228:16 232:17 296:18 299:6 348:9 353:12
**prepping** 179:15
**prescribed** 309:16 313:3
**prescriber** 309:22

**prescription** 310:11 312:15
**prescriptions** 310:9
**present** 6:5 325:14,21 359:20
**presentation** 85:15
**presented** 351:1 352:16
**press** 285:4,10 285:12 286:22 287:12
**presumably** 245:19
**pretty** 154:9 277:12 342:3
**prewire** 293:21
**price** 74:18,19 158:2,4,10 245:11 273:7
**primarily** 93:14 98:22 299:15 325:3
**primary** 310:6 312:21
**printed** 234:7 357:18
**prior** 2:12 11:4 18:16 42:4 119:12 153:8 178:16 195:18 287:21 308:10 320:2 335:7 345:1 358:13
**prioritize** 281:13 282:6
**private** 15:5,21
**privileged** 80:1 81:8
**privy** 210:9
**probably** 10:13 83:12 103:23 229:5 283:2 284:21 321:18 323:13 324:4 355:5
**problem** 30:7 50:4 93:18 147:4 163:10 194:15 207:17
**problems** 48:16
**procedure** 7:5
**proceeded** 103:13
**proceedings** 7:12
**process** 35:18 56:5 76:13 98:10 146:14 154:8 156:12 180:12 193:1 193:11 194:3 240:23 241:5 284:4 290:17 302:5,10 303:23 311:7 314:11,17,20 319:19 326:3 326:23 327:12 329:23 331:10 331:15 332:11 340:3,9,22 352:5,22 353:15
**produce** 241:11 241:14 245:23 247:1,2 290:12
**produced** 237:23 248:2 279:18 342:15 343:2 349:18
**produces** 245:15
**product** 81:2
**production** 278:14 349:11
**products** 242:14 246:2
**professional** 348:10
**programming** 293:23
**progress** 96:22
**progressed** 124:6
**project** 158:14 175:6 178:6
**promise** 10:3
**prompted** 121:3 312:1
**prone** 341:4,10
**pronounce** 11:14 102:5
**pronouncing** 250:21
**pronunciation** 11:19
**proof** 3:18 168:6 170:15 175:18,21 177:19 198:22 225:2,20 227:5 228:12 230:18 231:9 234:20 288:22
**properties** 39:11,18 211:15
**property** 13:9 22:18 39:6,7 42:18 140:19 221:1
**protocol** 101:22 119:18 120:14 121:20 123:18 125:7,9 126:19 133:19 141:7 162:4,6 162:9 163:21 167:1,4 348:15
**protocols** 165:19 166:1
**prove** 256:17
**provide** 121:8 122:2 123:18 166:5,20 209:9 217:16

**provided** 7:4 106:17 113:1 162:22 169:14 208:1 214:23 282:3 304:7,22 304:23 353:17
**provider** 216:2
**providers** 324:12
**provides** 121:19 354:22
**providing** 166:11 167:15 167:16 209:1
**psychiatric** 307:2 308:10 309:9
**psychiatrist** 309:5 310:9 312:14,19 324:16,22
**psychological** 302:2 308:10 309:9 315:2 324:10
**psychologica...** 317:18
**psychologist** 324:15,23
**ptsd** 317:11 318:18 319:7 326:8
**public** 15:23 366:23
**pull** 168:22 171:8 198:13 206:22 223:16 225:4 226:7,23 278:18 292:1 295:20 357:16
**pulled** 293:1 295:19
**pulling** 209:19 292:1,3 362:13
**punch** 20:19 135:9,11 136:10,13 137:17 156:13 156:17,22 157:2,7
**purchase** 46:4 244:8 277:7 288:2
**purchased** 38:14 244:23 283:7 284:18 284:20 285:1 287:5
**purchases** 242:22
**purchasing** 243:3,5
**purpose** 94:20 105:13
**pursuant** 91:11
**put** 32:5 35:19 36:1 107:12 108:14 109:4 109:15 128:16 146:12,18 154:10 156:16 168:6 170:22 178:14 190:14 192:12 196:23 204:13 293:22 296:20 305:7 329:11 356:3
**putting** 28:14 108:11 143:16 328:4

**q**

**qualifications** 120:21
**quality** 91:7
**question** 8:18 9:14,22 10:5 10:19,20 22:19 45:18 63:14 81:10 83:14 84:19 87:22 92:14 108:4 111:17 135:23 135:23 136:7 151:16 162:16 169:19 172:19 185:22 193:18 194:14 202:18 208:12 232:20 247:11,12 264:13 288:9 293:12 296:16 301:11,16 318:22 319:1 339:16 361:10 362:21,22,23 363:10,14,16 363:23
**questioning** 305:22 306:13
**questionnaire** 307:11,18,23
**questions** 2:8,9 8:14 82:13 149:9 172:15 193:1,10,17,21 194:2 209:4 240:23 241:6 279:12 290:5 301:13 333:11 342:6,14 360:2 364:20,22 366:7
**quick** 342:4
**quicker** 177:17
**quickly** 65:10 282:22
**quotation** 352:13
**quote** 137:8,9 364:21
**quotes** 352:5,6

**r**

**r** 84:6 93:15,15 93:19,20 94:11 188:4 213:7,8 343:5,5 366:1
**race** 19:12,14
**rain** 128:11

**rains** 128:19 129:1,2
**raise** 19:13,15 167:8
**raised** 77:16
**ran** 180:22
**rate** 246:16 307:13
**rather** 210:18 361:12
**reach** 331:16
**read** 86:18 88:10 89:18 90:1,18 91:7 288:8,12 305:8 351:3 354:13 355:2,3 360:7
**reading** 1:22 89:7 130:22 253:13 258:16 301:10,12 317:13 340:14
**ready** 43:20 59:22 73:20 82:9 89:18 211:5 292:10 299:2 340:16
**real** 37:21 41:5
**reality** 305:22 306:13
**realize** 282:23
**realized** 65:8
**really** 128:5 133:17 152:22 153:1 167:10 183:15 203:20 311:15,15 332:7 334:18 337:12
**reask** 162:15
**reason** 74:23 104:6 116:19 139:21 140:23 162:7 203:15 263:18 290:19
**reasonable** 186:16
**reasons** 109:6 169:21
**rebuild** 91:4,13 110:3 112:15 112:22 113:4 113:21 114:13 114:16 115:1 129:13 132:18 132:19 135:1 143:10 155:21 170:20 298:2 316:9 361:13
**rebuilding** 115:17,18 124:11 130:4 132:2,22 137:22 140:2 143:3 155:18 156:1 159:6
**rebuilt** 13:17 110:1 111:8,22 111:22 131:19 133:13,21 134:2 137:13 145:1
**recall** 18:1 21:1 22:2 28:18 30:4 33:5,18 33:19 34:12 36:3,16 40:20 41:21 44:4 45:21 47:14 48:8,9 51:3 54:1,1 55:19 56:2,2,13 60:18,23 61:3 62:20 64:23 68:14 69:11,13 72:1,22 73:1,9 73:21 75:14 79:10 80:5 82:1 93:4 96:10,13,21 97:4,9,10 98:6 99:12,12 101:14,16 103:22 104:8,9 104:19 109:10 111:5 113:5 118:1,20 120:19 123:1 128:2 129:23 132:1 138:14 145:21 159:7 163:15 167:17 192:23 203:13 216:11 240:22 241:4 275:18 278:16 291:16 317:5,11 318:2 319:3 321:4 326:4 330:22 350:9 353:22
**receipt** 286:5
**receipts** 238:11 262:14 289:8
**receive** 230:7
**received** 135:5 142:19 198:3 205:13 254:9 257:13 259:4 265:3 273:17 276:2,6 287:23 309:13 358:5
**receiving** 230:1 309:8
**recent** 168:9 313:9
**recess** 52:3 77:4 145:11 199:6 248:22 342:10
**recessed** 71:20 71:21 72:3,11 72:14
**reciprocity** 208:3 209:5
**recoated** 136:22
**recollection** 35:17 93:3 359:11

**recommendat...** 120:11
**recommended** 40:23 41:2 158:15
**reconstruct** 106:1,19 143:7
**reconstructing** 142:7 155:22
**reconstruction** 87:11,16,19 88:21 90:12,15 90:21 91:1,11 106:2,8 139:3 141:22 174:21 178:6 326:12
**record** 9:1 52:6 77:2,8 145:9 145:15 160:12 169:4,8,11 171:15,18 188:17 199:3 225:9 249:2 303:20 313:20
**recovered** 283:23
**red** 167:8 237:9 268:3
**redesign** 131:17
**redo** 107:8 163:23
**redraw** 131:21 131:23
**reduce** 126:9
**reducing** 117:2 321:8
**refer** 87:8
**reference** 78:9 197:3 232:11 239:21,23 240:2,8,11 244:20 278:1
**referenced** 87:18 113:13 113:19 306:15
**references** 240:17 258:13 361:21
**referencing** 78:2 179:4 210:10 223:13 225:13,16 226:10 227:13 264:16 344:8 348:2 365:9
**referred** 312:13
**referring** 108:7 154:1 155:3,5 355:8 360:4
**refers** 361:7
**refinished** 61:11 67:19
**refuses** 352:11
**regardless** 218:5
**regards** 112:11
**regency** 286:22 287:12
**regular** 70:7 220:13
**rehash** 78:4
**reimburse** 54:3
**reimbursed** 53:18
**reimbursement** 53:10
**reinstall** 291:22
**relate** 314:19
**related** 31:5 278:10 320:3 329:5
**relating** 2:3
**relationship** 116:13 119:1 119:13 344:19 345:1
**relax** 307:12
**relay** 329:7
**released** 55:5
**relevant** 220:6 246:11 294:23
**relieve** 335:18
**relieves** 314:3
**remain** 330:9
**remainder** 194:13
**remaining** 136:18 173:2 173:22 250:6 294:21
**remediate** 94:23 120:6 140:21 143:22 146:12 163:6 170:22 364:7
**remediated** 98:8 100:1 142:6 144:9,17 146:7,17
**remediating** 117:14
**remediation** 98:10,17,19 99:6,9,15 101:23 106:4,4 107:1,2,13,14 112:11 115:16 116:5 117:2,4 117:5,6,7,11 119:4,17 120:5 120:12,22 121:12 124:2 125:1,7,9 126:3,9,19 138:8,23 139:8 139:22 140:12 140:18 141:1,7 141:13 142:15 143:16,20,23 144:5 145:2 146:6 150:18 161:19 162:1 174:14 276:20 340:22 346:1,3 346:8,21 347:4 347:5,13 354:22 361:3,8 361:14 362:4

363:3 364:2,3 364:11
**remember** 18:8 29:8,17 32:14 37:17 38:23 39:2 41:23 45:6 49:14 58:6,14 68:23 70:17,19 71:5 83:11 92:18,20 100:19 114:7 136:6 138:15 161:4 186:23 187:15 193:4 193:14 215:9 219:10 291:21 301:3 309:14 317:13 359:19
**removal** 95:11 96:20 106:15 115:3 139:3 180:20 182:15 275:1
**remove** 146:9 150:12 201:7 328:19 343:14
**removed** 146:16 149:22 150:5 151:12 152:4
**renee** 325:8
**renovated** 61:9 64:14 66:17
**renovation** 61:7 65:22
**renovations** 61:13,16 62:8 62:22 64:4,22 65:12 158:23 159:3 326:18
**rent** 43:5,10 56:8 58:23 74:18,21 75:13 75:18 204:23 205:18 206:14
**rental** 37:14 38:10 41:5 55:4 56:6 58:20 64:4 65:10 75:9 201:10,10 203:20 211:14 213:21 214:15 215:23 216:9 220:2,23
**rentals** 41:9
**renter's** 221:12
**renters** 221:10
**renting** 42:9
**repainting** 139:1
**repair** 52:15 53:18,19 54:3 86:4 91:3,12 105:16 106:1,9 110:4 112:1,14 112:20 114:12 115:15 116:8,9 132:19 133:14 136:12,19 143:5,11,13,15 148:16 161:4 170:22 171:4,7 184:16 186:7,8 190:10,14 191:21 193:13 194:18 195:16 281:18,18 361:12
**repaired** 109:23 115:4 139:6,7
**repairing** 106:3 133:18 276:22 277:6
**repairs** 53:9,14 53:16,23 54:6 54:16,18 204:1
**repeat** 10:7 11:5 319:5
**rephrase** 10:7 81:9 87:22 144:16 202:18 264:15 302:12
**replace** 91:3,13 148:20 184:12 185:5 193:12 194:18 241:21 280:16 285:2 289:15,19 316:9
**replaced** 48:7 68:1 139:5 148:13,14 181:16 185:13 187:11,13 192:8 193:3 215:11 247:19 247:23 248:9 283:18 287:11 289:3,4,9 290:9
**replacement** 86:3,5,15 87:11,17 88:1 88:19 89:15 90:11 185:17 190:2 229:1 230:8 236:15 236:23 239:15 239:18,20 240:15,17 241:1,7,11,20 244:12 246:8 246:12 257:13 258:3 266:22 268:9 282:12 283:8,10,16 284:5 285:10 285:22 287:4 288:2,3 289:16 290:2,5,10,13 290:18
**replacing** 284:17,19
**replanting** 179:17
**report** 3:23 33:6,7,8 252:14,23

256:3,7,21
258:18 259:2,8
260:1,17
261:19 262:1,3
262:6 263:2,5
263:11,16
264:3 265:16
265:20 266:3,8
266:12,13
267:3 268:9
269:6,11,21
298:12,15
299:3,5,23
300:2,11
301:14,21
302:16 305:5,6
305:16 306:21
308:17 309:15
311:7 317:4
336:14 340:7
348:9
**reported** 32:19
305:10 306:19
307:16,20
308:22 332:23
333:7,13,21
340:19 341:6
**reporter** 5:16
7:2,18 8:15 9:3
70:22 104:23
113:16 135:15
135:22 136:3
236:3 288:13
339:3,5 366:20
**represent** 8:7
**representation**
305:11
**representatives**
242:16
**represented**
166:9
**represents**
366:10
**request** 105:11
109:8 113:6,9
207:5
**requested**
275:20
**requests**
241:15
**require** 68:20
**required** 91:2
91:12,14 203:6
**requires** 39:23
134:2
**resells** 242:22
**residences**
40:16
**residue** 30:20
101:10 116:6
128:5 152:19
**resilient** 337:11
**resolve** 316:11
**respect** 194:20
297:16 336:15
337:15
**respective** 1:16
233:14
**respond** 110:11
208:19 251:8
332:2
**responded**
322:18 332:3
**response**
111:10 113:15
113:22 114:1
127:4,5 241:14
357:20 358:14
360:1,17
361:20 363:13
364:18
**responses**
168:15 169:13
173:4,13 191:8
268:7 279:19
321:20
**responsibility**
326:11
**responsible**
22:8 63:22
221:1 361:14
**rest** 44:10
96:22 266:13
267:12 343:13
**restoration**
34:14 46:5
95:9 150:18
274:8 276:9,18
278:7
**restore** 281:12
**restored** 226:2
282:4
**restoring**
276:14
**resubmit**
275:17
**result** 118:9,11
121:14 366:16
**resulting**
306:16
**resumed**
213:23
**retired** 325:6
**return** 312:18
**returned** 45:2
**reuse** 151:20
**reused** 149:16
149:17 151:18
152:6,10
**revealed** 99:16
**review** 79:11
79:20,22 80:3
80:8,20 81:3,6
81:12,17 195:5
199:13 299:23
300:2 303:20
304:1 345:19
355:3,14
356:19 358:17
**reviewed** 79:5
79:9,16 80:7
80:14,19,23
81:21 82:2,3
305:2,4 359:1
359:4
**reviewing**
333:15

**rewire** 293:21
**rh** 201:20
**rid** 141:10 276:22
**ride** 19:15
**right** 11:2 12:22 17:7 24:3,6 31:10 32:22 33:23 34:16,19 42:11 46:2,8 48:2,13 50:23 51:4 52:8 59:13,21 60:18 63:1 68:18,19 77:9 78:7 79:4 80:2 82:6,12 85:18 86:8 87:7 88:9 89:7 90:10,18 102:12 105:8 108:9,19 115:23 116:14 118:18 122:12 122:19 128:14 137:5 145:16 147:10 155:16 160:1 164:15 165:5 172:1 177:21 178:19 180:9 184:2,9 195:2 196:7,21 200:22 205:7 206:23 211:10 211:23 218:6 222:23 224:9 226:20 227:2,7 229:22,22 230:19 233:2 234:15 239:2,9 239:22 242:11 242:23 243:5 244:16 245:13 248:7 250:21 251:5 255:9,12 256:12 258:14 259:19 260:13 263:7,13 269:15 270:7 271:8 275:8 276:8,10 279:21 280:4,8 282:20 286:2 298:7 300:13 300:19 303:12 306:11 309:17 311:11,12 336:1 341:21 342:2 343:8,17 345:22 347:17 349:8 351:21 352:19 356:11 360:11 362:5,6 363:4 365:11
**riner** 4:1 299:7 300:6,8,12 301:2 302:17 302:17 303:17 303:21 306:19 307:6 308:11 308:22 317:15 318:10 319:12 319:18 324:18 324:19 325:15 326:1 340:8,19
**riner's** 317:4 328:6,8
**road** 12:2,10,15 12:21 20:6 22:17 30:2,3 38:12,14 40:6 58:16 74:11 84:12 91:19 103:5 119:16 201:8,16 211:17 213:10 213:15,21 214:4,10,11,14 215:14,22 216:3,8,18 217:3,8,12,16 221:21 222:2 222:11,21 247:6 291:23 292:20 294:11
**roadblock** 208:14
**roadmap** 170:14 171:5 172:8 198:7,17 225:1,18,23 227:8,13 228:6 229:11,13 231:14,20 232:5,19 233:7 233:8 234:10 234:16 264:6 264:11,17 272:20 295:10 295:12,13
**roadmaps** 170:13 220:4
**rob** 310:1
**role** 158:1
**roof** 31:22 32:2 36:2 86:4 115:6
**roofing** 147:7
**room** 24:12 44:9 47:20 69:19 70:8 72:13,13 130:17,23 154:5 229:16 255:3,7,18,18 257:5
**rooms** 72:10 131:7
**rotting** 112:12
**roughly** 174:13 215:15 260:21
**round** 259:20
**rude** 8:23
**rug** 251:14,21 252:10 254:8,8 255:4,21 256:1 257:3 258:17
**rugs** 254:9
**rules** 2:3 7:4
**run** 148:18,19 335:15

**running** 59:16 153:17 183:13
**runs** 147:16 182:20,21 192:21

**s**

**s** 1:13 83:18,19 84:6 213:7 310:4
**sad** 318:7
**safe** 32:16
**safety** 55:10
**saith** 365:22
**sake** 214:20
**sales** 258:5 285:23
**salvageable** 35:9
**salvaged** 214:17
**sanitized** 43:22
**sat** 112:13 127:21 153:1
**save** 237:17
**saw** 27:23 30:4 33:12 36:4 38:1 45:22 62:17 71:14 122:10 125:23 126:1 128:10 138:1 151:9 278:14 285:11 305:2,7 308:13 312:12,15 337:4
**saying** 8:16,20 9:10 111:5 163:21 205:5 352:12
**says** 82:12 85:22 86:2,12 86:22 88:10,12 88:15,22 90:11 90:21 108:14 108:18 154:15 155:5 157:20 165:13 173:22 184:10 197:15 199:16 201:11 201:20 204:12 218:9 220:1 224:12 229:16 233:14 239:21 245:2,3 250:14 252:14 253:10 253:14 255:2 255:20 258:11 258:17 266:11 269:21 270:12 271:2 272:4 274:1 275:6 280:9 296:4 299:19 303:9 304:13,15 305:21 306:16 307:11 327:5 332:23 335:9 338:21 339:1,8 340:12 341:3 343:16 346:5 347:1,18,19 352:11 354:14 357:22 360:1 363:5
**scale** 319:10
**scaled** 117:12
**scales** 338:22
**scape** 3:12 179:2 184:10 188:9,23 193:7 196:3 197:5
**scared** 336:16
**scenario** 323:4
**scene** 29:4,11 336:21
**schedule** 186:14
**school** 14:22,23 15:2,4,5,7,15 15:21,23 16:1 16:5,7,12 17:6 17:21 18:4 40:8
**schools** 40:1
**sconce** 24:13 26:16
**scope** 99:15 106:16 117:2 125:21 126:2,9 126:17 150:7 150:14 155:19 321:8
**scratch** 113:4 129:14 135:1
**scratches** 154:22
**scroll** 205:8 292:10
**sealed** 98:9
**sealing** 122:9
**seamstress** 69:20
**sean** 346:10 347:2,2,3,8,18 348:14,16
**search** 40:21 119:7,23
**season** 23:23
**seasonally** 217:13
**second** 24:15 24:16,23 25:3 25:12,14 31:19 35:12 78:10 83:6 87:13 89:11,17 97:20 105:4 145:23 164:1 165:11 168:20,22 169:4 171:11 199:2 228:8 233:11 248:8 258:6 267:19 278:19 279:5,7 280:16 285:14 291:6,23 293:10 299:1 303:12 307:3 316:12,14

318:17 332:19 345:19 352:2 355:14 360:13 362:17
**section** 177:6
**secure** 84:15
**secured** 85:8
**security** 37:6 75:16,21 222:20
**see** 8:14 28:6 40:2 43:1 49:15 58:1 85:22 86:1,5,9 86:12,16 87:9 89:15 90:10,21 95:15,17 108:5 140:6 145:7 171:8 173:2 191:11 198:13 199:20 211:11 211:19 212:12 218:7,17 221:19,22 226:9 232:5 249:16 250:15 255:22 257:6 262:13 268:15 269:2 270:7,17 274:14 281:2 285:16,17 286:14 288:21 291:11,18 292:16,22 294:14 300:15 303:10,14 304:18,20 312:6,16 327:7 334:21 335:23 346:16 352:15 365:6
**seeing** 171:4
**seek** 312:1 331:2
**seeking** 226:17 361:8 362:8 363:4
**seems** 193:20 305:11
**seen** 77:22 165:7 169:16 207:11 241:22 262:4 298:15 349:14
**selected** 99:5
**self** 305:23 306:17
**sell** 19:13
**semi** 277:9
**send** 113:10 173:23 178:21 208:18 227:19 283:16 292:5 293:7
**sense** 10:5 99:19 184:14 260:19 305:22 327:6,23 329:9 329:18
**senses** 111:17
**sent** 284:6 308:1 354:8 357:14,18
**sentence** 306:14 327:17
**sentimental** 276:16
**separate** 25:17 144:10
**separately** 243:19 244:16
**septic** 160:15 160:19,21,23 161:2,2
**served** 300:3
**serves** 354:23
**service** 26:19 213:12
**services** 82:14 82:23 186:1,13 186:20 187:2 188:7 214:10 214:13,23 217:8,12,15
**set** 43:5 46:17 74:5 201:14 354:14
**sets** 354:18
**seven** 58:17 112:14 170:1 173:1,5,7,11 185:3 205:19 224:14 236:17 236:19 239:12 258:6,9 269:1 270:5,6,21 271:5,12,19,23 273:2,20,21 274:6,10,11 358:1,3
**seventy** 179:11 185:3 224:13 228:2 258:4 260:9 270:6 272:8,11 273:10,21 274:11
**several** 218:15 266:1 291:17 335:5 355:15
**sgc** 1:5 5:5
**share** 164:20
**she'll** 244:7
**sheetrock** 30:14 97:16 101:9
**sheets** 128:16
**shifted** 130:16 130:21
**shop** 285:6
**short** 76:23
**shortly** 46:13 336:10
**shot** 32:2
**show** 162:11 172:4 192:7 288:2 290:9 360:9

**showed** 50:3 117:21 226:17
**shower** 48:21 53:17 54:7 104:3,12,16 115:11 343:18 344:3,4
**showrooms** 242:17
**shows** 290:13
**shredded** 275:7 275:9
**side** 249:23 269:20
**sign** 157:12 158:11 354:9
**signature** 1:22 351:17 360:18 363:21 366:18
**signed** 41:15 351:4
**significant** 133:12
**silence** 126:23
**silent** 112:10 340:21
**similar** 8:13 45:18 150:19 178:5 198:11 225:18 264:21 284:7 287:4,9 287:16
**simple** 329:23 331:10
**simply** 194:7
**singed** 180:10
**single** 20:14 72:9
**sink** 49:3 52:18 53:2 63:10
**sit** 167:21 176:21 210:17
**site** 156:3 159:5
**situation** 64:18
**six** 25:10 42:14 42:17,19,23 43:7 112:13 136:14 153:3,3 156:15 170:2 173:1,6,8,11 174:9,10 179:10 197:16 199:20 233:4 233:15 236:13 236:14,16,18 238:8,18 239:5 239:7 249:20 251:18 253:20 257:21 258:2,3 258:13 265:10 270:2,3,13,14 271:11,17,18 271:22 291:15 294:16 296:9
**sixty** 236:14 239:7,12 253:17,22 258:6 269:1 270:3,4,19 271:18 273:20
**skip** 292:15
**skipped** 90:5
**slade** 119:4,6,9 119:10,13,13 119:15 120:17 120:18 121:9 126:16 127:1 139:9,11,23 143:19 144:2 144:21 345:23 346:1,3,4,21 347:3,13
**slash** 268:3 272:4
**slate** 146:7
**sleep** 322:14
**sleeping** 315:4 320:13,18 321:3
**slow** 339:3
**small** 75:3,9 262:15
**smaller** 69:10
**smell** 163:9
**smelled** 51:14 51:15
**smith** 27:6
**smoke** 30:16,20 31:4 98:20 101:10 102:1 102:17 104:17 104:18,21 106:4 107:1,13 112:18 116:5,6 117:5,6 119:3 120:4,6,11,22 121:12,15,23 122:18 124:1 126:4,5,19 128:4 138:8,23 139:8,22 140:12,16,17 141:10,12,13 141:14 142:15 143:20,23 144:5 145:1 152:18 153:19 162:21 163:9 163:22 166:2 167:3 276:20 276:23 347:4 362:4 363:2 364:11
**socially** 339:2,9 339:23
**sod** 180:6 181:20,20 184:1,2,3 189:16,22 192:21
**soda** 98:8 106:5 122:8
**sofa** 229:17 244:3,20 245:1 245:2,10,17
**sold** 76:5 287:15
**solely** 70:4

**somebody** 27:21 121:9 338:1
**somers** 226:2
**son** 159:21
**son's** 34:6
**soon** 41:22 109:5
**sorry** 21:22 23:22 34:9 39:4 50:14 51:18 57:1 59:10 61:19,20 63:13,23 64:13 71:1 73:1,5 88:22 94:16 108:14 113:18 114:18 123:4 127:17 128:23 131:15 133:9 134:15,17,21 135:17 142:2 142:10 153:3,3 164:17 178:16 181:8 182:5 186:7 204:14 212:3 216:14 217:5 220:5 229:22 236:2 237:16 240:1,5 243:16 250:12 251:4 255:13 256:14 270:8,9 270:11 276:7 285:17 301:17 302:11 315:15 316:15 317:19 318:23 327:20 339:4 346:17 360:13 365:5
**sort** 78:16 120:9 121:13 281:20 299:14
**sought** 324:14
**sound** 166:12
**sounds** 165:13
**source** 239:20 240:14,18 245:16 246:1
**sourced** 246:1
**sources** 40:15 241:1,7 242:13 288:1
**southern** 1:3 3:12 5:3 179:2 184:9 188:9,23 193:7 196:3 197:5
**space** 44:5 182:18
**speak** 9:4,11 29:3,9 33:1,8 50:6 70:23 72:23 75:5 83:8 210:10
**speakers** 293:23
**speaking** 9:23 33:5
**specific** 32:4 50:22 95:16 103:1 120:20 150:1 163:8 180:3 198:8 210:23 247:20 265:7 352:7
**specifically** 48:9 70:14 79:12 80:17 81:13 83:5 95:14 98:6 99:20 100:16 101:14 104:10 121:8 123:17 168:5,17 172:22 240:20 263:6,10 266:10 276:13 304:17 324:15 327:16 335:20 350:7 353:9 354:4 357:3,8 357:21 360:5
**specifics** 99:9 315:8
**specify** 290:1
**speculating** 49:6 334:3
**spell** 84:5
**spending** 315:20
**spent** 190:1
**spiegel** 310:1,3 310:4
**spire** 213:6
**split** 188:13,19
**spoke** 30:5 39:2
**spot** 72:9 249:5 258:7
**sprayed** 31:15 217:19
**spread** 274:23
**spreadsheet** 228:15,22 229:21 231:8 231:11 235:1 237:20 238:1,3 239:16,19 241:2,8,12 284:13 289:5 316:4
**spreadsheets** 264:10
**spring** 215:16
**sprinkler** 181:7
**sprott** 22:12 159:12,14,18 160:2,8
**square** 102:2 117:12 131:6 131:10,10 142:9,12 181:4 183:3,4
**stables** 19:6
**stages** 21:11
**staining** 104:18 152:19
**stairs** 66:14

**standard** 60:7 66:23 203:5,7
**start** 9:23 24:10 78:10 81:21 132:3 164:16 172:17 184:15 200:11 211:20 229:9 231:5 268:17 339:5
**started** 16:6 21:20 22:3 24:8 25:20 28:14 42:23 78:8 115:15 116:8 130:23 141:21 160:6 185:23 186:19 212:12 252:2,6 270:9 282:11 284:4 298:9 306:10,10
**starting** 131:15 164:7 218:15 280:7 301:21 302:19 318:18 321:1 360:10 362:21
**starts** 78:20 89:14 90:22 165:12 250:13 280:1 303:13 332:20 362:1 362:11
**state** 366:3
**stated** 304:3 357:22
**statement** 3:18 234:20 304:11 304:15 306:20 354:22 358:7 359:23 361:18 361:23
**statements** 303:19,21 305:5 307:10 351:23
**states** 1:1 5:1 7:5
**stay** 34:10 36:8 181:1 219:6 294:1
**stayed** 73:15
**stenotype** 366:7
**step** 163:13
**steps** 156:7
**stipulated** 1:14 1:21 2:5,13
**stipulation** 7:6
**stipulations** 7:19
**stood** 121:2
**stop** 275:13
**stopping** 248:14
**storage** 35:1 230:2 243:13
**store** 230:8
**stored** 151:12
**stores** 242:21 286:12,17,17
**straight** 132:16
**stratton** 83:21 83:23 84:1,5,8
**street** 6:1 27:18 27:19 29:22 33:23 37:11 189:16,22 338:13,14
**stress** 317:5 318:11 341:5 341:11
**stressful** 329:4
**structure** 90:13 91:5
**structures** 86:8 89:13
**struggle** 333:5
**studs** 95:6 97:12,15,18 98:13 99:21 100:9,15 103:14,18 106:11,15,21 107:8,13,22 111:21 112:1 115:12,14 116:3 124:10 306:8 344:12 348:5,8,11
**study** 100:20
**stuff** 71:4 79:16 97:17 109:3 130:16 154:20 179:14 186:1 281:1 328:20 340:2
**sub** 16:23
**subject** 230:9 230:10
**submit** 53:9 65:14,15,22 126:17 127:8,9 143:2 170:14 190:16 195:5,9 208:4,20 210:15 222:5 222:10 289:18 290:2
**submitted** 65:21 120:23 123:19 125:12 127:2 128:3 137:21 142:22 143:12 157:20 175:18 177:19 190:6,13 192:6 192:12 193:7 193:22 194:16 195:11,14,16 198:1 200:17 218:20,22 222:16 226:22 229:4 252:8,8 254:6 274:16 287:21 288:15

288:16,21,23 289:7,10 290:16,20 291:7 295:1,7 297:12 298:12 299:10 350:6 354:21
**submitting** 210:21 294:18 333:11 334:8,9
**subsequent** 30:11
**subsequently** 363:8
**subtracted** 197:23 198:2 257:9 259:15 273:3,16
**subtracting** 252:7
**suffered** 133:11
**suggest** 331:2
**suggested** 42:19
**suggestion** 206:10
**suite** 1:19 5:20 6:1 7:8 100:17
**suites** 25:15,18
**sum** 43:6
**summary** 172:7 198:18 225:15 226:9 305:9
**summer** 17:22 18:5,9 76:6
185:16 187:8 187:11,13 215:16
**super** 220:5
**supplement** 195:9
**supplemental** 207:21
**support** 109:5 170:15 175:19 299:10 317:10 338:17
**supporting** 241:11
**supposed** 98:23
**sure** 8:23 9:7 10:8 13:22 21:1,2 47:23 50:6 59:4 78:5 82:7 87:14 90:9 91:23 93:6 95:18 101:18 102:4 105:22 107:3 112:17 118:14 124:4 130:1 132:15 144:14 150:13 152:4,5 154:9 157:1 159:9 161:3 164:2 167:20 171:5,9 176:18 187:4 190:23 193:6 198:11 200:8,10 205:3
206:1,11 207:3 207:13 208:8 220:6 230:14 232:21 233:10 233:12 241:4 248:4 253:9 255:11 257:6 257:12,16 264:12 266:18 267:21 278:12 279:10 288:6 295:16,17 301:16 302:12 324:13 328:2 334:4 336:6,11 343:23 352:9 360:9 361:17
**surprisingly** 147:20
**susie** 15:18 337:2
**sustained** 31:13 180:8
**swearing** 241:19
**sweet** 19:5
**switch** 298:7 330:3
**switches** 149:7
**sworn** 3:18 7:15 234:20
**symptoms** 307:2 314:18 315:3 324:10 325:1 326:22
328:11 336:4
**system** 30:18 46:17,19 153:17 180:22 181:2,10,21,23 182:8,20 184:13 185:12 185:18 190:3 192:15,18 194:19 195:12 201:14 297:1 338:17

**t**

**t** 1:13,13 84:6,6 84:6 94:11 102:10,13 343:5 366:1,1
**tab** 78:14 105:3 291:9
**tail** 50:9
**take** 8:21 9:9 10:12,15 14:9 21:7 28:3,23 29:15 51:20 63:13 76:22 79:4 82:7 89:17 97:11,14 97:18 108:13 111:20 112:1 145:5 152:1 164:21 169:4 224:5,6 247:1 248:19 279:5,7 294:5 298:8 299:1 306:8

309:20 315:16 315:17 316:12 316:14,17,22 327:17 329:22 331:11 334:20 342:3 345:19 349:22 352:2 355:13,15 361:22
**taken** 1:17 18:15 34:21 52:4 77:5 95:5 98:12 100:14 100:23 103:17 106:20 107:7 107:11 109:5 115:11 116:3 145:12 149:19 199:7 248:23 331:9 342:11 348:7,11 366:6
**talk** 12:12 18:19 24:4 76:7 77:15 78:6,11 81:20 103:10 145:16 148:1 160:14 177:15 179:8 223:1 227:21 227:22 237:6,8 248:11 307:9 317:2
**talked** 51:4 54:9,10 65:3 77:12 106:11 115:4 145:20 152:2,15,17 238:10 289:2 308:6 324:18 344:13
**talking** 21:10 30:10 47:17 49:12 56:15 66:19 69:4 88:14 99:13 129:21 136:2 139:14 155:1 171:10 172:8 172:21 174:17 181:6 200:10 209:14 210:3,4 219:14,22 226:12 231:20 231:21 232:1 232:11 233:10 233:16 234:9 234:17,18 249:16 257:16 262:12,21 268:10,14 273:19 275:3 278:15 284:8 292:14 296:1 327:16 343:13 343:21 344:6 347:22 350:1 350:12 351:8 357:9,13 361:17
**talks** 242:16 317:9 338:20
**tank** 160:15,19 160:21,23 161:2
**tankersley** 94:15,17
**tarnished** 154:23
**tarp** 127:23 128:17
**tarps** 36:1
**tax** 243:9 245:12 258:5 270:3,18 285:23
**tcc** 22:6 45:14 59:23 64:16 68:11 92:6,10 92:15,22 93:14 94:2 95:13,22 96:1,7,13 97:4 105:5,23 106:17 107:6 108:22 109:8 109:20 113:1,3 113:14,20 115:3 119:2 124:15 125:4 125:11 130:4 132:10 135:4 137:21 138:11 139:12,13,22 140:11,22 141:17 142:14 146:19 155:21 156:18,23 158:15 162:3,8 165:19,22 174:7 202:5
**tcc's** 156:19 158:4 171:1,4 173:17 174:20
**team** 26:13,14
**tear** 115:22 129:13
**tearing** 112:16
**technically** 260:10
**teeth** 209:19
**tell** 29:7 48:18 52:13 59:4 104:4 180:14 236:1 244:23 246:13,18 308:23 343:3 345:19 349:12 363:7
**telling** 209:17 317:11
**tells** 181:14
**ten** 234:13 252:16 261:1 264:19 342:6
**tenants** 42:4
**term** 41:7,8,9
**terminated** 116:13,20 118:23 126:12 344:19

**terminating** 55:9 345:1
**terminology** 353:3,10
**terms** 86:19 87:10 129:18 129:18 262:22
**test** 102:3
**testified** 7:16 162:17
**testimony** 288:12 366:11
**testing** 348:9
**text** 3:21 4:3,5 90:2 279:20 280:8,20 332:19 343:2,7 343:12 345:20
**textiles** 226:6
**texting** 280:10 343:4 345:21 345:23
**thank** 51:22 84:7 93:17 123:13 134:19 147:3 167:19 176:5,7 177:8 178:23 218:13 221:19 251:7 267:18 279:1,3 293:19 298:22 301:14 342:8 346:18 349:1 354:6 356:4 365:13
**thanks** 134:22
**therapist** 308:13 309:3 312:7,11 320:5 335:23
**therapy** 308:15 312:17 331:3
**thereto** 2:12 366:8
**thing** 74:3 136:18 154:13 159:2 171:10 211:6 212:15 213:2 233:10 252:12 257:17 262:21 269:19 281:20 284:2 298:3 311:12 331:12
**things** 54:19 65:6 76:14 80:21 95:14 104:22 109:2 130:19 131:1 133:6 135:13 136:11,17,23 145:17 150:5 153:6 181:4 207:8 208:15 211:19 226:21 226:22 254:11 261:18 282:13 304:2 306:3,5 306:22 307:21 314:9,15 315:19 316:10 316:11 317:10 322:19 323:1,2 323:4 328:14 328:19,23 330:8,9 331:8 333:7,12,14 340:18 343:23
**think** 17:23 28:16 38:23 59:11,13 67:6 75:2,8 80:22 85:20 87:19 95:17 102:12 104:8 136:1,2 137:10 140:17 149:6 153:22 175:9,14,17 177:16 181:9 182:2 186:8 198:16 207:17 211:4 213:10 227:8 231:19 231:20 235:13 253:8 262:20 262:22 267:17 267:17 274:11 280:17 284:23 293:2 296:14 302:1 322:6 323:23 331:17 336:16,18 338:6 341:7 342:2 353:21 355:22
**thinking** 66:2,3 337:16
**third** 86:11 285:14 332:19
**thirteen** 179:10 296:2,7
**thirty** 43:11 55:13 174:1,16 205:19 233:15 236:17 239:12 253:17,22 265:10 269:1 271:12,23 291:15 294:16 296:9
**thoroughbred** 19:11
**thorpe** 69:18 69:23 94:11 109:20 238:2 242:11 283:8 283:11
**thought** 51:19 133:14 176:9 287:3 291:10 319:1 323:17 337:20
**thoughts** 267:20 310:20 315:6 322:6,10 323:1
**thousand** 86:23 161:9,14 170:2 172:23 173:6,8 173:11 174:1,3

174:9,10,13 175:23 177:21 179:10 185:3 191:12,15,20 192:3 197:16 198:5 199:19 200:14 201:1 202:6,19 204:6 204:20 205:2,5 205:20 224:13 228:3 233:16 236:13 238:9 238:18 239:6 239:11 249:14 250:8,9,14 251:14,20 252:10,13,16 253:5,16,20,21 254:3,8,10,12 256:5,9 259:9 259:12 260:18 260:21,23 261:3 263:3 265:10 267:5,7 268:23 269:16 270:2,4,15,19 271:11,22 273:2,20,20 274:2,6,11 285:21,23 286:2,9 287:4 291:15 294:16 296:2,7,9 358:1,2 359:12

**three** 14:15 20:8 43:15,16 51:20 58:11 59:19 86:2 123:2 164:17 174:15 197:15 198:5 199:19 219:19 233:3,3 233:15 236:16 236:18,18,19 236:19 239:11 249:14,20 250:8 251:18 251:18 253:17 253:20,22 254:2,11 265:9 268:23 269:8,9 269:16 270:6

**thumbs** 61:23 157:4

**tidy** 214:19

**tile** 67:4,6,10 97:17 343:18 344:3

**tiles** 104:18,20 146:7

**till** 318:21

**time** 2:11,11 13:7 17:13 18:7,11 20:18 22:5 25:20 29:21 32:4,7 41:4 42:5 75:10 79:8 82:15 91:3,15 92:22 94:18 95:1 96:8,15 99:1,3,19 103:1,1 105:22 114:20 127:20 131:5 135:16 166:17 182:14 185:19 186:16 204:16 207:19 214:6 215:6 224:6 236:4 237:17 246:17 278:9 280:9 288:5 289:1 297:1 301:5,13 302:11 308:1,5 309:12 313:9 315:16,18,20 325:4 330:18 331:17 332:10 339:23 340:23 360:8

**timeline** 124:5

**times** 92:21 197:4 217:13 300:21 313:7,8 334:20 335:5 335:10

**tinkered** 62:14

**titled** 356:13

**today** 79:13,17 79:21 81:14 167:21 176:21 194:2 200:1 251:9 323:18

**together** 59:16 156:16 190:3 230:3 239:5 259:8 273:14 274:22 275:4

**told** 32:15 51:10 52:20 53:1 55:4 70:21 71:3 81:1,6 95:4 135:18 202:21 208:4 302:17 328:21 334:9 341:21

**tomorrow** 211:5

**took** 32:5 34:22 35:1 151:14,16 152:5 202:1 226:15 275:11 283:2 315:15 326:16 335:23

**top** 72:1 82:11 85:20 183:11 207:1 252:3 280:1,6 346:14

**tore** 115:20 181:20 275:9

**tos** 286:14

**total** 174:4 185:1 199:17 226:17 229:23 232:23 233:19 235:23 236:10 236:17 238:7

238:22 239:1 239:12 244:12 245:6,10,13 252:3 253:5,14 253:23 256:11 257:10 258:8 268:19 270:1,5 270:12,21 272:1 273:15 277:15 286:1 291:15 294:15 295:11
**totaled** 226:15 236:14,17
**totaling** 260:5
**totally** 330:15
**totals** 236:13 239:5 265:9
**touch** 36:17 300:5
**touched** 49:5
**tough** 65:2
**toward** 204:9
**towards** 55:23 56:1 161:9 221:21 250:1 254:3,16 257:13
**track** 262:16
**train** 51:18 287:3
**trainer** 335:15
**training** 335:14
**transcribed** 366:8
**transcript** 358:18 359:2 366:11
**transcription** 366:9
**transport** 274:21
**transported** 153:16
**trash** 213:12
**trauma** 326:7
**traumatic** 318:5,8 319:13 319:13,20,21 326:1,5
**treated** 329:15
**treatment** 309:10,13 312:2 324:14 340:2
**treatments** 45:23 68:16 69:17 70:10 71:6 201:23
**tree** 180:3
**trees** 291:10
**trial** 2:11
**trick** 88:5 89:6 360:2 361:10 362:23 364:21
**trickier** 64:18
**tried** 214:16,17
**triggered** 311:9 311:16
**triggers** 311:3
**trouble** 321:11 328:3
**trucks** 136:22 180:20,20,23 182:13,15,16 182:23 183:13 184:5
**true** 364:2,8 366:10
**trust** 330:10
**try** 9:13 76:12 305:20 316:3
**trying** 8:23 17:23 79:22 83:10 88:5,5,6 89:3,6 124:4 151:17 168:20 175:12 177:10 184:15 208:14 208:15 213:10 235:7 259:17 262:17 271:13 271:20 293:9 316:1,1,1 322:14
**turbulent** 340:12,18
**turn** 303:8 310:21 315:5 316:6 322:12 322:13 337:22
**turned** 24:14 212:7,10,16,17 213:2,5,18
**tv** 46:19
**tvs** 46:16 74:5 201:11,12
**twelve** 14:18 15:19 58:19
**twenty** 161:14 172:23 173:1 185:2,2 201:1 250:8,9,13 252:13,15 256:5,9 257:21 258:2,14 259:9 259:11 260:6 260:18,23 261:3 263:3 267:5,7 271:6 271:19 285:22 285:23 286:1,9 287:3 358:1,2 359:12
**twice** 257:11
**two** 17:6 19:4 19:20 26:7 27:18 43:18,19 78:15 91:21 98:1 116:4 123:2 158:2,9 170:3 173:12 174:20 175:22 178:13 185:2,2 197:15 198:4 199:18 201:18 205:1,1,1,2,2 215:18 230:2 232:3 236:16

236:19 239:10 246:20 249:19 250:15 251:17 253:4,10,20 254:9,12 256:8 258:9 268:23 269:8,9,16 271:11,22 272:3 273:17 278:2 285:22 285:23 286:2,9 287:3 300:12 335:10 336:18 336:20,22 337:3 349:10
**tylenol** 334:20 335:4,6
**type** 23:11 37:5 37:10 41:7 44:23 47:16 69:3 73:7 134:1 180:2 302:1 315:2 323:4 332:10 340:12,18
**typically** 14:5 133:10

**u**

**u** 1:13 93:15,16
**uh** 16:19 21:5 38:11 41:11 46:23 51:7 64:20 66:7 67:22 69:22 90:19 93:11 95:19 98:17 107:5 112:21 112:23 125:22 126:6 127:18 128:8 130:20 133:7,16,23 136:16 140:4 141:16,23 142:4 154:21 156:4,9 162:20 163:7 166:22 169:1 171:21 172:1 173:9 174:8 176:20 186:12 187:22 188:12 189:17 196:2,18 197:1 201:21 210:1 213:4,8 214:8 222:14 225:19 227:4 229:8 231:15 236:7 242:12 244:4 244:21 245:5 251:19,22 252:5,19 254:18 257:4 260:22 262:19 266:6 268:1 269:3 272:2 274:17 284:16 286:19 288:18 296:6 302:18 308:20 310:7 319:6,9 320:9 321:14 322:7 324:20 327:13 327:20 332:22 335:12 337:6 337:13 358:21 364:16
**unable** 307:12
**unaccounted** 260:10 261:4
**unair** 153:2
**uncomfortable** 95:20
**under** 8:8 11:4 18:15 76:11 77:22 89:12 105:20 108:5,9 145:18 148:5 160:17 167:23 168:4,7 169:18 169:20,22 170:7 173:5 183:18,21,22 184:2 197:13 197:18 198:2,3 199:17 200:17 203:3 204:22 222:5 224:11 224:16 234:20 238:23 256:11 260:16 273:4 274:9,12,18 291:14 294:13 294:18 295:6 297:15 303:9 303:19 305:19 307:2 327:11 334:19 340:17 341:5,10 352:17 359:21 361:11
**underground** 183:10,12,18 183:18
**understand** 8:8 8:19 20:7 59:18 78:5 88:15 91:10 107:4 124:5 133:5 175:12 175:16 194:23 207:7,12 234:4 235:7 259:17 262:18 264:12 290:4 294:14 315:21 316:7 341:18 352:16 353:6,11
**understanding** 12:20 17:5,12 24:3 31:8 34:13,23 42:13 48:10 58:18 68:15 77:18 87:8,10,23 88:3,7,11,16,18 89:3,8 116:12 121:17 143:18 162:17 163:23 165:22 166:5,8 166:14,19,23

167:5,14 169:14 187:5 218:19 221:15 266:20 292:18 299:17 301:23 310:12 363:15
**understood** 18:2,10 19:19 23:20 26:23 27:4,17 31:21 95:18 176:1 194:10 218:6 261:11 267:16 272:6 321:21 331:6
**unfair** 353:21
**united** 1:1 5:1 7:5 16:13
**universe** 24:2
**unkind** 330:5
**unlacquered** 154:18
**unlivable** 48:17
**unquote** 364:21
**unwillingness** 203:23
**updated** 343:20
**upgraded** 64:6 64:12
**upgrades** 67:16 67:18
**upper** 98:2 103:18,20,23
**upset** 322:20 340:20
**upsetting** 324:8 336:13 341:1
**upstairs** 24:17 28:9 30:12,13 30:23 67:10,13 67:21,22 96:21 130:18
**urge** 306:18
**use** 40:15 41:7 129:18 205:22 206:3,7 214:21 220:14 259:20 341:22
**used** 44:17 47:9 48:22 69:21 158:22 164:11 215:2 224:3 277:4 288:1 346:8
**uses** 70:5
**usi** 82:13,16,18 82:23
**using** 85:5 91:5 215:7 220:19 257:14 360:2
**usual** 7:18 60:8 60:9
**usually** 133:21 277:6
**utilities** 211:16 213:9 216:8 219:4 221:2
**utility** 220:14

**v**

**valley** 243:22 244:9,10
**valuation** 253:6
**valuations** 253:23 257:7
**value** 240:15 276:17
**valued** 254:9
**varied** 211:18
**various** 181:5
**verbal** 8:18
**verified** 90:5 363:13
**verifying** 290:17
**vestavia** 5:20
**vetted** 120:13
**vigilant** 9:13
**violated** 327:5 328:12,17 329:1
**visit** 161:16,18 301:8
**void** 275:13
**voided** 275:7
**volatile** 330:6
**vs** 1:10 5:10
**vulnerable** 341:2

**w**

**w** 83:19
**wait** 79:2 80:4 99:11 237:12 318:21
**waived** 1:23 2:15
**wake** 322:1
**walk** 32:10
**walked** 41:20
**wall** 66:18,18 97:17 209:6
**walls** 101:10,20 101:21 102:2 103:14 104:18 122:19
**wally** 358:15 359:14
**wally's** 223:7 235:12 358:17
**want** 8:23 10:8 40:10 43:2 65:5,6 77:14 77:15 78:4,10 78:10 81:3 87:9 109:22,23 111:7,21 145:5 145:16 148:1 151:18 152:11 152:12 160:14 164:2 168:10 168:22 171:9 175:8,10 177:3 179:7 183:5 197:2 205:22 206:4,23 207:19 208:5 209:3,5,6,19 227:21 228:1 233:9 237:5

248:11 253:8 257:15 265:14 279:10 281:11 283:17 293:6 297:20 298:8 301:12,15 302:12 345:2 352:2
**wanted** 42:9 47:23 64:5,8 68:8 90:9 105:15 127:6 151:13 220:6 237:16 281:15 281:16 343:20 347:19
**wants** 237:15
**warned** 281:10
**warped** 102:18 102:19 153:6 154:11
**waste** 207:19
**water** 31:9,13 48:20 128:11 152:23 153:18 154:6 180:17 181:5 211:20 212:7,23 213:1 213:11 218:11 219:12 220:14 220:19 221:6
**watertight** 128:7,20
**way** 9:23 37:9 107:12 109:16 110:13 143:17 165:12 170:23 178:15,16 184:4 199:15 218:14,16 229:20 237:10 237:13 248:5 259:15 260:18 265:18 268:2 296:22 322:18 331:21 340:6
**ways** 310:13
**we've** 54:19 69:14 133:4 135:6 136:19 158:22 164:10 193:20 207:11 209:17 224:2 291:9 295:15 342:23 347:19 347:20 351:15 354:9 356:12 357:5
**websites** 40:19 286:20
**week** 215:15,17 330:2 335:5,11
**weeks** 42:3 153:3 215:18
**weight** 335:14
**welcome** 279:4 298:23 355:3
**went** 31:15 40:18 43:1 77:13 78:17 99:16 125:13 133:3 134:20 148:17 193:16 204:15 206:14 217:22 219:8,8 224:22 260:4 283:19 340:21
**wet** 128:5 153:1
**whichever** 265:14
**white** 68:10
**wholesale** 242:4
**width** 69:6
**willing** 195:4 204:17 209:20 357:22 358:8
**wimbleton** 56:15 58:8,15 58:21 59:22 60:3,15 66:11 66:22 68:17 69:2,9 70:11 71:16 72:4 73:23 74:8,11 75:16 76:3 84:21 202:2 204:9 211:15 221:11
**wind** 87:3
**window** 45:23 68:16 69:17 70:10 71:6 201:23
**windows** 28:9 35:20 69:7,9 69:15 108:12 108:13
**winter** 215:17 215:19
**wipe** 154:10
**witness** 1:23 7:10 9:5 10:10 50:8,10,13 52:1 54:14 63:17 70:18 71:1 75:7 80:9 83:10 89:22 104:13 105:1 113:18 124:8 172:16,18 176:3,5,8 177:9,12 191:2 202:16 205:21 206:1,12,16,19 211:22 220:12 226:11,18,21 227:10 232:7,9 235:5,11,16 236:2 237:14 251:10 292:23 293:4,19 295:18 298:1,5 314:6 318:23 342:7 346:12 346:14,16,19 359:9 366:12
**witnesses** 306:12

**wonderful** 158:20
**wondering** 315:6
**word** 41:3 65:2 315:12 328:7,9 329:3,6 341:22
**wording** 114:8
**words** 328:4 329:12 353:2
**work** 17:9 27:20,21 46:11 61:4,7 63:7,21 64:6,8,10,15 67:12 68:3,13 69:19,23 70:2 70:3,8 73:18 74:2 81:2 95:8 95:12,16,21,22 95:23 96:2,16 97:2,5,8 98:4 98:16,17,19 99:1,6,9,15 100:21 103:15 106:4 109:7 114:16,19 115:1,5,15 116:8,9,10 117:3 119:2,9 119:19 120:16 121:14 122:5 126:18 129:5 138:6,22 140:18 148:11 150:7,18 151:2 155:19 156:19 161:1,4 162:23 163:19 165:16 165:18,23 167:16 174:5 195:23 196:3 208:6 209:22 277:11,17 280:17 283:15 321:8 328:22 345:2 346:21 347:11,14
**worked** 17:13 18:1,11 82:16 126:9 188:6 277:1 278:10
**working** 95:10 125:5 135:2 278:6 283:14 287:17 315:19
**workmanship** 91:6
**workmen** 27:18
**workroom** 243:14,18
**works** 160:2 213:1 218:11
**workshop** 153:16
**worried** 351:8
**worry** 306:11 329:22 338:11
**worrying** 316:10
**worse** 307:11
**worst** 323:3
**write** 167:20 341:19
**wrong** 60:10 136:20 204:13 323:8 325:20 352:22 353:14
**wrongfully** 333:9
**wrote** 120:5 121:6 256:1 266:2

**x**

**x** 3:1

**y**

**y** 93:15,19
**y'all** 155:4 208:2,16 209:19 211:3 354:9
**yard** 180:21 183:19
**yea** 210:3
**yeah** 7:20 10:2 18:3 26:5 59:14,15,17,20 62:1 70:15,20 71:13 76:18,20 76:21 77:1 79:1 83:10 88:4 90:8 108:11 110:14 115:10,19 134:13 137:10 145:6 146:14 151:22 154:17 154:18,18 155:9 172:1 175:16 177:9 183:5,20 184:12 187:19 188:1 189:23 191:9 197:10 201:12 202:16 205:12 206:1 207:16 220:15 220:17,22 223:17 226:13 227:11 231:22 235:19 247:13 249:18 250:16 250:22 251:10 277:12,14,16 279:11 287:19 292:12 298:5 308:12 311:4 318:7 321:22 322:9 336:8,12 337:6 349:20 355:11,19 357:15 362:1 362:15 365:5
**year** 12:22 15:10,19,20 21:16,17 50:22 217:14
**years** 17:6 59:14,19

132:16 308:13
324:3
**yell** 50:16
**yesterday**
354:9,11
357:14,19
**younger** 337:2

**z**

**z** 102:10,13
**zero** 87:2
236:19 258:7
286:1 331:22
**zlotnik** 102:5
102:10 103:3
119:18,22
120:2,10,20
121:17,20
122:11,23
125:6 133:18
138:12 140:11
161:6 162:18
165:14 347:22
**zlotnik's**
123:10,15
**zoloft** 309:16
309:23 313:4
320:8
**zone** 40:13
**zoom** 300:12

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**From:** Chuck Dauphin
**To:** Alexandra Goodrich
**Subject:** FW: PRIVILEGED and CONFIDENTIAL This email and attachments is subject to the Attorney-Client Privilege and/or represents confidential attorney work product. RE: Goodrich House Fire - Dell Road - Zlotnik Consulting Services Proposal
**Date:** Tuesday, January 14, 2020 1:37:00 PM

---

Zlotkin is backing up a little. I suggest we leave things as they are and see what happens.

**From:** czlotnik@cs.com <czlotnik@cs.com>
**Sent:** Tuesday, January 14, 2020 11:53 AM
**To:** Chuck Dauphin <cdauphin@dauphinparis.com>
**Subject:** PRIVILEGED and CONFIDENTIAL This email and attachments is subject to the Attorney-Client Privilege and/or represents confidential attorney work product. RE: Goodrich House Fire - Dell Road - Zlotnik Consulting Services Proposal

**PRIVILEGED and CONFIDENTIAL**

**This email and attachments is subject to the Attorney-Client Privilege and/or represents confidential attorney work product**

January 14, 2020

Chuck.

There is an ongoing misunderstanding regarding the smoke odor removal warranty.

During our conference call with Brad Kovar; I stated that beginning in 1974 I started providing a written 5 year guarantee on fire related smoke odor treatments that my firm made. Between 1974-2001 we performed thousands of smoke odor removal treatments. In 2001 we ceased performing service work including smoke odor removal treatment.

Beginning in 1980, I began teaching my Odor Removal methods to disaster restoration firms and selling our odor removal products. I sold the training and chemical manufacturing business in 2007 where the training and product manufacturing continues. My former firm is now a specialty products brand owned by RPM International. My current business practice is limited to product development and disaster restoration/indoor environmental quality consulting.

DEFENDANT'S EXHIBIT
PENGAD 800-631-6989
1

# Goodrich Production
8335

Under the terms of insurance policies, following a fire and subsequent remediation and odor removal treatment, homeowners are entitled to have a smoke odor free home.

Guaranteeing Smoke Odor Removal following fire damage is now a much more common industry practice and fire restoration firms of repute guarantee their work. For practical financial reasons, fire restoration contractors encounter difficulty getting paid when the property retains lingering smoke odors.

The guarantee is provided by the contractor doing the work. The guarantee is simple: a promise to come back and retreat as needed and/or refund the treatment fee. A time period can be specified as once fire related smoke odor from an event is gone, it's gone and it isn't coming back. The real smoke odor removal test is getting through a year's seasonal charges.

My intent is to provide Brookstone with the needed guidance to gain the confidence needed to guarantee their work (and or that done by their subcontractors and supervised by Brookstone). Brookstone will be charging fees for the various odor removal steps and procedures I specify.

Each treatment phase will have an inspection stage in which the homeowners and interested parties are invited to participate. The project doesn't move forward unless everyone is satisfied that the smoke odor in that area has been eliminated. Sampling and analysis can be done at various stages of the project to validate odor removal.

My approach is be conservative, like I am working on my mother's home. eliminating the main risks by removing major odor sources and managing the small risks with thoughtful, creative and careful treatment.

As I didn't have an opportunity to see the worksite prior to demolition and work on the project has begun, I'm at an informational disadvantage.

Should Chubb or another entity hire me, it's not anticipated I will have a daily presence on the worksite, so adherence to my direction, methods and specifications is beyond my control. Between visits, I'll be relying on Brookstone as my eyes, ears and nose on the job.

Goodrich Production 8336

I'll be providing my best efforts to ensure a best job possible under the circumstances and constraints, and that is all.

Respectfully yours,

Cliff Zlotnik
Ideaz, LLC
Disaster Restoration Advisors

-----Original Message-----
From: Chuck Dauphin <cdauphin@dauphinparis.com>
To: Elliott, Jeremy E <jelliott@chubb.com>
Cc: Andrew Arrant <aarrant@brookstonecompanies.com>; Alexandra Goodrich <aligoodrich@gmail.com>
Sent: Mon, Jan 13, 2020 1:42 pm
Subject: Goodrich House Fire - Dell Road - Zlotnik Consulting Services Proposal

Jeremy – As you have requested, attached is a proposal from Cliff Zlotnik and another copy of his resume. Mr. Zlotnik is a leader in the industry and brings a level of expertise and experience which is unparalleled. Therefore, his supervision and input is not duplicative of other services but absolutely necessary to insure the Goodrich house is reconstructed "using like design, and materials and workmanship of comparable kind and quality" as to the house's original construction. This standard cannot be maintained unless all sources of possible future smoke contamination are effectively identified and treated.

Unlike Brookstone, Mr. Zlotnik and his company will provide a written guarantee that there will be no smoke odors in the future provided he oversees and supervises the clean-up. His guarantee provides the protection and assurance to the Goodrich family that their house will reconstructed to its condition immediately prior to the fire. It also provides financial protection against repair costs if the need should arise. Frankly, there is no justification for not using Mr. Zlotnik's expertise.

Mr. Zlotnik has discussed his participation with Brookstone and already has offered suggestions to aid in the restoration. To fully assess the extent of the clean-up that is needed, Mr. Zlotnik needs to conduct a site inspection in the immediate future. Therefore, please accept his proposal and notify Brookstone of the same.

Regards, Chuck
Charles A. Dauphin
Dauphn Paris, LLC
300 Vestavia Pkwy, Ste. 3200
Vestavia Hills, AL 35216
205-518-6821

*Confidentiality Notice - The information contained in this e-mail and any attachments to it may be legally privileged and include confidential information. If you are not the intended recipient, be aware that any disclosure, distribution or copying of this e-mail or its attachments is prohibited. If you have received this e-mail in error, please notify the sender immediately of that fact by return e-mail and permanently delete the e-mail and any*

| Amount | Notes |
|---:|---|
| $44,780.02 | TCC - Demo |
| $20,338.41 | Cliff Zlotnik - Professional Services |
| $311,939.89 | Slade LLC - Remediation Bid |
| $2,009,647.43 | TCC - Reconstruction Estimate |
| $50,241.19 | Henry Sprott Long & Associates Architects - Project Administration Fee |
| $25,800.00 | Iris & Co. - Professional Services for Reconstruction |
| $13,141.83 | HD Innovations - Audio/Video Estimate (Dwelling Expenses Highlighted) |
| $2,414.00 | ADT - Quote to Replace Security System |
| $2,478,302.77 | TOTAL |
| | |
| -$38,806.50 | LESS Check #4708941 dated 01/29/2020 |
| -$15,000.00 | LESS Check #4773672 dated 03/02/2020 |
| -$1,400,000.00 | LESS Check #4853904 dated 04/13/2020 |
| | |
| **$1,024,496.27** | **Remaining balance due** |

Southern Scape

**Goodrich Residence**
**Birmingham, AL**
**4-Dec-20**

**Bid Items Per Plan:**

**Demo and Bed Prep**
Mulch all disturbed areas

| | |
|---|---|
| **Demo, Mulch and Bed Prep Subtotal:** | **$13,674.00** |

**Plant Material**
A. Install Plant Material per plans- Plans from Page/Duke Dated 4/10/2019

| | |
|---|---|
| **Plant Material Subtotal:** | **$122,177.00** |

**Sod Disturbed areas around residence**
A. Allowance

| | |
|---|---|
| **Sod Allowance** | **$8,500.00** |

**Irrigation**
adjust irrigation as needed

| | |
|---|---|
| **Irrigation Subtotal: (allowance)** | **$17,000.00** |

| | |
|---|---|
| **Total Project Costs :** | **$161,351.00** |

Note: All site site debris and extraneous material to be removed prior to landscape installations
Note: Rough Grading By Site Contractor To +/- 2" Of Final Grade
Note: Additional Soil Conditioner Or Mulch Can Be Installed In Extents Of All Beds But Will Be Priced Separatelty

DEFENDANT'S EXHIBIT 3
PENGAD 800-631-6989

| Date | Expense | Amount | Notes | Paid |
|---|---|---|---|---|
| 11/18/2019 | EJ Melton | $330.00 | Security Expense - Dell Road | 12/09/2019 |
| 11/20/2019 | ADT Security Services | $1,489.96 | Cancellation Charges - Dell Road | 01/13/2020 |
| 11/23/2019 | Robert Roche | $24,950.00 | Rental Agreement - Fairway Drive | 12/09/2019 |
| 11/25/2019 | Oxmoor Animal Clinic | $738.68 | Boarding Expense | 01/13/2020 |
| 11/25/2019 | RH Order #1 | $13,352.95 | Furniture & Bedding for Rental House | 12/09/2019 |
| 11/26/2019 | RH Order #2 | $2,403.50 | Bedding for Rental House | 12/09/2019 |
| 11/26/2019 | Target | $74.73 | Bedding for Rental House | 12/09/2019 |
| 11/26/2019 | RH Order #3 | $793.83 | Bedding, Shower Curtain/Liner/Rings, and Bath Towels/Mats for Rental House | 12/09/2019 |
| 11/26/2019 | PBK Order #1 | $65.00 | Bath Towels for Rental House | 12/09/2019 |
| 11/26/2019 | Valet Moving | $9,060.00 | Moving Expense, Storage Unit Rental - 3 Months (thru 02/20/2020) | 01/13/2020 |
| 11/27/2019 | Gabby Home | $12,307.81 | Furniture for Rental House | 12/09/2019 |
| 11/27/2019 | RH Order #4 | $2,394.40 | Wall Art, Mirror, Table Lamp, and Rug for Rental House | 12/09/2019 |
| 11/27/2019 | PBK Order #2 | $808.28 | Rug & Rug Pad for Rental House | 12/09/2019 |
| 12/01/2019 | RH Order #5 | $2,775.30 | Bedding, Rug, and Rug Pad for Rental House | 03/04/2020 |
| 12/01/2019 | RH Order #6 | $468.73 | Bedding for Rental House | 03/04/2020 |
| 12/02/2019 | Birmingham Water Works | $162.95 | Security Deposit, Establishment Fee, Convenience Fee for Water and Sewer at Rental House (Fairway Drive) | 03/04/2020 |
| 12/03/2019 | RH Order #7 | $2,542.50 | Rugs and Rug Pads for Rental House | 03/04/2020 |
| 12/06/2019 | All South Appliance Group | $1,987.64 | Washer & Dryer for Rental House | 03/04/2020 |
| 12/06/2019 | Oxmoor Animal Clinic | $324.00 | Board Expense | 03/04/2020 |
| 12/06/2019 | RH Order #8 | $1,306.60 | Lighting for Rental House | 03/04/2020 |
| 12/09/2019 | Bailey Electric LLC | $100.00 | Electrician - Rental House (Fairway Drive) | 03/04/2020 |
| 12/09/2019 | RH Order #9 | $5,918.90 | Window Treatments and Window Hardware for Rental House | |
| 12/10/2019 | Amazon Order #1 | $118.79 | Flatware for Rental House | 03/04/2020 |
| 12/10/2019 | Amazon Order #2 | $100.25 | Bakeware for Rental House | 03/04/2020 |
| 12/10/2019 | Macy's | $32.67 | Glassware for Rental House | 03/04/2020 |
| 12/10/2019 | Mountainvew Chem-Dry | $1,170.18 | Clean & Sanitize Wood Flooring & Carpet at Rental House (Fairway Drive) | 03/04/2020 |
| 12/10/2019 | Target Order #2 | $140.22 | Dinnerware for Rental House | 03/04/2020 |
| 12/10/2019 | Target Order #3 | $198.35 | Microwave, Coffee Maker, and Iron for Rental House | 03/04/2020 |
| 12/10/2019 | Valet Moving - 12-09-2019 | $149.00 | Moving Expense - Dell Road to Rental House (Fairway Drive) | 03/04/2020 |
| 12/12/2019 | Mr Buggs | $85.00 | Seasonal Pest Control - Rental House (Fairway Drive) | 03/04/2020 |
| 12/12/2019 | RH Order #10 | $227.90 | Shower Rod Set for Rental House | 03/04/2020 |
| 12/13/2019 | House of Vacuums | $439.94 | Vacuum for Rental House | 03/04/2020 |
| 12/13/2019 | Valet Moving - 12-11-2019 | $3,097.50 | Moving Expense - Rental House (Fairway Drive) | 03/04/2020 |
| 12/17/2019 | HD Innovations LLC | $4,820.04 | Remove AV Gear from Dell Road, TVs for Rental House, Install TVs at Rental House (Fairway Drive) | |
| 12/23/2019 | S. H. Lowery's Electric Inc. | $130.00 | Electrician - Rental House (Fairway Drive) | 03/04/2020 |
| 12/23/2019 | Valet Moving - 12-23-2019 | $298.00 | Moving Expense - Rental House (Fairway Drive) | 03/04/2020 |
| 12/24/2019 | BlackJack Horticulture | $316.99 | Monthly Landscape Management - December 2019 - Rental House (Fairway Drive) | 03/04/2020 |
| 12/27/2019 | Alabama Power | $90.81 | Monthly Utility Bill - Power - December 2019 - Rental House (Fairway Drive) | 03/04/2020 |
| 12/30/2019 | TCC | $14,100.00 | Interior Paint - Rental House (Fairway Drive) | |
| 01/08/2019 | Birmingham Water Works | $86.39 | Monthly Utility Bill - Water - January 2020 - Rental (Fairway Drive) | 03/04/2020 |
| 01/13/2020 | Spectrum | $425.78 | Monthly Utility Bill - Cable/Internet/Phone - December 2019 & January 2020 - Rental (Fairway Drive) | 03/04/2020 |
| 01/15/2020 | DPMB Properties, LLC | $58,500.00 | DPMB Properties, LLC - Annual Lease Agreement (thru 01/14/2021) (Wimbleton Drive) (PARTIAL PAYMENT) | 03/30/2020 |
| 01/18/2020 | Alabama Power | $194.26 | Monthly Utility Bill - Power - January 2020 - Rental (Fairway Drive) | 03/04/2020 |

EXHIBIT
DX 4

| Date | Expense | Amount | Notes | Paid |
|---|---|---|---|---|
| 01/18/2020 | Alabama Power | $42.00 | Monthly Utility Bill - Power - January 2020 - Rental (Wimbleton Drive) | 03/04/2020 |
| 01/28/2020 | Valet Moving | $1,810.00 | Moving Expense - Dell Road to Storage Units | 03/04/2020 |
| 02/04/2020 | Alabama Power | $111.20 | Utility Bill - Power - Final - Rental (Fairway Drive) | 03/04/2020 |
| 02/09/2020 | Blackjack Horticulture | $316.99 | Landscape Management - January 2020 - Rental (Fairway Drive) | 03/04/2020 |
| 02/11/2020 | Birmingham Water Works | $5.43 | Utility Bill - Water - Final - Rental (Fairway Drive) | 03/04/2020 |
| 02/11/2020 | Birmingham Water Works | $108.75 | Monthly Utility Bill - Water - January 2020 - Rental (Fairway Drive) | 03/04/2020 |
| 02/18/2020 | Alabama Power | $111.91 | Monthly Utility Bill - Power - February 2020 - Rental (Wimbleton Drive) | 03/04/2020 |
| 02/18/2020 | Birmingham Water Works | $115.83 | Monthly Utility Bill - Water - February 2020 - Rental (Wimbleton Drive) | 03/04/2020 |
| 02/18/2020 | Spectrum | $201.01 | Monthly Utility Bill - Cable/Internet/Phone - January 2020 - Rental (Fairway Drive) | 03/04/2020 |
| 02/18/2020 | Spire | $298.80 | Monthly Utility Bills - December 2019 & January 2020 (FINAL) - Rental (Fairway Drive) | 03/04/2020 |
| 01/31/2020 | Valet Moving | $4,042.75 | Moving Expense - Rental House (Fairway Drive) to Rental House (Wimbleton Drive) | 11/30/2020 |
| 02/28/2020 | Valet Moving | $3,162.00 | Moving Expenses (Receiving, Storing, Transporting) - February 2020 | 11/30/2020 |
| 03/13/2020 | Safe Haven/ADT | $2,420.00 | Install Security System at Rental House (Wimbleton Drive) | |
| 03/13/2020 | Safe Haven/ADT | $327.80 | Install Security System at Rental House (Wimbleton Drive) | |
| 03/17/2020 | Greenlight Electric LLC | $1,630.00 | Install Lighting at Rental House (Wimbleton Drive) | |
| 03/18/2020 | BWWB | $32.31 | Monthly Utility Bill - Water - March 2020 - Rental (Wimbleton Drive) | 11/30/2020 |
| 03/19/2020 | Mr. Bugg's | $85.00 | Seasonal Pest Control - Spring 2020 - Rental (Wimbleton Drive) | 11/30/2020 |
| 03/20/2020 | Iris & Co. | $20,394.20 | Blackout Shades, Rugs, Window Hardware, Labor to Measure and Install - Rental House (Wimbleton Drive) | |
| 03/24/2020 | Valet Moving | $4,338.25 | Moving Expenses (Receiving, Storing, Transporting) - March 2020 | 11/30/2020 |
| 03/27/2020 | Alabama Power | $152.58 | Monthly Utility Bill - Power - March 2020 - Rental (Wimbleton Drive) | 11/30/2020 |
| 04/09/2020 | BWWB | $48.37 | Monthly Utility Bill - Water - April 2020 - Rental (Wimbleton Drive) | |
| 04/15/2020 | TCC | $12,700.00 | Interior Paint - Rental (Wimbleton Drive) | |
| 04/18/2020 | Alabama Power | $213.57 | Monthly Utility Bill - Power - April 2020 - Rental (Wimbleton Drive) | |
| 04/23/2020 | Valet Moving | $3,600.00 | Storage Unit Rental - April 2020 | |
| 04/24/2020 | Iris & Co. | $4,773.50 | Labor to Alter, Deliver, and Install Window Treatments | |
| 04/24/2020 | Iris & Co. | $8,010.20 | Labor to Alter, Deliver, and Install Window Treatments | |
| 04/29/2020 | Spire | $141.65 | Monthly Utility Bill - Gas - February 2020 - Rental (Wimbleton Drive) | 11/30/2020 |
| 04/29/2020 | Spire | $88.63 | Monthly Utility Bill - Gas - March 2020 - Rental (Wimbleton Drive) | 11/30/2020 |
| 04/29/2020 | Spire | $43.91 | Monthly Utility Bill - Gas - April 2020 - Rental (Wimbleton Drive) | 11/30/2020 |
| 04/30/2020 | Iris & Co. | $9,130.00 | Carpet and Rug Pad for Downstairs; Labor to Install | |
| 05/20/2020 | Alabama Power | $171.34 | Monthly Utility Bill - Power - May 2020 | 11/30/2020 |
| 05/20/2020 | BWWB | $53.53 | Monthly Utility Bill - Sewer & Water - May 2020 | 11/30/2020 |
| 05/22/2020 | Valet Moving | $3,600.00 | Monthly Storage Bill - May 2020 | 11/30/2020 |
| 05/27/2020 | Spire | $37.98 | Monthly Utility Bill - Gas - May 2020 | 11/30/2020 |
| 06/01/2020 | Fidel Lopez Landscaping | $1,315.00 | Monthly Landscape Maintenance - April 2020 & May 2020 - Rental | 11/30/2020 |
| 06/01/2020 | Mr. Bugg's | $85.00 | Seasonal Pest Control - Summer 2020 - Rental | 11/30/2020 |
| 06/07/2020 | Valet Moving | $3,120.00 | Monthly Storage Unit Rental - March 2020 | 11/30/2020 |
| 06/07/2020 | Valet Moving | $3,748.00 | Misc. Monthly Moving Expenses - April 2020, May 2020, June 2020 | 11/30/2020 |
| 06/07/2020 | Valet Moving | $2,400.00 | Monthly Storage Unit Rental - June 2020 | 11/30/2020 |
| 06/09/2020 | Birmingham Water Works | $53.53 | Monthly Utility Bill - Water - June 2020 - Rental | 11/30/2020 |
| 06/16/2020 | Iris & Co. | $115.00 | Installation of Master Bedroom Shades - Rental | |
| 06/26/2020 | Iris & Co. | $12,894.20 | Furniture for Rental House | |
| 06/28/2020 | Alabama Power | $329.51 | Monthly Utility Bill - Power - June 2020 - Rental | 11/30/2020 |

| Date | Expense | Amount | Notes | Paid |
|---|---|---|---|---|
| 06/30/2020 | Iris & Co. | $11,400.00 | Hourly Charges - November 2019-June 2020 - Rental | |
| 06/30/2020 | TCC | $6,050.00 | Interior Paint - Lower Level - Rental | |
| 07/06/2020 | Birmingham Water Works | $49.97 | Monthly Utility Bill - Water - 05/21/2020-06/19/2020 - Rental | 07/28/2021 |
| 07/08/2020 | Spire | $36.49 | Monthly Utility Bill - Gas - 05/21/2020-06/19/2020 - Rental | 07/28/2021 |
| | | -$36.49 | (above bill submitted for record only at this time) | |
| 07/13/2020 | Valet Moving | $4,197.00 | Misc. Moving Expenses - June 2020 & Monthly Storage Unit Rental - July 2020 | 07/28/2021 |
| 07/20/2020 | Alabama Power | $281.02 | Monthly Utility Bill - Power - 06/15/2020-07/15/2020 - Rental | 07/28/2021 |
| 07/24/2020 | Fidel Lopez Landscaping | $500.00 | Monthly Landscaping Service - June 2020 - Rental | 07/28/2021 |
| 08/04/2020 | Birmingham Water Works | $49.97 | Monthly Utility Bill - Water - 06/19/2020-07/24/2020 - Rental | 07/28/2021 |
| 08/06/2020 | Valet Moving | $3,907.00 | Misc. Moving Expenses - July 2020 & Monthly Storage Unit Rental - August 2020 | 07/28/2021 |
| 08/18/2020 | Alabama Power | $291.24 | Monthly Utility Bill - Power - 07/15/2020-08/13/2020 - Rental | 07/28/2021 |
| 08/20/2020 | Iris & Co. | $1,051.69 | Invoice #599 | |
| 08/20/2020 | HD Innovations | $450.00 | Invoice #1820 - Labor Only | |
| 08/27/2020 | Fidel Lopez Landscaping | $500.00 | Monthly Landscaping Service - July 2020 - Rental | 07/28/2021 |
| 09/25/2020 | Birmingham Water Works | $49.97 | Monthly Utility Bill - Water - 07/24/2020-08/21/2020 - Rental | 07/28/2021 |
| 09/25/2020 | Alabama Power | $340.93 | Monthly Utility Bill - Power - 08/13/2020-09/14/2020 - Rental | 07/28/2021 |
| 09/27/2020 | Frontgate | $1,865.97 | Additional Storage for Bathrooms - Rental | |
| 09/29/2020 | Fidel Lopez Landscaping | $500.00 | Monthly Landscaping Service - August 2020 - Rental | 07/28/2021 |
| 09/29/2020 | Valet Moving | $3,158.50 | Misc. Moving Expenses & Monthly Storage Unit Rental - September 2020 | 07/28/2021 |
| 09/29/2020 | HD Innovations | $150.00 | Invoice #1841 - Labor Only | |
| 10/02/2020 | Birmingham Water Works | $103.50 | Monthly Utility Bill - Water - 08/21/2020-09/22/2020 - Rental | 07/28/2021 |
| 10/19/2020 | Alabama Power | $192.93 | Monthly Utility Bill - Power - 09/14/2020-10/14/2020 - Rental | 07/28/2021 |
| 10/19/2020 | Valet Moving | $3,886.50 | Misc. Moving Expenses - September & October 2020 & Monthly Storage Unit Rental - October 2020 | 07/28/2021 |
| 10/30/2020 | Fidel Lopez Landscaping | $500.00 | Monthly Landscaping Service - September 2020 - Rental | 07/28/2021 |
| 11/03/2020 | Birmingham Water Works | $46.42 | Monthly Utility Bill - Water - 09/22/2020-10/22/2020 - Rental | 07/28/2021 |
| 11/13/2020 | Iris & Co. | $350.00 | Invoice #610 - Installation of Art & Mirrors - Rental | |
| 11/13/2020 | Valet Moving | $4,298.50 | Misc. Moving Expenses - October & November 2020 & Monthly Storage Unit Rental - November 2020 | 07/28/2021 |
| 11/17/2020 | Alabama Power | $180.38 | Monthly Utility Bill - Power - 10/14/2020-11/12/2020 - Rental | 07/28/2021 |
| 11/17/2020 | Iris & Co. | $275.00 | Invoice #613 - Labor to custom-make shower curtain - Rental | |
| 11/19/2020 | Fidel Lopez Landscaping | $500.00 | Monthly Landscaping Service - October 2020 - Rental | 07/28/2021 |
| 12/08/2020 | Birmingham Water Works | $57.09 | Monthly Utility Bill - Water - 10/22/2020-11/25/2020 - Rental | 07/28/2021 |
| 12/17/2020 | Fidel Lopez Landscaping | $500.00 | Monthly Landscaping Service - November 2020 - Rental | 07/28/2021 |
| 12/21/2020 | Alabama Power | $156.38 | Monthly Utility Bill - Power - 11/12/2020-12/15/2020 - Rental | 07/28/2021 |
| 12/24/2020 | Iris & Co. | $600.00 | Invoice #620 - Denny (Labor to hang art, mirrors, etc.) - Rental | |
| 12/24/2020 | Valet Moving | $3,200.00 | Monthly Storage Unit Rental - December 2020 | 07/28/2021 |
| 01/12/2020 | Birmingham Water Works | $57.09 | Monthly Utility Bill - Water - 11/25/2020-12/29/2020 - Rental | 07/28/2021 |
| 01/14/2020 | Fidel Lopez Landscaping | $500.00 | Monthly Landscaping Service - December 2020 - Rental | 07/28/2021 |
| 01/14/2020 | Valet Moving | $3,200.00 | Monthly Storage Unit Rental - January 2021 | 07/28/2021 |
| 01/14/2021 | DPMB Properties, LLC | $66,000.00 | Rental Agreement - Wimbleton Drive (Annual Term 01/15/2021-01/14/2022) (PARTIAL PAYMENT) | 07/28/2021 |
| 02/02/2020 | Alabama Power | $144.51 | Monthly Utility Bill - Power - 12/15/2020-01/14/2021 - Rental | 07/28/2021 |
| 02/08/2021 | Birmingham Water Works | $57.09 | Monthly Utility Bill - Water - 12/29/2020-01/27/2021 - Rental | 07/28/2021 |
| 02/17/2021 | Alabama Power | $127.30 | Monthly Power Bill - 01/14/2021-02/12/2021 - Rental | 07/28/2021 |
| 02/19/2021 | Valet Moving | $3,200.00 | Monthly Storage Unit Rental - February 2021 | 07/28/2021 |

| Date | Expense | Amount | Notes | Paid |
|---|---|---|---|---|
| 03/08/2021 | Birmingham Water Works | $67.47 | Monthly Utility Bill - Water - 01/27/2021-02/25/2021 - Rental | 07/28/2021 |
| 03/19/2021 | Alabama Power | $148.24 | Monthly Utility Bill - Power - 02/12/2021-03/16/2021 - Rental | 07/28/2021 |
| 03/22/2021 | Valet Moving | $3,628.00 | Monthly Storage Unit Rental & Misc. Moving Expenses - March 2021 | 07/28/2021 |
| 04/07/2021 | Birmingham Water Works | $67.76 | Monthly Water Bill - 02/25/2021-03/29/2021 - Rental | |
| 04/09/2021 | Valet Moving | $4,536.25 | Misc. Moving Expenses & Monthly Storage Unit Rental - April 2021 | |
| 04/20/2021 | Alabama Power | $128.40 | Monthly Power Bill - 03/16/2021-04/14/2021 - Rental | |
| 04/20/2021 | Iris & Co. | $5,428.20 | Invoice #639 - Rugs | |
| 04/22/2021 | Fidel Lopez Landscaping | $500.00 | Monthly Landscaping Service - March 2021 - Rental | |
| 05/10/2021 | Valet Moving | $3,329.00 | Misc. Moving Expenses & Monthly Storage Unit Rental - May 2021 | |
| 05/11/2021 | Birmingham Water Works | $64.20 | Monthly Water Bill - 03/29/2021-04/27/2021 - Rental | |
| 05/18/2021 | Fidel Lopez Landscaping | $500.00 | Monthly Landscaping Service - April 2021 - Rental | |
| 05/19/2021 | Alabama Power | $161.23 | Monthly Power Bill - 04/14/2021-05/13/2021 - Rental | |
| 06/08/2021 | Birmingham Water Works | $57.09 | Monthly Water Bill - 04/27/2021-05/25/2021 - Rental | |
| 06/14/2021 | Valet Moving | $3,200.00 | Monthly Storage Unit Rental - June 2021 | |
| 06/17/2021 | Fidel Lopez Landscaping | $500.00 | Monthly Landscaping Service - May 2021 - Rental | |
| 06/22/2021 | Alabama Power | $257.69 | Monthly Power Bill - 05/13/2021-06/14/2021 - Rental | |
| 07/08/2021 | Birmingham Water Works | $49.97 | Monthly Water Bill - 05/25/2021-06/25/2021 - Rental | |
| 07/12/2021 | Valet Moving | $3,399.00 | Misc. Moving Expenses & Monthly Storage Unit Rental - July 2021 | |
| 07/20/2021 | Alabama Power | $247.02 | Monthly Power Bill - 06/14/2021-07/14/2021 - Rental | |
| 07/22/2021 | Fidel Lopez Landscaping | $500.00 | Monthly Landscaping Service - June 2021 - Rental | |
| 08/09/2021 | Valet Moving | $3,809.00 | Misc. Moving Expenses (July 2021) & Monthly Storage Unit Rental (August 2021) | |
| 08/17/2021 | Birmingham Water Works | $46.42 | Monthly Water Bill - 06/25/2021-07/31/2021 - Rental | |
| 08/17/2021 | Alabama Power | $328.14 | Monthly Power Bill - 07/14/2021-08/13/2021 - Rental | |
| 08/18/2021 | Fidel Lopez Landscaping | $500.00 | Monthly Landscaping Service - June 2021 - Rental | |
| 09/09/2021 | Valet Moving | $4,196.00 | Misc. Expenses (August 2021) & Monthly Storage Unit Rental (September 2021) | |
| 09/22/2021 | Birmingham Water Works | $53.53 | Monthly Water Bill - 07/31/2021-08/27/2021 - Rental | |
| 09/22/2021 | Alabama Power | $364.15 | Monthly Power Bill - 08/13/2021-09/14/2021 - Rental | |
| 09/24/2021 | Fidel Lopez Landscaping | $500.00 | Monthly Landscaping Service - August 2021 - Rental | |
| 10/13/2021 | Birmingham Water Works | $64.20 | Monthly Water Bill - 08/27/2021-09/28/2021 - Rental | |
| 10/15/2021 | Valet Moving | $4,263.75 | Misc. Expenses (September 2021) & Monthly Storage Unit Rental (October 2021) | |
| 10/19/2021 | Alabama Power | $227.58 | Monthly Power Bill - 09/14/2021-10/13/2021 - Rental | |
| 10/30/2021 | Fidel Lopez Landscaping | $500.00 | Monthly Landscaping Service - September 2021 - Rental | |
| 11/05/2021 | Valet Moving | $1,920.00 | Monthly Storage Unit Rental (November 2021) (Prorated) | |
| 11/16/2021 | Birmingham Water Works | $53.53 | Monthly Water Bill - 09/28/2021-10/28/2021 - Rental | |
| 11/16/2021 | Alabama Power | $169.58 | Monthly Power Bill - 10/13/2021-11/11/2021 - Rental | |
| 11/23/2021 | Fidel Lopez Landscaping | $500.00 | Monthly Landscaping Service - September 2021 - Rental | |
| 12/13/2021 | Birmingham Water Works | $53.02 | Monthly Water Bill - 10/28/2021-12/03/2021 - Rental (Prorated) | |
| 12/21/2021 | Alabama Power | $34.72 | Monthly Power Bill - 11/11/2021-12/13/2021 - Rental (Prorated) | |
| 12/27/2021 | Fidel Lopez Landscaping | $300.00 | Monthly Landscaping Service - November 2021 - Rental (Prorated) | |
| 02/10/2022 | Valet Moving | $25,342.50 | Move to Dell Road - Part 1 of 2 | |
| 03/11/2022 | Valet Moving | $1,495.00 | Move to Dell Road - Part 2 of 2 | |
| | | -$11,000.00 | Rental Agreement Expense (Prorated) | |
| | | **$458,874.15** | **Total amount submitted for payment under ALE** | |

| Date | Expense | Amount | Notes | Paid |
|---|---|---|---|---|
| 12/09/2019 | Check #1 - ALE | $25,280.00 | | |
| 12/09/2019 | Check #2 - ALE | $32,200.50 | | |
| 01/13/2020 | Check #3 - ALE & Contents* | $11,288.64 | * Expense ($9,060.00) was incorrectly paid under Contents | |
| 03/04/2020 | Check #4 - ALE | $20,091.67 | | |
| 03/31/2020 | Check #5 - ALE | $37,000.00 | | |
| 11/30/2020 | Check #6 - ALE & Contents | $28,388.51 | | |
| 07/28/2021 | Check #7 - ALE & Contents* | $61,224.27 | * Expenses ($28,314.50) were incorrectly paid under Contents | |
| | | **$215,473.59** | **Total amount Pacific has paid under ALE (includes amounts that were paid under contents but should have been paid under ALE)** | |
| | | | | |
| | | **$243,400.56** | **TOTAL PACIFIC STILL OWES UNDER ALE** | |

PENGAD 800-631-6989
DEFENDANT'S EXHIBIT
5

EXHIBIT 149
WIT:
DATE: 2-9-23
JULIE BRANDT, RMR, CRR

| Room | Description | Original Cost | Replacement Cost | Sales Tax | Shipping/ Freight | TOTAL | Reference | Notes |
|---|---|---|---|---|---|---|---|---|
| Living Room | Knole Sofa * | **$9,290.00** | $12,450.00 | $1,245.00 | $715.00 | $14,410.00 | Iris & Co. Invoice #421 | See Magali Somers Maus' letter regarding upholstered furniture. The Knole sofa is Item #20 in Brookstone Restoration's inventory list. (The bolster pillows are among the items pictured as Item #21.) Chubb may pick up this item from Brookstone once the claim on this item has been paid. |
| Living Room | Fabric for Knole Sofa | **$4,400.00** | $6,300.00 | $630.00 | $160.00 | $7,090.00 | Iris & Co. Invoice #421 | |
| Living Room | Trim for Knole Sofa | **$520.00** | $1,274.00 | $127.40 | $54.00 | $1,455.40 | Iris & Co. Invoice #421 | |
| Living Room | Two Cords for Knole Sofa | **$660.00** | $1,040.00 | $104.00 | $145.00 | $1,289.00 | Iris & Co. Invoice #426 | |
| Living Room | Two Wing Chairs * | **$9,520.00** | $11,500.00 | $1,150.00 | $690.00 | $13,340.00 | Iris & Co. Invoice #421 | See Magali Somers Maus' letter regarding upholstered furniture. One of the wing chairs is Item #19 in Brookstone Restoration's inventory list. The other wing chair is among the items pictured as Item #21. Chubb may pick up these items from Brookstone once the claim on these items has been paid. |
| Living Room | Fabric for Wing Chairs | **$2,502.00** | $7,200.00 | $720.00 | $145.00 | $8,065.00 | Iris & Co. Invoice #421 | |
| Living Room | Fabric for Murphy Bed | | $1,200.00 | $120.00 | $45.00 | $1,365.00 | | |
| Living Room | Labor to Upholster Murphy Bed * ** | | $1,218.00 | $121.80 | $0.00 | $1,339.80 | | See Magali Somers Maus' letter regarding upholstered furniture. The antique Murphy bed is Item #8 in Magali Somers Maus' first proposal and estimate. |
| Living Room | Cost of New Materials for Murphy Bed | | $595.00 | $59.50 | $75.00 | $729.50 | | |
| Living Room | Fabric for Window Treatments | **$17,670.00** | $19,932.20 | $1,993.22 | $86.00 | $22,011.42 | Iris & Co. Invoice #552 | |
| Living Room | Labor to Make Window Treatments * ** *** | **$2,088.00** | $2,401.20 | $240.12 | $0.00 | $2,641.32 | Iris & Co. Invoice #585 | The living room custom window treatments appear to be Item #601 ($150.35) in Enservio's report. |
| Living Room | Cost of Lining and Bump for Window Treatments | **$1,040.00** | $1,196.00 | $119.60 | $0.00 | $1,315.60 | Iris & Co. Invoice #585 | |
| Living Room | Rug * | **$14,800.00** | $35,000.00 | $3,500.00 | $0.00 | $38,500.00 | Turkish Carpets Inc. Receipt | See Paige Albright Orientals' proposal for replacement cost. The Turkish Oushak rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid |
| Living Room | Labor to Cut, Deliver, and Install New Rug Pad - 12'9 x 17'3 | | $786.50 | $78.65 | $0.00 | $865.15 | | The rug pad appears to be Item #433 ($135.57) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Living Room | B. Viz Pillow (Blue Velvet) | **$1,550.00** | $3,600.00 | $360.00 | $75.00 | $4,035.00 | Iris & Co. Invoice #111 | The pillow is among the items pictured as Item #21 in Brookstone Restoration's inventory list. This item is lost. |
| Living Room | B. Viz Pillow (Cream Velvet) | **$350.00** | $425.00 | $42.50 | $55.00 | $522.50 | Iris & Co. Invoice #426 | The pillow was cleaned by CRDN, but a strong smoke odor is still present. Additionally, the antique velvet fabric is discolored and damaged. Chubb may pick up this item from Valet Moving once the claim on this item has been paid |
| Sunroom | Fabric for Daybed | **$3,136.00** | $6,530.00 | $653.00 | $65.00 | $7,248.00 | Iris & Co. Invoice #84 | |
| Sunroom | Lining for Daybed | **$54.00** | $275.00 | $27.50 | $0.00 | $302.50 | Iris & Co. Invoice #108 | |
| Sunroom | Labor to Upholster Daybed * ** | | $1,837.00 | $183.70 | $0.00 | $2,020.70 | | See Magali Somers Maus' letter regarding upholstered furniture. The antique daybed is Item #27 in Magali Somers Maus' first proposal and estimate. |
| Sunroom | Cost of Foam, Cotton, and Down for Daybed and Bolster Pillows | | $242.50 | $24.25 | $0.00 | $266.75 | | |
| Sunroom | Labor and Cost to Replace Foam and Cotton on Daybed | | $337.50 | $33.75 | $0.00 | $371.25 | | |
| Sunroom | Labor and Cost to Make Cushion for Daybed | | $1,162.50 | $116.25 | $0.00 | $1,278.75 | | |
| Sunroom | Labor to Make Two Custom Bolster Pillows for Daybed | | $337.50 | $33.75 | $0.00 | $371.25 | | |
| Sunroom | Bell Jar Light Fixture * | **$510.00** | $675.00 | $67.50 | $55.00 | $797.50 | Iris & Co. Invoice #483 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace this light fixtures with a new one--which comes UL-wired--than to go through the process of having this light fixture rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Sunroom | Pair of Sconces * | **$3,400.00** | $3,580.00 | $358.00 | $215.00 | $4,153.00 | Iris & Co. Invoice #421 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace these light fixtures with new ones--which come UL-wired--than to go through the process of having these light fixtures rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Sunroom | Labor to Cut, Deliver, and Install New Rug Pad - 6'2" x 10'0" | | $295.00 | $29.50 | $0.00 | $324.50 | | See payments to Dustin Cox as evidence that custom rug pads were purchased from him. This item is lost. |
| Dining Room | Fabric for Dining Chairs | **$9,480.00** | $10,932.00 | $1,093.20 | $125.00 | $12,150.20 | Iris & Co. Invoice #569 | |
| Dining Room | Backing of Fabric for Dining Chairs | **$850.00** | $918.00 | $91.80 | $250.00 | $1,259.80 | Iris & Co. Invoice #576 | |
| Dining Room | Labor to Upholster Chairs * ** | **$4,820.00** | $6,840.00 | $684.00 | $0.00 | $7,524.00 | Iris & Co. Invoice #585 | See Magali Somers Maus' letter regarding upholstered furniture. The antique dining chairs are Item #31 in Magali Somers Maus' first proposal and estimate. |
| Dining Room | Cost of New Foam for Dining Chairs | | $2,692.00 | $269.20 | $0.00 | $2,961.20 | | |
| Dining Room | Fabric for Window Treatments | **$19,068.00** | $22,196.80 | $2,219.68 | $190.00 | $24,606.48 | Iris & Co. Invoice #552 | |
| Dining Room | Labor to Make Window Treatments * ** *** | **$2,784.00** | $3,065.00 | $306.50 | $0.00 | $3,371.50 | Iris & Co. Invoice #585 | The dining room custom window treatments appear to be Item #600 ($200.47) in Enservio's report. |
| Dining Room | Cost of Lining and Bump for Window Treatments | **$1,390.00** | $1,598.00 | $159.80 | $0.00 | $1,757.80 | Iris & Co. Invoice #585 | |
| Dining Room | Rug * | **$22,000.00** | $18,000.00 | $1,800.00 | $0.00 | $19,800.00 | Paige Albright Orientals Invoice #1957 | The Safira rug was taken by Brookstone Restoration to Asia Rug Company and appears to be Rug #1 ($8,000.00) in Asia Rug Company's appraisal. |
| Dining Room | Labor to Cut, Deliver, and Install New Rug Pad - 12'6" x 14'1" | **$625.00** | $675.00 | $67.50 | $0.00 | $742.50 | Paige Albright Orientals Invoice #1957 | The rug pad appears to be Item #436 ($154.94) in Enservio's report. |
| Kitchen | Fabric for Kitchen Chairs and Mudroom Cushion Cover | **$580.00** | $683.00 | $68.30 | $50.00 | $801.30 | Iris & Co. Invoice #569 | |
| Kitchen | Labor to Upholster Kitchen Chairs * ** | **$1,260.00** | $1,386.00 | $138.60 | $0.00 | $1,524.60 | Iris & Co. Invoice #585 | See Magali Somers Maus' letter regarding upholstered furniture. The antique dining chairs are Item #30 in Magali Somers Maus' first proposal and estimate. |
| Kitchen | Cost of New Foam for Kitchen Chairs | **$465.00** | $511.00 | $51.10 | $0.00 | $562.10 | Iris & Co. Invoice #585 | |
| Kitchen | Labor to Make New Wooden Seats for Kitchen Chairs | | $360.00 | $36.00 | $0.00 | $396.00 | | |
| Kitchen | Labor to Replace Caning on Seats of Kitchen Chairs | | $1,800.00 | $180.00 | $0.00 | $1,980.00 | | |
| Kitchen | Lantern Light Fixture * | **$5,900.00** | $9,390.00 | $939.00 | $325.00 | $10,654.00 | Iris & Co. Invoice #253 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace this light fixture with a new one--which comes UL-wired--than to go through the process of having this light fixture rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid |
| Kitchen | Labor to Cut, Serge, Deliver, and Install Two Runners with New Rug Pads | | $1,157.75 | $115.78 | $0.00 | $1,273.53 | | The sisal runners appear to be Item #1066 ($525.36) in Enservio's report. The replacement cost of the sisal is included below. The rug pads appear to be Item #480 ($109.24) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Mudroom | Labor to Make Bench Cushion Cover * ** | **$234.00** | $260.00 | $26.00 | $0.00 | $286.00 | Iris & Co. Invoice #585 | The cushion appears to be Item #487 ($96.69) in Enservio's report. |
| Mudroom | Labor to Make Insert for Bench Cushion | **$140.00** | $160.00 | $16.00 | $0.00 | $176.00 | Iris & Co. Invoice #585 | |
| Mudroom | Rug * | | $5,500.00 | $550.00 | $0.00 | $6,050.00 | | See Claire Drummond's email confirming the purchase of the Oushak rug from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. The rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid |
| Mudroom | Labor to Cut, Deliver, and Install New Rug Pad - 9'8.5" x 2'4" | | $225.00 | $22.50 | $0.00 | $247.50 | | The rug pad appears to be Item #488 ($61.87) in Enservio's report. |
| Laundry Room | Rug * | | $2,800.00 | $280.00 | $0.00 | $3,080.00 | | See Claire Drummond's email confirming the purchase of the "foyer rug around 5x9" from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. This item is lost |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Laundry Room | Labor to Cut, Deliver, and Install New Rug Pad - 5' x 8' | | $210.00 | $21.00 | $0.00 | $231.00 | | The rug pad appears to be Item #531 ($35.46) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Family Room | Sofa * | **$2,588.00** | $8,920.00 | $892.00 | $520.10 | $10,332.10 | Iris & Co. Invoice #44 | See Magali Somers Maus' letter regarding upholstered furniture. The sofa is Item #17 in Brookstone Restoration's inventory list. Chubb may pick up this item from Brookstone once the claim on this item has been paid. |
| Family Room | Two Club Chairs * | **$2,586.00** | $11,440.00 | $1,144.00 | $682.00 | $13,266.00 | Iris & Co. Invoice #51 | See Magali Somers Maus' letter regarding upholstered furniture. The club chairs are among the items pictured as Items #18 and #24 in Brookstone Restoration's inventory list. Chubb may pick up these items from Brookstone once the claim on these items has been paid. |
| Family Room | Two Bergere Chair Frames, Including Cost to Finish Frames * | **$952.00** | $7,180.00 | $718.00 | $425.00 | $8,323.00 | Iris & Co. Invoice #39 | See Magali Somers Maus' letter regarding upholstered furniture. The Bergere chairs are Items #25 and #26 in Brookstone Restoration's inventory list. Chubb may pick up these items from Brookstone once the claim on these items has been paid. |
| Family Room | Fabric for Sofa, Club Chairs, Bergere Chairs, and Slipcover for Sofa (in Basement) | **$26,268.00** | $34,992.00 | $3,499.20 | $225.00 | $38,716.20 | Iris & Co. Invoice #39, #44, #293 | |
| Family Room | Fabric for Pair of Painted French Stools | | $750.00 | $75.00 | $35.00 | $860.00 | | See Magali Somers Maus' letter regarding upholstered furniture. The antique painted French stools are Item #21 in Magali Somers Maus' first proposal and estimate. |
| Family Room | Labor to Upholster Pair of Painted French Stools * ** | | $425.00 | $42.50 | $0.00 | $467.50 | | |
| Family Room | Pair of Sconces * | **$4,460.00** | $5,160.00 | $516.00 | $175.00 | $5,851.00 | Iris & Co. Invoice #265 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace these light fixtures with new ones--which come UL-wired--than to go through the process of having these light fixtures rewired with the necessary UL certification. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Family Room | Sisal for Rug | **$3,410.00** | $4,100.00 | $410.00 | $155.00 | $4,665.00 | Iris & Co. Invoice #566 | This item is lost. |
| Family Room | Labor to Cut, Serge, Deliver, and Install Rug and New Rug Pad | **$3,378.00** | $3,750.00 | $375.00 | $0.00 | $4,125.00 | | The rug pad appears to be Item #395 ($525.28) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Bar Hallway | Three Flush-Mount Brass Lights for Bar Hallway & Gallery * | **$2,663.00** | $2,720.99 | $272.10 | $408.00 | $3,401.09 | Iris & Co. Invoice #566 | These items are lost. |
| Bar Hallway | Rug * | | $5,500.00 | $550.00 | $0.00 | $6,050.00 | | See Claire Drummond's email confirming the purchase of this vintage Oushak rug from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. The rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Bar Hallway | Labor to Make, Deliver, and Install New Rug Pad - 3'1" x 6'0" | | $210.00 | $21.00 | $0.00 | $231.00 | | See payments to Dustin Cox as evidence that custom rug pads were purchased from him. This item is lost. |
| Study | Fabric to Upholster Desk Chair | **$3,760.00** | $3,900.00 | $390.00 | $75.00 | $4,365.00 | Iris & Co. Invoice #392 | See Magali Somers Maus' letter regarding upholstered furniture. The antique desk chair is Item #26 in Magali Somers Maus' first proposal and estimate. |
| Study | Labor to Upholster Desk Chair * ** | **$150.00** | $175.00 | $17.50 | $0.00 | $192.50 | Iris & Co. Invoice #585 | |
| Study | Fabric for Two Antique Chairs | | $3,250.00 | $325.00 | $275.00 | $3,850.00 | Iris & Co. Invoice #392 | See Magali Somers Maus' letter regarding upholstered furniture. The antique chairs are Item #1 in Magali Somers Maus' first proposal and estimate. |
| Study | Labor to Upholster Antique Chairs * ** | | $1,781.50 | $178.15 | $0.00 | $1,959.65 | Iris & Co. Invoice #392 | |
| Study | Labor to Apply Nailheads on Antique Chairs | | $675.00 | $67.50 | $0.00 | $742.50 | | |
| Study | Cost of Nailheads | | $363.75 | $36.38 | $0.00 | $400.13 | | |
| Study | Cost of Foam | | $1,406.25 | $140.63 | $0.00 | $1,546.88 | | |
| Study | Bar Cart * | **$2,356.90** | $5,890.00 | $589.00 | $325.00 | $6,804.00 | Iris & Co. Invoice #199 | The bar cart is among the items pictured as Item #32 in Brookstone Restoration's inventory list. The finish on the bar cart is now damaged, and two of the shelves are lost. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Study | Three Library Lights * | **$1,979.55** | $2,179.00 | $217.90 | $326.85 | $2,723.75 | Iris & Co. Invoice #555 | These items are lost. |
| Study | Rug * | | $12,000.00 | $1,200.00 | $0.00 | $13,200.00 | | See Claire Drummond's email confirming the purchase of the vintage Oushak rug from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. The rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Study | Labor to Cut, Deliver, and Install New Rug Pad - 5'4" x 8'8" | | $300.00 | $30.00 | $0.00 | $330.00 | | The rug pad appears to be Item #414 ($28.85) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Master Bedroom | Fabric for Bedskirt, Chaise, and Window Treatments | **$22,304.00** | $31,816.00 | $3,181.60 | $385.00 | $35,382.60 | Iris & Co. Invoice #84, #552, #555 | |
| Master Bedroom | Labor to Make Bedskirt * ** *** | **$525.00** | $600.00 | $60.00 | $0.00 | $660.00 | Iris & Co. Invoice #585 | The bedskirt was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Master Bedroom | Labor to Upholster Chaise * ** | | $2,087.50 | $208.75 | $0.00 | $2,296.25 | | See Magali Somers Maus' letter regarding upholstered furniture. The antique chaise is Item #15 in Magali Somers Maus' first proposal and estimate. |
| Master Bedroom | Labor to Make Cushions for Chaise | | $1,531.25 | $153.13 | $0.00 | $1,684.38 | | |
| Master Bedroom | Cost of Foam and Cotton for Chaise | | $475.00 | $47.50 | $0.00 | $522.50 | | |
| Master Bedroom | Labor to Make Window Treatments * ** *** | **$2,780.00** | $3,197.00 | $319.70 | $0.00 | $3,516.70 | Iris & Co. Invoice #585 | The master bedroom custom window treatments were cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim for this item has been paid. |
| Master Bedroom | Labor to Make Shades for Master Bathroom * ** *** | **$650.00** | $740.00 | $74.00 | $0.00 | $814.00 | Iris & Co. Invoice #585 | The master bathroom custom shades were disposed of during debris removal. |
| Master Bedroom | Cost of Lining, Bump, and Interlining for Window Treatments and Shades | **$1,619.00** | $1,860.00 | $186.00 | $0.00 | $2,046.00 | Iris & Co. Invoice #585 | |
| Master Bedroom | Fabric for Antique Bench | | $1,500.00 | $150.00 | $145.00 | $1,795.00 | | See Magali Somers Maus' letter regarding upholstered items. The antique bench is Item #12 in Magali Somers Maus' first proposal and estimate. |
| Master Bedroom | Labor to Upholster Antique Bench * ** | | $1,156.00 | $115.60 | $0.00 | $1,271.60 | | |
| Master Bedroom | Labor and Cost to Make Cushion for Bench | | $1,596.25 | $159.63 | $0.00 | $1,755.88 | | |
| Master Bedroom | Cost of Foam and Cotton for Bench | | $225.00 | $22.50 | $0.00 | $247.50 | | |
| Master Bedroom | Bed Linens from Leontine Linens | **$7,710.00** | $7,710.00 | $771.00 | $100.00 | $8,581.00 | Iris & Co. Invoice #566 | Some of the bed linens were cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. The remaining bed linens are lost. |
| Master Bedroom | Pillows from Leontine Linens | **$275.00** | $275.00 | $27.50 | $20.00 | $322.50 | | The pillows appear to be Items #373 ($61.04) and #393 ($228.74) in Enservio's report. See Leontine Linens estimate #16706 for replacement cost. |
| Master Bedroom | Chandelier * | **$5,990.00** | $7,640.00 | $764.00 | $720.00 | $9,124.00 | Iris & Co. Invoice #454 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace this light fixture with a new one--which comes UL-wired--than to go through the process of having this light fixture rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Master Bedroom | Pair of Sconces * | **$6,220.00** | $7,600.00 | $760.00 | $275.00 | $8,635.00 | Iris & Co. Invoice #310 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace these light fixtures with new ones--which come UL-wired--than to go through the process of having these light fixtures rewired with the necessary UL certification. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Master Bedroom | Rug * | | $16,000.00 | $1,600.00 | $0.00 | $17,600.00 | | See Claire Drummond's email confirming that the Oushak rug was purchased from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. The rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Master Bedroom | Labor to Cut, Deliver, and Install New Rug Pad - 13' x 17' | | $2,797.00 | $279.70 | $0.00 | $3,076.70 | | The rug pad appears to be Item #376 ($279.59) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Master Bedroom | Antique Mother of Pearl Tea Caddy | **$2,500.00** | $7,000.00 | $700.00 | $0.00 | $7,700.00 | Robert Hill Antiques Invoice | This item is lost. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Powder Room | Pair of Sconces * | **$7,700.00** | $9,000.00 | $900.00 | $325.00 | $10,225.00 | Iris & Co. Invoice #310 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace these light fixtures with new ones--which come UL-wired--than to go through the process of having these light fixtures rewired with the necessary UL certification. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Foyer | Library Light * | **$440.00** | $496.00 | $49.60 | $99.20 | $644.80 | Iris & Co. Invoice #555 | This item is lost. |
| Foyer | Half-Round Wall Lanterns * | **$3,159.95** | $22,720.00 | $2,272.00 | $2,750.00 | $27,742.00 | Iris & Co. Invoice #576 | These items are lost. |
| Foyer | Rug * | **$6,500.00** | $7,500.00 | $750.00 | $0.00 | $8,250.00 | Paige Albright Orientals Invoice #1511 | See Paige Albright Orientals proposal for replacement cost. This item is lost. |
| Foyer | Labor to Make, Deliver, and Install New Rug Pad - 5'4" x 12'3" | | $290.00 | $29.00 | $0.00 | $319.00 | | The rug pad appears to be Item #435 ($46.54) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Upstairs Hallway | Pair of Antique Painted Bookcases * | **$5,022.00** | $24,000.00 | $2,400.00 | $0.00 | $26,400.00 | Iris & Co. Invoice #227, #244 | The pair of antique bookcases appears to be Item #173 ($2,823.10) in Enservio's report. |
| Upstairs Hallway | Antique Louis XVI Bench * | **$1,760.00** | $3,950.00 | $395.00 | $0.00 | $4,345.00 | The King's House Antiques Receipt | The antique caned bench is listed in Magali Somers Maus' first proposal and estimate. This item was irreparably damaged in the fire. |
| Upstairs Hallway | Fabric for Shower Curtain (Girls' Bathroom - Montevallo Road) | **$1,280.00** | $2,560.00 | $256.00 | $65.00 | $2,881.00 | Iris & Co. Invoice #392 | |
| Upstairs Hallway | Labor to Make Shower Curtain * ** | **$356.25** | $420.00 | $42.00 | $0.00 | $462.00 | Iris & Co. Invoice #421 | This item is lost. |
| Upstairs Hallway | Lining and Interlining for Shower Curtain | **$317.30** | $364.90 | $36.49 | $0.00 | $401.39 | Iris & Co. Invoice #244 | |
| Upstairs Hallway | Labor to Make Shower Curtain (Caroline's Bathroom - Montevallo Road) * ** | **$250.00** | $425.00 | $42.50 | $0.00 | $467.50 | Iris & Co. Invoice #392 | This item is lost. |
| Upstairs Hallway | Labor to Make, Serge, Deliver, and Install Runner with New Rug Pad | | $1,196.00 | $119.60 | $0.00 | $1,315.60 | | The replacement cost of the sisal for the runner is included below. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. These items are lost. |
| Guest Bedroom | Antique Regency Linen Press * | **$9,500.00** | $22,000.00 | $2,200.00 | $0.00 | $24,200.00 | The King's House Antiques Receipt | This item was irreparably damaged in the fire and disposed of during debris removal. |
| Guest Bedroom | Antique Game Table * | | $9,500.00 | $950.00 | $0.00 | $10,450.00 | | The antique game table is Item #23 in Magali Somers Maus' first proposal and estimate. A strong smoke odor is still present after treatment. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Guest Bedroom | Pair of Antique Lamps | **$2,079.00** | $5,800.00 | $580.00 | $0.00 | $6,380.00 | Henhouse Antiques Receipt | The pair of antiques lamps is Item #49 in Magali Somers Maus' first proposal and estimate. A strong smoke odor is still present after treatment. Chubb may pick up this item once the claim on this item has been paid. |
| Guest Bedroom | Headboard, Including Labor to Finish and Upholster * | **$1,990.00** | $4,910.00 | $491.00 | $432.08 | $5,833.08 | Iris & Co. Invoice #39, #44, #585 | The headboard appears to be Item #154 ($2,178.91) in Enservio's report. |
| Guest Bedroom | Fabric for Headboard | **$630.00** | $2,784.00 | $278.40 | $78.00 | $3,140.40 | Iris & Co. Invoice #44 | |
| Guest Bedroom | Mattress, Box Springs, and Frame * | **$4,498.00** | $5,098.99 | $509.90 | $79.99 | $5,688.88 | Mattress Firm Receipts | The mattress and box springs appear to be Item #155 ($1,240.42) in Enservio's report. |
| Guest Bedroom | Bed Linens from Leontine Linens | | $5,670.00 | $567.00 | $100.00 | $6,337.00 | | See Leontine Linens Estimate #16708 for the replacement cost. These items are lost. |
| Guest Bedroom | Fabric for Bedskirt, Window Treatments, and Shower Curtain | **$5,764.00** | $11,044.00 | $1,104.40 | $810.00 | $12,958.40 | Iris & Co. Invoice #39, #310, #585 | |
| Guest Bedroom | Backing of Fabric for Bedskirt | **$306.00** | $356.00 | $35.60 | $48.00 | $439.60 | Iris & Co. Invoice #506 | |
| Guest Bedroom | Labor to Make Bedskirt * ** *** | **$770.00** | $825.00 | $82.50 | $0.00 | $907.50 | Iris & Co. Invoice #585 | This item is lost. |
| Guest Bedroom | Lining for Bedskirt | **$123.00** | $142.00 | $14.20 | $0.00 | $156.20 | Iris & Co. Invoice #506 | |
| Guest Bedroom | Labor to Make Window Treatments * ** *** | **$1,350.00** | $1,370.00 | $137.00 | $0.00 | $1,507.00 | Iris & Co. Invoice #39, #312, #488, #585 | This item is lost. |
| Guest Bedroom | Labor to Make Shade for Guest Bedroom * ** *** | **$450.00** | $515.00 | $51.50 | $0.00 | $566.50 | Iris & Co. Invoice #585 | This item is lost. |
| Guest Bedroom | Rug * | **$6,577.00** | $7,535.00 | $753.50 | $125.00 | $8,413.50 | Iris & Co. Invoice #515 | This item is lost. |
| Guest Bedroom | Labor to Make, Serge, Deliver, and Install Rug and New Rug Pad | **$1,249.00** | $2,627.00 | $262.70 | $0.00 | $2,889.70 | | See payments to Dustin Cox as evidence that custom rug pads were purchased from him. This item is lost. |
| Guest Bedroom | Labor to Make Shower Curtain * ** *** | **$475.00** | $550.00 | $55.00 | $0.00 | $605.00 | Iris & Co. Invoice #585 | The shower curtain appears to be one of the items that is Item #1046 ($39.23) in Enservio's report. |
| Guest Bedroom | Labor to Make Shade for Guest Bathroom * ** *** | **$320.00** | $370.00 | $37.00 | $0.00 | $407.00 | Iris & Co. Invoice #585 | This item is lost. |
| Guest Bedroom | Pair of Sconces for Bathroom * | **$840.00** | $900.00 | $90.00 | $135.00 | $1,125.00 | Iris & Co. Invoice #576 | These items are lost. |
| Gillian's Bedroom | Daybed * | **$3,390.00** | $5,990.00 | $599.00 | $325.00 | $6,914.00 | Iris & Co. Invoice #576 | This item is lost. |
| Gillian's Bedroom | Desk * | **$579.99** | $1,499.00 | $149.90 | $315.00 | $1,963.90 | Ballard Designs Order | This item is lost. |
| Gillian's Bedroom | Chair for Desk * | | $2,339.00 | $233.90 | $0.00 | $2,572.90 | | This item is lost. |
| Gillian's Bedroom | Labor to Paint Desk and Chair * | **$1,400.00** | $1,610.00 | $0.00 | $0.00 | $1,610.00 | Iris & Co. Invoice #566 | |
| Gillian's Bedroom | Bedside Table * | **$1,260.00** | $1,330.00 | $133.00 | $150.00 | $1,613.00 | Iris &Co. Invoice #364 | This item is lost. |
| Gillian's Bedroom | Antique White Trumeau * | **$4,600.00** | $5,750.00 | $575.00 | $0.00 | $6,325.00 | Iris & Co. Receipt | This item is lost. |
| Gillian's Bedroom | Fabric for Daybed, Bedskirt, Pillows, Window Treatments | **$24,024.00** | $25,749.60 | $2,574.96 | $165.00 | $28,489.56 | Iris & Co. Invoice #576 | |
| Gillian's Bedroom | Fabric for Desk Chair, and Window Seat | **$3,952.00** | $3,952.00 | $395.20 | $172.00 | $4,519.20 | Iris & Co. Invoice #576 | |
| Gillian's Bedroom | Fabric for Shower Curtain | **$1,032.00** | $1,032.00 | $103.20 | $75.00 | $1,210.20 | Iris & Co. Invoice #576 | |
| Gillian's Bedroom | Trim for Desk Chair, Window Seat, and Shower Curtain | **$794.00** | $794.00 | $79.40 | $34.00 | $907.40 | Iris & Co. Invoice #569 | |
| Gillian's Bedroom | Labor to Make Bedskirt * ** *** | **$495.00** | $545.00 | $54.50 | $0.00 | $599.50 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Labor to Upholster Desk Chair * ** | **$285.00** | $330.00 | $33.00 | $0.00 | $363.00 | Iris & Co. Invoice #585 | |
| Gillian's Bedroom | Labor to Modify Desk Chair to Accommodate Seat Cushion | **$95.00** | $110.00 | $11.00 | $0.00 | $121.00 | Iris & Co. Invoice #585 | |
| Gillian's Bedroom | Labor to Make Cushion for Desk Chair | **$235.00** | $270.00 | $27.00 | $0.00 | $297.00 | Iris & Co. Invoice #585 | |
| Gillian's Bedroom | Labor to Make Window Treatments - Longer Panels * ** *** | **$1,875.00** | $2,065.00 | $206.50 | $0.00 | $2,271.50 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Labor to Make Window Treatments - Shorter Panels * ** *** | **$480.00** | $525.00 | $52.50 | $0.00 | $577.50 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Labor to Make Window Treatments - Shades * ** *** | **$530.00** | $590.00 | $59.00 | $0.00 | $649.00 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Lining and Bump for Window Treatments | **$1,233.60** | $1,418.64 | $141.86 | $0.00 | $1,560.50 | Iris & Co. Invoice #585 | |
| Gillian's Bedroom | Labor and Cost to Make Window Seat Cushion * ** | **$930.00** | $1,023.00 | $102.30 | $0.00 | $1,125.30 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Labor to Make Shower Curtain * ** *** | **$535.00** | $600.00 | $60.00 | $125.00 | $785.00 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Bed Linens from Leontine Linens | **$2,050.00** | $2,050.00 | $205.00 | $100.00 | $2,355.00 | Iris & Co. Invoice #559 | This item is lost. |
| Gillian's Bedroom | Pillow from Leontine Linens | **$100.00** | $100.00 | $10.00 | $0.00 | $110.00 | | See Leontine Linens estimate #16706 for replacement cost. This item is lost. |
| Gillian's Bedroom | Mattress | **$1,599.00** | $1,979.00 | $197.90 | $0.00 | $2,176.90 | Mattress Firm Receipts | This item is lost. |
| Gillian's Bedroom | Trundle and Mattress | **$498.00** | $689.00 | $68.90 | $0.00 | $757.90 | Mattress Firm Receipts | These items are lost. |
| Gillian's Bedroom | Chandelier * | **$3,390.00** | $5,780.00 | $578.00 | $315.00 | $6,673.00 | Iris & Co. Invoice #253 | This item is lost. |
| Gillian's Bedroom | Antique Gold Leaf Bow Sconces * | | $4,950.00 | $495.00 | $0.00 | $5,445.00 | | This item is lost. |
| Gillian's Bedroom | Pair of Sconces for Bathroom * | **$799.80** | $856.00 | $85.60 | $64.20 | $1,005.80 | Iris & Co. Invoice #576 | These items are lost. |
| Gillian's Bedroom | Rug; Labor to Cut, Serge, Deliver, and Install New Rug and Rug Pad | **$2,330.00** | $3,290.00 | $329.00 | $75.00 | $3,694.00 | Iris & Co. Invoice #566 | These items are lost. |
| Susie's Bedroom | Bed * | **$1,536.00** | $1,536.00 | $153.60 | $199.00 | $1,888.60 | Restoration Hardware Receipts | This item is lost. |
| Susie's Bedroom | Alteration of Canopy | **$295.00** | $315.00 | $31.50 | $0.00 | $346.50 | Iris & Co. Invoice #569 | |
| Susie's Bedroom | Two Chests * | **$3,545.00** | $5,200.00 | $520.00 | $500.00 | $6,220.00 | Iris & Co. Invoice #253, #426 | The chests appear to be Item #172 ($869.82) in Enservio's report. |
| Susie's Bedroom | Labor to Paint Chests * | **$930.00** | $1,070.00 | $0.00 | $0.00 | $1,070.00 | Iris & Co. Invoice #569 | |
| Susie's Bedroom | Dressing Table * | **$950.00** | $1,500.00 | $150.00 | $150.00 | $1,800.00 | Iris & Co. Invoice #569 | This item is lost. |
| Susie's Bedroom | Single Antique Lamp | **$301.60** | $1,600.00 | $160.00 | $0.00 | $1,760.00 | Iris & Co. Invoice #260 | This item is lost. |
| Susie's Bedroom | Fabric for Bed and Shower Curtain | **$43,800.00** | $43,800.00 | $4,380.00 | $810.00 | $48,990.00 | Iris & Co. Invoice #576 | |
| Susie's Bedroom | Backing of Fabric for Bed and Shower Curtain | **$1,320.00** | $1,425.60 | $142.56 | $293.00 | $1,861.16 | Iris & Co. Invoice #569 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Susie's Bedroom | Cost of Lining for Bed and Shower Curtain | $165.00 | $180.00 | $18.00 | $0.00 | $198.00 | Iris & Co. Invoice #585 | |
| Susie's Bedroom | Fabric for Canopies and Window Seat | $12,040.00 | $12,040.00 | $1,204.00 | $168.00 | $13,412.00 | Iris & Co. Invoice #576 | |
| Susie's Bedroom | Fabric for Window Treatments - Shades | $3,120.00 | $3,120.00 | $312.00 | $73.00 | $3,505.00 | Iris & Co. Invoice #576 | |
| Susie's Bedroom | Labor to Make Top of Bed Canopy * ** *** | $2,130.00 | $2,345.00 | $234.50 | $0.00 | $2,579.50 | Iris & Co. Invoice #585 | This item is lost. |
| Susie's Bedroom | Labor to Make Panels for Bed * ** *** | $3,168.00 | $3,485.00 | $348.50 | $0.00 | $3,833.50 | Iris & Co. Invoice #585 | This item is lost. |
| Susie's Bedroom | Labor to Make Bedskirt * ** *** | $775.00 | $850.00 | $85.00 | $0.00 | $935.00 | Iris & Co. Invoice #585 | The bedskirt appears to be Item #1062 ($43.59) in Enservio's report |
| Susie's Bedroom | Silk Bow for Bed Canopy | $500.00 | $500.00 | $50.00 | $25.00 | $575.00 | Iris & Co. Invoice #555 | This item is lost. |
| Susie's Bedroom | Fabric for Pillows | $7,600.00 | $7,600.00 | $760.00 | $105.00 | $8,465.00 | Iris & Co. Invoice #576 | |
| Susie's Bedroom | Labor to Make Bolster Pillow * ** | $210.00 | $230.00 | $23.00 | $0.00 | $253.00 | Iris & Co. Invoice #585 | The custom bolster pillow appears to be Item #610 ($132.98) in Enservio's report |
| Susie's Bedroom | Labor to Make Insert for Pillow | $225.00 | $247.00 | $24.70 | $0.00 | $271.70 | Iris & Co. Invoice #585 | |
| Susie's Bedroom | Bed Linens from Leontine Linens | $4,850.00 | $4,850.00 | $485.00 | $100.00 | $5,435.00 | Iris & Co. Invoice #559 | These items are lost |
| Susie's Bedroom | Pillows from Leontine Linens | $100.00 | $100.00 | $10.00 | $0.00 | $110.00 | | See Leontine Linens estimate #16706 for replacement cost. This item is lost. |
| Susie's Bedroom | Labor to Make Window Treatments - Shade for Bedroom * ** *** | $1,340.00 | $1,475.00 | $147.50 | $0.00 | $1,622.50 | Iris & Co. Invoice #585 | This item is lost. |
| Susie's Bedroom | Labor to Make Window Seat Cushion * ** | $1,950.00 | $2,145.00 | $214.50 | $0.00 | $2,359.50 | Iris & Co. Invoice #585 | The window seat cushion appears to be Item #169 ($588.85) in Enservio's report. |
| Susie's Bedroom | Labor to Make Shower Curtain * ** *** | $420.00 | $465.00 | $46.50 | $0.00 | $511.50 | Iris & Co. Invoice #585 | The shower curtain appears to be Item #1047 ($39.23) in Enservio's report. |
| Susie's Bedroom | Labor to Make Window Treatments - Shade for Bathroom * ** *** | $178.00 | $195.00 | $19.50 | $0.00 | $214.50 | Iris & Co. Invoice #585 | This item is lost. |
| Susie's Bedroom | Pair of Sconces for Bathroom * | $799.00 | $856.00 | $85.60 | $64.20 | $1,005.80 | Iris & Co. Invoice #576 | This item is lost. |
| Susie's Bedroom | Rug; Labor to Cut, Serge, Deliver, and Install New Rug and Rug Pad | $2,875.00 | $3,726.50 | $372.65 | $45.00 | $4,144.15 | Iris & Co. Invoice #576 | The rug appears to be Item #319 ($47.63) in Enservio's report. The rug pad appears to be Item #318 ($21.80) in Enservio's report. |
| Caroline's Bedroom | Two Headboards * | $2,200.00 | $4,512.00 | $451.20 | $250.00 | $5,213.20 | Iris & Co. Invoice #138 | The headboards appear to be Item #175 ($979.91) in Enservio's report. |
| Caroline's Bedroom | Two Antique Benches * | $2,380.00 | $6,900.00 | $690.00 | $250.00 | $7,840.00 | Iris & Co. Invoice #260 | The antique benches appear to be Item #252 ($610.29) in Enservio's report. |
| Caroline's Bedroom | Labor to Upholster Antique Benches * ** | $425.00 | $530.00 | $53.00 | $0.00 | $583.00 | Iris & Co. Invoice #260 | See Magali Somers Maus' letter regarding upholstered furniture. |
| Caroline's Bedroom | Fabric for Canopies, Bedskirts, Window Seat, Window Treatments, and Shower Curtain | $14,760.00 | $15,890.00 | $1,589.00 | $250.00 | $17,729.00 | Iris & Co. Invoice #569 | |
| Caroline's Bedroom | Strike Off for Above Fabric | $250.00 | $250.00 | $0.00 | $25.00 | $275.00 | Iris & Co. Invoice #569 | |
| Caroline's Bedroom | Fabric for Canopies and Benches | $3,950.00 | $3,950.00 | $395.00 | $66.72 | $4,411.72 | Iris & Co. Invoice #569 | |
| Caroline's Bedroom | Cost of Lining and Interlining | $325.00 | $390.00 | $39.00 | $0.00 | $429.00 | Iris & Co. Invoice #585 | |
| Caroline's Bedroom | Labor to Make Canopies * ** *** | $900.00 | $990.00 | $99.00 | $0.00 | $1,089.00 | Iris & Co. Invoice #569 | This item is lost. |
| Caroline's Bedroom | Labor to Make Panels for Canopies * ** *** | $1,200.00 | $1,320.00 | $132.00 | $0.00 | $1,452.00 | Iris & Co. Invoice #569 | This item is lost. |
| Caroline's Bedroom | Labor to Make Bedskirts * ** *** | $1,500.00 | $1,650.00 | $165.00 | $0.00 | $1,815.00 | Iris & Co. Invoice #569 | The bedskirts appear to be Items #605 ($43.59) and #609 ($43.59) in Enservio's report |
| Caroline's Bedroom | Labor to Make Window Treatments - Shade for Bedroom * ** *** | $935.00 | $1,075.00 | $107.50 | $0.00 | $1,182.50 | Iris & Co. Invoice #569 | This item is lost. |
| Caroline's Bedroom | Labor to Make Window Seat Cushion * ** | $1,818.00 | $1,990.00 | $199.00 | $0.00 | $2,189.00 | Iris & Co. Invoice #569 | The window seat cushion appears to be Item #168 ($391.43) in Enservio's report. |
| Caroline's Bedroom | Labor to Paint Desk and Chair * | $1,037.00 | $1,192.00 | $0.00 | $0.00 | $1,192.00 | Iris & Co. Invoice #566 | The antique desk is Item #4 in Magali Somers Maus' first proposal and estimate. The antique chair is Item #5 in Magali Somers Maus' first proposal and estimate. |
| Caroline's Bedroom | Labor to Upholster Desk Chair * ** | $54.00 | $60.00 | $6.00 | $0.00 | $66.00 | Iris & Co. Invoice #585 | See Magali Somers Maus' letter regarding upholstered furniture. The antique desk chair is Item #5 in Magali Somers Maus' first proposal and estimate. |
| Caroline's Bedroom | Labor to Make Shower Curtain * ** *** | $420.00 | $465.00 | $46.50 | $0.00 | $511.50 | Iris & Co. Invoice #585 | The shower curtain appears to be one of the items that is Item #1046 ($39.23) in Enservio's report. |
| Caroline's Bedroom | Labor to Make Window Treatments - Shade for Bathroom * ** *** | $266.00 | $295.00 | $29.50 | $0.00 | $324.50 | Iris & Co. Invoice #585 | This item is lost. |
| Caroline's Bedroom | Rug; Labor to Cut, Serge, Deliver and Install New Rug and Rug Pad | $2,875.00 | $3,726.50 | $372.65 | $45.00 | $4,144.15 | Iris & Co. Invoice #576 | The rug was taken by Brookstone Restoration to Asia Rug Company and appears to be Rug #2 ($1,000.00) in Asia Rug Company's appraisal. The rug pad is lost. |
| Caroline's Bedroom | Bed Linens from Leontine Linens | | $6,690.00 | $669.00 | $100.00 | $7,459.00 | | See Leontine Linens estimate #16711 for the replacement cost. These items are lost. |
| Caroline's Bedroom | French Blue Throw | $265.00 | $350.00 | $35.00 | $25.00 | $410.00 | Iris & Co. Invoice #253 | The throw was cleaned by CRDN, but there is still a strong smoke odor. Additionally, the color has faded and the texture has changed. Chubb may pick up this item from Valet Moving once the claim on this item has been paid |
| Caroline's Bedroom | Pair of Antique Lamps | $676.00 | $3,900.00 | $390.00 | $0.00 | $4,290.00 | Iris & Co. Invoice #260 | The pair of antique lamps appear to be Item #242 ($324.82) in Enservio's report |
| Playroom | Sofa * | | $8,280.00 | $828.00 | $903.00 | $10,011.00 | | The sofa appears to be Item #170 ($1,088.91) in Enservio's report. |
| Playroom | Two Chairs * | | $10,980.00 | $1,098.00 | $659.00 | $12,737.00 | | The chairs appear to be Item #171 ($1,447.52) in Enservio's report |
| Playroom | Large Antiqued Mirror * | $1,813.19 | $3,125.00 | $312.50 | $0.00 | $3,437.50 | Iris & Co. Invoice #260 | The mirror appears to be Item #294 ($1,962.00) in Enservio's report |
| Playroom | Fabric for Sofa, Chairs, Bolster Pillows, Antique Round Bench, and Dressing Table | $5,188.00 | $10,480.00 | $1,048.00 | $62.00 | $11,590.00 | Iris & Co. Invoice #51, #244, #421 | |
| Playroom | Backing of Fabric for Sofa and Chairs | $317.00 | $348.00 | $34.80 | $76.00 | $458.80 | Iris & Co. Invoice #569 | |
| Playroom | Fabric for Trim on Bolster Pillows | $255.00 | $389.00 | $38.90 | $43.00 | $470.90 | Iris & Co. Invoice #51 | |
| Playroom | Labor to Make Bolster Pillows * ** | $254.40 | $318.00 | $31.80 | $0.00 | $349.80 | Iris & Co. Invoice #51 | |
| Playroom | Antique Iron Daybed * | | $3,500.00 | $350.00 | $0.00 | $3,850.00 | | The antique iron daybed is Item #99 in Magali Somers Maus' second proposal and estimate. A strong smoke odor is still present after treatment. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Playroom | Fabric for Daybed Cushion, Bolster, and Pillows | | $2,400.00 | $240.00 | $65.00 | $2,705.00 | | See Magali Somers Maus' letter regarding upholstered furniture |
| Playroom | Labor to Make Cushion, Bolster, and Pillows for Daybed * ** | | $1,255.00 | $125.50 | $0.00 | $1,380.50 | | |
| Playroom | Cost of Materials for Cushion, Bolster, and Pillows for Daybed | | $1,440.50 | $144.05 | $0.00 | $1,584.55 | | |
| Attic | Antique Round Bench * | $595.00 | $950.00 | $95.00 | $0.00 | $1,045.00 | Iris & Co. Invoice #260 | The antique bench appears to be Item #162 ($163.50) in Enservio's report. |
| Attic | Labor to Upholster Round Bench * ** | $45.00 | $350.00 | $35.00 | $0.00 | $385.00 | Iris & Co. Invoice #260 | |
| Attic | Cost of New Materials for Round Bench | | $197.50 | $19.75 | $0.00 | $217.25 | | |
| Basement | Labor to Make Slipcover for Sofa * ** | $1,343.75 | $1,680.00 | $168.00 | $0.00 | $1,848.00 | Iris & Co. Invoice #320 | The sofa slipcovers appear to be Item #119 ($122.08) in Enservio's report. |
| Basement | Fabric for Club Chair Slipcovers | $4,550.00 | $7,320.00 | $732.00 | $125.00 | $8,177.00 | Iris & Co. Invoice #253, #320 | |
| Basement | Labor to Make Slipcovers for Club Chairs * ** | $1,343.75 | $1,670.00 | $167.00 | $0.00 | $1,837.00 | Iris & Co. Invoice #320 | The club chair slipcovers appear to be Item #120 ($712.86) in Enservio's report |
| Basement | Pre-Wash Fabric for Slipcovers | $380.00 | $425.00 | $42.50 | $87.00 | $554.50 | Iris & Co. Invoice #320 | |
| Basement | Fabric for Bedskirts | | $7,600.00 | $760.00 | $145.00 | $8,505.00 | | |
| Basement | Labor to Make Bedskirts * ** | | $1,650.00 | $165.00 | $0.00 | $1,815.00 | | The bedskirts appear to be Item #122 ($53.41) in Enservio's report. |
| Basement | Fabric for Window Treatments (Living Room - Montevallo Road) | $21,420.00 | $23,436.00 | $2,343.60 | $90.00 | $25,869.60 | Iris & Co. Invoice #421 | |
| Basement | Labor to Make Window Treatments (Living Room - Montevallo Road) * ** | $3,325.00 | $3,657.50 | $365.75 | $0.00 | $4,023.25 | Iris & Co. Invoice #421 | The custom window treatments appear to be Item #121 ($283.40) in Enservio's report. |
| Basement | Lining and Interlining for Window Treatments (Living Room - Montevallo Road) | $2,502.00 | $3,100.00 | $310.00 | $0.00 | $3,410.00 | Iris & Co. Invoice #421 | |
| Basement | Fabric for Window Treatments (Dining Room - Montevallo Road) | $15,780.00 | $20,460.00 | $2,046.00 | $140.00 | $22,646.00 | Iris & Co. Invoice #39, #310 | |
| Basement | Labor to Make Window Treatments (Dining Room - Montevallo Road) * ** | $3,552.00 | $4,440.00 | $444.00 | $0.00 | $4,884.00 | Iris & Co. Invoice #39, #312, #497 | The custom window treatments sustained significant water damage due to the fire. A strong smoke odor was still present after cleaning. |
| Basement | Lining and Interlining for Window Treatments (Dining Room - Montevallo Road) | $561.86 | $653.00 | $65.30 | $0.00 | $718.30 | Iris & Co. Invoice #39, #312 | |
| Basement | Fabric for Window Treatments (Susie's Bedroom - Montevallo Road) | $5,130.00 | $6,412.50 | $641.25 | $61.00 | $7,114.75 | Iris & Co. Invoice #338 | |
| Basement | Labor to Make Window Treatments (Susie's Bedroom - Montevallo Road) * ** | $1,275.00 | $1,600.00 | $160.00 | $0.00 | $1,760.00 | Iris & Co. Invoice #421 | The window treatments appear to be one of two sets of window treatments included as Item #123 ($270.32) in Enservio's report. |
| Playroom | Labor to Make Custom Skirt for Dressing Table * ** | $415.00 | $520.00 | $52.00 | $0.00 | $572.00 | Iris & Co. Invoice #260 | The custom skirt sustained significant water damage due to the fire. A strong smoke odor was still present after cleaning. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Basement | Labor to Add Trim on Bumper Pads, Crib Skirt, and Baby Blanket * ** | $354.00 | $442.50 | $44.25 | $0.00 | $486.75 | Iris & Co. Invoice #108 | The bumper pads, crib skirt, and baby blanket appear to be Item #118 ($152.60) in Enservio's report. |
| Basement | Fabric for Window Treatments (Caroline's Bedroom - Montevallo Road) | $5,130.00 | $6,415.00 | $641.50 | $604.35 | $7,660.85 | Iris & Co. Invoice #388 | |
| Basement | Labor to Make Window Treatments (Caroline's Bedroom - Montevallo Road) * ** | $1,400.00 | $1,750.00 | $175.00 | $0.00 | $1,925.00 | Iris & Co. Invoice #388 | The window treatments appear to be one of two sets of window treatments included as Item #123 ($270.32) in Enservio's report. |
| Basement | Bed * | $1,149.00 | $1,236.00 | $123.60 | $199.00 | $1,558.60 | Restoration Hardware Receipts | The bed appears to be Item #344 ($0.00) in Enservio's report. It sustained significant water damage as a result of the fire. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Basement | Fabric for Four Chairs from Pub Table | | $815.00 | $81.50 | $28.00 | $924.50 | | See Magali Somers Maus' letter regarding upholstered furniture. The chairs are Item #76 in Magali Somers Maus' second proposal and estimate. |
| Basement | Labor to Upholster Four Chairs from Pub Table * ** | | $625.00 | $62.50 | $0.00 | $687.50 | | |
| Basement | Pair of Sconces * | $1,980.00 | $2,850.00 | $285.00 | $0.00 | $3,135.00 | Iris & Co. Invoice #44, #310 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace these light fixtures with new ones--which come UL-wired--than to go through the process of having these light fixtures rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Basement | Sisal for Rugs (Includes Kitchen and Upstairs Hallway Runners) | $15,644.00 | $18,648.48 | $1,864.85 | $377.00 | $20,890.33 | Iris & Co. Invoice #454, #515 | |
| Basement | Cost of New Rug Pads for Rugs in Basement | | $5,490.00 | $549.00 | $0.00 | $6,039.00 | | See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Basement | Labor to Cut, Serge, and Deliver New L-Shaped Rug & Rug Pad | | $1,755.00 | $175.50 | $0.00 | $1,930.50 | | The L-shaped rug appears to be Item #143 ($592.18) in Enservio's report. The L-shaped rug pad appears to be Item #144 ($42.51) in Enservio's report. |
| Basement | Labor to Cut, Serge, and Deliver New Rugs and Rug Pads - 13' x 11' | | $4,000.00 | $400.00 | $0.00 | $4,400.00 | | The rugs appear to be Item #145 ($2,182.18) in Enservio's report. The rug pads appear to be Item #148 ($521.02) in Enservio's report. |
| Basement | Labor to Cut, Serge, and Deliver New Rug + Rug Pad - 13' x 12' | | $2,095.00 | $209.50 | $0.00 | $2,304.50 | | The rug appears to be Item #146 ($1,190.28) in Enservio's report. The rug pad appears to be Item #147 ($260.51) in Enservio's report. |
| Outdoor Furniture | Sofa with Custom Cushions * | $3,725.00 | $4,850.00 | $485.00 | $281.00 | $5,616.00 | Iris & Co. Invoice #320 | See Magali Somers Maus' letter regarding upholstered furniture. The sofa has a very strong smoke odor. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Outdoor Furniture | Two Chairs with Custom cushions * | $3,230.00 | $3,890.00 | $389.00 | $269.00 | $4,548.00 | Iris & Co. Invoice #320 | See Magali Somers Maus' letter regarding upholstered furniture. The chairs have a very strong smoke odor. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Outdoor Furniture | Coffee Table * | $1,200.00 | $1,695.00 | $169.50 | $75.00 | $1,939.50 | Iris & Co. Invoice #320 | The coffee table has a very strong smoke odor. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Outdoor Furniture | Table and Six chairs * | $6,744.77 | $6,950.00 | $695.00 | $425.00 | $8,070.00 | Iris & Co. Invoice #421 | The table and chairs have a very strong smoke odor. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Outdoor Furniture | Fabric for Pillows | $450.00 | $475.00 | $47.50 | $28.00 | $550.50 | Iris & Co. Invoice #421 | |
| Outdoor Furniture | Wicker Outdoor Furniture * | $3,080.00 | $4,850.00 | $485.00 | $388.00 | $5,723.00 | Iris & Co. Invoice #327 | These items are lost. |
| Outdoor Furniture | Labor to Paint Wicker Furniture * ** | $1,250.00 | $1,550.00 | $155.00 | $0.00 | $1,705.00 | Iris & Co. Invoice #569 | |
| Exterior Lighting | Custom Lantern for Front Porch * | $11,720.00 | $14,900.00 | $1,490.00 | $1,100.00 | $17,490.00 | Iris & Co. Invoice #559 | This item is lost. |
| Exterior Lighting | Four Exterior Wall Lanterns * | $4,880.00 | $4,880.00 | $488.00 | $625.00 | $5,993.00 | Iris & Co. Invoice #559 | These items are lost. |
| Miscellaneous | Blackout Shades for All Bedrooms and Bathrooms | $9,486.00 | $9,486.00 | $948.60 | $150.00 | $10,584.60 | Iris & Co. Invoice #559 | These items are lost. |
| Miscellaneous | Labor to Measure and Install Blackout Shades | $440.00 | $440.00 | $0.00 | $0.00 | $440.00 | Iris & Co. Invoice #559 | |
| Miscellaneous | All Rods, Brackets, and Rings for Window Treatments | $6,559.00 | $8,573.72 | $857.37 | $87.00 | $9,518.09 | Iris & Co. Invoice #506, #559, $569 | These items are lost. |
| Miscellaneous | Lamp Shades - Large (10) | $1,540.00 | $3,000.00 | $300.00 | $0.00 | $3,300.00 | Invoice #159, #260 | A strong smoke odor is still present after cleaning. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Miscellaneous | Lamp Shades - Medium (5) | | $875.00 | $87.50 | $0.00 | $962.50 | Invoice #260 | Some of the lamp shades appear to be included as Item #177 ($87.09) in Enservio's report. A strong smoke odor is still present after cleaning the remaining lamp shades. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Miscellaneous | Lamp Shades - Small (15) | | $705.00 | $70.50 | $0.00 | $775.50 | Invoice #260 | A strong smoke odor is still present after cleaning. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Miscellaneous | Installation of Art | $625.00 | $625.00 | $62.50 | $0.00 | $687.50 | Invoice #569 | |
| Miscellaneous | Iris & Co. Inc. - Hourly Charges for Dell Road - 650 hours @ $200/hour | | $130,000.00 | $0.00 | $0.00 | $130,000.00 | Iris & Co. Letter | |
| | Receiving and Initial Storage Fees (* Items Included in Receiving and Initial Storage Fees) | | $5,900.00 | $0.00 | $0.00 | $5,900.00 | | |
| | Delivery Fees (** Items Included in Delivery Fees) | | $7,500.00 | $750.00 | $0.00 | $8,250.00 | Misc. Iris & Co. Invoices | |
| | Installation Fees (*** Items Included in Installation Fees) | | $3,220.00 | $0.00 | $0.00 | $3,220.00 | Misc. Iris & Co. Invoices | |
| | TOTAL | $650,400.66 | $1,203,804.37 | | | $1,336,273.30 | | |

Replacement cost is higher than original cost
Replacement cost is equal to original cost
Replacement cost is lower than original cost
No invoice so nothing paid under Contents
No invoice but replacement cost + 10% tax was paid (see below)

Total original amount column - $650,400.66
Tax on this amount - $65,040.07
Total - $715,440.73 (rounded up - correctly)

Alycen paid $721,677.72
Difference - $6,237.00

Guest Bedroom - Bed Linens from Leontine Linens - replacement cost $5,670.00
Tax 10% 0 $567.00
Equals $6,237.00

$715,440.72 (rounded down) + $6,237.00 = $721,677.72

EXHIBIT 149
WIT: 
DATE: 2-9-23
JULIE BRANDT, RMR, CRR

| Room | Description | Original Cost | Replacement Cost | Sales Tax | Shipping/ Freight | TOTAL | Reference | Notes |
|---|---|---|---|---|---|---|---|---|
| Living Room | Knole Sofa * | $9,290.00 | $12,450.00 | $1,245.00 | $715.00 | $14,410.00 | Iris & Co. Invoice #421 | See Magali Somers Maus' letter regarding upholstered furniture. The Knole sofa is Item #20 in Brookstone Restoration's inventory list. (The bolster pillows are among the items pictured as Item #21.) Chubb may pick up this item from Brookstone once the claim on this item has been paid. |
| Living Room | Fabric for Knole Sofa | $4,400.00 | $6,300.00 | $630.00 | $160.00 | $7,090.00 | Iris & Co. Invoice #421 | |
| Living Room | Trim for Knole Sofa | $520.00 | $1,274.00 | $127.40 | $54.00 | $1,455.40 | Iris & Co. Invoice #421 | |
| Living Room | Two Cords for Knole Sofa | $660.00 | $1,040.00 | $104.00 | $145.00 | $1,289.00 | Iris & Co. Invoice #426 | |
| Living Room | Two Wing Chairs * | $9,520.00 | $11,500.00 | $1,150.00 | $690.00 | $13,340.00 | Iris & Co. Invoice #421 | See Magali Somers Maus' letter regarding upholstered furniture. One of the wing chairs is Item #19 in Brookstone Restoration's inventory list. The other wing chair is among the items pictured as Item #21. Chubb may pick up these items from Brookstone once the claim on these items has been paid. |
| Living Room | Fabric for Wing Chairs | $2,502.00 | $7,200.00 | $720.00 | $145.00 | $8,065.00 | Iris & Co. Invoice #421 | |
| Living Room | Fabric for Murphy Bed | | $1,200.00 | $120.00 | $45.00 | $1,365.00 | | |
| Living Room | Labor to Upholster Murphy Bed * ** | | $1,218.00 | $121.80 | $0.00 | $1,339.80 | | See Magali Somers Maus' letter regarding upholstered furniture. The antique Murphy bed is Item #8 in Magali Somers Maus' first proposal and estimate. |
| Living Room | Cost of New Materials for Murphy Bed | | $595.00 | $59.50 | $75.00 | $729.50 | | |
| Living Room | Fabric for Window Treatments | $17,670.00 | $19,932.20 | $1,993.22 | $86.00 | $22,011.42 | Iris & Co. Invoice #552 | |
| Living Room | Labor to Make Window Treatments * ** *** | $2,088.00 | $2,401.20 | $240.12 | $0.00 | $2,641.32 | Iris & Co. Invoice #585 | The living room custom window treatments appear to be Item #601 ($150.35) in Enservio's report. |
| Living Room | Cost of Lining and Bump for Window Treatments | $1,040.00 | $1,196.00 | $119.60 | $0.00 | $1,315.60 | Iris & Co. Invoice #585 | |
| Living Room | Rug * | $14,800.00 | $35,000.00 | $3,500.00 | $0.00 | $38,500.00 | Turkish Carpets Inc. Receipt | See Paige Albright Orientals' proposal for replacement cost. The Turkish Oushak rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Living Room | Labor to Cut, Deliver, and Install New Rug Pad - 12'9 x 17'3 | | $786.50 | $78.65 | $0.00 | $865.15 | | The rug pad appears to be Item #433 ($135.57) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Living Room | B. Viz Pillow (Blue Velvet) | $1,550.00 | $3,600.00 | $360.00 | $75.00 | $4,035.00 | Iris & Co. Invoice #111 | The pillow is among the items pictured as Item #21 in Brookstone Restoration's inventory list. This item is lost. |
| Living Room | B. Viz Pillow (Cream Velvet) | $350.00 | $425.00 | $42.50 | $55.00 | $522.50 | Iris & Co. Invoice #426 | The pillow was cleaned by CRDN, but a strong smoke odor is still present. Additionally, the antique velvet fabric is discolored and damaged. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Sunroom | Fabric for Daybed | $3,136.00 | $6,530.00 | $653.00 | $65.00 | $7,248.00 | Iris & Co. Invoice #84 | |
| Sunroom | Lining for Daybed | $54.00 | $275.00 | $27.50 | $0.00 | $302.50 | Iris & Co. Invoice #108 | |
| Sunroom | Labor to Upholster Daybed * ** | | $1,837.00 | $183.70 | $0.00 | $2,020.70 | | See Magali Somers Maus' letter regarding upholstered furniture. The antique daybed is Item #27 in Magali Somers Maus' first proposal and estimate. |
| Sunroom | Cost of Foam, Cotton, and Down for Daybed and Bolster Pillows | | $242.50 | $24.25 | $0.00 | $266.75 | | |
| Sunroom | Labor and Cost to Replace Foam and Cotton on Daybed | | $337.50 | $33.75 | $0.00 | $371.25 | | |
| Sunroom | Labor and Cost to Make Cushion for Daybed | | $1,162.50 | $116.25 | $0.00 | $1,278.75 | | |
| Sunroom | Labor to Make Two Custom Bolster Pillows for Daybed | | $337.50 | $33.75 | $0.00 | $371.25 | | |
| Sunroom | Bell Jar Light Fixture * | $510.00 | $675.00 | $67.50 | $55.00 | $797.50 | Iris & Co. Invoice #483 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace this light fixtures with a new one--which comes UL-wired--than to go through the process of having this light fixture rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Sunroom | Pair of Sconces * | $3,400.00 | $3,580.00 | $358.00 | $215.00 | $4,153.00 | Iris & Co. Invoice #421 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace these light fixtures with new ones--which come UL-wired--than to go through the process of having these light fixtures rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Sunroom | Labor to Cut, Deliver, and Install New Rug Pad - 6'2" x 10'0" | | $295.00 | $29.50 | $0.00 | $324.50 | | See payments to Dustin Cox as evidence that custom rug pads were purchased from him. This item is lost |
| Dining Room | Fabric for Dining Chairs | $9,480.00 | $10,932.00 | $1,093.20 | $125.00 | $12,150.20 | Iris & Co. Invoice #569 | |
| Dining Room | Backing of Fabric for Dining Chairs | $850.00 | $918.00 | $91.80 | $250.00 | $1,259.80 | Iris & Co. Invoice #576 | |
| Dining Room | Labor to Upholster Chairs * ** | $4,820.00 | $6,840.00 | $684.00 | $0.00 | $7,524.00 | Iris & Co. Invoice #585 | See Magali Somers Maus' letter regarding upholstered furniture. The antique dining chairs are Item #31 in Magali Somers Maus' first proposal and estimate. |
| Dining Room | Cost of New Foam for Dining Chairs | | $2,692.00 | $269.20 | $0.00 | $2,961.20 | | |
| Dining Room | Fabric for Window Treatments | $19,068.00 | $22,196.80 | $2,219.68 | $190.00 | $24,606.48 | Iris & Co. Invoice #552 | |
| Dining Room | Labor to Make Window Treatments * ** *** | $2,784.00 | $3,065.00 | $306.50 | $0.00 | $3,371.50 | Iris & Co. Invoice #585 | The dining room custom window treatments appear to be Item #600 ($200.47) in Enservio's report. |
| Dining Room | Cost of Lining and Bump for Window Treatments | $1,390.00 | $1,598.00 | $159.80 | $0.00 | $1,757.80 | Iris & Co. Invoice #585 | |
| Dining Room | Rug * | $22,000.00 | $18,000.00 | $1,800.00 | $0.00 | $19,800.00 | Paige Albright Orientals Invoice #1957 | The Safira rug was taken by Brookstone Restoration to Asia Rug Company and appears to be Rug #1 ($8,000.00) in Asia Rug Company's appraisal. |
| Dining Room | Labor to Cut, Deliver, and Install New Rug Pad - 12'6" x 14'1" | $625.00 | $675.00 | $67.50 | $0.00 | $742.50 | Paige Albright Orientals Invoice #1957 | The rug pad appears to be Item #436 ($154.94) in Enservio's report. |
| Kitchen | Fabric for Kitchen Chairs and Mudroom Cushion Cover | $580.00 | $683.00 | $68.30 | $50.00 | $801.30 | Iris & Co. Invoice #569 | |
| Kitchen | Labor to Upholster Kitchen Chairs * ** | $1,260.00 | $1,386.00 | $138.60 | $0.00 | $1,524.60 | Iris & Co. Invoice #585 | See Magali Somers Maus' letter regarding upholstered furniture. The antique dining chairs are Item #30 in Magali Somers Maus' first proposal and estimate. |
| Kitchen | Cost of New Foam for Kitchen Chairs | $465.00 | $511.00 | $51.10 | $0.00 | $562.10 | Iris & Co. Invoice #585 | |
| Kitchen | Labor to Make New Wooden Seats for Kitchen Chairs | | $360.00 | $36.00 | $0.00 | $396.00 | | |
| Kitchen | Labor to Replace Caning on Seats of Kitchen Chairs | | $1,800.00 | $180.00 | $0.00 | $1,980.00 | | |
| Kitchen | Lantern Light Fixture * | $5,900.00 | $9,390.00 | $939.00 | $325.00 | $10,654.00 | Iris & Co. Invoice #253 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace this light fixture with a new one--which comes UL-wired--than to go through the process of having this light fixture rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Kitchen | Labor to Cut, Serge, Deliver, and Install Two Runners with New Rug Pads | | $1,157.75 | $115.78 | $0.00 | $1,273.53 | | The sisal runners appear to be Item #1066 ($525.36) in Enservio's report. The replacement cost of the sisal is included below. The rug pads appear to be Item #480 ($109.24) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Mudroom | Labor to Make Bench Cushion Cover * ** | $234.00 | $260.00 | $26.00 | $0.00 | $286.00 | Iris & Co. Invoice #585 | The cushion appears to be Item #487 ($96.69) in Enservio's report. |
| Mudroom | Labor to Make Insert for Bench Cushion | $140.00 | $160.00 | $16.00 | $0.00 | $176.00 | Iris & Co. Invoice #585 | |
| Mudroom | Rug * | | $5,500.00 | $550.00 | $0.00 | $6,050.00 | | See Claire Drummond's email confirming the purchase of the Oushak rug from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. The rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Mudroom | Labor to Cut, Deliver, and Install New Rug Pad - 9'8 5" x 2'4" | | $225.00 | $22.50 | $0.00 | $247.50 | | The rug pad appears to be Item #488 ($61.87) in Enservio's report. |
| Laundry Room | Rug * | | $2,800.00 | $280.00 | $0.00 | $3,080.00 | | See Claire Drummond's email confirming the purchase of the "foyer rug around 5x9" from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. This item is lost |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Laundry Room | Labor to Cut, Deliver, and Install New Rug Pad - 5' x 8' | | $210.00 | $21.00 | $0.00 | $231.00 | | The rug pad appears to be Item #531 ($35.46) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Family Room | Sofa * | **$2,588.00** | $8,920.00 | $892.00 | $520.10 | $10,332.10 | Iris & Co. Invoice #44 | See Magali Somers Maus' letter regarding upholstered furniture. The sofa is Item #17 in Brookstone Restoration's inventory list. Chubb may pick up this item from Brookstone once the claim on this item has been paid. |
| Family Room | Two Club Chairs * | **$2,586.00** | $11,440.00 | $1,144.00 | $682.00 | $13,266.00 | Iris & Co. Invoice #51 | See Magali Somers Maus' letter regarding upholstered furniture. The club chairs are among the items pictured as Items #18 and #24 in Brookstone Restoration's inventory list. Chubb may pick up these items from Brookstone once the claim on these items has been paid. |
| Family Room | Two Bergere Chair Frames, Including Cost to Finish Frames * | **$952.00** | $7,180.00 | $718.00 | $425.00 | $8,323.00 | Iris & Co. Invoice #39 | See Magali Somers Maus' letter regarding upholstered furniture. The Bergere chairs are Items #25 and #26 in Brookstone Restoration's inventory list. Chubb may pick up these items from Brookstone once the claim on these items has been paid. |
| Family Room | Fabric for Sofa, Club Chairs, Bergere Chairs, and Slipcover for Sofa (in Basement) | **$26,268.00** | $34,992.00 | $3,499.20 | $225.00 | $38,716.20 | Iris & Co. Invoice #39, #44, #293 | |
| Family Room | Fabric for Pair of Painted French Stools | | $750.00 | $75.00 | $35.00 | $860.00 | | See Magali Somers Maus' letter regarding upholstered furniture. The antique painted French stools are Item #21 in Magali Somers Maus' first proposal and estimate. |
| Family Room | Labor to Upholster Pair of Painted French Stools * ** | | $425.00 | $42.50 | $0.00 | $467.50 | | |
| Family Room | Pair of Sconces * | **$4,460.00** | $5,160.00 | $516.00 | $175.00 | $5,851.00 | Iris & Co. Invoice #265 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace these light fixtures with new ones--which come UL-wired--than to go through the process of having these light fixtures rewired with the necessary UL certification. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Family Room | Sisal for Rug | **$3,410.00** | $4,100.00 | $410.00 | $155.00 | $4,665.00 | Iris & Co. Invoice #566 | This item is lost. |
| Family Room | Labor to Cut, Serge, Deliver, and Install Rug and New Rug Pad | **$3,378.00** | $3,750.00 | $375.00 | $0.00 | $4,125.00 | | The rug pad appears to be Item #395 ($525.28) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Bar Hallway | Three Flush-Mount Brass Lights for Bar Hallway & Gallery * | **$2,663.00** | $2,720.99 | $272.10 | $408.00 | $3,401.09 | Iris & Co. Invoice #566 | These items are lost. |
| Bar Hallway | Rug * | | $5,500.00 | $550.00 | $0.00 | $6,050.00 | | See Claire Drummond's email confirming the purchase of this vintage Oushak rug from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. The rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Bar Hallway | Labor to Make, Deliver, and Install New Rug Pad - 3'1" x 6'0" | | $210.00 | $21.00 | $0.00 | $231.00 | | See payments to Dustin Cox as evidence that custom rug pads were purchased from him. This item is lost. |
| Study | Fabric to Upholster Desk Chair | **$3,760.00** | $3,900.00 | $390.00 | $75.00 | $4,365.00 | Iris & Co. Invoice #392 | See Magali Somers Maus' letter regarding upholstered furniture. The antique desk chair is Item #26 in Magali Somers Maus' first proposal and estimate. |
| Study | Labor to Upholster Desk Chair * ** | **$150.00** | $175.00 | $17.50 | $0.00 | $192.50 | Iris & Co. Invoice #585 | |
| Study | Fabric for Two Antique Chairs | | $3,250.00 | $325.00 | $275.00 | $3,850.00 | Iris & Co. Invoice #392 | See Magali Somers Maus' letter regarding upholstered furniture. The antique chairs are Item #1 in Magali Somers Maus' first proposal and estimate. |
| Study | Labor to Upholster Antique Chairs * ** | | $1,781.50 | $178.15 | $0.00 | $1,959.65 | Iris & Co. Invoice #392 | |
| Study | Labor to Apply Nailheads on Antique Chairs | | $675.00 | $67.50 | $0.00 | $742.50 | | |
| Study | Cost of Nailheads | | $363.75 | $36.38 | $0.00 | $400.13 | | |
| Study | Cost of Foam | | $1,406.25 | $140.63 | $0.00 | $1,546.88 | | |
| Study | Bar Cart * | **$2,356.90** | $5,890.00 | $589.00 | $325.00 | $6,804.00 | Iris & Co. Invoice #199 | The bar cart is among the items pictured as Item #32 in Brookstone Restoration's inventory list. The finish on the bar cart is now damaged, and two of the shelves are lost. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Study | Three Library Lights * | **$1,979.55** | $2,179.00 | $217.90 | $326.85 | $2,723.75 | Iris & Co. Invoice #555 | These items are lost. |
| Study | Rug * | | $12,000.00 | $1,200.00 | $0.00 | $13,200.00 | | See Claire Drummond's email confirming the purchase of the vintage Oushak rug from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. The rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Study | Labor to Cut, Deliver, and Install New Rug Pad - 5'4" x 8'8" | | $300.00 | $30.00 | $0.00 | $330.00 | | The rug pad appears to be Item #414 ($28.85) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Master Bedroom | Fabric for Bedskirt, Chaise, and Window Treatments | **$22,304.00** | $31,816.00 | $3,181.60 | $385.00 | $35,382.60 | Iris & Co. Invoice #84, #552, #555 | |
| Master Bedroom | Labor to Make Bedskirt * ** *** | **$525.00** | $600.00 | $60.00 | $0.00 | $660.00 | Iris & Co. Invoice #585 | The bedskirt was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Master Bedroom | Labor to Upholster Chaise * ** | | $2,087.50 | $208.75 | $0.00 | $2,296.25 | | See Magali Somers Maus' letter regarding upholstered furniture. The antique chaise is Item #15 in Magali Somers Maus' first proposal and estimate. |
| Master Bedroom | Labor to Make Cushions for Chaise | | $1,531.25 | $153.13 | $0.00 | $1,684.38 | | |
| Master Bedroom | Cost of Foam and Cotton for Chaise | | $475.00 | $47.50 | $0.00 | $522.50 | | |
| Master Bedroom | Labor to Make Window Treatments * ** *** | **$2,780.00** | $3,197.00 | $319.70 | $0.00 | $3,516.70 | Iris & Co. Invoice #585 | The master bedroom custom window treatments were cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim for this item has been paid. |
| Master Bedroom | Labor to Make Shades for Master Bathroom * ** *** | **$650.00** | $740.00 | $74.00 | $0.00 | $814.00 | Iris & Co. Invoice #585 | The master bathroom custom shades were disposed of during debris removal. |
| Master Bedroom | Cost of Lining, Bump, and Interlining for Window Treatments and Shades | **$1,619.00** | $1,860.00 | $186.00 | $0.00 | $2,046.00 | Iris & Co. Invoice #585 | |
| Master Bedroom | Fabric for Antique Bench | | $1,500.00 | $150.00 | $145.00 | $1,795.00 | | See Magali Somers Maus' letter regarding upholstered items. The antique bench is Item #12 in Magali Somers Maus' first proposal and estimate. |
| Master Bedroom | Labor to Upholster Antique Bench * ** | | $1,156.00 | $115.60 | $0.00 | $1,271.60 | | |
| Master Bedroom | Labor and Cost to Make Cushion for Bench | | $1,596.25 | $159.63 | $0.00 | $1,755.88 | | |
| Master Bedroom | Cost of Foam and Cotton for Bench | | $225.00 | $22.50 | $0.00 | $247.50 | | |
| Master Bedroom | Bed Linens from Leontine Linens | **$7,710.00** | $7,710.00 | $771.00 | $100.00 | $8,581.00 | Iris & Co. Invoice #566 | Some of the bed linens were cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. The remaining bed linens are lost. |
| Master Bedroom | Pillows from Leontine Linens | **$275.00** | $275.00 | $27.50 | $20.00 | $322.50 | | The pillows appear to be Items #373 ($61.04) and #393 ($228.74) in Enservio's report. See Leontine Linens estimate #16706 for replacement cost. |
| Master Bedroom | Chandelier * | **$5,990.00** | $7,640.00 | $764.00 | $720.00 | $9,124.00 | Iris & Co. Invoice #454 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace this light fixture with a new one--which comes UL-wired--than to go through the process of having this light fixture rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Master Bedroom | Pair of Sconces * | **$6,220.00** | $7,600.00 | $760.00 | $275.00 | $8,635.00 | Iris & Co. Invoice #310 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace these light fixtures with new ones--which come UL-wired--than to go through the process of having these light fixtures rewired with the necessary UL certification. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Master Bedroom | Rug * | | $16,000.00 | $1,600.00 | $0.00 | $17,600.00 | | See Claire Drummond's email confirming that the Oushak rug was purchased from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. The rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Master Bedroom | Labor to Cut, Deliver, and Install New Rug Pad - 13' x 17' | | $2,797.00 | $279.70 | $0.00 | $3,076.70 | | The rug pad appears to be Item #376 ($279.59) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Master Bedroom | Antique Mother of Pearl Tea Caddy | **$2,500.00** | $7,000.00 | $700.00 | $0.00 | $7,700.00 | Robert Hill Antiques Invoice | This item is lost. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Powder Room | Pair of Sconces * | **$7,700.00** | $9,000.00 | $900.00 | $325.00 | $10,225.00 | Iris & Co. Invoice #310 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace these light fixtures with new ones--which come UL-wired--than to go through the process of having these light fixtures rewired with the necessary UL certification. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Foyer | Library Light * | **$440.00** | $496.00 | $49.60 | $99.20 | $644.80 | Iris & Co. Invoice #555 | This item is lost. |
| Foyer | Half-Round Wall Lanterns * | **$3,159.95** | $22,720.00 | $2,272.00 | $2,750.00 | $27,742.00 | Iris & Co. Invoice #576 | These items are lost. |
| Foyer | Rug * | **$6,500.00** | $7,500.00 | $750.00 | $0.00 | $8,250.00 | Paige Albright Orientals Invoice #1511 | See Paige Albright Orientals proposal for replacement cost. This item is lost. |
| Foyer | Labor to Make, Deliver, and Install New Rug Pad - 5'4" x 12'3" | | $290.00 | $29.00 | $0.00 | $319.00 | | The rug pad appears to be Item #435 ($46.54) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Upstairs Hallway | Pair of Antique Painted Bookcases * | **$5,022.00** | $24,000.00 | $2,400.00 | $0.00 | $26,400.00 | Iris & Co. Invoice #227, #244 | The pair of antique bookcases appears to be Item #173 ($2,823.10) in Enservio's report. |
| Upstairs Hallway | Antique Louis XVI Bench * | **$1,760.00** | $3,950.00 | $395.00 | $0.00 | $4,345.00 | The King's House Antiques Receipt | The antique caned bench is listed in Magali Somers Maus' first proposal and estimate. This item was irreparably damaged in the fire. |
| Upstairs Hallway | Fabric for Shower Curtain (Girls' Bathroom - Montevallo Road) | **$1,280.00** | $2,560.00 | $256.00 | $65.00 | $2,881.00 | Iris & Co. Invoice #392 | |
| Upstairs Hallway | Labor to Make Shower Curtain * ** | **$356.25** | $420.00 | $42.00 | $0.00 | $462.00 | Iris & Co. Invoice #421 | This item is lost. |
| Upstairs Hallway | Lining and Interlining for Shower Curtain | **$317.30** | $364.90 | $36.49 | $0.00 | $401.39 | Iris & Co. Invoice #244 | |
| Upstairs Hallway | Labor to Make Shower Curtain (Caroline's Bathroom - Montevallo Road) * ** | **$250.00** | $425.00 | $42.50 | $0.00 | $467.50 | Iris & Co. Invoice #392 | This item is lost. |
| Upstairs Hallway | Labor to Make, Serge, Deliver, and Install Runner with New Rug Pad | | $1,196.00 | $119.60 | $0.00 | $1,315.60 | | The replacement cost of the sisal for the runner is included below. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. These items are lost. |
| Guest Bedroom | Antique Regency Linen Press * | **$9,500.00** | $22,000.00 | $2,200.00 | $0.00 | $24,200.00 | The King's House Antiques Receipt | This item was irreparably damaged in the fire and disposed of during debris removal. |
| Guest Bedroom | Antique Game Table * | | $9,500.00 | $950.00 | $0.00 | $10,450.00 | | The antique game table is Item #23 in Magali Somers Maus' first proposal and estimate. A strong smoke odor is still present after treatment. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Guest Bedroom | Pair of Antique Lamps | **$2,079.00** | $5,800.00 | $580.00 | $0.00 | $6,380.00 | Henhouse Antiques Receipt | The pair of antiques lamps is Item #49 in Magali Somers Maus' first proposal and estimate. A strong smoke odor is still present after treatment. Chubb may pick up this item once the claim on this item has been paid. |
| Guest Bedroom | Headboard, Including Labor to Finish and Upholster * | **$1,990.00** | $4,910.00 | $491.00 | $432.08 | $5,833.08 | Iris & Co. Invoice #39, #44, #585 | The headboard appears to be Item #154 ($2,178.91) in Enservio's report. |
| Guest Bedroom | Fabric for Headboard | **$630.00** | $2,784.00 | $278.40 | $78.00 | $3,140.40 | Iris & Co. Invoice #44 | |
| Guest Bedroom | Mattress, Box Springs, and Frame * | **$4,498.00** | $5,098.99 | $509.90 | $79.99 | $5,688.88 | Mattress Firm Receipts | The mattress and box springs appear to be Item #155 ($1,240.42) in Enservio's report |
| Guest Bedroom | Bed Linens from Leontine Linens | | $5,670.00 | $567.00 | $100.00 | $6,337.00 | | See Leontine Linens Estimate #16708 for the replacement cost. These items are lost. |
| Guest Bedroom | Fabric for Bedskirt, Window Treatments, and Shower Curtain | **$5,764.00** | $11,044.00 | $1,104.40 | $810.00 | $12,958.40 | Iris & Co. Invoice #39, #310, #585 | |
| Guest Bedroom | Backing of Fabric for Bedskirt | **$306.00** | $356.00 | $35.60 | $48.00 | $439.60 | Iris & Co. Invoice #506 | |
| Guest Bedroom | Labor to Make Bedskirt * ** *** | **$770.00** | $825.00 | $82.50 | $0.00 | $907.50 | Iris & Co. Invoice #585 | This item is lost. |
| Guest Bedroom | Lining for Bedskirt | **$123.00** | $142.00 | $14.20 | $0.00 | $156.20 | Iris & Co. Invoice #506 | |
| Guest Bedroom | Labor to Make Window Treatments * ** *** | **$1,350.00** | $1,370.00 | $137.00 | $0.00 | $1,507.00 | Iris & Co. Invoice #39, #312, #488, #585 | This item is lost. |
| Guest Bedroom | Labor to Make Shade for Guest Bedroom * ** *** | **$450.00** | $515.00 | $51.50 | $0.00 | $566.50 | Iris & Co. Invoice #585 | This item is lost. |
| Guest Bedroom | Rug * | **$6,577.00** | $7,535.00 | $753.50 | $125.00 | $8,413.50 | Iris & Co. Invoice #515 | This item is lost. |
| Guest Bedroom | Labor to Make, Serge, Deliver, and Install Rug and New Rug Pad | **$1,249.00** | $2,627.00 | $262.70 | $0.00 | $2,889.70 | | See payments to Dustin Cox as evidence that custom rug pads were purchased from him. This item is lost. |
| Guest Bedroom | Labor to Make Shower Curtain * ** *** | **$475.00** | $550.00 | $55.00 | $0.00 | $605.00 | Iris & Co. Invoice #585 | The shower curtain appears to be one of the items that is Item #1046 ($39.23) in Enservio's report. |
| Guest Bedroom | Labor to Make Shade for Guest Bathroom * ** *** | **$320.00** | $370.00 | $37.00 | $0.00 | $407.00 | Iris & Co. Invoice #585 | This item is lost. |
| Guest Bedroom | Pair of Sconces for Bathroom * | **$840.00** | $900.00 | $90.00 | $135.00 | $1,125.00 | Iris & Co. Invoice #576 | These items are lost. |
| Gillian's Bedroom | Daybed * | **$3,390.00** | $5,990.00 | $599.00 | $325.00 | $6,914.00 | Iris & Co. Invoice #576 | This item is lost. |
| Gillian's Bedroom | Desk * | **$579.99** | $1,499.00 | $149.90 | $315.00 | $1,963.90 | Ballard Designs Order | This item is lost. |
| Gillian's Bedroom | Chair for Desk * | | $2,339.00 | $233.90 | $0.00 | $2,572.90 | | This item is lost. |
| Gillian's Bedroom | Labor to Paint Desk and Chair * | **$1,400.00** | $1,610.00 | $0.00 | $0.00 | $1,610.00 | Iris & Co. Invoice #566 | |
| Gillian's Bedroom | Bedside Table * | **$1,260.00** | $1,330.00 | $133.00 | $150.00 | $1,613.00 | Iris &Co. Invoice #364 | This item is lost. |
| Gillian's Bedroom | Antique White Trumeau * | **$4,600.00** | $5,750.00 | $575.00 | $0.00 | $6,325.00 | Iris & Co. Receipt | This item is lost. |
| Gillian's Bedroom | Fabric for Daybed, Bedskirt, Pillows, Window Treatments | **$24,024.00** | $25,749.60 | $2,574.96 | $165.00 | $28,489.56 | Iris & Co. Invoice #576 | |
| Gillian's Bedroom | Fabric for Desk Chair, and Window Seat | **$3,952.00** | $3,952.00 | $395.20 | $172.00 | $4,519.20 | Iris & Co. Invoice #576 | |
| Gillian's Bedroom | Fabric for Shower Curtain | **$1,032.00** | $1,032.00 | $103.20 | $75.00 | $1,210.20 | Iris & Co. Invoice #576 | |
| Gillian's Bedroom | Trim for Desk Chair, Window Seat, and Shower Curtain | **$794.00** | $794.00 | $79.40 | $34.00 | $907.40 | Iris & Co. Invoice #569 | |
| Gillian's Bedroom | Labor to Make Bedskirt * ** *** | **$495.00** | $545.00 | $54.50 | $0.00 | $599.50 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Labor to Upholster Desk Chair * ** | **$285.00** | $330.00 | $33.00 | $0.00 | $363.00 | Iris & Co. Invoice #585 | |
| Gillian's Bedroom | Labor to Modify Desk Chair to Accommodate Seat Cushion | **$95.00** | $110.00 | $11.00 | $0.00 | $121.00 | Iris & Co. Invoice #585 | |
| Gillian's Bedroom | Labor to Make Cushion for Desk Chair | **$235.00** | $270.00 | $27.00 | $0.00 | $297.00 | Iris & Co. Invoice #585 | |
| Gillian's Bedroom | Labor to Make Window Treatments - Longer Panels * ** *** | **$1,875.00** | $2,065.00 | $206.50 | $0.00 | $2,271.50 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Labor to Make Window Treatments - Shorter Panels * ** *** | **$480.00** | $525.00 | $52.50 | $0.00 | $577.50 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Labor to Make Window Treatments - Shades * ** *** | **$530.00** | $590.00 | $59.00 | $0.00 | $649.00 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Lining and Bump for Window Treatments | **$1,233.60** | $1,418.64 | $141.86 | $0.00 | $1,560.50 | Iris & Co. Invoice #585 | |
| Gillian's Bedroom | Labor and Cost to Make Window Seat Cushion * ** | **$930.00** | $1,023.00 | $102.30 | $0.00 | $1,125.30 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Labor to Make Shower Curtain * ** *** | **$535.00** | $600.00 | $60.00 | $125.00 | $785.00 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Bed Linens from Leontine Linens | **$2,050.00** | $2,050.00 | $205.00 | $100.00 | $2,355.00 | Iris & Co. Invoice #559 | This item is lost. |
| Gillian's Bedroom | Pillow from Leontine Linens | **$100.00** | $100.00 | $10.00 | $0.00 | $110.00 | | See Leontine Linens estimate #16706 for replacement cost. This item is lost. |
| Gillian's Bedroom | Mattress | **$1,599.00** | $1,979.00 | $197.90 | $0.00 | $2,176.90 | Mattress Firm Receipts | This item is lost. |
| Gillian's Bedroom | Trundle and Mattress | **$498.00** | $689.00 | $68.90 | $0.00 | $757.90 | Mattress Firm Receipts | These items are lost. |
| Gillian's Bedroom | Chandelier * | **$3,390.00** | $5,780.00 | $578.00 | $315.00 | $6,673.00 | Iris & Co. Invoice #253 | This item is lost. |
| Gillian's Bedroom | Antique Gold Leaf Bow Sconces * | | $4,950.00 | $495.00 | $0.00 | $5,445.00 | | This item is lost. |
| Gillian's Bedroom | Pair of Sconces for Bathroom * | **$799.80** | $856.00 | $85.60 | $64.20 | $1,005.80 | Iris & Co. Invoice #576 | These items are lost. |
| Gillian's Bedroom | Rug; Labor to Cut, Serge, Deliver, and Install New Rug and Rug Pad | **$2,330.00** | $3,290.00 | $329.00 | $75.00 | $3,694.00 | Iris & Co. Invoice #566 | These items are lost. |
| Susie's Bedroom | Bed * | **$1,536.00** | $1,536.00 | $153.60 | $199.00 | $1,888.60 | Restoration Hardware Receipts | This item is lost. |
| Susie's Bedroom | Alteration of Canopy | **$295.00** | $315.00 | $31.50 | $0.00 | $346.50 | Iris & Co. Invoice #569 | |
| Susie's Bedroom | Two Chests * | **$3,545.00** | $5,200.00 | $520.00 | $500.00 | $6,220.00 | Iris & Co. Invoice #253, #426 | The chests appear to be Item #172 ($869.82) in Enservio's report. |
| Susie's Bedroom | Labor to Paint Chests * | **$930.00** | $1,070.00 | $0.00 | $0.00 | $1,070.00 | Iris & Co. Invoice #569 | |
| Susie's Bedroom | Dressing Table * | **$950.00** | $1,500.00 | $150.00 | $150.00 | $1,800.00 | Iris & Co. Invoice #569 | This item is lost. |
| Susie's Bedroom | Single Antique Lamp | **$301.60** | $1,600.00 | $160.00 | $0.00 | $1,760.00 | Iris & Co. Invoice #260 | This item is lost. |
| Susie's Bedroom | Fabric for Bed and Shower Curtain | **$43,800.00** | $43,800.00 | $4,380.00 | $810.00 | $48,990.00 | Iris & Co. Invoice #576 | |
| Susie's Bedroom | Backing of Fabric for Bed and Shower Curtain | **$1,320.00** | $1,425.60 | $142.56 | $293.00 | $1,861.16 | Iris & Co. Invoice #569 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Susie's Bedroom | Cost of Lining for Bed and Shower Curtain | **$165.00** | $180.00 | $18.00 | $0.00 | $198.00 | Iris & Co. Invoice #585 | |
| Susie's Bedroom | Fabric for Canopies and Window Seat | **$12,040.00** | $12,040.00 | $1,204.00 | $168.00 | $13,412.00 | Iris & Co. Invoice #576 | |
| Susie's Bedroom | Fabric for Window Treatments - Shades | **$3,120.00** | $3,120.00 | $312.00 | $73.00 | $3,505.00 | Iris & Co. Invoice #576 | |
| Susie's Bedroom | Labor to Make Top of Bed Canopy * ** *** | **$2,130.00** | $2,345.00 | $234.50 | $0.00 | $2,579.50 | Iris & Co. Invoice #585 | This item is lost. |
| Susie's Bedroom | Labor to Make Panels for Bed * ** *** | **$3,168.00** | $3,485.00 | $348.50 | $0.00 | $3,833.50 | Iris & Co. Invoice #585 | This item is lost. |
| Susie's Bedroom | Labor to Make Bedskirt * ** *** | **$775.00** | $850.00 | $85.00 | $0.00 | $935.00 | Iris & Co. Invoice #585 | The bedskirt appears to be Item #1062 ($43.59) in Enservio's report |
| Susie's Bedroom | Silk Bow for Bed Canopy | **$500.00** | $500.00 | $50.00 | $25.00 | $575.00 | Iris & Co. Invoice #555 | This item is lost. |
| Susie's Bedroom | Fabric for Pillows | **$7,600.00** | $7,600.00 | $760.00 | $105.00 | $8,465.00 | Iris & Co. Invoice #576 | |
| Susie's Bedroom | Labor to Make Bolster Pillow * ** | **$210.00** | $230.00 | $23.00 | $0.00 | $253.00 | Iris & Co. Invoice #585 | The custom bolster pillow appears to be Item #610 ($132.98) in Enservio's report |
| Susie's Bedroom | Labor to Make Insert for Pillow | **$225.00** | $247.00 | $24.70 | $0.00 | $271.70 | Iris & Co. Invoice #585 | |
| Susie's Bedroom | Bed Linens from Leontine Linens | **$4,850.00** | $4,850.00 | $485.00 | $100.00 | $5,435.00 | Iris & Co. Invoice #559 | These items are lost. |
| Susie's Bedroom | Pillows from Leontine Linens | **$100.00** | $100.00 | $10.00 | $0.00 | $110.00 | | See Leontine Linens estimate #16706 for replacement cost. This item is lost. |
| Susie's Bedroom | Labor to Make Window Treatments - Shade for Bedroom * ** *** | **$1,340.00** | $1,475.00 | $147.50 | $0.00 | $1,622.50 | Iris & Co. Invoice #585 | This item is lost. |
| Susie's Bedroom | Labor to Make Window Seat Cushion * ** | **$1,950.00** | $2,145.00 | $214.50 | $0.00 | $2,359.50 | Iris & Co. Invoice #585 | The window seat cushion appears to be Item #169 ($588.85) in Enservio's report. |
| Susie's Bedroom | Labor to Make Shower Curtain * ** *** | **$420.00** | $465.00 | $46.50 | $0.00 | $511.50 | Iris & Co. Invoice #585 | The shower curtain appears to be Item #1047 ($39.23) in Enservio's report |
| Susie's Bedroom | Labor to Make Window Treatments - Shade for Bathroom * ** *** | **$178.00** | $195.00 | $19.50 | $0.00 | $214.50 | Iris & Co. Invoice #585 | This item is lost. |
| Susie's Bedroom | Pair of Sconces for Bathroom * | **$799.00** | $856.00 | $85.60 | $64.20 | $1,005.80 | Iris & Co. Invoice #576 | This item is lost. |
| Susie's Bedroom | Rug; Labor to Cut, Serge, Deliver, and Install New Rug and Rug Pad | **$2,875.00** | $3,726.50 | $372.65 | $45.00 | $4,144.15 | Iris & Co. Invoice #576 | The rug appears to be Item #319 ($47.63) in Enservio's report. The rug pad appears to be Item #318 ($21.80) in Enservio's report. |
| Caroline's Bedroom | Two Headboards * | **$2,200.00** | $4,512.00 | $451.20 | $250.00 | $5,213.20 | Iris & Co. Invoice #138 | The headboards appear to be Item #175 ($979.91) in Enservio's report. |
| Caroline's Bedroom | Two Antique Benches * | **$2,380.00** | $6,900.00 | $690.00 | $250.00 | $7,840.00 | Iris & Co. Invoice #260 | The antique benches appear to be Item #252 ($610.29) in Enservio's report. |
| Caroline's Bedroom | Labor to Upholster Antique Benches * ** | **$425.00** | $530.00 | $53.00 | $0.00 | $583.00 | Iris & Co. Invoice #260 | See Magali Somers Maus' letter regarding upholstered furniture. |
| Caroline's Bedroom | Fabric for Canopies, Bedskirts, Window Seat, Window Treatments, and Shower Curtain | **$14,760.00** | $15,890.00 | $1,589.00 | $250.00 | $17,729.00 | Iris & Co. Invoice #569 | |
| Caroline's Bedroom | Strike Off for Above Fabric | **$250.00** | $250.00 | $0.00 | $25.00 | $275.00 | Iris & Co. Invoice #569 | |
| Caroline's Bedroom | Fabric for Canopies and Benches | **$3,950.00** | $3,950.00 | $395.00 | $66.72 | $4,411.72 | Iris & Co. Invoice #569 | |
| Caroline's Bedroom | Cost of Lining and Interlining | **$325.00** | $390.00 | $39.00 | $0.00 | $429.00 | Iris & Co. Invoice #585 | |
| Caroline's Bedroom | Labor to Make Canopies * ** *** | **$900.00** | $990.00 | $99.00 | $0.00 | $1,089.00 | Iris & Co. Invoice #569 | This item is lost. |
| Caroline's Bedroom | Labor to Make Panels for Canopies * ** *** | **$1,200.00** | $1,320.00 | $132.00 | $0.00 | $1,452.00 | Iris & Co. Invoice #569 | This item is lost. |
| Caroline's Bedroom | Labor to Make Bedskirts * ** *** | **$1,500.00** | $1,650.00 | $165.00 | $0.00 | $1,815.00 | Iris & Co. Invoice #569 | The bedskirts appear to be Items #605 ($43.59) and #609 ($43.59) in Enservio's report. |
| Caroline's Bedroom | Labor to Make Window Treatments - Shade for Bedroom * ** *** | **$935.00** | $1,075.00 | $107.50 | $0.00 | $1,182.50 | Iris & Co. Invoice #569 | This item is lost. |
| Caroline's Bedroom | Labor to Make Window Seat Cushion * ** | **$1,818.00** | $1,990.00 | $199.00 | $0.00 | $2,189.00 | Iris & Co. Invoice #569 | The window seat cushion appears to be Item #168 ($391.43) in Enservio's report. |
| Caroline's Bedroom | Labor to Paint Desk and Chair * | **$1,037.00** | $1,192.00 | $0.00 | $0.00 | $1,192.00 | Iris & Co. Invoice #566 | The antique desk is Item #4 in Magali Somers Maus' first proposal and estimate. The antique chair is Item #5 in Magali Somers Maus' first proposal and estimate. |
| Caroline's Bedroom | Labor to Upholster Desk Chair * ** | **$54.00** | $60.00 | $6.00 | $0.00 | $66.00 | Iris & Co. Invoice #585 | See Magali Somers Maus' letter regarding upholstered furniture. The antique desk chair is Item #5 in Magali Somers Maus' first proposal and estimate. |
| Caroline's Bedroom | Labor to Make Shower Curtain * ** *** | **$420.00** | $465.00 | $46.50 | $0.00 | $511.50 | Iris & Co. Invoice #585 | The shower curtain appears to be one of the items that is Item #1046 ($39.23) in Enservio's report. |
| Caroline's Bedroom | Labor to Make Window Treatments - Shade for Bathroom * ** *** | **$266.00** | $295.00 | $29.50 | $0.00 | $324.50 | Iris & Co. Invoice #585 | This item is lost. |
| Caroline's Bedroom | Rug; Labor to Cut, Serge, Deliver and Install New Rug and Rug Pad | **$2,875.00** | $3,726.50 | $372.65 | $45.00 | $4,144.15 | Iris & Co. Invoice #576 | The rug was taken by Brookstone Restoration to Asia Rug Company and appears to be Rug #2 ($1,000.00) in Asia Rug Company's appraisal. The rug pad is lost. |
| Caroline's Bedroom | Bed Linens from Leontine Linens | | $6,690.00 | $669.00 | $100.00 | $7,459.00 | | See Leontine Linens estimate #16711 for the replacement cost. These items are lost. |
| Caroline's Bedroom | French Blue Throw | **$265.00** | $350.00 | $35.00 | $25.00 | $410.00 | Iris & Co. Invoice #253 | The throw was cleaned by CRDN, but there is still a strong smoke odor. Additionally, the color has faded and the texture has changed. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Caroline's Bedroom | Pair of Antique Lamps | **$676.00** | $3,900.00 | $390.00 | $0.00 | $4,290.00 | Iris & Co. Invoice #260 | The pair of antique lamps appear to be Item #242 ($324.82) in Enservio's report |
| Playroom | Sofa * | | $8,280.00 | $828.00 | $903.00 | $10,011.00 | | The sofa appears to be Item #170 ($1,088.91) in Enservio's report. |
| Playroom | Two Chairs * | | $10,980.00 | $1,098.00 | $659.00 | $12,737.00 | | The chairs appear to be Item #171 ($1,447.52) in Enservio's report |
| Playroom | Large Antiqued Mirror * | **$1,813.19** | $3,125.00 | $312.50 | $0.00 | $3,437.50 | Iris & Co. Invoice #260 | The mirror appears to be Item #294 ($1,962.00) in Enservio's report |
| Playroom | Fabric for Sofa, Chairs, Bolster Pillows, Antique Round Bench, and Dressing Table | **$5,188.00** | $10,480.00 | $1,048.00 | $62.00 | $11,590.00 | Iris & Co. Invoice #51, #244, #421 | |
| Playroom | Backing of Fabric for Sofa and Chairs | **$317.00** | $348.00 | $34.80 | $76.00 | $458.80 | Iris & Co. Invoice #569 | |
| Playroom | Fabric for Trim on Bolster Pillows | **$255.00** | $389.00 | $38.90 | $43.00 | $470.90 | Iris & Co. Invoice #51 | |
| Playroom | Labor to Make Bolster Pillows * ** | **$254.40** | $318.00 | $31.80 | $0.00 | $349.80 | Iris & Co. Invoice #51 | |
| Playroom | Antique Iron Daybed * | | $3,500.00 | $350.00 | $0.00 | $3,850.00 | | The antique iron daybed is Item #99 in Magali Somers Maus' second proposal and estimate. A strong smoke odor is still present after treatment. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Playroom | Fabric for Daybed Cushion, Bolster, and Pillows | | $2,400.00 | $240.00 | $65.00 | $2,705.00 | | See Magali Somers Maus' letter regarding upholstered furniture. |
| Playroom | Labor to Make Cushion, Bolster, and Pillows for Daybed * ** | | $1,255.00 | $125.50 | $0.00 | $1,380.50 | | |
| Playroom | Cost of Materials for Cushion, Bolster, and Pillows for Daybed | | $1,440.50 | $144.05 | $0.00 | $1,584.55 | | |
| Attic | Antique Round Bench * | **$595.00** | $950.00 | $95.00 | $0.00 | $1,045.00 | Iris & Co. Invoice #260 | The antique bench appears to be Item #162 ($163.50) in Enservio's report. |
| Attic | Labor to Upholster Round Bench * ** | **$45.00** | $350.00 | $35.00 | $0.00 | $385.00 | Iris & Co. Invoice #260 | |
| Attic | Cost of New Materials for Round Bench | | $197.50 | $19.75 | $0.00 | $217.25 | | |
| Basement | Labor to Make Slipcover for Sofa * ** | **$1,343.75** | $1,680.00 | $168.00 | $0.00 | $1,848.00 | Iris & Co. Invoice #320 | The sofa slipcovers appear to be Item #119 ($122.08) in Enservio's report. |
| Basement | Fabric for Club Chair Slipcovers | **$4,550.00** | $7,320.00 | $732.00 | $125.00 | $8,177.00 | Iris & Co. Invoice #253, #320 | |
| Basement | Labor to Make Slipcovers for Club Chairs * ** | **$1,343.75** | $1,670.00 | $167.00 | $0.00 | $1,837.00 | Iris & Co. Invoice #320 | The club chair slipcovers appear to be Item #120 ($712.86) in Enservio's report |
| Basement | Pre-Wash Fabric for Slipcovers | **$380.00** | $425.00 | $42.50 | $87.00 | $554.50 | Iris & Co. Invoice #320 | |
| Basement | Fabric for Bedskirts | | $7,600.00 | $760.00 | $145.00 | $8,505.00 | | |
| Basement | Labor to Make Bedskirts * ** | | $1,650.00 | $165.00 | $0.00 | $1,815.00 | | The bedskirts appear to be Item #122 ($53.41) in Enservio's report. |
| Basement | Fabric for Window Treatments (Living Room - Montevallo Road) | **$21,420.00** | $23,436.00 | $2,343.60 | $90.00 | $25,869.60 | Iris & Co. Invoice #421 | |
| Basement | Labor to Make Window Treatments (Living Room - Montevallo Road) * ** | **$3,325.00** | $3,657.50 | $365.75 | $0.00 | $4,023.25 | Iris & Co. Invoice #421 | The custom window treatments appear to be Item #121 ($283.40) in Enservio's report. |
| Basement | Lining and Interlining for Window Treatments (Living Room - Montevallo Road) | **$2,502.00** | $3,100.00 | $310.00 | $0.00 | $3,410.00 | Iris & Co. Invoice #421 | |
| Basement | Fabric for Window Treatments (Dining Room - Montevallo Road) | **$15,780.00** | $20,460.00 | $2,046.00 | $140.00 | $22,646.00 | Iris & Co. Invoice #39, #310 | |
| Basement | Labor to Make Window Treatments (Dining Room - Montevallo Road) * ** | **$3,552.00** | $4,440.00 | $444.00 | $0.00 | $4,884.00 | Iris & Co. Invoice #39, #312, #497 | The custom window treatments sustained significant water damage due to the fire. A strong smoke odor was still present after cleaning. |
| Basement | Lining and Interlining for Window Treatments (Dining Room - Montevallo Road) | **$561.86** | $653.00 | $65.30 | $0.00 | $718.30 | Iris & Co. Invoice #39, #312 | |
| Basement | Fabric for Window Treatments (Susie's Bedroom - Montevallo Road) | **$5,130.00** | $6,412.50 | $641.25 | $61.00 | $7,114.75 | Iris & Co. Invoice #338 | |
| Basement | Labor to Make Window Treatments (Susie's Bedroom - Montevallo Road) * ** | **$1,275.00** | $1,600.00 | $160.00 | $0.00 | $1,760.00 | Iris & Co. Invoice #421 | The window treatments appear to be one of two sets of window treatments included as Item #123 ($270.32) in Enservio's report. |
| Playroom | Labor to Make Custom Skirt for Dressing Table * ** | **$415.00** | $520.00 | $52.00 | $0.00 | $572.00 | Iris & Co. Invoice #260 | The custom skirt sustained significant water damage due to the fire. A strong smoke odor was still present after cleaning. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Basement | Labor to Add Trim on Bumper Pads, Crib Skirt, and Baby Blanket * ** | $354.00 | $442.50 | $44.25 | $0.00 | $486.75 | Iris & Co. Invoice #108 | The bumper pads, crib skirt, and baby blanket appear to be Item #118 ($152.60) in Enservio's report. |
| Basement | Fabric for Window Treatments (Caroline's Bedroom - Montevallo Road) | $5,130.00 | $6,415.00 | $641.50 | $604.35 | $7,660.85 | Iris & Co. Invoice #388 | |
| Basement | Labor to Make Window Treatments (Caroline's Bedroom - Montevallo Road) * ** | $1,400.00 | $1,750.00 | $175.00 | $0.00 | $1,925.00 | Iris & Co. Invoice #388 | The window treatments appear to be one of two sets of window treatments included as Item #123 ($270.32) in Enservio's report. |
| Basement | Bed * | $1,149.00 | $1,236.00 | $123.60 | $199.00 | $1,558.60 | Restoration Hardware Receipts | The bed appears to be Item #344 ($0.00) in Enservio's report. It sustained significant water damage as a result of the fire. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Basement | Fabric for Four Chairs from Pub Table | | $815.00 | $81.50 | $28.00 | $924.50 | | See Magali Somers Maus' letter regarding upholstered furniture. The chairs are Item #76 in Magali Somers Maus' second proposal and estimate. |
| Basement | Labor to Upholster Four Chairs from Pub Table * ** | | $625.00 | $62.50 | $0.00 | $687.50 | | |
| Basement | Pair of Sconces * | $1,980.00 | $2,850.00 | $285.00 | $0.00 | $3,135.00 | Iris & Co. Invoice #44, #310 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace these light fixtures with new ones--which come UL-wired--than to go through the process of having these light fixtures rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Basement | Sisal for Rugs (Includes Kitchen and Upstairs Hallway Runners) | $15,644.00 | $18,648.48 | $1,864.85 | $377.00 | $20,890.33 | Iris & Co. Invoice #454, #515 | |
| Basement | Cost of New Rug Pads for Rugs in Basement | | $5,490.00 | $549.00 | $0.00 | $6,039.00 | | See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Basement | Labor to Cut, Serge, and Deliver New L-Shaped Rug & Rug Pad | | $1,755.00 | $175.50 | $0.00 | $1,930.50 | | The L-shaped rug appears to be Item #143 ($592.18) in Enservio's report. The L-shaped rug pad appears to be Item #144 ($42.51) in Enservio's report. |
| Basement | Labor to Cut, Serge, and Deliver New Rugs and Rug Pads - 13' x 11' | | $4,000.00 | $400.00 | $0.00 | $4,400.00 | | The rugs appear to be Item #145 ($2,182.18) in Enservio's report. The rug pads appear to be Item #148 ($521.02) in Enservio's report. |
| Basement | Labor to Cut, Serge, and Deliver New Rug + Rug Pad - 13' x 12' | | $2,095.00 | $209.50 | $0.00 | $2,304.50 | | The rug appears to be Item #146 ($1,190.28) in Enservio's report. The rug pad appears to be Item #147 ($260.51) in Enservio's report. |
| Outdoor Furniture | Sofa with Custom Cushions * | $3,725.00 | $4,850.00 | $485.00 | $281.00 | $5,616.00 | Iris & Co. Invoice #320 | See Magali Somers Maus' letter regarding upholstered furniture. The sofa has a very strong smoke odor. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Outdoor Furniture | Two Chairs with Custom cushions * | $3,230.00 | $3,890.00 | $389.00 | $269.00 | $4,548.00 | Iris & Co. Invoice #320 | See Magali Somers Maus' letter regarding upholstered furniture. The chairs have a very strong smoke odor. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Outdoor Furniture | Coffee Table * | $1,200.00 | $1,695.00 | $169.50 | $75.00 | $1,939.50 | Iris & Co. Invoice #320 | The coffee table has a very strong smoke odor. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Outdoor Furniture | Table and Six chairs * | $6,744.77 | $6,950.00 | $695.00 | $425.00 | $8,070.00 | Iris & Co. Invoice #421 | The table and chairs have a very strong smoke odor. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Outdoor Furniture | Fabric for Pillows | $450.00 | $475.00 | $47.50 | $28.00 | $550.50 | Iris & Co. Invoice #421 | |
| Outdoor Furniture | Wicker Outdoor Furniture * | $3,080.00 | $4,850.00 | $485.00 | $388.00 | $5,723.00 | Iris & Co. Invoice #327 | These items are lost. |
| Outdoor Furniture | Labor to Paint Wicker Furniture * ** | $1,250.00 | $1,550.00 | $155.00 | $0.00 | $1,705.00 | Iris & Co. Invoice #569 | |
| Exterior Lighting | Custom Lantern for Front Porch * | $11,720.00 | $14,900.00 | $1,490.00 | $1,100.00 | $17,490.00 | Iris & Co. Invoice #559 | This item is lost. |
| Exterior Lighting | Four Exterior Wall Lanterns * | $4,880.00 | $4,880.00 | $488.00 | $625.00 | $5,993.00 | Iris & Co. Invoice #559 | These items are lost. |
| Miscellaneous | Blackout Shades for All Bedrooms and Bathrooms | $9,486.00 | $9,486.00 | $948.60 | $150.00 | $10,584.60 | Iris & Co. Invoice #559 | These items are lost. |
| Miscellaneous | Labor to Measure and Install Blackout Shades | $440.00 | $440.00 | $0.00 | $0.00 | $440.00 | Iris & Co. Invoice #559 | |
| Miscellaneous | All Rods, Brackets, and Rings for Window Treatments | $6,559.00 | $8,573.72 | $857.37 | $87.00 | $9,518.09 | Iris & Co. Invoice #506, #559, $569 | These items are lost. |
| Miscellaneous | Lamp Shades - Large (10) | $1,540.00 | $3,000.00 | $300.00 | $0.00 | $3,300.00 | Invoice #159, #260 | A strong smoke odor is still present after cleaning. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Miscellaneous | Lamp Shades - Medium (5) | | $875.00 | $87.50 | $0.00 | $962.50 | Invoice #260 | Some of the lamp shades appear to be included as Item #177 ($87.09) in Enservio's report. A strong smoke odor is still present after cleaning the remaining lamp shades. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Miscellaneous | Lamp Shades - Small (15) | | $705.00 | $70.50 | $0.00 | $775.50 | Invoice #260 | A strong smoke odor is still present after cleaning. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Miscellaneous | Installation of Art | $625.00 | $625.00 | $62.50 | $0.00 | $687.50 | Invoice #569 | |
| Miscellaneous | Iris & Co. Inc. - Hourly Charges for Dell Road - 650 hours @ $200/hour | | $130,000.00 | $0.00 | $0.00 | $130,000.00 | Iris & Co. Letter | |
| | Receiving and Initial Storage Fees (* Items Included in Receiving and Initial Storage Fees) | | $5,900.00 | $0.00 | $0.00 | $5,900.00 | | |
| | Delivery Fees (** Items Included in Delivery Fees) | | $7,500.00 | $750.00 | $0.00 | $8,250.00 | Misc. Iris & Co. Invoices | |
| | Installation Fees (*** Items Included in Installation Fees) | | $3,220.00 | $0.00 | $0.00 | $3,220.00 | Misc. Iris & Co. Invoices | |
| | TOTAL | $650,400.66 | $1,203,864.37 | | | $1,336,273.30 | | |

Replacement cost is higher than original cost
Replacement cost is equal to original cost
Replacement cost is lower than original cost
No invoice so nothing paid under Contents
No invoice but replacement cost + 10% tax was paid (see below)

Total original amount column - $650,400.66
Tax on this amount - $65,040.07
Total - $715,440.73 (rounded up - correctly)

Alycen paid $721,677.72
Difference - $6,237.00

Guest Bedroom - Bed Linens from Leontine Linens - replacement cost $5,670.00
Tax 10% 0 $567.00
Equals $6,237.00

$715,440.72 (rounded down) + $6,237.00 = $721,677.72

EXHIBIT 149
WIT:
DATE: 2-9-23
JULIE BRANDT, RMR, CRR

| Room | Description | Original Cost | Replacement Cost | Sales Tax | Shipping/ Freight | TOTAL | Reference | Notes |
|---|---|---|---|---|---|---|---|---|
| Living Room | Knole Sofa * | $9,290.00 | $12,450.00 | $1,245.00 | $715.00 | $14,410.00 | Iris & Co. Invoice #421 | See Magali Somers Maus' letter regarding upholstered furniture. The Knole sofa is Item #20 in Brookstone Restoration's inventory list. (The bolster pillows are among the items pictured as Item #21.) Chubb may pick up this item from Brookstone once the claim on this item has been paid. |
| Living Room | Fabric for Knole Sofa | $4,400.00 | $6,300.00 | $630.00 | $160.00 | $7,090.00 | Iris & Co. Invoice #421 | |
| Living Room | Trim for Knole Sofa | $520.00 | $1,274.00 | $127.40 | $54.00 | $1,455.40 | Iris & Co. Invoice #421 | |
| Living Room | Two Cords for Knole Sofa | $660.00 | $1,040.00 | $104.00 | $145.00 | $1,289.00 | Iris & Co. Invoice #426 | |
| Living Room | Two Wing Chairs * | $9,520.00 | $11,500.00 | $1,150.00 | $690.00 | $13,340.00 | Iris & Co. Invoice #421 | See Magali Somers Maus' letter regarding upholstered furniture. One of the wing chairs is Item #19 in Brookstone Restoration's inventory list. The other wing chair is among the items pictured as Item #21. Chubb may pick up these items from Brookstone once the claim on these items has been paid. |
| Living Room | Fabric for Wing Chairs | $2,502.00 | $7,200.00 | $720.00 | $145.00 | $8,065.00 | Iris & Co. Invoice #421 | |
| Living Room | Fabric for Murphy Bed | | $1,200.00 | $120.00 | $45.00 | $1,365.00 | | |
| Living Room | Labor to Upholster Murphy Bed * ** | | $1,218.00 | $121.80 | $0.00 | $1,339.80 | | See Magali Somers Maus' letter regarding upholstered furniture. The antique Murphy bed is Item #8 in Magali Somers Maus' first proposal and estimate. |
| Living Room | Cost of New Materials for Murphy Bed | | $595.00 | $59.50 | $75.00 | $729.50 | | |
| Living Room | Fabric for Window Treatments | $17,670.00 | $19,932.20 | $1,993.22 | $86.00 | $22,011.42 | Iris & Co. Invoice #552 | |
| Living Room | Labor to Make Window Treatments * ** *** | $2,088.00 | $2,401.20 | $240.12 | $0.00 | $2,641.32 | Iris & Co. Invoice #585 | The living room custom window treatments appear to be Item #601 ($150.35) in Enservio's report. |
| Living Room | Cost of Lining and Bump for Window Treatments | $1,040.00 | $1,196.00 | $119.60 | $0.00 | $1,315.60 | Iris & Co. Invoice #585 | |
| Living Room | Rug * | $14,800.00 | $35,000.00 | $3,500.00 | $0.00 | $38,500.00 | Turkish Carpets Inc. Receipt | See Paige Albright Orientals' proposal for replacement cost. The Turkish Oushak rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid |
| Living Room | Labor to Cut, Deliver, and Install New Rug Pad - 12'9 x 17'3 | | $786.50 | $78.65 | $0.00 | $865.15 | | The rug pad appears to be Item #433 ($135.57) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Living Room | B. Viz Pillow (Blue Velvet) | $1,550.00 | $3,600.00 | $360.00 | $75.00 | $4,035.00 | Iris & Co. Invoice #111 | The pillow is among the items pictured as Item #21 in Brookstone Restoration's inventory list. This item is lost |
| Living Room | B. Viz Pillow (Cream Velvet) | $350.00 | $425.00 | $42.50 | $55.00 | $522.50 | Iris & Co. Invoice #426 | The pillow was cleaned by CRDN, but a strong smoke odor is still present. Additionally, the antique velvet fabric is discolored and damaged. Chubb may pick up this item from Valet Moving once the claim on this item has been paid |
| Sunroom | Fabric for Daybed | $3,136.00 | $6,530.00 | $653.00 | $65.00 | $7,248.00 | Iris & Co. Invoice #84 | |
| Sunroom | Lining for Daybed | $54.00 | $275.00 | $27.50 | $0.00 | $302.50 | Iris & Co. Invoice #108 | |
| Sunroom | Labor to Upholster Daybed * ** | | $1,837.00 | $183.70 | $0.00 | $2,020.70 | | See Magali Somers Maus' letter regarding upholstered furniture. The antique daybed is Item #27 in Magali Somers Maus' first proposal and estimate. |
| Sunroom | Cost of Foam, Cotton, and Down for Daybed and Bolster Pillows | | $242.50 | $24.25 | $0.00 | $266.75 | | |
| Sunroom | Labor and Cost to Replace Foam and Cotton on Daybed | | $337.50 | $33.75 | $0.00 | $371.25 | | |
| Sunroom | Labor and Cost to Make Cushion for Daybed | | $1,162.50 | $116.25 | $0.00 | $1,278.75 | | |
| Sunroom | Labor to Make Two Custom Bolster Pillows for Daybed | | $337.50 | $33.75 | $0.00 | $371.25 | | |
| Sunroom | Bell Jar Light Fixture * | $510.00 | $675.00 | $67.50 | $55.00 | $797.50 | Iris & Co. Invoice #483 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace this light fixtures with a new one--which comes UL-wired--than to go through the process of having this light fixture rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Sunroom | Pair of Sconces * | $3,400.00 | $3,580.00 | $358.00 | $215.00 | $4,153.00 | Iris & Co. Invoice #421 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace these light fixtures with new ones--which come UL-wired--than to go through the process of having these light fixtures rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Sunroom | Labor to Cut, Deliver, and Install New Rug Pad - 6'2" x 10'0" | | $295.00 | $29.50 | $0.00 | $324.50 | | See payments to Dustin Cox as evidence that custom rug pads were purchased from him. This item is lost |
| Dining Room | Fabric for Dining Chairs | $9,480.00 | $10,932.00 | $1,093.20 | $125.00 | $12,150.20 | Iris & Co. Invoice #569 | |
| Dining Room | Backing of Fabric for Dining Chairs | $850.00 | $918.00 | $91.80 | $250.00 | $1,259.80 | Iris & Co. Invoice #576 | |
| Dining Room | Labor to Upholster Chairs * ** | $4,820.00 | $6,840.00 | $684.00 | $0.00 | $7,524.00 | Iris & Co. Invoice #585 | See Magali Somers Maus' letter regarding upholstered furniture. The antique dining chairs are Item #31 in Magali Somers Maus' first proposal and estimate. |
| Dining Room | Cost of New Foam for Dining Chairs | | $2,692.00 | $269.20 | $0.00 | $2,961.20 | | |
| Dining Room | Fabric for Window Treatments | $19,068.00 | $22,196.80 | $2,219.68 | $190.00 | $24,606.48 | Iris & Co. Invoice #552 | |
| Dining Room | Labor to Make Window Treatments * ** *** | $2,784.00 | $3,065.00 | $306.50 | $0.00 | $3,371.50 | Iris & Co. Invoice #585 | The dining room custom window treatments appear to be Item #600 ($200.47) in Enservio's report. |
| Dining Room | Cost of Lining and Bump for Window Treatments | $1,390.00 | $1,598.00 | $159.80 | $0.00 | $1,757.80 | Iris & Co. Invoice #585 | |
| Dining Room | Rug * | $22,000.00 | $18,000.00 | $1,800.00 | $0.00 | $19,800.00 | Paige Albright Orientals Invoice #1957 | The Safira rug was taken by Brookstone Restoration to Asia Rug Company and appears to be Rug #1 ($8,000.00) in Asia Rug Company's appraisal. |
| Dining Room | Labor to Cut, Deliver, and Install New Rug Pad - 12'6" x 14'1" | $625.00 | $675.00 | $67.50 | $0.00 | $742.50 | Paige Albright Orientals Invoice #1957 | The rug pad appears to be Item #436 ($154.94) in Enservio's report. |
| Kitchen | Fabric for Kitchen Chairs and Mudroom Cushion Cover | $580.00 | $683.00 | $68.30 | $50.00 | $801.30 | Iris & Co. Invoice #569 | |
| Kitchen | Labor to Upholster Kitchen Chairs * ** | $1,260.00 | $1,386.00 | $138.60 | $0.00 | $1,524.60 | Iris & Co. Invoice #585 | See Magali Somers Maus' letter regarding upholstered furniture. The antique dining chairs are Item #30 in Magali Somers Maus' first proposal and estimate. |
| Kitchen | Cost of New Foam for Kitchen Chairs | $465.00 | $511.00 | $51.10 | $0.00 | $562.10 | Iris & Co. Invoice #585 | |
| Kitchen | Labor to Make New Wooden Seats for Kitchen Chairs | | $360.00 | $36.00 | $0.00 | $396.00 | | |
| Kitchen | Labor to Replace Caning on Seats of Kitchen Chairs | | $1,800.00 | $180.00 | $0.00 | $1,980.00 | | |
| Kitchen | Lantern Light Fixture * | $5,900.00 | $9,390.00 | $939.00 | $325.00 | $10,654.00 | Iris & Co. Invoice #253 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace this light fixture with a new one--which comes UL-wired--than to go through the process of having this light fixture rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid |
| Kitchen | Labor to Cut, Serge, Deliver, and Install Two Runners with New Rug Pads | | $1,157.75 | $115.78 | $0.00 | $1,273.53 | | The sisal runners appear to be Item #1066 ($525.36) in Enservio's report. The replacement cost of the sisal is included below. The rug pads appear to be Item #480 ($109.24) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Mudroom | Labor to Make Bench Cushion Cover * ** | $234.00 | $260.00 | $26.00 | $0.00 | $286.00 | Iris & Co. Invoice #585 | The cushion appears to be Item #487 ($96.69) in Enservio's report. |
| Mudroom | Labor to Make Insert for Bench Cushion | $140.00 | $160.00 | $16.00 | $0.00 | $176.00 | Iris & Co. Invoice #585 | |
| Mudroom | Rug * | | $5,500.00 | $550.00 | $0.00 | $6,050.00 | | See Claire Drummond's email confirming the purchase of the Oushak rug from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. The rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid |
| Mudroom | Labor to Cut, Deliver, and Install New Rug Pad - 9'8.5" x 2'4" | | $225.00 | $22.50 | $0.00 | $247.50 | | The rug pad appears to be Item #488 ($61.87) in Enservio's report. |
| Laundry Room | Rug * | | $2,800.00 | $280.00 | $0.00 | $3,080.00 | | See Claire Drummond's email confirming the purchase of the "foyer rug around 5x9" from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. This item is lost |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Laundry Room | Labor to Cut, Deliver, and Install New Rug Pad - 5' x 8' | | $210.00 | $21.00 | $0.00 | $231.00 | | The rug pad appears to be Item #531 ($35.46) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Family Room | Sofa * | **$2,588.00** | $8,920.00 | $892.00 | $520.10 | $10,332.10 | Iris & Co. Invoice #44 | See Magali Somers Maus' letter regarding upholstered furniture. The sofa is Item #17 in Brookstone Restoration's inventory list. Chubb may pick up this item from Brookstone once the claim on this item has been paid. |
| Family Room | Two Club Chairs * | **$2,586.00** | $11,440.00 | $1,144.00 | $682.00 | $13,266.00 | Iris & Co. Invoice #51 | See Magali Somers Maus' letter regarding upholstered furniture. The club chairs are among the items pictured as Items #18 and #24 in Brookstone Restoration's inventory list. Chubb may pick up these items from Brookstone once the claim on these items has been paid. |
| Family Room | Two Bergere Chair Frames, Including Cost to Finish Frames * | **$952.00** | $7,180.00 | $718.00 | $425.00 | $8,323.00 | Iris & Co. Invoice #39 | See Magali Somers Maus' letter regarding upholstered furniture. The Bergere chairs are Items #25 and #26 in Brookstone Restoration's inventory list. Chubb may pick up these items from Brookstone once the claim on these items has been paid. |
| Family Room | Fabric for Sofa, Club Chairs, Bergere Chairs, and Slipcover for Sofa (in Basement) | **$26,268.00** | $34,992.00 | $3,499.20 | $225.00 | $38,716.20 | Iris & Co. Invoice #39, #44, #293 | |
| Family Room | Fabric for Pair of Painted French Stools | | $750.00 | $75.00 | $35.00 | $860.00 | | See Magali Somers Maus' letter regarding upholstered furniture. The antique painted French stools are Item #21 in Magali Somers Maus' first proposal and estimate. |
| Family Room | Labor to Upholster Pair of Painted French Stools * ** | | $425.00 | $42.50 | $0.00 | $467.50 | | |
| Family Room | Pair of Sconces * | **$4,460.00** | $5,160.00 | $516.00 | $175.00 | $5,851.00 | Iris & Co. Invoice #265 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace these light fixtures with new ones--which come UL-wired--than to go through the process of having these light fixtures rewired with the necessary UL certification. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Family Room | Sisal for Rug | **$3,410.00** | $4,100.00 | $410.00 | $155.00 | $4,665.00 | Iris & Co. Invoice #566 | This item is lost. |
| Family Room | Labor to Cut, Serge, Deliver, and Install Rug and New Rug Pad | **$3,378.00** | $3,750.00 | $375.00 | $0.00 | $4,125.00 | | The rug pad appears to be Item #395 ($525.28) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Bar Hallway | Three Flush-Mount Brass Lights for Bar Hallway & Gallery * | **$2,663.00** | $2,720.99 | $272.10 | $408.00 | $3,401.09 | Iris & Co. Invoice #566 | These items are lost. |
| Bar Hallway | Rug * | | $5,500.00 | $550.00 | $0.00 | $6,050.00 | | See Claire Drummond's email confirming the purchase of this vintage Oushak rug from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. The rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Bar Hallway | Labor to Make, Deliver, and Install New Rug Pad - 3'1" x 6'0" | | $210.00 | $21.00 | $0.00 | $231.00 | | See payments to Dustin Cox as evidence that custom rug pads were purchased from him. This item is lost. |
| Study | Fabric to Upholster Desk Chair | **$3,760.00** | $3,900.00 | $390.00 | $75.00 | $4,365.00 | Iris & Co. Invoice #392 | See Magali Somers Maus' letter regarding upholstered furniture. The antique desk chair is Item #26 in Magali Somers Maus' first proposal and estimate. |
| Study | Labor to Upholster Desk Chair * ** | **$150.00** | $175.00 | $17.50 | $0.00 | $192.50 | Iris & Co. Invoice #585 | |
| Study | Fabric for Two Antique Chairs | | $3,250.00 | $325.00 | $275.00 | $3,850.00 | Iris & Co. Invoice #392 | See Magali Somers Maus' letter regarding upholstered furniture. The antique chairs are Item #1 in Magali Somers Maus' first proposal and estimate. |
| Study | Labor to Upholster Antique Chairs * ** | | $1,781.50 | $178.15 | $0.00 | $1,959.65 | Iris & Co. Invoice #392 | |
| Study | Labor to Apply Nailheads on Antique Chairs | | $675.00 | $67.50 | $0.00 | $742.50 | | |
| Study | Cost of Nailheads | | $363.75 | $36.38 | $0.00 | $400.13 | | |
| Study | Cost of Foam | | $1,406.25 | $140.63 | $0.00 | $1,546.88 | | |
| Study | Bar Cart * | **$2,356.90** | $5,890.00 | $589.00 | $325.00 | $6,804.00 | Iris & Co. Invoice #199 | The bar cart is among the items pictured as Item #32 in Brookstone Restoration's inventory list. The finish on the bar cart is now damaged, and two of the shelves are lost. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Study | Three Library Lights * | **$1,979.55** | $2,179.00 | $217.90 | $326.85 | $2,723.75 | Iris & Co. Invoice #555 | These items are lost. |
| Study | Rug * | | $12,000.00 | $1,200.00 | $0.00 | $13,200.00 | | See Claire Drummond's email confirming the purchase of the vintage Oushak rug from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. The rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Study | Labor to Cut, Deliver, and Install New Rug Pad - 5'4" x 8'8" | | $300.00 | $30.00 | $0.00 | $330.00 | | The rug pad appears to be Item #414 ($28.85) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Master Bedroom | Fabric for Bedskirt, Chaise, and Window Treatments | **$22,304.00** | $31,816.00 | $3,181.60 | $385.00 | $35,382.60 | Iris & Co. Invoice #84, #552, #555 | |
| Master Bedroom | Labor to Make Bedskirt * ** *** | **$525.00** | $600.00 | $60.00 | $0.00 | $660.00 | Iris & Co. Invoice #585 | The bedskirt was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Master Bedroom | Labor to Upholster Chaise * ** | | $2,087.50 | $208.75 | $0.00 | $2,296.25 | | See Magali Somers Maus' letter regarding upholstered furniture. The antique chaise is Item #15 in Magali Somers Maus' first proposal and estimate. |
| Master Bedroom | Labor to Make Cushions for Chaise | | $1,531.25 | $153.13 | $0.00 | $1,684.38 | | |
| Master Bedroom | Cost of Foam and Cotton for Chaise | | $475.00 | $47.50 | $0.00 | $522.50 | | |
| Master Bedroom | Labor to Make Window Treatments * ** *** | **$2,780.00** | $3,197.00 | $319.70 | $0.00 | $3,516.70 | Iris & Co. Invoice #585 | The master bedroom custom window treatments were cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim for this item has been paid. |
| Master Bedroom | Labor to Make Shades for Master Bathroom * ** *** | **$650.00** | $740.00 | $74.00 | $0.00 | $814.00 | Iris & Co. Invoice #585 | The master bathroom custom shades were disposed of during debris removal. |
| Master Bedroom | Cost of Lining, Bump, and Interlining for Window Treatments and Shades | **$1,619.00** | $1,860.00 | $186.00 | $0.00 | $2,046.00 | Iris & Co. Invoice #585 | |
| Master Bedroom | Fabric for Antique Bench | | $1,500.00 | $150.00 | $145.00 | $1,795.00 | | See Magali Somers Maus' letter regarding upholstered items. The antique bench is Item #12 in Magali Somers Maus' first proposal and estimate. |
| Master Bedroom | Labor to Upholster Antique Bench * ** | | $1,156.00 | $115.60 | $0.00 | $1,271.60 | | |
| Master Bedroom | Labor and Cost to Make Cushion for Bench | | $1,596.25 | $159.63 | $0.00 | $1,755.88 | | |
| Master Bedroom | Cost of Foam and Cotton for Bench | | $225.00 | $22.50 | $0.00 | $247.50 | | |
| Master Bedroom | Bed Linens from Leontine Linens | **$7,710.00** | $7,710.00 | $771.00 | $100.00 | $8,581.00 | Iris & Co. Invoice #566 | Some of the bed linens were cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. The remaining bed linens are lost. |
| Master Bedroom | Pillows from Leontine Linens | **$275.00** | $275.00 | $27.50 | $20.00 | $322.50 | | The pillows appear to be Items #373 ($61.04) and #393 ($228.74) in Enservio's report. See Leontine Linens estimate #16706 for replacement cost. |
| Master Bedroom | Chandelier * | **$5,990.00** | $7,640.00 | $764.00 | $720.00 | $9,124.00 | Iris & Co. Invoice #454 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace this light fixture with a new one--which comes UL-wired--than to go through the process of having this light fixture rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Master Bedroom | Pair of Sconces * | **$6,220.00** | $7,600.00 | $760.00 | $275.00 | $8,635.00 | Iris & Co. Invoice #310 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace these light fixtures with new ones--which come UL-wired--than to go through the process of having these light fixtures rewired with the necessary UL certification. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Master Bedroom | Rug * | | $16,000.00 | $1,600.00 | $0.00 | $17,600.00 | | See Claire Drummond's email confirming that the Oushak rug was purchased from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. The rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Master Bedroom | Labor to Cut, Deliver, and Install New Rug Pad - 13' x 17' | | $2,797.00 | $279.70 | $0.00 | $3,076.70 | | The rug pad appears to be Item #376 ($279.59) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Master Bedroom | Antique Mother of Pearl Tea Caddy | **$2,500.00** | $7,000.00 | $700.00 | $0.00 | $7,700.00 | Robert Hill Antiques Invoice | This item is lost. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Powder Room | Pair of Sconces * | $7,700.00 | $9,000.00 | $900.00 | $325.00 | $10,225.00 | Iris & Co. Invoice #310 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace these light fixtures with new ones--which come UL-wired--than to go through the process of having these light fixtures rewired with the necessary UL certification. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Foyer | Library Light * | $440.00 | $496.00 | $49.60 | $99.20 | $644.80 | Iris & Co. Invoice #555 | This item is lost. |
| Foyer | Half-Round Wall Lanterns * | $3,159.95 | $22,720.00 | $2,272.00 | $2,750.00 | $27,742.00 | Iris & Co. Invoice #576 | These items are lost. |
| Foyer | Rug * | $6,500.00 | $7,500.00 | $750.00 | $0.00 | $8,250.00 | Paige Albright Orientals Invoice #1511 | See Paige Albright Orientals proposal for replacement cost. This item is lost. |
| Foyer | Labor to Make, Deliver, and Install New Rug Pad - 5'4" x 12'3" | | $290.00 | $29.00 | $0.00 | $319.00 | | The rug pad appears to be Item #435 ($46.54) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Upstairs Hallway | Pair of Antique Painted Bookcases * | $5,022.00 | $24,000.00 | $2,400.00 | $0.00 | $26,400.00 | Iris & Co. Invoice #227, #244 | The pair of antique bookcases appears to be Item #173 ($2,823.10) in Enservio's report. |
| Upstairs Hallway | Antique Louis XVI Bench * | $1,760.00 | $3,950.00 | $395.00 | $0.00 | $4,345.00 | The King's House Antiques Receipt | The antique caned bench is listed in Magali Somers Maus' first proposal and estimate. This item was irreparably damaged in the fire. |
| Upstairs Hallway | Fabric for Shower Curtain (Girls' Bathroom - Montevallo Road) | $1,280.00 | $2,560.00 | $256.00 | $65.00 | $2,881.00 | Iris & Co. Invoice #392 | |
| Upstairs Hallway | Labor to Make Shower Curtain * ** | $356.25 | $420.00 | $42.00 | $0.00 | $462.00 | Iris & Co. Invoice #421 | This item is lost |
| Upstairs Hallway | Lining and Interlining for Shower Curtain | $317.30 | $364.90 | $36.49 | $0.00 | $401.39 | Iris & Co. Invoice #244 | |
| Upstairs Hallway | Labor to Make Shower Curtain (Caroline's Bathroom - Montevallo Road) * ** | $250.00 | $425.00 | $42.50 | $0.00 | $467.50 | Iris & Co. Invoice #392 | This item is lost. |
| Upstairs Hallway | Labor to Make, Serge, Deliver, and Install Runner with New Rug Pad | | $1,196.00 | $119.60 | $0.00 | $1,315.60 | | The replacement cost of the sisal for the runner is included below. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. These items are lost. |
| Guest Bedroom | Antique Regency Linen Press * | $9,500.00 | $22,000.00 | $2,200.00 | $0.00 | $24,200.00 | The King's House Antiques Receipt | This item was irreparably damaged in the fire and disposed of during debris removal. |
| Guest Bedroom | Antique Game Table * | | $9,500.00 | $950.00 | $0.00 | $10,450.00 | | The antique game table is Item #23 in Magali Somers Maus' first proposal and estimate. A strong smoke odor is still present after treatment. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Guest Bedroom | Pair of Antique Lamps | $2,079.00 | $5,800.00 | $580.00 | $0.00 | $6,380.00 | Henhouse Antiques Receipt | The pair of antiques lamps is Item #49 in Magali Somers Maus' first proposal and estimate. A strong smoke odor is still present after treatment. Chubb may pick up this item once the claim on this item has been paid. |
| Guest Bedroom | Headboard, Including Labor to Finish and Upholster * | $1,990.00 | $4,910.00 | $491.00 | $432.08 | $5,833.08 | Iris & Co. Invoice #39, #44, #585 | The headboard appears to be Item #154 ($2,178.91) in Enservio's report. |
| Guest Bedroom | Fabric for Headboard | $630.00 | $2,784.00 | $278.40 | $78.00 | $3,140.40 | Iris & Co. Invoice #44 | |
| Guest Bedroom | Mattress, Box Springs, and Frame * | $4,498.00 | $5,098.99 | $509.90 | $79.99 | $5,688.88 | Mattress Firm Receipts | The mattress and box springs appear to be Item #155 ($1,240.42) in Enservio's report |
| Guest Bedroom | Bed Linens from Leontine Linens | | $5,670.00 | $567.00 | $100.00 | $6,337.00 | | See Leontine Linens Estimate #16708 for the replacement cost. These items are lost. |
| Guest Bedroom | Fabric for Bedskirt, Window Treatments, and Shower Curtain | $5,764.00 | $11,044.00 | $1,104.40 | $810.00 | $12,958.40 | Iris & Co. Invoice #39, #310, #585 | |
| Guest Bedroom | Backing of Fabric for Bedskirt | $306.00 | $356.00 | $35.60 | $48.00 | $439.60 | Iris & Co. Invoice #506 | |
| Guest Bedroom | Labor to Make Bedskirt * ** *** | $770.00 | $825.00 | $82.50 | $0.00 | $907.50 | Iris & Co. Invoice #585 | This item is lost |
| Guest Bedroom | Lining for Bedskirt | $123.00 | $142.00 | $14.20 | $0.00 | $156.20 | Iris & Co. Invoice #506 | |
| Guest Bedroom | Labor to Make Window Treatments * ** *** | $1,350.00 | $1,370.00 | $137.00 | $0.00 | $1,507.00 | Iris & Co. Invoice #39, #312, #488, #585 | This item is lost. |
| Guest Bedroom | Labor to Make Shade for Guest Bedroom * ** *** | $450.00 | $515.00 | $51.50 | $0.00 | $566.50 | Iris & Co. Invoice #585 | This item is lost. |
| Guest Bedroom | Rug * | $6,577.00 | $7,535.00 | $753.50 | $125.00 | $8,413.50 | Iris & Co. Invoice #515 | This item is lost. |
| Guest Bedroom | Labor to Make, Serge, Deliver, and Install Rug and New Rug Pad | $1,249.00 | $2,627.00 | $262.70 | $0.00 | $2,889.70 | | See payments to Dustin Cox as evidence that custom rug pads were purchased from him. This item is lost. |
| Guest Bedroom | Labor to Make Shower Curtain * ** *** | $475.00 | $550.00 | $55.00 | $0.00 | $605.00 | Iris & Co. Invoice #585 | The shower curtain appears to be one of the items that is Item #1046 ($39.23) in Enservio's report. |
| Guest Bedroom | Labor to Make Shade for Guest Bathroom * ** *** | $320.00 | $370.00 | $37.00 | $0.00 | $407.00 | Iris & Co. Invoice #585 | This item is lost |
| Guest Bedroom | Pair of Sconces for Bathroom * | $840.00 | $900.00 | $90.00 | $135.00 | $1,125.00 | Iris & Co. Invoice #576 | These items are lost. |
| Gillian's Bedroom | Daybed * | $3,390.00 | $5,990.00 | $599.00 | $325.00 | $6,914.00 | Iris & Co. Invoice #576 | This item is lost. |
| Gillian's Bedroom | Desk * | $579.99 | $1,499.00 | $149.90 | $315.00 | $1,963.90 | Ballard Designs Order | This item is lost. |
| Gillian's Bedroom | Chair for Desk * | | $2,339.00 | $233.90 | $0.00 | $2,572.90 | | This item is lost. |
| Gillian's Bedroom | Labor to Paint Desk and Chair * | $1,400.00 | $1,610.00 | $0.00 | $0.00 | $1,610.00 | Iris & Co. Invoice #566 | |
| Gillian's Bedroom | Bedside Table * | $1,260.00 | $1,330.00 | $133.00 | $150.00 | $1,613.00 | Iris &Co. Invoice #364 | This item is lost. |
| Gillian's Bedroom | Antique White Trumeau * | $4,600.00 | $5,750.00 | $575.00 | $0.00 | $6,325.00 | Iris & Co. Receipt | This item is lost. |
| Gillian's Bedroom | Fabric for Daybed, Bedskirt, Pillows, Window Treatments | $24,024.00 | $25,749.60 | $2,574.96 | $165.00 | $28,489.56 | Iris & Co. Invoice #576 | |
| Gillian's Bedroom | Fabric for Desk Chair, and Window Seat | $3,952.00 | $3,952.00 | $395.20 | $172.00 | $4,519.20 | Iris & Co. Invoice #576 | |
| Gillian's Bedroom | Fabric for Shower Curtain | $1,032.00 | $1,032.00 | $103.20 | $75.00 | $1,210.20 | Iris & Co. Invoice #576 | |
| Gillian's Bedroom | Trim for Desk Chair, Window Seat, and Shower Curtain | $794.00 | $794.00 | $79.40 | $34.00 | $907.40 | Iris & Co. Invoice #569 | |
| Gillian's Bedroom | Labor to Make Bedskirt * ** *** | $495.00 | $545.00 | $54.50 | $0.00 | $599.50 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Labor to Upholster Desk Chair * ** | $285.00 | $330.00 | $33.00 | $0.00 | $363.00 | Iris & Co. Invoice #585 | |
| Gillian's Bedroom | Labor to Modify Desk Chair to Accommodate Seat Cushion | $95.00 | $110.00 | $11.00 | $0.00 | $121.00 | Iris & Co. Invoice #585 | |
| Gillian's Bedroom | Labor to Make Cushion for Desk Chair | $235.00 | $270.00 | $27.00 | $0.00 | $297.00 | Iris & Co. Invoice #585 | |
| Gillian's Bedroom | Labor to Make Window Treatments - Longer Panels * ** *** | $1,875.00 | $2,065.00 | $206.50 | $0.00 | $2,271.50 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Labor to Make Window Treatments - Shorter Panels * ** *** | $480.00 | $525.00 | $52.50 | $0.00 | $577.50 | Iris & Co. Invoice #585 | This item is lost |
| Gillian's Bedroom | Labor to Make Window Treatments - Shades * ** *** | $530.00 | $590.00 | $59.00 | $0.00 | $649.00 | Iris & Co. Invoice #585 | This item is lost |
| Gillian's Bedroom | Lining and Bump for Window Treatments | $1,233.60 | $1,418.64 | $141.86 | $0.00 | $1,560.50 | Iris & Co. Invoice #585 | |
| Gillian's Bedroom | Labor and Cost to Make Window Seat Cushion * ** | $930.00 | $1,023.00 | $102.30 | $0.00 | $1,125.30 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Labor to Make Shower Curtain * ** *** | $535.00 | $600.00 | $60.00 | $125.00 | $785.00 | Iris & Co. Invoice #585 | This item is lost. |
| Gillian's Bedroom | Bed Linens from Leontine Linens | $2,050.00 | $2,050.00 | $205.00 | $100.00 | $2,355.00 | Iris & Co. Invoice #559 | This item is lost. |
| Gillian's Bedroom | Pillow from Leontine Linens | $100.00 | $100.00 | $10.00 | $0.00 | $110.00 | | See Leontine Linens estimate #16706 for replacement cost. This item is lost. |
| Gillian's Bedroom | Mattress | $1,599.00 | $1,979.00 | $197.90 | $0.00 | $2,176.90 | Mattress Firm Receipts | This item is lost. |
| Gillian's Bedroom | Trundle and Mattress | $498.00 | $689.00 | $68.90 | $0.00 | $757.90 | Mattress Firm Receipts | These items are lost. |
| Gillian's Bedroom | Chandelier * | $3,390.00 | $5,780.00 | $578.00 | $315.00 | $6,673.00 | Iris & Co. Invoice #253 | This item is lost |
| Gillian's Bedroom | Antique Gold Leaf Bow Sconces * | | $4,950.00 | $495.00 | $0.00 | $5,445.00 | | This item is lost. |
| Gillian's Bedroom | Pair of Sconces for Bathroom * | $799.80 | $856.00 | $85.60 | $64.20 | $1,005.80 | Iris & Co. Invoice #576 | These items are lost. |
| Gillian's Bedroom | Rug; Labor to Cut, Serge, Deliver, and Install New Rug and Rug Pad | $2,330.00 | $3,290.00 | $329.00 | $75.00 | $3,694.00 | Iris & Co. Invoice #566 | These items are lost |
| Susie's Bedroom | Bed * | $1,536.00 | $1,536.00 | $153.60 | $199.00 | $1,888.60 | Restoration Hardware Receipts | This item is lost. |
| Susie's Bedroom | Alteration of Canopy | $295.00 | $315.00 | $31.50 | $0.00 | $346.50 | Iris & Co. Invoice #569 | |
| Susie's Bedroom | Two Chests * | $3,545.00 | $5,200.00 | $520.00 | $500.00 | $6,220.00 | Iris & Co. Invoice #253, #426 | The chests appear to be Item #172 ($869.82) in Enservio's report |
| Susie's Bedroom | Labor to Paint Chests * | $930.00 | $1,070.00 | $0.00 | $0.00 | $1,070.00 | Iris & Co. Invoice #569 | |
| Susie's Bedroom | Dressing Table * | $950.00 | $1,500.00 | $150.00 | $150.00 | $1,800.00 | Iris & Co. Invoice #569 | This item is lost. |
| Susie's Bedroom | Single Antique Lamp | $301.60 | $1,600.00 | $160.00 | $0.00 | $1,760.00 | Iris & Co. Invoice #260 | This item is lost. |
| Susie's Bedroom | Fabric for Bed and Shower Curtain | $43,800.00 | $43,800.00 | $4,380.00 | $810.00 | $48,990.00 | Iris & Co. Invoice #576 | |
| Susie's Bedroom | Backing of Fabric for Bed and Shower Curtain | $1,320.00 | $1,425.60 | $142.56 | $293.00 | $1,861.16 | Iris & Co. Invoice #569 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Susie's Bedroom | Cost of Lining for Bed and Shower Curtain | $165.00 | $180.00 | $18.00 | $0.00 | $198.00 | Iris & Co. Invoice #585 | |
| Susie's Bedroom | Fabric for Canopies and Window Seat | $12,040.00 | $12,040.00 | $1,204.00 | $168.00 | $13,412.00 | Iris & Co. Invoice #576 | |
| Susie's Bedroom | Fabric for Window Treatments - Shades | $3,120.00 | $3,120.00 | $312.00 | $73.00 | $3,505.00 | Iris & Co. Invoice #576 | |
| Susie's Bedroom | Labor to Make Top of Bed Canopy * ** *** | $2,130.00 | $2,345.00 | $234.50 | $0.00 | $2,579.50 | Iris & Co. Invoice #585 | This item is lost. |
| Susie's Bedroom | Labor to Make Panels for Bed * ** *** | $3,168.00 | $3,485.00 | $348.50 | $0.00 | $3,833.50 | Iris & Co. Invoice #585 | This item is lost. |
| Susie's Bedroom | Labor to Make Bedskirt * ** *** | $775.00 | $850.00 | $85.00 | $0.00 | $935.00 | Iris & Co. Invoice #585 | The bedskirt appears to be Item #1062 ($43.59) in Enservio's report. |
| Susie's Bedroom | Silk Bow for Bed Canopy | $500.00 | $500.00 | $50.00 | $25.00 | $575.00 | Iris & Co. Invoice #555 | This item is lost. |
| Susie's Bedroom | Fabric for Pillows | $7,600.00 | $7,600.00 | $760.00 | $105.00 | $8,465.00 | Iris & Co. Invoice #576 | |
| Susie's Bedroom | Labor to Make Bolster Pillow * ** | $210.00 | $230.00 | $23.00 | $0.00 | $253.00 | Iris & Co. Invoice #585 | The custom bolster pillow appears to be Item #610 ($132.98) in Enservio's report. |
| Susie's Bedroom | Labor to Make Insert for Pillow | $225.00 | $247.00 | $24.70 | $0.00 | $271.70 | Iris & Co. Invoice #585 | |
| Susie's Bedroom | Bed Linens from Leontine Linens | $4,850.00 | $4,850.00 | $485.00 | $100.00 | $5,435.00 | Iris & Co. Invoice #559 | These items are lost. |
| Susie's Bedroom | Pillows from Leontine Linens | $100.00 | $100.00 | $10.00 | $0.00 | $110.00 | | See Leontine Linens estimate #16706 for replacement cost. This item is lost. |
| Susie's Bedroom | Labor to Make Window Treatments - Shade for Bedroom * ** *** | $1,340.00 | $1,475.00 | $147.50 | $0.00 | $1,622.50 | Iris & Co. Invoice #585 | This item is lost. |
| Susie's Bedroom | Labor to Make Window Seat Cushion * ** | $1,950.00 | $2,145.00 | $214.50 | $0.00 | $2,359.50 | Iris & Co. Invoice #585 | The window seat cushion appears to be Item #169 ($588.85) in Enservio's report. |
| Susie's Bedroom | Labor to Make Shower Curtain * ** *** | $420.00 | $465.00 | $46.50 | $0.00 | $511.50 | Iris & Co. Invoice #585 | The shower curtain appears to be Item #1047 ($39.23) in Enservio's report. |
| Susie's Bedroom | Labor to Make Window Treatments - Shade for Bathroom * ** *** | $178.00 | $195.00 | $19.50 | $0.00 | $214.50 | Iris & Co. Invoice #585 | This item is lost. |
| Susie's Bedroom | Pair of Sconces for Bathroom * | $799.00 | $856.00 | $85.60 | $64.20 | $1,005.80 | Iris & Co. Invoice #576 | This item is lost. |
| Susie's Bedroom | Rug; Labor to Cut, Serge, Deliver, and Install New Rug and Rug Pad | $2,875.00 | $3,726.50 | $372.65 | $45.00 | $4,144.15 | Iris & Co. Invoice #576 | The rug appears to be Item #319 ($47.63) in Enservio's report. The rug pad appears to be Item #318 ($21.80) in Enservio's report. |
| Caroline's Bedroom | Two Headboards * | $2,200.00 | $4,512.00 | $451.20 | $250.00 | $5,213.20 | Iris & Co. Invoice #138 | The headboards appear to be Item #175 ($979.91) in Enservio's report. |
| Caroline's Bedroom | Two Antique Benches * | $2,380.00 | $6,900.00 | $690.00 | $250.00 | $7,840.00 | Iris & Co. Invoice #260 | The antique benches appear to be Item #252 ($610.29) in Enservio's report. |
| Caroline's Bedroom | Labor to Upholster Antique Benches * ** | $425.00 | $530.00 | $53.00 | $0.00 | $583.00 | Iris & Co. Invoice #260 | See Magali Somers Maus' letter regarding upholstered furniture. |
| Caroline's Bedroom | Fabric for Canopies, Bedskirts, Window Seat, Window Treatments, and Shower Curtain | $14,760.00 | $15,890.00 | $1,589.00 | $250.00 | $17,729.00 | Iris & Co. Invoice #569 | |
| Caroline's Bedroom | Strike Off for Above Fabric | $250.00 | $250.00 | $0.00 | $25.00 | $275.00 | Iris & Co. Invoice #569 | |
| Caroline's Bedroom | Fabric for Canopies and Benches | $3,950.00 | $3,950.00 | $395.00 | $66.72 | $4,411.72 | Iris & Co. Invoice #569 | |
| Caroline's Bedroom | Cost of Lining and Interlining | $325.00 | $390.00 | $39.00 | $0.00 | $429.00 | Iris & Co. Invoice #585 | |
| Caroline's Bedroom | Labor to Make Canopies * ** *** | $900.00 | $990.00 | $99.00 | $0.00 | $1,089.00 | Iris & Co. Invoice #569 | This item is lost |
| Caroline's Bedroom | Labor to Make Panels for Canopies * ** *** | $1,200.00 | $1,320.00 | $132.00 | $0.00 | $1,452.00 | Iris & Co. Invoice #569 | This item is lost. |
| Caroline's Bedroom | Labor to Make Bedskirts * ** *** | $1,500.00 | $1,650.00 | $165.00 | $0.00 | $1,815.00 | Iris & Co. Invoice #569 | The bedskirts appear to be Items #605 ($43.59) and #609 ($43.59) in Enservio's report. |
| Caroline's Bedroom | Labor to Make Window Treatments - Shade for Bedroom * ** *** | $935.00 | $1,075.00 | $107.50 | $0.00 | $1,182.50 | Iris & Co. Invoice #569 | This item is lost. |
| Caroline's Bedroom | Labor to Make Window Seat Cushion * ** | $1,818.00 | $1,990.00 | $199.00 | $0.00 | $2,189.00 | Iris & Co. Invoice #569 | The window seat cushion appears to be Item #168 ($391.43) in Enservio's report. |
| Caroline's Bedroom | Labor to Paint Desk and Chair * | $1,037.00 | $1,192.00 | $0.00 | $0.00 | $1,192.00 | Iris & Co. Invoice #566 | The antique desk is Item #4 in Magali Somers Maus' first proposal and estimate. The antique chair is Item #5 in Magali Somers Maus' first proposal and estimate. |
| Caroline's Bedroom | Labor to Upholster Desk Chair * ** | $54.00 | $60.00 | $6.00 | $0.00 | $66.00 | Iris & Co. Invoice #585 | See Magali Somers Maus' letter regarding upholstered furniture. The antique desk chair is Item #5 in Magali Somers Maus' first proposal and estimate. |
| Caroline's Bedroom | Labor to Make Shower Curtain * ** *** | $420.00 | $465.00 | $46.50 | $0.00 | $511.50 | Iris & Co. Invoice #585 | The shower curtain appears to be one of the items that is Item #1046 ($39.23) in Enservio's report. |
| Caroline's Bedroom | Labor to Make Window Treatments - Shade for Bathroom * ** *** | $266.00 | $295.00 | $29.50 | $0.00 | $324.50 | Iris & Co. Invoice #585 | This item is lost. |
| Caroline's Bedroom | Rug; Labor to Cut, Serge, Deliver and Install New Rug and Rug Pad | $2,875.00 | $3,726.50 | $372.65 | $45.00 | $4,144.15 | Iris & Co. Invoice #576 | The rug was taken by Brookstone Restoration to Asia Rug Company and appears to be Rug #2 ($1,000.00) in Asia Rug Company's appraisal. The rug pad is lost. |
| Caroline's Bedroom | Bed Linens from Leontine Linens | | $6,690.00 | $669.00 | $100.00 | $7,459.00 | | See Leontine Linens estimate #16711 for the replacement cost. These items are lost. |
| Caroline's Bedroom | French Blue Throw | $265.00 | $350.00 | $35.00 | $25.00 | $410.00 | Iris & Co. Invoice #253 | The throw was cleaned by CRDN, but there is still a strong smoke odor. Additionally, the color has faded and the texture has changed. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Caroline's Bedroom | Pair of Antique Lamps | $676.00 | $3,900.00 | $390.00 | $0.00 | $4,290.00 | Iris & Co. Invoice #260 | The pair of antique lamps appear to be Item #242 ($324.82) in Enservio's report. |
| Playroom | Sofa * | | $8,280.00 | $828.00 | $903.00 | $10,011.00 | | The sofa appears to be Item #170 ($1,088.91) in Enservio's report. |
| Playroom | Two Chairs * | | $10,980.00 | $1,098.00 | $659.00 | $12,737.00 | | The chairs appear to be Item #171 ($1,447.52) in Enservio's report. |
| Playroom | Large Antiqued Mirror * | $1,813.19 | $3,125.00 | $312.50 | $0.00 | $3,437.50 | Iris & Co. Invoice #260 | The mirror appears to be Item #294 ($1,962.00) in Enservio's report. |
| Playroom | Fabric for Sofa, Chairs, Bolster Pillows, Antique Round Bench, and Dressing Table | $5,188.00 | $10,480.00 | $1,048.00 | $62.00 | $11,590.00 | Iris & Co. Invoice #51, #244, #421 | |
| Playroom | Backing of Fabric for Sofa and Chairs | $317.00 | $348.00 | $34.80 | $76.00 | $458.80 | Iris & Co. Invoice #569 | |
| Playroom | Fabric for Trim on Bolster Pillows | $255.00 | $389.00 | $38.90 | $43.00 | $470.90 | Iris & Co. Invoice #51 | |
| Playroom | Labor to Make Bolster Pillows * ** | $254.40 | $318.00 | $31.80 | $0.00 | $349.80 | Iris & Co. Invoice #51 | |
| Playroom | Antique Iron Daybed * | | $3,500.00 | $350.00 | $0.00 | $3,850.00 | | The antique iron daybed is Item #99 in Magali Somers Maus' second proposal and estimate. A strong smoke odor is still present after treatment. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Playroom | Fabric for Daybed Cushion, Bolster, and Pillows | | $2,400.00 | $240.00 | $65.00 | $2,705.00 | | See Magali Somers Maus' letter regarding upholstered furniture. |
| Playroom | Labor to Make Cushion, Bolster, and Pillows for Daybed * ** | | $1,255.00 | $125.50 | $0.00 | $1,380.50 | | |
| Playroom | Cost of Materials for Cushion, Bolster, and Pillows for Daybed | | $1,440.50 | $144.05 | $0.00 | $1,584.55 | | |
| Attic | Antique Round Bench * | $595.00 | $950.00 | $95.00 | $0.00 | $1,045.00 | Iris & Co. Invoice #260 | The antique bench appears to be Item #162 ($163.50) in Enservio's report. |
| Attic | Labor to Upholster Round Bench * ** | $45.00 | $350.00 | $35.00 | $0.00 | $385.00 | Iris & Co. Invoice #260 | |
| Attic | Cost of New Materials for Round Bench | | $197.50 | $19.75 | $0.00 | $217.25 | | |
| Basement | Labor to Make Slipcover for Sofa * ** | $1,343.75 | $1,680.00 | $168.00 | $0.00 | $1,848.00 | Iris & Co. Invoice #320 | The sofa slipcovers appear to be Item #119 ($122.08) in Enservio's report. |
| Basement | Fabric for Club Chair Slipcovers | $4,550.00 | $7,320.00 | $732.00 | $125.00 | $8,177.00 | Iris & Co. Invoice #253, #320 | |
| Basement | Labor to Make Slipcovers for Club Chairs * ** | $1,343.75 | $1,670.00 | $167.00 | $0.00 | $1,837.00 | Iris & Co. Invoice #320 | The club chair slipcovers appear to be Item #120 ($712.86) in Enservio's report. |
| Basement | Pre-Wash Fabric for Slipcovers | $380.00 | $425.00 | $42.50 | $87.00 | $554.50 | Iris & Co. Invoice #320 | |
| Basement | Fabric for Bedskirts | | $7,600.00 | $760.00 | $145.00 | $8,505.00 | | |
| Basement | Labor to Make Bedskirts * ** | | $1,650.00 | $165.00 | $0.00 | $1,815.00 | | The bedskirts appear to be Item #122 ($53.41) in Enservio's report. |
| Basement | Fabric for Window Treatments (Living Room - Montevallo Road) | $21,420.00 | $23,436.00 | $2,343.60 | $90.00 | $25,869.60 | Iris & Co. Invoice #421 | |
| Basement | Labor to Make Window Treatments (Living Room - Montevallo Road) * ** | $3,325.00 | $3,657.50 | $365.75 | $0.00 | $4,023.25 | Iris & Co. Invoice #421 | The custom window treatments appear to be Item #121 ($283.40) in Enservio's report. |
| Basement | Lining and Interlining for Window Treatments (Living Room - Montevallo Road) | $2,502.00 | $3,100.00 | $310.00 | $0.00 | $3,410.00 | Iris & Co. Invoice #421 | |
| Basement | Fabric for Window Treatments (Dining Room - Montevallo Road) | $15,780.00 | $20,460.00 | $2,046.00 | $140.00 | $22,646.00 | Iris & Co. Invoice #39, #310 | |
| Basement | Labor to Make Window Treatments (Dining Room - Montevallo Road) * ** | $3,552.00 | $4,440.00 | $444.00 | $0.00 | $4,884.00 | Iris & Co. Invoice #39, #312, #497 | The custom window treatments sustained significant water damage due to the fire. A strong smoke odor was still present after cleaning. |
| Basement | Lining and Interlining for Window Treatments (Dining Room - Montevallo Road) | $561.86 | $653.00 | $65.30 | $0.00 | $718.30 | Iris & Co. Invoice #39, #312 | |
| Basement | Fabric for Window Treatments (Susie's Bedroom - Montevallo Road) | $5,130.00 | $6,412.50 | $641.25 | $61.00 | $7,114.75 | Iris & Co. Invoice #338 | |
| Basement | Labor to Make Window Treatments (Susie's Bedroom - Montevallo Road) * ** | $1,275.00 | $1,600.00 | $160.00 | $0.00 | $1,760.00 | Iris & Co. Invoice #421 | The window treatments appear to be one of two sets of window treatments included as Item #123 ($270.32) in Enservio's report. |
| Playroom | Labor to Make Custom Skirt for Dressing Table * ** | $415.00 | $520.00 | $52.00 | $0.00 | $572.00 | Iris & Co. Invoice #260 | The custom skirt sustained significant water damage due to the fire. A strong smoke odor was still present after cleaning. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Basement | Labor to Add Trim on Bumper Pads, Crib Skirt, and Baby Blanket * ** | $354.00 | $442.50 | $44.25 | $0.00 | $486.75 | Iris & Co. Invoice #108 | The bumper pads, crib skirt, and baby blanket appear to be Item #118 ($152.60) in Enservio's report. |
| Basement | Fabric for Window Treatments (Caroline's Bedroom - Montevallo Road) | $5,130.00 | $6,415.00 | $641.50 | $604.35 | $7,660.85 | Iris & Co. Invoice #388 | |
| Basement | Labor to Make Window Treatments (Caroline's Bedroom - Montevallo Road) * ** | $1,400.00 | $1,750.00 | $175.00 | $0.00 | $1,925.00 | Iris & Co. Invoice #388 | The window treatments appear to be one of two sets of window treatments included as Item #123 ($270.32) in Enservio's report. |
| Basement | Bed * | $1,149.00 | $1,236.00 | $123.60 | $199.00 | $1,558.60 | Restoration Hardware Receipts | The bed appears to be Item #344 ($0.00) in Enservio's report. It sustained significant water damage as a result of the fire. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Basement | Fabric for Four Chairs from Pub Table | | $815.00 | $81.50 | $28.00 | $924.50 | | See Magali Somers Maus' letter regarding upholstered furniture. The chairs are Item #76 in Magali Somers Maus' second proposal and estimate. |
| Basement | Labor to Upholster Four Chairs from Pub Table * ** | | $625.00 | $62.50 | $0.00 | $687.50 | | |
| Basement | Pair of Sconces * | $1,980.00 | $2,850.00 | $285.00 | $0.00 | $3,135.00 | Iris & Co. Invoice #44, #310 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace these light fixtures with new ones--which come UL-wired--than to go through the process of having these light fixtures rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Basement | Sisal for Rugs (Includes Kitchen and Upstairs Hallway Runners) | $15,644.00 | $18,648.48 | $1,864.85 | $377.00 | $20,890.33 | Iris & Co. Invoice #454, #515 | |
| Basement | Cost of New Rug Pads for Rugs in Basement | | $5,490.00 | $549.00 | $0.00 | $6,039.00 | | See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Basement | Labor to Cut, Serge, and Deliver New L-Shaped Rug & Rug Pad | | $1,755.00 | $175.50 | $0.00 | $1,930.50 | | The L-shaped rug appears to be Item #143 ($592.18) in Enservio's report. The L-shaped rug pad appears to be Item #144 ($42.51) in Enservio's report. |
| Basement | Labor to Cut, Serge, and Deliver New Rugs and Rug Pads - 13' x 11' | | $4,000.00 | $400.00 | $0.00 | $4,400.00 | | The rugs appear to be Item #145 ($2,182.18) in Enservio's report. The rug pads appear to be Item #148 ($521.02) in Enservio's report. |
| Basement | Labor to Cut, Serge, and Deliver New Rug + Rug Pad - 13' x 12' | | $2,095.00 | $209.50 | $0.00 | $2,304.50 | | The rug appears to be Item #146 ($1,190.28) in Enservio's report. The rug pad appears to be Item #147 ($260.51) in Enservio's report. |
| Outdoor Furniture | Sofa with Custom Cushions * | $3,725.00 | $4,850.00 | $485.00 | $281.00 | $5,616.00 | Iris & Co. Invoice #320 | See Magali Somers Maus' letter regarding upholstered furniture. The sofa has a very strong smoke odor. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Outdoor Furniture | Two Chairs with Custom cushions * | $3,230.00 | $3,890.00 | $389.00 | $269.00 | $4,548.00 | Iris & Co. Invoice #320 | See Magali Somers Maus' letter regarding upholstered furniture. The chairs have a very strong smoke odor. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Outdoor Furniture | Coffee Table * | $1,200.00 | $1,695.00 | $169.50 | $75.00 | $1,939.50 | Iris & Co. Invoice #320 | The coffee table has a very strong smoke odor. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Outdoor Furniture | Table and Six chairs * | $6,744.77 | $6,950.00 | $695.00 | $425.00 | $8,070.00 | Iris & Co. Invoice #421 | The table and chairs have a very strong smoke odor. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Outdoor Furniture | Fabric for Pillows | $450.00 | $475.00 | $47.50 | $28.00 | $550.50 | Iris & Co. Invoice #421 | |
| Outdoor Furniture | Wicker Outdoor Furniture * | $3,080.00 | $4,850.00 | $485.00 | $388.00 | $5,723.00 | Iris & Co. Invoice #327 | These items are lost. |
| Outdoor Furniture | Labor to Paint Wicker Furniture * ** | $1,250.00 | $1,550.00 | $155.00 | $0.00 | $1,705.00 | Iris & Co. Invoice #569 | |
| Exterior Lighting | Custom Lantern for Front Porch * | $11,720.00 | $14,900.00 | $1,490.00 | $1,100.00 | $17,490.00 | Iris & Co. Invoice #559 | This item is lost. |
| Exterior Lighting | Four Exterior Wall Lanterns * | $4,880.00 | $4,880.00 | $488.00 | $625.00 | $5,993.00 | Iris & Co. Invoice #559 | These items are lost. |
| Miscellaneous | Blackout Shades for All Bedrooms and Bathrooms | $9,486.00 | $9,486.00 | $948.60 | $150.00 | $10,584.60 | Iris & Co. Invoice #559 | These items are lost. |
| Miscellaneous | Labor to Measure and Install Blackout Shades | $440.00 | $440.00 | $0.00 | $0.00 | $440.00 | Iris & Co. Invoice #559 | |
| Miscellaneous | All Rods, Brackets, and Rings for Window Treatments | $6,559.00 | $8,573.72 | $857.37 | $87.00 | $9,518.09 | Iris & Co. Invoice #506, #559, $569 | These items are lost. |
| Miscellaneous | Lamp Shades - Large (10) | $1,540.00 | $3,000.00 | $300.00 | $0.00 | $3,300.00 | Invoice #159, #260 | A strong smoke odor is still present after cleaning. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Miscellaneous | Lamp Shades - Medium (5) | | $875.00 | $87.50 | $0.00 | $962.50 | Invoice #260 | Some of the lamp shades appear to be included as Item #177 ($87.09) in Enservio's report. A strong smoke odor is still present after cleaning the remaining lamp shades. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Miscellaneous | Lamp Shades - Small (15) | | $705.00 | $70.50 | $0.00 | $775.50 | Invoice #260 | A strong smoke odor is still present after cleaning. Chubb may pick up these items from Valet Moving once the claim on these items has been paid. |
| Miscellaneous | Installation of Art | $625.00 | $625.00 | $62.50 | $0.00 | $687.50 | Invoice #569 | |
| Miscellaneous | Iris & Co. Inc. - Hourly Charges for Dell Road - 650 hours @ $200/hour | | $130,000.00 | $0.00 | $0.00 | $130,000.00 | Iris & Co. Letter | |
| | Receiving and Initial Storage Fees (* Items Included in Receiving and Initial Storage Fees) | | $5,900.00 | $0.00 | $0.00 | $5,900.00 | | |
| | Delivery Fees (** Items Included in Delivery Fees) | | $7,500.00 | $750.00 | $0.00 | $8,250.00 | Misc. Iris & Co. Invoices | |
| | Installation Fees (*** Items Included in Installation Fees) | | $3,220.00 | $0.00 | $0.00 | $3,220.00 | Misc. Iris & Co. Invoices | |
| | TOTAL | $650,400.66 | $1,203,864.37 | | | $1,336,273.30 | | |

Replacement cost is higher than original cost
Replacement cost is equal to original cost
Replacement cost is lower than original cost
No invoice so nothing paid under Contents
No invoice but replacement cost + 10% tax was paid (see below)

Total original amount column - $650,400.66
Tax on this amount - $65,040.07
Total - $715,440.73 (rounded up - correctly)

Alycen paid $721,677.72
Difference - $6,237.00

Guest Bedroom - Bed Linens from Leontine Linens - replacement cost $5,670.00
Tax 10% 0 $567.00
Equals $6,237.00

$715,440.72 (rounded down) + $6,237.00 = $721,677.72

EXHIBIT
6

| POLICY NUMBER | SWORN STATEMENT IN PROOF OF LOSS | Amount of Policy | |
|---|---|---|---|
| 14945478-01 | | See Policy | |
| AGENT<br>USI Insurance Services LLC (AL) | TO | ISSUED<br>Effective 6/18/19 | EXPIRES<br>6/18/20 |

CHUBB

LOSS OF CONENTS

To the Pacific Indemnity Company (Writing Company). At time of loss by the above referenced policy of insurance you insured Charles Goodrich and Alexandra Goodrich against loss from fire to the property described according to the terms and conditions of the aforementioned policy and all forms, endorsements, transfers and assignments attached thereto.

1. Time and Origin: A fire occurred about the hour of 10:00 A.M. on the 18th day of November, 2019. The cause and origin of the said loss was the fire. As to the cause, we rely on the opinions from the Mountain Brook Fire Department, with which Chubb has talked.

2. Occupancy: The building described, or containing the property described, was occupied at the time of the loss as follows, and for no other purposes whatever: Our home.

3. Title and Interest: At the time of the loss the interest of your insured in the property described therein was owners____________________. No other person or persons had any interest therein or encumbrance thereon, except. As stated in the policy, Oakworth Capital held a first mortgage, which has now been satisfied.

4. Changes: Since the said policy was issued there has been no assignment thereof, or change of interest, use, occupancy, possession, location or exposure of the property described, except: none as of the date of the fire.

5. Total Insurance: The total amount of insurance upon the property described by this policy was, at the time of the loss $ , as more particularly specified in the above referenced policy, besides which there was no policy or other contract of insurance, written or oral, valid or invalid. A copy of the Coverage Summary is attached which shows base coverages of $3 million for the Dwelling and $1.5 million for contents. The policy provision, however, increased those amounts depending on the occurrence of certain events. Therefore, it is difficult, if not impossible, to determine the exact total amount of insurance.

6. The Gross Amount Claimed of said property at the time of the loss was: Currently, the Gross Amount claimed for lost contents is $1,576,501.91, which includes the amount that has already been paid under the Contents coverage. If the maximum coverage amount is not paid, we reserve the right to submit additional claims under the contents coverage. Because the maximum coverage has been met, we have not incurred the cost to value other lost items.

7. Less the policy Deductible of: Zero, according to our reading of the policy, but we will defer to the language of the policy.

8. The Net Amount Claimed under the above numbered policy is: For loss of Contents, we are claiming maximum amount under the policy, believed to be $1,507,500. If the maximum amount allowed under the policy is more, we are claiming the maximum amount allowed.

9. The said loss did not originate by any act, design or procurement on the part of your insured, or this affiant; nothing has been done by or with the privity or consent of your insured or this affiant, to violate the conditions of the policy, or render it void; no articles are mentioned herein or in annexed schedules but such as

were destroyed or damaged at the time of said loss; no property saved has in any manner been concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made. Any other information that may be required will be furnished and considered a part of this proof.

The furnishing of this blank or the preparation of proofs by a representative of the above insurance company is not a waiver of any of its rights. Nor do the insureds waive any of their rights.

State of Alabama
County of Jefferson

Insured Signature [signature]
Insured Signature Alyandra Guevara

Subscribed and sworn to, before me this: 11th day of September, 20 20.

[signature]
Notary Public.