FILED
2023 Jul-12 PM 02:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT "D" – Part 3

(Exhibit B are copies of Elliott's emails discussing the smoke remediation process.)

A few months after the fire, Charles and I had decided to proceed with the repair of the house and Brookstone Restoration was going to move forward with the smoke remediation process. Brookstone Restoration ("Brookstone") was the restoration or clean-up company which had been performing demolition and clean-up since the fire. At this time, Charles and I had retained the services of Cliff Zlotnik, an expert in smoke remediation, who directed Brookstone on the procedures to be used. One of the steps in the process was to have a pressure blasting company blast the inside of the burned house to remove all residue of mold and insulation prior to starting the sealing process.

The work to be done by Alabama Soda Blasting was delayed initially by Chubb's withholding its approval of the process. Then, Charles and I made a decision to replace Brookstone as the primary restoration company because Brookstone and Chubb were having private discussions about the extent of the soda blasting without disclosing any of their discussions to Charles or me.

During the delay in proceeding with the smoke remediation, Charles and I reassessed our decision to repair the house rather than to demolish the main house and rebuild. Because the cost to repair and the cost to rebuild were fairly close, and a demolition would remove most all sources of smoke contamination, we decided to demolish the house and rebuild. The main house was demolished except for the steel framing supports and foundation. The attached two car garage and storage room were left intact.

Dwelling Proof of Loss. Charles and I submitted a sworn proof of loss under the dwelling coverage of the Masterpiece Policy based upon the cost to repair, not the cost to

demolish and rebuild. The cost to repair included the cost of the smoke remediation process, which was to be performed by Slade, LLC, the company we retained to replace Brookstone. The estimate from Slade LLC was $311,939.80. Exhibit C is the itemized list of repair costs which was submitted with the proof of loss and which included the remediation cost from Slade LLC.

Pacific refused this cost saying initially: "If you demolish the house there is no need for smoke remediation." Exhibit D - May 15, 2020 letter from Attorney Alycen Moss. We still decided to demolish the house believing that the policy covers the cost of repair at the time of loss, not the cost of repair five months later, and that we would be paid the cost of the smoke remediation.

A year later Pacific wrote:

> 3. Slade LLC's Remediation Bid ($311,939.80): As we have said previously, there is no need to perform smoke remediation because the insureds demolished and reconstructed the Property. As such, Pacific will not pay this item.

Exhibit E - Attorney Moss' letter of May 19, 2021.

Landscape Proof of Loss. Charles and I also submitted a Proof of Loss for landscaping costs. (A copy of the Landscaping Proof of Loss is attached as Exhibit J.) The landscaping claim evolved as follows.

We had TCC General Contractors prepare an estimate of the cost to repair our burned residence shortly after the fire. In its estimate dated February 12, 2020,which was less than three months after the fire, TCC noted: "Landscape/Irrigation Allowance - $50,000 - GUESS - Need scope determined." A copy of the February 12, 2020 TCC Construction Estimate is attached as Exhibit K. This initial estimate by TCC was passed on to Pacific shortly thereafter.

In April, 2020 Pacific asked for a global settlement offer. A global settlement offer was

made through our attorney's letter of May 4, 2020, a copy of which is attached as Exhibit L. In that letter, the landscape repair costs was discussed.

> In the initial construction, Page Duke Landscape Architects and Ben Page were paid $55,473.48 on plans and oversight. His participation will continue as the Goodrichs make repairs and replacements to the landscaping. $215,174.00 was spent on the installation of a lighting system, irrigation system, and plantings.
>
> The lighting and irrigation systems are inoperable and must be replaced, and it is impractical to do so prior to the reconstruction of the house. It is likely that many of the plants will have to be replaced. In an attempt to salvage some of the more expensive plants, an effort to transplant them may be made. That, however, is an expensive proposition which necessitates installing a temporary irrigation system. Although a precise cost cannot be determined at this time, conservative estimates to repair and replace these landscaping necessities exceed the policy limit of $150,000.00

In response to our global offer, Pacific had its attorney send a letter responding to the settlement offer, which, again, had been requested by Pacific. In a letter dated May 15, 2020, Pacific's attorney addressed the landscaping claim of $150,000 by stating:

> The insureds' landscaping costs were included in the TCC estimate above (a $50,000 line item + 20%). This appears to be a duplicate charge and will not be paid.

Ex. D. Pacific made no mention that the initial estimate of $50,000 was a "GUESS - need scope determined," or to the description of the damage to the landscape made in the settlement offer, the document to which Ms. Moss claimed she was responding.

Subsequent to this correspondence, Pacific asked for a Sworn Proof of Loss on a specific form and demanded that Charles and I make ourselves available for an examination under oath. We complied with each request. Our Sworn Proof of Loss included the landscaping claim for $150,000, which was further supported by an estimate from a landscaping company, Southern Scape, for $161,000.

Pacific's attorney responded in a letter dated May 19, 2021 as follows:

**C. Landscape**

On March 19, 2021, you provided an executed Sworn Statement in Proof of Loss on behalf of the insureds, setting forth a claim for $150,000.00 for the Landscaping. In support of this claim, you submitted a bid prepared by Southern Scape in the amount of $161,351.00. The bid was dated December 4, 2020, and identified the property for which it was prepared only as "Goodrich Residence, Birmingham, AL."

As we said in the May 15, 2020 letter, the insureds' landscaping costs were included in the TCC estimate, so this appears to be a duplicate charge. Moreover, it is unclear how the fire damaged the landscaping to the extent claimed. Please advise as to the meaning of "disturbed areas." Please also advise as to the need for adjustment of irrigation and/or an irrigation allowance. Irrigation is located underground, and as such should not have been affected by the loss.

Finally, it is unclear from the Southern Scape estimate what property is being landscaped. Can you please confirm what property needs the landscaping work?

See Exhibit E.

I authorized the following response from my lawyer to Ms. Moss' May 19, 2021 letter:

C. <u>Landscape</u>

In your letter you note that it was a sworn claim for this loss. The Goodriches resent the implication that the landscaping estimate may have been for another property. I can confirm that 3305 Dell Road, where the fire occurred, is the property referenced in the estimate.

The Goodriches further resent your repeated false allegations that they have made duplicative claims. The landscaping costs are not included in TCC's final reconstruction estimate upon which the sworn claim has been made.

Regarding damage to the landscape, Pacific representatives have had unfettered access to Del Road as the Goodriches have asked only to be given notice when a site visit was going to be made. Any such visit would have revealed the extensive damage to the landscape if anyone had bothered to look. A good deal of burn damage to the vegetation close to the house has been visible from the day of he fire. A significant amount of loss was caused by vehicles that were on the property as a result of the fire. The workers regularly drove their vehicles through the yard and parked wherever a spot could be

> found. The irrigation system, located underground and along the driveway was damaged beyond repair. All plants around the house will have to be re-planted. All of the sod will have to be replaced.
>
> While the fire directly killed some of the plants, which is damage that should be covered under the Dwelling Coverage of the policy, the Goodriches have not taken the time to parse out which damage was caused by the fire itself and which damage was caused by fire trucks, Brookstone Restoration trucks, dumpsters, or lack of irrigation.

Exhibit M.

Pacific made no further response and refused to make any payment for our landscape loss, not even the $50,000 that was an initial "GUESS" from TCC but upon which Pacific seemed to rely.

Contents Proof of Loss. We also submitted a contents proof of loss. (A copy of the contents proof of loss is attached as Exhibit F.) Initially, Pacific or Chubb hired Enservio, a national claim valuation company that caters to insurance companies, to determine the replacement costs of items destroyed in the fire. According to Elliott, the Chubb claims manager,

> ...This inventory is based on the walk thru completed with the insured by the Enservio representative and pricing for similar items. Although not a perfect process, this is a great starting point which we utilize daily on claims all across the United States for over two decades now. I am sure once we receive support for any items in dispute we can indemnify the insured in whole.

(Exhibit G. - Elliott's email of February 20, 2020.)

A significant number of Enservio's replacement valuations were well below the original cost of the items and didn't reflect the replacement cost. In addition, and from the Enservio report I obtained, Enservio did not determine a replacement cost for many items which tended to be more expensive household furnishings.

Therefore, to support my contents claim I submitted a second inventory after the one prepared by Enservio, in the form of a detailed spread sheet which identified the items valued by Enservio which I questioned and items for which there had been no valuation. The spreadsheet contained the original cost of the item when I could find it, (I submitted ten year's worth of invoices), the replacement cost for the item, shipping costs, and tax. I noted on the spread sheet any payment I had received based upon Enservio's estimate. Iris Thorpe, the owner of Iris & Co., an interior design firm, assisted me in finding the replacement costs and, at my request, signed an affidavit verifying the replacement cost, which was also submitted to Pacific. Exhibit F contains the spreadsheet and Exhibit H is a copy of the affidavit from Ms. Thorpe.

The contents claim I submitted was for $1,336,273.30, which, when added to the amounts Pacific had paid under the contents coverage, exceeded the policy limits.

Pacific refused to pay the replacement costs for the items detailed on the spreadsheets, with one or two exceptions. (An exception occurred when Pacific paid the Enservio cost, which was less than the item's original cost, and then subsequently paid the original cost of the same item. When this "double payment" is added together, the replacement cost for that item may be exceeded. In my calculations, Pacific was credited with the double payment as Pacific's total payment is applied against the contents coverage cap.) While Pacific refused to pay the replacement costs for the items detailed on the spreadsheets, Pacific paid the original costs. In still another letter Attorney Moss stated:

> 1. Contents Inventory: We reviewed the inventory at length in Mrs. Goodrich's EUO, and there is <u>minimal backup documentation for the replacement items.</u> We are willing to consider the invoices of Iris & Co. that were submitted as backup documentation <u>for the original cost and will pay that amount</u> which totals $656,070.66. We have added 10% in tax to total $65,607.06. The total amount

Pacific will pay on contents is $721,677.72.

(Exhibit I. Moss Ltr - Nov. 6, pgs 1-2)(emphasis supplied)

Last Demand from Pacific.

In August 2022, Pacific stated that it would not pay anything further on our claims unless we reduced the amount of our claims. If we would do so, Pacific would agree to "negotiate." We did not reduce the amount of our claims.

Alyandra Gwand
Affiant

Sworn to before me and subscribed in my presence this 19th day of April, 2022.

Notary Public

My Commission Expires: 2/24/24

DEFENDANT'S EXHIBIT 13
PENGAD 800-631-6989

# OUTLINE OF CHUBB/ PACIFIC'S BAD FAITH[1]

## I. DWELLING

Chubb promised to pay the "reconstruction cost," which Chubb defined as the lesser of the amount required "at the time of loss" to repair, replace or rebuild at the same location, using "like design, and materials and workmanship of comparable kind and quality."

### A. **Fire Remediation Costs - $311,939.80**

- Chubb insisted on paying for the repair of the Goodrich home rather than paying for the main house to be demolished and rebuilt. Eventually Chubb agreed to take the house "down to the studs," meaning the inside was stripped except for the studs.

  1045; 1005; 1011[2]

- The inside then had to be blasted with soda and tiny bits of glass to strip the insides of any remaining smoke residue, including all insulation. A sealant would then be applied to the studs.

  1129; 4007

- The blasting was to be done by Alabama Soda Blasters. This is the cleaning about which Chubb secretly asked Brookstone to reduce the scope. Brookstone's acquiescence to Chubb's secret demands led the Goodriches to fire Brookstone.

- Chubb's interference led to Brookstone being fired and Slade LLC, an environmental general contractor, being retained. Slade LLC agreed to follow the protocol established by Cliff Zlotnick. Slade presented an estimate of $311,939.80.

---

[1]This outline is the product of the Goodriches' counsel and is submitted in furtherance of the pre-suit mediation agreed to by the parties. It is governed by the rules applicable to mediation confidentiality and settlement discussions and cannot be used outside of the mediation proceedings. No statement or allegation contained herein is an admission of fact by the Goodriches.

[2]These are Bates numbers which reference the emails and correspondence submitted herewith.

- When the proposal from Slade was presented to Chubb, Chubb did nothing. Alabama Soda Blasting was ready to begin and sent several emails requesting a start date.

    1071; 3047

- Chubb's silence led the Goodriches' to believe that waiting on Chubb to approve the Slade proposal for fire remediation would unnecessarily delay their house being rebuilt. The Goodriches also discovered additional smoke residue between the "house wrap" and the outside brick.

- Because the cost to repair and the cost to rebuild was so close, the Goodriches decided to demolish the main house.

- Chubb has refused to pay the $311,939.80 fire remediation cost arguing that the repair was no longer necessary <u>because the house was torn down</u>.

    510

- Chubb refused to pay to have the house demolished and then refused to pay the full cost of repair because the Goodriches had the house demolished.

- Initially, Elliott said that Chubb would pay the Goodriches a large amount and the Goodriches could do with the money as they wished. Now, Chubb is reducing payments because of the manner in which the Goodriches wanted to use the promised insurance proceeds.

**<u>B.</u>** **<u>Architect Hank Long's fee</u>** **<u>$50,241.19</u>**

- Hank Long designed the house and oversaw the original construction.

- Chubb initially said the Goodriches were attempting to collect his fee twice.

    490

- When Chubb realized it was wrong, it then claimed Long's supervision fee was unnecessary.

    510

**<u>C.</u>** **<u>Reconstruction Costs</u>**

- In its letter of 5/20/2020, Pacific stated that it had already paid $1,400,000 for the reconstruction of the dwelling, was willing to pay an additional amount, but

disagreed with the remaining scope of the estimate from TCC and set forth "the disputed issues." Therefore, the initial payment of $1,400,000 did not apply to any of the "disputed issues."

- When Pacific paid the additional amount on the dwelling, it claimed that the additional amount was in fact based upon TCC's estimate. It appears, however, that the payment was based upon the cost in TCC's original construction contract and not TCC's estimate to repair the house after the fire. Thus, Pacific did not pay the "reconstruction cost" ... "at the time of the loss," a clear violation of the policy and Pacific's duty to act in good faith.

- The Goodriches also believe that the $1.4 million initial payment is less than the TCC estimate but has nothing, at this time, to confirm its belief because Pacific has not explained the basis of its $1.4 million payment. At some time, it will have to explain its figure and the data on which it was based.

**D. Landscaping $150,000**

- Chubb refused to pay for any of the damage to the Goodriches' plants and yard caused by the fire and the vehicles required to put out the fire.

  3072-3073

- Chubb sought verification that the invoice submitted was for Dell Road even though the claim was submitted in a sworn proof of loss.

  5022

- Chubb never did any investigation as its lawyer claimed not to know how the fire damaged the landscape.

  5023

- Ali had addressed irrigation system with Brookstone.

  3012

- Chubb had access to the burned house at any time with 24 hours notice.

  2137; 5028

- Chubb never questioned the landscaping company to see the extent of the damage and their costs to repair.

- At one time Chubb insisted that the Goodriches had to look to Brookstone for the landscape damage.

**E. Zlotnik's fee (\$20,338.41 less \$15,000 = \$5338.41)**

- Zlotnik is an expert in fire remediation who offered a guarantee that there would be no lingering smoke odors if his protocol was followed. Brookstone offered no such guarantee. Therefore, the Goodriches asked that Chubb pay Zlotnik's fee, estimated to be \$25,500, to establish a protocol and oversee the clean-up which was to be performed by Brookstone. Brookstone did not have Zlotnik's qualifications.

  56, 57, 58, 74, 75

- Chubb agreed to pay only \$15,000 of his fee claiming that Brookstone had the necessary expertise to perform the remediation. Brookstone did not and did not offer a guarantee of no lingering smoke odors. Zlotnik's final fee was only \$20,338.41.

  74, 75

**F. TCC's Framing Demolition and Repair Work - Demo Costs - \$5,973.70**

- Demo Costs - The Goodriches notified Chubb of the need for structural repairs and Chubb agreed. Chubb paid the estimate (\$38,806.50) but refused to pay the final invoice from TCC, the general contractor which performed the work. The final invoice was \$44,780.02, of which approximately \$6,000 had not been paid.

  422

- When the Goodriches submitted the claim for full payment to TCC, Chubb replied: " Demo Costs (\$44,780.02): As you know, Pacific has already paid for the demo costs. It will not pay for this duplicative cost."

- The Goodriches never asked for a duplicative payment. They only asked that TCC"s full invoice be paid. Chubb never objected to the amount billed by TCC but, instead, chose to falsely assert that it had already paid the invoice in full and to intentionally imply that the Goodriches were seeking a double payment.

  522

**G. HD Innovations - Audio/Video Estimate \$13,141.83**

- After the fire the Goodriches had to pay for the removal of all of the Audio/Video

equipment and wiring as part of the demolition clean-up.

- When the new house is near completion, they will have to pay for the reinstallation of the Audio/Video equipment and wiring.
- The Goodriches have submitted an invoice for the work done and an estimate of the future costs.
- Chubb claimed that this claim "is not a dwelling expense and is discussed below under contents."

510

- The Goodriches explained that this was not a contents claim but represented invoices for materials and labor under the Dwelling coverage.

517

- The Goodriches also submitted a claim under their additional living expenses for HD Innovation services for setting up their audio/video equipment at their rental house. Chubb "conveniently confused the two claims and insisted that payment of the ALE invoice for HD Innovations was payment of the dwelling claim for labor and materials.

511

**H. ADT - Quote to Replace Security System $2,414.00**

- The Goodriches had an ADT security service at their Dell Road home. After the fire, they cancelled the service but had to pay a cancellation fee of approximately $1500. Chubb paid this expense under the ALE coverage.
- The Goodriches also obtained a cost from ADT for reinstalling the service once their home was rebuilt. The charge, which ADT agreed to stand behind regardless of any price increases, was $2,414.00. Chubb has refused to pay this cost.

**I. Dwelling Shenanigans - Mold Remediation**

- Chubb claimed it was responsible for only $10,000 of the cost of mold remediation and asked that Brookstone do Chubb's dirty work and inform the Goodriches of the lack of coverage.

1080

- The Goodriches had to explain to Elliott, Chubb's Senior Vice-President, that the policy provided for $300,000 in mold remediation coverage.

  1099; 2074

### J. Dwelling Shenanigans - Physical Damage

- Chubb claimed there was no physical damage to the master bedroom and bath and that it would not pay for the removal of the drywall and cabinets in those areas.

  1147

- Nowhere in the policy is "physical damage" referenced. "Physical damage" was a made up condition used by Chubb in an attempt to reduce the amount it had to pay.

  2117-2118

- Cliff Zlotnik later conducted a simple test of cutting a small square in the bedroom wall which showed smoke damage inside the walls, which was "physical damage."

- Andrew/Brookstone acknowledged to Elliott that smoke residue was discovered in the master bedroom, kitchen hallway and living room only after Zlotnik found it.

  1023; 1045

## II. CONTENTS

Chubb promised to pay the "Replacement Cost." "Replacement cost means the cost to repair or replace your contents."

### A. Lost Contents Claim

- Chubb promised to pay the replacement costs.

  1038; 5002

- The policy only requires the Goodriches to submit a list of contents with the original invoice cost. There is no requirement that the insured make a claim for a certain amount or submit a replacement cost.

  1037; 5022; (5018 Proof of Loss)

- Chubb's website has a lost contents form which only asks for the original invoice costs.

- The Goodriches provided a detailed spread sheet with the original costs and replacement costs. See attached.

- Chubb stated there was "minimal back-up documentation" for the replacement costs. Even though not required by the policy, the Goodriches submitted an affidavit from Iris Thorpe verifying the replacement costs listed in the spread sheet.

  5003; 5015

- Chubb demanded invoices which showed the wholesale cost to Ms. Thorpe.

- The Goodriches refused to incur the costs of paying Ms. Thorpe to produce her wholesale costs.

- Chubb claimed the Goodriches had not met their obligations under the contract and that their claim was deficient because of the lack of invoices from Iris and Co. Again, the policy does not require the Goodriches to submit any replacement costs.

  5004

- Chubb never contacted Ms. Thorpe to ask her about the costs.

- Chubb paid only the original cost of the lost contents.

**B. Chubb's Shenanigans - Enservio**

- Enservio is an insurance industry dedicated company. https://www.enservio.com/why-enservio/overview

- Chubb paid Enservio to conduct a contents valuation of the Goodriches' contents.

  1015

- Chubb forwarded Enservio's valuation to the Goodriches as an initial evaluation of the Goodriches' contents.

  1015

- Enservio valued the replacement cost of custom made curtains with double lined silk french pleats at $250 based on a "look alike" from Paul's Home Fashions, an on-line only extremely cheap source of "home fashions." A copy of the curtains from Paul's Home Fashions is attached.

- Enservio certified the replacement costs of several items of clothing based upon the costs at Bagsy, a website for <u>used</u> children's clothes! https://shopbagsy.com/

  1015

- The Goodriches asked for the inventory prepared by Enservio with pictures of the damaged items Enservio sought to replace. Chubb claimed that Enservio did not offer its inventory of the Goodrich items in that format.

  1016; 1017; 1018

- Enservio's website says differently. www.enservio.com/products-services/contents-claims-inventory/service-on-site

- Enservio has a service for "high worth" insured, its "*Select* for Specialty Valuation" product. This service includes access to interior decorators for content valuations.

  https://www.enservio.com/products-services/select-for-specialty-valuation

- Chubb <u>did not</u> access Enservio's select service but relied upon prices from JC Penny.

- Chubb intentionally obtained prices of inferior items and presented them to the Goodriches as "replacement" costs in order to establish a floor for negotiating a reduced payment.

## III. Adjusted Living Expenses ("ALE") - $235,761.09

Under the policy, Pacific promised to cover "the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living......we cover these increases to your normal living expenses for a period of time commencing with the date of loss and ending with the earliest of the following: the reasonable amount of time required to restore your house or other permanent structure to a habitable condition."

A spreadsheet showing the exact expenses Chubb owes is attached. The following outlines categories of ALE's Chubb has refused to pay.

## A. Replacement Furniture

- Elliott said to buy the temporary furniture at Restoration Hardware, that Chubb would reimburse the Goodriches for the furniture, and that Chubb would take back the furniture if it was not to be used at Dell Road.

  1132

- Chubb paid for the furniture from Restoration Hardware.

- The Goodriches ordered living room furniture through Iris & Co. The furniture was standard, not custom, quick ship furniture. While the furniture was less than the Goodriches' standard of living, it was readily available during pandemic when so much else wasn't. Chubb refused to pay for the furniture.

## B. Window Treatments and Blinds

- Jeremy said Chubb will pay cost of blinds, but not "curtains," which he attributed to replacement of contents rather than ALE despite Ali clearly explaining the curtains were not "replacement" items.

- Pacific states blinds are not covered as ALE

  5006

- Pacific refused to pay for the window treatments purchased for the rental house. The window treatments cost far less than the window treatments the Goodriches purchased for the Dell Road house. There were no blinds, much less window treatments, for the windows at the first rental, the Fairview address, so something had to be purchased. The fact that window treatments of lesser quality could have been purchased is immaterial. Actually, the Goodriches could have purchased much more expensive window treatments and still been under their usual standard of living. These same window treatments purchased for the Fairview rental, with some modifications, are being used in the Wimbleton rental house.

## C. Painting

- The Goodriches have purchased and lived in five homes and built one home, the Dell Road house. Each home was repainted either before or immediately after they moved in. The fresh painting of the rental houses is no more than that to which the Goodrich's are accustomed.

- The Goodriches did the same with the rental houses they lived in after the fire.

- Chubb refused to pay this additional expense.

**D. Lighting Fixtures**

- The lighting fixtures purchased for the Fairview rental house fall within the same analysis as painting and window treatments. In fact, the lighting fixtures were essential to living in the rental house as there we no lighting fixtures in the home. These were eventually paid for by Chubb as ALE's.

- When the Goodriches moved into the Wimbleton rental, it had only one hanging light in each room. The Goodriches with three daughters needed more light and added recessed lights and hanging fixtures, with which they were accustomed. Chubb refused to pay for the lighting at Wimbleton.

**E. Artificial Cut-Off of ALE's**

- Chubb initially said it would not pay any ALE's into 2021. Chubb later paid ALE's into 2021 but cut off all ALE payments after June 2021 claiming a reasonable time to rebuild or repair the house had passed, i.e., a year and a half after the fire.

- Two years plus to rebuild the house during the current pandemic with its labor and product shortages is very reasonable.

- Chubb caused the delay in having the reconstruction of the house started.

- The Goodriches and their contractor have acted promptly. There have been no unreasonable delays. TCC will so testify.

- The Goodriches interest in getting back into their home is far greater than even Chubb's interest in saving money on the claim by setting an artificial cut-off date.

## IV. Miscellaneous Acts of Bad Faith

**A. Chubb's Shenanigans - False Accusations Made to the Goodriches**

- After the fire, Chubb stated the Goodriches had nothing to worry about because the value of their contents was "well within" the contents limit.

  1038-1039

- Chubb claimed the Goodriches' content's claim was so inflated it bordered on being fraudulent.

- Chubb had a risk analyst tour the Goodriches' home after the policy was issued to make certain that the contents justified a coverage of $1.5 million. The $1.5 million was justified.

- Chubb, not the Goodriches, engaged in fraudulent behavior.

**B. Chubb's Shenanigans - Attributing Dwelling Payments to Contents Coverage**

- The limits of the Dwelling Coverage, $4.5 million, included an increased reconstruction cost which would not be reached on rebuilding this recently build home.

- The Contents Coverage was capped at $1.5 million.

- Chubb repeatedly attributed benefits paid under the Dwelling coverage to the Contents coverage.

- The payment of some ALE's was also attributed to Contents coverage.

  1049; 1053

- Chubb continued this practice even after the Goodriches' objected.

**C. Chubb's Shenanigans - Sending Payment to Dell Road**

- On January 8, 2020, the Goodriches requested that all payments be sent to Charles' office.

  1134

- In December, 2020 Pacific sent a $200,000 plus check by UPS delivery to the Goodriches at their Dell Road address, which of course was dark and under construction. The UPS driver informed a neighbor, who thought the delivery had to have been to her neighbor who lived on the side of her house. It was later determined that the check was delivered to the Dell Road house and a search party went searching for the check at night with flashlights.

  6001

## IV. Interference with Business Relations

- The Goodriches had a business relationship with Brookstone Restoration. Chubb acknowledged this relationship through several emails in which Chubb asked that

the Goodriches be made aware of services to be provided by Brookstone which were not covered by the policy and which were to be paid by the Goodriches. In other emails, Chubb notified Brookstone that Brookstone would be responsible for damages it may have caused.

1027; 1077-1080; 1099; 3038; 4049

- Chubb knew of the Goodrich / Brookstone arrangement and acknowledged that the insured can choose the vendor to perform the clean-up work at Dell Road.

  1001

- Even after this acknowledgment, Elliott had his "preferred vendor" for odor removal, Paul Davis Restoration, perform services of which the Goodrich's were not aware and did not approve. The Goodriches believed Brookstone was doing that task.

  1003

- The Goodriches allowed Brookstone to remain as the restoration company <u>only</u> as long as it followed the fire remediation protocol established by Cliff Zlotnik.

  3038; 3040; 3076; 3103; 4033

- Chubb tortuously interfered with that business relationship when it asked Brookstone to reduce the scope of the glass and soda blast to be performed by Alabama Soda Blasting without informing the Goodriches.

  1151; 2031; 3030

- The emails show that Brookstone forwarded the pressure blasting proposal to Elliott on March 15. On March 17, Elliott sent an email to Andrew Arrant of Brookstone raising questions about the extent of the soda blasting and concluding with "I would request you update the estimate to reflect these items." On the same day Andrew replied to Elliott that he could reduce the SF from 57,110.62 to 45,688.05, and that he would send over the revised estimate. Neither of these emails were sent to the Goodriches.

  The next morning, March 18, knowing that Brookstone had already acquiesced to his demand for a revised estimate, Mr. Elliott sent an email to Andrew and Dauphin in which Elliott again questioned the proposal and stated to let him know if we "anticipated something different."

  5034

- The Goodriches terminated Brookstone. After the Goodriches terminated Brookstone, Chubb requested that the Goodriches again retain Brookstone. The Goodriches refused.

  2044; 3055

- Chubb subsequently paid Brookstone for an invoice Brookstone presented to the Goodriches but which the Goodriches refused to authorize because Brookstone could not back up the charges it was making. The Goodriches specifically directed Chubb not to pay the invoice.

  3095; 3098

- Chubb paid the invoice and then charged it to the Contents coverage of the Goodriches' policy, which was capped.

  2004; 3006

- After Brookstone was terminated, the Goodriches retained Slade Environmental to perform the smoke and water remediation. Slade agreed to follow Zlotnick's protocol. Elliott said he would get a "comparative quote" after Goodriches chose Slade as their vendor. Elliott never followed through.

  1071

Dated: 12/31/2021

Charles Dauphin
Dauphin Paris LLC