FILED
2023 Jul-12 PM 02:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT "F" – Part 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CHARLES GOODRICH and )
ALEXANDRA GOODRICH, )
)
Plaintiffs, )
) Civil Action No.
vs. ) 2:22-cv-21-MHH
)
PACIFIC INDEMNITY )
COMPANY, )
)
Defendant. )

*****************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
WALLY HAESSIG
INDIVIDUALLY AND AS 30(b)(6) REPRESENTATIVE OF
PACIFIC INDEMNITY COMPANY
FEBRUARY 9, 2023

*****************************************************

ORAL AND VIDEOTAPED DEPOSITION OF WALLY HAESSIG, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on February 9, 2023, from 9:10 a.m. to 4:24 p.m., before Julie C. Brandt, RMR, CRR, and Texas CSR, reported by machine shorthand at Cozen O'Connor, 1717 Main Street, Suite 3100, Dallas, Texas, pursuant to the Federal Rules of Civil Procedure.

APPEARANCES

FOR THE PLAINTIFFS:

Charles A. Dauphin
Diane Paris
DAUPHIN PARIS, LLC
408 Discovering Cypress Dr.
San Marcos, Texas 78666
205-516-1058
cdauphin@dauphinparis.com

FOR THE DEFENDANT:

Alycen A. Moss
COZEN O'CONNOR
The Promenade, Suite 400
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309
404-572-2052
amoss@cozen.com

ALSO PRESENT:

Alexandra Goodrich

VIDEOGRAPHER:

John Frank - Veritext

INDEX


| | | PAGE |
|---|---|---|
| Appearances | | 2 |
| Proceedings | | 5 |
| Stipulations | | 215 |
| WALLY HAESSIG | | |
| Examination by Mr. Dauphin | | 5 |
| Signature and Changes | | 216 |
| Reporter's Certificate | | 218 |

| DEPOSITION EXHIBITS | | IDENTIFIED |
|---|---|---|
| Exhibit 4 | May 4, 2020 letter to Chubb Claims from Dauphin Paris | 120 |
| Exhibit 5 | May 15, 2020 letter to Dauphin Paris from Cozen O'Connor | 106 |
| Exhibit 6 | June 1, 2020 letter to Cozen O'Connor from Dauphin Paris | 118 |
| Exhibit 7 | June 26, 2020 letter to Dauphin Paris from Cozen O'Connor | 122 |
| Exhibit 8 | Nov. 6, 2020 letter to Dauphin Paris from Cozen O'Connor | 93 |
| Exhibit 10 | May 19, 2021 letter to Dauphin Paris from Cozen O'Connor | 212 |
| Exhibit 13 | General Adjuster Best Practices Guidelines Aug. 20, 2018 PACIFIC 003568 - 003580 | 64 |
| Exhibit 86 | Jan. 24, 2020 email string | 166 |
| Exhibit 101 | 11/19/2019 email string PACIFIC 01254 - 01256 | 116 |
| Exhibit 106 | Declaration of Jerry Rudoshko | 11 |
| Exhibit 107 | Letter to Mr. Moss Oct. 4th | 214 |
| Exhibit 119 | 1/27/2020 email PACIFIC 00408 | 71 |

| | | |
|---|---|---|
| Exhibit 141 | Brookstone Restoration pricing PACIFIC 01628 - 01633 | 153 |
| Exhibit 144 | March 2020 email string PACIFIC 01661 | 153 |
| Exhibit 145 | March 2020 email string PACIFIC 01662 | 147 |
| Exhibit 149 | Spreadsheet of costs | 34 |
| Exhibit 152 | Invoices from Iris & Company and other decorating companies | 41 |
| Exhibit 153 | Notice of depo of Corp Rep | 5 |
| Exhibit 155 | Sworn Statement in Proof of Loss | 8 |
| Exhibit 157 | March 20, 2020 letter from Mr. Dauphin to Wally Haessig | 142 |

P R O C E E D I N G S

THE VIDEOGRAPHER: And we're going on the record in the videotaped deposition of Mr. Walter Haessig. Today's date is February 9, 2023. The time is 9:10 a.m.

At this time, will counsel please state their appearances for the record, and then the court reporter will swear in the witness.

MR. DAUPHIN: Chuck Dauphin, along with my partner Diane Paris, for the plaintiffs. And Alexander Goodrich, who is one of the plaintiffs, is with us today.

MS. MOSS: My name is Alycen Moss. I'm here for defendant Pacific Indemnity Company.

WALTER HAESSIG,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. DAUPHIN:

Q. Is it okay if I call you Wally?

A. Yes, sir.

Q. Please call me Chuck.

A. All right.

Q. We're going to start with Exhibit 153.

(Exhibit 153 marked.)

A. Sir, are you sliding documents to me or they

in this thing?
Q. (BY MR. DAUPHIN) Yes. They're in these three, unfortunately.
A. Thank you.
Q. And that is a deposition notice of a 30(b)(6) witness.
MS. MOSS: Thank you.
Q. (BY MR. DAUPHIN) And I understand that you are appearing today in your individual capacity because you were involved with a claim, but you are also appearing as a corporate witness. Is that correct?
A. That is correct.
MS. MOSS: And sorry, I don't mean to interrupt you, but I do want to make clear that we have responded to the 30(b)(6) notice and have offered up some objections. So he is here in the capacity set forth in our objections and to speak on those topics that we said he would speak on, but not to the topics that we objected to.
MR. DAUPHIN: So are you going to identify somebody else to address those topics?
MS. MOSS: No. I think those topics are objectionable.
MR. DAUPHIN: Okay. Well, we'll work that out.

Q. (BY MR. DAUPHIN) What is your understanding of a 30(b)(6) witness or a corporate representative witness?
A. So a corporate witness, I'm designated by the company to speak on its behalf to the questions that are outlined.
Q. Okay. And did you do any investigation or research on corporate -- on the issues in which you may not have personally been involved?
A. As it pertains to the questions here?
Q. Yes.
A. Yeah, my general knowledge is in how the company operates, but nothing -- nothing specific was done.
Q. Did you review the claim file?
A. Yes, sir.
Q. Okay. And did you review the correspondence between the parties?
A. Yes, sir.
Q. Any other specific category that you can recall reviewing?
A. So reviewed the claim file, reviewed the production documents. That's -- that's the extent of the said claim file, I suppose.
Q. Let's start with the contents, the contents

claim. In this case Pacific paid, I think, 245,000, approximately, in the contents claim, and then Ms. Goodrich submitted a spreadsheet of content items, and then she submitted a proof of loss.

Now, the -- how should an insured for Ms. Goodrich -- like Ms. Goodrich state in her proof of loss what her claim is? Would it be just the amount that's not been paid or would it include the amount that has been paid?

A. So I've seen partial proof of loss and fool proof of loss.

Q. Okay.

A. At times an insured may submit a partial proof of loss.

Q. And we could look at the proof of loss. Let me see where that is. That might be a little easier to understand. If you would look at 155.

A. There's not a tab 155. Is it in the next book?

MR. DAUPHIN: Is there another?

MS. PARIS: There will not be tabs. There will be yellow pages. I ran out of tabs.

THE WITNESS: I understand.

(Exhibit 155 marked.)

A. There it is.

Q. (BY MR. DAUPHIN) It's the proof of loss.
A. Okay. I see it.
Q. And if you would come down to -- well, at the top this identifies it as proof of loss as contents. Is that right?
You're looking at a letter. Do you have a proof of loss?
A. Yeah, so 156 begins with a letter dated April 6th. I'm sorry, 7th.
Q. 155.
A. 155. Yeah.
Q. There we go.
A. 155.
Q. Okay.
A. Yeah.
Q. And that's a loss of contents form from Chubb?
Or it's a proof of loss form, and underneath it's got loss of contents?
A. You're accurate. It's a proof of loss, and on the document it says loss of contents.
Q. Okay. And if we would come down to paragraph 6, and it says the gross amount claimed of said property at the time of the loss was. And it says currently the gross amount claimed is $1,576,501.91, which includes the amount that has already been paid under the contents

coverage. Is that clear to you?
A. I would agree that it does say currently the gross amount claimed for loss contents is -- and I'm going to round, if that's okay -- 1.5, which includes the amount that's already been paid under the claim under the contents coverage.
Q. Do you consider that claiming making a claim twice for the amount that's already been paid?
A. Without reviewing the supporting documents, I would just have to take the statement for what it says and that it is amounts that -- includes amounts that have already been paid.
Q. I mean --
A. Yeah.
Q. -- that's about as clear as you can get, isn't it?
MS. MOSS: Object to the form.
A. I mean, it says 1.5 and that includes the amounts that have already been paid.
Q. (BY MR. DAUPHIN) Okay.
A. I don't think --
Q. There's nothing -- you know, nothing questionable about that, is there? It's pretty straightforward?
MS. MOSS: Object to the form. I mean,

it says what it says.
A. Yeah, it's --
Q. (BY MR. DAUPHIN) All right.
A. It's clear in what it says.
Q. If you'd look at -- this is Exhibit 106, and that is a declaration from Mr. Rudoshko filed in this case. And if you would come down to -- starting on paragraph 21, page 3, it talks about plaintiffs's contents claim. And do you see that?
A. I'm sorry, Chuck. I'm on page 3. What --
Q. Oh, I'm sorry. It's actually page 5.
A. Okay.
Q. It's paragraph 21.
A. Gotcha. I do see that.
Q. All right. So it's talking about the same thing as a proof of loss. That is their claim for contents. Is that correct?
A. I do see that it's plaintiffs's contents claim is the title of the paragraph.
Q. All right. And then if you would come to paragraph 26, and it says plaintiffs have provided conflicting information on what they believe they're owed under the policy.
A. That is what it says on paragraph 26.
Q. And if you would look at -- then read

paragraphs 27 and 28.
A. On May 4, 2020, plaintiffs's submitted an estimated related --
Q. You can just read it to yourself.
A. Oh.
Q. That's quite all right.
A. I'll do that.
Q. That happens all the time.
And have you done that?
A. Yes, sir.
Q. All right. If you would look at paragraph 28, it says that plaintiff submitted a sworn statement and proof of loss setting forth the net amount of claim as the maximum amount of the policy.
What does the net amount mean to you?
A. I take that to mean that they're claiming $1,507,000 -- I'm sorry, 1,507,000.
Q. That would be the gross amount, wouldn't it?
A. I would agree with that.
Q. Okay. And then they say, the paragraph 29, the estimate included with plaintiffs's contents proof of loss is significantly higher than the prior estimate.
That, of course, is true. The difference between what was submitted as -- or paid as an initial estimate and then what was submitted in the proof of

loss is clearly understandable, isn't it?
MS. MOSS: Object to the form.
A. I'd have to ask for you to refer me back to the original estimate.
Q. (BY MR. DAUPHIN) When it says on paragraph 26 plaintiffs have provided conflicting information, what is conflicting information?
And read those paragraphs again if you need to refresh your recollection.
A. So, I'm sorry, paragraph?
Q. All right. Paragraph 26 says plaintiffs have provided conflicting information. Is that correct?
A. Yes, sir.
Q. Then paragraph 27 says that they submitted an estimate related to the contents which totaled 1.225.
A. All right. Yeah.
Q. All right. Now that estimate did not include what had already been paid, does it?
It doesn't, but that's okay.
A. Yeah, so I don't -- I don't have the benefit of having that estimate in front of me.
Q. All right.
A. But what I will speak to is Pacific -- and at times I might refer to Pacific as Chubb. But at times we had received an estimate, and then at a later date we

received an estimate that was higher.
Q. Sure.
A. I don't know --
Q. And just assume for these questions that the initial estimate of May 4, the 1.225, was just an estimate of what had not been paid. Okay?
MS. MOSS: Object to the form.
Q. (BY MR. DAUPHIN) And then if you look at the next page, this next paragraph 28 --
A. Uh-huh.
Q. -- it says there's a total of 1,507,500 and they call that a net amount. Is that confusing to you in any way, that plaintiff would submit an initial estimate at the request of Chubb which did not include what was already paid and then in her proof of loss she included a total amount which included what had already been paid?
A. I believe that I understand --
MS. MOSS: I'm objecting to the form because I don't understand what you're -- I don't understand what you're asking.
MR. DAUPHIN: Well, it's your document and you probably drafted it, so I don't see how you could not understand it.
MS. MOSS: I don't understand the

question. It's not the matter of the document.
Q. (BY MR. DAUPHIN) Here is the question. There's no conflicting information on those two, on the estimate that did not include what had already been paid and the proof of loss that did include what had already been paid. Do you see anything conflicting about that?
A. I believe I understand the question and what. Is there confusion --
Q. Go ahead, and then I'll ask it again.
A. -- or conflicting information --
MS. MOSS: Same objection.
A. -- between 1.2 and 1.5.
Q. (BY MR. DAUPHIN) With the explanation of 1.5, that this includes what has been paid?
A. What I understand is an initial estimate was provided of 1.2.
Q. Correct.
A. Another point in time, later in time, if you will, an estimate of rounding 1.5 was provided, and it wouldn't be the sum of 1.2 and 1.5. It clearly says that the net claim is 1.5.
Q. I know, but it says net is 1.5; and 1.5 is the gross, isn't it?
A. The -- as I understand it, the totality of the contents that is claimed is 1.5.

Q. I know.
A. Okay.
Q. I agree.
And the 1.2 that was submitted was submitted without the amount that had already been paid. If that is true, then it makes sense that the first estimate of 1.2 is not going to be as great as the proof of loss which includes the amount that had already been paid?
MS. MOSS: Object to the form.
A. One more time. Can you repeat the question, please?
Q. (BY MR. DAUPHIN) Yeah.
A. I mean, I feel like we agree, but I'm having a hard time --
Q. I've got a sworn statement from Mr. Rudoshko that says this is conflicting information. It's not. But if it is, I want you to explain to me the conflict.
Let's try again. We submit an estimate contents loss of 1.2 which does not include what has already been paid?
A. Okay.
Q. All right.
MS. MOSS: So --
Q. (BY MR. DAUPHIN) We then --
MR. DAUPHIN: Let me finish, please.

Q. (BY MR. DAUPHIN) We then submit a subsequent proof of loss which includes what has not been paid and includes the amount that has been paid; therefore, the proof of loss is greater than what was initially submitted. Do you see any conflict whatsoever in that?

MS. MOSS: Can I look at what he's -- what I'm looking at says something different than what you're saying.

MR. DAUPHIN: I'm looking at the affidavit, 106.

MS. MOSS: I know, but the proof of loss says something --

MR. DAUPHIN: Well, I've got my questions. If you want to object to the form, you may.

MS. MOSS: Well, I just want to make sure that he's looking at the same exhibit that I have been handed. I think I'm entitled to make sure he's looking at the same thing.

MR. DAUPHIN: If you want the exhibit, it's 106.

MS. MOSS: Well, I don't know what 106 is.

MR. DAUPHIN: Okay. It's the affidavit.

MS. PARIS: And we do not have --

MR. DAUPHIN: Just give 106. It's in

there.

MS. MOSS: Let me see the proof of loss he showed you.

THE WITNESS: I think I understand. There's --

MS. PARIS: We've given 106 previously.

MS. MOSS: So the previous amount -- okay. Okay. It's the same thing. I just wanted to make sure I was looking at the same thing. It sounded like your questions were saying something different.

A. And there is -- there's a slight difference in the number between what's listed on the proof of loss, which is -- we talked about 1.576 and 1.507.

Q. (BY MR. DAUPHIN) That's not the point of the affidavit, is it? Isn't the point of the affidavit that it accuses the plaintiffs of having provided conflicting information?

MS. MOSS: Object to the form.

A. Mr. Dauphin, if I can, as I understand it, 1.2 -- right?

Q. (BY MR. DAUPHIN) Correct, yeah.

A. Was submitted.

Q. Right.

A. Later, 1.5 was submitted.

Q. Right.

A. There was some questions around as to if 1.5 -- and like the number in and of itself is not confusing. I understand the numbers from 1.2 to 1.5. And there's not an accusation that -- that it's the sum of 1.2 and 1.5. I think we all agree it's 1.5.
There's confusion around the spreadsheet that was submitted as to if --
Q. We're going to get to the spreadsheet.
A. Okay.
Q. But I'm just talking about the affidavit and the allegation that plaintiffs have provided conflicting information.
A. Okay.
MS. MOSS: Okay. Well, don't interrupt him. You didn't let him finish what he was saying. And now he probably doesn't remember, but --
THE WITNESS: That's all right.
Q. (BY MR. DAUPHIN) I will give you the opportunity to say if I interrupt you. Please say let me finish, and I'll let you finish, and then we'll go to it.
A. Fair enough.
Q. And we're going to get to the spreadsheets.
A. Okay.
Q. If you would look back at the proof of loss,

which is 155, and paragraph 6 says which includes the amount that has already been paid under the contents coverage. That's clear, isn't it?
A. I find the statement clear.
Q. Okay. And looking at paragraph 28 on Exhibit 106, it says that the approximate maximum amount of the policy is believed to be 105 -- I'm sorry, hang on just a second. What I was making reference to was just the net amount being a gross amount.
And then paragraph 30 on Exhibit 106, the proof of -- I mean, the affidavit or declaration states neither of the estimates from Iris & Co. include supporting documentation regarding the replacement values of the items listed.
Well, the estimates were from the plaintiffs, weren't they?
A. Okay. I apologize, I need to take a minute to read paragraph 31. What was the question?
Q. Paragraph 30. It says neither of the estimates from Iris & Co. The estimates were from the plaintiffs, weren't they?
A. I would agree that the plaintiffs submitted the proof of loss. Within the proof of loss is information that seemingly would have been provided to plaintiffs from Iris.

Q. No doubt Iris helped with it, but it's not her estimate, is it?
A. Iris's estimate or plaintiffs's estimate?
Q. It's not Iris's estimate, is it?
A. As I understand it, it is Iris's estimate that the plaintiffs produced in the documents.
Q. Well, the proof of loss is sworn to by the plaintiffs. Right?
A. I agree.
Q. Okay. And that's their estimate that was submitted along with a proof of loss, wasn't it?
A. An estimate that we believe was from Iris as part of the supporting documents that the plaintiffs submitted with the proof of loss.
Q. So you think Iris just prepared the entire estimate?
MS. MOSS: Object to the form. I don't really know what it matters, to be quite honest, but he can answer.
A. And I apologize, could you repeat the question? Same objection, I understand. Sorry.
Q. (BY MR. DAUPHIN) You know -- what's your understanding of who prepared the estimates? And we're talking about contents.
A. Yeah, so for the Iris portion, I would imagine

that Iris created estimates for replacement values of the contents that are outlined in that spreadsheet.

Q. Okay. But Ali prepared the spreadsheets, didn't she?

A. I don't know.

Q. You don't know.

You don't know that Iris did either?

A. If you provide the document to me for reference, I --

Q. Okay.

A. -- would like the opportunity to look at it.

Q. Have you reviewed the spreadsheet of lost contents prior to today?

A. I did.

Q. Okay. That's the one I'm talking about.

Do you know who prepared that spreadsheet?

A. Mr. Dauphin, I've reviewed a lot of documents. As you're aware, the production documents are quite lengthy. I can -- I can testify that I reviewed the document.

Q. Okay.

A. If I was given a reference, it would help. It would assist.

Q. All right. And we'll get to the --

A. Okay.

Q. -- proof of loss on that.
Plaintiff submitted lots of receipts, didn't she?
MS. MOSS: Object to form.
Q. (BY MR. DAUPHIN) In support of her contents?
A. There were receipts that were produced, yes.
Q. Okay. And if you would look at paragraph 24 of the affidavit.
A. Still 106?
Q. 106, correct.
A. Paragraph 24.
Q. And does that state that, according to Mr. Rudoshko, plaintiffs's self-prepared inventory. Does that indicate to you that it was one prepared by Ms. Goodrich?
A. It does.
Q. Okay. And then on 25, it says the replacement cost for many of the items was oftentimes triple or even quadruple the original cost, with no backup documentation for the replacement cost and no explanation for the discrepancy.
Do you know if Pacific ever asked for an explanation of the discrepancy?
A. We did.
Q. Okay. How?

A. You mean by what form?
Q. Yes.
A. Like by email?
Q. Yeah.
A. Oh --
Q. I mean, I know Pacific asked for backup.
A. I would say, to answer the question directly, written documentation, if that's a letter or email or a combination of both.
Q. Are you aware of it, whether you can point me to an email or a letter which says please explain the discrepancy between this original cost and the replacement cost?
A. There's --
MS. MOSS: Object to the form.
A. As I sit here right now, can I show you a letter with a date and an email with a date? In the six volumes of production, I would not be able to identify that in a timely manner.
Q. (BY MR. DAUPHIN) All right.
A. But in review of the production documents and the claim file, Pacific did request additional information.
Q. All right. I want to make sure. I know they requested additional information.

A. Uh-huh.
Q. They never requested that the Goodrichs explain the difference in the original cost and the replacement cost, did they?
A. What I can testify to is we asked for clarification as to the original -- the original cost and the replacement values that were presented.
Q. That would certainly be a reasonable thing to do, is to ask for an explanation between the two if you had questions about it, wouldn't it?
MS. MOSS: Object to the form. I think you're mischaracterizing the facts of the claim and trying to lead him improperly.
MR. DAUPHIN: You can lead a hostile witness of the other party improperly, but we'll move on.
Q. (BY MR. DAUPHIN) Let me ask you this.
A. Okay.
Q. It would have been a reasonable thing for Pacific to do to say here is the original cost you've given us, here is the replacement cost, can you explain the increase?
A. Federal requested additional information as to the replacement cost of the items.
Q. Did you understand my question?

A. I believe I did. Feel free to repeat it.
Q. I asked would it be reasonable for Pacific to have asked to explain the difference between the original cost and the replacement cost if Pacific had a question about it?
A. So I believe it to be reasonable --
Q. Yes.
A. -- to ask questions, which Pacific did, as to the difference between the original cost and the replacement cost.
Q. Okay. And you think Pacific did that?
A. Pacific did do that.
Q. Okay. But you can't show me the document right now?
A. Again --
Q. I understand.
A. -- there's a volume of information. I reviewed the documents. We requested information. As I sit here right now, can I find if it's on, you know, 150 or 600? No, I wouldn't be able to point to it in a timely manner.
Q. Would it be in the claim file?
A. Yes, sir.
Q. Okay. The items on the spreadsheet which are in dispute, there's no doubt that there was coverage for

those items, is there?
A. What I can -- what I will speak to as it relates to coverage is that the property that is presented for replacement or repair or damage is covered under the insurance policy.
Q. Okay. So these items on the spreadsheet are covered, and Pacific paid the original cost of the invoice on several of those items, didn't it?
MS. MOSS: Object to the form.
A. We did.
Q. (BY MR. DAUPHIN) Okay. They did not pay the replacement cost on those items, did they?
MS. MOSS: Object to the form.
A. So Pacific has requested additional information. We haven't received that information. Because we haven't received the information to support the additional claim between the original purchase price and the, as it has been stated, the replacement values, we haven't paid that delta.
Q. (BY MR. DAUPHIN) What do you mean by that delta?
A. The amount of money that is between what has been claimed as the original price and the amount of money that has been claimed as the replacement cost, the difference between those numbers.

Q. So there's no doubt that Pacific has not paid the replacement cost. Is that correct?
A. I think there is doubt, and that's why we requested additional information.
Q. All right. There's no question but that Pacific did not pay the replacement cost.
MS. MOSS: Object to the form.
Q. (BY MR. DAUPHIN) Correct?
A. The doubts that Pacific has had as to what the replacement values are is the reason why we asked for the additional questions.
Q. Do you understand my -- all right. Let me ask you this. Did Pacific pay the replacement cost on those items?
A. The Goodrichs have presented a claim for replacement cost, which I'm going to identify in this statement as the number that is column 3 maybe on the spreadsheet. Those values we've not paid while we have asked for supporting documentation as to how those documents -- how those values were arrived at.
Q. Okay. So Pacific has not paid the replacement cost as claimed by the Goodrichs?
A. That is not my testimony.
MS. MOSS: Object to the form, asked and answered, mischaracterizes testimony.

Q. (BY MR. DAUPHIN) I thought you said that Pacific had not -- all right. Clarify why that's -- so what has -- well, tell me this. What has Pacific paid? We'll get to it that way.

A. Uh-huh. So in part, the Goodrichs, in part, as it relates to contents and specifically the spreadsheet.

Q. And that's what we're talking about. You know, there -- some were paid and that aren't in dispute, but we're talking right now about the spreadsheet.

A. Yes. So what Chubb has paid is the question?

Q. Correct.

A. We have paid, based on the spreadsheet, the original purchase price.

Q. Okay. You did not pay the replacement price reflected in the spreadsheet?

A. We didn't pay the replacement price that is reflected in the spreadsheet because we have questions that have been asked as to how those values were arrived at that haven't been answered.

Q. Okay. And did Pacific do -- make any attempt to determine the replacement cost on their own?

A. It's not Pacific's duty to present the plaintiffs's claim or the insured's claim. We are

relying on the information that has been presented, waiting for additional documents to support the replacement values. We so much relied on the original purchase price as it's outlined in the spreadsheet that with very little, if any, documentation to the values of the original cost, we issued payment on the original cost.

MR. DAUPHIN: Can you read back my question, please?

(Requested testimony read.)

A. We did not. It's not -- it is not Chubb's duty to find those values.

Q. (BY MR. DAUPHIN) And plaintiff submitted values for the replacement cost. Correct?

MS. MOSS: Object to the form.

A. Yes.

Q. (BY MR. DAUPHIN) And Chubb just said that's not enough so we want more information?

MS. MOSS: Object to the form.

Q. (BY MR. DAUPHIN) Is that correct?

A. Chubb requested for additional information to support those values.

Q. And Chubb said we're not going to pay you that information until you submit this additional information?

A. Payment hasn't been based on those values while we wait for additional information.
Q. Okay.
A. And we've asked the question and haven't gotten answers.
Q. And why did you want additional information? And I say you. Why did Pacific want additional information?
A. To support the values that have been outlined in the spreadsheet.
Q. What were wrong -- what about the values caused you any concern?
A. So the original purchase prices in comparison to the replacement prices over a short period of time appear to be much higher than what would be anticipated over that short period of time, leading to asking for additional questions as to how the increase was arrived at.
Q. When you say short period of time, what are you referencing?
A. The period between when the items were purchased and the period of time of the fire or shortly thereafter.
Q. And what makes you think that was a short period of time?

A. As we understand it, the house was new and that the purchase of the contents within the home were made sometime before the -- shortly before the home was -- was moved into.

Q. And where do you get that understanding or belief that the items were purchased a short time prior to the fire?

A. That's -- that's how I understand the claim, and if there's information that's presented that conflicts with that, it's something that Pacific would be happy to review. But I don't know that that answers the line of questioning that you're really at. The line of questioning really has to do with there's not supporting documentations between the original price and the replacement cost. On very little information, Chubb issued a payment of -- I'm going to round -- $700,000 based on the Iris number. We did that based on a spreadsheet. We've asked additional questions. Again, we've asked additional questions to support that --

Q. And --

A. Let me finish.

Q. Hang on just a second.

A. No, let me finish.

Q. I'm going to let you finish, but also --

MS. MOSS: Let him finish what he's

saying. You're interrupting him.
Q. (BY MR. DAUPHIN) I am going to ask you to also limit your responses to my questions, but go ahead.
MS. MOSS: He is doing that, and you're interrupting him.
THE WITNESS: Can I ask the court reporter to speak to where I was at, or is that unallowed?
MR. DAUPHIN: Yeah, read back the question and then speak to where he was at, please.
(Requested portion was read.)
A. Yeah, to support the increase between the original purchase price and the replacement prices. If we were provided information that's been requested, it's certainly something that would be considered.
Q. (BY MR. DAUPHIN) Okay. And when you say -- let's talk about the information that was provided. That was a series of invoices for the original -- showed the original prices. Is that correct?
I tell you what. We'll just get to it this way.
A. Okay. Thanks for making it large.
MS. MOSS: I forgot my reading glasses, so I'm very glad.
Q. (BY MR. DAUPHIN) One second. What I have

handed you is a copy of Exhibit 149, which is a spreadsheet that was submitted, which the color coding was not in the original one, nor was the explanation we'll get to in the legend at the very bottom. But otherwise the language and the numbers, I think other than the totals, are in the original one submitted.

Are you looking for Exhibit 149?

A. Yeah. It's not in the binder, and there's not a Bates number on the bottom. I just want to make sure we're on the same page.

Q. Well, that's what this is. We can mark it as 149.

A. Okay. So the Iris spreadsheet?

Q. No.

A. Okay.

Q. Why do you call it the Iris spreadsheet?

A. From what I understand, the costs that are presented on here originated with Iris & Co.

Q. Okay. Not all of them, did they?

A. Well, let's talk about it.

Q. You tell me. You're the one that reviewed it, so I'm trying to figure out.

A. Yeah, so.

Q. There's no doubt Iris worked on it, but she didn't do all of these costs, did she?

A. Mr. Dauphin, I'm not -- I'm not sure.
Q. Okay. Well, you called it the Iris spreadsheet. This is the spreadsheet Ali Goodrich submitted, isn't it?
A. Okay.
Q. Did she?
A. I'm -- Mr. Dauphin, I'm trying to make sure that we're referencing the right document for the record. It doesn't have a Bates number on it. We're arguing over what we want to entitle the document. I'm just trying to make sure we're talking about this --
Q. No, we're not arguing. We're talking about this 149.
A. 149, all right.
Q. Yeah.
A. Okay.
Q. Do you have any spreadsheet that Iris ever submitted?
MS. MOSS: Asked and answered.
A. If Ali presented this document --
Q. (BY MR. DAUPHIN) My question is do you have --
A. Let me finish.
Q. No. If you don't answer my question --
A. You're not going to let me finish?

Q. No. I was going to finish my question. My question is do you have any spreadsheet that Iris ever submitted?

MS. MOSS: It's asked and answered, number one.

Number two, I don't even know --

MR. DAUPHIN: You get objection to form, Alycen, and so let's object to form.

Are we doing this under usual stipulations?

MS. MOSS: That's fine with me.

MR. DAUPHIN: Okay. Then you have an objection to form.

Q. (BY MR. DAUPHIN) Do you have any spreadsheet submitted by Iris?

MS. MOSS: Asked and answered.

A. I referred to this as the Iris spreadsheet.

Q. (BY MR. DAUPHIN) And why?

A. If this -- if this was produced by Ali, I stand corrected.

Q. Okay.

A. Okay.

Q. Other than the totals and the colors, it was produced by Ali.

MS. MOSS: Object to the form. I don't know if that's a question or not, but it's a statement.

Q. (BY MR. DAUPHIN) Let's look then at the spreadsheet.

MR. DAUPHIN: May I borrow your glasses? Did you bring another pair? Or I could do it this way.

Q. (BY MR. DAUPHIN) All right. We start out with the first one is a sofa. And the cost -- original cost was 9,200, and replacement cost was 12,000, approximately a $3,000 increase. Is that correct?

A. The schedule says 9,290 for the original. The replacement cost is 12,450.

Q. Approximately $3,000. Is that correct?

A. Sure.

Q. All right. And what is objectionable or causes questions about that?

A. There's not supporting documentation about how the price was arrived at.

Q. You have an affidavit, don't you, from Iris that says that this -- I'm sorry.

You have an affidavit from Iris that says she determined these to be the cost of replacement, don't you?

A. Iris has presented an affidavit. This is correct. There's still questions as to how the costs were arrived at.

Q. When you say -- you mean questions as to how

Iris arrived at them?

A. Yes, sir.

Q. Well, Ali doesn't know that, does she?

A. We asked the question. It hasn't -- it hasn't been answered. We have not been provided any supporting documentation other than an affidavit that says --

Q. Who is Iris Thorpe, do you know?

A. I'm going to call her a designer. She may be more than a designer, but, yeah.

Q. Okay. And so you're asking for her information, not for Ali's information that Ali knows. Is that correct?

A. We're simply asking for documentation as to how there was an increase in, not only the couch, but the values from the original price to the replacement cost.

Q. Well, what's the difference in asking Iris for it and if Walmart sold it looking at the internet on Walmart?

A. I'm sorry, we're not -- we're not talking about Walmart items.

Can you rephrase the question, please?

Q. Sure.

Ali is looking at a replacement cost, what it would cost for her to replace this sofa. Is that

correct?
A. That is correct.
Q. All right. And if they had it at Restoration Hardware, you could go to Restoration Hardware and get the replacement cost, couldn't you?
A. You could.
Q. All right. And you could not get the backup information at Restoration Hardware as to what it cost them, could you?
A. The Restoration Hardware advertises a cost. You could find that information. Most of their items, I'm sure.
Q. But you would not be entitled to their backup information as to what it cost them to acquire the sofa, would you?
A. I can't speak to, you know, entitlement.
Q. You can't -- if you requested it, you wouldn't get it, would you?
A. I have never requested anything at Restoration Hardware.
Q. Okay. You don't expect that you could get that information, do you?
A. Outside of an affidavit from Iris that simply says this is what I would charge, there's not supporting documentation. In your example of Restoration Hardware,

one would be able to go to Restoration Hardware's website and see that they would charge this amount of money. I believe there's a difference between being able to document that price and document a single page affidavit from -- from Iris.
Q. Do you recall my question?
A. Feel free to ask the question again, please.
Q. Well, do you recall what it was?
A. If you don't want to repeat it, I'll ask the court reporter if she would.
Q. I'm just asking if even you recall what I asked you?
A. Will you rephrase the question?
Q. Sure.
MR. DAUPHIN: Read it back, please, ma'am.
THE WITNESS: Thank you.
(Requested testimony read.)
Q. (BY MR. DAUPHIN) We're talking about the information which is the backup for Restoration Hardware.
A. Yeah. To support a claim, we would be able to validate a cost if we went and saw that it was this purchase price or this sales price from Restoration Hardware. To answer your question, yes, I do. Thank

you for asking again. Yeah.
Q. You think Restoration Hardware is going to give you their backup information as to what they paid to acquire the furniture? Is that what your testimony is?
A. I've never asked Restoration Hardware to support document -- or document what -- what their costs are.
Q. Okay. Just a second.
THE WITNESS: Chuck, probably in about 15 minutes I need to use the restroom.
MR. DAUPHIN: We're going to be here a while. Whenever you want to take a break, that's fine.
Q. (BY MR. DAUPHIN) If you would look at 152, please. And those are a list of invoices which were submitted, along with the spreadsheet that we're looking at. And they have invoice numbers. The first one is sort of covered up, but if you come down to the second page, do you see invoice number 39?
A. I do.
Q. Okay. And if you would come down to -- let's see. We're looking -- according to the spreadsheet, Iris & Co. invoice 421 is referenced. Is that correct? Do you see under the column reference?
A. The first line? I'm sorry, what line are we?

Q. We're on the very first invoice, still talking about the Knole sofa, invoice 421. Do you see that reference to 421? Do you see the column that says reference?
A. Oh, my apologies. Yes, I do.
Q. Okay. And underneath that, 421? Do you see the 421?
A. Yes.
Q. Okay. And then if you would go to -- it's by date, but it's about halfway down on the invoices until you see 421. Have you found it?
A. Yes.
Q. Okay. I think there may be several pages of invoice 421, three pages.
A. Okay.
Q. And what is the date of invoice 421?
A. 12/08/15.
Q. All right. And that was four years prior to the fire, wasn't it?
A. Approximately.
Q. Does an increase of $3,000 over four years bother you?
A. This one item?
Q. Yeah.
A. In and of itself?

Q. Right.
A. Does it bother me? I don't know that I'm bothered by -- I mean, I'm indifferent to that.
Q. Okay.
A. What I would say is what I'm more interested in is the 14,410 number and any supporting documentation that might help Chubb or Pacific understand that value.
Q. Well, that 14,410 is explained on the spreadsheet. It's got a sales tax and a shipping amount on to the replacement cost, isn't it?
A. The 14,410 includes sales and --
Q. Sales tax?
A. Sales tax, yes, and freight.
Q. All right. So it wouldn't -- so the original cost and the replacement cost, you agree they always had to pay sales tax and always had to have a freight shipping charge, is that correct, on these type of items?
A. Mr. Dauphin, we work with nonprofits that come to mind. I mean, I can't say that tax is always applicable. Where tax is supposed to be applied, yes, we would pay for tax, of course.
Q. Okay. Now the -- hang on one second.
And if you would look on invoice number 421 that starts out living room, description under living

room, and you come down to Knole sofa. Do you see that?
A. I do.
Q. And what is the net due on that invoice?
A. 9,290.
Q. And that's what she's got listed on the original cost, doesn't she?
A. That is correct.
Q. Now that amount does not include any tax or anything, does it? Any tax or shipping freight, does it?
A. The invoice --
Q. The number 9,200 does not?
A. No, tax is not included in that --
Q. Okay.
A. -- number. There is a line item for tax later at the bottom.
Q. But as far as what the cost was, that does not include sales tax or shipping. Right?
A. Correct.
Q. So if you're going to compare the original cost to the replacement cost, you wouldn't include sales tax or shipping in the replacement cost, would you?
MS. MOSS: Object to the form.
A. Repeat the question, please.
Q. (BY MR. DAUPHIN) All right. If you're going

to make an apples to apples comparison, you -- and the original cost is 9,290 without sales tax and freight shipping, the apple -- the replacement cost would also be without sales tax and shipping, wouldn't it?

A. Yes.

Q. Okay. So the correct comparison would be between the original cost and the replacement cost, wouldn't it?

A. I don't know that I'm following you, but what I do understand is that the invoice has 9,290. The spreadsheet has 9,290. The 9,290 in what I would call A3 on a spreadsheet, if this was a spreadsheet, you know, the unit costs 9,290, and the 9,290 in invoice 421, neither of those include sales tax.

Q. Okay. And comparising the original -- "comparasing," I'm sorry.

Comparing the original cost to the replacement cost, you look at the replacement cost without sales tax and shipping freight, wouldn't you?

A. The 9,290 in the invoice doesn't include sales tax or freight. We've established that. The replacement cost of 14,410 on the spreadsheet includes sales tax and freight.

Q. Well, you keep saying the replacement cost of $14,410. That's not under the column replacement cost,

is it?
A. I stand corrected. It is not. It's under the totals --
Q. Right.
A. -- cost.
Q. So if you look at the replacement cost of 12,450, that does not include the sales tax or shipping freight, does it?
A. That is correct.
Q. So if you were going -- if an increase in price would shock you, you would look at the original cost and replacement cost without consideration of the sales tax or shipping freight, would you not?
MS. MOSS: Object to the form.
A. So we've established that sales tax would be paid. Appropriate freight if it's incurred, sure, would be paid. I mean, if you're looking for, in your term apples to apples, let's look at the replacement cost that would be before shipping and before taxes.
Q. (BY MR. DAUPHIN) Okay. And that's what these first two columns -- I mean, that's what this spreadsheet does. It gives you the original cost and replacement cost to look at to compare, doesn't it?
A. I do understand that, yes.
Q. All right. Well, why were you concerned with

the total number of $14,410?
MS. MOSS: Object to the form.
A. The 14,410, which we've established is inclusive of freight and tax, in part is based on the 12,450. We're simply seeking additional information as to the replacement value and total cost that have been claimed. I don't know if that answers your question, but --
Q. (BY MR. DAUPHIN) You stated earlier that what concerns you was the 14,410 in relation by comparison to the original cost.
A. Uh-huh.
Q. And my question is why is that a concern if you're looking at an increase in cost and not freight and taxes?
A. I mean, the 14,410 is, in part, anyway -- I can't speak to freight, but assuming tax is a percentage is based on the 1,240. The concern would be -- would be both.
Q. So you're saying that -- I'm sorry. Are you saying that Pacific is concerned over the price as reflected on the spreadsheet because you look at the total of 14,410 and compare that to the original cost of 9,200?
A. In part, yes.

Q. And do you think that's fair to the Goodrichs?
MS. MOSS: Object to the form.
A. There's -- there's a contract in place, the insurance policy. It outlines duties after the loss and supporting documentation and proof of loss which, in part, was submitted, as you know. Chubb is simply asking to help us understand, not only the replacement values, but the total costs that have been claimed.
I would add it's -- at least in our view, is not an unreasonable request. It's something that would be requested often to help us understand how the replacement costs were derived.
Q. (BY MR. DAUPHIN) So my question is do you believe it's fair to the Goodrichs to look at the total amount under this column of 14,4 and compare that to the original cost 9,290?
MS. MOSS: Object to form, asked and answered.
A. I can't speak to fairness. What I can -- what I can say is we've asked for additional information to help us understand the claimed amount.
MS. MOSS: Do you want to take a break?
MR. DAUPHIN: Oh, I'm sorry.
MS. MOSS: Are we at a good time for a break?

MR. DAUPHIN: If you're good.
THE WITNESS: Okay.
THE VIDEOGRAPHER: We're going off the record at 10:15.
(Break from 10:15 a.m. to 10:26 a.m.)
THE VIDEOGRAPHER: And we are back on the record. The time is 10:26.
Q. (BY MR. DAUPHIN) If you would look under references, come down about halfway the page to invoice 421 with the sun room, pair of sconces.
Do you see that?
A. I do.
Q. And so we know 421 was in the year 2015. We've established that. And so the price for the pair of sconces went up from 3,400 to $3,580. Is that correct?
A. That is what is reflected on the spreadsheet.
Q. It went up $358. I'm sorry, went up $180. Is that reflected on the spreadsheet?
A. Yeah, from $3,400 to 3,580, yes.
Q. Okay. $180 over four years, that doesn't appear to be unreasonable, does it?
A. What I can say is it's $180. We can agree to that.
Q. Does that strike you as unreasonable?

A. $180 over -- and I was noticing that the paid amount happens to be 2016, although the invoice is dated 2015, but $180 over that period of time I'm not concerned with.

Q. Then why didn't Chubb pay that?

A. So we asked for documentation as to how the increases were arrived to for the entire document, not just one item --

Q. Did y'all look at --

A. -- and we haven't -- and we haven't received that information.

Q. Did Chubb --

A. Let me finish.

If we have had received -- if we had received that information --

Q. No, I didn't ask that question.

A. And even if we would -- even if we would receive the information --

MR. DAUPHIN: Alycen, if he keeps this up, we're going to ask for an extension of time because we're not going to get through. So I'm just letting you know that.

MS. MOSS: Well, you're interrupting his question --

MR. DAUPHIN: No.

MS. MOSS: -- his answer, so he's not able to answer.

MR. DAUPHIN: He's obviously been coached to answer a certain way and go on and on about the length and not be responsive to the questions, and I'm just letting you know now if he keeps it up, we're going to ask for more time on the depositions.

MS. MOSS: I think he is responding to the questions. You have seven hours today. The fact that you're wasting your time going through all of this is fine --

MR. DAUPHIN: I'm letting you know -- I'm letting you know what's going to happen.

MS. MOSS: -- but it's seven hours.

Q. (BY MR. DAUPHIN) So did Pacific look at each individual item on the spreadsheet?

A. Pacific would have looked at every item on the spreadsheet.

Q. Who did that?

A. At the time we received this, I can't remember if it was Jeremy or Jerry, but the claims adjuster at the time.

Q. Okay. So you're saying Jeremy, if he was the claims adjuster, looked at each item on this spreadsheet?

A. He would have, yes.
Q. You don't know whether he did or didn't, do you?
A. I would not have been in the room when he looked at the spreadsheet, but he reviewed the spreadsheet, yes.
Q. Who made the determination that additional documentation would be needed?
A. Pacific.
Q. Which person?
A. So, ultimately, it would -- it would be my determination to ask for the additional information. Jeremy may, or Jerry, may or may not -- may or may not have originated with him. I don't remember.
Q. So --
A. But ultimately --
Q. -- how did it come to your attention that in somebody's opinion these invoices were too high? Or I'm sorry, the replacement costs were too high?
MS. MOSS: Object to the form.
A. We've never --
Q. (BY MR. DAUPHIN) Let me ask you --
A. No, let me answer the question.
Q. I'm withdrawing the question. I'm going to rephrase it.

A. Fair enough.
Q. Thank you.
How did it come to your attention that the discrepancy in the costs were so great that led you -- led Pacific to request additional information?
A. The -- the questioning implies that Chubb is not paying because it's too high, which is not my testimony. Who brought it to my attention would have been the claim handler at the time, and in response to the replacement value cost, we asked for additional that hasn't been received.
Q. How would that person have brought it to your attention?
A. I don't -- I don't recall how he would have brought it to my attention. It could have been by correspondence in a file note. It could have been a phone call. The details of how we discussed it, I don't know.
Q. Is there any note anywhere that says we need to ask for additional information?
A. If there is a claim file note that specifically says that, as I sit here today, I don't know.
Q. Is --
A. What I would tell you, it's very clear that we

requested additional information.

MS. MOSS: Just answer the question.

THE WITNESS: Okay.

Q. (BY MR. DAUPHIN) Did the increase in price, was that a factor in leading Pacific to request additional information?

A. The increase in price?

Q. Well, I mean -- I'll withdraw the question.

Was the increase between the original cost and the replacement cost, as reflected on the spreadsheet, was that a factor in Chubb asking for additional information?

A. Chubb asked for additional information to help us understand the increase between the cost as it was originally purchased and the replacement cost.

Q. Okay. And you agree that on this one example for the pair of sconces in the sun room, that cost alone on that item would not cause Chubb to ask for more information. Do you agree with that?

A. If this was a silo and we were talking about one item, as your question indicates, we would not be alarmed.

Q. Okay. And Ms. Goodrich in her claim made her claim item by item, didn't she?

A. That is correct.

Q. Why didn't Chubb address it item by item?
A. We -- I don't know how to answer your question, quite honestly. We addressed the replacement cost of the totality of the items.
Q. What steps did Ms. Thorpe take to determine the replacement cost?
MS. MOSS: Object to the form. Did you mean Iris Thorpe?
MR. DAUPHIN: Yeah.
MS. MOSS: Oh, okay.
A. You'd have to ask Ms. Thorpe. I don't know.
Q. (BY MR. DAUPHIN) If you would look at Exhibit 152. This is the invoices.
A. Okay.
Q. Coming up from the back, about 12 pages from the back, 15 pages from the back. Do you see that? It's a statement from Iris & Co. Do you see the yellow sales slip? It is toward the back by -- it's right in front of that, excuse me.
A. So just for clarification, this?
Q. No, go right behind that. It's real close to that. Go the other -- yeah, we'll get there. Go toward -- I'm sorry, one second.
A. No worries.
Q. Go toward the back.

May I see the book just a second? Ah, there were two yellow receipts in there.
See a statement in there from Iris & Co., which is a letter to Ali from Iris Thorpe?
A. I do.
Q. Okay. And in that letter does she state in the second paragraph: To determine the cost to replace damaged items, I contacted the vendors to get current pricing and shipping. For the items that are discontinued, I determined replacement cost based on the most similar item. Antiques are much more difficult to replace. For those, I refer to 1stDibs and Chairish, both considered by designers to be industry standards. Many items were crafted by local artisans with whom I consulted to determine replacement cost.
Does she not say that?
A. That is what the document reads.
Q. All right. And isn't she telling Chubb this is how I did it, or she's telling Ali and Ali submitted it to Pacific?
A. The document states as you read it, at least in part. I'm unclear on the question. The document is clear in how it reads.
Q. And how it reads is it tells you this is what I did to determine the replacement cost, doesn't it?

A. She starts out saying to determine replacement cost of damaged items.
Q. And that was given to Pacific. Did Pacific even read it?
A. Of course we read it.
Q. Well, why didn't you know how she got to her replacement cost then if you read it?
A. So, for example, 1stDibs --
Q. Sure.
A. -- using your Restoration Hardware --
Q. Well --
A. Restoration Hardware --
MR. DAUPHIN: Read back my question, please.
Q. (BY MR. DAUPHIN) And you may be answering it. Let's see.
MS. MOSS: Well, you don't let him answer, so we don't know.
MR. DAUPHIN: Well, that's why I asked her to read back the question. Go ahead, and then we'll start over again.
(Requested testimony read.)
A. So affirming, we did read it. We've received it and we've read it. At least in part, she talks about 1stDibs and replacement cost. In part, we've asked for

additional documentation as to how she arrived to it.
Using your prior example of Restoration Hardware, 1stDibs is an online retailer of sorts, meaning their cost anyway is online. So to support this statement and our request for additional documentation, although not specifically and I don't think it's our duty to give the specifics, but it would be easy to document at least that portion of it, which hasn't been done.
Q. (BY MR. DAUPHIN) What -- what is Chairish?
A. I'm not familiar with Chairish.
Q. Okay.
A. I am familiar with 1stDibs.
Q. And 1stDibs is primarily used by designers to purchase items, isn't it?
A. I don't know. I can't speak to who their primary customer base is.
Q. What do you know about 1stDibs if you don't know who their primary customer base is?
A. You can look at items on their website or on their app, and there's values for those items that are there for sale.
Q. Do you know when they went to a retail format?
A. I don't know when 1stDibs went to a retail format.

Q. The process she used that is described in that letter, is that objectionable to Pacific?
A. As you know, I'm not -- I'm not an attorney. So objectionable, I don't know about objectionable.
Q. Is it --
A. What I can speak to is --
Q. Let me ask you. I'm not asking you what you could speak to. I'm just asking the question is it problematic or any cause of concern that the process she used to get to the replacement cost is inadequate?
A. I would say it is inadequate.
Q. All right. What else would be needed for her to get to the cost?
A. So, in part -- and we requested supporting documentation. Again, not the details of how that's going to be supported.
Q. Okay. Have you finished your answer?
A. Yes.
Q. Now if you would look at the back of Exhibit 149, the spreadsheet in front of you. The spreadsheet.
A. Oh, yeah.
Q. On the last page, please. It says the replacement cost is higher than original cost. That's in blue. Do you understand that?

A. I do understand that.
Q. Okay. And that there are some cases where the replacement cost is equal to original cost. Do you see that?
A. I do.
Q. Okay. And in purple, there was one where the replacement cost was actually lower than the original cost. That's on the very first page. Do you see that?
A. I see the highlighted purple line on the first page, yes.
Q. And if you look at the two columns, the replacement cost is less than the original cost, isn't it?
A. It is.
Q. Do you believe that the replacement costs are inflated?
MS. MOSS: Object to the form.
A. I don't -- I don't have an opinion as to if they're inflated because we haven't been provided the documentation to further evaluate the cost.
Q. (BY MR. DAUPHIN) So any statements that the replacement costs requested are inflated, there's no basis for that statement?
MS. MOSS: Object to the form.
Q. (BY MR. DAUPHIN) Is there?

A. We haven't made that statement.
Q. Okay. Have you made the statement they're so high, they're almost fraudulent? I'm sorry, that the replacement costs are so high and inflated, that they are almost fraudulent?
MS. MOSS: Object to the form.
A. So personally?
Q. (BY MR. DAUPHIN) No.
A. As a rep?
Q. A Pacific rep.
A. I am not aware Pacific has made that statement, and furthermore, I have certainly not made that statement.
Q. Right.
And if that statement was made, there's no basis for that statement, is there?
MS. MOSS: Object to form.
A. Repeat the statement one more time.
Q. (BY MR. DAUPHIN) If the statement was made by a Pacific representative that the costs are so high, the replacement costs, to almost be fraudulent, to your knowledge there's no factual basis for that statement, is there?
A. Chubb has not made an accusation of fraud. There's not a level of documentation to be -- to be

evaluated that would even lead to that conclusion.
Q. And the statement was to be almost fraudulent. They didn't claim that it was fraudulent but, quote, "almost fraudulent."
MS. MOSS: Object to form.
Q. (BY MR. DAUPHIN) There's not a factual basis for that statement, is there?
MS. MOSS: Object to the form.
A. Again, I'm having some difficulty following you, but we certainly have not made an accusation or a claim against the Goodrichs that fraud has been committed. I do want to be very clear on that. And --
Q. Well, I just want clarification. Did you say allegation or claim?
A. Either.
Q. Okay. If you had made such an allegation, it would be improper, wouldn't it? I'm sorry --
MS. MOSS: Object to form.
Q. (BY MR. DAUPHIN) If you had made such an allegation that her estimated costs were high as to be almost fraudulent, that would be improper, wouldn't it?
MS. MOSS: Object to the form.
A. I don't know. I would say just simply we would -- and we are not conducting a fraud investigation. If -- but there's not -- there's not a

level of detail that would lead me to believe that. I don't know if that answers your question.

Q. (BY MR. DAUPHIN) That's good enough. That's good enough. We'll go with that.

And certainly the fact that the submission shows a replacement cost that is less than the original cost is an indication that this is -- she is not fraudulent, isn't it?

MS. MOSS: Object to the form.

A. I can't make that statement either, but again, we're not making a claim or an accusation that there has been fraud.

Q. (BY MR. DAUPHIN) All right. Now in yellow, looking at the legend, that's where there was no invoice so nothing has been paid under the contents.

What do you do when you've lost something and you don't have the original invoice?

A. Give me a moment.

Q. Sure.

A. So as an insurance carrier, we would ask for the documentation to support the replacement of the item.

Q. Okay. But certainly if the insured doesn't have the original invoice, the insured can still make a claim for the replacement cost of that item?

A. That is true.

Q. All right. If you would turn to Exhibit 13, and that's going to be in the first half over there to your left. Correct.

And is that -- can you tell us what that is, please, sir?

A. It's entitled "General Adjuster Best Practice Guidelines."

Q. And what does that document do?

A. It's the guidelines that a general adjuster should follow.

Q. If you would come to the ninth page of that, I believe it talks about contents/personal property loss estimate. Do you see that?

A. I do.

Q. And does it state under the first bullet point the general adjuster should with the assistance of an approved expert/vendor validate the replacement cost for like kind and quality?

Was that done in this case?

A. In this case?

Q. Yes.

A. We were working with the Goodrichs to assist us in understanding the documentation that was received.

Q. Was the --

A. At least through Iris.

Q. Was the assistance of an approved expert/vendor, was that done to validate the replacement cost for like kind and quality?

A. So there's kind of two parts to unpack.

There is -- Enservio, as you know, was assigned initially to assist at a given period of time during the claim. And then later, this spreadsheet had been provided to us. And, again, we're talking about guidelines, not requirements. We elected to continue asking questions as to how the replacement costs were arrived on the spreadsheet.

Let me answer your question more fully. In that as it relates to the spreadsheet, we didn't assign an expert, and the portion that you read to us is a guideline and not a requirement.

Q. So you did not -- Chubb did not seek assistance of an approved expert or vendor to examine most of the items on the spreadsheet?

MS. MOSS: Object to the form.

Q. (BY MR. DAUPHIN) Is that correct?

A. Chubb requested additional information. We did not utilize an expert in seeking the additional information.

Q. Okay. And the next part of that is determine

repairability versus replacement. Does that have anything to do in this case?
A. I believe the items that are in question are items that are for replacement.
Q. All right. But not to be repaired?
A. As I understand it, yeah, they're all replacement items.
Q. Okay. Just wanted to make sure.
Then the next bullet point under these guidelines: To validate pricing of a representative sample of personal property items. This validation may be provided by an approved vendor, expert and reviewed by the general adjuster.
Regarding the items on the spreadsheet, Chubb did not make any attempt to validate pricing of a sample of these personal property items, did it?
A. That is not accurate.
MS. MOSS: Object to form.
Q. (BY MR. DAUPHIN) Okay. What did Chubb do to validate these prices on the replacement cost prices on the spreadsheet?
A. We requested additional information to assist in the valuation.
Q. Okay. You didn't request validation from anybody else, did you?

A. We did not.
Q. Okay.
A. And I do want to point out that the validation may be, and these are guidelines and not requirements. There's not a requirement to use the vendor.
Q. I think you said that three or four times. If you would like to say it again, please do so.
MS. MOSS: Object to the form of the question.
Q. (BY MR. DAUPHIN) Why didn't you use Enservio to validate the replacement cost prices?
A. In our opinion, the best way forward to validate these prices was to ask for the information of Ms. Goodrich or assuming it would have come from Iris.
Q. Iris is an expert in the valuation of antiques, isn't she?
A. I don't know if she's an expert in antiques or not.
Q. Do you know what her qualifications are?
A. I don't know what her qualifications are.
Q. Did you make -- did Chubb make any attempt to find out?
A. Again, I don't know what her qualifications are.
Q. My question is did Chubb make any attempt to

find out what her qualifications were?
A. I don't know.
Q. Do you know what the Southern Living list of certified decorators is?
A. I do not.
Q. Would it surprise you that that is a list of decorators that Southern Living magazine certifies as being very good in the profession?
A. I don't know that I would be surprised. I'm not familiar with it.
Q. Are you aware of Southern Living?
A. I've heard of Southern Living.
Q. And it's a respected magazine?
A. Sure.
Q. Okay. Do you know that they had designated Ms. Iris as a member of that group?
A. I don't know --
Q. Certified her?
A. -- anything about the group.
Q. Now if you would look at page 7 of Exhibit 13, the guidelines. And does that say use of vendors, consultants and experts at the top of it?
A. Yes.
Q. Okay. Does this guideline underneath the use of vendors, consultants and experts set out when it is

appropriate to get permission to contact a vendor by a general adjuster?

A. There's a lot under the subtitle. Do you want to point me to a specific bullet point?

Q. Well, first of all, the caption is use of vendors, consultants and experts. I was trying to get an overall description of what do you think is underneath that category.

A. It outlines use of vendors, consultants and experts.

Q. All right. We'll go with that. Come down to the vendor (expert) utilization process. Do you see that?

A. I do.

Q. And does it say documented approval from the supervisor is necessary when hiring an expert or a consultant on behalf of Chubb? Cause and origin investigators and Enservio Classic are exceptions to this rule.

Does that mean that a general adjuster, such as Mr. Elliott, can use the services of Enservio Classic without getting approval?

A. That is what the statement says.

Q. Okay. And is that true?

A. It is true.

Q. Okay. Who made the decision not to consult Enservio on the items on the spreadsheet?

A. I don't know that there was a decision made not to use Enservio. The decision was made, as I mentioned, to request different additional documentation.

Q. Well, how was Enservio instructed what to value and what not to value?

A. So at the -- early in the point of the claim, as you're aware, Enservio was engaged to help itemize the contents that were damaged or that were known to be damaged at the time and provide replacement cost or repair cost for those items.

Q. Someone had to make a decision as to -- I'm sorry. Someone with Chubb had to make the decision as to what Enservio valued and what Enservio would not value. Is that correct?

A. We engaged Enservio to assist in identifying those items. To the level of detail of specifically items, I can't say that there was a direction from Chubb to evaluate this but not evaluate that.

Q. Well, I'm just trying to find out Enservio comes in and evaluates some things and doesn't evaluate obviously what's on the spreadsheet, most of what's on the spreadsheet, which are high value items.

How did it come to be that Enservio did some and not something else?

A. Yeah, so at different points in time, you know, you're identifying if something is -- needs to be replaced or if it needs to be repaired or if it's damaged. I don't have an answer for you as to how one item at a point in time was evaluated or not evaluated or at a different time it was or was not.

Q. Somebody had to make the decision not to have Enservio provide or validate the replacement costs on the spreadsheet, didn't they?

A. I feel like I've answered this question.

Q. Well, who made that decision if you've answered the question?

A. And I believe that my response was there was not a decision made not to use or to use Enservio for these items.

Q. Okay. Who made the decision to address the items on the spreadsheet in the manner in which Pacific addressed them?

A. It would have likely been the adjuster at the time, as well as myself.

Q. Okay. Would you look at Exhibit 119, which should be in the second book here.

A. The second book goes to 110.

Q. Oh, sorry about that.
And this is out of your claim file?
A. This is an email from E. Myers at Enservio, Eric, to yourself and Jeremy Elliott.
Q. Is this in Pacific's claim file?
A. Yeah, emails make up the claim file.
Q. And that is from -- okay. From Mr. Myers at Enservio and, if you would look, it's to Jeremy and me.
If you would just read that first one, and I want to ask you a question about it.
A. So just to confirm, it says copied body, but then good afternoon Jeremy and Mr. Dauphin. I apologize --
Q. I'm sorry, just read it to yourself. I just want you to get familiar with it, and then -- it's only five lines.
And do you see the sentence that reads on certain line (example, line 2) there is no link as these are custom items not commercially available for mass purchase?
So -- and it's got --
A. Let me interrupt. I'm a slow reader.
Q. That's all right. Do you see that line?
A. I do.
Q. Okay. So is he acknowledging that there are

certain items that are custom and are not commercially available?

A. Yeah, he writes there is no link as these are either custom items or not commercially available for mass purchase. That's what he says.

Q. He couldn't find where that price would be readily available. Is that correct? And we're talking about -- strike that. We're talking about replacement costs, aren't we?

A. I believe we are talking about replacement costs.

Q. Okay. It's not a trick question. It's not a trick question, okay, just to give us focus. All right.

And that's what he's talking about, we can't find readily available replacement costs and so there's no link and that's because these are custom items or not commercially available for mass purchase?

A. That is what he wrote, yes, sir.

Q. Okay. That's understandable, isn't it?

A. I think it's self-explanatory, yes.

Q. Okay. And then the next line he says so an -- and he's got this capital letter -- Expert has priced out based on details provided. Is that what it says?

A. That is what it says.

Q. What expert did he use?

A. I do not know.
Q. Did Pacific ask for any backup information on this expert's valuations?
A. As I sit here today, I'm unsure.
Q. Would it surprise you today that there's no written record of Pacific asking that expert for its information?
A. I don't know. I mean, I'm indifferent. I don't know that I would be surprised or not surprised.
Q. This quote "expert," according to Enservio, there's no indication that he or she works for Enservio, is there?
A. So I'm unclear. I don't know who Enservio would have used or -- or the expert that is referenced in this email.
Q. Do you have any -- let's assume that Pacific has not asked that expert for its backup information. Do you have any explanation as to why it would not ask that expert for its backup information but does ask Ali to provide Ms. Thorpe's backup?
A. Can you ask the court reporter to repeat the question, please, or repeat the question?
MR. DAUPHIN: I'm going to ask the court reporter to repeat that. I think I had it perfect.
(Requested testimony read.)

A. So, again, I don't know if we've asked for expert documentation from Enservio or not. The Goodrichs presented a proof of loss that included these costs. To help us understand how those costs were derived at, we asked additional questions as to their replacement values.

Q. (BY MR. DAUPHIN) And this is just to set my next series of questions. I am not trying to rehash what we've already done.

But Pacific did not determine a replacement cost for the items on the spreadsheet. Is that correct? And I'm using replacement cost generally just -- we've got -- Ali has submitted replacement costs on these certain items. Certain items are identified. And we know that Pacific did not go out and get an expert to determine the validity of the replacement costs. Is that correct?

A. Yes.

Q. All right. And Pacific on its own did not determine a replacement cost for these items. Is that correct?

A. Give me a second.

Q. Okay.

A. So I can't speak to every last item on the spreadsheet, but let me say as a general --

Q. Right.
A. -- statement, we didn't use experts to validate these costs. We asked additional questions.
Q. Right.
A. Now if there's an item in here or two that overlaps with Enservio, possibly.
Q. And there is, and I'm not trying to get there. I understand.
But -- and not only did Pacific not use experts, it didn't make any determination from anybody as to what a replacement cost would be on the items in the spreadsheet?
A. Other than asking for the additional information?
Q. Right.
A. We -- and that was the attempt to validate these costs. We didn't use --
Q. Okay.
A. -- an expert to assist in that.
Q. And nobody at Pacific on his own attempted to determine a replacement cost?
A. An individual from Pacific?
Q. Correct.
A. To determine the replacement cost?
No. Again, we used -- you know, we were

presented a spreadsheet that's got replacement cost value -- or original prices on it. You know, Mr. Dauphin, we're just trying to -- we're trying to figure out what the accurate value is, and quite honestly, if the value was more and it was -- and we felt it was supported, we would pay more. But we asked those questions and, other than the affidavit, we didn't get the number.

Q. I'm just trying to establish the overall picture.

A. Okay.

Q. You say you didn't consult an expert, which I understand. I just want to make sure there's nobody in-house at Pacific that tried to determine a replacement cost.

A. I understand the question. No, nobody --

Q. Okay.

A. -- in-house would have done that.

Q. Was there anybody in-house who had the qualifications to do that?

A. I can't speak to everybody in the organization's qualifications. It's a large organization.

Q. To say the least.

A. Yeah.

But I can speak to the adjusting team, if you will. We did not -- we would utilize the information that was presented and ask some questions. And I'm sorry I keep saying the same thing; that's just what we did.

Q. Okay.

A. And a reasonable course of action, at least in my opinion, your question was is the qualifications of someone at Chubb. I don't -- I don't know.

Q. Okay. You don't know of any. Is that fair?

A. Yeah.

Q. Okay. I'm sorry, I need to -- you may have answered. I'm not sure.

There's nobody -- you don't know of anybody at Chubb who would have those qualifications to determine a replacement cost on these items on the spreadsheet?

A. That is correct.

Q. Okay. So what information did you want from Iris & Co. to validate the replacement costs?

A. So, for example -- and I'm just going to use the Restoration Hardware example and in her document she talks about 1stDibs. I'm not saying any one particular item, just a general statement.

MS. MOSS: Just answer the question --

THE WITNESS: Okay.

MR. DAUPHIN: -- that he asked.
A. What was the question?
MS. MOSS: The question is what information do you want from Iris & Co. to validate the replacement cost?
THE WITNESS: Thank you.
A. For example, if she verified a cost for 1stDibs, just show us where that was at. That would have been an item that we would have found to be a supporting document.
Q. (BY MR. DAUPHIN) Well, let's assume -- and we'll go back to the spreadsheet, Knole sofa, $12,450.
A. Yeah.
Q. Let's just assume 1stDibs says the cost was $12,000.
A. Okay.
Q. Would that have been sufficient for you?
A. So if 1stDibs -- and, you know, there's not a gotcha moment, I don't think, at least in my opinion. We're looking to pay claims that are supported. If the claim was supported, we would pay it. If 1st -- if this had like a -- for example, a 1stDibs website, you click on the link, it says, hey, this is for sale for $12,000, in my view, I would find that to be supportive.
Q. Well, would you have paid it?

A. Assuming all other things, it's like kind and quality, yes, we would have paid it.
Q. Okay. What if it was $11,000 was the replacement cost shown on 1stDibs?
A. If it was supported, absolutely. And I'll take it a step further. If it was ten times the value and supported, we would have paid it.
Q. All right. I'm sorry, what would you have paid? Would you pay the replacement cost or what 1stDibs said?
A. Well, I'm sorry, because I thought we were talking about rate is the replacement cost --
Q. Right.
A. -- for the assumption of this hypothetical.
Q. Well, decorators get a markup, don't they?
A. I don't know. I don't know -- well, let me say that I do know. I would imagine, just like you and I don't work for free.
Q. Right.
A. Yes, they have some markup, yes.
Q. So is there a markup that Pacific approves versus a markup it would not approve?
A. No.
Q. Then why does the cost to Iris & Co. matter?
A. Well, and back to this affidavit. That

clearly calls out something as 1stDibs --
Q. May I rephrase the question?
A. Sure.
Q. Let's eliminate 1stDibs.
A. I don't know that we can do that because it's what's in the affidavit. Go ahead.
Q. I don't think all of these items are on 1stDibs. I think she consulted on the ones they could. I'm talking about the items that weren't on 1stDibs.
A. Okay.
Q. I don't think -- I think she gave that as an example. She also looked at Chairish.
A. Uh-huh.
Q. So let's assume that another company has an item that's -- just for example purposes, looking at the Knole sofa, it's roughly $9,000. Let's say another company that's offering a similar like kind and quality sofa has it at wholesale of 9,000 and Iris charges 12,000 for it as a retail cost to Ali. Is that objectionable to Chubb?
A. Again objectionable, I don't know, but that's not what has happened here. We had not been provided, in your example, any wholesale cost and a markup cost.
Q. You asked for the wholesale cost, haven't you?
A. In the volume of documents, I'm not sure if we

specifically called out the wholesale cost or not.
Q. Well, what did you want from Iris & Co. then?
MS. MOSS: Object to the form of the question. It's asked and answered and asked and answered over and over.
Q. (BY MR. DAUPHIN) Here is what I'm trying to get to. What information did you expect from Iris & Co. that you would act on, that you would receive that would make a difference to you?
A. So I think the wholesale --
MS. MOSS: Asked and answered.
A. I think the wholesale prices has got some merit to it, but we asked for the information. We never had -- we didn't get the information, so we never had an opportunity to review any of -- any of that additional information. How Iris or how -- I mean, let me rephrase. How the Goodrichs obtain that information or present that information, that's -- you know, that's not our -- that's not the insurer's or Pacific's duty.
Q. (BY MR. DAUPHIN) Why didn't Pacific go to Chairish and look at the cost of some of these items on here?
A. So remember my prior testimony? I'm not very familiar with Chairish --
Q. Okay.

A. -- but 1stDibs, okay.

Q. Yeah, why didn't you go to 1stDibs and look at them?

A. So I don't know what items she's referring to even in the spreadsheet that would have come from 1stDibs. I wouldn't have known where to look.

Q. Okay. You've got the invoices for these items or most of these items, the original invoices, don't you?

A. We have invoices for the originals, we do, yes.

Q. And the guidelines state you could use experts to validate these costs, doesn't it?

A. The guidelines do say that.

Q. And one way to validate them is go to Chairish and see if any of these items are on Chairish, isn't it?

A. Not an exclusive way. And in my opinion, the reasonable path forward was to ask the person who is presenting these as the replacement costs to provide information.

Q. Pacific never asked the Goodrichs to designate which of these items appeared on Chairish, did they?

A. Pacific did not address individual items to any -- sorry, let me restart.

We did not -- Pacific did not look at any one

item and ask the question is this on Chairish.

Q. Nor did Pacific say please list the items that were on 1stDibs and/or Chairish. You didn't ask that information, did you?

MS. MOSS: Object to the form.

A. Similar question and a similar answer to what I just provided. And again, it's not -- it's not our duty to present the claim.

Q. (BY MR. DAUPHIN) Did you understand my question?

MS. MOSS: Object to the form. He answered the question.

MR. DAUPHIN: Repeat it, please, ma'am.

(Requested testimony read.)

A. The information to be listed in the manner of what is 1stDibs or what is Parish or what is anywhere else, that answer or that question was not asked.

Q. (BY MR. DAUPHIN) Did you want that information?

A. We asked the Goodrichs for information to support the claim. If they elected to support the claim in that manner, that's -- that's not Chubb's determination.

Q. Well, how many sources did Iris or Ali look at to determine the replacement cost?

A. I don't know. That's a good question. We would have liked to have known that.
Q. What if they looked at five sources and provided you information on four, would you want the information on the fifth source?
A. They didn't provide information for four or five sources.
Q. What if they had, what would you have done with the information?
A. Your question is hypothetical in nature because that's not what happened, but --
Q. Well, I'm trying to figure out what you would have -- I know that they looked at several sources on several items. They didn't buy them.
Well, let me ask you this. The items on this spreadsheet may not have been replaced. Is that correct?
A. I have no knowledge to what items were or were not replaced.
Q. Whether or not an item is replaced or not replaced does not bear on Pacific's duty to pay the replacement cost, does it?
A. So replacement cost is a defined term by the insurance policy. As I sit here, I can't recite it. If you have a copy, it would be beneficial.

With that said, can you repeat the question?
Q. Do you -- please listen.
A. I'm listening.
MR. DAUPHIN: Read the question again. Reread it.
(Requested testimony read.)
A. Replacement cost is a defined term that I don't have in front of me. Whether it's replaced or not, without the benefit of looking at how it is defined doesn't change the valuation of the item or the payment that we would issue for that item.
Q. (BY MR. DAUPHIN) So whether it's replaced or is not replaced doesn't have any bearing on the replacement cost. Is that correct?
A. Assuming we're not talking about any items to be repaired.
Q. Correct.
A. If an item is required for replacement --
Q. No, no, no, no. I'm sorry, just to make sure you understand, I know I'm interrupting --
A. Go ahead.
Q. The sofa on here, the first one, is not replaced. Okay?
A. I don't know.
Q. I know. Assume it's not replaced.

A. Okay.

Q. Does Chubb owe a replacement cost on that sofa?

A. The replacement cost value -- or, I'm sorry, the replacement cost is defined. I don't have the definition in front of me.

With that said, I do not believe, as I sit here today without the definition, that it has a bearing on if we owe for the value of the replacement cost.

(Sotto voce discussion.)

Q. (BY MR. DAUPHIN) Now you are aware of the appraisal provisions in the policy, aren't you, generally?

A. Yeah. Mr. Dauphin, generally, yes.

Q. Okay.

A. However, there's multiple policies, multiple jurisdictions and states, but generally speaking, yes.

MS. MOSS: Yes.

Q. (BY MR. DAUPHIN) That was my question generally. What do you -- and I'm not going to hold you to specifics, but generally what does the appraisal process do under this policy?

A. So generally and under this policy are a little conflicting. However, generally speaking --

Q. Well -- okay.

A. Yeah. You know, I don't think the question is a setup, so --

Q. Right.

A. -- let me just answer it generally speaking.

Generally speaking, an appraisal cause is an avenue by which the insured and the insurer can both elect an appraiser to determine the value of an item. This would assume that the item is, you know, covered. So it's an avenue by which these parties can resolve a dispute over the cost of an item.

Q. Now that -- we better look at this anyway.

MR. DAUPHIN: I tell you what. Let's take -- let's go off the record a second.

THE VIDEOGRAPHER: And we're going off the record at 11:27.

(Break from 11:27 a.m. to 11:40 a.m.)

THE VIDEOGRAPHER: And we are back on the record. The time is 11:40.

Q. (BY MR. DAUPHIN) Are you aware that certain examples from Chairish -- I'm sorry, from 1stDibs was submitted and to -- I'm sorry.

Are you aware that comparisons for costs at 1stDibs was submitted to Chubb as an example of what they did to determine the --

A. I don't recall seeing that information.

Q. Did you ever look at it?
A. Well, I don't recall seeing the information.
Q. Well, if Pacific takes the position that we needed more information and part of that information we need is did you look at 1stDibs and what did you see at 1stDibs and that information was actually provided on certain items, wouldn't that be significant?
A. If the information was provided, and as I sit here right now, I don't recall seeing that in the documentation, but, yeah, that would support the claim.
Q. Well, what more information would you want?
A. That information would suffice.
Q. And so those specific items you agree should have been paid? I'm sorry, the replacement cost based on the 1stDibs chairs or, I don't know what the name of the piece of furniture is, that should have been paid by Pacific?
A. I don't know what the information is. However, if -- if it's supported, we pay supported claims.
Q. Did you ever tell the Goodrichs all we need is what 1stDibs or Chairish or your source said and we'll pay it?
A. We did not direct the Goodrichs on how to support their claim.

Q. Well, isn't an insured entitled to know what the insured needs to submit in order to have the claim paid?

A. We requested the supporting documentation. How the methodology between that -- behind that is not Chubb's duty.

Q. So Chubb doesn't have a duty to tell the Goodrichs, look, this isn't sufficient information. If you look at 1stDibs, which is referenced in the letter that's submitted, and give us their cost, then we'll pay it? You don't think the insured is entitled to know that?

MS. MOSS: Object to the form.

A. We ask for additional information. Should we have received that information that supported the claim, we -- we would have and would pay for it.

Q. (BY MR. DAUPHIN) But Chubb didn't.

MS. MOSS: Object to form.

Q. (BY MR. DAUPHIN) And the fact that Chubb did not pay what they had already submitted on 1stDibs, isn't it reasonable to believe that the insured thinks something more has to be produced?

MS. MOSS: Object to the form. I think that mischaracterizes the testimony and the file.

A. So I don't believe, I have not seen, that

we've received something from 1stDibs. I would say that if it supports the claim --
Q. (BY MR. DAUPHIN) I'm sorry, not from 1stDibs --
A. -- we pay it.
Q. -- but a copy of what they look at on 1stDibs, just so that we're accurate.
A. We understand each other.
Q. Okay. I thought we did.
Assume for a minute that was submitted and on those items Chubb didn't pay it. Isn't that an indication to the Goodrichs that something more than that is needed?
A. I don't know if that was submitted, and I don't know that -- I don't know.
Q. Well, the Goodrichs don't know what's needed either if they submit what you say is good and you don't act on it and nothing else is told them what they need to submit. What are they supposed to do?
MS. MOSS: Object to the form.
A. The question is what if?
Q. (BY MR. DAUPHIN) No, that's what happened, but I want you to assume it. You can say "what if" if you want to --
MS. MOSS: Objection.

Q. (BY MR. DAUPHIN) -- and we'll establish it later.

MS. MOSS: Objection.

Q. (BY MR. DAUPHIN) But what if or assume that on certain items that they did look at Dibs, those pages were submitted, and Chubb never acted on it.

A. Okay. Assuming that we were provided supporting documentation, which could be 1stDibs, in my view that would support the claim.

Q. And if it's not done, isn't that a message to the Goodrichs that something else needs to be provided?

A. If that wasn't done, and I don't know that that's the case, but I would think that the Goodrichs could be confused on what should be presented.

Q. Okay. In fact, what happened, Chubb just said we're not going to pay these claims because -- and we're going to claim there's insufficient documentation and they didn't look at any of the individual claims. Isn't that correct?

MS. MOSS: Object to the form.

A. That is not accurate.

Q. (BY MR. DAUPHIN) Is an insured entitled to believe that the insurance company will look at the documentation that the insured submits?

A. The insurance company should look at the

information the insured submits.

Q. Okay. Looking at this exhibit, this spreadsheet, I guess we need to look in Exhibit 1 -- I mean, the first book, Exhibit 8. That's a letter from Alycen dated November 6, 2020. Do you see that?

A. I do.

Q. And is that a letter dated that date?

A. November 6, 2020.

Q. All right. And if you will come down to paragraph 1, under A, contents inventory, and it says what Pacific is going to pay. And then on the next page, it says -- no, I'm sorry. On the bottom of the first page, contents inventory, it says we are willing to consider the invoices of Iris & Co. that were submitted as a backup documentation for the original cost and will pay that amount which totals the number. Do you see that?

A. I do.

Q. Okay. Now then, if we would look at the spreadsheet which has the original cost, and look on the last page. And the spreadsheet total of the original cost is $650,400. Is that correct?

A. That is.

Q. And that's a little less than the amount that was paid -- I mean that is on the letter. The letter

says 656,000; the spreadsheet says 650,000?
A. That is correct.
Q. Okay. So somehow -- now there's a difference of about $6,000. Is that right?
A. That is right.
Q. Now if you would look on the spreadsheet on I think it's about the third page down, under guest bedroom do you see the pink line, bed linens?
A. I do.
Q. And there's not an original cost, but there's a payment of $5,670?
A. I see the -- I see the pink line.
Q. Okay. And Leontine Linens estimate, and it's out on the notes on the far right. It says Leontine Linens estimate.
A. I see that.
Q. All right. And do you see under the total, 6,337.0? Do you see that?
A. I do.
Q. If you take that 6,337.0 and you add it to the 650, you get that 6,570 number, don't you? I think you do.
My question is this: Why did Pacific pay the bed linens from Leontine Linens when there's not an original invoice and only an estimated replacement cost

but they paid that one?

And if it helps, if you look at the last page of the exhibit in the legend, that box on the bottom explains the math.

MS. MOSS: So just I just object to the use of this document and the fact that this states that I paid $721,000. That is not something I paid. That is something Pacific paid.

MR. DAUPHIN: That was incorrectly said. You're correct. Your letter is where we got that information, is why that's there.

Q. (BY MR. DAUPHIN) And the difference says 6,237, and I am looking at it. It actually should be 6,337.

So what we did, said paid the original cost and we added up the original cost of 650. That doesn't get us to the number in the letter of 656. So we look what's close to that, because Chubb did not provide us a list of which items it was paying for. And the bed linens that's in pink is close to that. And you add the tax to it and everything else, and it comes out, I think, right on the money.

So if Chubb paid for that item, why did it pay for that item when all we had was the replacement cost?

A. I'm sorry, I'm having trouble finding the

math, and we talked about a lot of different numbers. But if you take 650,400.66 --

Q. Where are you looking?

A. The total.

Q. On which page?

A. Of the last page, the totals.

Q. The 650,400?

A. Right. And you're asking me to add 650,400.66 plus $6,337 -- seven three -- well, it's close.

Q. Wait a second. Let me -- if you look on the second page of the letter, she's added the tax, and it gets up to 721,677.22.

A. I guess I'm --

MS. MOSS: Again, I object to the form. This is not something that I am doing. This is Pacific's.

MR. DAUPHIN: It is. It's your letter. I'm sorry. It is Pacific's doing. Okay.

Q. (BY MR. DAUPHIN) Well, we may can get it this way.

Has Pacific got a list of which items they paid the original cost on?

A. The $674,733 number is based on information that was derived from the EUOs.

Q. Okay.

A. As I'm sitting here today, I don't know of a list that totals 764,733.
Q. Well --
A. There's some madness behind that. I don't know what it is right now.
Q. And I'm looking under the contents inventory only under that, which the number is 721,677.72.
A. I'm sorry, where are you at?
Q. All right. Let's start on the first page you've got contents.
A. Yes.
Q. You come down to number 1, contents inventory?
A. Yes, sir.
Q. All right. And we have backup documentation for the original cost of 656, et cetera. Do you see that?
A. Right. I do.
Q. All right. Then it says we have added 10 percent in tax to 65,006.07.
A. Okay.
Q. So I mean that was the total of the tax.
A. I see that, yes.
Q. So you add the 656 and the 65, you get 721. I interpret that -- or we interpret that to be the original cost of the contents inventory.

A. Okay.
Q. But when we add up the contents that we've got and have submitted, it comes out a little short of the number in the letter, the 721. Do you know why that is?
A. I do not.
Q. Okay. Our analysis indicates that it was about 6,000 short. And you look at guest bedroom of 5,670 and you add the tax and freight and all that, and the numbers come out, if not exactly, almost exactly.
And the guest bedroom -- I don't know if I spoke correctly. The guest bedroom, bed linens, 5,670 was a replacement cost. It was not -- did not have an original invoice. Do you know if that was included in what Pacific paid?
A. I do not know.
Q. Okay. Now getting back to the letter which was Exhibit 8 -- well, let's look under contents. And do you see where she quotes from the policy?
MS. MOSS: Again --
Q. (BY MR. DAUPHIN) I'm sorry, the letter quotes from the policy under prepare an inventory?
A. I do see that.
Q. Okay. And this spreadsheet is an inventory, is it not?
A. I would agree it's an inventory.

Q. Okay. And it says you must prepare an inventory of damaged personal property, describing the property in full. The invoices that back up the spreadsheet describe the property in full, does it not?
A. I would agree with the original costs, that the invoices support that, yes, sir.
Q. All right. Well, my question is the Goodrichs described the property they were claiming in full. Correct?
A. The description?
Q. Yeah.
A. Yes.
Q. Okay. The inventory should show in detail the amount insured under the policy. That's not a question, is it? I mean, that's not an issue in this case, is it?
A. No, sir.
Q. Okay. And an actual amount of the loss, actual amount isn't -- I'm sorry.
What is actual amount of the loss?
A. I take that to mean the replacement cost value.
Q. Okay. It shows in detail the actual amount of the loss. It has a specific figure for the replacement cost, doesn't it?
A. It does have a specific figure, yes.

Q. Okay. And attach bills, receipts and other documents to support your inventory. They attached all the original invoices they had?

A. For the original prices, yes, sir.

Q. Okay. Now it just doesn't say attach bills, receipts and other documents to support your amount of loss, does it?

A. It says attach bills, receipts and other documents to support your inventory.

Q. Okay. If you would come down to page 4 of 5, do you see the proof of loss? And letter C. Do you see where that is?

A. (Witness nods head.)

Q. Okay. And underneath it, it says we are unable to accept or reject the proof of loss and/or amended proof of loss because it is inconsistent with the documentation that has been submitted in support. How is it inconsistent?

A. We simply didn't have the information as it relates to the replacement cost values.

Q. Is that the only thing that this inconsistent responds to?

A. I believe so.

Q. And then it says we request such as the cause of loss inventories. You got that, don't you?

A. I'm sorry, where are you at?
Q. I'm sorry, there's a -- I'm still on proof of loss, that same -- right above the sentence we just read.
A. Thank you.
Q. Do you see that?
A. Yeah.
Q. There was a signed sworn proof of loss submitted, wasn't there?
A. There was.
Q. Information and documentation such as the cause of loss. That's not a question in this case, is it?
A. It is not.
Q. An inventory was submitted, we've just been over. Is that correct?
A. That is correct.
Q. Repair estimates, in this case there is a stated replacement cost. Is that correct?
A. I'm sorry, are you talking to the -- I don't remember, the pink line item?
Q. No.
A. What are you specifically talking to?
Q. We're not talking about the pink item, per say, now. We're talking about everything else. That

may have been an outlier. I don't know why --
A. Okay.
Q. -- so, but I'm not addressing that right now. I'm just saying that she gave a specific cost for the replacement cost. And then it says and other similar records.
What I'm trying to understand is what records you want. There aren't any receipts, because most of these items on the spreadsheet were not purchased, or at least were not purchased at the time the spreadsheet was submitted. So there's not going to be any receipts for the purchasing again of these items. So it can't give those receipts. Right?
A. I would agree you can't provide a receipt for something that hasn't been purchased.
Q. Right.
A. Yeah.
Q. So what records did you want if the items weren't purchased?
A. Well, it's -- you know, we request such as the cause of loss, inventories, receipts, repair estimates and other similar records. What we're looking for is the repair estimates, the replacement costs or total costs, if you will, and the documents that support those values.

Q. But that's not in this proof of loss request, is it?

A. Repair estimates is in this paragraph.

Q. But the repair estimate came -- as you're calling it as a replacement, as a repair. Iris has provided that, hasn't she, that -- this is the cost of replacement cost. Isn't that the cost of the repair, repair estimate?

MS. MOSS: Object to the form.

A. Iris provided -- well, I don't know what Iris provided. We're talking about this spreadsheet which we established earlier the Goodrichs, you know, have sent us. But there's an affidavit, and that's the single item that we have to support the repair estimates, as it relates to the Iris information.

Q. (BY MR. DAUPHIN) Well, you've also gotten a letter from her to Ali that said what she did to determine that repair item?

A. Uh-huh.

Q. Okay. But the repair estimate and how she got the repair estimate has been provided to Pacific, hasn't it?

A. Pacific is in receipt of the information -- well, the items we just talked about, the Iris letter and affidavit.

Q. And that is -- according to this, if you wanted to call repair or replacement, that is the repair estimate, isn't it?
MS. MOSS: Object to the form. I mean, I'm trying to be patient, but I feel like this has been asked over and over and answered over and over.
MR. DAUPHIN: Well, it's relating to the language of the policy.
A. It's -- it's a repair estimate.
Q. (BY MR. DAUPHIN) Okay.
A. We -- we asked for additional information around -- around the Iris statements.
Q. All right. Enough with contents, let's -- oh, let me ask you this. I forgot.
So if Pacific says we cannot accept your proof of loss, which it apparently did not -- well, let me just ask you. Did Pacific accept the proof of loss? You may want to look back at the letter is what I'm referencing.
A. Thank you. The bottom of page 4 --
Q. Yeah.
A. -- Pacific says we're unable to accept or reject.
Q. What does that mean?
A. We're not accepting the proof of loss as it's

been presented. At the same time, we don't have enough information to reject the proof of loss, please provide additional information.

Q. The -- so getting back to this appraisal, is it Pacific's position that the Goodrichs did not adequately comply with the policy provisions?

A. We haven't put forth that there was a -- any sort of a breach of the contract or anything. I don't think that we've made a claim that they haven't abided by the policy provisions.

Q. Could they have sought the appraisal provisions?

A. Without having the appraisal provision in front of me, I think it would say either party can seek appraisal.

Q. Well, would Pacific have raised the defense to the appraisal process that you have not provided an adequate proof of loss and, therefore, we cannot engage in the appraisal process?

A. We didn't make that argument, no, sir.

Q. Well, the appraisal process was never initiated, was it?

A. Neither side initiated an appraisal process.

Q. Has Pacific ever taken the position that because a proof of loss has not been accepted, we will

not engage in the appraisal process?
A. We have not.
Q. Are you aware within the industry of insurance companies taking that position, that the appraisal process is not applicable until you have provided -- you have complied with the proof of loss provisions as we interpret it?
MS. MOSS: Object to the form.
Q. (BY MR. DAUPHIN) That's all right. I'll withdraw that. Let's move on.
Okay. On the dwelling claim, did Pacific pay for the cost of repair in this case?
A. Yes, sir.
Q. Is there any letter or email that you're aware of prior to filing the suit in this case that Pacific tells the insured we are going to pay the cost to rebuild?
A. In -- in our view, it's always been a repair. I am not aware of a document where we say we were paying for a replace -- I'm sorry, the cost to rebuild.
Q. Okay. If you would look at Exhibit 5, please.
Well, before we do that, what I want to know is how Pacific came up to its first payment of a million four. Is there a way you can explain to me how that payment was derived?

A. Sure.
Q. Okay. What do you need? How can you do that?
A. Thank you.
So if -- I'm sure you recall, you and I had a conversation together in which both sides at that point in time were identifying what the repair costs would be. At that time we issued an advance payment of 1.4 million.
MS. MOSS: He wants to know what it's based on. So answer the question that he's asked. What's it based on?
THE WITNESS: Thank you. I'm sorry.
A. It's based on a rough order of magnitude from J.S. Held.
Q. (BY MR. DAUPHIN) Okay. Can we look at their estimate and determine from their estimate how you got to the 1.4?
A. Their rough order of magnitude, we could look at that.
MR. DAUPHIN: Why don't we get something to eat, and I will pull that up.
Alycen, I've got that on a jump drive in another computer as opposed to looking -- it's like 80 pages or something, and I've got it. So I was just going to -- and I will give you a copy of the jump drive

that's got that also. Is that okay? Or do you want the pages printed out?

MS. MOSS: I mean, it doesn't matter to me.

MR. DAUPHIN: Okay.

MS. MOSS: You're just going to have him look at it on the computer?

MR. DAUPHIN: Yeah, I've got to have the computer, and he can pull it up and look at that on there.

MS. MOSS: That's fine.

THE VIDEOGRAPHER: Off the record?

MR. DAUPHIN: Before we go off the record, let me just -- one second. Let's come back after lunch. Let's go off the record.

THE VIDEOGRAPHER: And we're going off the record at 12:15.

(Break from 12:15 p.m. to 1:00 p.m.)

THE VIDEOGRAPHER: And we are back on the record. The time is 1:00 p.m.

Q. (BY MR. DAUPHIN) If you will look at Exhibit 5, which is the May 15th letter, on page 2. And it says, paragraph 1, reconstruction estimate, Pacific has already paid 1.4 million for the reconstruction of the dwelling. Do you see that?

A. I do.
Q. And as I understand, that number was obtained from J.S. Held's estimate that they produced or that they prepared?
A. Yeah, their rough order of magnitude, or ROM, yes, sir.
Q. Okay. If I send an interrogatory and ask you to list the costs on that estimate, which comprise the 1.4, are you able to do that? It doesn't have to be exact. You've said it's a rough number.
A. Yes, I can. I don't understand all of the legal terminology there, but, yeah, I can produce that.
Q. Okay. And I'm not -- I don't have any legal terminology here.
A. Okay.
Q. I just want to figure out what from J.S. Held Pacific says came the 1.4.
A. Yeah, we can do that.
Q. All right. Then the next, same sentence, and is willing to pay an additional $124,765 to total 1.524. What -- when it says and it is willing to pay an additional 124,000, what does that mean?
A. Based on the information in the box below that totals the 1.524 million, Chubb is willing to pay the difference between the moneys that were advanced and the

1.5.
Q. Okay. And when did Chubb make that payment?
A. I don't know when Chubb made the $124,000 payment. At the time that this letter was written, we were -- we, Chubb and the Goodrichs were still determining what the total cost of the repair would be.
Q. Well, that's why I was asking what is the term "is willing to pay"? Is Pacific going to pay it or not pay it? Strike that. Let me --
How do you interpret the language "is willing to pay"?
A. Just that, that we're willing to outlay $124,000 as the difference between the estimate and the ROM.
Q. Is that because Pacific thinks it owes 124,000?
A. Yes.
Q. I don't think Pacific ever paid the 124,000 unless it was included in another figure. That's why I'm trying to find out, do you know if the 124,000 was ever paid?
A. So there is clearly the 1.4 million that we've talked about, and then there was additional payments that were totaled as it relates to the repair cost --
MS. MOSS: Do you know specifically

whether the 124 was paid? And if it wasn't, we could check and see and get the money to them, but --

MR. DAUPHIN: Well --

MS. MOSS: I think he's just asking if you know specifically --

THE WITNESS: Sorry.

MS. MOSS: -- on the 124.

A. I don't think a check for 124,000 was paid.

Q. (BY MR. DAUPHIN) Why wasn't it?

MS. MOSS: Well --

A. We were at this point --

MS. MOSS: Do you know or do you -- okay. I just want to make sure you're definitively testifying to what you know. Do you know it wasn't paid or do you know it was or --

A. So, I'm sorry --

MS. MOSS: Sorry. I don't want to jump in. I just want to make sure that he can make an answer to your question.

Q. (BY MR. DAUPHIN) Yeah, I don't think it was paid. If it was paid, I would like to know where it was included and what it covered.

A. Yeah. We didn't pay $124,000.

Q. Okay.

A. I know we didn't issue a check for that amount

of money.
Q. Then why didn't you do that?
A. Thank you. At this point in time when the letter was written, we were still identifying what the total cost of the repair would have been.
Q. Well, you paid 1.4 without knowing the total cost of repair, didn't you?
A. We did.
Q. Why wouldn't you go ahead and pay the other 124,000?
A. At this point in time, we were determining what the total cost of the repairs would have been. The intention would have been to pay those additional moneys when we identified what the repair cost would be.
Q. Were you holding that back as a bargaining chip to negotiate a settlement?
A. No, sir.
Q. If you would look at Exhibit 10, May 19 letter. And this is from Ms. Moss to me. And if you would come down to paragraph number 4, I think it's on the second page, TCC reconstruction estimate. And that has on there that Pacific will pay the insureds $268,303 for these items, and it's talking about mantles, doors, hardware, cabinetry, beams. Is that correct?
A. Yes, sir.

Q. Do you think that that 268 includes that 124?
A. I don't know.
Q. Okay. Can you in an interrogatory take the TCC reconstruction estimate that was used to come up with the 268 and explain which items are included in the 268?
A. Yes, sir.
Q. Okay. Do you agree that Pacific has not provided the Goodrichs an explanation as to how Pacific arrived at the construction payments it made?
MS. MOSS: Object to the form.
A. I don't know that I agree with the statement.
Q. (BY MR. DAUPHIN) Well, do you disagree with it?
A. The payment -- the payment would have been the 1.4 million that was the J.S. Held rough order of magnitude. And then, in addition to that, we made the $268,000 payment. That's how the payments -- what the payments were based on.
Q. Based on what?
A. The J.S. Held number, plus the 268. And we can provide both of those by interrogatory, as you mentioned.
Q. Which reconstruction -- TCC reconstruction estimate are you using here?

A. I believe that the 268, as I sit here -- and today I would have to look at the documents and we can provide that, but I think the 268 is based on -- I don't know that it's based on a TCC estimate.
Q. The letter states it is, doesn't it?
A. Well, the letter says TCC reconstruction estimate and then it goes on, and then it says -- after EUOs and what have you, that we are agreeing to pay the 268. I don't know if the 268 is from the TCC number or if it's from a different -- a different contractor.
Q. Read into the record the last sentence of paragraph 4.
A. I appreciate that. So it clearly does say based on the TCC estimate, so I stand corrected.
Q. All right. How many estimates did TCC submit?
A. I don't know.
Q. Do you know which -- all right. So you don't know which estimate this was based on, do you?
A. As I sit here right now, I don't know. I would have to look.
Q. Do you know that TCC submitted an estimate that the Goodrichs included on their sworn proof of loss?
A. I'm aware of that, yes.
Q. Okay. Still looking at that letter on the

paragraph 4, Pacific will pay the insureds $268,303.82. When did Pacific make that payment?

A. I can't recall the exact day that the payment was issued. Sometime after the letter was written, but go ahead.

Q. It was on into July after they made the payment the letter says it was going to pay in May. Do you recall that?

A. Yeah, the letter, without question, was dated May. If you have when the check was issued, you know, I don't know when it was issued.

Q. Do you know that I had to submit a letter saying we hadn't been paid or they haven't been paid?

A. I do recall some reference to that, yes.

Q. Well, does Chubb delay payment by two months on money it says it owed simply to earn interest on that money?

A. No, sir.

Q. Then why does it delay so long in making the payment? I mean, it's a substantial sum. What's the reason for the delay?

A. My preference would have been that the check was issued shortly after the letter was written.

Q. That would have been the Goodrichs's preference also, but I'll move on.

In looking at the TCC estimate, would you be able to identify which costs were not paid?
A. If I had the estimate and the time to look at it, I believe I could do that, yes.
Q. Okay. Did Pacific ever inform the Goodrichs of the areas of the TCC estimate that they were not paying?
A. I don't believe we would have called out individual items that were not paid. The payment was based on the J.S. Held number and then the TCC number for mantles and doors, cabinetry, what have you.
Q. All right. If we will look at Exhibit 101, which is right here. I'll hand it to you.
MR. DAUPHIN: Well, do we have it in that one? It was the one that was identified earlier.
MS. PARIS: You've already --
MR. DAUPHIN: That's all right. I'll ask it this way.
Q. (BY MR. DAUPHIN) Do you agree with the statement in a letter Mr. Elliott wrote that stated early on in the process one of his goals is to, quote, clearly outline --
Here we go. Okay. All right. This is Exhibit 101, and I think it's on the second page. There's an email from Jeremy to the Goodrichs. Do you

see that? And if I can, I'll just point you to the phrase I'm going to reference.

A. Okay.

Q. And it's right there in the middle at the conclusion. Please read any of the email you want to to put it in context, but I am going to ask you about that specific sentence.

A. I'm familiar with the document.

Q. Okay. And does it state that a goal is to clearly outline what -- or how I determine the settlement proposal for your claimed damages?

A. Yeah, what it states is the conclusion -- and that's chopped off, but I think it says in the conclusion or at the conclusion, I'm not sure, my goal is to clearly outline how I determine the settlement proposal for your claimed damages.

Q. And are the Goodrichs entitled to that?

A. I have no issue with that statement.

Q. Okay. And even though it says proposed settlement, are the Goodrichs also entitled to know how the payments were made and what they were based on?

A. Yeah, the payments should be detailed in how they're -- the basis for the payment.

Q. It's tough to know based on the correspondence that the Goodrichs have received what the 1.4 million is

based upon, isn't it?
MS. MOSS: Object to the form.
A. Yeah, I don't -- I don't know if it's unclear for them or not. You would have to ask the Goodrichs.
Q. (BY MR. DAUPHIN) Okay. If you would look, please, at -- let's first look at Exhibit 6.
A. I'm going to give 101 back to you.
Q. Thank you.
And are you looking at Exhibit 6? It should be a letter from me to Alycen on June 1, 2020.
A. Yes, sir.
Q. Okay. And it says, My May 1st -- second sentence, My May 1st letter conveyed the Goodrichs's global settlement offer which had been requested by Mr. Haessig.
You and I discussed on the phone this claim, didn't we?
A. We did.
Q. And did you ask for a global settlement offer or asked if we could consider one?
A. Yeah, we discussed the potential of reaching an agreed settlement, yes.
Q. Okay. And the, quote, "global settlement offer" was requested by you, wasn't it?
A. I don't recall if I requested it or if it was

something we just generally spoke of.

Q. Okay. You weren't surprised to get a letter with a global settlement offer, were you?

A. No.

Q. And it was in response to our conversation, wasn't it?

A. Yes.

Q. Okay. And in exchange for that, we got the May 15 letter from Ms. Moss. Is that correct? I think that's Exhibit 5.

A. Thank you.

Yeah, so Exhibit 6 we're talking about is dated June 1.

Q. Right. And it references a global offer that was made, and in response to the global offer that was made, we've got the May 15 letter from Ms. Moss.

A. I see that, yes.

Q. Okay. What happened in the interim whereby you and I were talking about possible settlement and then we get the May 15 letter from Ms. Moss saying they won't pay, Pacific won't pay this and won't pay that?

A. Yeah, so you and I --

MS. MOSS: Real quick before you answer. I don't want you to talk about anything that you and I may have talked about or any potential in-house lawyers

at Chubb.

THE WITNESS: Understood.

MS. MOSS: Otherwise, you can answer the question.

A. The best that I can recall, you and I were talking about the resolution of the claim in its totality, which would have included some items that Chubb didn't have a full understanding of. In response to the -- that conversation, you did write the May 15 letter.

Q. (BY MR. DAUPHIN) Before that. That's her letter, I believe, May 15th.

A. You're correct, the May 4 letter. You did -- I apologize. You did have an offer or a demand, but anyway, the total is $4 million. It became clear at that point, based on the information that we had at the time, we weren't going to be able to reach an agreement, and I asked Ms. Moss to become involved.

MS. MOSS: Please don't talk about what we talked about.

Q. (BY MR. DAUPHIN) And she never made an offer in response to the May 4 -- my May 4 letter, did she?

A. I don't believe so.

Q. Okay. And the -- look at Exhibit 4. It's my May 4 letter.

And as far as the reconstruction, that number of 2.3 million is close to what their claim was, wasn't it?

A. So there's a couple different claimed amounts because, again, we're going through the process of identifying what the repair costs would be. But this letter does talk about 2.254 and then some oversight fees of 56 and then it outlines a sum of 2.3.

Q. That's pretty close to what they're claiming in the case, isn't it?

MS. MOSS: Object to the form of the question. I think that is not an accurate representation of what this letter says.

Q. (BY MR. DAUPHIN) Isn't the cleanup cost pretty close to what they're claiming for -- I'm sorry, isn't the construction cost pretty close to what the final construction cost claim was?

A. So, I'm sorry, I'm going to have ask for some clarification. Are we talking about the repair estimate or the total cost to reconstruct the home?

Q. The -- okay. The repair estimate.

A. So the J.S. Held ROM was 1.4 and then the 230,000 approximately. So if it's close -- I mean, I'll let you decide if that's close or not --

Q. Okay.

A. -- but those are the numbers.
Q. All right. Did you -- never mind, we'll just move on.
So looking at Exhibit 6, my letter -- I'm sorry, let me find it. Let's move instead to our June 28 letter, which is Exhibit -- just one sec -- Exhibit 7. It's actually the June 26 letter. Do you see that?
A. I do.
Q. And if you would look at page 3. Looking at page 3, under B, response to June 1, 2020 letter, and if you would come down and just read the two paragraphs starting with the bulk of your June 1 letter, and then I'm going to ask you some questions about it.
Okay. Looking at the paragraph that says the insureds are requesting payment for work and/or repairs that are unnecessary, is that referencing the request that the smoke remediation cost be paid?
A. That is what I understand it to mean.
Q. Okay. And it says if the Goodrichs are tearing down the house, as well as costs associated with tearing down and rebuilding the house.
Are you aware of any claim that the insureds were -- that the Goodrichs were making about the costs of tearing down the house?

A. So back to the May 4 letter --
Q. Yeah.
A. -- your letter to me, I understand that tearing down and rebuilding the house, as the last paragraph of the first page mentions, is the cost to tear down and replace the house, yes, that's my understanding the claim that was made.
Q. That was an alternative claim for the cost to rebuild versus the cost to repair, wasn't it?
MS. MOSS: Object to the form.
A. The original question was was a claim made to rebuild the home, and yeah, I believe that is the claim. Multiple claims were made, and that --
Q. (BY MR. DAUPHIN) Don't you know that in the May 4 letter we said this is the cost to repair, we believe the cost to rebuild is a little greater and ask that Chubb pay the cost to rebuild instead of the cost to repair?
A. So the letter, in part, in May 4th?
Q. Yeah.
A. Says TCC has offered to tear down and rebuild the house for 2.254.
Q. Keep reading.
A. And Hank Long has an architect oversight of $56,000. The sum is 2.3. As the teardown option is

only an additional 49,000 and is the only complete guarantee that there will be no smoke odor, the house should be demolished and rebuilt.

Q. Right.

And does that not say it's for settlement purposes only?

A. It does.

Q. And it expressed the Goodrichs's belief that the teardown and rebuild was the only way at that time to -- or it was the only way -- the best way to get rid of the smoke odor. Is that correct?

MS. MOSS: Object to the form.

A. It says as the teardown option is the only -- I'm sorry, let me rephrase.

As the teardown option is only an additional 49 and is the only complete guarantee that there will be no smoke odor.

Q. (BY MR. DAUPHIN) Right. And Pacific did not agree to that, did they?

A. Pacific did not agree to that.

Q. Okay. So do you think -- where it says if the Goodrichs are tearing down the house, as well as costs associated with tearing down and rebuilding the house. So you think the Goodrichs were asking that they tear down the house, and then they were asking Chubb to pay

for all of the rebuild instead of a -- instead of a repair estimate? I tell you what. Let me back that up.

The Goodrichs submitted a repair estimate from TCC, did it not?

A. Yes.

Q. All right. And then you asked for a global settlement, didn't you?

A. Well, we discussed a global settlement.

Q. Okay.

A. Yeah, we --

Q. And in response to that global settlement, the Goodrichs pointed out that a teardown is only $42,000, that's the way to get rid of the smoke odor, and that's why we think you ought to go with the total teardown.

A. I understand that to be what the document says, yes, sir.

Q. Okay. And you think the letter we were just looking at, that's what it's talking about? And talking about Exhibit 7.

A. So the June 26 letter?

Q. Yes.

A. Yeah, it was -- excuse me. It was our understanding that there's been a couple claims made, the claim referenced in the prior letter, and then there is some discussion at this point in time about

additional costs for smoke that wouldn't be accomplished because the house was going to be demolished.

Q. Right.

And as well as costs associated with tearing down and rebuilding the house. That's what I don't understand, how you conflate the two, put the two together: the cost of repair, which includes the smoke remediation, and the cost to rebuild, which it does not. The two are separate, aren't they?

A. There is certainly a difference between repairing and replacing the home.

Q. And is the cost to repair, does that include the cost of smoke remediation?

A. In my opinion, the cost to replace a home wouldn't include smoke remediation.

Q. Do you recall what -- did you say would or would not?

A. Did you say repair or replace?

Q. I said repair.

A. Thank you.

So the question is should -- can you repeat the question?

Q. Does the cost of repair include the cost of smoke remediation?

A. So if repair was completed, smoke remediation

would -- would be considered, yes.
Q. Well, it's a normal cost of repair, isn't it?
MS. MOSS: Object to the form.
A. And -- and Chubb paid quite a bit of money in repair and the remediation of -- of smoke.
Q. (BY MR. DAUPHIN) You know there was a specific request by Slade Company of 311,000 for smoke remediation?
A. Yes, sir.
Q. And that that fee was declined by Chubb?
A. That is correct.
Q. All right. And you know that's the main fee we're talking about on the smoke remediation, don't you?
A. Okay. So you're referring to the $311,000 by Slade?
Q. Right.
A. Okay.
Q. Or anybody else's smoke remediation costs, but that's the process, whether it was Slade or Brookstone or anybody else. Whatever the final smoke remediation process to be done, that was not done, was it?
A. No, it wasn't done.
Q. And there was no need to do it because the house was torn down?
A. I would agree with that.

Q. But that doesn't -- but that smoke remediation process was planned to be done, wasn't it?
A. From my understanding, there was dialogue as to if it would be done, the process by which it would be done; and some point around that time, there was a decision that the Goodrichs made to demolish the home.
Q. Is it your testimony that the smoke remediation process was not part of the cost to repair the Goodrich home?
A. The repair cost that Chubb issued did not include the Slade 311,000.
Q. Is it your testimony that the need for the smoke remediation process was not part of the repair that was going to be done to the Goodrich house?
A. So I want to delineate a little bit between the Slade number and just smoke remediation in general.
Q. I'm not talking about the numbers. I'm just talking about the need for the smoke repair process.
A. Yes. So the repair cost included some smoke removal process.
Q. It did not include the 311,000. Is that correct?
A. That is correct.
Q. Nor did it include 97,000 -- I'm sorry, about 106,000 or so submitted by Brookstone for the repair

process, did it?
A. I don't -- I don't recall 106 from Brookstone. If -- I would be happy to look at the document.
Q. Well, approximately what was Brookstone's estimate?
A. Are we talking about -- specifically, Slade was soda blasting. I'm confused on the document you're referencing.
Q. Did Slade submit -- I'm sorry. Did Brookstone submit a cost to do the smoke remediation process which included soda blasting?
A. Yes, Brookstone presented a cost for soda blasting, yes.
Q. Okay. And that was done at the request of Mr. Elliott, wasn't it?
A. I believe so.
Q. And that's because that smoke remediation process was a part of the repair that was to be done, wasn't it?
A. If the repair was to have been accomplished, that would have been part of it, yes.
Q. Okay. And is there anything in the policy, to your knowledge, that says Pacific does not have to pay a part of the repair cost if it is not -- if that repair is not performed?

A. So what the policy does say is it defines replacement cost -- I'm sorry, it defines reconstruction cost, and it would say that we owe for the repair or replacement, whichever is lesser.

Q. Do you think that answers my question?

A. Ask the question again. We'll see.

MS. MOSS: I object to the form of your question because, yes, it did answer your question.

MR. DAUPHIN: Go ahead.

(Requested testimony read.)

A. No, the policy doesn't -- doesn't speak to the question that was asked.

Q. (BY MR. DAUPHIN) Hang on just a second. I'm thinking about that.

And the last sentence or the next to -- or the last sentence in that paragraph that starts the insureds, the last sentence says Pacific is not obligated under to pay for both the cost of repair and the cost to rebuild.

Now the Goodrichs never asked that Pacific pay both, did they?

A. It's my understanding that is what's been requested.

Q. How?

A. The cost to repair the home --

Q. Okay.
A. -- with $311,000, and at the same time the cost to replace the home, also with $311,000.
Q. Are you using the term "replace" as opposed to "rebuild"?
A. So a repair meaning remove materials and put the same -- you know, put like kind and quality materials back. Repair, you know, demolition the house and -- I'm sorry, replace, demolition the house and start over.
MR. DAUPHIN: Read back my question, please, ma'am.
Q. (BY MR. DAUPHIN) Listen, please.
(Requested testimony read.)
A. No. I'm clear on replace and rebuild.
Q. (BY MR. DAUPHIN) Where are you getting this concept of replace?
A. The reconstruction cost -- sorry. Yes, reconstruction cost, as the policy defines it, discusses rebuilding and replacing. When I'm referring to rebuilding or replacing, those are the terms the policy uses.
Q. I just need to know when you are saying repair, it's the same as rebuild?
A. No.

Q. I'm sorry, that replace is the same as rebuild?

A. Replace and rebuild? So there's a repair, and then there's a replace and a rebuild. If -- if at some point you need me to clarify if -- what I mean, please do that. But repair and replace, it would be, in my mind, very different. You're repairing the items or you're replacing the items. Replace and rebuild, would I sometimes use those terms interchangeably? Yes.

Q. Okay. And you're saying that the Goodrichs asked that the cost of repair and the cost to rebuild be paid?

A. In part.

Q. Okay. The sworn proof of loss is just the cost to repair, isn't it?

A. I would be happy to look at it. I can't recall exactly what the details are without having it presented in front of me.

Q. Okay. Well, let's assume the estimate with the sworn proof of loss is cost of repair only.

A. Okay.

Q. Should that include the cost of smoke remediation?

A. If the home was repaired, I think that the proof of loss should include the smoke remediation.

Q. And why does the fact as to whether the house is repaired or not repaired, what does that have to do with the cost to repair it?

A. So the cost to repair it, as I recall it being presented to us, included smoke remediation. The replacement of the home or the rebuild of the home also included those numbers. Chubb wouldn't pay for both the repair and the replacement of the home.

Q. Well, just the sworn proof of loss was an estimate to repair only, and that included the smoke remediation cost. So why -- why is that not payable regardless of whether the house is repaired or not?

MS. MOSS: Object to the form, asked and answered.

THE WITNESS: Yes.

A. We paid the repair costs. And I don't have the exact number in front of me. We were presented with repair costs. We were presented with replacement costs.

Q. (BY MR. DAUPHIN) No, you weren't, not on the sworn proof of loss estimate. It didn't have anything to do with the rebuild cost.

MS. MOSS: Object to the form.

Q. (BY MR. DAUPHIN) So why didn't -- if that sworn proof of loss estimate that was presented with a cost to repair, why wouldn't you pay -- well, let me

start over.

The sworn proof of loss is submitted. The TCC estimate and their claim under the sworn proof of loss included the smoke remediation fee as a cost to repair. What difference does it make whether the house is repaired or not?

A. The work for the smoke removal wasn't accomplished. At some point the Goodrichs elected to demolish the home.

Q. No doubt about that.

A. No doubt about that.

Q. Thank you.

My question is why does that impact the cost to repair?

MS. MOSS: Asked and answered. I think he's answered this multiple times, and you've asked it multiple times.

A. Again, we will pay to repair or replace, whichever is lesser. The repair costs that have been presented -- I think I've answered the question.

Q. (BY MR. DAUPHIN) Is it fair to say you can't provide a better answer than you've already given?

MS. MOSS: Object to the form of the question.

Don't -- you don't need to answer that.

I think he's given an answer.
MR. DAUPHIN: You can't instruct him not to answer that question, Alycen. It's a legitimate question. He says I've answered the question repeatedly. And my question is simply is it your testimony that you could not answer that question any better than you already have? Now that's not objectionable.
MS. MOSS: That is a different question. He can answer that. I still --
MR. DAUPHIN: Read back. Well, let him answer that question I just proposed, I just offered, and we'll move on.
(Requested testimony read.)
MS. MOSS: Object to the form.
A. The testimony I've given is the testimony that I'll give on that line of questioning.
Q. (BY MR. DAUPHIN) Now the last aspect of that sentence states -- and we're looking at Exhibit 7 -- it is -- it, meaning Pacific, is not obligated to pay for repairs and/or other work that are unnecessary given the fact that the house is being demolished.
Is there anyplace in the policy, to your knowledge, that says Pacific is not obligated to pay for repairs that are unnecessary when the house is being

demolished?

A. That terminology is not in the policy.

MR. DAUPHIN: I'm sorry, I've got to take a three minute break. I will be right back.

THE WITNESS: Sure.

THE VIDEOGRAPHER: All right. We're going off the record at 1:53.

(Break from 1:53 p.m. to 2:04 p.m.)

THE VIDEOGRAPHER: And we are back on the record. The time is 2:04.

Q. (BY MR. DAUPHIN) Let me ask you just a couple questions, and I'll be finished with this smoke remediation cost.

Is there anything in the policy which states Pacific will pay the cost of repair only if the repairs are actually done?

A. That is not stated in the policy.

Q. Let's talk about landscaping.

A. Okay.

Q. Why didn't Chubb pay the landscaping claim?

A. We're unclear to what the extent of the damage to landscaping may or may not have been, and to some extent we're also unclear as to what the cost of some of those damages might have been.

Q. Does the fact that the damages are -- part of

the damages are to the irrigation system, does that impact your decision whether or not to pay that landscaping claim?

A. No, sir.

Q. Do you know Mr. Rudoshko said that the irrigation system, part of the reason it wasn't paid was because it was not part of the fire loss. Do you know anything about that?

A. I read his testimony. I don't remember specifically what he -- what he mentioned there.

Q. But you don't believe the fact that the irrigation system may have been damaged by the fire trucks prevents -- as opposed to burning in the fire, that distinction is not pertinent to whether the claim is paid, is it?

A. I have no concerns over if it was damaged by a fire truck or by actual fire.

Q. All right. What if the irrigation system was damaged by trucks coming to rebuild the house? Is that a problem in paying the claim?

A. So we would ask some additional questions as to if it is, indeed, damaged and how it was damaged. And we asked for some of the documentation surrounding, for example, the septic tank or the septic lines.

MR. DAUPHIN: Read back my question,

please.

(Requested testimony read.)

Q. (BY MR. DAUPHIN) The fact that they were damaged by trucks rebuilding the house, coming to the initial debris removal and initial repairs that may have been made.

A. So if, indeed, there was damage from trucks, I wouldn't have much concern, no.

Q. Okay. Did Mr. Elliott ever take pictures of the landscape?

A. I can't recall photos of landscaping or not.

Q. Okay. And as early as February after the fire in November, the Goodrichs advised Pacific of the possibility of a claim under the landscaping, didn't they?

A. I don't know about the date, but I would agree that, yeah, there's been a claimed made for landscaping.

Q. And Pacific knew about it early on?

A. Pacific knew there was a claim for landscaping. I don't know the date, but I don't know if that's --

Q. You don't dispute it was in February of 2020?

A. I don't dispute that, no.

Q. Okay. Why does Chubb dispute payment to the architect to review the repair, to oversee the repair?

A. Sorry, can you be more specific on that charge?
Q. Yeah.
A claim was submitted for the cost of the architect to oversee the repair.
A. We don't take issue with an architect overseeing a repair.
Q. Well, you know you did in this case?
MS. MOSS: Object to the form.
Q. (BY MR. DAUPHIN) Do you know that you objected to paying the architect's fee in this case?
A. I believe that that's been paid, as we sit here now.
Q. Has it? Can you point me to what payments encompass that fee?
A. As I'm sitting here now, I cannot.
MR. DAUPHIN: Alycen, I don't want to make a big deal about it if they paid it and we just overlooked payment. So if you want to tell me whether the architect's fee was included in the payment, fine.
MS. MOSS: I'll double check. I think it was paid. I mean, the issue with it it was a duplicate, but I think one was paid.
MR. DAUPHIN: Okay.
MS. MOSS: But we can confirm.

Q. (BY MR. DAUPHIN) Is there any issue with the fact that Diane and I bought the house and rented it to the Goodrichs?
A. I don't have an issue with that.
Q. There were -- this company HD Innovations came in and removed from Dell Road a lot of the media wires, burned TVs, whatever, because it was a rather extensive media plan they had in the house, and they stored that in a warehouse in case Chubb wanted the salvage value and you had to have HD remove it. Would that removal not be a cost of debris removal in the dwelling?
A. If we're removing debris, it's -- it's debris removal. And I'm not aware of the charge specifically, but if they're removing debris, yeah, it's debris removal.
Q. Now there were also some TVs that were purchased for use in the rental house, and a claim was made for them under adjusted living expenses, and the claim was not made under contents for those devices. But the TVs used in the rental house was paid under contents as opposed to additional or extra living expenses. Why would that be paid under contents if the insureds were unsure whether or not those TVs would be used in the new house?
A. There is a point in time where there's

discussion and Chubb is seeking clarification as to if it's contents or additional living expenses.

Q. On the TVs?

A. On the TVs, yes.

Q. But they were submitted as living expenses and not as contents?

A. If you say so. I don't recall that level of detail.

Q. You can assume that to be true. So why would Chubb on its own decide to pay it under contents when it wasn't even claimed under contents?

A. It would be -- it would be normal for us to ask questions as to if the TVs that have been presented, even though they're presented under ALE, if they are indeed replacing TVs that were at the house.

Q. Okay. If they were to replace TVs at the house, they wouldn't be additional living expenses?

A. I would agree with that.

Q. And do you know that Ali handled at least 90 percent, if not more, of the insurance claim and the issues around rebuilding the house at Dell Road?

A. I don't know what percent of involvement she would have had.

Q. All right. If the Goodrichs did not ultimately use the TVs that they had in the rental house

at their Dell Road house, would it be an additional living expense or a content expense?
A. I don't know if their ultimate use is how we would characterize if it's additional living expenses or contents. If the TVs were to replace like kind and quality TVs that were at the Dell house, then Chubb would consider them to be contents.
Q. Okay. So you would look to see if they were like kind and quality?
A. (Witness nods head.)
Q. Not whether they were going to be used in the Dell house?
A. Yes.
Q. Okay. If you would -- do you have an Exhibit 157? Hang on. I think I've got it. No, it should be in one of those books in here. It's a letter dated March 20, 2020 from me to you. Do you see that?
A. I see that.
Q. Okay.
(Exhibit 157 marked.)
Q. (BY MR. DAUPHIN) And in it I relate concerns about the actions of Mr. Elliott. Do you recall receiving this letter?
A. I do.
Q. Okay. And do you recall the scenario that had

the emails attached which showed that Jeremy and Andrew Arrant of Brookstone were discussing the extent of the fire remediation process?
A. I recall the correspondence.
Q. And that correspondence between those two was not shown to the Goodrichs?
A. My understanding is that they had conversations about the scope of the work and -- sorry. So to answer your question, I'm not sure that the Goodrichs were involved in that correspondence.
Q. Okay. And that as part of that correspondence, Brookstone said we can reduce the scope of the fire remediation or soda blasting, that they made that representation to Mr. Elliott?
A. Yeah, I believe that they were discussing the scope of the work as to the extent or the square footage or how much soda blasting was required.
Q. Right.
A. Uh-huh.
Q. And that Mr. Elliott basically said can you reduce the scope or why are we doing the first floor?
A. I believe that is what he questioned.
Q. Okay. And that the response was that, well, we can reduce the square footage?
A. In response to --

MS. MOSS: Object to the form.

A. Yeah, in response to the -- I mean, they had a conversation about what the scope of work should be.

Q. (BY MR. DAUPHIN) All right. And it was in the emails, the first emails between the two, wasn't it?

A. Yeah.

Q. All right. And then Elliott sends out an email that copies the Goodrichs to Brookstone and says do you have any suggestions on the scope of the soda blasting. And Brookstone responds what about the second and third floor. Do you remember that?

A. I don't know. I don't remember that specific email.

Q. And that the Goodrichs were copied on this second set of emails but not the first email?

A. I can speak to there was some -- you had reservation as to not being copied on prior correspondences.

Q. Well, not just prior correspondence. We had questions about the fact that Jeremy was talking to Brookstone about reducing the scope of the soda blasting without notifying the Goodrichs.

A. That's -- I understand that was the concern.

Q. And do you find that objectionable as his supervisor?

A. I do not.

Q. If he -- and why do you not find that objectionable? Why aren't the insureds entitled to know about discussions from your adjuster to someone trying to reduce the scope of the repair?

A. The premise of the question is the idea that the intent was to reduce the repair. I don't know that that is the intent of that conversation. It is to accurately identify what needs to be soda blasted. It would be common practice for an adjuster to have a similar conversation with a contractor.

Q. Well, the Brookstone contracted with the Goodrichs, did it not?

A. Yes.

Q. And its obligation was to the Goodrichs, was it not?

A. I don't know what the contract says.

Q. Do you know that Ali and Arrant and the guy from Alabama Soda Blasting all met at the house to discuss the scope?

A. I believe I recall that.

Q. And that scope that they discussed and planned on was submitted to Jeremy?

A. Okay.

Q. And Jeremy then emails back and says why do we

need to do a certain portion of it?
A. There is emails, yes.
Q. And those emails are not copied to the Goodrichs?
A. That is correct.
Q. Right. They are in the dark, aren't they, about this negotiation to reduce the scope of the soda blasting, aren't they?
MS. MOSS: Object to the form.
A. Again, I don't know that the intent is to reduce scope. It's to identify the inaccurate scope. And Jeremy just had questions as to why are we doing this area as opposed to a different area.
Q. (BY MR. DAUPHIN) And that's because he's questioning whether or not that should be paid for by the insurance company?
MS. MOSS: Object to the form.
A. Again, he's just seeking to understand why that is required.
Q. (BY MR. DAUPHIN) But that's -- the insured could make its own decisions to the scope of the repair work that it wants done, can't it?
A. Sure.
Q. All right. And that's -- the scope of the repair that the insurance is willing to do is a separate

issue from what Pacific has to pay under the policy, isn't it?

A. I'm sorry, can you restate the question?

Q. What the Goodrichs want to have repaired and agree to repair is separate from what Pacific is obligated to pay under the policy as a cost of repair, isn't it?

A. Ultimately, what the insured elects to do is, you know, their decision.

Q. Right.

A. Yeah.

Q. And you don't think Jeremy was trying to get Brookstone to reduce the scope of the soda blasting?

A. I do not.

Q. If you would look at Exhibit 145, please. And this -- if you start from the bottom of the page, there's an email, is there not, from Andrew to Jeremy Elliott?

A. It is.

Q. And the Goodrichs are not copied on that email, are they?

A. That is correct.

Q. And it says, Jeremy, here is the final demo -- here is the final for the demo and estimate for the structure clean.

What do you understand structure clean to mean?

A. So, in part, says here is the final for the demo and the estimate for the structure clean. I can't recall exactly what was attached to here, but the best that I can recall, the soda blasting estimate.

Q. Okay.

A. A soda blasting estimate was there.

Q. And the structure clean estimate is based off the protocol written. That's how that email concludes.

And then if we scroll up to the top of the page, we have an email from Elliott to Andrew in response to the email we just looked at. And it says, Andrew, why are we soda blasting the entire main level? Is that his question?

A. That is his question.

Q. Okay. Soda blasting for fire damage to framing, mold or other items. I agree with second level and attic, but main level and basement should be cleaned and sealed.

Is that what it says?

A. That is what it says.

Q. Okay. Of course, any fire damage that should be soda blasted or replaced in general versus -- I'm sorry. Of course, any fire damage that should be soda

blast or replaced in general versus blasting it, what does that mean?

A. So he continues to say I thought TCC was replacing all the charred framing on the second level anyway. And he goes on to request them to update the estimate. So for that to mean any fire -- any fire damage that was going to be replaced wouldn't be soda blasted.

Q. Based on what he thought TCC was going to do?

A. Based on TCC replacing charred framing.

Q. Okay. And this is in March 17th. Do you know when Elliott last visited the house?

A. I don't recall when Elliott was last at the home.

Q. And he says I would request you update the estimate to reflect these items.

What estimate do you think he's referencing?

A. I believe he's referencing the soda blasting estimate.

Q. And he wants it to be updated to reflect that these items. What items is he talking about?

A. The square footage of the home, the square footage of area that needs to be soda blasted.

Q. And to me that means update the estimate to reflect that the square footage, particularly in the

first floor, is reduced. Do you not read it that way?
A. The way that I read this email is Jeremy is questioning the total square footage for both floors, what's the area that should be soda blasted. And he says which why would we soda blast areas that are going to be removed? And I -- that's what I take it to mean.
Q. And -- well, when he requests an update to the estimate, how is that update to be -- how is that estimate to be updated other than reduce the square footage?
A. I don't have -- I don't have issue with your question. He's seeking clarification on what should be done and asking them to update the estimate. I agree.
Q. Right, and to update it by reducing the square footage. That's inherent in that request, isn't it?
MS. MOSS: Object to the form.
A. He's asking them to update the estimate for the scope of work.
Q. (BY MR. DAUPHIN) Okay. Exactly.
And to update it, it certainly wasn't to update it to increase the scope, was it?
A. It's to update it to what we thought was the accurate scope.
Q. Well -- and when you say accurate, that's Pacific's determination of what's accurate on the scope

of the repair, isn't it?
A. What Jeremy thought was to be the accurate number.
Q. And that's not his decision, is it? That's the Goodrichs's decision as to the extent of the soda blasting at their home, isn't it?
A. What they elect to do is -- it's their home, yes.
Q. And Ali had been out to the house and talked with the soda blasting expert and talked with Brookstone, and they had agreed with the plan that Mr. Zlotnik had approved, submitted it -- Andrew submitted it to Jeremy, and Jeremy said you need to revisit this and give me another -- and update your estimate, didn't he?
A. So the question is did Jeremy request them to update the estimate? He did.
Q. After he knew Ali had met with Brookstone and followed -- and soda blasting and were following Cliff Zlotnik's protocol, Jeremy, who we don't know when he had been to the house last, says update the estimate, doesn't he?
A. Jeremy is clearly seeking clarification on to why we're doing some of the area, and he asks for the estimate to be updated.

Q. And if Pacific wanted to pay less than the whole amount, it could have agreed to pay less, couldn't it?

A. Could we agree to pay less --

Q. Sorry, let me back up.

If Pacific did not want to pay for the first floor to be soda blasted, it could have been done on Jeremy's own say-so. Isn't that correct?

MS. MOSS: Object to form.

A. I suppose.

Q. (BY MR. DAUPHIN) And before Jeremy made that payment, though, he wanted Brookstone to give him something that would justify what he wanted to do. Is that correct?

MS. MOSS: Object to the form.

A. Again, Jeremy's questioning why the second floor should be included. We agree to that, I think.

Q. (BY MR. DAUPHIN) Or the first floor, actually, I think is what he's questioning?

A. Sorry. Yes, thank you.

And if you remove the first floor, you're removing square footage. In his opinion at that time, he was questioning why. And then he asked for -- asked for a revised estimate.

Q. And Brookstone, in fact, revised the square

footage, didn't they?
A. They did.
Q. Okay. And if you would look at Exhibit 144.
And is that a letter from Jeremy to -- I mean, from Andrew to Jeremy? It says I can move the square footage from 57,000 to 45,000 to remove the area downstairs that don't have smoke damage or spray foam insulation?
A. That is what it says.
Q. Okay. Do you know that right before Jeremy's email, Andrew had written Jeremy that said the entire downstairs needs to be soda blasted?
A. I'm not aware of that.
Q. Really? All right.
Well, give me just a second. If you would look at Exhibit 141, this is the Brookstone Restoration estimate on the soda blasting.
A. Okay.
Q. If you would come down to the main level, which is the first floor, do you see where I'm talking about, main level description?
A. I do.
Q. Does it come down, number 15, soda blasting, heavy?
A. That is what it states.

Q. So -- so before Jeremy's request, they're recommending heavy soda blasting; and after Jeremy's request, they did away with it on the first floor. Is that accurate?
A. I don't have the revised estimate in front of me, but the email outlines not including on the revised the main floor. So I'm going to make what I think to be a safe assumption that it's not there any longer.
Q. And because of that, the Goodrichs terminated Brookstone?
A. That's my understanding.
Q. Okay. And that didn't cause you any heartburn as Jeremy's supervisor that he was doing all of that.
MS. MOSS: Object to form.
Q. (BY MR. DAUPHIN) Correct?
A. I don't take issue with Jeremy having conversations with a contractor about the scope of work.
Q. Do you have any issue with what transpired in this case that was described to you in my letter?
A. What exhibit is the letter?
Q. Just a second. I think it's Exhibit 4.
A. 144?
Q. No. I'm sorry, it's Exhibit -- it's not Exhibit 4. It's Exhibit -- no, hang on a minute. I'm sorry.

A. That's all right.
Q. We'll get there.
A. It's a big claim file.
MS. PARIS: 157.
Q. (BY MR. DAUPHIN) Yes, 157. I got all out of whack. 157.
A. And the question again?
Q. Do you have any problems with the -- what is explained in the letter about Jeremy contacting Andrew, et cetera, that we've just gone over?
MS. MOSS: Asked and answered.
A. Yeah, I -- without reading the entirety of the letter, so just the premise of the question do I have concerns about Jeremy speaking to the contractor about the scope, I don't have reservations about that.
Q. (BY MR. DAUPHIN) Okay. Without informing the insured?
A. Well, the question implies there's something sinister happening, and I don't believe that to be the case.
Q. Okay. To question definitely -- I don't mean to imply. I mean to assert that there was something going on. I don't want to just imply.
All right. Then also in the letter it has a footnote 1. This is Exhibit 157. It's on the second

page of the letter. Do you see that footnote?
A. I do.
Q. Did you review that footnote?
A. I reviewed this letter. I believe I responded to this letter. Would I have reviewed the entirety of the letter? Yes, sir.
Q. And were you aware that Mr. Elliott initially told the Goodrichs that he was going to take the house down to the studs, and then later said, no, we're not going to remove the Sheetrock and insulation in the master bedroom and master bath and Charles's office? Are you aware of that?
A. Yeah, I'm familiar.
Q. And that he also told Ms. Palk, an underwriter, on the same day he visited the Goodrich house that it was going to be taken down to the studs.
A. Okay.
Q. Does that concern you in any way?
A. If I'm recalling to correspondence correctly --
Q. Look at the footnote if you need a reference. I think it outlines it.
A. So the footnote specifically says since the framers discovered additional fire damage to the roof which has to be repaired before the soda blasting can

begin.

Your line of questioning is related to Charles's office?

Q. No. I'm looking at footnote 1, during a site visit when the removal of the interior walls was discussed. Do you see that?

A. Oh, I do see 1, sorry.

Q. Okay. That's what I'm talking about.

A. Thank you. Okay.

Q. Have you read all of footnote 1?

A. I have.

Q. Does any of that cause you concern about Mr. Elliott's actions?

A. What I understand was going on was to identify what the scope of the work was to be. If that was to remove everything to the studs, I mean, there's continuing developments. You're trying to identify what the scope of the work was. I'm not -- I'm not alarmed that there is conversation about what the scope of the work was. Should there be conversations around what the scope? Yes. Does it include all the rooms? Does it include specifically Charles's office? Yeah. And I believe that ultimately there was some other additional correspondence from you and Jeremy on this particular issue, and ultimately this idea of physical damage was

resolved.

Q. And you do know that Elliott told people it had to be taken down to the studs and then said, no, it doesn't have to be taken down to the studs, basically?

MS. MOSS: Object to the form.

Q. (BY MR. DAUPHIN) That he reversed course?

MS. MOSS: Object to the form.

Q. (BY MR. DAUPHIN) Do you understand that?

A. I understand what you're saying, yes.

Q. Okay. And that he denied saying that he had ever told anybody to take it down to the studs. And, in fact, we've got Ms. Palk's records where he told her it was going to be taken down to the studs.

A. Okay.

Q. All right. It appears to be that Mr. Elliott is not being truthful to the insureds.

MS. MOSS: Object to the form.

Q. (BY MR. DAUPHIN) Did that concern you at all?

A. So if there is -- if there is, in fact, a misrepresentation by Jeremy, which I don't think that to be the case, that would give me concern.

Q. Okay. And did you know that Mr. Elliott never even checked to see if there was smoke damage behind the walls in the bedroom and bathroom areas before he declared that they should -- that they would not be torn

down or that Chubb would not pay for the teardown?
A. I don't know.
Q. You don't know.
Do you know that Mr. Zlotnik came in and was the one that paid -- or the one that discovered that the insulation behind the walls in the bedroom were covered with smoke residue?
A. I believe so, yes. I recall that correspondence.
Q. Well, does Chubb desire to pay for the damage that it is required to pay for under the policy?
A. Yes.
Q. And is the insulation, if it's covered with smoke residue in the master bedroom, should it be taken out and paid for and the cost of removing it paid for by Chubb?
A. Repair or replace, It should be addressed, yes.
Q. Okay. And should be paid for by Chubb?
A. Yes.
Q. And Chubb wants to abide by the policy. Correct?
A. Yes.
Q. And Mr. Zlotnik was the one that found that after Jeremy said it would not be torn down. Assume

that to be true.
A. Okay.
MS. MOSS: Object to the form.
Q. (BY MR. DAUPHIN) Then why doesn't Chubb want to pay Mr. Zlotnik's fee for bringing to Chubb's attention a wrong -- I mean, a loss under the policy that Chubb should pay for?
A. Chubb agreed to pay for those costs in part, as you're aware.
Q. Only after Mr. Zlotnik came in and discovered it. Do you agree with that?
A. I can't remember the timeline, but we did agree to pay for, in part, some of his costs.
Q. And -- right. Why wouldn't you pay for all of his costs if he's the one that found the damage that Chubb was obligated to investigate to begin with?
A. You have to questions in there.
Q. No, that's one.
MR. DAUPHIN: Read back the question, please.
(Requested testimony read.)
THE WITNESS: Thank you.
A. It would be unusual to bring in somebody from Philadelphia. There are industrial hygienists that undoubtedly are closer that we would pay for those

costs, and that's --
Q. (BY MR. DAUPHIN) Why didn't you do it then? Why didn't you investigate -- okay, I'm sorry. What now?
A. Hang on. We did pay $15,000, which was agreed in advance, if I remember right -- and feel free to correct me if I'm wrong, but --
Q. You're wrong.
A. -- we paid those costs in advance of him coming down.
Q. We didn't agree to accept $15,000.
A. You didn't agree to accept it?
Q. No.
A. I do understand that, yeah.
Q. Okay. And you know that you initially objected to paying any of Mr. Zlotnik's fee?
A. Yes.
Q. And prior to his arrival, nobody had checked behind the master bedroom to see if the insulation was -- had smoke residue, did they?
A. I don't know.
Q. All right. To your knowledge, nobody did it before Mr. Zlotnik came by?
A. I don't know.
Q. To your knowledge, you don't know of anybody

that did it before Mr. Zlotnik discovered it, do you?
A. That is true.
Q. Okay. So let's assume that Mr. Zlotnik had not come back and we had agreed with what Jeremy had said that it doesn't have to be torn down and it was left there. And you got a home that's less than a year old that is being repaired, and the master bedroom and the master bath, the insulation behind their walls are soaked with smoke residue. That's a problem for the homeowner, isn't it?
A. If that would have been left, I would agree, that's a problem.
Q. So the impact of Jeremy saying one thing, we're going to take it down to the studs, and then saying, no, we're not, had the potential of having very serious consequences, didn't it?
MS. MOSS: Object to the form.
A. Potentially, if it would have been left, yes.
Q. (BY MR. DAUPHIN) And the reason -- one of the reasons it wasn't left at that time is because Mr. Zlotnik found it?
MS. MOSS: Object to the form.
A. Sure, one of the reasons.
Q. (BY MR. DAUPHIN) And Pacific won't even pay his full fee for doing it, will they?

A. We agreed to pay what we thought was reasonable for the service.
Q. Why was he initially brought to Alabama by the Goodrichs?
A. I'm not sure of all of the reasons why he was brought to Alabama.
Q. In an attempt to refresh your recollection, don't you know that he was brought to develop a protocol to ensure that there would not be any smoke odors in the future?
A. I agree with that.
Q. Okay. He was not just an industrial hygienist, was he?
A. I don't recall what all of his qualifications are. He's a industrial hygienist from what I do recall.
Q. Well, you don't dispute that he is one of the leading experts in the country over smoke remediation processes, do you?
MS. MOSS: Object to the form.
A. Yeah, I don't know if he is a leader or not.
Q. (BY MR. DAUPHIN) Well, did you consider that when you were going to pay his fee?
A. Again, I'm unclear if he was a leader in the industry, so it wouldn't have been a consideration because I had no knowledge.

Q. Well, we submitted his résumé.
A. Okay.
Q. And to a new homeowner who has lost a house due to a fire, you certainly understand that whether smoke odors are going to come back in the future is a very important consideration, don't you?
A. I would agree with that.
Q. Okay. Do you still believe that Pacific should not have paid the entire fee for Mr. Zlotnik?
A. I believe we agreed for $15,000, which I understand you didn't agree with. That is what was paid.
Q. Okay.
A. There's certainly industrial hygienists that wouldn't have to travel to that extent that he did.
Q. Were any of those industrial hygienists that you're referencing have his expertise in the prevention of future smoke odors?
A. Again, as I just mentioned, I don't recall what his résumé is. So without that, I wouldn't have the résumé of others to compare in front of me today.
MR. DAUPHIN: I tell you what. Let's take another five minute break. I am going to be through in an hour, so you can make your -- as long as we don't have to go through those construction

contracts, I think I will be.

THE VIDEOGRAPHER: And we're going off the record at 2:52.

(Break from 2:52 p.m. to 3:04 p.m.)

THE VIDEOGRAPHER: And we are back on the record. The time is 3:04.

Q. (BY MR. DAUPHIN) I want to talk about Brookstone a second. How -- who arranged for Brookstone to appear at Dell Road?

A. I don't recall.

Q. Where would that information be? Jeremy says he didn't do it.

A. Maybe in the claim file. I don't recall reviewing that information, but it's a possibility it's there.

Q. I didn't see it. Where else would it be if it's not in the claim file?

A. It would be in the claim file if we called them out.

Q. Well, somebody called them out. So it should be in the claim file is what you're saying?

A. Yes.

Q. Okay. If you would look -- you don't dispute that Brookstone probably, in all likelihood, appeared at the request of Pacific?

A. Yeah, I think that's a probability.
Q. Okay. And what is Brookstone?
A. Can you clarify?
Q. They are a restoration company that has -- are they national and have individual franchises?
A. I do believe they're a restoration company.
Q. Right.
A. How large their operation or footprint is, I don't know.
Q. Okay. And to your information, does Chubb use them on a regular basis?
A. I don't know to what degree Brookstone's used.
Q. Is there any reason they called Brookstone as opposed to Servpro?
A. Not that I'm aware of.
Q. Does Chubb frequently use Servpro?
A. How frequently, I don't know, but I've certainly seen Servpro on -- on jobs.
Q. If you would turn to Exhibit 86. Sorry about that.
A. Thank you.
Q. Can I hold something here? Sorry about that.
Looking at Exhibit 86, starting from the bottom up, is that an email from Andrew Arrant to Jeremy Elliott?

A. It is.
Q. And does he say, Ms. Goodrich called me this morning to discuss what other things we will be demoing after Cliff. The consultant -- that's Mr. Zlotnik for your sake -- found smoke in the master bedroom, living room and kitchen hallway. She wanted us to go ahead and start the demo of these areas.
And then Arrant tells Jeremy, I did inspect these areas myself and do see some smoke residue, but I won't move forward until you can see it and approve it. So at this point I am also waiting for the report to come back to finish the structure clean estimate as well.
Mr. Arrant, of course, did not work for Pacific or Chubb or Mr. Elliott, did he?
A. No.
Q. And whether he moved forward on the repairs that Ms. Goodrich asked him to do should not be contingent on Jeremy approving it, should it?
A. The ultimate decision of the work to be accomplished Jeremy wouldn't approve.
Q. Shouldn't approve anyway? I mean, he shouldn't play a role in the work that's ultimately decided to be done by the Goodrichs. Correct?
A. Yeah.

Q. He decides what Pacific will pay?
A. Fair.
MS. MOSS: Object to the form.
Q. (BY MR. DAUPHIN) Okay. And this email is not copied to the Goodrichs, is it?
A. No, the Goodrichs are not on this email.
Q. And at the top of the page is Jeremy's response. He says, Andrew, thank you for the update. Once we have the report we could determine steps moving forward.
He doesn't reference the Goodrichs, does he?
A. He does not specifically reference the Goodrichs.
Q. And then he says, I am not agreeing to expanding the scope until I get the IH report, which would be reviewed by our IH.
So in the email, he says he's not going to agree to expand the scope, doesn't he?
A. That is, in part, what his email says.
Q. Okay. And he says until I get the IH report which will be reviewed by our IH. They never had an IH, did they?
A. Chubb didn't engage an IH.
Q. And that's because Mr. Zlotnik gave them all the information they needed. Right?

A. I don't recall the exact details. There was some discussion later, I think between you and Mr. Elliott, about not needing duplicate efforts.

Q. I think the email was we don't need any more IH information. Here is Mr. Zlotnik's report. If Chubb wants to, the house is open.

A. Okay.

Q. Is that a fair --

A. Without having it in front of me --

Q. -- representation?

A. -- it seems to be, to the best of my knowledge.

Q. The Goodrichs certainly weren't telling Pacific what it could do and not do in looking at the construction project, were they?

A. I don't recall the Goodrichs telling Chubb they could or could not do something.

Q. Okay. Then why is Chubb not agreeing or would later agree to expand the scope of the repair? If the Goodrichs aren't telling Pacific what to do, why is Pacific having to agree to the scope of things to be done on behalf of the Goodrichs?

MS. MOSS: Object to the form.

A. I'm unclear on the question.

Q. (BY MR. DAUPHIN) Okay. Also, are you aware

that when we talked with Brookstone about doing the smoke remediation, that they had not met some of the qualifications the Goodrichs thought they needed to have in order to perform the smoke remediation?

MS. MOSS: Object to the form.

MR. DAUPHIN: I'm just asking if he's aware of that.

Q. (BY MR. DAUPHIN) Are you aware of that generally?

A. I'm generally -- sorry. I am generally aware that there was correspondence between you and Jeremy and possibly others about Brookstone's qualifications.

Q. And that Jeremy, for lack of a better phrase, stood up for Brookstone saying we had approved -- or they had explained their qualifications to us which were good qualifications, and that Jeremy was, therefore, whatever phrase you want to point it, he was supporting Brookstone?

MS. MOSS: Object to form.

A. Yeah, I don't know that he was standing up or supporting Brookstone.

Q. (BY MR. DAUPHIN) Okay. But let's say he was sending an email in support of Brookstone. How about that?

MS. MOSS: Object to the form.

A. I recall some correspondence. As I'm sitting here right now, I don't remember the details of it.
Q. But it's not -- it's not Jeremy's role to approve or not approve of Brookstone, is it?
MS. MOSS: Object to form.
A. Yes, we -- as I answered earlier, the Goodrichs ultimately are going to decide who performs work at their home.
Q. (BY MR. DAUPHIN) Right. So in addition to the discussion we just talked about on basically hiring Mr. Zlotnik because of his smoke remediation expertise, we've got the -- Jeremy -- I'm sorry, Andrew with Brookstone writing Jeremy about the scope of tearing down the bathroom and bedroom walls. And then we've got Andrew and Jeremy discussing the extent of the soda blasting. And then after Goodrichs -- were terminated, there was an issue about water in the basement, and Elliott calls me wanting me to get the Goodrichs to hire Brookstone again. Do you recall that?
A. I recall that correspondence.
Q. That demonstrates to me there's a pretty good close relationship between Jeremy and Brookstone.
MS. MOSS: Object to the form.
A. If that's -- if that's what it demonstrates for you.

Q. (BY MR. DAUPHIN) Does that demonstrate that to you?
A. What it demonstrates to me is that Jeremy is trying to identify the scope of the repairs, and then the latter part of the question concerning the water in the basement, I honestly think that Jeremy's first reaction was how can we stop the water and Brookstone might be the most familiar, maybe they can help.
Q. What about Jeremy asking Enservio to ask Andrew or Brookstone to take these rugs and get them appraised for me?
A. I'm sorry, what's the question?
Q. Is that normal for an insurance adjuster to ask Enservio to ask a restoration company to take rugs to get an appraised value on the rugs?
A. It is common practice for a vendor to take contents, in this case rugs, to be cleaned or to be appraised.
Q. Wouldn't you expect Jeremy to have that direct contact with Brookstone on that, or do you just assume -- well, here is what it looks like to me, that Jeremy knew Andrew would do whatever he wanted him to do, and he just could tell Enservio get Andrew to do this and get something on the rugs, and Jeremy knew it would be done because Andrew was going to do everything

Jeremy wanted him to do?
MS. MOSS: Object to form.
Q. (BY MR. DAUPHIN) Now what is wrong with that picture --
MS. MOSS: Object to the form.
Q. (BY MR. DAUPHIN) -- if anything?
A. So you started this line of questioning with it seems to me that this is what has occurred.
Q. Right.
A. And so what's wrong with that picture? I don't -- I don't believe that, as you outlined it, is what happened in this matter. Jeremy is not up to something sinister to try to get Brookstone to do something. I mean, maybe to the extent that something needs to be done, for example, these rugs do need to be transported to an appraiser. Again, that's pretty normal.
Q. Okay. Well, you would agree that toward the end, while Brookstone was still on the job, that they were asking Elliott if it was okay with him if they did certain repairs at the house? You agree that happened, don't you?
A. I'm aware of some correspondence, again, going back to what the scope of the work is.
Q. All right. Speaking of the rugs, we're

talking about the rugs that went to Asia Rug Company. Do you know -- Asia Rug Company, do you know what they do?

A. I'm not familiar with Asia Rug.

Q. All right. They are a restorer or a fixer of rugs.

A. Okay.

Q. They don't sell and they don't buy rugs.

A. Okay.

Q. Why would you ask them for the replacement cost if they don't sell or buy rugs?

A. I think it's -- there's a lot of appraisers that aren't in the business of selling or buying rugs. I don't have an issue, assuming that they're qualified, to give an opinion as to what the value of the rugs would be to clean or replace.

Q. Well, how -- if they don't buy rugs and don't sell rugs, how are they going to know the cost to replace the rugs?

A. I mean, there's -- there's appraisers that what they do is appraise the value of items, rugs or other, you know, personal property items, and those appraisers may not be in the business of buying or selling rugs.

Q. You know that -- I said replacement cost in my

question. Do you recall that?
A. Please repeat the question.
Q. There's -- I won't go back through that again. There's a difference in replacement cost and the valuation of a rug, isn't there? I'm sorry, between a replacement cost and the appraisal of a rug?
MS. MOSS: Object to the form.
A. I'm unclear on the question.
Q. (BY MR. DAUPHIN) Well, an appraisal could be this is the value of a ten year old rug, what you could sell it for now.
A. Okay.
Q. And a replacement cost is what it would cost to replace that rug not in its used condition but in it's new condition. Isn't that right?
A. My understanding -- my understanding of a rug appraiser -- or appraisal, sorry, or the appraisal of any particular item is to identify what the value of the piece is. Whether you want to call that the appraised value or the replacement cost value, I think we're talking about the same value.
Q. I don't.
Are you saying -- and you called replacement cost value. The policy doesn't talk about replacement cost value, does it?

A. The policy talks about repairing or replacing --
Q. Okay.
A. -- as it relates to contents.
Q. Okay. And we're talking about replacing. All right? Now the replacement cost is different than the appraisal value, isn't it?
A. I think they're the same value. I don't understand the line of questioning on -- and help me, if you can. What are we talking about the appraisal difference between the -- the appraisal versus the replacement? If you have an example that would probably help.
Q. No, if you don't know the difference in appraisal and replacement cost, that's okay.
A. I believe them to be the same.
Q. All right. And you know the appraisal by Asia Rugs was an appraised cost and not a replacement cost, don't you?
A. That's fine.
Q. And you do know that on the -- we will just look at it real quick. That's all right. When they submitted the replacement cost on the rugs, there were two rugs, one rug on replacement cost was less than the original cost? You don't recall that?

A. Without it in front of me, I don't remember the level of detail on the rugs.

(Sotto voce discussion.)

Q. (BY MR. DAUPHIN) Okay. One of the rugs that I am going to show you -- you've got Exhibit 149 in front of you. Oh, excuse me. Looking at Exhibit 149, on the first page you see the purple line, and that is a dining room rug?

A. I do, yes.

Q. Okay. And the replacement cost is less than the original cost, according to this spreadsheet?

A. According to the spreadsheet, original cost 22,000, replacement cost 18,000.

Q. And Asia Rug, if you look under the notes out to the side, and that talks about Asia Rug Company's appraisal, doesn't it?

A. It does.

Q. And they appraised it at $8,000?

A. They do.

Q. Okay. That's not -- you're not saying you can buy that rug for $8,000, are you?

A. I can't speak to the level of detail of this rug, but an appraisal value, in my mind, is the value that the rug can be replaced for.

Q. Okay. That equating of appraisal and

replacement cost is not in the policy, is it?
A. The policy speaks to replacement.
Q. It does not speak to appraised value, does it?
A. It doesn't talk to appraised value.
Q. Okay. Did -- I have got some miscellaneous items to talk about.
On the construction, the repair costs --
A. Okay.
Q. -- did Pacific have any objection to the costs submitted by TCC, or was it the scope submitted by TCC?
A. I think we have multiple proposals from TCC. So just to help my understanding and clarification --
Q. And I'm talking about the one that was submitted with the sworn proof of loss.
A. Okay.
Q. Does Chubb have a problem with the scope, such as the -- including the outside doors, or do they have a problem with the cost of the outside doors, for example?
A. I don't -- so scope drives cost, of course. Concerning the level of detail as to if outdoor doors, exterior doors required replacement or not, I don't recall us having issue with replacing exterior doors. And as long as those -- you know, the doors are what the doors cost, I wouldn't have any concern of that.
Q. Okay. What if the cost of the doors if -- and

I'm using doors as an example.
A. Okay.
Q. Okay. But let's say the cost of molding or the cost to do the molding is $10,000.
A. Okay.
Q. And does Chubb have a problem with the cost of the molding as opposed to whether or not the molding should be replaced as an -- for example purposes?
A. We don't take issue with the scope of work specifically in the example of removing or replacing crown molding.
Q. Okay. I'm using molding, crown molding just as an example --
A. Sure.
Q. -- to explain whether or not you are challenging the cost of an item or whether the scope of that item, whether it needs to be used. Do you understand that distinction?
A. I understand.
Q. All right. Does Chubb object to TCC's estimate on the cost of the repairs versus whether the repair is needed?
A. So we don't take issue with the repair costs -- or I'm sorry, let me rephrase.
Chubb doesn't take issue with the scope of

work. Generally speaking, I think we all agree the repair cost included removal of materials to the -- to the studs. And there's a lot involved in that, and we understand. I think we understand that together.

The cost of the repairs, I cannot think, as I'm sitting here today, that there is a particular item that I would point to and I say, oh, no, that we take issue with. I can't think of any costs that stand out like that.

Q. Did Chubb review Ms. Goldsmith's compilation of costs -- construction costs in Birmingham, Alabama?

A. Can you refresh my memory on Goldsmith?

Q. She was the risk -- she's the person that went in to judge the risk after the policy is issued.

A. Okay.

Q. And as part of her job, she testified that she keeps track of costs of contractors in Birmingham, Alabama.

A. Okay.

Q. Do you recall if Chubb looked at that resource to determine whether or not TCC's costs were reasonable?

A. I don't know that we would have compared TCC's costs to the costs of Goldsmith's appraisal.

Q. Not to her appraisal, but to all the information she has accumulated about the construction

costs in Mountain Brook, Alabama?

MS. MOSS: Object to the form. I think that mischaracterizes her testimony.

Q. (BY MR. DAUPHIN) Did Chubb look at any of that information?

A. Yeah, we're -- and I am aware of the appraisal and the values of the home. I don't know if that answers the question.

Q. It does not.

A. I'm unclear on what your question is.

Q. I'm not talking about the appraisal at all. I'm talking about the information she accumulates and stores on the cost of building houses in Mountain Brook, Alabama.

MS. MOSS: Object to the form.

MR. DAUPHIN: I'm just trying to find out if he looked at it or not. It's a simple question. Either he looked at it or he didn't.

MS. MOSS: Well, I object to the form because I think it mischaracterizes the evidence, and I don't even recall her saying that she had that.

A. So I'm unaware if she has a database or it includes contractors, I don't know.

Q. (BY MR. DAUPHIN) So if she has it, you certainly -- no one at Chubb looked at it, did they?

A. I don't have knowledge to a database that she might have.

Q. Okay. And you didn't see anything in the claim file or anywhere else that Chubb had accessed that information in relation to the payments under this claim?

A. That is accurate.

Q. Thank you.

Do you believe window shades should be part of the extra living expenses or not?

A. I'm sorry, I didn't -- it's not that I didn't understand. I didn't hear the question.

Q. Under the extra living expenses, do you believe window shades are covered as an extra expense?

A. I believe that the reasonableness of window shades could be considered an extra expense.

Q. What would you say is a reasonable cost to comport with the usual standard of living for the Goodrichs for window shades?

A. I can't provide testimony on a cost that would be -- that would be reasonable without additional information from you. I'm sorry.

Q. Something would be reasonable for window shades. Right?

A. Sure, I would agree with that.

Q. Okay. The security system, ADT system --
A. Uh-huh.
Q. -- was not provided by the landlord at the rental house, so the Goodrichs supplied the ADT system. Why isn't that an extra cost of living covered by the policy?
A. In general?
Q. Yeah.
A. We're not making improvements to a rental home.
Q. Even if the Goodrichs, of course, had a security system and they've got three young daughters, they want a security system in the rental home, Pacific says that's not covered under the policy as an extra living expense?
A. So if the home is missing some of the most basic items that it needs, I would say -- I would say that a different house should be considered.
Q. How many rental houses were available in the school zone in Mountain Brook, Alabama in which the Goodrich children attended?
A. Yeah, I have no idea.
Q. Would you be surprised if there was only one which they initially rented?
A. I don't have any information to how many would

be available.
Q. Well, don't you know that we purchased the house and rented it to them because there were no rental houses available, decent rental houses available in the school district?
A. I'm aware that you purchased a home and later they moved into it as a rental.
Q. And don't you know it's because there were no other alternatives?
A. I don't know.
Q. Well, if there are no rental houses in the school district except this one and it doesn't have an ADT system, do you still say, well, that's tough, we're not going to pay for your security? Is that right?
A. I think we should look at solutions that stay within reasonableness. That might be a different house.
Q. There aren't any available.
A. Well, that's --
Q. How are you going to find a different house?
A. That's what you say, there's not any available.
Q. Well, there's going to be sworn testimony to that effect. Do you know of any evidence otherwise?
MS. MOSS: Object to the form.
A. Yeah, and I'm saying that there are other

solutions available oftentimes anyway.

Q. (BY MR. DAUPHIN) Well, why didn't Pacific offer them?

A. We didn't -- we weren't even aware that certainly moving into the -- from the -- I'm going to call it the first rental house to the second rental house, Pacific wasn't even aware that that was happening.

Q. Well, the Goodrichs weren't under any obligation to tell Chubb that the first rental house was unlivable so they're moving before they told him that, were they?

MS. MOSS: Object to the form.

Q. (BY MR. DAUPHIN) I mean, they didn't have to -- I will strike that then.

The Goodrichs were under no obligation to ask Chubb is it okay if we move from this uninhabitable rental house to another rental house, were they?

A. No.

Q. I'm sorry, what now?

A. I said no.

Q. All right. Do you know that Jeremy, one of his solutions was that they move into the Grand Bohemian Hotel?

A. I don't know what the Grand Bohemian Hotel is.

Q. It is a very fine, upscale hotel.
A. Okay.
Q. And do you think that's reasonable for Chubb to place the Goodrichs in two bedrooms of about $300 to $400 per night each for a long-term stay?
A. I don't have the level of details, one, for the hotel or the length of stay that might have been proposed.
Q. Well, from Jeremy it was until your house is repaired.
A. This is the first I've heard of the Bohemian Hotel.
Q. Well, the concept of them living in a hotel for a year and a half with three children is ridiculous, isn't it?
MS. MOSS: Object to the form.
A. That's not my testimony.
Q. (BY MR. DAUPHIN) I'm sorry?
A. You asked me if it was ridiculous.
Q. Right.
A. I wouldn't use the word "ridiculous." That's not my testimony.
Q. What would you use? Unreasonable?
A. I don't know. Again, I don't have the level of details that are around this idea. It's the first

that I've heard of this hotel. I don't know that it was going to be an 18-month stay. I would speak to it's normal for someone to move into a hotel while they're identifying temporary living accommodations.
Q. Well --
A. That's normal.
Q. -- your adjuster who you supervise recommended or said why don't y'all just move into the Grand Bohemian, you can do that and we'll pay for it. Would Chubb pay for the Grand Bohemian, plus dog expense because they can't live in the Grand Bohemian, for a year?
A. Potentially. I don't have the level of details to be able to tell you for certain one way or the other.
Q. So you might pay that, but you won't pay the $2,500 to install an ADT system. Is that correct?
MS. MOSS: Object to the form.
A. It's about the coverage, not about the cost.
Q. (BY MR. DAUPHIN) We're talking about reasonableness, aren't we?
A. Correct.
Q. Nowhere in the policy does it say that if it's a fixture in a house, it will not be covered as an extra living expense, does it?

MS. MOSS: Object to form.
A. The terminology you just used is not in the policy.
Q. (BY MR. DAUPHIN) Is there any language in the policy which you interpret to mean we will not pay for any fixture that is attached to a rental house as an extra living expense?
MS. MOSS: Object to the form.
A. What I understand the policy to say, and it does state, is it talks about the reasonableness.
Q. (BY MR. DAUPHIN) Well, exactly. And what I was comparing was the reasonableness of a Grand Bohemian stay with the reasonableness of a $2,400 ADT security system.
A. I understand what you're saying.
Q. All right.
A. And my prior testimony was we're talking about a coverage and we're talking about a cost. There are differences.
Q. Well, I asked you about the coverage, and you said it came down to reasonableness as to whether a fixture would be covered as an extra living expense. And we're talking about the Grand Bohemian as being an extra living expense, So aren't we both talking about the reasonableness of those two things?

A. You're talking about the fixtures. I'm saying to do the level of detail to a rental house would be unusual, not what we would generally find to be reasonable. A hotel stay --
Q. For a year?
A. -- we often find to be reasonable.
Q. For a year's stay, is it a reasonable payment?
A. Certainly -- and I'm not suggesting that this was a solution for the Goodrichs, but people have stayed in hotels for longer than a year.
Q. And Chubb pays for it?
A. Chubb does pay for that.
Q. Okay. And you expect a family with three children and two -- two dogs to do that?
A. I didn't say that.
Q. It's not reasonable under these circumstances, is it? Sir?
A. Again, a year? I don't know.
Q. Well, it's actually 18 months.
A. 18 months? You used a year, but I understand.
Q. All right.
A. And we're talking about -- go ahead.
Q. No. We were talking about what? I don't want to interrupt you.
A. Yeah, I lost my train of thought.

Q. Okay. We'll move on.
How does Chubb determine the length of time which additional living expenses will be paid?
A. Generally, we would be talking about a period of restoration and how long it would take -- a reasonable time it would take to construct the project.
Q. And where do you get that information?
A. Various sources. It could be from a building consultant like J.S. Held. It could be from the contractor.
Q. And, in fact, that's what guidelines say do. Don't the guidelines say based on experts, vendors, that sort of stuff? I mean contractors.
A. Yeah, I know we have it in this volume of paper. I don't have it in front of me, but --
Q. Well, look at Exhibit 13. I don't think the guidelines are but 12 pages long.
A. Right. I'm at 13.
Q. I'm sorry, Exhibit 13?
A. Yes.
Q. If you look under time element, I think that's page 10.
A. Thank you.
Q. And under time element, the first bullet point says the adjuster should document the file with an

evaluation of potential ALE based on the reasonable amount of time it takes to complete repairs as provided by the approved expert/vendors. Is that what it says?

A. That is what it says.

Q. Okay. And then it says you should also document the file with an evaluation of the insured's normal standard of living, the insured's ongoing expenses and based on a documented and incurred basis per the contract language. Is that what the guideline states?

A. That is.

Q. Now did you see anything in the claim file about the insured's normal standard of living?

A. Yes.

Q. What was that?

A. I think the normal standard of living has been talked about numerous times throughout the claim document.

Q. I am looking at the language of the guideline under time element at the bullet point that says document the file with an evaluation of, and then it says on down, the insured's normal standard of living.

The insured's normal standard of living, did the file have any evaluation of that?

A. I believe that we all understood what the home

was. I don't believe that I understood we know and understand what the standard of the house and the living expenses in that house -- or not the expenses, but the standard of living in that house were.

Q. All right. And your guidelines said your general adjuster not only should evaluate that, but should file that evaluation of the insured's standard of living, doesn't it?

A. We read it, yes.

Q. Okay. And there's not such thing in the claim file, is there?

A. I can't point to a file note that talks about a standard of living or details that to some extent. What I can tell you is it was clear that Pacific understood the standard of living.

Q. Then why didn't they pay for the window shades if they understood the standard of living?

A. Again, back to reasonableness.

Q. Okay. And why didn't they pay for the rugs on the floors in the rental house if they understood the standard of living?

A. Two part answer. Some reasonableness. And secondly, there was a period of time where we're trying to identify if the rugs, and several other items, are replacing contents over at the home or if they were,

indeed, related to any kind of additional living expenses.

Q. Well, they weren't filed under the claim for contents, were they?

A. They weren't filed for the claim of contents --

Q. Okay.

A. -- but the carrier will still ask questions as to the submission, which is what we did.

Q. Okay. Was that asked anywhere?

A. Yes, sir.

Q. I tell you what. I'll move on from this.

A. Okay.

Q. We can show that otherwise.

Now the reasonable time of completion of the repairs, is that from the date the repairs are started?

A. The policy talks about from the time of loss.

Q. Okay. But if you're looking at the cost of repair from the time of loss, there has to be a planning stage before the construction actually begins, doesn't it?

A. Yeah, I would agree with that.

Q. Okay. So the time of construction -- I'm sorry, strike that.

The time for payment of additional living

expenses would be the time of actual construction and the time of planning as to what the reconstruction is going to require?

A. I would agree with that as well.

Q. Okay. Would the fact that COVID may have impacted the cost -- the time in which you could get it repaired, would that be a factor that should also be considered?

A. I think it should be.

Q. Okay.

THE WITNESS: Not a rush, I don't mean to interrupt you, but whenever there's a natural break, I want to run for one more restroom break.

MR. DAUPHIN: Yeah, that's good timing.

THE WITNESS: Okay.

MR. DAUPHIN: And I really do think I'm about through.

THE VIDEOGRAPHER: We're going off the record at 3:46.

(Break from 3:46 p.m. to 3:53 p.m.)

THE VIDEOGRAPHER: And we are back on the records. The time is 3:53.

Q. (BY MR. DAUPHIN) If you would please look at Exhibit 7, page 6, paragraph numbered 7 on that page.

A. All right. Hold on. Mr. Dauphin, 7?

Q. Correct. Page 6, paragraph 7.
And if you want to look at page 5, paragraph C it starts a topic. Do you see that? And then the first line is your June 9, 2020 email seeks additional living expenses. Do you see that?
A. I do see it, yes, sir.
Q. And then if you'll come down to the next page, which is to paragraph number 7, do you see that?
A. I do.
Q. So we're talking about additional living expenses. It's got 12,800 for additional furniture. It states the Goodrichs seek $12,894 for an additional $5,700 sofa and $5,600 Heyburn chair. Is that right?
A. That is.
Q. Now the letter says the policy covers normal living expenses, not luxury furniture to remodel rental homes. Is that right?
A. That is what it says.
Q. Now you do know that the agreement with Jeremy was any furniture bought temporarily, which was not going to be used at Dell Road, would go back to Chubb as salvage, for salvage value?
A. I understand that.
Q. And none of the furniture that was bought for Wimbleton would be to remodel the rental home

permanently, and that Chubb -- it was always understood that Chubb could get that furniture back and resell it for salvage value. Right?
A. We understood that Chubb would take back the -- for salvage, yes.
Q. Why do you -- why does the letter state it's not luxury furniture to remodel rental homes? That furniture wasn't going to remodel rental homes, was it?
A. So we're -- in my view, what we're talking about is the reasonableness of the values of these -- of these costs for sofas and what have you.
Q. Well, first of all, you agree there's no evidence that this furniture was going to remodel a rental home, don't you?
A. In this -- in this paragraph, yeah, I don't see any evidence to say that.
Q. And the Goodrichs never contested the fact that Chubb wanted this furniture back, did they?
A. They did not that I'm aware of.
Q. And the sofa and chair are smaller -- do you know that they are smaller than the sofa and chairs that the Goodrichs use at Dell Road, their home?
A. No, I'm not familiar with the level of detail of the size of items.
Q. And did you know that this sofa was in stock

and could be gotten right away?

A. Okay. I think I remember some dialogue over that.

Q. And that these values of this furniture are less than the value or the cost of the furniture she uses in her residence?

A. Okay.

Q. So if you're going to determine the reasonable cost to the normal standard of living --

A. Uh-huh.

Q. -- the reasonable cost to the normal standard of living would be greater than the cost of this sofa and chair, wouldn't it?

MS. MOSS: Object to form.

A. So the policy is clear, in my view, that we pay for the reasonable costs associated with living expenses to maintain the same standard of living.

Q. (BY MR. DAUPHIN) Right.

A. And we take issue with a reasonable cost of 13,000 -- and I'm rounding -- for -- well, I'm sorry. 5,700 for a sofa as being a reasonable cost for temporary furniture.

Q. Well, the paragraph then states the average cost of a sofa. What does the average cost of a sofa have to do with determining the reasonable value of

furniture according to the Goodrichs's standard of living?

A. I think we're just pointing out the difference in the value of an average sofa, and that has been claimed.

Q. You agree that the Goodrichs standard of living is above average?

A. I would agree that they're above average, yeah.

Q. Okay. And yet, Pacific rejects the claim and on the basis says this is the average cost, and aren't they implying that you have to buy something that is an average cost?

A. I don't think that that is what this paragraph says. The way that I understand this is that we take issue with 5,700 being a reasonable cost for furniture in a rental home.

Q. And you object because you think that is greater than the Goodrichs's standard of living?

A. We've established that the standard of living for the Goodrichs is above average.

Q. Right. Do you contend that these costs are greater than the Goodrichs's standard of living?

A. We contend that these costs are above the normal standard, yes.

Q. Average, correct? You're contending these costs are above average?

A. Yeah, so a reasonable cost. They're certainly above average, yes.

Q. All right. And if the Goodrichs had bought something that was average cost, would Pacific have paid it?

A. I believe so.

Q. Well, why didn't Pacific pay the $3,000 then as opposed to paying nothing?

A. I don't know.

Q. That would be -- even if you were to adopt Pacific's rationale, the -- that $3,000 would be a reasonable cost, wouldn't it?

I tell you what. I'll move on --

A. Okay.

Q. -- it's pretty obvious, just to get through.

What comprises the file claim?

A. The claim file would be the file documentation, the emails.

Q. What besides emails would be there?

A. The claim file itself.

Q. What comprises the claim file?

A. So we have what I would generally reference as the claim file, a system by which notes are entered, and

I would normally call that the claim file. And then in addition to that is the emails, the claim file all together. Documentation that has to do with the claim.

Q. Is there a diary of sorts that the general agent keeps on when he does things?

A. The general adjuster?

Q. Uh-huh.

A. Yes. There's a task system, if you will.

Q. All right. And is that part of the claim file?

A. The task system itself is not part of the claim file, no.

Q. All right. And what is in the task system?

A. Reminders. You know, you would set yourself a task to go back into the claim system to, a diary management --

Q. Okay.

A. -- I think, to answer your question.

Q. If you were going to have a meeting with the insureds at the house at a certain date, would that be in your task system?

A. I mean, not -- not necessarily, no.

Q. Would there be any record of a meeting that your general agent had with the insured at the house?

A. Yes. The general adjuster would document that

they met at the house on a particular day.

Q. Would that just be a note to the file?

A. Yes, sir.

Q. Okay. Then what's in the task system?

A. I mean, there -- it's -- it's a reminder type of system. I don't know how else to describe it. It would be -- you know, so for me personally, you know, I keep a task or a diary system for claims. Let's say it's time to go and look at that particular claim. So it would come up on my dashboard that day, and I would go and look at the claim.

Q. Now under that system, do you ever put in what you've done?

A. Not necessarily. What's done is captured in the file notes.

Q. All right. Did Mr. Elliott use the task system?

A. Everybody uses the task system differently. He would to some extent have had to have used it, yes.

Q. And would it have notations about the Goodrich file and what his tasks were in relation to that?

A. No, not necessarily, because that information would be captured in the file notes. So there's file notes, and then there's just this rolling task system that comes up that says, hey, reminders.

Q. Would that reference the Goodrich file?
A. I mean, there's a task system associated with all of -- with every file.
Q. And there's a task system associated with the Goodrich file?
A. Sure.
MS. MOSS: Asked and answered.
Q. (BY MR. DAUPHIN) What other systems are there that you or Jeremy would have entered information about on this file?
A. There's emails, and then there's the claim system.
Q. All right. What is the claim system?
A. The title of it? It's called the Claim Vision.
Q. And what's in it?
A. It's an electronic file of where we would enter file notes, the status of what's happened on the claim.
Q. How are those kept? I mean, if you were to open up the --
I'm sorry, what was the name?
A. Claim Vision.
Q. -- Claim Vision, what would you see?
A. There's various icons, you know, you tap on.

For example, if I wanted to type in a claim number, it would pull up that claim.
Q. And when you pull up that claim, what would you see?
A. The file notes.
Q. Okay. How about the emails?
A. The emails would be in the file notes, although not every email is going to be in there. The pertinent emails would make it into the file, though.
Q. Okay. How do you determine which ones are pertinent and which ones aren't?
A. Well, so I don't know how to answer your question. Things -- there's -- you know, like, for example, if you and I were corresponding -- and we did.
Q. Yeah.
A. Mr. Dauphin, are you available today at 2? That may not be in the file. I would say that's not pertinent, but --
Q. Did you have a discussion with Jeremy about the complaints I raised in my letters to you?
A. Yes, sir.
Q. Did you make any notes of that conversation?
A. I don't know that I made notes about the conversation.
Q. If you did, where would they be?

A. In the claim file.
Q. So by their absence, you're saying you did not make any notes of the conversation?
A. I don't know that I made notes of the conversation.
Q. Is it you just don't recall it, or do you -- is it possible that you made notes and you don't recall?
A. It could be either.
Q. Are the emails intermingled with the file notes?
A. They are.
Q. So if I wanted to look at an email that I knew I had on March 5th, how would I find it?
A. You can search by date. You can, like, scroll through by date.
Q. So they're not in any chronological order or anything?
A. Yeah, they are in chronological order. So you would scroll to -- you know, just scroll down to that date and begin looking for the correspondence you're looking for.
Q. Okay. And that would be intermingled with file notes?
A. It would be.
Q. And who made the decision to contact Cozen

O'Connor?
A. I don't recall, but ultimately it would be my decision.
Q. And did you review all the letters that has Ms. Moss's name on it before they went out?
A. I have.
Q. Okay. Did you review them before they went out?
A. I have.
Q. Okay. Who wrote those letters?
A. So we would ask for assistance.
MS. MOSS: I object to the extent that it's getting into attorney/client privilege information, and I think that in order for him to answer that question, he's going to have to provide information that's attorney/client privileged.
MR. DAUPHIN: Well, I don't think the identification of the person who wrote the letter, because we're obviously not talking about any confidential information because the letters were written and given out. I just want to know who wrote them. I thought you did. I got the impression today that you may not have. That's why I'm asking who wrote the letters. I think I'm entitled to know that.
MS. MOSS: Well, we're not talking about

confidential information. We're talking about attorney/client privileged information is what my objection is, not confidentiality.

MR. DAUPHIN: So you think it's privileged as to who wrote -- wrote the letter that went to the insured?

MS. MOSS: The -- any conversations related to the letter I think, yes, are privileged.

MR. DAUPHIN: And I'm not asking about those other than I just want to know who wrote the letter.

MS. MOSS: I think that goes to privilege.

MR. DAUPHIN: Well, you know the consequences if they rule against you. So I would just put it out there I don't think it's privileged because there's nothing confidential about it and I'm not asking about any discussions. So you can either --

Q. (BY MR. DAUPHIN) So I will ask again. Who wrote the letters?

MS. MOSS: So to be clear, my objection is not about confidentiality.

MR. DAUPHIN: I understand.

MS. MOSS: Well, you keep saying confidential. It's attorney/client privileged.

MR. DAUPHIN: Okay.

Q. (BY MR. DAUPHIN) And I think the same holds for --

MS. MOSS: You can answer to the extent you are not -- you cannot say anything about conversations that anyone at Pacific may have had with me.

MR. DAUPHIN: Well, let me say this. The only thing protected by the attorney/client privilege are those communications that are intended to be kept confidential. So whether you call it confidentiality or attorney/client privilege, it doesn't matter. We're talking about confidentiality, regardless.

MS. MOSS: Well, that's not right. And on top of that, it could be -- I would also say it's work product as well.

MR. DAUPHIN: That's something different. That's not attorney/client privilege.

MS. MOSS: Well, I know, but I'm adding that objection for you.

MR. DAUPHIN: But --

MS. MOSS: Because I think it is work product as well.

MR. DAUPHIN: If you're the attorney and you didn't write it, I don't know how it's your work

product.

Q. (BY MR. DAUPHIN) Let me ask you. Who wrote the letters?

THE WITNESS: I'm good to answer with the objections that you already made?

MS. MOSS: Yes, just -- but not anything that is conversations that we have had or work product between me and Chubb.

THE WITNESS: Okay.

A. So I think I can answer this safely. It's a collaborative effort. You know, there's -- there's an exchange of information and thoughts, and ultimately we land on an agreement on what the letter is going to entail.

Q. (BY MR. DAUPHIN) Who was involved in that collaborative agreement?

A. It would be -- generally speaking?

Q. No, who actually were involved?

A. Well, there's multiple letters, so.

Q. Okay. Who all was involved in the letters?

A. Well, so I can't say that every letter included all of these people. Fair?

Q. Sure.

A. Okay. So I would be involved. The adjuster would be involved. Alycen would be involved.

Q. Who else?
A. I think that's the extent.
Q. So who drafted the letter?
MS. MOSS: I have the same objection, attorney/client privilege and work product.
MR. DAUPHIN: All right.
MS. MOSS: And I think it's also asked and answered. He testified earlier that it was collaborative.
Q. (BY MR. DAUPHIN) Well, so you're saying those are the only people that collaborated on the letter?
A. To the -- to the best that I can remember, yeah, I don't recall be anybody else being involved on -- on the letters.
Q. All right. Looking at Exhibit 7, for instance. Is that Ms. Moss's signature or is that a stamp signature?
A. So you're on the last page of 7?
Q. Correct.
MS. MOSS: I object.
I mean, you can answer to the extent you know.
A. Whether -- whether it's a stamp or a wet signature, I don't know.
Q. (BY MR. DAUPHIN) Did Mr. Koos have any involvement in the decisions reflected in the letters?

A. Thank you, because Koos I had forgotten was involved at one point. So I would like to correct the record on my other statement.
Q. It's no problem.
A. Yes, so serving as the manager of --
Q. Rudoshko?
A. Yes. He may have had some, and Jerry as well.
Q. All right. Anybody else that touched this claim file and had any input on decisions?
A. Not that I recall. So just to be clear, it would be the supervisor at the time, which I had served in that role as well as Mike, and then the general adjuster, which at times was Jeremy -- Jeremy and then Jerry.
Q. Okay. So did you talk with Mike Koos?
MR. DAUPHIN: K-O-O-S, I believe.
THE WITNESS: That's correct.
A. Of course, you're asking if I've talked to Mike Koos specifically about the Goodrich file?
Q. (BY MR. DAUPHIN) Certainly.
A. I don't ever remember talking to Mike about this file.
Q. How about Jerry Rudoshko?
A. I probably would have spoken with Jerry once or twice just concerning the status of the claim, just

following it.
Q. Who had to sign off on the final action in the claim? Was that you or Koos?
A. It depends on the point in time, but the supervisor which --
Q. The final action in the file.
A. It would depend on the point in time of what actions were taken.
Q. The last actions on the claim file.
A. So right now, as it sits right now, Jerry is -- I'm sorry, Jerry is the claim adjuster and Koos is the supervisor.
Q. The claim file before the lawsuit was filed.
A. So I get a little bit uncertain on who was in what role at what time when the claim file was started, but it would either be -- it would be the manager. It would either be myself or Mike Koos.
Q. Okay. Well, Jeremy testified he left around March or April or May of 2021.
A. That seems about correct.
Q. And there's a letter of May 19, 2021.
A. Okay.
Q. I'm sorry. Yeah, it's either the 19th or 15th. Were you involved in that letter, or would that have been Koos?

A. So, sorry, one --
Q. Would you like to look at it and see?
A. I don't know that looking at the letter is going to help my recollection, because I just can't remember exactly when Jeremy would have left and exactly when letters -- but I can be definitive in that the supervisor who was involved at the time of any of the letters would have been involved.
Q. Okay. And I need to know who that supervisor was. I'm not trying to be difficult, but as of -- just look at Exhibit 10.
A. Okay.
Q. What's the date of that, please, sir?
A. It's May 19, '21.
Q. Now do you think you had any input into that letter or did that go to Mr. Koos?
A. May 19 of 2021 is awfully close to the time when Jeremy would have departed Chubb.
Q. Correct.
A. So I just cannot recall, and I'm also not trying to be difficult. I just don't -- I just don't know the time that Mike would have been involved or I would have been involved.
Q. Okay. Were you involved in decisions made in late July or August 2021?

A. That would be after Elliott left?
Q. Yes.
A. After Elliott left, the claim went to Jeremy and so did the supervision of that.
Q. Okay.
A. So that would have been Mike.
Q. Are you aware that Pacific stated that we will pay more if the Goodrichs come off the amount of their claims?
MS. MOSS: Object to the form.
Q. (BY MR. DAUPHIN) Or something to that effect?
A. I'm not aware that we made any statements that would imply that if the Goodrichs were to settle for something lesser or to give a discount or any variety of those type of situations, I'm not aware that we made any of those comments.
Q. Well, if you did, would it be proper?
A. If we -- if we've made comments that would suggest they take a discount, for example, I would not agree with it.
Q. Before -- before Pacific responded further. In other words, Pacific said we'll pay more if you reduce the amount of your claim?
A. That would be improper.
Q. All right. Do you know that was made in this

case?

A. I don't know that that's been made in this case.

Q. Well, this is, I think, the last thing I've got. Let me find it here. Just a minute. If you would look at 107. I finally found it.

THE WITNESS: Sorry.

Q. (BY MR. DAUPHIN) And is that a letter from me to Ms. Moss dated October 4th?

A. It is.

Q. And in the first sentence, do I say that Goodrichs reject Pacific's offer to consider further payment on the Goodrichs's claims only if the Goodrichs reduce the amounts of their claims?

A. Give me a moment to familiarize myself with this.

The first sentence of the letter does state the Goodrichs reject Pacific's offer to consider further payment on the Goodrichs's claim only if the Goodrichs reduce the amount of their claims.

Q. Did you see this letter?

A. Again, I've reviewed the volume of documents. I have laid eyes on every last one of these documents. I'm more familiar with it now than I was a few minutes ago.

Q. To your knowledge, did Pacific ever refute that statement?

A. To my knowledge, I don't know that we refuted the statement that you made in your letter.

MR. DAUPHIN: Okay. Let me step outside for two or three minutes, and I think I'm through.

THE VIDEOGRAPHER: And we're going off the record at 4:22.

(Break from 4:22 p.m. to 4:24 p.m.)

THE VIDEOGRAPHER: And we are back on the record. The time is 4:24.

MR. DAUPHIN: That's all we've got. Thank you.

THE WITNESS: Thank you.

MS. MOSS: Thank you.

THE VIDEOGRAPHER: Are you going to reserve? We're done?

MS. MOSS: Yes, I don't have any questions, but we will reserve signature.

THE VIDEOGRAPHER: That being said, we are going off the record at 4:24.

(Proceedings ended at 4:24 p.m.)

CHANGES AND SIGNATURE

WITNESS NAME: WALLY HAESSIG

DATE OF DEPOSITION: FEBRUARY 9, 2023

PAGE LINE CHANGE REASON

I, WALLY HAESSIG, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

___________________________________

WALLY HAESSIG

THE STATE OF __________)
COUNTY OF _____________)

Before me, ___________________________, on this day personally appeared WALLY HAESSIG, known to me (or proved to me under oath or through ___________________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this __________ day of ________________________, __________.

___________________________________

NOTARY PUBLIC IN AND FOR
THE STATE OF ______________________
COMMISSION EXPIRES: _______________

REPORTER'S CERTIFICATE

The undersigned Certified Shorthand Reporter licensed in the State of Texas does hereby certify:

I am authorized to administer oaths or affirmations, and prior to being examined, the witness was duly administered an oath by me.

I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of this action.

I am the deposition officer who stenographically recorded the testimony in the foregoing deposition, and the foregoing transcript is a true record of the testimony given by the witness.

Before completion of the deposition, review of the transcript [X] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

In witness whereof, I have subscribed my name this 15th day of February, 2023.



Julie C. Brandt, CSR, RMR, CRR
TX CSR No. 4018, Exp. 10/31/23

**&**

**&** 4:7 20:12,20 34:18 41:23 55:17 56:3 78:19 79:4 80:24 82:2,7 93:14

**0**

**003568** 3:19
**003580** 3:19
**00408** 3:25
**01254** 3:22
**01256** 3:22
**01628** 4:2
**01633** 4:2
**01661** 4:3
**01662** 4:5

**1**

**1** 3:12 93:3,10 97:12 108:23 118:10 119:13 122:11,13 155:25 157:4,7 157:10
**1,240** 47:18
**1,507,000** 12:17 12:17
**1,507,500** 14:11
**1,576,501.91** 9:24
**1.2** 15:12,20 16:4,7,19 18:20 19:3,5
**1.2.** 15:16
**1.225** 14:5
**1.225.** 13:15
**1.4** 107:8,17 108:24 109:9 110:22 112:6 113:16 117:25 121:22
**1.4.** 109:17
**1.5** 10:4,18 15:13,19,22,22 18:24 19:2
**1.5.** 15:12,20,21 15:25 19:3,5,5 110:1
**1.507.** 18:13
**1.524** 109:24
**1.524.** 109:20
**1.576** 18:13
**1/27/2020** 3:25
**10** 3:16 97:18 112:18 190:22 212:11
**10,000** 179:4
**10/31/23** 218:25
**101** 3:21 116:12 116:24 118:7
**105** 20:7
**106** 3:10,23 11:5 17:10,20,21,25 18:6 20:6,10 23:9,10 129:2
**106,000** 128:25
**107** 3:24 214:6
**10:15** 49:4,5
**10:26** 49:5,7
**11** 3:23
**11,000** 80:3
**11/19/2019** 3:21
**110** 71:25
**116** 3:21
**118** 3:12
**119** 3:25 71:23
**11:27** 88:15,16
**11:40** 88:16,18
**12** 55:15 190:17
**12,000** 37:7 79:15,23 81:19
**12,450** 37:10 46:7 47:5 79:12
**12,800** 195:11
**12,894** 195:12
**12/08/15** 42:17
**120** 3:9
**122** 3:13
**1230** 2:15
**124** 111:1,7 113:1
**124,000** 109:22 110:3,13,16,18 110:20 111:8,23 112:10
**124,765** 109:20
**12865** 218:23
**12:15** 108:17,18
**13** 3:18 64:2 68:20 190:16,18 190:19
**13,000** 197:20
**14,4** 48:15
**14,410** 43:6,8,11 45:22,25 47:1,3 47:10,16,23
**141** 4:1 153:16
**142** 4:10
**144** 4:3 153:3 154:22
**145** 4:4 147:15
**147** 4:4
**149** 4:6 34:1,7 34:12 35:13,14 59:20 177:5,6
**15** 3:10 41:10 55:16 119:9,16 119:20 120:9 153:23
**15,000** 161:5,11 164:10
**150** 26:19
**152** 4:7 41:14 55:13
**153** 4:1,3,8 5:23 5:24
**155** 4:9 8:17,18 8:24 9:10,11,13 20:1
**156** 9:8
**157** 4:10 142:15 142:20 155:4,5 155:6,25
**15th** 108:22 120:12 211:24 218:21

**166** 3:20
**1717** 1:23
**17th** 149:11
**18** 187:2 189:19 189:20
**18,000** 177:13
**180** 49:18,21,23 50:1,3
**19** 3:16 112:18 211:21 212:14 212:17
**19th** 211:23
**1:00** 108:18,20
**1:53** 136:7,8
**1st** 79:21 118:12 118:13
**1stdibs** 56:12 57:8,25 58:3,13 58:14,18,24 78:22 79:8,14 79:18,22 80:4 80:10 81:1,4,8,9 83:1,2,6 84:3,16 88:20,23 89:5,6 89:15,22 90:9 90:20 91:1,4,6 92:8

**2**

**2** 3:2 72:18 108:22 203:16
**2,400** 188:13
**2,500** 187:17
**2.254** 121:7
**2.254.** 123:22
**2.3** 121:2
**2.3.** 121:8 123:25
**20** 3:18 4:10 142:17
**2015** 49:13 50:3
**2016** 50:2
**2018** 3:18
**2020** 3:9,10,12 3:13,15,20 4:3,4 4:10 12:2 93:5,8 118:10 122:11 138:22 142:17 195:4
**2021** 3:16 211:19,21 212:17,25
**2023** 1:15,20 5:4 216:3 218:21
**205-516-1058** 2:8
**21** 1:5 11:8,13 212:14
**212** 3:16
**214** 3:24
**215** 3:3
**216** 3:6
**218** 3:6
**22,000** 177:13
**230,000** 121:23
**24** 3:20 23:7,11
**245,000** 8:1
**25** 23:17
**26** 3:13 11:21,24 13:5,11 122:7 125:20
**268** 113:1,5,6,21 114:1,3,9,9
**268,000** 113:18
**268,303** 112:22
**268,303.82.** 115:1
**27** 12:1 13:14
**28** 12:1,11 14:9 20:5 122:6
**29** 12:20
**2:04** 136:8,10
**2:22** 1:5
**2:52** 165:3,4

**3**

**3** 11:8,10 28:17 122:10,11
**3,000** 37:8,11 42:21 199:9,13
**3,400** 49:15,20
**3,580** 49:15,20
**30** 1:13 6:5,15 7:2 20:10,19
**300** 186:4
**30309** 2:16
**31** 20:18
**3100** 1:23
**311,000** 127:7 127:14 128:11 128:21 131:2,3
**34** 4:6
**358** 49:18
**39** 41:19
**3:04** 165:4,6
**3:46** 194:19,20
**3:53** 194:20,22

**4**

**4** 3:9,9 12:2 14:5 100:10 104:20 112:20 114:12 115:1 120:13,15 120:22,22,24,25 123:1,15 154:21 154:24
**400** 2:14 186:5
**4018** 218:25
**404-572-2052** 2:17
**408** 2:6
**41** 4:7
**42,000** 125:12
**421** 41:23 42:2,3 42:6,7,11,14,16 43:24 45:14 49:10,13
**45,000** 153:6
**49** 124:16
**49,000** 124:1
**4:22** 215:8,9
**4:24** 1:21 215:9 215:11,21,22
**4th** 3:24 123:19 214:9

**5**

**5** 3:3,5,10 4:8 11:11 100:10 106:21 108:22 119:10 195:2

**5,600** 195:13
**5,670** 94:11 98:8 98:11
**5,700** 195:13 197:21 198:16
**56** 121:8
**56,000** 123:25
**57,000** 153:6
**5th** 204:13

**6**

**6** 1:13 3:12,15 6:5,15 7:2 9:22 20:1 93:5,8 118:6,9 119:12 122:4 194:24 195:1
**6,000** 94:4 98:7
**6,237** 95:13
**6,337** 95:14 96:9
**6,337.0** 94:18,20
**6,570** 94:21
**600** 26:20
**64** 3:18
**65** 97:23
**65,006.07.** 97:19
**650** 94:21 95:16
**650,000** 94:1
**650,400** 93:22 96:7
**650,400.66** 96:2 96:8
**656** 95:17 97:15 97:23
**656,000** 94:1
**674,733** 96:23
**6th** 9:9

**7**

**7** 3:13 68:20 122:7 125:19 135:19 194:24 194:24,25 195:1 195:8 209:15,18
**700,000** 32:16
**71** 3:25
**721** 97:23 98:4
**721,000** 95:7
**721,677.22.** 96:12
**721,677.72.** 97:7
**764,733** 97:2
**78666** 2:7
**7th** 9:9

**8**

**8** 3:15 4:9 93:4 98:17
**8,000** 177:18,21
**80** 107:24
**86** 3:20 166:19 166:23

**9**

**9** 1:15,20 5:4 195:4 216:3
**9,000** 81:16,18
**9,200** 37:7 44:12 47:24
**9,290** 37:9 44:4 45:2,10,11,11 45:13,13,20 48:16
**90** 141:20
**93** 3:15
**97,000** 128:24
**9:10** 1:20 5:5

**a**

**a.m.** 1:20 5:5 49:5,5 88:16,16
**a3** 45:12
**abide** 159:21
**abided** 105:9
**able** 24:18 26:20 40:1,4,22 51:2 109:9 116:2 120:17 187:14
**above** 1:19 101:3 198:7,8 198:21,24 199:2 199:4 217:3
**absence** 204:2
**absolutely** 80:5
**accept** 100:15 104:15,17,22 161:11,12
**accepted** 105:25
**accepting** 104:25
**accessed** 182:4
**accommodati...** 187:4
**accomplished** 126:1 129:20 134:8 167:21
**accumulated** 180:25
**accumulates** 181:12
**accurate** 9:19 66:17 77:4 91:7 92:21 121:12 150:23,24,25 151:2 154:4 182:7
**accurately** 145:9
**accusation** 19:4 61:24 62:10 63:11
**accuses** 18:16
**acknowledged** 217:15
**acknowledging** 72:25
**acquire** 39:14 41:4
**act** 82:8 91:18
**acted** 92:6
**action** 1:5 78:7 211:2,6 218:10
**actions** 142:22 157:13 211:8,9
**actual** 99:17,18 99:19,22 137:17 194:1
**actually** 11:11 60:7 89:6 95:13 122:7 136:16 152:19 189:19 193:20 208:18

**add** 48:9 94:20 95:20 96:8 97:23 98:2,8
**added** 95:16 96:11 97:18
**adding** 207:19
**addition** 113:17 171:9 200:2
**additional** 24:22,25 25:23 27:14,17 28:4 28:11 30:2,21 30:24 31:2,6,7 31:17 32:18,19 47:5 48:20 52:7 52:12 53:5,10 53:20 54:1,6,11 54:13 58:1,5 65:22,23 66:22 70:5 75:5 76:3 76:13 82:15 90:14 104:11 105:3 109:20,22 110:23 112:13 124:1,15 126:1 137:21 140:21 141:2,17 142:1 142:4 156:24 157:23 182:21 190:3 193:1,25 195:4,10,11,12
**address** 6:21 55:1 71:18 83:23
**addressed** 55:3 71:20 159:17
**addressing** 102:3
**adequate** 105:18
**adequately** 105:6
**adjusted** 140:18
**adjuster** 3:18 51:21,24 64:7 64:10,17 66:13 69:2,20 71:21 145:4,10 172:13 187:7 190:25 192:6 200:6,25 208:24 210:13 211:11
**adjusting** 78:1
**administer** 218:4
**administered** 218:6
**adopt** 199:12
**adt** 183:1,4 184:13 187:17 188:13
**advance** 107:7 161:6,9
**advanced** 109:25
**advertises** 39:10
**advised** 138:13
**affidavit** 17:10 17:23 18:15,15 19:10 20:11 23:8 37:17,19 37:22 38:6 39:23 40:5 77:7 80:25 81:6 103:13,25
**affirmations** 218:5
**affirming** 57:23
**affix** 217:2
**afternoon** 72:12
**agent** 200:5,24
**ago** 214:25
**agree** 10:2 12:19 16:3,13 19:5 20:22 21:9 43:15 49:23 54:16,19 89:13 98:25 99:5 102:14 113:8,12 116:19 124:19 124:20 127:25 138:16 141:18 147:5 148:18 150:13 152:4,17 160:11,13 161:11,12 162:11 163:11 164:7,11 168:18 169:19,21 173:18,21 180:1 182:25 193:22 194:4 196:12 198:6,8 213:20
**agreed** 118:22 151:11 152:2 160:8 161:5 162:4 163:1 164:10
**agreeing** 114:8 168:14 169:18
**agreement** 120:17 195:19 208:13,16
**ah** 56:1
**ahead** 15:9 33:3 57:20 81:6 86:21 112:9 115:5 130:9 167:6 189:22
**alabama** 1:1 145:19 163:3,6 180:11,18 181:1 181:14 183:20
**alarmed** 54:22 157:18
**ale** 141:14 191:1
**alexander** 5:11
**alexandra** 1:3 2:21
**ali** 22:3 35:3,20 36:18,23 38:3 38:11,24 56:4 56:19,19 74:19 75:13 81:19 84:24 103:17 141:19 145:18 151:9,18

**ali's** 38:11
**allegation** 19:11 62:14,16,20
**allowed** 218:18
**alternative** 123:8
**alternatives** 184:9
**alycen** 2:12 5:13 36:8 50:19 93:5 107:22 118:10 135:3 139:17 208:25
**amended** 100:16
**amoss** 2:18
**amount** 8:7,8 9:22,24,25 10:3 10:5,8 12:13,14 12:15,18 14:12 14:16 16:5,8 17:3 18:7 20:2,6 20:9,9 27:22,23 40:2 43:9 44:8 48:15,21 50:2 93:16,24 99:14 99:17,18,19,22 100:6 111:25 152:2 191:2 213:8,23 214:20
**amounts** 10:11 10:11,19 121:4 214:14
**analysis** 98:6
**andrew** 143:1 147:17 148:12 148:14 151:12 153:5,11 155:9 166:24 168:8 171:12,15 172:10,22,23,25
**answer** 21:19 24:7 35:24 40:25 51:1,2,4 52:23 54:2 55:2 57:18 59:17 65:13 71:6 78:24 84:6,17 88:4 107:10 111:18 119:23 120:3 130:8 134:22,25 135:1 135:3,6,10,12 143:9 192:22 200:18 203:12 205:14 207:4 208:4,10 209:21
**answered** 28:25 29:21 35:19 36:4,15 38:5 48:18 71:12,14 78:13 82:4,5,11 84:12 104:6 133:14 134:15 134:16,20 135:4 155:11 171:6 202:7 209:8
**answering** 57:15
**answers** 31:5 32:11 47:7 63:2 130:5 181:8
**anticipated** 31:15
**antiques** 56:11 67:16,17
**anybody** 66:25 76:10 77:19 78:14 127:18,20 158:11 161:25 209:13 210:8
**anyplace** 135:23
**anyway** 47:16 58:4 88:11 120:15 149:5 167:22 185:1
**apologies** 42:5
**apologize** 20:17 21:20 72:13 120:14
**app** 58:21
**apparently** 104:16
**appear** 31:15 49:22 165:9
**appearances** 2:1 3:2 5:7
**appeared** 83:22 165:24 217:11
**appearing** 6:9 6:11
**appears** 158:15
**appended** 218:19
**apple** 45:3
**apples** 45:1,1 46:18,18
**applicable** 43:21 106:5
**applied** 43:21
**appraisal** 87:12 87:21 88:5 105:4,11,13,15 105:17,19,21,23 106:1,4 175:6,9 175:17,17 176:7 176:10,11,15,17 177:16,23,25 180:23,24 181:6 181:11
**appraise** 174:21
**appraised** 172:11,15,18 175:19 176:18 177:18 178:3,4
**appraiser** 88:7 173:16 175:17
**appraisers** 174:12,20,23
**appreciate** 114:13
**appropriate** 46:16 69:1
**approval** 69:15 69:22
**approve** 80:22 167:10,21,22 171:4,4

**approved** 64:18 65:2,18 66:12 151:12 170:14 191:3
**approves** 80:21
**approving** 167:19
**approximate** 20:6
**approximately** 8:2 37:8,11 42:20 121:23 129:4
**april** 9:8 211:19
**architect** 123:24 138:25 139:5,6
**architect's** 139:11,20
**area** 146:13,13 149:23 150:4 151:24 153:6
**areas** 116:6 150:5 158:24 167:7,9
**arguing** 35:10 35:12
**argument** 105:20
**arranged** 165:8
**arrant** 143:2 145:18 166:24 167:8,14
**arrival** 161:18
**arrived** 28:20 29:20 31:17 37:16,24 38:1 50:7 58:1 65:12 113:10
**artisans** 56:14
**asia** 174:1,2,4 176:17 177:14 177:15
**asked** 23:22 24:6 25:5 26:2,3 28:10,19,24 29:20 31:4 32:18,19 35:19 36:4,15 38:4 40:12 41:6 48:17,20 50:6 53:10 54:13 57:19,25 74:17 75:1,5 76:3 77:6 79:1 81:24 82:4 82:4,11,13 83:21 84:17,20 104:6,11 107:10 118:20 120:18 125:6 130:12,20 132:11 133:13 134:15,16 137:23 152:23 152:23 155:11 167:18 186:19 188:20 193:10 202:7 209:7
**asking** 14:21 31:16 38:10,13 38:17 40:11 41:1 48:7 54:11 59:7,8 65:11 74:6 76:13 96:8 110:7 111:4 124:24,25 150:13,17 170:6 172:9 173:20 205:23 206:9,17 210:18
**asks** 151:24
**aspect** 135:18
**assert** 155:22
**assign** 65:14
**assigned** 65:7
**assist** 22:23 64:23 65:7 66:22 70:18 76:19
**assistance** 64:17 65:2,18 205:11
**associated** 122:21 124:23 126:4 197:16 202:2,4
**assume** 14:4 74:16 79:11,14 81:14 86:25 88:8 91:10,23 92:4 132:19 141:9 159:25 162:3 172:21
**assuming** 47:17 67:14 80:1 86:15 92:7 174:14
**assumption** 80:14 154:8
**atlanta** 2:16
**attach** 100:1,5,8
**attached** 100:2 143:1 148:5 188:6
**attempt** 29:22 66:15 67:21,25 76:16 163:7
**attempted** 76:20
**attended** 183:21
**attention** 52:17 53:3,8,13,15 160:6
**attic** 148:19
**attorney** 59:3 205:13,16 206:2 206:25 207:9,12 207:18,24 209:5 218:7,9
**aug** 3:18
**august** 212:25
**authorized** 218:4
**available** 72:19 73:2,4,7,15,17 183:19 184:1,4 184:4,17,21 185:1 203:16
**avenue** 88:6,9
**average** 197:23 197:24 198:4,7 198:8,11,13,21 199:1,2,4,6

**aware** 22:18 24:10 61:11 68:11 70:10 87:11 88:19,22 106:3,14,19 114:24 122:23 140:13 153:13 156:7,12 160:9 166:15 169:25 170:7,8,10 173:23 181:6 184:6 185:4,7 196:19 213:7,12 213:15
**awfully** 212:17

**b**

**b** 1:13 6:5,15 7:2 122:11
**back** 13:3 19:25 30:8 33:9 40:15 49:6 55:15,16 55:16,18,25 57:13,20 59:19 79:12 80:25 88:17 98:16 99:3 104:18 105:4 108:14,19 112:15 118:7 123:1 125:2 131:8,11 135:11 136:4,9 137:25 145:25 152:5 160:19 162:4 164:5 165:5 167:12 173:24 175:3 192:18 194:21 195:21 196:2,4,18 200:15 215:10
**backup** 23:19 24:6 39:7,13 40:20 41:3 74:2 74:17,19,20 93:15 97:14
**bargaining** 112:15
**base** 58:17,19
**based** 29:14 31:1 32:17,17 47:4,18 56:10 73:23 89:14 96:23 107:10,11 107:13 109:23 113:19,20 114:3 114:4,14,18 116:10 117:21 117:24 118:1 120:16 148:9 149:9,10 190:12 191:1,8
**basement** 148:19 171:17 172:6
**basic** 183:17
**basically** 143:20 158:4 171:10
**basis** 60:23 61:16,22 62:6 117:23 166:11 191:8 198:11
**bates** 34:9 35:9
**bath** 156:11 162:8
**bathroom** 158:24 171:14
**beams** 112:24
**bear** 85:21
**bearing** 86:13 87:8
**bed** 94:8,24 95:19 98:11
**bedroom** 94:8 98:7,10,11 156:11 158:24 159:6,14 161:19 162:7 167:5 171:14
**bedrooms** 186:4
**begins** 9:8 193:20
**behalf** 7:5 69:17 169:22
**belief** 32:6 124:8
**believe** 11:22 14:18 15:7 21:12 26:1,6 40:3 48:14 60:15 63:1 64:13 66:3 71:15 73:10 87:7 90:21,25 92:23 100:23 114:1 116:4,8 120:12,23 123:12,16 129:16 137:11 139:12 143:15 143:22 145:21 149:18 155:19 156:4 157:23 159:8 164:8,10 166:6 173:11 176:16 182:9,14 182:15 191:25 192:1 199:8 210:16
**believed** 20:7
**beneficial** 85:25
**benefit** 13:20 86:9
**best** 3:18 64:7 67:12 120:5 124:10 148:5 169:11 209:12
**better** 88:11 134:22 135:7 170:13
**big** 139:18 155:3
**bills** 100:1,5,8
**binder** 34:8
**birmingham** 180:11,17
**bit** 127:4 128:15 211:14
**blast** 149:1 150:5
**blasted** 145:9 148:24 149:8,23

150:4 152:7 153:12
**blasting** 129:7 129:11,13 143:13,17 144:10,21 145:19 146:8 147:13 148:6,8 148:14,17 149:1 149:18 151:6,10 151:19 153:17 153:23 154:2 156:25 171:16
**blue** 59:25
**body** 72:11
**bohemian** 185:23,25 186:11 187:9,10 187:11 188:12 188:23
**book** 8:19 56:1 71:24,25 93:4
**books** 142:16
**borrow** 37:3
**bother** 42:22 43:2
**bothered** 43:3
**bottom** 34:4,9 44:16 93:12 95:3 104:20 147:16 166:24
**bought** 140:2 195:20,24 199:5
**box** 95:3 109:23
**brandt** 1:21 218:24
**breach** 105:8
**break** 41:13 48:22,25 49:5 88:16 108:18 136:4,8 164:23 165:4 194:12,13 194:20 215:9
**bring** 37:4 160:23
**bringing** 160:5
**brook** 181:1,13 183:20
**brookstone** 4:1 127:19 128:25 129:2,9,12 143:2,12 144:8 144:10,21 145:12 147:13 151:11,18 152:12,25 153:16 154:10 165:8,8,24 166:2,13 170:1 170:14,18,21,23 171:4,13,19,22 172:7,10,20 173:13,19
**brookstone's** 129:4 166:12 170:12
**brought** 53:8,12 53:15 163:3,6,8
**building** 181:13 190:9
**bulk** 122:13
**bullet** 64:16 66:9 69:4 190:24 191:20
**burned** 140:7
**burning** 137:13
**business** 174:13 174:23
**buy** 85:14 174:8 174:11,17 177:21 198:12
**buying** 174:13 174:23

**c**

**c** 1:21 5:1 100:11 195:2 218:24
**cabinetry** 112:24 116:11
**call** 5:19,21 14:12 34:16 38:8 45:11 53:17 104:2 175:19 185:6 200:1 207:11
**called** 35:2 82:1 116:8 165:18,20 166:13 167:2 175:23 202:14
**calling** 103:5
**calls** 81:1 171:18
**capacity** 6:9,16
**capital** 73:22
**caption** 69:5
**captured** 201:14,23
**card** 217:14
**carrier** 63:20 193:8
**case** 8:1 11:7 64:20,21 66:2 92:13 99:15 101:12,18 106:12,15 121:10 139:8,11 140:9 154:19 155:20 158:21 172:17 214:1,3
**cases** 60:2
**category** 7:20 69:8
**cause** 1:20 54:18 59:9 69:17 88:5 100:24 101:12 102:21 154:12 157:12
**caused** 31:12
**causes** 37:14
**cdauphin** 2:9
**certain** 51:4 72:18 73:1 75:14,14 88:19 89:7 92:5 146:1 173:21 187:14 200:20

**certainly** 25:8 33:15 61:12 62:10 63:5,23 126:10 150:20 164:4,14 166:18 169:13 181:25 185:5 189:8 199:3 210:20
**certificate** 3:6 218:1
**certified** 68:4,18 218:2
**certifies** 68:7
**certify** 218:3
**cetera** 97:15 155:10
**chair** 195:13 196:20 197:13
**chairish** 56:12 58:10,11 81:12 82:21,24 83:15 83:16,22 84:1,3 88:20 89:22
**chairs** 89:15 196:21
**challenging** 179:16
**change** 86:10 216:4
**changes** 3:6 216:1 218:17
**characterize** 142:4
**charge** 39:24 40:2 43:17 139:2 140:13
**charges** 81:18
**charles** 1:3 2:3
**charles's** 156:11 157:3,22
**charred** 149:4 149:10
**check** 111:2,8 111:25 115:10 115:22 139:21
**checked** 158:23 161:18
**children** 183:21 186:14 189:14
**chip** 112:16
**chopped** 117:13
**chronological** 204:16,18
**chubb** 3:9 9:16 13:24 14:14 29:12 30:17,21 30:23 32:15 43:7 48:6 50:5 50:12 53:6 54:11,13,18 55:1 56:18 61:24 65:17,22 66:14,19 67:21 67:25 69:17 70:15,20 78:9 78:15 81:20 87:2 88:23 90:7 90:17,19 91:11 92:6,15 95:18 95:23 109:24 110:2,3,5 115:15 120:1,8 123:17 124:25 127:4,10 128:10 133:7 136:20 138:24 140:9 141:1,10 142:6 159:1,10,16,19 159:21 160:4,7 160:8,16 166:10 166:16 167:15 168:23 169:5,16 169:18 178:16 179:6,20,25 180:10,20 181:4 181:25 182:4 185:10,17 186:3 187:10 189:11 189:12 190:2 195:21 196:1,2 196:4,18 208:8 212:18
**chubb's** 30:11 84:22 90:6 160:5
**chuck** 5:9,21 11:10 41:10
**circumstances** 189:16
**civil** 1:5,24
**claim** 6:10 7:15 7:22,24 8:1,2,7 10:5,7 11:9,16 11:18 12:13 15:21 24:22 25:12 26:22 27:17 28:15 29:25,25 32:8 40:22 53:9,21 54:23,24 62:3 62:11,14 63:11 63:25 65:8 70:9 72:2,5,6 79:21 84:8,21,21 89:10,25 90:2 90:15 91:2 92:9 92:17 105:9 106:11 118:16 120:6 121:2,17 122:23 123:7,8 123:11,12 125:24 134:3 136:20 137:3,14 137:20 138:14 138:19 139:4 140:17,19 141:20 155:3 165:13,17,18,21 182:4,6 191:12 191:17 192:10 193:3,5 198:10 199:18,19,22,23 199:25 200:1,2 200:3,9,12,15 201:9,11 202:11 202:13,14,19,23 202:24 203:1,2 203:3 204:1 210:9,25 211:3 211:9,11,13,15

213:3,23 214:19
**claimed** 9:22,24 10:3 15:25 27:23,24 28:22 47:7 48:8,21 117:11,16 121:4 138:17 141:11 198:5
**claiming** 10:7 12:16 99:8 121:9,15
**claims** 3:9 51:21 51:24 79:20 89:20 92:16,18 123:13 125:23 201:8 213:9 214:13,14,20
**clarification** 25:6 55:20 62:13 121:19 141:1 150:12 151:23 178:12
**clarify** 29:2 132:5 166:3
**classic** 69:18,21
**clean** 147:25 148:1,4,9 167:12 174:16
**cleaned** 148:19 172:17
**cleanup** 121:14
**clear** 6:14 10:1 10:15 11:4 20:3 20:4 53:25 56:23 62:12 120:15 131:15 192:14 197:15 206:21 210:10
**clearly** 13:1 15:20 81:1 110:22 114:13 116:22 117:10 117:15 151:23
**click** 79:22
**client** 205:13,16 206:2,25 207:9 207:12,18 209:5
**cliff** 151:19 167:4
**close** 55:21 95:18,20 96:9 121:2,9,15,16 121:23,24 171:22 212:17
**closer** 160:25
**coached** 51:3
**coding** 34:2
**collaborated** 209:11
**collaborative** 208:11,16 209:9
**color** 34:2
**colors** 36:22
**column** 28:17 41:24 42:3 45:25 48:15
**columns** 46:21 60:11
**combination** 24:9
**come** 9:3,21 11:7,20 41:18 41:21 43:19 44:1 49:9 52:17 53:3 64:12 67:14 69:11 71:1 83:5 93:9 97:12 98:9 100:10 108:14 112:20 113:4 122:12 153:19 153:23 162:4 164:5 167:12 195:7 201:10 213:8
**comes** 70:23 95:21 98:3 201:25
**coming** 55:15 137:19 138:4 161:10
**comments** 213:16,18
**commercially** 72:19 73:1,4,17
**commission** 217:25
**committed** 62:12
**common** 145:10 172:16
**communicatio...** 207:10
**companies** 4:7 106:4
**company** 1:7,14 4:7 5:14 7:5,13 81:14,17 92:23 92:25 127:7 140:5 146:16 166:4,6 172:14 174:1,2
**company's** 177:15
**comparasing** 45:16
**compare** 44:20 46:23 47:23 48:15 164:21
**compared** 180:22
**comparing** 45:17 188:12
**comparising** 45:15
**comparison** 31:13 45:1,6 47:10
**comparisons** 88:22
**compilation** 180:10
**complaints** 203:20
**complete** 124:1 124:16 191:2
**completed** 126:25
**completion** 193:15 218:15

**complied** 106:6
**comply** 105:6
**comport** 182:18
**comprise** 109:8
**comprises** 199:18,23
**computer** 107:23 108:7,9
**concept** 131:17 186:13
**concern** 31:12 47:13,18 59:9 138:8 144:23 156:18 157:12 158:18,21 178:24
**concerned** 46:25 47:21 50:4
**concerning** 172:5 178:20 210:25
**concerns** 47:10 137:16 142:21 155:14
**concludes** 148:10
**conclusion** 62:1 117:5,12,14,14
**condition** 175:14,15
**conducting** 62:24
**confidential** 205:20 206:1,17 206:25 207:11
**confidentiality** 206:3,22 207:11 207:13
**confirm** 72:11 139:25
**conflate** 126:6
**conflict** 16:17 17:5
**conflicting** 11:22 13:6,7,12 15:3,6,10 16:16 18:16 19:11 87:24
**conflicts** 32:10
**confused** 92:14 129:7
**confusing** 14:12 19:3
**confusion** 15:8 19:6
**consequences** 162:16 206:15
**consider** 10:7 93:14 118:20 142:7 163:21 214:12,18
**consideration** 46:12 163:24 164:6 217:17
**considered** 33:15 56:13 127:1 182:16 183:18 194:8
**construct** 190:6
**construction** 113:10 121:16 121:17 164:25 169:15 178:7 180:11,25 193:20,23 194:1
**consult** 70:1 77:12
**consultant** 69:17 167:4 190:9
**consultants** 68:22,25 69:6,9
**consulted** 56:15 81:8
**contact** 69:1 172:20 204:25
**contacted** 56:8
**contacting** 155:9
**contend** 198:22 198:24
**contending** 199:1
**content** 8:3 142:2
**contents** 7:25,25 8:2 9:4,16,18,20 9:25 10:3,6 11:9 11:17,18 12:21 13:15 15:25 16:19 20:2 21:24 22:2,13 23:5 29:6 32:2 63:15 64:13 70:11 93:10,13 97:6,10,12,25 98:2,17 104:13 140:19,21,22 141:2,6,10,11 142:5,7 172:17 176:4 192:25 193:4,6
**contested** 196:17
**context** 117:6
**contingent** 167:19
**continue** 65:10
**continues** 149:3
**continuing** 157:17
**contract** 48:3 105:8 145:17 191:9
**contracted** 145:12
**contractor** 114:10 145:11 154:17 155:14 190:10
**contractors** 180:17 181:23 190:13
**contracts** 165:1
**conversation** 107:5 119:5 120:9 144:3 145:8,11 157:19

203:22,24 204:3 204:5
**conversations** 143:8 154:17 157:20 206:7 207:6 208:7
**conveyed** 118:13
**copied** 72:11 144:14,17 146:3 147:20 168:5
**copies** 144:8
**copy** 34:1 85:25 91:6 107:25
**corp** 4:8
**corporate** 6:11 7:2,4,8
**correct** 6:11,12 11:17 13:12 15:17 18:21 23:10 28:2,8 29:13 30:14,20 33:19 37:8,11 37:23 38:12 39:1,2 41:23 43:17 44:7,19 45:6 46:9 49:16 54:25 64:4 65:21 70:17 73:7 75:11,17 75:21 76:23 78:17 85:17 86:14,17 92:19 93:22 94:2 95:10 99:9 101:16,17,19 112:24 119:9 120:13 124:11 127:11 128:22 128:23 146:5 147:22 152:8,14 154:15 159:22 161:7 167:24 187:17,22 195:1 199:1 209:19 210:2,17 211:20 212:19 217:3
**corrected** 36:19 46:2 114:14
**correctly** 98:11 156:20
**correspondence** 7:17 53:16 117:24 143:4,5 143:10,12 144:19 156:19 157:24 159:9 170:11 171:1,20 173:23 204:20
**corresponden...** 144:18
**corresponding** 203:14
**cost** 23:18,19,20 24:12,13 25:3,4 25:6,20,21,24 26:4,4,9,10 27:7 27:12,24 28:2,6 28:13,16,22 29:23 30:6,7,14 32:15 37:6,7,7 37:10,20 38:16 38:24,25 39:5,8 39:10,14 40:23 43:10,15,15 44:6,17,21,21 44:22 45:2,3,7,7 45:17,18,18,22 45:24,25 46:5,6 46:12,12,18,22 46:23 47:6,11 47:14,23 48:16 53:10 54:9,10 54:14,15,17 55:4,6 56:7,10 56:15,25 57:2,7 57:25 58:4 59:10,13,24,24 60:3,3,7,8,12,12 60:20 63:6,7,25 64:18 65:4 66:20 67:11 70:12,13 75:11 75:12,20 76:11 76:21,24 77:1 77:15 78:16 79:5,7,14 80:4,9 80:12,24 81:19 81:23,23,24 82:1,21 84:25 85:22,23 86:7 86:14 87:2,4,5,9 88:10 89:14 90:10 93:16,20 93:22 94:10,25 95:15,16,24 96:22 97:15,25 98:12 99:20,24 100:20 101:19 102:4,5 103:6,7 103:7 106:12,16 106:20 110:6,24 112:5,7,12,14 121:14,16,17,20 122:18 123:5,8 123:9,15,16,17 123:17 126:7,8 126:12,13,14,23 126:23 127:2 128:8,10,19 129:10,12,24 130:2,3,18,19 130:25 131:3,18 131:19 132:11 132:11,15,20,22 133:3,4,11,21 133:25 134:4,13 136:13,15,23 139:4 140:11 147:6 159:15 174:11,18,25 175:4,6,13,13 175:20,24,25 176:6,15,18,18 176:23,24,25 177:10,11,12,13 178:1,18,19,24 178:25 179:3,4 179:6,16,21 180:2,5 181:13

182:17,20 183:5 187:19 188:18 193:18 194:6 197:5,9,11,12 197:19,21,24,24 198:11,13,16 199:3,6,14
**costs** 4:6 34:17 34:25 37:23 41:7 45:13 48:8 48:12 52:19 53:4 60:15,22 61:4,20,21 62:20 65:11 71:10 73:9,11 73:15 75:4,4,13 75:16 76:3,17 78:19 83:13,19 88:22 99:5 102:23,24 107:6 109:8 116:2 121:6 122:21,24 124:22 126:1,4 127:18 133:16 133:18,18 134:19 160:8,13 160:15 161:1,9 178:7,9 179:24 180:8,11,11,17 180:21,23,23 181:1 196:11 197:16 198:22 198:24 199:2
**couch** 38:14
**counsel** 5:6 218:8,9
**country** 163:17
**county** 217:9
**couple** 121:4 125:23 136:11
**course** 12:23 43:22 57:5 78:7 148:23,25 158:6 167:14 178:19 183:11 210:18
**court** 1:1 5:7 33:6 40:10 74:21,23
**coverage** 10:1,6 20:3 26:25 27:3 187:19 188:18 188:20
**covered** 27:4,7 41:18 88:8 111:22 159:6,13 182:14 183:5,14 187:24 188:22
**covers** 195:15
**covid** 194:5
**cozen** 1:22 2:13 3:11,12,14,15 3:17 204:25
**cozen.com** 2:18
**crafted** 56:14
**created** 22:1
**crown** 179:11 179:12
**crr** 1:21 218:24
**csr** 1:22 218:24 218:25
**current** 56:8
**currently** 9:23 10:2
**custom** 72:19 73:1,4,16
**customer** 58:17 58:19
**cv** 1:5
**cypress** 2:6

**d**

**d** 5:1
**dallas** 1:23
**damage** 27:4 136:21 138:7 148:17,23,25 149:7 153:7 156:24 157:25 158:23 159:10 160:15
**damaged** 56:8 57:2 70:11,12 71:6 99:2 137:12,16,19,22 137:22 138:4
**damages** 117:11 117:16 136:24 136:25 137:1
**dark** 146:6
**dashboard** 201:10
**database** 181:22 182:1
**date** 5:4 13:25 24:17,17 42:10 42:16 93:7 138:16,20 193:16 200:20 204:14,15,20 212:13 216:3
**dated** 9:8 50:2 93:5,7 115:9 119:13 142:17 214:9
**daughters** 183:12
**dauphin** 2:3,5 3:5,9,10,12,13 3:15,16 4:11 5:9 5:9,18 6:2,8,20 6:24 7:1 8:20 9:1 10:20 11:3 13:5 14:8,22 15:2,13 16:12 16:24,25 17:1,9 17:13,19,23,25 18:14,19,21 19:18 21:22 22:17 23:5 24:20 25:14,17 27:11,20 28:8 29:1 30:8,13,17 30:20 33:2,9,16 33:25 35:1,7,21 36:7,11,13,17 37:1,3,5 40:15 40:19 41:12,14 43:19 44:25

46:20 47:9 48:13,23 49:1,8 50:19,25 51:3 51:12,15 52:22 54:4 55:9,12 57:13,15,19 58:10 60:21,25 61:8,19 62:6,19 63:3,13 65:21 66:19 67:10 72:12 74:23 75:7 77:3 79:1 79:11 82:6,20 84:9,13,18 86:4 86:12 87:11,14 87:19 88:12,19 90:17,19 91:3 91:22 92:1,4,22 95:9,12 96:17 96:19 98:20 103:16 104:7,10 106:9 107:15,20 108:5,8,13,21 111:3,9,20 113:13 116:14 116:17,19 118:5 120:11,21 121:14 123:14 124:18 127:6 130:9,13 131:11 131:13,16 133:19,23 134:21 135:2,11 135:18 136:3,11 137:25 138:3 139:10,17,24 140:1 142:21 144:4 146:14,20 150:19 152:11 152:18 154:15 155:5,16 158:6 158:8,18 160:4 160:19 161:2 162:19,24 163:21 164:22 165:7 168:4 169:25 170:6,8 170:22 171:9 172:1 173:3,6 175:9 177:4 181:4,16,24 185:2,14 186:18 187:20 188:4,11 194:14,16,23,25 197:18 202:8 203:16 205:17 206:4,9,14,19 206:23 207:1,2 207:8,17,21,24 208:2,15 209:6 209:10,24 210:16,20 213:11 214:8 215:5,12

**dauphinparis....** 2:9

**day** 115:3 156:15 201:1,10 217:11,19 218:21

**deal** 139:18

**debris** 138:5 140:11,12,12,14 140:14

**decent** 184:4

**decide** 121:24 141:10 171:7

**decided** 167:24

**decides** 168:1

**decision** 70:1,3 70:4,14,15 71:9 71:13,16,18 128:6 137:2 147:9 151:4,5 167:20 204:25 205:3

**decisions** 146:21 209:25 210:9 212:24

**declaration** 3:23 11:6 20:11

**declared** 158:25

**declined** 127:10

**decorating** 4:7

**decorators** 68:4 68:7 80:15

**defendant** 1:8 2:11 5:14

**defense** 105:16

**defined** 85:23 86:7,9 87:5

**defines** 130:1,2 131:19

**definitely** 155:21

**definition** 87:6 87:8

**definitive** 212:6

**definitively** 111:13

**degree** 166:12

**delay** 115:15,19 115:21

**delineate** 128:15

**dell** 140:6 141:21 142:1,6 142:12 165:9 195:21 196:22

**delta** 27:19,21

**demand** 120:14

**demo** 147:23,24 148:4 167:7

**demoing** 167:3

**demolish** 128:6 134:9

**demolished** 124:3 126:2 135:22 136:1

**demolition** 131:8,9

**demonstrate** 172:1

**demonstrates** 171:21,24 172:3

**denied** 158:10

**departed** 212:18

**depend** 211:7

**depends** 211:4
**depo** 4:8
**deponent** 218:17
**deposition** 1:11 1:17 3:8 5:3 6:5 216:3 217:2 218:11,13,15
**depositions** 51:7
**derived** 48:12 75:5 96:24 106:25
**describe** 99:4 201:6
**described** 59:1 99:8 154:19
**describing** 99:2
**description** 43:25 69:7 99:10 153:21 217:13
**designate** 83:21
**designated** 7:4 68:15
**designer** 38:8,9
**designers** 56:13 58:14
**desire** 159:10
**detail** 63:1 70:19 99:13,22 141:8 177:2,22 178:20 189:2 196:23
**detailed** 117:22
**details** 53:17 59:15 73:23 132:17 169:1 171:2 186:6,25 187:14 192:13
**determination** 52:7,12 76:10 84:23 150:25
**determine** 29:23 55:5 56:7,15,25 57:1 65:25 75:10,16,20 76:21,24 77:14 78:15 84:25 88:7,24 103:18 107:16 117:10 117:15 168:9 180:21 190:2 197:8 203:10
**determined** 37:20 56:10
**determining** 110:6 112:11 197:25
**develop** 163:8
**developments** 157:17
**devices** 140:19
**dialogue** 128:3 197:2
**diane** 2:4 5:10 140:2
**diary** 200:4,15 201:8
**dibs** 92:5
**difference** 12:23 18:11 25:3 26:3 26:9 27:25 38:17 40:3 82:9 94:3 95:12 109:25 110:13 126:10 134:5 175:4 176:11,14 198:3
**differences** 188:19
**different** 17:7 18:10 70:5 71:3 71:8 96:1 114:10,10 121:4 132:7 135:9 146:13 176:6 183:18 184:16 184:19 207:17
**differently** 201:18
**difficult** 56:11 212:10,21
**difficulty** 62:9
**dining** 177:8
**direct** 89:24 172:20
**direction** 70:20
**directly** 24:7
**disagree** 113:13
**discontinued** 56:10
**discount** 213:14 213:19
**discovered** 156:24 159:5 160:10 162:1
**discovering** 2:6
**discrepancy** 23:21,23 24:12 53:4
**discuss** 145:20 167:3
**discussed** 53:17 118:16,21 125:8 145:22 157:6
**discusses** 131:19
**discussing** 143:2,15 171:15
**discussion** 87:10 125:25 141:1 169:2 171:10 177:3 203:19
**discussions** 145:4 206:18
**dispute** 26:25 29:10 88:10 138:22,23,24 163:16 165:23
**distinction** 137:14 179:18
**district** 1:1,1 184:5,12
**division** 1:2
**document** 9:20 14:22 15:1 22:8 22:20 26:13

35:8,10,20 40:4 40:4 41:7,7 50:7 56:17,21,22 58:8 64:9 78:21 79:10 95:6 106:19 117:8 125:15 129:3,7 190:25 191:6,18 191:21 200:25 217:14
**documentation** 20:13 23:20 24:8 28:19 30:5 37:15 38:6,13 39:25 43:6 48:5 50:6 52:8 58:1,5 59:15 60:20 61:25 63:21 64:24 70:6 75:2 89:10 90:4 92:8 92:17,24 93:15 97:14 100:17 101:11 137:23 199:20 200:3
**documentations** 32:14
**documented** 69:15 191:8
**documents** 5:25 7:23 10:9 21:6 21:13 22:17,18 24:21 26:18 28:20 30:2 81:25 100:2,6,9 102:24 114:2 214:22,23
**dog** 187:10
**dogs** 189:14
**doing** 33:4 36:9 96:15,18 143:21 146:12 151:24 154:13 162:25 170:1
**doors** 112:23 116:11 178:17 178:18,20,21,22 178:23,24,25 179:1
**double** 139:21
**doubt** 21:1 26:25 28:1,3 34:24 134:10,11
**doubts** 28:9
**downstairs** 153:7,12
**dr** 2:6
**drafted** 14:23 209:3
**drive** 107:22,25
**drives** 178:19
**due** 44:3 164:4
**duly** 1:19 5:16 218:6
**duplicate** 139:22 169:3
**duties** 48:4
**duty** 29:24 30:12 58:7 82:19 84:8 85:21 90:6,7
**dwelling** 106:11 108:25 140:11

**e**

**e** 5:1,1 72:3
**earlier** 47:9 103:12 116:15 171:6 209:8
**early** 70:9 116:21 138:12 138:18
**earn** 115:16
**easier** 8:16
**easy** 58:7
**eat** 107:21
**effect** 184:23 213:11
**effort** 208:11
**efforts** 169:3
**either** 22:7 62:15 63:10 73:4 91:17 105:14 181:18 204:8 206:18 211:16,17,23
**elect** 88:7 151:7
**elected** 65:10 84:21 134:8
**electronic** 202:17
**elects** 147:8
**element** 190:21 190:24 191:20
**eliminate** 81:4
**elliott** 69:21 72:4 116:20 129:15 138:9 142:22 143:14 143:20 144:7 147:18 148:12 149:12,13 156:7 158:2,15,22 166:25 167:15 169:3 171:18 173:20 201:16 213:1,3
**elliott's** 157:13
**else's** 127:18
**email** 3:20,21,25 4:3,4 24:3,8,11 24:17 72:3 74:15 106:14 116:25 117:5 144:8,13,15 147:17,21 148:10,12,13 150:2 153:11 154:6 166:24 168:4,6,17,19 169:4 170:23 195:4 203:8 204:12
**emails** 72:6 143:1 144:5,5 144:15 145:25 146:2,3 199:20 199:21 200:2 202:11 203:6,7 203:9 204:9
**employee** 218:7 218:9

**encompass** 139:15
**ended** 215:22
**engage** 105:18 106:1 168:23
**engaged** 70:10 70:18
**enservio** 65:6 67:10 69:18,21 70:2,4,7,10,16 70:16,18,22 71:1,10,16 72:3 72:8 74:10,11 74:13 75:2 76:6 172:9,14,23
**ensure** 163:9
**entail** 208:14
**enter** 202:18
**entered** 199:25 202:9
**entire** 21:15 50:7 148:14 153:11 164:9
**entirety** 155:12 156:5
**entitle** 35:10
**entitled** 17:17 39:13 64:7 90:1 90:11 92:22 117:17,20 145:3 205:24
**entitlement** 39:16
**equal** 60:3
**equating** 177:25
**eric** 72:4
**establish** 77:9 92:1
**established** 45:21 46:15 47:3 49:14 103:12 198:20
**estimate** 12:21 12:22,25 13:4 13:15,17,21,25 14:1,5,6,14 15:4 15:15,19 16:6 16:18 21:2,3,3,4 21:5,10,12,16 64:14 94:13,15 103:4,8,20,21 104:3,9 107:16 107:16 108:23 109:3,8 110:13 112:21 113:4,25 114:4,7,14,18 114:21 116:1,3 116:6 121:19,21 125:2,3 129:5 132:19 133:10 133:20,24 134:3 147:24 148:4,6 148:8,9 149:6 149:16,17,19,24 150:8,9,13,17 151:15,17,21,25 152:24 153:17 154:5 167:12 179:21
**estimated** 12:3 62:20 94:25
**estimates** 20:12 20:15,20,20 21:23 22:1 101:18 102:21 102:23 103:3,14 114:15
**et** 97:15 155:10
**euos** 96:24 114:8
**evaluate** 60:20 70:21,21,23 192:6
**evaluated** 62:1 71:7,7
**evaluates** 70:23
**evaluation** 191:1,6,21,24 192:7
**everybody** 77:21 201:18
**evidence** 181:20 184:23 196:13 196:16
**exact** 109:10 115:3 133:17 169:1
**exactly** 98:9,9 132:17 148:5 150:19 188:11 212:5,5
**examination** 3:5 5:17
**examine** 65:18
**examined** 218:5
**example** 39:25 54:16 57:8 58:2 72:18 78:20,21 79:7,22 81:12 81:15,23 88:23 137:24 173:15 176:12 178:18 179:1,8,10,13 203:1,14 213:19
**examples** 88:20
**except** 184:12 217:3
**exceptions** 69:18
**exchange** 119:8 208:12
**exclusive** 83:17
**excuse** 55:19 125:22 177:6
**executed** 217:16
**exhibit** 3:9,10 3:12,13,15,16 3:18,20,21,23 3:24,25 4:1,3,4 4:6,7,8,9,10 5:23,24 8:24 11:5 17:16,19 20:6,10 34:1,7 55:13 59:20 64:2 68:20 71:23 93:2,3,4 95:3 98:17 106:21 108:22

112:18 116:12 116:24 118:6,9 119:10,12 120:24 122:4,6 122:7 125:19 135:19 142:15 142:20 147:15 153:3,16 154:20 154:21,23,24,24 155:25 166:19 166:23 177:5,6 190:16,19 194:24 209:15 212:11
**exhibits** 3:8
**exp** 218:25
**expand** 168:18 169:19
**expanding** 168:15
**expect** 39:21 82:7 172:19 189:13
**expense** 142:2,2 182:14,16 183:15 187:10 187:25 188:7,22 188:24
**expenses** 140:18 140:22 141:2,5 141:17 142:4 182:10,13 190:3 191:8 192:3,3 193:2 194:1 195:5,11,16
197:17
**expert** 64:18 65:3,15,18,23 66:12 67:15,17 69:12,16 73:22 73:25 74:6,10 74:14,17,19 75:2,15 76:19 77:12 151:10 191:3
**expert's** 74:3
**expertise** 164:17 171:11
**experts** 68:22 68:25 69:6,10 76:2,10 83:12 163:17 190:12
**expires** 217:25
**explain** 16:17 24:11 25:3,21 26:3 106:24 113:5 179:15
**explained** 43:8 155:9 170:15
**explains** 95:4
**explanation** 15:13 23:21,23 25:9 34:3 74:18 113:9
**explanatory** 73:20
**expressed** 124:8 217:17
**extension** 50:20
**extensive** 140:7
**extent** 7:23 136:21,23 143:2 143:16 151:5 164:15 171:15 173:14 192:13 201:19 205:12 207:4 209:2,21
**exterior** 178:21 178:22
**extra** 140:21 182:10,13,14,16 183:5,14 187:24 188:7,22,24
**eyes** 214:23

**f**

**fact** 51:9 63:5 90:19 92:15 95:6 133:1 135:22 136:25 137:11 138:3 140:2 144:20 152:25 158:12 158:19 190:11 194:5 196:17
**factor** 54:5,11 194:7
**facts** 25:12
**factual** 61:22 62:6
**fair** 19:22 48:1 48:14 53:1 78:10 134:21 168:2 169:8 208:22
**fairness** 48:19
**familiar** 58:11 58:13 68:10 72:15 82:24 117:8 156:13 172:8 174:4 196:23 214:24
**familiarize** 214:15
**family** 189:13
**far** 44:17 94:14 121:1
**february** 1:15 1:20 5:4 138:12 138:22 216:3 218:21
**federal** 1:24 25:23
**fee** 127:10,12 134:4 139:11,15 139:20 160:5 161:16 162:25 163:22 164:9
**feel** 16:13 26:1 40:7 71:12 104:5 161:6
**fees** 121:8
**felt** 77:6
**fifth** 85:5
**figure** 34:22 77:4 85:12 99:23,25 109:16 110:19
**file** 7:15,22,24 24:22 26:22

53:16,21 72:2,5 72:6 90:24 155:3 165:13,17 165:18,21 182:4 190:25 191:6,12 191:21,24 192:7 192:11,12 199:18,19,19,22 199:23,25 200:1 200:2,10,12 201:2,15,21,23 201:23 202:1,3 202:5,10,17,18 203:5,7,9,17 204:1,9,23 210:9,19,22 211:6,9,13,15
**filed** 11:6 193:3 193:5 211:13
**filing** 106:15
**final** 121:17 127:20 147:23 147:24 148:3 211:2,6
**finally** 214:6
**financially** 218:10
**find** 20:4 26:19 30:12 39:11 67:22 68:1 70:22 73:6,15 79:24 110:20 122:5 144:24 145:2 181:16 184:19 189:3,6 204:13 214:5
**finding** 95:25
**fine** 36:10 41:13 51:11 108:11 139:20 176:20 186:1
**finish** 16:25 19:15,20,20 32:21,23,24,25 35:23,25 36:1 50:13 167:12
**finished** 59:17 136:12
**fire** 31:22 32:7 42:19 137:7,12 137:13,17,17 138:12 143:3,13 148:17,23,25 149:6,6 156:24 164:4
**first** 5:16 16:6 37:6 41:17,25 42:1 46:21 60:8 60:9 64:3,16 69:5 72:9 86:22 93:4,13 97:9 106:23 118:6 123:5 143:21 144:5,15 150:1 152:6,18,21 153:20 154:3 172:6 177:7 185:6,10 186:11 186:25 190:24 195:3 196:12 214:11,17
**five** 72:16 85:3 85:7 164:23
**fixer** 174:5
**fixture** 187:24 188:6,22
**fixtures** 189:1
**floor** 143:21 144:11 150:1 152:7,17,18,21 153:20 154:3,7
**floors** 150:3 192:20
**foam** 153:7
**focus** 73:13
**follow** 64:11
**followed** 151:19
**following** 45:9 62:9 151:19 211:1
**follows** 5:16
**fool** 8:10
**footage** 143:16 143:24 149:22 149:23,25 150:3 150:10,15 152:22 153:1,6
**footnote** 155:25 156:1,3,21,23 157:4,10
**footprint** 166:8
**foregoing** 217:1 217:15 218:12 218:13
**forgot** 33:23 104:14
**forgotten** 210:1
**form** 9:16,17 10:17,25 13:2 14:7,19 16:9 17:14 18:18 21:17 23:4 24:1 24:15 25:11 27:9,13 28:7,24 30:15,19 36:7,8 36:12,24 44:23 46:14 47:2 48:2 48:17 52:20 55:7 60:17,24 61:6,17 62:5,8 62:18,22 63:9 65:20 66:18 67:8 82:3 84:5 84:11 90:13,18 90:23 91:20 92:20 96:14 103:9 104:4 106:8 113:11 118:2 121:11 123:10 124:12 127:3 130:7 133:13,22 134:23 135:15 139:9 144:1 146:9,17 150:16 152:9,15 154:14 158:5,7,17 160:3 162:17,22 163:19 168:3

169:23 170:5,19 170:25 171:5,23 173:2,5 175:7 181:2,15,19 184:24 185:13 186:16 187:18 188:1,8 197:14 213:10
**format** 58:23,25
**forth** 6:17 12:13 105:7
**forward** 67:12 83:18 167:10,17 168:10
**found** 42:11 79:9 159:24 160:15 162:21 167:5 214:6
**four** 42:18,21 49:21 67:6 85:4 85:6 106:24
**framers** 156:24
**framing** 148:18 149:4,10
**franchises** 166:5
**frank** 2:24
**fraud** 61:24 62:11,24 63:12
**fraudulent** 61:3 61:5,21 62:2,3,4 62:21 63:8
**free** 26:1 40:7 80:18 161:6
**freight** 43:13,16 44:9 45:2,19,21 45:23 46:8,13 46:16 47:4,14 47:17 98:8
**frequently** 166:16,17
**front** 13:21 55:19 59:20 86:8 87:6 105:14 132:18 133:17 154:5 164:21 169:9 177:1,6 190:15
**full** 99:3,4,8 120:8 162:25
**fully** 65:13
**furniture** 41:4 89:16 195:11,16 195:20,24 196:2 196:7,8,13,18 197:4,5,22 198:1,16
**further** 60:20 80:6 213:21 214:12,18
**furthermore** 61:12
**future** 163:10 164:5,18

**g**

**g** 5:1
**general** 3:18 7:12 64:7,10,17 66:13 69:2,20 75:25 78:23 128:16 148:24 149:1 183:7 192:6 200:4,6 200:24,25 210:12
**generally** 75:12 87:13,14,17,20 87:21,23,24 88:4,5 119:1 170:9,10,10 180:1 189:3 190:4 199:24 208:17
**georgia** 2:16
**getting** 69:22 98:16 105:4 131:16 205:13
**give** 17:25 19:18 41:3 58:7 63:18 73:13 75:22 90:10 102:12 107:25 118:7 135:17 151:14 152:12 153:15 158:21 174:15 213:14 214:15
**given** 18:6 22:22 25:21 57:3 65:7 134:22 135:1,16 135:21 205:21 217:18 218:14
**gives** 46:22
**glad** 33:24
**glasses** 33:23 37:3
**global** 118:14 118:19,23 119:3 119:14,15 125:6 125:8,11
**go** 9:12 15:9 19:20 33:3 39:4 40:1 42:9 51:4 55:21,22,22,25 57:20 63:4 69:11 75:15 79:12 81:6 82:20 83:2,15 86:21 88:13 108:13,15 112:9 115:5 116:23 125:14 130:9 164:25 167:6 175:3 189:22 195:21 200:15 201:9,11 212:16
**goal** 117:9,14
**goals** 116:21
**goes** 71:25 114:7 149:5 206:12
**going** 5:2,23 6:20 10:4 16:7 19:8,23 28:16 30:23 32:16,24 33:2 35:25 36:1 38:8 41:2,12 44:20,25 46:10 49:3 50:20,21

51:6,10,13 52:24 59:16 64:3 74:23 78:20 87:20 88:14 92:16,17 93:11 102:11 106:16 107:25 108:6,16 110:8 115:7 117:2,6 118:7 120:17 121:5,18 122:14 126:2 128:14 136:7 142:11 149:7,9 150:5 154:7 155:23 156:8,10,16 157:14 158:13 162:14 163:22 164:5,23 165:2 168:17 171:7 172:25 173:23 174:18 177:5 184:14,19,22 185:5 187:2 194:3,18 195:21 196:8,13 197:8 200:19 203:8 205:15 208:13 212:4 215:7,16 215:21
**goldsmith** 180:12
**goldsmith's** 180:10,23
**good** 48:24 49:1 63:3,4 68:8 72:12 85:1 91:17 170:16 171:21 194:14 208:4
**goodrich** 1:3,3 2:21 5:11 8:3,6 8:6 23:15 35:3 54:23 67:14 128:9,14 156:15 167:2,18 183:21 201:20 202:1,5 210:19
**goodrichs** 25:2 28:15,22 29:5 48:1,14 62:11 64:23 75:3 82:17 83:21 84:20 89:21,24 90:8 91:12,16 92:11,13 99:7 103:12 105:5 110:5 113:9 114:22 116:5,25 117:17,20,25 118:4 122:20,24 124:22,24 125:3 125:12 128:6 130:20 132:10 134:8 138:13 140:3 141:24 143:6,10 144:8 144:14,22 145:13,15 146:4 147:4,20 154:9 156:8 163:4 167:24 168:5,6 168:11,13 169:13,16,20,22 170:3 171:7,16 171:18 182:19 183:4,11 185:9 185:16 186:4 189:9 195:12 196:17,22 198:6 198:21 199:5 213:8,13 214:12 214:13,18,19
**goodrichs's** 115:24 118:13 124:8 151:5 198:1,19,23 214:13,19
**gotcha** 11:14 79:19
**gotten** 31:5 103:16 197:1
**grand** 185:23,25 187:8,10,11 188:12,23
**great** 16:7 53:4
**greater** 17:4 123:16 197:12 198:19,23
**gross** 9:22,24 10:3 12:18 15:23 20:9
**group** 68:16,19
**guarantee** 124:2 124:16
**guess** 93:3 96:13
**guest** 94:7 98:7 98:10,11
**guideline** 65:16 68:24 191:9,19
**guidelines** 3:18 64:8,10 65:10 66:10 67:4 68:21 83:12,14 190:11,12,17 192:5
**guy** 145:18

**h**

**haessig** 1:12,17 3:4 4:11 5:4,15 118:15 216:2 217:1,6,11
**half** 64:3 186:14
**halfway** 42:10 49:9
**hallway** 167:6
**hand** 116:13 217:18
**handed** 17:17 34:1
**handled** 141:19
**handler** 53:9
**hang** 20:7 32:22 43:23 130:13 142:15 154:24 161:5
**hank** 123:24

**happen** 51:13
**happened** 81:22 85:11 91:22 92:15 119:18 173:12,21 202:18
**happening** 155:19 185:8
**happens** 12:8 50:2
**happy** 32:11 129:3 132:16
**hard** 16:14
**hardware** 39:4 39:4,8,10,20,25 40:21,25 41:2,6 57:10,12 58:3 78:21 112:24
**hardware's** 40:1
**hd** 140:5,10
**head** 100:13 142:10
**hear** 182:12
**heard** 68:12 186:11 187:1
**heartburn** 154:12
**heavy** 153:24 154:2
**held** 107:14 109:16 113:16 113:21 116:10 121:22 190:9
**held's** 109:3
**help** 22:22 43:7 48:7,11,21 54:13 70:10 75:4 172:8 176:9,13 178:12 212:4
**helped** 21:1
**helps** 95:2
**hereto** 218:19
**hey** 79:23 201:25
**heyburn** 195:13
**high** 52:18,19 53:7 61:3,4,20 62:20 70:25
**higher** 12:22 14:1 31:15 59:24
**highlighted** 60:9
**hire** 171:18
**hiring** 69:16 171:10
**hold** 87:20 166:22 194:25
**holding** 112:15
**holds** 207:2
**home** 32:2,3 121:20 123:12 126:11,14 128:6 128:9 130:25 131:3 132:24 133:6,6,8 134:9 149:14,22 151:6 151:7 162:6 171:8 181:7 183:10,13,16 184:6 191:25 192:25 195:25 196:14,22 198:17
**homeowner** 162:10 164:3
**homes** 195:17 196:7,8
**honest** 21:18
**honestly** 55:3 77:5 172:6
**hostile** 25:14
**hotel** 185:24,25 186:1,7,12,13 187:1,3 189:4
**hotels** 189:10
**hour** 164:24
**hours** 51:9,14
**house** 32:1 77:14,18,19 119:25 122:21 122:22,25 123:4 123:6,22 124:2 124:22,23,25 126:2,5 127:24 128:14 131:9,9 133:1,12 134:5 135:22,25 137:19 138:4 140:2,8,17,20 140:24 141:15 141:17,21,25 142:1,6,12 145:19 149:12 151:9,21 156:8 156:16 164:3 169:6 173:21 183:4,18 184:3 184:16,19 185:6 185:7,10,18,18 186:9 187:24 188:6 189:2 192:2,3,4,20 200:20,24 201:1
**houses** 181:13 183:19 184:4,4 184:11
**huh** 14:10 25:1 29:5 47:12 81:13 103:19 143:19 183:2 197:10 200:7
**hygienist** 163:13,15
**hygienists** 160:24 164:14 164:16
**hypothetical** 80:14 85:10

**i**

**icons** 202:25
**idea** 145:6 157:25 183:22 186:25
**identification** 205:18

**identified** 3:8 75:14 112:14 116:15
**identifies** 9:4
**identify** 6:21 24:18 28:16 116:2 145:9 146:11 157:14 157:17 172:4 175:18 192:24
**identifying** 70:18 71:4 107:6 112:4 121:6 187:4
**identity** 217:13
**ih** 168:15,16,20 168:21,21,23 169:5
**imagine** 21:25 80:17
**impact** 134:13 137:2 162:13
**impacted** 194:6
**implies** 53:6 155:18
**imply** 155:22,23 213:13
**implying** 198:12
**important** 164:6
**impression** 205:22
**improper** 62:17 62:21 213:24
**improperly** 25:13,15
**improvements** 183:9
**inaccurate** 146:11
**inadequate** 59:10,11
**include** 8:8 13:17 14:14 15:4,5 16:19 20:12 44:8,18 44:21 45:14,20 46:7 126:12,15 126:23 128:11 128:21,24 132:22,25 157:21,22
**included** 12:21 14:16,16 44:13 75:3 98:13 110:19 111:22 113:5 114:22 120:7 128:19 129:11 133:5,7 133:10 134:4 139:20 152:17 180:2 208:22
**includes** 9:24 10:4,11,18 15:14 16:8 17:2 17:3 20:1 43:11 45:22 113:1 126:7 181:23
**including** 154:6 178:17
**inclusive** 47:4
**inconsistent** 100:16,18,21
**incorrectly** 95:9
**increase** 25:22 31:17 33:12 37:8 38:14 42:21 46:10 47:14 54:4,7,9 54:14 150:21
**increases** 50:7
**incurred** 46:16 191:8
**indemnity** 1:6 1:14 5:14
**index** 3:1
**indicate** 23:14
**indicates** 54:21 98:6
**indication** 63:7 74:11 91:12
**indifferent** 43:3 74:8
**individual** 6:9 51:16 76:22 83:23 92:18 116:9 166:5
**individually** 1:13
**industrial** 160:24 163:12 163:15 164:14 164:16
**industry** 56:13 106:3 163:24
**inflated** 60:16 60:19,22 61:4
**inform** 116:5
**information** 11:22 13:6,7,12 15:3,10 16:16 18:17 19:12 20:24 24:23,25 25:23 26:17,18 27:15,15,16 28:4 30:1,18,21 30:24,25 31:2,6 31:8 32:9,15 33:14,17 38:11 38:11 39:8,11 39:14,22 40:20 41:3 47:5 48:20 50:11,15,18 52:12 53:5,20 54:1,6,12,13,19 65:22,24 66:22 67:13 74:2,7,17 74:19 76:14 78:2,18 79:4 82:7,13,14,16 82:17,18 83:20 84:4,15,19,20 85:4,5,6,9 88:25 89:2,4,4,6,8,11 89:12,18 90:8 90:14,15 93:1 95:11 96:23 100:19 101:11 103:15,23 104:11 105:2,3

109:23 120:16 165:11,14 166:10 168:25 169:5 180:25 181:5,12 182:5 182:22 183:25 190:7 201:22 202:9 205:13,15 205:20 206:1,2 208:12
**informing** 155:16
**inherent** 150:15
**initial** 12:24 14:5,13 15:15 138:5,5
**initially** 17:4 65:7 156:7 161:15 163:3 183:24
**initiated** 105:22 105:23
**innovations** 140:5
**input** 210:9 212:15
**inspect** 167:8
**install** 187:17
**instance** 1:18 209:16
**instruct** 135:2
**instructed** 70:7
**instrument** 217:15
**insufficient** 92:17
**insulation** 153:8 156:10 159:6,13 161:19 162:8
**insurance** 27:5 48:4 63:20 85:24 92:23,25 106:3 141:20 146:16,25 172:13
**insured** 8:5,13 63:23,24 88:6 90:1,2,11,21 92:22,24 93:1 99:14 106:16 146:20 147:8 155:17 200:24 206:6
**insured's** 29:25 191:6,7,13,22 191:23 192:7
**insureds** 112:22 115:1 122:16,23 130:17 140:23 145:3 158:16 200:20
**insurer** 88:6
**insurer's** 82:19
**intended** 207:10
**intent** 145:7,8 146:10
**intention** 112:13
**interchangeably** 132:9
**interest** 115:16
**interested** 43:5 218:10
**interim** 119:18
**interior** 157:5
**intermingled** 204:9,22
**internet** 38:18
**interpret** 97:24 97:24 106:7 110:10 188:5
**interrogatory** 109:7 113:3,22
**interrupt** 6:14 19:14,19 72:22 189:24 194:12
**interrupting** 33:1,5 50:23 86:20
**inventories** 100:25 102:21
**inventory** 23:13 93:10,13 97:6 97:12,25 98:21 98:23,25 99:2 99:13 100:2,9 101:15
**investigate** 160:16 161:3
**investigation** 7:7 62:25
**investigators** 69:18
**invoice** 27:8 41:17,19,23 42:1,2,14,16 43:24 44:3,11 45:10,13,20 49:9 50:2 63:14 63:17,24 94:25 98:13
**invoices** 4:7 33:18 41:15 42:10 52:18 55:13 83:7,8,10 93:14 99:3,6 100:3
**involved** 6:10 7:9 120:18 143:10 180:3 208:15,18,20,24 208:25,25 209:13 210:2 211:24 212:7,8 212:22,23,24
**involvement** 141:22 209:25
**iris** 4:7 20:12,20 20:25 21:1,12 21:15,25 22:1,7 32:17 34:13,16 34:18,24 35:2 35:17 36:2,14 36:16 37:17,19 37:22 38:1,7,17 39:23 40:5 41:23 55:8,17 56:3,4 65:1

67:14,15 68:16 78:19 79:4 80:24 81:18 82:2,7,16 84:24 93:14 103:5,10 103:10,15,24 104:12
**iris's** 21:3,4,5
**irrigation** 137:1 137:6,12,18
**issue** 86:11 99:15 111:25 117:18 139:6,22 140:1,4 147:1 150:11 154:16 154:18 157:25 171:17 174:14 178:22 179:9,23 179:25 180:8 197:19 198:16
**issued** 30:6 32:16 107:7 115:4,10,11,23 128:10 180:14
**issues** 7:8 141:21
**item** 42:23 44:15 50:8 51:16,17,24 54:18,21,24,24 55:1,1 56:11 63:22,25 71:7 75:24 76:5 78:23 79:9 81:15 84:1 85:20 86:10,11 86:18 88:7,8,10 95:23,24 101:21 101:24 103:14 103:18 175:18 179:16,17 180:6
**itemize** 70:10
**items** 8:3 20:14 23:18 25:24 26:24 27:1,6,8 27:12 28:14 31:21 32:6 38:21 39:11 43:18 55:4 56:8 56:9,14 57:2 58:15,20,21 65:19 66:3,4,7 66:11,14,16 70:2,13,19,20 70:25 71:17,19 72:19 73:1,4,16 75:11,14,14,20 76:11 78:16 81:7,9 82:21 83:4,7,8,16,22 83:23 84:2 85:14,15,18 86:15 89:7,13 91:11 92:5 95:19 96:21 102:9,12,18 103:24 112:23 113:5 116:9 120:7 132:7,8 148:18 149:16 149:21,21 174:21,22 178:6 183:17 192:24 196:24

**j**

**j.s.** 107:14 109:3 109:16 113:16 113:21 116:10 121:22 190:9
**jan** 3:20
**jeremy** 51:21,23 52:13 72:4,8,12 116:25 143:1 144:20 145:23 145:25 146:12 147:12,17,23 150:2 151:2,13 151:13,16,20,23 152:11 153:4,5 153:11 154:16 155:9,14 157:24 158:20 159:25 162:4,13 165:11 166:24 167:8,19 167:21 170:11 170:13,16 171:12,13,15,22 172:3,9,19,22 172:24 173:1,12 185:22 186:9 195:19 202:9 203:19 210:13 210:13 211:18 212:5,18 213:3
**jeremy's** 152:8 152:16 153:10 154:1,2,13 168:7 171:3 172:6
**jerry** 3:23 51:21 52:13 210:7,14 210:23,24 211:10,11
**job** 173:19 180:16
**jobs** 166:18
**john** 2:24
**judge** 180:14
**julie** 1:21 218:24
**july** 115:6 212:25
**jump** 107:22,25 111:17
**june** 3:12,13 118:10 119:13 122:5,7,11,13 125:20 195:4
**jurisdictions** 87:17
**justify** 152:13

**k**

**k** 210:16
**keep** 45:24 78:4 123:23 201:8 206:24
**keeps** 50:19 51:6 180:17 200:5

**kept** 202:20 207:10
**kind** 64:19 65:4 65:5 80:1 81:17 131:7 142:5,9 193:1
**kitchen** 167:6
**knew** 138:18,19 151:18 172:22 172:24 204:12
**knole** 42:2 44:1 79:12 81:16
**know** 10:22 14:3 15:22 16:1 17:11,21 21:18 21:22 22:5,6,7 22:16 23:22 24:6,24 26:19 29:9 32:11 36:6 36:25 38:3,7 39:16 43:2 45:9 45:13 47:7 48:6 49:13 50:22 51:6,12,13 52:2 53:18,23 55:2 55:11 57:6,18 58:16,18,19,23 58:24 59:3,4 62:23 63:2 65:6 67:17,19,20,23 68:2,3,9,15,17 70:3 71:4 74:1,8 74:9,13 75:1,15 76:25 77:2 78:9 78:10,14 79:18 80:16,16,17 81:5,21 82:18 83:4 85:1,13 86:20,24,25 88:1,8 89:15,18 90:1,11 91:14 91:15,15,16 92:12 97:1,5 98:4,10,13,15 102:1,20 103:10 103:12 106:22 107:9 110:3,20 110:25 111:5,12 111:14,14,15,21 111:25 113:2,12 114:4,9,16,17 114:18,19,21 115:10,11,12 117:20,24 118:3 123:14 127:6,12 131:7,8,23 137:5,7 138:16 138:20,20 139:8 139:10 141:19 141:22 142:3 144:12 145:3,7 145:17,18 146:10 147:9 149:11 151:20 153:10 158:2,22 159:2,3,4 161:15,21,24,25 163:8,20 166:9 166:12,17 170:20 174:2,2 174:18,22,25 176:14,17,21 178:23 180:22 181:7,23 184:2 184:8,10,23 185:22,25 186:24 187:1 189:18 190:14 192:1 195:19 196:21,25 199:11 200:14 201:6,7,7 202:25 203:12 203:13,23 204:4 204:19 205:21 205:24 206:10 206:14 207:19 207:25 208:11 209:21,23 212:3 212:9,22 213:25 214:2 215:3
**knowing** 112:6
**knowledge** 7:12 61:22 85:18 129:23 135:24 161:22,25 163:25 169:12 182:1 215:1,3
**known** 70:11 83:6 85:2 217:11
**knows** 38:11
**koos** 209:24 210:1,15,19 211:3,11,17,25 212:16

**l**

**lack** 170:13
**laid** 214:23
**land** 208:13
**landlord** 183:3
**landscape** 138:10
**landscaping** 136:18,20,22 137:3 138:11,14 138:17,20
**language** 34:5 104:8 110:10 188:4 191:9,19
**large** 33:22 77:22 166:8
**late** 212:25
**lawsuit** 211:13
**lawyers** 119:25
**lead** 25:13,14 62:1 63:1
**leader** 163:20 163:23
**leading** 31:16 54:5 163:17
**led** 53:4,5
**left** 64:4 162:6 162:11,18,20 211:18 212:5 213:1,3
**legal** 109:12,13
**legend** 34:4 63:14 95:3

**legitimate** 135:3
**length** 51:5 186:7 190:2
**lengthy** 22:19
**leontine** 94:13 94:14,24
**lesser** 130:4 134:19 213:14
**letter** 3:9,10,12 3:13,15,16,24 4:10 9:6,8 24:8 24:11,17 56:4,6 59:2 73:22 90:9 93:4,7,25,25 95:10,17 96:11 96:17 98:4,16 98:20 100:11 103:17,24 104:18 106:14 108:22 110:4 112:4,19 114:5 114:6,25 115:4 115:7,9,12,23 116:20 118:10 118:13 119:2,9 119:16,20 120:10,12,13,22 120:25 121:7,13 122:4,6,7,11,13 123:1,3,15,19 125:17,20,24 142:16,23 153:4 154:19,20 155:9 155:13,24 156:1 156:4,5,6 195:15 196:6 205:18 206:5,8 206:11 208:13 208:21 209:3,11 211:21,24 212:3 212:16 214:8,17 214:21 215:4
**letters** 203:20 205:4,10,20,24 206:20 208:3,19 208:20 209:14 209:25 212:6,8
**letting** 50:21 51:6,12,13
**level** 61:25 63:1 70:19 141:7 148:14,18,19 149:4 153:19,21 177:2,22 178:20 186:6,24 187:13 189:2 196:23
**licensed** 218:3
**liked** 85:2
**likelihood** 165:24
**likely** 71:21
**limit** 33:3
**line** 32:12,12 41:25,25 44:15 60:9 72:18,18 72:23 73:21 94:8,12 101:21 135:17 157:2 173:7 176:9 177:7 195:4 216:4
**linens** 94:8,13 94:15,24,24 95:20 98:11
**lines** 72:16 137:24
**link** 72:18 73:3 73:16 79:23
**list** 41:15 68:3,6 84:2 95:19 96:21 97:2 109:8
**listed** 18:12 20:14 44:5 84:15
**listen** 86:2 131:13
**listening** 86:3
**little** 8:16 30:5 32:15 87:24 93:24 98:3 123:16 128:15 211:14
**live** 187:11
**living** 43:25,25 68:3,7,11,12 140:18,21 141:2 141:5,17 142:2 142:4 167:5 182:10,13,18 183:5,15 186:13 187:4,25 188:7 188:22,24 190:3 191:7,13,16,22 191:23 192:2,4 192:8,13,15,17 192:21 193:1,25 195:4,10,16 197:9,12,16,17 198:2,7,19,20 198:23
**llc** 2:5
**local** 56:14
**long** 115:19 123:24 164:24 178:23 186:5 190:5,17
**longer** 154:8 189:10
**look** 8:15,17 11:5,25 12:11 14:8 17:6 19:25 22:11 23:7 37:1 41:14 43:24 45:18 46:6,11 46:18,23 47:22 48:14 49:8 50:9 51:15 55:12 58:20 59:19 60:11 68:20 71:23 72:8 82:21 83:2,6,25 84:24 88:11 89:1,5 90:8,9 91:6 92:5,18,23 92:25 93:3,19 93:20 94:6 95:2 95:17 96:10 98:7,17 104:18 106:21 107:15

107:18 108:7,9 108:21 112:18 114:2,20 116:3 116:12 118:5,6 120:24 122:10 129:3 132:16 142:8 147:15 153:3,16 156:21 165:23 176:22 177:14 181:4 184:15 190:16 190:21 194:23 195:2 201:9,11 204:12 212:2,11 214:6

**looked** 51:17,24 52:5 81:12 85:3 85:13 148:13 180:20 181:17 181:18,25

**looking** 9:6 17:7 17:9,16,17 18:9 20:5 34:7 38:18 38:24 41:16,22 46:17 47:14 63:14 79:20 81:15 86:9 93:2 95:13 96:3 97:6 102:22 107:23 114:25 116:1 118:9 122:4,10 122:15 125:18 135:19 157:4 166:23 169:14 177:6 191:19 193:18 204:20 204:21 209:15 212:3

**looks** 172:21

**loss** 4:9 8:4,7,10 8:11,14,15 9:1,4 9:7,16,17,18,19 9:20,23 10:3 11:16 12:13,22 13:1 14:15 15:5 16:7,19 17:2,4 17:11 18:2,12 19:25 20:23,23 21:7,11,14 23:1 48:4,5 64:13 75:3 99:17,19 99:23 100:7,11 100:15,16,25 101:3,8,12 102:21 103:1 104:16,17,25 105:2,18,25 106:6 114:23 132:14,20,25 133:9,20,24 134:2,3 137:7 160:6 178:14 193:17,19

**lost** 22:12 63:16 164:3 189:25

**lot** 22:17 69:3 96:1 140:6 174:12 180:3

**lots** 23:2

**lower** 60:7

**lunch** 108:15

**luxury** 195:16 196:7

**m**

**ma'am** 40:16 84:13 131:12

**machine** 1:22

**made** 32:3 52:7 54:23 61:1,2,11 61:12,15,19,24 62:10,16,19 70:1,3,4 71:13 71:16,18 105:9 110:3 113:10,17 115:6 117:21 119:15,16 120:21 123:7,11 123:13 125:23 128:6 138:6,17 140:18,19 143:13 152:11 203:23 204:4,7 204:25 208:5 212:24 213:12 213:15,18,25 214:2 215:4 218:17

**madness** 97:4

**magazine** 68:7 68:13

**magnitude** 107:13,18 109:5 113:17

**main** 1:23 127:12 148:14 148:19 153:19 153:21 154:7

**maintain** 197:17

**make** 6:14 17:15,17 18:9 24:24 29:22 34:9 35:7,11 45:1 63:10,24 66:8,15 67:21 67:21,25 70:14 70:15 71:9 72:6 76:10 77:13 82:9 86:19 105:20 110:2 111:13,18,18 115:2 134:5 139:18 146:21 154:7 164:24 203:9,22 204:3

**makes** 16:6 31:24

**making** 10:7 20:8 33:22 63:11 115:19 122:24 183:9

**management** 200:16

**manager** 210:5 211:16

**manner** 24:19 26:21 71:19 84:15,22

**mantles** 112:23 116:11
**march** 4:3,4,10 142:17 149:11 204:13 211:19
**marcos** 2:7
**mark** 34:11
**marked** 5:24 8:24 142:20
**markup** 80:15 80:20,21,22 81:23
**mass** 72:19 73:5 73:17
**master** 156:11 156:11 159:14 161:19 162:7,8 167:5
**materials** 131:6 131:8 180:2
**math** 95:4 96:1
**matter** 15:1 80:24 108:3 173:12 207:12
**matters** 21:18
**maximum** 12:14 20:6
**mean** 6:13 10:13,18,25 12:15,16 16:13 20:11 24:1,6 27:20 37:25 43:3,20 46:17 46:21 47:16 54:8 55:8 69:20 74:8 82:16 93:4 93:25 97:21 99:15,20 104:4 104:24 108:3 109:22 115:20 121:23 122:19 132:5 139:22 144:2 148:2 149:2,6 150:6 153:4 155:21,22 157:16 160:6 167:22 173:14 174:20 185:14 188:5 190:13 194:11 200:22 201:5 202:2,20 209:21
**meaning** 58:4 131:6 135:20
**means** 149:24
**media** 140:6,8
**meeting** 200:19 200:23
**member** 68:16
**memory** 180:12
**mentioned** 70:5 113:23 137:10 164:19
**mentions** 123:5
**merit** 82:13
**message** 92:10
**met** 145:19 151:18 170:2 201:1
**methodology** 90:5
**mhh** 1:5
**middle** 117:4
**mike** 210:12,15 210:19,21 211:17 212:22 213:6
**million** 106:23 107:8 108:24 109:24 110:22 113:16 117:25 120:15 121:2
**mind** 43:20 122:2 132:7 177:23
**minute** 20:17 91:10 136:4 154:24 164:23 214:5
**minutes** 41:11 214:24 215:6
**miscellaneous** 178:5
**mischaracteri...** 28:25 90:24 181:3,20
**mischaracteri...** 25:12
**misrepresenta...** 158:20
**missing** 183:16
**mold** 148:18
**molding** 179:3,4 179:7,7,11,12 179:12
**moment** 63:18 79:19 214:15
**money** 27:22,24 40:3 95:22 111:2 112:1 115:16,17 127:4
**moneys** 109:25 112:13
**month** 187:2
**months** 115:15 189:19,20
**morning** 167:3
**moss** 2:12 3:24 5:13,13 6:7,13 6:22 10:17,25 13:2 14:7,19,25 15:11 16:9,23 17:6,11,15,21 18:2,7,18 19:14 21:17 23:4 24:15 25:11 27:9,13 28:7,24 30:15,19 32:25 33:4,23 35:19 36:4,10,15,24 44:23 46:14 47:2 48:2,17,22 48:24 50:23 51:1,8,14 52:20 54:2 55:7,10 57:17 60:17,24 61:6,17 62:5,8 62:18,22 63:9 65:20 66:18

67:8 78:24 79:3 82:3,11 84:5,11 87:18 90:13,18 90:23 91:20,25 92:3,20 95:5 96:14 98:19 103:9 104:4 106:8 107:9 108:3,6,11 110:25 111:4,7 111:10,12,17 112:19 113:11 118:2 119:9,16 119:20,23 120:3 120:18,19 121:11 123:10 124:12 127:3 130:7 133:13,22 134:15,23 135:9 135:15 139:9,21 139:25 144:1 146:9,17 150:16 152:9,15 154:14 155:11 158:5,7 158:17 160:3 162:17,22 163:19 168:3 169:23 170:5,19 170:25 171:5,23 173:2,5 175:7 181:2,15,19 184:24 185:13 186:16 187:18 188:1,8 197:14 202:7 205:12,25 206:7,12,21,24 207:4,14,19,22 208:6 209:4,7 209:20 213:10 214:9 215:15,18

**moss's** 205:5 209:16

**mountain** 181:1 181:13 183:20

**move** 25:15 106:10 115:25 122:3,5 135:13 153:5 167:10 185:17,23 187:3 187:8 190:1 193:12 199:15

**moved** 32:4 167:17 184:7

**moving** 168:9 185:5,11

**multiple** 87:16 87:16 123:13 134:16,17 178:11 208:19

**myers** 72:3,7

**n**

**n** 5:1

**n.e.** 2:15

**name** 5:13 89:15 202:22 205:5 216:2 217:14 218:20

**national** 166:5

**natural** 194:12

**nature** 85:10

**necessarily** 200:22 201:14 201:22

**necessary** 69:16

**need** 13:8 20:17 41:11 53:19 78:12 89:5,21 91:18 93:3 107:2 127:23 128:12,18 131:23 132:5 134:25 146:1 151:13 156:21 169:4 173:15 212:9

**needed** 52:8 59:12 89:4 91:13,16 168:25 170:3 179:22

**needing** 169:3

**needs** 71:4,5 90:2 92:11 145:9 149:23 153:12 173:15 179:17 183:17

**negotiate** 112:16

**negotiation** 146:7

**neither** 20:12,19 45:14 105:23

**net** 12:13,15 14:12 15:21,22 20:9 44:3

**never** 25:2 39:19 41:6 52:21 82:13,14 83:21 92:6 105:21 120:21 122:2 130:20 158:22 168:21 196:17

**new** 32:1 140:24 164:3 175:15

**night** 186:5

**ninth** 64:12

**nods** 100:13 142:10

**nonprofits** 43:19

**normal** 127:2 141:12 172:13 173:17 187:3,6 191:7,13,16,22 191:23 195:15 197:9,11 198:25

**normally** 200:1

**northern** 1:1

**notary** 217:23

**notations** 201:20

**note** 53:16,19 53:21 192:12 201:2

**noted** 217:3

**notes** 94:14 177:14 199:25 201:15,23,24 202:18 203:5,7

203:22,23 204:3 204:4,7,10,23
**notice** 4:8 6:5 6:15
**noticing** 50:1
**notifying** 144:22
**nov** 3:15
**november** 93:5 93:8 138:13
**number** 18:12 19:2 28:17 32:17 34:9 35:9 36:5,6 41:19 43:6,24 44:12 44:15 47:1 77:8 93:16 94:21 95:17 96:23 97:7,12 98:4 109:2,10 112:20 113:21 114:9 116:10,10 121:1 128:16 133:17 151:3 153:23 195:8 203:1
**numbered** 1:20 194:24
**numbers** 19:3 27:25 34:5 41:17 96:1 98:9 122:1 128:17 133:7
**numerous** 191:17

**o**

**o** 5:1 210:16,16
**o'connor** 1:22 2:13 3:11,12,14 3:15,17 205:1
**oath** 217:12 218:6
**oaths** 218:4
**object** 10:17,25 13:2 14:7 16:9 17:14 18:18 21:17 23:4 24:15 25:11 27:9,13 28:7,24 30:15,19 36:8 36:24 44:23 46:14 47:2 48:2 48:17 52:20 55:7 60:17,24 61:6,17 62:5,8 62:18,22 63:9 65:20 66:18 67:8 82:3 84:5 84:11 90:13,18 90:23 91:20 92:20 95:5 96:14 103:9 104:4 106:8 113:11 118:2 121:11 123:10 124:12 127:3 130:7 133:13,22 134:23 135:15 139:9 144:1 146:9,17 150:16 152:9,15 154:14 158:5,7,17 160:3 162:17,22 163:19 168:3 169:23 170:5,19 170:25 171:5,23 173:2,5 175:7 179:20 181:2,15 181:19 184:24 185:13 186:16 187:18 188:1,8 197:14 198:18 205:12 209:20 213:10
**objected** 6:19 139:11 161:16
**objecting** 14:19
**objection** 15:11 21:21 36:7,12 91:25 92:3 178:9 206:3,21 207:20 209:4
**objectionable** 6:23 37:13 59:2 59:4,4 81:20,21 135:8 144:24 145:3
**objections** 6:16 6:17 208:5
**obligated** 130:18 135:20 135:24 147:6 160:16
**obligation** 145:15 185:10 185:16
**obtain** 82:17
**obtained** 109:2
**obvious** 199:17
**obviously** 51:3 70:24 205:19
**occurred** 173:8
**oct** 3:24
**october** 214:9
**odor** 124:2,11 124:17 125:13
**odors** 163:9 164:5,18
**offer** 118:14,19 118:24 119:3,14 119:15 120:14 120:21 185:3 214:12,18
**offered** 6:15 123:21 135:12
**offering** 81:17
**office** 156:11 157:3,22 217:18
**officer** 218:11
**oftentimes** 23:18 185:1
**oh** 11:11 12:5 24:5 42:5 48:23 55:10 59:22 72:1 104:13 157:7 177:6 180:7
**okay** 5:19 6:24 7:7,17 8:12 9:2 9:14,21 10:4,20

11:12 12:20
13:19 14:6 16:2
16:21 17:23
18:8,8 19:9,13
19:14,24 20:5
20:17 21:10
22:3,10,15,21
22:25 23:7,17
23:25 25:18
26:11,13,24
27:6,11 28:21
29:16,22 31:3
33:16,22 34:13
34:15,19 35:2,5
35:16 36:11,20
36:21 38:10
39:21 41:9,21
42:6,9,13,15
43:4,23 44:14
45:6,15 46:20
49:2,21 51:23
54:3,16,23
55:10,14 56:6
58:12 59:17
60:2,6 61:2
62:16 63:23
65:25 66:8,19
66:24 67:2
68:15,24 69:24
70:1 71:18,23
72:7,25 73:12
73:13,19,21
75:23 76:18
77:11,17 78:6
78:10,12,18,25
79:16 80:3
81:10 82:25
83:1,7 86:23
87:1,15,25 91:9
92:7,15 93:2,19
94:3,13 96:18
96:25 97:20
98:1,6,16,23
99:1,13,17,22
100:1,5,10,14
102:2 103:20
104:10 106:11
106:21 107:2,15
108:1,5 109:7
109:13,15 110:2
111:12,24 113:3
113:8 114:25
116:5,23 117:3
117:9,19 118:5
118:12,23 119:2
119:8,18 120:24
121:21,25
122:15,20
124:21 125:9,17
127:14,17
129:14,22 131:1
132:10,14,19,21
136:19 138:9,12
138:24 139:24
141:16 142:8,14
142:19,25
143:11,23
145:24 148:7,17
148:23 149:11
150:19 153:3,10
153:18 154:12
155:16,21
156:17 157:8,9
158:10,14,22
159:19 160:2
161:3,15 162:3
163:12 164:2,8
164:13 165:23
166:2,10 168:4
168:20 169:7,18
169:25 170:22
173:18,20 174:7
174:9 175:12
176:3,5,15
177:4,10,20,25
178:5,8,15,25
179:2,3,5,12
180:15,19 182:3
183:1 185:17
186:2 189:13
190:1 191:5
192:10,19 193:7
193:10,13,18,23
194:5,10,15
197:2,7 198:10
199:16 200:17
201:4 203:6,10
204:22 205:7,10
207:1 208:9,20
208:24 210:15
211:18,22 212:9
212:12,24 213:5
215:5
**old** 162:7
175:10
**once** 168:9
210:24
**ones** 81:8
203:10,11
**ongoing** 191:7
**online** 58:3,4
**open** 169:6
202:21
**operates** 7:13
**operation** 166:8
**opinion** 52:18
60:18 67:12
78:8 79:19
83:17 126:14
152:22 174:15
**opportunity**
19:19 22:11
82:15
**opposed** 107:23
131:4 137:13
140:21 146:13
166:14 179:7
199:10
**option** 123:25
124:13,15
**oral** 1:11,17
**order** 90:2
107:13,18 109:5
113:16 170:4
204:16,18
205:14
**organization**
77:23
**organization's**
77:22

**origin** 69:17
**original** 13:4 23:19 24:12 25:3,6,6,20 26:4 26:9 27:7,17,23 29:15 30:3,6,6 31:13 32:14 33:13,18,19 34:3,6 37:6,9 38:15 43:14 44:6,20 45:2,7 45:15,17 46:11 46:22 47:11,23 48:16 54:9 59:24 60:3,7,12 63:6,17,24 77:2 83:8 93:15,20 93:21 94:10,25 95:15,16 96:22 97:15,25 98:13 99:5 100:3,4 123:11 176:25 177:11,12
**originally** 54:15
**originals** 83:10
**originated** 34:18 52:14
**ought** 125:14
**outcome** 218:10
**outdoor** 178:20
**outlay** 110:12
**outlier** 102:1
**outline** 116:22 117:10,15
**outlined** 7:6 22:2 30:4 31:9 173:11
**outlines** 48:4 69:9 121:8 154:6 156:22
**outside** 39:23 178:17,18 215:5
**overall** 69:7 77:9
**overlaps** 76:6
**overlooked** 139:19
**oversee** 138:25 139:5
**overseeing** 139:7
**oversight** 121:7 123:24
**owe** 87:2,9 130:3
**owed** 11:23 115:16
**owes** 110:15
**own** 29:23 75:19 76:20 141:10 146:21 152:8

**p**

**p** 5:1
**p.m.** 1:21 108:18,18,20 136:8,8 165:4,4 194:20,20 215:9 215:9,22
**pacific** 1:6,14 3:19,22,25 4:2,3 4:5 5:14 8:1 13:23,24 23:22 24:6,22 25:20 26:2,4,8,11,12 27:7,14 28:1,6,9 28:13,21 29:2,3 29:22 31:7 32:10 43:7 47:21 51:15,17 52:9 53:5 54:5 56:20 57:3,3 59:2 61:10,11 61:20 71:19 74:2,6,16 75:10 75:15,19 76:9 76:20,22 77:14 80:21 82:20 83:21,23,25 84:2 89:3,17 93:11 94:23 95:8 96:21 98:14 103:21,23 104:15,17,22 105:16,24 106:11,15,23 108:23 109:17 110:8,15,18 112:22 113:8,9 115:1,2 116:5 119:21 124:18 124:20 129:23 130:17,20 135:20,24 136:15 138:13 138:18,19 147:1 147:5 152:1,6 162:24 164:8 165:25 167:15 168:1 169:14,20 169:21 178:9 183:13 185:2,7 192:14 198:10 199:6,9 207:6 213:7,21,22 215:1
**pacific's** 29:24 72:5 82:19 85:21 96:16,18 105:5 150:25 199:13 214:12 214:18
**page** 3:1 11:8,10 11:11 14:9 34:10 40:4 41:19 49:9 59:23 60:8,10 64:12 68:20 93:12,13,21 94:7 95:2 96:5,6 96:11 97:9 100:10 104:20 108:22 112:21 116:24 122:10 122:11 123:5 147:16 148:12 156:1 168:7 177:7 190:22 194:24,24 195:1

195:2,7 209:18 216:4
**pages** 8:22 42:13,14 55:15 55:16 92:5 107:24 108:2 190:17
**paid** 8:1,8,9 9:25 10:5,8,12 10:19 12:24 13:18 14:6,15 14:17 15:4,6,14 16:5,8,20 17:2,3 20:2 27:7,19 28:1,18,21 29:3 29:9,12,14 41:3 46:16,17 50:1 63:15 79:25 80:2,7,9 89:14 89:16 90:3 93:25 95:1,7,7,8 95:15,23 96:22 98:14 108:24 110:18,21 111:1 111:8,14,21,21 112:6 115:13,13 116:2,9 122:18 127:4 132:12 133:16 137:6,15 139:12,18,22,23 140:20,22 146:15 159:5,15 159:15,19 161:9 164:9,12 190:3 199:6
**pair** 37:4 49:10 49:14 54:17
**palk** 156:14
**palk's** 158:12
**paper** 190:15
**paragraph** 9:21 11:8,13,19,21 11:24 12:11,20 13:5,10,11,14 14:9 20:1,5,10 20:18,19 23:7 23:11 56:7 93:10 103:3 108:23 112:20 114:12 115:1 122:15 123:5 130:16 194:24 195:1,2,8 196:15 197:23 198:14
**paragraphs** 12:1 13:8 122:12
**paris** 2:4,5 3:9 3:11,12,14,15 3:17 5:10 8:21 17:24 18:6 116:16 155:4
**parish** 84:16
**part** 21:13 29:5 29:5 47:4,16,25 48:6 56:22 57:24,25 59:14 65:25 89:4 123:19 128:8,13 129:18,21,24 132:13 136:25 137:6,7 143:11 148:3 160:8,13 168:19 172:5 180:16 182:9 192:22 200:9,11
**partial** 8:10,13
**particular** 78:22 157:24 175:18 180:6 201:1,9
**particularly** 149:25
**parties** 7:18 88:9 218:8
**partner** 5:10
**parts** 65:5
**party** 25:15 105:14
**path** 83:18
**patient** 104:5
**pay** 27:11 28:6 28:13 29:16,18 30:23 43:16,22 50:5 77:6 79:20 79:21 80:9 85:21 89:19,23 90:10,16,20 91:5,11 92:16 93:11,16 94:23 95:23 106:11,16 109:20,21,24 110:8,8,9,11 111:23 112:9,13 112:22 114:8 115:1,7 119:21 119:21,21 123:17 124:25 129:23 130:18 130:20 133:7,25 134:18 135:20 135:24 136:15 136:20 137:2 141:10 147:1,6 152:1,2,4,6 159:1,10,11 160:5,7,8,13,14 160:25 161:5 162:24 163:1,22 168:1 184:14 187:9,10,16,16 188:5 189:12 192:16,19 197:16 199:9 213:8,22
**payable** 133:11
**paying** 53:7 95:19 106:19 116:7 137:20 139:11 161:16 199:10
**payment** 30:6 31:1 32:16 86:10 94:11 106:23,25 107:7 110:2,4 113:15 113:15,18 115:2 115:3,7,15,20 116:9 117:23

122:16 138:24 139:19,20 152:12 189:7 193:25 214:13 214:19
**payments** 110:23 113:10 113:18,19 117:21,22 139:14 182:5
**pays** 189:11
**peachtree** 2:15
**people** 158:2 189:9 208:22 209:11
**percent** 97:19 141:20,22
**percentage** 47:17
**perfect** 74:24
**perform** 170:4
**performed** 129:25
**performs** 171:7
**period** 31:14,16 31:19,21,22,25 50:3 65:7 190:4 192:23 218:18
**permanently** 196:1
**permission** 69:1
**person** 52:10 53:12 83:18 180:13 205:18 217:14
**personal** 64:13 66:11,16 99:2 174:22
**personally** 7:9 61:7 201:7 217:11
**pertains** 7:10
**pertinent** 137:14 203:9,11 203:18
**philadelphia** 160:24
**phone** 53:17 118:16
**photos** 138:11
**phrase** 117:2 170:13,17
**physical** 157:25
**picture** 77:10 173:4,10
**pictures** 138:9
**piece** 89:16 175:19
**pink** 94:8,12 95:20 101:21,24
**place** 48:3 186:4
**plaintiff** 12:12 14:13 23:2 30:13
**plaintiffs** 1:4,18 2:2 5:10,11 11:21 13:6,11 18:16 19:11 20:15,21,22,25 21:6,8,13
**plaintiffs's** 11:8 11:18 12:2,21 21:3 23:13 29:25
**plan** 140:8 151:11
**planned** 128:2 145:22
**planning** 193:19 194:2
**play** 167:23
**please** 5:6,21 16:11,25 19:19 24:11 30:9 33:10 38:22 40:7,15 41:15 44:24 57:14 59:23 64:6 67:7 74:22 84:2,13 86:2 105:2 106:21 117:5 118:6 120:19 131:12,13 132:5 138:1 147:15 160:20 175:2 194:23 212:13
**plus** 96:9 113:21 187:10
**point** 15:18 18:14,15 24:10 26:20 64:16 66:9 67:3 69:4,4 70:9 71:7 107:5 111:11 112:3,11 117:1 120:16
125:25 128:5 132:5 134:8 139:14 140:25 167:11 170:17 180:7 190:24 191:20 192:12 210:2 211:4,7
**pointed** 125:12
**pointing** 198:3
**points** 71:3
**policies** 87:16
**policy** 11:23 12:14 20:7 27:5 48:4 85:24 87:12,22,23 98:18,21 99:14 104:8 105:6,10 129:22 130:1,11 131:19,21 135:23 136:2,14 136:17 147:1,6 159:11,21 160:6 175:24 176:1 178:1,2 180:14 183:6,14 187:23 188:3,5,9 193:17 195:15 197:15
**portion** 21:25 33:11 58:8 65:15 146:1
**position** 89:3 105:5,24 106:4
**possibility** 138:14 165:14

**possible** 119:19 204:7
**possibly** 76:6 170:12
**potential** 118:21 119:25 162:15 191:1
**potentially** 162:18 187:13
**practice** 64:7 145:10 172:16
**practices** 3:18
**preference** 115:22,25
**premise** 145:6 155:13
**prepare** 98:21 99:1
**prepared** 21:15 21:23 22:3,16 23:13,14 109:4
**present** 2:20 29:24 82:18 84:8
**presented** 25:7 27:4 28:15 30:1 32:9 34:18 35:20 37:22 75:3 77:1 78:3 92:14 105:1 129:12 132:18 133:5,17,18,24 134:20 141:13 141:14
**presenting** 83:19
**pretty** 10:23 121:9,15,16 171:21 173:16 199:17
**prevention** 164:17
**prevents** 137:13
**previous** 18:7
**previously** 18:6
**price** 27:17,23 29:15,16,18 30:4 32:14 33:13 37:16 38:15 40:4,24 40:24 46:11 47:21 49:14 54:4,7 73:6
**priced** 73:22
**prices** 31:13,14 33:13,19 66:20 66:20 67:11,13 77:2 82:12 100:4
**pricing** 4:1 56:9 66:10,15
**primarily** 58:14
**primary** 58:17 58:19
**printed** 108:2
**prior** 12:22 22:13 32:6 42:18 58:2 82:23 106:15 125:24 144:17 144:19 161:18 188:17 218:5
**privilege** 205:13 206:13 207:9,12 207:18 209:5
**privileged** 205:16 206:2,5 206:8,16,25
**probability** 166:1
**probably** 14:23 19:16 41:10 165:24 176:12 210:24
**problem** 137:20 162:9,12 178:16 178:18 179:6 210:4
**problematic** 59:9
**problems** 155:8
**procedure** 1:24
**proceedings** 3:3 215:22
**process** 59:1,9 69:12 87:22 105:17,19,21,23 106:1,5 116:21 121:5 127:19,21 128:2,4,8,13,18 128:20 129:1,10 129:18 143:3
**processes** 163:18
**produce** 109:12
**produced** 1:18 21:6 23:6 36:18 36:23 90:22 109:3
**product** 207:16 207:23 208:1,7 209:5
**production** 7:23 22:18 24:18,21
**profession** 68:8
**project** 169:15 190:6
**promenade** 2:14
**proof** 4:9 8:4,6 8:10,11,13,15 9:1,4,7,17,19 11:16 12:13,21 12:25 14:15 15:5 16:7 17:2,4 17:11 18:2,12 19:25 20:11,23 20:23 21:7,11 21:14 23:1 48:5 75:3 100:11,15 100:16 101:2,8 103:1 104:15,17 104:25 105:2,18 105:25 106:6 114:22 132:14 132:20,25 133:9 133:20,24 134:2 134:3 178:14
**proper** 213:17

**property** 9:22 27:3 64:13 66:11,16 99:2,3 99:4,8 174:22
**proposal** 117:11 117:16
**proposals** 178:11
**proposed** 117:19 135:12 186:8
**protected** 207:9
**protocol** 148:10 151:20 163:8
**proved** 217:12
**provide** 22:8 70:12 71:10 74:20 83:19 85:6 95:18 102:14 105:2 113:22 114:3 134:22 182:20 205:15
**provided** 11:21 13:6,12 15:16 15:19 18:16 19:11 20:24 33:14,17 38:5 60:19 65:9 66:12 73:23 81:22 84:7 85:4 89:6,8 92:7,11 103:6,10,11,21 105:17 106:5 113:9 183:3 191:2 218:18
**provision** 105:13
**provisions** 87:12 105:6,10 105:12 106:6
**public** 217:23
**pull** 107:21 108:9 203:2,3
**purchase** 27:17 29:15 30:4 31:13 32:2 33:13 40:24 58:15 72:20 73:5,17
**purchased** 31:22 32:6 54:15 102:9,10 102:15,19 140:17 184:2,6
**purchasing** 102:12
**purple** 60:6,9 177:7
**purposes** 81:15 124:6 179:8 217:16
**pursuant** 1:23
**put** 105:7 117:6 126:6 131:6,7 201:12 206:16

**q**

**quadruple** 23:19
**qualifications** 67:19,20,23 68:1 77:20,22 78:8,15 163:14 170:3,12,15,16
**qualified** 174:14
**quality** 64:19 65:4 80:2 81:17 131:7 142:6,9
**question** 15:1,2 15:7 16:10 20:18 21:21 24:7 25:25 26:5 28:5 29:12 30:9 31:4 33:10 35:21,24 36:1,2 36:25 38:4,22 40:6,7,13,25 44:24 47:7,13 48:13 50:16,24 52:23,24 54:2,8 54:21 55:3 56:22 57:13,20 59:8 63:2 65:13 66:3 67:9,25 71:12,14 72:10 73:12,13 74:22 74:22 77:16 78:8,24 79:2,3 81:2 82:4 84:1,6 84:10,12,17 85:1,10 86:1,4 87:19 88:1 91:21 94:23 99:7,14 101:12 107:10 111:19 115:9 120:4 121:12 123:11 126:21,22 130:5 130:6,8,8,12 131:11 134:13 134:20,24 135:3 135:4,4,5,6,9,12 137:25 143:9 145:6 147:3 148:15,16 150:12 151:16 155:7,13,18,21 160:19 169:24 172:5,12 175:1 175:2,8 181:8 181:10,17 182:12 200:18 203:13 205:15
**questionable** 10:23
**questioned** 143:22
**questioning** 32:12,13 53:6 135:17 146:15 150:3 152:16,19 152:23 157:2 173:7 176:9
**questions** 7:5,10 14:4 17:14 18:10 19:1 25:10 26:8 28:11 29:19 31:17 32:18,19

33:3 37:14,23 37:25 51:5,9 65:11 75:5,8 76:3 77:7 78:3 122:14 136:12 137:21 141:13 144:20 146:12 160:17 193:8 215:19
**quick** 119:23 176:22
**quite** 12:6 21:18 22:18 55:3 77:4 127:4
**quote** 62:3 74:10 116:21 118:23
**quotes** 98:18,20

**r**

**r** 5:1
**raised** 105:16 203:20
**ran** 8:22
**rate** 80:12
**rather** 140:7
**rationale** 199:13
**reach** 120:17
**reaching** 118:21
**reaction** 172:7
**read** 11:25 12:4 13:8 20:18 30:8 30:10 33:9,11 40:15,18 56:21 57:4,5,7,13,20 57:22,23,24 65:15 72:9,14 74:25 84:14 86:4,6 101:4 114:11 117:5 122:12 130:10 131:11,14 135:11,14 137:9 137:25 138:2 150:1,2 157:10 160:19,21 192:9 217:1
**reader** 72:22
**readily** 73:7,15
**reading** 33:23 123:23 155:12
**reads** 56:17,23 56:24 72:17
**real** 55:21 119:23 176:22
**really** 21:18 32:12,13 153:14 194:16
**reason** 28:10 115:21 137:6 162:19 166:13 216:4
**reasonable** 25:8 25:19 26:2,6 78:7 83:18 90:21 163:2 180:21 182:17 182:21,23 186:3 189:4,6,7,16 190:6 191:1 193:15 197:8,11 197:16,19,21,25 198:16 199:3,14
**reasonableness** 182:15 184:16 187:21 188:10 188:12,13,21,25 192:18,22 196:10
**reasons** 162:20 162:23 163:5
**rebuild** 106:17 106:20 123:9,12 123:16,17,21 124:9 125:1 126:8 130:19 131:5,15,24 132:2,3,4,8,11 133:6,21 137:19
**rebuilding** 122:22 123:4 124:23 126:5 131:20,21 138:4 141:21
**rebuilt** 124:3
**recall** 7:21 40:6 40:8,11 53:14 88:25 89:2,9 107:4 115:3,8 115:14 118:25 120:5 126:16 129:2 132:17 133:4 138:11 141:7 142:22,25 143:4 145:21 148:5,6 149:13 159:8 163:14,15 164:19 165:10 165:13 169:1,16 171:1,19,20 175:1 176:25 178:22 180:20 181:21 204:6,7 205:2 209:13 210:10 212:20
**recalling** 156:19
**receipt** 102:14 103:23
**receipts** 23:2,6 56:2 100:1,6,8 102:8,11,13,21
**receive** 50:18 82:8
**received** 13:25 14:1 27:15,16 50:10,14,14 51:20 53:11 57:23 64:24 90:15 91:1 117:25
**receiving** 142:23
**recite** 85:24
**recollection** 13:9 163:7 212:4
**recommended** 187:7
**recommending** 154:2

**reconstruct** 121:20
**reconstruction** 108:23,24 112:21 113:4,24 113:24 114:6 121:1 130:2 131:18,19 194:2
**record** 5:3,7 35:9 49:4,7 74:6 88:13,15,18 108:12,14,15,17 108:20 114:11 136:7,10 165:3 165:6 194:19 200:23 210:3 215:8,11,21 218:14
**recorded** 218:12
**records** 102:6,7 102:18,22 158:12 194:22
**reduce** 143:12 143:21,24 145:5 145:7 146:7,11 147:13 150:9 213:23 214:14 214:20
**reduced** 150:1
**reducing** 144:21 150:14
**refer** 13:3,24 56:12
**reference** 20:8 22:9,22 41:24 42:3,4 115:14 117:2 156:21 168:11,12 199:24 202:1
**referenced** 41:23 74:14 90:9 125:24
**references** 49:9 119:14
**referencing** 31:20 35:8 104:19 122:17 129:8 149:17,18 164:17
**referred** 36:16
**referring** 83:4 127:14 131:20
**reflect** 149:16 149:20,25
**reflected** 29:17 29:19 47:22 49:17,19 54:10 209:25
**refresh** 13:9 163:7 180:12
**refute** 215:1
**refuted** 215:3
**regarding** 20:13 66:14
**regardless** 133:12 207:13
**regular** 166:11
**rehash** 75:8
**reject** 100:15 104:23 105:2 214:12,18
**rejects** 198:10
**relate** 142:21
**related** 12:3 13:15 157:2 193:1 206:8
**relates** 27:3 29:6 65:14 100:20 103:15 110:24 176:4
**relating** 104:7
**relation** 47:10 182:5 201:21
**relationship** 171:22
**relative** 218:7,8
**relied** 30:3
**relying** 30:1
**remediation** 122:18 126:8,13 126:15,24,25 127:5,8,13,18 127:20 128:1,8 128:13,16 129:10,17 132:23,25 133:5 133:11 134:4 136:13 143:3,13 163:17 170:2,4 171:11
**remember** 19:16 51:20 52:14 82:23 101:21 137:9 144:11,12 160:12 161:6 171:2 177:1 197:2 209:12 210:21 212:5
**reminder** 201:5
**reminders** 200:14 201:25
**remodel** 195:16 195:25 196:7,8 196:13
**removal** 128:20 134:7 138:5 140:10,11,13,15 157:5 180:2
**remove** 131:6 140:10 152:21 153:6 156:10 157:16
**removed** 140:6 150:6
**removing** 140:12,14 152:22 159:15 179:10
**rental** 140:17,20 141:25 183:4,9 183:13,19 184:3 184:4,7,11 185:6,6,10,18 185:18 188:6 189:2 192:20 195:16,25 196:7 196:8,14 198:17
**rented** 140:2 183:24 184:3

**rep** 4:8 61:9,10
**repair** 27:4 70:13 101:18 102:21,23 103:3 103:4,5,7,8,14 103:18,20,21 104:2,2,9 106:12,18 107:6 110:6,24 112:5 112:7,14 121:6 121:19,21 123:9 123:15,18 125:2 125:3 126:7,12 126:18,19,23,25 127:2,5 128:8 128:10,13,18,19 128:25 129:18 129:20,24,24 130:3,18,25 131:6,8,24 132:3,6,11,15 132:20 133:3,4 133:8,10,16,18 133:25 134:4,14 134:18,19 136:15 138:25 138:25 139:5,7 145:5,7 146:21 146:25 147:5,6 151:1 159:17 169:19 178:7 179:22,23 180:2 193:19
**repairability** 66:1
**repaired** 66:5 71:5 86:16 132:24 133:2,2 133:12 134:6 147:4 156:25 162:7 186:10 194:7
**repairing** 126:11 132:7 176:1
**repairs** 112:12 122:16 135:21 135:25 136:15 138:5 167:17 172:4 173:21 179:21 180:5 191:2 193:16,16
**repeat** 16:10 21:20 26:1 40:9 44:24 61:18 74:21,22,24 84:13 86:1 126:21 175:2
**repeatedly** 135:5
**rephrase** 38:22 40:13 52:25 81:2 82:17 124:14 179:24
**replace** 38:25 56:7,12 106:20 123:6 126:14,18 131:3,4,9,15,17 132:1,3,4,6,8 134:18 141:16 142:5 159:17 174:16,19 175:14
**replaced** 71:5 85:16,19,20,21 86:8,12,13,23 86:25 148:24 149:1,7 177:24 179:8
**replacement** 20:13 22:1 23:17,20 24:13 25:4,7,21,24 26:4,10 27:4,12 27:18,24 28:2,6 28:10,13,16,21 29:16,18,23 30:3,14 31:14 32:15 33:13 37:7,10,20 38:15,24 39:5 43:10,15 44:21 44:22 45:3,7,17 45:18,22,24,25 46:6,12,18,23 47:6 48:7,12 52:19 53:10 54:10,15 55:3,6 56:10,15,25 57:1,7,25 59:10 59:24 60:3,7,12 60:15,22 61:4 61:21 63:6,21 63:25 64:18 65:3,11 66:1,4,7 66:20 67:11 70:12 71:10 73:8,10,15 75:6 75:10,12,13,16 75:20 76:11,21 76:24 77:1,15 78:16,19 79:5 80:4,9,12 83:19 84:25 85:22,23 86:7,14,18 87:2 87:4,5,9 89:14 94:25 95:24 98:12 99:20,23 100:20 101:19 102:5,23 103:5 103:7 104:2 130:2,4 133:6,8 133:18 174:10 174:25 175:4,6 175:13,20,23,24 176:6,12,15,18 176:23,24 177:10,13 178:1 178:2,21
**replacing** 126:11 131:20 131:21 132:8 141:15 149:4,10 176:2,5 178:22 179:10 192:25
**report** 167:11 168:9,15,20 169:5
**reported** 1:22

**reporter** 5:7 33:7 40:10 74:21,24 218:2 218:18
**reporter's** 3:6 218:1
**representation** 121:13 143:14 169:10
**representative** 1:13 7:2 61:20 66:10
**request** 14:14 24:22 48:10 53:5 54:5 58:5 66:24 70:5 100:24 102:20 103:1 122:17 127:7 129:14 149:5,15 150:15 151:16 154:1,3 165:25
**requested** 24:25 25:2,23 26:18 27:14 28:4 30:10,21 33:11 33:14 39:17,19 40:18 48:11 54:1 57:22 59:14 60:22 65:22 66:22 74:25 84:14 86:6 90:4 118:14,24,25 130:10,23 131:14 135:14 138:2 160:21 218:16,17
**requesting** 122:16
**requests** 150:7
**require** 194:3
**required** 86:18 143:17 146:19 159:11 178:21
**requirement** 65:16 67:5
**requirements** 65:10 67:4
**reread** 86:5
**research** 7:8
**resell** 196:2
**reservation** 144:17
**reservations** 155:15
**reserve** 215:17 215:19
**residence** 197:6
**residue** 159:7 159:14 161:20 162:9 167:9
**resolution** 120:6
**resolve** 88:9
**resolved** 158:1
**resource** 180:20
**respected** 68:13
**responded** 6:15 156:4 213:21
**responding** 51:8
**responds** 100:22 144:10
**response** 53:9 71:15 119:5,15 120:8,22 122:11 125:11 143:23 143:25 144:2 148:13 168:8
**responses** 33:3
**responsive** 51:5
**restart** 83:24
**restate** 147:3
**restoration** 4:1 39:3,4,8,10,19 39:25 40:1,20 40:24 41:2,6 57:10,12 58:2 78:21 153:16 166:4,6 172:14 190:5
**restorer** 174:5
**restroom** 41:11 194:13
**retail** 58:23,24 81:19
**retailer** 58:3
**reversed** 158:6
**review** 7:15,17 24:21 32:11 82:15 138:25 156:3 180:10 205:4,7 218:15
**reviewed** 7:22 7:22 22:12,17 22:19 26:18 34:21 52:5 66:12 156:4,5 168:16,21 214:22
**reviewing** 7:21 10:9 165:14
**revised** 152:24 152:25 154:5,6
**revisit** 151:14
**rid** 124:10 125:13
**ridiculous** 186:14,19,21
**right** 5:22 9:5 11:3,15,20 12:6 12:11 13:11,16 13:17,22 16:22 18:20,23,25 19:17 21:8 22:24 24:16,20 24:24 26:14,19 28:5,12 29:2,10 35:8,14 37:5,13 39:3,7 42:18 43:1,14 44:18 44:25 46:4,25 55:18,21 56:18 59:12 61:14 63:13 64:2 66:5 69:11 72:23 73:13 75:19 76:1,4,15 80:8 80:13,19 88:3 89:9 93:9 94:4,5

94:14,17 95:22 96:8 97:5,9,14 97:17,18 99:7 101:3 102:3,13 102:16 104:13 106:9 109:19 114:15,17,19 116:12,13,17,23 117:4 119:14 122:2 124:4,18 125:6 126:3 127:12,16 136:4 136:6 137:18 141:24 143:18 144:4,7 146:6 146:24 147:10 150:14 153:10 153:14 155:1,24 158:15 160:14 161:6,22 166:7 168:25 171:2,9 173:9,25 174:5 175:15 176:6,17 176:22 179:20 182:24 184:14 185:22 186:20 188:16 189:21 190:18 192:5 194:25 195:13 195:17 196:3 197:1,18 198:22 199:5 200:9,13 201:16 202:13 207:14 209:6,15 210:8 211:10,10 213:25

**risk** 180:13,14

**rmr** 1:21 218:24

**road** 140:6 141:21 142:1 165:9 195:21 196:22

**role** 167:23 171:3 210:12 211:15

**rolling** 201:24

**rom** 109:5 110:14 121:22

**roof** 156:24

**room** 43:25 44:1 49:10 52:4 54:17 167:6 177:8

**rooms** 157:21

**rough** 107:13,18 109:5,10 113:16

**roughly** 81:16

**round** 10:4 32:16

**rounding** 15:19 197:20

**rudoshko** 3:23 11:6 16:15 23:13 137:5 210:6,23

**rug** 174:1,2,4 175:5,6,10,14 175:16 176:24 177:8,14,15,21 177:23,24

**rugs** 172:10,14 172:15,17,24 173:15,25 174:1 174:6,8,11,13 174:15,17,18,19 174:21,24 176:18,23,24 177:2,4 192:19 192:24

**rule** 69:19 206:15

**rules** 1:24

**run** 194:13

**rush** 194:11

**résumé** 164:1 164:20,21

**s**

**s** 5:1 210:16

**safe** 154:8

**safely** 208:10

**sake** 167:5

**sale** 58:22 79:23

**sales** 40:24 43:9 43:11,12,13,16 44:18,21 45:2,4 45:14,18,20,23 46:7,13,15 55:18

**salvage** 140:9 195:22,22 196:3 196:5

**sample** 66:11,15

**san** 2:7

**saw** 40:23

**saying** 17:8 18:10 19:15 33:1 45:24 47:20,21 51:23 57:1 78:4,22 102:4 115:13 119:20 131:23 132:10 158:9,10 162:13,15 165:21 170:14 175:23 177:20 181:21 184:25 188:15 189:2 204:2 206:24 209:10

**says** 9:20,22,23 10:10,18 11:1,1 11:4,21,24 12:12 13:5,11 13:14 14:11 15:20,22 16:16 17:7,12 20:1,6 20:19 23:17 24:11 37:9,18 37:19 38:6 39:24 42:3 53:19,22 59:23 69:23 72:11 73:5,21,23,24 79:14,23 93:10 93:12,13 94:1,1 94:14 95:12 97:18 99:1 100:8,14,24 102:5 104:15,22

108:23 109:17 109:21 114:6,7 115:7,16 117:13 117:19 118:12 121:13 122:15 122:20 123:21 124:13,21 125:16 129:23 130:17 135:4,24 144:8 145:17,25 147:23 148:3,13 148:21,22 149:15 150:5 151:21 153:5,9 156:23 165:11 168:8,14,17,19 168:20 183:14 190:25 191:3,4 191:5,20,22 195:15,18 198:11,15 201:25
**scenario** 142:25
**schedule** 37:9
**school** 183:20 184:5,12
**sconces** 49:10 49:15 54:17
**scope** 143:8,12 143:16,21 144:3 144:9,21 145:5 145:20,22 146:7 146:11,11,21,24 147:13 150:18 150:21,23,25 154:17 155:15 157:15,18,19,21 168:15,18 169:19,21 171:13 172:4 173:24 178:10 178:16,19 179:9 179:16,25
**scroll** 148:11 204:14,19,19
**seal** 217:18
**sealed** 148:20
**search** 204:14
**sec** 122:6
**second** 20:8 32:22 33:25 41:9,18 43:23 55:23 56:1,7 71:24,25 75:22 88:13 96:10,11 108:14 112:21 116:24 118:12 130:13 144:10 144:15 148:18 149:4 152:16 153:15 154:21 155:25 165:8 185:6
**secondly** 192:23
**security** 183:1 183:12,13 184:14 188:13
**see** 8:16 9:2 11:9,14,18 14:23 15:6 17:5 18:2 40:2 41:19 41:22,24 42:2,3 42:6,11 44:1 49:11 55:16,17 56:1,3 57:16 60:3,8,9 64:14 69:12 72:17,23 83:16 89:5 93:5 93:17 94:8,12 94:12,16,17,18 97:15,22 98:18 98:22 100:11,11 101:6 108:25 111:2 117:1 119:17 122:8 130:6 142:8,17 142:18 153:20 156:1 157:6,7 158:23 161:19 165:16 167:9,10 177:7 182:3 191:12 195:3,5 195:6,8 196:16 202:24 203:4 212:2 214:21
**seeing** 88:25 89:2,9
**seek** 65:17 105:14 195:12
**seeking** 47:5 65:23 141:1 146:18 150:12 151:23
**seeks** 195:4
**seemingly** 20:24
**seems** 169:11 173:8 211:20
**seen** 8:10 90:25 166:18
**self** 23:13 73:20
**sell** 174:8,11,18 175:11
**selling** 174:13 174:24
**send** 109:7
**sending** 170:23
**sends** 144:7
**sense** 16:6
**sent** 103:12
**sentence** 72:17 101:3 109:19 114:11 117:7 118:13 130:15 130:16,17 135:19 214:11 214:17
**separate** 126:9 146:25 147:5
**septic** 137:24,24
**series** 33:18 75:8
**serious** 162:16
**served** 210:11
**service** 163:2
**services** 69:21
**serving** 210:5
**servpro** 166:14 166:16,18

**set** 6:16 68:25 75:7 144:15 200:14
**setting** 12:13
**settle** 213:13
**settlement** 112:16 117:11 117:15,20 118:14,19,22,23 119:3,19 124:5 125:7,8,11
**setup** 88:2
**seven** 51:9,14 96:9
**several** 27:8 42:13 85:13,14 192:24
**shades** 182:9,14 182:16,19,24 192:16
**sheetrock** 156:10
**shipping** 43:9 43:17 44:9,18 44:22 45:3,4,19 46:7,13,19 56:9
**shock** 46:11
**short** 31:14,16 31:19,24 32:6 98:3,7
**shorthand** 1:22 218:2
**shortly** 31:22 32:3 115:23
**show** 24:16 26:13 79:8 99:13 177:5 193:14
**showed** 18:3 33:18 143:1
**shown** 80:4 143:6
**shows** 63:6 99:22
**side** 105:23 177:15
**sides** 107:5
**sign** 211:2
**signature** 3:6 209:16,17,23 215:19 216:1 217:2 218:23
**signed** 101:8
**significant** 89:7
**significantly** 12:22
**silo** 54:20
**similar** 56:11 81:17 84:6,6 102:5,22 145:11
**simple** 181:17
**simply** 38:13 39:23 47:5 48:6 62:23 100:19 115:16 135:5
**single** 40:4 103:13
**sinister** 155:19 173:13
**sir** 5:20,25 7:16 7:19 12:10 13:13 26:23 38:2 64:6 73:18 97:13 99:6,16 100:4 105:20 106:13 109:6 112:17,25 113:7 115:18 118:11 125:16 127:9 137:4 156:6 189:17 193:11 195:6 201:3 203:21 212:13
**sit** 24:16 26:19 53:22 74:4 85:24 87:7 89:8 114:1,19 139:12
**site** 157:4
**sits** 211:10
**sitting** 97:1 139:16 171:1 180:6
**situations** 213:15
**six** 24:17
**size** 196:24
**slade** 127:7,15 127:19 128:11 128:16 129:6,9
**sliding** 5:25
**slight** 18:11
**slip** 55:18
**slow** 72:22
**smaller** 196:20 196:21
**smoke** 122:18 124:2,11,17 125:13 126:1,7 126:13,15,24,25 127:5,7,13,18 127:20 128:1,7 128:13,16,18,19 129:10,17 132:22,25 133:5 133:10 134:4,7 136:12 153:7 158:23 159:7,14 161:20 162:9 163:9,17 164:5 164:18 167:5,9 170:2,4 171:11
**soaked** 162:9
**soda** 129:7,11 129:12 143:13 143:17 144:9,21 145:9,19 146:7 147:13 148:6,8 148:14,17,24,25 149:7,18,23 150:4,5 151:5 151:10,19 152:7 153:12,17,23 154:2 156:25 171:15
**sofa** 37:6 38:25 39:14 42:2 44:1 79:12 81:16,18 86:22 87:3

195:13 196:20 196:21,25 197:12,21,24,24 198:4
**sofas** 196:11
**sold** 38:18
**solution** 189:9
**solutions** 184:15 185:1,23
**somebody** 6:21 71:9 160:23 165:20
**somebody's** 52:18
**sorry** 6:13 9:9 11:10,11 12:17 13:10 20:7 21:21 37:18 38:20 41:25 45:16 47:20 48:23 49:18 52:19 55:23 61:3 62:17 70:15 72:1,14 78:4,12 80:8,11 83:24 86:19 87:4 88:20,21 89:14 91:3 93:12 95:25 96:18 97:8 98:20 99:18 101:1,2,20 106:20 107:12 111:6,16,17 121:15,18 122:5 124:14 128:24 129:9 130:2 131:9,18 132:1 136:3 139:1 143:8 147:3 148:25 152:5,20 154:23,25 157:7 161:3 166:19,22 170:10 171:12 172:12 175:5,17 179:24 182:11 182:22 185:20 186:18 190:19 193:24 197:20 202:22 211:11 211:23 212:1 214:7
**sort** 41:18 105:8 190:13
**sorts** 58:3 200:4
**sotto** 87:10 177:3
**sought** 105:11
**sounded** 18:9
**source** 85:5 89:22
**sources** 84:24 85:3,7,13 190:8
**southern** 1:2 68:3,7,11,12
**speak** 6:17,18 7:5 13:23 27:2 33:7,10 39:16 47:17 48:19 58:16 59:6,8 75:24 77:21 78:1 130:11 144:16 177:22 178:3 187:2
**speaking** 87:17 87:24 88:4,5 155:14 173:25 180:1 208:17
**speaks** 178:2
**specific** 7:13,20 69:4 89:13 99:23,25 102:4 117:7 127:7 139:1 144:12
**specifically** 29:6 53:22 58:6 70:19 82:1 101:23 110:25 111:5 129:6 137:10 140:13 156:23 157:22 168:12 179:10 210:19
**specifics** 58:7 87:21
**spoke** 98:11 119:1
**spoken** 210:24
**spray** 153:7
**spreadsheet** 4:6 8:3 19:6,8 22:2 22:12,16 26:24 27:6 28:18 29:7 29:11,14,17,19 30:4 31:10 32:18 34:2,13 34:16 35:3,3,17 36:2,13,16 37:2 41:16,22 43:9 45:11,12,12,22 46:22 47:22 49:17,19 51:16 51:18,25 52:5,6 54:10 59:20,21 65:8,12,14,19 66:14,21 70:2 70:24,25 71:11 71:19 75:11,25 76:12 77:1 78:16 79:12 83:5 85:16 93:3 93:20,21 94:1,6 98:23 99:4 102:9,10 103:11 177:11,12
**spreadsheets** 19:23 22:3
**square** 143:16 143:24 149:22 149:22,25 150:3 150:9,14 152:22 152:25 153:5
**stage** 193:20
**stamp** 209:17 209:22
**stand** 36:19 46:2 114:14 180:8
**standard** 182:18 191:7,13

191:16,22,23 192:2,4,7,13,15 192:17,21 197:9 197:11,17 198:1 198:6,19,20,23 198:25
**standards** 56:13
**standing** 170:20
**start** 5:23 7:25 37:5 57:21 97:9 131:10 134:1 147:16 167:7
**started** 173:7 193:16 211:15
**starting** 11:7 122:13 166:23
**starts** 43:25 57:1 130:16 195:3
**state** 5:6 8:6 23:12 56:6 64:16 83:12 117:9 188:10 196:6 214:17 217:8,24 218:3
**stated** 27:18 47:9 101:19 116:20 136:17 213:7
**statement** 4:9 10:10 12:12 16:15 20:4 28:17 36:25 55:17 56:3 58:5 60:23 61:1,2,12 61:13,15,16,18 61:19,22 62:2,7 63:10 69:23 76:2 78:23 113:12 116:20 117:18 210:3 215:2,4
**statements** 60:21 104:12 213:12
**states** 1:1 20:11 56:21 87:17 95:6 114:5 117:12 135:19 136:14 153:25 191:10 195:12 197:23
**status** 202:18 210:25
**stay** 184:15 186:5,7 187:2 188:13 189:4,7
**stayed** 189:9
**stenographica...** 218:12
**step** 80:6 215:5
**steps** 55:5 168:9
**stipulations** 3:3 36:9
**stock** 196:25
**stood** 170:14
**stop** 172:7
**stored** 140:8
**stores** 181:13
**straightforward** 10:24
**street** 1:23 2:15
**strike** 49:25 73:8 110:9 185:15 193:24
**string** 3:20,21 4:3,4
**structure** 147:25 148:1,4 148:9 167:12
**studs** 156:9,16 157:16 158:3,4 158:11,13 162:14 180:3
**stuff** 190:13
**styled** 1:19
**submission** 63:5 193:9
**submit** 8:13 14:13 16:18 17:1 30:24 90:2 91:17,19 114:15 115:12 129:9,10
**submits** 92:24 93:1
**submitted** 8:3,4 12:2,12,24,25 13:14 16:4,4 17:5 18:22,24 19:7 20:22 21:11,14 23:2 30:13 34:2,6 35:4,18 36:3,14 41:16 48:6 56:19 75:13 88:21,23 90:10 90:20 91:10,14 92:6 93:15 98:3 100:17 101:9,15 102:11 114:21 125:3 128:25 134:2 139:4 141:5 145:23 151:12,13 164:1 176:23 178:10 178:10,14
**subscribed** 217:15 218:20
**subsequent** 17:1
**substantial** 115:20
**subtitle** 69:3
**suffice** 89:12
**sufficient** 79:17 90:8
**suggest** 213:19
**suggesting** 189:8
**suggestions** 144:9
**suit** 106:15
**suite** 1:23 2:14
**sum** 15:20 19:4 115:20 121:8 123:25
**sun** 49:10 54:17
**supervise** 187:7
**supervision** 213:4

**supervisor** 69:16 144:25 154:13 210:11 211:5,12 212:7 212:9
**supplied** 183:4
**support** 23:5 27:16 30:2,22 31:9 32:19 33:12 40:22 41:7 58:4 63:21 84:21,21 89:10 89:25 92:9 99:6 100:2,6,9,17 102:24 103:14 170:23
**supported** 59:16 77:6 79:20,21 80:5,7 89:19,19 90:15
**supporting** 10:9 20:13 21:13 28:19 32:14 37:15 38:5 39:24 43:6 48:5 59:14 79:10 90:4 92:8 170:17,21
**supportive** 79:24
**supports** 91:2
**suppose** 7:24 152:10
**supposed** 43:21 91:19
**sure** 14:2 17:15 17:17 18:9 24:24 34:9 35:1 35:7,11 37:12 38:23 39:12 40:14 46:16 57:9 63:19 66:8 68:14 77:13 78:13 81:3,25 86:19 107:1,4 111:13,18 117:14 136:5 143:9 146:23 162:23 163:5 179:14 182:25 202:6 208:23
**surprise** 68:6 74:5
**surprised** 68:9 74:9,9 119:2 183:23
**surrounding** 137:23
**swear** 5:8
**sworn** 1:19 4:9 5:16 12:12 16:15 21:7 101:8 114:22 132:14,20 133:9 133:20,24 134:2 134:3 178:14 184:22
**system** 137:1,6 137:12,18 183:1 183:1,4,12,13 184:13 187:17 188:14 199:25 200:8,11,13,15 200:21 201:4,6 201:8,12,17,18 201:24 202:2,4 202:12,13
**systems** 202:8

**t**

**tab** 8:18
**tabs** 8:21,22
**take** 10:10 12:16 20:17 41:13 48:22 55:5 80:6 88:13 94:20 96:2 99:20 113:3 136:3 138:9 139:6 150:6 154:16 156:8 158:11 162:14 164:23 172:10 172:14,16 179:9 179:23,25 180:7 190:5,6 196:4 197:19 198:15 213:19
**taken** 1:19 105:24 156:16 158:3,4,13 159:14 211:8
**takes** 89:3 191:2
**talk** 33:17 34:20 119:24 120:19 121:7 136:18 165:7 175:24 178:4,6 210:15
**talked** 18:13 96:1 103:24 110:23 119:25 120:20 151:9,10 170:1 171:10 191:17 210:18
**talking** 11:15 19:10 21:24 22:15 29:8,10 35:11,12 38:20 40:19 42:1 54:20 65:9 73:7 73:8,10,14 80:12 81:9 86:15 101:20,23 101:24,25 103:11 112:23 119:12,19 120:6 121:19 125:18 125:18 127:13 128:17,18 129:6 144:20 149:21 153:20 157:8 174:1 175:21 176:5,10 178:13 181:11,12 187:20 188:17 188:18,23,24 189:1,22,23 190:4 195:10 196:9 205:19,25 206:1 207:13 210:21

**talks** 11:8 57:24 64:13 78:22 176:1 177:15 188:10 192:12 193:17
**tank** 137:24
**tap** 202:25
**task** 200:8,11,13 200:15,21 201:4 201:8,16,18,24 202:2,4
**tasks** 201:21
**tax** 43:9,12,13 43:16,20,21,22 44:8,9,13,15,18 44:22 45:2,4,14 45:18,21,23 46:7,13,15 47:4 47:17 95:21 96:11 97:19,21 98:8
**taxes** 46:19 47:15
**tcc** 112:21 113:4 113:24 114:4,6 114:9,14,15,21 116:1,6,10 123:21 125:4 134:2 149:3,9 149:10 178:10 178:10,11
**tcc's** 179:20 180:21,22
**team** 78:1
**tear** 123:6,21 124:24
**teardown** 123:25 124:9,13 124:15 125:12 125:14 159:1
**tearing** 122:21 122:22,25 123:4 124:22,23 126:4 171:13
**tell** 29:3 33:20 34:21 53:25 64:5 88:12 89:21 90:7 125:2 139:19 164:22 172:23 185:10 187:14 192:14 193:12 199:15
**telling** 56:18,19 169:13,16,20
**tells** 56:24 106:16 167:8
**temporarily** 195:20
**temporary** 187:4 197:22
**ten** 80:6 175:10
**term** 46:17 85:23 86:7 110:7 131:4 186:5
**terminated** 154:9 171:16
**terminology** 109:12,14 136:2 188:2
**terms** 131:21 132:9
**testified** 5:16 180:16 209:8 211:18
**testify** 22:19 25:5
**testifying** 111:13
**testimony** 28:23 28:25 30:10 40:18 41:4 53:8 57:22 74:25 82:23 84:14 86:6 90:24 128:7,12 130:10 131:14 135:6,14 135:16,16 137:9 138:2 160:21 181:3 182:20 184:22 186:17 186:22 188:17 218:12,14
**texas** 1:21,23 2:7 218:3
**thank** 6:4,7 40:17,25 53:2 79:6 101:5 104:20 107:3,12 112:3 118:8 119:11 126:20 134:12 152:20 157:9 160:22 166:21 168:8 182:8 190:23 210:1 215:13,14 215:15
**thanks** 33:22
**thing** 6:1 11:16 17:18 18:8,9 25:8,19 78:4 100:21 162:13 192:10 207:9 214:4
**things** 70:23 80:1 167:3 169:21 188:25 200:5 203:13
**think** 6:22 8:1 10:21 17:17 18:4 19:5 21:15 25:11 26:11 28:3 31:24 34:5 41:2 42:13 48:1 51:8 58:6 67:6 69:7 73:20 74:24 79:19 81:7,8,11,11 82:10,12 88:1 90:11,23 92:13 94:7,21 95:22 105:9,14 110:18 111:4,8,20 112:20 113:1 114:3 116:24 117:13 119:9 121:12 124:21

124:24 125:14 125:17 130:5 132:24 134:15 134:20 135:1 139:21,23 142:15 147:12 149:17 152:17 152:19 154:7,21 156:22 158:20 165:1 166:1 169:2,4 172:6 174:12 175:20 176:8 178:11 180:1,4,5,8 181:2,20 184:15 186:3 190:16,21 191:16 194:9,16 197:2 198:3,14 198:18 200:18 205:14,17,24 206:4,8,12,16 207:2,22 208:10 209:2,7 212:15 214:4 215:6
**thinking** 130:14
**thinks** 90:21 110:15
**third** 94:7 144:11
**thorpe** 38:7 55:5,8,11 56:4
**thorpe's** 74:20
**thought** 29:1 80:11 91:9 149:3,9 150:22 151:2 163:1 170:3 189:25 205:22
**thoughts** 208:12
**three** 6:3 42:14 67:6 96:9 136:4 183:12 186:14 189:13 215:6
**time** 5:4,6 9:23 12:8 15:18,18 16:10,14 31:14 31:16,19,22,25 32:6 48:24 49:7 50:3,20 51:7,10 51:20,22 53:9 61:18 65:7 70:12 71:3,7,8 71:22 88:18 102:10 105:1 107:6,7 108:20 110:4 112:3,11 116:3 120:17 124:9 125:25 128:5 131:2 136:10 140:25 152:22 162:20 165:6 190:2,6 190:21,24 191:2 191:20 192:23 193:15,17,19,23 193:25 194:1,2 194:6,22 201:9 210:11 211:4,7 211:15 212:7,17 212:22 215:11
**timeline** 160:12
**timely** 24:19 26:21
**times** 8:13 13:24 13:24 67:6 80:6 134:16,17 191:17 210:13
**timing** 194:14
**title** 11:19 202:14
**today** 5:12 6:9 22:13 51:9 53:22 74:4,5 87:8 97:1 114:2 164:21 180:6 203:16 205:22
**today's** 5:4
**together** 107:5 126:7 180:4 200:3
**told** 91:18 156:8 156:14 158:2,11 158:12 185:11
**top** 9:4 68:22 148:11 168:7 207:15
**topic** 195:3
**topics** 6:17,18 6:21,22
**torn** 127:24 158:25 159:25 162:5
**total** 14:11,16 47:1,6,23 48:8 48:14 93:21 94:17 96:4 97:21 102:23 109:20 110:6 112:5,6,12 120:15 121:20 125:14 150:3
**totaled** 13:15 110:24
**totality** 15:24 55:4 120:7
**totals** 34:6 36:22 46:3 93:16 96:6 97:2 109:24
**touched** 210:8
**tough** 117:24 184:13
**toward** 55:18,23 55:25 173:18
**track** 180:17
**train** 189:25
**transcript** 218:13,16
**transpired** 154:18
**transported** 173:16
**travel** 164:15
**trick** 73:12,13
**tried** 77:14
**triple** 23:18
**trouble** 95:25
**truck** 137:17
**trucks** 137:13 137:19 138:4,7

**true** 12:23 16:6 64:1 69:24,25 141:9 160:1 162:2 217:3 218:13
**truthful** 158:16
**try** 16:18 173:13
**trying** 25:13 34:22 35:7,11 69:6 70:22 75:8 76:7 77:3,3,9 82:6 85:12 102:7 104:5 110:20 145:4 147:12 157:17 172:4 181:16 192:23 212:10 212:21
**turn** 64:2 166:19
**tvs** 140:7,16,20 140:23 141:3,4 141:13,15,16,25 142:5,6
**twice** 10:8 210:25
**two** 15:3 25:9 36:6 46:21 56:2 60:11 65:5 76:5 115:15 122:12 126:6,6,9 143:5 144:5 176:24 186:4 188:25 189:14,14 192:22 215:6
**tx** 218:25
**type** 43:17 201:5 203:1 213:15

**u**

**uh** 14:10 25:1 29:5 47:12 81:13 103:19 143:19 183:2 197:10 200:7
**ultimate** 142:3 167:20
**ultimately** 52:11 52:16 141:25 147:8 157:23,25 167:23 171:7 205:2 208:12
**unable** 100:15 104:22
**unallowed** 33:8
**unaware** 181:22
**uncertain** 211:14
**unclear** 56:22 74:13 118:3 136:21,23 163:23 169:24 175:8 181:10
**under** 9:25 10:5 10:6 11:23 20:2 27:5 36:9 41:24 43:25 45:25 46:2 48:15 49:8 63:15 64:16 66:9 69:3 87:22 87:23 93:10 94:7,17 97:6,7 98:17,21 99:14 122:11 130:18 134:3 138:14 140:18,19,20,22 141:10,11,14 147:1,6 159:11 160:6 177:14 182:5,13 183:14 185:9,16 189:16 190:21,24 191:20 193:3 201:12 217:12 217:18
**underneath** 9:17 42:6 68:24 69:8 100:14
**undersigned** 218:2
**understand** 6:8 8:17,23 14:18 14:20,21,24,25 15:7,15,24 18:4 18:19 19:3 21:5 21:21 25:25 26:16 28:12 32:1,8 34:17 43:7 45:10 46:24 48:7,11 48:21 54:14 59:25 60:1 66:6 75:4 76:8 77:13 77:16 84:9 86:20 91:8 102:7 109:2,11 122:19 123:3 125:15 126:6 144:23 146:18 148:1 157:14 158:8,9 161:14 164:4,11 176:9 179:18,19 180:4 180:4 182:12 188:9,15 189:20 192:2 195:23 198:15 206:23
**understandable** 13:1 73:19
**understanding** 7:1 21:23 32:5 64:24 120:8 123:7 125:23 128:3 130:22 143:7 154:11 175:16,16 178:12
**understood** 120:2 191:25 192:1,15,17,20 196:1,4
**underwriter** 156:15
**undoubtedly** 160:25
**unfortunately** 6:3
**uninhabitable** 185:17

**unit** 45:13
**united** 1:1
**unlivable** 185:11
**unnecessary** 122:17 135:21 135:25
**unpack** 65:5
**unreasonable** 48:10 49:22,25 186:23
**unsure** 74:4 140:23
**unusual** 160:23 189:3
**update** 149:5,15 149:24 150:7,8 150:13,14,17,20 150:21,22 151:14,17,21 168:8
**updated** 149:20 150:9 151:25
**upscale** 186:1
**use** 41:11 67:5 67:10 68:21,24 69:5,9,21 70:4 71:16,16 73:25 76:2,9,17 78:20 83:12 95:6 132:9 140:17 141:25 142:3 166:10,16 186:21,23 196:22 201:16
**used** 58:14 59:1 59:10 74:14 76:25 113:4 140:20,24 142:11 166:12 175:14 179:17 188:2 189:20 195:21 201:19
**uses** 131:22 197:6 201:18
**using** 57:10 58:2 75:12 113:25 131:4 179:1,12
**usual** 36:9 182:18
**utilization** 69:12
**utilize** 65:23 78:2

**v**

**validate** 40:23 64:18 65:3 66:10,15,20 67:11,13 71:10 76:3,16 78:19 79:4 83:13,15
**validation** 66:11 66:24 67:3
**validity** 75:16
**valuation** 66:23 67:15 86:10 175:5
**valuations** 74:3
**value** 43:7 47:6 53:10 70:8,8,17 70:25 77:2,4,5 80:6 87:4,9 88:7 99:21 140:9 172:15 174:15 174:21 175:10 175:18,20,20,21 175:24,25 176:7 176:8 177:23,23 178:3,4 195:22 196:3 197:5,25 198:4
**valued** 70:16
**values** 20:14 22:1 25:7 27:18 28:10,18,20 29:20 30:3,5,12 30:14,22 31:1,9 31:11 38:15 48:8 58:21 75:6 100:20 102:25 181:7 196:10 197:4
**variety** 213:14
**various** 190:8 202:25
**vendor** 64:18 65:3,18 66:12 67:5 69:1,12 172:16
**vendors** 56:8 68:21,25 69:6,9 190:12 191:3
**verified** 79:7
**veritext** 2:24
**versus** 66:1 80:22 123:9 148:24 149:1 176:11 179:21
**videographer** 2:23 5:2 49:3,6 88:14,17 108:12 108:16,19 136:6 136:9 165:2,5 194:18,21 215:7 215:10,16,20
**videotaped** 1:11 1:17 5:3
**view** 48:9 79:24 92:9 106:18 196:9 197:15
**vision** 202:15,23 202:24
**visit** 157:5
**visited** 149:12 156:15
**voce** 87:10 177:3
**volume** 26:17 81:25 190:14 214:22
**volumes** 24:18
**vs** 1:5

**w**

**wait** 31:2 96:10
**waiting** 30:2 167:11
**walls** 157:5 158:24 159:6 162:8 171:14

**wally** 1:12,17 3:4 4:11 5:19 216:2 217:1,6 217:11
**walmart** 38:18 38:19,21
**walter** 5:3,15
**want** 6:14 16:17 17:14,15,19 24:24 30:18 31:6,7 34:9 35:10 40:9 41:13 48:22 62:12,13 67:3 69:3 72:10,15 77:13 78:18 79:4 82:2 84:18 85:4 89:11 91:23,24 102:8 102:18 104:18 106:22 108:1 109:16 111:13 111:17,18 117:5 119:24 128:15 139:17,19 147:4 152:6 155:23 160:4 165:7 170:17 175:19 183:13 189:23 194:13 195:2 205:21 206:10
**wanted** 18:8 66:8 104:2 140:9 152:1,12 152:13 167:6 172:22 173:1 196:18 203:1 204:12
**wanting** 171:18
**wants** 107:9 146:22 149:20 159:21 169:6
**warehouse** 140:9
**wasting** 51:10
**water** 171:17 172:5,7
**way** 14:13 29:4 33:21 37:4 51:4 67:12 83:15,17 96:20 106:24 116:18 124:9,10 124:10 125:13 150:1,2 156:18 187:14 198:15
**we've** 18:6 28:18 31:4 32:18,19 45:21 46:15 47:3 48:20 49:14 52:21 57:23,24 57:25 75:1,9,12 91:1 98:2 101:15 105:9 110:22 119:16 155:10 158:12 171:12,14 198:20 213:18 215:12
**website** 40:2 58:20 79:22
**went** 40:23 49:15,18,18 58:23,24 174:1 180:13 205:5,7 206:5 213:3
**wet** 209:22
**whack** 155:6
**whatsoever** 17:5
**whereof** 218:20
**whichever** 130:4 134:19
**wholesale** 81:18 81:23,24 82:1 82:10,12
**willing** 93:13 109:20,21,24 110:8,10,12 146:25
**wimbleton** 195:25
**window** 182:9 182:14,15,19,23 192:16
**wires** 140:6
**withdraw** 54:8 106:10
**withdrawing** 52:24
**witness** 1:18 5:8 6:6,11 7:2,3,4 8:23 18:4 19:17 25:15 33:6 40:17 41:10 49:2 54:3 78:25 79:6 100:13 107:12 111:6 120:2 133:15 136:5 142:10 160:22 194:11 194:15 208:4,9 210:17 214:7 215:14 216:2 218:5,14,20
**word** 186:21
**words** 213:22
**work** 6:24 43:19 80:18 122:16 134:7 135:21 143:8,16 144:3 146:22 150:18 154:17 157:15 157:18,20 167:14,20,23 171:8 173:24 179:9 180:1 207:16,22,25 208:7 209:5
**worked** 34:24
**working** 64:23
**works** 74:11
**worries** 55:24
**write** 120:9 207:25
**writes** 73:3
**writing** 171:13
**written** 24:8 74:6 110:4

112:4 115:4,23 148:10 153:11 205:21
**wrong** 31:11 160:6 161:7,8 173:3,10
**wrote** 73:18 116:20 205:10 205:18,21,23 206:5,5,10,20 208:2

**x**

**x** 218:16

**y**

**y'all** 50:9 187:8
**yeah** 7:12 9:8,11 9:15 10:14 11:2 13:16,20 16:12 18:21 21:25 24:4 33:9,12 34:8,23 35:15 38:9 40:22 41:1 42:24 49:20 55:9,22 59:22 66:6 71:3 72:6 73:3 77:25 78:11 79:13 83:2 87:14 88:1 89:10 99:11 101:7 102:17 104:21 108:8 109:5,12,18 111:20,23 115:9 117:12,22 118:3 118:21 119:12 119:22 123:2,12 123:20 125:10 125:22 138:17 139:3 140:14 143:15 144:2,6 147:11 155:12 156:13 157:22 161:14 163:20 166:1 167:25 170:20 181:6 183:8,22 184:25 189:25 190:14 193:22 194:14 196:15 198:9 199:3 203:15 204:18 209:13 211:23
**year** 49:13 162:6 175:10 186:14 187:12 189:5,10,18,20
**year's** 189:7
**years** 42:18,21 49:21
**yellow** 8:22 55:17 56:2 63:13
**young** 183:12

**z**

**zlotnik** 151:12 159:4,24 160:10 161:23 162:1,3 162:21 164:9 167:4 168:24 171:11
**zlotnik's** 151:20 160:5 161:16 169:5
**zone** 183:20

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

DAUPHIN PARIS, LLC
ATTORNEYS AT LAW
300 Vestavia Parkway, Suite 3200
Vestavia Hills, Alabama 35216
Phone: 205-518-6821
Fax: 205-518-6805

Charles A. Dauphin
cdauphin@dauphinparis.com

B. Diane Paris
diane@dauphinparis.com

May 4, 2020

Mr. Wally Haessig
Chubb Claims

*Via Email Only*: whaessig@chubb.com

Re: Claim of Charles and Alexandra Goodrich
PACIFIC INDEMNITY COMPANY- claim 040519056755

Dear Mr. Haessig:

The Goodrichs will agree to a global settlement of their claims as follows.

**Reconstruction and Clean-up (Dwelling)** **2,310,548.34** **Per TCC proposal**

The current projected costs are:

| | |
|---|---|
| TCC's reconstruction estimate | $1,879,262.79 |
| Henry Sprott Long & Associates Architects oversight fee | $46,981.57 |
| Slade LLC's remediation bid | $311,939.8 |
| Remaining balance owed Cliff Zlotnik | $5,338.41 |
| TCC's estimate to repair the septic field | $18,000.00 |
| | **$2,261,522.66** |

TCC has offered to tear down and rebuild for $2,254,193.50 and Hank Long has an architectural oversight fee of $56,354.84 (2.5%). The sum is **$2,310,548.34.** As the tear down option is only an additional $49,025.68 and is the only complete guarantee that there will be no smoke odor, the house should be demolished and rebuilt. $2,310,548.34 is the basis for this aspect of the global settlement. For settlement purposes only, this figure will also cover the repair of the septic field and the balance owed Zlotnik.

EXHIBIT 4
WIT:
DATE: 2-9-23
JULIE BRANDT, RMR, CRR

274

**Contents** **1,265,086.29** **Policy Limit**[1]

Attached is a spread sheet from Iris & Co. which estimates the the current replacement costs of lost contents to be $1,225,307.66. When that amount is added to the other known costs to replace contents, the total is **$1,257,586.29**. Chubb has already paid $242,413.71 for lost contents which includes fees for cleaning and estimates which were not requested or agreed to by the Goodrichs. Be that as it may and for settlement purposes only, the Goodrichs are willing to accept this figure which brings the total to more than the policy limit, as they understand it.

The following justifies their claim for the replacement of contents.

| | |
|---|---|
| Magali Somers Maus Estimate #1 remaining balance | $23,825.00 |
| Magali Somers Maus Estimate #2 | $15,000.00 |
| HD Innovations Estimate | $36,451.48 |
| Iris & Co. Estimate | $1,225,307.66 |
| | **$1,300,584.14** |

This submission does not include a grouping of antiques that will comprise a third and fourth estimates from Magali Somers Maus. In addition, the Goodrichs have not yet obtained

(a) replacement costs for all of the antique furniture that has been lost:
(b) pricing to rewire all antique light fixtures;
(c) pricing to restore or replace damaged art;
(d) pricing to restore or replace their collection of silver;
(e) a reconciliation of the purported replacement costs by Enservio with the true replacement costs - an initial review shows the difference is substantial. (For instance: window treatments which cost over $28,000 were valued by Enservio at $200!)
(f) a value for their wine collection.

**Landscape** **150,000** **Policy Limit**

In the initial construction, Page Duke Landscape Architects and Ben Page were paid $55,473.48 on plans and oversight. His participation will continue as the Goodrichs make repairs and replacements to the landscaping. $215,174.00 was spent on the installation of a lighting system, irrigation system, and plantings.

The lighting and irrigation systems are inoperable and must be replaced, and it is impractical to do so prior to the reconstruction of the house. It is likely that many of the plants will have to be replaced. In an attempt to salvage some of the more expensive plants, an effort to

---

[1]This includes an increase in coverage of $7,500, which is based upon a .5% increase in CPI from the date the policy was issued to the date of the fire.

transplant them may be made. That, however, is an expensive proposition which necessitates installing a temporary irrigation system. Although a precise cost cannot be determined at this time, conservative estimates to repair and replace these landscaping necessities exceed the policy limit of $150,000.00.

| | | |
|---|---|---|
| **Additional Living Expenses** | **291,483.90** | **Thru August, 2021** |

TCC initially estimated one year for completion of the reconstruction. Due to the pandemic and its effect on local construction companies which will actually perform the subcontracted work, TCC estimates the rebuild will take 15 months from the date a contract is signed. Assuming a contract can be signed on or before June 1, the estimated additional living expenses are calculated through August 31, 2021.

The total number includes the following:

| | |
|---|---|
| Additional Living Expenses from March (previously submitted) | $61,961.83 |
| Additional Living Expenses for April - | $39,008.07 |
| Monthly Expenses (Utilities, Landscaping, Pest Control, Valet Moving inventory management, etc.) | $56,000.00 |
| Rental Expense - Wimbleton (January 1, 2021-August 31, 2021) | $36,000.00 |
| Rental Expense - Storage Units (May 2020-August 2021) | $57,600.00 |
| Moving Expense - Wimbleton & Storage Units to Dell Road | $18,500.00 |
| ADT Security System Replacement | $2,414.00 |
| Cost of Additional Furniture | $20,000.00[2] |
| | **$291,483.90** |

To summarize:

| | | |
|---|---|---|
| **Reconstruction and Clean-up (Dwelling)** | **2,310,548.34** | **Per TCC proposal** |
| **Contents** | **1,265,086.29** | **Policy Limit** |
| **Landscape** | **150,000.00** | **Policy Limit** |
| **Additional Living Expenses** | **291,483.90** | **Thru August, 2021** |
| **TOTAL** | **$4,017,118.53** | |

The Goodrichs agree to settle all aspects of their insurance claim against Pacific Indemnity Company exchange for an additional payment of **$4,017,118.53**

[2]The Goodrichs will need additional furniture when they move the den furniture downstairs in the Wimbleton Drive house. They are currently using the furniture upstairs while repairs are being made downstairs. Their furniture from Dell Road is too large for Wimbleton and is in storage.

Sincerely Yours,

Dauphin Paris, LLC

/s/ Charles A. Dauphin
Charles A. Dauphin

COZEN O'CONNOR

May 15, 2020

**Alycen A. Moss**
Direct Phone 404-572-2052
Direct Fax 877-728-1396
amoss@cozen.com

**VIA E-MAIL**

Charles A. Dauphin
Dauphin Paris, LLC
300 Vestavia Pkwy, Ste. 3200
Vestavia Hills, AL 35216

**Re: Insureds: Alexandra Goodrich and Charles Goodrich**
**Claim No.: 040519056755**

Dear Chuck:

As you know, Cozen O'Connor has been retained to represent Pacific Indemnity Insurance Company ("Pacific") with regard to the above-referenced claim. Your correspondence and documentation have been forwarded to me, and I have reviewed in detail. This letter responds to yours and sets forth the status of the items that remain outstanding on the claim.

In total, Pacific has paid $2,016,883.15 on the Goodriches' claim. It has issued payments totaling $1,438,806.50 on the dwelling, payments totaling $298,642.16 on contents (either directly to the Goodriches or to vendors), payments totaling $15,000 under the dwelling mold coverage, payments totaling $147,633.68 under the debris removal feature, and payments totaling $116,800.81 for Additional Living Expenses ("ALE"). While Pacific will certainly pay additional monies on covered items under the terms of the insurance policy at issue, it is not willing to pay for items that are not covered under the policy or duplicates.

Furthermore, I want to make sure I understand your relationship with the insureds and involvement in this claim. It is my understanding that you are the father of the insured, Alexandra Goodrich, and you are also representing Alexandra and Charles Goodrich as their attorney. Additionally, I understand that you bought the Wimbleton home, so you are currently the owner of the rental home that your daughter and her family are living in, and you are seeking rental payments and also seeking to be paid for upgrades to the home. Given the timing, it appears that you bought specifically for your daughter and her family to live in. I am concerned there could be an inherent conflict of interest with your involvement as the "landlord" of the home, and in particular, your request that Pacific pay for improvements to be made on the fixtures of the home.

With that being said, the following responds to your May 4, 2020 letter and the issues raised therein in the order they are discussed in your letter.

EXHIBIT 5
WIT:
DATE: 2-9-23
JULIE BRANDT, RMR, CRR



G+5

**A. Reconstruction and Clean-up (Dwelling) in the Amount of $2,310,548.34**

The Goodriches have submitted the following expenses with respect to the "reconstruction and clean up" of the dwelling:

1. **Reconstruction Estimate (Totaling $1,879,262.79):** Pacific has already paid $1,400,000 for the reconstruction of the dwelling, and it is willing to pay an additional $124,765.84 to total $1,524,765.84. Pacific disagrees with the remaining scope of the insureds' estimate and believes it is overly broad. The following sets forth the disputed issues and adjustments being made (which I believe you have a copy of):

**Bid Difference**

| Line # | Item/Area | Description | TCC | Disputed | Adjusted | Recommended |
|---|---|---|---|---|---|---|
| 1 | Repairs | Original cost | $1,566,052.23 | | | |
| 2 | | Wood mantles | | 50% | $ 5,000.00 | $ - |
| 3 | | Garage Doors | | 100% | $ 3,990.00 | $ - |
| 4 | | Plumbing | | 4% | $ 4,720.21 | $ - |
| 5 | | Generator | | 100% | $ 18,400.00 | $ - |
| 6 | | Builders Risk | | 100% | $ 6,100.00 | $ - |
| 7 | | Doors | | 50% | $ 12,587.50 | $ - |
| 8 | | Door Hardware | | 50% | $ 28,298.00 | $ - |
| 9 | | Cabinetry | - | 37% | $ 97,813.32 | $ - |
| 10 | | HVAC | | 50% | $ 48,391.00 | |
| 11 | | Beams | | 90% | $ 70,114.00 | |
| | | | - | | | $ - |
| **13** | **Subtotal** | | **$1,566,052.23** | | **$ 295,414.03** | **$ 1,270,638.20** |
| 14 | O and P | Calculated at 20% | | | | $ 254,127.64 |
| **15** | **Subtotal** | | | | | |
| 16 | Contingency | | | | | $ - |
| **17** | **Total Repair Budget** | | **$ 1,879,262.79** | | | **$ 1,524,765.84** |

In short, it is my understanding that the mantles, doors, hardware, cabinetry, beams were not damaged and did not need to be replaced. Rather, they could simply be reset. The generator was outside and not damaged, so it does not need to be replaced. Also, the general contractor is typically responsible for its builders risk insurance, and it should not be passing that expense on to the insureds.

2. **Henry Sprott Long & Associates Architects oversight fee (Unclear on total):** You list the oversight fee for Hank Long as $46,981.57 in your listing of projected costs, and then you mention an additional $56,354.84 (2.5%) in the paragraph below. Are these duplicate charges? Pacific will not be paying 2 oversight charges to the architect. Please confirm Hank Long's exact charge.

3. **Slade LLC's remediation bid (Totaling $311,939.80):** I understand this expense is to remediate smoke in the home. First, can you please advise whether the insureds are rebuilding the house or whether they are going to demolish it and start from scratch. If they are demolishing the home, there is no reason to perform smoke remediation. Second, Pacific has gotten several bids for this remediation, and they are half of Slade's bid. Slade's bid does not seem reasonable or customary for the industry in this area.

4. **Remaining balance owed Cliff Zlotnik (Totaling $5,338.41):** As opposed to hiring a local or regional industrial hygienist, I understand that you retained Mr. Zlotnik and incurred expenses in flying him in from Pennsylvania. Jeremy Elliott approved up to $15,000 in expenses for an industrial hygienist, which is more than reasonable and customary. The Goodriches have been paid this $15,000, and Pacific will not be paid additional monies. To the extent there is an outstanding balance, that is the insureds' responsibility.

5. **Estimate to repair the septic field (Totaling $18,000.00):** I understand that Brookstone Restoration may have parked on top of the septic field, and that is why you believe it is damaged. To the extent the septic field was damaged by actions of Brookstone Restoration, the insureds will need to address directly with Brookstone Restoration. Putting this aside, have the insureds performed any tests to determine whether the septic field is, in fact, damaged?

**B. Contents in the Amount of $1,265,086.29**

The Goodriches' contents coverage is $1,500,000. The Policy provides as follows with regard to the insured's duties after a loss:

> Prepare an inventory. You must prepare an inventory of damaged personal property, describing the property in full. It should show in detail the amount insured under this policy and actual amount of the loss. Attach bills, receipts, and other documents to support your inventory.

Policy Terms, Page Y-4.

Additionally, the Policy states as follows with regard to the payment of losses for contents:

> **Payment basis**
>
> Your Coverage Summary indicates the payment basis for contents.
>
> **Replacement cost.** If the payment basis is replacement cost, we will pay the full cost to replace the contents without deduction for depreciation, or the amount required to repair the damage, whichever is less, up to the amount of coverage.
>
> However, for contents which are obsolete or unusable for the purpose for which they were originally intended because of their age or condition, the payment basis will be actual cash value.
>
> **Actual cash value.** If the payment basis is actual cash value, we will pay the cost to replace the contents less depreciation, or the amount required to repair the damage, whichever is less, up to the amount of coverage.

> **Pairs, sets, and parts**. For a covered loss to a pair or set, or to part of a larger unit, we will pay whichever is least: the cost to repair the damaged property to its condition before the loss; the cost to replace it; or the cost to make up the difference between its market value before and after the loss.
>
> However, if you agree to surrender the undamaged article(s) of the pair, set, or parts to us and we agree to accept, we will pay you the full replacement cost of the entire pair, set, or parts.

The following discusses the items in your letter:

1. **Inventory submitted by Iris & Co. (Totaling $1,225,307.66):** I have reviewed the invoice submitted by Iris & Co., but it contains no backup documentation, such as receipts. Additionally, we need to understand which contents items these are replacing. Please provide this information, and we can consider.

2. **Magali Somers Maus Estimate #1 (Remaining balance of $23,825.00) + Magali Somers Maus Estimate # 2 (in the amount of $15,000.00):** Magali's estimate to restore the antiques was $100,000, and Pacific agreed to pay this amount. Pacific has paid $75,000, and it will pay the remaining balance of $23,825. We do not appear to have Estimate # 2. Can you please submit and we will review.

3. **HD Innovations Estimate (Totaling $36,451.48):** Please provide an itemized invoice with regard to this estimate.

**C. <u>Landscape in the Amount of $150,000</u>**

The policy limit on landscaping is $150,000, and the Policy states as follows:

> **Landscaping**
>
> We cover trees, shrubs, plants, and lawns, which are on the grounds of your house and other permanent structures, against certain kinds of perils. These are fire, lightning, explosion, civil disturbance, vandalism, malicious mischief, theft, and loss caused by a vehicle or aircraft.
>
> ...
>
> This extra coverage does not apply to naturally occurring or native grown vegetation, including but not limited to brush, woodlands, forests, grasslands, wetlands or mangroves. We also do not cover vineyards, sod farms, tree farms, orchards, and crops grown or used primarily for business purposes.

> This extra coverage applies only if you begin to repair or replace the lost or damaged property within 180 days of the date of loss, or a later date if agreed to by us.

The insureds' landscaping costs were included in the TCC estimate above (a $50,000 line item + 20%). This appears to be a duplicate charge and will not be paid.

**D. Additional Living Expenses Totaling $291,483.90 Through August 2021**

"Extra Coverages" are addressed on page B-5 of the Policy, which provides as follows with regard to Extra living expenses:

> **Extra living expenses.** If a covered loss makes your house or other permanent structure uninhabitable, we cover the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living, including the boarding of domestic animals not primarily owned or kept for business use. We will pay for the boarding of your domestic animals displaced from another permanent structure even when you have not been displaced by the covered loss. We cover these increases to your normal living expenses for a period of time commencing with the date of loss and ending with the earliest of the following:
>
> - the reasonable amount of time required to restore your house or other permanent structure to a habitable condition;
> - the shortest amount of time required to settle elsewhere if you or members of your household permanently relocate;
> - the reasonable amount of time required to restore the house or other permanent structure to the condition it was in prior to the covered loss if you are newly constructing your house or other permanent structure or constructing additions, alterations, or renovations to your house or other permanent structure at the time of a covered loss, but we will only cover the increase in your normal living expenses incurred by you; or
> - up to two years from the date of loss, or a later date if agreed to by us.

Policy, p. B-5 (Emphasis added).

Thus, an insured is only entitled to be reimbursed for extra living expenses if there is an increase in his/her normal living expenses due to the loss. Furthermore, the additional living expenses must be actually incurred by the Goodriches. The Policy does not pay for a regular living expense that they would have paid on a normal, everyday basis. Furthermore, the policy does not pay for expenses that would typically be incurred by someone else, such as a landlord.

The following addresses each of the items listed in your Statement of Additional Living Expenses through March 31, 2020 in the order in which you have them in the letter:

**1. March Additional Living Expenses (Totaling $61,961.83)**

a. Window treatments and hardware purchased for use at the Fairway Drive rental (totaling 5,918.90): I understand the Goodriches installed new curtains in their rental home. This expense is not considered to be a "reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living;" thus, it is not payable. Do these window treatments replace any from their Dell Road home? If so, please advise which ones.

b. Media invoice from HD Innovations (totaling $4,820.04): I understand this was for labor to remove existing TVs (7) and audio visual gear from Dell Road and store for inspection, as well as the purchase of new TVs (4) and labor to install and set up TVs (3) at rental. Again, this is not considered to be a reasonable increase in the insureds' normal living expenses. Do the TVs replace any of the TVs from their Dell Road home? If so, please advise which ones.

c. TCC invoice for interior painting of the Fairway rental (totaling $14,100): Again, this is not an extra living expense per the terms of the policy. If the Goodriches felt that the Fairway rental needed to be painted before moving in, then they should have discussed with the landlord. If the landlord did not agree, then the Goodriches would be expected to do this at their own expense.

d. Valet Moving (Move from Fairway Drive rental to Wimbleton Drive (totaling $4,042.75); February expenses for receiving, storing and transporting (totaling $3,162) + March expenses for receiving, storing and transporting (totaling $4,388): Pacific is not willing to pay for the insureds to move from the Fairway Drive rental to Wimbleton Drive. The insureds chose the rental, and it was their choice to move to the Wimbleton Drive home after you bought it. With regard to the storage invoices, can you please provide additional information advising exactly what is being stored?

e. Install security system at Wimbleton Drive (totaling $2,747.80): This is not an extra living expense per the terms of the policy. If the Goodriches felt that the Wimbleton rental needed to have a security system installed, then they should have discussed with you, as their landlord and owner of the home. This is considered to be a fixture that will stay with the house; therefore, it is your responsibility (as the owner of the home) to install in your rental home. If you were not willing to do this, then the Goodriches could have installed at their own expense or found another rental that was more suitable.

f. Greenlight Electric to install lighting at Wimbleton Drive (totaling $1,630): Again, this is not an extra living expense per the terms of the policy. If the Goodriches felt that the Wimbleton rental needed to have lighting installed, then they should have discussed with you, as their landlord and owner of the home. This is considered to be a fixture that will stay with the house; therefore, it is your responsibility (as the owner of the home) to install in your rental home. If you

---

were not willing to do this, then the Goodriches could have installed at their own expense or found another rental that was more suitable.

g. Iris & Company (totaling $20,394.20): I understand these are expenses for blackout shades, rugs, window hardware, and labor to measure and install. The blackout shades, window hardware, and labor to measure and install are not extra living expenses per the terms of the policy. As is discussed above, these are fixtures that will stay with the house; therefore, it is your responsibility (as the owner of the home) to install in your rental home. If you were not willing to do this, then the Goodriches could have installed at their own expense or found another rental that was more suitable. As for the rugs, do they replace rugs that were at the Dell Road home? If so, please advise which ones.

h. Greenlight Electric (totaling $1,630), BWWB (totaling $32.31), Spectrum (totaling $538), Mr. Buggs (totaling $85), and Alabama Power (totaling $152.58): The Greenlight Electric charge is duplicative of the expense listed above and is not payable for the reasons stated. Can you please provide invoices for utilities at the Dell Road home for the 3 months prior to the loss. Also, please advise us whether the insureds are currently paying power, cable, water and pest expenses at the Dell Rd house?

2. **April Additional Living Expenses (Totaling $39,008.07):** We do not appear to have any documentation regarding additional living expenses for April. Please submit, and we will review.

3. **Monthly Expenses (Utilities, Landscaping, Pest Control, Valet Moving inventory management, etc.) (Totaling $56,000.00)**: These expenses appear to be duplicates of those included with the March and April expenses and will not be paid twice.

4. **Rental Expense – Wimbleton (January 1, 2021 - August 31, 2021) (Totaling $36,000):** It is my understanding that you bought the Wimbleton home in January 2020. I'm assuming that you bought specifically for your daughter and her family to live in. So any rent that you are claiming as additional living expenses is rent the insureds are paying to you. Putting this aside, at this time, Pacific is not willing to pay for rental expense into 2021.

5. **Rental Expense - Storage Units (May 2020 - August 2021) (Totaling $57,600.00) –** At this time, Pacific is not willing to pay for rental expense into 2021.

6. **Moving Expense - Wimbleton & Storage Units to Dell Road (Totaling $18,500.00)** – Pacific will pay for moving expenses back to Dell Road when this expense is incurred.

7. **ADT Security System Replacement (Totaling $2,414.00):** This expense appears to be a duplicate of those included with the March expenses. As is stated above, it is not payable.

8. **Cost of Additional Furniture (Totaling $20,000.00)**: What is the additional furniture? We have not been provided information on this.

**E. Proof of Loss and Examination Under Oath**

The insureds' obligations following a loss are outlined in the Property Conditions, Your duties after a loss, which provides as follows:

> **Proof of loss.** You must submit to us your signed, sworn proof of loss providing all information and documentation we request such as the cause of loss, inventories, receipts, repair estimates and other similar records.
>
> **Examination under oath.** We have the right to examine separately under oath as often as we may reasonably require you, family members and any other members of your household and have them subscribe the same. We may also ask you to give us a signed description of the circumstances surrounding a loss and your interest in it, and to produce all records and documents we request and permit us to make copies.

Per the above-referenced Policy provision, the Policy requires the insureds to submit a sworn proof of loss. I have enclosed a proof of loss. Please have the insureds complete, sign under oath, and return to me.

Additionally, I would like to take the examination under oath of Mr. and Mrs. Goodrich to discuss this claim. Can you please provide me with some dates that they are available in June? I am hopeful that the social distancing guidelines will be lifted by then so that we can do it in person.

**F. Conclusion**

In sum, at this time, Pacific plans to pay an additional $124,765.84 on the dwelling, plus $23,825 for the remaining balance on Estimate # 1 from Magali Somers Maus, totaling **$148,590.84**. As for the other expenses discussed above, we look forward to receiving the information requested and working towards a resolution of this claim.

Pacific's investigation is ongoing, and nothing that has been done, or will be done, by or for Pacific should be construed as a waiver of Pacific's rights or defenses. Pacific reserves all of its rights under the Policy and the law. You should not construe any statements or actions by Pacific or its representatives as a waiver of its rights unless a specific waiver is communicated to you in writing.

If you have any questions, please do not hesitate to contact me.

Yours very truly,

COZEN O'CONNOR

By: Alycen A. Moss

AAM
Enclosure

DAUPHIN PARIS, LLC
ATTORNEYS AT LAW
300 Vestavia Parkway, Suite 3200
Vestavia Hills, Alabama 35216
Phone: 205-518-6821
Fax: 205-518-6805

Charles A. Dauphin
cdauphin@dauphinparis.com

B. Diane Paris
diane@dauphinparis.com

June 1, 2020

Alycen A. Moss
Cozen O'Connor
The Promenade
1230 Peachtree Street, NE
Suite 400
Atlanta, GA 30309

*Via Email Only:* amos@cozen.com

Re: **Alexandra Goodrich and Charles Goodrich**
**Claim No.: 040519056755**

Dear Alycen:

I have reviewed with the Goodrichs your letter of May 15, which appears to be a response to my letter of May 1 to Mr. Wally Hasseig. My May 1 letter conveyed the Goodrichs' global settlement offer which had been requested by Mr. Hasseig. In exchange for their good faith offer, which again had been requested by Chubb, Pacific declared, without explanation, that it will not pay additional living expenses beyond 2020, will not pay the additional monies due Cliff Zolnick (even though his expertise was necessitated by Jeremy Elliott's declaration that no remediation company would issue a guarantee that the Goodrichs would not experience smoke odors in subsequent years) incorrectly asserted that the Goodrichs were seeking to have Hank Long's fee paid twice, refused to acknowledge that the Goodrichs had offered previously to provide any documentation requested by Chubb/Pacific, made a veiled threat that the Goodrichs may have to

EXHIBIT 6
WIT:
DATE: 2-9-23
JULIE BRANDT, RMR, CRR

sit for multiple interviews, insinuated that the Goodrichs, through their claims for additional living expenses, were improperly seeking to recover for improvements to the Wimbleton rental for my benefit, and insisted I had a conflict of interest in representing the Goodrichs while even referring to the claim as "your," apparently meaning my, claim.

Obviously, Chubb/Pacific has no interest in discussing a global settlement, and Mr. Hasseig's request was just one more example of Chubb's nefariousness. It is interesting that your letter begins with payments Pacific has made and later asserts that Pacific will not pay more than is required by the policy. Conjoining those two statements means that Pacific has paid only what it believes is required under the policy. I don't think Pacific needs a "thank you" for partially performing its contractual obligations. In the future, the Goodrichs would like to focus on their expenses which are covered by the policy and not what Pacific has paid or what Pacific believes is a conflict of interest between me and the Goodrichs. That being said, the classification of payments made by Pacific will likely have to be clarified at some point.

Moving forward, the Goodrichs will make themselves available for an interview at any mutually convenient time. I, however, am out of town until the week of June 22 and the Goodrich's are gone for some of the weeks during July. Can the interviews be conducted June 25 or June 26? By that date, the Goodrichs will have submitted their claim for contents and in accordance with the claim form which accompanied your letter. I must note that your letter was the first time such a form has been submitted to the Goodrichs.

The following references the parts of your letter which address specific areas of coverage.

**A. Reconstruction**

Under the terms of the policy, Pacific must pay the "Reconstruction Cost," which means the lesser of the amount required at the time of loss to repair, replace or rebuild, at the same

location, your house or any other permanent structure, using like design, and materials and workmanship of comparable kind and quality." (The omission of this policy provision from your letter while other policy provisions are quoted is telling.). As I'm sure Mr. Elliott noted in his file, when the Goodrichs initially asked that the house be torn down, Mr. Elliott adamantly refused and actually laughed at that suggestion. Accordingly, Pacific has chosen the cost to repair the Goodrich's house.

Your letter raises ten areas denominated as "Bid Difference:" It is my understanding that the "Bid Difference" is not a challenge to the costs but suggests that certain materials may be reused in the construction. Please keep in mind that the policy mandates any repair be done "using like design, and materials and workmanship of comparable kind and quality."

Wood mantles - You state the bid difference is 50%. What 50% of the wood mantles does Pacific contend can be reused? Any attempt to reuse damaged materials will not provide a repair done "using like design, and materials and workmanship of comparable kind and quality." The Goodrich home was less than 6 months old.

Garage Doors - These can likely be reused.

Plumbing - What 4% of plumbing does Pacific contend should be reused? If it is the tub in the master bathroom, the tub has been permanently scratched.

Generator - Whether the generator still works cannot be determined until the gas has been restored at Dell Road. There is no basis for your assertion that it has not been damaged. To make a global settlement offer, the Goodrichs had to include all possible aspects of their loss, including the possibility that the generator has been damaged.

Builder's Risk - The cost of this insurance is often charged back to the home owner.

Doors - What 50% of the doors does Pacific contend should be reused? The Goodrichs are unaware of any doors which can be restored to their prior condition.

Door Hardware. What 50% of Door Hardware does Pacific content should be reused? None can be restored to their prior condition.

Cabinetry - What 37% of cabinetry does Pacific contend can be reused? Who is Pacific relying upon to base this contention? To which cabinets are Pacific referring? The

Goodrichs have explained the reasons the cabinets cannot be replaced and have based their position upon the opinions of their builder, architect, and cabinet manufacturer. If Pacific thinks these experts are wrong, it should explain why?

HVAC - at one of the first meetings, Mr. Elliott stated in front of several witnesses that the entire HVAC system would be replaced. What is the basis for Chubb's change and why was Mr. Elliott wrong?

Beams - What is the distinction between the 90% that Pacific claims can be reused and the 10% which cannot?

It appears that Pacific is taking the position that Mr. Elliott has expressed in prior conversations: "Those (cabinets, beams, doors) can easily be reset and reused." Mr. Elliott, of course, failed acknowledge that the reset or reuse of doors, etc., does not mean the they are of "comparable kind and quality" as their condition prior to the fire.

Architect's Fee

The Goodrichs have not asked that the architect's fee be paid twice.

Slade LLC Remediation Fee

To rebuild the house without tearing it down, one has to perform the smoke and mold clean-up. The mold continues to be an increasing problem, which could result in an even higher cost if the Goodrichs were not going to tear down the house. Of course, if Pacific had agreed to tear down the house initially, it would be ahead of the game financially at this point and the Goodrichs would be only months away from moving in.

The Goodrichs have decided to move ahead with a tear down. Additional removal of the roof and brick at the front of the house has revealed smoke residue on the house wrap in large sections of the house. The smoke residue on the house wrap indicates the porous side of the brick was saturated with smoke. The only way to permanently remediate that source of smoke odors is to tear down the house.

Accordingly, while the Goodrichs' decision negates the need for the remediation work to have been performed by Slade LLC., that cost is still part of the reconstruction cost necessary to rebuild the house short of a tear down, which is the option Pacific chose.

Cliff Zlotnik

The reasons for Mr. Zlotnik expertise have been explained numerous times. Mr. Elliott, of course, admitted there was no one local who would perform the work as Mr. Zlotnik outlined and provide a guarantee against future smoke odor. Brookstone agreed to perform the work only after it had met with Mr. Zlotnik, who explained his protocol to them. If there were other local sources, Mr. Elliott could have provided their names to the Goodrichs. Regardless, you have made Pacific's position clear.

Septic Field

The Goodrichs do not know if the septic field has been damaged but included this amount as part of the global offer Mr. Hasseig requested. Regarding Pacific's insistence that the Goodrichs pursue Brookstone for any damage, please provide the policy language which requires an insured to pursue a tort feasor before the insured is entitled to recover a covered claim under the policy.

**B. Contents**

The Goodrichs previously have offered to provide any back-up Pacific may request and will do so accordingly.

**C. Landscaping**

As with the septic tank, the cost of the landscaping has not been finalized. It is expected to exceed $150,000. TCC's cost was an estimate. All costs will be supported.

**D. Additional Living Expenses**

Your letter clearly states the decision of Pacific regarding the Goodrich's additional living expenses. In the instances where you have requested additional information, the same will be provided.

**E. Sworn Proof of Loss and Examination Under Oath**

The Goodrichs have agreed to both requests.

If you would like to discuss any of these issues, please don't hesitate to contact me.

Sincerely Yours,

Dauphin Paris, LLC

/s/ Charles A. Dauphin
Charles A. Dauphin

COZEN O'CONNOR

June 26, 2020

**Alycen A. Moss**
Direct Phone 404-572-2052
Direct Fax 877-728-1396
amoss@cozen.com

**VIA E-MAIL**

EXHIBIT 7
WIT:
DATE: 2-9-23
JULIE BRANDT, RMR, CRR

Charles A. Dauphin
Dauphin Paris, LLC
300 Vestavia Pkwy, Ste. 3200
Vestavia Hills, AL 35216

**Re: Insureds: Alexandra Goodrich and Charles Goodrich**
**Claim No.: 040519056755**

Dear Chuck:

I write in response to your May 18, 2020, June 1, 2020, and June 9, 2020 correspondence with regard to the above-referenced claim.

**A. Response to May 18, 2020 Email**

Your May 18, 2020 email requests an additional payment in the amount of $100,969.90 for additional living expenses ("ALE") incurred by the Goodriches. My May 15, 2020 letter addressed most of the items listed in your May 18 submission, so I refer you to that letter for our coverage position on those items. In this letter, I set forth our position and questions with regard to the items not previously addressed.

As I've previously said, the Policy does not cover all living expenses, but only covers "extra" or additional living expenses. *See* Policy, p. B-5. Thus, an insured is only entitled to be reimbursed for extra living expenses if there is an increase in his/her normal living expenses due to the loss. Furthermore, the additional living expenses must be actually incurred by the Goodriches. The Policy does not pay for a regular living expense that they would have paid on a normal, everyday basis. Furthermore, the policy does not pay for expenses that would typically be incurred by someone else, such as a landlord.

The following addresses each of the new, previously unaddressed, items listed in your Statement of Additional Living Expenses through April 2020:

1. <u>4/3/2020 Monthly Security Bill From ADT Security Services ($73.58)</u>: Are the insureds paying for security at the Dell Road house? If so, please provide proof of payment for security at the Dell Road home since the loss.

2. <u>4/9/2020 Monthly Water Bill ($48.37)</u>: We've previously asked that the insureds provide invoices for utilities at the Dell Road home for the 3 months prior to the loss, and reiterate that request again. Also, please provide the insureds' invoices for any water bills that they have paid at the Dell Road home since the loss.

3. <u>4/15/2020 TCC invoice for interior painting of the Wimbleton rental ($12,700)</u>: This is not an extra living expense per the terms of the Policy. If the insureds felt the rental needed to be painted, they should have asked you – as their landlord – to paint. If you did not agree, then the insureds could have rented elsewhere or painted at their own expense.

4. <u>4/18/2020 Monthly Cable/Internet Bill ($184.66)</u>: We've previously asked that the insureds provide invoices for cable at the Dell Road home for the 3 months prior to the loss, and reiterate that request again. Also, please provide the insureds' invoices for any cable/internet bills that they have paid at the Dell Road home since the loss.

5. <u>4/18/2020 Monthly Power Bill ($213.57)</u>: We've previously asked that the insureds provide invoices for utilities at the Dell Road home for the 3 months prior to the loss, and reiterate that request again. Also, please provide the insureds' invoices for any power bills that they have paid at the Dell Road home since the loss.

6. <u>4/23/2020 Valet Moving Storage Unit Rental ($3,600.00)</u>: Please provide additional information advising exactly what is being stored.

7. <u>4/24/2020 Labor to Alter, Deliver, and Install Window Treatments at the Wimbleton rental ($4,773.50)</u>: It is our understanding that the Goodriches installed four custom pleated drapery panels, custom shades for the master bedroom, custom shades for the master bathroom, a window seat cover, and an insert for the window seat in their rental home. This expense is not a "reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living;" thus, it is not payable. Moreover, these are not extra living expenses per the terms of the policy because they are fixtures that will stay with the house; therefore, it is your responsibility (as the owner of the home) to install in your rental home. If you were not willing to do this, then the Goodriches could have installed at their own expense or found another rental that was more suitable. Do these window treatments replace any from their Dell Road home? If so, please advise which ones.

8. <u>4/24/2020 Labor to Alter, Deliver, and Install Window Treatments at the Wimbleton rental ($8,010.20)</u>: It is our understanding that the Goodriches installed sheer panels for the dining room, drapery panels with lining and interlining for the living room, sheer drapery panels with contrast trim for the bedroom, and custom shades for the kitchen in their rental home. As I said above, this expense is not a "reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living;" thus, it is not payable. Moreover, these are not extra living expenses per the terms of the policy because they are fixtures that will stay with the house; therefore, it is your responsibility (as the owner of the home) to install in your rental home. If you were not willing to do this, then the Goodriches could have installed at their own expense or found another rental that was more suitable. Do these window treatments replace any from their Dell Road home? If so, please advise which ones.

9. <u>4/29/2020 Monthly Gas Bills for February, March, and April 2020 (totaling $274.19)</u>: We've previously asked that the insureds please provide invoices for utilities at the Dell Road home for the 3 months prior to the loss, and reiterate that request again. Also,

please provide the insureds' invoices for any gas bills that they have paid at the Dell Road home since the loss.

10. 4/30/2020 Installation of Carpet and Rug Pads ($9,130.00): We understand this is for padding and installation of seagrass carpet for the basement and stairs in the Wimbleton rental. This expense is not a "reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living;" thus, it is not payable. Moreover, these are not extra living expenses per the terms of the policy because they are fixtures that will stay with the house; therefore, it is your responsibility (as the owner of the home) to install in your rental home. If you were not willing to do this, then the Goodriches could have installed at their own expense or found another rental that was more suitable.

**B. Response to June 1, 2020 Letter**

Your June 1, 2020 letter addresses a number of issues regarding the dwelling, contents, and ALE portions of the Goodriches' claim. As to contents, we are still awaiting documentation to support the Goodriches' claims. When we receive the requested documentation, we will evaluate the scope of coverage for the Goodriches' contents. As to ALE, we are still awaiting responses to our prior requests for information. In this regard, I reiterate that the policy covers additional/extra living expenses only for the time reasonably necessary to make repairs, and does not cover future, un-incurred expenses.

The bulk of your June 1, 2020 letter addresses the dwelling portion of the Goodriches' claim. As you correctly note, when a covered loss occurs, the policy requires Pacific to pay for the lesser of the amount required at the time of loss to repair, replace, or rebuild the damaged structure. Here, the house can be repaired, but the insureds have chosen to demolish and replace the entire house. The insureds can certainly make that choice, but they are not entitled to be paid additional monies under the policy due to their voluntary decision to go over and above what is necessary to repair the home.

The insureds are requesting payment for work and/or repairs that are unnecessary if the Goodriches are tearing down the house, as well as costs associated with tearing down and rebuilding the house. Pacific is not obligated under to pay for both the cost to repair and the cost to rebuild, and it is not obligated to pay for repairs and/or other work that are unnecessary given the fact that the house is being demolished.

The following addresses the specific items you reference in your June 1, 2020 letter:

1. Wood Mantles, Plumbing, Doors, Door Hardware, Cabinetry, HVAC, and Beams:

The bid differences for the wood mantles, plumbing, doors, door hardware, cabinetry, HVAC, and beams arise from a disagreement between Pacific and the Goodriches regarding whether these items need to be replaced. The Goodriches' estimate was based on the value to remove and replace the items, while Pacific's original estimate was based on the value to detach, clean, and reset the items so that they could be used in the same manner as before the loss. JS Held, a consulting firm with significant construction expertise, inspected the loss and

---

concluded that the items were not damaged and did not need to be replaced. Rather, each item could be reused after cleaning and, in some cases, repainting and/or refinishing. In reaching its valuation for these items, JS Held calculated the average prices of the items adjusted upwards by 15% to account for potential market conditions that could serve to enhance their value.

While Pacific continues to maintain this position, it revised the original JS Held estimate upwards three times in an effort to settle the claim and satisfy the Goodriches. Thus, Pacific's latest estimate represents the halfway point between its assessment of the true value of the loss and the Goodriches' assessment of the value to fully replace all items affected by the loss. Pacific continues to maintain that all items could be fully reused, but has offered a higher percentage of the true repair cost in the spirit of good-faith compromise. Accordingly, Pacific's estimate already represents numbers that are significantly higher than the true value of the loss.

In addition to the inflated value of these items, we note that some items, such as the door, are in storage, indicating that the Goodriches do not intend to replace them. Pacific will not pay to fully replace items that the Goodriches can, and intend to, reuse.

2. Generator: You concede that you do not know whether the generator was damaged. Pacific is not obligated to pay for potential damage, only actual damage.

3. Builder's Risk: Builder's risk insurance, as its name implies, is insurance purchased by a builder, not a homeowner. Pacific is not obligated to pay for the insurance of the contractor hired to rebuild the Goodriches' home.

4. Architect's Fee: You assert that the Goodriches have not asked that the architect's fee be paid twice. However, you list the oversight fee for Hank Long as $46,981.57 in your listing of projected costs, and then you mention an additional $56,354.84 as Hank Long's "architectural oversight fee." If this is not a duplicate charge, please explain the difference between these two items.

5. Slade LLC Remediation Fee: You concede that the Goodriches' decision to tear down the house "negates the need for the remediation work to have been performed by Slade LLC." Pacific is only obligated to pay for actual repairs, not repairs that may have hypothetically been necessary had the insureds taken a different course of action. Because there is no actual need for remediation work, Pacific is not obligated to pay for it.

6. Cliff Zlotnik: You correctly note that I have made Pacific's position clear on the balance owed to Cliff Zlotnik in my previous letter.

7. Septic Field: You concede that you do not know whether the septic field has been damaged. Pacific is not obligated to pay for potential damage, only actual damage. If you would like to further pursue this claim, Pacific would like to inspect the septic field to determine the nature and scope of any alleged damage.

Although Pacific maintains it is not liable for any payments beyond its original estimate, it is prepared to offer the Goodriches $1,600,000, in exchange for a release of the dwelling portion

---

of their claim. This settlement offer represents an increase for replacement of all the interior doors and hardware, cabinets, countertops, and other disputed items. However, Pacific will not pay for the tear-down and rebuilding of the Goodriches' house. Moreover, Pacific emphasizes that its coverage position remains unchanged; it simply makes this offer in a good faith effort to work with the insureds towards a resolution of the claim.

**C. Response to June 9, 2020 Email**

Your June 9, 2020 email seeks additional living expenses for May 2020, as well as additional furniture. The following addresses each item:

1. <u>$46.99 May Bill for Security System at Wimbleton rental home</u>: It does not appear that the Goodriches are currently paying for security at their Dell Road home. As noted above, the policy only covers extra living expenses if there is an increase in normal living expenses due to the loss. The Policy does not pay for a regular living expense that the Goodriches would have paid on a normal, everyday basis. If you contend that the current security bill exceeds what the Goodriches would have paid for security at their Dell Road home, please submit security invoices for the Dell Road home from the date of loss. Also, as we've previously requested, please submit invoices for three months prior to the loss.

2. <u>$171.34 May Bill for Power at Wimbleton rental home</u>: We've previously asked that the insureds provide invoices for utilities at the Dell Road home for the three months prior to the loss, and reiterate that request again. Please also provide the insureds' invoices for any power bills that they have paid at the Dell Road home since the loss.

3. <u>$53.53 May Bill for Sewer and Water at Wimbleton rental home</u>: We've previously asked that the insureds provide invoices for utilities at the Dell Road home for the three months prior to the loss, and reiterate that request again. Please also provide the insureds' invoices for any sewer and water bills that they have paid at the Dell Road home since the loss.

4. <u>$184.66 May Bill for Cable/Internet/Phone at Wimbleton rental home</u>: It is our understanding that the Goodriches are not currently paying for cable, internet, or phone service at their Dell Road home. As noted above, the policy only covers extra living expenses if there is an increase in normal living expenses due to the loss. The Policy does not pay for a regular living expense that they would have paid on a normal, everyday basis. If you contend that the current bills for cable, internet, and/or phone service exceed what the Goodriches would have paid for these services at their Dell Road home, please submit invoices for these services at the Dell Road home for three months prior to the loss.

5. <u>$3,600.00 May Bill for Storage</u>: The storage units appear to contain furniture from the Dell Road home and replacement furniture for the same items. Pacific will not pay for storage of both old and new furniture items if only one is needed. In addition, it is unclear why some of those furniture items are too large to be used in the Wimbleton home. For example, why can't the Goodriches use their silverware,

Keurig coffee pod maker, microwave, and dining room chairs in the Wimbleton home instead of paying to store them?

6. $37.98 May Bill for Gas: We've previously asked that the insureds provide invoices for utilities at the Dell Road home for the three months prior to the loss, and reiterate that request again. Please also provide the insureds' invoices for any gas bills that they have paid at the Dell Road home since the loss.

7. $12,894.20 for Additional Furniture: The Goodriches seek $12,894.20 for an additional $5,764.00 Fargo sofa and $5,608.00 Heyburn chair. However, the Policy covers normal living expenses, not luxury furniture to remodel rental homes. The average cost of a sofa is approximately $1,500, and the average cost of a club chair is below $1,000. Does this replace furniture that was damaged as a result of the loss? If so, please specifically advise what these items replace.

We have received the spread sheet of purported utility charges at Dell Road for the three months preceding the loss, but this is insufficient. It does not show what was actually charged and paid for each month, and it does not show when each payment was made. Please provide the invoices for utilities at the Dell Road home for three months prior to the loss and for each month since the loss.

**D. Response to My May 15 Letter and EUOs**

We are still awaiting your complete response to my prior letter, as well as the insureds' sworn proof of loss per the policy requirements as outlined in my previous letter. Additionally, please let us know whether the Goodriches are available for in-person examinations under oath on August 4, 5, or 6, 2020.

We remind you that Pacific's investigation is ongoing, and nothing that has been done, or will be done, by or for Pacific should be construed as a waiver of Pacific's rights or defenses. Pacific reserves all of its rights under the Policy and the law. You should not construe any statements or actions by Pacific or its representatives as a waiver of its rights unless a specific waiver is communicated to you in writing.

If you have any questions, please do not hesitate to contact me.

Yours very truly,

COZEN O'CONNOR

Alycen Moss

By: Alycen A. Moss

AAM

COZEN O'CONNOR

November 6, 2020

**Alycen A. Moss**
Direct Phone 404-572-2052
Direct Fax 877-728-1396
amoss@cozen.com

**VIA E-MAIL**

Charles A. Dauphin
Dauphin Paris, LLC
300 Vestavia Pkwy, Ste. 3200
Vestavia Hills, AL 35216

**Re: Insureds: Alexandra Goodrich and Charles Goodrich**
**Claim No.: 040519056755**

Dear Chuck:

Pacific Indemnity Insurance Company ("Pacific") has carefully considered the information provided, testimony from the Examinations Under Oath ("EUO"), and pertinent policy provisions, and it has determined it will pay the following pursuant to the terms of the Policy.

**A. <u>Contents</u>**

The insureds' Amended Sworn Statement in Proof of Loss with respect to contents states that "the Gross Amount claimed for lost contents is $1,576,501.91,which includes the amount that has already been paid under the Contents coverage." Pacific has made payments totaling $298,642.16 on contents (either directly to the Goodriches or to vendors). The coverage for contents is $1,500,000, yet the Goodriches are requesting that they be paid $1,507,500. I'm not sure how they reached this amount, but regardless, we do not feel the Goodriches have met their obligations under the Policy. As we have previously discussed, the Policy provides as follows with regard to the insured's duties after a loss:

> Prepare an inventory. You must prepare an inventory of damaged personal property, describing the property in full. It should show in detail the amount insured under this policy and actual amount of the loss. Attach bills, receipts, and other documents to support your inventory.

Policy Terms, Page Y-4.

In an effort to work with the Goodriches, Pacific is willing to pay the following:

1. <u>Contents Inventory:</u> We reviewed the inventory at length in Mrs. Goodrich's EUO, and there is minimal backup documentation for the replacement items. We are willing to consider the invoices of Iris & Co. that were submitted as backup documentation for the original cost and will pay that amount which totals $656,070.66. We have



EXHIBIT 8
WIT:
DATE: 2-9-23
JULIE BRANDT, RMR, CRR

added 10% in tax to total $65,607.06.[1] The total amount Pacific will pay on contents is $721,677.72.

2. Magali Somers Maus: Pacific is willing to pay the remaining balance of $23,825 on Estimate #1, as well as Estimate # 2 in the amount of $15,000.00, totaling $38,825.

3. TVs from HD Innovations (on Invoice # 1617): Mr. Goodrich testified that these TVs will replace TVs in the Dell Road home. Based on this testimony, Pacific will pay for the TVs totaling $4,231.04.

Thus, Pacific will pay an additional **$764,733.76** under the Contents coverage.

**B. Additional Living Expenses**

Pacific has previously made payments totaling $116,800.81 for Additional Living Expenses ("ALE"). "Extra Coverages" are addressed on page B-5 of the Policy, which provides as follows with regard to Extra living expenses:

> **Extra living expenses.** If a covered loss makes your house or other permanent structure uninhabitable, we cover the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living ... .

Policy, p. B-5 (Emphasis added).

Thus, an insured is only entitled to be reimbursed for extra living expenses if there is an increase in his/her normal living expenses due to the loss. Furthermore, the additional living expenses must be actually incurred by the Goodriches. The Policy does not pay for a regular living expense that they would have paid on a normal, everyday basis. Furthermore, the policy does not pay for expenses that would typically be incurred by someone else, such as a landlord.

With this in mind, and based on the testimony of Mr. and Mrs. Goodrich, Pacific is willing to pay the following additional living expenses:

1. Valet Moving: Pacific will pay a total of $24,461.00 representing the following expenses related to Valet Moving:

   a. $4,042.75 (Invoice # 013120.01 dated 2/4/2020): Move from the Fairway Drive rental to Wimbleton Drive;

   b. $3,162.00 (Invoice # 022820.01 dated 2/28/2020): Move items from Magali shop, and VM storage to Wimbleton Drive

   c. $3,120.00 (Invoice # 030420.21 dated 3/4/2020): February/March expenses for receiving, storing and transporting

[1] Mrs. Goodrich testified that tax could be 9-10%, and we have calculated using the rate of 10%.

d. $4,388.25 (Invoice # 032420.05 dated 3/24/2020): Storage and expense from transport and movement of furniture from VM storage to Magali workshop, rental house and Julio's Upholstery

e. $3,600.00 (Invoice # 050120.24 dated 5/5/2020): May expense for storage

f. $3,748.00 (Invoice # 060720.01 dated 6/7/2020): April and May expenses for transporting furniture

g. $2,400.00 (Invoice # 060720.20 dated 6/7/2020): June expense for storage

2. Birmingham Water Works: Pacific will pay $449.92 for the following invoices:

   a. 12/27/2019 invoice in the amount of $84.44 for Fairway Drive

   b. 1/29/2020 invoice in the amount of $108.75 for Fairway Drive

   c. 1/31/2020 invoice in the amount of $5.43 for Fairway Drive (final bill)

   d. 1/31/2020 invoice in the amount of $113.88 for Wimbleton Drive (which included establishment fee of $43 and surety deposit of $60)

   e. 3/2/2020 invoice in the amount of $30.36 for Wimbleton Drive

   f. 4/24/2020 invoice in the amount of $53.53 for Wimbleton Drive

   g. 5/26/2020 invoice in the amount of $53.53 for Wimbleton Drive

3. Mr. Buggs Pest Control: Based on Mrs. Goodrich's testimony, the Goodriches were paying for pest control at Dell Road through June 2020. Based on this testimony, Pacific will pay the following invoices that have been submitted totaling $255:

   a. 12/12/2019 invoice in the amount of $85 for Fairway Drive

   b. 4/2/2020 invoice in the amount of $85 for Wimbleton Drive

   c. 6/1/2020 invoice in the amount of $85 for Wimbleton Drive

4. Alabama Power: Based on Mrs. Goodrich's testimony, the Goodriches are currently paying for power at Dell Road. Based on this testimony, Pacific will pay the following invoices that have been submitted totaling $1,193.61:

   a. 12/2/2019-12/12/2019 invoice totaling $90.81 for Fairway Drive

   b. 12/12/2019-1/13/2020 invoice totaling $192.26 for Fairway Drive

   c. 1/13/2020-1/31/2020 invoice totaling $109.20 for Fairway Drive

d. Opening bill totaling $40.00 for Wimbleton Drive

e. 1/15/2020-2/13/2020 invoice totaling $109.91 for Wimbleton Drive

f. 2/13/2020-3/16/2020 invoice totaling $150.58 for Wimbleton Drive

g. 4/14/2020-5/14/2020 invoice totaling $171.34 for Wimbleton Drive

h. 5/14/2020-6/15/2020 invoice totaling $329.51 for Wimbleton Drive

5. Spire: Based on Mrs. Goodrich's testimony, the Goodriches are currently paying $8/month for their gas meter, but otherwise, they are not paying for gas at Dell Road. Based on this testimony, Pacific will pay $80 (10 months x $8/month).

6. Landscape/yard work: Based on Mrs. Goodrich's testimony that the Goodriches are currently paying for landscape/yard work at the Dell Road house, Pacific will pay the following totaling $1,948.98:

   a. Blackjack Horticulture Invoice # 6321 dated 12/24/19 in the amount of $316.99 for landscape management at the Fairway Drive house in December 2019

   b. Blackjack Horticulture Invoice # 6490 dated 1/25/2020 in the amount of $316.99 for landscape management at the Fairway Drive house in January 2020

   c. Lopez Landscaping Invoice # 1142 dated 4/26/2020 in the amount of $1,000 for April and May lawn service at Wimbleton Drive

   d. Lopez Landscaping Invoice # 1143 dated 4/26/2020 in the amount of $315 for mulch at Wimbleton Drive

In sum, the Goodriches are being paid **$28,388.51** for their additional living expenses.

## C. Proof of Loss

Thank you for the submission of the first Proof of Loss, as well as the Amended Proof of Loss. The policy provides as follows with regard to a proof of loss:

> **Proof of loss.** You must submit to us your signed, sworn proof of loss providing all information and documentation we request such as the cause of loss, inventories, receipts, repair estimates and other similar records.

We are unable to accept or reject the Proof of Loss and/or Amended Proof of Loss because it is inconsistent with the documentation that has been submitted in support.

D. **Conclusion**

In sum, at this time, Pacific plans to pay the following under separate cover:

| Coverage | Description of Payment | Amount |
|---|---|---|
| Contents | Inventory | $721,677.72 |
| | Magali Somers Maus | $38,825.00 |
| | TVs from HD Innovations | $4,231.04 |
| ALE | Valet Moving | 24,461.00 |
| | Birmingham Water Works | $449.92 |
| | Mr. Buggs Pest Control | $255.00 |
| | Alabama Power | $1,193.61 |
| | Spire (gas) | $80.00 |
| | Landscape | $1,948.98 |
| **TOTAL** | | **$793,122.27** |

Pacific's investigation is ongoing, and nothing that has been done, or will be done, by or for Pacific should be construed as a waiver of Pacific's rights or defenses. Pacific reserves all of its rights under the Policy and the law. You should not construe any statements or actions by Pacific or its representatives as a waiver of its rights unless a specific waiver is communicated to you in writing.

If you have any questions, please do not hesitate to contact me.

Yours very truly,

COZEN O'CONNOR

Alycen Moss

By: Alycen A. Moss

AAM
Enclosure

---

The following addresses each of these items:

1. Demo Costs ($44,780.02): As you know, Pacific has already paid for the demo costs. It will not pay for this duplicative cost.

2. Cliff Zlotnik ($20,338.41): As we have previously explained on multiple occasions, Pacific will not pay the remaining balance due from the Goodriches to Mr. Zlotnik. As opposed to hiring a local or regional industrial hygienist, the insureds retained Mr. Zlotnik and incurred expenses in flying him in from Pennsylvania. Jeremy Elliott approved up to $15,000.00 in expenses for an industrial hygienist, which is more than reasonable and customary. This amount has been paid, and any additional, outstanding balance due to Mr. Zlotnik or any other industrial hygienist is the insureds' responsibility.

3. Slade LLC's Remediation Bid ($311,939.80): As we have said previously, there is no need to perform smoke remediation because the insureds demolished and reconstructed the Property. As such, Pacific will not pay this item.

4. TCC Reconstruction Estimate: Although it does not appear the mantles, doors, hardware, cabinetry, and beams were damaged, in a good faith effort to resolve this matter, Pacific is willing to pay to replace these items. Pacific will also pay for the builder's risk insurance given the EUO testimony, although this expense is not typically not passed on to the homeowner. Based on TCC's estimate of these costs, Pacific will pay the insureds $268,303.82 for these items.

5. Henry Sprott Long & Associates Architect's Oversight Fee: It is our understanding that TCC will be doing the oversight, so it is unclear why the architect needs to do this as well.

6. Invoice from Iris & Co. for $25,800.00: This invoice is not a dwelling expense and is discussed below under extra living expenses.

7. HD Innovations Estimate ($36,451.48): This invoice is not a dwelling expense and is discussed below under contents.

8. ADT Quote to replace security system in rental house (2,414.00): As we've previously stated, this is not payable under the terms of the Policy.

In sum, Pacific is willing to pay an additional **$268,303.82** under the Dwelling coverage.

**B. Contents**

1. Iris & Co. Decorator Services: On March 19, 2021, you provided an Estimate of ]Costs for Reconstruction Services for Iris & Co. in the amount of $25,800.00. Pacific has reviewed this document and has determined that it is payable. As such, Pacific will remit payment for this expense under the Dwelling section of the Policy in the amount of **$25,800.00**.

EXHIBIT 10
WIT:
DATE: 2-9-23
JULIE BRANDT, RMR, CRR

2. Furniture at Wimbleton House: You have submitted multiple invoices for furniture that was bought for the Wimbleton rental house as follows:

   - July 21, 2020 invoice from Iris & Co. with the following items: a sofa and fabric ($5,764.00); two club chairs and fabric ($5,608.00); shaggy rug ($2,449.00); shipping ($473.00); and sales tax ($1,243.89), totaling $15,537.89. $14,486.20 was subtracted from that amount for deposits received, leaving a balance of $1,051.69.

   - October 20, 2020 invoice from Iris & Co. with the following items: fabric for master headboard ($2,528.00); king-size Louis XVI ($4,190.00); daybed ($5,385.00); installation of art and mirrors ($350.00); shipping ($559.00); and sales tax ($1,089.27), totaling $16,629.27. $7,863.00 was subtracted from that amount for deposits received, leaving a balance of $6,238.27.

   - September 27, 2020 receipt from Frontgate for two (2) étagères and two tension-mount shower rods, for a total of $1,865.97.

   - November 10, 2020 invoice from Iris & Co. with the following items: labor to reupholster six (6) chair seats for kitchen ($2,142.50); labor to custom-make shower curtain ($275.00); delivery fee ($120.00); cane twin headboards ($4,512.00.00); shipping ($250.00); and sales tax ($430.83), totaling $7,730.33. $2,933.00 was subtracted from that amount for deposits received, leaving a balance of $4,797.33.

   - December 8, 2020 invoice from Iris & Co. for hourly consultation charges on the Wimbleton home.

Please advise whether any of these items replace items at the home.

3. Magali Somers Maus Estimates ($23,825.00; $15,000.00): These have has been paid previously.

4. HD Innovations Estimate ($36,451.48): Pacific has paid of $4,231.00 of this invoice already. On May 15, 2020, we requested that the insureds provide an itemized invoice with regard to this estimate. On March 19, 2021, you resubmitted the HD Innovations estimate, dated February 18, 2020, in the amount of $36,451.48, but have still not provided additional information on these items.

**C. Landscape**

On March 19, 2021, you provided an executed Sworn Statement in Proof of Loss on behalf of the insureds, setting forth a claim for $150,000.00 for the Landscaping. In support of this claim, you submitted a bid prepared by Southern Scape in the amount of $161,351.00. The bid was dated December 4, 2020, and identified the property for which it was prepared only as "Goodrich Residence, Birmingham, AL."

---

As we said in the May 15, 2020 letter, the insureds' landscaping costs were included in the TCC estimate, so this appears to be a duplicate charge. Moreover, it is unclear how the fire damaged the landscaping to the extent claimed. Please advise as to the meaning of "disturbed areas." Please also advise as to the need for adjustment of irrigation and/or an irrigation allowance. Irrigation is located underground, and as such should not have been affected by the loss.

Finally, it is unclear from the Southern Scape estimate what property is being landscaped. Can you please confirm what property needs the landscaping work?

**D. <u>Additional Living Expenses</u>**

Pacific has paid the monthly rental expense for the Wimbleton home through December 31, 2020, and it is agreeable to paying an additional 6 months of rental expense through June 30, 2021, in the amount of **$27,000.00**.

As a reminder, Pacific only covers extra living expenses for the following time period:

> We cover these increases to your normal living expenses for a period of time commencing with the date of loss and ending with the earliest of the following:
> - the reasonable amount of time required to restore your house or other permanent structure to a habitable condition;
> - the shortest amount of time required to settle elsewhere if you or members of your household permanently relocate;
> - the reasonable amount of time required to restore the house or other permanent structure to the condition it was in prior to the covered loss if you are newly constructing your house or other permanent structure or constructing additions, alterations, or renovations to your house or other permanent structure at the time of a covered loss, but we will only cover the increase in your normal living expenses incurred by you; or
> - up to two years from the date of loss, or a later date if agreed to by us.

Mr. and Mrs. Goodrich testified that it took about a year and a half to build the house on Dell Road originally; thus, this would be "the reasonable amount of time required to restore the house or other permanent structure to the condition it was in prior to the covered loss if you are newly constructing your house." The fire occurred on November, 18, 2019; thus, it would reasonably be expected that the house would be reconstructed no later than June 2021.

With that being said, Pacific will only pay extra living expenses through June 30, 2021. The following items are payable from your submissions:

1. <u>Valet Moving:</u> Pacific will pay a total of **$28,314.50** representing storage expenses related to Valet Moving:

$ 3,200.00 - portion of July 6, 2020 invoice for storage;
$ 2,400.00 - portion of August 2, 2020 invoice for storage;
$ 2,400.00 - portion of September 10, 2020 invoice for storage;
$ 3,886.50 - October 13, 2020 invoice;
$ 3,200.00 - portion of October 25, 2020 invoice for storage;
$ 3,200.00 - December 13, 2020 invoice;
$ 3,200.00 - January 3, 2021 invoice;
$ 3,200.00 - February 7, 2021 invoice; and
$ 3,628.00 - March 2, 2021 invoice.

The following invoices appear to be charges for the delivery and assembly of items such as a headboard, assorted furniture, and three beds, for the rental property. Pacific will also pay for these items:

$ 997.00 - July 6, 2020 invoice, exclusive of $3,200.00 for storage;
$ 1,507.00 - August 2, 2020 invoice, exclusive of $2,400.00 for storage;
$ 758.50 - September 10, 2020 invoice, exclusive of $2,400.00 for storage; and
$ 1,098.50 - October 25, 2020 invoice, exclusive of $3,200.00 for storage.

2. Birmingham Water Works: Pacific will pay **$538.84** for the following invoices:

$ 49.97 - June 23, 2020 invoice;
$ 49.97 - July 24, 2020 invoice;
$ 49.97 - August 25, 2020 invoice;
$ 103.50 - September 24, 2020 invoice;
$ 46.42 - October 23, 2020 invoice;
$ 57.09 - November 25, 2020 invoice;
$ 57.09 - December 29, 2020 invoice;
$ 57.09 - January 27, 2021 invoice; and
$ 67.74 - February 25, 2021 invoice.

3. Alabama Power: Pacific will pay a total of **$1,862.93** for the following invoices:

$ 281.02 - July 30, 2020 invoice;
$ 291.24 - August 28, 2020 invoice;
$ 340.93 - September 27, 2020 invoice;
$ 192.93 - October 29, 2020 invoice;
$ 180.38 - November 27, 2020 invoice;
$ 156.38 - December 28, 2020 invoice;
$ 144.51 - January 30, 2021 invoice;
$ 127.30 - February 27, 2021 invoice; and
$ 148.24 - March 29, 2021 invoice.

4. Fidel Lopez Landscaping: Pacific will pay a total of **$3,500.00** for the following invoices:

$ 500.00 - June 29, 2020 invoice;

$ 500.00 - August 2, 2020 invoice;
$ 500.00 - September 2, 2020 invoice;
$ 500.00 - October 4, 2020 invoice;
$ 500.00 - November 5, 2020 invoice;
$ 500.00 - November 30, 2020 invoice; and
$ 500.00 - January 2, 2021 invoice.

5. Spire: Pacific will pay a total of **$8.00**, for the invoice dated June 19, 2020. As set forth in prior letters, this amount is based on Mrs. Goodrich's testimony that the Goodriches are paying $8.00 per month for their gas meter, but are otherwise not paying for gas at Dell Road.

As you know, the insureds are only entitled to be reimbursed for extra living expenses if there is an increase in their normal living expenses due to the loss. Furthermore, the additional living expenses must be actually incurred by the Goodriches. The Policy does not pay for a regular living expense that they would have paid on a normal, everyday basis. Also, the Policy does not pay for expenses that would typically be incurred by someone else, such as a landlord. With that said, the following items are not covered under the Policy as additional living expenses, and as such will not be paid by Pacific:

1. ADT Security Services: Per your July 20, 2020 letter, the Goodriches are not paying for security at Dell Road. Therefore, the following invoices for ADT Security Services expenses are not payable as extra living expenses under the Policy:
   $ 73.58 - April 3, 2020 invoice; and
   $ 46.99 - June 1, 2020 invoice.

2. Interior Decorating and Renovation at Rental Property: As we previously advised, these expenses are not covered as extra living expenses. To the extent that any of these invoices include items that are intended to replace items damaged as a result of the loss, please advise us as to which items they are intended to replace. Otherwise, the following invoices are not payable:

   $ 4,773.50 - April 24, 2020 invoice for moving window treatments;
   $ 8,010.20 - April 24, 2020 invoice for moving window treatments;
   $ 9,130.00 - April 30, 2020 invoice for carpet and rug pad installation;
   $ 53,429.05 - June 30, 2020 invoice for renovation of Wimbleton house;
   $ 2,768.43 - August 3, 2020 invoice for televisions and installation at Wimbleton house; and
   $ 339.66 - September 21, 2020 invoice for television installation at Wimbleton house.

**E. Conclusion**

In sum, at this time, Pacific plans to pay the following:

| | | |
|---|---|---|
| $ 268,303.82 | Dwelling | TCC |
| $ 25,800.00 | Contents | Iris & Co. |

| | | |
|---|---|---|
| $ 27,000.00 | ALE | Rent, January 2021 to June 2021 |
| $ 538.84 | ALE | Water, July 2020 to March 2021 |
| $ 8.00 | ALE | Gas, July 2020 |
| $ 1,862.93 | ALE | Power, July 2020 to March 2021 |
| $ 3,500.00 | ALE | Landscaping, July 2020 to January 2021 |
| $ 28,314.50 | ALE | Storage, July 2020 to March 2021 |
| **$ 355,328.09** | **Total** | |

As for the other expenses discussed above, we look forward to receiving the information requested and working towards a resolution of this claim.

Pacific's investigation is ongoing, and nothing that has been done, or will be done, by or for Pacific should be construed as a waiver of Pacific's rights or defenses. Pacific reserves all of its rights under the Policy and the law. You should not construe any statements or actions by Pacific or its representatives as a waiver of its rights unless a specific waiver is communicated to you in writing.

If you have any questions, please do not hesitate to contact me.

Yours very truly,

COZEN O'CONNOR

Alycen Moss

By: Alycen A. Moss

AAM
Enclosure

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

# General Adjuster (GA)
# Best Practices Guidelines

**Updated:**

**AUGUST 20, 2018**

EXHIBIT 13
WIT:
DATE: 2-9-23
JULIE BRANDT, RMR, CRR

*Confidential and Proprietary information of the Chubb Group of Companies. For internal use only. Do not distribute copies of this document, whether physical or electronic, to any person or organization outside of Chubb. Compliance with all applicable statutes, laws, regulations and/or ordinances, including without limitation the applicable Unfair Claim Settlement Practices Acts, is required. These Guidelines do not supersede any such law, regulation, statute or ordinance. Nor do these Guidelines create any duty under the law where none otherwise exists. Claim handlers are encouraged to reference the Regulatory MAP in the Village:* [*https://officespace.ace-ina.com/s/PRS/ClaimsMap/SitePages/Home.aspx*]

## Contents


Coverage ........ 3

Contact ........ 4

Investigation ........ 4

*Building Loss Evaluation* ........ 5

*Personal Property* ........ 5

*Time Element (ALE, BI, EE)* ........ 5

*Additional Living Expense* ........ 6

Use of Vendors, Consultants and Experts ........ 7

Assessment ........ 9

*Building Loss Estimate* ........ 9

*Loss Valuation Differences Reconciliation* ........ 9

*Contents/Personal Property Loss Estimate* ........ 9

*Time Element* ........ 10

Reserve ........ 10

Case Management ........ 11

Supervision ........ 12


CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

## Coverage

- Upon receipt of a new loss, the General Adjuster should document the file to reflect a review and preliminary evaluation of the coverage based on the policy information, available loss details, and review Chubb Personal Insurance appraisal and Commercial Underwriting Workstation where available.
- Lienholders/mortgagees/loss payees should be documented for all losses that: involve potential fraud, exceed $50,000 in structural damage for Personal Lines losses, and all Commercial losses.
- The General Adjuster should document the file with their overall valuation of the claim to include all applicable coverages, limits and sub-limits, endorsements, exclusions and deductibles.

***Cause of loss***

The General Adjuster should:

- Through their efforts or with the help of experts, determine or confirm the cause of loss, and identify any previous damages potentially unrelated to the current loss. Any other contributing causes of loss should be documented.
- Identify potential third party contributors and follow the EIP guidelines for subrogation.
- Where applicable, investigate salvage opportunities and pursue them through the established salvage handling guidelines.

***Coverage Evaluation***

- Gather and document loss facts and determine the appropriate application of coverage (i.e. covered cause of loss, policy limits and sub-limits, endorsements, and deductibles applicable to the loss).

***Loss History***

- If loss history exists, the GA should review (if not previously completed by ISA/OSA) and comment on any potential relationship between the loss history and the new loss to include:
- Similar Damage: Any loss history of a similar origin, nature or causal relationship (e.g. roof been replaced for a prior hail claim when looking at a new hail loss.)
- Multiple Losses: Three or more claims within the past two years.

***Reservation of Rights/Coverage Position letters***

- Adjusters have no authority to deny a claim.
- Reservations of Rights and/or Coverage Position letters need to be communicated in accordance with the governing state guidelines and no later than 5 days business days beyond recognition that a potential coverage exclusion or breach of a policy condition exists.
- Coverage analysis should be clearly documented in the claim file.
- Complete denials must be in writing. Partial denials should be in writing where required by state guidelines (FL, NY, RI, NH, CA, TX, IL, WA, and MS). Draft letters sent within the company should be marked as such in order to identify the correspondence as a work in progress. The appropriate coverage letter should then be sent with a copy to the agent and attached electronically to the file.
- All Reservation of Rights and Denial letters are to include any state required language and should be reviewed by a Supervisor before any communication to the agent or client.
- Once the Supervisor has approved the correspondence and protocol, the adjuster should inform the agent of the Reservation of Rights and/or coverage position letter before contacting the insured, and include the agent as a cc on all of these letters.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

- If an Insured or Agent does not agree with a denial, a determination needs to be made whether they can support their dispute with "additional information" which may change our position. If the dispute cannot be supported with additional information, the denial should be re-affirmed in writing and communicated to the appropriate parties prior to issuing the letter. Senior Supervisor and/or RDM approval is needed to re-affirm denials as well.

## Contact

General Adjuster quality contact is considered as direct contact with the insured or their designated representative as soon as possible, but no later than 24 hours *(no later than by the close of the next business day (example Monday to COB Tuesday))* after assignment to the General Adjuster to confirm loss facts in one call, confirm mitigation in progress, and schedule an appointment.

**If mitigation is not underway, provide preferred vendor options to the insured:**

- If the insured or their representative is not available, the General Adjuster should make daily calls to begin the claim handling process until the insured is contacted and document the file with those attempts including the phone number called, any person with whom they have spoken and/or whether they left a message on an answering machine. Consider contact with the agent to assist.
- If daily contact attempts are not appropriate, document the file notes with the reason (i.e. insured on vacation, business trip, etc.) Upon the insured's return, daily contact attempts should resume.
- If unable to reach the Insured in the first 72 hours *(no later than by close of the 3rd business day (example Monday to Thursday)*, the General Adjuster should send a contact letter or email, requesting a callback as soon as possible and document the file.
- Daily contact should be continued until contact is made.

**Once contact is made, the General Adjuster should:**

- Confirm or obtain the relevant facts of the loss, mitigation is underway, and ensures key issues are addressed.
- Explain the initial claim handling process to the insured, and schedule an appointment to inspect.
- Schedule an inspection within 48 hours *(no later than by the close of the 2nd business day (example Monday to Wednesday)* of contact with the Insured, documenting the file with the agreed upon date and time. This is essential where mitigation is necessary so we can confirm progress. If necessary, document why an inspection cannot be completed within 48 hours.
- In cases where immediate inspection is essential and the Insured cannot meet with the General Adjuster in 48 hours *(no later than by the close of the 2nd business day (example Monday to Wednesday)*, the General Adjuster should explain the Insured's duties in providing access to the damaged property and the need to proceed with mitigation efforts. The General Adjuster should ask the Insured for an alternate party, who is authorized to meet with us for the inspection, and document their actions in the file. The insured and agent should be kept informed of any inspections scheduled with the alternate party.

## Investigation

The General Adjuster should gather the pertinent loss facts to determine the cause of loss complete a coverage analysis, complete a scope of loss that will help them accurately and effectively evaluate the full exposure, and assess recovery possibilities.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

***Cause of loss***

The GA should:

- Determine or confirm the cause of loss, and
  identify any previous damages potentially unrelated to the current loss. Any other contributing causes of loss should be documented.
- Address insurable interest issues (e.g. condos, coops and other instances where the review of the lease is necessary) as well as other insurance in place with landlords and/or tenant as well as potential for other carriers with B&M, builders risk, installation, etc.
- Identify potential third party contributors and follow the EIP guidelines for subrogation. Exceptions: Files coded to CAT, including temporary CATs, unless a recovery opportunity is identified on the file. Significant fires ($1M plus) should have consultation with SIU team on selection of origin and cause experts.

***Building Loss Evaluation***

The General Adjuster should:

- Inspect every loss unless waived by the Supervisor with documented rationale.
- Provide a feature specific scope of loss to include: a damage description, labeled photos, full scope of damage, and a diagram of the damaged areas with help from local experts as needed.
  - Labeled photos should illustrate the risk in question, the damage and the suspected point of origin.
- Provide an inspection report within 72 hours (no later than by close of the 3rd business day (example Monday to Thursday)) of inspection. Consider reserving guidelines as appropriate after initial inspection.
- Identify and report on any historic construction issues or specialized building components, repair vs replace issues, unique construction characteristics, environmental and code issues, or other appropriate issues that could affect the adjustment.
- As part of an established action plan, address any open and unresolved issues with appropriate target dates.
- Obtain and review pertinent loss control, appraisal, or SOV documents.
- Identify and document the insured's chosen contractor or builder once established.
- Secure a title search to verify ownership and liens on significant losses.

***Personal Property***

The General Adjuster should:

- On all BPP, Stock or contents damages, validate with the assistance of an approved expert, if warranted, the damaged item with descriptions, age, model number, and replacement cost for like kind and quality and determine repair vs. replacement using any approved vendors, internet resources, and/or local retailers.
- Provide the necessary photographic evidence to validate the damaged BPP, contents or stock loss. This
- Investigation may be supplemented by an approved vendor or expert and reviewed by the General Adjuster.
- Collect enough detail to calculate an actual cash value (ACV) analysis, if warranted.

***Time Element (ALE, BI, EE)***

The General Adjuster should:

- Document the file with an evaluation of potential ALE, Extra Expense or Business Income loss based on the estimated time of repairs, the Insured's ongoing expenses, the cost to resume business, along with the policy benefits applicable to the loss. The file should also demonstrate the GA obtained initial verbal details and inquired about appropriate preliminary documents (P&L, tax returns, business continuation plans, etc.) to allow for an early assessment of a time

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

element exposure.

- Identify and document the file with a completed ALE analysis detailing all continuing expenses and amounts.
- With Supervisory approval, the GA may engage an expert or accountant to help with the preparation of the time element claims after providing a documented rationale.
- GA and accountant should set expectations with the customer to explain the coverage, detail the method to measure the loss, and provide guidance to how the customer should develop and present their claim. These discussions should be documented with a letter/email to the customer that originates from the GA.

***Additional Living Expense***

The initial agreement and any changes to all key elements of the ALE handling should be communicated to the insured verbally followed by written confirmation.

- The OSA should determine if potential for an ALE claim exists at the time of reassignment or in the future when repairs commence.
- If the potential exists the OSA should explain the coverage, options available to the insured under this coverage, send the appropriate letter to the insured and document the file.
- The OSA should promptly engage a Chubb approved vendor to assist with the temporary relocation of the insured and/or to assess the fair rental value of the residence.
- If the insured wishes to secure or has already secured their own temporary housing, then the costs should be compared with assessment made by OSA and preferred vendor. Any consideration beyond the amounts determined by our vendors should be reviewed by a RDM.
- OSA should determine the period of restoration associated with reconstruction to the pre-loss condition and should manage and update the period based on factors that will impact the reconstruction to the pre-loss condition.
- All delays in the construction process should be reviewed and analyzed by OSA to determine their "reasonableness". If necessary the insured should be advised of their responsibility for any costs associated with delays deemed "unreasonable" by OSA.
- All changes to the period of restoration should be documented in the file and communicated to the insured verbally and in writing.

***Supplements***

- Re-inspections should follow the initial inspection when there is a significant change in the original scope of loss and the re- inspection will provide relevant information to further assess the damages. When possible GA should complete first inspection prior to demolition and then should return post agreed demo to assess full repair scope.
- The GA should identify the nature of the supplement, the scope of the additional work, why it was not included in the original estimate, and why it is or is not warranted.
- File notes should be updated no more than 72 hours from receipt.

***Proof of Loss***

- Any proof of Loss needs to be communicated in accordance with the governing state guidelines. A Proof of Loss is recommended in the following examples or when otherwise deemed necessary by management:
    - All claims with SIU involvement
    - In claims with Subrogation potential
    - When enforcing compliance with policy conditions, example: prior to an EUO
- Upon return, the Proof of Loss should be reviewed with management for an appropriate and timely response (i.e. accept, reject or neither pending further investigation).

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

***Code Evaluation***

The General Adjuster should:

- Identify and address any known or perceived code issues relative to the loss.
- Establish the age of the building.
- Provide an analysis of the applicable coverage relative to code issues.
- As part of the established action plan, validate and identify the minimum standards to comply with the specific code requirements with help from their appointed experts.

## Use of Vendors, Consultants and Experts

- The GA should follow the defined assignment, handling, oversight and authority protocols when hiring experts in support of our claim handling responsibilities.
- The GA is expected to play a significant role in providing oversight, coordinating the appropriate scope of loss, addressing any technical issues that arise on the claim and setting expectations with the client and the assigned experts.
- GA's should use a variety of experts in the same field to prevent over-reliance on any one vendor. Vendor database should be utilized.

***The Vendor (Expert) Utilization Process***

Documented approval from the Supervisor is necessary when hiring an expert or consultant on behalf of Chubb. Cause and Origin investigators and Enservio Classic are exceptions to this rule. Dwelling values of $1M or more requires further consultation.

The General Adjuster should:

- Identify, deploy and document the file regarding the necessary experts using the appropriate authority protocols with joint inspection wherever possible.
- Document the use of any vendor in the file with a sound rationale to support the need and purpose.
- When an approved expert is available, consider selecting from Chubb's library of experts found in the Chubb Expert Database Facility.
    - If an expert not in the database is used, they should be validated as having expertise in the assigned area. The source of the expert referral, as well as their background information, should be documented. An expert which is not listed in the database should be approved by the Supervisor.
    - Consider coordinated response when SIU or Subro team members are engaged in loss (EIP process should be utilized on all claims exceeding $100K.)
- If the insured has not secured a reconstruction vendor, the GA should offer a Chubb preferred vendor, if applicable, as potential option for the client.

***Vendor (Expert) Communication Process***

- Both verbal and written confirmation should go to the insured confirming the name of the company being utilized (including the individual's name that will be on-site) and why this expert is performing a particular evaluation or analysis. (This form letter is also available in the Forms and Correspondence database.)

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER



CHUBB

***Vendor (Expert) Oversight***

GA is responsible for and has full ownership coordinating all vendors/experts. The GA should provide the customer with specific role clarity, awareness of inspection date/s, timeframe of resulting reports, and promptly addressing delays/rescheduling.

The General Adjuster should:

- Follow up in writing with the expert validating the scope of the expert's involvement.
- Document their rationale when an expert is needed to validate a loss, establish damages, or facilitate repairs.
- Solicit a target date from the expert for the inspection date and the completion of their report. Make every effort to accompany the expert on any inspections and/or meetings with the insured and, if not possible, document the file why it is not possible.
- Jointly discuss the scope while working with the assigned vendor who will provide their expert evaluation.
- Document the file with a summary of the expert's report along with any ongoing or supplemental discussion with the expert regarding their findings and indicate if those reports impact his / her assessment of the loss.
- If the Sr. Supervisor or claims Counsel agrees a written report is un-necessary to the adjudication of the file, and does not add value to the final adjustment, a GA recap of the expert findings would be appropriate.
- The GA cannot authorize experts to hire other independent experts. If architects, industrial hygienists, code experts, engineers and other such experts are needed to develop either the scope and/or pricing of the loss, their retention should follow the expert approval process.
- Building Consultants are permitted to consult with internal or external subs to validate a particular trade. No separate billing for these sub consultations to Chubb is permitted unless pre-approved by the GA following the expert approval process.
    - Building Consultants should disclose the identity of any subs, outside of their firm; they will use in preparing their loss estimate and obtain approval from the GA.
    - The General Adjuster must document any potential conflict of interest if the expert or building consultant becomes an active contractor for the insured.

***Expert Expense Oversight***

The General Adjuster should:

- Solicit a case budget for use of the expert on complex cases where their fee is anticipated to exceed $5,000 or $10,000 for Building Consultants. The budget should reflect:
    - GA's oversight on scope of assignment
    - The potential for additional inspections
    - Any subs involved / anticipated
- Ensure the vendor provides a detailed statement of their services and document the file with their analysis of the vendor charges to include:
    - Appropriateness of travel time
    - Hourly charges consistent with industry standards
    - Bill is in line with the initial projected budget
    - Time investment commensurate with the project assignment

CONFIDENTIAL PRODUCED PURSUANT TO PROTECTIVE ORDER

## Assessment

- The General Adjuster should be actively engaged in loss analysis and scoping with vendors/experts.
- The General Adjuster should proactively seek the input of any resource that might assist him/her in accurately assessing the value of the loss.

***Building Loss Estimate***

- If the General Adjuster utilizes a building contractor/consultant to write an estimate, the General Adjuster should accompany them to the loss site. If they cannot complete the inspection with the contractor/consultant, the GA should document the file accordingly.
- The GA should review the contractor/expert estimate/report to confirm the GA agrees with their scope. This review should be entered into the file within 10 (calendar) days of receipt. Documentation of this review includes:
    - Confirmation that the overall scope is consistent with the quality of building materials
    - Identification that repair or replacement options are consistent with the original scope
    - Inconsistencies or deviation between the original scope and the estimate are discussed and reconciled.

- If the GA does not utilize a contractor/expert to establish the estimate, the GA should independently validate pricing and document the resource used.
- The GA should provide a copy of the estimate to the insured via mail/email noting any open items and their action plan on these and document the file.
- If the Insured engages the initial expert for the loss, Chubb should hire another consultant to replace the initial expert to verify any scope or pricing changes alleged necessary by our original consultant after engagement by the insured.

***Loss Valuation Differences Reconciliation***

If the insured presents an estimate, supplement or a material change in the exposure that is in excess of our evaluation of the loss, the GA should:

- Identify the items of difference in scope, material quality, pricing or repair or replace techniques.
- In consultation with the Supervisor, determine if a re-inspection is required to address the differences. If a re-inspection is not deemed necessary, document the conversation in the file.
- Discuss the identified differences with the Insured's contractor. If the contractor agrees with our price, the GA should pay the loss based on our Expert's estimate.
- Detail both the specific nature of the changes to the estimate and the value of each specific adjustment if it is necessary to adjust our experts estimate.
- Identify the rationale and the loss payment basis in support of the undisputed amount.
- In accordance with the "Replacement Cost Basis" policy provision, review documentation prior to issuing the final payment for replacement cost. Advances against Replacement Cost Basis should not exceed the Actual Cash Value unless there is supporting documentation and repairs have commenced.

***Contents/Personal Property Loss Estimate***

The General Adjuster should:

- With the assistance of an approved expert / vendor, validate the replacement cost for like kind and quality and determine reparability vs. replacement using any approved vendors, internet resources, and/or local retailers and document the file.
- Validate pricing of a representative sample of personal property items. This validation may be provided by an approved vendor / expert and reviewed by the General Adjuster.
- With the assistance of an approved vendor / expert, create an Actual Cash Value estimate of any

CONFIDENTIAL PRODUCED PURSUANT TO PROTECTIVE ORDER

damaged items identified as obsolete (no longer in use and/or outdated in design) for personal lines losses or in instances where subrogation might be involved and document the file.

- Identify the rationale and the loss payment basis behind the undisputed payment.
- Advances against Replacement Cost Basis should not exceed Actual Cash Value, unless there is supporting documentation or for personal lines losses, the policy does not allow for ACV settlement on contents.

***Time Element***

The General Adjuster should:

- Document the file with an evaluation of potential ALE based on the reasonable amount of time it takes to complete repairs as provided by the approved expert / vendors, the Insured's normal standard of living, the Insured's ongoing expenses, and based on a documented and incurred basis per the contract language.
- Document the file detailing all continuing and abated expenses and their respective amounts.
- Communicate the period of restoration or reasonable time to rebuilding to the insured so expectations are set on the time limitations.
- Follow-up in the first 30 (calendar) days to ensure the repairs are proceeding on the agreed schedule. An appropriate diary follow-up should be set based on the loss facts, not to exceed 90(calendar) day intervals.
- Document the file, not to exceed 30 (calendar) days, with an evaluation of potential time element exposure and, if any, strategies to mitigate the time element loss.
- File should reflect the proactive involvement of the GA in the investigation and assessment of the time element claim including the communication, document requests and assumptions used by the accountant.

## Reserve

- Redacted [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

- Redacted [redacted]

[redacted]

[redacted]

## Case Management

The General Adjuster should document the file within the timelines noted below and all material activities and actions taken on a file. This should include but is not limited to:

***File Activity Time Standards***

The GA should perform the following activities within 72 hours (*no later than by close of the 3rd business day (example Monday to Thursday)):*

- Prepare their loss site Inspection report and notes from any subsequent loss site meetings.
- Address materials that have been mailed, faxed, or emailed to the General Adjuster.
- Confirm their receipt, review and analysis of Consultants or Experts reports or work product.
- Respond to all file requests from their Supervisor.

***48 hour claim payment***

- The claim file will reflect that all Indemnity claim payments were issued within 48 hours (from authority obtained) upon receipt of necessary documentation and when settlement was reached with the insured/insured's representative.

***Documentation Standards***

- A documented note including status by feature should be completed when file reserves are being recommended unless an exception is granted by the Supervisor and a rationale posted in the file.

- A Status by Feature Report with an Action Plan file note should be in the claim file every 30 (calendar) days with a current copy of the updated Statement of Loss. The General Adjuster or Supervisor can increase this time frame and document why the increase is appropriate. An equivalent note could include a Captioned Report or detailed letter to the policyholder that outlines the current adjustment of the claim by feature, and the plan to resolve or investigate pending claims.

- An updated Statement of Loss should be sent to the policyholder when an indemnity payment is made. Exceptions to this should be documented in the file.

- The General Adjuster should document the file and send a Large Loss Notification to the appropriate parties when an exposure of $500,000 or greater is recognized. Losses of $5 million or greater should be distributed only after appropriate notification and approval.

- Prepare a Large Loss Summary for losses with a potential exposure to exceed $5M to be forwarded

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

to the Senior Director for distribution to executive management

- The Large Loss Notice should be completed as soon as practical, but within 10 (Calendar) days of the exposure being recognized. If the LLN cannot be completed during that time frame then the reason for the delay should be documented in the file.

- A Sworn Statement in Proof of Loss, where required in files, unless waived by the Supervisor and the rationale documented.

***Diary Management***

- The GA should document an action plan to move the file toward conclusion and subsequent notes should support that action plan or explain any deviations from it.
- The GA should maintain an active diary (in support of the action plan to move the file to conclusion in the most efficient and timely manner. Diaries should not exceed 30 calendar days unless the file facts/documentation support longer diary intervals, and regulatory requirements do not require shorter intervals.
- All correspondence, including email, should be professional and include the Chubb office address and contact information of the adjuster. All emails should be attached to the file at the time they are sent/received, should follow corporate guidelines and include privacy language.
- GA should adhere to all UCPA and State compliance guidelines. Proper letters and forms should be sent out when applicable. Coverage position letters should contain any state specific language.
- Proper full name of the correct writing company should be referenced on all outgoing external correspondence.

## Supervision

The Supervisor should provide ongoing, value-added guidance to ensure the file is aggressively moving toward resolution and adjusters are adhering to GA Best Practices Guidelines.

File documentation should confirm the following have taken place:

- The primary Supervisor should document the file progression. A specific file note in any instance where direct supervision is transferred to the SDR. The Senior Director would then be considered the Primary Supervisor. The Supervisor should establish a diary and confirm handling of the claim.

- The Supervisor should be involved in discussions related to any site inspections required by the General Adjuster including any initial inspection on transferred claims and/or follow up inspections on other existing losses.

- The Supervisor should participate in the selection and approval of vendors and experts to include discussions of any specific expertise required and any initial budgets to be established for those services.

- The Supervisor should review and comment on the progress of the file within the first 30 (calendar) days (and a minimum of every 60 (calendar) days thereafter as appropriate) to assess and adhere to the Best Practice guidelines. Further, the Supervisor should review and comment on initial action plans and make any suggestions that might improve those plans, when applicable.

- When the majority of the claim has been resolved, the Supervisor can conclude his or her oversight of the file, which should be documented in the file.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



PACIFIC 003579

- The Supervisor should respond to all file requests from the General Adjuster within 48 hours (no later than by the close of the 2nd business day (example Monday to Wednesday)). If additional time is needed, the Supervisor should document the file with an anticipated timeframe for response.

- The Supervisor should document the files with their actions and direction.

- The Supervisor should respond to all High Recovery Potential tasks notating file as appropriate.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**From:** Elliott, Jeremy E
**To:** Andrew Arrant; Joni Holman
**Cc:** Chuck Dauphin; US Property Claims
**Subject:** RE: Charles Goodrich- claim 040519056755
**Date:** Friday, January 24, 2020 2:28:32 PM

---

Andrew, thank you for the update. Once we have the report we can determine steps moving forward. I am not agreeing to expanding the scope until I get the IH report which will be reviewed by our IH. If necessary, we can complete a walk thru with the report in hand for our IH and the insured vendor to confirm the protocol. I await the report for our review.

Thank You

**Jeremy Elliott,MBA**
Senior General Adjuster, Claims

1400 Urban Center Drive, Suite 450, Vestavia Hills, Alabama 35242, USA
O 205-470-8370 F 205-968-5496
E jelliott@chubb.com

*For more information on your Claim experience with Chubb, visit us here:* Chubb Claim Guidance

*Welcome to Chubb Claims. Life is about to get easier.*

I strive to take care of all inquiries and questions directly with you. If you need to speak with my supervisor, please contact Wally Haessig at (214) 460-1779 or via e-mail at whaessig@chubb.com.

**From:** Andrew Arrant [mailto:aarrant@brookstonecompanies.com]
**Sent:** Friday, January 24, 2020 2:25 PM
**To:** Elliott, Jeremy E <jelliott@chubb.com>
**Subject:** [EXTERNAL] Goodrich

Jermey,

Mrs. Goodrich called me this morning to discuss what other things we will be demoing after Cliff (the consultant) found smoke in the master bedroom, living room and kitchen hallway. She wanted us to go ahead and start the demo of these areas. I did inspect the areas myself and do see some smoke residue but I won't move forward until you can see it and approve it. So at this point, I am also waiting for the report to come back to finish the structure clean estimate as well.

Thanks,
Andrew

EXHIBIT 86
WIT:
DATE: 2-9-23
JULIE BRANDT, RMR, CRR

**File Note Title:** Genl Cor - General correspondence
**Create Date:** 11/19/2019 12:46 PM
**Author:** ATTACHINGBOT1 EPAM
**File Note Text:**
From: jelliott@chubb.com.
Sent: 11/19/2019 11:50.
To: [charlesgoodrich@hotmail.com charlesgoodrich@hotmail.com].
CC: [US Property Claims uspropertyclaims@Chubb.com]
Subject: Pacific Indemnity Insurance Co- claim 040519056755.

Copied body:
RE: Claim Reference #:
040519056755
Writing Company
Pacific Indemnity Insurance

Dear Charles & Alexandra,

Thank you for taking the time to discuss the unfortunate events surrounding your property damage claim to your home. I have included the details of our scheduled appointment below, but should you have any questions please feel free to contact me in the interim at 205-470-8370.

Date:
Tuesday , November, 19th
Time:
Noon

In advance of our meeting, I wanted to briefly explain the claim process to you. I have found that the more informed you are about the overall claim process, the better your claim experience.

On-Site Inspection:

When we meet at your home I will conduct a thorough inspection of the damages to your building to determine available coverage and the scope of your loss.

During this time, I will investigate the cause of your loss, take photographs, and measure/estimate the extent of the damage.

If any of your belongings were impacted, I will also conduct an inventory of those items.

Following the inspection, I will provide you a written estimate of the damages so that you can have an informed conversation with any contractor(s) you wish to engage for repairs. When a situation requires additional time for preparation of a comprehensive damage estimate, we will promptly advise you of same and keep you well informed throughout the process and associated time frame specific to your claim.

EXHIBIT 101
WIT: 
DATE: 2-9-23
JULIE BRANDT, RMR, CRR

Once complete, we will review the information together, discuss next steps and determine if additional resources are needed to assess your claim.

I will follow up with you on a regular basis to provide you any status updates, answer questions you may have and, if needed, to obtain any outstanding documentation.

Throughout the process, should you need to send me any estimates, photographs, or other documents related to your claim you can do so using your preferred method of communication:.

Electronic Document Upload:
www.chubb.com/uploadclaimdoc
Email:
jelliott@chubb.commailto:jelliott@chubb.com
Fax:
205-968-5496
Regular Mail:
jelliott@chubb.commailto:jelliott@chubb.com

*Important - please be certain to include your name and the claim reference number in the subject line of any such submission.

This will ensure that your response and any documentation will be attached to the electronic claim file.

At the conclusion of your claim, my goal is to clearly outline how I determined the settlement proposal for your claimed damages.

To assist you, I have included additional information in the Chubb Claim Experience attachment below. Please feel free to review it at your convenience.

I welcome any questions you might have and aim to provide you with prompt and professional service throughout this process.

Sincerely,

Thank You
[Chubb Logo]

Jeremy Elliott,MBA
Senior General Adjuster, Claims

1400 Urban Center Drive, Suite 450, Vestavia Hills, Alabama 35242, USA
O 205-470-8370 F 205-968-5496
E jelliott@chubb.commailto:jelliott@chubb.com

For more information on your Claim experience with Chubb, visit us here: Chubb Claim

November 19th, 2019

Charles Goodrich Alexandra Goodrich
3305 Dell Rd
Mountain Brook, AL 35223

| | | |
|---|---|---|
| Re: | Insured: | Charles Goodrich & Alexandra Goodrich |
| | Policy Number: | 001494547801 |
| | Claim Number: | 040519056755 |
| | Date of Loss: | 11/18/2019 |
| | Loss Location: | 3305 Dell Rd<br>Mountain Brook, AL 35223 |
| | Writing Company: | Pacific Indemnity Company |

Dear Mr. & Mrs. Goodrich, please be advised that the above captioned claim is being handled by me.

Please forward any additional information for me to review and consider including any additional amounts claimed under the policy. Kindly make note of this and direct all correspondence to the following:

Chubb Group of Insurance Companies
1400 Urban Center Drive, Suite 450
Birmingham, AL 35242

Should you have any questions or concerns regarding this matter, please contact me at, 205-470-8370.

Sincerely,

*Jeremy Elliott*

**Jeremy E. Elliott, MBA**
Pacific Indemnity Company
Sr. General Adjuster

Cc:

USI INSURANCE SERVICES LLC (AL)
1701 MCFARLAND BLVD N.

TUSCALOOSA, AL 35406-0000

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| CHARLES GOODRICH and ALEXANDRA GOODRICH, | ) | |
| Plaintiffs, | ) | CIVIL ACTION FILE NO: 2:22-CV-00021-MHH |
| vs. | ) | |
| PACIFIC INDEMNITY COMPANY; | ) | |
| Defendant. | ) | |

**DECLARATION OF JERRY RUDOSHKO**

My name is Jerry Rudoshko, and I am over eighteen (18) years of age and competent to testify to the matters stated herein. All of the statements herein are of my personal knowledge, information and belief.

1. I am a Senior General Adjustor handling Pacific Indemnity Company claims, and I have knowledge regarding the claim at issue in this lawsuit.

2. Pacific issued a Masterpiece insurance policy bearing policy number 14945478-01 ("the Policy") to Charles Goodrich and Alexandra Goodrich, insuring the property located at 3305 Dell Road, Mountain Brook, AL 35223 (the "Property"). A true, accurate and correct copy of the Policy is attached as Exhibit "A."

EXHIBIT 106
WIT:
DATE: 2-9-23
JULIE BRANDT, RMR, CRR

DEPOSITION EXHIBIT
106
1/13/23



LEGAL\57968609\1

3. The Policy provides up to $3,000,000 of "Dwelling" Coverage. Pacific Policy, Exhibit A, Policy Coverage Summary, p.1.

4. Pacific pays the "reconstruction cost," which is defined as follows in the Policy:

> "Reconstruction cost" means the lesser of the amount required at the time of loss to **repair, replace, or rebuild**, at the same location, your house or any other permanent structure, using like design, and materials and workmanship of comparable kind and quality.

Pacific Policy, Exhibit A, p. B-2 (emphasis added).

5. The Policy provides "Extra Coverages," including coverage for landscaping, which is defined as follows:

> We cover trees, shrubs, plants, and lawns, which are on the grounds of your house and other permanent structures, against certain kinds of perils. These are fire …
>
> We will pay:
> - up to a total of 5% of the amount of coverage for the house at which the loss occurs, … , but
> - not more than $10,000 for any one tree, shrub, or plant.

Pacific Policy, Exhibit A, p. B-7.

6. The maximum landscaping benefit under the Policy is $150,000.

7. The Policy provides "Contents" coverage at "Replacement Cost," which is defined as follows:

> …[W]e will pay the full cost to replace the contents without deduction for depreciation, or the amount required

> to repair the damage, whichever is less, up to the amount of coverage.

Pacific Policy, Exhibit A, p. C-2.

8. The Policy includes the following provisions regarding an insured's duties after a loss:

> **Prepare an Inventory.** [The Insureds] must prepare an inventory of damaged personal property, describing the property in full. It should show in detail the amount insured under this policy and actual amount of the loss. Attach bills, receipts, and other documents to support your inventory.
>
> . . .
>
> **Proof of Loss.** [The Insureds] must submit [a] signed, sworn proof of loss providing all information and documentation [Pacific] request[s] such as the cause of loss, inventories, receipts, repair estimates and other similar records.

Pacific Policy, Exhibit A, pp. Y-4 and Y-5.

9. This claim involves a fire that occurred at Plaintiffs' home on November 18, 2019.

10. I have reviewed Plaintiffs' Motion for Partial Summary Judgment where Plaintiffs claim they are entitled to be paid (1) $311,989.80 for smoke remediation that was not required and never occurred; (2) the policy limit of $150,000 for landscaping costs that have not been performed or properly documented; and (3) "approximately" $575,000 for contents where the replacement

cost has not been properly documented. This Declaration addresses only those aspects of Plaintiffs' claim.

***Smoke Remediation Bid***

11. On March 19, 2021, Plaintiffs executed a Sworn Statement in Proof of Loss – Dwelling ("Dwelling Proof of Loss").

12. Plaintiffs' Dwelling Proof of Loss included a breakdown of amounts owed, including $311,939.89 described as "Slade LLC – Remediation Bid." [Doc No. 29-4, p. 4].

13. The Slade Remediation Bid included costs associated with smoke and mold remediation for several areas of the Property, including the basement. The Slade Remediation Bid did not provide for smoke or mold remediation for the garage. A true, accurate and correct copy of the Slade LLC estimate, dated April 1, 2020, is attached hereto at Exhibit B.

14. By March 19, 2021, when Plaintiffs submitted the sworn Dwelling Proof of Loss, Plaintiffs had already demolished the entire house.

15. To my knowledge, the smoke and mold remediation proposed by Slade LLC was never performed and the cost was never incurred.

***Plaintiffs' Landscaping Claim***

16. On March 19, 2021, Plaintiffs executed a Sworn Statement in Proof of Loss – Landscaping ("Landscaping Proof of Loss") which set forth the net amount

claimed by Plaintiffs as $150,000 "or the maximum allowed under the policy, whichever is greater." [Doc No. 29-11].

17. The Landscaping Proof of Loss included an estimate for the landscaping at the Property from Southern Scape which totaled $161,351. A true, accurate and correct copy of the estimate is attached hereto as Exhibit C.

18. This estimate provides no information regarding the extent of the damage to the landscaping features or the location of allegedly damaged plants/shrubs/etc.

19. Likewise, the estimate provided no photographs or other evidentiary support for the claimed damages.

20. It has been almost 2 years since Plaintiffs' Examinations Under Oath occurred, and it is my understanding that the house has been rebuilt, yet Plaintiffs have refused to provide specific information or documentation regarding the landscaping work that was performed.

***Plaintiffs' Contents Claim***

21. As part of Pacific's initial investigation into Plaintiffs' claim, Pacific retained Enservio, Inc., a third-party vendor specializing in the adjustment of contents claims, to inventory and appraise Plaintiffs' fire damaged items.

22. On January 14, 2020, less than two months following Plaintiffs' fire loss, Pacific issued the first payment for Plaintiffs' damaged contents. This payment in the amount of $204,463.30 was based on Enservio's content inventory.

23. On January 21, 2020, Plaintiffs wrote to Pacific to dispute the contents valuation contained in Enservio's inventory and the valuation of other damaged items. In this email, Plaintiffs indicated they would "forward a list of items [that] were lost with replacement values for comparison." A true, accurate and correct copy of this email is attached as Exhibit D.

24. Plaintiffs' self-prepared inventory provided original costs for most items (with the required back up documentation); however, they provided no information on how they arrived at the replacement cost for each item.

25. The replacement cost for many of the items was oftentimes triple or even quadruple the original cost, with no back-up documentation for the replacement costs and no explanation for the discrepancy.

26. Plaintiffs have provided conflicting information on what they believe they are owed under the Policy.

27. On May 4, 2020, Plaintiffs submitted an estimate related to their contents which totaled $1,225,307.66. A true, accurate and correct copy of the correspondence from Charles Dauphin, dated May 4, 2020, is attached hereto as Exhibit E, p. 2.

28. On September 11, 2020, Plaintiffs executed a Sworn Statement in Proof of Loss – Contents ("Contents Proof of Loss") setting forth the net amount of claimed as the "maximum amount under the policy, believed to be $1,507,500." [NEF 29-7, p. 3].

29. The estimate included with Plaintiffs' Contents Proof of Loss is significantly higher than the prior estimate.

30. Neither of the estimates from Iris & Co. include supporting documentation regarding the replacement value of the items listed.

31. Pacific has repeatedly requested supporting documentation in the form of receipts, invoices from vendors, or even simply details regarding the specific items to be replaced or the identity of the vendors from whom Plaintiffs intended to purchase the items listed.

32. To date, Plaintiffs have refused to provide the requested documentation.

33. On August 14, 2020, Plaintiffs agreed to comply with the terms of the Policy and promised to request backup documentation from Iris & Co. regarding the replacement cost of the contents items.

34. Pacific specifically requested documentation regarding each item of Plaintiffs' contents claim, including documentation for the item itself, as well as

documentation regarding any fabric, labor, or other items involved in the claimed replacement cost of each item.

35. While Plaintiffs have produced a brief affidavit from Iris Thorpe, owner of Iris & Co., this affidavit is woefully deficient insofar as it provides none of the backup documentation requested by Pacific regarding alleged replacement costs for the items listed on Iris & Co.'s estimates. [Doc No. 29-9].

36. To date, no such documentation has been provided to Pacific.

37. To date, Pacific has paid $3,165,132.90 to Plaintiffs as follows:

a. $1,732,910.32 on the dwelling

b. $147,633.68 for debris removal

c. $1,091,489.81 on the contents

d. $178,099.09 for extra living expenses

e. $15,000 for mold remediation

I declare under penalty of perjury, pursuant to the provisions of 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this __18th_ day of May, 2022.

Jerry Rudoshko

EXHIBIT

107

DAUPHIN PARIS, LLC
ATTORNEYS AT LAW
300 Vestavia Parkway, Suite 3200
Vestavia Hills, Alabama 35216
Phone: 205-518-6821
Fax: 205-518-6805

Charles A. Dauphin
cdauphin@dauphinparis.com

B. Diane Paris
diane@dauphinparis.com

October 4, 2021

Alycen A. Moss
Cozen O'Connor
The Promenade
1230 Peachtree Street, NE
Suite 400
Atlanta, GA 30309

*Via Email Only:* amos@cozen.com

Re: **Charles Goodrich and Alexandra Goodrich - Claim No.: 040519056755**

Dear Alycen:

The Goodriches reject Pacific's offer to consider further payment on the Goodriches claims only if the Goodriches reduce the amounts of their claims. In light of Pacific's position that it will make no other payments without a concession from the Goodriches, the Goodriches have authorized the filing of the attached complaint. Before filing the complaint, however, the Goodriches offer to participate in a mediation of their legal claims, provided Pacific bears the cost of the mediation. In addition to mediation, or as an alternative to mediation and a jury trial, the Goodriches offer arbitration under terms to be agreed upon. I will suspend the filing of the complaint until October 19, 2021 for Pacific to consider this offer.

Sincerely Yours,

Charles A. Dauphin

EXHIBIT 119
WIT:
DATE: 2-9-23
JULIE BRANDT, RMR, CRR

**File Note Title:**Genl Cor - General correspondence
**Create Date:**1/27/2020 2:15 PM
**Author:**ATTACHINGBOT1 EPAM
**File Note Text:**
From: emyers@enservio.com.
Sent: 01/27/2020 12:45.
To: [Elliott, Jeremy E jelliott@chubb.com, Chuck Dauphin cdauphin@dauphinparis.com].
CC: [US Property Claims uspropertyclaims@Chubb.com]
Subject: [EXTERNAL] RE: RE: PACIFIC INDEMNITY COMPANY- claim 040519056755- Goodrich House Fire - Dell Road.

Copied body: Good afternoon Jeremy & Mr. Dauphin,
I apologize but we are unfortunately unable to change / modify our format to match other company styles and sheets.
I can however note that each line has a hyperlink attached (the far right end of the spreadsheet on the inventory details tab) that provides our supports / where we located the replacement item and the price quoted.
On certain line (ex. Line 2) there is no link as these are either custom items or not commercially available for mass purchase, so an Expert has priced out based on details provided.
Thank you
Eric

From: Elliott, Jeremy E jelliott@chubb.com
Sent: Monday, January 27, 2020 12:38 PM
To: Chuck Dauphin cdauphin@dauphinparis.com
Cc: Myers, Eric [Enservio] emyers@enservio.com; US Property Claims uspropertyclaims@Chubb.com
Subject: EXTRE: PACIFIC INDEMNITY COMPANY- claim 040519056755- Goodrich House Fire - Dell Road

Mr. Dauphin, this is the standard format used by Enservio for all content claims. I have included Eric Myers with Enservio on this email and he may be able to provide some additional assistance. Eric, please assist the insured with the valuation portion and any recommendation. Mr. Dauphin is representing the insured moving forward so please run all request thru him directly.

Per previous discussion, my understanding from Mrs. Goodrich was the majority of the content items with the exception of the antiques were less than six months old and she would submit supporting documents from either personal records or her decorator. Which items are of concern on the inventory? I appreciate your update and assistance.

Thank You
[Image removed by sender. Chubb Logo]

Jeremy Elliott,MBA
Senior General Adjuster, Claims

1400 Urban Center Drive, Suite 450, Vestavia Hills, Alabama 35242, USA
O 205-470-8370 F 205-968-5496
E jelliott@chubb.commailto:jelliott@chubb.com

For more information on your Claim experience with Chubb, visit us here: Chubb Claim Guidancehttps://urldefense.proofpoint.com/v2/url?u=https-3A nam01.safelinks.protection.outlook.com -3Furl-3Dhttps-

**Brookstone Restoration**

4000 Farr Road
Bessemer, Alabama 35022
Alabama Tax ID: 22-3887129

EXHIBIT 141
WIT:
DATE: 2-9-23
JULIE BRANDT, RMR, CRR

**GOODRICH_SC**

**3305 Dell Rd**

**STAIRS**

**STAIRS**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | TOTAL |
|---|---|---|---|---|---|
| 1. Soda blasting - Heavy | 1,040.44 SF | 0.00 | 2.39 | 90.52 | 2,577.17 |
| 2. Seal stud wall for odor control (shellac) | 818.38 SF | 0.00 | 0.86 | 20.46 | 724.27 |
| 3. Seal underlayment for odor control | 128.79 SF | 0.00 | 0.48 | 0.77 | 62.59 |
| 4. Clean stud wall | 818.38 SF | 0.00 | 0.52 | 1.64 | 427.20 |
| 5. Clean floor or roof joist system | 93.28 SF | 0.00 | 0.63 | 0.19 | 58.96 |
| Total: STAIRS | | | | 113.58 | 3,850.19 |

**SECOND FLOOR**

**SECOND FLOOR**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | TOTAL |
|---|---|---|---|---|---|
| 6. Soda blasting - Heavy | 18,250.00 SF | 0.00 | 2.39 | 1,587.75 | 45,205.25 |
| 7. Seal stud wall for odor control (shellac) | 10,000.00 SF | 0.00 | 0.86 | 250.00 | 8,850.00 |
| 8. Seal floor or ceiling joist system (shellac) | 1,941.38 SF | 0.00 | 1.16 | 56.30 | 2,308.30 |
| 9. Seal underlayment for odor control | 1,941.38 SF | 0.00 | 0.48 | 11.65 | 943.51 |
| 10. Clean stud wall | 6,761.77 SF | 0.00 | 0.52 | 13.52 | 3,529.64 |
| 11. Clean floor or roof joist system | 1,941.38 SF | 0.00 | 0.63 | 3.88 | 1,226.95 |
| Total: SECOND FLOOR | | | | 1,923.10 | 62,063.65 |

**MAIN LEVEL**

**MAIN LEVEL**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | TOTAL |
|---|---|---|---|---|---|
| 12. Seal stud wall for odor control (shellac) | 9,985.56 SF | 0.00 | 0.86 | 249.64 | 8,837.22 |
| 13. Seal floor or ceiling joist system (shellac) | 3,231.63 SF | 0.00 | 1.16 | 93.72 | 3,842.41 |
| 14. Seal underlayment for odor control | 3,231.63 SF | 0.00 | 0.48 | 19.39 | 1,570.57 |
| 15. Soda blasting - Heavy | 12,224.14 SF | 0.00 | 2.39 | 1,063.50 | 30,279.19 |
| 16. Clean stud wall | 9,985.56 SF | 0.00 | 0.52 | 19.97 | 5,212.46 |
| 17. Clean floor or roof joist system | 3,356.35 SF | 0.00 | 0.63 | 6.71 | 2,121.21 |

BROOKSTONE

**Brookstone Restoration**

4000 Farr Road
Bessemer, Alabama 35022
Alabama Tax ID: 22-3887129

**CONTINUED - MAIN LEVEL**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | TOTAL |
|---|---|---|---|---|---|
| Total: MAIN LEVEL | | | | 1,452.93 | 51,863.06 |

## BASEMENT




**Basement** — **Height: 9' 11"**

| | |
|---|---|
| 857.26 SF Walls | 439.31 SF Ceiling |
| 1,296.57 SF Walls & Ceiling | 439.31 SF Floor |
| 48.81 SY Flooring | 86.45 LF Floor Perimeter |
| 86.45 LF Ceil. Perimeter | |



**Subroom: Room1 (1)** — **Height: 9' 11"**

| | |
|---|---|
| 612.31 SF Walls | 218.47 SF Ceiling |
| 830.78 SF Walls & Ceiling | 218.47 SF Floor |
| 24.27 SY Flooring | 61.75 LF Floor Perimeter |
| 61.75 LF Ceil. Perimeter | |



**Subroom: Room2 (2)** — **Height: 9' 11"**

| | |
|---|---|
| 188.98 SF Walls | 21.98 SF Ceiling |
| 210.96 SF Walls & Ceiling | 21.98 SF Floor |
| 2.44 SY Flooring | 19.06 LF Floor Perimeter |
| 19.06 LF Ceil. Perimeter | |



**Subroom: Room3 (3)** — **Height: 9' 11"**

| | |
|---|---|
| 962.65 SF Walls | 505.64 SF Ceiling |
| 1,468.29 SF Walls & Ceiling | 505.64 SF Floor |
| 56.18 SY Flooring | 97.07 LF Floor Perimeter |
| 97.07 LF Ceil. Perimeter | |

BROOKSTONE

**Brookstone Restoration**

4000 Farr Road
Bessemer, Alabama 35022
Alabama Tax ID: 22-3887129

**CONTINUED - Basement**



**Subroom: Room5 (4)** **Height: 9' 11"**

| | | | |
|---|---|---|---|
| 835.85 | SF Walls | 258.93 | SF Ceiling |
| 1,094.78 | SF Walls & Ceiling | 258.93 | SF Floor |
| 28.77 | SY Flooring | 84.29 | LF Floor Perimeter |
| 84.29 | LF Ceil. Perimeter | | |



**Subroom: Room6 (5)** **Height: 9' 11"**

| | | | |
|---|---|---|---|
| 847.34 | SF Walls | 425.86 | SF Ceiling |
| 1,273.20 | SF Walls & Ceiling | 425.86 | SF Floor |
| 47.32 | SY Flooring | 85.45 | LF Floor Perimeter |
| 85.45 | LF Ceil. Perimeter | | |



**Subroom: Room7 (6)** **Height: 9' 11"**

| | | | |
|---|---|---|---|
| 606.34 | SF Walls | 216.06 | SF Ceiling |
| 822.40 | SF Walls & Ceiling | 216.06 | SF Floor |
| 24.01 | SY Flooring | 61.14 | LF Floor Perimeter |
| 61.14 | LF Ceil. Perimeter | | |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | TOTAL |
|---|---|---|---|---|---|
| 18. Seal floor or ceiling joist system (shellac) | 2,086.24 SF | 0.00 | 1.16 | 60.50 | 2,480.54 |
| 19. Seal stud wall for odor control (shellac) | 2,455.37 SF | 0.00 | 0.86 | 61.38 | 2,173.00 |
| 20. Mask the floor per square foot - plastic and tape - 4 mil | 2,086.24 SF | 0.00 | 0.20 | 10.43 | 427.68 |
| 21. Clean stud wall | 2,455.37 SF | 0.00 | 0.52 | 4.91 | 1,281.70 |
| Totals: Basement | | | | 137.22 | 6,362.92 |
| Total: BASEMENT | | | | **137.22** | **6,362.92** |

**Attic2**

BROOKSTONE

**Brookstone Restoration**

4000 Farr Road
Bessemer, Alabama 35022
Alabama Tax ID: 22-3887129



**Roof1**

| | | | |
|---|---|---|---|
| 5,934.46 | Surface Area | 59.34 | Number of Squares |
| 713.77 | Total Perimeter Length | 184.65 | Total Ridge Length |
| 34.34 | Total Hip Length | | |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | TOTAL |
|---|---|---|---|---|---|
| 22. Soda blasting - Heavy | 9,000.00 SF | 0.00 | 2.39 | 783.00 | 22,293.00 |
| 23. Seal attic framing (shellac) - 9 to 12/12 | 9,000.00 SF | 0.00 | 1.69 | 333.00 | 15,543.00 |
| 24. Clean stud wall | SF | 0.00 | 0.52 | 0.00 | 0.00 |
| 25. Clean floor or roof joist system | 9,000.00 SF | 0.00 | 0.63 | 18.00 | 5,688.00 |
| Totals: Roof1 | | | | 1,134.00 | 43,524.00 |
| Total: Attic2 | | | | **1,134.00** | **43,524.00** |

**attic walls**



**Room1** **Height: 15'**

| | | | |
|---|---|---|---|
| 3,109.70 | SF Walls | 2,064.21 | SF Ceiling |
| 5,173.92 | SF Walls & Ceiling | 2,064.21 | SF Floor |
| 229.36 | SY Flooring | 207.31 | LF Floor Perimeter |
| 207.31 | LF Ceil. Perimeter | | |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | TOTAL |
|---|---|---|---|---|---|
| 26. Soda blasting - Heavy | 5,173.92 SF | 0.00 | 2.39 | 450.13 | 12,815.80 |
| 27. Seal stud wall for odor control (shellac) | 5,500.00 SF | 0.00 | 0.86 | 137.50 | 4,867.50 |
| 28. Seal underlayment for odor control | 2,064.21 SF | 0.00 | 0.48 | 12.39 | 1,003.21 |
| 29. Clean stud wall | 3,109.70 SF | 0.00 | 0.52 | 6.22 | 1,623.26 |
| Totals: Room1 | | | | 606.24 | 20,309.77 |
| Total: attic walls | | | | **606.24** | **20,309.77** |
| Total: 3305 Dell Rd | | | | **5,367.07** | **187,973.59** |
| **Line Item Totals: GOODRICH_SC** | | | | **5,367.07** | **187,973.59** |

BROOKSTONE

**Brookstone Restoration**

4000 Farr Road
Bessemer, Alabama 35022
Alabama Tax ID: 22-3887129

**Grand Total Areas:**

| | | | | | |
|---|---|---|---|---|---|
| 25,586.16 | SF Walls | 9,541.45 | SF Ceiling | 35,127.61 | SF Walls and Ceiling |
| 9,452.25 | SF Floor | 1,050.25 | SY Flooring | 2,578.20 | LF Floor Perimeter |
| 0.00 | SF Long Wall | 0.00 | SF Short Wall | 2,691.00 | LF Ceil. Perimeter |
| 9,452.25 | Floor Area | 10,196.31 | Total Area | 24,503.66 | Interior Wall Area |
| 23,512.17 | Exterior Wall Area | 1,127.85 | Exterior Perimeter of Walls | | |
| 5,934.46 | Surface Area | 59.34 | Number of Squares | 0.00 | Total Perimeter Length |
| 184.65 | Total Ridge Length | 34.34 | Total Hip Length | | |

BROOKSTONE

**Brookstone Restoration**

4000 Farr Road
Bessemer, Alabama 35022
Alabama Tax ID: 22-3887129

## Summary for Dwelling

| | |
|---|---|
| Line Item Total | 182,606.52 |
| Material Sales Tax | 5,367.07 |
| **Replacement Cost Value** | **$187,973.59** |
| **Net Claim** | **$187,973.59** |

Whitcomb, Rob
Director of Construction

**File Note Title:**Genl Cor - General correspondence
**Create Date:**3/27/2020 7:06 PM
**Author:**ATTACHINGBOT1 EPAM
**File Note Text:**
From: jelliott@chubb.com.
Sent: 03/27/2020 06:46.
To: [US Property Claims uspropertyclaims@Chubb.com].
CC: []
Subject: claim 040519056755 Re: Goodrich Estimates.

Copied body: Brookstone revised square footage for smoke and odor removal

Thank You
[Chubb Logo]

Jeremy Elliott,MBA
Senior General Adjuster, Claims

1400 Urban Center Drive, Suite 450, Vestavia Hills, Alabama 35242, USA
O 205-470-8370 F 205-968-5496
E jelliott@chubb.commailto:jelliott@chubb.com

For more information on your Claim experience with Chubb, visit us here: Chubb Claim Guidancehttps://www2.chubb.com/us-en/claims/report-a-claim.aspx#claims_guidance

[Chubb Insured]

Welcome to Chubb Claims. Life is about to get easier.https://www2.chubb.com/us-en/claims/

I strive to take care of all inquiries and questions directly with you. If you need to speak with my supervisor, please contact Wally Haessig at (214) 460-1779 or via e-mail at whaessig@chubb.commailto:whaessig@chubb.com.

From: Andrew Arrant [mailto:aarrant@brookstonecompanies.com]
Sent: Tuesday, March 17, 2020 4:46 PM
To: Elliott, Jeremy E jelliott@chubb.com
Subject: [EXTERNAL] Re: Goodrich Estimates

Jeremy,

I can move the SF from 57,110.62 sf to 45,688.50 sf to remove the areas down stairs that don't have smoke damage or spray foam insulation. I will send over the revised estimate with that blasting taken out.

Thanks,
Andrew

EXHIBIT 144
WIT: 
DATE: 2-9-23
JULIE BRANDT, RMR, CRR

On Mar 17, 2020, at 2:31 PM, Elliott, Jeremy E jelliott@chubb.commailto:jelliott@chubb.com wrote:

Andrew, why are we soda blasting the entire main level? Soda blasting for fire damage to framing , mold or other items. I agree with second level and attic, but main level and basement should be clean and seal. OF course any fire damage that should be soda blast or replaced in general versus blasting it. I thought TCC was replacing all the charred framing on second level anyway? I would request you update the estimate to reflect these items.

Thank You
[Chubb Logo]

Jeremy Elliott,MBA
Senior General Adjuster, Claims

1400 Urban Center Drive, Suite 450, Vestavia Hills, Alabama 35242, USA
O 205-470-8370 F 205-968-5496
E jelliott@chubb.commailto:jelliott@chubb.com

For more information on your Claim experience with Chubb, visit us here: Chubb Claim Guidancehttps://www2.chubb.com/us-en/claims/report-a-claim.aspx#claims_guidance

[Chubb Insured]

Welcome to Chubb Claims. Life is about to get easier.https://www2.chubb.com/us-en/claims/

I strive to take care of all inquiries and questions directly with you. If you need to speak with my supervisor, please contact Wally Haessig at (214) 460-1779 or via e-mail at whaessig@chubb.commailto:whaessig@chubb.com.

From: Andrew Arrant [mailto:aarrant@brookstonecompanies.com]
Sent: Monday, March 16, 2020 5:21 PM
To: Elliott, Jeremy E jelliott@chubb.commailto:jelliott@chubb.com
Subject: [EXTERNAL] Goodrich Estimates

Jeremy,

Hopefully, you are avoiding all this crazy stuff with coronavirus. We have been pretty busy cleaning schools here in town. Here is the final for the demo and the estimate for the structure clean. The structure clean estimate is based off the protocol written.

Thanks,
Andrew

EXHIBIT 145
WIT: 
DATE: 2-9-23
JULIE BRANDT, RMR, CRR

EXHIBIT 149
WIT:
DATE: 2-9-23
JULIE BRANDT, RMR, CRR

| Room | Description | Original Cost | Replacement Cost | Sales Tax | Shipping/ Freight | TOTAL | Reference | Notes |
|---|---|---|---|---|---|---|---|---|
| Living Room | Knole Sofa * | **$9,290.00** | $12,450.00 | $1,245.00 | $715.00 | $14,410.00 | Iris & Co. Invoice #421 | See Magali Somers Maus' letter regarding upholstered furniture. The Knole sofa is Item #20 in Brookstone Restoration's inventory list. (The bolster pillows are among the items pictured as Item #21.) Chubb may pick up this item from Brookstone once the claim on this item has been paid. |
| Living Room | Fabric for Knole Sofa | **$4,400.00** | $6,300.00 | $630.00 | $160.00 | $7,090.00 | Iris & Co. Invoice #421 | |
| Living Room | Trim for Knole Sofa | **$520.00** | $1,274.00 | $127.40 | $54.00 | $1,455.40 | Iris & Co. Invoice #421 | |
| Living Room | Two Cords for Knole Sofa | **$660.00** | $1,040.00 | $104.00 | $145.00 | $1,289.00 | Iris & Co. Invoice #426 | |
| Living Room | Two Wing Chairs * | **$9,520.00** | $11,500.00 | $1,150.00 | $690.00 | $13,340.00 | Iris & Co. Invoice #421 | See Magali Somers Maus' letter regarding upholstered furniture. One of the wing chairs is Item #19 in Brookstone Restoration's inventory list. The other wing chair is among the items pictured as Item #21. Chubb may pick up these items from Brookstone once the claim on these items has been paid. |
| Living Room | Fabric for Wing Chairs | **$2,502.00** | $7,200.00 | $720.00 | $145.00 | $8,065.00 | Iris & Co. Invoice #421 | |
| Living Room | Fabric for Murphy Bed | | $1,200.00 | $120.00 | $45.00 | $1,365.00 | | |
| Living Room | Labor to Upholster Murphy Bed * ** | | $1,218.00 | $121.80 | $0.00 | $1,339.80 | | See Magali Somers Maus' letter regarding upholstered furniture. The antique Murphy bed is Item #8 in Magali Somers Maus' first proposal and estimate. |
| Living Room | Cost of New Materials for Murphy Bed | | $595.00 | $59.50 | $75.00 | $729.50 | | |
| Living Room | Fabric for Window Treatments | **$17,670.00** | $19,932.20 | $1,993.22 | $86.00 | $22,011.42 | Iris & Co. Invoice #552 | |
| Living Room | Labor to Make Window Treatments * ** *** | **$2,088.00** | $2,401.20 | $240.12 | $0.00 | $2,641.32 | Iris & Co. Invoice #585 | The living room custom window treatments appear to be Item #601 ($150.35) in Enservio's report. |
| Living Room | Cost of Lining and Bump for Window Treatments | **$1,040.00** | $1,196.00 | $119.60 | $0.00 | $1,315.60 | Iris & Co. Invoice #585 | |
| Living Room | Rug * | **$14,800.00** | $35,000.00 | $3,500.00 | $0.00 | $38,500.00 | Turkish Carpets Inc. Receipt | See Paige Albright Orientals' proposal for replacement cost. The Turkish Oushak rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Living Room | Labor to Cut, Deliver, and Install New Rug Pad - 12'9 x 17'3 | | $786.50 | $78.65 | $0.00 | $865.15 | | The rug pad appears to be Item #433 ($135.57) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Living Room | B. Viz Pillow (Blue Velvet) | **$1,550.00** | $3,600.00 | $360.00 | $75.00 | $4,035.00 | Iris & Co. Invoice #111 | The pillow is among the items pictured as Item #21 in Brookstone Restoration's inventory list. This item is lost. |
| Living Room | B. Viz Pillow (Cream Velvet) | **$350.00** | $425.00 | $42.50 | $55.00 | $522.50 | Iris & Co. Invoice #426 | The pillow was cleaned by CRDN, but a strong smoke odor is still present. Additionally, the antique velvet fabric is discolored and damaged. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Sunroom | Fabric for Daybed | **$3,136.00** | $6,530.00 | $653.00 | $65.00 | $7,248.00 | Iris & Co. Invoice #84 | |
| Sunroom | Lining for Daybed | **$54.00** | $275.00 | $27.50 | $0.00 | $302.50 | Iris & Co. Invoice #108 | |
| Sunroom | Labor to Upholster Daybed * ** | | $1,837.00 | $183.70 | $0.00 | $2,020.70 | | See Magali Somers Maus' letter regarding upholstered furniture. The antique daybed is Item #27 in Magali Somers Maus' first proposal and estimate. |
| Sunroom | Cost of Foam, Cotton, and Down for Daybed and Bolster Pillows | | $242.50 | $24.25 | $0.00 | $266.75 | | |
| Sunroom | Labor and Cost to Replace Foam and Cotton on Daybed | | $337.50 | $33.75 | $0.00 | $371.25 | | |
| Sunroom | Labor and Cost to Make Cushion for Daybed | | $1,162.50 | $116.25 | $0.00 | $1,278.75 | | |
| Sunroom | Labor to Make Two Custom Bolster Pillows for Daybed | | $337.50 | $33.75 | $0.00 | $371.25 | | |
| Sunroom | Bell Jar Light Fixture * | **$510.00** | $675.00 | $67.50 | $55.00 | $797.50 | Iris & Co. Invoice #483 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace this light fixtures with a new one--which comes UL-wired--than to go through the process of having this light fixture rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Sunroom | Pair of Sconces * | **$3,400.00** | $3,580.00 | $358.00 | $215.00 | $4,153.00 | Iris & Co. Invoice #421 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace these light fixtures with new ones--which come UL-wired--than to go through the process of having these light fixtures rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Sunroom | Labor to Cut, Deliver, and Install New Rug Pad - 6'2" x 10'0" | | $295.00 | $29.50 | $0.00 | $324.50 | | See payments to Dustin Cox as evidence that custom rug pads were purchased from him. This item is lost. |
| Dining Room | Fabric for Dining Chairs | **$9,480.00** | $10,932.00 | $1,093.20 | $125.00 | $12,150.20 | Iris & Co. Invoice #569 | |
| Dining Room | Backing of Fabric for Dining Chairs | **$850.00** | $918.00 | $91.80 | $250.00 | $1,259.80 | Iris & Co. Invoice #576 | |
| Dining Room | Labor to Upholster Chairs * ** | **$4,820.00** | $6,840.00 | $684.00 | $0.00 | $7,524.00 | Iris & Co. Invoice #585 | See Magali Somers Maus' letter regarding upholstered furniture. The antique dining chairs are Item #31 in Magali Somers Maus' first proposal and estimate. |
| Dining Room | Cost of New Foam for Dining Chairs | | $2,692.00 | $269.20 | $0.00 | $2,961.20 | | |
| Dining Room | Fabric for Window Treatments | **$19,068.00** | $22,196.80 | $2,219.68 | $190.00 | $24,606.48 | Iris & Co. Invoice #552 | |
| Dining Room | Labor to Make Window Treatments * ** *** | **$2,784.00** | $3,065.00 | $306.50 | $0.00 | $3,371.50 | Iris & Co. Invoice #585 | The dining room custom window treatments appear to be Item #600 ($200.47) in Enservio's report. |
| Dining Room | Cost of Lining and Bump for Window Treatments | **$1,390.00** | $1,598.00 | $159.80 | $0.00 | $1,757.80 | Iris & Co. Invoice #585 | |
| Dining Room | Rug * | **$22,000.00** | $18,000.00 | $1,800.00 | $0.00 | $19,800.00 | Paige Albright Orientals Invoice #1957 | The Safira rug was taken by Brookstone Restoration to Asia Rug Company and appears to be Rug #1 ($8,000.00) in Asia Rug Company's appraisal. |
| Dining Room | Labor to Cut, Deliver, and Install New Rug Pad - 12'6" x 14'1" | **$625.00** | $675.00 | $67.50 | $0.00 | $742.50 | Paige Albright Orientals Invoice #1957 | The rug pad appears to be Item #436 ($154.94) in Enservio's report. |
| Kitchen | Fabric for Kitchen Chairs and Mudroom Cushion Cover | **$580.00** | $683.00 | $68.30 | $50.00 | $801.30 | Iris & Co. Invoice #569 | |
| Kitchen | Labor to Upholster Kitchen Chairs * ** | **$1,260.00** | $1,386.00 | $138.60 | $0.00 | $1,524.60 | Iris & Co. Invoice #585 | See Magali Somers Maus' letter regarding upholstered furniture. The antique dining chairs are Item #30 in Magali Somers Maus' first proposal and estimate. |
| Kitchen | Cost of New Foam for Kitchen Chairs | **$465.00** | $511.00 | $51.10 | $0.00 | $562.10 | Iris & Co. Invoice #585 | |
| Kitchen | Labor to Make New Wooden Seats for Kitchen Chairs | | $360.00 | $36.00 | $0.00 | $396.00 | | |
| Kitchen | Labor to Replace Caning on Seats of Kitchen Chairs | | $1,800.00 | $180.00 | $0.00 | $1,980.00 | | |
| Kitchen | Lantern Light Fixture * | **$5,900.00** | $9,390.00 | $939.00 | $325.00 | $10,654.00 | Iris & Co. Invoice #253 | See Magali Somers Maus' letter advising the rewiring of light fixtures. The City of Mountain Brook's Electrical Code requires that all installed light fixtures have Underwriters Laboratories (UL)-certified wiring. It is more cost-effective to replace this light fixture with a new one--which comes UL-wired--than to go through the process of having this light fixture rewired with the necessary UL certification. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Kitchen | Labor to Cut, Serge, Deliver, and Install Two Runners with New Rug Pads | | $1,157.75 | $115.78 | $0.00 | $1,273.53 | | The sisal runners appear to be Item #1066 ($525.36) in Enservio's report. The replacement cost of the sisal is included below. The rug pads appear to be Item #480 ($109.24) in Enservio's report. See payments to Dustin Cox as evidence that custom rug pads were purchased from him. |
| Mudroom | Labor to Make Bench Cushion Cover * ** | **$234.00** | $260.00 | $26.00 | $0.00 | $286.00 | Iris & Co. Invoice #585 | The cushion appears to be Item #487 ($96.69) in Enservio's report. |
| Mudroom | Labor to Make Insert for Bench Cushion | **$140.00** | $160.00 | $16.00 | $0.00 | $176.00 | Iris & Co. Invoice #585 | |
| Mudroom | Rug * | | $5,500.00 | $550.00 | $0.00 | $6,050.00 | | See Claire Drummond's email confirming the purchase of the Oushak rug from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. The rug was cleaned by CRDN, but a strong smoke odor is still present. Chubb may pick up this item from Valet Moving once the claim on this item has been paid. |
| Mudroom | Labor to Cut, Deliver, and Install New Rug Pad - 9'8.5" x 2'4" | | $225.00 | $22.50 | $0.00 | $247.50 | | The rug pad appears to be Item #488 ($61.87) in Enservio's report. |
| Laundry Room | Rug * | | $2,800.00 | $280.00 | $0.00 | $3,080.00 | | See Claire Drummond's email confirming the purchase of the "foyer rug around 5x9" from King's House Oriental Rugs. See Paige Albright Orientals' proposal for replacement cost. This item is lost. |