FILED
2023 Jul-12 PM 04:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

VERITEXT LEGAL SOLUTIONS

Deposition of:

# EUO Alexandra Goodrich

*August 14, 2020*

In the Matter of:

# Goodrich, Alexandra And Charles

Veritext Legal Solutions
800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Policy Number 14945478-0`

Claim Number 040519056755-020

EXAMINATION UNDER OATH OF

ALEXANDRA GOODRICH

TAKEN BY REMOTE VIDEOCONFERENCE

August 14, 2020

11:21 a.m.

San Marcos, Texas

Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138

APPEARANCES OF COUNSEL:

On behalf of the Insured:

CHARLES A. DAUPHIN, ESQ. (via Zoom)
Dauphin & Paris
300 Vestavia Parkway
Suite 3400
Vestavia Hills, Alabama 35216

On behalf of Pacific Indemnity Company:

ALYCEN A. MOSS, ESQ. (via Zoom)
Cozen O'Connor
Promenade
1230 Peachtree Street NE
Suite 400
Atlanta, Georgia 30309

Also Present: Jeremy Elliott (via Zoom)

MS. MOSS: This will be the examination under oath of Alexandra Goodrich taken by Pacific Indemnity Company with regard to Claim Number 04051020, pursuant to Policy Number 14945478-01.

Robyn, can you go ahead and swear her in.

ALEXANDRA GOODRICH,

having been first duly sworn, was examined and testified as follows:

MR. DAUPHIN: Alycen, before you get started, do you have any objections to providing us a copy of the transcript?

MS. MOSS: I think you need to order it from Veritext, but I certainly don't have any issue with you ordering it.

MR. DAUPHIN: No, I don't have any problem ordering it. Some people say the person being examined doesn't get a copy of it, so that's fine then.

MS. MOSS: Oh, no, y'all are more than welcome to it.

MR. DAUPHIN: We're good to go.

EXAMINATION

BY MS. MOSS:

Q Are you okay if I call you Ali?

A Uh-huh.

Q Your insurance contract with Pacific Indemnity Insurance Company gives us the right to take this examination under oath. The examination is the company's chance to really sit down with you and ask you some questions about the facts and circumstances surrounding the claim, and for you to tell us what's going on with it.

You have been sworn to tell the truth here today, and so it's important that you do so because the company is going to rely on what you say when considering your claim.

I want to be clear that this is a voluntary process, no subpoena has been issued to compel your attendance here, nor is the case in litigation.

Have you ever had your deposition taken or had to sit for an examination under oath or anything like this before?

A I don't believe so.

Q I want to go over a few ground rules here. My purpose here today is to ask you some questions about this claim. I don't want to ask you a question -- I'm not asking you questions to trick you or make you say something that you don't mean to say. So if I ask you a question and you don't

understand it or doesn't make sense to you, please make sure that you ask me to repeat it. If you do answer a question, I'm going to assume you understood. Is that fair?

A Yes.

MR. DAUPHIN: No, it's not. I object to you assuming that she understands the question just because she answers it. Go ahead.

MS. MOSS: Well, I asked her to tell me if she doesn't understand it. So if she answers it, I've got to assume that she understood it.

MR. DAUPHIN: Well, a lot of times, I don't think it's going to come up, but there have been circumstances where the person asking the question and the person answering it believe there are two different matters, now. So it's not automatic that simply because she answers it that it's an assumption this that she understood it. In all likelihood she will, and I don't think that's going to be an issue, but this comes up, and I always object, and we always go through this, but go ahead.

MS. MOSS: Okay. Well, Chuck, if I ask a question that you think Ali does not understand for some reason, you let me know. Okay?

MR. DAUPHIN: If I -- if I can perceive that I certainly will, but...

BY MS. MOSS:

Q And we are doing this deposition -- excuse me, this examination under oath virtually, so we're doing it under Zoom. If for some reason you don't hear a question or it comes out broken or something like that, definitely let me know that so that I can repeat it or rephrase it for you. Of course, if you are tired or need to take a break for any reason, just let me know that.

With all of that being said, let's get started. I hope we're going to move pretty quickly. You do have the notebook that I sent you, right?

A Right.

Q Okay. And we'll refer to that throughout.

Tell me your name for the record, please.

A Alexandra Goodrich.

Q And is your middle -- maiden name Dauphin?

A Yes.

Q And Mr. Dauphin, who is your lawyer, is also your father, right?

A Yes.

Q Tell me your date of birth.

A 10/21/81.

Q And what's your present address?
A Where I am right now?
Q Well, no, where you're currently living.
A 3770 Wimbleton Drive, and that's Mountain Brook, Alabama 35223.
Q And you're renting that house, right?
A Yes.
Q What's your marital status?
A I am married.
Q To Charles Goodrich?
A Charles Goodrich.
Q And how many children do you guys have?
A Three.
Q How old are your kids?
A 12, nine, and five.
Q What is your highest educational level?
A I have a bachelor's degree.
Q And where did you go to college?
A Birmingham Southern College.
Q And you don't have any post-college education? Have you gone to graduate school or anything like that after college?
A Yes. Yes. I don't have a degree, but I did go to law school for two years.
Q Okay. You decided not to enter the

profession, I guess?
A You know, I had a baby and would rather be with her than finish law school.
Q Other than minor traffic offenses, have you ever been arrested or had any trouble with the law?
A No.
Q Are you presently employed?
A I am not.
Q When is the last time you worked?
A 2007.
Q Is that when you had your first baby?
A It would have been 2006 or 2007, yes. I had my first child in January of 2008, so...
Q And what did you do in that last job?
A It would have been a summer clerk position.
Q For a judge in Alabama?
A For my dad.
Q For your dad.
When you went to law school, where did you go?
A Alabama. University of Alabama.
Q Other than working for your dad, have you had any other jobs?

A Uh-huh.
Q What was the most recent that you had?
A Before -- before clerking at my dad's firm?
Q Yes.
A I was a legal assistant at Bradley. I think it's just Bradley now.
Q That's a law firm?
A Uh-huh.
Q And is that the type of job that you've always had some sort of legal assistant or summer clerkship in law firms?
A I've had various jobs since I was 15 or 16.
Q Okay.
A But --
Q But as an adult as you were older?
A As an adult, yeah, I interned for Oxmoor House, and then started doing legal work.
Q Okay. Do you own any businesses?
A Yes.
Q What businesses do you own?
A I have a couple of LLCs that are in my name, and then Charles -- Charles does investments, so a large portfolio of businesses.

Q Okay. What are the LLCs that are in your name?
A One is Parkinson & Goodrich, LLC. I have 50 percent of that, and my partner is the other 50 percent. I also have Sweet Home Stables, LLC is in my name.
Q Okay. Parkinson, is it P-A-R-K-I-N-S-O-N?
A Uh-huh.
Q Okay. And you own 50 percent of that?
A Yes.
Q Who is your partner?
A Mark Parkinson.
Q And what kind of business is that?
A We breed and raise Thoroughbred horses.
Q And does that business make any money?
A Varies from year to year.
Q It does provide -- it provides some income to you?
A I would have to look at the tax returns. I'm not positive. Not every year, no.
Q Okay. What about Sweet Home Stables, are you the hundred percent owner of that?
A Uh-huh.
Q You've got to verbally answer me.
A I'm sorry. Yes.

Q I probably should have said that in the beginning just to make sure that you verbally answer me so that Robyn can take it all down and not nod your head or say uh-huh or huh-uh so we get an accurate record.

Tell me what Sweet Home Stables does.

A The same, I breed and raise Thoroughbred racehorses.

Q Are you personally racing them or you hire people to race them or you have jockeys to race them?

A Right, we have jockeys and trainers. I own them.

Q Okay. So I understand that your address at the time of this loss was 3305 Dell Road; is that correct?

A Yes.

Q Is the city Mountain Brook or Birmingham?

A Mountain Brook.

Q And who lived at that address at the time of the loss?

A Charles and I did with our three children.

Q And that is a single-family home, correct?

A Correct.

Q When was it built?

A Finished in 2019.
Q When in 2019?
A June 17th, I believe. Mid June. I believe we moved in on the 17th.
Q Okay. And when did y'all start building that house?
A November 2017.
Q Other than the house on Dell Road, do you own any other property?
A Yes. Charles will probably be able to elaborate better.
Q Okay. Do you have any personal knowledge in property you guys own?
A Do I what?
Q Do you have personal knowledge with regard to the property that you own?
A I know that we own some land in Greene County in Boligee. Just not sure how much.
Q Okay. Other than that, is there any other property that you know of that you own?
A No.
Q Do you know anything about Charles' businesses that he owns?
A I would have to ask about them.
Q That's fine. I just didn't know if you

knew anything specifically.
Have you ever been involved in any kind of lawsuit?
A I don't believe so.
Q You seemed to hesitate as you're answering that question, which makes me wonder if there was something you were involved in that you're trying to decide whether --
A That's not it at all.
MR. DAUPHIN: My impression was she was just trying to --
THE WITNESS: Be thorough.
MR. DAUPHIN: -- situations. Go ahead.
THE WITNESS: You know how you get those class action things in the mail like when your car is --
BY MS. MOSS:
Q Yes. Yes.
A I was -- that's what I was thinking about. I wasn't --
Q Okay.
A That's what went through my mind.
Q Okay. So other than something like that, you personally have not sued anybody else or been sued by someone?

A No.
Q Okay. And I understand that --
A Let me say not that I am aware of. I don't know -- I don't know about the businesses. I don't know if there is any, but I personally do not think I've been sued.
Q Okay. I want to go ahead and start talking with you about the claim that you have filed with Pacific, and it relates to a fire that occurred on November 18th, 2019; is that right?
A Yes.
Q And the damage was to your home located at 3305 Dell Road, Mountain Brook, Alabama, correct?
A Yes.
Q Tell me what happened with that fire.
A I believe our housekeeper draped one of my daughter's curtain panels over a sconce while she was cleaning, and it caught fire, the panel did, and then the house burned.
Q Was there some issue or some questions as to whether you had draped it over the sconce or whether the housekeeper draped it over the sconce?
A No. The housekeeper told the -- one of the firemen that that's what had happened.
Q Okay. Is there any possibility that you

Page 15

personally could have draped it over the sconce?
A No.
Q Were y'all at the house when the fire started?
A No.
Q And where were you?
A In the car.
Q Had you been somewhere?
A I was headed somewhere. I just left the house.
Q Where were you going?
A Maybe 15 minutes. I was going to the Finley Center.
Q Is that in Birmingham?
A It's in Hoover.
Q I guess you were going maybe for some sort of sports thing?
A I was taking a load of Junior League gift shop items to set up for the Junior League Market Noel --
Q Okay.
A -- that was held.
Q And you had been gone for 15 minutes?
A Yes, about.
Q And how did you hear about the fire?

A The head housekeeper called me, and ADT at the same time was beeping in.
Q I guess you turned around and went home?
A Yes. Yes.
Q So how -- you were home 30 minutes after it started then it sounds like.
A Yes.
Q What did you see -- yes. What did you see when you got there?
A There were still some flames coming out of the second story, but the firemen were on the site and had the hoses and had started putting out the fire.
Q Was Charles with you?
A He arrived -- I can't remember if it was just before or just after, but we came separately.
Q Okay. I want to pull out this notebook that I've sent to you. Had you reviewed this notebook before opening it up right now?
A Just a cursory glance through it.
Q Did you go over it with your dad at all?
A No.
Q Are there any specific documents that you reviewed before right now?
A No, I didn't review anything.

Q Okay. You just looked through it?
A Yeah, exactly.
Q If you will, turn to tab number 1 in that notebook.
MR. DAUPHIN: I was just going at that say we didn't get it until five minutes before we started this.
MS. MOSS: Y'all just got that notebook? I sent it two days ago. Wow. Good. Then I'm glad you got it then.
BY MS. MOSS:
Q Are you at tab 1 with me?
A Yes.
Q Okay. If you look at this, this is a copy of the policy. Do you see that?
A Yes.
Q If you turn past the first cover page to the second page, we can see that the house was insured under a Masterpiece policy that was issued by Pacific Indemnity Company.
A Yes.
Q Do you see that?
A Yes.
Q And the policy number is listed there?
A Yes.

Q Right?
A Yes.
Q Do you see that the policy period is June 18th, 2019, to June 18th, 2020?
A Yes.
Q And it's issued to you and your husband, Charles Goodrich?
A Yes.
Q Have you ever reviewed this policy before?
A Yes.
Q You have. When have you reviewed it?
A A ton of times since the fire.
Q What in particular have you been reviewing it for? Like, what are you looking at when you're reviewing?
A I have looked at -- I've read a lot about the reconstruction and the contents and the additional living and the landscaping primarily.
Q Are you reviewing that with your dad or with your husband or just completely on your own?
A All of those.
Q Have you ever discussed the coverages available under the policy with anyone else, such as a broker or an agent or anybody like that?
A I'm sure we have.

Q And who would those people be?
A I'm sure that Charles has discussed it with Joni, our agent.
Q I'm asking about you in particular.
A I do not recall. I know I've e-mailed Joni about some things, but I don't recall exactly what it was.
Q Okay. I want to -- this is kind of hard to do in a situation like this, but about I'd say 20 pages in or so there is a page that says Masterpiece. I'm going to show you if you can see it. It says Masterpiece up here, and it has Alabama Outline of Coverages and Comprehensive Policy Coverage Checklist.
A Can you pull the sheet up a little bit more, please, so I can see the Alabama part? Okay. Give me one second.
Q It's 17 pages in exactly. So you're going to pass the premium summary part, which is four pages, and pass the premium discount summary.
A I've got it. Alabama Outline of Coverage?
Q Yes. Okay. So if you turn to the next page, you'll see the coverages under the policy. Do you see that?
A Yes.

Q Okay. House coverage, the amount of coverage is $3 million, correct?
A Yes.
Q And the payment basis is on an extended replacement cost, correct?
A Yes.
Q We'll look at this policy language later, but while I've got this all in one place, I want to go over it with you.
For other permanent structures, the amount of coverage is 600, and that payment basis is also extended replacement cost, right?
A Yes.
Q Contents coverage is in the amount of $1,500,000, and the payment base is replacement cost, right?
A Yes.
Q And there is a $5,000 deductible, correct?
A Yes.
Q Okay.
MR. DAUPHIN: (Inaudible.)
MS. MOSS: What?
THE REPORTER: I can't hear Mr. Dauphin whenever he's speaking. So if it's for the record, Mr. Dauphin -- I don't know. We need to resolve

that.

MR. DAUPHIN: I'll speak up louder. How's that?

THE REPORTER: That sounds better.

MR. DAUPHIN: There's a cost of living...(inaudible).

MS. MOSS: I can't hear you either.

MR. DAUPHIN: There's a cost of living increase on the contents coverage.

MS. MOSS: This is not your examination under oath, this is Ali's, so I need for her to answer the question.

MR. DAUPHIN: Well I'm going to have to object to you asking her about what questions there are on the policy when she hadn't read the entire policy, and you omit portions that are covered.

So, you know, we can all come to an understanding what the policy is, or I'll object to her answering anything about the terms of the policy itself because they speak for themselves.

MS. MOSS: Well, she's telling me that she has reviewed the policy, she has the policy in front of her, she's more than capable of reading along with me and going over the terms of the policy. At the end of the day it says what it says. I'm trying

to make sure that I understand what her understanding is.

We don't need to spend a lot of time going back and forth on this. My point is that I need her to testify here and not you.

MR. DAUPHIN: I know, but when you omit coverages in the policy after you've asked her a question about them, I'm certainly entitled to clarify that.

MS. MOSS: Chuck, the policy says what it says. All I'm trying to understand is what her understanding of the policy says. She just told me that she has read through the policy and specific provisions. The policy is not going -- the coverage under the policy is not going to be changed because of what she testifies to. It is what it is.

MR. DAUPHIN: Certainly, so her understanding of the policy is pretty irrelevant, but I'm letting you go through that with her even though her understanding has really nothing to do with this claim itself. But if you omit things in her -- and all I'm doing is trying to fill in the holes that you've left out. We can go ahead and do that on a step-by-step basis, and we'll see where we go.

MS. MOSS: All right. Well, let's try to refrain from the speaking objections.

MR. DAUPHIN: Well, if you don't miss anything in the policy, I won't.

BY MS. MOSS:

Q Am I correct that the deductible was $5,000?

MR. DAUPHIN: Well, that's because the policy -- it's in the policy that it's $5,000, you're correct. If it's not in the policy, you're incorrect. I don't know how to say it other than that.

MS. MOSS: Chuck, I am asking Ali these questions. Let her answer the questions and quit trying to answer for her.

MR. DAUPHIN: I didn't answer for her, but this is about her loss and what she has suffered for the loss, and that's why she's here. She's not here to interpret the policy. Let's go ahead.

BY MS. MOSS:

Q Can you answer my question?

A On this page it says the deductible is $5,000.

Q Thank you.

So after the fire you guys reported this

claim to Pacific on the same day, right?
A Yes.
Q And did you call or did Charles call?
A I believe Charles called.
Q Have you had any calls with anybody at Pacific?
A I don't believe so. I mean, Jeremy is Chubb. Is Jeremy Pacific?
Q Chubb. Have you had calls with anybody at Chubb or Pacific?
A Jeremy at Chubb.
Q Okay. All right. Anyone else other than Jeremy?
A I don't believe so.
Q And can you remember the content of any of those calls?
A Some of them.
Q Tell me about what you remember.
A Give me one second. I'm going to see what my dad -- hold on one second.
Q Wait. Hold on. You need to answer my question before you speak with your dad.
MR. DAUPHIN: Answer the question before you speak with me.
BY MS. MOSS:

Q There is a pending question. If you need to take a break, then we can do it after you answer the question, but I need you to answer my question without consulting with your father.

A You want the detail of the conversations that I've had with Jeremy?

Q Yeah, I want you to tell me what you remember about conversations that you've had with him. Is it a ton of conversations, is it two conversations?

A Over the -- I'm sorry, are we talking about over the phone?

Q Any conversations you guys have had. Let's start with the phone. How many conversations have you had with him over the phone?

A I would just say a couple. A handful at most.

Q And what were those conversations about?

A One of them was about additional living expenses in particular.

Q Okay. What about?

A I asked basically, you know, what parameters there were. He said there were none. I asked him specifically about the additional living furniture that I wanted to order. I had looked at

some places, and they did not have much in stock, and so I asked him specifically about whether I could order from Restoration Hardware, he said yes, but it is a more permanent type of furniture, so when I no longer needed it, he would either deduct it from our contents or just come pick it up; it would be that simple.

Q And you did ultimately order that furniture from Restoration Hardware, right?

A Yes.

Q And you were paid for that furniture?

A Yes.

Q Okay. Any other conversations that you can remember?

A We had a conversation the day before Thanksgiving. If I can recall it was just about -- I was getting ready to order furniture, and I just had some questions about additional living.

Q Any other conversations that you can remember with him?

A Those are the only phone conversations that I can recall at the moment. We had some conversations at Dell Road early on.

Q And what were the conversations at Dell Road?

A We had a big meeting on December 13th to kind of assess the situation, and the big takeaway from that meeting was that we would take the interior of the house down to the studs.
Q Okay. Anything else you remember about that conversation?
A I mean, there were some disagreements about things, but that was the takeaway. That was the important part.
Q What were the disagreements?
A I can't even remember the details. I just remember it was a very contentious meeting. When I got there, he had already gotten into a verbal altercation with my builder and the project manager.
Q Do you know what that was about?
A I don't. I don't recall. I was very confused.
Q Who was the builder that he got -- when you say "he," who is "he"?
A Jeremy had a verbal altercation with Marbury McCullogh, our builder, and Bradley Moncrief, who was our project manager.
Q How did you know that happened?
A They were still picking at each other when I got there.

Q But you don't really have any idea what that was about?
A I don't remember. I really don't. It was bizarre, and other people started arriving, so we just moved on.
Q What do you mean it was bizarre?
A I mean, they had just met, and they were in my drive having a fight.
Q Like, not a physical fight?
A Verbal. Verbal.
Q Okay.
A It was bizarre.
Q Did you ever talk with the builder or the project manager to say, hey, what were you guys talking about?
A Yes. I don't recall what it was, though.
Q Okay. That was December 13, 2019?
A Yes.
Q Okay. Any other conversations that you had in person with Jeremy?
A We had some meetings at the house that -- beyond that December meeting. I don't recall the last one off the top of my head. I do recall him telling me that I just want a new house.
Q I don't understand what you mean by that.

A Just that I don't think he liked that we were -- we had agreed to gut the house, and he said -- he said we're both emotional people, and he also said that I just clearly wanted a new house.

Q Is that what you wanted? You wanted to take the house down to the studs I'm assuming, and you wanted it to be completely rebuilt, right?

A Yes, because of the extensive smoke damage and fire damage. I had a brand new house.

Q Any other conversations that you can remember with him?

A No. Shortly after -- after that we got into some contents discussions over e-mail, and I ended my contact with him.

Q Why was that?

A I'm sorry?

Q Why was that?

A Why was that?

Q Was there a reason you -- was there a reason you ended your contact with him?

A Yes.

Q Why?

A He was disrespectful, we were making no progress, and I realized it was time to get a lawyer involved.

Q Is that when you got your dad involved?
A He was involved before that, but that is when I told my dad that I was no longer going to communicate with Jeremy, and all communications would go through my dad.
Q And when was that?
A I don't know off the top of my head, I'm sorry. I'm going to guess January or early February.
Q Of this year?
A Yes, of 2020.
Q Okay. Any other conversations that you can remember --
A No.
Q -- whether on the phone, in person, via e-mail, anything like that?
A Not at the moment.
Q When I first asked you the question, you were wanting to consult with your dad about it. Why were you wanting to talk to him before you answered my question?
MR. DAUPHIN: Don't answer that. That gets into the attorney-client privilege.
MS. MOSS: Well, I'm not asking her about a conversation with you, I'm asking her about why

she needed to consult with you -- why she felt she wanted to talk to you before answering that question.

MR. DAUPHIN: I think that's covered by the privilege if you're just thinking about a lawyer and her mental operations on that, so I'm going to instruct her not to answer. If you give me some law on that we'll sit again. We'll put her on the phone with you.

BY MS. MOSS:

Q What was the specific damage to your house?

A The specific damage the upstairs there was a lot of charring, a lot of smoke damage, lot of heat damage from the fire. Downstairs there was smoke damage, less heat damage, more water damage down there. There was water damage upstairs as well, but that was secondary to the fire damage. And in the basement there was a lot of water damage, and there was heavy smoke smell. There was a lot of -- the particulates ended up down there as well. And mold set in, and so mold became a huge problem.

Q Throughout the house or just in the basement?

A Throughout the house. It was a good bit

the damage to the exterior, especially in the front, but there has been smoke odors everywhere all over the house.

Q And it's my understanding Brookstone Restoration initially came out, and they did an emergency board-up of the house, right?

A Yes.

Q And they also did a pack-out of a lot of the contents?

A Yes.

Q And initially -- go ahead, I'm sorry. What?

A Just some of the contents. I don't know if it was most.

Q Where did you go on the night of the fire to spend the night on November 18, 2019?

A To my in-laws' house on Dell Road as well.

Q What are their names?

A Mike and Jillian Goodrich.

Q How long did you stay with them?

A We stayed with them until December when we moved into our first rental.

Q Is that the house on Fairway Drive?

A Yes.

Q How did you come to find that house?

A We have a real estate agent friend. And I'll add that we stayed with them intermittently during -- we stayed with my in-laws intermittently during the time that we were at Fairway because it had issues.
Q Who is the real estate agent that found Fairway for you?
A Kelly Caine.
Q K or C? Kelly --
A Kelly with a K, Caine with a C.
Q C-A-I-N-E?
A Yes. There may not be an E. I can never remember.
Q Okay. When Kelly first found this house for you, did it seem to be satisfactory?
A Yell. I'll say somebody was living there, so I assumed it was satisfactory.
Q When did that person move out?
A End of November.
Q You saw the house at some point in November?
A Yes.
Q When you saw the house, was there any issues that you thought you would immediately need to address upon moving in?

A No.
Q I understand you did paint when you moved in, right?
A Yes.
Q Why did you paint?
A The house was gross, and we paint every house that we move into.
Q Did you ask the landlord to paint it?
A Did I ask him to or --
Q Yeah.
A No, I did not.
Q Any house that you've moved into before, you obviously bear that expense yourself?
A Yes.
Q Have you ever asked a landlord to paint for you?
A No.
Q Why was it necessary for you to paint?
A It was an old house, and it was not maintained.
Q Did you not see that when you first walked through it?
A No. They had -- the people that were renting it had a lot of things that they were -- there was artwork on the wall, entire rooms were

closets, so I just kind of -- I knew it was an older house, of course, but I didn't pay attention to those details. There just aren't a lot of rentals in Mountain Brook.

Q You ultimately moved out of that house, right?

A Yes.

Q And what made you move out?

A In particular, the plumbing was not adequate. One of the bathtubs didn't even work. We couldn't operate the sink. The house did not have a locking back door, which was not something that I thought to check when I was there. The owner just had, like, a painter's cloth around it to keep it locked, and he declined to fix that himself. He said that was fine, just tying it up was fine. And we tried to have that lock replaced ourselves, but they don't make the lock. They couldn't order the parts, it was outdated. There was mold everywhere. We tried to clean the floors and paint over it, and it just -- it was still there and -- and outside. It was not up to code to the electrical code, and I thought that was pretty dangerous for the girls.

Q When did you realize that it wasn't up to electrical code?

A When the electricians came out there, they pointed it out.
Q And when did they come out?
A It would have been the day or the day after we moved in.
Q When did you realize all the issues with the plumbing?
A It kind of unfolded over -- over the month.
Q When did you paint?
A We painted before we moved in.
Q Anything else that you did to the house?
A We had the floor sanitized.
Q What does that mean?
A It means that Mountain View Chem-Dry came in and deep cleaned and did a sanitizing treatment on all of the floors.
Q Did I read that you hung some curtains or something as well?
A Yes. I'm sorry, yes.
Q Tell me about that.
A Well, it -- we needed window treatments for privacy. It sits up on a hill, and you can see straight through.
Q When did you put those up?

A I believe that would be sometime in December.
Q After you moved in?
A Yes.
Q And TVs?
A Yes. What about them? We got them.
Q Okay. Just tell me about that.
A We got some TVs, and we had our usual AV company come and install. They usually meet with the cable, Internet, TV provider and set it up on one system. I'm not going to be good with these technical terms, but just what we usually do.
Q And when did they come to do the TV install?
A It may have been the day we moved in. It may have been right after. I can't recall exactly. If you need me to look this stuff up, I can.
Q No, I'm just asking what you can remember as we're sitting here today.
So why did you -- if you moved into the house, you knew it was gross, you knew that it was not up to electrical code, why did you guys go ahead and put up these window treatments and buy TVs and put up TVs and all that sort of thing in this house?
A We had to live somewhere.

Q But, I mean, it sounds like -- if it's not up to electrical code, and you guys knew that a day or two after you moved in, I'm assuming that you would not have wanted to stay there with your family.

A No, but there -- like I said before, there aren't a lot of rentals in Mountain Brook, Alabama, so we didn't have anywhere to go. That's why we stayed with the Goodriches intermittently.

Q But you knew, I'm assuming, that as soon as you found something else you were moving out of that house?

A Yes.

Q So why spend the money and take the time to put up TVs and window treatments and all that sort of thing in this house you knew you were going to leave?

A Well, I had already ordered the window treatments, and I just usually alter window treatments to fit whatever house I'm in. And as far as the TV, we were going to need a TV wherever we lived. But --

Q But -- go ahead. Sorry.

MR. DAUPHIN: Go ahead.

THE WITNESS: Did you have a question?

MR. DAUPHIN: Finish your answer.
BY MS. MOSS:
Q I was going to say did you move the window treatments and TVs from the Fairway house to the house you're in now?
A Yes.
Q So how long were y'all in that Fairway Drive house?
A They let us out of our lease as of January 31st.
Q So you basically lived there, what, about --
A Two months.
Q Two months?
A Yeah.
Q And how did it come to be that you found another rental home that was more suitable?
A My dad bought a home.
Q And did he buy that specifically for you guys to live in?
A Yes, although he's going to keep it as a rental house, so...
Q How did it come to be that he decided to buy this house?
A This particular house?

Q Yes.
A He picked it.
Q Did you help him pick it at all?
A No.
Q Did you go over there to see if it was suitable to live in?
A Yes.
Q And what did you think when you saw it?
A Suitable to live in. The plumbing worked. He had an inspection done, so before he bought it, of course, so we knew that things were in working order.
Q But that house also needed to be painted?
A Yes. We paint every house that we live in, and we paint them in the same colors. It's part of making it feel like home and, you know, giving us and particularly the girls some comfort. It's just what we've always done. We paint every house the same colors.
Q Did you talk to your dad, who at this point is also your landlord, about paying to paint the house?
A Did I ask my dad to paint it, is that what you're asking?
Q Yes.

A No, we did not.
Q All right. And you said you used the same window treatments in Wimbleton that you used in Fairway Drive, right?
A Yes, they had just been altered to fit the windows at Wimbleton.
Q Will those window treatments also be used at Dell Road?
A No.
Q What about the TVs? You used the same TVs in Wimbleton that you had bought at Fairway, correct?
A Correct.
Q And will those TVs be used at Dell Road?
A I'm not sure. I know that some of them will not. They're not the same size -- sizes and -- that we had at Dell, so those would not be replacements, and the others I just haven't delved into it enough yet.
Q Why can the window treatments not be used at Dell Road?
A Well, we had custom window treatments at Dell Road, and the ceilings are much taller, but mostly because we had custom treatments at Dell Road. These are not custom. They're not the same

quality of fabric or workmanship. Even though they've been altered, it's not the same workmanship and quality.

Q So did you just buy these window treatments off the rack at whatever store?

A Restoration Hardware.

Q Then you had them altered?

A I did not alter them for Fairway, but I did alter them for Wimbleton. Some of them.

Q And when you leave Wimbleton, do you plan to leave those window treatments there?

A No.

Q What are you going to do with them?

A They'll go back -- they'll go to Chubb because they're additional living.

Q You would agree with me that Chubb has paid a little bit over $2 million on this claim, right?

A Let me -- let me think for a second about what I know they've paid out.

Q Let me ask it this way, then, to help you: It looks like that there have been payments totaling $298,642 on contents, and those payments either went to you directly or to vendors.

A Is that including the Brookstone payment?

Q The what?
A The Brookstone payment, the most recent one?
Q How recent was that? I think it includes everything to date.
A That one was contested, and I certainly --
Q The 47,000?
A Yes.
Q That does not include that 47,000.
A Okay.
Q So does that sound right, $298,642 on contents either to you or vendors?
A I'm not sure. I would have to look at my spreadsheet.
Q And do you understand payments totaling $15,000 have been made under the dwelling mold coverage allotment?
A Yes.
Q And there have been payments totaling $147,633 under the debris removal feature?
A Yes. I haven't looked at that recently, so I don't recall.
Q And payments totaling $116,800 for additional living expenses?
A I haven't looked at my spreadsheet

recently, so I don't recall.
Q And what about -- for the dwelling, I have that there have been payments issued totaling $1,438 -- 1.4 million approximately on the dwelling?
A Yes.
Q So when I total that all up, it looks like Pacific has paid a little over $2 million on this claim.
A Okay.
Q That sound right? I'm not holding you to it. What we paid is what we paid. I'm just asking to make sure you and I have the same understanding what's been paid on the claim.
A Okay.
Q Does that sound about right to you?
A Yes. I didn't add it up.
Q Okay. Have they started rebuilding the house?
A Yes.
Q Your plan is to tear down to the studs and completely rebuild, correct?
A We tore the house down. We demolished the house. There's no studs.
Q When did they start the rebuild?
A They started framing either last week or

this week. It was either Friday or Monday.

Q Why did they just now start the framing?

A Just trying to get everybody lined up and ready to go. The framers were on another job.

Q Are you building the exact same house?

A More or less. The footprint is the same.

Q What is different?

A It's tiny things. Little things like the girls' knobs aren't being manufactured anymore, the knobs that were on their cabinets, so we'll have to switch those out, but for all intents and purposes it's the exact same house.

Q I'm asking more from an architectural standpoint, did you have to go back to the architect and ask him to redraw any plans or are you using the original plans?

A We're using the original footprint. We moved a door. The kitchen is going -- the pantry is going to open in the kitchen instead of the hallway, but that's -- I mean, that was a five-minute redraw.

Q Anything else that you changed on the plans?

A I'm thinking. Oh, yes, we moved the toilets in the master.

Q Why? You just didn't like where it was

after you moved in?
A We have a shower that opens in between the his-and-hers, and our toilets, like, sat there where we could see each other.
Q Okay. Anything else?
A No. No, I can't think of anything else that we changed. No.
Q Okay. Do you have the notebook in front of you still?
A Yes.
Q All right. Is it still open to that same coverage summary page?
A Yes.
Q Okay. Turn -- looks like maybe five or six pages past that on the top says Masterpiece Select House Coverage. The bottom -- this is what it looks like, and then the bottom says B1, if you can see that, page B1.
A Okay. Yes.
Q Okay. You with me?
A Yes.
Q So turn to page B2. And if you remember earlier we talked about the fact that the dwelling was insured under the extended replacement cost, right?

A Yes.
Q And page B2 here talks about the payment basis. Do you see that?
A Yes.
Q Okay. Sorry.
MR. DAUPHIN: Can we take a five-minute break?
MS. MOSS: Sure. We can take a five-minute break.
MR. DAUPHIN: Whenever it's convenient.
MS. MOSS: Let me finish this question, then we'll take a break.
BY MS. MOSS:
Q So looking at the payment basis, is this a section that you have looked at previously?
A Yes.
Q Okay. And is -- looking at the extended replacement cost -- which is your payment basis, right?
A Yes.
Q -- it says: If the payment basis is extended replacement cost, we will pay the reconstruction cost.
Do you see that?
A Yes.

Q Then if you look back up at reconstruction cost, it says it means: The lesser of the amount required at the time of loss to repair, replace or rebuild at the same location your house or any other permanent structure using like design and materials and workmanship of comparable kind and quality.
Correct?
A Yes.
Q So you understand that that is the coverage that is provided under this policy for the dwelling, right?
A Yes.
Q Okay.
MS. MOSS: Why don't we take a quick break.
(Recess 12:27-12:39 p.m.)
BY MS. MOSS:
Q We're back on the record. You understand that you are still under oath, correct?
A Yes.
Q So our next tab is tab number 2, and that is an estimate from TCC for the demo and repair work. Do you see that?
A Yes.
Q Do you recall when this estimate was

submitted?
A I do not.
Q And then if you turn to the next page, it's the reconstruction estimate for the entire house, I believe, that's dated 2/12/20, correct?
A Yes, it is dated 2/12.
Q And is this estimate to completely tear down and demolish the house and rebuild it?
A No.
Q What is this for?
A This is a reconstruction estimate from -- it's taking it down to the studs and building it back.
Q So why is it -- if this estimate was provided to you guys in February of 2020, why is it that they are just now doing any work this week?
A We never made any progress towards remediation.
Q What exactly did you need to remediate if you were planning to tear the house down?
A We weren't planning to tear the house down in February when this was submitted.
Q Well, you were planning to take it down to the studs, correct?
A Yes.

Q So what needed to be remediated from that standpoint?

A All of the mold, and all of the -- okay. So we needed to remediate the mold, we needed to get rid of the spray foam, and we needed to get rid of the smoke damage and odor, and there was not a single area of the interior that did not have at least one of those things.

Q So why was that work never done? That seems like if that's what you were waiting to do, why was that not done after the February 2020 estimate?

A Because we -- we had an agreed-upon scope of remediation that the company we had chosen initially, Brookstone, had been our expert, Cliff, Cliff Zlotnik, his protocol, and we agreed upon scope of remediation and discovered through e-mails that Andrew from Brookstone forwarded us that Jeremy had deceptively scaled back the scope of remediation.

So we had to fire Brookstone, and we then hired -- not hire, we asked Slade Remediation -- excuse me, Slade, LLC to provide a quote for remediation using Cliff Zlotnik's protocol, and we submitted that.

So we fired Brookstone in March, and we submitted Slade's proposal in April. Jeremy said that he would look at it, and that he would get another vendor to bid -- to provide a comparative quote. So that was JS Held, and he said he would forward the quote. He never forwarded the quote.

He then asked if Paul Davis could have access to the house -- this was late April -- to provide a comparative quote, and we said yes, and they accessed the house.

And six weeks went by, and we never had any comparative quote to look at, and they never accepted our proposal from Slade, and by June 1st you had said that Pacific was not going to pay additional living expenses into 2020, and something had to be done.

Q What do you mean something had to be done?

A We had to move forward on the house.

Q What does additional living expenses have to do with moving forward on the house?

A If they're not going to pay additional living in 2021, then how -- how are we supposed to -- are we supposed to just wait forever for Pacific to negotiate or get back to us on the remediation costs? It was never approved, the

remediation cost, or the scope.
Q But I'm confused because I thought you told me that the plan was to rebuild this house, that you are rebuilding this house, so why is it that you needed to do any smoke remediation or anything like that?
If you're rebuilding the house, you don't need to be doing any of that, be correct? You demolished the entire house.
A We did not demolish the entire house until six weeks -- sorry, it's actually more like eight, but we did not decide to demolish the house until six weeks had gone by without any communication regarding remediation and until after we realized that Pacific did not want to pay additional living expenses into 2021.
Q So you're saying that the only reason you demolished the house is because you hadn't heard from Pacific?
A No, that's not the only reason, but that --
Q Why --
A That was one of the big reasons.
Q What were the other reasons?
A One second. I need to grab a charger,

please. My battery is low. It's here. One second.
Q Okay.
A I'm sorry, what were you asking?
Q I'm just trying to understand the decision to demolish the house, and it sounded like you were telling me the whole reason that y'all demolished the house is because according to your take on it, it took Pacific six weeks to get back to you, and I don't know that I agree with that in looking at the file, but just taking you at your word. Is that the only reason you demolished the house or is there more to that decision?
A That was one of the reasons was that we had made no progress on remediation, and by June we had, to use Jeremy's phrase, peel back more layers of the onion and continue to discover smoke and fire damage to the house, and we had asked TCC to provide a quote to tear down the house, and it was similar in number to the reconstruction cost plus the remediation cost, and we chose to go ahead and demolish the house.
Q Did you talk with anybody at Chubb about that decision?
A No.
Q Why not?

Page 54

A It's our decision what we do with our house.
Q Earlier you said that Jeremy had somehow deceptively done something about a Brookstone quote?
A Yes, he e-mailed Andrew without copying my dad or Charles or me and told him to scale back the scope of remediation.
Q Who is Andrew?
A Andrew was in charge of the demolition, debris re -- sorry, not demolition, debris removal and remediation at Brookstone.
Q And why do you think that was deceptive?
A Because we weren't included on the e-mails. We were included on most e-mails, but not that particular chain in which he told Andrew to scale back the scope of remediation.
Obviously when you scale back the scope of remediation there's a chance that not all of the smoke odor will be removed, there's a chance that not all of the mold was going to be dealt with, things like that, and we absolutely should have been privy to those e-mails.
Q How much did it originally cost you guys to build the house?
A I believe around 2.5.

Q Are you sure?
A I said I believe.
Q My understanding is that it was closer to about 1.5.
A To build the house?
Q Yes.
A How -- okay, I can't ask questions? I'm not sure --
MR. DAUPHIN: She didn't ask you a question. She told you what she believed.
BY MS. MOSS:
Q My understanding is that it was 1.5 million. Is that not right?
A I do not believe that's correct.
Q Excuse me?
A I don't believe that's correct.
Q When you ended up completely demolishing the house, did you also demolish your garage?
A No, not yet.
Q So is the garage still standing as completely fine?
A It is not completely fine. It is still standing today.
Q Why is it not fine?
A There's still some smoke odor. We are

trying to pinpoint the source of it. We are still peeling back the layers.

Q When you say "we," is that you and TCC?

A Yes.

Q If you'll turn to tab 3 for me. This is the estimate from JS Held. Do you see that?

A Yes.

Q And is it your position that you never received a copy of this estimate?

A I believe we did.

Q Okay.

A If this is the first estimate that TCC would have received, then we would have received it.

Q This is the latest.

A What I was referring to earlier was the -- we did not receive a copy of JS Held's remediation. Like, the sealing and smoke odor removal, all of that.

Q Okay. But you did receive a copy of the estimate from JS Held to rebuild, correct?

A Do you know what is the date on this one?

Q Well, the only one that I have here is the most current one. I cannot remember, or I don't have in front of me the date that the original estimate was sent.

A I saw the original. I don't -- I do not know that I've seen this one from April.
Q Okay. And this one's in the amount of $1,406,301. Do you see that on the very last page?
A Yes.
Q And I understand that this was later revised due to some mold in the laundry room and master closet to be closer to 1.5 million?
A I don't know.
Q Turn, if you will, with me to tab number 4.
A Okay.
Q Behind tab number 4 is basically a chart that was prepared with the differences between the JS Held estimate and the TCC estimate, and there's a list there of about 10 things where they differed, so I want to talk with each one of things with you.
A Okay.
Q First of all, the wood mantles. Is it your position that the wood mantles need to be completely replaced?
A Yes.
Q Why is that?
A There was smoke damage definitely to the one in the -- in the living room, and then they sat

in an un-air conditioned house after being hit with heat and water, and the wood does not always recover, so it's not the same quality that it was before.

Q Are the mantles currently in storage?

A I don't know.

Q If you aren't planning to use them, I'm assuming you agree with me that there is no reason to have them in storage, correct?

A Correct. I never asked for anything in the house to be stored. Jeremy --

Q Why? Because you were not planning to use -- you were not planning to use any of it?

A Correct. We had agreed that the house needed to be taken down to the studs, and I didn't believe any of those materials were going to be reusable.

Q What about the garage doors; what's the issue with the garage doors?

A We don't know about that one yet. We just don't know.

Q Is there an issue with the garage doors?

A We don't know. We don't have power to the garage.

Q In looking at them, does there appear to

be an issue?
A I haven't looked at them that closely. There's an odor, but I haven't looked closely to assess damage yet.
Q What are the doors made of?
A I don't know off the top of my head.
Q Are they steel or wood?
A I don't know.
Q What's the issue with the plumbing?
A I don't know what the 4 percent is. I'm not sure what Pacific objected to, so I'm not sure how to answer that.
Q There is a generator listed on here that TCC has said needs to be completely replaced for $18,000. I understand that this generator was outside, correct?
A Yes.
Q And I understand that there was no damage to this generator; is that right?
A We don't know yet. We don't have gas, so we have not been able to run and test the generator yet.
Q And is that in storage?
A The generator?
Q Yes.

A No.
Q Where is it? Outside still? Where is it?
A It's outside on the property at Dell.
Q Are the garage doors still on the garage?
A Yes.
Q Builders risk insurance, which is on line 6 here, it looks like TCC is passing through the entire amount of their builders risk insurance to you guys. Do you see that?
A Yes.
Q And my experience has been that builders risk insurance is, as the name says, it's insurance purchased by the builder, and the builder pays for that insurance, and it is typically not passed on to a homeowner. Is that what your understanding of builders risk is?
A No, my understanding is -- I wouldn't say that it's not typically passed on to a homeowner. It can go either way.
I discussed it with TCC, and I discussed it with our architect who works with a lot of contractors, obviously, and it can go either way. And this is how TCC does it, and we paid for it in our first contract, and it's included in our second.
Q You paid for the builders risk outright

like this?
A It was in our contract the first time around, yes.
Q Okay. Next on the list is the doors. That's item number 7. Do you see that?
A Yes.
Q Is it your position that the doors cannot be reused?
A Yes.
Q And why is that?
A I'm assuming that these are the interior doors. The same thing, they were hit with heat and water and left in the house in a drastically changed environment, and they're not going to be the same quality.
Q And do you know if they're being stored or not?
A I don't know how many or -- yeah, I don't know how many, if any, are being stored.
Q Next is the door hardware. Is it your position that the door hardware cannot be used anymore?
A Yes.
Q I'm assuming that the door hardware is metal, right?

A It's an unlacquered brass, which etches very easily.
Q Which can do what very easily?
A Etches very easily.
Q Have you specifically looked at the door hardware to see if it's okay to be reused?
A I've seen some of the door hardware, and it had tarnished.
Q But that could be cleaned, correct?
A No, it can't. It can be cleaned, but it won't look the same way it did prior to the fire.
Q Well, if it could be cleaned for -- and you looked at it, and they looked fine, would that be acceptable to you?
A No.
Q Why?
A Well, they can't restore the finish. I mean, you can clean it, and you can wipe off smoke, but they can't restore the finish. Now, in particular I don't know which hardware this is, but in my master, it was a specialty finish. We delacquered everything and had a specialty finish done.
Q If the door hardware could be delacquered and relacquered and repaired to your satisfaction,

do you agree with me that it would be fine to use in the house?

A No, it can't be.

Q What is the issue with the cabinetry?

A There's smoke damage, there's still -- the ones that I have seen still have a heavy smoke odor after being cleaned. Like the other wood items we talked about, they were hit with smoke and water and left in a drastically changed environment.

And these are custom cabinets from a cabinetmaker who has an air conditioned shop, and so this wood has been fully acclimated. From the time he got the wood to the time it came to our house up until the moment of the fire it was fully acclimated, so nobody can guarantee that it's going to be the same quality. He's also a cabinetmaker that has very tight margins, and the least bit of shrinkage is going to show.

Q Who is the cabinetmaker?

A Michael Morrow of MDM Designs.

Q And what about the HVAC, what's the issue with that?

A Brookstone demoed the refrigerant lines, and they -- they cut it, so the assumption was that it was never supposed to be reused. The units that

are sitting outside, the cooling units have been contaminated because of the way they cut the refrigerant lines.

Q And what about the beams, what's the issue with the beams?

A They had smoke and water damage, and I don't know how they could ever be the same, they could ever be the same quality they were prior to the fire.

Q Have you personally inspected the mantles and these items listed here on this bid difference that's behind tab 4?

A Yes. I mean, at least some of them. I haven't inspected the doors. If any are in storage, I haven't been to any storage unit to inspect. I have seen some cabinets that Brookstone mistakenly delivered to our movers.

Then the beams, they were on site, the HVAC units were on site, cabinetry was on site for a while. I also saw Paul Davis removing the cabinetry, and I know what they look like. There's nothing on here that I haven't laid eyes on at some point since the fire.

Q But we do know at least for the garage doors and the generator, at this point you do not

know if those need to be replaced or not?

A That's right.

Q Let's turn over to tab 5. This is a letter from Henry Sprott Long & Associates. Do you see that?

A Yes.

Q Okay. And is Mr. Long your architect?

A Yes.

Q You said earlier you did not need him to redraw the plans, correct?

A Correct.

Q And so are you just using him to basically observe the work while it's under construction, as this letter states here?

A Yes. He will do everything that he states in that letter.

Q And for this work that he set forth here in the letter, he is supposed to be paid 2 and a half percent of the cost of the work?

A Yes.

Q Why do you think that you even need his help?

A He goes behind the workers and makes sure there are no mistakes. And there always be. They're not intentional, but there always are

mistakes.

Q Do y'all hear that beeping?

A I'm sorry, I don't know how to turn off my -- do you know how to turn off messages on the computer, text messages?

Q Is that what it is, messages coming through? Are you on a computer or -- let's go off the record for a second.

(Recess 1:09-1:13 p.m.)

BY MS. MOSS:

Q Going back to Hank Long's fee, I received a letter from your dad that has listed $46,981 as Mr. Long's fee, and then there was an additional fee that he mentioned that was $56,354. Hank Long only has one oversight fee, correct?

A Correct.

Q And if we use TCC's estimate we looked at earlier that's about $1.5 million, then that 2.5 percent oversight fee comes to about $39,151 if you do the math.

A He gets 2 percent of the total contract price, not just --

Q So looking -- total contract cost what? Sorry.

A So it would be he gets 2.5 percent of the

1.9.
Q What's 1.9?
A He gets 2.5 percent of the contract with TCC. So it's 2.5 --
Q Are you saying the contract with TCC is now for 1.9 million?
A That includes the TCC fee.
Q Let's go back to tab 2. This estimate at the end -- okay, I see where you're getting that from -- is $1,879,000, right?
A Right.
Q Okay. Okay. So then if I do my math on that, his fee is $46,981.56.
A Okay.
Q So -- which is one number that your dad has listed in a letter to me, but he has also listed this other fee of $56,354, but it's either one -- it's the 46,000. It's 2.5 of the 1.879, correct?
A For the reconstruction, yes.
Q Is there any other fee that could potentially be applicable?
A Is there any other fee for Hank Long?
Q Yes.
A No, that's it.
Q Okay. So can we agree that the correct

amount for Hank Long's architectural oversight fee is $46,981.56?

A For the reconstruction, yes.

Q Well, is there any other fee that's due him?

A No.

Q Okay. You kind of qualified your answer there. So the only thing that's due to him is this $46,000 number, right? That's his 2 and a half percent fee of the 1.9?

A Yes, of the reconstruction price, yes.

Q Let's turn now to tab 6 in the notebook. This is the remediation -- the smoke remediation bid from Slade. Do you see that?

A Yes.

Q I have to charge my air pods. Give me one minute. I'm going to have to put you on speaker.

A Yes.

Q Okay. So the Slade remediation bid is an expense to remediate smoke in the home, correct?

A And mold, I believe.

Q So now that you've decided to demolish the home, do you agree with me that there is no reason to be performing any kind of smoke or mold remediation?

A We -- there will be some remediation in the basement and to some extent in the garage. We have not determined that yet.
Q Was the basement not demolished?
A No.
Q The basement is not being rebuilt at this point, and the garage is not being rebuilt at this point?
A Correct.
Q So this remediation bid is for $311,000. So would you agree with me that to the extent any smoke remediation is done, it is not needed to this extent?
A Now that we've torn the house down?
Q Right.
A No, not being needed to this extent, but the basement and garage.
Q So you don't need any smoke remediation or mold remediation in any parts of the house other than potentially the basement or garage, right?
A Right.
Q If you will turn to tab 7 for me. This is a invoice from Cliff Zlotnik. Do you know who that is?
A Yes.

Q Who is that?
A The expert that we retained to provide a protocol for remediation.
Q And why was it that you wanted to retain this particular guy?
A Jeremy mentioned that there is no one in our area that will provide a guarantee that there will be no smoke odors in the house after remediation is completed, so we found one that would provide a guarantee that there are no more smoke odors if his protocol is followed.
Q Did you look for somebody in the area to see if there was somebody that could provide that guarantee?
A Yeah, we did a lot of research. We didn't find anyone.
Q Is this somebody that you or your father have worked with before? How did you find them?
A Dad found him.
Q Have you ever even talked to this guy?
A Yes. Yes, I met with him when he was in Birmingham.
Q What were your conversations with him?
A Figure out the protocol to make sure that there is no lingering smoke odor if we remediate

this house, that there is no long-term -- that I won't have any long-term concerns about mold coming back or smoke odor being there or any particulates remaining. I worry a lot about my three girls, so I needed him to make sure that the house was going to be a smoke-, odor-free, safe place to live at the end of remediation.

Q Do you recall that Jeremy approved up to $15,000 in expenses for an industrial hygienist?

A Yes.

Q And did you feel like that was a reasonable amount?

MR. DAUPHIN: You don't have to answer that. We're not commenting on your offers.

MS. MOSS: Chuck, I'm asking Ali. I'm not asking you.

MR. DAUPHIN: Well, you'll have to explain to me why she has to opine at this stage as to whether your offers are reasonable or not. I don't think that's required.

MS. MOSS: She can tell me whether or not she thinks that that's reasonable or not. If she doesn't know, she can say she doesn't know, but she doesn't need you to testify for her.

MR. DAUPHIN: I'm not testifying for her.

I'm just objecting to the question. I haven't testified for her. I haven't suggested the answer or not answer or not answer, but if she knows --

MS. MOSS: You are trying to instruct her via your objection.

MR. DAUPHIN: I disagree.

BY MS. MOSS:

Q Do you think $15,000 is a reasonable amount to pay an industrial hygienist? Are you looking at your dad because he's telling you something?

MR. DAUPHIN: I'm trying to figure out whether to object or not, Alycen.

MS. MOSS: She keeps looking at you, so I can't -- and obviously I'm not there, which is why I don't like to do this virtually. So I can't tell if you guys are talking, if you are holding up signs and telling her what to say, but she is looking at you for a long period of time.

MR. DAUPHIN: I was contemplating whether to object or not. I was not communicating.

MS. MOSS: You already objected. Your objection is on the record. I don't think it's proper. She can answer the question.

MR. DAUPHIN: I'm contemplating whether to

instruct her not to answer in addition to my objection. I'll just instruct her not to answer on that.

MS. MOSS: You're going to instruct her not to answer about whether or not she thinks the $15,000 is a reasonable amount to pay an industrial hygienist.

MR. DAUPHIN: Yes.

MS. MOSS: That is -- that is not a proper objection. It is certainly not proper to instruct her not to answer in a -- even if we were in a discovery deposition if this was in litigation, it is absolutely an improper instruction in a situation like this with an examination under oath.

MR. DAUPHIN: I think that it's the exact opposite. I think because this is not a deposition a lot of what you're entitled to do you're not entitled to. A deposition, of course, is anything that may lead to something discoverable or admittable. In this case you're much more limited, so just depends our view. We can talk about that later. I'm instructing her not to later.

MS. MOSS: She has a duty to cooperate under the policy, she has a duty to sit for an examination under oath and answer the questions, and

to the extent you are instructing her not a answer my questions, she is not fulfilling her duty under the policy. So if you're instructing her not to answer, that is fine. I will move on, and we will go to something else.
BY MS. MOSS:
Q Regardless of whether you feel it is -- let me ask you this again to make sure that I understand. You are --
A Me?
Q Are you taking your father's advice and refusing to answer my question about whether $15,000 in expenses is reasonable for an industrial hygienist?
A Yes, I am taking his advice. I'm not going to answer that.
Q Okay. And it's my understanding that Mr. Zlotnik was there for three days; is that right?
A I believe so.
Q And why exactly was he there for three days?
A He took samples and evaluated the house.
Q And his testing indicated that there was no mold in the house, right?
A No.

Q What did it show?
A There was mold and -- on all three levels and -- four including the attic, and that there was smoke in every wall of the house that was still remaining.
Q So in looking at the report myself, it looks like the bacteria that was present there is just the typical bacteria you would find in a hot southern town like Birmingham; it was not any sort of mold or additional bacteria. Is your understanding different than that?
A My understanding is that it's mold. It was mold.
Q You understand to the extent there is an outstanding balance here that's over and above the 15,000 that was approved by Chubb it's your responsibility to pay?
MR. DAUPHIN: If you don't understand the question, have her repeat it.
BY MS. MOSS:
Q What did your dad say?
MR. DAUPHIN: I said if she doesn't understand the question, she should ask you to repeat it.
THE WITNESS: I understand Jeremy --

MS. MOSS: Hold on because I can't hear him, and I'm assuming Robyn could not either, who is the court reporter.

MR. DAUPHIN: I said that if you did not understand the question she should ask you to repeat it because she looked puzzled.

BY MS. MOSS:

Q Do you understand my question or do you need me to repeat it?

A I understand that Jeremy said he would pay $15,000 towards an industrial hygienist.

Q And to the extent there is an outstanding balance, that's your responsibility, correct?

MR. DAUPHIN: If you don't know, you don't know. Just answer the question.

THE WITNESS: Yeah, I don't know.

MS. MOSS: Chuck, I need her to answer the questions. If she doesn't know, then she can say she doesn't know, but she does not need to be instructed by you.

MR. DAUPHIN: I'm not trying -- I think I'm doing very well with the little that I've said. Go ahead, Ali, answer to the best you can on every question she asks unless I say don't answer.

THE WITNESS: I don't know.

BY MS. MOSS:
Q I understand you have some concerns about your septic field?
A Yes.
Q Have you done any testing to determine whether or not the septic field is, in fact, damaged?
A We have not yet.
Q So there has been an expense submitted in the amount of $18,000 to repair the septic field. Can you agree with me that that is not something that should be payable if there is no damage to the septic field?
A Yes.
Q I need you to look at me.
A I am looking at you.
Q I feel like you guys are communicating kind of behind the scenes, and I'm not able to see it. I see you looking at your dad. I just want to make sure that you're answering my questions, and he's not telling you what to say.
A No, he is not. When -- when he talks, you hear him. He is not telling me what to say.
Q Is he nodding his head yes or no?
A Just my eyes go to him. He is my lawyer.

Page 78

I mean --
Q Is your dad nodding -- is he nodding his head and telling you what to say?
A I don't even know what he's doing, but, no, he is not guiding me. When he objects, you hear him.
Q I'm not -- I hear his speaking objections. What I'm worried about is him telling you to say yes, say no because I'm not in the room with you. Typically I would be, so I would be able to see if he's coaching you in some way, but I'm obviously not there, so I can't see what he's doing.
MR. DAUPHIN: I'm not coaching her, Alycen.
THE WITNESS: I don't know what else to tell you. He's not coaching me. I do look at him. I feel like I've looked out the window as well.
BY MS. MOSS:
Q But back to the septic field, you agree with me that $18,000 to repair the septic field is not payable if there is no damage?
A Yes.
Q Are you planning to get anybody to test the septic field to figure out whether it's damaged?
A Yes.

Q Who's doing that?
A I don't -- I haven't set it up yet. I don't know. Quite possibly the Health Department.
Q Anything else on the dwelling that we have not discussed that you believe is payable? Just on the dwelling.
A Just on the dwelling, I believe that all the full scope of remediation is payable, I believe that the full amount of our reconstruction estimate is payable. Are we discussing landscaping separately?
Q We're discussing landscaping separately. So we basically have talked about the items that you see here on this notebook. We've talked about the dwelling issues, the differences between the TCC and the JS Held bill, the architect's fees, the Slade smoke remediation, Zlotnik, and the septic field. That's all I have on my list that are at issue in the dwelling. Is there anything else?
A I went blank. The roof may be an issue. We haven't decided yet.
Q What roof? You tore the house down. What do you mean the roof?
A The slate roof. I can't -- I'll have to look. I can't recall if the entire roof is included

in TCC's initial reconstruction estimate. I don't believe it is because that was one of the layers that we were peeling back, but it's got a strong smoke odor, and we are working on it.

Q Did you save the slate from the roof?

A Uh-huh. Yes.

Q And you're planning to reuse the slate?

A Yes, we're trying to.

Q Okay. So you're saying you're just not sure if you can reuse that slate for the roof or not?

A Correct. And I don't -- I don't believe it's in TCC's ' estimate. We just don't know about that either yet.

Q Okay. Anything else?

A Some of the exterior, the patio, the front porch, like, the brick walkways and the brick lining the drive, that's all sustained significant damage during debris removal. Not during the teardown, it was all prior to it when the fire trucks were there. We just haven't found out the extent of the damage yet.

Q So you're saying that the front porch -- are you calling the patio and the front porch same thing or is the patio in the back?

A Patio is in the back, there's a side walkway as well, and there's a front porch. Well, there's a walkway to the front porch. Basically all of the masonry and stone has damage. We just haven't figured out the extent of it yet.
Q Is the damage due to the fire, or you're saying the damage is due to something that Brookstone did when they were over there?
A Both.
Q How would a brick walkway be damaged by the fire or an outside patio or an outside front porch?
A Well, the fire was started in the front of the house, and a lot of the debris fell down onto the front porch, and obviously brick is porous, and there's some smoke odor.
Q This is the first I'm hearing about this, so I'm a little bit surprised that it hasn't been brought up before. Are you saying you know that there is smoke odor, and you feel like it needs to be replaced or you're not sure?
A We're still peeling back the layers. We haven't determined the full extent of the damage yet.
Q It's been about, what, eight months?

A Yes.
Q What else do you have to do to determine the extent of the damage?
A It just takes time to figure it out. We tore down the house, we removed all of that debris, we were still smelling smoke. It takes a while to remove things and pinpoint the source of the odor, and -- what was the question again? I briefly lost may train of thought.
Q I just was saying I hadn't heard anything about brick driveway -- the brick walkway, the patio, all of that stuff. So I'm just wondering why that's just now coming up and why after eight months you still don't know whether or not there's damage or not.
A It takes a while to peel back all the layers. We were going to -- we had plans to remediate the house and never got any approval or agreement there, and then once we tore it down and we removed that debris and we still smelled smoke we had to keep looking to see what the problems were. And the damage to the brick, some of it was obvious, but it -- I mean, at the time TCC submitted the first proposal, we just hadn't gotten to that point yet. We just hadn't figured out all the damage.

Q Anything else?
A The brick along the front of the house had damage. We discovered when we took off the brick that smoke had gotten into that cavity in between, and so the brick, the porous side of it had absorbed a lot of odor.
Q What did Cliff Zlotnik say about all of this? I thought that he had come and inspected and had told you what he thought were the issues.
A He looked at the interior for the most part, and when he left we were in agreement that we still had a lot of layers to peel back. The roof had not yet been taken off; we still had to look at the water/ice shield that we had not taken off the front of the house yet. And also remember we were trying to follow protocol in doing this. We were running things by Jeremy and trying to get approval to keep peeling back these layers.
Q Did you follow your -- the protocol from the industrial hygienist as far as remediation goes?
A We have begun.
Q And what are you doing in that regard?
A We have cleaned and sealed the basement, and we -- we've put a huge dehumidifier in the garage. That is step one in trying to figure out

where the odor is.
Q Is that not why you hired Cliff Zlotnik, to figure out where the smoke odor was coming from?
A Yes.
Q Why is it that eight months later you still are not sure with respect to the smoke and the remediation that's necessary?
A Because it takes time to peel back the layers and find where the smoke is coming from. We didn't make it to remediation because we couldn't agree on scope and price or get approval, and, you know, it just -- it smells until you figure out what it is and fix it. We weren't taking off the bricks on the front of the house yet; we weren't taking off the roof yet. He did exactly what he could do at the time.
Q Where is the slate from the roof being stored?
A In a lot that TCC owns.
Q Okay. Is there anything else as it relates to the dwelling?
A I believe that's it.
Q Okay. I'm going to move on to your additional living expenses then. I want to start by looking at the policy. If you will go back to the

section in the policy that is -- talks about the deluxe house coverage that's page B1 where we were reading about the payment basis for the house.

A Okay.

Q Okay. Turn over to page B5. Do you see at the bottom there it talks about additional living expenses?

A Yes.

Q Then if you turn over to the next page, it talks about extra living expenses.

A Yes.

Q Okay. If you read along with me, the extra living expenses says that: If a covered loss makes your house or other permanent structure uninhabitable, we cover the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living.

Do you see that?

A Yes.

Q And you understand that as an insured you are only entitled to be reimbursed for extra living expenses if there is an increase in your normal living expenses due to the loss?

A Yes.

Q And do you understand that these extra

living expenses have to actually be incurred by you?
A Yes.
Q And do you understand that the policy does not pay for your regular living expense that you would have paid on a normal everyday basis?
A Yes.
Q And do you understand that the policy doesn't pay for expenses that would typically be incurred by somebody else like a landlord?
A I don't know.
MR. DAUPHIN: Well --
THE WITNESS: Sorry, I interrupted you.
MR. DAUPHIN: No, that's fine.
BY MS. MOSS:
Q Okay. Going back up to the extra living expenses, the very last sentence in that first paragraph talks about the period of time that they're covered. Starts, "We cover these increases." Do you see that?
A I don't. Where am I looking again?
Q It's the very last sentence in the first paragraph.
A Yes. I'm sorry, yes.
Q Yes. So it says: We cover these increases to your normal living expenses for a

period of time commencing with the date of loss and ending with the earliest of the following.

The first thing listed is: The reasonable amount of time required to restore your house or other permanent structure to a habitable condition.

Do you see that?

A I do.

Q Okay. So the policy is going to pay for extra living expenses for that reasonable amount of time that is required for you to restore your house back to the habitable condition, correct?

A Yes.

Q What do you think that reasonable amount of time is?

A When we -- the time it takes to reconstruct a house and move back in.

Q Has TCC told you how long that's going to take?

A We have an estimate. Obviously COVID has affected things.

Q And what's the estimate?

A August to November 2021.

Q And how has COVID affected it?

A The materials and the labor force. A lot of the labor force is uncomfortable working, and so

the contractors are all scrambling to get the smaller pool of subcontractors.

Q Did Cliff Zlotnik ever recommend that the brick and the roof and those items be pulled for some sort of industrial hygiene testing?

A I can't recall. I know that he was there during those conversations, though. He knew that that was going to be done. I don't recall specifically what he said.

Q Why has it not been done?

A It has been done.

Q I thought you told me you did not know if there was -- the smoke could be remediated. Are you saying that the brick has been pulled and --

A Oh, the brick has been -- we demolished the house. We saved the slate, but we wouldn't be reusing the brick.

Q No, I'm talking about the brick on the patio and the front porch and the pathway you're talking about.

A Well, it has -- in addition to the odor, it has physical damage as well.

Q But the physical damage is not from the fire, correct? The physical damage is from contractors being there?

A Debris removal. Some of it -- some of it because the fire, again, started upstairs at the front of the house, and things fell out the window. We had an entire set of outdoor furniture that burned on the front porch.

Q Okay. I'm not -- I want to talk to you about the contract, but what I'm talking about right now is just the brick itself.

A Yes, my point was it burned on that brick. Like, things -- there was fire on the brick porch.

Q But that could be cleaned off.

A I don't know. We don't know yet.

Q And some of the damage it sounds like was caused by contractors?

A Yes, during debris removal, correct.

Q Do you know for certain that it would have been during debris removal? Could it have been by TCC or other contractors as well?

A Brookstone did the debris removal. I suppose Paul Davis could have damaged something when they were there. Brookstone did the debris removal. TCC came in after to replace some stuff. TCC took some cabinets out, but it wasn't until January or February, but, yeah, Brookstone did the debris removal.

Q I understand that, I'm just saying is there a possibility that there could have been damage after that time?
A After the debris removal?
Q Yes.
A I don't know. There was a lot of damage.
Q Where had you previously rented a house prior to the fire?
A We rented a house on Berwick and that was it.
Q When did you rent on Berwick?
A I believe that was 2013.
Q Why did you -- why were you renting at that point?
A We sold our house, and we weren't finished with renovations on the new one that we had purchased.
Q Was that the Dell Road house? No, you said that was 2013. What house was that you were moving into?
A A house on Guilford Road.
Q When you moved into that house, did you do any work on it?
A We did. We did work prior to moving in, and we did more work when we lived there.

Q What did you do prior to moving in?
A We gutted the house.
Q I'm talking about the rental house.
A I'm sorry. We painted the rental.
Q I was like, goodness.
Is there anything else you did to the rental?
A No, we just painted the entire interior and cleaned it.
Q Did you pay -- did you pay for the painting or did the landlord pay for it?
A He paid for it.
Q Did you ask the landlord to pay for it?
A No, we just asked for permission to paint.
Q Did you put any custom window treatments in that house?
A We used what we had.
Q Did you put any kind of custom light fixtures or anything like that?
A We used what we had.
Q Did you refinish the wood floors?
A In the rental, no.
Q Only thing you did in that rental was the painting?
A Yes.

Page 92

Q And did you buy new TVs for that rental?
A No, we used the TVs that we owned.
Q Did you have somebody come and install the TVs?
A We weren't using the HD Innovations at the time. It would have been somebody different. But, no, we did not -- it wasn't -- it wasn't the same full setup that we had on Dell.
Q So I just want to understand or make sure I understand your answer. Am I correct that you did not install any TVs on this rental or in this rental on Berwick Road?
A We -- if I'm understanding correctly, we had TVs, we had -- our movers would have installed them, I believe, and we had them hooked up to cable, we just didn't have the same, like, expansive AV setup at that point in our lives. But I did not hook up the TV myself or bring it in myself.
Q Okay. So you -- I understand that. I'm just asking whether you did the same AV setup in Berwick that you did on Fairway Drive or on Wimbleton. And it sounds like the answer to that is no.
A No, not to the same extent.
Q Let's go back to the notebook and turn

over to tab 8 for me. So this is the Residential Rental Agreement for the Fairway house, right?
A Yes.
Q And it looks like this lease was signed from December 1, 2019, through May 31, 2021?
A Yes.
Q How did you come up with that length of time?
A That's what they preferred. They asked if we would be doing a six-month lease. Their suggestion.
Q I'm sorry, I said that wrong. May 2020, not 2021. So you did a six-month lease.
A Yes.
Q Okay. Were you thinking that the house would be finished by then?
A No, we were hopeful that we would be able to find a larger rental, something that would better accommodate us better than this one.
Q How big was this one?
A I don't think it was 3,000 square feet. It was a 3/2 with no basement level and no upstairs.
Q And it was $3500 a month?
A Yes.
Q Did you know the landlord, Robert Roche?

A I didn't. Not prior to renting it.
Q And Chubb has paid the rental expense related to the Fairway Drive home, right?
A Yes.
Q And you have no issues with that, correct?
A I have no issue with what they paid the --
Q Right.
A You mean up front, or are we getting into what they credited us when we ended the lease early?
Q Well, are you contending that Chubb owes you any additional money with regard to the rental expense on the Fairway Drive house? It's all paid and it's fine, correct?
A They paid us for the full lease and the security deposit and the pet fee.
Q We're good on the Fairway Drive rental, correct?
A Am I understanding this correctly like -- initially, yes. I do have an issue. I think that they owe us our security deposit, which we were not able to get back from the -- from Robert Roche.
Q Why were you not able to get your security deposit back?
A Because we terminated the lease early.
Q How much was that?

A The security deposit? It was 3500. It was one month.
Q Other than the $3500 security deposit, you do not contend that Chubb owes you any additional money with respect to the rental on the Fairway Drive house, correct?
A Correct.
Q Is that right?
A Yes.
Q So let's move on now then to tab number 9, which is the Residential Rental Lease Agreement for Wimbleton Drive; is that right?
A Yes.
Q This was signed for January 15, 2020, through January 14 of 2021; is that right?
A Yes.
Q When did you move into the Wimbleton Drive house?
A I do not recall the exact date.
Q Were you even in there in January of 2020?
A No, it would have been sometime in February. We moved out of Fairway at the end of January.
Q Why were you paying rent in January?
A It's just the term of the lease.

Q It's not like you were dealing with a random landlord here. This was your dad, right?
A He's still a landlord in this capacity.
Q But if you were already paying rent on Fairway Drive and living in Fairway Drive, why would you agree to a lease term before you were even moved out of Fairway?
A It's just a lease term.
Q Well, did you say to your dad, hey, we're not moving in until February 1st, I don't want to pay for two weeks because I'm already paying at Fairway?
A I don't recall having any conversations about it.
Q And this lease agreement is through January 2021, like I said. Did you make it through that time because you were thinking the house would be finished by then?
A I didn't have anything to do with the drawing of the lease.
Q But you typically have a dialogue with a landlord when you rent a house and say, I want to stay there six months or a year or whatnot. Did that happen here?
A No, we have no idea. At the time we had

no idea how long it was going to take.
Q Why did you agree to a year lease, I guess, is my ultimate question?
A Well, we knew it would take at least a year to rebuild the house, and we hadn't started on anything yet.
Q Okay. Who is DPMB Properties?
A Dauphin Paris Mountain Brook Properties. It's the company that owns the house.
Q Do you know anything about who owns that company?
A Yes, my dad and/or his wife. I'm not sure about those particulars.
Q Who is your dad's wife?
A Diane Paris.
Q Is that also his law partner?
A Yes.
Q And your father is listed as the registered agent and the organizer for this company. Did you know that?
A No.
Q And did you know that this entity was set up basically two days before the lease began?
A No.
Q Did he specifically set up this company to

buy this house?
A I don't know.
Q Did he specifically buy the house for you and your family to live in?
A Yes.
Q Have you paid your dad any rent on the house?
A Yes.
Q Are you paying him $4500 a month?
A Yes.
Q And I believe that your dad charged you a security deposit; is that right?
A Yes.
Q And why did he charge you a security deposit?
A It's standard in a lease agreement, and we're renting the house from him.
Q Right, but this is a little different lease agreement because it is with your father, and certainly landlords can waive security deposits all the time.
A No.
Q Did you ask him to waive the security deposit? No?
A No. We signed a lease like we would from

any other landlord.
Q And you have been paying your dad monthly payments since you moved into the house?
A To the LLC, yes.
Q Has your dad or Ms. Paris turned around and paid any of that money back to you?
A No.
Q Have you been provided with any other benefit to pay you back for that rent?
A No.
Q And am I right that you are seeking to be reimbursed for the entire year of the rental expense that was 36,000?
A Sorry, will you ask me that again?
Q Let me just scratch that and ask it this way: You have been paid already for the entire year of rental expense on this house, which is $36,000, correct? I can't hear you.
A Yes. Correct.
Q So as far as the lease agreement for the Wimbleton house, are we square on that one; you are not contending at this point that you are owed any additional moneys as far as the lease goes on Wimbleton?
A The lease goes -- there is something. I

have to look it up. There is -- there's something, a partial month. I guess maybe what it is, is December 2020, so it's not the entire lease term, it doesn't go through January 14th of 2021.

Q So are you saying there's two weeks missing?

A Yes, Chubb sent the amount through 12/31/2020, but the lease term goes until January 14th, 2021.

Q Okay. And on the Fairway house, you were paid up front that entire six months for that lease, right?

A Yes.

Q And so when you -- when you rented the Wimbleton house, Chubb backed out the remaining money that was owed on that lease agreement and then paid you the difference that was owed on the Wimbleton house, right?

A That sounds right. Through 12/31.

Q That sounds right?

A Through 12/31, yes.

Q Tab 10 looks like these are window treatments and hardware purchases from Restoration Hardware for use at the Fairway Drive house?

A Yes.

Q Okay. Total of this is $5,918.90?
A Yes.
Q Do these window treatments replace any from the Dell Road home?
A No.
Q But you are using these in the Wimbleton home, correct?
A Some of them, yes.
Q Which ones -- what are you not using?
A We are not using the hardware, and we're not using the tassel-trimmed voile drapery panels. The others have been altered, and we are using them.
Q Why are you not using the hardware?
A One of them broke. It's not the quality that we usually have.
Q It broke when you were trying to install it or did you lose it at Fairway?
A No, it broke. After it had been installed a couple weeks it just fell. So we're not using it, so we got our -- we had our usual custom hardware made for Wimbleton since we would be there longer.
Q So what are you going to do with that custom hardware? Can you use that at Dell Road?
A No.
Q Why not?

A It's not the same size.
Q Do you believe that the drapery and hardware bump is a reasonable increase in your normal living expenses that's necessary to maintain your household's usual standard of living?
A It's far below our usual standard, but it is an increase.
Q Is it necessary to maintain your standard of living?
A Yes, we need window treatments for privacy.
Q Why did you put the window treatments even up in Fairway Drive if you knew that house was not suitable?
A We needed privacy, and we didn't know how unsuitable it was until we had been in there for a little bit. We didn't know the extent of the plumbing problems.
Q Okay. Tab number 11 is the media invoice from HD Innovations. Do you see that?
A Yes.
Q So I understand that this is -- it's not on the invoice, but according to your dad this is for labor to remove seven existing TVs and audiovisual gear from Dell Road and store for

inspection as well as the purchase of four new TVs and the labor to set up and install three TVs at the Fairway Drive rental. Is that your understanding?
A Yes, we elaborated on the labor charges on there, yes.
Q So why did you remove the existing seven TVs and store them and not use them in Fairway Drive?
A They're damaged.
Q Why were you storing them then?
A In case Chubb or Pacific wanted to view them.
Q What is the damage?
A Some of them melted. The others have smoke damage and possibly water damage.
Q The four new TVs that you built, you have now installed -- excuse me, the four new TVs that you bought, you have now installed those at Wimbleton, right?
A Right.
Q And you can use those TVs when you move back into Dell Road?
A They're not the same. Some of them are not replacement items. Some of them we don't know about. I haven't compared all of that yet.

Q But you may be able to use some of these at Dell Road; you just don't know?
A We -- some of them we might be able to once I go through the former invoices more closely. Others are not the same size, and we would never reuse them. They're not replacement.
Q Which ones are not the same size that you would never reuse?
A I can't remember.
Q Why do you consider these to be a reasonable increase in your normal living expenses?
A I mean, we wouldn't have bought four more TVs.
Q I know, but these seem to be fairly standard sized TVs. It looks like there's a 55-inch, 65-inch, 49-inch, and I don't even see a fourth one, actually, on here. Are there four TVs or three TVs? The last one looks like it's a TV mount.
A Yeah, I agree it looks like a TV mount.
Q So there's only three TVs, not four?
A Yes.
Q Okay. Why would these not be able to be used at your house on Dell Road?
A They're not the same size, and they're not

the same TVs we had before.
Q Do you know that for sure? Sounds like you need to look and see.
A I know that -- I can't remember what one isn't and which ones might work. I just -- I can't remember.
Q Okay. Next tab is tab 12, which is a TCC invoice to paint the Fairway Drive rental home for $14,100. Do you see that?
A Yes.
Q Why do you feel like this is considered to be a reasonable increase in your normal living expenses?
A It's what we have always done in our houses, and if we hadn't had the fire, we wouldn't have had that expense.
Q Typically this is something that a renter would ask the landlord to do. This is really not a typical expense that I see, at least in situations like this. Typically if the renter does not think the house painting looks suitable, they'll go to the landlord and ask the landlord if they're willing to paint, the landlord either says yes or no, and if he doesn't agree, it's your responsibility as the renter to paint. But it sounds like you did not

even approach the landlord about painting; is that right?
A I don't know any landlord -- and I have friends who are landlords. I don't know any landlord who paints houses for every new tenant upon rental.
Q Did you ask the landlord?
A No. To paint for us, no.
Q And you did not ask your dad to paint the Wimbleton house either, correct?
A No, I did not ask him.
Q Did you feel like that was just an expense that could be passed on to the insurance company?
A I feel like it's an additional living expense, and it's not a landlord's responsibility. And even though he's my dad, he's a landlord, and we are tenants.
Q Okay. Turning to tab 13, this is a grouping of invoices from Valet Moving. Do you see that?
A Yes.
Q It looks like I got that first one is to move from Fairway Drive to Wimbleton?
A Uh-huh.
Q And it says that the date was on February

the 4th, 2020.
A Yes.
Q Does that help you recall that that was the date, or do you think it was earlier?
A No, that was the date if that's what we put on there. Hold on.
Q If you look in the middle of the invoice there it says start-finish time, and the date is listed as February the 4th. That's where I'm getting that from.
A Yes, it was done over a weekend. He moved us out on the 31st and then moved us in on the 4th.
Q What was being done -- why the time in between?
A There's not enough time to pack everything up at Fairway and go straight to Wimbleton. It was a full day of packing up.
Q But there were three days in between. What happened on the three days in between?
A I believe the 31st was a Friday, and they didn't move that weekend. They also had only scheduled one day and didn't realize how much packing up there would be and should have been on the 4th. I don't know if he moved people around or what.

Q Okay. The rest of these invoices from Valet Moving are for the most part expenses for receiving and storing and transporting. What exactly is being stored at Valet Moving?

A Initially we had, I believe, some units, we were storing the antiques that had been damaged by the fire that were waiting to go to Magali, who restores them, she doesn't have room in her shop for all of my things at once. So there was the -- that unit, there was a unit of things that she had treated and cleaned things that were coming in, and obviously we would never mix those two things because of the odors.

There is a unit that the workroom has access to, things that are clean and waiting to be re-covered, things that will come back to that unit once they are re-covered if they don't fit in our rental house. And not everything will fit in the rental house.

There was a unit of items that Brookstone returned, and if it still had an obvious smell, we put it in its own unit, and if it had less of a smell or less obvious smell, we put it in a unit with the additional living items that I was ready to return to Chubb.

And then we had a sixth unit, which was a spillover unit that initially had extra damaged items that were going to go to Magali, and then it eventually all just contained content replacement items and cleaned furniture.

We are not paying for that right now because some of the cleaned items have come to the rental, and we were able to clear it out, but as we add contents, replace our contents, we may need it back at any time.

MR. DAUPHIN: Alycen, let's take a break whenever you get to a stopping point.

MS. MOSS: Do you want to take one now or you want to go for another five or 10 minutes?

MR. DAUPHIN: Whenever is convenient for you.

MS. MOSS: Let me finish the storage stuff.

BY MS. MOSS:

Q Turn to the very last page behind this tab 13 that's a written-out document, says storage unit at the top. Do you see that?

A Yes.

Q Who typed this out? Did you write this or did your dad?

A I did.
Q So this is pretty much what you just told me?
A Uh-huh.
Q But right now you do not have the sixth unit, you're saying?
A Right now we do not have the sixth unit, and we have -- since I submitted this, we have cleaned out another one. Hold on, I'll tell you which one. Number 1. We brought all of our Brookstone and some contents to the rental to sort through them and kind of assess them. The unit number 2 right now only contains additional living items that Chubb can pick up at any point.
Q What do you mean -- what additional living items are in there that Chubb can pick up? Items from Brookstone that have smoke?
A I haven't included any of those yet. It's just items that we submitted as additional living. Every month when we submit the monthly additional living expenses, we include a spreadsheet of those items that are ready to pick up, so you can reference those and see. It's too many to name.
Q I've got that spreadsheet, so let me find it and we can quickly look at it. Hold on.

Actually, you know what? Let's take a break, and I'll find that spreadsheet, then you won't have to wait for me to find it, and we'll talk about it when we come back.

You want to take about a five-, 10-minute break?

A Sounds good.

(Recess 2:28-2:50 p.m.)

BY MS. MOSS:

Q I want to remind you you're still under oath. When we left off you were talking about some items that you have in storage that could be picked up, and it looks like those items are behind tab number 38, if you'll turn in the notebook. Are you there?

A Yes.

Q Yes?

A Yes.

Q So is this a list of the items that are in storage that could be picked up?

A Yes.

Q Okay. And which storage unit are they in?

A Well, I can give you the exact number if you'll let me look it up, but -- do you know what tab we were on before? 13. It's number 2 on the

explanation that I provided, but if Chubb wants to pick it up, I'll give the actual unit number.

Q Are these the Restoration items that Jeremy originally approved, the Restoration Hardware stuff --

A Yes.

Q -- for the Fairway rental house?

A Yes.

Q And why are you not still using this stuff? Are you using your own furniture?

A Yes, or I have replaced some of the things.

Q Okay. Let's go back to our other tab. We should be on 14, I think. Are you on tab 14?

A Yes.

Q Okay. So tab number 14 is an invoice for a security system that I believe was maybe installed at Wimbleton; is that right?

A Yes.

Q And the customer here is listed as Diane Paris, and I believe you said that's your dad's wife, who is also the owner of the house?

A Yes.

Q Did you personally pay to have the security system installed in this house?

A I paid to have it upgraded. The security system that came with the house, while operable, was very basic. It was really just a front and back door sensor, and that's not -- we haven't -- for the last 10 years of our lives, we've had a pretty extensive security system in every house.

Q Did you talk with your dad or Diane about installing this security system in the house?

A I told them that we were going to do it and that I wanted to put it in their name since they owned the house.

Q Do you understand that a security system like this is a fixture that stays with the house?

A It doesn't have to. All the sensors can be removed.

Q All the sensors can be what?

A It's a wireless system. It's not hard wired, so all of the door sensors, window contacts, smoke alarms, if you want them, can be removed.

Q Okay. So are you planning to remove all of that and use it in the Dell Road house for security?

A No.

Q Why not?

A I was going to -- it's not the exact same

pieces. The windows are different. The Wimbleton windows are not like the Dell Road windows, and just because of the different layouts of the houses we had different security needs. But when Pacific pays us additional living expense, I will give the sensors and door contacts, et cetera, back to them just as I have the other additional items that we're not using.

Q What exactly do you think -- do you think there is some sort of salvage value or something to these sensors?

A I don't really speculate on that.

Q I mean, it probably makes most sense to keep the sensors with the house, correct?

A Not -- it's not for me to decide.

Q Does your dad want you to leave them?

A We have not talked about that. But he certainly doesn't expect me to keep any of my additional living expenses.

Q I don't know what you mean by that.

A If I'm submitting this as an additional living expense, he doesn't expect me to leave it for his benefit.

Q But if you did leave it, it would be beneficial to your dad in his rental house, right?

A That's irrelevant. I wouldn't leave it. I would give everything back to Chubb, and Chubb or Pacific can do whatever they like with it.
Q Okay. Let's turn to tab 15. These are -- this is an invoice from Green Light Electric for $1,630. What is this for?
A Hanging light fixtures, and we installed recessed lights.
Q Why did you install recessed lights in a rental home?
A We needed more lights than the rental home provided.
Q We can agree that this is a fixture; this stays with the home, correct?
A I mean, technically if Chubb or Pacific wants the recess lights, we can remove the cans and give that to them.
Q That doesn't make any sense, does it?
A Yeah. If they can be reused.
Q So would your dad be okay then with them coming and pulling the can lights out of his rental home?
A Of course he would. He'll put his own cans back in there.
Q Of course, the labor, there's no salvage

on the $1100 worth of labor, correct?
A Correct.
Q So the fact that that wiring is in there is beneficial to your dad, and that is a fixture that will stay with the rental house, correct?
A I mean, you're welcome to pull the wiring if you like.
Q What's your typical water bill at Dell Road?
A It varies. We only lived there for five months. Some of it was summer, then end of fall.
Q What was the typical bill?
A I don't know. I'll have to look. I don't know off the top of my head.
Q So I've asked you guys to provide copy of your three months of utilities prior to the fire, but we have not gotten it yet. Excuse me?
A We sent all of the invoices for the three months prior and all of the months post fire. We have provided --
Q I have not received that, so if you can re-send --
A We'll re-send them, but we absolutely --
Q Okay. I don't have it. Okay.
So turn to tab 16 for me. Looks like

these are your bills from the Birmingham Water Works; is that right?
A Yes.
Q And are you still paying your bill over at Dell Road as well?
A Yes.
Q Okay. So for the water then, if you'll send me your three months prior and your current bills at Dell Road.
A Yes, we will re-send.
Q Okay. And the reason that I'm asking for that, and it sounds like you understand from us talking about this earlier, but the policy pays for anything that is over and above what you typically would pay on your water bill. So if you're paying for water at Dell Road, and you're paying for water over at Wimbleton, then we would pay for whatever is over and above. Do you understand that?
A I will tell you this, Jeremy Elliott told us that Chubb or Pacific would pay the rental utilities, and that is why we submit them every month.
Q And for your water if you're paying the water, it just pays what would be extra over and above what you're paying at Dell Road. It's your

extra living expenses.
A I hear what you're saying. I'm telling you what Jeremy told us and why we submit them every month.
Q Okay. So I need for the water, and we're getting ready to go through the rest of your utilities, but just speaking on the water, I need three months prior to the loss, and I need all of the water bills over at Dell Road since the loss. Looks like I have water bills for Wimbleton.
A We will send you what we sent before. I'm not going to go to the trouble of getting the -- any that have occurred since then.
MR. DAUPHIN: We'll look at what you sent and give you what's required. I mean, we'll clear up any confusion and give you what's requested if we haven't already sent them.
MS. MOSS: All I have is -- for water bills is what is behind this tab. So looks like I have December 2019 bills for Fairway Drive.
MR. DAUPHIN: I know we looked at it, and I thought we sent it, but until I actually find the e-mail we'll see -- we'll get it to you.
MS. MOSS: I have December for Fairway, I have January for Fairway, looks like I've got --

then it skips over to April for Wimbleton, and I have May for Wimbleton.

MR. DAUPHIN: Okay.

MS. MOSS: I'm sorry, I didn't hear you Ali, what did you say?

MR. DAUPHIN: I said okay.

BY MS. MOSS:

Q Okay. All right. So moving to 17 it looks like these are your spectrum cable bills. What was your typical cable bill at Dell Road?

A I don't recall off the top of my head.

Q I'm assuming that you are not paying for cable over at Dell Road, correct?

A Correct.

Q So if you're not paying for cable at Dell Road, then the cable bills would not be considered to be an extra living expense, it's just your normal living expense. Do you understand that?

A I mean, I understand what you're saying.

Q Okay. Can we agree that because you were not paying for cable over at Dell Road that the cable bills for Fairway and Wimbleton would not be payable under the extra living expense provision of the policy?

A No.

Q Why not?
A Because our insurance adjuster told us otherwise.
Q Well, I think that he would disagree with that statement, but we read your policy earlier, and your policy does not provide to pay your regular living expenses, it just provides to pay for your extra living expenses, right?
MR. DAUPHIN: Alycen, we're not going to get -- the policy speaks for itself. It says what it is, and --
MS. MOSS: We'll go back and look for the policy for a minute.
MR. DAUPHIN: Language in the policy is what it is. There's no dispute about it.
MS. MOSS: I know, that's why I'm confused as to why -- we agree that it's extra living expenses, right?
MR. DAUPHIN: We agree with what the policy -- she says she understood what you were saying, and she's explained why she submits them every month because she claims that's what Jeremy told her to do. So that's just the facts both sides as to what it is.
MS. MOSS: And Jeremy does not say he said

that, but putting that aside, what is payable under the policy is what the policy contract itself says. Do you agree with me on that?

MR. DAUPHIN: We're not agreeing on anything as to what the terms of the policy say or don't say at this stage. We are here to discuss what the claim is and what's been submitted. And she has told you why she submitted the claim.

BY MS. MOSS:

Q Let's turn back to the policy for a minute. Let's reread this. Go back to tab 1, if you will, page B5, and that's -- excuse me, it's actually B6. Look at B6. Okay. Are you there?

A Yes.

Q Okay. So reading that again for extra living expenses it says: If a covered loss makes your house or other permanent structure uninhabitable, we cover the reasonable increase in your normal living expenses that is necessary to maintain your household usual standard of living.

Is it your position that the Spectrum cable bills are additional or extra living expenses even though you were not paying for any cable over at Dell Road?

A Yes.

Q Don't look at your dad. Just answer my question.

A Yes, Jeremy told me that Chubb would pay for all of our rental utilities. It is my position that they're all additional living expenses then.

Q But they're not -- you're not paying for anything over at Dell Road, so they are not -- putting aside what Jeremy said and what the policy says, they're not over and above what you were paying at Dell Road, are they?

A No.

Q And it's probably less than what you were paying at Dell Road, right?

A I don't recall.

Q It's a smaller house, right?

A It's -- I mean, it's cable and Internet, so it's a pretty --

Q At the very least it's the same.

A I don't know.

Q All right. Let's move over to tab 18. This is for Mr. Bug's Pest Patrol. Its look like this is a quarterly general pest treatment?

A Yes.

Q Are you still paying to have this done over at Dell Road?

A Not since we tore the house down. We're still paying termite control over there, though.
Q When did you tear the house down?
A On or around 6/22.
Q So since the fire then, if you're paying this on a quarterly basis, they would have done a treatment at Dell Road in April, right?
A I have to look back at my billing.
Q This first page is for treatment at Fairway?
A Yes.
Q Okay. And the second one is for Wimbleton?
A Yes.
Q So do you think that you had the pest control done both at Wimbleton and Dell Road for this April time period?
A Yes.
Q Okay.
A I don't know if it was March, April or May. I'll have to look back.
Q Regardless, the payment for this would be over and above what you pay for pest control at Dell Road for the quarterly treatment, right?
A It's the same. I mean, well, it's -- yes,

sorry. The same amount, but it would be additional, yes.

Q Okay. So that's additional. The June 1, 2020, looks like it was at Wimbleton, right, and that's a general pest quarterly detail?

A Yes.

Q And do you think as of June 1, 2020, you were also paying for this at Dell Road?

A No, I'm pretty sure Charles canceled it --

Q Okay.

A -- when we decided to tear the house down.

Q All right. So was it canceled when you decided to tear the house down or when the house was torn down?

A I don't know.

Q When did you decide to tear the house down?

A June 1st.

Q How do you remember that so well?

A Because it was a Monday, and the fresh start of a month, and that was a red line that we said we were going to do something June 1st.

Q So you're thinking as of June 1st you probably did not pay the pest control over at Dell Road?

A Yes, but I will -- I'm happy to check my billing and see.
Q Okay. Alabama Power, which is behind tab 19 if you turn. What was your typical bill at Dell Road, do you know?
A I don't know.
Q Are you still paying for power over at Dell Road?
A Yes.
Q And these bills that are behind tab 19 are the ones for Fairway Drive and for Wimbleton.
A Okay.
Q Does that look right to you?
A Yes.
Q And these bills are in addition to the power bill that you're paying over at Dell Road?
A Correct.
Q Okay. Turn over to tab 20. This is an invoice from ADT. What is this for?
A The cancellation of our service at Dell Road after the fire.
Q And ADT charged you to cancel?
A Yes, the remaining amount on our contract.
Q Was this -- this was paid by Chubb already, right?

A Right.
Q Okay. So this has been paid. All right. Let's turn to tab number 21. What are these?
A These are gas.
Q Did you say earlier that you are not paying for gas over at Dell Road right now?
A We're paying a basically eight-ish dollar fee to keep the meter. Is that right? There's a gas meter, right? Or to keep that -- yeah, there's a base level monthly charge to keep the account open and I think the meter.
Q You think that's about $8 a month?
A Uh-huh. Like 8.10 or 8.01 or something.
Q So less -- these gas bills then are not extra because you're not paying that bill over at Dell Road, right?
A It's the same answer. Jeremy said that they would pay all of rental utilities.
Q Okay. So I also need the three months of these bills.
A No problem. We'll send you all of them.
Q The three months prior.
A Yes.
Q Okay. Next tab is tab number 22. These are some invoices from Blackjack Horticulture as

well as Lopez Landscaping.
A Yes.
Q Are these landscaping companies that you've used at the Dell Road house?
A Blackjack we used at the Dell Road house. Lopez is one that we used prior to Dell Road.
Q Why did you switch?
A We think he does a better job, and he's reasonable.
Q Are you still doing any kind of yard service, landscaping work over at Dell Road?
A Yes, we still employ Blackjack at Dell Road. We are trying to salvage some of our plantings.
Q So Blackjack, if you turn to the third page behind this exhibit, is -- it looks like they have a proposal for you to do yard maintenance services.
A Yes.
Q $316.99 a month. Do you see that?
A Yes.
Q So is that what you are paying Blackjack every month?
A No, that was the proposal for Fairway.
Q Oh, that was for Fairway.

A Yes.
Q How much were you paying Blackjack over at Dell Road?
A It's been anywhere from 362 to, I believe, 900 and something. Because of the situation it's no longer, like, a monthly fee, it's kind of on an as-needed whatever they have to do that month.
Q Okay. So can you provide me with a copy of whatever you pay Blackjack?
A Yes.
Q Okay. And then for the Lopez then, that's just for Wimbleton?
A Yes.
Q Is your yard over at Wimbleton bigger than the yard at Dell Road?
A That's a really good question. Do y'all know the acreage? I don't know.
Q My question really goes to the fact that Lopez was charging you $500 a month over at Wimbleton, and it sounds like from your testimony that the Wimbleton house is much smaller than the Dell Road house.
A The lot is big at Wimbleton.
Q More yard you're saying?
A Yes.

Q Okay. Let's turn to tab number 23. These are some invoices from Iris & Company. Is she your decorator?
A Yes.
Q And how long have you worked with her?
A Since 2008.
Q So this first invoice I have here behind tab number 23 is invoice number 590, it's dated March 20th, 2020, and lists out some rods and blackout shades. Do you see that?
A Yes.
Q What is this for?
A Well, the blackout shades are for the bathroom windows and the bedroom windows. It's the same blackout shades that we have put in our houses since 2010.
Q Real quick, do you have these at Wimbleton?
A Yes, the ones on this invoice are at Wimbleton.
Q Okay. Is Gilly your daughter?
A Yes.
Q Okay. So this is -- the shades and the rug are for her room?
A The shades are for all three bedrooms and

the master bath.
Q And can those shades be used back at Dell Road or are they custom made?
A They're custom, so they cannot be used at Dell Road.
Q What about the rod, can it be used at Dell Road?
A No. These rooms are smaller.
Q Was this rug something that was in that original Restoration Hardware stuff that you've already been paid for?
A No, this is different.
Q What about master bedroom rug, can that be used over at Dell Road?
A No.
Q Let me ask it this way: Can any of these rugs be used at Dell Road?
A No, they're all custom.
Q Why not?
A Because they're custom, and they don't fit the rooms at Dell Road.
Q So are you saying that you just want Chubb to come pick these up after you rent this house?
A Yes, I'll send them to the storage unit, and Chubb will pick them up.

Q What about these two Swedish chests that are $5,200?

A Those are replacement items. I did not include that price in the additional living request.

Q What did they replace?

A They replaced the two Swedish chests on the contents claim.

Q Where are the chests located?

A On the contents claim?

Q What room?

A They are in one -- the bedroom that my daughters share.

Q Okay. So those will go back to Dell Road?

A Yes.

Q Okay. Next invoice is 595, if you turn the page dated June 16th, 2020. Can these chase go back to Dell Road?

A No.

Q What about the armoire, is that a replacement item?

A No, it's -- I did not include that in the additional living request I don't believe. If I did it was a mistake. But it's not a replacement item. It is -- it's just something we found and purchased.

Q Okay. So I want to make sure when you're

saying you didn't include it in the additional living request, are you saying that -- let's go back to the chests. So you did not charge $5,200 back to Chubb as an additional living expense, since you are considering that to be a contents replacement?

A Correct. If you look at the spreadsheets that we send every month of additional living expenses for the month, sometimes those don't add up to what's on the invoice, so I've made sure not to include anything that's not additional living. If there's a question if I made a mistake, let me know, but that's why sometimes those totals don't match up, and that's --

Q The 52 -- okay. So the 5200, then, is a contents item, correct, on that invoice --

A Correct.

Q -- number 590?

Then on invoice number 595, the armoire is a contents item?

A No, it's -- it is -- it's nothing. It's neither contents nor additional living.

Q It's nothing?

A Correct. Completely different furniture piece than we've ever had.

Q Okay. So I have listed a couple of

invoices here that were listed in a letter from your dad that are dated April 24th, 2020, of labor to alter, deliver, and install window treatments. One is $4,773, another one is $8,010. I do not have either of those.

A Okay, we'll re-send. You don't have either invoice?

Q No.

A We'll re-send those. When -- what month was it submitted for, do you remember? Never mind, I have it in my file.

Q It's in April 24th, 2020.

A Okay. I will send those or dad will.

Q Okay. Looks like actually there's another one too, April 30th installation of carpet and rug pads for $9,130. I don't have that either.

A Okay.

Q Okay. So going back to this invoice number 595, it looks like you've got some items listed for both Gilly and Susie's room. These are both your girls? Susie is your daughter too?

A Yes, and it's neither ALE or contents.

Q So you're not charging those items back?

A Correct.

Q So on this invoice, is the only thing

you're seeking to be paid for on this invoice the $115 for the installation of the shades?

A Correct.

Q Okay. Then the last invoice is invoice number 597. This is dated June 30th, 2020. Do you see that?

A Yes.

Q And are these just the consultation charges for Iris?

A Yes.

Q What does she charge you, $200 an hour?

A Yes.

Q And has she always charged that amount?

A No, she's increased her price over the years.

Q Okay. All right. Landscaping. Let's talk about that for a minute. TCC included a $50,000 line item for their -- for landscaping costs. Are you aware of that?

A Yes, I am aware of that.

Q And then in addition to the 50 percent, TCC would also get the 20 percent overhead charge on top of that, right?

A That's --

THE WITNESS: Are we going to get into

whether or not that should be included in here?
MR. DAUPHIN: Just answer her question.
THE WITNESS: I'm sorry. The way they have it in the -- the way they have it in the reconstruction estimate, yes.
BY MS. MOSS:
Q And when -- you're saying are we going into what? What were you referring to?
A I was referring to in the global offer I -- when we were looking at numbers, I had removed that landscaping charge. I would prefer to compartmentalize and have all the landscaping together and not have TCC overseeing that part.
Q Okay.
A This may be a discussion --
Q Okay. At this point, though, TCC has allocated $50,000 for landscaping plus their 20 percent profit and overhead?
A Yes.
Q Okay. And is it your position that the landscaping is going to be over this $50,000 line item that has been allocated by TCC?
A Yes, I believe so.
Q Do you know that or you just think that?
A I mean, until we have the final bills I

can't say for sure, but I'm very confident that we're going to reach our policy limits.

Q Well, the -- did the fire burn any of the landscaping?

A Yes.

Q But I'm assuming that a good bit of it is intact.

A The irrigation system was ruined, and it hasn't had water since the day of the fire. We transplanted some of the plants that are still alive, but it's not going well, to be honest. There's still some hanging on.

Q Okay. What happened to the irrigation system?

A You know, I don't -- I don't know. But it's busted. It was in pieces in our yard.

Q Is the irrigation system underneath the --

A It is. The -- whether it was fire trucks or Brookstone, I don't know, but there -- there's pretty significant damage to a lot of the landscaping in the yard along the driveway.

Q Has anybody come out there and given you a specific quote on what it's going to cost to replace the irrigation system or any of the landscaping?

A No. We haven't gotten that far yet.

We've employed Blackjack, and we kind of reevaluate every month or so what's living and what's dying, and until we're done with the house, it's not really practical to start fixing the landscaping. So we haven't gotten any quotes on that yet.

Q So at this point you're not saying that there's any specific amount of money due on the landscaping because you don't even know what needs to be done, right?

A We don't know the extent of it. I know what I paid to put it in, and I know what I paid the landscape architect, so I have a good idea of what it all costs, but we have not -- the only thing is we've paid to transplant some of the plantings. That's the only thing we've paid on it so far.

Q How much did you pay to put the landscaping in to begin with?

A I'm going to have to look at my numbers.

Q How much did you pay to transplant?

A Somewhere between 3- and 5,000, I believe.

Q And Blackjack did that?

A Blackjack did that, yes.

Q So you're doing your best to save the landscaping that is there?

A Yes.

Q And I'm assuming you do not need the landscape architect to do another plan because you already have that done, right?

A He oversees -- he does everything that the architect does for our house, he oversees the plantings, he helps secure the plants when the fellows can't find them. He's based in Nashville, so he makes trips to Birmingham. He also oversees to put it back the way it was.

Q Does he just charge a percentage fee for the overseeing, does he charge an hourly fee?

A I don't know.

Q You don't have to have the plans redone, though, correct?

A Correct. We don't have to have them redone.

Q Is there anything else you can tell me about the landscaping that we haven't talked about?

A I don't believe so.

Q I should have asked you that, actually, about the additional living expenses too. Are there any other additional living expenses that you believe you are owed that we haven't talked about?

A I don't know. I've submitted everything that I believe I'm owed.

Q All right. You good? You want to take a break or you want to keep moving?
A I'm good.
MR. DAUPHIN: Alycen, I have Charles. He's standing by, and I'm certainly not rushing you. Is there anything else I can tell him to report back?
MS. MOSS: You want to go off the record and we can talk about it?
(Recess 3:35-3:46 p.m.)
BY MS. MOSS:
Q I'm now going to move on to your contents, and I want you to turn over to tab number 24 in the notebook. I believe that this is the most recent documentation that we have received on your contents. Does this look right to you?
A Yes.
Q The total amount of the contents you're claiming is $1,336,000 -- $1,336,273, right?
A Yes. On this.
Q On the contents. That's what I'm talking about.
A Yes, on the contents then yes.
Q All right.
MR. DAUPHIN: (Inaudible.)

THE WITNESS: I do have other contents that aren't on here. I just stopped when I went over the policy limits.

MS. MOSS: Chuck, you're testifying for her.

MR. DAUPHIN: That's in my letter to you also. I didn't think that was in dispute. I just didn't want a mischaracterization. When we submitted the claim we made that point, so it's not an instruction. Go ahead.

MS. MOSS: I've seen your documentation, and I'm trying to get the testimony from Ali right now.

BY MS. MOSS:

Q The items that are listed on here total a little over $1.3 million, right?

A Yes.

Q Okay. Who prepared this list?

A I did.

Q And how did you prepare it?

A A lot of -- most of this stuff I worked with Iris on. It claims in her letter that we included with this. Do you want to be more specific about what you want to know about how I prepared it? I'm not sure I'm answering your question.

Q I just want to know what you did in order to prepare this. What sources did you use? Did you talk to Iris? How did you come up with all of the information that you have on this spreadsheet?

A Okay. Most of it I worked with Iris. She would call. The rest that we ordered originals from and get updated pricing and shipping estimates, she talked to the workroom to get updated labor costs, we looked on some of the industry standard websites for antique replacements, similar items, checked local stores and other regional antique stores that we've purchased from to try to find similar items. That's -- most of it is Iris. If there's anything in particular you want to know, ask me and I'll tell you, but the vast majority.

Q I've got particular questions, but I guess for now let's look at the very first thing you have listed here, the Knole sofa, to make sure I'm understanding how the spreadsheet works.

So you've got your original cost here $9,290, right?

A Right.

Q And as I read that, you're referencing that cost is from Iris & Company, invoice number 421, right?

A Right.
Q And I've got Iris's invoices behind tab number 26. Do you see that?
A Yes.
Q So if I go to 420 -- invoice number 421, I see the Knole sofa on there for 9290.
A Yes.
Q So is that how you came up with the original cost on this list, you referred back to the invoices that you had from Iris?
A Correct.
Q Okay. So for the sofa -- for example, where did she get the sofa from? Is there any backup for anything behind Iris's invoices?
A No.
Q So, like, where is the sofa from?
A I don't know which particular company, but it would have been a company that designers purchase from. It's not a company I could go order something from.
Q Does she ever give you any kind of backup documentation, invoices, receipts, anything like that?
A Only if I bought -- I think I included an invoice for an antique mirror that I purchased from

her, but, no, that's what her invoices look like. They're consistent. You can see over the last, what, 12 years. We talk about it beforehand, I know what it costs, so I've never asked her for any more detail. I'm fully aware of what's going on the invoice when she sends it to me.

Q But do you know if she keeps any kind of backup documentation with respect to what she buys for you?

A Oh, yes. She has a file.

Q Can you get a copy of her file that has the backup documentation on these items?

A I'll ask her.

Q Why are you looking at your dad?

A I'm looking for my legal pad to write a note to ask Iris for the documentation.

Q So you and he are fine to get the backup documentation for her invoices?

A I will ask her. I mean, she has -- my file that I'm talking about is a box of fabric samples and things. I don't know exactly what she'll be able to give you, but she knows what she purchases.

Q What is your deal with her? You pay her an hourly fee that's 200 an hour, right?

A Right.
Q And then do you pay her 20 percent on top of whatever she buys for you?
A I don't know.
Q You don't know what you pay her on top of her purchase price?
A No.
Q And she never told you that?
A No. We don't talk about it.
Q Okay. So back to the sofa, it says replacement cost is $12,450. How did you come up with that replacement cost?
A That is what the manufacturer told Iris the sofa costs now.
Q Who is the manufacturer of that sofa?
A I don't know.
Q Well, did Iris give you that replacement cost?
A Yes. Iris and I collaborated on this spreadsheet, but I am the one that put this exact one together with the notes and the references to send to you.
Q For this replacement cost, did you go to Iris and say, hey, how much is it going to cost me to replace this Knole sofa, and she in turn called

the manufacturer, who in turn told her that that sofa is $12,000?

A Yes, and the manufacturer estimated the shipping and the freight for her.

Q What do you pay for sales tax in Birmingham? Is it 10 percent?

A Yeah. There's a little pocket of Mountain Brook that's 9 percent, but most of the things we order goes to a storage unit that's in Birmingham, it's a destination-based sales tax, or they go to Iris. And hers is 10 percent.

Q Iris's sales tax is 10 percent?

A No, her ware -- when we buy it and we ship it to Iris & Company, the sales tax for that ZIP code is 10 percent. But where I live in Mountain Brook it is actually 9 percent. But, I mean, if I go to Target, it's 10 percent.

Q Is it being shipped from out of state?

A Yes.

Q Then they shouldn't be charging you for sales tax and shipping, right?

A No.

Q When you ship from out of state, you should only be charged for shipping, not sales tax.

A That is -- it's never been that way.

Page 146

Q Really? Okay. You've always paid sales tax and shipping on your furniture when it's coming from out of state?
A Yes. So if you look at Iris's bills, there's always sales tax and shipping.
Q So the trim, the cord for that, how did you come up with the replacement cost on that?
A Exact same way, Iris called up the manufacturer and asked them for the updated costs.
Q Iris did you said?
A Yes.
Q Or you did?
A Iris did. These are not companies I can call. Only a decorator can order these items and get the information.
Q Same thing for the two wingback chairs?
A Yes.
Q Do you know who the manufacturer of those were?
A No.
Q And if this invoice number 421 is dated December 8, 2015, is it safe to say that that is when you bought that furniture around that time?
A Around that time, yes.
Q So the fabric for the wing chairs was

about $2500, but you were estimating that fabric as $7,200 now?

A Yes.

Q Is it the same fabric or it's a different fabric?

A I'm not sure about that one. I'm not sure, but if the fabric is no longer available, then she looked for the most similar fabric and priced it.

Q What kind of fabric was on there?

A I don't know. Light blue diamond. I don't know.

Q Do you know who the manufacturer of the fabric was?

A No, not of that fabric.

Q How involved are you with decorating and picking out furniture?

A Iris brings me options, and I pick everything with her.

Q So do you know manufacturers and fabric people, and do you know the names to know if it's high end, low end, anything like that, or she just gives it to you, and that's that?

A No. I mean, it's high end. I don't know necessarily which one of these is the Bennison, but

I'm familiar with these manufacturers that she gets everything from.

Q Looking at the Murphy bed and the labor to upholster the Murphy bed, that doesn't have any kind of original cost listed on it.

A Right. When we purchased the Murphy bed, it was already upholstered. It had cushions.

Q Where was this bed?

A I'm sorry?

Q Where was it located?

A In the living room. The rooms are listed to the left.

Q Sorry. Okay. I see that now.

How much did you pay for the original -- the Murphy bed originally?

A I don't know. I'd have to look at the invoice.

Q You don't have an original cost listed, which is why I asked.

A Right, but I had to the side a note that it is -- the antique Murphy bed is number 8 in Magali Maus's first proposal, and you know that I actually owned the Murphy bed. It is a thing.

Q Well, if Magali Somers has them, am I correct in assuming she is refinishing it?

A Yes.
Q Okay. So then you're not rebuying the bed, you are just charging for fabric and labor here?
A Yes, the fabric, the labor, and the cost of new materials.
Q Okay. And then what are the new materials?
A Whatever it is to make the -- the -- oh, my God, I'm blanking -- the cushions. The stuffing and stuff like that. Foam I think is what they use.
Q Okay. For labor, you don't pay sales tax on labor, correct?
A It depends. I'm not entirely familiar with the rules. I think if she's working with new materials, we do pay tax on that labor.
Q It's my understanding you pay tax on the items, but there's no tax on labor.
A Sometimes there is. Iris's accountant is more familiar with when you pay the sales -- when you pay tax on labor than I am, but -- and her accountant helped us with this. So if I listed tax on it, it's correct.
Q Okay. So you specifically looked up each one of these to determine whether or not tax was

Page 150

owed on it?
A Yes. But most of this if not all of it -- I don't think there's anything -- I believe all of it would be new materials. If there is something, I'll catch it, so there should be tax on most of it if not all.
Q Okay. Next thing is the fabric for the window treatments in the living room.
A Uh-huh.
Q Looks like your original cost was 17,670. When I match that up to Iris & Company's invoice number 520 -- excuse me, 552, it looks like this fabric was bought in April of 2019. Does that sound correct?
A Yes, sometime around then.
Q So in the last year has the fabric appreciated, or is it different fabric, or the price has gone up?
A The price has gone up.
Q Price has gone up on this fabric by $2500 in a year?
A Yes. I think the only fabric that did not go up in price were our custom fabrics that were created for us. Everything else I believe had increased.

Q Okay. So let's look at the labor to make the window treatments. Turn, if you will, over to invoice number 585.
A Okay.
Q Let's see. This is labor to make the window treatments. I think that was -- it's on page 2. So this invoice 585 is dated January 21st, 2020, so this was prepared by Iris after the fire, correct?
A I don't see a page 6, I'm sorry. Invoice 585.
Q Yeah, 585, it's dated January 21, 2020. Do you see that?
A I'm on page 2.
Q I'm sorry, did I say 6?
A Okay.
Q Okay. So this was done by Iris after the fire, correct?
A This is what they submitted to Iris after the fire. We had not paid them for their labor. They delivered things the Friday before the fire, and then, of course, they didn't want to submit the bill right after.
Q They who?
A The workroom, Julio and Maria that made

the window treatments and upholstered the furniture.

Q So you're saying that all of this January 21, 2020, items were delivered the day before the fire?

A Not all of them. Some of them. The Friday before the fire. Susie's room, the majority of that was delivered, and also Caroline's room, the majority of that was delivered the Friday before the fire.

Q Okay. Well, let me -- look at page 2. The labor to make the French-pleated drapery panels with lining, bump, and hand-stitched, $2,088; do you see that?

A Yes.

Q So if I go back to your chart here, you've got the labor, the original cost is $2,088, replacement cost of the labor is $2,401.

A Yes.

Q What is the difference there?

A Their price went up. They've increased their prices, which they're welcome to do at any time.

Q They've increased their prices in the last six months since you got this stuff?

A Yes.

Q I'm not understanding what this January 21st, '20, invoice is. All of this stuff is invoiced before the fire?
A Yes.
Q Or was some of it after the fire?
A No, the invoice was sent after the fire, but their work was completed and delivered prior to the fire. They just didn't want to send the invoice immediately after when my house had just burned, and half of the stuff they just made me no longer existed. They were trying to be kind.
Q So can Iris or can you provide some sort of backup documentation to show that this labor has appreciated to this extent?
A I mean, she says in her letter how she determined the cost. I don't -- of course. I don't know why her letter isn't enough backup documentation. They --
Q Are you talking about -- look behind tab --
A It's in 25.
Q Okay. You're talking about the letter that's behind tab 25?
A Yes.
Q I don't see that she says anything about

labor here.

A Many items were crafted by local artisans with whom I consulted to determine replacement costs.

Q Is she talking about the labor there?

A Yes. Many items, the window treatments, the upholstery.

Q So is Iris someone that determined the replacement cost for everything then?

A No. I mean, we have to go item by item, but if it came from -- if I bought it from Iris, then yes, she determined the replacement cost and the labor, anything from there. For example, the mattress, I called Mattress Firm to see what the pricing was. But if it's an Iris & Company item, then, yes, she did.

Q Okay. Moving on to the living room, the next thing is the rug. The original price it says is 14,800; the replacement cost is 35,000. It looks like that rug was bought October 25th of 2019. So are you saying that the rug is now double the price not even a year later?

A It's a rug -- you can't buy the exact same rug, so I found a replacement rug, and that's what the replacement costs. If you look at the dining

room rug, the replacement costs less than the one I bought 10 years ago.

Q What?

A If you go down to the dining room rug, the replacement rug is less expensive than the rug that I lost that was purchased 10 years ago. I couldn't make everything match up. I could not find, you know, an exact copy of those rugs.

Q Okay. So if I look at tab number 28, is this a receipt for the rug in the living room that we were just talking about?

A Yes.

Q How did you go about trying to find a replacement for this rug?

A Well, this we had a language barrier, and they never did understand what we were needing, so I went to Paige Albright, where I bought several of my other Oriental rugs, the local shop, and got replacement rugs there.

Q How did you match them? Are you looking at size, color, what exactly are you looking at to find a replacement?

A The type of the rug, the size, and the color. We just looked for the same we could find.

Q So pretty much you went to Paige Albright

and just looked at what she had?
A Yeah. She has -- it's very well stocked. She has a huge selection of antique and new Oriental rugs.
Q This is a huge -- this is double the price less than a year later. Is there somewhere else that you could look for this rug?
A Again, we -- we tried to contact Turkish Rugs to work with us and, again, there was a language barrier. They did not understand what we needed, could not help us, we could not get anywhere with them. I went to Paige Albright because I bought a number of other rugs from her over the years, so that's someone I would go to to buy an antique rug. And then the other company that I bought antique rugs from, the owners moved to Paris, so that was not a good option.
Q Okay. Then you've got labor to cut, deliver, and install the rug pad. This is something that Dustin Cox had done for you?
A Yes.
Q And it looks -- I think you submitted his invoice -- checks that you wrote for him. That's behind tab number 29. Are those -- are these the checks that you wrote to Dustin Cox, is that for the

labor to cut, deliver, and install rug pads at Dell Road?

A It is. They're not going to match up perfectly to exactly what was lost, but it's just evidence that I have custom rug pads and that he does them.

Q So moving forward, I guess if I add up these three checks, is that what would be the total amount to be paid for the custom rug pads?

A No, his prices have increased.

Q Okay.

A And also these are -- some of the rugs already had rug pads. These are just checks that were recent and easily accessible for me. This is work he had done at Dell Road over the summer. The other rugs had rug pads that he had cut, I mean, anywhere from one to five-ish years ago. So no, it will not match that number.

Q So I need -- we've already talked about whatever kind of original receipts that Iris had, but I also am going to need some kind of backup on this replacement cost. I know that you have given me some, and we'll look at those, but --

A You know that I've given you what?

Q I know you've given me some evidence of

replacement cost, and we're going to go through that stuff, but for the majority of the items listed on here, I don't have any sort of indication or backup with respect to the replacement cost of the item.

A There's a letter from my decorator stating how she got the replacement cost. I don't know --

Q Iris is saying. I need some information about how she came up with this, and -- what?

A It's in her letter. She detailed to you what she did to obtain these replacement costs. This is where I purchased them.

Q This is basically a two-paragraph letter that does not give any detail about how she came up with these replacement costs. When I'm talking about detail, I mean I need some sort of backup documentation showing these two wing chairs are going to cost $11,500 to replace; this rug is going to specifically cost $35,000 to replace --

A Are you going to pay for her time to gather all of that?

Q -- labor has increased, you know, from $1,000 to $3,000, or the fabric has increased. I need the backup on the costs.

MR. DAUPHIN: How about an affidavit from Iris as to what all she did?

MS. MOSS: I mean, she can provide an affidavit as a backup documentation, but her just saying a rug is going to cost $35,000 is not enough. I need some documentation showing that this rug --

(Simultaneous speaking.)

THE REPORTER: I'm sorry. You guys are talking at the same time. I can't get you --

MS. MOSS: Sorry.

THE REPORTER: Ali, I didn't get your whole last answer because you guys were talking at the same time.

THE WITNESS: The rug is the attachment I provided. She can see how big it is, and she can see what it costs, and she can see what color it is.

I have to pay her for her time to do all of this. She has put so many hours into getting this information for me, and we haven't even started ordering things for the most part.

BY MS. MOSS:

Q Okay. Let's look at the documentation that you have sent me for replacement costs, which is behind tab number 30. Hold on. Tab 30 actually is -- tab 30 is additional backup documentation, I believe, on your original purchases, right? Yes.

Okay. Tab 31. Are you with me on tab 31?

A Yes.
Q Okay. So it looks like this is -- this is all that I have that you submitted for backup documentation regarding the replacement costs. So, I mean --
A For A&P. I mean, I submitted an entire spreadsheet of replacement costs.
Q When I say backup documentation, I mean some sort of documentation that verifies what the actual cost is that you are going to have to pay over and above Iris just saying that it's going to cost X amount.
A You realize that Iris can charge me anything she wants? It is well within her right as a decorator. If she wants to charge me 80,000 for the sofa, she can say that's the replacement cost.
Q Well, let's do this, let's take a look back at the policy. I realize Iris can charge you whatever she wants --
A All right.
Q -- but that does not necessarily mean that it's payable under the policy. So let's go back to the policy. Now we're looking at the lost contents coverage. Do you see that page? It's C2. You see that?

A Yes.
Q If you look under payment basis, earlier, you know, we discussed the fact that your payment basis is replacement cost. Do you recall that?
A Yes.
Q And here it says: The payment basis is replacement cost. We'll pay the full costs to replace the contents without deduction for appreciation or the amount required to repair the damage whichever is less of the amount of coverage.
Do you see that?
A Yes.
Q So while Iris may charge you $80,000 or whatever amount she wants to charge you, that does not necessarily mean that is what's covered under the policy.
What's covered under the policy is the true replacement cost for the item, and what I'm trying to understand is whether you have any backup documentation for these items. And I know that do have some behind tab 31, so let's look at that, and then we'll go through the other items that you don't have replacement.
MR. DAUPHIN: Don't ask me anything. Just answer her question.

BY MS. MOSS:
Q What did you just ask your dad because I can't hear you?
A Is the replacement cost not what it costs me to replace it?
Q The replacement cost is something that is of like kind and quality.
MR. DAUPHIN: We'll argue over the policy language later.
BY MS. MOSS:
Q Okay. So let's turn to tab 31 then. First thing I have listed here is pearl box -- mother of pearl tea caddy. If I look on your inventory -- see if I can find it easily -- that's on page 2, bottom of page 2 on your inventory. Do you see that?
A Yes.
Q Okay. So it looks like you originally paid $2500 for the -- at Robert Hill Antiques, correct?
A Yes.
Q And the one that you have gotten a replacement cost of $7,000.
A Yes.
Q When I looked for this, I see that there

are 20 of these antique mother of pearl tea caddies that -- there are a lot that are exactly like this one. So I'm wondering how do you choose the $7,000 one versus a $2500 one?
A They're not exactly like this one. This one opens up. This one has a red velvet interior like mine had; this one has a drawer. This looks -- it has the same gold feet that mine had. I mean, we -- this is --
MR. DAUPHIN: Just answer the question.
BY MS. MOSS:
Q Okay. The next thing I have here is bookcases. So it looks like you originally paid $5,000 for these bookcases, and these replacements are $24,000.
A Yes.
Q So that's a huge difference in cost.
A It is, but I bought those out of an antique store that is more like a warehouse, and I had them fixed up and cleaned every year. We added shelving. So the price that I paid for some of these antiques is not necessarily all that relevant to, like, their replacement costs.
Q Well, it is relevant because it shows what you paid for them.

A It doesn't reflect --
MR. DAUPHIN: Let her ask a question, then you just answer it.
THE WITNESS: Okay.
BY MS. MOSS:
Q What does it not reflect?
A The cleaning and the work done to repair and improve them and adding the shelves.
Q Okay. The next thing is this bench. It looks like you paid $1,760, and this replacement is 3950. Iris found it for you, I guess?
A Yes. It's the most similar bench that we have seen to what we had, and you also have to pay attention to when I purchased the bench. It was years ago. Prices of antiques have gone up.
Q Okay. The linen press is the next item. You paid $9,500 for that.
A Yes.
Q And the replacement is 22,000?
A Yes.
Q So what about all of this stuff that Magali Somers has? Does she not have the bookcases or the bench, the linen press? I thought that she was restoring a lot of these items.
A She is restoring a lot of the items. The

bookcases burned in the fire, as did the linen press, and they were not salvageable. And the bench was not either. We sent it to her. She began work on it and found that it could not be saved.

Q Okay. So the next thing is the lamps. Looks like you paid -- I'm sorry. Oh, the game table. So the replacement is $9500. I don't see anything showing the original price that you paid on that.

A I don't have the invoice, but you are welcome to view the table.

Q I'm asking more about documentation with respect to the original price. Do you have anything on that?

A No.

Q Next is thing is an antique lamp that you paid $2,079, and the replacement is $5,800?

A Yes.

Q See the white -- okay, the antique gold leaf bow sconces, what was the original price of those?

A I don't know. I didn't have a receipt for that -- for those.

Q But the replacement is $4,950?

A Yes.

Q Next thing is actually not sconces, it's a single antique lamp, I guess, that's in here. You paid $300 for this, but now this is $1600?
A Yes.
Q And, again, this is just what Iris -- all of these documents that we've been looking at is what Iris found and sent you --
A Yes.
Q -- as a replacement?
A Yes.
Q The pair of antique lamps are the next thing in this exhibit. Were those in Caroline's bedroom?
A Yes.
Q Excuse me.
A Or the guest bedroom. Are you looking at Caroline's?
Q Well, I'm on now page 4 of your spreadsheet, about halfway down it says Caroline's bedroom, pair of antique lamps.
A Okay.
Q It lists $3900 as the replacement. Is that what these are?
A There's a set for the guest room and a set for Caroline's room. I'm not sure what picture

you're looking at.
Q I'm looking at the next picture behind tab number 31 that says 19th century candlestick lamps for $3900.
A Okay.
Q Are those the lamps for Caroline's bedroom? Am I matching that up correctly on the spreadsheet?
A Yes.
Q All right. The next thing listed is the iron bed with the red velvet. It says that replacement cost is $3500. I do not see an original receipt for that.
A I don't have the original receipt for that.
Q Do you have any photos or anything like that of these items that you do not have receipts for?
A Yes.
Q When did you buy the day bed?
A 2009 or '10 probably.
Q Is this what it looked like with the red velvet?
A No, we couldn't find an antique iron day bed. This is an iron day bed.

Q And are you planning to re-cover it?
A Yes.
Q And is that the next item, that's the fabric for the day bed, the $2400?
A Yes.
Q And then there's additional labor that's 1255, and then cost of materials, which are 1440?
A Yes.
Q Okay. So this next one, somehow this is actually one of your original receipts, isn't it?
A Yes.
Q Okay. Are these the linens that you bought since the fire to replace what you had in the house?
A No, we have not replaced these yet.
Q What is this estimate for then?
A What?
Q Under tab number -- what is this estimate for Leontine linens that is behind tab number 31?
A It's the replacement cost, but we haven't replaced them.
Q Okay. So they just sent you this estimate to replace?
A Yes. They drew up an estimate. When we asked for the replacement costs, this is what they

sent.
Q Okay. This is for all the bedding in the house?
A No, this is just for the Leontine linens.
Q What bedding does this cover?
A Look at the spreadsheet. It covers --
Q I see one for Susie's bedroom?
A Susie, Gilly, master, Caroline, and guest. Every room had one set of Leontine linens.
Q And then you have other rooms that need linens, or does this cover your linens?
A I have backup sets of linens that I did not include in the contents claim.
Q These were the original linens that you bought, and you're basically rebuying the same thing?
A Yes.
Q Okay. Moving past the linens to the Asia Rug. This was an appraisal that was done on December 5th, 2019, and it looks like they said that these two rugs were not in good condition, correct?
A Correct.
Q And you have been paid for those rugs, right?
A Partially.

Q What do you mean partially?
A That's not the value of them. The replacement value that they gave, the approximate replacement value is not the fair replacement value for those rugs. I included the remaining balance in my contents claim.
Q Why do you say that? This is from a rug company in Birmingham that has appraised the rugs. Why --
(Simultaneous speaking.)
MR. DAUPHIN: Just answer the question. Go ahead.
THE WITNESS: What was the question?
MR. DAUPHIN: Ask her to repeat the question.
THE WITNESS: Please repeat.
BY MS. MOSS:
Q The question is: A rug company in Birmingham appraised these rugs and provided this appraisal dated December 5th, 2019. Why do you contend that you know the replacement value of these rugs better than the rug company?
A Because that rug company does not do appraisals, and they didn't even know that it was a Safira rug, they said it was a Turkish Oushak. They

also said this was an Indian tufted rug, and it was -- I don't know what it was made out of. They didn't even know what kind of rugs they are, and I provided the invoices that showed you what I paid for them. Both of them. This company cleans rugs. That's all they do now.

Q Go to tab number 30 for me. It's maybe two to three pages in -- four pages in maybe, is that the rug you're talking about that you provided the documentation from?

A On this Paige Orientals -- Paige Albright Orientals, it is the Safira new production that cost 24,000 10 years ago. Nine years ago.

Q Are you on tab 30?

A I am.

Q So you're looking at the Paige Albright Oriental, okay. The one that has the note on it?

A Yes.

Q Says the rug -- which rug is the $24,000 one?

A The one that they think was a Turkish Oushak.

Q The one that they listed number 1, Turkish Oushak as $8,000, you're saying is this exact rug that you paid 22,000 for it on August 15 in 2011?

A Yes.
Q And then what about for number 2, the India tufted solid that they valued at a thousand dollars for a quote?
A On this spreadsheet that's the rug from Caroline's bedroom, and it is on one of the Iris & Company invoices.
Q Okay. So that's not one of Paige Albright's rugs?
A No.
Q Okay. So for the mattresses that you listed on here with the original and the replacement costs, did you look up those mattresses to determine the replacement costs or did you have Iris give you that?
A I called Mattress Firm myself, and I asked if -- I asked what the replacement cost would be. I asked if they would honor the price that we paid for them, and they said that it depended on whatever manager special was running.
Q Okay.
A That is where I listed the actual price as the replacement cost.
Q Okay. Because I will say I looked on the website, and the original cost was still the same.

It had not increased.
A This isn't increased. No, I -- it's not an increase. The question is whether they're going to be running the manager special on those mattresses when I want to buy them. That's why --
Q You don't know the replacement costs for the mattresses. Yes.
A She's saying that she can find -- I'm assuming that if --
MR. DAUPHIN: Ask her what the question was. Wait for a question, then give an answer. I don't know if there's a question out there.
BY MS. MOSS:
Q The question is: At this point you don't know the replacement cost of the mattresses because you haven't bought them, right?
A Right. I'll have to buy them, and you have a pretty good idea of what they'll cost.
Q Okay. The next tab is number 32, if you'll turn over to that. This is a Trumeau that's $5,650. I do not see this on the inventory.
A It's the one in Gillian's bedroom that burned in the fire. It no longer exists.
Q The one that says the antique white Trumeau?

A Yes.
Q So this was a gold one, but --
A Well, the white one had gilt on it. This is also painted and has gilt on it.
Q Okay. The next thing is the stool, the gilt wood stool. I did not see that on the inventory either. I think that's actually the one before the Trumeau.
A It is the antique round bench that was in the attic.
Q Okay. Antique round bench. Okay.
The next thing is tab 33, sofa and some club chairs. Is this to replace an item in the house? What is this?
A It's additional living furniture. It does not replace our contents.
Q I thought you bought additional living furniture from Restoration Hardware. Why are you buying more furniture in June?
A We bought additional living furniture. We just bought for a family room, and we have -- there was also a living room there, but obviously we didn't stay there long enough to buy for it. So Wimbleton also has a family room area and a living room, and we needed a sofa and chairs up there.

Q Did you actually buy this --
A Yes.
Q -- furniture?
A It's in the room.
Q This says -- it just says it's a proposal.
A Well, we submitted the proposal and asked about it, and you did not give us clear answer one way or the other, so we bought it. This proposal is also a receipt.
Q Tab number 34 relates to some rugs. What is this?
A What?
Q What is on tab 34 that lists out the Goodrich rugs at Dell Road?
A These are the replacement rugs that we --
Q Who prepared this document?
A Paige Albright.
Q Have you bought any of these rugs from her?
A I did not buy the sunroom rug, which is page 3. I'm holding out hope that my sunroom rug will come through after being cleaned again, and I didn't buy the square rug. I don't know what that is. I don't know that that should have been included on the last page.

Q So the square rug, you need it or you don't need it? Is this replacing something or it's not.
A The square -- don't look at the square rug. It's nothing.
Q Okay. So you are not asking to be paid the $7500 for the square rug?
A No. Or the 7500 for the sunroom rug on page 3.
Q Turn to page -- tab 35, excuse me, please. This is something -- a document that's been prepared by Magali Somers Maus. Who is that?
A She restores our antiques.
Q So you are having her restore some of your antiques, right?
A She is treating everything, all of the antiques that went through the fire, yes.
Q And has she had luck in restoring them?
A A good bit. Not everything.
Q I understand that Magali gave a verbal estimate to restore the antiques in the amount of about a hundred thousand dollars. Does that sound right?
A Where -- what makes you think that?
Q That was just my understanding from

looking at the claim file.
A A verbal? I mean, it's all written. I provided her estimates.
Q Well, Chubb has paid her $50,000 already, right?
A I can't recall exactly how much. I know that they sent two payments.
Q Okay. And then I think they paid another 23,825, right?
A They have not paid for the full first estimate. They sent a check for two partial payments on her first estimate.
Q Look behind tab 35. Total estimates on all pieces is $15,000. Do you see that?
A Oh, this is her second estimate.
Q Right.
A Okay.
Q So is that estimate in addition to a hundred thousand dollars, or is it in addition to the 78,500 that Chubb has already paid?
A This is -- I have not submitted this. This would be in addition to her first full estimate. Did I answer your question?
Q Well, you said you haven't submitted it, but --

A Sorry, I have not submitted it on its own. The first time you would have seen this is with our contents claim.
Q Okay. Does Magali have an estimate or invoice like this for the items that she has already restored?
A I have paid her the amount that Chubb has sent. I've paid her that full amount.
Q Okay. The next tab is tab number 36. Do you see that?
A Yes.
Q Who prepared this?
A I did.
Q And this basically sets out what has and has not been paid, right?
A Yes.
Q And the main issue is -- well, you're saying that Magali Somers's 23,825 has not been paid, right?
A Correct, on -- for the first estimate.
Q You're also saying an additional 15,000 due to Magali Somers, which is the estimate we just looked at, right?
A Yes.
Q And then the 1.3 is based on the

spreadsheet you were just looking at?

A Yes.

Q And the credit, what's --

A I claimed -- just for ease I claimed the entire amount of the two rugs that Asia Rug appraised, I included the entire replacement cost in the contents claim, and so that's where I credited back the 9,000 that Chubb has already paid towards those rugs, and I credited the 24,500 from Enservio. I don't know if you looked at that report. It's difficult to match up the items, but I did my very best and credited that amount back because we had already been paid out 204.

Q Then what's CPI?

A I'm looking at dad because I'm blanking on what that stands for.

MR. DAUPHIN: Consumer Price Index.

THE WITNESS: Consumer Price Index, there we go.

BY MS. MOSS:

Q Why do you have that included?

A It's in the policy.

Q Where in the policy? Do y'all want to take a break while we look at that?

MR. DAUPHIN: C1.

THE WITNESS: C1. Did you hear that?
BY MS. MOSS:
Q So I'm assuming since you do not know what that was for that that was something your dad added to the list for you.
A No, I know -- I blanked on what CPI stood for, but I read it in the policy: At the time of the covered loss, the amount of coverage for contents will be adjusted to include any increase in the US Consumer Price Index calculated from the beginning of the policy period.
Q So you added that yourself?
A I did. Does it matter?
MR. DAUPHIN: Just answer her question.
THE WITNESS: Yes. Yes, I calculated, so my mistake if I got it wrong.
BY MS. MOSS:
Q So the next tab is 37. These are just the checks that have been paid to you. Looking at those, do you recall being paid those payments?
A Yes.
Q Turn to tab 38. So this is a proof of loss that was prepared with respect to this claim -- excuse me. Did I say 38?
A 39.

Q Tab 39, sorry. Is that the Sworn Statement and Proof of Loss?
A Yes.
Q Okay. Is that your signature at the bottom of this Sworn Statement and Proof of Loss?
A Yes.
Q In looking at this, it looks like most of this is not completed. Number 1 is not completed, number 5, number 7, and number 8 are not completed. Why is that?
A Y'all have all the information.
Q Well, that's not what this document is. This is a Sworn Statement and Proof of Loss where you swear under oath that what you're submitting is true and correct, that you have not violated the conditions of the policy, basically everything that's listed on here. You understand that's what a proof of loss is?
A I understand what it is. I signed this. I don't know if Charles drew it up, but I know -- I know what it is, and I signed it. Do you want me to sign another one?
Q This is not a proof of loss that we can accept because it does not have the specific information that is needed on here. The point of

this is to swear under oath that what you are submitting is correct, that the loss -- basically if you read number 9, the loss did not originate by any act, design or procurement on the part of your insured, nothing would violate the condition of the policy, the articles were destroyed or damaged at the time of loss, no property saved has in any manner been concealed, there's been no attempt to deceive the company.

A I mean, the only -- the only thing that's missing is the -- what would you like me to do? Submit another --

Q I need a completed proof of loss --

A Okay.

Q -- not one that just refers you to the policy or the net amount claims being unknown at this time.

A We don't know the net amount. That's a fair -- we don't know the net amount claim because of the dwelling and the landscaping and the ALE. So that answer probably won't change, but I can fill in when the fire happened.

Q Okay. So going back to the contents sheet, I just -- I don't necessarily want to belabor this point and go through every single thing listed

on here, but I do need to have some documentation with regard to the original cost over and above just Iris saying this is what she paid. I need to have her backup documentation, and sounds like you said you can ask Iris to provide that; is that right?

A I will -- I'll discuss -- I mean, we'll -- okay, we'll ask Iris.

Q And then I also need to have some sort of documentation with respect to the replacement cost and what has been -- the work that has been done to determine replacement cost, some sort of invoice or information that shows that it is like kind and quality of the original item that was in the house.

Are you okay? Why are you rolling your eyes?

MR. DAUPHIN: We will get back in touch with you, Alycen. And well, you can't just -- my understanding you can't get written invoices from -- I don't think decorators can get it from their manufacturers, they're going to take the time to submit documents for y'all to look at.

THE WITNESS: From 10 years ago.

MR. DAUPHIN: Anyway, we will see what we can do with it and try to get you what we can.

BY MS. MOSS:

Q Okay. So that's great for the original cost, but what I'm also looking for is documentation with respect to the replacement cost.

MR. DAUPHIN: We'll look and see what we can get. I don't know if we can --

THE WITNESS: When it's a phone call, I mean...

MR. DAUPHIN: I don't know if the suppliers will provide -- we'll see. We'll see and get back in touch with you on that. We have given you what our suppliers says they will charge -- she will charge us. And as I understand it you want to go behind that and get a -- what she -- how she determined what she is going to charge out. So we'll look and see what we can get.

BY MS. MOSS:

Q Okay. Turn back to the policy, if you will. And I'm looking on page Y4. Are you on that page?

A Yes.

Q Okay. I'm looking at the property conditions, and if you go down towards the bottom where it says your duties after loss; do you see that?

A Yes.

Q Says: If you have a loss this policy may cover, you must perform these duties.

And if you go down a few, it says prepare an inventory: You must prepare an inventory of damaged personal property describing the property in full. It should show in detail the amount insured under the policy, the actual amount of the loss. Attach sales receipts and other documents to support your inventory.

A Which I did.

MR. DAUPHIN: Wait for a question.

BY MS. MOSS:

Q Well, I think I have bills and receipts for some items, but not all. So I just want to be clear that you have an obligation under the policy to provide this information. Do you understand that?

MR. DAUPHIN: She understands the policy, yes.

MS. MOSS: Chuck, it is not your policy, and I am not asking you to answer for her.

THE WITNESS: I understand the policy.

BY MS. MOSS:

Q And you understand your obligations under the policy, correct?

Page 186

A I understand my obligations under the policy.
Q Okay. So all I'm asking you is to provide backup documentation with respect to the original cost and the replacement cost.
A We will comply with the policy.
Q I'm not getting that you are on the same page as me.
A I'll comply with the policy. I don't know what else you want me to say right now. I understand the policy. I will comply with it.
Q Okay. So you're going to ask Iris for her backup documentation with regard to her invoices, right?
A Yeah, I will -- I will discuss -- I'm not making any promises as to what I'm going to be able to obtain. I will discuss this with her.
Q And then you are also going to obtain some information and backup documentation with respect to the replacement costs of the items, correct?
A Yes, I will speak with Iris about that. Now, some of these that I don't have an original cost of, pieces of furniture that we inherited.
Q Okay.
A It is what it is.

Q What did your dad just tell you to say?
A He didn't tell me to say anything.
Q Well, you were looking at him, and it looked like he did say something to you.
A He did not say anything to me. I remembered to only answer questions.
Q Let me go to the last page of the document that's the contents inventory. I'm looking at the miscellaneous for Iris & Company hourly charges. She has 650 hours listed here, 200 an hour, which is totaling $130,000. Do you see that?
A I'm sorry, which tab are you on?
Q Sorry, I'm back on your contents inventory.
A Okay. Yes, the final line item. Okay. Yes.
Q Has Iris already spent 650 hours, or she is estimating that is what she is going to spend?
A She has estimated that's what she's going to spend. She has obviously spent a lot of hours. We have not reached 650 yet.
Q So the next thing is receiving an initial storage fee, and that's $5900. What is that?
A That is our movers, our moving company, they have to have an employee stay behind and

receive the furniture and store it, and there is an associated fee per piece received.

Q Who is the moving company?

A Valet Moving.

Q So you're saying they are charging a fee. You're shipping items to Valet Moving, and they're charging a fee for receiving them?

A Yes. And storing them initially.

Q Is that included in the storage fee we've already talked about, or is it an additional storage fee?

A It's an additional receiving and storage fee.

Q So as of now should you only have four containers over at Valet storage?

A Yes.

Q So the next line item is delivery fees that you've got $7,500?

A Yes.

Q So there's a column on here that's for shipping and freight. Does that not include delivery? What is that for?

A The two asterisks are the items that are included in this -- these particular delivery fees. Those are the fees that the workroom charges to

deliver items, and they -- because of space they deliver the items when they're ready, so each item has a corresponding delivery fee. It's not like they can just wait and delivery my whole first floor at once.

Q What about the installation fees, what's that?

A It's also the workroom. It's when they install window treatments. Trying to think what else they install. Separate from the delivery fee because they actually come and install it.

Q Does Iris have her own workroom, or who does she use for labor?

A Maria and Julio.

Q I'm assuming that you can also provide documentation with regard to the labor costs, the fabric costs, and any kind of related charges that relate to upholstering and labor, window treatments, that kind of thing that are listed on here?

A Ask me that again, please.

Q We talked about providing documentation for the replacement cost of the items earlier, and I want to make sure that I was clear that not only do I need the documentation for just the physical item itself, but to the extent you are charging for

fabric, labor, any other items on here, I need documentation as it relates to those charges as well.

A I will discuss it with Iris.

Q Okay. Is there anything on this contents list that Magali is currently trying to restore, or is everything that Magali has excluded from this contents list that has replacement items?

A There are a couple of things. The bench and the game table come to mind that she treated and -- or began treatment on, and it could not be saved. They could not be saved. There was still a smoke odor.

Q That's what I'm asking -- what I'm asking for is if Magali has an item in your house and she is restoring it, you have excluded those items from this contents list, right?

A No. If she has restored them, yes. But, for example, the cane bench. She began treating it, realized it could not be saved, and I have now claimed it as a loss.

Q Okay. But to the extent it has been cleaned and it has been restored and you have it in the storage facility over at Valet Moving, those items are not included on this contents list?

A No. That said, we have not -- we have not gone through every item yet. The game table, for example, came back after being treated, and at Valet Moving we realized there was still a strong smoke odor, we sent it back. I have not gone through every single piece yet. It takes time. Sometimes it -- you think it's okay, and then it's colder, and it's not.

Q So like the game table you've been talking about, does Magali have that now, and it may be able to be restored but maybe not?

A No, it's back at Valet Moving. It's not worth the extent to -- sorry, that was the bench. The game table, I don't think we can get the smoke odor out of that one. It was in the room that was heavily damaged by fire.

Q And has she told you that, that she cannot get the smoke odor out of it?

A We -- we've discussed it.

Q Is there anything that is on the contents list that Magali still has that she is continuing to try to restore?

A No.

Q So everything that you've listed on the contents list is something that has to be replaced?

A Yes.
Q I think I'm about finished. Let me just run through my outline real quick.
(Recess 5:26-5:30 p.m.)
BY MS. MOSS:
Q I just have a couple follow-up. One is that I have a moving expense for $18,500 that says it's for the Wimbleton and storage unit to go to Dell Road, but I don't have any kind of backup documentation on that. What is that?
A That was submitted as part of our global offer settlement. That was the estimate to move back into Dell Road, but the global offer is off the table, so it's not important now.
Q Okay. So that expense has not been incurred, correct, and you are not seeking to be paid back at this point?
A Correct.
Q I also have a submission for an HD Innovations estimate that's in the amount of $36,451.48, but I don't have any kind of backup documentation on that. Do you know what that's for?
A That was also part of the global offer -- global settlement offer. Shelve that for now.
Q What was that for?

A It's for TVs that we need to -- we need to determine which of our ALE, if any, would be replacement costs, and it was also to reinstall a new version of the AV system that we had at Dell Road, so some of that falls under dwelling.

Q Okay. On the -- I've asked you this, I think, on everything, but on the contents, is there anything in particular that we have not discussed on contents that you think is payable?

A I mean, I think everything is payable, so...

Q I know, but I'm saying is there anything that we have not discussed here today that I've missed on contents?

A You mean that's not included in my spreadsheet?

Q Yeah. I know I didn't go through every single thing on the spreadsheet, but anything over and above on the spreadsheet and that we've discussed that that I've missed as a --

(Simultaneous speaking.)

Q -- contents?

A Not that I submitted.

Q And I know I've asked you a lot of questions today, and I appreciate your patience. Is

there anything else just in general that you want to add or that I have missed that you want to discuss?

A I don't believe so.

Q I do want to say that I'll reserve my right to take a second EUO if I need to on additional issues, but for now I think that assumes we've have addressed everything we submitted so far, and if you could submit the additional documentation that we've discussed, that would be great.

A Okay.

Q That's all I have. Thank you.

A Thank you.

Q I don't know that we discussed it, but do you want to read and sign this examination under oath?

MR. DAUPHIN: No.

MS. MOSS: Did you say no? Okay. Thank you.

BY MS. MOSS:

Q Let's go off the record, but don't go off the Zoom because I want to talk to your dad about Charles's deposition.

(Examination concluded at 5:34 p.m.)

(Signature waived.)

CERTIFICATE

STATE OF GEORGIA:
COUNTY OF FULTON:

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the colloquies, questions and answers were reduced to typewriting under my direction; that the transcript is a true and correct record of the evidence given upon said proceeding.

I further certify that I am not a relative or employee or attorney of any party, nor am I financially interested in the outcome of this action.

I have no relationship of interest in this matter which would disqualify me from maintaining my obligation of impartiality in compliance with the Code of Professional Ethics.

I have no direct contract with any party in this action and my compensation is based solely on the terms of my subcontractor agreement.

Nothing in the arrangements made for this proceeding impacts my absolute commitment to serve all parties as an impartial officer of the court.

This the 31st day of August, 2020.

ROBYN BOSWORTH, RPR, CRR, CRC, CCR-B-2138

**&**

**&** 2:4 10:3 65:4 129:2 141:24 145:14 150:11 154:15 172:6 187:9

**0**

**04051020** 3:4
**040519056755-...** 1:5

**1**

**1** 17:3,12 93:5 110:10 121:11 124:3,7 171:23 181:8
**1,000** 158:22
**1,336,000** 139:19
**1,336,273** 139:19
**1,406,301** 57:4
**1,438** 44:4
**1,500,000** 20:15
**1,630** 115:6
**1,760** 164:10
**1,879,000** 67:10
**1.3** 140:16 178:25
**1.4** 44:4
**1.5** 55:12 57:8 66:18
**1.5.** 55:4
**1.879** 67:18
**1.9** 67:2,6 68:10
**1.9.** 67:1
**10** 57:16 100:22 109:14 111:5 113:5 145:6,11,12 145:15,17 155:2,6 167:21 171:13 183:22
**10/21/81** 6:25
**11** 102:19
**11,500** 158:17
**1100** 116:1
**115** 134:2
**116,800** 43:23
**11:21** 1:13
**12** 7:15 105:7 143:3
**12,000** 145:2
**12,450** 144:11
**12/31** 100:19,21
**12/31/2020** 100:8
**1230** 2:13
**1255** 168:7
**12:27-12:39** 48:16
**13** 28:17 106:18 109:21 111:25
**130,000** 187:11
**13609** 195:18
**13th** 27:1
**14** 1:12 95:15 112:14,14,16
**14,100** 105:9
**14,800** 154:19
**1440** 168:7
**147,633** 43:20
**14945478-0** 1:4
**14945478-01** 3:4
**14th** 100:4,9
**15** 9:13 15:12,23 95:14 115:4 171:25
**15,000** 43:16 71:9 72:8 73:6 74:12 75:16 76:11 177:14 178:21
**16** 9:14 116:25
**1600** 166:3
**16th** 131:16
**17** 19:18 119:8
**17,670** 150:10
**17th** 12:3,4
**18** 32:16 122:20
**18,000** 59:15 77:10 78:20
**18,500** 192:7
**18th** 14:10 18:4,4
**19** 125:4,10
**19th** 167:3
**1:09-1:13** 66:9
**1st** 51:13 96:10 124:18,22,23

**2**

**2** 42:17 44:7 48:21 65:18 66:21 67:8 68:9 110:13 111:25 151:7,14 152:10 162:15,15 172:2
**2,079** 165:17
**2,088** 152:12,16
**2,401** 152:17
**2.5** 66:18,25 67:3,4 67:18
**2.5.** 54:25
**2/12** 49:6
**2/12/20** 49:5
**20** 19:9 125:18 134:22 135:17 144:2 153:2 163:1
**200** 134:11 143:25 187:10
**2006** 8:13
**2007** 8:11,13
**2008** 8:14 129:6
**2009** 167:21
**2010** 129:16
**2011** 171:25
**2013** 90:12,19
**2015** 146:22
**2017** 12:7
**2019** 12:1,2 14:10 18:4 28:17 32:16 93:5 118:20 150:13 154:20 169:20 170:20
**2020** 1:12 18:4 30:11 49:15 50:11 51:15 93:12 95:14 95:20 100:3 107:1 124:4,7 129:9 131:16 133:2,12 134:5 151:7,12 152:3 195:15
**2021** 51:22 52:16 87:22 93:5,13 95:15 96:16 100:4 100:9
**204** 179:13
**20th** 129:9
**21** 126:3 151:12 152:3
**2138** 1:15 195:19
**21st** 151:7 153:2
**22** 126:24
**22,000** 164:19 171:25
**23** 129:1,8
**23,825** 177:9 178:18
**24** 139:13
**24,000** 163:15 171:13,19
**24,500** 179:9
**2400** 168:4
**24th** 133:2,12
**25** 153:21,23
**2500** 147:1 150:20 162:19 163:4
**25th** 154:20

**26** 142:3
**28** 155:9
**29** 156:24
**298,642** 42:23 43:11
**2:28-2:50** 111:8

**3**

**3** 20:2 56:5 137:20 175:21 176:9
**3,000** 93:21 158:22
**3/2** 93:22
**30** 16:5 159:22,22 159:23 171:7,14
**300** 2:5 166:3
**30309** 2:15
**30th** 133:15 134:5
**31** 93:5 159:25,25 161:21 162:11 167:3 168:19
**311,000** 69:10
**316.99** 127:20
**31st** 39:10 107:12 107:20 195:15
**32** 173:19
**33** 174:12
**3305** 11:15 14:13
**34** 175:10,13
**3400** 2:6
**35** 176:10 177:13
**35,000** 154:19 158:18 159:3
**3500** 93:23 95:1,3 167:12
**35216** 2:7
**35223** 7:5
**36** 178:9
**36,000** 99:13,17
**36,451.48** 192:21
**362** 128:4
**37** 180:18
**3770** 7:4
**38** 111:14 180:22 180:24
**39** 180:25 181:1
**39,151** 66:19
**3900** 166:22 167:4
**3950** 164:11
**3:35-3:46** 139:10

**4**

**4** 57:11,13 59:10 64:12 166:18
**4,773** 133:4
**4,950** 165:24
**400** 2:14
**420** 142:5
**421** 141:25 142:5 146:21
**4500** 98:9
**46,000** 67:18 68:9
**46,981** 66:12
**46,981.56** 68:2
**46,981.56.** 67:13
**47,000** 43:7,9
**49** 104:16
**4th** 107:1,9,12,24

**5**

**5** 65:3 181:9
**5,000** 20:18 23:7,9 23:23 137:20 163:14
**5,200** 131:2 132:3
**5,650** 173:21
**5,800** 165:17
**5,918.90** 101:1
**50** 10:4,4,9 134:21
**50,000** 134:18 135:17,21 177:4
**500** 128:19
**52** 132:14
**520** 150:12
**5200** 132:14
**55** 104:16
**552** 150:12
**56,354** 66:14 67:17
**585** 151:3,7,11,12
**590** 129:8 132:17
**5900** 187:23
**595** 131:15 132:18 133:19
**597** 134:5
**5:26-5:30** 192:4
**5:34** 194:23
**5th** 169:20 170:20

**6**

**6** 60:7 68:12 151:10,15
**6/22** 123:4
**600** 20:11
**65** 104:16
**650** 187:10,17,21

**7**

**7** 61:5 69:22 181:9
**7,000** 162:23 163:3
**7,200** 147:2
**7,500** 188:18
**7500** 176:7,8
**78,500** 177:20

**8**

**8** 93:1 126:12 146:22 148:21 181:9
**8,000** 171:24
**8,010** 133:4
**8.01** 126:13
**8.10** 126:13
**80,000** 160:15 161:13

**9**

**9** 95:10 145:8,16 182:3
**9,000** 179:8
**9,130** 133:16
**9,290** 141:21
**9,500** 164:17
**900** 128:5
**9290** 142:6
**9500** 165:7

**a**

**a&p** 160:6
**a.m.** 1:13
**able** 12:10 59:21 77:18 78:10 93:17 94:21,22 104:1,3 104:23 109:8 143:22 186:16 191:10
**absolute** 195:13
**absolutely** 54:21 73:13 116:23
**absorbed** 83:5
**accept** 181:24
**acceptable** 62:14
**accepted** 51:13
**access** 51:8 108:15
**accessed** 51:10
**accessible** 157:14
**acclimated** 63:12 63:15
**accommodate** 93:19
**account** 126:10
**accountant** 149:19 149:22
**accurate** 11:5
**acreage** 128:17
**act** 182:4

**action** 13:15 195:8 195:11
**actual** 112:2 160:10 172:22 185:7
**add** 33:2 44:16 109:9 132:8 157:7 194:2
**added** 163:20 180:4,12
**adding** 164:8
**addition** 73:1 88:21 125:15 134:21 177:18,19 177:22
**additional** 18:18 25:19,24 26:18 42:15 43:24 51:15 51:19,21 52:15 66:13 75:10 84:24 85:6 94:11 95:4 99:23 106:14 108:24 110:13,15 110:19,20 114:5,7 114:19,21 121:22 122:5 124:1,3 131:4,22 132:1,4,7 132:10,21 138:21 138:22 159:23 168:6 174:15,17 174:20 178:21 188:10,12 194:6,8
**address** 7:1 11:14 11:20 33:25
**addressed** 194:7
**adequate** 35:10
**adjusted** 180:9
**adjuster** 120:2
**admittable** 73:20
**adt** 16:1 125:19,22
**adult** 9:17,18
**advice** 74:11,15
**affidavit** 158:24 159:2
**agent** 18:24 19:3 33:1,6 97:19
**ago** 17:9 155:2,6 157:17 164:15 171:13,13 183:22
**agree** 42:16 53:9 58:8 63:1 67:25 68:23 69:11 77:11 78:19 84:11 96:6 97:2 104:20 105:24 115:13 119:20 120:17,19 121:3
**agreed** 29:2 50:13 50:16 58:14
**agreeing** 121:4
**agreement** 82:19 83:11 93:2 95:11 96:15 98:16,19 99:20 100:16 195:12
**ahead** 3:5 5:8,22 13:13 14:7 22:23 23:19 32:11 37:22 38:23,24 53:20 76:23 140:10 170:12
**air** 58:1 63:11 68:16
**alabama** 2:7 7:5 8:18,23,23 14:13 19:12,16,21 38:7 125:3
**alarms** 113:19
**albright** 155:17,25 156:12 171:11,16 175:17
**albright's** 172:9
**ale** 133:22 182:20 193:2
**alexandra** 1:10 3:2,6 6:18
**ali** 3:24 5:24 23:13 71:15 76:23 119:5 140:12 159:9
**ali's** 21:11
**alive** 136:11
**allocated** 135:17 135:22
**allotment** 43:17
**alter** 38:19 42:8,9 133:3
**altercation** 27:14 27:20
**altered** 41:5 42:2,7 101:12
**alycen** 2:10 3:9 72:13 78:14 109:11 120:9 139:4 183:17
**amount** 20:1,10,14 48:2 57:3 60:8 68:1 71:12 72:9 73:6 77:10 79:9 87:4,9,13 100:7 124:1 125:23 134:13 137:7 139:18 157:9 160:12 161:9,10 161:14 176:21 178:7,8 179:5,12 180:8 182:16,18 182:19 185:6,7 192:20
**andrew** 50:18 54:5 54:8,9,15
**answer** 5:3 10:24 11:2 21:12 23:14 23:15,16,21 24:21 24:23 25:2,3 30:22 31:7 39:1 59:12 68:7 71:13 72:2,3,3,24 73:1,2 73:5,11,25 74:1,4 74:12,16 76:15,17 76:23,24 92:10,22 122:1 126:17 135:2 159:10 161:25 163:10 164:3 170:11 173:11 175:7 177:23 180:14 182:21 185:21 187:6
**answered** 30:20
**answering** 5:15 13:5 21:19 31:2 77:20 140:25
**answers** 5:8,10,17 195:5
**antique** 141:10,11 142:25 148:21 156:3,15,16 163:1 163:19 165:16,19 166:2,11,20 167:24 173:24 174:9,11
**antiques** 108:6 162:19 163:22 164:15 176:13,15 176:17,21
**anybody** 13:24 18:24 24:5,9 53:22 78:23 136:22
**anymore** 45:9 61:22
**anyway** 183:23

**appear** 58:25
**appearances** 2:1
**applicable** 67:21
**appraisal** 169:19 170:20
**appraisals** 170:24
**appraised** 170:8 170:19 179:6
**appreciate** 193:25
**appreciated** 150:17 153:14
**appreciation** 161:9
**approach** 106:1
**approval** 82:18 83:17 84:11
**approved** 51:25 71:8 75:16 112:4
**approximate** 170:3
**approximately** 44:4
**april** 51:2,8 57:2 119:1 123:7,17,20 133:2,12,15 150:13
**architect** 45:14 60:21 65:7 137:12 138:2,5
**architect's** 79:16
**architectural** 45:13 68:1
**area** 50:7 70:7,12 174:24
**argue** 162:8
**armoire** 131:19 132:18
**arrangements** 195:12
**arrested** 8:5
**arrived** 16:15
**arriving** 28:4
**articles** 182:6
**artisans** 154:2
**artwork** 34:25
**asia** 169:18 179:5
**aside** 121:1 122:8
**asked** 5:9 22:7 25:22,24 26:2 30:18 34:15 50:22 51:7 53:17 58:10 91:14 93:9 116:15 138:20 143:4 146:9 148:19 168:25 172:16,17 172:18 175:6 193:6,24
**asking** 4:23 5:14 19:4 21:14 23:13 30:24,25 37:18 40:24 44:11 45:13 53:3 71:15,16 92:20 117:11 165:12 176:6 185:21 186:3 190:14,14
**asks** 76:24
**assess** 27:2 59:4 110:12
**assistant** 9:6,11
**associated** 188:2
**associates** 65:4
**assume** 5:3,11
**assumed** 33:17
**assumes** 194:6
**assuming** 5:7 29:6 38:3,10 58:8 61:11,24 76:2 119:12 136:6 138:1 148:25 173:9 180:3 189:15
**assumption** 5:18 63:24
**asterisks** 188:23
**atlanta** 2:15
**attach** 185:8
**attachment** 159:12
**attempt** 182:8
**attendance** 4:14
**attention** 35:2 164:14
**attic** 75:3 174:10
**attorney** 30:23 195:7
**audiovisual** 102:25
**august** 1:12 87:22 171:25 195:15
**automatic** 5:17
**av** 37:8 92:16,20 193:4
**available** 18:23 147:7
**aware** 14:3 134:19 134:20 143:5

**b**

**b** 1:15 195:19
**b1** 46:17,18 85:2
**b2** 46:22 47:2
**b5** 85:5 121:12
**b6** 121:13,13
**baby** 8:2,12
**bachelor's** 7:17
**back** 22:4 35:12 42:14 45:14 48:1 48:18 49:13 50:19 51:24 53:8,15 54:6,16,17 56:2 66:11 67:8 71:3 78:19 80:3,25 81:1,22 82:16 83:12,18 84:8,25 86:15 87:11,16 92:25 94:21,23 99:6,9 103:22 108:16 109:10 111:4 112:13 113:3 114:6 115:2 115:24 120:12 121:10,11 123:8 123:21 130:2 131:13,17 132:2,3 133:18,23 138:9 139:7 142:9 144:10 152:15 160:18,22 179:8 179:12 182:23 183:16 184:10,17 187:13 191:3,5,12 192:13,17
**backed** 100:15
**backup** 142:14,21 143:8,12,17 153:13,17 157:21 158:3,15,23 159:2 159:23 160:3,8 161:19 169:12 183:4 186:4,13,19 192:9,21
**bacteria** 75:7,8,10
**balance** 75:15 76:13 170:5
**barrier** 155:15 156:10
**base** 20:15 126:10
**based** 138:7 145:10 178:25 195:11
**basement** 31:19 31:24 69:2,4,6,17 69:20 83:23 93:22

**basic** 113:3
**basically** 25:22 39:11 57:13 65:12 79:13 81:3 97:23 126:7 158:12 169:15 178:14 181:16 182:2
**basis** 20:4,11 22:24 47:3,14,18 47:21 85:3 86:5 123:6 161:2,4,6
**bath** 130:1
**bathroom** 129:14
**bathtubs** 35:10
**battery** 53:1
**beams** 64:4,5,18
**bear** 34:13
**bed** 148:3,4,6,8,15 148:21,23 149:3 167:11,20,25,25 168:4
**bedding** 169:2,5
**bedroom** 129:14 130:13 131:11 166:13,16,20 167:7 169:7 172:6 173:22
**bedrooms** 129:25
**beeping** 16:2 66:2
**began** 97:23 165:3 190:11,19
**beginning** 11:2 180:11
**begun** 83:21
**behalf** 2:2,9
**belabor** 182:24
**believe** 4:19 5:15 12:3,4 13:4 14:16 24:4,7,14 37:1 49:5 54:25 55:2 55:14,16 56:10 58:16 68:21 74:19 79:5,7,8 80:2,12 84:22 90:12 92:15 98:11 102:2 107:20 108:5 112:17,21 128:4 131:22 135:23 137:20 138:19,23 138:25 139:14 150:3,24 159:24 194:3
**believed** 55:10
**bench** 164:9,12,14 164:23 165:2 174:9,11 190:9,19 191:13
**beneficial** 114:25 116:4
**benefit** 99:9 114:23
**bennison** 147:25
**berwick** 90:9,11 92:12,21
**best** 76:23 137:23 179:12
**better** 12:11 21:4 93:18,19 127:8 170:22
**beyond** 28:22
**bid** 51:4 64:11 68:13,19 69:10
**big** 27:1,2 52:23 93:20 128:23 159:13
**bigger** 128:14
**bill** 79:16 116:8,12 117:4,15 119:10 125:4,16 126:15 151:23
**billing** 123:8 125:2
**bills** 117:1,9 118:9 118:10,19,20 119:9,16,22 121:22 125:10,15 126:14,20 135:25 146:4 185:13
**birmingham** 7:19 11:18 15:14 70:22 75:9 117:1 138:8 145:6,9 170:8,19
**birth** 6:24
**bit** 19:15 31:25 42:17 63:17 81:18 102:17 136:6 176:19
**bizarre** 28:4,6,12
**blackjack** 126:25 127:5,12,15,22 128:2,9 137:1,21 137:22
**blackout** 129:10 129:13,15
**blank** 79:20
**blanked** 180:6
**blanking** 149:10 179:15
**blue** 147:11
**board** 32:6
**boligee** 12:18
**bookcases** 163:13 163:14 164:22 165:1
**bosworth** 1:15 195:19
**bottom** 46:16,17 85:6 162:15 181:5 184:22
**bought** 39:18 40:10 41:11 103:18 104:12 142:24 146:23 150:13 154:11,20 155:2,17 156:13 156:16 163:18 168:13 169:15 173:16 174:17,20 174:21 175:8,18
**bow** 165:20
**box** 143:20 162:12
**bradley** 9:6,7 27:21
**brand** 29:9
**brass** 62:1
**break** 6:10 25:2 47:7,9,12 48:15 109:11 111:1,6 139:2 179:24
**breed** 10:14 11:7
**brick** 80:17,17 81:10,15 82:11,11 82:22 83:2,3,5 88:4,14,15,17,18 89:8,9,10
**bricks** 84:13
**briefly** 82:8
**bring** 92:18
**brings** 147:18
**broke** 101:14,16 101:18
**broken** 6:7
**broker** 18:24
**brook** 7:5 11:18 11:19 14:13 35:4 38:7 97:8 145:8 145:16
**brookstone** 32:4 42:25 43:2 50:15 50:18,21 51:1 54:4,11 63:23 64:16 81:8 89:19 89:21,24 108:20 110:11,17 136:19

**brought** 81:19 110:10
**bug's** 122:21
**build** 54:24 55:5
**builder** 27:14,18 27:21 28:13 60:13 60:13
**builders** 60:6,8,11 60:16,25
**building** 12:5 45:5 49:12
**built** 11:25 103:16
**bump** 102:3 152:12
**burn** 136:3
**burned** 14:19 89:5 89:9 153:9 165:1 173:23
**business** 10:13,15
**businesses** 9:20,22 9:25 12:23 14:4
**busted** 136:16
**buy** 37:23 39:19 39:24 42:4 92:1 98:1,3 145:13 154:23 156:14 167:20 173:5,17 174:23 175:1,20 175:23
**buying** 174:19
**buys** 143:8 144:3

**c**

**c** 33:9,10,11
**c1** 179:25 180:1
**c2** 160:24
**cabinetmaker** 63:11,16,19
**cabinetry** 63:4 64:19,21
**cabinets** 45:10 63:10 64:16 89:23
**cable** 37:10 92:15 119:9,10,13,15,16 119:21,22 121:22 121:23 122:16
**caddies** 163:1
**caddy** 162:13
**caine** 33:8,10
**calculated** 180:10 180:15
**call** 3:24 24:3,3 141:6 146:14 184:6
**called** 16:1 24:4 144:25 146:8 154:14 172:16
**calling** 80:24
**calls** 24:5,9,16
**cancel** 125:22
**canceled** 124:9,12
**cancellation** 125:20
**candlestick** 167:3
**cane** 190:19
**cans** 115:16,24
**capable** 21:23
**capacity** 96:3
**caption** 195:4
**car** 13:15 15:7
**caroline** 169:8
**caroline's** 152:7 166:12,17,19,25 167:6 172:6
**carpet** 133:15
**case** 4:14 73:20 103:11
**catch** 150:5
**caught** 14:18
**caused** 89:14
**cavity** 83:4
**ccr** 1:15 195:19
**ceilings** 41:23
**center** 15:13
**century** 167:3
**certain** 89:16
**certainly** 3:13 6:2 22:8,17 43:6 73:10 98:20 114:18 139:5
**certificate** 195:1
**certify** 195:4,7
**cetera** 114:6
**chain** 54:15
**chairs** 146:16,25 158:16 174:13,25
**chance** 4:4 54:18 54:19
**change** 182:21
**changed** 22:15 45:21 46:7 61:13 63:9
**charge** 54:9 68:16 98:14 126:10 132:3 134:11,22 135:11 138:10,11 160:13,15,18 161:13,14 184:11 184:12,14
**charged** 98:11 125:22 134:13 145:24
**charger** 52:25
**charges** 103:4 134:9 187:9 188:25 189:17 190:2
**charging** 128:19 133:23 145:20 149:3 188:5,7 189:25
**charles** 2:3 7:10 7:11 9:24,24 11:22 12:10,22 16:14 18:7 19:2 24:3,4 54:6 124:9 139:4 181:20
**charles's** 194:22
**charring** 31:14
**chart** 57:13 152:15
**chase** 131:16
**check** 35:13 125:1 177:11
**checked** 141:10
**checklist** 19:14
**checks** 156:23,25 157:8,13 180:19
**chem** 36:15
**chests** 131:1,6,8 132:3
**child** 8:14
**children** 7:12 11:22
**choose** 163:3
**chose** 53:20
**chosen** 50:14
**chubb** 24:8,9,10 24:11 42:14,16 53:22 75:16 94:2 94:10 95:4 100:7 100:15 103:11 108:25 110:14,16 112:1 115:2,2,15 117:20 122:3 125:24 130:22,25 132:4 177:4,20 178:7 179:8
**chuck** 5:23 22:10 23:13 71:15 76:17 140:4 185:20
**circumstances** 4:6 5:14

**city** 11:18
**claim** 1:5 3:3 4:6 4:11,22 14:8 22:21 24:1 42:17 44:8,13 121:7,8 131:7,9 140:9 169:13 170:6 177:1 178:3 179:7 180:23 182:19
**claimed** 179:4,4 190:21
**claiming** 139:19
**claims** 120:22 140:22 182:16
**clarify** 22:9
**class** 13:15
**clean** 35:20 62:18 108:15
**cleaned** 36:16 62:9 62:10,12 63:7 83:23 89:11 91:9 108:11 109:5,7 110:9 163:20 175:22 190:23
**cleaning** 14:18 164:7
**cleans** 171:5
**clear** 4:12 109:8 118:15 175:7 185:15 189:23
**clearly** 29:4
**clerk** 8:16
**clerking** 9:3
**clerkship** 9:12
**client** 30:23
**cliff** 50:15,16,24 69:23 83:7 84:2 88:3
**closely** 59:2,3 104:4
**closer** 55:3 57:8
**closet** 57:8
**closets** 35:1
**cloth** 35:14
**club** 174:13
**coaching** 78:11,13 78:16
**code** 35:22,22,25 37:22 38:2 145:15 195:10
**colder** 191:7
**collaborated** 144:19
**college** 7:18,19,20 7:22
**colloquies** 195:5
**color** 155:21,24 159:14
**colors** 40:15,19
**column** 188:20
**come** 5:13 21:17 26:6 32:25 36:3 37:9,13 39:16,23 83:8 92:3 93:7 108:16 109:7 111:4 130:23 136:22 141:3 144:11 146:7 175:22 189:11 190:10
**comes** 5:20 6:7 66:19
**comfort** 40:17
**coming** 16:10 66:6 71:2 82:13 84:3,9 108:11 115:21 146:2
**commencing** 87:1
**commenting** 71:14
**commitment** 195:13
**communicate** 30:4
**communicating** 72:21 77:17
**communication** 52:13
**communications** 30:4
**companies** 127:3 146:13
**company** 2:9 3:3 4:2,10 17:20 37:9 50:14 97:9,11,19 97:25 106:13 129:2 141:24 142:17,18,19 145:14 154:15 156:15 170:8,18 170:22,23 171:5 172:7 182:9 187:9 187:24 188:3
**company's** 4:4 150:11
**comparable** 48:6
**comparative** 51:4 51:9,12
**compared** 103:25
**compartmentalize** 135:12
**compel** 4:14
**compensation** 195:11
**completed** 70:9 153:7 181:8,8,9 182:13
**completely** 18:20 29:7 44:21 49:7 55:17,21,22 57:21 59:14 132:23
**compliance** 195:10
**comply** 186:6,9,11
**comprehensive** 19:13
**computer** 66:5,7
**concealed** 182:8
**concerns** 71:2 77:2
**concluded** 194:23
**condition** 87:5,11 169:21 182:5
**conditioned** 58:1 63:11
**conditions** 181:16 184:22
**confident** 136:1
**confused** 27:17 52:2 120:16
**confusion** 118:16
**consider** 104:10
**considered** 105:11 119:16
**considering** 4:11 132:5
**consistent** 143:2
**construction** 65:13
**consult** 30:19 31:1
**consultation** 134:8
**consulted** 154:3
**consulting** 25:4
**consumer** 179:17 179:18 180:10
**contact** 29:14,20 156:8
**contacts** 113:18 114:6
**contained** 109:4
**containers** 188:15
**contains** 110:13
**contaminated** 64:2

**contemplating** 72:20,25
**contend** 95:4 170:21
**contending** 94:10 99:22
**content** 24:15 109:4
**contentious** 27:12
**contents** 18:17 20:14 21:9 26:6 29:13 32:9,13 42:23 43:12 109:9 109:9 110:11 131:7,9 132:5,15 132:19,21 133:22 139:12,16,18,21 139:23 140:1 160:23 161:8 169:13 170:6 174:16 178:3 179:7 180:9 182:23 187:8,13 190:5,8,17,25 191:20,25 193:7,9 193:14,22
**contested** 43:6
**continue** 53:16
**continuing** 191:21
**contract** 4:1 60:24 61:2 66:21,23 67:3,5 89:7 121:2 125:23 195:11
**contractors** 60:22 88:1,25 89:14,18
**control** 123:2,16 123:23 124:24
**convenient** 47:10 109:15
**conversation** 26:15 27:6 30:25
**conversations** 25:5,8,9,10,13,14 25:18 26:13,19,21 26:23,24 28:19 29:10 30:12 70:23 88:7 96:13
**cooling** 64:1
**cooperate** 73:23
**copy** 3:11,17 17:14 56:9,16,19 116:15 128:8 143:11 155:8
**copying** 54:5
**cord** 146:6
**correct** 11:16,23 11:24 14:13 20:2 20:5,18 23:6,10 41:12,13 44:21 48:7,19 49:5,24 52:8 55:14,16 56:20 58:9,10,14 59:16 62:9 65:10 65:11 66:15,16 67:18,25 68:20 69:9 76:13 80:12 87:11 88:24 89:15 92:10 94:5,13,17 95:6,7 99:18,19 101:7 106:10 114:14 115:14 116:1,2,5 119:13 119:14 125:17 132:6,15,16,23 133:24 134:3 138:14,15 142:11 148:25 149:13,23 150:14 151:9,18 162:20 169:21,22 178:20 181:15 182:2 185:25 186:20 192:16,18 195:6
**correctly** 92:13 94:18 167:7
**corresponding** 189:3
**cost** 20:5,12,16 21:5,8 46:24 47:18,22,23 48:2 52:1 53:19,20 54:23 65:19 66:23 136:23 141:20,24 142:9 144:11,12 144:18,23,24 146:7 148:5,18 149:5 150:10 152:16,17 153:16 154:9,12,19 157:22 158:1,4,6 158:17,18 159:3 160:10,12,16 161:4,7,18 162:4,6 162:23 163:17 167:12 168:7,20 171:12 172:17,23 172:25 173:15,18 179:6 183:2,9,11 184:2,3 186:5,5,23 189:22
**costs** 51:25 134:19 137:13 141:8 143:4 144:14 146:9 154:4,25 155:1 158:10,14 158:23 159:14,21 160:4,7 161:7 162:4 163:23 168:25 172:13,14 173:6 186:20 189:16,17 193:3
**counsel** 2:1
**county** 12:18 195:2
**couple** 9:23 25:16 101:19 132:25 190:9 192:6
**course** 6:9 35:2 40:11 73:18 115:23,25 151:22 153:16
**court** 76:3 195:13
**cover** 17:17 85:15 86:18,24 121:18 168:1 169:5,11 185:2
**coverage** 19:14,21 20:1,2,11,14 21:9 22:14 43:17 46:12 46:16 48:10 85:2 160:24 161:10 180:8
**coverages** 18:22 19:13,23 22:7
**covered** 21:16 31:4 85:13 86:18 108:16,17 121:16 161:15,17 180:8
**covers** 169:6
**covid** 87:19,23
**cox** 156:20,25
**cozen** 2:11
**cpi** 179:14 180:6
**crafted** 154:2
**crc** 1:15 195:19
**created** 150:24
**credit** 179:3
**credited** 94:9 179:7,9,12
**crr** 1:15 195:19
**current** 56:23 117:8

**currently** 7:3 58:5 190:6
**cursory** 16:20
**curtain** 14:17
**curtains** 36:18
**cushions** 148:7 149:10
**custom** 41:22,24 41:25 63:10 91:15 91:18 101:20,23 130:3,4,18,20 150:23 157:5,9
**customer** 112:20
**cut** 63:24 64:2 156:18 157:1,16

**d**

**dad** 8:19,20,24 16:21 18:19 24:20 24:22 30:1,3,5,19 39:18 40:20,23 54:6 66:12 67:15 70:19 72:10 75:21 77:19 78:2 96:2,9 97:12 98:6,11 99:2,5 102:23 106:9,16 109:25 113:7 114:16,25 115:20 116:4 122:1 133:2,13 143:14 162:2 179:15 180:4 187:1 194:21
**dad's** 9:3 97:14 112:21
**damage** 14:12 29:8,9 31:11,13,14 31:15,16,16,16,17 31:18,19 32:1 50:6 53:17 57:24 59:4,18 63:5 64:6 77:12 78:21 80:18 80:21 81:4,6,7,23 82:3,14,22,25 83:3 88:22,23,24 89:13 90:3,6 103:13,15 103:15 136:20 161:10
**damaged** 77:7 78:24 81:10 89:20 103:9 108:6 109:2 182:6 185:5 191:16
**dangerous** 35:23
**date** 6:24 43:5 56:21,24 87:1 95:19 106:25 107:4,5,8
**dated** 49:5,6 129:8 131:16 133:2 134:5 146:21 151:7,12 170:20
**daughter** 129:21 133:21
**daughter's** 14:17
**daughters** 131:12
**dauphin** 2:3,4 3:9 3:15,21 5:6,12 6:1 6:19,21 13:10,13 17:5 20:21,23,25 21:2,5,8,13 22:6 22:17 23:3,8,16 24:23 30:22 31:4 38:24 39:1 47:6 47:10 55:9 71:13 71:17,25 72:6,12 72:20,25 73:8,15 75:18,22 76:4,14 76:21 78:13 86:11 86:13 97:8 109:11 109:15 118:14,21 119:3,6 120:9,14 120:19 121:4 135:2 139:4,25 140:6 158:24 161:24 162:8 163:10 164:2 170:11,14 173:10 179:17,25 180:14 183:16,23 184:4,8 185:11,18 194:16
**davis** 51:7 64:20 89:20
**day** 21:25 24:1 26:15 36:4,4 37:15 38:2 107:17 107:22 136:9 152:3 167:20,24 167:25 168:4 195:15
**days** 17:9 74:18,21 97:23 107:18,19
**deal** 143:24
**dealing** 96:1
**dealt** 54:20
**debris** 43:20 54:10 54:10 80:19 81:14 82:5,20 89:1,15,17 89:19,21,24 90:4
**deceive** 182:9
**december** 27:1 28:17,22 32:21 37:2 93:5 100:3 118:20,24 146:22 169:20 170:20
**deceptive** 54:12
**deceptively** 50:19 54:4
**decide** 13:8 52:12 114:15 124:16
**decided** 7:25 39:23 68:22 79:21 124:11,13
**decision** 53:4,12 53:23 54:1
**declined** 35:15
**decorating** 147:16
**decorator** 129:3 146:14 158:5 160:15
**decorators** 183:19
**deduct** 26:5
**deductible** 20:18 23:6,22
**deduction** 161:8
**deep** 36:16
**definitely** 6:8 57:24
**degree** 7:17,23
**dehumidifier** 83:24
**delacquered** 62:22 62:24
**deliver** 133:3 156:19 157:1 189:1,2
**delivered** 64:17 151:21 152:3,7,8 153:7
**delivery** 188:17,22 188:24 189:3,4,10
**dell** 11:15 12:8 14:13 26:23,24 32:17 41:8,14,17 41:21,23,24 60:3 90:18 92:8 101:4 101:23 102:25 103:22 104:2,24 113:21 114:2 116:8 117:5,9,16 117:25 118:9 119:10,13,15,21 121:24 122:7,10 122:13,25 123:7

123:16,23 124:8 124:24 125:4,8,16 125:20 126:6,16 127:4,5,6,11,12 128:3,15,22 130:2 130:5,6,14,17,21 131:13,17 157:1 157:15 175:14 192:9,13 193:4
**deluxe** 85:2
**delved** 41:18
**demo** 48:22
**demoed** 63:23
**demolish** 49:8 52:10,12 53:5,21 55:18 68:22
**demolished** 44:22 52:9,18 53:6,11 69:4 88:15
**demolishing** 55:17
**demolition** 54:9 54:10
**department** 79:3
**depended** 172:19
**depends** 73:21 149:14
**deposit** 94:15,20 94:23 95:1,3 98:12,15,24
**deposition** 4:16 6:4 73:12,16,18 194:22
**deposits** 98:20
**describing** 185:5
**design** 48:5 182:4
**designers** 142:18
**designs** 63:20
**destination** 145:10
**destroyed** 182:6
**detail** 25:5 124:5 143:5 158:13,15 185:6
**detailed** 158:9
**details** 27:11 35:3
**determine** 77:5 82:2 149:25 154:3 172:13 183:11 193:2
**determined** 69:3 81:23 153:16 154:8,12 184:14
**dialogue** 96:21
**diamond** 147:11
**diane** 97:15 112:20 113:7
**differed** 57:16
**difference** 64:11 100:17 152:19 163:17
**differences** 57:14 79:15
**different** 5:16 45:7 75:11 92:6 98:18 114:1,3,4 130:12 132:23 147:4 150:17
**difficult** 179:11
**dining** 154:25 155:4
**direct** 195:11
**direction** 195:5
**directly** 42:24
**disagree** 72:6 120:4
**disagreements** 27:7,10
**discount** 19:20
**discover** 53:16
**discoverable** 73:19
**discovered** 50:17 83:3
**discovery** 73:12
**discuss** 121:6 183:6 186:15,17 190:4 194:2
**discussed** 18:22 19:2 60:20,20 79:5 161:3 191:19 193:8,13,20 194:9 194:13
**discussing** 79:10 79:12
**discussion** 135:15
**discussions** 29:13
**dispute** 120:15 140:7
**disqualify** 195:9
**disrespectful** 29:23
**document** 109:21 175:16 176:11 181:12 187:7
**documentation** 139:15 140:11 142:22 143:8,12 143:16,18 153:13 153:18 158:16 159:2,4,20,23 160:4,8,9 161:20 165:12 171:10 183:1,4,9 184:2 186:4,13,19 189:16,21,24 190:2 192:10,22 194:8
**documents** 16:23 166:6 183:21 185:8
**doing** 6:4,6 9:19 22:22 49:16 52:8 76:22 78:4,12 79:1 83:16,22 93:10 127:10 137:23
**dollar** 126:7
**dollars** 172:4 176:22 177:19
**door** 35:12 45:18 61:20,21,24 62:5,7 62:24 113:4,18 114:6
**doors** 58:18,19,22 59:5 60:4 61:4,7 61:12 64:14,25
**double** 154:21 156:5
**downstairs** 31:15
**dpmb** 97:7
**draped** 14:16,21 14:22 15:1
**drapery** 101:11 102:2 152:11
**drastically** 61:13 63:9
**drawer** 163:7
**drawing** 96:20
**drew** 168:24 181:20
**drive** 7:4 28:8 32:23 39:8 41:4 80:18 92:21 94:3 94:12,16 95:6,12 95:17 96:5,5 100:24 102:13 103:3,8 105:8 106:23 118:20 125:11
**driveway** 82:11 136:21
**dry** 36:15
**due** 57:7 68:4,8 81:6,7 85:23 137:7 178:22

**duly** 3:7
**dustin** 156:20,25
**duties** 184:23 185:2
**duty** 73:23,24 74:2
**dwelling** 43:16 44:2,4 46:23 48:11 79:4,6,7,15 79:19 84:21 182:20 193:5
**dying** 137:2

**e**

**e** 19:5 29:13 30:16 33:11,12 50:17 54:5,14,14,22 118:23
**earlier** 46:23 54:3 56:15 65:9 66:18 107:4 117:13 120:5 126:5 161:2 189:22
**earliest** 87:2
**early** 26:23 30:8 94:9,24
**ease** 179:4
**easily** 62:2,3,4 157:14 162:14
**education** 7:21
**educational** 7:16
**eight** 52:11 81:25 82:13 84:5 126:7
**either** 21:7 26:5 42:23 43:12 44:25 45:1 60:19,22 67:17 76:2 80:14 105:23 106:10 133:5,7,16 165:3 174:7
**elaborate** 12:11
**elaborated** 103:4
**electric** 115:5
**electrical** 35:22,25 37:22 38:2
**electricians** 36:1
**elliott** 2:17 117:19
**emergency** 32:6
**emotional** 29:3
**employ** 127:12
**employed** 8:8 137:1
**employee** 187:25 195:7
**ended** 29:14,20 31:21 55:17 94:9
**enservio** 179:9
**enter** 7:25
**entire** 21:15 34:25 49:4 52:9,10 60:8 79:25 89:4 91:8 99:12,16 100:3,11 160:6 179:5,6
**entirely** 149:14
**entitled** 22:8 73:17 73:18 85:21
**entity** 97:22
**environment** 61:14 63:9
**especially** 32:1
**esq** 2:3,10
**estate** 33:1,6
**estimate** 48:22,25 49:4,7,11,14 50:12 56:6,9,12,20,25 57:15,15 66:17 67:8 79:9 80:1,13 87:19,21 135:5 168:16,18,22,24 176:21 177:11,12 177:15,18,23 178:4,20,22 192:12,20
**estimated** 145:3 187:19
**estimates** 141:7 177:3,13
**estimating** 147:1 187:18
**et** 114:6
**etches** 62:1,4
**ethics** 195:10
**euo** 194:5
**evaluated** 74:22
**eventually** 109:4
**everybody** 45:3
**everyday** 86:5
**evidence** 157:5,25 195:6
**exact** 45:5,12 73:15 95:19 111:23 113:25 144:20 146:8 154:23 155:8 171:24
**exactly** 17:2 19:6 19:18 37:16 49:19 74:20 84:15 108:4 114:9 143:21 155:21 157:4 163:2,5 177:6
**examination** 1:9 3:1,22 4:3,3,17 6:5 21:10 73:14 73:25 194:14,23
**examined** 3:7,17
**example** 142:12 154:13 190:19 191:3
**excluded** 190:7,16
**excuse** 6:4 50:23 55:15 103:17 116:17 121:12 150:12 166:15 176:10 180:24
**exhibit** 127:16 166:12
**existed** 153:11
**existing** 102:24 103:6
**exists** 173:23
**expansive** 92:16
**expect** 114:18,22
**expense** 34:13 68:20 77:9 86:4 94:2,12 99:12,17 105:16,19 106:12 106:15 114:5,22 119:17,18,23 132:4 192:7,15
**expenses** 25:20 43:24 51:15,19 52:16 71:9 74:13 84:24 85:7,10,13 85:16,22,23 86:1,8 86:16,25 87:9 102:4 104:11 105:13 108:2 110:21 114:19 118:1 120:7,8,18 121:16,19,22 122:5 132:8 138:21,22
**expensive** 155:5
**experience** 60:11
**expert** 50:15 70:2
**explain** 71:17
**explained** 120:21
**explanation** 112:1
**extended** 20:4,12 46:24 47:17,22
**extensive** 29:8 113:6
**extent** 69:2,11,13 69:16 74:1 75:14

76:12 80:21 81:5 81:23 82:3 92:24 102:17 137:10 153:14 189:25 190:22 191:13
**exterior** 32:1 80:16
**extra** 85:10,13,21 85:25 86:15 87:9 109:2 117:24 118:1 119:17,23 120:8,17 121:15 121:22 126:15
**eyes** 64:22 77:25 183:15

**f**

**fabric** 42:1 143:20 146:25 147:1,4,5,7 147:8,10,14,15,20 149:3,5 150:7,13 150:16,17,20,22 158:22 168:4 189:17 190:1
**fabrics** 150:23
**facility** 190:24
**fact** 46:23 77:6 116:3 128:18 161:3
**facts** 4:5 120:23
**fair** 5:4 170:4 182:19
**fairly** 104:14
**fairway** 32:23 33:4,7 39:4,7 41:4 41:11 42:8 92:21 93:2 94:3,12,16 95:5,22 96:5,5,7 96:12 100:10,24 101:17 102:13 103:3,7 105:8 106:23 107:16 112:7 118:20,24 118:25 119:22 123:10 125:11 127:24,25
**fall** 116:11
**falls** 193:5
**familiar** 148:1 149:14,20
**family** 11:23 38:5 98:4 174:21,24
**far** 38:20 83:20 99:20,23 102:6 136:25 137:15 194:7
**father** 6:22 25:4 70:17 97:18 98:19
**father's** 74:11
**feature** 43:20
**february** 30:9 49:15,22 50:11 89:24 95:22 96:10 106:25 107:9
**fee** 66:11,13,13,15 66:19 67:7,13,17 67:20,22 68:1,4,10 94:15 126:8 128:6 138:10,11 143:25 187:23 188:2,5,7,9 188:11,13 189:3 189:10
**feel** 40:16 71:11 74:7 77:17 78:17 81:20 105:11 106:12,14
**fees** 79:16 188:17 188:24,25 189:6
**feet** 93:21 163:8
**fell** 81:14 89:3 101:19
**fellows** 138:7
**felt** 31:1
**field** 77:3,6,10,13 78:19,20,24 79:17
**fight** 28:8,9
**figure** 70:24 72:12 78:24 82:4 83:25 84:3,12
**figured** 81:5 82:25
**file** 53:10 133:11 143:10,11,20 177:1
**filed** 14:8
**fill** 22:22 182:21
**final** 135:25 187:15
**financially** 195:8
**find** 32:25 70:16 70:18 75:8 84:9 93:18 110:24 111:2,3 118:22 138:7 141:12 155:7,13,22,24 162:14 167:24 173:8
**fine** 3:17 12:25 35:16,16 55:21,22 55:24 62:13 63:1 74:4 86:13 94:13 143:17
**finish** 8:3 39:1 47:11 62:17,19,21 62:22 107:8 109:17
**finished** 12:1 90:15 93:16 96:18 192:2
**finley** 15:13
**fire** 14:9,15,18 15:3,25 16:13 18:12 23:25 29:9 31:15,18 32:15 50:21 53:16 62:11 63:14 64:9,23 80:20 81:6,11,13 88:24 89:2,10 90:8 105:15 108:7 116:16,19 123:5 125:21 136:3,9,18 151:8,18,20,21 152:4,6,9 153:3,5 153:6,8 165:1 168:13 173:23 176:17 182:22 191:16
**fired** 51:1
**firemen** 14:24 16:11
**firm** 9:4,8 154:14 172:16
**firms** 9:12
**first** 3:7 8:12,14 17:17 30:18 32:22 33:14 34:21 56:12 57:19 60:24 61:2 81:17 82:24 86:16 86:21 87:3 106:22 123:9 129:7 141:17 148:22 162:12 177:10,12 177:22 178:2,20 189:4
**fit** 38:20 41:5 108:17,18 130:20
**five** 7:15 17:6 45:20 46:14 47:6 47:9 109:14 111:5 116:10 157:17
**fix** 35:15 84:13
**fixed** 163:20
**fixing** 137:4
**fixture** 113:13 115:13 116:4

**fixtures** 91:19 115:7
**flames** 16:10
**floor** 36:13 189:4
**floors** 35:20 36:17 91:21
**foam** 50:5 149:11
**follow** 83:16,19 192:6
**followed** 70:11
**following** 87:2
**follows** 3:8
**footprint** 45:6,17
**force** 87:24,25
**foregoing** 195:4
**forever** 51:23
**former** 104:4
**forth** 22:4 65:17
**forward** 51:6,18 51:20 157:7
**forwarded** 50:18 51:6
**found** 33:6,14 38:11 39:16 70:9 70:19 80:21 131:24 154:24 164:11 165:4 166:7
**four** 19:19 75:3 103:1,16,17 104:12,17,21 171:8 188:14
**fourth** 104:17
**framers** 45:4
**framing** 44:25 45:2
**free** 71:6
**freight** 145:4 188:21
**french** 152:11
**fresh** 124:20
**friday** 45:1 107:20 151:21 152:6,8
**friend** 33:1
**friends** 106:4
**front** 21:22 32:1 46:8 56:24 80:16 80:23,24 81:2,3,11 81:13,15 83:2,15 84:14 88:19 89:3 89:5 94:8 100:11 113:3
**fulfilling** 74:2
**full** 79:8,9 81:23 92:8 94:14 107:17 161:7 177:10,22 178:8 185:6
**fully** 63:12,14 143:5
**fulton** 195:2
**furniture** 25:25 26:4,9,11,17 89:4 109:5 112:10 132:23 146:2,23 147:17 152:1 174:15,18,19,20 175:3 186:23 188:1
**further** 195:7

**g**

**game** 165:6 190:10 191:2,9,14
**garage** 55:18,20 58:18,19,22,24 60:4,4 64:24 69:2 69:7,17,20 83:25
**gas** 59:20 126:4,6 126:9,14
**gather** 158:20
**gear** 102:25
**general** 122:22 124:5 194:1
**generator** 59:13 59:15,19,21,24 64:25
**georgia** 2:15 195:2
**getting** 26:17 67:9 94:8 107:10 118:6 118:12 159:16 186:7
**gift** 15:18
**gillian's** 173:22
**gilly** 129:21 133:20 169:8
**gilt** 174:3,4,6
**girls** 35:23 40:17 45:9 71:4 133:21
**give** 19:17 24:19 31:7 68:16 111:23 112:2 114:5 115:2 115:17 118:15,16 142:21 143:22 144:17 158:13 172:14 173:11 175:7
**given** 136:22 157:22,24,25 184:10 195:6
**gives** 4:2 147:23
**giving** 40:16
**glad** 17:9
**glance** 16:20
**global** 135:9 192:11,13,23,24
**go** 3:5,21 4:20 5:8 5:21,21 7:18,24 8:22 13:13 14:7 16:21 20:9 22:19 22:23,25 23:19 30:5 32:11,15 37:22 38:8,23,24 40:5 42:14,14 45:4,14 53:20 60:19,22 66:7 67:8 74:5 76:23 77:25 84:25 92:25 100:4 104:4 105:21 107:16 108:7 109:3,14 112:13 118:6,12 120:12 121:11 131:13,16 132:2 139:8 140:10 142:5,19 144:23 145:10,17 150:23 152:15 154:10 155:4,13 156:14 158:1 160:22 161:22 170:12 171:7 179:19 182:25 184:13,22 185:3 187:7 192:8 193:17 194:20,20
**god** 149:10
**goes** 65:23 83:20 99:23,25 100:8 128:18 145:9
**going** 4:7,10 5:3 5:13,20 6:13 15:11,12,16 17:5 19:11,18 21:13,24 22:3,14,15 24:19 30:3,8 31:6 37:11 38:16,21 39:3,21 42:13 45:18,19 51:14,21 54:20 58:16 61:14 63:15 63:18 66:11 68:17 71:5 73:4 74:16 82:17 84:23 86:15 87:8,17 88:8 97:1 101:22 109:3

113:9,25 118:12 120:9 124:22 133:18 134:25 135:7,21 136:2,11 136:23 137:18 139:12 143:5 144:24 157:3,21 158:1,17,17,19 159:3 160:10,11 173:3 182:23 183:20 184:14 186:12,16,18 187:18,19
**gold** 163:8 165:19 174:2
**good** 3:21 17:9 31:25 37:11 94:16 111:7 128:16 136:6 137:12 139:1,3 156:17 169:21 173:18 176:19
**goodness** 91:5
**goodrich** 1:10 3:2 3:6 6:18 7:10,11 10:3 18:7 32:19 175:14
**goodriches** 38:9
**gotten** 27:13 82:24 83:4 116:17 136:25 137:5 162:22
**grab** 52:25
**graduate** 7:21
**great** 184:1 194:9
**green** 115:5
**greene** 12:17
**gross** 34:6 37:21
**ground** 4:20
**grouping** 106:19
**guarantee** 63:15 70:7,10,14
**guess** 8:1 15:16 16:3 30:8 97:3 100:2 141:16 157:7 164:11 166:2
**guest** 166:16,24 169:8
**guiding** 78:5
**guilford** 90:21
**gut** 29:2
**gutted** 91:2
**guy** 70:5,20
**guys** 7:12 12:13 23:25 25:13 28:14 37:22 38:2 39:20 49:15 54:23 60:9 72:17 77:17 116:15 159:6,10

**h**

**habitable** 87:5,11
**half** 65:19 68:9 153:10
**halfway** 166:19
**hallway** 45:19
**hand** 152:12
**handful** 25:16
**hanging** 115:7 136:12
**hank** 66:11,14 67:22 68:1
**happen** 96:24
**happened** 14:15 14:24 27:23 107:19 136:13 182:22
**happy** 125:1
**hard** 19:8 113:17
**hardware** 26:3,9 42:6 61:20,21,24 62:6,7,20,24 100:23,24 101:10 101:13,20,23 102:3 112:4 130:10 174:18
**hd** 92:5 102:20 192:19
**he'll** 115:23
**head** 11:4 16:1 28:23 30:7 59:6 77:24 78:3 116:14 119:11
**headed** 15:9
**health** 79:3
**hear** 6:7 15:25 20:23 21:7 66:2 76:1 77:23 78:5,7 99:18 118:2 119:4 162:3 180:1
**heard** 52:18 82:10
**hearing** 81:17
**heat** 31:15,16 58:2 61:12
**heavily** 191:16
**heavy** 31:20 63:6
**held** 15:22 51:5 56:6,20 57:15 79:16
**held's** 56:16
**help** 40:3 42:21 65:22 107:3 156:11
**helped** 149:22
**helps** 138:6
**henry** 65:4
**hesitate** 13:5
**hey** 28:14 96:9 144:24
**high** 147:22,24
**highest** 7:16
**hill** 36:23 162:19
**hills** 2:7
**hire** 11:9 50:22
**hired** 50:22 84:2
**hit** 58:1 61:12 63:8
**hold** 24:20,21 76:1 107:6 110:9,25 159:22
**holding** 44:10 72:17 175:21
**holes** 22:23
**home** 10:5,21 11:6 11:23 14:12 16:3 16:5 39:17,18 40:16 68:20,23 94:3 101:4,7 105:8 115:10,11 115:14,22
**homeowner** 60:15 60:18
**honest** 136:11
**honor** 172:18
**hook** 92:18
**hooked** 92:15
**hoover** 15:15
**hope** 6:13 175:21
**hopeful** 93:17
**horses** 10:14
**horticulture** 126:25
**hoses** 16:12
**hot** 75:8
**hour** 134:11 143:25 187:10
**hourly** 138:11 143:25 187:9
**hours** 159:16 187:10,17,20
**house** 7:6 9:19 12:6,8 14:19 15:3 15:10 17:18 20:1

27:4 28:21,24 29:2,4,6,9 31:12 31:23,25 32:3,6,17 32:23,25 33:14,20 33:23 34:6,7,12,19 35:2,5,11 36:12 37:21,24 38:12,16 38:20 39:4,5,8,22 39:24,25 40:13,14 40:18,22 44:18,22 44:23 45:5,12 46:16 48:4 49:5,8 49:20,21 51:8,10 51:18,20 52:3,4,7 52:9,10,12,18 53:5 53:7,11,17,18,21 54:2,24 55:5,18 58:1,11,14 61:13 63:2,13 69:14,19 70:8 71:1,5 74:22 74:24 75:4 79:22 81:14 82:5,18 83:2,15 84:14 85:2,3,14 87:4,10 87:16 88:16 89:3 90:7,9,15,18,19,21 90:22 91:2,3,16 93:2,15 94:12 95:6,18 96:17,22 97:5,9 98:1,3,7,17 99:3,17,21 100:10 100:15,18,24 102:13 104:24 105:21 106:10 108:18,19 112:7 112:22,25 113:2,6 113:8,11,13,21 114:14,25 116:5 121:17 122:15 123:1,3 124:11,13 124:13,16 127:4,5 128:21,22 130:23 137:3 138:5 153:9 168:14 169:3 174:14 183:13 190:15

**household** 121:20
**household's** 85:17 102:5
**housekeeper** 14:16,22,23 16:1
**houses** 105:15 106:5 114:3 129:15
**how's** 21:2
**huge** 31:22 83:24 156:3,5 163:17
**huh** 3:25 9:1,9 10:8,23 11:4,4 80:6 106:24 110:4 126:13 150:9
**hundred** 10:22 176:22 177:19
**hung** 36:18
**husband** 18:6,20
**hvac** 63:21 64:19
**hygiene** 88:5
**hygienist** 71:9 72:9 73:7 74:14 76:11 83:20

**i**

**ice** 83:14
**idea** 28:1 96:25 97:1 137:12 173:18
**immediately** 33:24 153:9
**impacts** 195:13
**impartial** 195:13
**impartiality** 195:10
**important** 4:9 27:9 192:14
**impression** 13:10
**improper** 73:13
**improve** 164:8
**inaudible** 20:21 21:6 139:25
**inch** 104:16,16,16
**include** 43:9 110:21 131:4,21 132:1,10 169:13 180:9 188:21
**included** 54:13,14 60:24 79:25 110:18 134:17 135:1 140:23 142:24 170:5 175:25 179:6,21 188:9,24 190:25 193:15
**includes** 43:4 67:7
**including** 42:25 75:3
**income** 10:17
**incorrect** 23:11
**increase** 21:9 85:15,22 102:3,7 104:11 105:12 121:18 173:3 180:9
**increased** 134:14 150:25 152:20,23 157:10 158:21,22 173:1,2
**increases** 86:19,25
**incurred** 86:1,9 192:16
**indemnity** 2:9 3:3 4:2 17:20
**index** 179:17,18 180:10
**india** 172:3
**indian** 171:1
**indicated** 74:23
**indication** 158:3
**industrial** 71:9 72:9 73:6 74:13 76:11 83:20 88:5
**industry** 141:9
**information** 141:4 146:15 158:7 159:17 181:11,25 183:12 185:16 186:19
**inherited** 186:23
**initial** 80:1 187:22
**initially** 32:5,11 50:15 94:19 108:5 109:2 188:8
**innovations** 92:5 102:20 192:20
**inspect** 64:15
**inspected** 64:10,14 83:8
**inspection** 40:10 103:1
**install** 37:9,14 92:3,11 101:16 103:2 115:9 133:3 156:19 157:1 189:9,10,11
**installation** 133:15 134:2 189:6
**installed** 92:14 101:18 103:17,18 112:17,25 115:7
**installing** 113:8
**instruct** 31:7 72:4 73:1,2,4,10
**instructed** 76:20
**instructing** 73:22 74:1,3

**instruction** 73:13 140:10
**insurance** 4:1,2 60:6,8,12,12,14 106:13 120:2
**insured** 2:2 17:19 46:24 85:20 182:5 185:6
**intact** 136:7
**intentional** 65:25
**intents** 45:11
**interest** 195:9
**interested** 195:8
**interior** 27:4 50:7 61:11 83:10 91:8 163:6
**intermittently** 33:2,3 38:9
**interned** 9:18
**internet** 37:10 122:16
**interpret** 23:19
**interrupted** 86:12
**inventory** 162:14 162:15 173:21 174:7 185:4,4,9 187:8,14
**investments** 9:24
**invoice** 69:23 102:19,23 105:8 107:7 112:16 115:5 125:19 129:7,8,19 131:15 132:9,15,18 133:7 133:18,25 134:1,4 134:4 141:24 142:5,25 143:6 146:21 148:17 150:11 151:3,7,10 153:2,6,8 156:23 165:10 178:5 183:11
**invoiced** 153:3
**invoices** 104:4 106:19 108:1 116:18 126:25 129:2 133:1 142:2 142:10,14,22 143:1,18 171:4 172:7 183:18 186:13
**involved** 13:2,7 29:25 30:1,2 147:16
**iris** 129:2 134:9 140:22 141:3,5,13 141:24 142:10 143:16 144:13,17 144:19,24 145:11 145:14 146:8,10 146:13 147:18 150:11 151:8,17 151:19 153:12 154:8,11,15 157:20 158:7,25 160:11,13,18 161:13 164:11 166:5,7 172:6,14 183:3,5,7 186:12 186:21 187:9,17 189:12 190:4
**iris's** 142:2,14 145:12 146:4 149:19
**iron** 167:11,24,25
**irrelevant** 22:18 115:1
**irrigation** 136:8 136:13,17,24
**ish** 126:7 157:17
**issue** 3:13 5:20 14:20 58:19,22 59:1,9 63:4,21 64:4 79:18,20 94:6,19 178:17
**issued** 4:13 17:19 18:6 44:3
**issues** 33:5,24 36:6 79:15 83:9 94:5 194:6
**item** 61:5 131:20 131:23 132:15,19 134:18 135:22 154:10,10,15 158:4 161:18 164:16 168:3 174:13 183:13 187:15 188:17 189:2,24 190:15 191:2
**items** 15:19 63:7 64:11 79:13 88:4 103:24 108:20,24 109:3,5,7 110:14 110:16,16,19,22 111:12,13,19 112:3 114:7 131:3 133:19,23 140:15 141:10,12 143:12 146:14 149:18 152:3 154:2,6 158:2 161:20,22 164:24,25 167:17 178:5 179:11 185:14 186:20 188:6,23 189:1,2 189:22 190:1,8,16 190:25

**j**

**january** 8:14 30:8 39:9 89:23 95:14 95:15,20,23,24 96:16 100:4,8 118:25 151:7,12 152:2 153:1
**jeremy** 2:17 24:7,8 24:11,13 25:6 27:20 28:20 30:4 50:18 51:2 54:3 58:11 70:6 71:8 75:25 76:10 83:17 112:4 117:19 118:3 120:22,25 122:3,8 126:17
**jeremy's** 53:15
**jillian** 32:19
**job** 8:15 9:10 45:4 127:8
**jobs** 8:25 9:13
**jockeys** 11:10,12
**joni** 19:3,6
**js** 51:5 56:6,16,20 57:15 79:16
**judge** 8:18
**julio** 151:25 189:14
**june** 12:3,3 18:3,4 51:13 53:14 124:3 124:7,18,22,23 131:16 134:5 174:19
**junior** 15:18,19

**k**

**k** 10:7 33:9,10
**keep** 35:14 39:21 82:21 83:18 114:14,18 126:8,9 126:10 139:2
**keeps** 72:14 143:7
**kelly** 33:8,9,10,14
**kids** 7:14
**kind** 10:13 13:2 19:8 27:2 35:1 36:8 48:6 68:7,24

77:18 91:18 110:12 127:10 128:6 137:1 142:21 143:7 147:10 148:4 153:11 157:20,21 162:7 171:3 183:12 189:17,19 192:9,21
**kitchen** 45:18,19
**knew** 13:1 35:1 37:21,21 38:2,10 38:16 40:11 88:7 97:4 102:13
**knobs** 45:9,10
**knole** 141:18 142:6 144:25
**know** 5:25 6:8,11 8:2 12:17,20,22,25 13:14 14:4,4,5 19:5 20:25 21:17 22:6 23:11 25:22 27:15,23 30:7 32:13 40:16 41:15 42:20 53:9 56:21 57:2,9 58:6,20,21 58:23 59:6,8,10,20 61:16,18,19 62:20 64:7,21,24 65:1 66:3,4 69:23 71:23,23 76:14,15 76:16,18,19,25 78:4,15 79:3 80:13 81:19 82:14 84:12 86:10 88:6 88:12 89:12,12,16 90:6 93:25 97:10 97:20,22 98:2 102:15,17 103:24 104:2,14 105:2,4 106:3,4 107:24 111:1,24 114:20 116:13,14 118:21 120:16 122:19 123:20 124:15 125:5,6 128:17,17 132:11 135:24 136:15,15,19 137:8,10,10,11 138:12,24 140:24 141:1,14 142:17 143:3,7,21 144:4,5 144:16 146:18 147:11,12,13,20 147:21,21,24 148:16,22 153:17 155:8 157:22,24 157:25 158:6,21 161:3,20 165:22 170:21,24 171:2,3 173:6,12,15 175:23,24 177:6 179:10 180:3,6 181:20,20,21 182:18,19 184:5,8 186:9 192:22 193:12,17,24 194:13
**knowledge** 12:12 12:15
**knows** 72:3 143:22

**l**

**labor** 87:24,25 102:24 103:2,4 115:25 116:1 133:2 141:8 148:3 149:3,5,12,13,16 149:18,21 151:1,5 151:20 152:11,16 152:17 153:13 154:1,5,13 156:18 157:1 158:21 168:6 189:13,16 189:18 190:1
**laid** 64:22
**lamp** 165:16 166:2
**lamps** 165:5 166:11,20 167:3,6
**land** 12:17
**landlord** 34:8,15 40:21 86:9 91:11 91:13 93:25 96:2 96:3,22 99:1 105:18,22,22,23 106:1,3,5,7,16
**landlord's** 106:15
**landlords** 98:20 106:4
**landscape** 137:12 138:2
**landscaping** 18:18 79:10,12 127:1,3 127:11 134:16,18 135:11,12,17,21 136:4,21,24 137:4 137:8,17,24 138:18 182:20
**language** 20:7 120:14 155:15 156:10 162:9
**large** 9:25
**larger** 93:18
**late** 51:8
**latest** 56:14
**laundry** 57:7
**law** 7:24 8:3,6,21 9:8,12 31:7 97:16
**laws** 32:17 33:3
**lawsuit** 13:3
**lawyer** 6:21 29:24 31:5 77:25
**layers** 53:15 56:2 80:2 81:22 82:17 83:12,18 84:9
**layouts** 114:3
**lead** 73:19
**leaf** 165:20
**league** 15:18,19
**lease** 39:9 93:4,10 93:13 94:9,14,24 95:11,25 96:6,8,15 96:20 97:2,23 98:16,19,25 99:20 99:23,25 100:3,8 100:11,16
**leave** 38:17 42:10 42:11 114:16,22 114:24 115:1
**left** 15:9 22:23 61:13 63:9 83:11 111:11 148:12
**legal** 9:6,11,19 143:15
**length** 93:7
**leontine** 168:19 169:4,9
**lesser** 48:2
**letter** 65:4,14,16 65:18 66:12 67:16 133:1 140:6,22 153:15,17,22 158:5,9,12
**letting** 22:19
**level** 7:16 93:22 126:10
**levels** 75:2
**light** 91:18 115:5,7 147:11
**lights** 115:8,9,11 115:16,21
**liked** 29:1
**likelihood** 5:19
**limited** 73:20

**limits** 136:2 140:3
**line** 60:6 124:21 134:18 135:21 187:15 188:17
**lined** 45:3
**linen** 164:16,23 165:1
**linens** 168:12,19 169:4,9,11,11,12 169:14,18
**lines** 63:23 64:3
**lingering** 70:25
**lining** 80:17 152:12
**list** 57:16 61:4 79:18 111:19 140:18 142:9 180:5 190:6,8,17 190:25 191:21,25
**listed** 17:24 59:13 64:11 66:12 67:16 67:16 87:3 97:18 107:9 112:20 132:25 133:1,20 140:15 141:18 148:5,11,18 149:22 158:2 162:12 167:10 171:23 172:12,22 181:17 182:25 187:10 189:19 191:24
**lists** 129:9 166:22 175:13
**litigation** 4:15 73:12
**little** 19:15 42:17 44:7 45:8 76:22 81:18 98:18 102:17 140:16 145:7
**live** 37:25 39:20 40:6,9,14 71:6 98:4 145:15
**lived** 11:20 38:22 39:11 90:25 116:10
**lives** 92:17 113:5
**living** 7:3 18:18 21:6,8 25:19,24 26:18 33:16 42:15 43:24 51:15,19,22 52:15 57:25 84:24 85:6,10,13,16,17 85:21,23 86:1,4,15 86:25 87:9 96:5 102:4,5,9 104:11 105:12 106:14 108:24 110:13,15 110:19,21 114:5 114:19,22 118:1 119:17,18,23 120:7,8,17 121:16 121:19,20,22 122:5 131:4,22 132:2,4,7,10,21 137:2 138:21,22 148:11 150:8 154:17 155:10 174:15,17,20,22 174:24
**llc** 10:3,5 50:23 99:4
**llcs** 9:23 10:1
**load** 15:18
**local** 141:11 154:2 155:18
**located** 14:12 131:8 148:10
**location** 48:4
**lock** 35:17,18
**locked** 35:15
**locking** 35:12
**long** 32:20 39:7 65:4,7 66:14 67:22 71:1,2 72:19 87:17 97:1 129:5 174:23
**long's** 66:11,13 68:1
**longer** 26:5 30:3 101:21 128:6 147:7 153:10 173:23
**look** 10:19 17:14 20:7 37:17 43:13 48:1 51:3,12 62:11 64:21 70:12 77:15 78:16 79:25 83:13 100:1 105:3 107:7 110:25 111:24 116:13 118:14 120:12 121:13 122:1,21 123:8,21 125:13 132:6 137:18 139:16 141:17 143:1 146:4 148:16 151:1 152:10 153:19 154:25 155:9 156:7 157:23 159:20 160:17 161:2,21 162:13 169:6 172:13 176:4 177:13 179:24 183:21 184:4,15
**looked** 17:1 18:16 25:25 43:21,25 47:15 59:2,3 62:5 62:13,13 66:17 76:6 78:17 83:10 118:21 141:9 147:8 149:24 155:24 156:1 162:25 167:22 172:24 178:23 179:10 187:4
**looking** 18:14 47:14,17 53:9 58:25 66:23 72:10 72:14,18 75:6 77:16,19 82:21 84:25 86:20 135:10 143:14,15 148:3 155:20,21 160:23 166:6,16 167:1,2 171:16 177:1 179:1,15 180:19 181:7 184:2,18,21 187:3 187:8
**looks** 42:22 44:6 46:14,17 60:7 75:7 93:4 100:22 104:15,18,20 105:21 106:22 111:13 116:25 118:10,19,25 119:9 124:4 127:16 133:14,19 150:10,12 154:19 156:22 160:2 162:18 163:7,13 164:10 165:6 169:20 181:7
**lopez** 127:1,6 128:11,19
**lose** 101:17
**loss** 11:15,21 23:17,18 48:3 85:13,23 87:1

118:8,9 121:16 180:8,23 181:2,5 181:13,18,23 182:2,3,7,13 184:23 185:1,7 190:21
**lost** 82:8 155:6 157:4 160:23
**lot** 5:12 18:16 22:3 31:14,14,14,19,20 32:8 34:24 35:3 38:7 60:21 70:15 71:4 73:17 81:14 83:6,12 84:19 87:24 90:6 128:23 136:20 140:21 163:2 164:24,25 187:20 193:24
**louder** 21:2
**low** 53:1 147:22
**luck** 176:18

**m**

**magali** 108:7 109:3 148:22,24 164:22 176:12,20 178:4,18,22 190:6 190:7,15 191:10 191:21
**maiden** 6:19
**mail** 13:15 29:13 30:16 118:23
**mailed** 19:5 54:5
**mails** 50:17 54:14 54:14,22
**main** 178:17
**maintain** 85:17 102:4,8 121:20
**maintained** 34:20
**maintaining** 195:9
**maintenance** 127:17
**majority** 141:15 152:6,8 158:2
**making** 29:23 40:16 186:16
**manager** 27:14,22 28:14 172:20 173:4
**manner** 182:8
**mantles** 57:19,20 58:5 64:10
**manufactured** 45:9
**manufacturer** 144:13,15 145:1,3 146:9,18 147:13
**manufacturers** 147:20 148:1 183:20
**marbury** 27:21
**march** 51:1 123:20 129:9
**marcos** 1:14
**margins** 63:17
**maria** 151:25 189:14
**marital** 7:8
**mark** 10:12
**market** 15:19
**married** 7:9
**masonry** 81:4
**master** 45:24 57:8 62:21 130:1,13 169:8
**masterpiece** 17:19 19:11,12 46:15
**match** 132:12 150:11 155:7,20 157:3,18 179:11
**matching** 167:7
**materials** 48:5 58:16 87:24 149:6 149:8,16 150:4 168:7
**math** 66:20 67:12
**matter** 180:13 195:9
**matters** 5:16
**mattress** 154:14 154:14 172:16
**mattresses** 172:11 172:13 173:5,7,15
**maus** 176:12
**maus's** 148:22
**mccullogh** 27:21
**mdm** 63:20
**mean** 4:24 24:7 27:7 28:6,7,25 36:14 38:1 45:20 51:17 62:18 64:13 78:1 79:23 82:23 94:8 104:12 110:15 114:13,20 115:15 116:6 118:15 119:19 122:16 123:25 135:25 143:19 145:16 147:24 153:15 154:10 157:16 158:15 159:1 160:5,6,8,21 161:15 163:8 170:1 177:2 182:10 183:6 184:7 193:10,15
**means** 36:15 48:2
**media** 102:19
**meet** 37:9
**meeting** 27:1,3,12 28:22
**meetings** 28:21
**melted** 103:14
**mental** 31:6
**mentioned** 66:14 70:6
**messages** 66:4,5,6
**met** 28:7 70:21
**metal** 61:25
**meter** 126:8,9,11
**michael** 63:20
**mid** 12:3
**middle** 6:19 107:7
**mike** 32:19
**million** 20:2 42:17 44:4,7 55:13 57:8 66:18 67:6 140:16
**mind** 13:22 133:10 190:10
**mine** 163:7,8
**minor** 8:4
**minute** 45:20 47:6 47:9 68:17 111:5 120:13 121:11 134:17
**minutes** 15:12,23 16:5 17:6 109:14
**mirror** 142:25
**miscellaneous** 187:9
**mischaracterizat...** 140:8
**missed** 193:14,20 194:2
**missing** 100:6 182:11
**mistake** 131:23 132:11 180:16
**mistakenly** 64:16
**mistakes** 65:24 66:1
**mix** 108:12
**mold** 31:22,22 35:19 43:16 50:3

50:4 54:20 57:7 68:21,24 69:19 71:2 74:24 75:2 75:10,12,13
**moment** 26:22 30:17 63:14
**moncrief** 27:22
**monday** 45:1 124:20
**money** 10:15 38:14 94:11 95:5 99:6 100:16 137:7
**moneys** 99:23
**month** 36:9 93:10 93:13,23 95:2 98:9 100:2 110:20 117:22 118:4 120:22 124:21 126:12 127:20,23 128:7,19 132:7,8 133:9 137:2
**monthly** 99:2 110:20 126:10 128:6
**months** 39:13,14 81:25 82:13 84:5 96:23 100:11 116:11,16,19,19 117:8 118:8 126:19,22 152:24
**morrow** 63:20
**moss** 2:10 3:1,12 3:19,23 5:9,23 6:3 13:17 17:8,11 20:22 21:7,10,21 22:10 23:1,5,13,20 24:25 30:24 31:10 39:2 47:8,11,13 48:14,17 55:11 66:10 71:15,21 72:4,7,14,22 73:4 73:9,23 74:6 75:20 76:1,7,17 77:1 78:18 86:14 109:13,17,19 111:9 118:18,24 119:4,7 120:12,16 120:25 121:9 135:6 139:8,11 140:4,11,14 159:1 159:8,19 162:1,10 163:11 164:5 170:17 173:13 179:20 180:2,17 183:25 184:16 185:12,20,23 192:5 194:17,19
**mother** 162:13 163:1
**mount** 104:19,20
**mountain** 7:4 11:18,19 14:13 35:4 36:15 38:7 97:8 145:7,15
**move** 6:13 33:18 34:7 35:8 39:3 51:18 74:4 84:23 87:16 95:10,17 103:21 106:23 107:21 122:20 139:12 192:12
**moved** 12:4 28:5 32:22 34:2,12 35:5 36:5,11 37:3 37:15,20 38:3 45:18,23 46:1 90:22 95:22 96:6 99:3 107:11,12,24 156:16
**movers** 64:17 92:14 187:24
**moving** 33:25 38:11 51:20 90:20 90:24 91:1 96:10 106:19 108:2,4 119:8 139:2 154:17 157:7 169:18 187:24 188:3,4,6 190:24 191:4,12 192:7
**murphy** 148:3,4,6 148:15,21,23

**n**

**n** 10:7,7 33:11
**name** 6:17,19 9:24 10:2,6 60:12 110:23 113:10
**names** 32:18 147:21
**nashville** 138:7
**ne** 2:13
**necessarily** 147:25 160:21 161:15 163:22 182:24
**necessary** 34:18 84:7 85:16 102:4 102:8 121:19
**need** 3:12 6:10 20:25 21:11 22:3 22:4 24:21 25:1,3 33:24 37:17 38:21 49:19 52:8,25 57:20 65:1,9,21 69:18 71:24 76:9 76:17,19 77:15 102:10 105:3 109:9 118:5,7,8 126:19 138:1 157:19,21 158:7 158:15,23 159:4 169:10 176:1,2 182:13 183:1,3,8 189:24 190:1 193:1,1 194:5
**needed** 26:5 31:1 36:22 40:13 50:1 50:4,4,5 52:5 58:15 69:12,16 71:5 102:15 115:11 128:7 156:11 174:25 181:25
**needing** 155:16
**needs** 59:14 81:20 114:4 137:8
**negotiate** 51:24
**neither** 132:21 133:22
**net** 182:16,18,19
**never** 33:12 49:17 50:9 51:6,11,12,25 56:8 58:10 63:25 82:18 104:5,8 108:12 133:10 143:4 144:8 145:25 155:16
**new** 28:24 29:4,9 90:16 92:1 103:1 103:16,17 106:5 149:6,7,15 150:4 156:3 171:12 193:4
**night** 32:15,16
**nine** 7:15 171:13
**nod** 11:3
**nodding** 77:24 78:2,2
**noel** 15:20
**normal** 85:16,22 86:5,25 102:4 104:11 105:12 119:17 121:19

**note** 143:16 148:20 171:17
**notebook** 6:14 16:17,19 17:4,8 46:8 68:12 79:14 92:25 111:14 139:14
**notes** 144:21
**november** 12:7 14:10 32:16 33:19 33:21 87:22
**number** 1:4,5 3:3 3:4 17:3,24 48:21 53:19 57:10,13 61:5 67:15 68:9 95:10 102:19 110:10,13 111:14 111:23,25 112:2 112:16 126:3,24 129:1,8,8 132:17 132:18 133:19 134:5 139:13 141:24 142:3,5 146:21 148:21 150:12 151:3 155:9 156:13,24 157:18 159:22 167:3 168:18,19 171:7,23 172:2 173:19 175:10 178:9 181:8,9,9,9 182:3
**numbers** 135:10 137:18

**o**

**o** 10:7
**o'connor** 2:11
**oath** 1:9 3:2 4:3,17 6:5 21:11 48:19 73:14,25 111:11 181:14 182:1
194:15
**object** 5:6,21 21:14,18 72:13,21
**objected** 59:11 72:22
**objecting** 72:1
**objection** 72:5,23 73:2,10
**objections** 3:10 23:2 78:7
**objects** 78:5
**obligation** 185:15 195:10
**obligations** 185:24 186:1
**observe** 65:13
**obtain** 158:10 186:17,18
**obvious** 82:22 108:21,23
**obviously** 34:13 54:17 60:22 72:15 78:11 81:15 87:19 108:12 174:22 187:20
**occurred** 14:9 118:13
**october** 154:20
**odor** 50:6 54:19 55:25 56:17 59:3 63:6 70:25 71:3,6 80:4 81:16,20 82:7 83:6 84:1,3 88:21 190:13 191:5,15,18
**odors** 32:2 70:8,11 108:13
**offenses** 8:4
**offer** 135:9 192:12 192:13,23,24
**offers** 71:14,19
**officer** 195:13
**oh** 3:19 45:23 88:15 127:25 143:10 149:9 165:6 177:15
**okay** 3:24 5:23,25 6:16 7:25 9:15,20 10:1,7,9,21 11:14 12:5,12,19 13:21 13:23 14:2,7,25 15:21 16:17 17:1 17:14 19:8,16,22 20:1,20 24:12 25:21 26:13 27:5 28:11,17,19 30:12 33:14 37:7 43:10 44:9,14,17 46:5,8 46:14,19,20 47:5 47:17 48:13 50:3 53:2 55:7 56:11 56:19 57:3,12,18 61:4 62:6 65:7 67:9,12,12,14,25 68:7,19 74:17 80:9,15 84:20,23 85:4,5,12 86:15 87:8 89:6 92:19 93:15 97:7 100:10 101:1 102:19 104:23 105:7 106:18 108:1 111:22 112:13,16 113:20 115:4,20 116:24,24 117:7 117:11 118:5 119:3,6,8,20 121:13,15 123:12 123:19 124:3,10 125:3,12,18 126:2 126:19,24 128:8
128:11 129:1,21 129:23 131:13,15 131:25 132:14,25 133:6,13,14,17,18 134:4,16 135:14 135:16,20 136:13 140:18 141:5 142:12 144:10 146:1 148:13 149:2,7,12,24 150:7 151:1,4,16 151:17 152:10 153:22 154:17 155:9 156:18 157:11 159:20,25 160:2 162:11,18 163:12 164:4,9,16 165:5,19 166:21 167:5 168:9,12,22 169:2,18 171:17 172:8,11,21,24 173:19 174:5,11 174:11 176:6 177:8,17 178:4,9 181:4 182:14,23 183:7,14 184:1,17 184:21 186:3,12 186:24 187:15,15 190:5,22 191:7 192:15 193:6 194:10,17
**old** 7:14 34:19
**older** 9:17 35:1
**omit** 21:16 22:6,21
**once** 82:19 104:4 108:9,17 189:5
**one's** 57:3
**ones** 63:6 101:9 104:7 105:5 125:11 129:19

**onion** 53:16
**open** 45:19 46:11 126:10
**opening** 16:19
**opens** 46:2 163:6
**operable** 113:2
**operate** 35:11
**operations** 31:6
**opine** 71:18
**opposite** 73:16
**option** 156:17
**options** 147:18
**order** 3:12 25:25 26:3,8,17 35:18 40:12 141:1 142:19 145:9 146:14
**ordered** 38:18 141:6
**ordering** 3:14,16 159:18
**organizer** 97:19
**oriental** 155:18 156:3 171:17
**orientals** 171:11 171:12
**original** 45:16,17 56:24 57:1 130:10 141:20 142:9 148:5,14,18 150:10 152:16 154:18 157:20 159:24 165:8,13 165:20 167:12,14 168:10 169:14 172:12,25 183:2 183:13 184:1 186:4,22
**originally** 54:23 112:4 148:15 162:18 163:13
**originals** 141:6
**originate** 182:3
**oushak** 170:25 171:22,24
**outcome** 195:8
**outdated** 35:19
**outdoor** 89:4
**outline** 19:13,21 192:3
**outright** 60:25
**outside** 35:21 59:16 60:2,3 64:1 81:11,11
**outstanding** 75:15 76:12
**overhead** 134:22 135:18
**overseeing** 135:13 138:11
**oversees** 138:4,5,8
**oversight** 66:15,19 68:1
**owe** 94:20
**owed** 99:22 100:16 100:17 138:23,25 150:1
**owes** 94:10 95:4
**owned** 92:2 113:11 148:23
**owner** 10:22 35:13 112:22
**owners** 156:16
**owns** 12:23 84:19 97:9,10
**oxmoor** 9:18

**p**

**p** 10:7
**p.m.** 48:16 66:9 111:8 139:10 192:4 194:23
**pacific** 2:9 3:2 4:1 14:9 17:20 24:1,6 24:8,10 44:7 51:14,24 52:15,19 53:8 59:11 103:11 114:4 115:3,15 117:20
**pack** 32:8 107:15
**packing** 107:17,23
**pad** 143:15 156:19
**pads** 133:16 157:1 157:5,9,13,16
**page** 17:17,18 19:10,23 23:22 46:12,18,22 47:2 49:3 57:4 85:2,5,9 109:20 121:12 123:9 127:16 131:16 151:6,10 151:14 152:10 160:24 162:15,15 166:18 175:21,25 176:9,10 184:18 184:19 186:8 187:7
**pages** 19:10,18,20 46:15 171:8,8
**paid** 26:11 42:17 42:20 44:7,11,11 44:13 60:23,25 65:18 86:5 91:12 94:2,6,12,14 98:6 99:6,16 100:11,17 113:1 125:24 126:2 130:11 134:1 137:11,11 137:14,15 146:1 151:20 157:9 162:19 163:13,21 163:25 164:10,17 165:6,8,17 166:3 169:23 171:4,25 172:18 176:6 177:4,8,10,20 178:7,8,15,19 179:8,13 180:19 180:20 183:3 192:17
**paige** 155:17,25 156:12 171:11,11 171:16 172:8 175:17
**paint** 34:2,5,6,8,15 34:18 35:20 36:10 40:14,15,18,21,23 91:14 105:8,23,25 106:8,9
**painted** 36:11 40:13 91:4,8 174:4
**painter's** 35:14
**painting** 91:11,24 105:21 106:1
**paints** 106:5
**pair** 166:11,20
**panel** 14:18
**panels** 14:17 101:11 152:11
**pantry** 45:18
**paragraph** 86:17 86:22 158:12
**parameters** 25:23
**paris** 2:4 97:8,15 99:5 112:21 156:16
**parkinson** 10:3,7 10:12
**parkway** 2:5
**part** 19:16,19 27:9 40:15 83:11 108:2 135:13 159:18 182:4 192:11,23

**partial** 100:2 177:11
**partially** 169:25 170:1
**particular** 18:13 19:4 25:20 35:9 39:25 54:15 62:20 70:5 141:14,16 142:17 188:24 193:8
**particularly** 40:17
**particulars** 97:13
**particulates** 31:21 71:3
**parties** 195:13
**partner** 10:4,11 97:16
**parts** 35:19 69:19
**party** 195:7,11
**pass** 19:19,20
**passed** 60:14,18 106:13
**passing** 60:7
**pathway** 88:19
**patience** 193:25
**patio** 80:16,24,25 81:1,11 82:12 88:19
**patrol** 122:21
**paul** 51:7 64:20 89:20
**pay** 35:2 47:22 51:14,21 52:15 72:9 73:6 75:17 76:10 86:4,8 87:8 91:10,10,11,13 96:11 99:9 112:24 117:15,17,20 120:6,7 122:3 123:23 124:24 126:18 128:9 137:16,19 143:24 144:2,5 145:5 148:14 149:12,16 149:17,20,21 158:19 159:15 160:10 161:7 164:13
**payable** 77:12 78:21 79:5,8,10 119:23 121:1 160:22 193:9,10
**paying** 40:21 95:24 96:4,11 98:9 99:2 109:6 117:4,15,16,23,25 119:12,15,21 121:23 122:6,10 122:13,24 123:2,5 124:8 125:7,16 126:6,7,15 127:22 128:2
**payment** 20:4,11 20:15 42:25 43:2 47:2,14,18,21 85:3 123:22 161:2,3,6
**payments** 42:22 42:23 43:15,19,23 44:3 99:3 177:7 177:12 180:20
**pays** 60:13 114:4 117:13,24
**peachtree** 2:13
**pearl** 162:12,13 163:1
**peel** 53:15 82:16 83:12 84:8
**peeling** 56:2 80:3 81:22 83:18
**pending** 25:1
**people** 3:16 11:10 19:1 28:4 29:3 34:23 107:24 147:21
**perceive** 6:1
**percent** 10:4,5,9 10:22 59:10 65:19 66:19,21,25 67:3 68:10 134:21,22 135:18 144:2 145:6,8,11,12,15 145:16,17
**percentage** 138:10
**perfectly** 157:4
**perform** 185:2
**performing** 68:24
**period** 18:3 72:19 86:17 87:1 123:17 180:11
**permanent** 20:10 26:4 48:5 85:14 87:5 121:17
**permission** 91:14
**person** 3:16 5:14 5:15 28:20 30:15 33:18
**personal** 12:12,15 185:5
**personally** 11:9 13:24 14:5 15:1 64:10 112:24
**pest** 122:21,22 123:15,23 124:5 124:24
**pet** 94:15
**phone** 25:12,14,15 26:21 30:15 31:8 184:6
**photos** 167:16
**phrase** 53:15
**physical** 28:9 88:22,23,24 189:24
**pick** 26:6 40:3 110:14,16,22 112:2 130:23,25 147:18
**picked** 40:2 111:12,20
**picking** 27:24 147:17
**picture** 166:25 167:2
**piece** 132:24 188:2 191:6
**pieces** 114:1 136:16 177:14 186:23
**pinpoint** 56:1 82:7
**place** 20:8 71:6
**places** 26:1
**plan** 42:10 44:20 52:3 138:2
**planning** 49:20,21 49:23 58:7,12,13 78:23 80:7 113:20 168:1
**plans** 45:15,16,22 65:10 82:17 138:13
**plantings** 127:14 137:14 138:6
**plants** 136:10 138:6
**please** 5:1 6:17 19:16 53:1 170:16 176:10 189:20
**pleated** 152:11
**plumbing** 35:9 36:7 40:9 59:9 102:18
**plus** 53:19 135:17
**pocket** 145:7

**pods** 68:16
**point** 22:4 33:20 40:21 64:23,25 69:7,8 82:24 89:9 90:14 92:17 99:22 109:12 110:14 135:16 137:6 140:9 173:14 181:25 182:25 192:17
**pointed** 36:2
**policy** 1:4 3:4 17:15,19,24 18:3,9 18:23 19:13,23 20:7 21:15,16,18 21:19,22,22,24 22:7,10,12,13,14 22:15,18 23:4,9,9 23:10,19 48:10 73:24 74:3 84:25 85:1 86:3,7 87:8 117:13 119:24 120:5,6,10,13,14 120:20 121:2,2,5 121:10 122:8 136:2 140:3 160:18,22,23 161:16,17 162:8 179:22,23 180:7 180:11 181:16 182:6,16 184:17 185:1,7,15,18,20 185:22,25 186:2,6 186:9,11
**pool** 88:2
**porch** 80:17,23,24 81:2,3,12,15 88:19 89:5,10
**porous** 81:15 83:5
**portfolio** 9:25
**portions** 21:16
**position** 8:17 56:8 57:20 61:7,21 121:21 122:4 135:20
**positive** 10:20
**possibility** 14:25 90:2
**possibly** 79:3 103:15
**post** 7:20 116:19
**potentially** 67:21 69:20
**power** 58:23 125:3 125:7,16
**practical** 137:4
**prefer** 135:11
**preferred** 93:9
**premium** 19:19,20
**prepare** 140:20 141:2 185:3,4
**prepared** 57:14 140:18,24 151:8 175:16 176:11 178:12 180:23
**present** 2:17 7:1 75:7
**presently** 8:8
**press** 164:16,23 165:2
**pretty** 6:13 22:18 35:23 110:2 113:5 122:17 124:9 136:20 155:25 173:18
**previously** 47:15 90:7
**price** 66:22 68:11 84:11 131:4 134:14 144:6 150:17,19,20,23 152:20 154:18,21 156:5 163:21 165:8,13,20 172:18,22 179:17 179:18 180:10
**priced** 147:8
**prices** 152:21,23 157:10 164:15
**pricing** 141:7 154:15
**primarily** 18:18
**prior** 62:11 64:8 80:20 90:8,24 91:1 94:1 116:16 116:19 117:8 118:8 126:22 127:6 153:7
**privacy** 36:23 102:11,15
**privilege** 30:23 31:5
**privy** 54:22
**probably** 11:1 12:10 114:13 122:12 124:24 167:21 182:21
**problem** 3:15 31:22 126:21
**problems** 82:21 102:18
**proceeding** 195:6 195:13
**process** 4:13
**procurement** 182:4
**production** 171:12
**profession** 8:1
**professional** 195:10
**profit** 135:18
**progress** 29:24 49:17 53:14
**project** 27:14,22 28:14
**promenade** 2:12
**promises** 186:16
**proof** 180:22 181:2,5,13,18,23 182:13
**proper** 72:24 73:9 73:10
**properties** 97:7,8
**property** 12:9,13 12:16,20 60:3 182:7 184:21 185:5,5
**proposal** 51:2,13 82:24 127:17,24 148:22 175:5,6,8
**protocol** 50:16,24 70:3,11,24 83:16 83:19
**provide** 10:17 50:23 51:4,9 53:17 70:2,7,10,13 116:15 120:6 128:8 153:12 159:1 183:5 184:9 185:16 186:3 189:15
**provided** 48:10 49:15 99:8 112:1 115:12 116:20 159:13 170:19 171:4,9 177:3
**provider** 37:10
**provides** 10:17 120:7
**providing** 3:10 189:21

**provision** 119:23
**provisions** 22:14
**pull** 16:17 19:15 116:6
**pulled** 88:4,14
**pulling** 115:21
**purchase** 103:1 142:18 144:6
**purchased** 60:13 90:17 131:24 141:12 142:25 148:6 155:6 158:11 164:14
**purchases** 100:23 143:23 159:24
**purpose** 4:21
**purposes** 45:11
**pursuant** 3:4
**put** 31:8 36:25 37:23,24 38:15 68:17 83:24 91:15 91:18 102:12 107:6 108:22,23 113:10 115:23 129:15 137:11,16 138:9 144:20 159:16
**putting** 16:12 121:1 122:8
**puzzled** 76:6

**q**

**qualified** 68:7
**quality** 42:1,3 48:6 58:3 61:15 63:16 64:8 101:14 162:7 183:13
**quarterly** 122:22 123:6,24 124:5
**question** 4:23,25 5:3,7,15,24 6:7 13:6 21:12 22:8 23:21 24:22,23 25:1,3,3 30:18,21 31:3 38:25 47:11 55:10 72:1,24 74:12 75:19,23 76:5,8,15,24 82:8 97:3 122:2 128:16 128:18 132:11 135:2 140:25 161:25 163:10 164:2 170:11,13 170:15,18 173:3 173:10,11,12,14 177:23 180:14 185:11
**questions** 4:5,21 4:23 14:20 21:14 23:14,14 26:18 55:7 73:25 74:2 76:18 77:20 141:16 187:6 193:25 195:5
**quick** 48:14 129:17 192:3
**quickly** 6:13 110:25
**quit** 23:14
**quite** 79:3
**quote** 50:23 51:5,6 51:6,9,12 53:18 54:4 136:23 172:4
**quotes** 137:5

**r**

**r** 10:7
**race** 11:10,10
**racehorses** 11:8
**racing** 11:9
**rack** 42:5
**raise** 10:14 11:7
**random** 96:2
**reach** 136:2
**reached** 187:21
**read** 18:16 21:15 22:13 36:18 85:12 120:5 141:23 180:7 182:3 194:14
**reading** 21:23 85:3 121:15
**ready** 26:17 45:4 108:24 110:22 118:6 189:2
**real** 33:1,6 129:17 192:3
**realize** 35:24 36:6 107:22 160:13,18
**realized** 29:24 52:14 190:20 191:4
**really** 4:4 22:20 28:1,3 105:18 113:3 114:12 128:16,18 137:3 146:1
**reason** 5:25 6:6,10 29:19,20 52:17,20 53:6,11 58:8 68:23 117:11
**reasonable** 71:12 71:19,22 72:8 73:6 74:13 85:15 87:3,9,13 102:3 104:11 105:12 121:18 127:9
**reasons** 52:23,24 53:13
**rebuild** 44:21,24 48:4 49:8 52:3 56:20 97:5
**rebuilding** 44:17 52:4,7
**rebuilt** 29:7 69:6,7
**rebuying** 149:2 169:15
**recall** 19:5,6 26:16 26:22 27:16 28:16 28:22,23 37:16 43:22 44:1 48:25 71:8 79:25 88:6,8 95:19 96:13 107:3 119:11 122:14 161:4 177:6 180:20
**receipt** 155:10 165:22 167:13,14 175:9
**receipts** 142:22 157:20 167:17 168:10 185:8,13
**receive** 56:16,19 188:1
**received** 56:9,13 56:13 66:11 116:21 139:15 188:2
**receiving** 108:3 187:22 188:7,12
**recess** 48:16 66:9 111:8 115:16 139:10 192:4
**recessed** 115:8,9
**recommend** 88:3
**reconstruct** 87:16
**reconstruction** 18:17 47:23 48:1 49:4,11 53:19 67:19 68:3,11 79:9 80:1 135:5
**record** 6:17 11:5 20:24 48:18 66:8 72:23 139:8 194:20 195:6

**recover** 58:3
**red** 124:21 163:6 167:11,22
**redone** 138:13,16
**redraw** 45:15,20 65:10
**reduced** 195:5
**reevaluate** 137:1
**refer** 6:16
**reference** 110:23
**references** 144:21
**referencing** 141:23
**referred** 142:9
**referring** 56:15 135:8,9
**refers** 182:15
**refinish** 91:21
**refinishing** 148:25
**reflect** 164:1,6
**refrain** 23:2
**refrigerant** 63:23 64:3
**refusing** 74:12
**regard** 3:3 12:15 83:22 94:11 183:2 186:13 189:16
**regarding** 52:14 160:4
**regardless** 74:7 123:22
**regional** 141:11
**registered** 97:19
**regular** 86:4 120:6
**reimbursed** 85:21 99:12
**reinstall** 193:3
**relacquered** 62:25
**relate** 189:18
**related** 94:3 189:17
**relates** 14:9 84:21 175:10 190:2
**relationship** 195:9
**relative** 195:7
**relevant** 163:22,24
**rely** 4:10
**remaining** 71:4 75:5 100:15 125:23 170:5
**remediate** 49:19 50:4 68:20 70:25 82:18
**remediated** 50:1 88:13
**remediation** 49:18 50:14,17,20,22,24 51:25 52:1,5,14 53:14,20 54:7,11 54:16,18 56:16 68:13,13,19,25 69:1,10,12,18,19 70:3,9 71:7 79:8 79:17 83:20 84:7 84:10
**remember** 16:15 24:15,18 25:8 26:14,20 27:5,11 27:12 28:3 29:11 30:13 33:13 37:18 46:22 56:23 83:15 104:9 105:4,6 124:19 133:10
**remembered** 187:6
**remind** 111:10
**remote** 1:11
**removal** 43:20 54:10 56:17 80:19 89:1,15,17,19,21 89:25 90:4
**remove** 82:7 102:24 103:6 113:20 115:16
**removed** 54:19 82:5,20 113:15,19 135:10
**removing** 64:20
**renovations** 90:16
**rent** 90:11 95:24 96:4,22 98:6 99:9 130:23
**rental** 32:22 39:17 39:22 91:3,4,7,22 91:23 92:1,11,11 93:2,18 94:2,11,16 95:5,11 99:12,17 103:3 105:8 106:6 108:18,19 109:8 110:11 112:7 114:25 115:10,11 115:21 116:5 117:20 122:4 126:18
**rentals** 35:3 38:7
**rented** 90:7,9 100:14
**renter** 105:17,20 105:25
**renting** 7:6 34:24 90:13 94:1 98:17
**repair** 48:3,22 77:10 78:20 161:9 164:7
**repaired** 62:25
**repeat** 5:2 6:9 75:19,24 76:5,9 170:14,16
**rephrase** 6:9
**replace** 48:3 89:22 101:3 109:9 131:5 136:23 144:25 158:17,18 161:8 162:5 168:13,23 174:13,16
**replaced** 35:17 57:21 59:14 65:1 81:21 112:11 131:6 168:15,21 191:25
**replacement** 20:5 20:12,15 46:24 47:18,22 103:24 104:6 109:4 131:3 131:20,23 132:5 144:11,12,17,23 146:7 152:17 154:3,9,12,19,24 154:25 155:1,5,14 155:19,22 157:22 158:1,4,6,10,14 159:21 160:4,7,16 161:4,7,18,23 162:4,6,23 163:23 164:10,19 165:7 165:17,24 166:9 166:22 167:12 168:20,25 170:3,4 170:4,21 172:12 172:14,17,23 173:6,15 175:15 179:6 183:9,11 184:3 186:5,20 189:22 190:8 193:3
**replacements** 41:18 141:10 163:14
**replacing** 176:2
**report** 75:6 139:6 179:10
**reported** 23:25

**reporter** 20:23 21:4 76:3 159:6,9
**request** 131:4,22 132:2
**requested** 118:16
**required** 48:3 71:20 87:4,10 118:15 161:9
**reread** 121:11
**research** 70:15
**reserve** 194:4
**residential** 93:1 95:11
**resolve** 20:25
**respect** 84:6 95:5 143:8 158:4 165:13 180:23 183:9 184:3 186:4 186:19
**responsibility** 75:17 76:13 105:24 106:15
**rest** 108:1 118:6 141:6
**restoration** 26:3,9 32:5 42:6 100:23 112:3,4 130:10 174:18
**restore** 62:17,19 87:4,10 176:14,21 190:6 191:22
**restored** 178:6 190:18,23 191:11
**restores** 108:8 176:13
**restoring** 164:24 164:25 176:18 190:16
**retain** 70:4
**retained** 70:2
**return** 108:25
**returned** 108:21
**returns** 10:19
**reusable** 58:17
**reuse** 80:7,10 104:6,8
**reused** 61:8 62:6 63:25 115:19
**reusing** 88:17
**review** 16:25
**reviewed** 16:18,24 18:9,11 21:22
**reviewing** 18:13 18:15,19
**revised** 57:7
**rid** 50:5,5
**right** 4:2 6:14,15 6:22 7:2,6 11:12 14:10 16:19,24 18:1 20:12,16 23:1 24:1,12 26:9 29:7 32:6 34:3 35:6 37:16 41:2,4 42:18 43:11 44:10 44:15 46:11,25 47:19 48:11 55:13 59:19 61:25 65:2 67:10,11 68:9 69:15,20,21 74:18 74:24 89:7 93:2 94:3,7 95:8,12,15 96:2 98:12,18 99:11 100:12,18 100:19,20 103:19 103:20 106:2 109:6 110:5,7,13 112:18 114:25 117:2 119:8 120:8 120:18 122:13,15 122:20 123:7,24 124:4,12 125:13 125:25 126:1,2,6,8 126:9,16 134:16 134:23 137:9 138:3 139:1,16,19 139:24 140:12,16 141:21,22,25 142:1 143:25 144:1 145:21 148:6,20 151:23 159:24 160:14,20 167:10 169:24 173:16,17 176:15 176:23 177:5,9,16 178:15,19,23 183:5 186:10,14 190:17 194:5
**risk** 60:6,8,12,16 60:25
**road** 11:15 12:8 14:13 26:23,25 32:17 41:8,14,21 41:23,25 90:18,21 92:12 101:4,23 102:25 103:22 104:2,24 113:21 114:2 116:9 117:5 117:9,16,25 118:9 119:10,13,16,21 121:24 122:7,10 122:13,25 123:7 123:16,24 124:8 124:25 125:5,8,16 125:21 126:6,16 127:4,5,6,11,13 128:3,15,22 130:3 130:5,7,14,17,21 131:13,17 157:2 157:15 175:14 192:9,13 193:5
**robert** 93:25 94:21 162:19
**robyn** 1:15 3:5 11:3 76:2 195:19
**roche** 93:25 94:21
**rod** 130:6
**rods** 129:9
**rolling** 183:14
**roof** 79:20,22,23 79:24,25 80:5,10 83:12 84:15,17 88:4
**room** 57:7,25 78:9 108:8 129:24 131:10 133:20 148:11 150:8 152:6,7 154:17 155:1,4,10 166:24 166:25 169:9 174:21,22,24,25 175:4 191:15
**rooms** 34:25 130:8 130:21 148:11 169:10
**round** 174:9,11
**rpr** 1:15 195:19
**rug** 129:24 130:9 130:13 133:15 154:18,20,21,23 154:24,24 155:1,4 155:5,5,10,14,23 156:7,15,19 157:1 157:5,9,13,16 158:17 159:3,4,12 169:19 170:7,18 170:22,23,25 171:1,9,19,19,24 172:5 175:20,21 175:23 176:1,5,7,8 179:5
**rugs** 130:17 155:8 155:18,19 156:4,9 156:13,16 157:12

157:16 169:21,23 170:5,8,19,22 171:3,5 172:9 175:10,14,15,18 179:5,9
**ruined** 136:8
**rules** 4:20 149:15
**run** 59:21 192:3
**running** 83:17 172:20 173:4
**rushing** 139:5

**s**

**s** 10:7
**safe** 71:6 146:22
**safira** 170:25 171:12
**sales** 145:5,10,12 145:14,21,24 146:1,5 149:12,20 185:8
**salvage** 114:10 115:25 127:13
**salvageable** 165:2
**samples** 74:22 143:21
**san** 1:14
**sanitized** 36:13
**sanitizing** 36:16
**sat** 46:3 57:25
**satisfaction** 62:25
**satisfactory** 33:15 33:17
**save** 80:5 137:23
**saved** 88:16 165:4 182:7 190:12,12 190:20
**saw** 33:20,23 40:8 57:1 64:20
**saying** 52:17 67:5 80:9,23 81:7,19 82:10 88:14 90:1 100:5 110:6 118:2 119:19 120:21 128:24 130:22 132:1,2 135:7 137:6 152:2 154:21 158:7 159:3 160:11 171:24 173:8 178:18,21 183:3 188:5 193:12
**says** 19:10,12 21:25,25 22:10,11 22:12 23:22 46:15 46:17 47:21 48:2 60:12 85:13 86:24 105:23 106:25 107:8 109:21 120:10,20 121:2 121:16 122:9 144:10 153:15,25 154:18 161:6 166:19 167:3,11 171:19 173:24 175:5,5 184:11,23 185:1,3 192:7
**scale** 54:6,16,17
**scaled** 50:19
**scenes** 77:18
**scheduled** 107:22
**school** 7:21,24 8:3 8:21
**sconce** 14:17,21,22 15:1
**sconces** 165:20 166:1
**scope** 50:13,17,19 52:1 54:7,16,17 79:8 84:11
**scrambling** 88:1
**scratch** 99:15
**sealed** 83:23
**sealing** 56:17
**second** 16:11 17:18 19:17 24:19 24:20 42:19 52:25 53:1 60:24 66:8 123:12 177:15 194:5
**secondary** 31:18
**section** 47:15 85:1
**secure** 138:6
**security** 94:15,20 94:22 95:1,3 98:12,14,20,23 112:17,25 113:1,6 113:8,12,22 114:4
**see** 16:8,8 17:15 17:18,22 18:3 19:11,16,23,24 22:24 24:19 34:21 36:23 40:5 46:4 46:18 47:3,24 48:23 56:6 57:4 60:9 61:5 62:6 65:5 67:9 68:14 70:13 77:18,19 78:10,12 79:14 82:21 85:5,18 86:19 87:6 102:20 104:16 105:3,9,19 106:19 109:22 110:23 118:23 125:2 127:20 129:10 134:6 142:3,6 143:2 148:13 151:5,10 151:13 152:13 153:25 154:14 159:13,14,14 160:24,24 161:11 162:14,16,25 165:7,19 167:12 169:7 173:21 174:6 177:14 178:10 183:23 184:4,9,9,15,23 187:11
**seeking** 99:11 134:1 192:16
**seen** 57:2 62:7 63:6 64:16 140:11 164:13 178:2
**select** 46:16
**selection** 156:3
**send** 116:22,23 117:8,10 118:11 126:21 130:24 132:7 133:6,9,13 144:22 153:8
**sends** 143:6
**sense** 5:1 114:13 115:18
**sensor** 113:4
**sensors** 113:14,16 113:18 114:6,11 114:14
**sent** 6:14 16:18 17:9 56:25 100:7 116:18 118:11,14 118:17,22 153:6 159:21 165:3 166:7 168:22 169:1 177:7,11 178:8 191:5
**sentence** 86:16,21
**separate** 189:10
**separately** 16:16 79:11,12
**septic** 77:3,6,10,13 78:19,20,24 79:17
**serve** 195:13

**service** 125:20 127:11
**services** 127:18
**set** 15:19 31:22 37:10 65:17 79:2 89:4 97:22,25 103:2 166:24,24 169:9
**sets** 169:12 178:14
**settlement** 192:12 192:24
**setup** 92:8,17,20
**seven** 102:24 103:6
**shades** 129:10,13 129:15,23,25 130:2 134:2
**share** 131:12
**she'll** 143:22
**sheet** 19:15 182:24
**shelve** 192:24
**shelves** 164:8
**shelving** 163:21
**shield** 83:14
**ship** 145:13,23
**shipped** 145:18
**shipping** 141:7 145:4,21,24 146:2 146:5 188:6,21
**shop** 15:19 63:11 108:8 155:18
**shortly** 29:12
**show** 19:11 63:18 75:1 153:13 185:6
**showed** 171:4
**shower** 46:2
**showing** 158:16 159:4 165:8
**shows** 163:24 183:12
**shrinkage** 63:18
**side** 81:1 83:5 148:20
**sides** 120:23
**sign** 181:22 194:14
**signature** 181:4 194:24 195:18
**signed** 93:4 95:14 98:25 181:19,21
**significant** 80:18 136:20
**signs** 72:17
**similar** 53:18 141:10,12 147:8 164:12
**simple** 26:7
**simply** 5:17
**simultaneous** 159:5 170:10 193:21
**single** 11:23 50:7 166:2 182:25 191:6 193:18
**sink** 35:11
**sit** 4:4,17 31:8 73:24
**site** 16:11 64:18,19 64:19
**sits** 36:23
**sitting** 37:19 64:1
**situation** 19:9 27:2 73:13 128:5
**situations** 13:13 105:19
**six** 46:15 51:11 52:11,13 53:8 93:10,13 96:23 100:11 152:24
**sixth** 109:1 110:5 110:7
**size** 41:16 102:1 104:5,7,25 155:21 155:23
**sized** 104:15
**sizes** 41:16
**skips** 119:1
**slade** 50:22,23 51:13 68:14,19 79:16
**slade's** 51:2
**slate** 79:24 80:5,7 80:10 84:17 88:16
**smaller** 88:2 122:15 128:21 130:8
**smell** 31:20 108:21 108:23,23
**smelled** 82:20
**smelling** 82:6
**smells** 84:12
**smoke** 29:8 31:14 31:16,20 32:2 50:6 52:5 53:16 54:19 55:25 56:17 57:24 62:18 63:5 63:6,8 64:6 68:13 68:20,24 69:12,18 70:8,10,25 71:3,6 75:4 79:17 80:4 81:16,20 82:6,20 83:4 84:3,6,9 88:13 103:15 110:17 113:19 190:13 191:4,14 191:18
**sofa** 141:18 142:6 142:12,13,16 144:10,14,15,25 145:2 160:16 174:12,25
**sold** 90:15
**solely** 195:11
**solid** 172:3
**somebody** 33:16 70:12,13,17 86:9 92:3,6
**somers** 148:24 164:22 176:12 178:22
**somers's** 178:18
**soon** 38:10
**sorry** 10:25 25:11 29:16 30:8 32:11 36:20 38:23 47:5 52:11 53:3 54:10 66:3,24 86:12,23 91:4 93:12 99:14 119:4 124:1 135:3 148:9,13 151:10 151:15 159:6,8 165:6 178:1 181:1 187:12,13 191:13
**sort** 9:11 15:16 37:24 38:16 75:9 88:5 110:11 114:10 153:12 158:3,15 160:9 183:8,11
**sound** 43:11 44:10 44:15 150:13 176:22
**sounded** 53:5
**sounds** 16:6 21:4 38:1 89:13 92:22 100:19,20 105:2 105:25 111:7 117:12 128:20 183:4
**source** 56:1 82:7
**sources** 141:2

**southern** 7:19 75:9
**space** 189:1
**speak** 21:2,20 24:22,24 186:21
**speaker** 68:17
**speaking** 20:24 23:2 78:7 118:7 159:5 170:10 193:21
**speaks** 120:10
**special** 172:20 173:4
**specialty** 62:21,22
**specific** 16:23 22:13 31:11,13 136:23 137:7 140:23 181:24
**specifically** 13:1 25:24 26:2 39:19 62:5 88:9 97:25 98:3 149:24 158:18
**spectrum** 119:9 121:21
**speculate** 114:12
**spend** 22:3 32:16 38:14 187:18,20
**spent** 187:17,20
**spillover** 109:2
**sports** 15:17
**spray** 50:5
**spreadsheet** 43:14 43:25 110:21,24 111:2 141:4,19 144:20 160:7 166:19 167:8 169:6 172:5 179:1 193:16,18,19
**spreadsheets** 132:6
**sprott** 65:4
**square** 93:21 99:21 175:23 176:1,4,4,7
**stables** 10:5,21 11:6
**stage** 71:18 121:6
**standard** 85:17 98:16 102:5,6,8 104:15 121:20 141:9
**standing** 55:20,23 139:5
**standpoint** 45:14 50:2
**stands** 179:16
**start** 12:5 14:7 25:14 44:24 45:2 84:24 107:8 124:21 137:4
**started** 3:10 6:13 9:19 15:4 16:6,12 17:7 28:4 44:17 44:25 81:13 89:2 97:5 159:17
**starts** 86:18
**state** 145:18,23 146:3 195:2
**stated** 195:4
**statement** 120:5 181:2,5,13
**states** 65:14,15
**stating** 158:5
**status** 7:8
**stay** 32:20 38:4 96:23 116:5 174:23 187:25
**stayed** 32:21 33:2 33:3 38:9
**stays** 113:13 115:14
**steel** 59:7
**step** 22:24,24 83:25
**stitched** 152:12
**stock** 26:1
**stocked** 156:2
**stone** 81:4
**stood** 180:6
**stool** 174:5,6
**stopped** 140:2
**stopping** 109:12
**storage** 58:5,9 59:23 64:14,15 109:17,21 111:12 111:20,22 130:24 145:9 187:23 188:9,10,12,15 190:24 192:8
**store** 42:5 102:25 103:7 163:19 188:1
**stored** 58:11 61:16 61:19 84:18 108:4
**stores** 141:11,11
**storing** 103:10 108:3,6 188:8
**story** 16:11
**straight** 36:24 107:16
**street** 2:13
**strong** 80:3 191:4
**structure** 48:5 85:14 87:5 121:17
**structures** 20:10
**studs** 27:4 29:6 44:20,23 49:12,24 58:15
**stuff** 37:17 82:12 89:22 109:18 112:5,10 130:10 140:21 149:11 152:24 153:2,10 158:2 164:21
**stuffing** 149:10
**subcontractor** 195:12
**subcontractors** 88:2
**submission** 192:19
**submit** 110:20 117:21 118:3 151:22 182:12 183:21 194:8
**submits** 120:21
**submitted** 49:1,22 50:25 51:2 77:9 82:23 110:8,19 121:7,8 133:10 138:24 140:9 151:19 156:22 160:3,6 175:6 177:21,24 178:1 192:11 193:23 194:7
**submitting** 114:21 181:14 182:2
**subpoena** 4:13
**sued** 13:24,25 14:6
**suffered** 23:17
**suggested** 72:2
**suggestion** 93:11
**suitable** 39:17 40:6,9 102:14 105:21
**suite** 2:6,14
**summary** 19:19 19:20 46:12
**summer** 8:16 9:11 116:11 157:15
**sunroom** 175:20 175:21 176:8

**suppliers** 184:9,11
**support** 185:8
**suppose** 89:20
**supposed** 51:22,23 63:25 65:18
**sure** 5:2 11:2 12:18 18:25 19:2 22:1 41:15 43:13 44:12 47:8 55:1,8 59:11,11 65:23 70:24 71:5 74:8 77:20 80:10 81:21 84:6 92:9 97:12 105:2 124:9 131:25 132:9 136:1 140:25 141:18 147:6,7 166:25 189:23
**surprised** 81:18
**surrounding** 4:6
**susie** 133:21 169:8
**susie's** 133:20 152:6 169:7
**sustained** 80:18
**swear** 3:5 181:14 182:1
**swedish** 131:1,6
**sweet** 10:5,21 11:6
**switch** 45:11 127:7
**sworn** 3:7 4:8 181:1,5,13
**system** 37:11 112:17,25 113:2,6 113:8,12,17 136:8 136:14,17,24 193:4

**t**

**tab** 17:3,12 48:21 48:21 56:5 57:10 57:13 64:12 65:3 67:8 68:12 69:22 93:1 95:10 100:22 102:19 105:7,7 106:18 109:20 111:13,25 112:13 112:14,16 115:4 116:25 118:19 121:11 122:20 125:3,10,18 126:3 126:24,24 129:1,8 139:13 142:2 153:20,23 155:9 156:24 159:22,22 159:23,25,25 161:21 162:11 167:2 168:18,19 171:7,14 173:19 174:12 175:10,13 176:10 177:13 178:9,9 180:18,22 181:1 187:12
**table** 165:7,11 190:10 191:2,9,14 192:14
**take** 4:3 6:10 11:3 25:2 27:3 29:6 38:14 47:6,8,12 48:14 49:23 53:7 87:18 97:1,4 109:11,13 111:1,5 139:1 160:17 179:24 183:20 194:5
**takeaway** 27:2,8
**taken** 1:11 3:2 4:16 58:15 83:13 83:14 195:4
**takes** 82:4,6,16 84:8 87:15 191:6
**talk** 28:13 30:20 31:2 40:20 53:22 57:17 73:21 89:6 111:3 113:7 134:17 139:9 141:3 143:3 144:9 194:21
**talked** 46:23 63:8 70:20 79:13,14 114:17 138:18,23 141:8 157:19 188:10 189:21
**talking** 14:8 25:11 28:15 72:17 88:18 88:20 89:7 91:3 111:11 117:13 139:21 143:20 153:19,22 154:5 155:11 158:14 159:7,10 171:9 191:9
**talks** 47:2 77:22 85:1,6,10 86:17
**taller** 41:23
**target** 145:17
**tarnished** 62:8
**tassel** 101:11
**tax** 10:19 145:5,10 145:12,14,21,24 146:2,5 149:12,16 149:17,18,21,22 149:25 150:5
**tcc** 48:22 53:17 56:3,12 57:15 59:14 60:7,20,23 67:4,5,7 79:15 82:23 84:19 87:17 89:18,22,22 105:7 134:17,22 135:13 135:16,22
**tcc's** 66:17 80:1,13
**tea** 162:13 163:1
**tear** 44:20 49:7,20 49:21 53:18 123:3 124:11,13,16
**teardown** 80:19
**technical** 37:12
**technically** 115:15
**tell** 4:7,8 5:9 6:17 6:24 11:6 14:15 24:18 25:7 36:21 37:7 71:21 72:16 78:16 110:9 117:19 138:17 139:6 141:14 187:1,2
**telling** 21:21 28:24 53:6 72:10,18 77:21,23 78:3,8 118:2
**tenant** 106:5
**tenants** 106:17
**term** 71:1,2 95:25 96:6,8 100:3,8
**terminated** 94:24
**termite** 123:2
**terms** 21:19,24 37:12 121:5 195:12
**test** 59:21 78:23
**testified** 3:8 72:2
**testifies** 22:16
**testify** 22:5 71:24
**testifying** 71:25 140:4
**testimony** 128:20 140:12
**testing** 74:23 77:5 88:5
**texas** 1:14
**text** 66:5
**thank** 23:24 194:11,12,17
**thanksgiving** 26:16

**thing** 15:17 37:24 38:16 61:12 68:8 80:25 87:3 91:23 133:25 137:13,15 141:17 146:16 148:23 150:7 154:18 162:12 163:12 164:9 165:5,16 166:1,12 167:10 169:16 174:5,12 182:10 182:25 187:22 189:19 193:18
**things** 13:15 19:6 22:21 27:8 34:24 40:11 45:8,8 50:8 54:21 57:16,17 82:7 83:17 87:20 89:3,10 108:9,10 108:11,12,15,16 112:12 143:21 145:8 151:21 159:18 190:9
**think** 3:12 5:13,19 5:24 9:7 14:6 29:1 31:4 40:8 42:19 43:4 46:6 54:12 65:21 71:20 72:8 72:23 73:15,16 76:21 87:13 93:21 94:19 105:20 107:4 112:14 114:9,9 120:4 123:15 124:7 126:11,12 127:8 135:24 140:7 142:24 149:11,15 150:3,22 151:6 156:22 171:21 174:7 176:24 177:8 183:19 185:13 189:9 191:7,14 192:2 193:7,9,10 194:6
**thinking** 13:19 31:5 45:23 93:15 96:17 124:23
**thinks** 71:22 73:5
**third** 127:15
**thorough** 13:12
**thoroughbred** 10:14 11:7
**thought** 33:24 35:13,23 52:2 82:9 83:8,9 88:12 118:22 164:23 174:17
**thousand** 172:3 176:22 177:19
**three** 7:13 11:22 71:4 74:18,20 75:2 103:2 104:18 104:21 107:18,19 116:16,18 117:8 118:8 126:19,22 129:25 157:8 171:8
**tight** 63:17
**time** 8:10 11:15,20 16:2 22:3 29:24 33:4 38:14 48:3 61:2 63:12,13 72:19 82:4,23 84:8,16 86:17 87:1,4,10,14,15 90:3 92:6 93:8 96:17,25 98:21 107:8,13,15 109:10 123:17 146:23,24 152:22 158:19 159:7,11 159:15 178:2 180:7 182:7,17 183:20 191:6
**times** 5:12 18:12
**tiny** 45:8
**tired** 6:10
**today** 4:9,21 37:19 55:23 193:13,25
**toilets** 45:24 46:3
**told** 14:23 22:12 30:3 52:3 54:6,15 55:10 83:9 87:17 88:12 110:2 113:9 117:19 118:3 120:2,23 121:8 122:3 144:8,13 145:1 191:17
**ton** 18:12 25:9
**top** 28:23 30:7 46:15 59:6 109:22 116:14 119:11 134:23 144:2,5
**tore** 44:22 79:22 82:5,19 123:1
**torn** 69:14 124:14
**total** 44:6 66:21,23 101:1 139:18 140:15 157:8 177:13
**totaling** 42:22 43:15,19,23 44:3 187:11
**totals** 132:12
**touch** 183:16 184:10
**town** 75:9
**traffic** 8:4
**train** 82:9
**trainers** 11:12
**transcript** 3:11 195:4,6
**transplant** 137:14 137:19
**transplanted** 136:10
**transporting** 108:3
**treated** 108:11 190:10 191:3
**treating** 176:16 190:19
**treatment** 36:16 122:22 123:7,9,24 190:11
**treatments** 36:22 37:23 38:15,19,20 39:4 41:3,7,20,22 41:24 42:5,11 91:15 100:23 101:3 102:10,12 133:3 150:8 151:2 151:6 152:1 154:6 189:9,18
**trick** 4:23
**tried** 35:17,20 156:8
**trim** 146:6
**trimmed** 101:11
**trips** 138:8
**trouble** 8:5 118:12
**trucks** 80:20 136:18
**true** 161:18 181:15 195:6
**trumeau** 173:20 173:25 174:8
**truth** 4:8
**try** 23:1 141:12 183:24 191:22
**trying** 13:7,11 21:25 22:11,22 23:15 45:3 53:4

56:1 72:4,12 76:21 80:8 83:16 83:17,25 101:16 127:13 140:12 153:11 155:13 161:19 189:9 190:6
**tufted** 171:1 172:3
**turkish** 156:8 170:25 171:21,23
**turn** 17:3,17 19:22 46:14,22 49:3 56:5 57:10 65:3 66:3,4 68:12 69:22 85:5,9 92:25 109:20 111:14 115:4 116:25 121:10 125:4,18 126:3 127:15 129:1 131:15 139:13 144:25 145:1 151:2 162:11 173:20 176:10 180:22 184:17
**turned** 16:3 99:5
**turning** 106:18
**tv** 37:10,13 38:21 38:21 92:18 104:18,20
**tvs** 37:5,8,23,24 38:15 39:4 41:10 41:10,14 92:1,2,4 92:11,14 102:24 103:1,2,7,16,17,21 104:13,15,17,18 104:21 105:1 193:1
**two** 5:16 7:24 17:9 25:9 38:3 39:13 39:14 96:11 97:23 100:5 108:12 131:1,6 146:16 158:12,16 169:21 171:8 177:7,11 179:5 188:23
**tying** 35:16
**type** 9:10 26:4 155:23
**typed** 109:24
**typewriting** 195:5
**typical** 75:8 105:19 116:8,12 119:10 125:4
**typically** 60:14,18 78:10 86:8 96:21 105:17,20 117:14

**u**

**uh** 3:25 9:1,9 10:8 10:23 11:4,4 80:6 106:24 110:4 126:13 150:9
**ultimate** 97:3
**ultimately** 26:8 35:5
**un** 58:1
**uncomfortable** 87:25
**underneath** 136:17
**understand** 5:1,10 5:24 11:14 14:2 22:1,11 28:25 34:2 43:15 48:9 48:18 53:4 57:6 59:15,18 74:9 75:14,18,23,25 76:5,8,10 77:2 85:20,25 86:3,7 90:1 92:9,10,19 102:22 113:12 117:12,18 119:18 119:19 155:16 156:10 161:19 176:20 181:17,19 184:12 185:16,22 185:24 186:1,11
**understanding** 21:18 22:2,12,18 22:20 32:4 44:12 55:3,12 60:15,17 74:17 75:11,12 92:13 94:18 103:3 141:19 149:17 153:1 176:25 183:18
**understands** 5:7 185:18
**understood** 5:4,11 5:18 120:20
**unfolded** 36:8
**uninhabitable** 85:15 121:18
**unit** 64:15 108:10 108:10,14,16,20 108:22,23 109:1,2 109:21 110:6,7,12 111:22 112:2 130:24 145:9 192:8
**units** 63:25 64:1 64:19 108:5
**university** 8:23
**unknown** 182:16
**unlacquered** 62:1
**unsuitable** 102:16
**updated** 141:7,8 146:9
**upgraded** 113:1
**upholster** 148:4
**upholstered** 148:7 152:1
**upholstering** 189:18
**upholstery** 154:7
**upstairs** 31:13,17 89:2 93:22
**use** 53:15 58:7,13 58:13 63:1 66:17 100:24 101:23 103:7,21 104:1 113:21 141:2 149:11 189:13
**usual** 37:8 85:17 101:20 102:5,6 121:20
**usually** 37:9,12 38:19 101:15
**utilities** 116:16 117:21 118:7 122:4 126:18

**v**

**valet** 106:19 108:2 108:4 188:4,6,15 190:24 191:3,12
**value** 114:10 170:2,3,4,4,21
**valued** 172:3
**varies** 10:16 116:10
**various** 9:13
**vast** 141:15
**velvet** 163:6 167:11,23
**vendor** 51:4
**vendors** 42:24 43:12
**verbal** 27:13,20 28:10,10 176:20 177:2
**verbally** 10:24 11:2

**verifies** 160:9
**veritext** 3:13
**version** 193:4
**versus** 163:4
**vestavia** 2:5,7
**videoconference** 1:11
**view** 36:15 73:21 103:11 165:11
**violate** 182:5
**violated** 181:15
**virtually** 6:5 72:16
**voile** 101:11
**voluntary** 4:13

**w**

**wait** 24:21 51:23 111:3 173:11 185:11 189:4
**waiting** 50:10 108:7,15
**waive** 98:20,23
**waived** 194:24
**walked** 34:21
**walkway** 81:2,3 81:10 82:11
**walkways** 80:17
**wall** 34:25 75:4
**want** 4:12,20,22 14:7 16:17 19:8 20:8 25:5,7 28:24 52:15 57:17 77:19 84:24 89:6 92:9 96:10,22 109:13 109:14 111:5,10 113:19 114:16 130:22 131:25 139:1,2,8,13 140:8 140:23,24 141:1 141:14 151:22 153:8 173:5 179:23 181:21 182:24 184:12 185:14 186:10 189:23 194:1,2,4 194:14,21
**wanted** 25:25 29:4 29:5,5,7 31:2 38:4 70:4 103:11 113:10
**wanting** 30:19,20
**wants** 112:1 115:16 160:14,15 160:19 161:14
**ware** 145:13
**warehouse** 163:19
**water** 31:16,17,19 58:2 61:13 63:8 64:6 83:14 103:15 116:8 117:1,7,15 117:16,16,23,24 118:5,7,9,10,18 136:9
**way** 42:21 60:19 60:22 62:11 64:2 78:11 99:16 130:16 135:3,4 138:9 145:25 146:8 175:8
**we've** 40:18 69:14 79:14 83:24 113:5 132:24 137:1,14 137:15 141:12 157:19 166:6 188:9 191:19 193:19 194:7,9
**website** 172:25
**websites** 141:9
**week** 44:25 45:1 49:16
**weekend** 107:11 107:21
**weeks** 51:11 52:11 52:13 53:8 96:11 100:5 101:19
**welcome** 3:20 116:6 152:21 165:11
**went** 8:21 13:22 16:3 42:23 51:11 79:20 140:2 152:20 155:17,25 156:12 176:17
**whatnot** 96:23
**whichever** 161:10
**white** 165:19 173:24 174:3
**wife** 97:12,14 112:22
**willing** 105:22
**wimbleton** 7:4 41:3,6,11 42:9,10 92:22 95:12,17 99:21,24 100:15 100:18 101:6,21 103:19 106:10,23 107:16 112:18 114:1 117:17 118:10 119:1,2,22 123:13,16 124:4 125:11 128:12,14 128:20,21,23 129:18,20 174:24 192:8
**window** 36:22 37:23 38:15,18,19 39:3 41:3,7,20,22 42:4,11 78:17 89:3 91:15 100:22 101:3 102:10,12 113:18 133:3 150:8 151:2,6 152:1 154:6 189:9 189:18
**windows** 41:6 114:1,2,2 129:14 129:14
**wing** 146:25 158:16
**wingback** 146:16
**wipe** 62:18
**wired** 113:18
**wireless** 113:17
**wiring** 116:3,6
**witness** 13:12,14 38:25 75:25 76:16 76:25 78:15 86:12 134:25 135:3 140:1 159:12 164:4 170:13,16 179:18 180:1,15 183:22 184:6 185:22
**wonder** 13:6
**wondering** 82:12 163:3
**wood** 57:19,20 58:2 59:7 63:7,12 63:13 91:21 174:6
**word** 53:10
**work** 9:19 35:10 48:23 49:16 50:9 65:13,17,19 90:23 90:24,25 105:5 127:11 153:7 156:9 157:15 164:7 165:3 183:10
**worked** 8:10 40:9 70:18 129:5 140:21 141:5
**workers** 65:23
**working** 8:24 40:11 80:4 87:25

149:15
**workmanship** 42:1,2 48:6
**workroom** 108:14 141:8 151:25 188:25 189:8,12
**works** 60:21 117:2 141:19
**worried** 78:8
**worry** 71:4
**worth** 116:1 191:13
**wow** 17:9
**write** 109:24 143:15
**written** 109:21 177:2 183:18
**wrong** 93:12 180:16
**wrote** 156:23,25

**x**

**x** 160:12

**y**

**y'all** 3:19 12:5 15:3 17:8 39:7 53:6 66:2 128:16 179:23 181:11 183:21
**y4** 184:18
**yard** 127:10,17 128:14,15,24 136:16,21
**yeah** 9:18 17:2 25:7 34:10 39:15 61:18 70:15 76:16 89:24 104:20 115:19 126:9 145:7 151:12 156:2 186:15 193:17
**year** 10:16,16,20 30:10 96:23 97:2 97:5 99:12,16 150:16,21 154:22 156:6 163:20
**years** 7:24 113:5 134:15 143:3 155:2,6 156:14 157:17 164:15 171:13,13 183:22
**yell** 33:16

**z**

**zip** 145:14
**zlotnik** 50:16 69:23 74:18 79:17 83:7 84:2 88:3
**zlotnik's** 50:24
**zoom** 2:3,10,17 6:6 194:21