FILED
2023 Jul-12 PM 04:34
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CHARLES GOODRICH and
ALEXANDRA GOODRICH,
Plaintiffs,
vs. Civil Action No. 2:22-cv-21-MHH
PACIFIC INDEMNITY COMPANY,
Defendant.
--------------------------------x

DEPOSITION OF
KATHLEEN BANACH
CONDUCTED VIRTUALLY
Tuesday, April 18, 2023
2:04 p.m. EDT

Laurie K. Langer, RPR

APPEARANCES

(All parties appeared
via Zoom.)

ON BEHALF OF THE PLAINTIFF(s):

BY: Charles A. Dauphin, Esq.
Diane Paris, Esq.
DAUPHIN PARIS LLC
P.O. Box 1727
Hoover, Alabama 35236
(205) 516-1058
cdauphin@dauphinparis.com

ON BEHALF OF THE DEFENDANT(s):

BY: Luciana Aquino, Esq.
Cozen O'Connor
The Promenade, Suite 400
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309
(404) 572-2052
laquino@cozen.com

ALSO PRESENT:

Alexandra Goodrich

INDEX OF EXAMINATION


WITNESS: Kathleen Banach

| EXAMINATION | PAGE NO. |
| --- | --- |
| By Mr. Dauphin | 4 |
| By Ms. Aquino | 42 |


INDEX TO EXHIBITS


| NO. | DESCRIPTION | PAGE NO. |
| --- | --- | --- |
| Exhibit 158 | Deposition Notice | 4 |
| Exhibit 159 | Enservio File | 10 |


(Deposition Exhibit 158 retained by Attorney Dauphin.)

P R O C E E D I N G S

KATHLEEN BANACH,

having been satisfactorily identified by the production of her driver's license, and duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION

BY MR. DAUPHIN:

Q. Good afternoon, Ms. Banach. I'll get it right. I played baseball with a young man named Banach, so I hope that's right. We'll go with Banach.

You're here pursuant to a deposition notice. And that is -- we will mark that deposition notice as Exhibit No. 158.

(Deposition Exhibit No. 158 marked for identification.)

Q. And that's a 30 (b)(5) or 30 (b)(6) notice where you are appearing on behalf of Enservio; is that correct?

A. Yes.

Q. And you are a lawyer; is that right?
A. I am not.
Q. You're not a lawyer. I don't know where I got that idea. Okay. I apologize.
What role do you play for Enservio?
A. I'm the director of our valuation team.
Q. And have you had any conversations with any representatives from Pacific prior to today's deposition?
A. Not specific to this case, no.
Q. Okay. What is the business of Enservio?
A. Enservio handles contents inventory and valuation services, mainly.
Q. And give me as much of a layperson's description of that as possible, please.
A. On a day-to-day basis our primary customer is an insurance company. They send in notice of a claim, a contents claim, and we assist in valuing that claim. Sometimes we go on-site to create the inventory and sometimes we just work off of a list that's submitted to us.
Q. Are most of your clients insurance companies?
A. Most of them, yes.
Q. And do you represent or provide services for

Chubb entities other than Pacific?
A. We provide service to Ace, for instance. I'm not sure of all the different entities.
Q. Would you refer to Pacific as a Chubb entity or Chubb company?
A. I think of it as Chubb. I don't think so much of it as Pacific.
Q. All right. And in this case -- well, let me ask you this. So whether or not a person visits a site or you do valuations based on a list, is the decision made by the insurance company; would that be correct?
A. Correct. We're just giving a recommendation.
Q. Okay. You say you're giving a recommendation, what do you mean?
A. We are giving our independent opinion of the value of the loss and it's up to the insurance company to apply the policy and to make coverage decisions and to ultimately make payment decisions.
Q. Right. Before we get to that stage, whether a person does an onsite valuation or a valuation from a list that's provided, that's the insurance company's choice?
A. Correct.
Q. And is there a contract between Enservio and any

of the Chubb companies?
A. I believe there is. But it's not something that I deal with on a regular basis. I could get clarification on that for you.
Q. Okay. And I think you were talking about this earlier, Enservio is one resource for an insurance company in the insurance company's payment of a claim; is that a correct analysis of it?
A. Yes. We do specifically contents.
Q. Okay. And your client is the insurance company?
A. Most of the time.
Q. Okay. And let me ask you about this specific situation. You reviewed the Goodrich file that you maintain; is that correct?
A. I did.
Q. And in this case your client is Chubb or Pacific Insurance Company?
A. Correct.
Q. And the -- what you were doing in the valuations, when I say "you" I mean Enservio, when you do those evaluations you're doing them for Pacific?
A. Correct.
Q. Okay. What was Enservio asked to do in this case?

A. We were asked to go on-site to create an inventory of the damaged contents and to value them.
Q. And internally how does Enservio create that work procedure?
A. So the claim gets set up in our system, it gets assigned over to our scheduling team with basic details on the assignment. The scheduling team specifically handles scheduling on-site, so they have all the field resources, you know, and they know what their schedules are and they know when they're available, so they select the most local available resource and schedule them to do the on-site inspection.
Q. Okay. Now, let me interrupt you, if I might. As regards to the on-site inspection, is he an employee of Enservio?
A. Yes.
Q. Okay. And once he comes out and does the site inspection what does he do with the information he gets?
A. He uploads it back into our system.
Q. Okay.
A. And then we transcribe it. We do photo matching, you know, to make sure that the photos that are referenced in the voice files get attached to the appropriate lines within our system. And he documents

his observations in an On-Site Contents Report.

Q. All right. Now, what was that last one one more time, please?

A. He documents his observations and experience on-site in an On-Site Contents Report.

Q. Okay.

A. Ultimately that's what gets handed to the valuation team.

Q. Okay. Is the On-Site Contents Report?

A. And the inventory and the photos.

Q. Whether or not -- am I correct in saying that whether or not a photograph is taken of a specific item, it's left to the on-site inspector?

A. Correct. They're supposed to take photos of anything that might be hard to identify from the word description. But generally speaking they're supposed to take photos of items over $500. They also take overall photos to capture the scene, but they're just not taking individual photos of items if they're lower value items.

Q. Gotcha. I had sent a subpoena to Enservio and Enservio provided several documents and files in relation to that subpoena. Are you aware of the file that contains Enservio's response to that subpoena?

A. Yes.

MR. DAUPHIN: And I talked with the court reporter about if Ms. Banach can provide a link to that file Miss Langer can take that and save it on their site. Is that acceptable to you?

MS. AQUINO: If it originates from her that's agreeable to me.

MR. DAUPHIN: And we will call this file, I'll do it, Exhibit 159 will be the Enservio file.

(Deposition Exhibit No. 159 marked for identification.)

Q. Ms. Banach, if you would walk through the Enservio file and tell me what's what, please.

A. Sure. Do you want me to share it now?

Q. Yes. That will be terrific.

A. One second. Let me -- what was the question?

Q. Okay. What did you just do? I'm sorry. I'm trying to catch up to you.

A. I sent a link to Laurie.

Q. All right. Walk through that file and just explain what the different sub folders or sub files are within that, please.

A. Okay. So the way I'm seeing it the first file is the claim notes.

Q. Okay.

A. Do you want me to go into detail?

Q. Just generally tell me what they are. We will come back and talk about those in a little bit.

A. The claim notes is, it's like a story of how the claim was processed that gets logged within our system.

Q. Okay. And who all makes entries into the claim notes?

A. Anybody that has a hand in the claim, the system will generally record the action, but then also people can leave notes independent of what the system is recording. So it's -- some of it is recorded automatically and some of it is someone is leaving a note in the claim. But anybody that does work on the claim would be reflected in the claim narrative, or the claim notes.

Q. All right. Next.

A. There is a zip folder of the claim number and then underscore INV. And that contains the nonsalvageable contents list that we received from the restoration company.

Q. Okay. That was CDNR or CDRN?

A. I think it was -- yes, CRDN.

Q. CRDN, okay. Were those items that were, are the list that was received from CRDN, that's in the zip

folder, did Enservio ever look at those documents to evaluate those?

A. Yes.

Q. And are those included in the overall document?

A. Yes.

Q. Okay. Go ahead.

A. The next file that I see is a PDF that's the claim number underscore REQ, which stands for request. Specifically this one is the request for us to add in the CRDN nonsalvageable contents.

Q. Okay. Next?

A. The next, I believe, is the same exact document but a redacted version removing insured name and claim number.

Q. Okay.

A. The next is an Excel document that says Chubb-claim number-Goodrich. And that is a copy of what we refer to as a Service Request Form a/k/a the SRF. And it's the instructions that came in with the assignment initially for us to go out and inspect it.

Q. Is there any connection between the Service Request Form entries and the entries in the claim notes?

A. I think you will find a lot of it to be duplicated between the two.

Q. Okay. Next?

A. There's a zip folder that ends with OCR and it just contains the OCR file which is the Onsite Contents Report.

Q. All right. And that is prepared from what the person on-site dictates?

A. Correct.

Q. Next.

A. The next is a file that is a PDF, it says Chubb request and then the claim number. And that is the initial request for us to process this assignment.

Q. All right.

A. Next is an Excel document that says Chubb, the claim number, Goodrich, and then transcription. The next two were actually -- well, the next one says Chubb, claim number, Goodrich, transcription, and that is -- let me just open it up. That is the inventory that was transcribed from the field rep's voice recordings. So that's essentially how it was transcribed and then uploaded into our database.

Q. How does that compare to the OCR, On-Site Contents Report?

A. The On-Site Contents Report is like an overall summary, no, I inspected this room, this is what I saw

for damages, et cetera. And the transcription file is an item-by-item inventory of the contents.

Q. Okay. Please proceed.

A. The next is Chubb-Goodrich-the claim number and then transcription. And this is a transcription file of the CRDN list.

Q. Okay. Okay. So when you received the CNDR letter -- CRDN list, someone went through and dictated what was in it and that dictation was transcribed.

A. It would have just been transcribed off of the list as they were written. No one translated it into a voice recording.

Q. Oh, okay. All right. Please go ahead.

A. The next two are reports that look like they are issued the same day on 12/31/2019.

Q. All right.

A. The first one totals 141,963.30. And the next....

Q. They look the same to me. I was going to ask you what the difference was.

A. They do look the same to me. I was only expecting one report, so I think it just maybe got saved in the system twice and we therefore gave you two different copies.

Q. Would you just take a minute and verify that's the case, one updated, another one, so we can use the most recent update.

A. They're exactly the same.

Q. Okay. And if you open those up are there -- is that where the detail summary is? Or not detail summary, but detail?

A. This will show you the values in addition to the itemization of the damaged items. So if you go to Inventory Details tab of the report it does go item by item and tells you each line item description and then the value.

Q. Okay. And we're going to come back to the inventory details. I'm just making sure we have the same document. While we're here, how is that inventory details document prepared?

A. That is -- those are all the items that were part of the inventory, whether that was from the on-site inspection or the CRDN report or the CRDN list, and then it gets input into our system, we price it all out and then that report is generated out of our system.

Q. On that -- how many people work on pricing the items? If you can reference this case, how many people worked on that, that would be good.

A. I would estimate it from looking at the claim notes, you'll be able to see all the different names. But it could be 10 or more people on a claim this size.

Q. How is it determined which people work on the valuations?

A. When we send the -- we call them lines, the items for pricing, they get sent to different pricing teams, depending on what kind of item they are. And the pricing teams pull those assignments and price out the line. So it basically gets divvied up to quite a few people.

Q. Based upon -- someone looks at the item and says, "it would be better to go to curtains" and someone else might look at it and say, "this would be better to go to furniture" or something like that?

A. Yes.

Q. Okay. What role did you play in it?

A. I didn't have a direct hand in this claim that I'm, that I noticed.

Q. So after -- what is next -- what do we call this report, the 12/31/2019 report?

A. The CVR, the Contents Valuation Report.

Q. And what is next, please?

A. Then we have all the photo files that were taken

by the field rep. It looks like we took, let's see if I can get a count, 359 photos.

Q. And how many lines are there on the CVR?

A. We have 1,066 lines on the CVR, that includes the contents -- the list from CRDN that we didn't inspect.

Q. Okay.

A. The next are zip photos of photos, there is photos 1, photos 2, photos 3, and those are the same photos but in zip files.

Q. Okay. If someone is working on the valuation do they have access to the photographs?

A. Yes.

Q. So the -- tell me how the photos are uploaded to the system.

A. So for items over $500, and that's just kind of a perceived value, they of course don't know it exactly is, then they would dictate a photo number and that photo number would get included in the item description. And then we would go through and attach the photo to the line item within the system, so that it was right there for the pricer to review when they're doing the pricing.

If it's under $500 generally they don't have an itemized photo, but the photos are available on the claim if anyone wanted to take a look at them.

Q. Okay. Explain that to me once more.
A. The photos as a whole are attached to the claim and available to anybody that's in the claim.
Q. Okay.
A. But item by item they're attached, making it more readily at the fingertips of the pricers if the item is worth $500 or more.
Q. Okay. So whoever is making the valuation, let's say, to a bed that was obviously worth more than $500, you would also have a picture of that bed to look at?
A. Correct.
Q. And it's attached to what?
A. It's a picture in the system, but it's attached to the line item. So when you're in our system you can click and open it and see it right there.
Q. Thank you. Let's start -- are we through with what is there or do we have more files?
A. I think -- let's see. Then there is one last -- well, there are two things. The next thing is a PDF, it's called solara-Enservio_18-10562662-0-1 and that's a copy of the invoice that we sent for our work.
Q. And the last one?
A. The last one is a zip file of the voice files that were recorded by the field rep that was on-site.

Q. Is there any -- where are e-mails kept that may go between Enservio and Pacific on this claim?

A. Generally speaking you'll find that all embedded within the claim notes.

Q. Okay. There's not a separate file that keeps e-mails?

A. No. I mean, there is a sales force system that sometimes things get logged in that don't make it into our main system, but the main processing of a claim exists within the system and gets recorded by the system.

Q. Okay. Let's go, start within the claim file notes.

A. Sure.

Q. If can you pull that up and looking at the first page.

A. The first page, these are kind of what we would refer in the very top section, what we would refer to as our special instructions. There's a type -- so for instance, the first type is Appraisal. And the -- the expectation of the field rep is that they'll record common vendors that they observe when they're doing the inventory, and list those out so that the appraisal team has those available to them so we know, for instance,

that common vendors for furniture was purchased through private decorators, Restoration Hardware, and Macy's, and that's helpful information to our pricing team if they're looking at a line item that doesn't have a specific brand listed. They would know, okay, well, these are the likely vendors where they purchased this piece of furniture.

Q. And if you would come down to Inventory Capture underneath that.

A. Specific details for the field inspection which were, I think, the exact same thing as written in the SRF.

Q. And in there there's a note in the middle of that block that says "adjuster does not think (given the smoke throughout the home) that it is worth trying to restore anything."

A. Correct.

Q. Is that a note that would have been made by the on-site representative?

A. That would have been made by the individual that was receiving the assignment from Chubb.

Q. Okay. And would that have been Miss Vreeland?

A. No. That would have been most likely Eric Myers who was in a role called a customer experience

executive.

Q. Okay. And the line after that is "please capture all items as presented."

Do you know what that means?

A. I think that that means please capture all items that are being claimed.

Q. Okay. My copy is cut off underneath there and it looks like something may be -- "please capture all items presented." And before you get to those safety restrictions.

A. I think it's -- I mean, you know, it's a manual cut and paste to get this out of our system, but I believe that the next line would have said, "no safety restrictions," it's just the way that it looks because it's literally a cut and paste.

Q. That's the way I read it. I just wanted to make sure that I was correct.

The next one that says, "Ages," and it's got everything under one year. Do you know where that information came from?

A. It -- I saw a reference to the fact that the home had just very recently been occupied and the items were generally all pretty new. So that was information that the field rep, Matthew Schilling had obtained when he

was on-site and conveyed that to our team. It didn't actually matter because we don't apply depreciation to Chubb claims.

Q. Okay. And those are -- those entries are recorded and made in the ordinary course of business for Enservio?

A. Yes.

Q. And to the extent they are relevant they are replied upon by Enservio?

A. Yes.

Q. And then let's start with the Contents Valuation Report, CVR.

A. Okay.

Q. What type of valuation did Enservio, I mean, did Pacific or Chubb ask Enservio to do?

A. So for Chubb we don't apply depreciation, so the values that are assigned are the replacement cost values.

Q. Okay. And what do you understand replacement cost value to mean?

A. The amount of money it would cost for you to go out and replace that same or like kind and quality item in the retail market.

Q. You use like kind and quality if there is a

replacement value for the specific item?

A. For the specific item if we can go price that same item we would try to do that. Though, if we're not, you might not find the specific item, like, we're not going to research something for two hours to find the specific item for everything. We sure try.

But we will go to like kind and quality if it's not super obvious. Like an example is something, you would find something specific as if we had the model number for a television, we might be able to find the exact same model television if it was recently purchased and if that was the case we would price the same TV.

Q. You would try to price the same item, if it's just not available or require extensive time and effort you would go to like kind and quality?

A. Correct.

Q. Then looking at the Inventory Details tab under the Cost Valuation Report. Can you just take a, take us across the top line and explain what the columns are.

A. Sure. You've got -- the first column is called B, that's Line number. So each line gets a number.

The next column is Room. Each item gets assigned a room name.

Then Description of Item. That description came

from the field rep's observations, so that's what he would have dictated, that it was a framed print for the first line.

The next column is ISV, that is short for Insured Stated Value. We take that to be the claim value.

The next column is Age and Years. And then Age and Months.

Then the next column is Source. That is the source of Enservio's replacement price.

Q. All right.

A. The next column is Quantity, which is self-evident.

The next column is Replace Cost Per Item. That's Enservio's opinion of the value to replace a like kind and quality item or the same item.

Then Column K, Total Replacement Cost, that is the replacement cost multiplied by the quantity.

Column L is Tax Rate. That's the tax rate applied to that ZIP code.

Column M, Tax Amount. That's the amount of tax in dollars.

Column O, Total Replacement Cost Including Tax. That's the total replacement cost plus tax.

Column P, Total Depreciation Percentage, which

doesn't really apply in this claim.

Column Q, Total Depreciation Amount Including Tax, which doesn't apply to this claim.

Column R, Actual Cash Value Including Tax. That is equivalent to the total replacement cost including tax because we didn't apply depreciation.

Column S is Item Limit Overage. If we had been supplied with limits for specific categories of items we would have applied them to the best of our ability and you would see if a limit had truncated the payment for an item in this column.

Q. All right.

A. Column T, not relevant, because it's ACV. It's again, equivalent to the total replacement cost including tax.

Column U is Limit. That's where you would see if a limit had been applied.

Column W is the Replacement Description that we use. So going back to the source we had sourced the first item at art.com and the description of the item that we used as the like kind and quality is singing, whatever that says, "Singing I Framed Art Print."

Then column X is URL. That would contain a link to the website and specifically to the product that we

used for our replacement pricing.
And Column Y would contain any notes that were set to display on the report that might provide additional detail about the value.
Q. Okay. And I want to look at a few specific items, I'm not going through all 800 or whatever. Let's start, go to line number 2 for an example.
A. Uh-huh.
Q. That's a custom framing wood. What is that?
A. It's just a custom frame with a double mat and glass.
Q. And the source was from Enservio's specialist?
A. That's correct. We -- we utilized our art specialist to estimate the cost for that item.
Q. Okay. But it's, is there a picture of that item? It was less than $500?
A. You don't see -- the way we would reference the photo is to put "photo" and then the number of the photo in the description of the item. So if you scroll down in the description of the item you would see a photo on line 89.
Q. Okay.
A. That's how it presents itself. So for item number 2 there was no photo specifically referenced.

It doesn't mean that there wasn't a photo in the file, but it wasn't specifically referenced and attached on that line item.

Q. Okay. And that is the art person's valuation based on the description dictated?

A. Correct.

Q. And whether or not Pacific ultimately goes with that valuation is a decision to be made by Pacific; is that correct?

A. Correct.

Q. And in other words, if Miss Goodrich, the insured, had an invoice that showed that the original invoice was more than that amount, that you did not have access to, that would be up to Pacific to decide which valuation to go with?

A. Yes.

Q. Certain things sort of jumped out at me. Look at number 69, please.

A. Okay.

Q. Let's look at number 60.

A. Okay.

Q. And that is a medium stuffed animal for the Bearington collection.

A. Correct.

Q. Are we talking about the same thing? And the source is Hallmark?
A. Yes.
Q. And the valuation was $9.35 before tax?
A. Nine ninety five before tax.
Q. Your eyes are better than mine. 9.95.
A. Correct.
Q. Why wouldn't you just Google Bearington Bear and get a specific value for a medium sized Bearington Bear as opposed to going to Hallmark, which I think just has stuffed animals generally, than the Bearington Bear?
A. That I couldn't say specifically for this item.
Q. Okay. It would make sense to just Google Bearington Bear, wouldn't it?
A. It would make sense to me, yes.
Q. Okay. Look at line 62. It says "infant onesie" and it's got Alice Kathleen & Company?
A. Yes.
Q. So you're giving -- that's the source of the infant clothing; right?
A. Correct. It looks like Alice Kathleen & Company.
Q. Correct. But the source for the valuation is Dick's Sporting Goods?
A. Yeah. Maybe I can explain a little. There's

some automation in the pricing that happens within our system where it tries to price the item using its intelligence. And then we review the pricing. And so it's possible that this system match was a 12.99 onesie from Dick's and that was deemed to be appropriate for the item to sort of establish the value for like kind and quality without getting too specific going to Alice Kathleen & Company.

Q. So if you went to the Internet and went to Alice Kathleen & Company and saw that most onesies went for $100 plus, wouldn't that be a red flag that something was improper?

A. That would be improper, yes, I agree. And that's definitely something that, had it not been someone's responsibility to point out our errors, but had it been pointed out certainly it would be something we would have corrected.

Q. Let's go to a little more substantial, possibly. 121.

A. Yes.

Q. Now, that has photographs, where it says photo it has those numbers, there's custom drapery and a panel ruffled top. Can you pull up and look at a couple of those photographs.

A. Yes.
Q. I'll do the same real quick. Do any of those photographs have a panel ruffled top?
A. Yes, they appear to be custom curtain panels --
Q. Okay.
A. -- with lines.
Q. And there are six of them. I'm sorry. Age is 6. I will let you tell me what's going on. 121 basement, and it's got the drapery and description of the photographs; right? It attaches photographs.
A. Correct. There was a quantity of eight.
Q. And then there's a quantity -- all right. Eight. I was looking under, "age." What does "age" mean?
A. That was the age of six months that had been estimated because the field rep said everything was pretty new. I think they used six months was the average age for everything.
Q. All right. I see the M at the top and the Y for those two columns. Do you know what Paul's Home Fashions are?
A. I would look at that link. It's not something that I'm familiar with.
Q. Okay. Just for -- if you can access the link, that's fine.

A. I can. Yes. I'm looking at it now.
Q. And that is not a link that has custom draperies, is it?
A. I agree, that is not.
Q. And if you look, come down to 140.
A. Got it.
Q. And is that the same, I think it's a larger version of 121. There aren't as many panels?
A. I see two, 94 by 208. Yes. Larger.
Q. Okay. And they're also custom curtains?
A. Yes.
Q. And the source that Enservio chose to use was Paul's Home Fashions; is that correct?
A. Correct.
Q. If you would look at the claim notes, right underneath the section we looked at previously.
A. I don't follow.
Q. All right. You see the inventory capture that we talked about previously in the claim notes?
A. In the claim notes document where everything was snapshotted?
Q. No, no, no. The claim notes file that we talked about earlier.
A. The claim notes file.

Q. It says, "Enservio claim notes."
A. Yes. Yes.
Q. Okay. And do you see the inventory capture that we discussed previously?
A. Correct. Yes. I'm with you.
Q. Okay. And if you'll come down to the next section and it has link to column?
A. Yes.
Q. And if you'll come down to 140.
A. Yes.
Q. If you see the note it says, "Caroline Custom Curtain Line, not sure if it needs to go to select." What does that mean?
A. Interesting. So that was somebody seeing that line 40 was for a custom curtain and directing it to our select team, which is the team that has interior designers on it.
Q. And the next entry is also an internal comment on 140. And can you review that entry for me?
A. Yes.
Q. First of all, this is an entry made by Miss Donnell?
A. It's just cut off. Her name is Caroline Donellan, L-L-A-N.

Q. And the one right above it is addressed to Caroline and this is Caroline's response; is that correct?
A. Yes.
Q. And what did she respond?
A. She did pricing and she was recommending 850 -- sorry. So she says, "we have estimated 8 yards of fabric at 225 per yard which came to 1,800, plus labor of 850, totaling 2,650 for each of the panels."
Q. So that's over 500, an amount over $5,000?
A. Yes.
Q. And how do we get from $5,000 to $240?
A. That's a good question. I do not know why her pricing didn't carry through on the CVR. Let me just see -- well, let's see.
We would have to dig in further to understand why that didn't end up on the record. I don't see any evidence of why it didn't. We would normally have select price that item and it does look like it was identified for select, so why it didn't end up getting identified by select I'm not sure.
Q. And what is select?
A. It is the team I directly manage. It's the high level pricing team. At Enservio we deal with all the

items generally worth 3,000 or more. Custom interior design items, antiques, collectables, art, jewelry.

Q. Thank you. If you look at a couple of the pictures referenced on line 140 and compare those quickly with the pictures we looked at on line 121, and see if those are similar-type items as far as silk curtains?

A. Yes, they look, if not matching, they look to be matching to me.

Q. And is it fair to say that based on those pictures the panels on 121 would have the same treatment as the panels on 140?

A. Yes.

Q. That's Miss Donellan?

A. Yes.

Q. Yes. Give me one second, I lost my file. And while we're on the topic, let's look at 123.

A. I see it.

Q. Okay. And there are no pictures of that because someone determined they weren't worth $500?

A. There -- it wasn't something that they thought would be worth $500 when they were creating the inventory. It doesn't mean that that isn't worth more than $500, it just wasn't evident to them.

Q. Okay. And then if we come down to number 145.
A. Yes.
Q. And that's a Sisal rug; is that correct?
A. Correct.
Q. And its value is a thousand dollars. I don't see a photograph referenced in the description box.
A. Correct.
Q. Should there be a photograph there?
A. The thing about it is it's up to the field rep, who is not a valuation expert, to save the photo if they think it will be worth more than 500, so they didn't think it would be worth more than 500. The pricer could have gone and looked for a photo within the file.
Q. And is there a difference in a Sisal rug and a Seagrass rug? You may not know. But would it --
A. They would be similar in my mind.
Q. Okay. Sisal rugs are fairly more expensive, aren't they?
A. That I couldn't say.
Q. If there's a Sisal rug that was damaged, that you were going to look for a replacement cost, it would be proper to look at the replacement cost for a Sisal rug as opposed to a Seagrass rug, would it not?
A. Unless the terms are the same. I'm not enough of

an expert on the difference between Seagrass and Sisal to say.

Q. Okay. But if a rug is Sisal you would at least first want to look to see if there is a similar Sisal rug on the Internet or wherever before you went and looked at Seagrass; is that correct?

A. Yeah.

Q. And look at 168, custom pad?

A. Yes.

Q. So I guess some of that, I thought it was worth more than $500 or for some reason attached photos of that; is that correct?

A. Correct. They -- I think because they saw that it was custom. And they wanted to add the photos.

Q. And we -- can you access that link real quick. And just look -- just compare the photograph with the link.

A. Yes. I'm looking at the link.

Q. And the photograph is a picture of a much fuller, thicker pad, is it?

A. I'm just pulling up the photo. There might be options to create fuller, there are thickness options, you can go up to 8 inches thick on this cushion source site. So I don't know if it's necessarily the wrong

site, but probably something that should have been looked at by the select team, the interior design team.

Q. If you would come down to, right underneath that 170. And if you would, the love seat or cushion pad with love seat and compare that picture for me with the link.

A. Yep, I see it.

Q. All right. And the picture is a much -- I don't know what the price, a more substantial, more well built than the one in the picture, would you agree?

A. I do agree.

Q. Than the one in the link, okay.

And just -- I just saw this. Look at 346.

A. Okay.

Q. Do you play golf?

A. No. I know what the Masters is, though.

Q. Okay. And this chair is a chair they sit on at the Masters which is set up on the course, a lot of them behind the 12th tee, and they're green and they have the Masters logo on them. And the replacement was from -- and where was the source of the replacement value?

A. Dick's.

Q. Okay. And what was the value, is it Dick's, or?

A. It looks like we went with 19.99.
Q. Yeah. And you can't buy one of those chairs for 19.99, I don't believe; would you agree with that?
A. I don't -- I'm not sure. But I will take your word for it.
Q. Okay. And look at 347, the one underneath there. Double rifle carrying case. Now, that is -- just assume that's a leather case. And a very nice gun, leather gun case. If you would go to the link, and I think that's a plastic case, a long hard case. Do you see that?
A. I do.
Q. Okay. And a fine leather rifle case is going to cost much more than a plastic case; correct?
A. Okay. Yes. The description didn't say, "leather," obviously it says the brand. And I don't see that reflected in the comparable that we used, so I would have to research the brand that's listed to better understand that item.
Q. Just one more item and we'll get off of this. Look at line 373.
A. Got it.
Q. And it says "Leon Time." I think it's talking about Liontine Linens which is a store in New Orleans where you, either through a representative or online you

go in and take the pillow and pick the linen fabric and pick the ruffles and pick everything out and it's custom and homemade. I mean, custom made based on your specific requirements. And according to Enservio they said the replacement cost of that would be from Macy's. Would that be another item that you would look into if it was brought to your attention?

A. Yes. It looks like the voice files are transcribed, and it sometimes can get lost in translation if it's not spelled out. So it looks like it was just misinterpreted.

Q. After the CVR is prepared, does anyone look it over?

A. We do look it over. But we always remain open to any feedback. If we've made mistakes we, we correct them. So it's just that we didn't have these things pointed out to us so there was never a second pass.

MS. AQUINO: Chuck, when you get to a stopping point can we take a quick break?

MR. DAUPHIN: Now is a good time because I'm almost through and I will check my notes and see what to go through.

(Short break taken.)

Q. Just a few more questions. If you would come to

line 755.
A. Yes.
Q. And do you see the source for that pricing is Bagsy, B-A-G-S-Y?
A. Yes.
Q. And are you familiar with Bagsy?
A. I am not. But I'm looking at the link and seeing that it's a resale site.
Q. Correct. It's not -- a resale site can't give you a replacement cost, can it?
A. It depends on what you're dealing with. But in this particular case, the new like kind and quality item would have probably cost more than the resale.
Q. Did anyone ever ask Enservio to go back and look at their valuations a second time?
A. No.
Q. Did anyone send to Enservio notes that Miss Goodrich had prepared which made specific questions about some of Enservio's valuations?
A. No, not that was evident to me in the file.
Q. And if -- well, generally, if such a request had been made on a specific claim, it would appear somewhere in that file, would it not?
A. Yes.

Q. And if Enservio had received such a request did you believe some of the errors that we have brought, that we had discussed today would have been discovered?

A. Definitely.

MS. AQUINO: Object to form.

Q. That's all -- oh. How does Enservio get feedback on its valuations?

A. Just like that. I mean, if the insured sees something that they feel is not correct then they would note it. And one way or another we could get an e-mail, they could print out a report and handwrite it, any which way is fine.

Q. Or they could send it to Chubb and Chubb could send it to you?

A. Yeah. If we got something directly from the insured we would run it by Chubb. We would take our directive from Chubb.

Q. You -- you would take your directive from Chubb, not the insured?

A. Correct. We would receive the e-mail from the insured and we would turn to the adjuster and say, "we received this, do you want us to do something?" You know, we would seek their direction.

Q. And would there be an additional charge for that?

A. Depending on the scenario.
Q. Okay. Thank you for your time. That's all I've got.
MS. AQUINO: I have a couple of questions. Give me just one second.

EXAMINATION

BY MS. AQUINO:
Q. My name is Luciana Aquino and I represent Pacific in this case. You mentioned just now that if you received an e-mail from an insured that you would forward it to, in this case, Chubb and ask for guidance; is that right?
A. Correct.
Q. Did any such e-mail occur in this case?
A. Not that I'm aware of.
Q. You mentioned very early in you deposition that when you are doing valuations for Chubb that you don't take into account depreciation; is that correct?
A. That's correct.
Q. In this case that was also not done, correct, you did not factor in any kind of depreciation?
A. Correct.

Q. And in this particular case when you received your assignment from Pacific to conduct your valuation of the contents, was there any type of instruction on any type of limit for the amount of each item or anything like that?

A. I didn't see any limits noted in the claim.

Q. Okay. So it was kind of left to Enservio's discretion to assign the value based on your expertise, what you believe the items were worth; correct?

A. Correct.

Q. That's all I have. Thank you.

MR. DAUPHIN: You have a good day.

Lucy, would you give me a call, please.

COURT REPORTER: Ms. Aquino, did you need a copy of the transcript?

MS. AQUINO: I will take an electronic copy, please.

(Whereupon, the deposition concluded at approximately 3:19 p.m.)

CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, ss.

I, Laurie Langer, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand and seal this 26th day of April, 2023.

NOTARY PUBLIC
Commission Expires
7/27/2023

**&**

**&** 28:17,21 29:8 29:10

**1**

**1** 17:8
**1,066** 17:4
**1,800** 33:8
**10** 3:11 16:3
**100** 29:11
**12.99** 29:4
**12/31/2019** 14:15 16:21
**121** 29:19 30:8 31:8 34:5,11
**123** 34:17
**1230** 2:18
**12th** 37:19
**140** 31:5 32:9,19 34:4,12
**141,963.30.** 14:17
**145** 35:1
**14646** 44:17
**158** 3:10,14 4:18 4:19
**159** 3:11 10:8,9
**168** 36:8
**170** 37:4
**1727** 2:9
**18** 1:17
**18-10562662-...** 18:20
**19.99** 38:3
**19.99.** 38:1

**2**

**2** 17:8 26:7,24
**2,650** 33:9
**2023** 1:17 44:14
**205** 2:11
**208** 31:9
**21** 1:7
**225** 33:8
**240** 33:12
**26th** 44:14
**2:04** 1:18
**2:22** 1:7

**3**

**3** 17:8
**3,000** 34:1
**30** 4:21,21
**30309** 2:19
**346** 37:13
**347** 38:6
**35236** 2:10
**359** 17:2
**373** 38:20
**3:19** 43:19

**4**

**4** 3:5,10
**40** 32:15
**400** 2:17
**404** 2:20
**42** 3:6

**5**

**5** 4:21
**5,000** 33:10,12
**500** 9:17 17:15 17:22 18:7,9 26:16 33:10 34:20,22,24 35:11,12 36:11
**516-1058** 2:11
**572-2052** 2:20

**6**

**6** 4:21 30:7
**60** 27:20
**62** 28:16
**69** 27:18

**7**

**7/27/2023** 44:19
**755** 40:1

**8**

**8** 33:7 36:23
**800** 26:6
**850** 33:7,9
**89** 26:21

**9**

**9.35** 28:4
**9.95.** 28:6
**94** 31:9

**a**

**ability** 25:9
**able** 16:2 23:10
**above** 33:1
**acceptable** 10:4
**access** 17:11 27:14 30:23 36:15
**account** 42:20
**ace** 6:2
**action** 1:7 11:9 44:11,12
**actual** 25:4
**actually** 13:15 22:2
**acv** 25:13
**add** 12:9 36:14
**addition** 15:8
**additional** 26:4 41:24
**addressed** 33:1
**adjuster** 20:14 41:21
**afternoon** 4:13
**age** 24:6,6 30:7 30:13,13,14,17
**ages** 21:18
**agree** 29:13 31:4 37:10,11 38:3
**agreeable** 10:6
**ahead** 12:6 14:13
**alabama** 1:2 2:10
**alexandra** 1:5 2:24
**alice** 28:17,21 29:7,9
**amount** 22:21 24:20,20 25:2 27:13 33:10 43:4
**analysis** 7:8

**animal** 27:22
**animals** 28:11
**antiques** 34:2
**anybody** 11:8 11:13 18:3
**apologize** 5:4
**appear** 30:4 40:22
**appearances** 2:1
**appeared** 2:2
**appearing** 4:22
**applied** 24:19 25:9,17
**apply** 6:17 22:2 22:16 25:1,3,6
**appraisal** 19:20 19:23
**appropriate** 8:24 29:5
**approximately** 43:19
**april** 1:17 44:14
**aquino** 2:15 3:6 10:5 39:18 41:5 42:4,9,10 43:14 43:16
**art** 25:22 26:13 27:4 34:2
**art.com** 25:20
**asked** 7:23 8:1
**assign** 43:8
**assigned** 8:6 22:17 23:22
**assignment** 8:7 12:20 13:11 20:21 43:2
**assignments** 16:9
**assist** 5:18
**assume** 38:7
**atlanta** 2:19
**attach** 17:19
**attached** 8:23 18:2,5,12,13 27:2 36:11
**attaches** 30:10
**attention** 39:7
**attorney** 3:14
**automatically** 11:12
**automation** 29:1
**available** 8:10 8:11 17:23 18:3 19:24 23:14
**average** 30:17
**aware** 9:22 42:17

**b**

**b** 4:21,21 23:21 40:4
**back** 8:19 11:3 15:13 25:19 40:14
**bagsy** 40:4,6
**banach** 1:15 3:3 4:4,13,14,15 10:2,11
**baseball** 4:14
**based** 6:10 16:12 27:5 34:10 39:3 43:8
**basement** 30:8
**basic** 8:6
**basically** 16:10
**basis** 5:16 7:3
**bear** 28:8,9,11 28:14
**bearington** 27:23 28:8,9,11 28:14
**bed** 18:9,10
**behalf** 2:5,14 4:22
**believe** 7:2 12:12 21:13 38:3 41:2 43:9
**best** 25:9
**better** 16:13,14 28:6 38:17
**bit** 11:3
**block** 20:14
**box** 2:9 35:6
**brand** 20:5 38:15,17
**break** 39:19,23
**brought** 39:7 41:2
**built** 37:9
**business** 5:11 22:5
**buy** 38:2

**c**

**c** 4:1
**call** 10:7 16:6,20 43:13
**called** 18:20 20:24 23:20
**capture** 9:18 20:8 21:2,5,8 31:18 32:3
**caroline** 32:11 32:23 33:2
**caroline's** 33:2
**carry** 33:14
**carrying** 38:7
**case** 5:10 6:8 7:16,24 15:2,23 23:12 38:7,8,9 38:10,10,12,13 40:12 42:11,13 42:16,22 43:1
**cash** 25:4
**catch** 10:17
**categories** 25:8
**cdauphin** 2:12
**cdnr** 11:21
**cdrn** 11:21
**certain** 27:17
**certainly** 29:16
**certificate** 44:1
**certify** 44:7,10
**cetera** 14:1
**chair** 37:17,17
**chairs** 38:2
**charge** 41:24

**charles** 1:4 2:6
**check** 39:21
**choice** 6:22
**chose** 31:12
**chubb** 6:1,4,5,6 7:1,16 12:17 13:9,13,15 14:4 20:21 22:3,15 22:16 41:13,13 41:16,17,18 42:13,19
**chuck** 39:18
**civil** 1:7
**claim** 5:17,18,18 7:7 8:5 10:23 11:4,5,6,8,13,14 11:14,15,17 12:8,13,17,22 13:10,14,16 14:4 16:1,3,18 17:24 18:2,3 19:2,4,9,12 24:5 25:1,3 31:15,19 31:20,22,24 32:1 40:22 43:6
**claimed** 21:6
**claims** 22:3
**clarification** 7:4
**click** 18:15
**client** 7:10,16
**clients** 5:22
**clothing** 28:20
**cndr** 14:7
**code** 24:19
**collectables** 34:2
**collection** 27:23
**column** 23:20 23:22 24:4,6,8 24:11,13,16,18 24:20,22,24 25:2,4,7,11,13 25:16,18,23 26:2 32:7
**columns** 23:19 30:19
**come** 11:3 15:13 20:8 31:5 32:6,9 35:1 37:3 39:24
**comes** 8:17
**comment** 32:18
**commission** 44:18
**common** 19:22 20:1
**commonwealth** 44:3,6
**companies** 5:22 7:1
**company** 1:8 5:17 6:5,11,16 7:7,10,17 11:20 28:17,21 29:8 29:10
**company's** 6:21 7:7
**comparable** 38:16
**compare** 13:21 34:4 36:16 37:5
**concluded** 43:18
**conduct** 43:2
**conducted** 1:16
**connection** 12:21
**contain** 25:23 26:2
**contains** 9:23 11:18 13:3
**contents** 5:12,18 7:9 8:2 9:1,5,9 11:19 12:10 13:3,22,23 14:2 16:22 17:5 22:11 43:3
**contract** 6:24
**conversations** 5:7
**conveyed** 22:1
**copies** 14:24
**copy** 12:17 18:21 21:7 43:15,16
**correct** 4:23 6:11,12,23 7:8 7:14,18,22 9:11 9:14 13:7 18:11 20:17 21:17 23:16 26:13 27:6,9,10,24 28:7,21,22 30:11 31:13,14 32:5 33:3 35:3,4 35:7 36:6,12,13 38:13 39:15 40:9 41:9,20 42:15,20,21,22 42:24 43:9,10
**corrected** 29:17
**cost** 22:17,20,21 23:18 24:13,16 24:17,22,23 25:5,14 26:14 35:21,22 38:13 39:5 40:10,13
**counsel** 44:11
**count** 17:2
**couple** 29:23 34:3 42:4
**course** 17:16 22:5 37:18
**court** 1:1 10:1 43:14
**coverage** 6:17
**cozen** 2:16
**cozen.com** 2:21
**crdn** 11:22,23 11:24 12:10 14:6,8 15:19,19 17:5
**create** 5:19 8:1 8:3 36:22
**creating** 34:22
**curtain** 30:4 32:12,15
**curtains** 16:13 31:10 34:7

**cushion** 36:23 37:4
**custom** 26:9,10 29:22 30:4 31:2 31:10 32:11,15 34:1 36:8,14 39:2,3
**customer** 5:16 20:24
**cut** 21:7,12,15 32:23
**cv** 1:7
**cvr** 16:22 17:3,4 22:12 33:14 39:12

**d**

**d** 4:1
**damaged** 8:2 15:9 35:20
**damages** 14:1
**database** 13:20
**dauphin** 2:6,8 3:5,14 4:12 10:1 10:7 39:20 43:12
**dauphinparis....** 2:12
**day** 5:16,16 14:15 43:12 44:14
**deal** 7:3 33:24
**dealing** 40:11
**decide** 27:14
**decision** 6:10 27:8
**decisions** 6:17 6:18
**decorators** 20:2
**deemed** 29:5
**defendant** 1:9 2:14
**definitely** 29:14 41:4
**depending** 16:8 42:1
**depends** 40:11
**deposition** 1:14 3:10,14 4:16,17 4:19 5:9 10:9 42:18 43:18 44:7,8
**depreciation** 22:2,16 24:24 25:2,6 42:20,23
**description** 3:9 5:14 9:16 15:11 17:18 23:24,24 25:18,20 26:19 26:20 27:5 30:9 35:6 38:14
**design** 34:2 37:2
**designers** 32:17
**detail** 11:1 15:6 15:6,7 26:4
**details** 8:6 15:10 15:14,16 20:10 23:17
**determined** 16:4 34:20
**diane** 2:7
**dick's** 28:23 29:5 37:23,24
**dictate** 17:17
**dictated** 14:8 24:2 27:5
**dictates** 13:6
**dictation** 14:9
**difference** 14:20 35:14 36:1
**different** 6:3 10:20 14:24 16:2,7
**dig** 33:16
**direct** 16:18
**directing** 32:15
**direction** 41:23
**directive** 41:17 41:18
**directly** 33:23 41:15
**director** 5:6
**discovered** 41:3
**discretion** 43:8
**discussed** 32:4 41:3
**display** 26:3
**district** 1:1,2
**division** 1:3
**divvied** 16:10
**document** 12:4 12:12,16 13:13 15:15,16 31:20
**documents** 8:24 9:4,21 12:1
**doing** 7:19,21 17:21 19:22 42:19
**dollars** 24:21 35:5
**donellan** 32:24 34:14
**donnell** 32:22
**double** 26:10 38:7
**draperies** 31:2
**drapery** 29:22 30:9
**driver's** 4:6
**duly** 4:6 44:7
**duplicated** 12:24

**e**

**e** 4:1,1 19:1,6 41:10,20 42:12 42:16
**earlier** 7:6 31:23
**early** 42:18
**edt** 1:18
**effort** 23:14
**eight** 30:11,12
**either** 38:24
**electronic** 43:16
**embedded** 19:3
**employed** 44:11
**employee** 8:14
**ends** 13:2
**enservio** 3:11 4:22 5:5,11,12

6:24 7:6,20,23 8:3,15 9:20,21 10:8,12 12:1 18:20 19:2 22:6 22:9,14,15 31:12 32:1 33:24 39:4 40:14,17 41:1,6
**enservio's** 9:23 24:9,14 26:12 40:19 43:7
**entities** 6:1,3
**entity** 6:4
**entries** 11:6 12:22,22 22:4
**entry** 32:18,19 32:21
**equivalent** 25:5 25:14
**eric** 20:23
**errors** 29:15 41:2
**esq** 2:6,7,15
**essentially** 13:19
**establish** 29:6
**estimate** 16:1 26:14
**estimated** 30:15 33:7
**et** 14:1
**evaluate** 12:2
**evaluations** 7:21
**evidence** 33:18
**evident** 24:12 34:24 40:20
**exact** 12:12 20:11 23:11
**exactly** 15:4 17:16
**examination** 3:1 3:4 4:10 42:7
**examined** 4:7
**example** 23:8 26:7
**excel** 12:16 13:13
**executive** 21:1
**exhibit** 3:10,11 3:14 4:18,19 10:8,9
**exhibits** 3:8
**exists** 19:10
**expectation** 19:21
**expecting** 14:22
**expensive** 35:17
**experience** 9:4 20:24
**expert** 35:10 36:1
**expertise** 43:8
**expires** 44:18
**explain** 10:20 18:1 23:19 28:24
**extensive** 23:14
**extent** 22:8
**eyes** 28:6

**f**

**fabric** 33:8 39:1
**fact** 21:21
**factor** 42:23
**fair** 34:10
**fairly** 35:17
**familiar** 30:22 40:6
**far** 34:6
**fashions** 30:20 31:13
**feedback** 39:15 41:6
**feel** 41:9
**field** 8:8 13:18 17:1 18:24 19:21 20:10 21:24 24:1 30:15 35:9
**file** 3:11 7:13 9:22 10:3,7,8,12 10:19,22 12:7 13:3,9 14:1,5 18:23 19:5,12 27:2 31:22,24 34:16 35:13 40:20,23
**files** 8:23 9:21 10:20 16:24 17:9 18:17,23 39:8
**financially** 44:11
**find** 12:23 19:3 23:4,5,9,10
**fine** 30:24 38:12 41:12
**fingertips** 18:6
**first** 10:22 14:17 19:15,17,20 23:20 24:3 25:20 32:21 36:4
**five** 28:5
**flag** 29:11
**folder** 11:17 12:1 13:2
**folders** 10:20
**follow** 31:17
**follows** 4:7
**force** 19:7
**form** 12:18,22 41:5
**forth** 44:7
**forward** 42:13
**frame** 26:10
**framed** 24:2 25:22
**framing** 26:9
**fuller** 36:19,22
**furniture** 16:15 20:1,7
**further** 33:16 44:10

**g**

**g** 4:1 40:4
**generally** 9:16 11:2,9 17:22

19:3 21:23 28:11 34:1 40:21
**generated** 15:21
**georgia** 2:19
**getting** 29:7 33:20
**give** 5:14 34:16 40:9 42:5 43:13
**given** 20:14 44:8
**giving** 6:12,13 6:15 28:19
**glass** 26:11
**go** 4:15 5:19 8:1 11:1 12:6,20 14:13 15:9,10 16:13,14 17:19 19:2,12 22:21 23:2,7,15 26:7 27:15 29:18 32:12 36:23 38:9 39:1,22 40:14
**goes** 27:7
**going** 14:19 15:13 23:5 25:19 26:6 28:10 29:7 30:8 35:21 38:12
**golf** 37:15
**good** 4:13 15:24 33:13 39:20 43:12
**goodrich** 1:4,5 2:24 7:13 12:17 13:14,16 14:4 27:11 40:18
**goods** 28:23
**google** 28:8,13
**gotcha** 9:20
**green** 37:19
**guess** 36:10
**guidance** 42:13
**gun** 38:8,8

**h**

**hallmark** 28:2 28:10
**hand** 11:8 16:18 44:13
**handed** 9:7
**handles** 5:12 8:8
**handwrite** 41:11
**happens** 29:1
**hard** 9:15 38:10
**hardware** 20:2
**helpful** 20:3
**hereinbefore** 44:7
**hereunto** 44:13
**high** 33:23
**home** 20:15 21:21 30:19 31:13
**homemade** 39:3
**hoover** 2:10
**hope** 4:15
**hours** 23:5
**huh** 26:8

**i**

**idea** 5:4
**identification** 4:20 10:10
**identified** 4:5 33:20,21
**identify** 9:15
**improper** 29:12 29:13
**inches** 36:23
**included** 12:4 17:18
**includes** 17:4
**including** 24:22 25:2,4,5,15
**indemnity** 1:8
**independent** 6:15 11:10
**index** 3:1,8
**individual** 9:19 20:20
**infant** 28:16,20
**information** 8:18 20:3 21:20 21:23
**initial** 13:11
**initially** 12:20
**input** 15:20
**inspect** 12:20 17:5
**inspected** 13:24
**inspection** 8:12 8:14,18 15:19 20:10
**inspector** 9:13
**instance** 6:2 19:20,24
**instruction** 43:3
**instructions** 12:19 19:19
**insurance** 5:17 5:22 6:11,16,21 7:6,7,10,17
**insured** 12:13 24:4 27:12 41:8 41:16,19,21 42:12
**intelligence** 29:3
**interested** 44:11
**interesting** 32:14
**interior** 32:16 34:1 37:2
**internal** 32:18
**internally** 8:3
**internet** 29:9 36:5
**interrupt** 8:13
**inv** 11:18
**inventory** 5:12 5:19 8:2 9:10 13:17 14:2 15:10,14,15,18 19:23 20:8 23:17 31:18 32:3 34:23
**invoice** 18:21 27:12,13

**issued** 14:15
**isv** 24:4
**item** 9:12 14:2,2 15:10,11,11 16:8,12 17:18 17:20 18:5,5,6 18:14 20:4 22:22 23:1,2,3,4 23:6,13,22,24 24:13,15,15 25:7,11,20,20 26:14,15,19,20 26:23 27:3 28:12 29:2,6 33:19 38:18,19 39:6 40:12 43:4
**itemization** 15:9
**itemized** 17:23
**items** 9:17,19,19 11:23 15:9,17 15:23 16:6 17:15 21:3,5,8 21:22 25:8 26:6 34:1,2,6 43:9

**j**

**jewelry** 34:2
**jumped** 27:17

**k**

**k** 1:22 12:18 24:16
**kathleen** 1:15 3:3 4:4 28:17,21 29:8,10
**keeps** 19:5
**kept** 19:1
**kind** 16:8 17:15 19:17 22:22,24 23:7,15 24:14 25:21 29:6 40:12 42:23 43:7
**know** 5:3 8:9,9 8:10,22 17:16 19:24 20:5 21:4 21:11,19 30:19 33:13 35:15 36:24 37:9,16 41:23

**l**

**l** 24:18 32:24,24
**labor** 33:9
**langer** 1:22 10:3 44:6
**laquino** 2:21
**larger** 31:7,9
**laurie** 1:22 10:18 44:6
**lawyer** 5:1,3
**layperson's** 5:14
**leather** 38:8,8 38:12,15
**leave** 11:10
**leaving** 11:12
**left** 9:13 43:7
**leon** 38:22
**letter** 14:8
**level** 33:24
**license** 4:6
**likely** 20:6,23
**limit** 25:7,10,16 25:17 43:4
**limits** 25:8 43:6
**line** 15:11 16:10 17:20 18:14 20:4 21:2,13 23:19,21,21 24:3 26:7,21 27:3 28:16 32:12,15 34:4,5 38:20 40:1
**linen** 39:1
**linens** 38:23
**lines** 8:24 16:6 17:3,4 30:6
**link** 10:2,18 25:23 30:21,23 31:2 32:7 36:15 36:17,18 37:6 37:12 38:9 40:7
**liontine** 38:23
**list** 5:20 6:10,21 11:19,24 14:6,8 14:11 15:19 17:5 19:23
**listed** 20:5 38:17
**literally** 21:15
**little** 11:3 28:24 29:18
**llc** 2:8
**local** 8:11
**logged** 11:5 19:8
**logo** 37:20
**long** 38:10
**look** 12:1 14:14 14:19,21 16:14 17:24 18:10 26:5 27:17,20 28:16 29:23 30:21 31:5,15 33:19 34:3,8,8 34:17 35:21,22 36:4,8,16 37:13 38:6,20 39:6,12 39:14 40:14
**looked** 31:16 34:5 35:13 36:6 37:2
**looking** 16:1 19:15 20:4 23:17 30:13 31:1 36:18 40:7
**looks** 16:12 17:1 21:8,14 28:21 38:1 39:8,10
**loss** 6:16
**lost** 34:16 39:9
**lot** 12:23 37:18
**love** 37:4,5
**lower** 9:19
**luciana** 2:15 42:10
**lucy** 43:13

**m**

**m** 24:20 30:18
**macy's** 20:2 39:5
**made** 6:10 20:18,20 22:5 27:8 32:21 39:3 39:15 40:18,22
**mail** 41:10,20 42:12,16
**mails** 19:1,6
**main** 19:9,9
**maintain** 7:14
**make** 6:17,18 8:22 19:8 21:16 28:13,15
**makes** 11:6
**making** 15:14 18:5,8
**man** 4:14
**manage** 33:23
**manual** 21:11
**mark** 4:17
**marked** 4:19 10:9
**market** 22:23
**massachusetts** 44:3,7
**masters** 37:16 37:18,20
**mat** 26:10
**match** 29:4
**matching** 8:21 34:8,9
**matter** 22:2
**matthew** 21:24
**mean** 6:14 7:20 19:7 21:11 22:14,20 27:1 30:13 32:13 34:23 39:3 41:8
**means** 21:4,5
**medium** 27:22 28:9
**mentioned** 42:11,18
**mhh** 1:7
**middle** 20:13
**mind** 35:16
**mine** 28:6
**minute** 15:1
**misinterpreted** 39:11
**mistakes** 39:15
**model** 23:9,11
**money** 22:21
**months** 24:7 30:14,16
**multiplied** 24:17
**myers** 20:23

**n**

**n** 4:1 32:24
**n.e.** 2:18
**name** 12:13 23:23 32:23 42:10
**named** 4:14
**names** 16:2
**narrative** 11:14
**necessarily** 36:24
**need** 43:14
**needs** 32:12
**neither** 44:10
**never** 39:17
**new** 21:23 30:16 38:23 40:12
**nice** 38:8
**nine** 28:5
**ninety** 28:5
**nonsalvageable** 11:19 12:10
**normally** 33:18
**northern** 1:2
**notary** 4:6 44:6 44:18
**note** 11:13 20:13,18 32:11 41:10
**noted** 43:6
**notes** 10:23 11:4 11:7,10,15 12:22 16:2 19:4 19:13 26:2 31:15,19,20,22 31:24 32:1 39:21 40:17
**notice** 3:10 4:16 4:17,21 5:17
**noticed** 16:19
**number** 11:17 12:8,14,17 13:10,14,16 14:4 17:17,18 23:10,21,21 26:7,18,24 27:18,20 35:1
**numbers** 29:22

**o**

**o** 4:1 24:22
**o'connor** 2:16
**object** 41:5
**observations** 9:1,4 24:1
**observe** 19:22
**obtained** 21:24
**obvious** 23:8
**obviously** 18:9 38:15
**occupied** 21:22
**occur** 42:16
**ocr** 13:2,3,21
**oh** 14:13 41:6
**okay** 5:4,11 6:13 7:5,10,12 7:23 8:13,17,20 9:6,9 10:16,22 10:24 11:6,21 11:23 12:6,11 12:15 13:1 14:3 14:7,7,13 15:5 15:13 16:17 17:6,10 18:1,4,8 19:5,12 20:5,22 21:2,7 22:4,13 22:19 26:5,15 26:22 27:4,19

27:21 28:13,16 30:5,23 31:10 32:3,6 34:19 35:1,17 36:3 37:12,14,17,24 38:6,12,14 42:2 43:7
**once** 8:17 18:1
**onesie** 28:16 29:4
**onesies** 29:10
**online** 38:24
**onsite** 6:20 13:3
**open** 13:17 15:5 18:15 39:14
**opinion** 6:15 24:14
**opposed** 28:10 35:23
**options** 36:22 36:22
**ordinary** 22:5
**original** 27:12
**originates** 10:5
**orleans** 38:23
**outcome** 44:11
**overage** 25:7
**overall** 9:17 12:4 13:23

**p**

**p** 4:1 24:24
**p.m.** 1:18 43:19
**p.o.** 2:9
**pacific** 1:8 5:8 6:1,4,7 7:16,21 19:2 22:15 27:7 27:8,14 42:10 43:2
**pad** 36:8,20 37:4
**page** 3:4,9 19:16 19:17
**panel** 29:22 30:3
**panels** 30:4 31:8 33:9 34:11,12
**paris** 2:7,8
**part** 15:17
**particular** 40:12 43:1
**parties** 2:2 44:11
**pass** 39:17
**paste** 21:12,15
**paul's** 30:19 31:13
**payment** 6:18 7:7 25:10
**pdf** 12:7 13:9 18:20
**peachtree** 2:18
**people** 11:9 15:22,23 16:3,4 16:11
**perceived** 17:16
**percentage** 24:24
**person** 6:9,20 13:6
**person's** 27:4
**photo** 8:21 16:24 17:17,18 17:19,23 26:18 26:18,18,20,24 27:1 29:21 35:10,13 36:21
**photograph** 9:12 35:6,8 36:16,19
**photographs** 17:11 29:21,24 30:3,10,10
**photos** 8:22 9:10,14,17,18 9:19 17:2,7,7,8 17:8,8,9,13,23 18:2 36:11,14
**pick** 39:1,2,2
**picture** 18:10,13 26:15 36:19 37:5,8,10
**pictures** 34:4,5 34:11,19
**piece** 20:7
**pillow** 39:1
**plaintiff** 2:5
**plaintiffs** 1:6
**plastic** 38:10,13
**play** 5:5 16:17 37:15
**played** 4:14
**please** 5:15 9:3 10:12,21 14:3 14:13 16:23 21:2,5,8 27:18 43:13,17
**plus** 24:23 29:11 33:8
**point** 29:15 39:19
**pointed** 29:16 39:17
**policy** 6:17
**possible** 5:15 29:4
**possibly** 29:18
**prepared** 13:5 15:16 39:12 40:18
**present** 2:23
**presented** 21:3 21:9
**presents** 26:23
**pretty** 21:23 30:16
**previously** 31:16,19 32:4
**price** 15:20 16:9 23:2,12,13 24:9 29:2 33:19 37:9
**pricer** 17:21 35:12
**pricers** 18:6
**pricing** 15:22 16:7,7,9 17:21 20:3 26:1 29:1,3 33:6,14,24 40:3
**primary** 5:16

**print** 24:2 25:22 41:11
**prior** 5:8
**private** 20:2
**probably** 37:1 40:13
**procedure** 8:4
**proceed** 14:3
**process** 13:11
**processed** 11:5
**processing** 19:9
**product** 25:24
**production** 4:5
**professional** 44:6
**promenade** 2:17
**proper** 35:22
**provide** 5:24 6:2 10:2 26:3
**provided** 6:21 9:21
**public** 4:7 44:6 44:18
**pull** 16:9 19:15 29:23
**pulling** 36:21
**purchased** 20:1 20:6 23:11
**pursuant** 4:16
**put** 26:18

**q**

**quality** 22:22,24 23:7,15 24:15 25:21 29:7 40:12
**quantity** 24:11 24:17 30:11,12
**question** 10:15 33:13
**questions** 39:24 40:18 42:4
**quick** 30:2 36:15 39:19
**quickly** 34:5
**quite** 16:10

**r**

**r** 4:1 25:4
**rate** 24:18,18
**read** 21:16
**readily** 18:6
**real** 30:2 36:15
**really** 25:1
**reason** 36:11
**receive** 41:20
**received** 11:19 11:24 14:7 41:1 41:22 42:12 43:1
**receiving** 20:21
**recent** 15:3
**recently** 21:22 23:11
**recommendati...** 6:12,13
**recommending** 33:6
**record** 11:9 19:21 33:17 44:8
**recorded** 11:11 18:24 19:10 22:5
**recording** 11:11 14:12
**recordings** 13:19
**red** 29:11
**redacted** 12:13
**refer** 6:4 12:18 19:18,18
**reference** 15:23 21:21 26:17
**referenced** 8:23 26:24 27:2 34:4 35:6
**reflected** 11:14 38:16
**regards** 8:14
**registered** 44:6
**regular** 7:3
**related** 44:10
**relation** 9:22
**relevant** 22:8 25:13
**remain** 39:14
**removing** 12:13
**rep** 17:1 18:24 19:21 21:24 30:15 35:9
**rep's** 13:18 24:1
**replace** 22:22 24:13,14
**replacement** 22:17,19 23:1 24:9,16,17,22 24:23 25:5,14 25:18 26:1 35:21,22 37:20 37:21 39:5 40:10
**replied** 22:9
**report** 9:1,5,9 13:4,22,23 14:22 15:10,19 15:21 16:21,21 16:22 22:12 23:18 26:3 41:11
**reporter** 10:2 43:14 44:6
**reports** 14:14
**represent** 5:24 42:10
**representative** 20:19 38:24
**representatives** 5:8
**req** 12:8
**request** 12:8,9 12:18,22 13:10 13:11 40:21 41:1
**require** 23:14
**requirements** 39:4
**resale** 40:8,9,13
**research** 23:5 38:17

**resource** 7:6 8:11
**resources** 8:9
**respond** 33:5
**response** 9:23 33:2
**responsibility** 29:15
**restoration** 11:20 20:2
**restore** 20:16
**restrictions** 21:10,14
**retail** 22:23
**retained** 3:14
**review** 17:21 29:3 32:19
**reviewed** 7:13
**rifle** 38:7,12
**right** 4:13,15 5:1 6:8,19 9:2 10:19 11:16 13:5,12 14:13 14:16 17:20 18:15 24:10 25:12 28:20 30:10,12,18 31:15,18 33:1 37:3,8 42:14
**role** 5:5 16:17 20:24
**room** 13:24 23:22,23
**rpr** 1:22
**ruffled** 29:23 30:3
**ruffles** 39:2
**rug** 35:3,14,15 35:20,22,23 36:3,5
**rugs** 35:17
**run** 41:16

**s**

**s** 2:5,14 4:1 25:7 40:4
**safety** 21:9,13
**sales** 19:7
**satisfactorily** 4:5
**save** 10:3 35:10
**saved** 14:22
**saw** 13:24 21:21 29:10 36:13 37:13
**saying** 9:11
**says** 12:16 13:9 13:13,15 16:12 20:14 21:18 25:22 28:16 29:21 32:1,11 33:7 38:15,22
**scenario** 42:1
**scene** 9:18
**schedule** 8:11
**schedules** 8:9
**scheduling** 8:6,7 8:8
**schilling** 21:24
**scroll** 26:19
**seagrass** 35:15 35:23 36:1,6
**seal** 44:14
**seat** 37:4,5
**second** 10:15 34:16 39:17 40:15 42:5
**section** 19:18 31:16 32:7
**see** 12:7 16:2 17:1 18:15,18 25:10,16 26:17 26:20 30:18 31:9,18 32:3,11 33:15,15,17 34:6,18 35:5 36:4 37:7 38:10 38:15 39:21 40:3 43:6
**seeing** 10:22 32:14 40:7
**seek** 41:23
**sees** 41:8
**select** 8:10 32:12,16 33:19 33:20,21,22 37:2
**self** 24:12
**send** 5:17 16:6 40:17 41:13,14
**sense** 28:13,15
**sent** 9:20 10:18 16:7 18:21
**separate** 19:5
**service** 6:2 12:18,21
**services** 5:13,24
**set** 8:5 26:3 37:18 44:7,13
**several** 9:21
**share** 10:13
**short** 24:4 39:23
**show** 15:8
**showed** 27:12
**signature** 44:17
**silk** 34:6
**similar** 34:6 35:16 36:4
**singing** 25:21,22
**sisal** 35:3,14,17 35:20,22 36:1,3 36:4
**sit** 37:17
**site** 5:19 6:9 8:1 8:8,12,14,17 9:1 9:5,5,9,13 10:4 13:6,21,23 15:18 18:24 20:19 22:1 36:24 37:1 40:8 40:9
**situation** 7:13
**six** 30:7,14,16
**size** 16:3
**sized** 28:9
**smoke** 20:15
**snapshotted** 31:21

**solara** 18:20
**somebody** 32:14
**someone's** 29:14
**sorry** 10:16 30:7 33:7
**sort** 27:17 29:6
**source** 24:8,9 25:19 26:12 28:2,19,22 31:12 36:23 37:21 40:3
**sourced** 25:19
**southern** 1:3
**speaking** 9:16 19:3
**special** 19:19
**specialist** 26:12 26:14
**specific** 5:10 7:12 9:12 20:5 20:10 23:1,2,4,6 23:9 25:8 26:5 28:9 29:7 39:4 40:18,22
**specifically** 7:9 8:7 12:9 25:24 26:24 27:2 28:12
**spelled** 39:10
**sporting** 28:23
**srf** 12:18 20:12
**ss** 44:4
**stage** 6:19
**stands** 12:8
**start** 18:16 19:12 22:11 26:7
**stated** 24:5
**states** 1:1
**stopping** 39:19
**store** 38:23
**story** 11:4
**street** 2:18
**stuffed** 27:22 28:11
**sub** 10:20,20
**submitted** 5:20
**subpoena** 9:20 9:22,23
**substantial** 29:18 37:9
**suffolk** 44:4
**suite** 2:17
**summary** 13:24 15:6,7
**super** 23:8
**supplied** 25:8
**supposed** 9:14 9:16
**sure** 6:3 8:22 10:13 15:14 19:14 21:17 23:6,20 32:12 33:21 38:4
**sworn** 4:6 44:7
**system** 8:5,19 8:24 11:5,8,10 14:23 15:20,21 17:14,20 18:13 18:14 19:7,9,10 19:11 21:12 29:2,4

**t**

**t** 25:13
**tab** 15:10 23:17
**take** 9:14,17,17 10:3 15:1 17:24 23:18,18 24:5 38:4 39:1,19 41:16,18 42:20 43:16
**taken** 9:12 16:24 39:23
**talk** 11:3
**talked** 10:1 31:19,22
**talking** 7:5 28:1 38:22
**tax** 24:18,18,20 24:20,22,23 25:3,4,6,15 28:4 28:5
**team** 5:6 8:6,7 9:8 19:23 20:3 22:1 32:16,16 33:23,24 37:2,2
**teams** 16:7,9
**tee** 37:19
**television** 23:10 23:11
**tell** 10:12 11:2 17:13 30:8
**tells** 15:11
**terms** 35:24
**terrific** 10:14
**testified** 4:7
**testimony** 44:8
**thank** 18:16 34:3 42:2 43:11
**thick** 36:23
**thicker** 36:20
**thickness** 36:22
**thing** 18:19 20:11 28:1 35:9
**things** 18:19 19:8 27:17 39:16
**think** 6:6,6 7:5 11:22 12:23 14:22 18:18 20:11,14 21:5 21:11 28:10 30:16 31:7 35:11,12 36:13 38:9,22
**thought** 34:21 36:10
**thousand** 35:5
**time** 7:11 9:3 23:14 38:22 39:20 40:15 42:2
**today** 41:3
**today's** 5:8
**took** 17:1
**top** 19:18 23:19 29:23 30:3,18

**topic** 34:17
**total** 24:16,22 24:23,24 25:2,5 25:14
**totaling** 33:9
**totals** 14:17
**transcribe** 8:21
**transcribed** 13:18,20 14:9 14:10 39:9
**transcript** 43:15
**transcription** 13:14,16 14:1,5 14:5
**translated** 14:11
**translation** 39:10
**treatment** 34:11
**tries** 29:2
**true** 44:8
**truncated** 25:10
**try** 23:3,6,13
**trying** 10:17 20:15
**tuesday** 1:17
**turn** 41:21
**tv** 23:12
**twice** 14:23
**two** 12:24 13:15 14:14,23 18:19 23:5 30:19 31:9
**type** 19:19,20 22:14 34:6 43:3 43:4

**u**

**u** 25:16
**uh** 26:8
**ultimately** 6:18 9:7 27:7
**under** 17:22 21:19 23:17 30:13
**underneath** 20:9 21:7 31:16 37:3 38:6
**underscore** 11:18 12:8
**understand** 22:19 33:16 38:18
**united** 1:1
**update** 15:3
**updated** 15:2
**uploaded** 13:20 17:13
**uploads** 8:19
**url** 25:23
**use** 15:2 22:24 25:19 31:12
**used** 25:21 26:1 30:16 38:16
**using** 29:2
**utilized** 26:13

**v**

**valuation** 5:6,12 6:20,20 9:8 16:22 17:10 18:8 22:11,14 23:18 27:4,8,15 28:4,22 35:10 43:2
**valuations** 6:10 7:19 16:5 40:15 40:19 41:7 42:19
**value** 6:16 8:2 9:19 15:12 17:16 22:20 23:1 24:5,5,14 25:4 26:4 28:9 29:6 35:5 37:22 37:24 43:8
**values** 15:8 22:17,18
**valuing** 5:18
**vendors** 19:22 20:1,6
**verify** 15:1
**version** 12:13 31:8
**virtually** 1:16
**visits** 6:9
**voice** 8:23 13:18 14:12 18:23 39:8
**vreeland** 20:22
**vs** 1:7

**w**

**w** 25:18
**walk** 10:11,19
**want** 10:13 11:1 26:5 36:4 41:22
**wanted** 17:24 21:16 36:14
**way** 10:22 21:14 21:16 26:17 41:10,12
**we've** 39:15
**website** 25:24
**went** 14:8 29:9 29:9,10 36:5 38:1
**whereof** 44:13
**witness** 3:3 44:7 44:8,13
**wood** 26:9
**word** 9:15 38:5
**words** 27:11
**work** 5:20 8:3 11:13 15:22 16:4 18:21
**worked** 15:24
**working** 17:10
**worth** 18:7,9 20:15 34:1,20 34:22,23 35:11 35:12 36:10 43:9
**written** 14:11 20:11
**wrong** 36:24

**x**

**x** 1:10 25:23

**y**

**y** 26:2 30:18 40:4
**yard** 33:8

**yards** 33:7
**yeah** 28:24 36:7 38:2 41:15
**year** 21:19
**years** 24:6
**yep** 37:7
**young** 4:14

**z**

**zip** 11:17,24 13:2 17:7,9 18:23 24:19
**zoom** 2:3

Alabama Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

(e) Submission to witness; changes; signing. When the testimony is fully transcribed the deposition shall be submitted to the witness for examination and shall be read to or by the witness, unless such examination and reading are waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness, unless the parties by stipulation waive the signing or the witness is ill or cannot be found or refuses to sign. If the deposition is not signed by the witness within thirty (30) days of its submission to the witness, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the witness or the fact of the refusal to sign together with the reason, if any, given therefor; the deposition may then be used as fully as though signed unless on a motion to suppress under Rule 32(d)(4) the

court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

(F) Certification and filing by officer; exhibits; copies; notice of filing.

(1) The officer shall certify on the deposition that the witness was duly sworn by the officer and that the deposition is a true record of the testimony given by the witness. Unless otherwise ordered by the court, the officer shall then securely seal the deposition in an envelope indorsed with the title of the action and marked "Deposition of [here insert name of witness]" and shall promptly file it with the court in which the action is pending or send it by registered or certified mail to the clerk thereof for filing.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.