FILED
2023 Jul-12 PM 04:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

VERITEXT LEGAL SOLUTIONS

Deposition of:

# EUO Charles Goodrich

*September 2, 2020*

In the Matter of:

## Goodrich, Charles

Veritext Legal Solutions
800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Policy Number 14945478-01

Claim Number 040519056755-020

EXAMINATION UNDER OATH OF

CHARLES GOODRICH

TAKEN BY REMOTE VIDEOCONFERENCE

September 2, 2020

11:00 a.m.

Birmingham, Alabama

Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138

APPEARANCES OF COUNSEL:

On behalf of the Insured:

CHARLES A. DAUPHIN, ESQ. (via Zoom)
Dauphin & Paris
300 Vestavia Parkway
Suite 3400
Vestavia Hills, Alabama 35216

On behalf of Pacific Indemnity Company:

ALYCEN A. MOSS, ESQ. (via Zoom)
Cozen O'Connor
The Promenade
1230 Peachtree Street NE
Suite 400
Atlanta, Georgia 30309

MS. MOSS: This will be the examination under oath of Charles Goodrich taken by Pacific Indemnity Company with regard to Claim Number 040519056755-020 pursuant to policy Number 14945478-01.

Robyn, can you swear the witness in.

CHARLES GOODRICH,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. MOSS:

Q Can you state your full name for the record, please?

A Charles Drennen Goodrich.

Q Mr. Goodrich, your insurance contract with Pacific Indemnity Company gives Pacific Indemnity the right to take this examination under oath. This examination is the company's chance to sit down with you and ask some questions about the facts and circumstances surrounding this claim. You have been sworn to tell the truth here today, and it's important that you do so because the company is going to rely on what you say in considering this claim.

This is a voluntary process. No subpoena

has been issued to compel your attendance, nor is the case in litigation.

Before we begin, have you ever had to sit for a deposition like this before -- excuse me, an examination under oath or a deposition like this?

A I have not.

Q Okay. So let me go through a few ground rules for you. I'm going to ask the questions. You'll see that we've got Robyn Bosworth here, who may be above you in the Zoom grid. Robyn is a court reporter, and she is going to be taking down everything that you and I say. It's important that you let me finish my question before you answer. It makes it easier for her to put it all together for you. It's also important that you give me a verbal answer and not a nod of the head or a huh-uh, uh-huh, that sort of thing, because then we won't have a clear record.

If I ask you a question that you don't understand or doesn't make sense to you, please ask me to repeat it, rephrase it, whatever to -- so that you do understand it.

And if you do answer a question, I'm going to assume that you understood it; is that fair?

MR. DAUPHIN: We object to you assuming

that he understands a question just because the fact that he answered it. Go ahead.

BY MS. MOSS:

Q Mr. Goodrich, can you and I have an understanding or agreement if you do not understand a question I ask you, you will ask me to rephrase or repeat it?

A Yes.

Q All right. Tell me your date of birth.

A January 26, 1976.

Q And what's your present address?

A We're at a rental house at 3770 Wimbleton Drive, Birmingham, Alabama 35223.

Q And you're renting that house from your father-in-law, Chuck Dauphin?

A Yes.

Q And you also own a house that this claim is about, correct?

A Yes.

Q And what is the address for that house?

A 3305 Dell Road, Birmingham, Alabama 35223.

Q That's a house you own or you have a mortgage on it?

A Yes.

Q Which is it? Do you own it outright or

you have a mortgage on it?
A We have a mortgage on it.
Q And you are married to Alexandra Goodrich, right?
A Yes.
Q You know I've already taken her examination under oath, so I'm going to try to move a little bit more quickly based on some of the answers that she gave me since --
A Sure.
Q -- I've already asked some of this.
She told me you guys have three children; is that right?
A Yes.
Q What's your highest educational level achieved?
A I have two graduate degrees: Law school from the University of Alabama, and business school from University of Alabama at Birmingham.
Q Any other training, anything like that --
A No.
Q -- from an educational standpoint?
A No. Professional training, but no school.
Q Okay. Other than minor traffic offenses, have you ever been arrested or have any trouble with

the law?
A No.
Q Where are you presently employed?
A Timberline Investment Company.
Q And what is that company?
A It is a family office that invests in private -- mostly private companies, some public equities.
Q Like a venture capital-type company?
A Yes, that is one, yes.
Q And what's your role at the company?
A So a partial owner, and, I think, vice president is the title.
Q And who are the other owners?
A My siblings. I have three -- there's four of us total, two brothers and a sister.
Q Is this your family business?
A Yes.
Q Okay. Was it something that your dad or your mother did, and now the kids are doing the same business?
A Yes. Yes.
Q And how long have you been at Timberline Investments?
A 2013. Maybe 2012. So I think it was '13.

Eight years.
Q Did you ever -- go ahead, I'm sorry.
A Eight or nine years.
Q I broke my own rule.
Did you ever practice law after coming out of law school?
A I clerked for a judge on the Alabama Supreme Court, Justice Harwood, for a year, and then -- then I worked at the -- UAB Research Foundation, which is their tech transfer, office for five years after that. Did not require a legal degree.
Q And why did you leave the legal field?
A Let's see. Well, I never really got -- other than clerking for a judge, I never got into the legal field, and I never wanted to be a courtroom lawyer, and the job at UAB didn't require a legal degree, but it used some knowledge from my law degree, and thought that that was the best way to go.
Q What was the job at UAB? What exactly were you doing?
A So they -- the tech transfer office, they take technologies invented at UAB and try and license them or commercialize them. Some people

start up companies with the technologies, so some licensing to drug companies, some helping people start up their business. So it was some contract negotiation and working with entrepreneurs and scientists to take their invention to the public.
Q Okay. And why did you leave that position?
A The opportunity to come work at the family office presented itself, and it was something I wanted to do.
Q Where are you physically located today? Are you in your office?
A Yeah, I'm in our office at 3800 Collonade Parkway.
Q In Birmingham?
A Birmingham, yes.
Q Are you and Chuck in different places?
A We're in the conference room. He's at the other end of the conference table.
Q Oh, he is in the conference room with you?
A Yes.
Q Okay. Other than Timberline Investments, do you guys own any other -- did you own any other businesses?
A Timberline Investments invests in many

businesses. Let's see. I have two personal investments in companies outside of Timberline.

Q And what are those?

MR. DAUPHIN: Alycen, what does this have to do with the claim? I don't mind you getting some background information, but I can't see where that has any -- what his investments are has anything to do with the claim in this case.

MS. MOSS: Well, I think if he owns any businesses, which is what -- I'm not asking him about his personal investments, I'm just asking him if he owns businesses other than Timberline Investments.

MR. DAUPHIN: What do you need to know his investments for?

MS. MOSS: I asked him if he owns any businesses, and he answered with personal investments, so my impression was he was saying that he was personally invested in other businesses.

BY MS. MOSS:

Q So why don't you explain that more.

A I own a minority, in both cases under 5 percent, in two businesses that I invested in before I came to Timberline.

Q Okay. So you are a minority owner of two

other businesses?
A Yes.
Q In addition to Timberline? Okay.
A In addition to Timberline.
Q What are those two businesses?
A One of them is my college roommate in Orlando, Florida, and it is a marketing agency, Feinsome and Windmoore. The second one is a retail store here in Alabama, Alabama Outdoors. It sells outdoor clothing and hiking and camping equipment.
Q Okay. Are those two and Timberline Investments your only businesses that you have any ownership interest in?
A Okay. So Timberline Investments is owned by me and my siblings. We invest in private companies. In some -- recently the deal has changed, but in some of those companies I would -- the structure of my employment contract was that I would invest alongside. So of a hundred percent of the capital, I would put in 10 percent.
Q Okay.
A And then the -- Timberline would put in the other 90.
Q Okay. So how many other companies do you think you are invested in due to that setup?

MR. DAUPHIN: Alycen, we've got to stop it somewhere. I mean, if you can explain to me what that has to do with filing an insurance claim, please do.

MS. MOSS: Well, I'm just trying to get some background as to what company he owns. I don't want to know every single one, but is it 20, is it a hundred?

MR. DAUPHIN: Well, are we getting to a stopping point fairly quickly?

MS. MOSS: Yes, I'm about to. I thought I was finished, then he'll add a bit more to it.

BY MS. MOSS:

Q So how many companies are you --

A Some of them are private companies, some of them are funds that we give money to, and then they invest in private companies. There's probably 10 direct investments into private companies.

Q Okay. I know the house located at Dell Road was recently built, and it was just finished in 2019. Do you remember exactly when it was finished?

A June 17th. Maybe the 18th is when we moved in.

Q Okay. When did you guys start building?

A So they -- it probably took six months to

design the house, and I think they broke ground around Christmastime of, I guess, 2017. It took a year and a half.

Q Okay. Did you have anything to do with furnishing the house on Dell Road?

A Very little. I always said as long as there's a couch and a TV and a bed, I'm good.

Q Were there any contents in particular that you picked out?

A I mean, I guess the audiovisual, the televisions, I worked with that contractor.

Q Anything else?

A I mean, very little. Maybe, but nothing I can remember. Nothing that I was --

Q Okay. Who was the audiovisual contractor that you worked with?

A It's a company called HD Innovations.

Q Other than the property located at Dell Road, do you own any other property?

A So I own 5 percent of a family farm in Greene County, Alabama. My parents own 80 percent, and then me and my siblings own the remaining 20 percent.

Q Where did you go to college?

A Rollins College in -- outside of Orlando,

Florida.

Q And when did you graduate?

A 1998.

Q Other than -- scratch that.

Other than the property in Greene County, do you own any other property other than, I guess, Greene County and Dell Road?

A Yes, that's all.

Q Have you been involved in any other lawsuits?

A No.

MR. DAUPHIN: This isn't a lawsuit, by the way.

MS. MOSS: I know. I realized when I said have you been involved in any lawsuits, but thank you.

BY MS. MOSS:

Q We are here today about a claim relating to a fire that occurred on Dell Road on November the 18th, 2019; is that right?

A Yes.

Q Tell me what you remember about that day and what happened.

A So it was a Monday morning, and I was in my office, and Ali called me probably around 10:00

and said our house is on fire, and she didn't know much. And so I left my office and started to drive home, and I got some other calls from people who lived on the street notifying me that my house is on fire.

And so I guess I got there at 10:15, and obviously the fire department and -- was still there putting out the fire. You know, I kind of -- there wasn't much we could do at that point except sit out in the front yard and watch and talk to the fire department and other people that came in, but at some point later in the day we were allowed to go back into the house, probably around 5 or 6, and get some things, and that was kind of it.

My parents live down the street, so we kind of of -- we stayed with them and were going back and forth from their house that day.

Q Okay. Do you know how the fire started?

A Yeah, the cleaning service that comes -- came -- I guess they left a linen curtain on a light bulb in my daughter's room, and I guess the curtain draped onto the area of the floor below it where there were books and stuff, and that kind of ignited it.

Q The curtain caught on fire from being on

the lamp?
A Yes.
Q The house on Dell Road was insured under a Masterpiece policy issued by Pacific Indemnity Company, correct?
A Yes. I mean, I assume so, yes.
Q Have you ever reviewed that policy?
A At the time of purchase I did a quick review, and then after the fire I've reviewed it, yeah, I've read it and reviewed it. I don't know how many times, but a fair amount.
Q What in particular have you reviewed in the policy?
A Well, I mean, I read the whole policy shortly after the fire, and then as this process has gone on, I've kind of reviewed to try and find the relevant area to our claim.
Q Okay. Do you have the notebook that I sent to you?
A Yes.
Q Okay. And is that in front of you --
A Yes.
Q -- or close to you? All right.
A Yes.
Q So I put this together to just make it

easy for us in terms of looking at different documents. So if you will turn to tab number 1 in the notebook.

A Okay.

Q Does that appear to be a copy of the policy that you've reviewed?

A Yes.

Q Okay. Have you ever discussed the coverages available under the policy with anybody?

A So explain that, the coverages available. What do you mean by that?

Q Have you ever talked about whether there's coverage for this, whether there's coverage for that?

A Yes. In terms of figuring out what the claim entitles -- what the policy says and what we're entitled to, we, of course, have reviewed it.

Q Okay. Who have you discussed the coverages with?

A Well, Ali and Chuck, his wife, Diane, and probably my parents.

Q What are your parents' names?

A Mike and Gillian Goodrich.

Q We're going to refer back to this policy as we move through some of the coverage that's

available under the claim, so we'll come back to that, but for now, I understand that the claim was reported to Pacific on November the 18th, 2019. Does that sound right to you?

A Yes, I do remember the day of the fire that that was one of the things I did.

Q Did you -- were you the person that reported the claim?

A Yes.

Q And what was said?

A Say that again. I didn't hear you.

Q What was the conversation when you reported the claim?

A I mean, it was a notification. I think I talked to a woman named Beverly, and it was just a notification that we had a house fire. We didn't know the -- at the time we didn't know the extent and exactly what we were dealing with.

Q Did you talk about is there coverage for this, is there coverage for that, or you just simply said we had a fire and that's it?

A Yeah, it was strictly, yeah, to notify Chubb that we had a fire so that they would be aware and can get the wheels in motion to send someone out, I guess.

Q Other than that conversation, have you talked with anybody else at Chubb about the claim or the coverage available under the policy?
A I mean, Jeremy, who came out, I believe, the next day. So Jeremy, and I have not spoken with anyone else. Yeah, I have not spoken with anyone else at Chubb.
Q Hold on one second. Let me let my dog out of my office. We're doing construction on our house, and this dog is scared, so he sits in here with me, but he heard somebody come in and wanted out.
A Sure.
Q So tell me about the conversation that you may have had with Jeremy.
A So the day or two after the fire he came to the house -- and I have not had many -- but he, I guess, explained the process. I don't remember a great deal about it. It was, obviously, a pretty chaotic time. I know he was there, and he at least gave us some basic information about what we needed to do.
Q Anything else you remember about any conversation with him?
A No. You know, I remember he explained,

you know, that they would cover once we found a new place to live, we didn't know much, and our contents, but we didn't go in depth.

I remember he saying he had recently covered somebody's $40 million art paintings or something like that, and that it was there -- insurance is there to pay -- to get you back into -- back into your old life, something along those lines.

Q Did you have any kind of issues with Jeremy or how he was adjusting the claim?

A Not at that time.

Q Was there a time later?

A Well, I've probably not seen Jeremy since that meeting or interacted with him since that meeting, so every -- since then it's been -- I've heard things about our claims process, but, you know -- so it's a reflection of Ali, what she's gone through.

Q What is it that you've heard about the claims process?

A You know, it's just -- it's partially my experience as well, but just in relation to Jeremy, I don't think I could pick Jeremy out of a police lineup. So I have not interacted with him, so I

guess I've made that point. It's been -- obviously this is our first major claim from an insurance company. It's been frustrating to go through, I guess.

Q Why is that? What has happened that has been frustrating?

MR. DAUPHIN: Alycen, what does that have to do with the claim? He's not in a lawsuit. He's not claiming mental anguish or anything. We're here to discuss the claim.

MS. MOSS: He's saying he's frustrated about the claim process. I'm trying to figure out what his frustrations are. I don't think that that's a question that is out of line.

MR. DAUPHIN: Explain to me what that has to do with the payment of the claim.

MS. MOSS: Chuck, are you going to instruct him not to answer or are you going to let him answer my question?

MR. DAUPHIN: I hope not to instruct him not to answer, but I need to have some understanding as to why you think that has something to do with the claim so I can make that decision.

MS. MOSS: I have very wide latitude in an examination under oath. We are here about a

specific claim, and I am certainly entitled to ask him about the claims process. He just told me he has some frustrations, and I want to know what those are.

MR. DAUPHIN: You still haven't told me -- it doesn't have to do --

THE REPORTER: Chuck, I'm having a real hard time hearing you. I'm so sorry.

MR. DAUPHIN: Sorry, I had it muted because we get an echo in here.

That still doesn't explain why that information helps Chubb or Pacific determine the amount of the claim.

MS. MOSS: Okay. Just have him answer or don't -- or don't have him answer. I'm a hundred percent entitled to know his frustrations with the claim, and we're just wasting time going back and forth with that.

MR. DAUPHIN: I'm going to let him answer that, but I disagree with you.

Go ahead, Charles.

THE WITNESS: There were times where we felt that Chubb was slowing us down, the process was taking longer than it should have.

BY MS. MOSS:

Q Anything else other than just the length of the process?
A Any delay to the length of the process Chubb was -- there were unnecessary delays because of the actions of Chubb.
Q Like what?
A You know, the main one I remember is that Jeremy insisted that the master bedroom area did not have smoke damage and was against us taking that area down to the framing, to the studs, and we found damage, but it cost us a month or two while we figured out how to handle that process. So he was not -- yeah, that's the main one I remember.
Q Is there anything else you can remember?
A There was a point where he didn't want us to take the tile off in the shower, you know. It was -- that was the main one, but there was -- it was the time -- there were different points in the spring where I felt like we were unnecessarily wasting time. My goal is to get my family back into my house as soon as possible, and there were times when not much was being done at the house to move the claim forward.
Q Anything else that you recall relating to any kind of unnecessary delays as you said?

A I don't recall at this time anything else.
Q Okay. So you were there for the initial inspection of the home that Jeremy did, but you were not present for any other meetings with Chubb; is that right?
A Correct.
Q All right. I understand you guys first moved to a rental on Fairway Drive, right?
A Yes.
Q And how did you find that home?
A Shortly after the fire it was -- we heard about it from a friend, I believe. I don't explicitly remember.
Q Did you go inspect the home prior to moving in?
A Yes.
Q And did it appear to be satisfactory?
A Yeah, we were looking for -- this was a week or two after the fire. We were at that point living in my parents' house, so we were looking for a place to live. We weren't demanding high quality.
Q So when you moved in, did you think it was not really a high quality house?
A It was not -- again, it had flaws. It was a place to live.

Q Why did you guys move out?
A The house was not -- trying to recall the details. It was too small for our family, and a lot of -- the kitchen and the bathroom were in poor condition. The two main reasons.
Q That would have all been stuff that you knew of before you moved in, though, right?
A Yeah. We were also -- at the time we were looking in December it was also -- it was kind of a short-term solution for -- but we were looking for a place to live. We were just trying to get a roof over us.
Q You guys signed a rental agreement from December the 1st, 2019, through May 31, 2020, right?
A Correct.
Q And were you planning to live in there for six months?
A That was the shortest the landlord would give us.
Q How big was that house?
A I don't know the square footage. It had three bedrooms, two baths, a small kitchen, and a TV room, and dining room.
Q How did it come to be that you found another rental house that was more suitable?

A I'm not very good with dates and the times, but Chuck kind of indicated that he was -- he could buy a house and we could rent it from him in January. I guess late December. And so him and Ali and some real estate agent started looking in that time frame, and then they found Wimbleton Drive, and the owner was willing to close quickly, so that's how it came together.

Q So Chuck specifically bought the house for you guys to live in?

A Well, I don't know his plans once we move back into the house on Dell Road, but the first year and a half or however long it takes, it was for us to rent from him.

Q And was that house in satisfactory condition to move into?

A We did some work on it. It wasn't -- it was not -- it had problems as well.

Q What were the problems with that house?

A We purchased it from an older gentleman, and so it just hadn't had any work done on it. The bathrooms were not in good shape, the kitchen was not suited for a family of five, and the downstairs area had been neglected.

Q What exact work did you guys do on it?

A So Ali does this. She was the primary person, so my knowledge is limited. So I know we refurnished -- redid the bathrooms and the kitchen, and in the downstairs area -- we repainted portions of the house and put carpeting down in the downstairs area, and there's a bathroom down there that we updated.
Q Who paid for that, to redo bathrooms?
A Ali and I.
Q What all did you guys do in the bathroom and the kitchen? Did you completely remodel them?
A No, just got new -- well, again, we got toilets and -- I'm trying -- it depends on what your definition of remodeling, I guess.
Q I don't know. I'm trying to just figure out what exactly you did at the Wimbleton home.
A Before we -- when Chuck purchased the house, I did not even look at it, so I'm not very clear. I don't know. I know a little bit, but I don't know much.
Q But it sounds like you did some work on the bathrooms and the kitchen?
A Yes. I know we did that, but I can't get -- I know we got new toilets, but I can't -- I don't know -- I could not --

Q So in the bathrooms you got new toilets. Anything else that you did in the bathrooms?

A Yes, I know other things were done, but I don't know the extent, so I don't want to say without being sure.

(Off-the-record discussion.)

BY MS. MOSS:

Q So any work that you did in the bathroom, you and Ali paid for that?

A Yes.

Q Are you and Ali part owners of the house on Wimbleton?

A No.

Q Why are you guys paying for work to be done in a house that you don't own?

A To make it satisfactory to live in.

Q Isn't that something you would typically ask the landlord to do?

A I'm not sure. Outside of college and law school I haven't rented. I mean, those were apartments.

Q Have you asked Chuck to pay you back for any improvements that you made on his rental house?

A No.

Q Do you plan to ask him to pay you back for

any improvements that you made on the rental house?
A No. This was not a massive renovation.
Q What about in the kitchen, what exactly did you guys do?
A As far as the -- we got a new oven, there was a few other things, but nothing -- we replaced the oven and the stove.
(Off-the-record discussion.)
BY MS. MOSS:
Q So, again, did you and Ali pay for the oven and stove and anything else that was bought in the kitchen?
A I don't know. I assume so, but -- but I don't know for sure.
Q I'm assuming that those are items that you're planning to leave at the Wimbleton house when you move out, right?
A Yes.
Q So you don't think you're going to be reimbursed for that?
A Well, I believe we're going to -- Chubb, slash, Pacific, I believe under our alternative additional living expenses that we're entitled to be reimbursed.
Q You think that Chubb is responsible for

buying the stove and the oven and the toilets?
A I don't know the -- yes, I do.
Q Why is that?
A Because under the policy they are required to pay additional living expenses that would have not have been incurred if we did not have the fire.
Q All right. Let's take a look at the policy. Maybe about 20 pages in, 25 pages in you'll see a form that's called Deluxe House Coverage.
MR. DAUPHIN: Page number?
THE WITNESS: Yeah, I need more information.
BY MS. MOSS:
Q It's on page B5 is what I'm looking at, B as in boy.
A Excuse me one second. B5. Okay.
Q Okay. If you look at the bottom of page B5, do you see it says additional living expenses?
A Yes.
Q Okay. If you turn over to the next page, it talks about coverage for extra living expenses. Do you see that?
A Yes.
Q And that provision says: If a covered loss makes your house or other permanent structure

uninhabitable, we cover the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living.

Do you see that?

A Yes.

Q And do you believe, based on this policy language, that buying permanent fixtures for a rental house like an oven, a stove, toilets fall within this definition?

A Yes.

Q Why is that?

A Because it's -- I mean, it's our normal standard of living. I'm trying to find the exact language, but...

Q Is there some specific language you're referring to that is different from what I read?

A We cover the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living. "Your household's usual standard of living" would be the language.

Q So then the toilets, the stove, the oven you're saying was necessary to maintain your household's usual standard of living?

A Yes.

Q That will remain as a fixture in your father-in-law's home when you guys move out, correct?
A Yes.
Q And did you ever ask him as the landlord to replace any of these items?
A Not me personally. I don't know.
Q I understand from Alexandra you guys have torn the house all the way down, right?
A The house on Dell Road?
Q The house on Dell Road, yes. Sorry, I'm switching gears.
A Yes.
Q And that house already has been demolished, right?
A Yes.
Q And the plan is to rebuild the house?
A Yes.
Q When should the house be finished?
A Approximately a year from now.
Q So you're thinking it will be finished in, what, September of 2021?
A Yes.
Q Why is it taking so much longer -- your original build time on the house was a year and a

half, right?
A Yes.
Q And presumably this would go a little quicker given that you're using the same plans, the same contractors, any issues that may have arisen the first time you aren't going to have to address the second time, right?
A Hopefully, yes.
Q So why would it be taking almost two years then to rebuild the house the second time around?
A We did not start rebuilding the house until recently, and the house was not knocked down until June.
Q Why was it not knocked down until June?
A Well, initially Jeremy and Chubb did not want to knock the house down. Actually, they still don't want to knock the house down as far as I know. And so that was the delay I was speaking to earlier. And then in the spring we were hoping that our claim would be -- we were, I guess, waiting partially on a resolution of the claim before we began to rebuild the house.
Q Let's talk a little bit about the rebuild.
A Okay.
Q If you would turn to tab 2 in the

notebook.
A Yes.
Q This contains a couple of different estimates from TCC General Contractors. Who is that?
A So it's a company, general contractor, that built the house originally. It's your standard high-quality general contractor.
Q So the first page that's behind tab 2 is the estimate for the demo and the repair work, right?
A Very first page after tab 2?
Q Just the very first page, yes.
A Okay. I'm not a construction guy. With my limited expertise, I think so.
Q Then if you turn to the next page, it looks like the rest of this is the estimate to completely tear down and rebuild the house, right?
A Yes.
Q And that reconstruction estimate totals $1,879,262.79, right?
A Yes, this was as of February, but --
Q Has that changed?
A Potentially.
Q Why?

A Because the house sat for six months, prices have changed potentially. I'm not -- I don't have the contract in front of us, but -- there is potential it has changed.

Q All right. I have not seen anything other than this $1.8 million estimate. Are you contending that Chubb owes something over and above this $1.8 million estimate?

A I don't know.

Q How much did it cost to originally build the house?

A Approximately, and this was with everything, 2 and a half million dollars. That's approximate.

MR. DAUPHIN: Alycen, we've been going about an hour. Whenever you get an opportunity --

MS. MOSS: We can take a break. You want to take a break for a minute?

MR. DAUPHIN: Now is a good time.

MS. MOSS: Okay. We'll take about a five-minute break.

(Recess 12:01-12:09 p.m.)

BY MS. MOSS:

Q Charles, I want to remind you that you are still under oath. Turn, if you will, over to tab

number 3. This is a copy of -- this is a copy of the reconstruction estimate from JS Held. Do you see that?

A Yes.

Q And have you ever had an opportunity to look at this?

A I don't know.

Q Turn to tab 4 for me.

A Okay.

Q So tab 4 is a spreadsheet that shows the differences in the estimates from TCC and JS Held. You can see that there are several different items that are listed here, so I want to ask you about each one of these. Specifically, let's just start with the wood mantles. What is the reason that you guys feel that the wood mantles in the house need to be replaced?

A I'm not sure. I don't know. I'm not even sure what the wood mantles refers to.

Q Okay. Well, let me ask you just generally then looking at this list --

A Okay.

Q -- do you know about specific damage to any of the items that are listed here in tab 4?

A So I know the garage doors, we haven't had

an opportunity to determine whether they are still working or not. All the -- and I guess the same goes for the generator. The plumbing -- no, I don't know anything about the plumbing. The builders risk I know because we recently -- what's the question with regard to builders risk?

Q Well, it looks like the builders risk insurance is being passed on to you guys as opposed to TCC being responsible for it. Usually GCs do not pass that cost on to their homeowners. Are you saying that TCC is passing that cost on to you?

A Yes.

Q Did they do the same thing with the original build of the house?

A Yes.

Q So let me just go back then and circle back to the wood mantles. Do you know anything about any damage to the wood mantles?

A Again, I'm -- I don't know. I mean, the best I can guess is -- it's a mantle over the fireplace, and I have no idea. I don't know.

Q If you don't know, that's fine to say you don't know. I just need to know what you do know.

A I don't know anything about the wood mantles. I'm not even sure what they are.

Q Okay. So I'm assuming you do not know if they're being stored, if they're not being stored, anything like that, right?
A No, I have no idea.
Q Okay. The garage doors, it sounds like you do not know for certain whether or not those need to be replaced or not, right?
A Correct.
Q You said you don't know anything about the plumbing, correct?
A No. I mean -- no, other than --
Q That's fine if you don't know.
A Yeah.
Q The generator is located outside, right?
A Yes.
Q And it sounds like you do not know if there was any damage to the generator, correct?
A No. We have not had -- we have not used it since the fire. There's no power or -- it has not been used, so...
Q Do you know anything about any damage to the doors or the door hardware?
A Outside of what I saw, no. I mean, they were substantially damaged, but I don't know anything specific.

Q What did you see?
A Well, doors that were damaged by fire and smoke and water.
MR. DAUPHIN: Alycen, Ali's come in. Any objection to her sitting in silently?
MS. MOSS: Yes.
MR. DAUPHIN: Why is that?
MS. MOSS: Because the policy says that the insured has to sit for their examination under oath outside the presence of another insured.
MR. DAUPHIN: You have to read that language to me. That language is not in the policy.
MS. MOSS: Do you want me to find the language for you? We've already been through this over e-mail, and you looked at the language, and you said yes, you are right, I understand that they cannot be in the EUO together.
MR. DAUPHIN: No, I did not, Alycen. I said we weren't going to argue the point, but you certainly can interview them independently, but not -- there's nothing in there about one not sitting in in the presence of the other.
That's all right. We won't insist on it now, but your description of our communication is totally off, and your reference to the policy

language is just flat wrong.

Ali, you are to be excused.

MS. MOSS: Would you like to look at the policy language?

MR. DAUPHIN: I'm agreeing to what you want. I know what -- Alycen, I know what the policy language says. I assume you do too.

MS. MOSS: The policy says that they need to sit for EUOs separately.

MR. DAUPHIN: No, it doesn't. Do a word search real quick for "separately" under the policy and see what comes up. Ali's left anyway.

MS. MOSS: I have -- I don't know that it says the word "separately." I cannot remember exactly the wording, but hold on --

MR. DAUPHIN: I know it does not. Anyway, she left. Go ahead.

MS. MOSS: Property condition examination under oath: We have the right to examine separately under oath as often as we may reasonably require you, family members, and any other members of your household and have them subscribe to the same.

MR. DAUPHIN: Well, I stand corrected. It says separately, but it doesn't say outside the presence of the other one, so...

MS. MOSS: Outside the presence was my wording, but separately, outside the presence, it's all the same.

MR. DAUPHIN: You and I can argue that later. She's no longer in the room. Don't know why we're having this discussion.

MS. MOSS: I don't think I -- did she walk out of the room?

MR. DAUPHIN: Yes. She's not -- Alycen, I'm not lying to you. She's out of the room.

MS. MOSS: I didn't see her walk out of the same door that she came in.

MR. DAUPHIN: I'm sorry. Charles, you're under oath. Please tell her that Ali is not in the room.

THE WITNESS: She is not. She's gone to my office.

MS. MOSS: Okay.

MR. DAUPHIN: Go ahead.

MS. MOSS: What? Why are you laughing? I mean, I had issues with you coaching Ali in the last examination.

MR. DAUPHIN: Your refusal to accept what I say is true as being true is just -- if a lawyer tells you something that -- I usually accept what

the lawyer says, but go ahead.
MS. MOSS: Well, typically I do, but in the last examination under oath you were coaching her --
MR. DAUPHIN: No, I wasn't.
MS. MOSS: -- so I just wanted to make sure that's not going on again.
MR. DAUPHIN: Alycen, this isn't a deposition, it's a simple statement under oath. Let's proceed.
BY MS. MOSS:
Q Okay. So back to the doors and the door hardware. You said you saw some damage to the doors, and it was -- was it smoke damage, fire damage, water damage, you said?
A Yes, all of the above.
Q Okay. All of the doors or only certain doors?
A So I don't know. I can't recall at that time which doors were damaged and which were not. That's not what I was looking for at the time.
MS. MOSS: Chuck, will you mute your line, please? We're getting feedback again. Thanks.
BY MS. MOSS:
Q What about the cabinetry, was there damage

to the cabinetry?
A Yes. So, yes. There was -- all the -- yes, there was damage to the cabinetry.
Q What was the damage to the cabinetry?
A There was a lot of cabinetry. Some of it was up in our children's bedroom. It was burnt beyond recognition, the kitchen cabinetry had smoke, fire, and water damage, as did our cabinets in the -- cabinetry in the master closet.
Q There's also a difference in HVAC. Do you know anything about the differences in the HVAC?
A What do you mean, the differences?
Q The differences in the quote to replace the HVAC from TCC versus JS Held.
A I remember the fire people telling me that fire and smoke, they get into the HVAC system because they're chasing oxygen, but I -- and that TCC determined that it was -- the system was completely destroyed or unusable.
Q Last thing listed here is beams. Tell me about any damage to the beams.
A I don't know specifically what that references, so I don't know.
Q Turn over to tab 5, if you will, please.
A Yes.

Q This is a letter dated January 31, 2020, from Henry Sprott Long, who is the president of Henry Sprott Long & Associates. Do you see that?
A Yes.
Q You did not need to redraw any of the plans for the house, did you?
A We -- a minimal amount. There were some -- a few things that were redrawn.
Q What was that?
A I know the master bathroom had an issue, and so we redrew that.
Q What were -- what was the issue?
A So the -- it had Ali and I's toilets, and the shower was in between, so you could look through and see --
Q Okay.
A Yes. We didn't like that.
Q So any changes that were made were really just, hey, we lived in the house, there were a few things that we would change if we had to do it again type of thing?
A Correct.
Q And this letter from Henry Long is for his 2 percent fee to oversee the work, right?
A Yes.

Q Two different oversight fees have been submitted for Hank Long. You guys are only paying him one fee that is 2 and a half percent of the cost of the work, right?

MR. DAUPHIN: There is no claim for his fees twice.

MS. MOSS: Okay.

MR. DAUPHIN: It's just not so.

MS. MOSS: Well, in your letters you've mentioned two. You've listed $46,981.56, and then you've also mentioned an additional fee of around 56,000.

MR. DAUPHIN: One was --

MS. MOSS: All I'm trying -- go ahead.

MR. DAUPHIN: One was connected with the overall global settlement offer y'all asked for, and one was connected with the -- TCC's discussion -- for purposes of discussion estimate that's tab 2. And the overall settlement proposal was a little larger, so, therefore, his 2 and a half percent increased, but there weren't a request for both of them.

MS. MOSS: That's what I want to confirm.

MR. DAUPHIN: Well, we confirmed it with Ali, but we'll confirm it. I assure you we're not

asking that he be paid 2 and a half percent twice.

BY MS. MOSS:

Q And the 2 and a half percent should be 2 and a half percent of this $1.8 million TCC reconstruction estimate, right?

MR. DAUPHIN: Well, once we finalize our estimate, it's 2 and a half percent of that amount, yes.

MS. MOSS: I need Charles to answer.

MR. DAUPHIN: I'm sorry. Go ahead.

BY MS. MOSS:

Q Go ahead.

A Yeah, I don't know the exact percentage, but it's whatever percentage of the final contract price.

Q Okay. Turn to tab 6 for me. This is a smoke remediation bid from Slade, LLC. Do you see that?

A Yes.

Q Do you agree with me that if you are demolishing the home, there is no need to be performing any kind of smoke remediation, right?

A Yes.

Q Yes, you agree with me?

A Yes. Yes.

Q Okay.
A Yes.
Q Okay. All right. So that is not an amount that you guys are seeking, correct?
A Correct.
Q All right. Turn to tab 7 for me. This is an invoice from Cliff Zlotnik. Do you know who Cliff Zlotnik is?
A Yes.
Q Who is that?
A So I don't know his exact title. He is a fire expert from Pittsburgh, who we hired as a consultant to help us discover the proper steps of rebuilding our house properly.
Q Was there nobody in Birmingham that was qualified to do this?
A Not as far as I know.
Q Did you do any research to see?
A Not me personally.
Q Do you know if Ali did?
A Yes, she did.
Q What did she do? What did she do?
A I don't know exactly what she did.
Q Do you understand that Jeremy Elliott approved up to $15,000 on expenses for an industrial

hygienist, which is what Cliff Zlotnik is?
A Yes.
Q It looks like this bill from Cliff Zlotnik is $20,338, correct?
A Correct.
Q Do you believe that Pacific should pay over and above the original agreement to pay the 15,000?
A I don't know. Do I believe they should, is that the question?
Q Yes.
A Yes, I believe they should.
Q Why?
A Because he was needed to -- knowledge to determine to get our house back to a place where we were comfortable that -- back to the house -- to the way the house was built originally without fire or smoke damage or water damage.
Q You ended up -- you were going to tear down the house anyway, so I don't know why you even needed him.
A At that point in time we were not necessarily going to tear the house down.
Q If you give somebody a budget at your work, do you expect them to stay within that budget

that you have given them?
A Sometimes circumstances, situations change.
Q What is a situation that is fine to go over that budget?
A If we ask them to do more work than originally budgeted.
Q Is that what happened here?
A I'm not sure.
Q Did you ever meet with Mr. Zlotnik yourself?
A Yes, at the house I met with him.
Q What was the conversation you had with him?
A He was -- he walked around and -- the part I was in he walked around the house and showed us what he was doing and what he was looking for.
Q What was that?
A I know he was running tests in different areas to determine the damage, and he was showing us -- we didn't -- he knew -- obviously knew a lot more about what had occurred than we did, so he would show us, well, you know, this means that so and so has happened. So he was giving us knowledge.
Q I've also been told that there could

potentially be an issue with the septic field. Do you know anything about that?

A Yeah, I recall that the septic field is down kind of in the bottom of the yard and that it was new because it was a new construction and that contractors, I think Brookstone, were parking on it, and TCC was worried that could cause damage.

Q Do you know if any tests have been done to determine whether the septic field is, in fact, damaged?

A I don't know.

Q So at this point you have no evidence of damage to the septic field such that that is an expense that should be paid by Chubb, right?

A TCC was concerned about it.

Q I'm going to move on, and I want to talk some about the extra living expenses and the policy. We looked at that provision earlier. Do you agree with me based on that policy language, and we can go back and look at it if you want me to, that an insured is only entitled to be reimbursed for extra living expenses if there is an increase in his or her normal living expenses due to the loss?

MR. DAUPHIN: Alycen, I don't think he's required in examination under oath to interpret the

policy. I'll let him answer the question, but that's not the purpose of the examination.

BY MS. MOSS:

Q Let's go back to the policy that's behind tab 1, page B6. Are you there?

A Almost. B6?

Q B as in boy.

A Yes, I'm there.

Q All right. Looking at that provision, do you agree with me that an insured is only entitled to be reimbursed for extra living expenses if there is a reasonable increase in normal living expenses that's necessary to maintain your household's usual standard of living?

MR. DAUPHIN: I object. He doesn't have to interpret the policy. Let's move on.

MS. MOSS: He can read the policy. That's all I'm doing.

MR. DAUPHIN: Well, you need to show him the language you're looking at.

BY MS. MOSS:

Q Do you see that language, Charles?

A So if a covered loss makes your house or other permanent -- is that the language --

Q Yes.

A -- we cover the reasonable increase in your normal living expenses --
Q Yes.
A -- that is necessary to maintain -- yes, okay, so I see the language.
Q Reading from there -- reading from there, let me ask you the question again. And you're welcome to follow along with me in the policy language. Do you agree with me that under the terms of the policy, an insured is only entitled to be reimbursed for extra living expenses that are a reasonable increase in your normal living expenses that are necessary to maintain your household's usual standard of living?
A Yes.
Q Do you understand that the policy does not pay for just a regular living expense that you would have paid on a normal, everyday basis?
A Give me an example of that because I'm not sure.
Q Well, if you went out and got a Starbucks coffee every single day for the last five years, that would be a normal living expense for you, so it would not be something that is additional or extra to your living expenses that you're incurring as a

result of the fire.
A Right.
Q Or as another example, if you are paying for a water bill over on Dell Road, and you are paying for a water bill over on Wimbleton, then that water bill at Wimbleton would be an extra living expense, right?
A Yes.
Q On the flip side of that, if for whatever reason you had your water cut off at Dell Road, and you are not paying any water at Dell Road, but you were paying for water over at Wimbleton, that would not be an additional living expense because you're typically paying for water, and you aren't paying for water for your Dell Road house.
A Okay. Okay, yes. Yes.
Q And the policy also pays for the reasonable amount of time required to restore your house or other permanent structure to a habitable condition, right?
A Correct.
Q What do you think is a reasonable amount of time to restore the house to a habitable condition?
A Well, every case is different. I know

we've been -- since -- my primary goal has been to get my family back into the house, and I've been trying to accomplish that, and -- so it's going to take a little under two years. You know, with the size and scope of the house that we originally lived in that we have to rebuild, you know, that seems reasonable.

Q Prior to the fire, what would you estimate your normal monthly living expenses are or were?

A I don't know. That number can include many different things. I don't know -- we did not budget closely enough to know the exact amount of money that was coming in and going out exactly, and if we did, I don't recall it.

Q Do you have any idea what the difference in monthly expenses is after the fire?

A No.

Q Are they more or are they less?

A Well, it's been -- it depends because initially we had to buy a bunch of stuff that was destroyed in the fire, so they probably were more. It's more settled down now, but, again, I don't have hard numbers. I don't know exactly what we're paying in terms of monthly living expenses. I don't know what our August monthly living expenses were.

Q I think Ali told me that you guys had previously rented a house on Berwick Road prior to the fire.

A Yes.

Q Did you live with her in that house or no?

A Yes.

Q Okay. Did you guys do any work prior to moving into that house?

A I don't recall. I don't know.

Q How long did you live there?

A I don't know exact time. We were finishing up a renovation, so I don't know exact time. Six months would be my guess.

Q Did you have to replace the stove or oven or anything like that in that house?

A Sorry, I could not hear you. I'm not sure what happened. Can't hear you.

Q Did you replace any toilets or the stove or an oven in that house?

A I don't recall.

Q Did you paint or do any kind of work to that house?

A I don't know.

Q Do you know if that house had any kind of custom window treatments, light fixtures, anything

like that?

A I don't know.

Q I'm going to go back to the notebook. If you'll turn to tab 8.

A Okay.

Q Is this the lease agreement for the house that you moved in on Fairway Drive?

A Yes.

Q Is that your signature on page 3?

A Yes.

Q And this lease agreement is from December 1st, 2019, through May 31, 2020, correct?

A Yes.

Q So it's just a six-month lease, right?

A Correct.

Q And I believe you said earlier that you guys did not plan to stay in this house for a very long time.

A Correct.

Q It was just a very short-term rental, correct?

A Yes.

Q Turn to tab 9 for me. This is the lease agreement for a Wimbleton home; is that right?

A Yes.

Q This is rented from January 15th, 2020, through January 14 of 2021, correct?
A Yes.
Q If you'll turn to section 16 of the lease agreement.
A Okay.
Q This section talks about remodeling. It says that the tenants are allowed to remodel the house with prior consent by the landlord. The default is that all remodeling expenses are to be borne by the tenant, as rent is paid for the condition in which the tenant first moved in. Landlord is open to discussion but under no obligation to remodel or allow remodeling.
Do you see that?
A Yes.
Q And is it your understanding that it was your responsibility to pay for any remodeling in the house that Chuck owned on Wimbleton?
A I don't know. I don't know specifically what happen -- I'm thinking -- what was the question again? Can you hear me?
Q Yeah, I can hear you. Is it your understanding that it was your responsibility as the tenant to pay for any remodeling in the house that

Chuck owned on Wimbleton?
A Yes.
Q And are you paying Chuck every month?
A Yes. The rent I assume you mean. Yes.
Q The rent, yeah.
A Yes.
Q And is Chuck or his law partner wife, Diane, reimbursing you guys in any way?
A No.
Q And Chubb has already paid you guys the rental payments on this house, right?
A What do you mean paid us the rental payments?
Q They've already paid you -- you've already been reimbursed for rental payments through January 2021, correct?
A Yes. I'm sorry, I thought you said Chuck. No, Chubb, yes. I believe that's right.
Q If you'll turn over to tab 10 for me. These are some receipts that relate to some window treatments and hardware that was purchased for use at Fairway Drive. Do you know anything about this?
A No. Very little.
Q Okay. And some of this you may not know about, and if you don't know, just tell me that and

we'll keep moving. We're starting to get into more of the house-type stuff that I think Ali may have been more involved in.

My question for you about the window treatments and the hardware is why would you guys be putting in custom window treatments and hardware in a house that you knew you were only living in for a very short period of time?

A I don't know. I have very little to do with that. I had nothing to do with it. I don't know.

Q Does that make sense to you to invest that kind of money in a rental home that you're going to be in for a short period of time?

A You know, I don't really recall I guess -- I assume these are curtains. I don't really recall why we purchased curtains for the rental house. I don't know if they moved with us to Wimbleton. I had very little to do with this decision.

Q Turn to tab 11, please. I understand that these are TVs that you guys bought then had installed over at the Fairway Drive home; is that right?

A Yes.

Q Why were you having TVs installed at a

rental home that you knew was a short-term rental?
A I think install means connected it to the Charter network and putting it on a piece of furniture, and then TVs were replacing TVs that were destroyed by the fire.
Q And are those TVs that will be used in the house once you're back in it?
A Yes.
Q Which TVs do these replace?
A I don't know.
Q It looks like it's a 55-inch, a 55-inch and a 49-inch?
A Yes.
Q How many TVs do you guys have in your house?
A In the Dell Road house?
Q The Dell Road house.
A I believe six.
Q Do you have TVs in each bedroom?
A We have a TV in the master bedroom, and there was a TV in -- the guest bedroom had a TV. The children's bedrooms did not have TV.
Q Master bedroom had a TV, guest bedroom had a TV, what other rooms?
A There was a playroom that had a TV, the

living room, and the kitchen.
Q That's five, I think.
A Trying to recollect.
MR. DAUPHIN: If you don't know...
THE WITNESS: I don't know. I guess there was five that I recall. Yeah.
BY MS. MOSS:
Q Okay. So of those five to six TVs at Dell Road, these three that are listed here on the HD Innovations invoice that's behind tab 11 will replace three of those TVs at Dell Road?
A Yes, assuming -- yes.
MR. DAUPHIN: Assuming what?
BY MS. MOSS:
Q And were these three -- were these three TVs moved over to Wimbleton Road with you guys?
A Yes. Yeah, assuming they're in good condition when we move back into Dell Road.
Q Why would they not be in good condition?
A You never know what can happen in a year.
Q Okay. Turn over, if you will, to tab 12, please. This is an invoice from TCC for $14,100 to paint the rental house over at Fairway Drive. You see that?
A Yes.

Q Why would you guys be spending $14,000 to paint a house that you were only going to live in for a short period of time, less than six months?
A Well, again, this was not -- I don't know. It's not something I was particularly involved with.
MR. DAUPHIN: If you don't know or don't recall, don't guess. If you know, tell her. If you don't know, you don't know.
THE WITNESS: I don't know. There was a chance that we could live there longer than six months. But, yeah -- sorry, go ahead.
BY MS. MOSS:
Q I was just going to say do you think that that sounds like a reasonable expense to spend $14,000 to paint a rental house that was a short-term rental?
A I don't know. That's not my -- at the time, yes.
Q Why was that?
A I mean, it depends on what your definition of reasonable is, you know.
Q What's your definition of reasonable?
A I don't know. Maintaining the usual standard of living I think is the language in the contract in the policy.

MR. DAUPHIN: Alycen, when you get to a stopping point --

BY MS. MOSS:

Q Turn over to tab 14 for me. This is -- these are some invoices from Valet Moving, multiple invoices.

MR. DAUPHIN: Just a minute. Whenever you get to a stopping point, we need to take a break and/or discuss whether we need to go to lunch.

MS. MOSS: Okay.

MR. DAUPHIN: Go ahead.

BY MS. MOSS:

Q Do you know anything about what's being stored at Valet Moving or anything about the invoices that are listed here behind tab 13?

A I know Valet Moving is our moving company, and they also have storage lockers that items from the Dell Road house are in. Specifically, I don't know in great detail what's in there in the storage unit.

Q Okay. All right.

MS. MOSS: You want to take a break for a second, and we can talk about what's left?

(Recess 12:58-1:09 p.m.)

BY MS. MOSS:

Q I'll remind you that you're still under oath.
A Yes.
Q Turn over to tab 14, please. This is an invoice to install security system over at Wimbleton Drive; is that right?
A Yes.
Q Okay. And did you guys have a security system installed over at Wimbleton Drive?
A Sorry, the receipt confused me because Safe Haven is not a company I recognize, but yes, we --
Q Do you know anything about Safe Haven or this receipt for the security system on tab number 14?
A ADT is our security company.
Q Do you know anything about this receipt from Safe Haven?
A No.
Q It looks like this was paid for with an American Express ending in 5004. Is that one of yours or Ali's cards?
A Yes, that's my credit card.
Q So looks like you paid for the security system, right?

A Yes.
Q Why did you guys install a security system over at Wimbleton?
A We've always had an alarm. Same reasons everybody installs a security system.
Q Did you ask Chuck as your landlord to pay to have the alarm installed or upgraded, whichever it would have been?
A I don't know. I did not personally.
Q And you agree that the alarm system is a fixture that will stay at the house, right?
A Yes. I don't know. They may deactivate it when we leave. I don't know. We will install a safety system at Dell Road.
Q Do you think that this is an extra living expense under the terms of the policy?
A I don't know.
Q Okay. Turn to tab 15 for me. This is an invoice from Greenlight Electric. Do you know what this is?
A No.
Q All right. Turn to tab 16 for me. These are some invoices from Birmingham Water Works for your water bill.
A Okay.

Q Do you still have the water on over at Dell Road?

A I don't know.

Q What was your typical water bill at Dell Road prior to the fire?

A I have no idea.

MS. MOSS: Chuck, I think that you and Ali said you were going to send three months prior of utilities bills, but I have not gotten that. Are you still planning to send?

MR. DAUPHIN: I think those were on the Dropbox link that we provided to you, but I will verify. If they weren't in the Dropbox link, we'll certainly give them to you.

MS. MOSS: All I have water bill-wise is what's behind this tab number 16 that starts at -- the first one is December 2nd, 2019.

MR. DAUPHIN: I'll check on the Dropbox link because I think it was there, but we'll resolve that issue one way or the other.

BY MS. MOSS:

Q Charles, turn to tab 17, please.

A Yes.

Q These are some cable bills from Spectrum Cable that were submitted to us. Do you see that?

A Yes.
Q And are you guys still paying for cable over at Dell Road?
A No.
Q Is the bill that you are paying now over at Wimbleton the same or less than the bill that you paid when you were at Dell Road?
A I don't know.
Q Okay. Turn to tab 18, please. This is -- these are some bills from Mr. Bugg's Pest Patrol. I believe Ali told me that you guys are not paying for this anymore over at Dell Road, right?
A Yes.
Q Yes, that's correct?
A Yes, that's correct.
Q Are you paying for pest control over at Wimbleton?
A Yes.
Q And these are the bills from pest control at Wimbleton, then looks like there might be one for Fairway Drive as well?
A Yes.
Q Turn over to tab 19. These are some bills from Alabama Power. Do you see that?
A Yes.

Q Are you still paying for power at Dell Road?
A Yes.
Q What was your typical power bill over at Dell Road prior to the fire?
A No idea.
Q Do you know if your bill now is about the same, more or less than it was when you were over at Dell Road?
A I don't know.
Q Tab number 20. This is an ADT bill for the cancellation of the security system over at Dell Road; is that right?
A I don't know what it's for.
Q Okay. I think Ali told me it was for cancellation of the security system, and it's been paid by Chubb.
A Okay.
Q So we can keep on moving unless you have anything different or separate to add to that.
A No.
Q The next tab is tab number 21. These are gas bills from before the fire. Do you see that?
A Yes.
Q And I understand that you guys are not --

let me ask it this way: Are you still paying for gas over at Dell Road?

A I don't know.

Q Ali says no.

A Okay. I believe they shut the gas off at the time of the fire and probably have not turned it back on.

Q Okay. So you don't have any reason to dispute that or say anything different, right?

A No.

Q Turn over to tab 22, please. These are some invoices that relate to your service and landscaping. Who deals with landscape and that sort of thing in the house, you or Ali?

A Primarily Ali.

Q So she would have -- flip through these invoices and tell me if you know anything about what these are for.

A I mean, other than -- I know Blackjack did work at the Dell Road house after the fire to try and keep the yard sustainable, but that's -- that's about all I know. And they were who we were using before the fire as well.

Q Are they still doing work over at Dell Road to keep the yard in order?

A Blackjack is not. We've terminated them and hired a new person.
Q Did you hire Lopez Landscaping?
A Yes.
Q Are they doing the landscaping over at Dell Road now?
A Yes.
Q And how much are you paying them to do that?
A I don't know.
Q And are you also paying for landscaping over at Wimbleton?
A Yes.
Q Okay. Turn to tab number 23, please.
A Okay.
Q These are some invoices from Iris & Company related to blackout shades, rugs, and some labor. Do you have any knowledge about these invoices behind this tab?
A No.
Q And you would just rely on Ali with respect to information about this?
A Yeah. I'm sure she told me she was doing this, but that's the extent of my knowledge.
Q Okay. As far as additional landscaping

that is needed over at Dell Road as a result of the fire, do you understand that TCC included a line item of $50,000 plus their 20 percent overhead and profit for those landscaping costs?

A That is for -- that's not upkeep. That is part of the rebuilding project.

Q And what exactly are they doing?

A I don't think that's been determined. I don't know.

Q So at this point we don't know if it's going to be $50,000 worth of additional landscaping cost or zero, right?

A We don't know the exact dollar amount.

Q And some -- how much of the landscape is intact still over there?

A Not much. When we moved in we planted trees and bushes, et cetera, and they pretty much have not survived, but I don't know exactly. Not a horticulturalist.

Q Do you know why they wouldn't have survived? Did it have anything to do with the fire or there's some other issue?

A The fire damaged some of it. I don't know -- I think the -- I don't know exactly. I know that when we moved in the landscaping cost was more

than $50,000, and that's -- that's all -- that's all I know.

Q But there is some landscaping that is fine?

A Not -- I mean, not really. We still have a year of construction where it's a job site, but most of the plants are not going to survive or have died.

Q Okay. Turn to tab 24, please.

A Okay.

Q This is a spreadsheet that Ali prepared --

A Yes.

Q -- relating to the contents on the house. Do you have any kind of knowledge about this spreadsheet?

A No. I mean, very, very little.

Q Tell me what you do know about it, I guess.

A I know Ali worked hard on it and collected information needed to document our contents loss.

Q Do you have any idea where the original cost numbers came from?

A From what I've heard it's what Iris -- from the bills that we paid Iris.

Q Do you know if there's any sort of backup

documentation from Iris or anybody else showing the actual cost of the items?
A I don't know.
Q What about the replacement cost that's listed on here, do you know where that number came from?
A Are you looking at a specific example or just in general?
Q Just in general.
A No. That's separate --
Q That's separate from what?
A Of Ali and Iris.
Q Do you know if you guys have any documentation to support the replacement cost?
A I believe we've submitted documentation to support, but I don't know.
Q Are there any specific invoices that you have to support the replacement costs that are listed on here?
A I have no idea. I don't know.
Q After Ali's examination under oath, Chuck submitted an affidavit to me from Iris. Have you seen a copy of that affidavit?
A Yes.
Q Okay. And how have you had an opportunity

Page 74

to see that?
A We have a notary in our office, and so Iris had came here and signed it in front of the notary, and I was here and introduced the two of them and at that time saw the document.
Q So you've read through the document?
A Yes. Yes.
Q It says: This affidavit confirms the effort I undertook at Ali's request as set forth in my letter of to her. I think that's maybe a typo.
And then she goes on to say: The prices provided Ali and included by Ali in her contents spreadsheet are the prices Iris & Co. would charge for each item it listed. The prices and related costs given Ali are the replacement cost for the items listed.
Do you have any idea what that means?
A I don't have the document in front of me, so without that, I don't know. I don't want to say exactly what it means.
MS. MOSS: Chuck, do you have a copy of that affidavit from Iris to show him?
MR. DAUPHIN: No, I don't have one with me.
BY MS. MOSS:

Q Let me ask you this: I asked Ali and Chuck to provide a copy of any kind of invoices or backup documentation regarding the original cost, as well as the replacement cost of the contents items. I have not received anything other than the affidavit from Iris. Is anything else being submitted or is this affidavit all that is being submitted?

A I don't know.

MS. MOSS: Chuck, do you know? Are you guys submitting anything else or is this it?

MR. DAUPHIN: You asking me?

THE WITNESS: I think she was.

MS. MOSS: Yeah, I just said the last time we talked about you guys providing some backup documentation on the original cost and replacement cost, and you sent the affidavit of Iris, but I'm not sure I totally even understand what she's saying. But putting that aside, are you planning to provide any other backup documentation on the contents items or is this it?

MR. DAUPHIN: I think that's it. I've got a letter coming to you probably tomorrow that explains that.

MS. MOSS: Explains the affidavit?

MR. DAUPHIN: No, explains that you -- well, the letter says we've made a more than reasonable effort to produce something, and to the extent that you say that's not sufficient, asks you to tell us -- not you but Chubb and Pacific want. So I'll get that letter to you tomorrow. I haven't finished it.

MS. MOSS: Okay.

BY MS. MOSS:

Q Going back to tab number 24, Charles, is there anything in particular on this spreadsheet that you know about or you can speak to?

A No.

Q All right. Let's turn to tab number 25, which is a letter from Iris. I'm assuming you don't know anything about this letter; is that correct?

A Yeah, this is the first I'm reading that letter.

Q Turn over to tab 26, if you will, please. These are some invoices from Iris & Company. Do you have any specific knowledge about these invoices?

A No.

Q Turn to tab 27, please. This is a letter from Magali Somers Maus. Do you know who that is?

A Yes.

Q Who is that?
A She is a local woman who periodically would come to our house to improve the antique furniture that we have. I think she preserves and improves antique furniture or antique items.
Q All right. So do you know anything about these two letters that are behind tab 27 here?
A No.
Q Okay. Let's move on to tab 28. These are some invoices from Turkish Carpets -- or one invoice, I should say, from Turkish Carpets. Do you know anything about this invoice?
A No.
Q Tab 29 contains some canceled checks written to Dustin Cox. Do you know who that is?
A I do not know who that is.
Q Tab 30 is an invoice from Iris & Co. Do you know anything about this invoice? Actually, there's multiple invoices looks like behind this tab. Do you know anything about those invoices?
A No, I do not.
Q Same question for tab number 31, do you know anything about the information behind tab 31?
A No.
Q Same for 32, do you know anything about

the documentation behind tab 32?
A No.
Q Turn over to tab 33. Do you know anything about this invoice from Iris & Co. that's behind tab 33?
A That's the sofa and chairs we have in our rental house.
Q That's over at Wimbleton Drive?
A Yes.
Q Are you guys planning to use the sofa and chairs when you move back into Dell Road?
A I don't know.
Q Turn to tab 34 for me.
A Okay.
Q This has photos of several rugs. Do you know anything about these rugs?
A No.
Q Do you know who Paige Albright is?
A I know she is -- owns a local rug company, furniture company.
Q Turn to page -- excuse me. Turn to tab 35. These are some -- this is an additional invoice from Magali Somers Maus -- Somers Maus. Do you know anything about this invoice?
A No.

Q Turn over to tab 36.
A Uh-huh.
Q Do you know anything about this spreadsheet?
A Not -- no.
Q Turn to tab 37, please. Do you see this is a collection of letters from Chubb to you and Ali with the -- memorializing the amount of the checks you were sent?
A Yes.
Q Do you agree that Pacific has paid $2,016,883.15 in total on this claim?
A I don't know the exact number.
Q And do you know or understand that Pacific has made payments totaling $1,438,806.50 on the dwelling?
A I don't know. I know there's a check for 1.4 million, and that's all I'm aware of or all I know.
Q And are you aware of or do you recall that Pacific has made payments totaling $298,642.16 on your contents either directly to you and Ali or to vendors?
A I don't know specifically what payments have been made.

Q Do you have any reason to dispute that any of these payments have been made that I've been talking about?
A I have not looked at them. I have no reason to dispute or accept them. I'm not sure. I don't know.
Q Do you understand and agree that a payment totaling $15,000 was made to Cliff Zlotnik under the dwelling mold coverage?
A Yes.
Q And do you understand and agree that payments totaling $147,633.68 were made under the debris removal feature of the policy?
A I was not aware of that, but -- I'm looking for it. I don't know, I'm not aware of it, but it doesn't...
Q Last one, do you understand and agree that payments totaling $116,800.81 were made for additional living expenses under the policy?
A I don't know the -- I don't know the exact dollar amount.
Q Turn over to tab 38, please.
A Okay.
Q This is a spreadsheet, I believe, that was prepared by Ali that relates to items that can be

picked up that are in storage. Do you know anything about these items?

A No. I know we have items that are in a storage facility that are owned -- that belong to Chubb, but I don't know specifically exactly what is in there.

Q Last one, tab 39. This is a sworn statement and proof of loss. Do you see that?

A Yes.

Q Is that your signature at the bottom?

A Yes.

Q And you guys did not complete number 1, 5, 7 or 8. Why is that?

A I think at the time we had not known the amounts.

Q And number 8 in particular asks the net amount claimed under the above-numbered policy, and it says unknown at this time, correct?

A Correct.

Q And is that because you do not know the amount of your loss?

A Correct. At the time -- yes, at the time we signed this, that was the case.

Q Okay. I think I'm finished. Let me just look through my outline quickly.

Other than the conversation you've told me earlier with Jeremy Elliott, is there anybody else from Chubb you have talked to about this claim?

A I don't think -- I may have spoken with Wally, but I don't think so.

Q How do you know that name?

A At one point during this process he was working with Chuck and Ali. I think he encouraged us to submit a global settlement offer.

Q All right. Charles, I've asked you a number of questions today over the course of this examination. Is there anything else you would like to add?

A No.

Q Then that will conclude your examination under oath. Thank you so much for coming in and doing this, and I will reserve my right to continue the EUO if necessary.

A Okay.

Q Thank you.

MR. DAUPHIN: As I understand the process, I'm not entitled to ask any questions to clear up any issues unless you want me to.

MS. MOSS: No, I don't think you need to ask questions. If there are issues that are

confusing --

MR. DAUPHIN: That's why I'm asking. I would like her to note that you've got a live feed of his answers, just for the record, and that you've had them throughout the deposition. Or examination.

MS. MOSS: I don't know why that's -- you're noting it. I have real-time at every deposition that I do or examination under oath.

MR. DAUPHIN: I'm just making the notation, so -- all right. Y'all have a great day.

MS. MOSS: Have you ever used it before? It's awesome. You'll be addicted.

MR. DAUPHIN: Yeah, I've used it once or twice.

MS. MOSS: It's great. I use it always. So, yeah, that'll --

MR. DAUPHIN: I wasn't afforded that opportunity, though, and at a deposition I would have been. That's all.

MS. MOSS: Okay. We'll conclude the deposition, but don't hang up yet, Chuck.

MR. DAUPHIN: All right.

(Examination concluded at 1:47 p.m.)

CERTIFICATE

STATE OF GEORGIA:
COUNTY OF FULTON:

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the colloquies, questions and answers were reduced to typewriting under my direction; that the transcript is a true and correct record of the evidence given upon said proceeding.

I further certify that I am not a relative or employee or attorney of any party, nor am I financially interested in the outcome of this action.

I have no relationship of interest in this matter which would disqualify me from maintaining my obligation of impartiality in compliance with the Code of Professional Ethics.

I have no direct contract with any party in this action and my compensation is based solely on the terms of my subcontractor agreement.

Nothing in the arrangements made for this proceeding impacts my absolute commitment to serve all parties as an impartial officer of the court.

This the 16th day of September, 2020.



ROBYN BOSWORTH, RPR, CRR, CRC, CCR-B-2138

**&**

**&** 2:4 44:3 70:16 74:13 76:20 77:17 78:4

**0**

**040519056755-...** 1:5 3:4

**1**

**1** 17:2 51:5 81:12
**1,438,806.50** 79:15
**1,879,262.79** 34:21
**1.4** 79:18
**1.8** 35:6,7 46:4
**10** 11:20 12:18 58:19
**10:15** 15:6
**11** 59:20 61:10
**116,800.81** 80:18
**11:00** 1:13
**12** 61:21
**1230** 2:13
**12:01-12:09** 35:22
**12:58-1:09** 63:24
**13** 7:25 63:15
**13609** 84:18
**14** 57:2 63:4 64:4 64:15
**14,000** 62:1,15
**14,100** 61:22
**147,633.68** 80:12
**14945478-01** 1:4 3:5
**15** 65:18
**15,000** 47:25 48:8 80:8
**15th** 57:1
**16** 57:4 65:22 66:16
**16th** 84:15
**17** 66:22
**17th** 12:22
**18** 67:9
**18th** 12:22 14:20 18:3
**19** 67:23
**1976** 5:10
**1998** 14:3
**1:47** 83:23
**1st** 25:14 56:12

**2**

**2** 1:12 33:25 34:9 34:12 35:13 44:24 45:3,18,20 46:1,3 46:3,7
**2,016,883.15** 79:12
**20** 12:7 13:22 30:8 68:11 71:3
**20,338** 48:4
**2012** 7:25
**2013** 7:25
**2017** 13:2
**2019** 12:21 14:20 18:3 25:14 56:12 66:17
**2020** 1:12 25:14 44:1 56:12 57:1 84:15
**2021** 32:22 57:2 58:16
**21** 68:22
**2138** 1:15 84:19
**22** 69:11
**23** 70:14
**24** 72:9 76:10
**25** 30:8 76:14
**26** 5:10 76:19
**27** 76:23 77:7
**28** 77:9
**29** 77:14
**298,642.16** 79:21
**2nd** 66:17

**3**

**3** 36:1 56:9
**30** 77:17
**300** 2:5
**30309** 2:15
**31** 25:14 44:1 56:12 77:22,23
**32** 77:25 78:1
**33** 78:3,5
**3305** 5:21
**34** 78:13
**3400** 2:6
**35** 78:22
**35216** 2:7
**35223** 5:13,21
**36** 79:1
**37** 79:6
**3770** 5:12
**38** 80:22
**3800** 9:13
**39** 81:7

**4**

**4** 36:8,10,24
**40** 20:5
**400** 2:14
**46,981.56** 45:10
**49** 60:12

**5**

**5** 10:22 13:20 15:13 43:24 81:12
**50,000** 71:3,11 72:1
**5004** 64:21
**55** 60:11,11
**56,000** 45:12

**6**

**6** 15:13 46:16

**7**

**7** 47:6 81:13

**8**

**8** 56:4 81:13,16
**80** 13:21

**9**

**9** 56:23
**90** 11:23

**a**

**a.m.** 1:13
**absolute** 84:13
**accept** 41:23,25 80:5
**accomplish** 54:3
**achieved** 6:16
**action** 84:8,11
**actions** 23:5
**actual** 73:2
**add** 12:12 68:20 82:13
**addicted** 83:12
**addition** 11:3,4
**additional** 29:23 30:5,18 45:11 52:24 53:13 70:25 71:11 78:22 80:19
**address** 5:11,20 33:6
**adjusting** 20:11
**adt** 64:16 68:11
**affidavit** 73:22,23 74:8,22 75:6,7,17 75:25
**afforded** 83:17
**agency** 11:7
**agent** 26:5

**agree** 46:20,24 50:18 51:10 52:9 65:10 79:11 80:7 80:11,17
**agreeing** 40:5
**agreement** 5:5 25:13 48:7 56:6 56:11,24 57:5 84:12
**ahead** 5:2 8:2 22:21 40:17 41:19 42:1 45:14 46:10 46:12 62:11 63:11
**alabama** 1:14 2:7 5:13,21 6:18,19 8:7 11:9,9 13:21 67:24
**alarm** 65:4,7,10
**albright** 78:18
**alexandra** 6:3 32:8
**ali** 14:25 17:20 20:18 26:4 27:1,9 28:9,11 29:10 40:2 41:14,21 44:13 45:25 47:20 55:1 59:2 66:7 67:11 68:15 69:4 69:14,15 70:21 72:11,19 73:12 74:12,12,15 75:1 79:7,22 80:25 82:8
**ali's** 39:4 40:12 64:22 73:21 74:9
**allow** 57:14
**allowed** 15:12 57:8
**alongside** 11:19
**alternative** 29:22
**alycen** 2:10 10:4 12:1 21:7 35:15 39:4,18 40:6 41:9 42:8 50:24 63:1
**american** 64:21
**amount** 16:11 22:13 44:7 46:7 47:4 53:18,22 54:12 71:13 79:8 80:21 81:17,21
**amounts** 81:15
**anguish** 21:9
**answer** 4:13,16,23 21:18,19,21 22:14 22:15,19 46:9 51:1
**answered** 5:2 10:17
**answers** 6:9 83:4 84:5
**antique** 77:3,5,5
**anybody** 17:9 19:2 73:1 82:2
**anymore** 67:12
**anyway** 40:12,16 48:20
**apartments** 28:21
**appear** 17:5 24:17
**appearances** 2:1
**approved** 47:25
**approximate** 35:14
**approximately** 32:20 35:12
**area** 15:22 16:17 23:8,10 26:24 27:4,6
**areas** 49:20
**argue** 39:19 41:4
**arisen** 33:5
**arrangements** 84:12
**arrested** 6:25
**art** 20:5
**aside** 75:19
**asked** 6:11 10:16 28:22 45:16 75:1 82:10
**asking** 10:10,11 46:1 75:12 83:2
**asks** 76:4 81:16
**associates** 44:3
**assume** 4:24 16:6 29:13 40:7 58:4 59:16
**assuming** 4:25 29:15 38:1 61:12 61:13,17 76:15
**assure** 45:25
**atlanta** 2:15
**attendance** 4:1
**attorney** 84:7
**audiovisual** 13:10 13:15
**august** 54:25
**available** 17:9,10 18:1 19:3
**aware** 18:23 79:18 79:20 80:14,15
**awesome** 83:12

**b**

**b** 1:15 30:14 51:7 84:19
**b5** 30:14,16,18
**b6** 51:5,6
**back** 15:13,16 17:24 18:1 20:7,8 22:17 23:20 26:12 28:22,25 37:16,17 42:12 48:15,16 50:20 51:4 54:2 56:3 60:7 61:18 69:7 76:10 78:11
**background** 10:6 12:6
**backup** 72:25 75:3 75:15,20
**based** 6:8 31:6 50:19 84:11
**basic** 19:21
**basis** 52:18
**bathroom** 25:4 27:6,10 28:8 44:10
**bathrooms** 26:22 27:3,8,22 28:1,2
**baths** 25:22
**beams** 43:20,21
**bed** 13:7
**bedroom** 23:8 43:6 60:19,20,21 60:23,23
**bedrooms** 25:22 60:22
**began** 33:21
**behalf** 2:2,9
**believe** 19:4 24:12 29:21,22 31:6 48:6,9,12 56:16 58:18 60:18 67:11 69:5 73:15 80:24
**belong** 81:4
**berwick** 55:2
**best** 8:19 37:20
**beverly** 18:15
**beyond** 43:7
**bid** 46:17
**big** 25:20
**bill** 48:3 53:4,5,6 65:24 66:4,15 67:5,6 68:4,7,11

**bills** 66:9,24 67:10 67:19,23 68:23 72:24
**birmingham** 1:14 5:13,21 6:19 9:15 9:16 47:15 65:23
**birth** 5:9
**bit** 6:8 12:12 27:19 33:23
**blackjack** 69:19 70:1
**blackout** 70:17
**books** 15:23
**borne** 57:11
**bosworth** 1:15 4:9 84:19
**bottom** 30:17 50:4 81:10
**bought** 26:9 29:11 59:21
**boy** 30:15 51:7
**break** 35:17,18,21 63:8,22
**broke** 8:4 13:1
**brookstone** 50:6
**brothers** 7:16
**budget** 48:24,25 49:5 54:12
**budgeted** 49:7
**bugg's** 67:10
**build** 32:25 35:10 37:14
**builders** 37:4,6,7
**building** 12:24
**built** 12:20 34:7 48:17
**bulb** 15:21
**bunch** 54:20
**burnt** 43:6
**bushes** 71:17
**business** 6:18 7:17 7:21 9:3
**businesses** 9:24 10:1,10,12,17,19 10:23 11:1,5,12
**buy** 26:3 54:20
**buying** 30:1 31:7

**c**

**cabinetry** 42:25 43:1,3,4,5,7,9
**cabinets** 43:8
**cable** 66:24,25 67:2
**called** 13:17 14:25 30:9
**calls** 15:3
**camping** 11:10
**canceled** 77:14
**cancellation** 68:12 68:16
**capital** 7:9 11:20
**caption** 84:4
**card** 64:23
**cards** 64:22
**carpeting** 27:5
**carpets** 77:10,11
**case** 4:2 10:8 53:25 81:23
**cases** 10:22
**caught** 15:25
**cause** 50:7
**ccr** 1:15 84:19
**certain** 38:6 42:17
**certainly** 22:1 39:20 66:14
**certificate** 84:1
**certify** 84:4,7
**cetera** 71:17
**chairs** 78:6,11
**chance** 3:18 62:10
**change** 44:20 49:3
**changed** 11:17 34:23 35:2,4
**changes** 44:18
**chaotic** 19:20
**charge** 74:13
**charles** 1:10 2:3 3:2,7,14 22:21 35:24 41:13 46:9 51:22 66:22 76:10 82:10
**charter** 60:3
**chasing** 43:17
**check** 66:18 79:17
**checks** 77:14 79:8
**children** 6:12
**children's** 43:6 60:22
**christmastime** 13:2
**chubb** 18:23 19:2 19:7 22:12,23 23:4,5 24:4 29:21 29:25 33:15 35:7 50:14 58:10,18 68:17 76:5 79:7 81:5 82:3
**chuck** 5:15 9:17 17:20 21:17 22:7 26:2,9 27:17 28:22 42:22 57:19 58:1,3,7,17 65:6 66:7 73:21 74:21 75:2,10 82:8 83:21
**circle** 37:16
**circumstances** 3:20 49:2
**claim** 1:5 3:3,20 3:24 5:17 10:5,8 12:3 14:18 16:17 17:16 18:1,2,8,13 19:2 20:11 21:2,8 21:10,12,16,23 22:1,13,17 23:23 33:19,21 45:5 79:12 82:3
**claimed** 81:17
**claiming** 21:9
**claims** 20:17,21 22:2
**cleaning** 15:19
**clear** 4:18 27:19 82:22
**clerked** 8:7
**clerking** 8:15
**cliff** 47:7,8 48:1,3 80:8
**close** 16:23 26:7
**closely** 54:12
**closet** 43:9
**clothing** 11:10
**coaching** 41:21 42:3
**code** 84:10
**coffee** 52:22
**collected** 72:19
**collection** 79:7
**college** 11:6 13:24 13:25 28:19
**collonade** 9:13
**colloquies** 84:5
**come** 9:8 18:1 19:11 25:24 39:4 77:3
**comes** 15:19 40:12
**comfortable** 48:16
**coming** 8:5 54:13 75:23 82:16
**commercialize** 8:25

**commitment** 84:13
**communication** 39:24
**companies** 7:7 9:1 9:2 10:2 11:16,17 11:24 12:14,15,17 12:18
**company** 2:9 3:3 3:16,22 7:4,5,9,11 12:6 13:17 16:5 21:3 34:6 63:16 64:11,16 70:17 76:20 78:19,20
**company's** 3:18
**compel** 4:1
**compensation** 84:11
**complete** 81:12
**completely** 27:11 34:18 43:19
**compliance** 84:10
**concerned** 50:15
**conclude** 82:15 83:20
**concluded** 83:23
**condition** 25:5 26:16 40:18 53:20 53:24 57:12 61:18 61:19
**conference** 9:18 9:19,20
**confirm** 45:23,25
**confirmed** 45:24
**confirms** 74:8
**confused** 64:10
**confusing** 83:1
**connected** 45:15 45:17 60:2
**consent** 57:9
**considering** 3:23
**construction** 19:9 34:14 50:5 72:6
**consultant** 47:13
**contains** 34:3 77:14
**contending** 35:6
**contents** 13:8 20:3 72:13,20 74:12 75:4,21 79:22
**continue** 82:17
**contract** 3:15 9:3 11:18 35:3 46:14 62:25 84:11
**contractor** 13:11 13:15 34:6,8
**contractors** 33:5 34:4 50:6
**control** 67:16,19
**conversation** 18:12 19:1,14,24 49:13 82:1
**copy** 17:5 36:1,1 73:23 74:21 75:2
**correct** 5:18 16:5 24:6 25:15 32:3 38:8,10,17 44:22 47:4,5 48:4,5 53:21 56:12,15,19 56:21 57:2 58:16 67:14,15 76:16 81:18,19,22 84:6
**corrected** 40:23
**cost** 23:11 35:10 37:10,11 45:3 71:12,25 72:22 73:2,4,14 74:15 75:3,4,16,17
**costs** 71:4 73:18 74:15
**couch** 13:7
**counsel** 2:1
**county** 13:21 14:5 14:7 84:2
**couple** 34:3
**course** 17:17 82:11
**court** 4:10 8:8 84:13
**courtroom** 8:17
**cover** 20:1 31:1,17 52:1
**coverage** 17:13,13 17:25 18:19,20 19:3 30:9,21 80:9
**coverages** 17:9,10 17:19
**covered** 20:5 30:24 51:23
**cox** 77:15
**cozen** 2:11
**crc** 1:15 84:19
**credit** 64:23
**crr** 1:15 84:19
**curtain** 15:20,21 15:25
**curtains** 59:16,17
**custom** 55:25 59:6
**cut** 53:10

**d**

**dad** 7:19
**damage** 23:9,11 36:23 37:18 38:17 38:21 42:13,14,15 42:15,25 43:3,4,8 43:21 48:18,18 49:20 50:7,13
**damaged** 38:24 39:2 42:20 50:10 71:23
**date** 5:9
**dated** 44:1
**dates** 26:1
**daughter's** 15:21
**dauphin** 2:3,4 4:25 5:15 10:4,14 12:1,9 14:12 21:7 21:15,20 22:5,9,19 30:10 35:15,19 39:4,7,11,18 40:5 40:10,16,23 41:4,9 41:13,19,23 42:5,8 45:5,8,13,15,24 46:6,10 50:24 51:15,19 61:4,13 62:6 63:1,7,11 66:11,18 74:23 75:12,22 76:1 82:21 83:2,9,13,17 83:22
**day** 14:22 15:12 15:17 18:5 19:5 19:16 52:22 83:10 84:15
**deactivate** 65:12
**deal** 11:16 19:19
**dealing** 18:18
**deals** 69:13
**debris** 80:13
**december** 25:9,14 26:4 56:11 66:17
**decision** 21:23 59:19
**default** 57:10
**definition** 27:14 31:9 62:20,22
**degree** 8:12,18,19
**degrees** 6:17
**delay** 23:3 33:18
**delays** 23:4,25

**dell** 5:21 12:19 13:5,18 14:7,19 16:3 26:12 32:10 32:11 53:4,10,11 53:15 60:16,17 61:8,11,18 63:18 65:14 66:2,4 67:3 67:7,12 68:1,5,9 68:12 69:2,20,24 70:6 71:1 78:11
**deluxe** 30:9
**demanding** 24:21
**demo** 34:10
**demolished** 32:15
**demolishing** 46:21
**department** 15:7 15:11
**depends** 27:13 54:19 62:20
**deposition** 4:4,5 42:9 83:5,8,18,21
**depth** 20:3
**description** 39:24
**design** 13:1
**destroyed** 43:19 54:21 60:5
**detail** 63:19
**details** 25:3
**determine** 22:12 37:1 48:15 49:20 50:9
**determined** 43:18 71:8
**diane** 17:20 58:8
**died** 72:8
**difference** 43:10 54:15
**differences** 36:11 43:11,12,13
**different** 9:17 17:1 23:18 31:16 34:3 36:12 45:1 49:19 53:25 54:11 68:20 69:9
**dining** 25:23
**direct** 12:18 84:11
**direction** 84:5
**directly** 79:22
**disagree** 22:20
**discover** 47:13
**discuss** 21:10 63:9
**discussed** 17:8,18
**discussion** 28:6 29:8 41:6 45:17 45:18 57:13
**dispute** 69:9 80:1 80:5
**disqualify** 84:9
**document** 72:20 74:5,6,18
**documentation** 73:1,14,15 75:3,16 75:20 78:1
**documents** 17:2
**dog** 19:8,10
**doing** 7:20 8:22 19:9 49:17 51:18 69:24 70:5,23 71:7 82:17
**dollar** 71:13 80:21
**dollars** 35:13
**door** 38:22 41:12 42:12
**doors** 36:25 38:5 38:22 39:2 42:12 42:14,17,18,20
**downstairs** 26:23 27:4,6
**draped** 15:22
**drennen** 3:14
**drive** 5:13 15:2 24:8 26:6 56:7 58:22 59:22 61:23 64:6,9 67:21 78:8
**dropbox** 66:12,13 66:18
**drug** 9:2
**due** 11:25 50:23
**duly** 3:8
**dustin** 77:15
**dwelling** 79:16 80:9

**e**

**e** 39:15
**earlier** 33:18 50:18 56:16 82:2
**easier** 4:14
**easy** 17:1
**echo** 22:10
**educational** 6:15 6:22
**effort** 74:9 76:3
**eight** 8:1,3
**either** 79:22
**electric** 65:19
**elliott** 47:24 82:2
**employed** 7:3
**employee** 84:7
**employment** 11:18
**encouraged** 82:8
**ended** 48:19
**entitled** 17:17 22:1 22:16 29:23 50:21 51:10 52:10 82:22
**entitles** 17:16
**entrepreneurs** 9:4
**equipment** 11:10
**equities** 7:8
**esq** 2:3,10
**estate** 26:5
**estimate** 34:10,17 34:20 35:6,8 36:2 45:18 46:5,7 54:8
**estimates** 34:4 36:11
**et** 71:17
**ethics** 84:10
**euo** 39:17 82:18
**euos** 40:9
**everybody** 65:5
**everyday** 52:18
**evidence** 50:12 84:6
**exact** 26:25 31:13 46:13 47:11 54:12 55:11,12 71:13 79:13 80:20
**exactly** 8:21 12:21 18:18 27:16 29:3 40:15 47:23 54:13 54:23 71:7,18,24 74:20 81:5
**examination** 1:9 3:1,10,17,18 4:5 6:7 21:25 39:9 40:18 41:22 42:3 50:25 51:2 73:21 82:12,15 83:5,8,23
**examine** 40:19
**examined** 3:8
**example** 52:19 53:3 73:7
**excuse** 4:4 30:16 78:21
**excused** 40:2
**expect** 48:25
**expense** 50:14 52:17,23 53:7,13 62:14 65:16
**expenses** 29:23 30:5,18,21 31:2,18 47:25 50:17,22,23 51:11,12 52:2,11 52:12,25 54:9,16

54:24,25 57:10 80:19
**experience** 20:23
**expert** 47:12
**expertise** 34:15
**explain** 10:21 12:2 17:10 21:15 22:11
**explained** 19:18 19:25
**explains** 75:24,25 76:1
**explicitly** 24:13
**express** 64:21
**extent** 18:17 28:4 70:24 76:4
**extra** 30:21 50:17 50:21 51:11 52:11 52:24 53:6 65:15

**f**

**facility** 81:4
**fact** 5:1 50:9
**facts** 3:19
**fair** 4:24 16:11
**fairly** 12:10
**fairway** 24:8 56:7 58:22 59:22 61:23 67:21
**fall** 31:8
**family** 7:6,17 9:8 13:20 23:20 25:3 26:23 40:21 54:2
**far** 29:5 33:17 47:17 70:25
**farm** 13:20
**father** 5:15 32:2
**feature** 80:13
**february** 34:22
**fee** 44:24 45:3,11
**feed** 83:3
**feedback** 42:23
**feel** 36:16
**fees** 45:1,6
**feinsome** 11:8
**felt** 22:23 23:19
**field** 8:13,16 50:1 50:3,9,13
**figure** 21:12 27:15
**figured** 23:12
**figuring** 17:15
**filing** 12:3
**final** 46:14
**finalize** 46:6
**financially** 84:8
**find** 16:16 24:10 31:13 39:13
**fine** 37:22 38:12 49:4 72:4
**finish** 4:13
**finished** 12:12,20 12:21 32:19,21 76:7 81:24
**finishing** 55:12
**fire** 14:19 15:1,5,7 15:8,10,18,25 16:9 16:15 18:5,16,21 18:23 19:16 24:11 24:19 30:6 38:19 39:2 42:14 43:8 43:15,16 47:12 48:17 53:1 54:8 54:16,21 55:3 60:5 66:5 68:5,23 69:6,20,23 71:2,21 71:23
**fireplace** 37:21
**first** 3:8 21:2 24:7 26:12 33:6 34:9 34:12,13 57:12 66:17 76:17
**five** 8:11 26:23 35:21 52:22 61:2
61:6,8
**fixture** 32:1 65:11
**fixtures** 31:7 55:25
**flat** 40:1
**flaws** 24:24
**flip** 53:9 69:16
**floor** 15:22
**florida** 11:7 14:1
**follow** 52:8
**follows** 3:9
**footage** 25:21
**foregoing** 84:4
**form** 30:9
**forth** 15:17 22:18 74:9
**forward** 23:23
**found** 20:1 23:10 25:24 26:6
**foundation** 8:10
**four** 7:15
**frame** 26:6
**framing** 23:10
**friend** 24:12
**front** 15:10 16:21 35:3 74:3,18
**frustrated** 21:11
**frustrating** 21:3,6
**frustrations** 21:13 22:3,16
**full** 3:12
**fulton** 84:2
**funds** 12:16
**furnishing** 13:5
**furniture** 60:4 77:4,5 78:20
**further** 84:7

**g**

**garage** 36:25 38:5
**gas** 68:23 69:2,5
**gcs** 37:9
**gears** 32:12
**general** 34:4,6,8 73:8,9
**generally** 36:20
**generator** 37:3 38:14,17
**gentleman** 26:20
**georgia** 2:15 84:2
**getting** 10:5 12:9 42:23
**gillian** 17:23
**give** 4:15 12:16 25:19 48:24 52:19 66:14
**given** 33:4 49:1 74:15 84:6
**gives** 3:16
**giving** 49:24
**global** 45:16 82:9
**go** 4:7 5:2 8:2,20 13:24 15:12 20:3 21:3 22:21 24:14 33:3 37:16 40:17 41:19 42:1 45:14 46:10,12 49:4 50:19 51:4 56:3 62:11 63:9,11
**goal** 23:20 54:1
**goes** 37:3 74:11
**going** 3:23 4:8,11 4:23 6:7 15:16 17:24 21:17,18 22:17,19 29:19,21 33:6 35:15 39:19 42:7 48:19,23 50:16 54:3,13 56:3 59:13 62:2 62:13 66:8 71:11 72:7 76:10

**good** 13:7 26:1,22 35:19 61:17,19
**goodrich** 1:10 3:2 3:7,14,15 5:4 6:3 17:23
**gotten** 66:9
**graduate** 6:17 14:2
**great** 19:19 63:19 83:10,15
**greene** 13:21 14:5 14:7
**greenlight** 65:19
**grid** 4:10
**ground** 4:7 13:1
**guess** 13:2,10 14:6 15:6,20,21 18:25 19:18 21:1,4 26:4 27:14 33:20 37:2 37:20 55:13 59:15 61:5 62:7 72:18
**guest** 60:21,23
**guy** 34:14
**guys** 6:12 9:23 12:24 24:7 25:1 25:13 26:10,25 27:10 28:14 29:4 32:2,8 36:16 37:8 45:2 47:4 55:1,7 56:17 58:8,10 59:5,21 60:14 61:16 62:1 64:8 65:2 67:2,11 68:25 73:13 75:11 75:15 78:10 81:12

**h**

**habitable** 53:19,23
**half** 13:3 26:13 33:1 35:13 45:3 45:20 46:1,3,4,7
**handle** 23:12
**hang** 83:21
**hank** 45:2
**happen** 57:21 61:20
**happened** 14:23 21:5 49:8,24 55:17
**hard** 22:8 54:23 72:19
**hardware** 38:22 42:13 58:21 59:5 59:6
**harwood** 8:8
**haven** 64:11,13,18
**hd** 13:17 61:9
**he'll** 12:12
**head** 4:16
**hear** 18:11 55:16 55:17 57:22,23
**heard** 19:11 20:17 20:20 24:11 72:23
**hearing** 22:8
**held** 36:2,11 43:14
**help** 47:13
**helping** 9:2
**helps** 22:12
**henry** 44:2,3,23
**hey** 44:19
**high** 24:21,23 34:8
**highest** 6:15
**hiking** 11:10
**hills** 2:7
**hire** 70:3
**hired** 47:12 70:2
**hold** 19:8 40:15
**home** 15:3 24:3,10 24:14 27:16 32:2 46:21 56:24 59:13 59:22 60:1
**homeowners** 37:10
**hope** 21:20
**hopefully** 33:8
**hoping** 33:19
**horticulturalist** 71:19
**hour** 35:16
**house** 5:12,14,17 5:20,22 12:19 13:1,5 15:1,4,13 15:17 16:3 18:16 19:10,17 23:21,22 24:20,23 25:2,20 25:25 26:3,9,12,15 26:19 27:5,18 28:11,15,23 29:1 29:16 30:9,25 31:8 32:9,10,11,14 32:17,19,25 33:10 33:11,12,16,17,22 34:7,18 35:1,11 36:16 37:14 44:6 44:19 47:14 48:15 48:16,17,20,23 49:12,16 51:23 53:15,19,23 54:2,5 55:2,5,8,15,19,22 55:24 56:6,17 57:9,19,25 58:11 59:2,7,17 60:7,15 60:16,17 61:23 62:2,15 63:18 65:11 69:14,20 72:13 77:3 78:7
**household** 40:22
**household's** 31:3 31:19,20,24 51:13 52:13
**huh** 4:16,17 79:2
**hundred** 11:19 12:8 22:15
**hvac** 43:10,11,14 43:16
**hygienist** 48:1

**i**

**idea** 37:21 38:4 54:15 66:6 68:6 72:21 73:20 74:17
**ignited** 15:23
**impacts** 84:13
**impartial** 84:13
**impartiality** 84:10
**important** 3:22 4:12,15
**impression** 10:18
**improve** 77:3
**improvements** 28:23 29:1
**improves** 77:5
**inch** 60:11,11,12
**include** 54:10
**included** 71:2 74:12
**increase** 31:1,17 50:22 51:12 52:1 52:12
**increased** 45:21
**incurred** 30:6
**incurring** 52:25
**indemnity** 2:9 3:3 3:16,16 16:4
**independently** 39:20
**indicated** 26:2
**industrial** 47:25
**information** 10:6 19:21 22:12 30:12 70:22 72:20 77:23
**initial** 24:2

**initially** 33:15 54:20
**innovations** 13:17 61:10
**insist** 39:23
**insisted** 23:8
**inspect** 24:14
**inspection** 24:3
**install** 60:2 64:5 65:2,13
**installed** 59:22,25 64:9 65:7
**installs** 65:5
**instruct** 21:18,20
**insurance** 3:15 12:3 20:7 21:2 37:8
**insured** 2:2 16:3 39:9,10 50:21 51:10 52:10
**intact** 71:15
**interacted** 20:15 20:25
**interest** 11:13 84:9
**interested** 84:8
**interpret** 50:25 51:16
**interview** 39:20
**introduced** 74:4
**invented** 8:24
**invention** 9:5
**invest** 11:15,19 12:17 59:12
**invested** 10:19,23 11:25
**investment** 7:4
**investments** 7:24 9:22,25 10:2,7,11 10:13,15,18 11:12 11:14 12:18
**invests** 7:6 9:25
**invoice** 47:7 61:10 61:22 64:5 65:19 77:11,12,17,18 78:4,22,24
**invoices** 63:5,6,15 65:23 69:12,17 70:16,19 73:17 75:2 76:20,21 77:10,19,20
**involved** 14:9,15 59:3 62:5
**iris** 70:16 72:23,24 73:1,12,22 74:3,13 74:22 75:6,17 76:15,20 77:17 78:4
**issue** 44:10,12 50:1 66:20 71:22
**issued** 4:1 16:4
**issues** 20:10 33:5 41:21 82:23,25
**item** 71:3 74:14
**items** 29:15 32:6 36:12,24 63:17 73:2 74:16 75:4 75:21 77:5 80:25 81:2,3

**j**

**january** 5:10 26:4 44:1 57:1,2 58:15
**jeremy** 19:4,5,15 20:11,14,23,24 23:8 24:3 33:15 47:24 82:2
**job** 8:17,21 72:6
**js** 36:2,11 43:14
**judge** 8:7,15
**june** 12:22 33:13 33:14
**justice** 8:8

**k**

**keep** 59:1 68:19 69:21,25
**kids** 7:20
**kind** 15:8,14,16,23 16:16 20:10 23:25 25:9 26:2 46:22 50:4 55:21,24 59:13 72:14 75:2
**kitchen** 25:4,22 26:22 27:3,11,22 29:3,12 43:7 61:1
**knew** 25:7 49:21 49:21 59:7 60:1
**knock** 33:16,17
**knocked** 33:12,14
**know** 6:6 10:14 12:7,19 14:14 15:1,8,18 16:10 18:17,17 19:20,25 20:1,2,18,22 22:3 22:16 23:7,16 25:21 26:11 27:2 27:15,19,19,20,23 27:24,25 28:3,4 29:13,14 30:2 32:7 33:17 35:9 36:7,18,23,25 37:4 37:5,17,19,21,22 37:23,23,23,24 38:1,6,9,12,16,21 38:24 40:6,6,13,16 41:5 42:19 43:11 43:22,23 44:10 46:13 47:7,11,17 47:20,23 48:9,20 49:19,23 50:2,8,11 53:25 54:4,6,10,11 54:12,23,25 55:9 55:11,12,23,24 56:2 57:20,20 58:22,24,25 59:9 59:11,15,18 60:10 61:4,5,20 62:4,6,7 62:8,8,9,17,21,23 63:13,16,19 64:13 64:17 65:9,12,13 65:17,19 66:3 67:8 68:7,10,14 69:3,17,19,22 70:10 71:9,10,13 71:18,20,24,24,24 72:2,17,19,25 73:3 73:5,13,16,20 74:19 75:9,10 76:12,16,24 77:6 77:12,15,16,18,20 77:23,25 78:3,12 78:16,18,19,23 79:3,13,14,17,17 79:19,24 80:6,15 80:20,20 81:1,3,5 81:20 82:6 83:6
**knowledge** 8:18 27:2 48:14 49:24 70:18,24 72:14 76:21
**known** 81:14

**l**

**labor** 70:18
**lamp** 16:1
**landlord** 25:18 28:18 32:5 57:9 57:13 65:6
**landscape** 69:13 71:14
**landscaping** 69:13 70:3,5,11,25 71:4 71:11,25 72:3
**language** 31:7,14 31:15,21 39:12,12

39:14,15 40:1,4,7 50:19 51:20,22,24 52:5,9 62:24
**larger** 45:20
**late** 26:4
**latitude** 21:24
**laughing** 41:20
**law** 5:15 6:17 7:1 8:5,6,19 28:19 58:7
**law's** 32:2
**lawsuit** 14:12 21:8
**lawsuits** 14:10,15
**lawyer** 8:17 41:24 42:1
**lease** 56:6,11,14 56:23 57:4
**leave** 8:13 9:6 29:16 65:13
**left** 15:2,20 40:12 40:17 63:23
**legal** 8:11,13,16,18
**length** 23:1,3
**letter** 44:1,23 74:10 75:23 76:2 76:6,15,16,18,23
**letters** 45:9 77:7 79:7
**level** 6:15
**license** 8:25
**licensing** 9:2
**life** 20:8
**light** 15:20 55:25
**limited** 27:2 34:15
**line** 21:14 42:22 71:2
**linen** 15:20
**lines** 20:9
**lineup** 20:25
**link** 66:12,13,19
**list** 36:21
**listed** 36:13,24 43:20 45:10 61:9 63:15 73:5,19 74:14,16
**litigation** 4:2
**little** 6:8 13:6,13 27:19 33:3,23 45:19 54:4 58:23 59:9,19 72:16
**live** 15:15 20:2 24:21,25 25:11,16 26:10 28:16 55:5 55:10 62:2,10 83:3
**lived** 15:4 44:19 54:5
**living** 24:20 29:23 30:5,18,21 31:2,3 31:13,18,19,20,24 50:17,22,23 51:11 51:12,14 52:2,11 52:12,14,17,23,25 53:6,13 54:9,24,25 59:7 61:1 62:24 65:15 80:19
**llc** 46:17
**local** 77:2 78:19
**located** 9:11 12:19 13:18 38:14
**lockers** 63:17
**long** 7:23 13:6 26:13 44:2,3,23 45:2 55:10 56:18
**longer** 22:24 32:24 41:5 62:10
**look** 27:18 30:7,17 36:6 40:3 44:14 50:20 81:25
**looked** 39:15 50:18 80:4
**looking** 17:1 24:18 24:20 25:9,10 26:5 30:14 36:21 42:21 49:17 51:9 51:20 73:7 80:15
**looks** 34:17 37:7 48:3 60:11 64:20 64:24 67:20 77:19
**lopez** 70:3
**loss** 30:25 50:23 51:23 72:20 81:8 81:21
**lot** 25:3 43:5 49:21
**lunch** 63:9
**lying** 41:10

**m**

**magali** 76:24 78:23
**mail** 39:15
**main** 23:7,13,17 25:5
**maintain** 31:3,18 31:23 51:13 52:4 52:13
**maintaining** 62:23 84:9
**major** 21:2
**making** 83:9
**mantle** 37:20
**mantles** 36:15,16 36:19 37:17,18,25
**marketing** 11:7
**married** 6:3
**massive** 29:2
**master** 23:8 43:9 44:10 60:20,23
**masterpiece** 16:4
**matter** 84:9
**maus** 76:24 78:23 78:23
**mean** 12:2 13:10 13:13 16:6,14 17:11 18:14 19:4 28:20 31:12 37:19 38:11,23 41:21 43:12 58:4,12 62:20 69:19 72:5 72:16
**means** 49:23 60:2 74:17,20
**meet** 49:10
**meeting** 20:15,16
**meetings** 24:4
**members** 40:21,21
**memorializing** 79:8
**mental** 21:9
**mentioned** 45:10 45:11
**met** 49:12
**mike** 17:23
**million** 20:5 35:6,8 35:13 46:4 79:18
**mind** 10:5
**minimal** 44:7
**minor** 6:24
**minority** 10:22,25
**minute** 35:18,21 63:7
**mold** 80:9
**monday** 14:24
**money** 12:16 54:13 59:13
**month** 23:11 56:14 58:3
**monthly** 54:9,16 54:24,25
**months** 12:25 25:17 35:1 55:13 62:3,11 66:8

**morning** 14:24
**mortgage** 5:23 6:1 6:2
**moss** 2:10 3:1,11 5:3 10:9,16,20 12:5,11,13 14:14 14:17 21:11,17,24 22:14,25 28:7 29:9 30:13 35:17 35:20,23 39:6,8,13 40:3,8,13,18 41:1 41:7,11,18,20 42:2 42:6,11,22,24 45:7 45:9,14,23 46:2,9 46:11 51:3,17,21 61:7,14 62:12 63:3,10,12,22,25 66:7,15,21 74:21 74:25 75:10,14,25 76:8,9 82:24 83:6 83:11,15,20
**mother** 7:20
**motion** 18:24
**move** 6:7 17:25 23:22 25:1 26:11 26:16 29:17 32:2 50:16 51:16 61:18 77:9 78:11
**moved** 12:23 24:8 24:22 25:7 56:7 57:12 59:18 61:16 71:16,25
**moving** 24:15 55:8 59:1 63:5,14,16,16 68:19
**multiple** 63:5 77:19
**mute** 42:22
**muted** 22:9

**n**

**name** 3:12 82:6
**named** 18:15
**names** 17:22
**ne** 2:13
**necessarily** 48:23
**necessary** 31:2,18 31:23 51:13 52:4 52:13 82:18
**need** 10:14 21:21 30:11 36:16 37:23 38:7 40:8 44:5 46:9,21 51:19 63:8,9 82:24
**needed** 19:21 48:14,21 71:1 72:20
**neglected** 26:24
**negotiation** 9:4
**net** 81:16
**network** 60:3
**never** 8:14,15,16 61:20
**new** 20:1 27:12,24 28:1 29:5 50:5,5 70:2
**nine** 8:3
**nod** 4:16
**normal** 31:2,12,18 50:23 51:12 52:2 52:12,18,23 54:9
**notary** 74:2,4
**notation** 83:10
**note** 83:3
**notebook** 16:18 17:3 34:1 56:3
**notification** 18:14 18:16
**notify** 18:22
**notifying** 15:4
**noting** 83:7
**november** 14:19 18:3
**number** 1:4,5 3:3 3:4 17:2 30:10 36:1 54:10 64:14 66:16 68:11,22 70:14 73:5 76:10 76:14 77:22 79:13 81:12,16 82:11
**numbered** 81:17
**numbers** 54:23 72:22

**o**

**o'connor** 2:11
**oath** 1:9 3:2,17 4:5 6:7 21:25 35:25 39:10 40:19,20 41:14 42:3,9 50:25 64:2 73:21 82:16 83:8
**object** 4:25 51:15
**objection** 39:5
**obligation** 57:14 84:10
**obviously** 15:7 19:19 21:1 49:21
**occurred** 14:19 49:22
**offenses** 6:24
**offer** 45:16 82:9
**office** 7:6 8:10,23 9:9,12,13 14:25 15:2 19:9 41:17 74:2
**officer** 84:13
**oh** 9:20
**okay** 4:7 6:24 7:19 9:6,22 10:25 11:3 11:11,14,21,24 12:19,24 13:4,15 15:18 16:18,21 17:4,8,18 22:14 24:2 30:16,17,20 33:24 34:14 35:20 36:9,20,22 38:1,5 41:18 42:12,17 44:16 45:7 46:16 47:1,3 52:5 53:16 53:16 55:7 56:5 57:6 58:24 61:8 61:21 63:10,21 64:8 65:18,25 67:9 68:15,18 69:5,8 70:14,15,25 72:9,10 73:25 76:8 77:9 78:14 80:23 81:24 82:19 83:20
**old** 20:8
**older** 26:20
**once** 20:1 26:11 46:6 60:7 83:13
**open** 57:13
**opportunity** 9:8 35:16 36:5 37:1 73:25 83:18
**opposed** 37:8
**order** 69:25
**original** 32:25 37:14 48:7 72:21 75:3,16
**originally** 34:7 35:10 48:17 49:7 54:5
**orlando** 11:7 13:25
**outcome** 84:8
**outdoor** 11:10
**outdoors** 11:9
**outline** 81:25

**outright** 5:25
**outside** 10:2 13:25 28:19 38:14,23 39:10 40:24 41:1 41:2
**oven** 29:5,7,11 30:1 31:8,22 55:14,19
**overall** 45:16,19
**overhead** 71:3
**oversee** 44:24
**oversight** 45:1
**owes** 35:7
**owned** 11:14 57:19 58:1 81:4
**owner** 7:12 10:25 26:7
**owners** 7:14 28:11
**ownership** 11:13
**owns** 10:9,12,16 12:6 78:19
**oxygen** 43:17

**p**

**p.m.** 35:22 63:24 83:23
**pacific** 2:9 3:2,16 3:16 16:4 18:3 22:12 29:22 48:6 76:5 79:11,14,21
**page** 30:10,14,17 30:20 34:9,12,13 34:16 51:5 56:9 78:21
**pages** 30:8,8
**paid** 27:8 28:9 46:1 50:14 52:18 57:11 58:10,12,14 64:20,24 67:7 68:17 72:24 79:11
**paige** 78:18
**paint** 55:21 61:23 62:2,15
**paintings** 20:5
**parents** 13:21 15:15 17:21,22 24:20
**paris** 2:4
**parking** 50:6
**parkway** 2:5 9:14
**part** 28:11 49:15 71:6
**partial** 7:12
**partially** 20:22 33:20
**particular** 13:8 16:12 76:11 81:16
**particularly** 62:5
**parties** 84:13
**partner** 58:7
**party** 84:7,11
**pass** 37:10
**passed** 37:8
**passing** 37:11
**patrol** 67:10
**pay** 20:7 28:22,25 29:10 30:5 48:6,7 52:17 57:18,25 65:6
**paying** 28:14 45:2 53:3,5,11,12,14,14 54:24 58:3 67:2,5 67:11,16 68:1 69:1 70:8,11
**payment** 21:16 80:7
**payments** 58:11 58:13,15 79:15,21 79:24 80:2,12,18
**pays** 53:17
**peachtree** 2:13
**people** 8:25 9:2 15:3,11 43:15
**percent** 10:23 11:19,20 13:20,21 13:23 22:16 44:24 45:3,20 46:1,3,4,7 71:3
**percentage** 46:13 46:14
**performing** 46:22
**period** 59:8,14 62:3
**periodically** 77:2
**permanent** 30:25 31:7 51:24 53:19
**person** 18:7 27:2 70:2
**personal** 10:1,11 10:17
**personally** 10:19 32:7 47:19 65:9
**pest** 67:10,16,19
**photos** 78:15
**physically** 9:11
**pick** 20:24
**picked** 13:9 81:1
**piece** 60:3
**pittsburgh** 47:12
**place** 20:2 24:21 24:25 25:11 48:15
**places** 9:17
**plan** 28:25 32:17 56:17
**planning** 25:16 29:16 66:10 75:19 78:10
**plans** 26:11 33:4 44:6
**planted** 71:16
**plants** 72:7
**playroom** 60:25
**please** 3:13 4:20 12:4 41:14 42:23 43:24 59:20 61:22 64:4 66:22 67:9 69:11 70:14 72:9 76:19,23 79:6 80:22
**plumbing** 37:3,4 38:10
**plus** 71:3
**point** 12:10 15:9 15:12 21:1 23:15 24:19 39:19 48:22 50:12 63:2,8 71:10 82:7
**points** 23:18
**police** 20:24
**policy** 1:4 3:4 16:4 16:7,13,14 17:6,9 17:16,24 19:3 30:4,8 31:6 39:8 39:12,25 40:4,6,8 40:11 50:17,19 51:1,4,16,17 52:8 52:10,16 53:17 62:25 65:16 80:13 80:19 81:17
**poor** 25:4
**portions** 27:4
**position** 9:7
**possible** 23:21
**potential** 35:4
**potentially** 34:24 35:2 50:1
**power** 38:19 67:24 68:1,4
**practice** 8:5
**prepared** 72:11 80:25

**presence** 39:10,22 40:25 41:1,2
**present** 5:11 24:4
**presented** 9:9
**presently** 7:3
**preserves** 77:4
**president** 7:13 44:2
**presumably** 33:3
**pretty** 19:19 71:17
**previously** 55:2
**price** 46:15
**prices** 35:2 74:11 74:13,14
**primarily** 69:15
**primary** 27:1 54:1
**prior** 24:14 54:8 55:2,7 57:9 66:5,8 68:5
**private** 7:7,7 11:15 12:15,17,18
**probably** 12:17,25 14:25 15:13 17:21 20:14 54:21 69:6 75:23
**problems** 26:18,19
**proceed** 42:10
**proceeding** 84:6 84:13
**process** 3:25 16:15 19:18 20:17,21 21:12 22:2,23 23:2,3,12 82:7,21
**produce** 76:3
**professional** 6:23 84:10
**profit** 71:4
**project** 71:6
**promenade** 2:12
**proof** 81:8
**proper** 47:13
**properly** 47:14
**property** 13:18,19 14:5,6 40:18
**proposal** 45:19
**provide** 75:2,20
**provided** 66:12 74:12
**providing** 75:15
**provision** 30:24 50:18 51:9
**public** 7:7 9:5
**purchase** 16:8
**purchased** 26:20 27:17 58:21 59:17
**purpose** 51:2
**purposes** 45:18
**pursuant** 3:4
**put** 4:14 11:20,22 16:25 27:5
**putting** 15:8 59:6 60:3 75:19

**q**

**qualified** 47:16
**quality** 24:21,23 34:8
**question** 4:13,19 4:23 5:1,6 21:14 21:19 37:5 48:10 51:1 52:7 57:21 59:4 77:22
**questions** 3:19 4:8 82:11,22,25 84:5
**quick** 16:8 40:11
**quicker** 33:4
**quickly** 6:8 12:10 26:7 81:25
**quote** 43:13

**r**

**read** 16:10,14 31:16 39:11 51:17 74:6
**reading** 52:6,6 76:17
**real** 22:7 26:5 40:11 83:7
**realized** 14:14
**really** 8:14 24:23 44:18 59:15,16 72:5
**reason** 36:15 53:10 69:8 80:1,5
**reasonable** 31:1 31:17 51:12 52:1 52:12 53:18,22 54:7 62:14,21,22 76:3
**reasonably** 40:20
**reasons** 25:5 65:4
**rebuild** 32:17 33:10,21,23 34:18 54:6
**rebuilding** 33:11 47:14 71:6
**recall** 23:24 24:1 25:2 42:19 50:3 54:14 55:9,20 59:15,16 61:6 62:7 79:20
**receipt** 64:10,14 64:17
**receipts** 58:20
**received** 75:5
**recess** 35:22 63:24
**recognition** 43:7
**recognize** 64:11
**recollect** 61:3
**reconstruction** 34:20 36:2 46:5
**record** 3:13 4:18 28:6 29:8 83:4 84:6
**redid** 27:3
**redo** 27:8
**redraw** 44:5
**redrawn** 44:8
**redrew** 44:11
**reduced** 84:5
**refer** 17:24
**reference** 39:25
**references** 43:23
**referring** 31:16
**refers** 36:19
**reflection** 20:18
**refurnished** 27:3
**refusal** 41:23
**regard** 3:3 37:6
**regarding** 75:3
**regular** 52:17
**reimbursed** 29:20 29:24 50:21 51:11 52:11 58:15
**reimbursing** 58:8
**relate** 58:20 69:12
**related** 70:17 74:14
**relates** 80:25
**relating** 14:18 23:24 72:13
**relation** 20:23
**relationship** 84:9
**relative** 84:7
**relevant** 16:17
**rely** 3:23 70:21
**remain** 32:1
**remaining** 13:22
**remediation** 46:17 46:22
**remember** 12:21 13:14 14:22 18:5

19:18,23,25 20:4 23:7,13,14 24:13 40:14 43:15
**remind** 35:24 64:1
**remodel** 27:11 57:8,14
**remodeling** 27:14 57:7,10,14,18,25
**remote** 1:11
**removal** 80:13
**renovation** 29:2 55:12
**rent** 26:3,14 57:11 58:4,5
**rental** 5:12 24:8 25:13,25 28:23 29:1 31:8 56:20 58:11,12,15 59:13 59:17 60:1,1 61:23 62:15,16 78:7
**rented** 28:20 55:2 57:1
**renting** 5:14
**repainted** 27:4
**repair** 34:10
**repeat** 4:21 5:7
**rephrase** 4:21 5:6
**replace** 32:6 43:13 55:14,18 60:9 61:11
**replaced** 29:6 36:17 38:7
**replacement** 73:4 73:14,18 74:15 75:4,16
**replacing** 60:4
**reported** 18:3,8,13
**reporter** 4:11 22:7
**request** 45:21 74:9
**require** 8:11,17 40:20
**required** 30:4 50:25 53:18
**research** 8:9 47:18
**reserve** 82:17
**resolution** 33:21
**resolve** 66:19
**respect** 70:22
**responsibility** 57:18,24
**responsible** 29:25 37:9
**rest** 34:17
**restore** 53:18,23
**result** 53:1 71:1
**retail** 11:8
**review** 16:9
**reviewed** 16:7,9 16:10,12,16 17:6 17:17
**right** 3:17 5:9 6:4 6:13 14:20 16:23 18:4 24:5,7,8 25:7 25:14 29:17 30:7 32:9,15 33:1,7 34:11,18,21 35:5 38:3,7,14 39:16,23 40:19 44:24 45:4 46:5,22 47:3,6 50:14 51:9 53:2,7 53:20 56:14,24 58:11,18 59:23 63:21 64:6,25 65:11,22 67:12 68:13 69:9 71:12 76:14 77:6 82:10 82:17 83:10,22
**risk** 37:4,6,7
**road** 5:21 12:20 13:5,19 14:7,19 16:3 26:12 32:10 32:11 53:4,10,11 53:15 55:2 60:16 60:17 61:9,11,16 61:18 63:18 65:14 66:2,5 67:3,7,12 68:2,5,9,13 69:2 69:20,25 70:6 71:1 78:11
**robyn** 1:15 3:6 4:9 4:10 84:19
**role** 7:11
**rollins** 13:25
**roof** 25:11
**room** 9:18,20 15:21 25:23,23 41:5,8,10,15 61:1
**roommate** 11:6
**rooms** 60:24
**rpr** 1:15 84:19
**rug** 78:19
**rugs** 70:17 78:15 78:16
**rule** 8:4
**rules** 4:8
**running** 49:19

**s**

**safe** 64:11,13,18
**safety** 65:14
**sat** 35:1
**satisfactory** 24:17 26:15 28:16
**saw** 38:23 42:13 74:5
**saying** 10:18 20:4 21:11 31:23 37:11 75:19
**says** 17:16 30:18 30:24 39:8 40:7,8 40:14,24 42:1 57:8 69:4 74:8 76:2 81:18
**scared** 19:10
**school** 6:17,18,23 8:6 28:20
**scientists** 9:5
**scope** 54:5
**scratch** 14:4
**search** 40:11
**second** 11:8 19:8 30:16 33:7,10 63:23
**section** 57:4,7
**security** 64:5,8,14 64:16,24 65:2,5 68:12,16
**see** 4:9 8:14 10:1,6 30:9,18,22 31:4 36:3,12 39:1 40:12 41:11 44:3 44:15 46:17 47:18 51:22 52:5 57:15 61:24 66:25 67:24 68:23 74:1 79:6 81:8
**seeking** 47:4
**seen** 20:14 35:5 73:23
**sells** 11:9
**send** 18:24 66:8,10
**sense** 4:20 59:12
**sent** 16:19 75:17 79:9
**separate** 68:20 73:10,11
**separately** 40:9,11 40:14,19,24 41:2
**september** 1:12 32:22 84:15
**septic** 50:1,3,9,13
**serve** 84:13

service 15:19 69:12
set 74:9
settled 54:22
settlement 45:16 45:19 82:9
setup 11:25
shades 70:17
shape 26:22
short 25:10 56:20 59:8,14 60:1 62:3 62:16
shortest 25:18
shortly 16:15 24:11
show 49:23 51:19 74:22
showed 49:16
shower 23:16 44:14
showing 49:20 73:1
shows 36:10
shut 69:5
siblings 7:15 11:15 13:22
side 53:9
signature 56:9 81:10 84:18
signed 25:13 74:3 81:23
silently 39:5
simple 42:9
simply 18:20
single 12:7 52:22
sister 7:16
sit 3:18 4:3 15:9 39:9 40:9
site 72:6
sits 19:10
sitting 39:5,22
situation 49:4
situations 49:2
six 12:25 25:17 35:1 55:13 56:14 60:18 61:8 62:3 62:10
size 54:5
slade 46:17
slash 29:22
slowing 22:23
small 25:3,22
smoke 23:9 39:3 42:14 43:7,16 46:17,22 48:18
sofa 78:6,10
solely 84:11
solution 25:10
somebody 19:11 48:24
somebody's 20:5
somers 76:24 78:23,23
soon 23:21
sorry 8:2 22:8,9 32:11 41:13 46:10 55:16 58:17 62:11 64:10
sort 4:17 69:13 72:25
sound 18:4
sounds 27:21 38:5 38:16 62:14
speak 76:12
speaking 33:18
specific 22:1 31:15 36:23 38:25 73:7 73:17 76:21
specifically 26:9 36:14 43:22 57:20 63:18 79:24 81:5
spectrum 66:24
spend 62:14
spending 62:1
spoken 19:5,6 82:4
spreadsheet 36:10 72:11,15 74:13 76:11 79:4 80:24
spring 23:19 33:19
sprott 44:2,3
square 25:21
stand 40:23
standard 31:3,13 31:19,20,24 34:7 51:14 52:14 62:24
standpoint 6:22
starbucks 52:21
start 9:1,3 12:24 33:11 36:14
started 15:2,18 26:5
starting 59:1
starts 66:16
state 3:12 84:2
stated 84:4
statement 42:9 81:8
stay 48:25 56:17 65:11
stayed 15:16
steps 47:13
stop 12:1
stopping 12:10 63:2,8
storage 63:17,19 81:1,4
store 11:9
stored 38:2,2 63:14
stove 29:7,11 30:1 31:8,22 55:14,18
street 2:13 15:4,15
strictly 18:22
structure 11:18 30:25 53:19
studs 23:10
stuff 15:23 25:6 54:20 59:2
subcontractor 84:12
submit 82:9
submitted 45:2 66:25 73:15,22 75:7,8
submitting 75:11
subpoena 3:25
subscribe 40:22
substantially 38:24
sufficient 76:4
suitable 25:25
suite 2:6,14
suited 26:23
support 73:14,16 73:18
supreme 8:8
sure 6:10 19:13 28:5,19 29:14 36:18,19 37:25 42:7 49:9 52:20 55:16 70:23 75:18 80:5
surrounding 3:20
survive 72:7
survived 71:18,21
sustainable 69:21
swear 3:6
switching 32:12
sworn 3:8,21 81:7
system 43:16,18 64:5,9,14,25 65:2 65:5,10,14 68:12

68:16

t

**tab** 17:2 33:25 34:9,12 35:25 36:8,10,24 43:24 45:18 46:16 47:6 51:5 56:4,23 58:19 59:20 61:10 61:21 63:4,15 64:4,14 65:18,22 66:16,22 67:9,23 68:11,22,22 69:11 70:14,19 72:9 76:10,14,19,23 77:7,9,14,17,20,22 77:23 78:1,3,4,13 78:21 79:1,6 80:22 81:7
**table** 9:19
**take** 3:17 8:24 9:5 23:16 30:7 35:17 35:18,20 54:4 63:8,22
**taken** 1:11 3:2 6:6 84:4
**takes** 26:13
**talk** 15:10 18:19 33:23 50:16 63:23
**talked** 17:12 18:15 19:2 75:15 82:3
**talking** 80:3
**talks** 30:21 57:7
**tcc** 34:4 36:11 37:9 37:11 43:14,18 46:4 50:7,15 61:22 71:2
**tcc's** 45:17
**tear** 34:18 48:19 48:23
**tech** 8:10,23
**technologies** 8:24 9:1
**televisions** 13:11
**tell** 3:21 5:9 14:22 19:14 41:14 43:20 58:25 62:7 69:17 72:17 76:5
**telling** 43:15
**tells** 41:25
**tenant** 57:11,12,25
**tenants** 57:8
**term** 25:10 56:20 60:1 62:16
**terminated** 70:1
**terms** 17:1,15 52:9 54:24 65:16 84:12
**testified** 3:9
**tests** 49:19 50:8
**thank** 14:15 82:16 82:20
**thanks** 42:23
**thing** 4:17 37:13 43:20 44:21 69:14
**things** 15:14 18:6 20:17 28:3 29:6 44:8,20 54:11
**think** 7:12,25 10:9 11:25 13:1 18:14 20:24 21:13,22 24:22 29:19,25 34:15 41:7 50:6 50:24 53:22 55:1 59:2 60:2 61:2 62:13,24 65:15 66:7,11,19 68:15 71:8,24 74:10 75:13,22 77:4 81:14,24 82:4,5,8 82:24
**thinking** 32:21 57:21
**thought** 8:19 12:11 58:17
**three** 6:12 7:15 25:22 61:9,11,15 61:15 66:8
**tile** 23:16
**timberline** 7:4,23 9:22,25 10:2,12,24 11:3,4,11,14,22
**time** 16:8 18:17 19:20 20:12,13 22:8,17 23:18,20 24:1 25:8 26:6 32:25 33:6,7,10 35:19 42:20,21 48:22 53:18,23 55:11,13 56:18 59:8,14 62:3,18 69:6 74:5 75:14 81:14,18,22,22 83:7
**times** 16:11 22:22 23:21 26:2
**title** 7:13 47:11
**today** 3:21 9:11 14:18 82:11
**toilets** 27:13,24 28:1 30:1 31:8,22 44:13 55:18
**told** 6:12 22:2,5 49:25 55:1 67:11 68:15 70:23 82:1
**tomorrow** 75:23 76:6
**torn** 32:9
**total** 7:16 79:12
**totaling** 79:15,21 80:8,12,18
**totally** 39:25 75:18
**totals** 34:20
**traffic** 6:24
**training** 6:20,23
**transcript** 84:4,6
**transfer** 8:10,23
**treatments** 55:25 58:21 59:5,6
**trees** 71:17
**trouble** 6:25
**true** 41:24,24 84:6
**truth** 3:21
**try** 6:7 8:24 16:16 69:20
**trying** 12:5 21:12 25:2,11 27:13,15 31:13 45:14 54:3 61:3
**turkish** 77:10,11
**turn** 17:2 30:20 33:25 34:16 35:25 36:8 43:24 46:16 47:6 56:4,23 57:4 58:19 59:20 61:21 63:4 64:4 65:18 65:22 66:22 67:9 67:23 69:11 70:14 72:9 76:14,19,23 78:3,13,21,21 79:1 79:6 80:22
**turned** 69:6
**tv** 13:7 25:22 60:20,21,21,22,23 60:24,25
**tvs** 59:21,25 60:4,4 60:6,9,14,19 61:8 61:11,16
**twice** 45:6 46:1 83:14
**two** 6:17 7:16 10:1 10:23,25 11:5,11 19:16 23:11 24:19 25:5,22 33:9 45:1

45:10 54:4 74:4 77:7
**type** 7:9 44:21 59:2
**typewriting** 84:5
**typical** 66:4 68:4
**typically** 28:17 42:2 53:14
**typo** 74:10

**u**

**uab** 8:9,17,21,24
**uh** 4:16,17 79:2
**understand** 4:20 4:22 5:5 18:2 24:7 32:8 39:16 47:24 52:16 59:20 68:25 71:2 75:18 79:14 80:7,11,17 82:21
**understanding** 5:5 21:21 57:17,24
**understands** 5:1
**understood** 4:24
**undertook** 74:9
**uninhabitable** 31:1
**unit** 63:20
**university** 6:18,19
**unknown** 81:18
**unnecessarily** 23:19
**unnecessary** 23:4 23:25
**unusable** 43:19
**updated** 27:7
**upgraded** 65:7
**upkeep** 71:5
**use** 58:21 78:10 83:15
**usual** 31:3,19,20 31:24 51:13 52:14 62:23
**usually** 37:9 41:25
**utilities** 66:9

**v**

**valet** 63:5,14,16
**vendors** 79:23
**venture** 7:9
**verbal** 4:15
**verify** 66:13
**versus** 43:14
**vestavia** 2:5,7
**vice** 7:12
**videoconference** 1:11
**voluntary** 3:25

**w**

**waiting** 33:20
**walk** 41:7,11
**walked** 49:15,16
**wally** 82:5
**want** 12:7 22:3 23:15 28:4 33:16 33:17 35:17,24 36:13 39:13 40:6 45:23 50:16,20 63:22 74:19 76:5 82:23
**wanted** 8:16 9:10 19:11 42:6
**wasting** 22:17 23:20
**watch** 15:10
**water** 39:3 42:15 43:8 48:18 53:4,5 53:6,10,11,12,14 53:15 65:23,24 66:1,4,15
**way** 8:19 14:13 32:9 48:17 58:8 66:20 69:1
**we've** 4:9 12:1 35:15 39:14 54:1 65:4 70:1 73:15 76:2
**week** 24:19
**welcome** 52:8
**went** 52:21
**wheels** 18:24
**whichever** 65:7
**wide** 21:24
**wife** 17:20 58:7
**willing** 26:7
**wimbleton** 5:12 26:6 27:16 28:12 29:16 53:5,6,12 56:24 57:19 58:1 59:18 61:16 64:5 64:9 65:3 67:6,17 67:20 70:12 78:8
**windmoore** 11:8
**window** 55:25 58:20 59:4,6
**wise** 66:15
**witness** 3:6 22:22 30:11 41:16 61:5 62:9 75:13
**woman** 18:15 77:2
**wood** 36:15,16,19 37:17,18,24
**word** 40:10,14
**wording** 40:15 41:2
**work** 9:8 26:17,21 26:25 27:21 28:8 28:14 34:10 44:24 45:4 48:25 49:6 55:7,21 69:20,24
**worked** 8:9 13:11 13:16 72:19
**working** 9:4 37:2 82:8
**works** 65:23
**worried** 50:7
**worth** 71:11
**written** 77:15
**wrong** 40:1

**y**

**y'all** 45:16 83:10
**yard** 15:10 50:4 69:21,25
**yeah** 9:13 15:19 16:10 18:22,22 19:6 23:13 24:18 25:8 30:11 38:13 46:13 50:3 57:23 58:5 61:6,17 62:11 70:23 75:14 76:17 83:13,16
**year** 8:8 13:3 26:12 32:20,25 61:20 72:6
**years** 8:1,3,11 33:9 52:22 54:4

**z**

**zero** 71:12
**zlotnik** 47:7,8 48:1 48:3 49:10 80:8
**zoom** 2:3,10 4:10