FILED
2023 Jul-12 PM 04:34
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CASE NUMBER: 2:22-CV-00021-SGC

CHARLES GOODRICH and
ALEXANDRA GOODRICH,
Plaintiffs,
vs.
PACIFIC INDEMNITY COMPANY,
Defendant.

S T I P U L A T I O N

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the deposition of CHARLES GOODRICH may be taken before Michelle L. Parvin, Commissioner, at 3800 Colonnade Parkway, Suite 430, Birmingham, Alabama, 35243, on the 5th day of April, 2023.

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is waived,

the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of trial, or at the time said deposition is offered in evidence, or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that notice of filing of the deposition by the Commissioner is waived.

Job No. CS5804553

I N D E X


EXAMINATION BY: PAGE NUMBER:

Ms. Aquino 7


DEFENDANT'S EXHIBITS:

(No exhibits marked)

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CASE NUMBER: 2:22-CV-00021-SGC

CHARLES GOODRICH and
ALEXANDRA GOODRICH,
Plaintiffs,
vs.
PACIFIC INDEMNITY COMPANY,
Defendant.

BEFORE:

Michelle L. Parvin, Certified Court Reporter

APPEARANCES:

DAUPHIN PARIS, L.L.C., by Mr. Charles A. Dauphin and Ms. Diane Paris, 300 Vestavia Parkway, Suite 3400, Birmingham, Alabama, 35216, appearing on behalf of the Plaintiffs.

COZEN O'CONNOR by Ms. Luciana

Aquino, the Promenade, 1230 Peachtree Street NE, Suite 400, Atlanta, Georgia, 30309, appearing on behalf of the Defendant.

Also Present:

Alexandra Goodrich

I, Michelle L. Parvin, a Court Reporter of Birmingham, Alabama, acting as Commissioner, certify that on this date, as provided by the Federal Rules of Civil Procedure of the United States District Court, and the foregoing stipulation of counsel, there came before me at 3800 Colonnade Parkway, Suite 430, Birmingham, Alabama, 35243, beginning at 9:40 a.m., CHARLES GOODRICH, witness in the above cause, for oral examination, whereupon the following proceedings were had:

CHARLES GOODRICH,

being first duly sworn, was examined and testified as follows:

THE COURT REPORTER: Okay. Usual stipulations?

MS. AQUINO: That's fine by me.

MR. DAUPHIN: Yes.

EXAMINATION BY MS. AQUINO:

Q. Good morning, Mr. Goodrich. How are you doing?

A. Good. Good morning.

Q. We met briefly yesterday. My name is Lucy Aquino. I represent Pacific in this case. Would it be okay if I called you Charles?

A. Yes.

Q. Okay. As you know, you've given an examination under oath in this case. This is going to follow a very similar process. I'm going to ask you a lot of questions today. We do have a court reporter. She is taking down everything that the two of us are saying.

If you could, do your best to give me a verbal answer as opposed to maybe nodding your head or giving me an uh-huh or huh-uh. If you do that, I will understand what you're saying, but it is very difficult to take that down. So, if at any point, I

prompt you and I say is that a yes or is that a no, I'm not trying to be rude. I just want to make sure that we have a clear record, okay?

A. Yes.

Q. If I ask you a question that you don't understand or you can't hear me, let me know. I can repeat it, rephrase it, whatever it is that you need. I want to make sure that you understand what it is that I'm asking you before you start answering; is that fair?

A. Yes.

Q. Okay. I don't anticipate that we're going to be here very long, but if you need a break at any point, just let me know.

A. Okay.

Q. The only caveat is, if I have asked you a question, I'm going to ask you to answer that question before we go on break, okay?

A. Sure.

Q. I'm going to go through some of

the information that you gave in your examination under oath just to confirm so that we don't have to rehash things that we've already covered, okay?

I have your name as Charles Drennen, D-r-e-n-n-e-n, Goodrich?

A. Yes.

Q. Okay. And what is your date of birth?

A. January 26, 1976.

Q. Okay. You are currently married to Alexandra Goodrich, correct?

A. Yes.

Q. And you have three children?

A. Yes.

Q. And she gave me their names and ages yesterday. I'll just go over that with you. Give me a second.

A. Do you want me -- I can --

Q. That might be quicker. Let's do that.

A. Gillian Goodrich, age fifteen.

Q. And she is at the Altamont

School, correct?
A. Yes.
Q. Okay.
A. Susannah Goodrich, age --
Q. Is that Susie?
A. Susie, yes.
Q. Okay.
A. Age twelve. And Caroline Goodrich, age eight.
Q. And both Susannah and Caroline are at Mountain Brook Elementary right now, correct?
A. Yes.
Q. Okay. At the time of the fire in 2019, I have that Caroline was at Canterbury Day School in Mountain Brook; is that correct?
A. Yes.
Q. Tell me a little bit about your educational background.
A. Okay. I grew up here and went to Mountain Brook High School, graduated, went to Rollins College outside of Orlando,

Florida, worked for two -- twoish years and went to law school at the University of Alabama from 2002 to 2005. And then, I clerked for Judge -- Justice Harwood on the Supreme Court for a year, started work at UAB, The Research Foundation, which is the tech transfer office. And during that period, I got my MBA from UAB over the course of many years. It was --

Q. Okay.

A. -- night and online program.

Q. And where do you -- where are you currently employed?

A. Timberline Management Company.

Q. What is Timberline?

A. So, it is a family investment office. So, we invest in private companies, invest in private companies and then attempt to sell them.

Q. Kind of like a hedge fund?

A. It is -- I would -- no. I think hedge fund investments are public, New York Stock Exchange type companies.

Q. Okay.
A. It's more like a private equity company.
Q. Understood. And what is your role at Timberline?
A. So, I started, and I did venture investments, which is early stage companies. And I still do that, as well as we own a company in Wichita, Kansas. It's an industrial paint distribution company. And I manage that. And I'm -- with me and my siblings am an owner, I guess.
Q. You're the owner of the Wichita company?
A. Oh, well, that's part of the Timberline Management Company, which owns a part -- a little over fifty percent of the industrial -- Spray is the name of the company. Industrial --
Q. Despray?
A. Spray.
Q. Spray?
A. Just Spray. Which we own --

Timberline owns a little over fifty percent. And the former CEO -- or he's still the CEO. He owns -- his family owns the remaining percent.

Q. Okay. And you said that the Spray company in Wichita, Kansas, you run that with your siblings?

A. No, run it with -- sorry. I probably wasn't clear. We run Timberline, my siblings, which I have two brothers and a sister. We own -- our families own twenty-five percent each of Timberline.

Q. Okay. Together?

A. Together.

Q. Okay.

A. Yes. Timberline owns fifty-five percent of Spray. So, we would own twenty-five percent of that fifty-five percent.

Q. Okay. Who owns the rest of the interest in Spray?

A. Mark Hammer and his family is his name. He's -- he was the CEO of the -- he

still is the CEO, but he's -- for twenty-five years. We purchased it from him in -- right before the pandemic. March 1st, 2020.

Q. Great timing, huh?

A. Yeah. Yeah.

Q. Not at all stressful?

A. Yeah. I believe that's right.

Q. Okay. And Timberline, how long have you been involved with Timberline?

A. I'm going to say closing on ten years, nine to ten years.

Q. Okay. Have you been in the same role within Timberline this whole time?

A. Generally, it changed kind of when we purchased Spray. I took on that responsibility.

Q. Do you have a title currently at Timberline?

A. We are not big on titles. Just manager.

Q. Okay.

A. Vice president if you -- yeah. I mean, not particularly. There's --

Q. Was there a title for you before you acquired Spray?
A. No. I mean, no, there's only four of us.
Q. So, yeah.
A. So, it's -- yeah.
Q. And you're all related, so it's kind of --
A. Well -- so, the -- Joe McCarty works here. He's the CEO of the company. And then, the other three people are -- kind of work for him --
Q. Uh-huh.
A. -- doing different things, but we don't -- I mean, you know -- you know, we have a title, I guess, but not really.
Q. Okay. Understood. And where we are currently located, I believe this is a foundation owned by the family; is that correct?
A. So, this side of the office is the Timberline office (indicating). That side of the office (indicating) is the office

for the Mike and Gillian Goodrich Family Foundation, which those are my parents.

Q. Okay. And what does the foundation do?

A. It is a charitable foundation. So, it gives money away to worthwhile organizations.

Q. As in the form of grants or is it just donations?

A. Both.

Q. Okay. Do you have any involvement in the foundation?

A. Yes. I mean, I've been on the board and, as of this year, the chair of the board.

Q. What does that entail as chair of the board? What are your roles or your duties with respect to the foundation?

A. And I work with Carol Butler, who's the executive director of the foundation. She -- you know, she does most of the work. But going over grant applications, as in preparing for the board

meetings, which are quarterly, where we decide --

Q. Okay.

A. -- on which -- on money giving, where -- we decide on how we're giving away the money.

Q. And as far as the granting of money through the foundation, is that something that businesses apply for or do you locate and identify businesses in the community that you're --

A. Well, this is just charities. And they generally apply for -- we have a few organizations -- everybody applies for it.

Q. Okay.

A. Yeah.

Q. Other than Timberline and the company in Wichita, Kansas, do you own or have part or all of any other businesses?

A. Yeah. So, Timberline owns eighty percent of a company called Gas Field Services.

MR. DAUPHIN: You know, this has

been going on and on. I don't know what businesses Timberline owns or what their interest is has anything to do with this lawsuit.

MS. AQUINO: I'm asking him personally, not Timberline.

Q. You personally.

A. Okay.

Q. Yes.

A. All right. What --

Q. Just to be clear.

MR. DAUPHIN: You understand the judge's order about inquiring as to his wealth?

MS. AQUINO: I understand. I think I'm still entitled to find out what his business ventures are for potential conflicts.

MR. DAUPHIN: Well, I won't object for now, but I will --

Q. (BY MS. AQUINO) And, again, I'm not asking about Timberline. I'm asking about you personally, either partial

ownership or sole ownership.
A. Right. Personally own thirtyish percent of Alabama Outdoors.
Q. Okay. And I don't need the percentages, just --
A. Okay.
Q. -- the actual businesses.
A. Which is a local outdoor clothing retail --
Q. Alabama what?
A. Outdoor.
Q. Outdoors. Okay.
A. And a small percentage of a company with my college roommate called Findsome & Winmore, which is in Orlando, Florida. It's a marketing agency.
Q. Okay. Does it have a business presence in Orlando or is it kind of like an online company?
A. No, he's in Orlando.
Q. Okay.
A. Yeah. And it's where the majority of -- it's a marketing business.

The majority of his clients are -- is in the Florida area.

Q. And what is your business partner's name?

A. Matt Certo.

Q. Can you spell his last name for me?

A. C-e-r-t-o.

Q. Thank you. Alabama Outdoor, does anyone own that with you, any partners?

A. Yes, my two brothers --

Q. Okay.

A. -- and then, the CEO of it, Scott McCrory, owns a percentage.

Q. McCory, M-c-C-o-r-y?

A. M-c -- yes.

Q. Okay. Thank you. That was a guess but --

A. Yeah. I think that's -- yeah.

Q. Any other business ventures?

A. No.

Q. We discussed with Ali yesterday her interest in Parkinson & Goodrich, LLC,

and Sweet Home Stables, LLC. Do you have any partnership interest or involvement in those two businesses?

A. We have a financial interest in it but --

Q. Do you -- no participation in the business as far as, like, running the business?

A. No.

Q. You currently live at 3305 Dell Road in Mountain Brook, Alabama; is that correct?

A. Yes.

Q. And my understanding is that you moved back into the property in January of 2022?

A. Yes.

Q. You originally built the property in 20 -- it was completed in June of 2019; is that right?

A. Yes.

Q. And that was when you moved in originally --

A. Yes.

Q. -- as well?

Okay. We are here to talk about the lawsuit that you filed relating to a fire and subsequent claim for that fire that happened November of 20 -- November 18 of 2019; is that your understanding as well?

A. Yes.

Q. Okay. What is your understanding of how that fire started?

A. The cleaning crew that come -- came every week, once a week, I guess on Monday mornings, but in this case, on Monday morning, were cleaning my daughter's room. And I guess they had a practice of when -- turning on lights when they were cleaning a room, and then, to signify they were done, turning them off. They somehow left the lights on, and a linen curtain caught -- was near a sconce and caught on fire. And then, it was above my daughter's desk. And it started dripping on the desk. And then, from there, the cleaning crew either saw or

noticed it and ran out.
At some point, a neighbor -- but, I mean, that's where it started and went from there. And I guess a neighbor alerted the fire department.
Q. How did you first learn about the fire?
A. I was at work, and I believe Ali called me and said that our house is on fire. And she didn't know much past that at that point. And so, I headed home.
Q. Okay. And how far is that from where you were at that point?
A. So, from -- it's a -- it's a twelve-minute drive with no traffic, or with minimal traffic, which is probably the conditions that morning.
Q. And my understanding is that this was around 10:15 in the morning on the 18th --
A. Yes.
Q. -- is that about right?
A. Yes.

Q. So, you arrived at the scene ten to fifteen minutes after you were notified by Ali of the fire; that sounds about right?
A. Right.
Q. When you got there, what did you see?
A. The fire department was there. I parked, I guess, down -- somewhere on the street or at the bottom of the driveway. And, you know, I don't really remember what stage the fire was. They told me, obviously, I couldn't go in the house at that point. So, we kind of sat on the lawn and watched them put out the fire.
Q. Was it the Mountain Brook Fire -- excuse me, Mountain Brook Fire Department?
A. Yes.
Q. Did anyone from your security company ever call you directly to notify you of the fire?
A. If they did, I never talked with anyone. They might have left a message or called but --

Q. And other than your family and Mountain Brook Fire Department, do you recall anyone else coming to the scene of the fire?

A. We probably -- we had some nosy neighbors.

Q. Always.

A. Yeah. But it -- you know, at least -- during that day -- well, Bradley Moncrief, who worked for TCC and was the -- he came. He was the managing -- managed the building of the house the first time. He came at some point in the afternoon. And as -- and Hank Long, the architect, came by at some point.

Q. And who notified them of the fire?

A. You know, I -- generally, probably -- I got twenty-five, thirty calls, texts, probably more than that from people, you know, the rumor mill, I guess, or the -- you know, I think people --

MR. DAUPHIN: If you don't know --

THE WITNESS: Yeah.
MR. DAUPHIN: -- just say you don't know.
A. I don't know who, yeah.
Q. (BY MS. AQUINO) Okay. Let me rephrase this. Did you call Mr. Moncrief to come to the scene?
A. No.
Q. Did you call Mr. Long to come to the scene?
A. No.
Q. Do you know if they live in the area, in the Mountain Brook area, as well?
A. Yes.
Q. Okay. And my understanding is that your parents also live down the street, is that correct, from the house?
A. Yes. At the time, they did.
Q. Did they come to the scene of the fire on that day?
A. Yes.
Q. Do you know about how long it took for them to arrive?

A. They were out of town. They -- late afternoon, I would say.

Q. Okay. How far away was their house from 3305 Dell Road?

A. It's on the other side of the street, three or four houses down.

Q. So, fairly close?

A. Pretty -- yes.

Q. And my understanding is that other than the house cleaners, there was no one home at the time of the fire; is that right?

A. Correct.

Q. Your wife and two children came to the scene from where they were originally --

A. Yes.

Q. -- correct?

Okay. And the fire started on the second floor of the house in your daughter's bedroom; is that right?

A. Yes.

Q. Okay. About how long did it take

for the fire department to put out the fire?
A. I don't know. I don't recall.
Q. Around what time were you allowed back in the house?
A. Late afternoon, I would --
Q. On the same day?
A. Yes.
Q. And when you were allowed back into the house, what kind of damage did you see from the fire itself?
A. So, the attic and the second floor were basically, I mean, not gone but very heavily burnt and damaged. The first floor, depending on the main floor, I guess, had damage, water. You know, I remember water collecting in the garage a couple feet at that point. And, you know, I don't remember -- recall exactly, but there was smoke and water and fire damage in points in the main floor.
Q. Okay. And your master bedroom was on the main floor; is that right?
A. Correct.

Q. And the top floor were four bedrooms and four bathrooms?
A. Yes.
Q. Okay.
A. And a playroom.
Q. Like a playroom for your children?
A. Yes.
Q. Okay. Who reported the claim to Chubb or Pacific?
A. I don't recall. Ali or me.
Q. Okay. Did you ever speak with your insurance agent about the fire?
A. Yes.
Q. Is that Jody?
A. Joni.
Q. Joni. Sorry.
A. Uh-huh.
Q. And when did you speak with her?
A. You know, within a quick time frame. Probably not that day but shortly thereafter.
Q. And what was the purpose of that

conversation with Joni?
A. To inform her that we had a fire.
Q. Did you ever ask her to assist you in the claims process?
A. I don't recall.
Q. Okay. My understanding is that you are primarily the one who deals with, like, the insurance matters and things like that; is that correct?
A. Yes.
Q. Were you the one who secured the policy with Pacific for the house?
A. Through Joni.
Q. Okay. That was going to be my question. So, you worked with Joni through that?
A. Yes.
Q. And how did that process -- how did that process go? Tell me a little bit about that.
A. So, that -- and the company has changed hands or -- I'm not sure. But we had -- I mean, they had insured all our prior

houses. And so, when we moved in in June, or shortly before then, we informed them that, you know, we were going to sell the house we were in and we're going to move in -- you know, we needed coverage on the new house. And so, I spoke with Joni. And then, she kind of handled it from there. And we ended up with the policy through Chubb/Pacific.

Q. And when you say they insured all of your prior houses, do you mean you obtained insurance for your prior residences through Joni and her agency?

A. Yes.

Q. Okay. Had you ever had any policies placed through Chubb or Pacific by Joni before?

A. I don't think so.

Q. And after you called her and told her you needed coverage for the 3305 Dell Road property, did she give you multiple options for policies or did she just send you one policy specifically and say, I recommend this?

A. I don't recall.
Q. Okay. Did she ever discuss the coverages that were available under your policy with you?
A. Not in great detail.
Q. When you called her and requested coverage for 3305 Dell Road, did you make any specific requests for policy limits, types of coverage, anything like that?
A. No.
Q. About how long had you been working with Joni and her agency by the -- by 2019?
A. The agency -- I got married in 2006. So, twelve years. The woman we initially worked with, Gail Stephens, retired at some point during that, and Joni became our person.
Q. Okay. Now, you mentioned that there was fire damage to the attic and the second floor, water damage to the main floor and the garage, and then, fire damage -- or smoke damage kind of throughout. My

understanding is, at some point, there was also mold in the house; is that right?
A. Yes.
Q. Where was that located?
A. Throughout in -- I mean, throughout the main story, main floor, I guess is what we're calling it, and, you know, kind of in walls and cabinets and flooring.
Q. When did that start? When did you first notice that?
A. I don't recall. I remember it would rain, and the house would get wet. And so, at some point after that, we started noticing mold. Probably -- yeah, I don't recall but quickly -- relatively quickly after the fire.
Q. My understanding is that on the night of the fire itself, you and your family stayed with your parents; is that right?
A. Correct.
Q. And how long did you stay with your parents after the fire?

A. A couple of weeks.

Q. Brookstone came out to the property on the day of the fire to do some emergency board-up; do you recall that?

A. Yes.

Q. Were you present for that?

A. Yes.

Q. Okay. And what did that emergency board-up entail?

A. I don't recall. I remember being there. I don't remember what they did.

Q. Okay. They also packed up some contents for you; is that right?

A. At some -- I mean, I don't know if they started the first day, but at some point, they did.

Q. Did you have any involvement with helping them identify items to be packed up or transported?

A. No.

Q. Is that something that your wife dealt mostly with?

A. Yes.

Q. Okay. Other than 3305 Dell Road, do you currently own any other properties?
A. No.
Q. As of 2019, did you own any other properties at the time?
A. So -- well, I own five percent of a -- of land slash farmhouse in Boligee, Alabama.
Q. Like undeveloped land?
A. No, there's a house on it.
Q. And where is that?
A. Boligee, Alabama. It's about an hour south of Tuscaloosa.
Q. I'm going to need your help spelling that, that city.
A. Yeah. B-o-l-i-g-e-e.
Q. Okay. You said that's about an hour out of Tuscaloosa?
A. Uh-huh.
Q. And how far is that from here?
A. An hour and forty-five minutes.
Q. Thank you. I'm not very familiar with Alabama geography.

A. Right. Yeah. It's in between Tuscaloosa and Mississippi.

Q. Thank you. And you no longer own that farmland?

A. No, I do.

Q. Okay. Any other property interest that you currently own?

A. No.

Q. Okay. So, following the fire, you guys were -- you guys moved into a rental property, is that right, on Fairway Drive?

A. Yes.

Q. Around what time was it when you first moved into the Fairway Drive property?

A. I want to say mid to late December. We had a prescheduled trip to Disney World. And when we came back from that, we -- it was -- we moved into the Fairway house, or that's where we began.

Q. So, was the trip around beginning of December?

A. Mid-December.

Q. Okay. So, it would have been

closer to Christmas by the time that you moved into the Fairway Drive house?

A. It was pretty close to Christmas.

Q. Were you involved at all in locating the rental property that you guys eventually moved into?

A. Yes.

Q. And what was your involvement with that?

A. Ali and I, starting shortly after the fire, began to look for property, a place to move to. We went to an apartment complex. And I think that was the only house we looked at. There was not a ton of selection.

Q. And where was the apartment complex that you guys looked at?

A. It's in Mountain Brook Village. I forget the name of it. Park Lane Apartments.

Q. Park Lane?

A. Uh-huh.

Q. And did they have any apartment available at that point?

A. Yes.
Q. And why did you decide not to get an apartment with Park Lane Apartments?
A. We had, I guess, two dogs at the time and three kids. And it was not big enough. I think the -- they had -- a three bedroom was as close. And we decided it was -- and it was -- I'm not sure if it was pet friendly or not. But even if it was, it would have been difficult to manage dogs and kids in the house, in an apartment of that size.
Q. Okay. And then, you looked at the Fairway Drive property?
A. Yes.
Q. And did you go to inspect that property with your wife?
A. Yes.
Q. And what was your -- what were your thoughts when you saw the property for the first time?
A. It was not great, but we were in need of a place to live. And it was kind of

the only -- at that point in time, the only place available --

Q. Okay.

A. -- either that or the apartment.

And we decided that that was a better choice.

Q. Understood. And when you say not great, what do you mean by that?

A. The condition wasn't great. The -- you know, the bathrooms weren't great. And we were -- it did not have enough room for our family. And just the kitchen wasn't in great shape. It just -- it was kind of an older, worn-down house.

Q. Not being in great shape, do you mean that it was not functioning?

A. It functioned.

Q. Okay. So --

A. Yeah.

Q. -- what do you mean by not great?

A. You know, I remember -- well -- and this probably was discovered after we moved in. But there was drainage issues in

the shower. There was a lot of electrical or -- you know, not everything worked well --

Q. Okay.

A. -- at the time.

And it -- it was -- it just -- I mean, there was nothing -- it was just an older house and not well kept up by the owner.

Q. My understanding is that the house was built in the '40s or '50s; does that sound about right?

A. I don't know.

Q. Okay. Do you know how you guys located the Fairway Drive property?

A. No, I don't.

Q. That was not something that you were involved with, locating that property?

A. I don't recall how we found it. I guess we -- my guess is we saw a sign or heard about it.

MR. DAUPHIN: Don't guess. Either you know or you don't know.

A. I don't recall.

MR. DAUPHIN: If you don't know, just tell her you don't know.

Q. (BY MS. AQUINO) There were -- was anyone living at the property when you went to look at it?

A. Yes.

Q. And those were tenants, to your knowledge?

A. Yes.

Q. Around what -- how quickly did you move into the property after your inspection?

A. I don't remember the timing.

Q. Okay. And you entered into a six-month lease for the Fairway Drive property; is that right?

A. Yes.

Q. Okay. How much was rent for that property?

A. I don't remember. I don't recall.

Q. Were you involved with negotiating the lease terms with anyone, with

the landlord?
A. I don't recall.
Q. Okay. Did you ever review a copy of the lease for the Fairway Drive property?
A. Yes.
Q. Did you have any involvement in getting the Fairway Drive property ready to move in, any of the painting, cleaning, anything like that?
A. No.
Q. Do you know why the house was painted?
A. I don't recall other than it needed a paint.
Q. What do you mean by it needed a paint?
A. I don't recall. I don't, you know.
Q. Was it your decision to paint the house?
A. No.
Q. My understanding is that the house was also cleaned, the floors were

cleaned prior to you guys moving in; is that right?

A. I don't recall.

Q. So, that seems like -- I assume that that was also not your decision to clean the house; is that right?

A. Well, I would assume that the owner would clean it before -- that's what I thought you were asking. The owner would clean it before new tenants moved in.

Q. That's actually a good point. Do you know if that was done?

A. I don't know.

Q. Was that ever requested?

A. I don't know.

Q. You never made that request of the landlord, to have them clean the house?

A. I don't know.

Q. Okay. Did you ever request that the landlord paint the house, you, yourself?

A. I don't know.

Q. Do you have any recollection of having any discussions with the landlord

about the condition of the house or any repairs or modifications or cleaning and maintenance that had to be done to the house?

A. Not at the -- not when we were moving in.

Q. You had subsequent conversations with the landlord about the house?

A. Not me.

Q. Not you personally?

A. No.

Q. But you -- is it your understanding that those conversations happened?

A. I mean, we -- I know we talked to the owner, but I don't know what was -- what the conversations generally.

Q. And when you say we, do you mean your wife?

A. Yes.

Q. Okay. Did you have any involvement in picking out the curtains or the TV equipment and audiovisual equipment that went into the rental house?

A. I probably called the audiovisual company. I know I called them when the fire occurred to tell them, you know, probably your TVs -- what happened and to come inspect their TVs. And then, when we moved into the rental house, I called them and set up -- set up that installation process.

Q. And that's HD Innovations?

A. Yes.

Q. Okay. And what did HD Innovations do at the Fairway Drive house?

A. Put in, I'm not sure how many TVs and internet and -- yeah, installed the TVs and internet.

Q. Okay. What about the installation of window dressings at the Fairway Drive; did you have any involvement with that?

A. No.

Q. You mentioned that after you moved in, you started noticing some issues with the house. And I think you mentioned the plumbing and some electrical issues?

A. Uh-huh.
Q. When did you first notice those issues with the house?
A. I don't recall exactly.
Q. What did you personally observe was wrong with the Fairway Drive house?
A. One of the -- our shower -- the showers didn't work and our shower drain had issues. And I think there was -- basically, the drain was very slow. And it had -- it was -- I remember it being very hot. It was tough to get a good shower temperature.
Q. The actual water temperature?
A. Yeah.
Q. Okay. Did you ever have any workers come out to the house and do any repairs either to the plumbing or to the electrical system?
A. I don't recall.
Q. To your knowledge, were you allowed to hire workers to do regular maintenance on the house pursuant to your lease?

A. I don't know.

Q. When did you move out of the Fairway Drive house?

A. I don't recall exactly. Winter, spring of -- what year are we in -- 2020.

Q. Okay. So, would February 2020 sound about right?

A. Yes.

Q. Did you terminate your lease for the Fairway Drive house?

A. I don't recall how -- what exactly we did with the remaining months on the lease.

Q. Were you involved in the discussions with the landlord about breaking the lease?

MR. DAUPHIN: Object to the form. Go ahead.

A. No.

Q. (BY MS. AQUINO) Is that something that your wife handled?

A. Yes.

Q. And then, subsequently, you moved

into the Wimbleton Drive house, which is owned by an LLC managed by Mr. Dauphin; is that correct?

A. And Diane.

Q. And Diane.

A. Yeah.

Q. Okay. When did you move into the Wimbleton Drive house?

A. I don't recall exactly.

Q. Okay.

A. Within this time frame.

Q. You went straight from the Fairway Drive house to the Wimbleton Drive house, correct?

A. You know, we might have had some nights at my parents' house or somewhere like that but pretty much. Yes.

Q. No in between rental properties?

A. Correct.

Q. Okay. Were you involved in any of the discussions about the purchasing of the Wimbleton Drive house?

A. Yes.

Q. To what extent?

A. I think Ali and Chuck -- I never looked at it before we moved in. Ali and Chuck and the real estate agent found it and negotiated it and purchased it. I gave general approval.

Q. Of the house?

A. Of it, yes.

Q. Okay. And what was the reason that the Wimbleton house was purchased?

A. Well, I can't speak to --

Q. To your knowledge.

A. We were going to rent it from Chuck and Diane and then -- and they were going to decide, once we moved back into the Dell Road house, if they wanted to manage it as a rental property or, at that point, they could have moved into it or sold -- sell it.

Q. Okay. The first time that you saw the Wimbleton house was when you moved in?

A. Well, I mean, I saw it from the outside, but, yes.

Q. Well, you weren't involved -- let me rephrase this, actually.

You weren't involved in inspecting the house prior to it being purchased?

A. Correct.

Q. Okay. And when you saw it for the first time, what were your thoughts on the house?

A. Well, again, it was -- you know, our state of mind at this point was still -- we were looking for a place to live. And this was a place to live. It was -- it was -- and it was much better than the Fairway rental house, the Fairway house.

Q. In what respects?

A. I mean, it was adequately suited for our house, for our children and dogs, and it was in much better condition.

Q. Okay. Were you involved in doing any modifications or repairs to the Wimbleton Drive house prior to moving in, painting, cleaning, anything like that?

A. No.
Q. That's something that your wife handled?
A. Yes.
Q. Okay. The Wimbleton house was also painted prior to you moving in; is that correct?
A. Yes.
Q. Do you know why that was?
A. No.
Q. And following -- after you moved in, there were some renovations done to the house; do you recall that?
A. Yes.
Q. Okay. What were those renovations?
A. What I recall is we purchased -- we installed new kitchen and certain kitchen appliances, not entire -- and remodeled the downstairs bathroom and I guess the master bathroom.
Q. Okay. Just making sure you were finished before I --

A. Yeah.
Q. Okay.
A. That's all I recall.
Q. And from what your wife indicated yesterday, it sounds like some of the renovations were handled by Mr. Dauphin and Ms. Paris in their LLC, and then, some of them were handled by you personally, you and your wife; do you recall that?
A. Yes.
Q. Which portion of the renovations did you guys handle?
A. I don't recall which portions -- how it was divided between the two groups.
Q. And why is it that you were making renovations to a rental property?
A. Because we -- to get the house into a comfortable standard of living that, you know, was not approaching but was relative to what we normally live in as best we could do.
Q. And once you returned the property, those renovations would then

benefit the landlord, correct?
A. Correct.
Q. Okay. Were you involved in discussing the lease terms for the Wimbleton Drive house, in negotiating the lease terms?
A. I mean, to the extent I signed the lease, yes --
Q. Okay.
A. -- but not a great deal.
Q. You didn't -- so, you reviewed the lease and signed it, but you weren't involved in actually negotiating any of the terms?
A. No.
Q. Okay. Actually, that was -- that was a bad question on my part because I want to make sure that I'm clear on your answer.
You reviewed the lease, correct?
A. Yes.
Q. And then, you signed the lease; is that right?
A. Yes.
Q. Did you participate in any of the

negotiation of the lease terms?
A. No.
Q. Thank you. And I think I understood what you meant, but I just wanted to make sure.
A. Okay.
Q. HD Innovations also came out to the Wimbleton Drive house to do some installation of audiovisual equipment; is that right?
A. Yes.
Q. Was that something that you handled?
A. Yes.
Q. And what did they do at the Wimbleton Drive house?
A. Similar to Fairway, installed TVs and cable.
Q. As far as getting the Wimbleton Drive house ready for you guys to move in, is that something that your wife primarily handled?
A. Yes.

Q. And you moved out of the Wimbleton house directly into the 3305 Dell Road once it was rebuilt; is that right?
A. Yes.
Q. Okay. That was around January of 2022?
A. Yes.
Q. Okay. The Wimbleton Drive house has been sold; is that correct?
A. Yes.
MS. AQUINO: Can we take a quick break for a second?
MR. DAUPHIN: Sure.
THE WITNESS: Sure.

(Whereupon, a brief recess was taken.)

MS. AQUINO: Where was I at?

(Whereupon, the desired portion of the testimony was read back by the court reporter.)

MS. AQUINO: Thank you.
Q. As far as the claim for the Dell Road, my understanding is that your wife primarily handled discussions with Pacific about that claim; is that correct?
A. Yes.
Q. What, if any, aspect of the claim did you handle primarily?
A. None --
Q. Okay.
A. -- I'm going to say.
Yeah.
Q. Okay.
A. None, yeah.
Q. Did you ever have any conversations with any representatives of Chubb or Pacific about your claim?
A. In the time shortly after the fire, I spoke with Jeremy at the house site. And I think that -- I think that would be it.
Q. And you're talking about the December meeting in person at the house?
A. Yes. And, you know, we were --

during that time period, we were at the house a lot, and he was, too. So, there was -- the December meeting, I was there. And, you know, probably during that time, I would see Jeremy at the site and we would talk.

Q. Okay. So, most of your conversations with Jeremy were in person?

A. Yes.

Q. Okay. Did you ever speak with him on the phone?

A. Not that I recall.

Q. Okay. Did you ever speak with any other representatives of Pacific other than Jeremy Elliott?

A. No.

Q. Okay.

A. Well, no.

Q. I'm sorry?

A. I was going to say Alycen at our -- this.

Q. Yes.

A. But, yes.

Q. Yes.

A. Okay.
Q. You understand that she is not affiliated with Pacific, correct?
A. Correct.
MR. DAUPHIN: I object. She is. She's represented to be.
MS. AQUINO: Well, she doesn't work for them.
MR. DAUPHIN: Well, but she's certainly their representative.
MS. AQUINO: I understand that. Let me rephrase.
Q. You understand that she is not an employee of Pacific, correct?
A. Yes.
Q. Okay. And other than Alycen Moss and Jeremy Elliott, any other individuals affiliated with Pacific or Chubb that you've spoken with?
A. Not that I recall.
Q. Okay. To your recollection, you never spoke with Wally Hasseig?
A. Correct.

Q. When you spoke with Jeremy Elliott, how were your interactions with him?

A. You know, initially, he was upbeat and said, well, you know, Chubb is going to do what it takes to get you back to -- back in your house. And it kind -- that was within the first day or two. And it kind of quickly -- well, and I didn't have a ton of interactions with him. It got worse. But I was definitely not speaking with him very often.

Q. When you say it got worse, do you mean he got -- his interactions -- your interactions with him got worse or were you informed the interactions with him got worse?

A. Yeah, I don't recall frankly any of my -- outside of the first day or two of the fire, I don't recall any of me interacting with Jeremy.

Q. Okay. Would it be fair to say that the negative interactions that were -- which may have had with Jeremy Elliott or Pacific, those were not your personal

experiences?

A. Well, and the December 13th meeting is really the only other time I recall interacting with Jeremy.

Q. And how were your interactions with Jeremy on the December 13th meeting?

A. I was disappointed in his behavior and I felt like we were not working to -- on a solution. We were not -- he was not helping us solve our problem.

Q. Okay. What do you mean by you were disappointed in his -- what is it? I'm sorry. I don't --

A. He was confrontational with people we knew and trusted.

Q. With whom specifically?

A. Marbury McCullogh from TCC and Hank Long.

Q. Did you witness any confrontations between Jeremy Elliott and Mr. McCullogh and Mr. Long?

A. I didn't -- not that I recall.

Q. Okay. So, they -- is that

something that they told you about?
A. Yes.
Q. And was it Mr. McCullogh and Mr. Long that told you about those confrontations?
A. I don't recall.
Q. Okay. Was he ever confrontational with you?
A. No.
Q. Okay. Did you personally ever have any interactions with Jeremy Elliott that you would qualify as negative?
A. His behavior at that meeting, however, it was not directed towards me.
Q. I'm sorry. Can you clarify --
A. Just his general --
Q. -- what you mean by that?
A. -- his general behavior.
Q. Okay.
A. We were trying to solve our problem, which was the fire.
Q. Uh-huh.
A. And he was not -- I did not think

he was trying and that he was working with us to solve -- to help us.

Q. And what about --

A. And he --

Q. I'm sorry. I didn't mean to interrupt you.

A. Yeah.

Q. Go ahead.

A. No, that's all. Yeah.

Q. Okay. What about Mr. Elliott's behavior made you feel like he wasn't trying to help you?

A. He did not -- he was negative towards our -- the group of people there. He did not value their opinions.

Q. Did he say anything to that effect?

A. I don't recall.

Q. Okay. It was just a general feeling that you got?

A. Yes.

Q. Okay. Was he ever rude to you?

A. Not personally.

Q. Okay. What knowledge do you have of any unprofessional or rude behavior on the part of Jeremy Elliott?
A. When you say what knowledge do I have --
Q. Yes.
A. -- what -- that I've seen personally or have heard or read about in --
Q. Both. And you -- I would like to separate that. What knowledge do you have that you have witnessed personally or heard?
A. So, basically, my interactions with Jeremy were limited and ended at the December 13th meeting.
Q. Okay.
A. And I guess we've gone over that. You know, I've heard he -- I mean, I -- well, at that meeting, that he was mean and unfair to Marbury McCullogh and Iris Thorpe and Hank Long, who we have, and Ali specifically, worked with very closely and are very respected within their professions. And he was not accepting of their opinions.

Q. Okay. And just to be clear, that is something that they reported to you?
A. Them or Ali.
Q. Okay. But not something that you witnessed personally, correct?
A. Correct.
Q. Okay. And what about any unprofessional, rude behavior that you have learned about?
A. He disparaged workers, the Mexican workers.
Q. And who told you that?
A. I don't recall.
Q. Okay.
A. And he -- Ali dealt with him a lot, and he was very erratic and uneven, you know, with her.
Q. And that's something that she reported to you?
A. Yes.
Q. Okay. You mentioned Iris Thorpe. She was your interior decorator; is that correct?

A. Yes.
Q. Have you had any interactions with Iris Thorpe with respect to the Pacific claim that we're here to talk about?
A. We've discussed it on a general level but nothing specific.
Q. What do you mean about discussed it on a general level?
A. How's it going.
Q. Okay. And what was her response?
A. It depends on when I was asking that question.
Q. Okay. Fine. Let me ask you a little bit more of a specific question. You're aware that there is some dispute as to the contents claim that was being presented, correct?
A. Yes.
Q. And that is an element of your claim?
A. Yes.
Q. What knowledge do you have with respect to your contents claim and Ms.

Thorpe's involvement with that?
A. So, her and Ali worked very hard -- I think our -- we -- the cap is approximately one point five million on contents. And she was our first source of getting -- putting our contents package together. And so, she got -- Ali and her worked hard to go through, you know, their fifteen years of buying things for our house and itemizing and got receipts on them as best possible. And we believe that everything they put together is correct, legitimate, and complying with the claim and that Chubb did not fully accept our contents claim. And I'm not sure that that's moratory but --
Q. Okay. I understand what you mean.
A. Yeah.
Q. Did you have any involvement in preparing the contents spreadsheets that have been provided to Pacific in this lawsuit?
A. No.

Q. Did you have any involvement in identifying the replacement costs of any of those contents?

A. No.

Q. How involved were you with the decorating of 3305 Dell Road?

A. Very little.

Q. Okay. Were there any specific rooms that you were responsible for decorating or primarily involved in decorating?

A. No.

Q. Were there any specific category of contents that you feel particularly strong about?

A. No.

Q. My understanding is that there was a number of antiques at the house; is that right?

A. Yes.

Q. Did you have any involvement in selecting and purchasing those antiques?

A. No.

Q. Okay. Prior to the fire, had you had any discussions with Ms. Thorpe about your contents?
A. No.
Q. You mentioned that you believe you've provided documentation that complies with the claim. What do you mean by that?
A. The policy asks in order -- sets out requirements to be reimbursed for your contents. And Ali and Iris put together a -- met all those requirements required in the policy --
Q. Okay.
A. -- to be funded for the claim.
Q. Were you aware that there were requests for additional documentation regarding the replacement costs of some of those items?
A. Yes.
Q. And do you know what documentation, if any, was provided in response to those requests?
A. No.

Q. You were not involved in providing any of that documentation?

A. No.

Q. Okay. What about the dwelling portion of your claim; how involved were you in the decisions to demolish the house and rebuild the house?

A. That was -- that was Ali and I's decision.

Q. Okay. And how did that decision come about?

A. So, the fire code in November of 2019. You know, there was a time period where they were removing debris from the house. And at some point -- and the dates are probably -- we submitted the global settlement offer.

During the spring, we were -- we were working with Chubb, and we were trying to figure out the financial plan to rebuild the house. You know, we had a hope and a belief that our insurance claim would be repaid in compliance with the policy and that

that would provide the money to rebuild, repair the house, whichever we decided to go.

The process was moving slow in the spring. We were not getting the -- Chubb was not quickly responsive, and the house was kind of deteriorating. We received that -- the response to the global settlement offer. And as time passed on, we kind of realized that we needed to -- that it was, I guess, our decision on how to rebuild, repair the house. And the cost difference between the two was not big enough for -- that we were more comfortable knocking the house down, that we would not have to, you know, worry about lingering smoke damage, you know.

And so, that was our decision because we felt -- we also -- you know, we have daughters that we -- our goal was to get back in that house and as quickly as possible. And so, the house was sitting there. And we weren't getting clear answers from the insurance company. And so, we said, well, let's -- we need to begin the process

of rebuilding the house.

Q. Okay. The house was demolished and rebuilt, correct?

A. Yes.

Q. When was that decision made to demolish and rebuild the house?

A. June of 2020.

Q. Okay. Prior to June of 2020, what was -- what was your position with respect to the house?

A. We -- my goal and our -- was to get into the house as -- I mean, I didn't -- as quickly as possible, I guess. I just wanted to get back into the house. And I was open to repair or rebuild, depending on cost factors and how confident I was that if we repaired the house, it would not have lingering effects from the fire.

Q. Did you ever have any discussions with any of the individuals involved in addressing the damages to the house regarding replacement or rebuilding of the house?

A. I mean, with Cliff Zlotnik would

be the only -- kind of his process and what he -- what he thought about -- I was -- what he thought about repairing the house, if it can satisfactorily be done.

Q. And what was his position on that?

A. That you could do it if you followed -- if you did what he told everybody to do.

Q. And when did you have that conversation with Mr. Zlotnik?

A. January or February of 2020. I don't recall.

Q. Did you have any involvement with selecting Mr. Zlotnik as an expert?

A. No.

Q. Okay. Was that a decision that your wife made?

A. Yes.

Q. Had you heard about Mr. Zlotnik before?

A. No.

Q. Other than this conversation with

him in January of 2020, did you have any other discussions with him regarding your house or your claim?

A. I mean, he came -- when he came, we, you know, walked around the house with him.

Q. That was around February; is that correct?

A. I think so.

Q. Okay. Who else was in attendance at that meeting?

A. Other than Ali, I don't recall.

Q. Okay. So, it was, to your recollection, you, Mr. Zlotnik, and Ali, and there may be other people, but you don't remember them; is that right? Is that fair?

A. Correct. Yes.

Q. How involved were you in the design and original build of the 3305 Dell Road property?

A. Not very.

Q. That was something that your wife also handled primarily?

A. Yes.

Q. Did you have any discussions with TCC following the fire about the property, the damage to the property?

A. I mean, with what regard or --

Q. Any discussions with TCC about the damage to the property, you personally.

A. I mean, we worked with them on getting a cost estimate for repair and rebuild.

Q. Okay. When was that provided?

A. I don't recall.

Q. Is it your understanding that they gave you an estimate for both repair and rebuild?

A. I don't recall.

Q. Have you reviewed your insurance policy, your Pacific insurance policy?

A. Since the fire, yes.

Q. Okay. When was the last time that you reviewed that policy?

A. I don't recall. It's been a while.

MS. AQUINO: Can you pull up that booklet?

Q. Okay. And on Tab 1 of that booklet, about sixteen pages in, you'll get to a page that says Page 2, and it starts with policy type, Homeowners. It kind of looks like this (indicating). It comes right after where it says Alabama Outline of Coverages. It's the page after that. Unfortunately, they're not sequentially numbered, so it's kind of --

A. Uh-huh. Okay. I'm there, I believe.

Q. Yeah, there you go. You're on the right page.

Okay. Take a second to just glance through that and just let me know when you're ready.

A. Okay.

Q. Have you seen this page before?

A. I don't recall.

Q. Does it look like -- does it look familiar at all to you?

A. I mean, I don't recall.
Q. Okay.
A. No, I guess.
Q. It does not? Okay.
A. No.
Q. That's fair. So, starting at this middle block where it says house coverage, do you see where it says amount of coverage, three million dollars, and there's payment basis, extended replacement cost?
A. Yes.
Q. That is the amount of coverage for the dwelling portion of your policy, correct? Is that your understanding?
A. Yes.
Q. Okay. And then, if you go down to -- right below where it says other permanent structures, there's a large block of text; do you see that?
A. Uh-huh.
Q. Take a second to read that data block, please, if you don't mind.
A. Okay.

Q. So, starting in the first paragraph, it says, extended replacement cost means the reconstruction cost for your house or other permanent structure up to fifty percent more than the amount of coverage if the reconstruction cost is greater than the amount of coverage. Did I read that correctly?

A. Yes.

Q. Okay. And then, reconstruction cost is a defined term. At the very last paragraph, it states, reconstruction cost means the lesser of the amount required at the time of loss to repair, replace, or rebuild at the same location your house or any other permanent structure using like design and materials and workmanship of comparable kind and quality. Did I read that correctly?

A. Yes.

Q. You agree with me that reconstruction cost pursuant to this definition is either the cost to repair,

replace, or rebuild, correct?
A. Well, it's the lesser of -- so, it's not -- well, I'm not -- it's the lesser amount. It says not either.
Q. But the lesser of one of these three options, correct, not a combination thereof; is that your understanding?
A. What's the third option?
Q. Repair, replace, or rebuild.
A. Okay.
Q. On the very first line.
A. Okay. Yes.
Q. Okay.
MR. DAUPHIN: I object to the form. I don't know what the difference in replace and rebuild is. So, I don't know if there's three options or two.
MS. AQUINO: Well, I just read what the policy says.
Q. And then, if you go down to contents coverage, it says amount of coverage, one point five million dollars. Is that what you were referencing when you said

that the cap was one point five million?
A. Well, I said approximately because I know there's costs of -- or there's -- it's --
Q. But this is the number that you were referencing?
A. Yes.
Q. Understood. That was the contents portion of the coverage?
A. Correct.
Q. Okay. And then, it says deductible, five thousand dollars at the bottom. Do you see that?
A. Yes.
Q. Okay. Following the fire, did you have any discussions with anyone affiliated with Brookstone Restoration?
A. After the first day or two when they were on site, no.
Q. Okay. And what were the -- what was the nature of your interactions with Brookstone during those early days?
A. Discovering what they were doing

and what they were going to do with our stuff that they were removing.

Q. And what did you -- who did you primarily deal with with Brookstone?

A. I've forgotten the guy's name.

Q. Was that Andrew Arrant?

A. I guess so.

Q. Okay.

A. I think so.

Q. That's fine. If you don't know, that's okay.

A. Yeah. I don't know.

Q. So, following those early days, you had some discussions with them while they were on the property physically; is that correct?

A. Yes.

Q. Did you ever have any discussions with them over the phone?

A. Not that I recall.

Q. With respect to addressing the damages to the property itself, is that something that your wife handled mostly?

A. Sorry. The --
Q. The discussions --
A. Is this with Brookstone?
Q. -- with Brookstone.
Yes.
A. Yes.
Q. Okay. At some point, you guys terminated your relationship with Brookstone; is that right?
A. Yes.
Q. Why was that?
A. They were -- well, they went behind our back with Jeremy with regards to -- what's the right word -- their removal process or their -- they were supposed -- we hired -- technically, we -- they were our -- they were working for us, but they were acting like they were working for Jeremy. They were following Jeremy's actions, or directions.
Q. And what makes you say that?
A. Well, because emails were found between Jeremy and Brookstone indicating that

that was what they were doing.
Q. And who found those emails?
A. Well, they were -- I don't know the exact circumstances how they were found.
Q. How did you learn about the emails?
A. In discussions with Ali and Chuck and Diane.
Q. Okay. And did you ever see the emails?
A. No.
Q. Did you have any discussions with anyone at Brookstone after you learned about these emails and their conversations with Jeremy Elliott?
A. No.
Q. Did you have any involvement in selecting Slade, LLC?
A. No.
Q. Did you have any conversations with any individual affiliated with Slade, LLC, regarding the damage to the property?
A. No.

Q. What is your understanding of what Slade, LLC's purpose with respect to your property was?
A. Remediation.
Q. Remediation of what?
A. Of -- and -- well, I don't know other than generally smoke and water and fire remediation is what they --
Q. Did you ever review their estimate or remediation proposal?
A. No.
Q. Was any smoke remediation ever performed at the house?
A. I don't know.
Q. Do you know if Slade, LLC, ever did any work for you at the property?
A. I don't know.
Q. As we've discussed before, the house was demolished and rebuilt, correct?
A. Correct.
Q. Was it entirely demolished and rebuilt or was there any other aspects of the house that were not demolished?

A. The basement area and the garage.
Q. Was there any damage to the garage that needed to be addressed following the fire?
A. I don't recall.
Q. And how about the basement; was there any damage to the basement following the fire that needed to be addressed?
A. It had water. It's a concrete structure, but it had water. I mean, that's where -- the water obviously goes to the lowest point. And that's -- there was a couple feet of water in the basement. But other than that, I don't know.
Q. Did you say there is currently water in the basement?
A. No. Shortly after the fire.
Q. Okay.
A. Yeah.
Q. Just making sure.
A. Yeah. Yeah. No.
Q. Do you know if any type of smoke or mold remediation was done to the basement?

A. No.
Q. Do you know if there was any smoke or mold remediation done to the garage?
A. I don't know.
Q. Following the fire, did you have any discussions with Hank Long of Sprott Long & Associates with respect to your property?
A. Yes.
Q. When were those conversations?
A. As part of the -- well, you know, he was going to work with us as part of the repair or rebuild. And I -- you know, he -- we did change some things in the repair. So, there was part of that. I mean, he -- and I guess I never -- I never got his opinion with regards to whether we should repair -- or I don't recall what his opinion was as to whether we should repair or rebuild the house.
Q. What was Mr. Long's purpose with respect to the house?
A. He's an architect.
Q. He designed the house?

A. He designed, yes, the original house.

Q. And then, you mentioned that he also did some redesign for the reconstruction of the house; is that --

A. Yes.

Q. -- is that correct?

A. Yes. And he over -- you know, the builder would call him with -- you know, he was always available to answer questions as it came up. I mean, he was kind of on a retainer type.

Q. Okay. What is your understanding of his oversight involvement or supervision involvement?

A. I mean, he was available and would meet with us and Marbury as -- both times as we rebuilt the house and provide guidance and answer questions that they have about, you know, construction issues.

Q. When you say both times, you mean the original building of the house and then the rebuilding of the house?

A. Yes.
Q. Okay. Do you know why Mr. Zlotnik was hired instead of a local individual with similar expertise?
A. He was -- I'm not sure that that was available in Birmingham, and he was recommended.
Q. By whom?
A. I don't -- I don't recall.
Q. Did you have any involvement in selecting Mr. Zlotnik to work on your property?
A. No.
Q. Did you have any discussions about Mr. Zlotnik's fee with Pacific?
A. No.
Q. Is that something that your wife handled?
A. I don't know.
Q. Okay. What is your understanding of what his fee was?
A. Expenses and twenty-five thousand dollars.

Q. Do you know if you have been paid by Pacific for any of those expenses?
A. I know -- well, fifteen thousand.
Q. Okay.
A. And I don't know other than that.
Q. Were you involved in any of the discussions regarding how much Pacific would pay towards Mr. Zlotnik's fee?
A. No.
Q. We had some extensive discussions with your wife yesterday about your additional living expenses. Were you involved at all in preparing the spreadsheet with your additional living expenses?
A. No.
Q. Were you involved at all in submitting any additional living expenses for reimbursement to Pacific?
A. No.
Q. Following the fire and after you guys moved into the rental property, what utilities and expenses were you still incurring at the Dell Road property?

MR. DAUPHIN: If you know.
A. Yeah, I mean, I don't recall.
Q. (BY MS. AQUINO) Who is primarily responsible for paying your utility bills?
A. Ali.
Q. Ali does? Okay.
A. Yeah.
Q. Do you know if you still had electricity at the property, at the Dell Road property, following the fire?
A. I mean, I know we shut -- it was DIRECTV. We shut them off. I think the fire department cut the electricity. I don't recall during the construction process what the status of that was. You know, I don't recall other than, generally, we obviously stopped, you know, any services we didn't need at the house anymore relatively quickly after the fire.
Q. Were you involved in suspending any of those services or was that something that your wife handled?
A. I don't recall.

Q. Do you know how much your utility bills were at the Dell Road property prior to the fire, generally speaking?
A. No.
Q. That's something that also your wife handled?
A. Yes.
Q. Okay. Do you know how much your utility expenses were at the rental properties, generally speaking?
A. I mean, generally? Well, no.
Q. Okay. Like, if I asked you how much your electric bill was on average, do you know that?
A. No.
Q. Was that also something that Ali handled?
A. Yes.
Q. You had contents in storage while your home was being rebuilt, correct?
A. Correct.
Q. Where were the storage units that you guys were utilizing?

A. I'm sorry. What?
Q. The storage unit facilities, do you know where they were?
A. They were in the east part of town called Eastwood, I guess. It's near Montevallo Lane.
Q. Do you know the name of the storage facilities?
A. I don't recall.
Q. Do you still have any items in storage?
A. No.
Q. When was the last time that you had any items in storage?
A. I don't recall exactly.
Q. Okay. Would it be fair to say it was shortly after you guys moved back into the property?
A. Yes.
Q. Okay. Did you have any involvement in the landscaping of Dell Road?
A. Very little.
Q. Okay. What was your involvement?

A. Well, I helped pay for it and --
Q. That's fair.
A. Yeah. I made my thoughts known and was overruled.
Q. Okay. So, fair to say that that was something that your wife handled primarily?
A. Yes.
Q. Okay. Did you have any discussions following the fire about the replacement or repairs to your landscaping?
A. Not -- I mean -- no. I know we moved some plants down into a part and tried to save them. That was the extent of -- we moved them to a part of the house, and they set up a water system to try and sprinkle -- to have the water. And every once in a while, we'd go take a look and see how they were doing but not really.
Q. Okay. What is your understanding of what damage your landscaping sustained from the fire itself?
A. I don't know. You know, it was

not something I was focused on in the first days after the fire.

Q. Okay. Do you know anything about what damage, if any, your irrigation system sustained?

A. It was broken.

Q. And how so?

A. I mean, I don't -- it didn't work. I don't know exactly past that.

Q. Do you -- do you know what happened to it?

A. No.

Q. Okay. Have you had any discussions with Magali Maus regarding your contents following the fire?

A. No.

Q. Do you know who that is?

A. Yes.

Q. What does she do?

A. She -- well, I know her because she'll come to our house and refurbish antique items. And so -- and she did that with items after the fire, made them --

repaired them and made them look better, I guess, is the --

Q. Okay. But the discussions with Ms. Maus regarding those contents, that's something that your wife handled?

A. Yes.

Q. What about with Iris Thorpe; did you have any discussions with Ms. Thorpe regarding your contents following the fire?

A. No.

Q. Again, that's something that your wife handled?

A. Yes.

Q. What was the extent of your involvement with submitting the proofs of loss to Pacific regarding your claim?

A. Remind me what the proof of loss --

Q. Okay.

A. -- is.

Q. Sure. I can show it to you. Give me one second.

A. Yeah.

Q. It's going to be on that book in front of you. Let me give you a tab number. I believe it's Tab 39, but let me make sure.

MR. DAUPHIN: I can show you this one, Charles. I don't think that has anything behind that tab in copying.

THE WITNESS: Okay.

MS. AQUINO: I think at some point, we ran out of tabs.

MR. DAUPHIN: It's got the tab. There just wasn't -- I don't know what happened to the attachment.

MS. AQUINO: Oh.

Q. And this is just -- this is a sample form. So, this is not the ones that you guys filled out. But do you --

A. Right.

Q. Do you recall seeing a form similar to this form?

A. Yes.

Q. What was your involvement with completing these forms?

A. Let me read it.

Q. Sure.
A. Well, I verified that it was correct and signed it.
Q. Okay. Is this something that your wife was primarily responsible for completing and filling out?
A. Yes.
Q. Okay. During your prior examination under oath, there was some discussions about some damage to your septic field and some septic tanks. My understanding is that the septic field and septic tank did not actually sustain any damage, correct?
A. I --
Q. If you know.
A. I don't know. Yeah.
Q. Okay. Do you know if there was any repairs or replacement done of the septic field or septic tank?
A. I know it was not replaced.
Q. Okay. Do you know if it was repaired at all?

A. I don't know.
Q. Okay. Prior to the fire, you had a mortgage on 3305 Dell Road, correct?
A. Yes.
Q. Did you ever have to notify your mortgage company of the fire?
A. Did I ever -- so -- this is -- the mortgage -- so, we borrowed the money from my parents, and Synovus Bank was the fiduciary.
Q. Okay.
A. So, they were notified and aware.
Q. Did they ever send anyone to the house to do an inspection of the property either during the reconstruction process or after the rebuild?
A. Synovus?
Q. Yes.
A. No.
Q. Okay. Did you ever have to notify them once the house was completely rebuilt?
A. They -- I don't know if we had

to, but they were notified.

Q. Okay. Were there any changes to your mortgage as a result of the fire and rebuilding of the house?

A. Yes.

Q. In what respect?

A. I would -- I need to look at -- go -- at this time, I don't -- I would need -- to make sure I'm right, I would need to go through some documents and --

Q. Okay.

A. -- and figure that out exactly.

Q. Is it still through the same fiduciary, so still through Synovus?

A. Well, so, to -- yes. And then, there is -- to help finance the reconstruction and repair, Oakworth Bank has a second security on the house, or they're behind the Synovus.

Q. So, kind of like a second mortgage?

A. Yeah.

Q. Okay. And is that a construction

loan or is it like a refinancing, a second mortgage?
A. It was a construction loan, and now, it is a second --
Q. Mortgage?
A. -- mortgage, yeah.
Q. Okay. When did you take out that construction loan initially?
A. I don't recall.
Q. Is that something that you handled?
A. Yes.
Q. Is that something that you would be able to determine if we had a chance to go through some documentation?
A. Yes.
Q. Okay. If you could do that, at some point, we're going to send some requests to your attorney. But --
A. Okay.
Q. -- just letting you know that that's coming.
A. Okay.

Q. Thank you. And you said that it's Oakworth or Oakwood?
A. Oakworth.
Q. Oakworth. Thank you.
You did not have to pay any penalties or early termination of your initial mortgage as a result of the fire, correct?
A. I don't know.
Q. Okay. Is that also something that you would be able to determine?
A. Yes.
Q. Prior to -- and I think I asked you a similar question. So, if you don't know the answer to this, it's absolutely fine. Prior to the fire, do you have any estimates of what your monthly expenses were excluding your mortgage for the Dell Road property?
A. No. Or I don't know. Yeah.
Q. Similar question. Following the fire, do you have any estimate of what your monthly expenses were with the rental

properties, excluding rent?
A. No.

(Whereupon, a discussion was held off the record.)

Q. (BY MS. AQUINO) Bear with me one second.
A. Sure.
Q. We have a lot of paper.
A. Uh-huh.
Q. Okay. What I'm handing to you is a copy of plaintiff's responses to the interrogatories that we served through your attorney. Now, my understanding is that these responses were prepared by your attorney, but have you had a chance to review these before they were served? And take a moment to go through if you would like to.
A. Yeah. I don't recall if I've seen this before or not.
Q. Okay. If you could turn to where it says Interrogatory Number 3, please.

A. Okay. Okay.
Q. Take a moment to read that and just let me know when you're ready.
A. Okay.
Q. There are some figures identified in plaintiff's response to Interrogatory Number 3 for the specific portions of your coverage with Pacific, the dwelling, the landscaping, the contents, and the additional living expenses, which is abbreviated as ALE; do you see that?
A. Yes.
Q. Did you have any involvement in arriving at those figures?
A. No.
Q. Is that something that your wife primarily handled with your attorneys?
A. Yes.
Q. Okay. Do you have any reason to dispute those figures?
A. No.
Q. If you could turn --
MR. DAUPHIN: Before we leave

that --

MS. AQUINO: Sure.

MR. DAUPHIN: -- there's one point I want to make.

We were talking yesterday about the ALEs that were incurred. We gave you a master list.

MS. AQUINO: Yes.

MR. DAUPHIN: I think you thought that we had not given that to you beforehand. But according to this interrogatory, it was attached to here and did cover the time through November of 2021, whereas --

MS. AQUINO: That's correct.

MR. DAUPHIN: Okay.

MS. AQUINO: Yeah. And then, the one you gave me yesterday was all the way through their move back to Dell Road, correct?

MR. DAUPHIN: Same one. We only went -- the policy says two years. So, I only went to November.

MS. AQUINO: Okay.

MR. DAUPHIN: They moved in in January, so --
MS. AQUINO: I believe the discrepancy --
And we can go off the record for this.

(Whereupon, a discussion was held off the record.)

MS. AQUINO: We can go back on the record, please.
Q. If you could turn to, I believe, the second to last page of that --
MR. DAUPHIN: Well --
Q. (BY MS. AQUINO) -- there should be a verification.
MR. DAUPHIN: Let me add this.
MS. AQUINO: Sure.
MR. DAUPHIN: To the extent that what we provided in Interrogatory Number 3 did not include the move back expenses, we are claiming those, also.

MS. AQUINO: Understood. And I will clarify that for you at a later time. I just don't have that in front of me right now.

A. So, where am I going?

Q. (BY MS. AQUINO) You're looking for a verification that identifies you. Do you see that? And I can find that page for you if you would like.

A. Okay.

Q. Okay. Do you see that?

A. Yes.

Q. And it says, verification. If you can take a second to read that to yourself and let me know when you're ready.

MR. DAUPHIN: I'm sorry. There's your signature (indicating). The verification is on the next page.

THE WITNESS: Okay.

A. Uh-huh.

Q. (BY MS. AQUINO) Okay. And then, if you turn back to the prior page, that is your signature on that page, correct?

A. Yes.
Q. Okay. Did you review the verification and were you aware that you were swearing that everything in your interrogatory responses were true to the best of your knowledge?
MR. DAUPHIN: Well, hang on a second.
MS. AQUINO: And I can quote the verification if you would like me to.
MR. DAUPHIN: Go ahead.
A. Okay. So, repeat the question.
MS. AQUINO: Ma'am, can you repeat my question? I don't remember know how I phrased it.
A. Yeah.

(Whereupon, the desired portion of the testimony was read back by the court reporter.)

A. Yes.
Q. (BY MS. AQUINO) Okay. I want to

switch gears a little bit. Are you aware that you guys have submitted a expert report by a Dr. Riner with respect to Mrs. Goodrich's psychological and psychiatric damages in connection with this lawsuit?

MR. DAUPHIN: Let me object to the form. It's not limited to that. That was a part of it, but it was a -- it was provided primarily as expert opinion as to bad faith and outrageous conduct.

MS. AQUINO: That's fine.

A. So, I'm aware that we submitted --

Q. (BY MS. AQUINO) Do you want me to rephrase my question?

A. Or -- yes. Or remind -- yeah.

Q. I'll actually ask you this: Do you know who Dr. Riner is?

A. Not -- well, do I know who she -- I know who she is, yes.

Q. What is your understanding of what her involvement is with respect to this case?

A. So, when she has submitted -- she has spoken with Ali over the phone or Zoom and is working with us regarding our mental anguish claim and gaslighting claim.

Q. Did you have any conversations with Dr. Riner with respect to this case?

A. No.

Q. Were you present for Dr. Riner's conversations with your wife?

A. No.

Q. You used the term "gaslighting". What do you mean by that?

A. That Chubb slash Pacific has lied slash manipulated us, primarily, Ali, during this process with regards to our getting our claim paid.

Q. Do you have any personal knowledge about any conduct on the part of Pacific that you define as gaslighting? And by that, I mean directed at you and that you were -- excuse me -- that you were present for?

A. Well, the December 13th meeting

probably was the beginning. And I was present for that. Because I have not -- well, I'm aware that Ali has been gaslit, and, obviously, that affects me --
Q. Okay.
A. -- as well.
But I have had very limited direct interactions with Chubb or Pacific. Yeah.
Q. I just wanted to make sure that you were finished.
A. I think I'm finished, yeah.
Q. Okay. You said that you are aware that Ali has been gaslit. How are you aware of that?
A. Via conversations with Ali.
Q. Okay. So, that's something that she told you?
A. Yes.
Q. Did she describe it as being gaslit or is that your word?
A. I mean, I see it as kind of interchangeable with lie or lied to probably.

So, that's the word that -- yeah.

Q. Your understanding is that you're using the terms "gaslighting" and "lying" interchangeably?

A. Yes. That's a component of gaslighting.

Q. Do you know what component -- what the components of gaslighting are?

A. A legal definition, I do not know.

Q. What is your knowledge of what gaslighting means?

MR. DAUPHIN: That's already been answered.

Go ahead.

A. Manipulating a circumstance or person to achieve your desired outcome.

Q. (BY MS. AQUINO) And what conduct did Ali describe to you or relate to you of Pacific that you would qualify as gaslighting?

A. So, I would -- my -- in the response to the -- probably with my

experience would be the response to the global settlement offer. You know, we put forth a specific dollar amount that we were willing to accept as -- and that the claim would be paid and removed. And the response letter did not have -- did not -- it -- all it said was things that Chubb did not think they should pay for and did not -- it was not a response to our letter.
Q. What do you mean by that?
A. That there was no attempt to settle the claim --
Q. Okay.
A. -- in that letter.
Q. Let me rephrase the question. You agree with me that it is possible for parties to disagree as to the value of a claim, correct?
A. Yes.
Q. And if a party disagrees with a settlement value, they have to set forth the reasons why they disagree, correct?
A. Well, they don't have to but --

Q. But that would the fair thing to do, correct?
A. Okay.
Q. So, if you are responding to a demand, you would expect someone to tell you what their position is with respect to your demand?
A. Well, it was not a demand.
Q. Okay.
A. It was an -- it was an offer.
Q. Okay.
A. And, you know, generally, when you're negotiating with someone, you know, you either accept or refuse an offer. And if you choose to, you can put forth a -- your offer.
Q. Okay.
A. And no offer was put forward.
Q. Would you consider discussions of --
A. And no offer was put forward. But they didn't explicitly reject our offer.
Q. What would you consider their

response to be?

A. It was just -- it was -- it basically listed things that Chubb was not willing to pay for.

Q. Did it set out any reasons for why Chubb was not willing to pay for those?

A. I mean, you know, I recall, like, garage doors. You know, we weren't certain at the time of whether -- and it's a fair point, whether that would have to be paid for, the generator.

Q. So --

A. And -- yeah.

Q. I'm sorry. Go ahead.

A. No, I'm done.

Q. Okay. What part of that response letter to your settlement offer would you describe as being -- I don't know if gaslighting is a word, but indicative of gaslighting?

A. It was not a legitimate response to our global settlement offer.

Q. When you sent out the settlement

offer, what type of response were you expecting?

A. I was expecting engagement with an attempt to resolve the claim.

Q. So, you were expecting a number in return, if they didn't accept your number, to have to give you a number back?

A. Sure.

Q. If they gave you a number, would you also expect to have an explanation of why they arrived at that number?

A. Yes. And we thoroughly explained in our -- how we arrived at our number.

Q. Okay. In the response letter that you -- that you reference, was there any -- do you recall seeing explanations as to why Chubb was disputing some of the items if your offer?

A. Yes.

Q. And do you recall that there were discussions -- and, again, I understand that you were not maybe directly involved with these. But do you understand that there were

discussions back and forth several times about the replacement costs of some of your contents and some of the supporting documentation that was received? Are you aware of those discussions?

MR. DAUPHIN: Well, I object to the form. It implies that the plaintiffs changed their position on the contents. They didn't. They were consistent.

MS. AQUINO: I'm not so sure that's what I was trying to get at, so I don't know that that's what is implied. But I'll rephrase the question.

MR. DAUPHIN: Okay.

Q. (BY MS. AQUINO) Were you aware of discussions either between Ali or your attorneys and Pacific with respect to your contents replacement costs?

A. I mean, I was aware that we were discussing that.

Q. And are you aware that there were requests for additional documentation with respect to your contents replacement costs?

A. Yes.

Q. Was that one of the items itemized in that response letter, to your recollection?

A. I don't recall.

Q. Do you know if there was ever any response to the request for additional documentation for the contents claim?

A. I don't recall.

Q. Were you involved in providing any response to that request for documentation?

A. No.

Q. Okay. You also mentioned that you are aware that Ali was, I think you used the term "gaslit", and that that affects you. How does that affect you?

A. Well, I mean, obviously, she's my wife. So, you know, we're dealing with a tough situation. And it was made more difficult through the actions of Chubb. And so, we're both very stressed out about the fire and then the time and financial and our

children's mental well-being with all the change and things that they're going through with at that time. And so, I mean, that's how it affected me. It added to an already stressful situation.

Q. Okay. What have you observed personally about Ali's emotional, psychological state?

A. You know, she's -- well, you know, she's, at times, been very emotional, crying, and very frustrated with Chubb, as have I been. And, you know, we both had very high -- definitely, at specific points, had very high stress levels. And we were frustrated because we could not get -- you know, this was a new situation to us, and we were working -- and we felt -- and our insurance company was not working with us to navigate the stress. They were adding to the stress.

Q. How did -- you mentioned increased stress. How did that manifest for you?

A. And, you know, sleep at varying -- at different points was difficult. I think I was definitely shorter with my -- with Ali and the children. And probably increased alcohol consumption would be -- you know, it was -- it was -- those would -- the ones I've noticed and had in looking back on it.

Q. And from what you observed, how did that increased stress manifest for Ali?

A. She had definitely -- she had more sleepless nights than I did. She -- more -- very hard to put a lot of this documentation together, and then, it was not valued by the insurance company, which kind of added to her frustration. She was -- you know, we all had -- since this became her primary responsibility, you know, she had less time for her family, which stressed her out and made her sad.

And, you know, especially at the beginning, we're navigating an unfamiliar situation, and we were all on a high stress

level. And so, it was -- you know, we were probably both short with each other and our children at various points and friends and family -- other family as well.

Q. Did you ever have any discussions with any type of psychiatrist or psychologist regarding your emotional and psychological state following the fire?

A. I did not.

Q. Were you ever present for any conversation that Ali may have had with such professionals?

A. No.

Q. Do you believe that the fire itself in any way contributed to your emotional status?

A. Yes.

Q. In what way?

A. I mean, it's a hugely -- it just disrupts your life completely, so, you know -- I mean, it -- and Ali's -- I mean, you have to go out and buy new clothes for -- I mean, you basically start at kind of ground

zero to some extent of trying to start with the very basics of going and buying a toothbrush for your kids and for yourself and going, you know. And then -- and then, you've got to find a place to live and you've got to try and get your kids to school and try and do your job. You're just dealing with way too many things.

Q. A lot of things to handle --

A. A lot of things --

Q. -- at the same time?

A. Yeah.

Q. Do you believe that the fire itself contributed to Ali's emotional status in any way?

A. Yes, the same --

Q. Same thing?

A. Same thing.

Q. Do you believe that the claims process following the fire was more stressful than the fire itself?

A. It all -- it all blends into one. It's hard to evaluate where the stress is

coming from when you're at a very high level. I don't -- I don't know which is -- you know, I think the first month after the fire was kind of all stress from the fire. And then, that lowered, and the claims process went up at that point, I guess.

Q. Okay.

A. Yeah.

Q. And at some point in early 2020, you also started dealing with the coronavirus pandemic, right?

A. Right.

Q. Do you believe that that added to your stress level in any way?

A. I mean, sure, when you can't leave your house or -- yeah, I mean, when the world shuts down.

Q. Yeah. I think, at that point, we were all pretty stressed out.

A. Right. Yeah.

Q. Do you know -- strike that.

What is your understanding of the impact of the pandemic and any subsequent

shutdowns had on your timeline for construction rebuilding and addressing your damages?

A. I mean, it lengthened it. You know, there was labor. There was definitely times when we were rebuilding the house that labor was short and they were short some supplies at times and made it more expensive because both of those costs went up. You know, I can't tell you exactly, well, it took six months longer because --

Q. Uh-huh.

A. -- they couldn't find the people.
But it did lengthen it.

Q. Was there ever a time where the repairs or reconstruction of your house was completely shut down because of the pandemic?

A. I don't recall.

Q. Okay. Have you seen Dr. Riner's report that she provided --

A. I have not.

Q. -- in this case?
One second. Let me pull that up.

I think we have that as an exhibit.

MS. AQUINO: Do you still have your copy, Chuck?

Q. This is Defendant's Exhibit 8. I'll represent to you that this is a copy of Dr. Riner's report that was produced to us. And I don't need you to read it. It's fairly lengthy. But I just -- there is a mention in this report that Ali had a preexisting diagnosis of obsessive compulsive disorder. Are you -- are you aware of that diagnosis?

A. Yes.

Q. Okay. And what is your knowledge with respect to Ali's obsessive compulsive diagnosis and behaviors?

A. Well, I mean -- well, please say that question again. What is my knowledge --

Q. Let me ask you in a different way because maybe that was a bad question.

So, you said that you knew that she had been diagnosed with OCD in the past, correct?

A. Uh-huh.

Q. How does that OCD manifest for Ali from what you've observed?
A. So, it's gotten much better. She -- there were times where she had, I guess, control issues and that -- yeah.
Q. Do you know when it started?
A. No.
Q. She mentioned yesterday that she sought treatment for OCD around 2007, and that was partly at your suggestion; do you recall that?
A. I mean, I don't recall the exact -- I remember discussing it with her. I don't recall the exact conversation. But I remember, you know, discussing it with her, yes.
Q. Okay. Around the time in 2007 when she first sought treatment for OCD, what kind of behaviors were you observing from her that concerned you?
A. So, we were newlyweds at that point, or had been married a year, a year to two, I guess. So, it -- you know, I don't

recall specific instances. I would say it's trying -- discovering or -- I don't recall, you know, specific things that occurred during that time period, I guess. I recall discussing it with her and become -- I guess, maybe making her aware of some of her behavior.

Q. And that's --

A. But I don't recall --

Q. -- kind of what I'm trying --

A. -- the behavior.

Yeah. Like -- yeah.

Q. What kind of behavior were you notifying --

A. I mean, I guess --

Q. -- her of --

A. So, she was in law school, and this was before we were married. And I remember -- right. She was -- she had a paper due. And she wrote, like, one page in two days. And it was due in a day. I remember thinking to myself, she can't -- she's got to go. But it was -- I guess,

later -- because she had issues of putting pen -- of, like, trying to make everything perfect.

Q. Okay. You mentioned that it got better. Around what time did it get better?

A. I mean, in the -- as we got married and had kids, it -- I mean, I -- you know, I'll say -- during that time frame of 2007 on when she started going to see Dr. Peacock, you know, that's when it started to get better.

Q. Okay. There's also mention in this report, and Ali confirmed yesterday, that she does have a prescription for Zoloft. Are you aware of that?

A. Yes.

Q. Is that something that she still takes?

A. Yes.

Q. And that's something that she started back around 2007?

A. I don't -- I don't know.

Q. Do you believe that the Zoloft is

helping or has helped?
A. Yes.
Q. Have you noticed any changes in Ali's emotional state with respect to her OCD behaviors since the fire?
A. I think it's -- the -- as life is stressful, it becomes -- it's -- it manifests itself in -- I mean, I think it's a little -- maybe a little more there, for lack of a better word, since the fire.
Q. In what ways?
A. She -- well, I mean, I think, like, putting -- like, doing all the work that she's done -- she's -- for -- to -- on our claim. I mean, she's done an incredibly thorough job. And I think that's part -- I mean, I think that's how -- I think that's part of -- you know, she's put together a report that is above what's asked for, and it's -- some of that's due to her OCD tendencies.
Q. You said a report that's above what's asked for. Asked for by who?

A. Chubb or Pacific or --

Q. And what makes you say that?

A. Well, that's my opinion.

Q. Okay. What do you believe it goes above and beyond? What portion of the report goes above and beyond what's asked for?

A. I mean, she's submitted, in my opinion, everything required by the claim to be paid.

Q. And what would -- in your opinion, what is required to be submitted under the claim?

A. Without -- I mean, what the claim says. Without looking at it, I can't tell you exactly the language and the -- but, you know, she's -- what the policy says, she has -- and everybody's worked on it. But she did the most of putting it together to try and get our claim resolved.

Q. Okay. Strike that. I didn't know where I was going with that.

And I know you don't know the

exact language of the policy, but from your -- from what you just stated, it sounds like your position is that you have complied with the terms of the policy. Is that what you were trying to say?

A. Yes.

MS. AQUINO: If we can take a quick break, I'd like to go through my notes. I have maybe a few more questions for you, but I want to make sure that I have everything lined up.

THE WITNESS: Okay. Great.

MS. AQUINO: Thank you.

We can go off the record.

(Whereupon, a brief recess was taken.)

Q. (BY MS. AQUINO) All right, Charles. I have just a few more questions for you.

A. Great.

Q. You talked a little bit earlier

about a generator. And my understanding from speaking with Ali yesterday is that the generator was not damaged from the fire, correct?

A. Correct.

Q. She mentioned that you made some modifications and added some -- I think the term she used was "lines" or "switches" to the generator for other areas of the house but that there was no other changes or repairs made to the generator; is that fair?

A. Yes.

Q. Okay. There's also some issues with the garage. Do you know what the -- what damage the garage sustained, if any, as a result of the fire?

A. I'm not sure. I don't know.

Q. Okay. The garage itself was not demolished and rebuilt, correct?

A. Correct.

Q. The items that were damaged by the fire, the contents items that were damaged by the fire, you've replaced some of

those items since the fire, correct?
A. Yes.
Q. I understand you may not have replaced everything, but there have been some items replaced; is that right?
A. Yes.
Q. Were you involved in purchasing those replacement items?
A. No.
Q. Okay. Other than maybe, like, helping --
A. My clothes or -- yeah.
Q. Yeah.
A. But, no.
Q. Okay. So, none of the furniture you were involved in picking out and purchasing, anything like that?
A. No.
Q. Have you seen any of the receipts or invoices for any of the replacement contents?
A. No.
Q. I will need this back from you,

but I'm going to hand you plaintiff's amended answer to Interrogatory Number 14. I believe you actually just signed that today.

A. Yes.

Q. Do you recall that?

A. Yes.

Q. If you could turn to Page -- I believe Page 2 of that document.

A. Okay.

Q. Take a moment to read that and just let me know when you're ready.

MR. DAUPHIN: Here's another copy.

A. Okay.

Q. (BY MS. AQUINO) And that is your signature on the bottom of Page 2, correct?

A. Yes.

Q. There is a paragraph in that document that mentions something about trick questions in your examination under oath and it identified page numbers; do you see that?

A. Yes.

Q. I will hand you Pages 46 and 47

from your EUO dated September 2nd of 2020.

A. Okay.

Q. Can you please let me know what question you are referring to in that document as a trick question?

A. Okay. Let me read the rest of it. Do you agree with me that if you are demolishing the home, there is no need to be performing any kind of smoke remediation, right? Yes was my answer. Yes, you agree with me? Yes. Yes. Okay. Yes. Okay. All right. So, that is not an amount that you guys are seeking, correct? Answer: Correct. That section.

Q. Okay. What about that question is a trick question, in your opinion?

A. Well, so, if you're tearing down the house, you don't need smoke remediation, but that's -- it doesn't -- the policy is not -- it doesn't matter -- it matters what the policy says. And you got -- Chubb can -- pays the lesser of repair or remediation. And that is part of the -- if you choose to

pay the remediation cost, that is part of the remediation cost. So, it doesn't really matter that we chose to knock the house down.
MR. DAUPHIN: Repair, I think. Go ahead.
A. Yeah.
Q. (BY MS. AQUINO) Is there any mention in that question about the language of the policy itself?
A. Well, do you agree with me -- say the question again.
Q. The questions that you identified that we --
A. Yeah.
Q. -- just talked about --
A. Right.
Q. -- is there any mention in those questions about the language of your policy with Chubb?
A. There is -- I mean, it depends -- there's not a specific mention, do you agree with me, being Alycen. I mean, she's a representative of Chubb. So, she is

representing -- that's --
Q. Well, my question was a little bit different.
A. Yeah.
Q. Is there any reference to the language of the policy in that question?
A. There is no specific reference to the policy language.
Q. And no smoke remediation was performed to the house, correct?
A. I don't recall if --
Q. I mean, actually --
A. -- we did --
Q. -- let me --
A. -- yeah.
I don't recall.
Q. -- restate that.
From Ali's testimony yesterday, there was smoke remediation performed to the basement and the garage to some extent.
A. Okay.
Q. There was no smoke remediation to the remainder of the house because the house

was demolished and rebuilt; is that your understanding as well?

A. Okay. Yes.

Q. Yes. Okay. So, the -- may I have this real quick?

A. Uh-huh.

Q. I don't want to misquote it. So the question was: If you are demolishing the house, paraphrasing, there is no need to provide any kind of smoke remediation, right? And your answer was yes.

Do you disagree with the statement that you were not performing any kind of smoke remediation to the house because it was demolished and rebuilt?

A. But it doesn't matter.

Q. That was not my question.

A. Okay. No.

Q. My question was --

A. Yeah.

Q. -- if you are demolishing and rebuilding the house, you are not performing smoke remediation to those portions of the

house, correct?
A. Correct.
Q. Okay. Now, you mentioned that it doesn't matter. Why does it not matter?
A. Because under the -- because under the policy -- and this is -- if you -- if Pacific chooses and -- so, to pay for the repair costs, then, that is part of the repair costs. And that's what you -- Pacific elects to do.
Q. But you are not repairing the house, correct?
A. No, we've -- we -- I mean, it's is -- it's a semantic question. We rebuilt the house, but it -- under the policy, you guys -- like, it doesn't matter what we -- whether we repaired or rebuilt it.
Q. Do you believe that Pacific or Chubb -- I get it. I'm using --
A. Yeah.
Q. -- the terms interchangeably.
But do you believe that Pacific or Chubb owes you for remediation repairs

that were never incurred?
A. Well -- and my understanding of the policy is that if you -- Pacific has the right to choose -- to pay the lesser amount between repair and rebuilding. We chose to rebuild --
Q. Uh-huh.
A. -- with the understanding that we would get money -- the money that it cost to repair.
So, I mean, basically, the whole -- any moneys paid was paid for -- I mean, not all of it, but a lot of the moneys paid was for money not -- work not done.
Q. If you are not repairing the house --
A. Uh-huh.
Q. -- which, in fact, you didn't.
You rebuilt the house, correct?
A. Right.
Q. Any amounts for the repair would have been estimates, correct?
A. Yes.

Q. Okay.
A. Yes.
Q. And would you agree with me that estimates change sometimes based on a variety of factors?
A. Yes.
Q. If you did not, in fact, repair the house, is there any way to determine what the cost to repair is other than an estimate?
A. I mean, I don't -- I don't know.
Q. How would you -- let me ask you this.
A. Yeah.
Q. How would you determine what the cost to repair is if the house is not repaired?
A. Right, through an estimate.
Q. Okay. And if you were, in fact, repairing the house and there was an initial estimate and there were changes to that estimate, you would expect to be paid for the changes to the estimate, correct?
A. If we did repair the house --

Q. Yes. Again, I'm asking you a hypothetical.

A. Yeah.

Q. In your scenario, if you had decided to pursue the repairs to the house --

A. Uh-huh.

Q. -- you had an initial estimate for that repair --

A. Uh-huh.

Q. -- for whatever circumstance, the fact that we were going through a global pandemic or whatever the circumstances were, there was an increase to that initial estimate for the repairs to the house --

A. Yes.

Q. -- you would expect to be paid for those increases, correct?

MR. DAUPHIN: Incorrect. I mean, you're misrepresenting the terms of the policy to cost of repair at the time of the loss.

MS. AQUINO: I'm not referencing the policy. I'm asking what --

MR. DAUPHIN: Well --
MS. AQUINO: -- he would expect to be paid.
MR. DAUPHIN: No.
Don't answer that.
This whole thing is about what the policy says and the cost to repair. And the cost to repair is at the time of loss.
MS. AQUINO: Chuck, I would appreciate --
MR. DAUPHIN: So, it's totally --
MS. AQUINO: -- if you would stop coaching your witness.
MR. DAUPHIN: Well --
MS. AQUINO: I really would.
MR. DAUPHIN: -- don't answer a question that's not related to the policy.
MS. AQUINO: I will rephrase my question, but please stop coaching your witness.
MR. DAUPHIN: Well --
MS. AQUINO: We've been -- we've been doing really well. Please stop --

MR. DAUPHIN: We have until you've gone off the rails.

MS. AQUINO: I don't believe I've gone off the rails. I object to that qualification, but I will rephrase my question.

Q. You had an initial estimate for the repair of the house, correct?

A. Yes.

Q. If you had gone through with repairs to the house, to the extent that there were increases related to those repairs, would you have presented those increases to Pacific for payment?

A. Yes.

Q. And would you expect payment for those increases under your policy?

MR. DAUPHIN: And I'm -- I don't understand. When you talk about increases, are you talking about additional repairs or --

MS. AQUINO: Yeah --

MR. DAUPHIN: -- are you talking

about --

MS. AQUINO: -- additional repairs costs under the --

MR. DAUPHIN: And not --

MS. AQUINO: -- repair.

MR. DAUPHIN: And not increases to the cost of repairs agreed to be performed?

MS. AQUINO: I'm not sure I understand the confusion.

MR. DAUPHIN: Well, it's an estimate that it's going to cost this much to repair the wall.

MS. AQUINO: Yeah.

MR. DAUPHIN: And that estimate goes up six months later --

MS. AQUINO: Okay.

MR. DAUPHIN: -- we're not asking for that payment for the increase in --

MS. AQUINO: But that was not my question. If there --

MR. DAUPHIN: All right. That's what I don't understand.

MS. AQUINO: Okay. So, let me clarify.

Q. Let me find a way to rephrase this.

So, say, you had an initial scope of an estimate --

A. Uh-huh.

Q. -- for repairs, correct --

A. Uh-huh.

Q. -- that said it will cost a thousand dollars -- using fake numbers, obviously -- it will cost a thousand dollars to repair these rooms --

A. Uh-huh.

Q. -- and as you go through the repairs, you discover additional damage to additional rooms and there's an increase to that estimate that goes to fifteen hundred dollars, would you present that additional five hundred dollars as a part of your claim for the additional damage that was discovered?

A. Yes.

Q. And would you expect to be paid for that additional damage?
A. Yes.
Q. Okay. So, in this scenario, you had an initial estimate for the repairs to your house, correct?
A. Uh-huh.
Q. I don't recall off the top of my head how much that is, but if you want, we can pull it up and we can look at it.
If you had gone through with the repairs in that same scenario and you had discovered additional damage to your house that needed repairs, would you expect to be paid for that additional damage that was discovered?
A. Yes.
Q. In the scenario that actually happened where you demolished the house and rebuilt it, how would you determine what the actual repair cost of the house is if you never went through with the repair process?
A. Through -- well, under the terms

of the policy. And I don't know -- my -- or that would be my first place, if there's something laid out in the policy to determine how that cost is determined. And then, this -- I guess, an estimate would be the second place I would go.

Q. The initial estimate?

A. I mean, I don't -- the best estimate. I don't know. I'm not sure.

Q. What do you mean by the best estimate? I'm not sure what you mean by that.

A. Well, I mean, you know, maybe there's an initial estimate done and one done later when changes -- when -- with other factors considered.

Q. How would you determine those changes if there are no repairs being done to the house? That is my question.

A. This is a theoretical exercise. Like, I don't know.

Q. Well, but it's really not because the house was not repaired, correct?

A. Correct.
Q. So, how would you have determined that there was additional damage to the house if there was no repair process that was undertaken?
A. And I'll give you the answer I just -- depending on what the policy says.
Q. Okay. Do you have -- from your recollection of reviewing the policy, do you have any recollection where that is outlined in the policy?
A. No.
Q. Okay. You have received payment from Pacific under the dwelling portion of your coverage, correct?
A. Yes.
Q. Do you know how much those payments total as we sit here today?
A. Not exactly.
Q. Do you have a ballpark figure?
A. One point four million.
Q. Okay. And what was that one point four million for as far as your

understanding goes?
A. I mean -- so, that's part -- like --
MR. DAUPHIN: If you know.
A. I don't know. You guys just sent a check. I mean, that's part of the -- our confusion was I guess one point four million for the dwelling. But that's all. We don't know where or why that amount was chosen.
Q. (BY MS. AQUINO) Okay. And if you'll go back to -- do you still have the original interrogatory responses in front of you?
A. 14?
MS. AQUINO: Can you just hand that back to him?
Q. Can you go back to that Interrogatory Number 3, please?
A. Okay.
Q. So, the very first line says dwelling coverage, and there is a number that I'm going to try to read upside down.
A. Yeah.

Q. Seven hundred and fifty-six thousand and some change; is that correct?
A. Yes.
Q. Do you know what is encompassed in that number?
A. No.
Q. Okay. You, like -- and I think we talked about this before. You did not participate in coming up with those figures, correct?
A. Correct.
Q. Okay. Have you submitted any invoices or expenses incurred following your demolition of the house with respect to the dwelling coverage, to your knowledge?
A. I personally have not.
Q. Okay. Do you know if any have been submitted on your behalf either by your wife or your attorneys?
A. I don't -- I do not know.
Q. Okay. Do you know if any documentation has been submitted to Pacific or to Chubb or in discovery in this lawsuit

with respect to the items -- the content items that you have replaced?

A. I know that Iris submitted her receipts for -- I mean, for content items.

Q. Do you believe that she submitted receipts or she submitted invoices?

A. I don't know --

Q. You don't know what she submitted?

A. -- if it was invoices or receipts.

Q. Okay.

A. I know she submitted something.

Q. Understood. You personally have not submitted any receipts for replacement of contents, correct?

A. Correct.

Q. Okay. Have you seen the documentation that has been submitted on your behalf either by your wife or your attorneys with respect to the contents?

A. Yes, for maybe -- I may have seen it, but I haven't -- I didn't participate.

Q. Do you -- do you -- do you recall generally what was submitted with respect to contents?

A. What we just discussed, Iris' invoices and --

MR. DAUPHIN: Haven't we been --

A. -- receipts.

MR. DAUPHIN: -- through all this --

A. Yeah.

MR. DAUPHIN: -- before already?

MS. AQUINO: I'm getting to where I'm going.

A. Or invoices or receipts or what -- yeah, Iris' submissions.

Q. (BY MS. AQUINO) Okay. As far as the additional living expenses, I know you mentioned that Ali was primarily responsible for handling all of those?

A. Yes.

Q. Do you have in your possession, not now, any of the invoices or receipts for your living expenses at the rental

properties?

A. I do not.

Q. Did you -- were you personally responsible for paying any of those expenses at the rental properties?

A. I mean, to the -- yes.

Q. Which bills were you responsible for paying?

A. Do you mean -- sorry. We had to pay all our bills.

Q. No.

A. No, Ali paid the bills. Okay.

Q. Let me make sure I understand we're talking about the same thing.

A. Got you.

Q. I understand that you guys share finances and all of that --

A. Yeah.

Q. -- but you personally, did you go and pay any of the bills --

A. No.

Q. -- for the rental properties?

A. No.

Q. Okay. Thank you. I'm not trying to imply that you're not contributing.
A. Yeah.
Q. How long did it take the rebuilding of Dell Road?
A. So, what, July 2020 to January 2022. So, is that --
Q. About a year and a half?
A. -- a year -- yeah, a little -- yeah, a little over a year and a half, I guess, or a year -- yeah.
Q. Was it completed in January or was that when you moved in?
A. I mean, it was substantially complete.
Q. Okay. And I know Ali mentioned that there's still some punch list items that you guys are dealing with.
A. Right.
Q. But you were able to move in in January of 2022, correct?
A. Yes.
Q. And you've been living there ever

since?

A. Yes.

Q. How long did it take to build the Dell Road house originally?

A. Off the top of my head, I don't recall. I could discover that.

Q. And it was the same contractor; it was TCC, correct?

A. Correct.

Q. And Ali mentioned yesterday that you guys made some minor changes to the plans of the house, but it was substantially the same footprint; is that fair?

A. Yes.

Q. With respect to the Wimbleton house, you had -- my understanding is that you had an initial lease from January of 2020 through January of 2021, and then, you renewed that lease for an additional year; is that correct?

A. Yes.

Q. Did you review the renewal lease?

A. Yes.

Q. Did you have any involvement in negotiating the renewal lease?

A. No.

Q. Ali testified yesterday there was an increase in the rent for the second year at the Wimbleton house. Are you aware of that?

A. Yes.

Q. Do you know how much that increase was?

A. No.

Q. Do you know why there was an increase in your rent?

A. We -- or -- that's -- to get in line with the going -- our landlords were getting in line with the going rates of rent, rental rate, as best they could in the neighborhood, in the area.

Q. Did you ever do any research to verify that that was in line with the rental rates in the area?

A. I actually -- the one thing I recall doing is I talked with Stratton

Fowlkes, who is our current insurance agent. He knew of a house that was -- he called me about a house that he thought was on the market. And I think it was -- it was nicer, but it was nine thousand dollars a month or something like that.

Q. And where was the house located?

A. Fairly -- you know, within walking distance of our house on Wimbleton.

Q. Do you know anything about --

MR. DAUPHIN: It's a good thing I didn't get that call.

Q. (BY MS. AQUINO) Do you know anything about the specifications of that house, like, size, square footage, number of bedrooms, number of bathrooms, anything like that?

A. We drove and walked past it. It was larger. But I don't know specifically.

Q. Okay. So, as we sit here today, you don't really know what about that house justified the nine-thousand-dollar rent; is that fair?

A. Correct.
Q. Okay. Do you know the address of that house by chance?
A. No.
Q. Is that something that you might be able to find out?
A. Possibly.
Q. Okay. And who was it that told you about the house? I'm sorry.
A. Stratton Fowlkes, who is our current insurance agent.
Q. Thank you. I believe I have his information already.
MS. AQUINO: I believe I'm almost done, so if you give me one second.
THE WITNESS: Sure.
MS. AQUINO: We can go off the record.

(Whereupon, a discussion was held off the record.)

MS. AQUINO: We can go back on

the record.

Q. I'm going to hand you what was previously marked as Defendant's Exhibit 13. If you could take a look at that for a moment. Just let me know when you're ready.

A. Is there a particular section or --

Q. Just glance through it, and I'm going to ask you some questions about it. But I don't need you to read all thirteen pages --

A. Okay.

Q. -- in detail.

A. (Witness complies.)

Okay.

Q. Have you seen that document before?

A. Yes.

Q. Okay. And it's a document entitled Acts of Bad Faith by Pacific, Outline of Acts of Bad Faith?

A. Yes.

Q. Okay. Did you have any

involvement in compiling that document?
A. No.
Q. Of the acts outlined in this document in Defendant's Exhibit 13, are there any alleged acts that you experienced personally?
MR. DAUPHIN: You're talking about thirteen pages, and you asked him not to look at it closely.
MS. AQUINO: We can take a break if you would like to review every page.
MR. DAUPHIN: Well --
MS. AQUINO: I have no problem with that.
MR. DAUPHIN: -- if we need to, you know, whatever.
It's an unfair question. I object to the form.
Q. (BY MS. AQUINO) And if you would like to take a break to review this document in its entirety, I'm happy to do so.
A. What's the question?
MR. DAUPHIN: Well, it's a little

unfair. We're all ready to go. You said you had very little. You gave him a thirteen-page document. You asked him if any one of those affects him directly.

MS. AQUINO: No, I didn't.

MR. DAUPHIN: And then, you --

MS. AQUINO: That was not my question.

MR. DAUPHIN: -- say, oh, we can stay here as late as we want and you can take all the time you want to review it.

That's just not fair.

MS. AQUINO: I will object to your characterization. I did not ask if it affects him directly. I said has he experienced them directly.

MR. DAUPHIN: Well, what's --

MS. AQUINO: Or personally actually was my question.

MR. DAUPHIN: -- what's the difference in affect and experience?

MS. AQUINO: Do we really want to go through the definitions of affect and

experience, because they have very different dictionary definitions? Do you want to do that?

Q. I will ask you in a different way.

Did you provide any information to your attorneys about any acts that Pacific did to you with respect to the allegations of bad faith?

A. Well -- and I hate -- repeat -- say the question one more time.

Q. Sure. Do you at any -- did you at any point provide information to your attorneys about acts or comments or conduct that Pacific did to you personally with respect to your claims about bad faith?

A. With the provision of -- I don't -- I have not thoroughly reviewed this document. I will say I'm most -- or the one section that I am the primary person to deal with is the audiovisual section, which is -- yeah.

Q. Did you have any interactions

with Pacific or any discussions with Pacific with respect to the audiovisual installation?

A. No.

Q. That's something that Ali primarily handled?

A. She would have with Pacific.

Q. Okay.

A. I would -- yes. All I did was hire the company to come do the work.

Q. So, make sure I'm understanding. So, you kind of discussed it with HD Innovations, what you wanted them to do, but with respect to presenting that portion of the claim to Pacific, that's something that Ali would have done?

A. Yes.

Q. Okay. And you identified that in the outline that that's mentioned, the HD Innovations. So, that's the portion that you identified that you have knowledge of, correct?

A. Yes.

Q. Okay. Can you think of any

interactions that you had with Pacific that you would describe as being unprofessional or rude, you personally?

A. Well, very quickly in this process, we generally -- the attorneys became the primary points of contact. And so, that limited my interactions with Pacific personally.

Q. So, just to make sure we're clear, does that mean no?

A. Yes.

Q. Thank you.

MS. AQUINO: That's all I have.

MR. DAUPHIN: Thank you very much.

FURTHER DEPONENT SAITH NOT.

121 164

C E R T I F I C A T E

STATE OF ALABAMA )
JEFFERSON COUNTY )

I hereby certify that the above and foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing.

I further certify that I am neither of counsel, nor of kin to the parties to the action, nor am I an anywise interested in the result of said cause.

MICHELLE L. PARVIN
Certified Court Reporter
License Number 126
Commission expires 9/30/23
Notary Public expires 1/26/26

**&**

**&** 19:15 20:23 85:7

**0**

**00021** 1:5 4:5

**1**

**1** 75:3
**1/26/26** 164:23
**10:15** 23:19
**121** 163:23
**1230** 5:1
**126** 164:21
**13** 158:3 159:4
**13th** 60:2,6 63:14 108:23
**14** 132:2 148:14
**164** 163:23
**18** 22:6
**18332** 164:18
**18th** 23:20
**1976** 9:10
**1st** 14:3

**2**

**2** 75:5 132:8,16
**20** 21:19 22:6
**2002** 11:3
**2005** 11:3
**2006** 32:15
**2007** 124:9,17 126:9,21
**2019** 10:15 21:19 22:7 32:13 35:4 69:13
**2020** 14:3 47:5 47:6 71:7,8 72:12 73:1 121:9 133:1 153:6 154:17
**2021** 103:13 154:18
**2022** 21:16 55:6 153:7,21
**2023** 1:20
**26** 9:10
**2:22** 1:5 4:5
**2nd** 133:1

**3**

**3** 101:23 102:7 104:21 148:18
**300** 4:19
**30309** 5:2
**3305** 21:10 27:4 31:19 32:7 35:1 55:2 67:6 73:19 97:3
**3400** 4:20
**35216** 4:21
**35243** 1:20 6:9
**3800** 1:18 6:7
**39** 95:3

**4**

**400** 5:2
**40s** 40:10
**430** 1:19 6:8
**46** 132:23
**47** 132:23

**5**

**50s** 40:10
**5th** 1:20

**7**

**7** 3:4

**8**

**8** 123:4

**9**

**9/30/23** 164:22
**9:40** 6:9

**a**

**a.m.** 6:9
**abbreviated** 102:10
**able** 99:14 100:11 153:20 157:6
**above** 6:10 22:21 127:19 127:22 128:5,6 164:5
**absolutely** 100:15
**accept** 66:14 111:4 112:14 114:6
**accepting** 63:23
**achieve** 110:17
**acquired** 15:2
**acting** 6:2 81:18
**action** 164:15
**actions** 81:19 116:21
**acts** 158:20,21 159:3,5 161:7 161:14
**actual** 19:7 46:13 145:21
**actually** 43:11 50:2 53:12,15 96:13 107:17 132:3 135:12 145:18 155:22 160:19
**add** 104:18
**added** 117:4 118:16 121:13 130:7
**adding** 117:19
**additional** 68:16 88:12,14 88:17 102:9 115:22 116:7 142:20 143:2 144:16,17,19 144:21 145:2 145:13,15 147:3 151:17 154:19
**address** 157:2
**addressed** 84:3 84:8

**addressing** 71:21 80:21 122:2
**adequately** 50:17
**affect** 116:17 160:21,23
**affected** 117:4
**affects** 109:4 116:16 160:4 160:15
**affiliated** 58:3 58:18 79:17 82:21
**afternoon** 25:12 27:2 28:5
**age** 9:22 10:4,8 10:9
**agency** 19:16 31:12 32:12,14
**agent** 29:13 49:4 156:1 157:11
**ages** 9:17
**agree** 77:21 111:16 133:7 133:10 134:10 134:21 139:3
**agreed** 1:14,22 2:6,14 143:7
**ahead** 47:18 62:8 106:11 110:15 113:14 134:5
**aided** 164:9
**alabama** 1:2,19 4:2,21 6:2,9 11:3 19:3,10 20:9 21:11 35:8,12,23 75:8 164:3
**alcohol** 118:5
**ale** 102:10
**alerted** 23:4
**ales** 103:6
**alexandra** 1:8 4:8 5:6 9:12
**ali** 20:22 23:8 24:3 29:11 37:10 49:2,3 63:20 64:3,15 66:2,7 68:10 69:8 73:12,14 82:7 89:5,6 90:16 108:2,14 109:3,14,16 110:19 115:16 116:15 118:4 118:10 119:11 123:9 124:2 126:13 130:2 151:18 152:12 153:16 154:10 155:4 162:4,15
**ali's** 117:7 119:21 120:14 123:14 127:4 135:18
**allegations** 161:8
**alleged** 159:5
**allowed** 28:3,8 46:21
**altamont** 9:23
**alycen** 57:19 58:16 134:22
**amended** 132:1
**amount** 76:8,12 77:5,7,13 78:4 78:21 111:3 133:12 138:4 148:9
**amounts** 138:21
**andrew** 80:6
**anguish** 108:4
**answer** 7:19 8:20 53:17 86:10,19 100:15 132:2 133:10,13 136:11 141:5 141:16 147:6
**answered** 110:14
**answering** 8:11
**answers** 70:21 164:7
**anticipate** 8:14
**antique** 93:22
**antiques** 67:18 67:22
**anymore** 89:18
**anywise** 164:15
**apartment** 37:12,15,22 38:3,11 39:4
**apartments** 37:19 38:3
**appearances** 4:17
**appearing** 4:21 5:3
**appliances** 51:19
**applications** 16:23
**applies** 17:14
**apply** 17:9,13
**appreciate** 141:10
**approaching** 52:19
**approval** 49:6
**approximately** 66:4 79:2
**april** 1:20
**aquino** 3:4 5:1 6:20 7:1,7 18:5 18:15,21 26:5 41:3 47:20 55:11,19 56:1 58:7,11 75:1 78:18 89:3 95:8,13 101:7 103:2,8,14,16 103:23 104:3

104:11,16,19 105:1,6,21 106:9,13,23 107:11,14 110:18 115:10 115:15 123:2 129:7,13,19 132:15 134:7 140:22 141:2,9 141:12,15,18 141:22 142:3 142:22 143:2,5 143:9,14,17,20 144:1 148:10 148:15 151:12 151:16 156:13 157:14,17,23 159:10,13,19 160:5,7,13,18 160:22 163:13
**architect** 25:13 85:22
**area** 20:2 26:13 26:13 84:1 155:18,21
**areas** 130:9
**arrant** 80:6
**arrive** 26:23
**arrived** 24:1 114:11,13
**arriving** 102:14
**asked** 8:19 90:12 100:13 127:19,23,23 128:6 159:8
160:3
**asking** 8:11 18:5,22,22 43:9 65:11 140:1,23 143:18
**asks** 68:8
**aspect** 56:7
**aspects** 83:22
**assign** 2:10
**assist** 30:3
**associates** 85:7
**assume** 43:4,7
**atlanta** 5:2
**attached** 103:12
**attachment** 95:12
**attempt** 11:18 111:11 114:4
**attendance** 73:10
**attic** 28:11 32:20
**attorney** 99:19 101:15,17
**attorneys** 102:17 115:17 149:19 150:20 161:7,14 163:5
**audiovisual** 44:22 45:1 54:9 161:21 162:2
**available** 32:3 37:23 39:2 86:10,16 87:6
**average** 90:13
**aware** 65:15 68:15 97:12 106:3 107:1,12 109:3,14,15 115:5,15,19,21 116:15 123:11 125:6 126:15 155:6

**b**

**b** 35:16
**back** 21:15 28:4,8 36:17 49:15 55:22 59:5,6 70:19 71:14 81:13 91:17 103:18 104:11,22 105:22 106:19 114:7 115:1 118:7 126:21 131:23 148:11 148:16,17 157:23
**background** 10:20
**bad** 53:16 107:10 123:19 158:20,21 161:9,16
**ballpark** 147:20
**bank** 97:9 98:17
**based** 139:4
**basement** 84:1 84:6,7,13,16,23 135:20
**basically** 28:12 46:9 63:12 113:3 119:23 138:11
**basics** 120:2
**basis** 76:10
**bathroom** 51:20,21
**bathrooms** 29:2 39:10 156:16
**bear** 101:7
**bedroom** 27:21 28:21 38:7
**bedrooms** 29:2 156:16
**began** 36:19 37:11
**beginning** 6:9 36:20 109:1 118:22
**behalf** 4:21 5:3 149:18 150:20
**behavior** 60:8 61:13,18 62:11 63:2 64:8 125:7,11,13
**behaviors** 123:15 124:19

127:5
**belief** 69:22
**believe** 14:7 15:18 23:8 66:11 68:5 75:13 95:3 104:3,13 119:14 120:13 120:19 121:13 126:23 128:4 132:2,8 137:18 137:22 142:3 150:5 157:12 157:14
**benefit** 53:1
**best** 7:18 52:20 66:11 106:5 146:8,10 155:17
**better** 39:6 50:14,19 94:1 124:3 126:5,5 126:11 127:10
**beyond** 128:5,6
**big** 14:19 38:5 70:12
**bill** 90:13
**bills** 89:4 90:2 152:7,10,12,20
**birmingham** 1:19 4:20 6:2,8 87:6
**birth** 9:9
**bit** 10:19 30:19 65:14 107:1
129:23 135:3
**blends** 120:22
**block** 76:7,18 76:22
**board** 16:14,15 16:17,23 34:4 34:9
**boligee** 35:7,12
**book** 95:1
**booklet** 75:2,4
**borrowed** 97:8
**bottom** 24:9 79:13 132:16
**bradley** 25:8
**break** 8:16,20 55:12 129:8 159:10,20
**breaking** 47:15
**brief** 55:16 129:16
**briefly** 7:6
**broken** 93:6
**brook** 10:11,16 10:22 21:11 24:15,16 25:2 26:13 37:17
**brookstone** 34:2 79:17,22 80:4 81:3,4,8 81:23 82:13
**brothers** 13:10 20:11
**build** 73:19 154:3
**builder** 86:9
**building** 25:11 86:22
**built** 21:18 40:10
**burnt** 28:13
**business** 18:17 19:17,23 20:3 20:20 21:7,8
**businesses** 17:9 17:10,19 18:2 19:7 21:3
**butler** 16:19
**buy** 119:22
**buying** 66:9 120:2

**c**

**c** 20:8,15,15,16 164:1,1
**cabinets** 33:8
**cable** 54:18
**call** 24:19 26:6 26:9 86:9 156:12
**called** 7:8 17:21 19:14 23:9 24:23 31:18 32:6 45:1,2,6 91:5 156:2
**calling** 33:7
**calls** 25:18
**canterbury** 10:15
**cap** 66:3 79:1
**carol** 16:19
**caroline** 10:8 10:10,15
**case** 1:5 4:5 7:8 7:12 22:13 107:23 108:6 122:22
**category** 67:13
**caught** 22:19 22:20
**cause** 6:10 164:16
**caveat** 8:18
**ceo** 13:2,2,23 14:1 15:10 20:13
**certain** 51:18 113:8
**certainly** 58:10
**certified** 4:15 164:20
**certify** 6:3 164:5,13
**certo** 20:5
**chair** 16:14,16
**chance** 99:14 101:17 157:3
**change** 85:13 117:2 139:4 149:2
**changed** 14:14 30:22 115:8
**changes** 98:2 127:3 130:10 139:20,22

146:15,18 154:11
**characterizati...** 160:14
**charitable** 16:5
**charities** 17:12
**charles** 1:7,17 4:7,19 6:10,14 7:9 9:5 95:5 129:20
**check** 148:6
**children** 9:14 27:14 29:7 50:18 118:4 119:3
**children's** 117:1
**choice** 39:6
**choose** 112:15 133:23 138:4
**chooses** 137:7
**chose** 134:3 138:5
**chosen** 148:9
**christmas** 37:1 37:3
**chubb** 29:10 31:8,15 56:17 58:18 59:4 66:14 69:19 70:4 108:13 109:8 111:7 113:3,6 114:17 116:21 117:11 128:1 133:21 134:19,23 137:19,23 149:23
**chuck** 49:2,4 49:14 82:7 123:3 141:9
**circumstance** 110:16 140:10
**circumstances** 82:4 140:12
**city** 35:15
**civil** 6:4
**claim** 22:5 29:9 56:2,5,7,17 65:4,16,20,23 66:13,15 68:7 68:14 69:5,22 73:3 94:16 108:4,4,16 111:4,12,18 114:4 116:8 127:15 128:9 128:13,14,20 144:20 162:14
**claiming** 104:23
**claims** 30:4 120:19 121:5 161:16
**clarify** 61:15 105:2 144:2
**clean** 43:5,8,10 43:17
**cleaned** 42:23 43:1
**cleaners** 27:10
**cleaning** 22:11 22:14,16,23 42:8 44:2 50:23
**clear** 8:3 13:9 18:11 53:17 64:1 70:21 163:10
**clerked** 11:4
**clients** 20:1
**cliff** 71:23
**close** 27:7 37:3 38:7
**closely** 63:21 159:9
**closer** 37:1
**closing** 14:10
**clothes** 119:22 131:12
**clothing** 19:8
**coaching** 141:13,19
**code** 69:12
**collecting** 28:16
**college** 10:23 19:14
**colonnade** 1:18 6:8
**combination** 78:6
**come** 22:11 26:7,9,19 45:4 46:16 69:11 93:21 162:9
**comes** 75:7
**comfortable** 52:18 70:13
**coming** 25:3 99:22 121:1 149:9
**comments** 161:14
**commission** 164:22
**commissioner** 1:18 2:15 6:3
**community** 17:11
**companies** 11:17,18,23 12:7
**company** 1:11 4:11 11:14 12:3,9,10,14,16 12:19 13:6 15:10 17:18,21 19:14,19 24:19 30:21 45:2 70:22 97:6 117:18 118:15 162:9
**comparable** 77:18
**compiling** 159:1
**complete** 153:15

**completed** 21:19 153:12
**completely** 97:21 119:20 122:17
**completing** 95:22 96:6
**complex** 37:12 37:16
**compliance** 2:2 69:23
**complied** 129:3
**complies** 68:6 158:14
**complying** 66:13
**component** 110:5,7
**components** 110:8
**compulsive** 123:10,14
**computer** 164:9
**concerned** 124:20
**concrete** 84:9
**condition** 39:9 44:1 50:19
**conditions** 23:17
**conduct** 107:10 108:18 110:18 161:14
**confident** 71:16
**confirm** 9:2
**confirmed** 126:13
**conflicts** 18:18
**confrontational** 60:14 61:8
**confrontations** 60:20 61:5
**confusion** 143:10 148:7
**connection** 107:5
**consider** 112:19,23
**considered** 146:16
**consistent** 115:9
**construction** 86:20 89:14 98:23 99:3,8 122:2
**consumption** 118:5
**contact** 163:6
**content** 150:1,4
**contents** 34:13 65:16,23 66:5 66:6,14,21 67:3,14 68:3 68:10 78:21 79:9 90:19 93:15 94:4,9 102:9 115:3,8 115:18,23 116:8 130:22 131:21 150:16 150:21 151:3
**contractor** 154:7
**contributed** 119:15 120:14
**contributing** 153:2
**control** 124:5
**conversation** 30:1 72:11,23 119:11 124:14
**conversations** 44:6,12,16 56:16 57:7 82:14,20 85:9 108:5,9 109:16
**copy** 42:3 101:13 123:3,5 132:13
**copying** 95:6
**coronavirus** 121:10
**correct** 9:12 10:1,12,17 15:20 21:12 26:17 27:13,18 28:23 30:9 33:21 48:3,14 48:19 50:6 51:7 53:1,2,18 55:9 56:5 58:3 58:4,14,23 64:5,6,23 65:17 66:12 71:3 73:8,17 76:14 78:1,6 79:10 80:16 83:19,20 86:7 90:20,21 96:3 96:14 97:3 100:8 103:14 103:19 105:23 111:18,22 112:2 123:22 130:4,5,19,20 131:1 132:16 133:13,13 135:10 137:1,2 137:12 138:19 138:22 139:22 140:17 142:8 144:8 145:6 146:23 147:1 147:15 149:2 149:10,11 150:16,17 153:21 154:8,9 154:20 157:1 162:21 164:10
**correctly** 77:8 77:19
**cost** 70:11 71:15 74:9 76:10 77:2,3,6 77:11,12,22,23 134:1,2 138:9 139:9,15

140:20 141:7,8 143:7,12 144:10,12 145:21 146:4
**costs** 67:2 68:17 79:3 115:2,18,23 122:9 137:8,9 143:3
**counsel** 1:16 2:7,9 6:7 164:14
**county** 164:4
**couple** 28:16 34:1 84:13
**course** 11:8
**court** 1:1 2:3 4:1,16 6:1,6,18 7:15 11:5 55:23 106:20 164:20
**cover** 103:12
**coverage** 31:5 31:19 32:7,9 76:8,9,12 77:5 77:7 78:21,22 79:9 102:8 147:15 148:21 149:15
**coverages** 32:3 75:9
**covered** 9:4
**cozen** 4:23
**crew** 22:11,23
**crying** 117:11
**cs5804553** 2:23
**current** 156:1 157:11
**currently** 9:11 11:13 14:17 15:18 21:10 35:2 36:7 84:15
**curtain** 22:19
**curtains** 44:21
**cut** 89:13
**cv** 1:5 4:5

**d**

**d** 3:1 9:6
**damage** 28:9 28:15,19 32:20 32:21,22,23 70:15 74:4,7 82:22 84:2,7 92:21 93:4 96:10,14 130:15 144:16 144:21 145:2 145:13,15 147:3
**damaged** 28:13 130:3,21,23
**damages** 71:21 80:22 107:5 122:3
**data** 76:21
**date** 6:3 9:8
**dated** 133:1
**dates** 69:15
**daughter's** 22:14,21 27:21
**daughters** 70:18
**dauphin** 4:18 4:19 6:21 17:23 18:12,19 25:22 26:2 40:21 41:1 47:17 48:2 52:6 55:13 58:5,9 78:14 89:1 95:4,10 102:23 103:3,9 103:15,20 104:1,15,18,20 105:16 106:7 106:11 107:6 110:13 115:6 115:14 132:12 134:4 140:18 141:1,4,11,14 141:16,21 142:1,18,23 143:4,6,11,15 143:18,22 148:4 151:6,8 151:11 156:11 159:7,12,15,23 160:6,9,17,20 163:14
**day** 1:20 10:16 25:8 26:20 28:6 29:21 34:3,15 59:7 59:17 79:18 125:21
**days** 79:22 80:13 93:2 125:21
**deal** 53:9 80:4 161:20
**dealing** 116:19 120:7 121:10 153:18
**deals** 30:7
**dealt** 34:22 64:15
**debris** 69:14
**december** 36:16,21,22 56:22 57:3 60:2,6 63:14 108:23
**decide** 17:2,5 38:2 49:15
**decided** 38:7 39:5 70:2 140:5
**decision** 42:19 43:5 69:9,10 70:10,16 71:5 72:17
**decisions** 69:6
**decorating** 67:6,10,11
**decorator** 64:22

**deductible** 79:12
**defendant** 1:12 4:12 5:3
**defendant's** 3:6 123:4 158:3 159:4
**define** 108:19
**defined** 77:11
**definitely** 59:10 117:13 118:3 118:11 122:5
**definition** 77:23 110:9
**definitions** 160:23 161:2
**dell** 21:10 27:4 31:19 32:7 35:1 49:16 55:2 56:2 67:6 73:19 88:23 89:9 90:2 91:21 97:3 100:18 103:18 153:5 154:4
**demand** 112:5 112:7,8
**demolish** 69:6 71:6
**demolished** 71:2 83:19,21 83:23 130:19 136:1,15 145:19
**demolishing** 133:8 136:8,21
**demolition** 149:14
**department** 23:5 24:7,16 25:2 28:1 89:13
**depending** 28:14 71:15 147:7
**depends** 65:11 134:20
**deponent** 163:16
**deposition** 1:16 1:23 2:1,11,15 164:6
**depositions** 2:4
**describe** 109:20 110:19 113:18 163:2
**design** 73:19 77:17
**designed** 85:23 86:1
**desired** 55:21 106:18 110:17
**desk** 22:21,22
**despray** 12:20
**detail** 32:5 158:13
**deteriorating** 70:6
**determine** 99:14 100:11 139:8,14 145:20 146:3 146:17
**determined** 146:4 147:2
**diagnosed** 123:21
**diagnosis** 123:10,11,15
**diane** 4:19 48:4 48:5 49:14 82:8
**dictionary** 161:2
**difference** 70:11 78:15 160:21
**different** 15:14 118:2 123:18 135:3 161:1,4
**difficult** 7:22 38:10 116:21 118:2
**direct** 109:8
**directed** 61:14 108:20
**directions** 81:20
**directly** 24:19 55:2 114:22 160:4,15,16
**director** 16:20
**directv** 89:12
**disagree** 111:17,22 136:12
**disagrees** 111:20
**disappointed** 60:7,12
**discover** 144:16 154:6
**discovered** 39:22 144:22 145:13,16
**discovering** 79:23 125:2
**discovery** 149:23
**discrepancy** 104:4
**discuss** 32:2
**discussed** 20:22 65:5,7 83:18 151:4 162:11
**discussing** 53:4 115:20 124:13 124:15 125:5
**discussion** 101:4 104:8 157:20
**discussions** 43:23 47:15 48:21 56:4 68:2 71:19 73:2 74:2,6 79:16 80:14,18

81:2 82:7,12 85:6 87:14 88:7,10 92:10 93:14 94:3,8 96:10 112:19 114:21 115:1,5 115:16 119:5 162:1
**disney** 36:17
**disorder** 123:10
**disparaged** 64:10
**dispute** 65:15 102:20
**disputing** 114:17
**disrupts** 119:20
**distance** 156:9
**distribution** 12:10
**district** 1:1,2 4:1,2 6:5
**divided** 52:14
**division** 1:3 4:3
**document** 132:8,19 133:5 158:16,19 159:1,4,20 160:3 161:19
**documentation** 68:6,16,21 69:2 99:15 115:4,22 116:8 116:12 118:14 149:22 150:19
**documents** 98:10
**dogs** 38:4,10 50:18
**doing** 7:4 15:14 50:20 79:23 82:1 92:19 127:13 141:23 155:23
**dollar** 111:3 156:22
**dollars** 76:9 78:22 79:12 87:23 144:11 144:12,19,20 156:5
**donations** 16:9
**doors** 113:8
**downstairs** 51:20
**dr** 107:3,18 108:6,8 122:19 123:6 126:9
**drain** 46:8,10
**drainage** 39:23
**drennen** 9:6
**dressings** 45:16
**dripping** 22:22
**drive** 23:15 36:11,14 37:2 38:14 40:14 41:15 42:4,7 45:11,17 46:6 47:3,10 48:1,8 48:13,13,22 50:22 53:5 54:8,16,20 55:8
**driveway** 24:9
**drove** 156:18
**due** 125:20,21 127:20
**duly** 6:15
**duties** 16:18
**dwelling** 69:4 76:13 102:8 147:14 148:8 148:21 149:15

**e**

**e** 3:1 9:6,6 20:8 35:16,16 164:1 164:1
**earlier** 129:23
**early** 12:7 79:22 80:13 100:6 121:9
**east** 91:4
**eastwood** 91:5
**educational** 10:20
**effect** 2:2 62:17
**effects** 71:18
**eight** 10:9
**eighty** 17:20
**either** 18:23 22:23 39:4 40:22 46:17 77:23 78:4 97:15 112:14 115:16 149:18 150:20
**electric** 90:13
**electrical** 40:1 45:23 46:18
**electricity** 89:9 89:13
**elects** 137:10
**element** 65:19
**elementary** 10:11
**elliott** 57:14 58:17 59:2,22 60:20 61:11 63:3 82:15
**elliott's** 62:10
**emails** 81:22 82:2,6,10,14
**emergency** 34:4,9
**emotional** 117:7,10 119:7 119:16 120:14 127:4
**employed** 11:13
**employee** 58:14
**encompassed** 149:4
**ended** 31:7 63:13
**engagement** 114:3
**entail** 16:16 34:9

**entered** 41:14
**entire** 51:19
**entirely** 83:21
**entirety** 159:21
**entitled** 18:16 158:20
**equipment** 44:22,22 54:9
**equity** 12:2
**erratic** 64:16
**especially** 118:21
**estate** 49:4
**estimate** 74:9 74:14 83:10 100:22 139:9 139:17,20,21 139:22 140:7 140:14 142:7 143:12,15 144:6,18 145:5 146:5,7,9,11,14
**estimates** 100:17 138:22 139:4
**euo** 133:1
**evaluate** 120:23
**eventually** 37:6
**everybody** 17:14 72:8
**everybody's** 128:18
**evidence** 2:12
**exact** 82:4 124:13,14 129:1
**exactly** 28:18 46:4 47:4,12 48:9 91:15 93:9 98:12 122:10 128:16 147:19
**examination** 3:3 6:11 7:1,12 9:2 96:9 132:20
**examined** 6:15
**except** 2:8
**exchange** 11:23
**excluding** 100:18 101:1
**excuse** 24:16 108:21
**executive** 16:20
**exercise** 146:20
**exhibit** 123:1,4 158:3 159:4
**exhibits** 3:6,7
**expect** 112:5 114:10 139:21 140:16 141:2 142:16 145:1 145:14
**expecting** 114:2,3,5
**expenses** 87:22 88:2,12,14,17 88:22 90:9 100:17,23 102:10 104:22 149:13 151:17 151:23 152:4
**expensive** 122:8
**experience** 111:1 160:21 161:1
**experienced** 159:5 160:16
**experiences** 60:1
**expert** 72:15 107:2,9
**expertise** 87:4
**expires** 164:22 164:23
**explained** 114:12
**explanation** 114:10
**explanations** 114:16
**explicitly** 112:22
**extended** 76:10 77:2
**extensive** 88:10
**extent** 49:1 53:6 92:14 94:14 104:20 120:1 135:20 142:11

**f**

**f** 164:1
**facilities** 91:2,8
**fact** 138:18 139:7,18 140:11
**factors** 71:16 139:5 146:16
**fair** 8:12 59:20 73:16 76:6 91:16 92:2,5 112:1 113:9 130:11 154:13 156:23 160:12
**fairly** 27:7 123:7 156:8
**fairway** 36:11 36:14,19 37:2 38:14 40:14 41:15 42:4,7 45:11,17 46:6 47:3,10 48:13 50:15,15 54:17
**faith** 107:10 158:20,21 161:9,16
**fake** 144:11
**familiar** 35:22 75:23
**families** 13:11
**family** 11:16 13:3,22 15:19 16:1 25:1 33:19 39:12 118:19 119:4,4

**far** 17:7 21:7 23:12 27:3 35:20 54:19 56:2 147:23 151:16
**farmhouse** 35:7
**farmland** 36:4
**february** 47:6 72:12 73:7
**federal** 6:4
**fee** 87:15,21 88:8
**feel** 62:11 67:14
**feeling** 62:20
**feet** 28:16 84:13
**felt** 60:8 70:17 117:17
**fiduciary** 97:10 98:14
**field** 17:21 96:11,12,20
**fifteen** 9:22 24:2 66:9 88:3 144:18
**fifty** 12:17 13:1 13:16,18 77:4 149:1
**figure** 69:20 98:12 147:20
**figures** 102:5 102:14,20 149:9
**filed** 22:4
**filing** 2:14
**filled** 95:16
**filling** 96:6
**finance** 98:16
**finances** 152:17
**financial** 21:4 69:20 116:23
**find** 18:16 105:8 120:5 122:13 144:3 157:6
**findsome** 19:15
**fine** 6:20 65:13 80:10 100:16 107:11
**finished** 51:23 109:11,12
**fire** 10:14 22:4 22:5,10,20 23:5,7,9 24:3,7 24:11,14,15,16 24:20 25:2,3 25:16 26:20 27:11,19 28:1 28:1,10,19 29:13 30:2 32:20,22 33:17 33:19,23 34:3 36:9 37:11 45:2 56:19 59:18 61:21 68:1 69:12 71:18 74:3,19 79:15 83:7 84:4,8,17 85:5 88:20 89:10,12 89:19 90:3 92:10,22 93:2 93:15,23 94:9 97:2,6 98:3 100:7,16,22 116:23 119:8 119:14 120:13 120:20,21 121:3,4 127:5 127:10 130:3 130:16,22,23 131:1
**first** 6:15 23:6 25:11 28:13 33:11 34:15 36:14 38:21 46:2 49:19 50:8 59:7,17 66:5 77:1 78:11 79:18 93:1 121:3 124:18 146:2 148:20
**five** 13:12,16 13:18,18 14:1 25:18 35:6,21 66:4 78:22 79:1,12 87:22 144:20
**floor** 27:20 28:12,14,14,20 28:22 29:1 32:21,21 33:6
**flooring** 33:9
**floors** 42:23
**florida** 11:1 19:16 20:2
**focused** 93:1
**follow** 7:13
**followed** 72:8
**following** 6:11 36:9 51:11 74:3 79:15 80:13 81:19 84:3,7 85:5 88:20 89:10 92:10 93:15 94:9 100:21 119:8 120:20 149:13
**follows** 6:16
**footage** 156:15
**footprint** 154:13
**force** 2:1
**foregoing** 6:6 164:6,10
**forget** 37:18
**forgotten** 80:5
**form** 2:8 16:8 47:17 78:15 95:15,18,19 107:7 115:7 159:18
**former** 13:2
**forms** 95:22
**forth** 111:3,21 112:15 115:1

**forty** 35:21
**forward** 112:18 112:21
**found** 40:18 49:4 81:22 82:2,4
**foundation** 11:6 15:19 16:2,4,5,12,18 16:21 17:8
**four** 15:4 27:6 29:1,2 147:21 147:23 148:7
**fowlkes** 156:1 157:10
**frame** 29:21 48:11 126:8
**frankly** 59:16
**friendly** 38:9
**friends** 119:3
**front** 95:2 105:3 148:12
**frustrated** 117:11,15
**frustration** 118:16
**full** 2:2
**fully** 66:14
**functioned** 39:17
**functioning** 39:16
**fund** 11:20,22
**funded** 68:14
**furniture** 131:15
**further** 1:21 2:5,13 163:16 164:13

**g**

**g** 35:16
**gail** 32:16
**garage** 28:16 32:22 84:1,3 85:3 113:8 130:14,15,18 135:20
**gas** 17:21
**gaslighting** 108:4,11,19 110:3,6,8,12,21 113:19,20
**gaslit** 109:3,14 109:21 116:16
**gears** 107:1
**general** 49:6 61:16,18 62:19 65:5,8
**generally** 14:14 17:13 25:17 44:16 83:7 89:16 90:3,10 90:11 112:12 151:2 163:5
**generator** 113:11 130:1,3 130:9,11
**geography** 35:23
**georgia** 5:2
**getting** 42:7 54:19 66:6 70:4,21 74:9 108:15 151:12 155:16
**gillian** 9:22 16:1
**give** 7:19 9:18 31:20 94:22 95:2 114:7 147:6 157:15
**given** 7:11 103:10 164:11
**gives** 16:6
**giving** 7:20 17:4,5
**glance** 75:17 158:8
**global** 69:16 70:7 111:2 113:22 140:11
**go** 8:20,23 9:17 24:12 30:19 38:16 47:18 62:8 66:8 70:2 75:14 76:16 78:20 92:18 98:8,10 99:14 101:19 104:5 104:11 106:11 110:15 113:14 119:22 125:23 129:8,14 134:5 144:15 146:6 148:11,17 152:19 157:17 157:23 160:1 160:23
**goal** 70:18 71:11
**goes** 84:11 128:5,6 143:16 144:18 148:1
**going** 7:13,14 8:15,19,23 14:10 16:22 18:1 30:14 31:3,4 35:14 49:13,15 56:11 57:19 59:5 65:9 80:1 85:11 95:1 99:18 105:5 117:2 120:2,4 126:9 128:22 132:1 140:11 143:12 148:22 151:13 155:15 155:16 158:2,9
**good** 7:3,5,5 43:11 46:12 156:11
**goodrich** 1:7,8 1:17 4:7,8 5:6 6:10,14 7:3 9:6 9:12,22 10:4,9 16:1 20:23
**goodrich's** 107:4

**gotten** 124:3
**graduated** 10:22
**grant** 16:22
**granting** 17:7
**grants** 16:8
**great** 14:4 32:5 38:22 39:8,9 39:10,13,15,20 53:9 129:12,22
**greater** 77:6
**grew** 10:21
**ground** 119:23
**grounds** 2:10
**group** 62:14
**groups** 52:14
**guess** 12:12 15:16 20:18 22:12,15 23:4 24:8 25:20 28:14 33:7 38:4 40:19,19 40:21 51:20 63:16 70:9 71:13 76:3 80:7 85:15 91:5 94:2 121:6 124:5,23 125:4,6,15,23 146:5 148:7 153:11
**guidance** 86:19
**guy's** 80:5
**guys** 36:10,10 37:5,16 40:13 43:1 52:12 54:20 81:7 88:21 90:23 91:17 95:16 107:2 133:13 137:16 148:5 152:16 153:18 154:11

**h**

**half** 153:8,10
**hammer** 13:22
**hand** 132:1,23 148:15 158:2
**handing** 101:12
**handle** 52:12 56:8 120:9
**handled** 31:7 47:21 51:3 52:6,8 54:13 54:22 56:4 73:23 80:23 87:18 89:22 90:6,17 92:6 94:5,12 99:11 102:17 162:5
**handling** 151:19
**hands** 30:22
**hang** 106:7
**hank** 25:13 60:18 63:19 85:6
**happened** 22:6 44:13 45:4 93:11 95:12 145:19
**happy** 159:21
**hard** 66:3,8 118:13 120:23
**harwood** 11:4
**hasseig** 58:22
**hate** 161:10
**hd** 45:8,10 54:7 162:11,18
**head** 7:20 145:9 154:5
**headed** 23:11
**hear** 8:7
**heard** 40:20 63:8,11,17 72:20
**hearing** 164:12
**heavily** 28:13
**hedge** 11:20,22
**held** 101:4 104:8 157:20
**help** 35:14 62:2 62:12 98:16
**helped** 92:1 127:1
**helping** 34:18 60:10 127:1 131:11
**high** 10:22 117:13,14 118:23 121:1
**hire** 46:21 162:9
**hired** 81:16 87:3
**home** 21:1 23:11 27:11 90:20 133:8
**homeowners** 75:6
**hope** 69:21
**hot** 46:11
**hour** 35:13,18 35:21
**house** 23:9 24:12 25:11 26:17 27:4,10 27:20 28:4,9 30:12 31:3,5 33:2,13 35:10 36:19 37:2,13 38:11 39:14 40:7,10 42:11 42:20,23 43:6 43:17,20 44:1 44:3,7,23 45:6 45:11,22 46:3 46:6,16,22 47:3,10 48:1,8 48:13,14,16,22 49:7,10,16,20 50:4,9,15,15,18 50:22 51:5,13 52:17 53:5 54:8,16,20 55:2,8 56:19 56:22 57:1 59:6 66:9 67:18 69:6,7 69:15,21 70:2

70:5,11,13,19 70:20 71:1,2,6 71:10,12,14,17 71:21,22 72:3 73:3,5 76:7 77:3,15 83:13 83:19,23 85:19 85:21,23 86:2 86:5,18,22,23 89:18 92:15 93:21 97:14,21 98:4,18 121:16 122:6,16 130:9 133:18 134:3 135:10,23,23 136:9,14,22 137:1,12,15 138:16,19 139:8,15,19,23 140:5,14 142:8 142:11 145:6 145:13,19,21 146:19,23 147:3 149:14 154:4,12,16 155:6 156:2,3 156:7,9,15,21 157:3,9

**houses** 27:6 31:1,10

**how's** 65:9

**hugely** 119:19

**huh** 7:20,21 14:4 15:13 29:18 35:19 37:21 46:1 61:22 75:12 76:20 101:11 105:20 122:12 123:23 136:6 138:7,17 140:6 140:9 144:7,9 144:14 145:7

**hundred** 144:18,20 149:1

**hypothetical** 140:2

**i**

**identified** 102:5 132:21 134:12 162:17 162:20

**identifies** 105:7

**identify** 17:10 34:18

**identifying** 67:2

**impact** 121:23

**implied** 115:12

**implies** 115:7

**imply** 153:2

**include** 104:22

**incorrect** 140:18

**increase** 140:13 143:19 144:17 155:5,10,13

**increased** 117:22 118:5 118:10

**increases** 140:17 142:12 142:14,17,19 143:6

**incredibly** 127:15

**incurred** 103:6 138:1 149:13

**incurring** 88:23

**indemnity** 1:11 4:11

**indicated** 52:4

**indicating** 15:22,23 75:7 81:23 105:17

**indicative** 113:19

**individual** 82:21 87:4

**individuals** 58:17 71:20

**industrial** 12:10,18,19

**inform** 30:2

**information** 9:1 157:13 161:6,13

**informed** 31:2 59:15

**initial** 100:7 139:19 140:7 140:13 142:7 144:5 145:5 146:7,14 154:17

**initially** 32:16 59:3 99:8

**innovations** 45:8,11 54:7 162:12,19

**inquiring** 18:13

**inspect** 38:16 45:4

**inspecting** 50:4

**inspection** 41:12 97:14

**installation** 45:7,16 54:9 162:2

**installed** 45:13 51:18 54:17

**instances** 125:1

**insurance** 29:13 30:8 31:11 69:22 70:22 74:17,18 117:18 118:15 156:1 157:11

**insured** 30:23 31:9

**interacting** 59:19 60:4

**interactions** 59:2,9,13,14,15 59:21 60:5 61:11 63:12 65:2 79:21 109:8 161:23

163:1,7
**interchangea...** 109:23
**interchangea...** 110:4 137:21
**interest** 13:21 18:3 20:23 21:2,4 36:7
**interested** 164:15
**interior** 64:22
**internet** 45:13 45:14
**interrogatories** 101:14
**interrogatory** 101:23 102:6 103:11 104:21 106:5 132:2 148:12,18
**interrupt** 62:6
**invest** 11:17,18
**investment** 11:16
**investments** 11:22 12:7
**invoices** 131:20 149:13 150:6 150:10 151:5 151:14,22
**involved** 14:9 37:4 40:17 41:22 47:14 48:20 50:1,3 50:20 53:3,12 67:5,10 69:1,5 71:20 73:18 88:6,13,16 89:20 114:22 116:10 131:7 131:16
**involvement** 16:12 21:2 34:17 37:8 42:6 44:21 45:17 66:1,20 67:1,21 72:14 82:17 86:14,15 87:10 91:21,23 94:15 95:21 102:13 107:22 155:1 159:1
**iris** 63:19 64:21 65:3 68:10 94:7 150:3 151:4,15
**irrigation** 93:4
**issues** 39:23 45:21,23 46:3 46:9 86:20 124:5 126:1 130:13
**itemized** 116:3
**itemizing** 66:10
**items** 34:18 68:18 91:10,14 93:22,23 114:17 116:2 130:21,22 131:1,5,8 150:1,2,4 153:17

**j**

**january** 9:10 21:15 55:5 72:12 73:1 104:2 153:6,12 153:21 154:17 154:18
**jefferson** 164:4
**jeremy** 56:19 57:5,7,14 58:17 59:1,19 59:22 60:4,6 60:20 61:11 63:3,13 81:13 81:18,23 82:15
**jeremy's** 81:19
**job** 2:23 120:7 127:16
**jody** 29:15
**joe** 15:9
**joni** 29:16,17 30:1,13,15 31:6,12,16 32:12,17
**judge** 11:4
**judge's** 18:13
**july** 153:6
**june** 21:19 31:1 71:7,8
**justice** 11:4
**justified** 156:22

**k**

**kansas** 12:9 13:6 17:18
**kept** 40:7
**kids** 38:5,11 120:3,6 126:7
**kin** 164:14
**kind** 11:20 14:14 15:8,11 19:18 24:13 28:9 31:7 32:23 33:8 38:23 39:13 59:6,8 70:6,8 72:1 75:6,11 77:18 86:11 98:20 109:22 118:15 119:23 121:4 124:19 125:10,13 133:9 136:10 136:14 162:11
**kitchen** 39:12 51:18,18
**knew** 60:15 123:20 156:2
**knock** 134:3
**knocking** 70:13
**know** 7:11 8:8 8:16 15:15,15 16:21 17:23 18:1 23:10 24:10 25:7,17 25:20,21,23 26:3,4,12,22

28:2,15,17 29:20 31:3,5 33:8 34:14 39:10,21 40:2 40:12,13,22,22 41:1,2 42:11 42:18 43:12,13 43:15,18,21 44:14,15 45:2 45:3 47:1 48:15 50:10 51:9 52:19 56:23 57:4 59:3,4 63:17 64:17 66:8 68:20 69:13,21 70:14,15,17 73:5 75:17 78:15,16 79:3 80:10,12 82:3 83:6,14,15,17 84:14,22 85:2 85:4,10,12 86:8,9,20 87:2 87:19 88:1,3,5 89:1,8,11,15,17 90:1,8,14 91:3 91:7 92:12,23 92:23 93:3,9 93:10,17,20 95:11 96:16,17 96:18,21,22 97:1,23 99:21 100:9,15,20 102:3 105:15 106:14 107:18 107:19,20 110:7,10 111:2 112:12,13 113:7,8,18 115:12 116:6 116:19 117:9 117:10,12,16 118:1,6,17,18 118:21 119:1 119:21 120:4 121:2,2,21 122:5,10 124:6 124:15,23 125:3 126:8,10 126:22 127:18 128:17,22,23 128:23 130:14 130:17 132:11 133:3 139:10 146:1,9,13,21 147:17 148:4,5 148:9 149:4,17 149:20,21 150:3,7,8,13 151:17 153:16 155:9,12 156:8 156:10,13,19 156:21 157:2 158:5 159:16

**knowledge** 41:8 46:20 49:12 63:1,4 63:10 65:22 106:6 108:18 110:11 123:13 123:17 149:15 162:20

**known** 92:3

**l**

**l** 1:13,18 4:15 6:1 35:16 164:19

**l.l.c.** 4:18

**labor** 122:5,7

**lack** 127:9

**laid** 146:3

**land** 35:7,9

**landlord** 42:1 43:17,20,23 44:7 47:15 53:1

**landlords** 155:15

**landscaping** 91:21 92:11,21 102:9

**lane** 37:18,20 38:3 91:6

**language** 128:16 129:1 134:8,18 135:6 135:8

**large** 76:18

**larger** 156:19

**late** 27:2 28:5 36:15 160:10

**law** 11:2 125:17

**lawn** 24:13

**laws** 2:3

**lawsuit** 18:4 22:4 66:22 107:5 149:23

**leading** 2:8

**learn** 23:6 82:5

**learned** 64:9 82:13

**lease** 41:15,23 42:4 46:23 47:9,13,16 53:4,5,7,11,18 53:20 54:1 154:17,19,22 155:2

**leave** 102:23 121:16

**left** 22:18 24:22

**legal** 110:9

**legitimate** 66:13 113:21

**lengthen** 122:14

**lengthened** 122:4

**lengthy** 123:8

**lesser** 77:13 78:2,3,5 133:22 138:4

**letter** 111:6,9 111:14 113:17 114:14 116:3

**letting** 99:21

**level** 65:6,8 119:1 121:1,14
**levels** 117:14
**license** 164:21
**lie** 109:23
**lied** 108:13 109:23
**life** 119:20 127:6
**lights** 22:16,19
**limited** 63:13 107:7 109:7 163:7
**limits** 32:8
**line** 78:11 148:20 155:15 155:16,20
**lined** 129:11
**linen** 22:19
**lines** 130:8
**lingering** 70:15 71:18
**list** 103:7 153:17
**listed** 113:3
**little** 10:19 12:17 13:1 30:19 65:14 67:7 91:22 107:1 127:8,9 129:23 135:2 153:9,10 159:23 160:2
**live** 21:10 26:12,16 38:23 50:12,13 52:20 120:5
**living** 41:4 52:18 88:12,14 88:17 102:10 151:17,23 153:23
**llc** 20:23 21:1 48:2 52:7 82:18,22 83:15
**llc's** 83:2
**loan** 99:1,3,8
**local** 19:8 87:3
**locate** 17:10
**located** 15:18 33:4 40:14 156:7
**locating** 37:5 40:17
**location** 77:15
**long** 8:15 14:8 25:13 26:9,22 27:23 32:11 33:22 60:18,21 61:4 63:20 85:6,6 153:4 154:3
**long's** 85:20
**longer** 36:3 122:11
**look** 37:11 41:5 75:22,22 92:18 94:1 98:7 145:10 158:4 159:9
**looked** 37:13 37:16 38:13 49:3
**looking** 50:12 105:6 118:7 128:15
**looks** 75:7
**loss** 77:14 94:16,18 140:21 141:8
**lot** 7:14 40:1 57:2 64:16 101:10 118:13 120:9,10 138:13
**lowered** 121:5
**lowest** 84:12
**luciana** 4:23
**lucy** 7:7
**lying** 110:3

**m**

**m** 20:15,16
**ma'am** 106:13
**made** 2:7 43:16 62:11 71:5 72:18 92:3 93:23 94:1 116:20 118:20 122:8 130:6,11 154:11
**magali** 93:14
**main** 28:14,20 28:22 32:21 33:6,6
**maintenance** 44:3 46:22
**majority** 19:23 20:1
**make** 2:10 8:3 8:9 32:7 53:17 54:5 95:3 98:9 103:4 109:10 126:2 129:10 152:13 162:10 163:9
**makes** 81:21 128:2
**making** 51:22 52:16 84:20 125:6
**manage** 12:11 38:10 49:16
**managed** 25:10 48:2
**management** 11:14 12:16
**manager** 14:20
**managing** 25:10
**manifest** 117:22 118:10 124:1
**manifests** 127:7
**manipulated** 108:14
**manipulating** 110:16

**marbury** 60:17 63:19 86:17
**march** 14:3
**mark** 13:22
**marked** 3:7 158:3
**market** 156:4
**marketing** 19:16,23
**married** 9:11 32:14 124:22 125:18 126:7
**master** 28:21 51:20 103:7
**materials** 77:17
**matt** 20:5
**matter** 133:20 134:3 136:16 137:4,4,16
**matters** 30:8 133:20
**maus** 93:14 94:4
**mba** 11:8
**mccarty** 15:9
**mccory** 20:15
**mccrory** 20:14
**mccullogh** 60:17,21 61:3 63:19
**mean** 14:23 15:3,15 16:13 23:3 28:12 30:23 31:10 33:5 34:14 39:8,16,20 40:6 42:15 44:14,17 49:22 50:17 53:6 59:13 60:11 61:17 62:5 63:17,18 65:7 66:18 68:7 71:12,23 73:4 74:5,8 76:1 84:10 85:14 86:11,16,21 89:2,11 90:11 92:12 93:8 108:12,20 109:22 111:10 113:7 115:19 116:18 117:3 119:19,21,21 119:23 121:15 121:16 122:4 123:16 124:12 125:15 126:6,7 127:8,12,15,17 128:8,14 134:20,22 135:12 137:13 138:11,13 139:10 140:18 146:8,10,11,13 148:2,6 150:4 152:6,9 153:14 163:10
**means** 77:3,13 110:12 164:8
**meant** 54:4
**meet** 86:17
**meeting** 56:22 57:3 60:3,6 61:13 63:14,18 73:11 108:23
**meetings** 17:1
**mental** 108:3 117:1
**mention** 123:8 126:12 134:8 134:17,21
**mentioned** 32:19 45:20,22 64:21 68:5 86:3 116:14 117:21 124:8 126:4 130:6 137:3 151:18 153:16 154:10 162:18
**mentions** 132:19
**message** 24:22
**met** 7:6 68:11
**mexican** 64:11
**michelle** 1:17 4:15 6:1 164:19
**mid** 36:15,22
**middle** 76:7
**mike** 16:1
**mill** 25:20
**million** 66:4 76:9 78:22 79:1 147:21,23 148:7
**mind** 50:11 76:22
**minimal** 23:16
**minor** 154:11
**minute** 23:15
**minutes** 24:2 35:21
**misquote** 136:7
**misrepresenti...** 140:19
**mississippi** 36:2
**modifications** 44:2 50:21 130:7
**mold** 33:2,15 84:23 85:3
**moment** 101:19 102:2 132:10 158:5
**moncrief** 25:9 26:6
**monday** 22:13 22:13
**money** 16:6 17:4,6,8 70:1 97:8 138:9,9 138:14
**moneys** 138:12 138:13
**montevallo** 91:6

**month** 41:15 121:3 156:5
**monthly** 100:17,23
**months** 47:12 122:11 143:16
**moratory** 66:15
**morning** 7:3,5 22:14 23:17,19
**mornings** 22:13
**mortgage** 97:3 97:6,8 98:3,21 99:2,5,6 100:7 100:18
**moss** 58:16
**mountain** 10:11,16,22 21:11 24:15,16 25:2 26:13 37:17
**move** 31:4 37:12 41:11 42:8 47:2 48:7 54:20 103:18 104:22 153:20
**moved** 21:15 21:22 31:1 36:10,14,18 37:2,6 39:23 43:10 45:5,21 47:23 49:3,15 49:18,20 51:11 55:1 88:21 91:17 92:13,15 104:1 153:13
**moving** 43:1 44:5 50:22 51:6 70:3
**multiple** 31:20

**n**

**n** 1:13 3:1 9:6,6 9:6
**name** 7:7 9:5 12:18 13:23 20:4,6 37:18 80:5 91:7
**names** 9:16
**nature** 79:21
**navigate** 117:19
**navigating** 118:22
**ne** 5:2
**near** 22:20 91:5
**necessary** 2:6
**need** 8:9,16 19:4 35:14 38:23 70:23 89:18 98:7,9,9 123:7 131:23 133:8,18 136:9 158:10 159:15
**needed** 31:5,19 42:14,15 70:9 84:3,8 145:14
**negative** 59:21 61:12 62:13
**negotiated** 49:5
**negotiating** 41:23 53:5,12 112:13 155:2
**negotiation** 54:1
**neighbor** 23:2 23:4
**neighborhood** 155:18
**neighbors** 25:5
**neither** 164:14
**never** 24:21 43:16 49:2 58:22 85:15,15 138:1 145:22
**new** 11:22 31:5 43:10 51:18 117:16 119:22
**newlyweds** 124:21
**nicer** 156:4
**night** 11:11 33:19
**nights** 48:16 118:12
**nine** 14:11 156:5,22
**nodding** 7:20
**normally** 52:20
**northern** 1:2 4:2
**nosy** 25:4
**notary** 164:23
**notes** 129:8
**notice** 2:14 33:11 46:2
**noticed** 23:1 118:7 127:3
**noticing** 33:15 45:21
**notified** 24:2 25:15 97:12 98:1
**notify** 24:19 97:5,21
**notifying** 125:14
**november** 22:6 22:6 69:12 103:13,22
**number** 1:5 3:3 4:5 67:18 79:5 95:2 101:23 102:7 104:21 114:5,6,7,9,11 114:13 132:2 148:18,21 149:5 156:15 156:16 164:21
**numbered** 75:11
**numbers** 132:21 144:11

**o**

**o** 1:13 20:8,15 35:16
**o'connor** 4:23

**oakwood** 100:2
**oakworth** 98:17 100:2,3 100:4
**oath** 7:12 9:2 96:9 132:20
**object** 18:20 47:17 58:5 78:14 107:6 115:6 142:4 159:18 160:13
**objections** 2:7 2:10
**observe** 46:5
**observed** 117:6 118:9 124:2
**observing** 124:19
**obsessive** 123:10,14
**obtained** 31:11
**obviously** 24:11 84:11 89:16 109:4 116:18 144:12
**occurred** 45:3 125:4
**ocd** 123:21 124:1,9,18 127:4,20
**offer** 69:17 70:7 111:2 112:10,14,16 112:18,21,22 113:17,22 114:1,18
**offered** 2:12
**office** 11:7,17 15:21,22,23,23
**oh** 12:15 95:13 160:9
**okay** 6:18 7:8 7:11 8:4,14,17 8:21 9:4,8,11 10:3,7,14,21 11:10 12:1 13:5,13,15,20 14:8,12,21 15:17 16:3,11 17:3,15 18:8 19:4,6,12,17,21 20:12,17 22:3 22:9 23:12 26:5,15 27:3 27:19,23 28:21 29:4,9,12 30:6 30:14 31:14 32:2,19 34:8 34:12 35:1,17 36:6,9,23 38:13 39:3,18 40:3,13 41:14 41:18 42:3 43:19 44:20 45:10,15 46:15 47:6 48:7,10 48:20 49:9,19 50:7,20 51:5 51:15,22 52:2 53:3,8,15 54:6 55:5,8 56:10 56:13 57:6,9 57:12,16 58:1 58:16,21 59:20 60:11,23 61:7 61:10,19 62:10 62:19,22 63:1 63:15 64:1,4,7 64:14,21 65:10 65:13 66:17 67:8 68:1,13 69:4,10 71:2,8 72:17 73:10,13 74:11,20 75:3 75:12,16,19 76:2,4,16,23 77:10 78:10,12 78:13 79:11,15 79:20 80:8,11 81:7 82:9 84:18 86:13 87:2,20 88:4 89:6 90:8,12 91:16,20,23 92:5,9,20 93:3 93:13 94:3,19 95:7 96:4,8,18 96:22 97:2,11 97:20 98:2,11 98:23 99:7,17 99:20,23 100:10 101:12 101:22 102:1,1 102:4,19 103:15,23 105:10,11,19 105:21 106:2 106:12,23 109:5,13,17 111:13 112:3,9 112:11,17 113:16 114:14 115:14 116:14 117:6 121:7 122:19 123:13 124:17 126:4 126:12 128:4 128:21 129:12 130:13,18 131:10,15 132:9,14 133:2 133:6,11,11,15 135:21 136:3,4 136:18 137:3 139:1,18 143:17 144:1 145:4 147:8,13 147:22 148:10 148:19 149:7 149:12,17,21 150:12,18 151:16 152:12 153:1,16 156:20 157:2,8 158:12,15,19 158:23 162:7 162:17,23
**older** 39:14 40:7

**once** 22:12 49:15 52:22 55:3 92:17 97:21
**ones** 95:15 118:7
**online** 11:11 19:19
**open** 71:15
**opinion** 85:15 85:17 107:9 128:3,9,12 133:16
**opinions** 62:15 63:23
**opposed** 7:19
**option** 78:8
**options** 31:21 78:6,17
**oral** 6:11
**order** 18:13 68:8
**organizations** 16:7 17:14
**original** 73:19 86:1,22 148:12
**originally** 21:18,23 27:16 154:4
**orlando** 10:23 19:15,18,20
**outcome** 110:17
**outdoor** 19:8 19:11 20:9
**outdoors** 19:3 19:12
**outline** 75:8 158:21 162:18
**outlined** 147:10 159:3
**outrageous** 107:10
**outside** 10:23 49:23 59:17
**overruled** 92:4
**oversight** 86:14
**owes** 137:23
**own** 12:8,23 13:11,11,17 17:18 19:2 20:10 35:2,4,6 36:3,7
**owned** 15:19 48:2
**owner** 12:12,13 40:8 43:8,9 44:15
**ownership** 19:1 19:1
**owns** 12:16 13:1,3,3,16,20 17:20 18:2 20:14

**p**

**p** 1:13
**pacific** 1:11 4:11 7:7 29:10 30:12 31:8,15 56:4,17 57:13 58:3,14,18 59:23 65:3 66:22 74:18 87:15 88:2,7 88:18 94:16 102:8 108:13 108:19 109:8 110:20 115:17 128:1 137:7,9 137:18,22 138:3 142:14 147:14 149:22 158:20 161:7 161:15 162:1,1 162:6,14 163:1 163:7
**package** 66:6
**packed** 34:12 34:18
**page** 3:3 75:5,5 75:9,15,20 104:14 105:8 105:18,22,23 125:20 132:7,8 132:16,21 159:11 160:3
**pages** 75:4 132:23 158:11 159:8
**paid** 88:1 108:16 111:5 113:10 128:10 138:12,12,14 139:21 140:16 141:3 145:1,15 152:12
**paint** 12:10 42:14,16,19 43:20
**painted** 42:12 51:6
**painting** 42:8 50:22
**pandemic** 14:3 121:11,23 122:17 140:12
**paper** 101:10 125:20
**paragraph** 77:2,12 132:18
**paraphrasing** 136:9
**parents** 16:2 26:16 33:20,23 48:16 97:9
**paris** 4:18,19 52:7
**park** 37:18,20 38:3
**parked** 24:8
**parkinson** 20:23
**parkway** 1:19 4:20 6:8
**part** 12:15,17 17:19 53:16 63:3 85:10,11 85:14 91:4 92:13,15 107:8 108:18 113:16

127:16,18 133:23 134:1 137:8 144:20 148:2,6
**partial** 18:23
**participate** 53:23 149:9 150:23
**participation** 21:6
**particular** 158:6
**particularly** 14:23 67:14
**parties** 1:15 2:9 111:17 164:14
**partly** 124:10
**partner's** 20:4
**partners** 20:10
**partnership** 21:2
**party** 111:20
**parvin** 1:18 4:15 6:1 164:19
**passed** 70:8
**past** 23:10 93:9 123:21 156:18
**pay** 88:8 92:1 100:5 111:8 113:4,6 134:1 137:7 138:4 152:10,20
**paying** 89:4 152:4,8
**payment** 76:10 142:14,16 143:19 147:13
**payments** 147:18
**pays** 133:22
**peachtree** 5:1
**peacock** 126:10
**pen** 126:2
**penalties** 100:6
**people** 15:11 25:19,21 60:15 62:14 73:15 122:13
**percent** 12:17 13:1,4,12,17,18 13:19 17:21 19:3 35:6 77:5
**percentage** 19:13 20:14
**percentages** 19:5
**perfect** 126:3
**performed** 83:13 135:10 135:19 143:8
**performing** 133:9 136:13 136:22
**period** 11:8 57:1 69:13 125:4
**permanent** 76:18 77:4,16
**person** 32:18 56:22 57:7 110:17 161:20
**personal** 59:23 108:17
**personally** 18:6 18:7,23 19:2 44:9 46:5 52:8 61:10 62:23 63:8,11 64:5 74:7 117:7 149:16 150:14 152:3,19 159:6 160:19 161:15 163:3,8
**pet** 38:9
**phone** 57:10 80:19 108:2
**phrased** 106:15
**physically** 80:15
**picking** 44:21 131:16
**place** 37:11 38:23 39:2 50:12,13 120:5 146:2,6
**placed** 31:15
**plaintiff's** 101:13 102:6 132:1
**plaintiffs** 1:9 4:9,22 115:7
**plan** 69:20
**plans** 154:11
**plants** 92:13
**playroom** 29:5 29:6
**please** 76:22 101:23 104:12 123:16 133:3 141:19,23 148:18
**plumbing** 45:23 46:17
**point** 7:23 8:16 23:2,11,13 24:12 25:12,14 28:17 32:17 33:1,14 34:16 37:23 39:1 43:11 49:17 50:11 66:4 69:15 78:22 79:1 81:7 84:12 95:9 99:18 103:4 113:10 121:6,9 121:18 124:22 147:21,23 148:7 161:13
**points** 28:19 117:13 118:2 119:3 163:6
**policies** 31:15 31:21
**policy** 30:12 31:8,22 32:4,8 68:8,12 69:23

74:18,18,21 75:6 76:13 78:19 103:21 128:17 129:1,4 133:19,21 134:9,18 135:6 135:8 137:6,15 138:3 140:20 140:23 141:7 141:17 142:17 146:1,3 147:7 147:9,11
**portion** 52:11 55:21 69:5 76:13 79:9 106:18 128:5 147:14 162:13 162:19
**portions** 52:13 102:7 136:23
**position** 71:9 72:5 112:6 115:8 129:3
**possession** 151:21
**possible** 66:11 70:20 71:13 111:16
**possibly** 157:7
**potential** 18:17
**practice** 22:15
**preexisting** 123:9
**prepared** 101:16
**preparing** 16:23 66:21 88:13
**prescheduled** 36:16
**prescription** 126:14
**presence** 19:18
**present** 5:5 34:6 108:8,21 109:2 119:10 144:19
**presented** 65:16 142:13
**presenting** 162:13
**president** 14:22
**pretty** 27:8 37:3 48:17 121:19
**previously** 158:3
**primarily** 30:7 54:21 56:4,8 67:10 73:23 80:4 89:3 92:7 96:5 102:17 107:9 108:14 151:18 162:5
**primary** 118:18 161:20 163:6
**prior** 2:12 30:23 31:10,11 43:1 50:4,22 51:6 68:1 71:8 90:2 96:8 97:2 100:13,16 105:22
**private** 11:17 11:18 12:2
**probably** 13:9 23:16 25:4,18 25:19 29:21 33:15 39:22 45:1,3 57:4 69:16 109:1,23 110:23 118:4 119:2
**problem** 60:10 61:21 159:13
**procedure** 6:5
**proceedings** 6:12
**process** 7:13 30:4,18,19 45:7 70:3,23 72:1 81:15 89:14 97:15 108:15 120:20 121:5 145:22 147:4 163:5
**produced** 123:6
**professionals** 119:12
**professions** 63:22
**program** 11:11
**promenade** 5:1
**prompt** 8:1
**proof** 94:17
**proofs** 94:15
**properties** 35:2 35:5 48:18 90:10 101:1 152:1,5,22
**property** 21:15 21:18 31:20 34:3 36:6,11 36:14 37:5,11 38:14,17,20 40:14,17 41:4 41:11,16,19 42:4,7 49:17 52:16,23 73:20 74:3,4,7 80:15 80:22 82:22 83:3,16 85:7 87:12 88:21,23 89:9,10 90:2 91:18 97:14 100:19
**proposal** 83:10
**provide** 70:1 86:18 136:10 161:6,13
**provided** 6:4 66:22 68:6,21 74:11 104:21 107:9 122:20
**providing** 69:2 116:10

**provision** 161:17
**psychiatric** 107:4
**psychiatrist** 119:6
**psychological** 107:4 117:8 119:7
**psychologist** 119:6
**public** 11:22 164:23
**pull** 75:1 122:23 145:10
**punch** 153:17
**purchased** 14:2 14:15 49:5,10 50:5 51:17
**purchasing** 48:21 67:22 131:7,17
**purpose** 29:23 83:2 85:20
**pursuant** 46:22 77:22
**pursue** 140:5
**put** 24:14 28:1 45:12 66:12 68:10 111:2 112:15,18,21 118:13 127:18
**putting** 66:6 126:1 127:13 128:19

**q**

**qualification** 142:5
**qualify** 61:12 110:20
**quality** 77:18
**quarterly** 17:1
**question** 8:6,19 8:20 30:15 53:16 65:12,14 100:14,21 106:12,14 107:15 111:15 115:13 123:17 123:19 133:4,5 133:15,16 134:8,11 135:2 135:6 136:8,17 136:19 137:14 141:17,19 142:6 143:21 146:19 159:17 159:22 160:8 160:19 161:11
**questions** 2:8,9 7:14 86:10,19 129:9,20 132:20 134:12 134:18 158:9 164:7
**quick** 29:20 55:11 129:8 136:5
**quicker** 9:20
**quickly** 33:16 33:16 41:10 59:8 70:5,19 71:13 89:18 163:4
**quote** 106:9

**r**

**r** 9:6 20:8,15 164:1
**rails** 142:2,4
**rain** 33:13
**ran** 23:1 95:9
**rate** 155:17
**rates** 155:16,21
**read** 55:22 63:8 76:21 77:7,18 78:18 95:23 102:2 105:14 106:19 123:7 132:10 133:6 148:22 158:10
**reading** 1:22
**ready** 42:7 54:20 75:18 102:3 105:15 132:11 158:5 160:1
**real** 49:4 136:5
**realized** 70:8
**really** 15:16 24:10 60:3 92:19 134:2 141:15,23 146:22 156:21 160:22
**reason** 49:9 102:19
**reasons** 111:22 113:5
**rebuild** 69:7,20 70:1,10 71:6 71:15 74:10,15 77:15 78:1,9 78:16 85:12,18 97:16 138:6
**rebuilding** 71:1 71:22 86:23 98:4 122:2,6 136:22 138:5 153:5
**rebuilt** 55:3 71:3 83:19,22 86:18 90:20 97:22 130:19 136:1,15 137:14,17 138:19 145:20
**recall** 25:2 28:2 28:18 29:11 30:5 32:1 33:12,16 34:4 34:10 40:18,23 41:21 42:2,13 42:17 43:3 46:4,19 47:4 47:11 48:9 51:13,17 52:3 52:9,13 57:11 58:20 59:16,18 60:4,22 61:6

62:18 64:13 72:13 73:12 74:12,16,22 75:21 76:1 80:20 84:5 85:17 87:9 89:2,14,16,23 91:9,15 95:18 99:9 101:20 113:7 114:16 114:20 116:5,9 122:18 124:11 124:12,14 125:1,3,5,9 132:5 135:11 135:16 145:8 151:1 154:6 155:23
**receipts** 66:10 131:19 150:4,6 150:11,15 151:7,14,22
**received** 70:6 115:4 147:13
**recess** 55:16 129:16
**recollection** 43:22 58:21 73:14 116:4 147:9,10
**recommend** 31:22
**recommended** 87:7
**reconstruction** 77:3,6,10,12,22 86:4 97:15 98:17 122:16
**record** 8:3 101:5 104:5,9 104:12 129:14 157:18,21 158:1
**redesign** 86:4
**reference** 114:15 135:5,7
**referencing** 78:23 79:6 140:22
**referring** 133:4
**refinancing** 99:1
**refurbish** 93:21
**refuse** 112:14
**regard** 74:5
**regarding** 68:17 71:21 73:2 82:22 88:7 93:14 94:4,9,16 108:3 119:7
**regards** 81:13 85:16 108:15
**regular** 46:21
**rehash** 9:3
**reimbursed** 68:9
**reimbursement** 88:18
**reject** 112:22
**relate** 110:19
**related** 15:7 141:17 142:12
**relating** 2:3 22:4
**relationship** 81:8
**relative** 52:20
**relatively** 33:16 89:18
**remainder** 135:23
**remaining** 13:3 47:12
**remediation** 83:4,5,8,10,12 84:23 85:3 133:9,18,22 134:1,2 135:9 135:19,22 136:10,14,23 137:23
**remember** 24:10 28:15,18 33:12 34:10,11 39:21 41:13,20 46:11 73:16 106:14 124:13 124:15 125:19 125:22
**remind** 94:17 107:16
**remodeled** 51:19
**removal** 81:14
**removed** 111:5
**removing** 69:14 80:2
**renewal** 154:22 155:2
**renewed** 154:19
**renovations** 51:12,16 52:6 52:11,16,23
**rent** 41:18 49:13 101:1 155:5,13,16 156:22
**rental** 36:10 37:5 44:23 45:6 48:18 49:17 50:15 52:16 88:21 90:9 100:23 151:23 152:5 152:22 155:17 155:20
**repaid** 69:23
**repair** 70:2,10 71:15 74:9,14 77:14,23 78:9 85:12,13,16,18 98:17 133:22 134:4 137:8,9 138:5,10,21 139:7,9,15,23 140:8,20 141:7 141:8 142:8

143:5,13 144:13 145:21 145:22 147:4
**repaired** 71:17 94:1 96:23 137:17 139:16 146:23
**repairing** 72:3 137:11 138:15 139:19
**repairs** 44:2 46:17 50:21 92:11 96:19 122:16 130:11 137:23 140:5 140:14 142:11 142:13,20 143:3,7 144:8 144:16 145:5 145:12,14 146:18
**repeat** 8:8 106:12,14 161:10
**rephrase** 8:8 26:6 50:2 58:12 107:15 111:15 115:13 141:18 142:5 144:3
**replace** 77:14 78:1,9,16
**replaced** 96:21 130:23 131:4,5 150:2
**replacement** 67:2 68:17 71:22 76:10 77:2 92:11 96:19 115:2,18 115:23 131:8 131:20 150:15
**report** 107:2 122:20 123:6,9 126:13 127:19 127:22 128:6
**reported** 29:9 64:2,19
**reporter** 4:16 6:2,18 7:15 55:23 106:20 164:20
**represent** 7:7 123:5
**representative** 58:10 134:23
**representatives** 56:16 57:13
**represented** 58:6
**representing** 135:1
**represents** 164:10
**request** 43:16 43:19 116:7,11
**requested** 32:6 43:14
**requests** 32:8 68:16,22 99:18 115:22
**required** 68:11 77:13 128:9,12
**requirements** 68:9,11
**research** 11:6 155:19
**residences** 31:11
**resolve** 114:4
**resolved** 128:20
**respect** 16:18 65:3,23 71:10 80:21 83:2 85:7,21 98:6 107:3,22 108:6 112:6 115:17 115:23 123:14 127:4 149:14 150:1,21 151:2 154:15 161:8 161:16 162:2 162:13
**respected** 63:22
**respective** 1:16
**respects** 50:16
**responding** 112:4
**response** 65:10 68:22 70:7 102:6 110:23 111:1,5,9 113:1,16,21 114:1,14 116:3 116:7,11
**responses** 101:13,16 106:5 148:12
**responsibility** 14:16 118:18
**responsible** 67:9 89:4 96:5 151:18 152:4,7
**responsive** 70:5
**rest** 13:20 133:6
**restate** 135:17
**restoration** 79:17
**result** 98:3 100:7 130:16 164:16
**retail** 19:9
**retainer** 86:12
**retired** 32:16
**return** 114:6
**returned** 52:22
**review** 42:3 83:9 101:17 106:2 154:22 159:11,20 160:11
**reviewed** 53:10 53:18 74:17,21 161:18
**reviewing** 147:9

**right** 10:11 14:2,7 18:10 19:2 21:20 23:22 24:3,4 27:12,21 28:22 33:2,20 34:13 36:1,11 40:11 41:16 43:2,6 47:7 53:21 54:10 55:3 67:19 73:16 75:7,15 76:17 81:9,14 95:17 98:9 105:3 121:11,12,20 125:19 129:19 131:5 133:10 133:12 134:16 136:10 138:4 138:20 139:17 143:22 153:19
**riner** 107:3,18 108:6
**riner's** 108:8 122:19 123:6
**road** 21:11 27:4 31:20 32:7 35:1 49:16 55:3 56:3 67:6 73:20 88:23 89:9 90:2 91:21 97:3 100:18 103:18 153:5 154:4
**role** 12:5 14:13
**roles** 16:17
**rollins** 10:23
**room** 22:14,17 39:11
**roommate** 19:14
**rooms** 67:9 144:13,17
**rude** 8:2 62:22 63:2 64:8 163:3
**rules** 2:3 6:4
**rumor** 25:20
**run** 13:6,8,9
**running** 21:7

**s**

**s** 1:13
**sad** 118:20
**saith** 163:16
**sample** 95:15
**sat** 24:13
**satisfactorily** 72:4
**save** 92:14
**saw** 22:23 38:20 40:19 49:20,22 50:7
**saying** 7:17,22
**says** 75:5,8 76:7,8,17 77:2 78:4,19,21 79:11 101:23 103:21 105:13 128:15,17 133:21 141:7 147:7 148:20
**scenario** 140:4 145:4,12,18
**scene** 24:1 25:3 26:7,10,19 27:15
**school** 10:1,16 10:22 11:2 120:6 125:17
**sconce** 22:20
**scope** 144:5
**scott** 20:13
**second** 9:18 27:20 28:11 32:21 55:12 75:16 76:21 94:22 98:18,20 99:1,4 101:8 104:14 105:14 106:8 122:23 146:6 155:5 157:15
**section** 133:14 158:6 161:20 161:21
**secured** 30:11
**security** 24:18 98:18
**see** 24:6 28:10 57:4 76:8,19 79:13 82:9 92:18 102:11 105:8,11 109:22 126:9 132:21
**seeing** 95:18 114:16
**seeking** 133:13
**seems** 43:4
**seen** 63:7 75:20 101:21 122:19 131:19 150:18 150:22 158:16
**selecting** 67:22 72:15 82:18 87:11
**selection** 37:14
**sell** 11:19 31:3 49:18
**semantic** 137:14
**send** 31:21 97:13 99:18
**sent** 113:23 148:5
**separate** 63:10
**september** 133:1
**septic** 96:10,11 96:12,13,19,20
**sequentially** 75:10
**served** 101:14 101:18
**services** 17:22 89:17,21
**set** 45:6,6 92:16 111:21 113:5

**sets** 68:8
**settle** 111:12
**settlement** 69:17 70:7 111:2,21 113:17,22,23
**seven** 149:1
**several** 115:1
**sgc** 1:5 4:5
**shape** 39:13,15
**share** 152:16
**she'll** 93:21
**short** 119:2 122:7,7
**shorter** 118:3
**shortly** 29:21 31:2 37:10 56:18 84:17 91:17
**show** 94:21 95:4
**shower** 40:1 46:7,8,12
**showers** 46:8
**shut** 89:11,12 122:17
**shutdowns** 122:1
**shuts** 121:17
**siblings** 12:12 13:7,10
**side** 15:21,23 27:5
**sign** 40:19
**signature** 1:22 105:17,23 132:16 164:18
**signed** 53:6,11 53:20 96:3 132:3
**signify** 22:17
**similar** 7:13 54:17 87:4 95:19 100:14 100:21
**sister** 13:11
**sit** 147:18 156:20
**site** 56:19 57:5 79:19
**sitting** 70:20
**situation** 116:20 117:5 117:16 118:23
**six** 41:15 122:11 143:16 149:1
**sixteen** 75:4
**size** 38:12 156:15
**slade** 82:18,21 83:2,15
**slash** 35:7 108:13,14
**sleep** 118:1
**sleepless** 118:12
**slow** 46:10 70:3
**small** 19:13
**smoke** 28:19 32:23 70:15 83:7,12 84:22 85:3 133:9,18 135:9,19,22 136:10,14,23
**sold** 49:18 55:9
**sole** 19:1
**solution** 60:9
**solve** 60:10 61:20 62:2
**sorry** 13:8 29:17 57:18 60:13 61:15 62:5 81:1 91:1 105:16 113:14 152:9 157:9
**sought** 124:9 124:18
**sound** 40:11 47:7
**sounds** 24:3 52:5 129:2
**source** 66:5
**south** 35:13
**southern** 1:3 4:3
**speak** 29:12,19 49:11 57:9,12
**speaking** 59:10 90:3,10 130:2
**specific** 32:8 65:6,14 67:8 67:13 102:7 111:3 117:13 125:1,3 134:21 135:7
**specifically** 31:22 60:16 63:20 156:19
**specifications** 156:14
**spell** 20:6
**spelling** 35:15
**spoke** 31:6 56:19 58:22 59:1
**spoken** 58:19 108:2
**spray** 12:18,21 12:22,23 13:6 13:17,21 14:15 15:2
**spreadsheet** 88:13
**spreadsheets** 66:21
**spring** 47:5 69:18 70:4
**sprinkle** 92:16
**sprott** 85:6
**square** 156:15
**stables** 21:1
**stage** 12:7 24:11
**standard** 52:18
**start** 8:11 33:10 119:23 120:1

**started** 11:5 12:6 22:10,22 23:3 27:19 33:14 34:15 45:21 121:10 124:6 126:9,10 126:21
**starting** 37:10 76:6 77:1
**starts** 75:5
**state** 50:11 117:8 119:8 127:4 164:3
**stated** 129:2
**statement** 136:13
**states** 1:1 4:1 6:5 77:12
**status** 89:15 119:16 120:14
**stay** 33:22 160:10
**stayed** 33:20
**stenotype** 164:7
**stephens** 32:16
**stipulated** 1:14 1:21 2:5,13
**stipulation** 6:6
**stipulations** 6:19
**stock** 11:23
**stop** 141:12,19 141:23
**stopped** 89:17
**storage** 90:19 90:22 91:2,8 91:11,14
**story** 33:6
**straight** 48:12
**stratton** 155:23 157:10
**street** 5:1 24:9 26:16 27:6
**stress** 117:14 117:19,20,22 118:10,23 120:23 121:4 121:14
**stressed** 116:22 118:19 121:19
**stressful** 14:6 117:5 120:20 127:7
**strike** 121:21 128:21
**strong** 67:14
**structure** 77:4 77:16 84:10
**structures** 76:18
**stuff** 80:1
**submissions** 151:15
**submitted** 69:16 107:2,13 108:1 128:8,12 149:12,18,22 150:3,5,6,9,13 150:15,19 151:2
**submitting** 88:17 94:15
**subsequent** 22:5 44:6 121:23
**subsequently** 47:23
**substantially** 153:14 154:12
**suggestion** 124:10
**suite** 1:19 4:20 5:2 6:8
**suited** 50:17
**supervision** 86:14
**supplies** 122:8
**supporting** 115:3
**supposed** 81:15
**supreme** 11:5
**sure** 8:3,9,22 30:22 38:8 45:12 51:22 53:17 54:5 55:13,14 66:15 84:20 87:5 94:21 95:3 96:1 98:9 101:9 103:2 104:19 109:10 114:8 115:10 121:15 129:10 130:17 143:9 146:9,11 152:13 157:16 161:12 162:10 163:9
**susannah** 10:4 10:10
**susie** 10:5,6
**suspending** 89:20
**sustain** 96:13
**sustained** 92:21 93:5 130:15
**swearing** 106:4
**sweet** 21:1
**switch** 107:1
**switches** 130:8
**sworn** 6:15
**synovus** 97:9 97:17 98:14,19
**system** 46:18 92:16 93:4

**t**

**t** 1:13,13 20:8 164:1,1
**tab** 75:3 95:2,3 95:6,10
**tabs** 95:9
**take** 7:23 27:23 55:11 75:16 76:21 92:18 99:7 101:18 102:2 105:14 129:7 132:10 153:4 154:3

158:4 159:10 159:20 160:10
**taken** 1:17 55:17 129:17 164:6
**takes** 59:5 126:18
**talk** 22:3 57:5 65:4 142:19
**talked** 24:21 44:14 129:23 134:15 149:8 155:23
**talking** 56:21 103:5 142:20 142:23 152:14 159:7
**tank** 96:13,20
**tanks** 96:11
**tcc** 25:9 60:17 74:3,6 154:8
**tearing** 133:17
**tech** 11:7
**technically** 81:16
**tell** 10:19 30:19 41:2 45:3 112:5 122:10 128:15
**temperature** 46:12,13
**ten** 14:10,11 24:1
**tenants** 41:7 43:10
**tendencies** 127:21
**term** 77:11 108:11 116:16 130:8
**terminate** 47:9
**terminated** 81:8
**termination** 100:6
**terms** 41:23 53:4,5,13 54:1 110:3 129:4 137:21 140:19 145:23
**testified** 6:16 155:4
**testimony** 55:22 106:19 135:18 164:11
**text** 76:19
**texts** 25:19
**thank** 20:9,17 35:22 36:3 54:3 56:1 100:1,4 129:13 153:1 157:12 163:12,14
**theoretical** 146:20
**thereof** 78:7
**thereto** 2:12 164:8
**thing** 112:1 120:17,18
141:6 152:14 155:22 156:11
**things** 9:3 15:14 30:8 66:9 85:13 111:7 113:3 117:2 120:8,9 120:10 125:3
**think** 11:21 18:16 20:19 25:21 31:17 37:13 38:6 45:22 46:9 49:2 54:3 56:20,20 61:23 66:3 73:9 80:9 89:12 95:5,8 100:13 103:9 109:12 111:7 116:15 118:3 121:3,18 123:1 127:6,8,12,16 127:17,17 130:7 134:4 149:7 156:4 162:23
**thinking** 125:22
**third** 78:8
**thirteen** 158:10 159:8 160:3
**thirty** 25:18
**thirtyish** 19:2
**thorough** 127:16
**thoroughly** 114:12 161:18
**thorpe** 63:19 64:21 65:3 68:2 94:7,8
**thorpe's** 66:1
**thought** 43:9 72:2,3 103:9 156:3
**thoughts** 38:20 50:8 92:3
**thousand** 79:12 87:22 88:3 144:11,12 149:2 156:5,22
**three** 9:14 15:11 27:6 38:5,6 76:9 78:6,17
**timberline** 11:14,15 12:5 12:16 13:1,9 13:12,16 14:8 14:9,13,18 15:22 17:17,20 18:2,6,22
**time** 2:11,11 10:14 14:13 25:11 26:18 27:11 28:3 29:20 35:5 36:13 37:1 38:5,21 39:1 40:4 48:11 49:19 50:8

56:18 57:1,4 60:3 69:13 70:8 74:20 77:14 91:13 98:8 103:12 105:2 113:9 116:23 117:3 118:19 120:11 122:15 124:17 125:4 126:5,8 140:20 141:8 160:11 161:11
**timeline** 122:1
**times** 86:18,21 115:1 117:10 122:6,8 124:4
**timing** 14:4 41:13
**title** 14:17 15:1 15:16
**titles** 14:19
**today** 7:15 132:3 147:18 156:20
**together** 13:13 13:14 66:7,12 68:10 118:14 127:18 128:19
**told** 24:11 31:18 61:1,4 64:12 72:8 109:18 157:8
**ton** 37:14 59:9
**took** 14:15 26:23 122:10
**toothbrush** 120:3
**top** 29:1 145:8 154:5
**total** 147:18
**totally** 141:11
**tough** 46:12 116:20
**towards** 61:14 62:14 88:8
**town** 27:1 91:5
**traffic** 23:15,16
**transcribed** 164:8
**transcript** 164:11
**transcription** 164:9
**transfer** 11:7
**transported** 34:19
**treatment** 124:9,18
**trial** 2:11
**trick** 132:19 133:5,16
**tried** 92:13
**trip** 36:16,20
**true** 106:5 164:10
**trusted** 60:15
**try** 92:16 120:6 120:7 128:19 148:22
**trying** 8:2 61:20 62:1,11 69:19 115:11 120:1 125:2,10 126:2 129:5 153:1
**turn** 101:22 102:22 104:13 105:22 132:7
**turning** 22:16 22:18
**tuscaloosa** 35:13,18 36:2
**tv** 44:22
**tvs** 45:4,5,12,13 54:17
**twelve** 10:8 23:15 32:15
**twenty** 13:12 13:18 14:1 25:18 87:22
**two** 7:16 11:1 13:10 20:11 21:3 27:14 38:4 52:14 59:7,17 70:12 78:17 79:18 103:21 124:23 125:21
**twoish** 11:1
**type** 11:23 75:6 84:22 86:12 114:1 119:6
**types** 32:8

**u**

**u** 1:13
**uab** 11:6,8
**uh** 7:20,21 15:13 29:18 35:19 37:21 46:1 61:22 75:12 76:20 101:11 105:20 122:12 123:23 136:6 138:7,17 140:6,9 144:7 144:9,14 145:7
**under** 7:12 9:2 32:3 96:9 128:13 132:20 137:5,6,15 142:17 143:3 145:23 147:14
**understand** 7:21 8:7,10 18:12,15 58:2 58:11,13 66:17 114:21,23 131:3 142:19 143:10,23 152:13,16
**understanding** 21:14 22:7,9 23:18 26:15 27:9 30:6 33:1 33:18 40:9 42:22 44:12 56:3 67:17 74:13 76:14

78:7 83:1 86:13 87:20 92:20 96:12 101:15 107:21 110:2 121:22 130:1 136:2 138:2,8 148:1 154:16 162:10
**understood** 12:4 15:17 39:7 54:4 79:8 105:1 150:14
**undertaken** 147:5
**undeveloped** 35:9
**uneven** 64:16
**unfair** 63:18 159:17 160:1
**unfamiliar** 118:22
**unfortunately** 75:10
**unit** 91:2
**united** 1:1 4:1 6:5
**units** 90:22
**university** 11:2
**unprofessional** 63:2 64:8 163:2
**upbeat** 59:4
**upside** 148:22
**used** 108:11 116:15 130:8
**using** 77:16 110:3 137:19 144:11
**usual** 6:18
**utilities** 88:22
**utility** 89:4 90:1,9
**utilizing** 90:23

**v**

**value** 62:15 111:17,21
**valued** 118:15
**variety** 139:4
**various** 119:3
**varying** 118:2
**venture** 12:6
**ventures** 18:17 20:20
**verbal** 7:19
**verification** 104:17 105:7 105:13,18 106:3,10
**verified** 96:2
**verify** 155:20
**vestavia** 4:20
**vice** 14:22
**village** 37:17
**vs** 1:10 4:10

**w**

**waived** 1:23 2:15
**walked** 73:5 156:18
**walking** 156:9
**wall** 143:13
**walls** 33:8
**wally** 58:22
**want** 8:2,9 9:19 36:15 53:16 103:4 106:23 107:14 129:10 136:7 145:9 160:10,11,22 161:2
**wanted** 49:16 54:4 71:14 109:10 162:12
**watched** 24:13
**water** 28:15,16 28:19 32:21 46:13 83:7 84:9,10,11,13 84:16 92:16,17
**way** 103:17 119:15,18 120:8,15 121:14 123:18 139:8 144:3 161:5
**ways** 127:11
**we've** 9:4 63:16 65:5 83:18 137:13 141:22 141:22
**wealth** 18:14
**week** 22:12,12
**weeks** 34:1
**went** 10:21,22 11:2 23:3 37:12 41:5 44:23 48:12 81:12 103:21 103:22 121:5 122:9 145:22
**wet** 33:13
**whichever** 70:2
**wichita** 12:9,13 13:6 17:18
**wife** 27:14 34:21 38:17 44:18 47:21 51:2 52:4,9 54:21 56:3 72:18 73:22 80:23 87:17 88:11 89:22 90:6 92:6 94:5 94:12 96:5 102:16 108:9 116:19 149:19 150:20
**willing** 111:4 113:4,6
**wimbleton** 48:1 48:8,13,22 49:10,20 50:21 51:5 53:4 54:8 54:16,19 55:2 55:8 154:15 155:6 156:9
**window** 45:16

**winmore** 19:15
**winter** 47:4
**witness** 1:23 6:10 26:1 55:14 60:19 95:7 105:19 129:12 141:13 141:20 157:16 158:14 164:12
**witnessed** 63:11 64:5
**woman** 32:15
**word** 81:14 109:21 110:1 113:19 127:10
**work** 11:5 15:12 16:19,22 23:8 46:8 58:8 83:16 85:11 87:11 93:9 127:13 138:14 162:9
**worked** 11:1 25:9 30:15 32:16 40:2 63:21 66:2,8 74:8 128:18
**workers** 46:16 46:21 64:10,11
**working** 32:12 60:8 62:1 69:19 81:17,18 108:3 117:17 117:18
**workmanship** 77:17
**works** 15:10
**world** 36:17 121:17
**worn** 39:14
**worry** 70:14
**worse** 59:9,12 59:14,15
**worthwhile** 16:6
**wrong** 46:6
**wrote** 125:20

**x**

**x** 3:1

**y**

**y** 20:15
**yeah** 14:5,5,7 14:22 15:5,6 17:16,20 19:22 20:19,19 25:7 26:1,4 33:15 35:16 36:1 39:19 45:13 46:14 48:6 52:1 56:12,14 59:16 62:7,9 66:19 75:14 80:12 84:19,21 84:21 89:2,7 92:3 94:23 96:17 98:22 99:6 100:20 101:20 103:16 106:16 107:16 109:9,12 110:1 113:13 120:12 121:8,16,18,20 124:5 125:12 125:12 131:12 131:13 134:6 134:14 135:4 135:15 136:20 137:20 139:13 140:3 142:22 143:14 148:23 151:10,15 152:18 153:3,9 153:10,11 161:22
**year** 11:5 16:14 47:5 124:22,22 153:8,9,10,11 154:19 155:5
**years** 11:1,9 14:2,11,11 32:15 66:9 103:21
**yesterday** 7:6 9:17 20:22 52:5 88:11 103:5,17 124:8 126:13 130:2 135:18 154:10 155:4
**york** 11:22

**z**

**zero** 120:1
**zlotnik** 71:23 72:11,15,20 73:14 87:3,11
**zlotnik's** 87:15 88:8
**zoloft** 126:14 126:23
**zoom** 108:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.