FILED
2023 Jul-12 PM 05:11
U.S. DISTRICT COURT
N.D. OF ALABAMA



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DISTRICT DIVISION

Civil Action No: 2:22-cv-21-MHH

-------------------------------------x

CHARLES GOODRICH and ALEXANDRA GOODRICH,

Plaintiffs,

-against-

PACIFIC INDEMNITY COMPANY,

Defendant.

-------------------------------------x

January 13, 2023

10:04 a.m.

Videotaped deposition of JERRY RUDOSHKO, held at the offices of Cozen O'Connor PC, 3 WTC, New York, New York, pursuant to Notice, before Lynne D. Metz, a Shorthand Reporter and Notary Public of the State of New York.

A P P E A R A N C E S:

DAUPHIN PARIS, LLC
Attorneys for Plaintiffs
408 Discovering Cypress
San Marcos, Texas 78666
BY: CHARLES A. DAUPHIN, ESQ.
DIANE PARIS, ESQ.

COZEN O'CONNOR PC
Attorneys for Defendant
The Promenade
Suite 400
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309
BY: ALYCEN A. MOSS, ESQ.

ALSO PRESENT:
Adrienne Chemel - Videographer

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the officer before whom the within deposition was taken.

THE VIDEOGRAPHER: Good morning. We are going on the record at 10:05 a.m. on January 13, 2023. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video recorded deposition of Jerry Rudoshko in the matter of Charles and Alexandra Goodrich versus Pacific Indemnity Company filed in the United States District Court for the Northern District of Alabama, Southern Division, case number 2:22-CV-21-MHH. This deposition is being held at Cozen O'Connor PC located at 3 WTC 175 Greenwich Street, 55th floor, New York, New York 10007.

My name is Adrienne Chemel from the firm Veritext and I am the videographer. The court reporter is Lynne Metz from the firm Veritext.

Counsel and all present in the room will now state their appearances and affiliations for the record.

MR. DAUPHIN: Chuck Dauphin for the plaintiff and my partner Diane Paris is here

J. Rudoshko

as well.

MS. MOSS: Alycen Moss for defendant Pacific Indemnity Company.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

J E R R Y R U D O S H K O,

called as a witness, having been first duly sworn by the Notary Public (Lynne D. Metz), was examined and testified as follows:

EXAMINATION BY

MR. DAUPHIN:

Q. Good morning Mr. Rudoshko.

Is it okay if I call you Jerry?

A. Certainly.

Q. You may certainly refer to me as Chuck.

A. Thank you.

Q. And I understand you are a little bit under the weather. I appreciate you being here. Any time you need to take a break just let me know.

A. Sure.

J. Rudoshko

Q. And if any of my questions aren't clear or you are not sure what I am asking, don't hesitate to let me know.
A. Okay.
Q. You have given depositions before?
A. Yes, I have.
Q. How long have you been with Chubb?
A. About 38 years.
Q. And generally, what is your position?
A. I am senior general adjuster.
Q. Do you know what positions Jeremy Elliot held?
A. I believe it was a general adjuster.
Q. When did you become a senior general adjuster?
A. Approximately, end of 2018 I believe.
Q. And what's the difference in the two?
A. Just experience in handling claims.
Q. Have you handled claims under a Masterpiece homeowners policy?
A. Yes.
Q. And have you handled fire claims brought under that policy?
A. Yes.

J. Rudoshko

Q. And how would you describe your experience in handling fire losses under the Masterpiece homeowners policy?

A. I would say I am well versed.

Q. When did you first become aware of the Goodrich claim?

A. I think it was reassigned to me in something like May of 2021, I think.

Q. And how did it become assigned to you?

A. It was through management that reassigned the claim.

Q. Do you know who in management did that?

A. My manager Michael Koos, K-O-O-S.

Q. Do you know Wally Haessig, H-A-S-S-E-I-G.

MS. MOSS: It's H-A-E-S-S-I-G.

MR. DAUPHIN: I apologize. I misspelled it.

A. Repeat the question please.

Q. Do you know Wally Haessig?

A. He's a supervisor manager.

Q. Would he be on the same level as Mr. Koos, to your knowledge?

J. Rudoshko

A. I believe so.

Q. Do you know why it was assigned to you as opposed to another general adjuster? Strike that.

Do you know why it was assigned to you, a senior general adjuster, as opposed to a general adjuster?

A. No.

Q. Is it unusual to have a claim reassigned to you?

A. No.

Q. What is the level above senior general adjuster in the adjusting hierarchy?

A. There is one more level and that would be executive general adjuster.

Q. What is Mr. Koos' level?

A. He was previously an executive general adjuster before he took the role of manager.

Q. And when you were assigned the claim, what did you understand your responsibilities were?

A. To see if we could resolve the balance of the claim, whatever items were still open.

Q. And you undertook a review of the file

J. Rudoshko

I assume?

A. Yes.

Q. And you had conversations with Miss Moss; is that correct?

A. Yes, I did.

Q. And did you have any conversations with anybody else?

A. Not that I recall other than my manager.

Q. Once a claim is reassigned to you and Mr. Haessig was the prior manager, does Mr. Koos take over management of the claim?

A. Yes.

Q. Do you know what role, if any, Mr. Haessig continued to play?

A. I don't believe he played any role from that point on.

Q. Did you prepare any reports that you sent to Mr. Koos?

A. Not that I recall.

Q. Did you prepare any reports based on your review of the claim file?

A. Maybe just update in the file notes, but not an actual report.

J. Rudoshko

Q. Those would be in the file notes of the claim file?

A. I believe so.

Q. Should be if you did any?

A. Should be.

Q. Did you have any conversations with Jeremy Elliot after you were assigned the file?

A. No.

MR. DAUPHIN: If you would mark that please 105.

(Deposition Exhibit 105, Defendant Pacific Indemnity Company's Responses to Plaintiffs' First Interrogatories, marked for identification, as of this date.)

Q. Can you identify what has been marked as Plaintiffs' Exhibit -- please identify the document Exhibit 105.

A. Defendant Pacific Indemnity Company's Responses to Plaintiffs' First Interrogatories.

Q. And are you familiar with these?

A. Yes.

Q. And I didn't copy the signature page, but do you recall that you did sign these answers to interrogatories?

J. Rudoshko

A. You are talking about the certificate page?

Q. No. There is a separate page that you signed as in answer to these interrogatories.

A. Is there a copy that I could see or just to make certain?

Q. Sure. Give me just a second. I will send you one if that's all right. The significant page was sent separate.

MS. MOSS: You want to use this as your exhibit?

MR. DAUPHIN: Yes.

MS. MOSS: Do you want it as part of that exhibit.

MR. DAUPHIN: Just attach it as part of that exhibit. Thank you. We will make a copy later and attach it.

BY MR. DAUPHIN:

Q. What do you have in front of you?

A. I have a verification page that I signed.

Q. And did you sign that in front of a notary?

A. I don't recall. It was done online.

J. Rudoshko

Q. Can I look at that?
A. (Handing.)
Q. Thank you.
And the verification states that you "States on oath that the facts and information contained within the responses are true and correct to the best of your knowledge and belief."
A. That's correct.
Q. And did you understand what you were saying when you signed that verification?
A. I believe so.
Q. Now then going back to the responses themselves. If you would look on page 5 and first look on page 6 it says see what the answer to number five is please, the response.
The response says Jerry Rudoshko?
A. Yes.
Q. And that's you?
MS. MOSS: I probably should amend this to say Wally to be quite honest. He is going to be the corporate rep to talk on these issues. Jerry certainly has knowledge and he can speak to his personal knowledge about the claim and these issues that are in

J. Rudoshko

interrogatory number 5, but I need to amend this to state that Wally is the person most knowledgeable.

Q. The answer is you correct, the answer in the interrogatory?

A. I signed the verification page, so yes.

Q. And the question is "State the name of the person from Pacific most knowledgeable regarding the following areas." And if you look on page 6 I want to go through those areas.

MS. MOSS: You can do that subject to my objection. I just want to make sure that you understand the scope of what his knowledge is.

MR. DAUPHIN: Thank you.

A. What are you asking me please?

Q. Looking at interrogatory number 5, you see that on page 6? I am sorry. Page 5.

A. Yes.

Q. Okay.

And the interrogatory asks for the name of the person most knowledgeable regarding certain areas.

J. Rudoshko

A. Yes.

Q. And the answer is you; is that correct?

A. Yes.

Q. And those areas are the denial of the cost of the smoke remediation?

A. Yes.

Q. For right now you can look at the other areas in interrogatory number 5, and do you have some knowledge of those areas?

A. Yes.

MR. DAUPHIN: Mark this as 106.

(Deposition Exhibit 106, declaration of Jerry Rudoshko, marked for identification, as of this date.)

Q. Can you tell me what Exhibit 106 is?

A. Declaration of Jerry Rudoshko.

Q. And is that your signature on page 8?

A. Yes, it is.

Q. And do you declare under penalty of perjury that the foregoing is true and correct?

A. Yes.

Q. Here is a book of exhibits and we are not going to go through very many of them.

J. Rudoshko

MR. DAUPHIN: Alycen, I am just going to go through the whole correspondence.

MS. MOSS: Okay.

Is that my copy or is that your copy?

MR. DAUPHIN: These are the ones we looked at earlier. I didn't bring copies.

MS. MOSS: I didn't bring copies. I am familiar enough with it. That's okay.

MR. DAUPHIN: They are your letters are my letters, so I am sure we are convenient.

BY MR. DAUPHIN:

Q. If you would look at Exhibit 5 please and is that a letter from Miss Moss to me May 15, 2020?

A. Yes, it is.

Q. And did you review that when you looked at the claim?

A. Yes, I did.

Q. And I want to go through the letter with you.

And we come down to page 2 and paragraph A that talks about reconstruction?

A. Yes.

J. Rudoshko

Q. Let's go back to page 1 real quick. And on that Miss Moss states that, under the last sentence in paragraph 2 "While Pacific will certainly pay additional moneys on covered items under the terms of the insurance policy at issue, it is not willing to pay for items that are not covered under the policy or duplicates."

A. Yes.

Q. You read that, okay.

Has Pacific made any payments that are not covered under the policy?

A. Not to my knowledge.

Q. Looking at page 2 now Reconstruction and Clean-Up.

In the first paragraph she set forth disputed issues and adjustments on the reconstruction?

A. Item number 1?

Q. Correct.

A. Yes.

Q. And it states "In short, it is my understanding that the mantles, doors, hardware, cabinetry, beams were not damaged and did not need to be replaced."

J. Rudoshko

Ultimately, Pacific agreed to pay for the mantles, doors, hardware, et cetera; did they not?

A. From what I recall, yes.

Q. Why did they change their mind?

A. We were working to resolve the claim.

Q. And that was a payment that Pacific decided was covered under the policy; is that correct?

MS. MOSS: Object to the form.

A. I'd have to have more details as to regarding that particular payment. We are talking about the mantles and the doors, et cetera, that would have been part of the claim in an effort to resolve.

Q. Well, was it an effort to resolve it or was it an effort to pay what was due under the policy?

A. We were working towards trying to the resolve the claim making some additional considerations.

Q. Do you understand the difference between or -- strike that.

What do you mean by resolve the claim?

J. Rudoshko

A. It appeared that the original offer was not satisfactory, so additional questions were brought up, estimates were submitted and it was disagreements and we worked towards moving to resolve the dwelling portion of the claim which is normal.

Q. When you say resolve, the plaintiff never agreed to anything but the amount of the claim they presented; is that correct?

MS. MOSS: Object to the form. I don't know if he can testify as to what the plaintiffs thought.

A. I would need to have more information to take a look at that because there are two different sides here.

Q. Well, and that's what I am getting at, the overall perspective. You keep using the term to resolve and two different sides.

The plaintiffs submitted a claim; did they not?

A. Yes.

Q. And they submitted lots of information in support of that claim?

MS. MOSS: Object to the form.

J. Rudoshko

A. It depends upon the category.

Q. They submitted information in support of the claim?

A. The overall claim or specific parts of the claim?

Q. Well, I am just trying to generally establish that plaintiffs submitted some documentation in support of the claim.

A. The only reason I am asking is because we are focusing on the dwelling and reconstruction. That's why I am asking.

Q. And I am sort of broadening it from that, and I don't mean to be confusing. Let's get on the same page, and I want to just talk about general about resolving the claim versus paying what is due under the policy.

Is there a distinction in your mind?

A. Yeah. There could be a difference of opinion of what two sides think the scope of repairs are.

Q. And what is the obligation of Pacific?

A. To make the insured whole.

Q. And there is no obligation on the insured to reduce the amount of their claim; is

J. Rudoshko

there?

A. We wouldn't ask the insured to reduce a claim that they feel that they are warrant, that they are entitled to. Again, it has to do with a matter of opinion.

Q. But you were never asked the insureds to reduce the amount of their claims and if you do so we will respond with a larger payment?

A. I never asked any questions.

Q. Looking back at Exhibit 105 -- I'm sorry 5, the letter, in paragraph 2 it states --

A. Excuse me for a second.

Is it Exhibit 105?

Q. I am sorry, 5. We are back on the letter.

A. Okay.

Q. Number 2 says Henry Sprott, S-P-R-O-T-T, Long and Associates and the question is "Are these duplicate charges? Pacific will not be paying two oversight charges to the architect."

Do you know what Miss Moss is talking about when she says there are two charges?

A. I think we had enough parties involved in this claim overseeing the project of the

J. Rudoshko

reconstruction and/or repair of the home. Didn't need to duplicate it.

Q. And I don't read her letter to say that. I read her letter to say that there are two charges for Mr. Long and that asking if those two charges are duplicate charges.

A. I'd have had to see more information to refresh my memory.

Q. Do you remember reviewing a global offer of settlement made by the Goodrichs?

A. I recall that a lot of numbers being thrown around. I don't know the exact figure, but I know there was multiple different figures.

Q. There was a letter which was a global settlement offer I think dated May 4th which is before this letter of May 15th.

A. Could you show me that letter?

Q. Sure.

If you would look at Exhibit 4 and is that a letter dated May 4, 2020 from me to Mr. Haessig?

A. Yes, it is.

Q. And for the record, I did get his name spelled right on this document.

J. Rudoshko

MS. MOSS: I think you always spelled his name right.

BY MR. DAUPHIN:

Q. Do you recall reviewing this letter?

A. Yes.

Q. Do you know that Chubb asked -- when I say Chubb I mean Pacific and sometimes use those names interchangeably.

Is that okay?

A. Yes.

Q. Did you know that Chubb asked the Goodrichs to make a settlement offer?

A. From what I understand.

Q. And this -- there is an entry for Henry Sprott Long and Associates of 46,000 as a current projected cost?

A. Yes.

Q. And looking at the May 5th letter Exhibit 5, and do you know where the -- and that has the 46,981.57 number. It is on paragraph 2 still talking about architectural fees.

A. Yes, I see it.

Q. And then it says there is an additional 46,354.84 in the paragraph below.

J. Rudoshko

Do you see that?

A. Yes, I do.

Q. Do you know the difference in those two numbers and why they are two different numbers?

A. I am not exactly clear on the difference. If it had to do with repair versus rebuild.

Q. If you could look back on Exhibit 4, the May 4th letter. I am looking under Reconstruction and Clean-Up. So look at the first full paragraph. "TCC has offered to tear down and rebuild for a certain figure and Hank Long has an oversight fee of 56,354 for the teardown and rebuild?

A. Correct.

Q. Isn't it clear that one number is for the repair of the house and one number is for the teardown and rebuild?

MS. MOSS: Object to the form.

A. What is clear is that it would be either or depending upon if it is repair or rebuild.

Q. They're not duplicate charges; are

J. Rudoshko

they? It is an either/or situation?

MS. MOSS: Object to the form.

A. When I take a look at the two letters. When reviewing the two letters --

Q. Correct.

A. -- it appears that way.

Q. And if you look at the Exhibit 5 back on paragraph 2 which is the May 15th letter and where we have been talking about the architects on May 5th.

A. Yes.

Q. Paragraph 2.

A. Number 2, yes.

Q. Right. And in that paragraph it states "Pacific will not be paying two oversight charges to the architect."

Is that correct?

A. That's correct.

Q. And the Goodrichs didn't ask for that; did they?

MS. MOSS: Object to the form.

A. The confusion appears to arise by having two separate amounts here, but not really being clear at the time.

J. Rudoshko

Q. And my question is: The Goodrichs never asked that Hank Long be paid for two oversights? I am sorry.

The Goodrichs never asked in their claim that there be two oversight charges that Mr. Long paid; did they?

MS. MOSS: I object to the form because I don't think it accurately represents what happened with the claim.

A. All that I can recall is that there was some questions regarding these two amounts.

Q. Well, looking at Exhibit 4 and looking at Exhibit 4 we just established that they were either/or, one or the other. One is a repair and one is a teardown.

So where's the confusion?

MS. MOSS: Object to the form.

A. Because I believe one was already paid for, if I am not mistaken.

Q. And I don't believe there is any paid for at that time.

The May 5th -- I am sorry.

The May 15th letter doesn't indicate that one has already been paid; doesn't it?

J. Rudoshko

A. Not that I can see.

Q. And in fact, the May 15th letter, that inserts a confusion and says that there are two oversight charges to the architect that are being claimed and that's where the confusion first arises; isn't it?

MS. MOSS: Object to the form.

A. I don't know for certain when the confusion came about. I just know that there were two numbers that were being presented.

Q. And based on the May 4th letter from me it's an either/or situation; isn't it?

MS. MOSS: Object to the form. He's testified and described what he knows about though.

Q. Go ahead?

A. Repeat the question please.

Q. Based on the May 4th letter we just reviewed, the two architect charges are an either/or situation; aren't they?

MS. MOSS: Same objection.

A. Based on what I am seeing here the best that I can interpret.

Q. Let's go to number 3 on the May 15th

J. Rudoshko

letter which is the Exhibit 5, and that talks about expense to remediate smoke in the home.

A. That's correct.

Q. What is the -- what phrase did you use to refer to a smoke or odor remediation process?

A. It would be smoke remediation.

Q. And what does that entail generally?

A. It depends upon the scenario and the scope of damage in the home. It could involve demo of the entire interior. Selected demo. It all depends on the extent of damage.

Q. And if there is demo down to the studs of the home, is it usual to have a smoke remediation process?

A. Yes. I had those scenarios in the past.

Q. What is the purpose of a smoke remediation process?

A. To eradicate the odor.

Q. Did you understand from the file that a smoke remediation process for the Goodrich house had been scheduled?

MS. MOSS: Object to the form.

A. That I don't recall.

J. Rudoshko

Q. At least from this letter we see that there had been a remediation bid presented to Pacific.

A. The bid I understand, yes.

Q. And if you would look at the second sentence under 3 on Exhibit 5. "First, can you please advise whether the insureds are rebuilding the house or whether they are going to demolish it and start from scratch?"

Do you see that?

A. Yes, I do.

Q. Is that a question that is normally asked of an insured in similar situations?

MS. MOSS: Object to the form. I think we are talking about this claim. I don't think it matters whether it relates to other insureds.

But you can answer to the extent you know.

A. Each claim is handled on its own merits and I can only address this claim.

Q. You are a senior general adjuster.

Have you seen that question asked of other insureds with fire losses?

J. Rudoshko

MS. MOSS: Same objection.

A. I don't recall offhand.

Q. So it is not something that you would say is regularly done in a fire loss?

MS. MOSS: Object to the form. Same objection.

A. Again, it depends upon the scenario.

Q. Well, where the insured is contemplating doing a repair or a demolish and rebuild, is this a question that is normally asked?

MS. MOSS: Same objection.

A. Well, in this case this was a repair.

Q. Correct.

So why do you want to know if there is a rebuild?

MS. MOSS: Same objection.

A. I believe there was some conversation about wanting to take down the house, but I don't recall the details.

Q. Well, the next sentence states "If they are demolishing the home, there is no reason to perform smoke remediation."

A. That's correct.

J. Rudoshko

Q. That's obvious; isn't it?

A. That's correct.

Q. What has that got to do with whether or not Pacific is going to pay the cost to repair?

A. If the house was going to be repaired, then smoke remediation would be part of that process.

Q. You understand that Pacific is obligated to pay the cost of the repair as of the time of the loss?

MS. MOSS: Object to the form.

Q. Do you understand that?

MS. MOSS: Object to the form as you haven't quoted the entire section of the policy.

A. Please explain what you are referring to within the policy language.

Q. I don't want to go through the policy. I just want -- and if you don't understand it, then that's okay, but do you generally understand that Pacific has the obligation to pay the cost of repair or rebuild the house as of the time of the loss?

MS. MOSS: I object to the form just

J. Rudoshko

because I think that if you want him to speak to Pacific's obligations under the policy, then show him the policy and let him look at the language.

MR. DAUPHIN: He is familiar with the policy.

BY MR. DAUPHIN:

Q. Go ahead.

Well, let me ask you this: What do you understand Pacific's obligation is if they elect to pay the cost of repair of a fire damaged house?

A. In this case we deemed it was a repair and that's the reason why there was also a smoke remediation bid because it could be repaired.

Q. Therefore, what is the relevance that the insureds are going to tear down and demolish as to the cost of repair?

A. That was their prerogative. They chose to demolish the house.

Q. And their decision to demolish the house doesn't affect what the cost of repair is; does it?

MS. MOSS: Object to the form of the

J. Rudoshko

question.

A. Repair versus rebuild are two different things.

Q. Correct. And it is a simple question or I think it is simple.

The decision to demolish doesn't affect what the cost of repair is; does it?

MS. MOSS: Object to the form.

A. Yes, it does.

Q. How?

A. Repair is something that can be repaired is a structure that's there versus rebuild starting from scratch. They are two different things.

Q. And you determined the cost of repairs as of the time of the loss; is that correct?

A. For repair, correct.

Q. And that's independent of the cost to, the decision to demolish and rebuild?

A. That's correct.

Q. So just looking at the cost to repair, there is no reason to consider whether or not it is going to be demolished; is it?

MS. MOSS: Object to the form.

J. Rudoshko

A. We had an estimate for repair and we said the home could be repaired.

Q. Correct.

And part of that estimate was the smoke remediation process?

A. Yes.

Q. You do know that Pacific did not pay the cost of the smoke remediation process; don't you?

A. That's correct.

Q. Do you know why they didn't pay it?

A. Because the home wasn't repaired. It was torn down and rebuilt.

Q. And what does that have to do with the cost of repair?

A. You didn't repair the house and the smoke remediation wasn't incurred.

Q. So whenever a repair process is not used, Pacific doesn't pay the cost to -- doesn't include that specific repair cost in the overall cost to repair?

A. We are talking about this claim specifically. No other claims.

Q. Well, I need to know whether this

J. Rudoshko

claim was treated differently than other claims.

A. Each claim is handled on its own merits. I am only discussing this claim now. We were dealing with a repair versus a rebuild and smoke remediation as it pertains to repair not part of the rebuild. Two different things.

Q. Are you aware that the plaintiffs asked and submitted an estimate for the cost of repair and that was their proof of loan?

A. Do you have a document to show me?

Q. I am just asking you what you are aware of.

A. I have seen a lot of documents. So if you have that handy I would like to look it at.

Q. You don't know whether the plaintiffs asked for a cost to repair or a cost to rebuild?

A. I don't know exactly how it was worded, if it was repair or rebuild.

Q. Are you aware of any language in the policy that says the cost to repair will be reduced if a specific aspect of the repair is not performed?

MS. MOSS: Object to the form of the question.

J. Rudoshko

A. I think you will have to show me the policy you are referring to.

Q. Well, I am just asking you as a senior general adjuster, are you aware of anything in the Masterpiece policy that says we are going to pay the cost of repair, but if a certain aspect of the cost of the repair is not done, we are going to reduce that amount from the overall cost of repair?

MS. MOSS: Same objection to the form.

A. If you have comments related to a section of the policy, then you would have to show it to me so I can comment on what you are referring to.

Q. I don't think it is in the policy and I have read it a lot. So there is no point in showing you the policy if it is not in there.

So I am asking you if you are familiar with any such language?

MS. MOSS: Object to the form.

A. I would need to see the policy as it relates to this claim so I can help you.

Q. You are aware of the Masterpiece policy?

J. Rudoshko

A. Yes, I am.

Q. And if you had a cost of repair on a fire loss where the insured ultimately decided to demolish and tear down and start from scratch and which you refused to pay the smoke remediation process?

MS. MOSS: So I object to the form. We have motions that are pending on this specific issue that the court has not ruled on. He is not going to testify as to other claims. You know that we are in motion practice and have a discovery dispute over that very issue.

MR. DAUPHIN: You have not moved for a motion to stay or protective order on this issue and this also goes to his qualifications. He submitted the answers to interrogatories under oath. You submitted an affidavit under oath and it certainly goes to his qualifications to make those declarations.

MS. MOSS: It doesn't go to his qualifications at all.

MR. DAUPHIN: It goes to his knowledge

J. Rudoshko

of the policy.

MS. MOSS: The declaration is speaking about the specific claim and about the specific policy.

MR. DAUPHIN: Can you read back my last question please?

(Record read.)

MS. MOSS: I have the same objection and you can -- I will let you answer, but I am not going to let you get into other insurance other than you can answer if he even can.

A. I don't recall.

Q. So to your recollection then it has never been an issue in any of the fire losses you have handled?

MS. MOSS: Same objection.

A. I don't recall.

Q. If we would come down to page -- let me ask you this: If I let you read the policy, would that help your explanation? I mean, would that help your memory?

A. If you point me to the direction you have a concerning as it relates to the repair.

J. Rudoshko

Q. Well again, I haven't found it in the policy so I don't know how to direct you to a particular provision of the policy that I don't think exists and I am just asking you to confirm whether or not you ever made that decision which I don't think is allowed by the policy?

MS. MOSS: Object to the form of the question. I think you are trying to testify.

MR. DAUPHIN: He asked me to show him the provision in the policy which I don't think exists, so --

MS. MOSS: It is asked and answered. He's already answered that he doesn't know.

BY MR. DAUPHIN:

Q. Looking back on the May 15th letter Exhibit 5.

Before I leave Slade's remediation looking at that paragraph again, Pacific doesn't say that they will not pay that cost; do they?

MS. MOSS: Which letter is he looking at?

MR. DAUPHIN: Exhibit 5. The May 15th letter under paragraph 3 Slade's remediation

J. Rudoshko

bid.

MS. MOSS: May 15th letter?

MR. DAUPHIN: Yes, 2020. The first one.

MS. MOSS: I don't have it in what I have here. Let me look at what he is talking about here so I know.

(Witness handing.)

BY MR. DAUPHIN:

Q. I'll repeat the question.

Does Pacific state in that letter in paragraph 3 that it will not pay a smoke remediation bid?

A. No, it does not.

Q. Looking at paragraph 4 in that same letter regarding Cliff Zlotnik, Z-L-O-T-N-I-K, are you familiar with Mr. Zlotnik's participation in the claim?

A. From what I recall this was the industrial hygienist.

Q. Well, what is a industrial hygienist?

A. Someone who tests for mold, smoke, asbestos, toxic things of that nature.

Q. And Mr. Zlotnik did more than that,

J. Rudoshko

didn't he?

A. I don't recall everything he had done.

Q. Do you know why the Goodrichs brought him in from Pennsylvania?

A. No, I don't.

Q. You don't know that it was for him to advise about the clean up of the house to prevent smoke odors from reoccurring in the future?

A. I know that a industrial hygienist was called in and it was a consideration made for the expenses.

Q. So you don't know the main purpose Mr. Zlotnik was brought in to the case?

A. To test for smoke and mold.

Q. And if you look at this May 15th letter on paragraph 4, that's all it mentions is that a local or regional industrial hygienist.

If you read that that's what you think Mr. Zlotnik was going to do, doesn't it? That's a bad question.

If you read paragraph 4 in Exhibit 5, paragraph 4 if you read that it looks like Mr. Zlotnik came in as an industrial hygienist; doesn't it?

J. Rudoshko

A. Yes.

Q. Would it surprise you that that was not his primary purpose?

MS. MOSS: Object to the form.

A. I don't know the details of what his purpose was for other than being a industrial hygienist.

Q. Would you move to paragraph number 5, Exhibit 5.

And that talks about a repair to the septic field; doesn't it?

A. Yes.

Q. And the first sentence is "I understand that Brookstone Restoration may have parked on top of the septic field and that's why you believe it is damaged." Then the letter states "To the extent the septic field was damaged by actions of Brookstone Restoration, the insureds will need to address directly with Brookstone Restoration."

Is that correct?

A. Yes.

Q. Is that something Pacific normally tells its insureds in this type of situation?

J. Rudoshko

MS. MOSS: Object to the form.

A. In this particular claim.

Q. Do they normally tell the insureds that?

MS. MOSS: So Chuck I mean I have the same objection. We are not going to get into what Pacific does with our insureds. This is an issue specifically pending before the court. It is completely against Alabama law to be asking about other insureds, getting documents about other insureds and we are still waiting to hear from the court on whether or not this is going to be an issue that you can seek discovery on.

MR. DAUPHIN: This question does not ask for identification of other insureds. It asks for what the normal practice is and to the extent Pacific handled this in a situation that is not normal to others, I am entitled to know that and in this question I am not asking for names or addresses or locations or anything else.

MS. MOSS: Well, that's not what is -- that's not the only thing at issue in the

J. Rudoshko

discovery dispute and you know that that's the case. I am letting him answer these very limited questions, but I object to them and I think this is something that's pending before the court.

MR. DAUPHIN: If you could read back that last question to the witness please.

(Record read.)

MR. DAUPHIN: I will rephrase.

BY MR. DAUPHIN:

Q. Paragraph 5 of the letter states that the insureds will need to address directly with Brookstone Restoration.

Is that a statement that is normally given to the insureds when they report a loss if the loss is caused by someone else?

A. We are only discussing this claim and that statement pertains to this claim only.

Q. So you refuse to answer the question?

A. I am not refusing.

MS. MOSS: He just answered your question.

Q. So you will not answer whether or not this direction to the Goodrichs to talk with

J. Rudoshko

Brookstone is a normal directive given to insureds if suffered such a loss?

A. I believe I have answered several times saying that each claim is handled on its own merits and this is how we address this particular claim.

Q. When you reviewed this claim, did that surprise you that that directive had been given?

A. No.

Q. Well, why should the insureds have to go to Brookstone Restoration when they filed that claim or seeking -- were going to file that claim with Pacific, why is it their responsibility to do that?

A. I don't know all the details regarding the septic field. I don't think enough information was supplied by the insureds.

Q. Well, this doesn't state that the insureds need to provide more information; does it?

A. I don't believe we had documentation to determine what was wrong with the septic field.

Q. Did you understand my question?

A. Could you repeat it?

J. Rudoshko

Q. This paragraph that we are talking about paragraph 5 doesn't say anything about the insureds providing more information; does it?

A. No.

Q. So why did Pacific direct the insureds to address directly with Brookstone Restoration the potential damage at the septic field?

A. It did not appear to be part of the fire claim.

Q. Well, that's not stated in the paragraph either; is it?

A. The paragraph states what it states. I have no other comments on it.

Q. You can confirm that the paragraph does not state that the septic field claim does not seem to be part of the fire loss?

A. That's correct and I believe I answered the question.

Q. Actually, what Pacific is trying to do is to get the insureds to take up the claim with Brookstone so Pacific wouldn't have to come in and pay for the loss if there was one.

Isn't that the intent of that paragraph?

J. Rudoshko

MS. MOSS: Object to the form.

A. No, I don't believe so.

Q. If there was a claim on the septic field and it was made to Pacific, whether or not the insureds contacted Brookstone has nothing to do with Pacific's obligation; does it?

MS. MOSS: Same objection.

A. We are starting to deviate from the actual claim itself discussing hypotheticals about another claim.

Q. Can you answer the question?

A. Repeat the question please.

MR. DAUPHIN: Could you read it back please?

(Record read.)

MS. MOSS: Same objection.

A. If a new claim was reported we respond accordingly.

Q. You understand that what I am asking about is the directive that the Goodrichs contact Brookstone about the claim; don't you?

A. Yes, I understand.

Q. And you understand that's what we are talking about in my question?

J. Rudoshko

A. Yes.

Q. Whether or not the Goodrichs were to follow through with Brookstone has no impact on Pacific's obligation to pay the claim; does it?

MS. MOSS: Object to the form.

A. When you say pay the claim?

Q. If there is a claim for the septic field, which is what we are talking about, the directive to the Goodrichs, doesn't impact Pacific's obligation; does it?

MS. MOSS: Same objection.

A. I think we need to have more information regarding this particular area of the claim.

Q. So you are saying you can't answer that?

A. I think I already have.

Q. Are you saying you cannot answer it?

A. Well, rephrase the question again and we will try it one more time.

Q. I will move on.

MS. MOSS: Is this a good time to take a break? We have been going over an hour.

MR. DAUPHIN: Yes.

J. Rudoshko

Q. And any time you need a break, just let me know.

A. Okay.

THE VIDEOGRAPHER: We are going off the record at 11:08 a.m.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record at 11:22 a.m.

BY MR. DAUPHIN:

Q. We are looking at Exhibit 5 which is the May 15, 2020 letter and look under paragraph B Contents.

A. Yes.

Q. Do you understand that under this Masterpiece policy the Goodrichs had contents coverage for replacement cost?

A. Yes.

Q. What is your understanding of replacement cost?

A. If an item is damaged and you have to replace it you get what it cost, the value to replace it.

Q. And looking at this letter under paragraph B she says "The policy provides as

J. Rudoshko

follows with regards to the insured's duties after a loss. Prepare an inventory. You must prepare an inventory of damaged personal property describing the property in full."

And you are talking about contents; aren't we?

A. Yes.

Q. And the Goodrichs did that; didn't they?

A. From what I recall in the files, yes.

Q. It should show in detail the amount insured under the policy.

There is no dispute about the amount insured under the policy; isn't it?

A. You are talking about the limits?

Q. Right, or let me ask you this.

The policy language according to the letter says it would show in detail the amount insured under this policy.

How do you interpret that?

A. The amount up to the coverage limits.

Q. And there is no dispute about that in this case; is there?

A. Not to my knowledge.

J. Rudoshko

Q. Then reading again from the policy provision that's stated in the letter "It should show in detail the amount insured under this policy and actual amount of the loss."

What does actual amount of the loss mean?

A. I am sorry.

Where are you in this --

Q. Still in that same paragraph duties, insures duties after a loss, and it is reading from the -- it is quoting the policy terms.

Do you see that?

A. That's correct, yes.

Q. What does actual amount of the loss mean?

A. Documented by receipts, invoices, appraisals, estimates, photographs if possible.

Q. Actual amount of loss doesn't have any real meaning when you are talking about replacement cost; does it?

A. Yes, it would. You need to know what the item is that you are replacing, intend on replacing.

Q. What does that have to do with actual

J. Rudoshko

amount of the loss?

A. You want to rephrase that question?

Q. We are looking at prepare an inventory, the first obligation; right?

A. Yes.

Q. And it says "It should show in detail the amount insured under the policy and quote actual amount of the loss."

Is that just the amount you are claiming or what does that mean?

A. That would be correct, the amount that the insured is claiming as their loss.

Q. Okay.

And then you attach bills, receipts and other documents to support your inventory.

To your knowledge, that was done in this case; wasn't it?

A. From what I recall in the documentation, yes.

Q. If you would come on down to paragraph number 1, under paragraph B-1 is on the next page which is page 4. Then there is a paragraph number 1 on page 4.

Do you see that?

J. Rudoshko

A. Yes.

Q. And it is discussing inventory that was submitted?

A. Yes.

Q. And the letter states "I have reviewed the invoice submitted to Iris and Company. That it contains no backup documentation such as receipts."

What is the letter asking for in that paragraph?

A. It is requesting backup documentation such as receipts.

Q. Receipts by who?

A. So the receipts were submitted, invoices were submitted by Iris and Company, but it contains no backup documentation. So there is nothing to support what's being claimed from Iris and Company.

Q. You know Iris and Company is not making the claim. The Goodrichs are making the claim.

A. Right. I understand that.

Q. And Iris and Company provided the replacement cost, the interior decorating firm and

J. Rudoshko

they said this is what it would cost to replace these items.

Are you aware of that?

A. Yes.

Q. So what documentation do you want from Iris and Company?

A. From what I recall the items that were damaged in the fire were fairly new.

Q. Correct. Some were, some weren't.

A. Within the past year of that fire, let's say.

Q. Okay.

A. From what I remember reviewing the file, there was a considerable upcharge from the original submitted invoices for the original costs versus the replacement cost as much as three times the value of some items. So therefore, we would ask for documentation to substantiate what those costs are as it relate to that and if we don't have it, it is very hard to justify paying additional without proper documentation.

Q. So you wanted the Goodrichs to go to the third-party and what documentation did you want from the third party?

J. Rudoshko

A. We wanted Iris and Company to support what they were claiming.

Q. Well, they weren't claiming anything; were they?

A. They are working with the Goodrichs to support their claims, so that's their --

Q. But it is the claim of the Goodrichs?

A. That's correct.

Q. And Iris and Company is a third party vendor?

A. Right.

Q. And you wanting the insured to go to the third-party vendor and ask the third-party vendor for what?

A. Supporting documentation for the estimate that they are coming up with.

Q. Such as?

A. Let's say it is an upholstered sofa and it just says upholstered sofa $12,000, how does that number -- where does the number come from? What is it? What's the manufacturer? What's the fabric? How much yardage? Why is there a change? Why is there a change, upcharge in something that was just recently purchased

J. Rudoshko

because I did notice in several items that were being submitted there was a different amount and it is possible, but without documentation from Iris and Company to help substantiate that portion of the claim, it is hard to justify paying more.

Q. You had the original invoice; didn't you?

A. Yes, we did.

Q. You had the description of the upholstered sofa; didn't you?

A. Right.

Q. Did you ever make an attempt to find out what another vendor would charge to sale that upholstered sofa?

A. I did not.

Q. Why not?

A. I think because the question was out there. The request was made for additional documentation.

Q. Let's say the cost on this, did we say ten thousand or 12,000 on the upholstered sofa?

A. Either/or just as an example.

Q. Well, I was just trying to be consistent.

J. Rudoshko

So let's say the upholstered sofa was ten thousand dollars and Iris and Company said this is what it would cost to replace, the cost to replace would be ten thousand dollars.

That's what Iris and Company submitted an affidavit saying; didn't they?

A. I guess specific items that they supplied. They were estimates for replacement.

Q. And then they submitted affidavits saying under oath this is what I would charge the Goodrichs to replace this item.

MS. MOSS: Object to the form.

Q. Do you recall that?

A. The question arises why is there a substantial increase from the original invoice when the items were fairly new within the past year before the fire.

Q. I am getting there. I need to just step by step.

Would you repeat my question please?

(Record read.)

Q. Do you recall that Iris and Company submitted an affidavit -- I am sorry.

The Goodrichs submitted an affidavit

J. Rudoshko

from Iris and Company that said this is the cost we would charge the Goodrichs to replace these items?

A. I don't remember seeing that particular document offhand, but I do remember seeing a schedule of actual value, cash value and replacement cost.

Q. If you would look at Exhibit 12 and just review that please sir.

A. Affidavit of Iris Thorpe, T-H-O-R-P-E.

Q. Just read it to yourself would be fine.

A. Okay.

Q. And is that an affidavit from the vendor saying this is what we charged the Goodrichs?

A. Yes.

Q. And what Pacific wants is for the Goodrichs to go ask the third-party vendor what their costs were; is that correct?

MS. MOSS: Object to form.

A. Asking for some additional support specifically because there was such an increase in the cost of the items that are being replaced.

J. Rudoshko

Q. We're going to get to the increase in just a minute.

My question is: Pacific was asking the Goodrichs to go contact Iris and Company and ask Iris and Company what their cost to acquire the items would be; is that correct?

MS. MOSS: Asked and answered. I think you've asked it. He's answered it multiple times.

A. It is not an unusual request.

Q. Is that the request that you are asking the Goodrichs to go to Iris and Company and say what were your costs in acquiring the sofa to be sold to the Goodrichs?

A. We could ask Iris directly.

Q. You didn't do that; did you?

A. I don't recall.

Q. But that's what you were asking the Goodrichs?

A. Yes.

MS. MOSS: So keep in mind too I mean this is in 2020. He wasn't even involved in the claim. So when you are saying you.

MR. DAUPHIN: Please don't coach the

witness.

MS. MOSS: I am not coaching him.

MR. DAUPHIN: Yes, you are.

MS. MOSS: You are saying --

MR. DAUPHIN: Alycen, sometime later on he's going to say well, that was in 1920 and I wasn't involved. In 2020 and I wasn't involved in the claim solely because you raised the objection that's not right.

MS. MOSS: Well, it is not right for you to say you when you know very well that he was not involved in the claim.

MR. DAUPHIN: Well, he certainly signed under oath that he is familiar with it, so.

MS. MOSS: He is not saying he is not familiar with it.

BY MR. DAUPHIN:

Q. So let's assume I say ten or 12,000. I'll go with ten thousand; okay?

A. Sure.

Q. The example where Iris and Company says it would cost ten thousand dollars to replace this sofa. Let's assume that Iris and Company's

J. Rudoshko

cost in acquiring that sofa is three thousand dollars.

Why is that important as to the replacement cost to the Goodrichs?

A. Again, it has to do with the age of the items that are being claimed which we had substantiation for, the original receipts, from what I recall based on this spreadsheet, and then seeing what the cost is for the actual replacement, but at the time it gets a little bit confusing as to why there is such a large increase if you are replacing the same item within roughly a year's time.

Q. So let's say there is an increase. Let's say that sofa two years prior to the fire cost two thousand dollars and you got a five hundred percent increase; okay.

What is Iris and Company's acquisition cost? How does that impact it?

A. I think it is a valid question to have an understanding as why, for example, there is a five hundred percent increase in 12 months.

Q. Can't you look for other vendors and see what their cost is in 2020?

J. Rudoshko

A. This is the vendor that the Goodrichs used before and using again to replace the item. So it made sense to request that information.

Q. Well, that vendor can use whatever markup it wants; can't it?

MS. MOSS: Object to the form.

A. Yeah, but I don't understand why they would mark it up so high from the original price within a year's time.

Q. Well, to make more money.

Isn't that a valid reason?

A. Well, maybe to make more money off the insurance company.

Q. No. I am just saying say that markup is their general markup.

Let me ask you this: Did she mark anything up greater than she normally would?

A. We never had received supporting documentation as far as I can tell other than that list.

Q. Well, if you contacted another vendor who sold that sofa for instead of ten thousand for 11,000, that indicate to you that the cost verified by Iris and Company was legitimate?

J. Rudoshko

A. We would have had to engage another vendor and that was before my involvement in the claim. It had already, the claim had already progressed from that point when we were requesting documentation from Iris and Company.

Q. My question is: Why couldn't you have contacted another vendor to see what the cost would be?

MS. MOSS: Object to the form.

A. I answered the question, because we were waiting for documentation from Iris and Company.

Q. So you made the intentional -- to your knowledge, Pacific made the intentional decision not to contact another vendor?

MS. MOSS: Object to the form.

A. We were going with the chosen vendor that the insured had picked.

Q. Does Pacific usually contact another vendor to see what another vendor's charges are?

MS. MOSS: Object to the form of the question on the grounds stated earlier that it doesn't relate to this claim and the court has not ruled on that yet.

J. Rudoshko

A. Depends upon the scenario.

Q. Have you contacted other vendors to see what they charged on a replacement cost item?

A. When the insured doesn't know.

Q. So if the insured knows what the replacement cost is, then you drill down on the insured to make the insured go to his or her vendor and see what that vendor would have required, would have acquired the piece of property from?

MS. MOSS: I object to the form of the question. This is asked and asked and asked and he's answered it on many occasions.

Q. Go ahead.

A. Repeat the question please.

MR. DAUPHIN: Read it back.

(Record read.)

A. I don't believe it is fair to say we drilled down an insurer. We just asked for further documentation from their vendors what was being claimed. It is not an usual request which I mentioned many times already.

Q. And what percentage markup by the third-party vendor is legitimate, in your

J. Rudoshko

estimation?

MS. MOSS: Object to the form.

A. I can't answer that.

Q. Why do you want to know the information if you don't have an idea what the legitimacy of the vendor's markup is?

A. Asking for supporting documentation to document what's being claimed is not an unusual request. What I see here, based on the contents that were submitted, actual cash value replacement cost, it was noted that there was a substantial increase. So we asked for additional documentation. It is not an unusual request.

Q. Well, you specifically asked for the vendor's backup information on their, what their cost would be; didn't you?

MS. MOSS: Object to the form.

A. That's not an unusual request.

Q. Did you ask for that in this case?

A. I think there was conversation asking those requests made.

Q. And your previous answer you threw in the term actual cash value.

Does that have any relevance to the

J. Rudoshko

Goodrich claim?

A. No. It is replacement cost.

Q. Why did you throw in the term actual cash value in your answer?

A. Well, it is what they actually were paid for it before. That's what they paid for it at one point and then we have replacement cost. That's what is being submitted.

Q. And it did say a ten-year old sofa?

A. They are entitled to replacement cost.

Q. Which would be whatever cost today to replace the sofa?

A. For like, kind and quality.

Q. Right, like, kind and quality.

Where does it say that in the policy in the replacement cost?

A. If you show me --

Q. Let me ask you this: What do you mean by like, kind and quality? You are talking about a ten-year old sofa or a new ten-year old sofa?

A. For example, if you have a cotton upholstered sofa. It is ten-years old. It is fire damaged and you go to replace it with a Italian leather sectional, that's not like and

J. Rudoshko

kind. That's an example.

Q. We are not talking about replacing it with a used ten-year old sofa are we?

A. No, we are not.

Q. Did Pacific do any investigation into Iris and Company?

A. From my review of the files and from requests were made from Iris and Company I think for documentation.

Q. Did you investigate the legitimacy of Iris and Company to see if they in fact were a legitimate business?

A. I did not.

Q. I am sorry. I said you.

Did Pacific do that, to your knowledge?

A. I don't recall.

Q. Would that be something that would bear on Pacific's decision as to whether Iris and Company's affidavit is legitimate or not?

A. I don't think there was a question about Iris and Company being legitimate because they did supply, if I remember correctly, original invoices for the purchase price of some of the

J. Rudoshko

contents. The question arose when we had replacement estimates and the value was so much greater in a very short period of time. Why was that. So there was no question about the original documentation because the insured had used them previously.

Q. So you are suggesting that Iris and Company intentionally provided inflated estimate of the replacement cost?

MS. MOSS: Object to the form.

A. That is not what I am saying.

Q. You refused to accept the affidavit of Iris and Company; is that correct?

MS. MOSS: Object to the form.

A. I could say it is part of the claim.

Q. Well, you would not accept that as the replacement cost. When I say you, I apologize. I mean Pacific.

Pacific would not accept Iris and Company's affidavit as to the amount of replacement cost?

MS. MOSS: Object to form.

A. We are accepting the affidavit as part of the overall documentation to support the

J. Rudoshko

contents claim.

Q. What is the purpose of replacement cost as opposed -- strike that.

What is the purpose of a policy that has replacement cost of contents rather than actual cash value of contents?

A. For example, you made earlier about the ten-year old sofa. If you have a significant loss it becomes a total loss. You don't get the value of what it is today for that. In other words, we don't appreciate. It is a replacement cost. You get replacement cost of the cost today.

Q. So if the value of the loss item increases in value, Chubb pays the increase in value?

A. That's correct.

Q. And in this case they are objecting because the estimated cost had too big of an increase in value; is that right?

A. That's fair.

MS. MOSS: Object to the form.

A. Because of the short period of time between ownership of those items and then wanting to replace.

J. Rudoshko

Q. What would be a acceptable increase in value?

A. That's hard to say because there is many, many different types of contents. There is electronics. There is upholstered goods. There is custom items.

Q. Don't you have to look to see what other vendors are charging to determine if the increase in value is legitimate or not?

MS. MOSS: Object to the form.

A. Again, it is not looking to see if it is legitimate. We are asking for supporting documentation how Iris and Company got to that value as a replacement cost.

Q. And your testimony is that you do that or Pacific does that regularly in cases of loss contents?

A. I ask for supporting documentation.

Q. From the vendor who is given an affidavit saying this is what I would charge?

MS. MOSS: Object to the form.

A. I have gone back to vendors before asking for additional documentation.

Q. Do you ask the insured to provide that

J. Rudoshko

information or do you go to the vendor?
A. It could be both.
Q. Why didn't you go, why didn't Pacific go to Iris and Company this time?
A. I don't know.
Q. Did Pacific ever establish what it considered a reasonable replacement cost to be on these disputed items?
A. Not to my knowledge.
Q. Why not?
MS. MOSS: Object to the form. That's a little late.
A. Repeat the question.
Q. Why not --
A. The previous question.
Q. I am sorry.
Why did Pacific go find what it considered a reasonable replacement cost to be on these disputed items?
A. Because we already had documentation from Iris and Company and that was the vendor that the Goodrichs had chosen they wanted to use and it is only fair. We are not going to push them onto somebody else. If they want to use Iris and

J. Rudoshko

Company there's no problem. Just support the claim. That's all we are asking.

Q. And my question is: There is not anything -- let me back up just a second.

Is there anything in that policy language on the duties which is we are looking at paragraph 3 capital letter B contents Exhibit 5.

Is there anything in that paragraph that says the insured must provide the replacement cost?

A. No, but it says here attach bills, receipts and other documents to support your inventory.

Q. And the Goodrichs did that; didn't they?

MS. MOSS: Object to the form.

A. For the original purchase price.

Q. And because they went a step further and provided replacement cost -- strike that. Let me ask you this.

What if they had not established a replacement cost, what would Pacific had paid?

A. Well, if they submitted the receipts for the items, they were fairly new, we would

J. Rudoshko

compensate them for the items based on receipts that they submitted.

Q. You wouldn't investigate to see what the replacement costs were?

MS. MOSS: Object to the form.

A. We do have the content evaluation experts.

Q. Right.

And you used those regardless of what an insured made stated the value is; don't you?

A. Contents evaluation experts can be used along with the insured's own experts as well.

Q. Well, in the situation where the insured doesn't provide a replacement cost; right?

A. Right. Then we would use a content evaluation expert.

Q. And Inservio is one of those content evaluation services; aren't they?

A. Yes.

Q. And Pacific did not ask Inservio to provide a replacement cost evaluation on these disputed items; did they? And I am talking about the ones where Pacific paid the original cost. They used Inservio on some items?

J. Rudoshko

A. Correct.

Q. But on several items where Pacific only paid the original cost, they did not use Inservio; is that correct?

A. Based on my review of the file, yes.

Q. Why not?

A. Because I believe it would come down to the same thing. Inservio would be asking for supporting documentation for the increased costs.

Q. Inservio does their own evaluations; don't they? I am sorry.

Inservio does their own valuations; don't they?

A. They work with insured's decorators as well.

Q. You didn't ask Inservio to do that in this case; did you?

MS. MOSS: Object to the form.

Q. Pacific didn't ask Inservio to do that in this case; did it?

MS. MOSS: Objection.

A. I don't recall.

Q. Are there provisions in the policy that if the insureds says this is my replacement

J. Rudoshko

cost and Pacific says no, your replacement cost is X, let's say, in this case, our hypothetical, the insureds said replacement cost for this sofa is ten thousand and Pacific went and determined that the replacement cost from another vendor was nine thousand, is there a provision in the policy whereby the difference in valuations can be resolved between the two?

A. I would say that we could come to an agreement.

Q. Isn't there a specific provision where, I forgot what the phrase is, but the difference in the two values can be submitted to somebody and it would be I think in arbitration or something like that?

A. Well, here we are talking about replacement cost. So again, the insured is entitled to replacement cost. We just asked for additional documentation to document it.

Q. My question is: If there is a difference in what Pacific thinks the replacement cost is and the insured thinks the replacement cost is, is there a provision in the policy that the insured can say I want to go to a arbitrator

J. Rudoshko

to resolve this dispute?

MS. MOSS: Object to the form.

Q. Does it say dispute over valuation?

A. I need to see specific policy language to be specific.

Q. You are not aware of any such language in the policy?

A. Again, I have to see the policy.

Q. What if Iris and Company charges a fee to research what their acquisition costs would be?

A. We could take that into consideration.

Q. Would you, Pacific pay for that?

A. As an example, there is a flat fee that they charge to research vendors in Europe to obtain fabrics, for example.

Are you talking about Inservio now or Iris and Company?

Q. Well, you said a flat fee. I don't understand whose flat fee.

A. Maybe you should repeat the question to make sure I understand it.

Q. We are talking about moneys that a vendor may charge to go back and determine what their acquisition costs would be.

J. Rudoshko

A. So in other words, if we were using Inservio, Inservio comes back to us and says it will be an additional charge expense to research then yes, we would incur that expense to help document the claim.

Q. Would you incur that expense for Iris and Company?

A. I guess it depends upon what -- it is different because we have a vendor that is going to do some extra work. Where Iris and Company already have those contacts. At that point Iris and Company would have that breakdown already for us.

Q. Iris and Company would have to go back and research where and go through their documents and see where they got the acquisition costs from; wouldn't it?

MS. MOSS: Object to the form.

A. I can't imagine how much it would cost if they are dealing with these vendors all the time as opposed to someone who is not familiar with the vendor would then have to do the research.

Q. You know that the furniture we are

J. Rudoshko

talking about in this case you couldn't go to Restoration Hardware and purchase; don't you?

A. Right.

Q. So would Pacific be willing to pay Iris and Company for Iris and Company looking through their records and providing their acquisition cost?

A. We would like to see something from Iris and Company like what is the expense. What is the expense? What is the additional cost that they are submitting?

Q. In this case Pacific never offered to do that; did they?

A. It never was asked of us, as far as I can tell.

Q. Well, if there was a cost Pacific expected the Goodrichs to bear that cost in this case; is that correct?

A. If that was the charge that was going to be incurred by the Goodrichs from Iris and Company, we would take that into consideration.

Q. Would you take into consideration Iris's fee in determining the replacement cost itself?

J. Rudoshko

A. That would be considered designer's fee and would be built into the price for the estimate for replacement cost. It is a markup.

Q. I am talking about determining the replacement cost in this, specifically for this case.

You think that would be part of the cost of the replacement item?

A. It was already -- those items were already submitted for replacement cost from Iris and Company.

Q. Pacific owes that replacement cost to the insured whether or not the insured actually replaces that piece of furniture; don't they?

A. Yes.

Q. Let's go down to paragraph C Landscape in the Amount of 150,000. And if you would look at the last two sentences of that section which start on page 5 and if you want to read all of that to get familiar with the issue you can.

A. The last two sentences you are referring to on page 5 just above "The insured's landscaping costs were included in the TCC."?

Is that your --

J. Rudoshko

Q. Yes.

A. Okay.

Q. The letter states that "The insured's landscaping costs were included in TCC estimate and a 50,000 line item plus 20 percent."

Is that what the letter states?

A. Yes.

Q. "This appears to be a duplicate charge and will not be paid."

What does that mean?

A. It is not quite clear in the one sentence.

Q. Look at Exhibit 42 please.

And is that a TCC estimate?

A. Yes.

Q. And I think I am looking down to see the landscaping estimate and it is on the first page.

A. I see it.

Q. And does it not state after the side that the 50,000 is a, it is in caps, a guess need scope determined?

A. Yes.

Q. That was not a claim of $50,000; was

J. Rudoshko

it?

MS. MOSS: Object to the form.

A. It is part of TCC's total estimate.

Q. But the 50,000 by the document itself says it is a guess; doesn't it?

A. But it is still included in the total.

Q. I understand that, but when you read that it is a guess, what does that mean to you?

A. That means it shouldn't be included in the total.

Q. It what?

A. It should not be included in the total.

Q. Okay.

Because it is not final?

A. That's correct.

Q. Then if we look back in the letter Exhibit 5 and it said the limits is $150,000 and it sets forth the policy language. And then going back to the sentence that we looked at "This appears to be a duplicate charge and will not be paid."

There hadn't been a charge yet, has it, because it's a guess?

J. Rudoshko

A. As I mentioned, it was in TCC's total estimate price. If it is a guess it should not being included in the total. Therefore, it is a duplicate.

Q. A duplicate of what?

A. For landscaping.

Q. What is a duplicate?

A. I believe it was referencing landscaping replacement cost as a separate item.

Q. Right.

A. From the TCC estimate.

Q. Correct.

And if you look at the May 4th letter, which is Exhibit 4, if you want to turn back to that exhibit second page and this is an offer; isn't it? It's not a claim; is that correct?

A. Where are you sir?

Q. This letter is not a claim.

It is an offer of global settlement; isn't it?

A. That's what it appears to be.

Q. And in the offer of global settlement it is showing part of that global settlement is 150,000 which is the landscape policy limit?

J. Rudoshko

A. Yes.

Q. Now so then we have seen the estimate of 50,000 which is a guess; is that correct?

A. Yes.

Q. And that estimate is dated February 12th; is that correct?

A. Yes.

Q. And this letter is May 4th; is that correct?

A. Yes.

Q. So doesn't it make sense that the 150,000 includes the 12,000 in the estimate?

MS. MOSS: Object to the form.

A. The 50,000 includes 12,000?

Q. The 150.

A. The 150.

Q. In the offer of settlement includes the 50,000 guess?

MS. MOSS: Object to the form.

A. That's not how I see it.

Q. How do you see it?

A. I see the request is being made for the policy limit for landscaping.

Q. And that would include the 50,000 that

J. Rudoshko

was in the estimate, wouldn't it?

MS. MOSS: Object to the form.

A. But that's not what it says.

Q. I am asking you what you think in looking at these two documents.

A. I am looking at his request for a $150,000 as part of the global settlement and then it also appears $50,000 in TCC estimate as part of their overall number.

Q. So you think based on an estimate that they include they are asking for both?

A. The estimate included $50,000 as the landscaping. Even though it is a guesstimate, if it is, it should not be in there.

Q. You knew it was a guess; right? I mean it says it is a guess, no doubt about that?

A. I didn't write the estimate. I am just letting you know that's part of the total. If it is a guesstimate, it shouldn't be in there.

Q. Do you think that the Goodrichs are asking for 150,000 landscape plus the 12,000 five -- I mean, I am sorry. Strike that.

Do you think the Goodrichs were claiming 150,000 limit on their landscaping plus

J. Rudoshko

the 50,000 guesstimate?

A. I think it would be regardless because the limit is $150,000.

Q. So what's duplicate?

A. It was being asked twice. Just pointing something out.

Q. So you think that the insureds are asking to be paid twice for the 50,000 estimate and the $150,000?

A. First of all, the policy limit is 150,000.

Q. Exactly.

So do you think the insureds are asking to be paid twice the 50,000 and the 150,000?

A. I don't think that's what it says.

Q. Exactly.

So there is no duplication; is there?

A. It says it is a duplicate.

Q. Well, when it says will not be paid, what are you talking about, the landscaping costs?

A. What are you referring to?

Q. The letter of May 5th where it says and will not be paid.

J. Rudoshko

MS. MOSS: May 15th.

MR. DAUPHIN: I am sorry, May 15th.

A. What page are you looking at?

Q. Page 5. Right after the TCC estimate.

A. That's a correct statement.

Q. We are talking about the $150,000 claim; aren't we?

A. Yes.

Q. And this letter says it is not going to pay any of it; doesn't it?

A. That's right.

Q. Why won't it pay one or the other charges?

A. For the landscaping?

Q. Right.

A. Because the house wasn't a total loss.

Q. Talking about the landscaping costs.

A. The landscaping wasn't affected.

Q. And that's not what this letter, this letter of May 15th states; does it? Strike that.

The May 15th letter that we are looking at under landscape doesn't state there was no loss to the landscape?

A. The claim is being made for it.

J. Rudoshko

Q. The letter May 15th does not state we deny the landscape claim because there was no loss to the landscape?

A. Would you repeat the question again?

Q. The May 5th letter does not state that the landscaping claim will not be paid because there was no damage to the landscape; is that correct?

A. Excuse me. You said May 5th. I have a May 4th. I have a May 15th.

Q. May 15th. The letter we've been talking about the whole time on landscaping.

A. It discusses the policy limit of $150,000.

Q. It says will not be paid; doesn't it?

A. Correct.

Q. And you stated it was not paid because there was no damage to the landscape; is that correct?

A. Correct.

Q. Now this letter doesn't state that; does it?

MS. MOSS: Object to the form.

A. No.

J. Rudoshko

Q. Why did you state that there was no damage to the landscape?

A. Because when I reviewed the photographs of the exterior of the house I did not see any damage to the landscaping.

Q. Did Pacific ever request pictures of the damage to the landscape?

A. Pictures were taken from onsite investigation.

Q. Did Pacific ever request pictures of the landscaping from the Goodrichs?

A. I don't know.

Q. If you would look at your declaration which is Exhibit 4 or 5. 104 or 105. I am sorry. If you would look on page 4 and you discuss the plaintiffs' landscaping claim at the bottom.

A. This is Exhibit 105?

Q. No, 104. The declaration right there to your left, I believe. Your left hand. Your right hand. I am looking in reverse.

A. This is 106. I have 105 and 106.

Q. Let's start all over. Please look at 106.

Is that your declaration that you

J. Rudoshko

signed?

A. Yes.

Q. And starting on page 4 of Plaintiffs' Landscaping Claim. I am sorry. Page 4. Let me go take a break here. I am getting my numbers all mixed up.

MS. MOSS: We have been going an hour if you want to take a break.

MR. DAUPHIN: Let me finish this point and we'll do it.

A. Page 4 of 104?

Q. No. Page 4 of 106.

A. Okay.

Q. That's your declaration; is that correct?

A. Yes.

Q. Looking do you see plaintiffs' landscaping claim?

A. Yes, I do.

Q. Coming down the next page on paragraph 19 --

A. Yes.

Q. -- you state "Likewise the estimate provided no photographs or other evidentiary

J. Rudoshko

support for the claimed damages."

Is that what you said?

A. Yes.

Q. And Mr. Elliot had access to the premises at all times; didn't he?

A. As far as I know.

Q. And did he ever make any report about the landscaping?

A. I don't know.

Q. From your review of the file, did you see any report from Mr. Elliot as to whether there was any damage to the landscape?

A. Not specifically.

Q. Did damage to the landscape include damage to the irrigation system? Let me ask you this. I'll rephrase it.

Did the claim for landscaping include damage to the irrigation system which caused plants to die according to the Goodrichs?

A. I would have to take a look at that section. I don't recall offhand.

Q. Did damage to the landscape include damages caused by vehicular traffic on the premises?

J. Rudoshko

A. I don't recall looking at the file seeing vehicular damage to plants.

Q. Sod and grass, is that covered?

A. Depends upon on what the scenario is.

Q. Well, you've got repair trucks coming to repair the house from the fire and they run all over the sod.

A. Not if it is an interior repair.

Q. Did you ever tell the Goodrichs that?

A. I didn't speak to them.

Q. You used the word we which makes me think we means includes Pacific and I ask you and so when I say you, that's all right we will get there.

Did Pacific ever state that the landscaping claim is being denied because this was an interior repair and it is not part of that loss?

MS. MOSS: If you know.

A. Specifically I don't know.

Q. You do know that the landscaping provision states it covers damage to the landscape from vehicular traffic or from vehicles.

You know that; don't you?

J. Rudoshko

A. Yes.

Q. So wouldn't it be covered under that language of the policy?

A. We were dealing with a home repair here interior and it was the choice to demolish the home and rebuild. In that case you are going to wind up with landscaping damage. It doesn't mean we would be responsible for it. It was a choice that was made.

Q. So do you think it is a timing question as to whether the damage to the landscape was before or after they began rebuild?

A. No. I think it was a choice. The landscaping, if any landscaping was damaged as a result of the fire would have been minimal based on my review of the initial photographs, but having the insured made the decision not to repair and rebuild when you knock down the house you most certainly damage the landscaping and have heavy equipment on the property.

Q. Well, my question was is the distinction whether the damage occurred before or after the rebuild process began.

Is that the distinction you are

J. Rudoshko

making?

A. That's the distinction I am making based on what I know about the file and the photographs in the file.

Q. Did you look at the examination under oath of Miss Goodrich?

A. I don't recall.

Q. Where she stated, described under oath what was done to the landscape?

A. Can you show me the document?

Q. No. I am just asking if you remember.

A. I said I don't recall.

Q. Did you look at the examination under oath?

A. I don't recall.

Q. Do you know that she brought in other landscape companies to move plants after the fire and before the rebuild started to a certain area where they could have irrigation in hopes to those plants would survive?

A. There again too I think that's a choice because we were --

MS. MOSS: He is just asking if you know.

J. Rudoshko

Do you know or not? Just answer what the question was.

A. No.

Q. If the irrigation system is damaged before the attempt to rebuild, demolish and rebuild, before that time if the irrigation system is damaged and the Goodrichs come in and have plants moved because they weren't going to be irrigated into another location where there would be irrigation in an attempt to save those plants, that cost would certainly be covered by the landscaping provisions in the policy; wouldn't it?

MS. MOSS: Object to the form.

A. The landscaping has its own named perils.

Q. I am just about through.

MR. DAUPHIN: If you would read back the question and try to answer that question please.

(Record read.)

A. I have would have to refer back to the policy and the category of landscaping which has its own named perils.

Q. One of those named perils is damaged

by vehicles; isn't it?

MS. MOSS: Object to the form.

A. Yes.

Q. So if the irrigation system was damaged by vehicles before the rebuild started and because the irrigation system was damaged plants were moved to a specific location that would be irrigated, under those facts that I just gave you, there would be coverage under the policy; is that correct?

MS. MOSS: Object to the form.

A. No, because it is not a proper question as it relates to this claim.

Q. The question I had posed to you, would that be covered by the policy?

MS. MOSS: Object to the form.

A. It was the insureds election to rebuild the house which then caused vehicular damage to the shrubbery and the plants.

Q. I am talking about before the rebuild started.

A. We weren't entertaining the rebuild. It was a repair.

Q. Right, but if during the repair

J. Rudoshko

vehicles came on and destroyed the irrigation system.

Do you understand that where we are so far in the question?

A. Yes, I do.

Q. All right.

And due to the damage in the irrigation system some of the plants were not going to be irrigated and a landscaping company came in and moved those plants to a specific location where there would be irrigation in an attempt to save those plants.

Would that not be covered by the policy?

A. I think it is an incorrect interpretation of the coverage.

Q. Why is that? Why wouldn't the policy cover that example I just gave you?

A. Because moving the plants because the irrigation was damaged due to heavy equipment has nothing to do with the actual destruction of the plant itself like a dump truck running over it.

Q. Let's assume that the plants don't survive even after they attempted to survive,

J. Rudoshko

after they did everything they could so they would survive.

Wouldn't the cost of the replacing those plants then be a legitimate landscaping claim?

A. No. The intent is when they say vehicular damage, it is if an automobile, auto, tractor, whatever it might be, runs over tree, shrubs, damages them, policy comes into play as far as landscaping.

Q. What if it runs over the irrigation system and destroys it?

A. That's due to lack of water because the irrigation can't be supplied. That's not a direct.

Q. What about damage to the irrigation system?

A. That's considered other structure and that's a separate provision in the policy.

Q. Pacific knew the Goodrichs were, under the landscaping claim were seeking damage to the irrigation system; didn't they?

MS. MOSS: Object to the form.

A. I think that was one part that I

J. Rudoshko

recall.

Q. Pacific never told the Goodrichs that's not covered under the landscaping, you can seek damage for that under other structures, that was never told the Goodrichs; was it?

MS. MOSS: Object to the form.

A. I don't know all the details as far as the landscaping piece with the irrigation system or how that became damaged.

Q. Assuming damage to the irrigation system was damage that was covered under other structures, wouldn't it be fair to tell the insureds you have to file a claim for that under damage to other structures?

MS. MOSS: Object to the form.

A. I believe that was a result of rebuilding the home which had no bearing on the fire.

Q. Well, the damage -- okay.

So you are saying that because the fire didn't damage the irrigation system that there is no coverage for that under the policy?

MS. MOSS: Object to the form.

A. I think the question is very broad.

J. Rudoshko

We were dealing originally with repair to the structure which later became a total rebuild which triggered other areas that didn't relate to the first part.

Q. You do know that the fire didn't cause mold to grow in the house; don't you?

MS. MOSS: Object to the form.

A. As far as I know fire doesn't cause mold, but water does.

Q. And yet the policy paid under the mold coverage several thousand dollars; didn't it?

A. It was for both mold and smoke, I believe.

Q. But Pacific paid under the mold coverage without making the Goodrichs file a separate claim under the mold coverage; didn't it?

MS. MOSS: Object to the form.

A. It is directly related to the fire.

Q. But the damage to the irrigation system is not directly related to the fire?

MS. MOSS: Object to the form.

A. I'd have to be made aware of the file where the irrigation was damaged during the fire.

Q. Did Pacific ever ask any questions of

J. Rudoshko

the Goodrichs about when the irrigation damage occurred?

A. I don't know.

MR. DAUPHIN: Let's take a break. Thank you. I think we all need a lunch break.

THE VIDEOGRAPHER: We are going off the record at 12:31 p.m.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record at 12:56 p.m.

BY MR. DAUPHIN:

Q. We were discussing the landscaping claim and looking at Exhibit 5, the letter of May 15th. Let's go back to that for just a minute please sir. Look on page 4 of the letter.

A. Yes.

Q. It says landscape under paragraph C in the amount of 150,000?

A. Yes.

Q. And then it quotes from the policy.

Do you see that?

A. Yes.

Q. And according to the policy per this

J. Rudoshko

letter "We cover trees, shrubs, plants and lawns which are on the grounds of your house and other permanent structures against certain kinds of perils. These are fire, lightening, explosion, civil disturbance, vandalism, malicious mischief, theft and loss caused by vehicle or aircraft."

Do you see that?

A. Yes.

Q. So if there is loss caused by a vehicle regardless of the fire it is covered by policy; isn't it?

A. I don't know exactly what happened to the landscaping. That's what the claim is being made for.

Q. You do know that part of the claim is for damage to the irrigation system that was caused by vehicles; don't you?

MS. MOSS: Object to the form.

A. I did see that a claim was being made for irrigation.

Q. And that the cause of that damage to the irrigation system was vehicles being on it?

A. I don't know exactly what happened to the irrigation system.

J. Rudoshko

Q. You know that the Goodrichs have stated that it was traffic that was on it that caused the damage?

A. It was some mention about vehicles.

Q. Let's turn to Additional Living Expenses which is paragraph D of the same letter. And after reading the policy language we talk about under on page 6 at the beginning paragraph number 1, window treatments and hardware purchased at the Fairway Drive rental, looking at that paragraph and we talk about new curtains in the rental home. "This expense is not considered to be a reasonable increase in your normal living expenses, et cetera, thus it is not payable."

Did Pacific ever pay for new curtains when an insured can't move into their house due to the fire loss, do they ever pay for new curtains in the rental?

MS. MOSS: Object to the form.

A. I can only speak to what I have done.

Q. What have you done?

A. Not to my knowledge.

Q. Do you pay for window shades?

MS. MOSS: Object to the form.

J. Rudoshko

A. Usually our customers that we have a housing company that helps them and they find them a furnished home.

Q. Did you know that there were few, if any, rental homes available in Mountain Brook, Alabama at the time of the fire?

A. I didn't know that.

Q. So if they, if the company Pacific assisted someone with a rental home that had window treatments already there, Pacific wouldn't pay for additional window treatments; is that correct?

MS. MOSS: Object to the form.

A. You are saying if window treatments were ready in the rent, proposed rental property we wouldn't pay for it again?

Q. Right.

A. That's correct.

Q. What if the window treatments weren't there?

A. I don't recall running into that scenario, so I don't know.

Q. It would certainly be reasonable to have some sort of window treatments in a family's

J. Rudoshko

home where they got three young daughters; isn't it?

A. Yes, but I don't know what this home looked like, this rental property beforehand. It didn't have any window treatments.

Q. Is the insured entitled to window treatments that are in accordance with their usual standard of living?

MS. MOSS: Object to the form.

A. We wouldn't pay to decorate a rental home.

Q. Why not?

A. It is not their home.

Q. But it would be an expense that they incurred because they had to move out of their house which was uninhabitable; isn't it?

A. It would have to be a reasonable expense.

Q. Right.

A reasonable increase in their normal living expenses in order to maintain the household's usual standard of living; correct?

A. Correct.

Q. So if the usual standard of living is

J. Rudoshko

to have window treatments, why wouldn't Pacific be responsible for the cost of window treatments in the rental home?

A. I don't know exactly this rental home what needed to be done there other than what I see in the documents here. I don't know why there were no window treatments to begin with or shades.

Q. What if the landlord just bought the house and the prior owner took the window treatments with him, would that make a difference?

MS. MOSS: Chuck --

MR. DAUPHIN: No. Alycen, this is significant. We are talking about a lot of money here and y'all are just thumbing your nose at it. I want to know what is going to happen.

MS. MOSS: So I object to the thumb your nose statement.

MR. DAUPHIN: I object to the very vocal sigh you just gave also.

MS. MOSS: I am not giving a vocal sigh. I am giving you an objection because you are just giving him all these hypotheticals. If you want to ask him a

J. Rudoshko

specific question, ask him a question and let's keep moving, but you are not really asking anything at times that relates to this claim.

BY MR. DAUPHIN:

Q. So you don't know of any instances where Pacific would pay for the cost of window shades in a rental home?

MS. MOSS: Same objection.

A. I can only speak to the claims that I have handled.

Q. How about rugs in a rental home?

MS. MOSS: Object. Same objection.

Q. I am not through yet.

MS. MOSS: You said what about rugs.

Q. Yes. If an insured who moves into a rental is accustomed to having rugs on the floor, why is that an additional living expense?

A. Quite honestly, they are usually furnished rentals. They could be a long term hotel rental or they could be homes that would require some additional rented furnishings. We don't -- at least I should say, I don't pay for decorating homes.

J. Rudoshko

Q. You consider rugs on a floor decoration?

A. Are you speaking about area rugs or wall-to-wall carpeting.

Q. We will start with area rugs.

A. If they needed them for their primary home they could have purchased them for the primary home and put it into the rental for the time being.

Q. Do you know what the lead time on getting rugs were, was? Strike that.

It took a year to get the rugs purchased that you were going to use in your residence, could you not buy other rugs to use in the rental?

MS. MOSS: Object to the form.

A. Again, you could always rent the furnishing as well including rugs.

Q. Are you aware that Pacific paid for the purchase of furniture that was used in the rental and then returned or and given to Pacific at the end of the rental time period?

A. I don't recall.

Q. Is there a difference between buying

J. Rudoshko

furniture and buying rugs for the rental house?

A. I don't know.

Q. Looking at paragraph number 7. Still on Exhibit 5, page 7.

A. We are on page 7?

Q. Correct.

You see the ADT security system replacement bottom of page paragraph 7?

A. Yes.

Q. Why wouldn't Pacific pay for that at the rental house?

MS. MOSS: Object to the form.

A. It is not something we would pay for. At least I have not paid for that in the past that I can recall.

Q. Well, you would agree a security system is important to a family?

MS. MOSS: Object to the form. I mean he can't speak to whether a security system is important to a family. Maybe it is. Maybe it isn't. It depends on the family.

Q. Go ahead.

A. Why wouldn't the landlord pay for it?

Q. Well, that's not my question.

J. Rudoshko

A. I don't know.

Q. Would you agree that a security system is important to a family?

A. That would be at their own expense then.

Q. Can you just answer my question?

A. I did.

Q. Do you agree that a security system is important to a family?

A. Depends on the family.

Q. If the Goodrichs had the security system at Dell Road, would that be an indication that it's important to them to have a security system?

A. At their primary home.

Q. So you think that because they were moving into a rental for over a year that the security system would not be important to them?

A. It may be important to them, but I don't see where I would allow for a security system being installed in the home that they don't own. That becomes permanent to the rental that somebody else owns.

Q. So what is the reason that Pacific

J. Rudoshko

would not pay the ADT security system because it just is in a rental and you considered it a fixture and you weren't going to pay for fixtures?

A. It would become part of that rental property.

Q. So therefore, that's a reason not to pay it?

A. Yeah. I don't know what the reason is pertaining to this claim. It just wasn't being entertained.

Q. Well, look at paragraph 7.

Does that give us a reason? Paragraph 7 says it appears to be a duplicate; doesn't it?

A. I don't recall.

Q. Would you look to page 5, paragraph D and you see where it quotes from the policy Extra Living Expenses?

A. Yes.

Q. And if you would looking at the first sentence "If your house is uninhabitable, we cover the reasonable increase in your normal living expenses that is necessary to maintain your house of usual standard of living including the boarding of domestic animals," et cetera.

J. Rudoshko

Is there anything in that portion of the policy that says we will not pay for fixtures that you may add to a rental home if that's your usual standard of living?

MS. MOSS: Object to the form.

A. No, it doesn't.

Q. If you would look at Exhibit 6 please and is that a letter from me to Miss Moss dated June 1, 2020?

A. Yes.

Q. And it starts out saying "Just reviewed the letter of May 15th" which is the letter we just have gone through?

A. Yes.

Q. And if we start under the capital letter A Reconstruction paragraph, I think it is on the second or third, second page.

A. Yes.

Q. And would you review that and come on down to the next page and if you would, I guess, coming back to the next page get to Architect's Fee.

You see that?

A. Yes.

J. Rudoshko

Q. And the statement "The Goodrichs have not asked that the architect's fee be paid twice."

A. Yes.

Q. And do you consider that a affirmative statement that the Goodrichs are not seeking an architect's fee to be paid twice?

A. Yes.

Q. And looking next at the Slade Remediation Fee and looking at the last paragraph under that section which is on the next page, paragraph 5 I believe, and in that paragraph on behalf of the Goodrichs does it not state that their decision that negates the need for the remediation work, that that cost is still part of the reconstruction cost necessary to rebuild the house short of a teardown which is the option Pacific chose.

Do you understand that to mean that the Goodrichs are explaining that the remediation cost is part of the cost to repair regardless of the teardown?

A. To me it means the cost of the repair.

Q. Right.

That the remediation work is part of

J. Rudoshko

the cost of repair?

A. Not the rebuild.

Q. Correct.

And from this letter and this paragraph the Goodrichs are explaining we consider the remediation cost to be cost of the repair and are informing Chubb of their position; aren't they?

A. I remember --

MS. MOSS: I object to the form just to the extent that he can't testify as to what the Goodrichs were thinking or what you were thinking when you write this letter.

MR. DAUPHIN: I will rephrase.

BY MR. DAUPHIN:

Q. Do you understand this paragraph we just looked at to state that the remediation cost is part of the cost to repair?

A. The remediation cost is part of the cost of repair.

Q. Correct, and that was the position of the Goodrichs according to this letter?

A. According to the letter.

Q. And under Landscaping, do they again

J. Rudoshko

state that the cost of the septic tank or the -- I am sorry. Strike that.

The cost of the landscaping has not been finalized but expected to exceed a $150,000 and that TCC's cost was an estimate?

A. That's what it says.

Q. If you look at Exhibit 7, the June 26, 2020 letter from Alycen and looking under the first page, do you see where it talks about monthly security bill from ADT Security Services?

A. Yes.

Q. Does Pacific agree that the monthly security bill is a extra living expense if it was not being paid at Dell Road?

A. I know it was agreed to because these letters predate my involvement in the claim.

Q. Coming down to the interior painting of Wimbleton page 2, number 3. If the -- do you see where we are?

A. Yes.

Q. And the request for the reimbursement of the interior painting of the rental was denied; is that correct?

A. I don't see the word denied.

J. Rudoshko

Q. Where it says "This is not an extra living expense by the terms of the policy."

Doesn't it?

A. That's what it says.

Q. And "If the insureds felt the rental needed to be painted, they should have asked the landlord."

Is that correct?

A. That's what it says.

Q. And you don't recall whether or not that request was denied?

A. This predates my involvement.

Q. From your -- that's all right.

Paragraph number 7, that's for labor to install the window treatments at Wimbleton?

A. Yes.

Q. If the window treatments at the rental house were also going to be used at Dell Road, would their installation at the rental house be covered as an additional living expense?

MS. MOSS: Would you repeat that one more time?

Q. If the window treatments at the rental house were purchased to be used at Dell Road when

J. Rudoshko

they moved back into it, would the installation of the window treatments at the rental house be an additional living expense?

A. I don't know what was agreed to on this. This again, predates me.

Q. I understand, but it's been represented that you know something about this claim.

Do you?

A. Yes. It is true I do, but as far as everything that went on before my involvement which I believe was somewhere around May 19th 2021. Something like that.

Q. You see the last sentence under paragraph 7 there "Do these window treatments replace any from the Dell Road home? If so, please advise which ones."?

A. Yes.

Q. Why is that relevant to Pacific?

A. I don't know.

Q. Why would it be relevant to you as a senior general adjuster?

A. I don't know what transpired.

Q. Well, here's what transpired. I want

J. Rudoshko

you to assume this for purposes of my question, that the insureds bought window treatments they were going to use at their residence when it was repaired; okay, and they decided to use those window treatments at the rental house.

Would the cost of installing those window treatments at the rental house be an additional living expense?

A. I guess it depends.

Q. On what?

A. There is a lot of factors. I just don't know why having the window treatments installed in the rental home and then later being used in the primary house when the windows are going to be different sizes anyway.

Q. So you don't know what purpose the question "Do these window treatments replace any from the Dell Road home? If so please advise which ones; you don't know what relevance that has to the claim?

A. No, I don't.

Q. If we look at page 3, paragraph B Response to June 1, 2020 letter.

Do you see that?

J. Rudoshko

A. Yes.

Q. And you see the paragraph says "The bulk of your June 1, 2020 letter"?

A. Yes.

Q. And then that paragraph halfway down, does the letter state "Here the house can be repaired, but the insureds have chosen to demolish and replace the entire house."

Does that reflect Pacific's position that the house could be repaired?

A. It says here the house can be repaired.

Q. Did that position ever change while you were handling the claim?

A. I came in after the fact. I believe the house was already completed.

Q. Well, did -- to your knowledge, has that position of Pacific that the house can be repaired, was that ever changed?

A. I don't believe so.

Q. Next it says "The insureds can certainly make that choice to demolish the house, but they are not entitled to be paid additional moneys under the policy due to their voluntary

J. Rudoshko

decision to go over and above what is necessary to repair the home."

Are you aware of any claim by the insureds that they wanted moneys greater than were necessary to repair the home?

A. Well, if we are repairing the home and they choose to rebuild, that's an increase in cost.

Q. But the insureds didn't claim the cost to rebuild; did they?

A. They elected to knock the house down so that's rebuilding.

Q. That's not a claim to Pacific; is it?

MS. MOSS: Object to the form.

Q. Don't you know that the claim was a claim for the repair cost?

A. That's what we were stating that it was a repair.

Q. Right, and the Goodrichs never made a claim to rebuild; did they?

MS. MOSS: Object to the form.

Q. Let me ask you.

They never made a claim to Pacific that Pacific pay the cost to rebuild; did they?

J. Rudoshko

MS. MOSS: Object to the form.

A. Based on my involvement in the claim from the time I got in, it seemed to me it was a claim for rebuilding.

Q. What do you base that on?

A. In documentation that's in the file.

Q. What documentation?

A. Documents are in the file.

Q. Did you look at the sworn proof of loss?

A. We deem it as a repair. You have it as a rebuild.

Q. Well, the estimate submitted by TCC we looked at earlier was an estimate to repair; wasn't it?

A. Yes.

Q. The next sentence of that where we are talking about on the paragraph B "The insureds are requesting payment for work and/or repairs that are unnecessary if the Goodrichs are tearing down the house."

Now does that reference the smoke remediation process?

A. The paragraph doesn't state that, so I

J. Rudoshko

don't know what.

Q. What do you think the paragraph is talking about, "The insureds are requesting payment for work and/or repairs that are unnecessary if the house is torn down"?

A. Again, this letter predates me, my involvement in the claim. I don't know what the thought process was.

Q. Who does know what the thought process was?

A. Again, I can speak to what my involvement was in the claim from the time I got in.

Q. My question is and now I will represent to you that Mr. Elliot said that the decision not to pay the cost of remediation, smoke remediation was a decision made over his head.

So who should I ask questions to as to why that decision was made?

A. You would have to ask Jeremy Elliot.

Q. He says he didn't make that decision.

A. I don't know what took place with that conversation was.

Q. Don't you know that the -- then the

J. Rudoshko

rest of that sentence we are looking at says "As well as cost associated with tearing down and rebuilding the house."

Are you familiar with any claim by the Goodrichs that they were seeking costs with tearing down the house?

MS. MOSS: Object to the form.

A. The house was rebuilt. That's all I know.

Q. Well, if the Goodrichs did not ask for any cost connected with rebuilding the cost, if they didn't seek that, what is the purpose of this statement about cost associated with tearing down the house? What does that got to do with anything?

MS. MOSS: Okay, I have to object because I don't know if you are intentionally doing this, but the Goodrichs did rebuild their house. They did seek payment for the rebuild of the house.

MR. DAUPHIN: No, they did not and you don't have any evidence that they sought -- and I resent you stating they did seek cost to rebuild because they did not.

J. Rudoshko

MS. MOSS: You are completely misrepresenting the facts of this claim.

MR. DAUPHIN: This is your letter and I will depose you if I have to. I am trying to deal with somebody else that they can say what you meant.

MS. MOSS: He wasn't even --

MR. DAUPHIN: If we have to get to you we will.

MS. MOSS: He wasn't even involved in the claim at the time. Let me finish so she can get this on record. You have sent me a 30(b)(6) notice. I have told you that Wally Haessig is the one that can speak on these issues. If you want to ask him about the position that was being taken a year before Mr. Rudoshko ever even got involved in the claim, he's the person to ask those questions to.

MR. DAUPHIN: Well, I'm gonna ask the persons I want to. Thank you very much.

MS. MOSS: Well, ask in a way that's not misrepresenting what the evidence is in this case.

J. Rudoshko

MR. DAUPHIN: You can have an objection as to what you think is a misrepresentation and we will move on.

MS. MOSS: I am making my objection.

MR. DAUPHIN: All right. Let me finish this point and we can pause.

BY MR. DAUPHIN:

Q. Again, my question is assume that there is no request for cost related to rebuild the house.

What's the purpose in telling the insureds that we are not going to pay for any cost associated with tearing down and rebuilding the house?

A. I don't know.

Q. Then the next sentence states "Pacific is not obligated under, I think is, the policy to pay for both the cost of repair and the cost to rebuild."

Are you aware of any claim that the Goodrichs are seeking the cost to repair and the cost to rebuild?

A. Based on my review of the file it clearly looked like a rebuild to me.

J. Rudoshko

Q. My question is: Are you aware that the Goodrichs asked to be paid both the cost to repair and the cost to rebuild?

A. Can't be paid both.

Q. Of course not.

Are you aware that the Goodrichs ever requested it?

MS. MOSS: Object to the form.

A. I don't know.

Q. Then the last portion of that sentence "It, meaning Pacific, is not obligated to pay for repairs and/or other work that are unnecessary given the fact that the house is being demolished."

MS. MOSS: Object to the form. Asked and answered.

MR. DAUPHIN: I'm just getting to telling him to read the letter.

BY MR. DAUPHIN:

Q. That's not an accurate statement; is it?

A. I don't know.

MS. MOSS: Object to the form.

MR. DAUPHIN: Why don't we eat lunch.

J. Rudoshko

THE VIDEOGRAPHER: We are going --

MR. DAUPHIN: Hang on one second.

THE VIDEOGRAPHER: Sure.

BY MR. DAUPHIN:

Q. Did Pacific pay any cost to rebuild to the Goodrichs?

A. We paid for the repair.

THE VIDEOGRAPHER: Are we going off?

MR. DAUPHIN: One second.

BY MR. DAUPHIN:

Q. But you didn't pay the cost for smoke remediation; did you?

A. Because the house was rebuilt.

Q. But you did not pay even though smoke remediation was cost to repair, Pacific didn't pay it; did they?

MS. MOSS: Object to the form.

A. No, because the house was rebuilt.

MR. DAUPHIN: Let's go to lunch.

THE VIDEOGRAPHER: We are going off the record at 1:39 p.m.

(Luncheon recess: 1:39 p.m.)

J. Rudoshko

A F T E R N O O N S E S S I O N.

(2:09 p.m.)

J E R R Y R U D O S H K O,

having been previously sworn, resumed the stand and testified further as follows:

THE VIDEOGRAPHER: We are back on the record at 2:09 p.m.

MR. DAUPHIN: Alycen, correct me if I misstate. I understand the 30(b)(6) notice that I have provided encompasses a discussion and examination and review of the correspondence between you and I.

MS. MOSS: Yes.

MR. DAUPHIN: And with that understanding I am going to limit my further questions to Jerry and not go through all the correspondence.

EXAMINATION (Cont'd)

BY MR. DAUPHIN:

Q. But for point of reference, if you would look at Exhibit 10 please. That's the May 19, 2021 letter.

J. Rudoshko

A. Yes.
Q. Did you have any involvement in that letter?
A. Yes.
Q. What was your involvement?
A. I spoke to counsel regarding the letter and reviewing.
Q. And did anybody else review this letter?
A. Management.
Q. That would be Mr. Koos?
A. Mike Koos.
Q. Do you know anybody else that reviewed the letter?
A. No, I don't.
Q. Did you make any notes about your review of the letter?
A. There might have been some edits here back and forth before the final draft.
Q. Would those be in the claim file?
A. I don't know.
Q. Would you have kept the notes?
A. They would have been part of the e-mail.

J. Rudoshko

Q. The e-mail between you and Mr. Koos?

A. Yes.

Q. And where would those e-mails be in the file?

A. I don't know.

Q. Is correspondence between you and Mr. Koos on any claim generally kept in the claims file or is there another file where that correspondence is kept?

A. No. There is one file.

Q. What was your involvement after this letter?

A. Basically monitoring the claim file for the status to see, try to resolve the claim basically.

Q. One way to have resolved the claim was to pay the claim; correct?

A. We paid a significant amount. In looking down here, which kind of brought back something, I see reconstruction estimate TCC. That is the rebuild number we paid for the rebuilding not the repair. So I just wanted to clarify that when I saw that here.

Earlier before the break --

J. Rudoshko

Q. Hang on one second.

You are saying that the reconstruction cost, the amount on this dwelling was for a cost rebuild?

A. What I am saying is when I am looking at the reconstruction, remember what I had said earlier about repair. You asked me a question repair rebuild. We actually paid for the rebuild not the repair.

Q. What did you base those payments off the cost to rebuild?

A. Before we broke we were having a conversation about repair or rebuild.

Q. Correct.

A. And I said repair. I want to clarify we actually paid for the rebuild costs.

Q. What did you base those payments on?

A. It was based on we moved from the repair cost and then some additional costs. I guess it was negotiated at some point. We paid off an estimate.

Q. The estimate was the repair estimate; wasn't it?

A. Well, we paid for rebuilding.

J. Rudoshko

Q. Based on what?

A. Based on estimates.

Q. For repair?

A. Well, the house was knocked down and rebuilt. I consider that a rebuild.

Q. But you didn't pay for brick; did you?

A. We paid for rebuild. I know the difference between a repair and a rebuilt.

Q. Did you pay for the brick that was used in the rebuild?

A. If there is no house there, if the house was demoed and you don't have anything, you can have a brick, but it does not constitute a repair. It is a rebuild.

Q. No. They rebuilt it with brick.

Are you saying that Pacific paid the cost of the brick and the cost to build the house using the bricks?

A. I am saying we paid for the cost of rebuild.

Q. You would agree that if there was a cost to rebuild, it would include the brick which rebuilt the house; wouldn't it?

A. We paid for the cost to rebuild not

J. Rudoshko

the repair.

Q. Do you agree that no cost for the brick was ever submitted to Pacific?

A. I don't know.

Q. And you can't tell me what document you looked at to base the rebuild cost; can you?

A. There is a statement of loss in the file.

Q. Where in this correspondence that you were involved in does it say the reconstruction cost is cost to rebuild?

A. I am just letting you know it was a rebuild.

Q. And I am just asking you to show me where you told the insureds that you were paying the cost to rebuild?

A. I didn't because majority of the payments were -- predate my involvement.

Q. In reviewing the file you know there are over a hundred instances where representatives of Pacific say it is a cost to repair; do you not?

A. I don't know.

Q. Do you think an insured should be told whether the payments are the cost to repair or the

J. Rudoshko

cost to rebuild?

MS. MOSS: Object to the form.

A. Again, those payments and how they were portioned out were, predates me.

Q. So there are going to be documents somewhere that Pacific has that shows these payments are based upon a cost to rebuild?

A. I don't know.

Q. So what happened after this letter was sent?

A. I think there was another payment that was issued in July of 2021. There is two.

Q. After those payments were sent out, what happened?

A. I don't remember how much activity actually transpired.

Q. What records would you have of what transpired?

A. It would be in the file notes.

Q. Why did Miss Moss made notes, where would those be, copied you on those notes that she made about conversations that she had with me, where would those be?

MS. MOSS: Object to the form.

J. Rudoshko

A. The correspondence would be part of the claim.

Q. Notes of conversations she had with me, where would those --

MS. MOSS: Are you asking him where I would put notes?

MR. DAUPHIN: No. Where -- I don't know.

BY MR. DAUPHIN:

Q. Do you know where she puts notes?

MS. MOSS: I mean object to the form. How -- calls for speculation.

MR. DAUPHIN: It is a good question.

BY MR. DAUPHIN:

Q. Did she ever provide you with copies of notes she made of conversations on the claim file on the claim?

A. No. Not that I recall.

MR. DAUPHIN: Mark this please as Exhibit 107.

(Deposition Exhibit 107, a letter from Charles Dauphin to Alycen Moss dated October 4, 2021, marked for identification, as of this date.)

J. Rudoshko

Q. This is a letter I wrote on October 4, 2021 and state in the first sentence that "Goodrichs reject Pacific's offer to consider further payment on the Goodrichs' claims only if the Goodrichs reduce the amounts of their claims."

Are you aware that that was Pacific's offer?

A. I would have to see the rest of the details. I don't remember offhand like what their values we're talking about.

Q. I'm sorry.

What now?

A. What values we were talking about.

Q. The letter says "They reject Pacific's offer to consider further payment on the Goodrichs' claims only if the Goodrichs reduce the amounts of their claims."

That's pretty straightforward; isn't it?

A. Yeah. I would have to see what actually is making reference to.

Q. It references the offer by Pacific to, that they would consider further payment only if the Goodrichs reduce the amounts of their claims.

J. Rudoshko

What's confusing about that?

A. Where is the claim that precedes this? I guess the letter.

Q. Oh, it was a conversation?

A. It was a conversation, yes.

MS. MOSS: Asked and answered.

Q. So what's confusing about this?

A. I don't know.

Q. And then the next sentence "In light of Pacific's position, it will make no other payments without a concession from the Goodrichs. The Goodrichs have authorized the filing of the attached complaint."

Is that pretty straightforward?

A. Yes.

Q. Now did Pacific ever contradict those statements?

MS. MOSS: Object to the form.

A. I don't know.

Q. Would you have known if Pacific objected or felt that those statements were incorrect?

A. I don't know.

Q. Did you have any discussions on that

J. Rudoshko

topic with anybody?
A. I may have, but I don't recall.
Q. Well, it is frankly hard for me to believe that if these statements were false or that Pacific was going to make further payments on the claims regardless, that you wouldn't have had a conversation on this topic with somebody?
MS. MOSS: Object to the extent it calls for him to reveal anything that's attorney/client privilege.
A. I just don't recall.
Q. You do know that there is nothing in writing of any kind that objected to these terms; don't you?
A. I don't recall.
Q. In September of 2021, who was making the decisions on which claims were paid and the amount of the claims?
A. We were.
Q. Who is we?
A. Well, myself, management as far as payments because I have up to a certain authority, then it goes above my head.
Q. And that authority went to Mr. Koos?

J. Rudoshko

A. Mr. Koos, yes.

Q. Would you know what he agreed to? What positions he agreed to? Strike that.

Do you know what amounts Mr. Koos agreed to?

A. I don't recall offhand. It would be filtered down back to me, so I don't remember.

Q. Who would have contact with Miss Moss; would it be you or Mr. Koos?

A. It would be me.

Q. Did Mr. Koos ever have any contact with her?

A. I don't know.

Q. What do you recall the status of the claim being the last -- strike that.

What do you recall the status of the claim being when you last participated in the claim?

A. After these letters, after October or before?

Q. Or before then.

What was the last thing you remember happening?

A. I remember negotiations going back and

J. Rudoshko

forth requesting additional documentation or areas we would make consideration or not. A variety of things.

Q. Well, you throw a variety of things.

Where would I look to find where those things were?

A. Well, for example, made additional payments. I think there were some money that was due for both the dwelling and I think additional living expenses and some contents. I think it was storage. Two separate payments back in July of 2021. Those are the last payments that were made.

Q. And what happened after those payments were made?

A. They went back to writing letters again and I think it went to mediation.

Q. You don't dispute that Pacific stated it would make further payments on it if the Goodrichs reduced the amount of their claims; do you?

A. That's just a general. I don't know exactly what that involved.

Q. But you don't dispute that was the conversation; do you?

J. Rudoshko

A. I don't remember what conversation took place. I just see what I see here.

Q. But you don't have any knowledge that that conversation did not take place; do you?

A. I don't know one way or the other.

Q. Did you and Mr. Koos have any conversations about the fact that Pacific would not pay anything else unless the Goodrichs reduced the amount of their claims?

MS. MOSS: Object to the form. I think it mischaracterizes the evidence.

A. We look ways to pay the claim, not pay the claim.

MR. DAUPHIN: Read back my question please.

(Record read.)

A. No.

MR. DAUPHIN: That's all.

(Continued on the next page.)

J. Rudoshko

THE VIDEOGRAPHER: This marks the end of the deposition. We are going off the record at 2:26 p.m.

(Time Noted: 2:26 p.m.)

C E R T I F I C A T E

STATE OF NEW YORK )
: ss.
COUNTY OF NEW YORK )

I, LYNNE D. METZ, a Shorthand Reporter and a Notary Public within and for the State of New York, do hereby certify that the foregoing deposition of JERRY RUDOSHKO was taken before me on the 13th day of January, 2023;

That the said witness was duly sworn before the commencement of his testimony; that the said testimony was taken stenographically by me and then transcribed.

I further certify that I am not related by blood or marriage to any of the parties to this action or interested directly or indirectly in the matter in controversy; nor am I in the employ of any of the counsel in this action.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of January, 2023.

Lynne Metz

LYNNE D. METZ

January 13, 2023

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| JERRY RUDOSHKO | MR. DAUPHIN | 5 |

---------- INFORMATION REQUESTS ----------

| | |
|---|---|
| DIRECTIONS (DI): | None |
| INSERT: | None |
| RULINGS (RL): | None |
| REQUESTS (RQ): | None |
| CERTIFIED (CE): | None |
| MOTIONS (MO): | None |

E X H I B I T S

| Deposition Exhibits | For ID |
|---|---|
| Exhibit 105, Defendant Pacific Indemnity Company's Responses to Plaintiffs' First Interrogatories | 10 |
| Exhibit 106, declaration of Jerry Rudoshko | 14 |
| Exhibit 107, a letter from Charles Dauphin to Alycen Moss dated October 4, | 133 |

2021

{Exhibits retained by the court reporter.)

To: ALYCEN A. MOSS, ESQ.
Re: Signature of Deponent Jerry Rudoshko
Date Errata due back at our offices: 30 days

Greetings:

This deposition has been requested for read and sign by the deponent. It is the deponent's responsibility to review the transcript, noting any changes or corrections on the attached PDF Errata. The deponent may fill out the Errata electronically or print and fill out manually.

Once the Errata is signed by the deponent and notarized, please mail it to the offices of Veritext (below).

When the signed Errata is returned to us, we will seal and forward to the taking attorney to file with the original transcript. We will also send copies of the Errata to all ordering parties.

If the signed Errata is not returned within the time above, the original transcript may be filed with the court without the signature of the deponent.

Please Email the completed errata/witness cert page to CS-SOUTHEAST@VERITEXT.COM
or mail to
Veritext Production Facility
2031 Shady Crest Drive
Hoover, AL 35216
205-397-2397

ERRATA for ASSIGNMENT #5652116

I, the undersigned, do hereby certify that I have read the transcript of my testimony, and that

___ There are no changes noted.

___ The following changes are noted:

Pursuant to Civil Procedure, Rule 30. ALA. CODE § 5-30(e) (2017). Rule 30(e) states any changes in form or substance which you desire to make to your testimony shall be entered upon the deposition with a statement of the reasons given for making them. To assist you in making any such corrections, please use the form below. If additional pages are necessary, please furnish same and attach.

Page _____ Line ______ Change ________________________

________________________________________________

Reason for change ______________________________

Page _____ Line ______ Change ________________________

________________________________________________

Reason for change ______________________________

Page _____ Line ______ Change ________________________

________________________________________________

Reason for change ______________________________

Page _____ Line ______ Change ________________________

________________________________________________

Reason for change ______________________________

Page _____ Line ______ Change ________________________

Page ______ Line _______ Change ______________________________

__________________________________________________________________

Reason for change ____________________________________________

Page ______ Line _______ Change ______________________________

__________________________________________________________________

Reason for change ____________________________________________

Page ______ Line _______ Change ______________________________

__________________________________________________________________

Reason for change ____________________________________________

Page ______ Line _______ Change ______________________________

__________________________________________________________________

Reason for change ____________________________________________

Page ______ Line _______ Change ______________________________

__________________________________________________________________

Reason for change ____________________________________________

____________________________________________

DEPONENT'S SIGNATURE

Sworn to and subscribed before me this ___ day of

____________________, ________.

________________________________________

NOTARY PUBLIC / My Commission Expires:_______________

**1**

**1** 16:2,19 51:22 51:22,24 101:10 110:10 116:24 117:4
**10** 126:24 142:19
**10007** 4:16
**104** 87:15,19 88:12
**105** 10:11,12,18 20:11,14 87:15 87:18,22 142:19
**106** 14:13,14,17 87:22,22,24 88:13 142:22
**107** 133:21,22 142:24
**10:04** 1:16
**10:05** 4:3
**11,000** 61:24
**11:08** 48:6
**11:22** 48:9
**12** 57:9 60:23
**12,000** 54:20 55:22 59:20 82:13,15 83:22
**1230** 2:16
**12:31** 99:9
**12:56** 99:12
**12th** 82:7
**13** 1:15 4:4 142:2
**133** 142:24
**13th** 141:9
**14** 142:22
**15** 15:15 48:12
**150** 82:16,17
**150,000** 78:18 80:19 81:25 82:13 83:8,22 83:25 84:4,10 84:12,16 85:7 86:15 99:20 113:5
**15th** 21:17 24:9 25:24 26:3,25 38:17,24 39:3 40:16 85:2,3,21 85:22 86:2,11 86:12 99:16 110:13 141:21
**175** 4:15
**19** 88:22 126:25
**1920** 59:7
**19th** 115:13
**1:39** 125:22,23

**2**

**2** 15:23 16:4,14 20:12,18 22:21 24:9,13,14 113:19
**20** 79:6
**2017** 145:7
**2018** 6:17
**2020** 15:16 21:21 39:4 48:12 58:23 59:8 60:25 110:10 113:9 116:24 117:4
**2021** 7:9 115:14 126:25 132:13 133:24 134:3 136:17 138:13 143:2
**2023** 1:15 4:4 141:9,21 142:2
**2031** 144:21
**205-397-2397** 144:23
**21** 1:5 4:13
**26** 113:8
**2:09** 126:3,10
**2:22** 1:5 4:13
**2:26** 140:4,5

**3**

**3** 1:20 4:15 26:25 28:7 38:25 39:13 71:8 113:19 116:23
**30** 122:14 126:12 144:3 145:6,7
**30309** 2:17
**35216** 144:22
**38** 6:9

**4**

**4** 21:20,21 23:10 25:13,14 39:16 40:17,22,23 51:23,24 81:15 87:15,16 88:4,5 88:12,13 99:17 133:24 134:2 142:25
**400** 2:15
**408** 2:6
**42** 79:14
**4313** 141:23
**46,000** 22:16
**46,354.84** 22:25
**46,981.57** 22:21
**4th** 21:16 23:11 26:12,19 81:14 82:9 86:11

**5**

**5** 12:14 13:2,19 13:20 14:10 15:14 20:12,15 22:20 24:8 27:2 28:7 38:18,24 40:22 41:9,10 43:12 45:3 48:11 71:8 78:20,23 80:19 85:5 87:15 99:15 107:5 109:16 111:12 142:6
**5-30** 145:6
**50,000** 79:6,22 79:25 80:5 82:4 82:15,19,25 83:9,13 84:2,9 84:15

**55th** 4:16
**56,354** 23:15
**5652116** 145:1
**5th** 22:19 24:11 25:23 84:24 86:6,10

**6**

**6** 12:15 13:12,20 101:9 110:8 122:14 126:12

**7**

**7** 107:4,5,6,9 109:12,14 113:8 114:15 115:16
**78666** 2:7

**8**

**8** 14:19

**a**

**a.m.** 1:16 4:3 48:6,9
**above** 8:13 78:23 118:2 136:24 144:15
**accept** 67:13,17 67:20
**acceptable** 69:2
**accepting** 67:24
**access** 89:5
**accordance** 103:8
**accurate** 124:21
**accurately** 25:9
**accustomed** 105:18
**acquire** 58:6
**acquired** 63:10
**acquiring** 58:14 60:2
**acquisition** 60:19 75:11,25 76:17 77:8
**action** 1:5 141:16,19
**actions** 41:19
**activity** 132:16
**actual** 9:25 46:10 50:5,6,15 50:19,25 51:9 57:7 60:10 64:11,24 65:4 68:7 95:22
**actually** 45:20 65:6 78:14 129:9,17 132:17 134:22
**add** 110:4
**additional** 16:5 17:21 18:3 22:25 53:22 55:19 57:23 64:13 69:24 74:20 76:4 77:11 101:6 102:12 105:19 105:23 114:21 115:4 116:9 117:24 129:20 138:2,8,10 145:9
**address** 28:22 41:20 43:13 44:6 45:7
**addresses** 42:22
**adjuster** 6:11,14 6:16 8:4,7,8,14 8:16,19 28:23 35:5 115:23
**adjusting** 8:14
**adjustments** 16:17
**administer** 3:14
**adrienne** 2:22 4:17
**adt** 107:8 109:2 113:11
**advise** 28:8 40:8 115:18 116:19
**affect** 31:23 32:8
**affected** 85:19
**affidavit** 36:20 56:7,24,25 57:11,15 66:21 67:13,21,24 69:21
**affidavits** 56:10
**affiliations** 4:23
**affirmative** 111:5
**age** 60:6
**agree** 4:6 107:17 108:3,9 113:13 130:22 131:3
**agreed** 3:4,8,12 17:2 18:9 113:16 115:5 137:3,4,6
**agreement** 74:11
**ahead** 26:17 31:9 63:15 107:23
**aircraft** 100:7
**al** 144:22
**ala** 145:6
**alabama** 1:3 4:12 42:10 102:7
**alexandra** 1:7 4:9
**allow** 108:21
**allowed** 38:7
**alycen** 2:18 5:3 15:2 59:6 104:13 113:9 126:11 133:23 142:25 144:1
**amend** 12:20 13:2
**amount** 18:9 19:25 20:8 35:9 49:12,14,19,22 50:4,5,6,15,19 51:2,8,9,10,12 55:3 67:21 78:18 99:20 128:19 129:4 136:19 138:20

139:10
**amounts** 24:24 25:12 134:6,18 134:25 137:5
**animals** 109:25
**answer** 11:5 12:15 13:5,5 14:3 28:19 37:10,12 43:3 43:20,24 46:12 47:16,19 64:4 64:23 65:5 93:2 93:19 108:7
**answered** 38:14 38:15 43:22 44:4 45:19 58:8 58:9 62:11 63:14 124:17 135:7
**answers** 10:24 36:18
**anybody** 9:8 127:9,14 136:2
**anyway** 116:16
**apologize** 7:19 67:18
**appear** 45:9
**appearances** 4:22
**appeared** 18:2
**appears** 24:7,23 79:9 80:22 81:22 83:9 109:14
**appraisals** 50:18
**appreciate** 5:22 68:12
**approximately** 6:17
**arbitration** 74:15
**arbitrator** 74:25
**architect** 20:21 24:17 26:5,20
**architect's** 110:22 111:3,7
**architects** 24:10
**architectural** 22:22
**area** 47:14 92:19 106:4,6
**areas** 13:11,12 13:25 14:6,10 14:11 98:4 138:2
**arises** 26:7 56:15
**arose** 67:2
**asbestos** 39:24
**asked** 20:7,10 22:7,12 25:3,5 28:14,24 29:12 34:9,17 38:11 38:14 58:8,9 63:13,13,13,20 64:13,15 74:19 77:15 84:6
111:3 114:7 124:3,16 129:8 135:7
**asking** 6:3 13:18 19:10,12 21:6 34:12 35:4,19 38:5 42:11,22 46:20 52:10 57:23 58:4,13 58:19 64:8,21 69:13,24 71:3 73:9 83:5,12,22 84:9,15 92:12 92:24 105:4 131:15 133:6
**asks** 13:23 42:18
**aspect** 34:22 35:7
**assigned** 7:10 8:3,6,20 10:8
**assignment** 145:1
**assist** 145:8
**assisted** 102:10
**associated** 121:3,14 123:14
**associates** 20:19 22:16
**assume** 9:2 59:20,25 95:24 116:2 123:9
**assuming** 97:11
**atlanta** 2:17
**attach** 11:16,18 51:15 71:12 145:9
**attached** 135:14 144:7
**attempt** 55:13 93:6,11 95:13
**attempted** 95:25
**attorney** 136:11 144:12
**attorneys** 2:5,13 3:5
**audio** 4:4
**authority** 136:23,25
**authorized** 3:14 135:13
**auto** 96:8
**automobile** 96:8
**available** 102:6
**aware** 7:6 34:8 34:13,20 35:5 35:24 53:4 75:7 98:23 106:20 118:4 123:21 124:2,7 134:7

**b**

**b** 48:12,25 51:22 71:8 116:23 119:19 122:14 126:12 142:16
**back** 12:13 16:2 20:11,15 23:10 24:8 37:6 38:17

43:7 46:14 48:8 63:17 69:23 71:5 75:24 76:3 76:15 80:18,21 81:15 93:18,22 99:11,16 110:22 115:2 126:9 127:20 128:20 137:8,25 138:12 138:16 139:15 144:3
**backup** 52:8,12 52:17 64:16
**bad** 40:21
**balance** 8:23
**base** 119:6 129:11,18 131:7
**based** 9:22 26:12,19,23 60:9 64:10 72:2 73:6 83:11 91:16 92:4 119:3 123:24 129:19 130:2,3 132:8
**basically** 128:14 128:16
**beams** 16:24
**bear** 66:20 77:18
**bearing** 97:18
**began** 91:13,24
**beginning** 101:9
**behalf** 111:13
**belief** 12:8
**believe** 6:14,17 8:2 9:17 10:4 12:12 25:19,21 29:19 41:17 44:4,22 45:18 46:3 63:19 73:8 81:9 87:20 97:17 98:14 111:12 115:13 117:16,21 136:5
**best** 12:8 26:24
**bid** 28:3,5 31:16 39:2,14
**big** 68:19
**bill** 113:11,14
**bills** 51:15 71:12
**bit** 5:21 60:11
**blood** 141:15
**boarding** 109:24
**book** 14:24
**bottom** 87:17 107:9
**bought** 104:9 116:3
**break** 5:23 47:24 48:2 88:6 88:9 99:5,7 128:25
**breakdown** 76:13
**brick** 130:7,10 130:14,16,18,23 131:4
**bricks** 130:19
**bring** 15:7,8
**broad** 97:25
**broadening** 19:13
**broke** 129:13
**brook** 102:6
**brookstone** 41:15,19,20 43:14 44:2,12 45:7,22 46:6,22 47:4
**brought** 6:24 18:4 40:4,14 92:17 128:20
**build** 130:18
**built** 78:3
**bulk** 117:4
**business** 66:13
**buy** 106:15
**buying** 106:25 107:2

**c**

**c** 2:2 78:17 99:19 141:2,2
**cabinetry** 16:24
**call** 5:16
**called** 5:9 40:11
**calls** 133:13 136:10
**capital** 71:8 110:16
**caps** 79:22
**carpeting** 106:5
**case** 4:13 29:14 31:14 40:14 43:3 49:24 51:18 64:20 68:18 73:18,21 74:3 77:2,13,19 78:7 91:7 122:25
**cases** 69:17
**cash** 57:7 64:11 64:24 65:5 68:7
**category** 19:2 93:23
**cause** 98:6,9 100:22
**caused** 43:17 89:19,24 94:19 100:7,10,18 101:4
**ce** 142:13
**cert** 144:18
**certain** 11:7 13:25 23:14 26:9 35:7 92:19 100:4 136:23
**certainly** 5:17 5:18 12:23 16:5 36:20 59:14 91:20 93:12 102:24 117:23
**certificate** 11:2
**certified** 142:13
**certify** 141:7,14 145:2

**cetera** 17:3,14 101:15 109:25
**change** 17:6 54:24,24 117:14 145:11,13,14,16 145:17,19,20,22 145:23 146:1,3 146:4,6,7,9,10 146:12,13,15
**changed** 117:20
**changes** 144:7 145:4,5,7
**charge** 55:14 56:11 57:3 69:21 75:15,24 76:4 77:20 79:9 80:22,24
**charged** 57:16 63:4
**charges** 20:20 20:21,23 21:6,7 21:7 23:25 24:17 25:6 26:5 26:20 62:21 75:10 85:14
**charging** 69:9
**charles** 1:7 2:8 4:9 133:23 142:24
**chemel** 2:22 4:17
**choice** 91:6,10 91:14 92:23 117:23
**choose** 118:8
**chose** 31:21 111:18
**chosen** 62:18 70:23 117:8
**chubb** 6:8 22:7 22:8,12 68:15 112:8
**chuck** 4:24 5:19 42:6 104:12
**civil** 1:5 100:6 145:6
**claim** 7:7,12 8:10,20,24 9:11 9:13,23 10:3 12:25 15:19 17:7,15,21,25 18:6,10,20,24 19:4,5,6,9,16,25 20:4,25 25:6,10 28:16,21,22 33:23 34:2,3,4 35:23 37:4 39:19 42:3 43:18,19 44:5,7 44:8,13,13 45:10,16,21 46:4,10,11,18 46:22 47:5,7,8 47:15 52:21,22 54:8 55:6 58:24 59:9,13 62:4,4 62:24 65:2 67:16 68:2 71:3 76:6 79:25 81:17,19 85:8 85:25 86:3,7 87:17 88:5,19 89:18 90:17 94:14 96:6,22 97:14 98:17 99:15 100:14,16 100:20 105:5 109:10 113:17 115:9 116:21 117:15 118:4,10 118:14,16,17,21 118:24 119:3,5 120:8,13 121:5 122:3,12,19 123:21 127:21 128:8,14,15,17 128:18 133:3,17 133:18 135:3 137:16,18,19 139:13,14
**claimed** 26:6 52:18 60:7 63:22 64:9 89:2
**claiming** 51:11 51:13 54:3,4 83:25
**claims** 6:19,20 6:23 20:8 33:24 34:2 36:12 54:7 105:11 128:8 134:5,6,17,18 134:25 136:7,18 136:19 138:20 139:10
**clarify** 128:24 129:16
**clean** 16:15 23:12 40:8
**clear** 6:3 23:7 23:18,22 24:25 79:12
**clearly** 123:25
**client** 136:11
**cliff** 39:17
**coach** 58:25
**coaching** 59:3
**code** 145:6
**come** 15:23 37:20 45:22 51:21 54:21 73:8 74:10 93:8 110:20
**comes** 76:3 96:10
**coming** 54:17 88:21 90:6 110:22 113:18
**commencement** 141:11
**comment** 35:14
**comments** 35:12 45:14
**commission** 146:23
**companies** 92:18
**company** 1:11 4:10 5:4 52:7,16 52:19,20,24

53:7 54:2,10 55:5 56:3,6,23 57:2 58:5,6,13 59:23 61:14,25 62:6,13 66:7,9 66:12,23 67:9 67:14 69:14 70:5,22 71:2 75:10,18 76:8 76:11,13,15 77:6,6,10,22 78:12 95:10 102:3,9
**company's** 10:13,19 59:25 60:19 66:21 67:21 142:20
**compensate** 72:2
**complaint** 135:14
**completed** 117:17 144:18
**completely** 42:10 122:2
**concerning** 37:25
**concession** 135:12
**confirm** 38:5 45:15
**confusing** 19:14 60:12 135:2,8
**confusion** 24:23 25:17 26:4,6,10
**connected** 121:12
**consider** 32:23 106:2 111:5 112:6 130:6 134:4,16,24
**considerable** 53:15
**consideration** 40:11 75:12 77:22,23 138:3
**considerations** 17:22
**considered** 70:8 70:19 78:2 96:19 101:13 109:3
**consistent** 55:25
**constitute** 130:14
**cont'd** 126:21
**contact** 46:21 58:5 62:16,20 137:9,12
**contacted** 46:6 61:22 62:8 63:3
**contacts** 76:12
**contained** 12:7
**contains** 52:8,17
**contemplating** 29:10
**content** 72:7,16 72:18
**contents** 48:13 48:16 49:6
64:10 67:2 68:2 68:6,7 69:5,18 71:8 72:12 138:11
**continue** 4:5
**continued** 9:16 139:20
**contradict** 135:17
**controversy** 141:17
**convenient** 15:12
**conversation** 29:19 64:21 120:24 129:14 135:5,6 136:8 138:25 139:2,5
**conversations** 9:4,7 10:7 132:23 133:4,17 139:8
**copied** 132:22
**copies** 15:7,8 133:16 144:13
**copy** 10:23 11:6 11:18 15:5,5
**corporate** 12:22
**correct** 9:5 12:8 12:9 13:5 14:4 14:22 16:20 17:10 18:10 23:17 24:6,18 24:19 27:4 29:15,25 30:3
32:5,17,18,21 33:4,11 41:22 45:18 50:14 51:12 53:10 54:9 57:21 58:7 67:14 68:17 73:2,5 77:19 80:17 81:13,17 82:4,7,10 85:6 86:9,17,20,21 88:16 94:11 102:13,19 103:23,24 107:7 112:4,22 113:24 114:9 126:11 128:18 129:15
**corrections** 144:7 145:9
**correctly** 66:24
**correspondence** 15:3 126:15,20 128:7,10 131:10 133:2
**cost** 14:7 22:17 30:5,10,22 31:12,19,23 32:8,16,19,22 33:9,16,20,21 33:22 34:9,17 34:17,21 35:7,8 35:9 36:3 38:21 48:17,20,22 50:21 52:25 53:2,17 55:21 56:4,4 57:2,8,25

58:6 59:24 60:2 60:5,10,17,20 60:25 61:24 62:8 63:4,7 64:12,17 65:3,8 65:11,12,17 67:10,18,22 68:4,6,13,13,13 68:19 69:15 70:8,19 71:11 71:20,23 72:15 72:22,24 73:4 74:2,2,4,6,18,19 74:23,24 76:20 77:8,11,17,18 77:24 78:4,6,9 78:11,13 81:10 93:12 96:4 104:3 105:8 111:15,16,21,21 111:23 112:2,7 112:7,18,19,20 112:21 113:2,4 113:6 116:7 118:9,10,17,25 120:17 121:3,12 121:12,14,24 123:10,13,19,19 123:22,23 124:3 124:4 125:6,12 125:16 129:4,4 129:12,20 130:18,18,20,23 130:25 131:3,7 131:12,12,17,22 131:25 132:2,8

**costs** 53:16,20 57:21 58:14 72:5 73:10 75:11,25 76:17 78:24 79:5 84:22 85:18 121:6 129:17,20

**cotton** 65:22

**counsel** 4:21 127:7 141:18

**county** 141:4

**course** 124:6

**court** 1:2 4:11 4:19 5:5 36:10 42:10,13 43:6 62:25 143:3 144:16

**cover** 95:19 100:2 109:21

**coverage** 48:17 49:22 94:10 95:17 97:23 98:12,16,17

**covered** 16:5,8 16:12 17:9 90:4 91:3 93:12 94:16 95:14 97:4,12 100:11 114:21

**covers** 90:23

**cozen** 1:19 2:12 4:14

**crest** 144:21

**cs** 144:18

**current** 22:17

**curtains** 101:12 101:16,18

**custom** 69:7

**customers** 102:2

**cv** 1:5 4:13

**cypress** 2:6

**d**

**d** 1:21 5:8,10 101:7 109:16 126:5 141:5,24 142:4

**damage** 27:10 27:12 45:8 86:8 86:19 87:3,6,8 89:13,15,16,19 89:23 90:3,23 91:8,12,20,23 94:20 95:8 96:8 96:17,22 97:5 97:11,12,15,20 97:22 98:20 99:2 100:17,22 101:4

**damaged** 16:24 31:12 41:17,18 48:21 49:4 53:9 65:24 91:15 93:5,8,25 94:6,7 95:21 97:10 98:24

**damages** 89:2 89:24 96:10

**date** 10:15 14:16 133:25 144:3

**dated** 21:16,21 82:6 110:9 133:23 142:25

**daughters** 103:2

**dauphin** 2:4,8 4:24,24 5:14 7:19 10:10 11:13,16,19 13:17 14:13 15:2,6,10,13 22:4 31:6,8 36:15,25 37:6 38:11,16,24 39:4,10 42:16 43:7,10,11 46:14 47:25 48:10 58:25 59:4,6,14,19 63:17 85:3 88:10 93:18 99:5,13 104:13 104:20 105:6 112:15,16 121:22 122:4,9 122:21 123:2,6 123:8 124:18,20 124:25 125:3,5 125:10,11,20 126:11,17,22 133:8,10,14,15 133:20,23 139:15,19 142:6

142:25
**day** 141:9,21 146:19
**days** 144:3
**deal** 122:6
**dealing** 34:5 76:21 91:5 98:2
**decided** 17:9 36:4 116:5
**decision** 31:22 32:7,20 38:6 62:15 66:20 91:18 111:14 118:2 120:17,18 120:20,22
**decisions** 136:18
**declaration** 14:14,18 37:3 87:14,19,25 88:15 142:22
**declarations** 36:22
**declare** 14:21
**decorate** 103:11
**decorating** 52:25 105:25
**decoration** 106:3
**decorators** 73:15
**deem** 119:12
**deemed** 31:14
**defendant** 1:12 2:13 5:3 10:12 10:19 142:19
**dell** 108:13 113:15 114:19 114:25 115:17 116:19
**demo** 27:11,11 27:13
**demoed** 130:13
**demolish** 28:9 29:10 31:18,21 31:22 32:7,20 36:5 91:6 93:6 117:8,23
**demolished** 32:24 124:15
**demolishing** 29:23
**denial** 14:6
**denied** 90:17 113:23,25 114:12
**deny** 86:3
**depending** 23:23
**depends** 19:2 27:9,12 29:8 63:2 76:9 90:5 107:22 108:11 116:10
**deponent** 144:2 144:6,7,10,16
**deponent's** 144:6 146:18
**depose** 122:5
**deposition** 1:18 3:13,17 4:8,14 10:12 14:14 133:22 140:3 141:8 142:18 144:6 145:8
**depositions** 6:6
**describe** 7:2
**described** 26:15 92:9
**describing** 49:5
**description** 55:10
**designer's** 78:2
**desire** 145:7
**destroyed** 95:2
**destroys** 96:13
**destruction** 95:22
**detail** 49:12,19 50:4 51:7
**details** 17:12 29:21 41:6 44:16 97:8 134:10
**determine** 44:23 69:9 75:24
**determined** 32:16 74:5 79:23
**determining** 77:24 78:5
**deviate** 46:9
**di** 142:9
**diane** 2:9 4:25
**die** 89:20
**difference** 6:18 17:23 19:19 23:4,8 74:8,14 74:22 104:11 106:25 130:9
**different** 18:16 18:19 21:14 23:5 32:4,15 34:7 55:3 69:5 76:10 116:16
**differently** 34:2
**direct** 38:3 45:6 96:16
**direction** 37:24 43:25
**directions** 142:9
**directive** 44:2,9 46:21 47:10
**directly** 41:20 43:13 45:7 58:16 98:19,21 141:16
**disagreements** 18:5
**discovering** 2:6
**discovery** 36:13 42:15 43:2
**discuss** 87:16
**discusses** 86:14
**discussing** 34:4 43:18 46:10 52:3 99:14

**discussion** 126:14
**discussions** 135:25
**dispute** 36:13 43:2 49:14,23 75:2,4 138:18 138:24
**disputed** 16:17 70:9,20 72:23
**distinction** 19:18 91:23,25 92:3
**district** 1:2,3 4:11,12
**disturbance** 100:6
**division** 1:4 4:13
**document** 10:18 21:25 34:11 57:6 64:9 74:20 76:6 80:5 92:11 131:6
**documentation** 19:9 44:22 51:20 52:8,12 52:17 53:6,19 53:22,24 54:16 55:4,20 61:20 62:6,12 63:21 64:8,14 66:10 67:6,25 69:14 69:19,24 70:21 73:10 74:20 119:7,8 138:2
**documented** 50:17
**documents** 34:14 42:12 51:16 71:13 76:16 83:6 104:7 119:9 132:6
**doing** 29:10 121:19
**dollars** 56:3,5 59:24 60:3,17 98:12
**domestic** 109:25
**doors** 16:23 17:3,14
**doubt** 83:17
**draft** 127:20
**drill** 63:7
**drilled** 63:20
**drive** 101:11 144:21
**due** 17:18 19:17 95:8,21 96:14 101:17 117:25 138:10 144:3
**duly** 5:9 141:10
**dump** 95:23
**duplicate** 20:20 21:3,7 23:25 79:9 80:22 81:5 81:6,8 84:5,20 109:14
**duplicates** 16:8
**duplication** 84:19
**duties** 49:2 50:10,11 71:7
**dwelling** 18:6 19:11 129:4 138:10

**e**

**e** 2:2,2 5:8 7:17 7:18 57:11 126:2,2,5 127:25 128:2,4 141:2,2 142:4 142:16 145:6,7
**earlier** 15:7 62:23 68:8 119:15 128:25 129:8
**eat** 124:25
**edits** 127:19
**effect** 3:15
**effort** 17:15,17 17:18
**either** 23:23 24:2 25:15 26:13,21 45:12 55:23
**elect** 31:12
**elected** 118:12
**election** 94:18
**electronically** 144:8
**electronics** 69:6
**elliot** 6:13 10:8 89:5,12 120:16 120:21
**email** 144:18
**employ** 141:18
**encompasses** 126:13
**engage** 62:2
**entail** 27:8
**entered** 145:8
**entertained** 109:11
**entertaining** 94:23
**entire** 27:11 30:15 117:9
**entitled** 20:5 42:21 65:11 74:19 103:7 117:24
**entry** 22:15
**equipment** 91:21 95:21
**eradicate** 27:20
**errata** 144:3,7,8 144:10,12,13,15 144:18 145:1
**esq** 2:8,9,18 144:1
**establish** 19:8 70:7
**established** 25:14 71:22
**estimate** 33:2,5 34:9 54:17 67:9

78:4 79:5,15,18 80:4 81:3,12 82:3,6,13 83:2,9 83:11,13,18 84:9 85:5 88:24 113:6 119:14,15 128:21 129:22 129:23,23
**estimated** 68:19
**estimates** 18:4 50:18 56:9 67:3 130:3
**estimation** 64:2
**et** 17:3,14 101:15 109:25
**europe** 75:15
**evaluation** 72:7 72:12,17,19,22
**evaluations** 73:11
**evidence** 121:23 122:24 139:12
**evidentiary** 88:25
**exact** 21:13
**exactly** 23:7 34:18 84:13,18 100:13,24 104:5 138:23
**examination** 5:13 92:6,14 126:14,21 142:5
**examined** 5:11
**example** 55:23 59:23 60:22
65:22 66:2 68:8 75:14,16 95:19 138:8
**exceed** 113:5
**except** 3:9
**excuse** 20:13 86:10
**executive** 8:16 8:18
**exhibit** 10:12,17 10:18 11:12,15 11:17 14:14,17 15:14 20:11,14 21:20 22:20 23:10 24:8 25:13,14 27:2 28:7 38:18,24 40:22 41:10 48:11 57:9 71:8 79:14 80:19 81:15,16 87:15 87:18 99:15 107:5 110:8 113:8 126:24 133:21,22 142:19,22,24
**exhibits** 14:24 142:18 143:3
**exists** 38:5,13
**expected** 77:18 113:5
**expense** 27:3 76:4,5,7 77:10 77:11 101:13 103:15,19
105:19 108:5 113:14 114:3,21 115:4 116:9
**expenses** 40:12 101:7,15 103:22 109:18,23 138:11
**experience** 6:19 7:3
**expert** 72:17
**experts** 72:8,12 72:13
**expires** 146:23
**explain** 30:17
**explaining** 111:20 112:6
**explanation** 37:22
**explosion** 100:5
**extent** 27:12 28:19 41:18 42:19 112:12 136:9
**exterior** 87:5
**extra** 76:11 109:17 113:14 114:2

**f**

**f** 126:2 141:2
**fabric** 54:23
**fabrics** 75:16
**facility** 144:20
**fact** 26:3 66:12 117:16 124:14 139:8
**factors** 116:12
**facts** 12:6 94:9 122:3
**fair** 63:19 68:21 70:24 97:13
**fairly** 53:9 56:17 71:25
**fairway** 101:11
**false** 136:5
**familiar** 10:21 15:9 31:6 35:19 39:18 59:15,18 76:22 78:21 121:5
**family** 107:18 107:21,22 108:4 108:10,11
**family's** 102:25
**far** 61:20 77:15 89:7 95:5 96:11 97:8 98:9 115:11 136:22
**february** 82:6
**fee** 23:15 75:10 75:14,19,20 77:24 78:3 110:23 111:3,7 111:10
**feel** 20:4
**fees** 22:22
**felt** 114:6 135:22
**field** 41:12,16 41:18 44:17,23 45:8,16 46:5

47:9
**figure** 21:13 23:14
**figures** 21:14
**file** 8:25 9:23,24 10:2,3,8 27:21 44:13 53:15 73:6 89:11 90:2 92:4,5 97:14 98:16,23 119:7 119:9 123:24 127:21 128:5,9 128:9,11,14 131:9,20 132:20 133:18 144:12
**filed** 4:10 44:12 144:15
**files** 49:11 66:8
**filing** 3:6 135:13
**fill** 144:7,8
**filtered** 137:8
**final** 80:16 127:20
**finalized** 113:5
**find** 55:13 70:18 102:3 138:6
**fine** 57:13
**finish** 88:10 122:12 123:7
**fire** 6:23 7:3 28:25 29:5 31:12 36:4 37:16 45:10,17 53:9,11 56:18 60:16 65:24 90:7 91:16 92:18 97:19,22 98:6,9,19,21,24 100:5,11 101:18 102:7
**firm** 4:18,20 52:25
**first** 5:9 7:6 10:14,20 12:14 16:16 23:12 26:6 28:7 39:4 41:14 51:5 79:18 84:11 98:5 109:20 113:10 134:3 142:21
**five** 12:16 60:17 60:23 83:23
**fixture** 109:4
**fixtures** 109:4 110:3
**flat** 75:14,19,20
**floor** 4:16 105:18 106:2
**focusing** 19:11
**follow** 47:4
**following** 13:11 145:5
**follows** 5:11 49:2 126:7
**force** 3:15
**foregoing** 14:22 141:7
**forgot** 74:13
**form** 3:9 17:11 18:11,25 23:21 24:3,22 25:8,18 26:8,14 27:24 28:15 29:6 30:12,14,25 31:25 32:9,25 34:24 35:11,21 36:8 38:8 41:5 42:2 46:2 47:6 56:13 57:22 61:7 62:10,17 62:22 63:12 64:3,18 67:11 67:15,23 68:22 69:11,22 70:12 71:17 72:6 73:19 75:3 76:19 80:3 82:14,20 83:3 86:24 93:14 94:3,12,17 96:24 97:7,16 97:24 98:8,18 98:22 100:19 101:20,25 102:14 103:10 106:17 107:13 107:19 110:6 112:11 118:15 118:22 119:2 121:8 124:9,16 124:24 125:18 132:3,25 133:12 135:19 139:11 145:7,9
**forth** 16:16 80:20 127:20 138:2
**forward** 144:12
**found** 38:2
**frankly** 136:4
**front** 11:20,23
**full** 23:13 49:5
**furnish** 145:9
**furnished** 102:4 105:21
**furnishing** 106:19
**furnishings** 105:23
**furniture** 76:25 78:15 106:21 107:2
**further** 3:8,12 63:21 71:19 126:7,18 134:5 134:16,24 136:6 138:19 141:14
**future** 40:9

**g**

**g** 7:17,18
**general** 6:11,14 6:15 8:4,7,8,13 8:16,18 19:16 28:23 35:5 61:16 115:23 138:22
**generally** 6:10 19:7 27:8 30:21

128:8
**georgia** 2:17
**getting** 18:17 42:12 56:19 88:6 106:12 124:18
**give** 11:8 109:13
**given** 6:6 43:16 44:2,9 69:20 106:22 124:14 145:8
**giving** 104:22 104:23,24
**global** 21:10,15 81:20,23,24 83:8
**go** 4:6 13:12 14:25 15:3,21 16:2 26:17,25 30:19 31:9 36:23 44:12 53:23 54:13 57:20 58:5,13 59:21 63:8,15 65:24 70:2,4,5 70:18 74:25 75:24 76:15,16 77:2 78:17 88:6 99:16 107:23 118:2 125:20 126:19
**goes** 36:17,21 36:25 136:24
**going** 4:3 12:13 12:22 14:25 15:2 28:9 30:5,6 31:18 32:24 35:6,8 36:11 37:11 40:20 42:7,14 44:13 47:24 48:5 58:2 59:7 62:18 70:24 76:10 77:20 80:20 85:10 88:8 91:7 93:9 95:10 99:8 104:16 106:14 109:4 114:19 116:4,16 123:13 125:2,9,21 126:18 132:6 136:6 137:25 140:3
**gonna** 122:21
**good** 4:2 5:15 47:23 133:14
**goodrich** 1:7,8 4:9 7:7 27:22 65:2 92:7
**goodrichs** 21:11 22:13 24:20 25:2,5 40:4 43:25 46:21 47:3,10 48:16 49:9 52:21 53:23 54:6,8 56:12,25 57:3 57:17,20 58:5 58:13,15,20 60:5 61:2 70:23 71:15 77:18,21 83:21,24 87:12 89:20 90:10 93:8 96:21 97:3 97:6 98:16 99:2 101:2 108:12 111:2,6,13,20 112:6,13,23 118:20 119:21 121:6,11,19 123:22 124:3,7 125:7 134:4,5,6 134:17,17,25 135:12,13 138:20 139:9
**goods** 69:6
**grass** 90:4
**greater** 61:18 67:4 118:5
**greenwich** 4:15
**greetings** 144:5
**grounds** 62:23 100:3
**grow** 98:7
**guess** 56:8 76:9 79:22 80:6,9,25 81:3 82:4,19 83:16,17 110:21 116:10 129:21 135:4
**guesstimate** 83:14,20 84:2

**h**

**h** 5:8 7:17,18 57:11 126:5 142:16
**haessig** 7:16,22 9:12,16 21:22 122:15
**halfway** 117:6
**hand** 87:20,21 141:21
**handing** 12:3 39:9
**handled** 6:20,23 28:21 34:3 37:17 42:19 44:5 105:12
**handling** 6:19 7:3 117:15
**handy** 34:15
**hang** 125:3 129:2
**hank** 23:14 25:3
**happen** 104:17
**happened** 25:10 100:13,24 132:10,15 138:14
**happening** 137:24
**hard** 53:21 55:6 69:4 136:4
**hardware** 16:23 17:3 77:3 101:10

**head** 120:18 136:24
**hear** 42:13
**heavy** 91:20 95:21
**held** 1:19 4:14 6:13
**help** 35:23 37:22,23 55:5 76:5
**helps** 102:3
**henry** 20:18 22:16
**hereunto** 141:20
**hesitate** 6:4
**hierarchy** 8:14
**high** 61:9
**home** 21:2 27:3 27:10,14 29:23 33:3,13 91:5,7 97:18 101:13 102:4,10 103:2 103:4,12,14 104:4,5 105:9 105:13 106:8,9 108:16,22 110:4 115:17 116:14 116:19 118:3,6 118:7
**homeowners** 6:21 7:4
**homes** 102:6 105:22,25
**honest** 12:21
**honestly** 105:20
**hoover** 144:22
**hopes** 92:20
**hotel** 105:22
**hour** 47:24 88:8
**house** 23:19 27:22 28:9 29:20 30:6,23 31:13,21,23 33:17 40:8 85:17 87:5 90:7 91:19 94:19 98:7 100:3 101:17 103:17 104:10 107:2,12 109:21,23 111:17 114:19 114:20,25 115:3 116:6,8,15 117:7,9,11,12 117:17,19,23 118:12 119:22 120:6 121:4,7,9 121:15,20,21 123:11,15 124:14 125:14 125:19 130:5,12 130:13,18,24
**household's** 103:23
**housing** 102:3
**hundred** 60:18 60:23 131:21
**hygienist** 39:21 39:22 40:10,18 40:24 41:8
**hypothetical** 74:3
**hypotheticals** 46:10 104:25

**i**

**idea** 64:6
**identification** 10:15 14:16 42:17 133:24
**identify** 10:16 10:17
**imagine** 76:20
**impact** 47:4,10 60:20
**important** 60:4 107:18,21 108:4 108:10,14,19,20
**include** 33:21 82:25 83:12 89:15,18,23 130:23
**included** 78:24 79:5 80:7,10,13 81:4 83:13
**includes** 82:13 82:15,18 90:13
**including** 106:19 109:24
**incorrect** 95:16 135:23
**increase** 56:16 57:24 58:2 60:12,15,18,23 64:13 68:15,20 69:2,10 101:14 103:21 109:22 118:8
**increased** 73:10
**increases** 68:15
**incur** 76:5,7
**incurred** 33:18 77:21 103:16
**indemnity** 1:11 4:10 5:4 10:13 10:19 142:20
**independent** 32:19
**indicate** 25:24 61:24
**indication** 108:13
**indirectly** 141:17
**industrial** 39:21 39:22 40:10,18 40:24 41:7
**inflated** 67:9
**information** 12:6 18:14,23 19:3 21:8 44:18 44:20 45:4 47:14 61:4 64:6 64:16 70:2 142:8
**informing** 112:8
**initial** 91:17

**insert** 142:10
**inserts** 26:4
**inservio** 72:18 72:21,25 73:5,9 73:11,13,17,20 75:17 76:3,3
**install** 114:16
**installation** 114:20 115:2
**installed** 108:22 116:14
**installing** 116:7
**instances** 105:7 131:21
**insurance** 16:6 37:12 61:14
**insured** 19:23 19:25 20:3 28:14 29:9 36:4 49:13,15,20 50:4 51:8,13 54:13 62:19 63:5,6,8,8 67:6 69:25 71:10 72:11,15 74:18 74:23,25 78:14 78:14 91:18 101:17 103:7 105:17 131:24
**insured's** 49:2 72:13 73:15 78:23 79:4
**insureds** 20:7 28:8,18,25 31:18 41:19,25 42:4,8,11,12,17 43:13,16 44:2 44:11,18,20 45:4,6,21 46:6 73:25 74:4 84:8 84:14 94:18 97:14 114:6 116:3 117:8,22 118:5,10 119:19 120:4 123:13 131:16
**insurer** 63:20
**insures** 50:11
**intend** 50:23
**intent** 45:24 96:7
**intentional** 62:14,15
**intentionally** 67:9 121:19
**interchangeably** 22:9
**interested** 141:16
**interior** 27:11 52:25 90:9,18 91:6 113:18,23
**interpret** 26:24 49:21
**interpretation** 95:17
**interrogatories** 10:14,20,25 11:5 36:19 142:21
**interrogatory** 13:2,6,19,23 14:10
**inventory** 49:3 49:4 51:5,16 52:3 71:14
**investigate** 66:11 72:4
**investigation** 66:6 87:10
**invoice** 52:7 55:7 56:16
**invoices** 50:17 52:16 53:16 66:25
**involve** 27:10
**involved** 20:24 58:23 59:8,9,13 122:11,18 131:11 138:23
**involvement** 62:3 113:17 114:13 115:12 119:3 120:8,13 127:3,6 128:12 131:19
**iris** 52:7,16,18 52:20,24 53:7 54:2,10 55:5 56:3,6,23 57:2 57:11 58:5,6,13 58:16 59:23,25 60:19 61:25 62:6,12 66:7,9 66:12,20,23 67:8,14,20 69:14 70:5,22 70:25 75:10,18 76:7,11,12,15 77:6,6,10,21 78:11
**iris's** 77:24
**irrigated** 93:10 94:9 95:10
**irrigation** 89:16 89:19 92:20 93:5,7,11 94:5,7 95:2,9,12,21 96:12,15,17,23 97:9,11,22 98:20,24 99:2 100:17,21,23,25
**issue** 16:6 36:10 36:14,17 37:16 42:9,15,25 78:21
**issued** 132:13
**issues** 12:23,25 16:17 122:16
**italian** 65:25
**item** 16:19 48:21 50:23 56:12 60:13 61:3 63:4 68:14 78:9 79:6 81:10
**items** 8:24 16:5 16:7 53:3,8,18 55:2 56:8,17 57:4,25 58:7 60:7 68:24 69:7

70:9,20 71:25 72:2,23,25 73:3 78:10

## j

**j** 5:1,8 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1,5 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1

**january** 1:15 4:4 141:9,21 142:2

**jeremy** 6:12 10:8 120:21

**jerry** 1:18 4:8 5:16 12:17,23 14:15,18 126:19 141:8 142:6,22 144:2

**july** 132:13 138:12

**june** 110:10 113:8 116:24 117:4

**justify** 53:21 55:6

## k

**k** 5:8 7:15 39:17 126:5

**keep** 18:18 58:22 105:3

**kept** 127:23 128:8,10

**kind** 65:14,15 65:20 66:2 128:20 136:14

**kinds** 100:4

**knew** 83:16 96:21

**knock** 91:19 118:12

**knocked** 130:5

**know** 5:24 6:4 6:12 7:13,16,22 8:3,6 9:15 18:12 20:22 21:13,14 22:7,12,20 23:4 26:9,10 28:20 29:16 33:8,12 33:25 34:16,18 36:12 38:3,15 39:8 40:4,7,10 40:13 41:6 42:21 43:2 44:16 48:3 50:22 52:20 59:12 63:5 64:5 70:6 76:25 83:19 87:13 89:7,10 90:20 90:21,22,25 92:4,17,25 93:2 97:8 98:6,9 99:4 100:13,16,24 101:2 102:5,8 102:23 103:4 104:5,7,16 105:7 106:11 107:3 108:2 109:9 113:16 115:5,8,21,24 116:13,17,20 118:16 120:2,8 120:10,23,25 121:10,18 123:16 124:10 124:23 127:14 127:22 128:6 130:8 131:5,13 131:20,23 132:9 133:9,11 135:9 135:20,24 136:13 137:3,5 137:14 138:22 139:6

**knowledge** 7:25 12:8,23,24 13:16 14:11 16:13 36:25 49:25 51:17 62:15 66:17 70:10 101:23 117:18 139:4

**knowledgeable** 13:4,10,24
**known** 135:21
**knows** 26:15 63:6
**koos** 7:15,25 8:17 9:12,20 127:12,13 128:2 128:8 136:25 137:2,5,10,12 139:7

**l**

**l** 39:17
**labor** 114:15
**lack** 96:14
**landlord** 104:9 107:24 114:8
**landscape** 78:17 81:25 83:22 85:23,24 86:3,4 86:8,19 87:3,8 89:13,15,23 90:23 91:12 92:10,18 99:19
**landscaping** 78:24 79:5,18 81:7,10 82:24 83:14,25 84:22 85:15,18,19 86:7,13 87:6,12 87:17 88:5,19 89:9,18 90:17 90:22 91:8,15 91:15,20 93:13 93:15,23 95:10 96:5,11,22 97:4 97:9 99:14 100:14 112:25 113:4
**language** 30:18 31:5 34:20 35:20 49:18 71:7 75:5,7 80:20 91:4 101:8
**large** 60:12
**larger** 20:9
**late** 70:13
**law** 42:11
**lawns** 100:2
**lead** 106:11
**leather** 65:25
**leave** 38:19
**left** 87:20,20
**legitimacy** 64:7 66:11
**legitimate** 61:25 63:25 66:13,21 66:23 69:10,13 96:5
**letter** 15:15,21 20:12,16 21:4,5 21:15,17,18,21 22:5,19 23:11 24:9 25:24 26:3 26:12,19 27:2 28:2 38:17,22 38:25 39:3,12 39:17 40:17 41:17 43:12 48:12,24 49:19 50:3 52:6,10 71:8 79:4,7 80:18 81:14,19 82:9 84:24 85:10,20,21,22 86:2,6,12,22 99:15,17 100:2 101:7 110:9,13 110:14,17 112:5 112:14,23,24 113:9 116:24 117:4,7 120:7 122:4 124:19 126:25 127:4,8 127:10,15,18 128:13 132:10 133:22 134:2,15 135:4 142:24
**letters** 15:10,11 24:4,5 113:17 137:20 138:16
**letting** 43:3 83:19 131:13
**level** 7:24 8:13 8:15,17
**light** 135:10
**lightening** 100:5
**likewise** 88:24
**limit** 81:25 82:24 83:25 84:4,11 86:14 126:18
**limited** 43:4
**limits** 49:16,22 80:19
**line** 79:6 145:11 145:14,17,20,23 146:1,4,7,10,13
**list** 61:21
**little** 5:21 60:11 70:13
**living** 101:6,14 103:9,22,23,25 105:19 109:18 109:22,24 110:5 113:14 114:3,21 115:4 116:9 138:11
**llc** 2:4
**loan** 34:10
**local** 40:18
**located** 4:15
**location** 93:10 94:8 95:12
**locations** 42:23
**long** 6:8 20:19 21:6 22:16 23:14 25:3,7 105:21
**look** 12:2,14,15 13:11 14:9 15:14 18:15 21:20 23:10,12 24:4,8 28:6 31:5 34:15 39:7 40:16 48:12 57:9 60:24 69:8 78:18 79:14

80:18 81:14 87:14,16,23 89:21 92:6,14 99:17 109:12,16 110:8 113:8 116:23 119:10 126:24 138:6 139:13
**looked** 15:7,19 80:21 103:5 112:18 119:15 123:25 131:7
**looking** 13:19 16:14 20:11 22:19 23:11 25:13,13 32:22 38:17,20,22 39:16 48:11,24 51:4 69:12 71:7 77:6 79:17 83:6 83:7 85:4,23 87:21 88:18 90:2 99:15 101:11 107:4 109:20 111:9,10 113:9 121:2 128:20 129:6
**looks** 40:23
**loss** 29:5 30:11 30:24 32:17 36:4 43:16,17 44:3 45:17,23 49:3 50:5,6,11 50:15,19 51:2,9 51:13 68:10,10 68:14 69:17 85:17,24 86:3 90:19 100:7,10 101:18 119:11 131:8
**losses** 7:3 28:25 37:16
**lot** 21:12 34:14 35:17 104:14 116:12
**lots** 18:23
**lunch** 99:6 124:25 125:20
**luncheon** 125:23
**lynne** 1:21 4:19 5:10 141:5,24

**m**

**made** 16:11 21:11 38:6 40:11 46:5 55:19 61:4 62:14,15 64:22 66:9 68:8 72:11 82:23 85:25 91:10,18 98:23 100:15,20 118:20,24 120:18,20 132:21,23 133:17 138:8,13 138:15
**mail** 127:25 128:2 144:10,19
**mails** 128:4
**main** 40:13
**maintain** 103:22 109:23
**majority** 131:18
**make** 11:7,17 13:14 19:23 22:13 36:21 55:13 61:11,13 63:8 75:22 82:12 89:8 104:11 117:23 120:22 127:17 135:11 136:6 138:3,19 145:7
**makes** 90:12
**making** 17:21 52:21,21 92:2,3 98:16 123:5 134:22 136:17 145:8,8
**malicious** 100:6
**management** 7:11,13 9:13 127:11 136:22
**manager** 7:15 7:23 8:19 9:10 9:12
**mantles** 16:23 17:3,14
**manually** 144:8
**manufacturer** 54:22
**marcos** 2:7
**mark** 10:10 14:13 61:9,17 133:20
**marked** 10:14 10:16 14:15 133:24
**marks** 140:2
**markup** 61:6,15 61:16 63:24 64:7 78:4
**marriage** 141:15
**masterpiece** 6:21 7:4 35:6,24 48:16
**matter** 4:9 20:6 141:17
**matters** 28:17
**mean** 17:25 19:14 22:8 37:22 42:6 50:7 50:16 51:11 58:22 65:19 67:19 79:11 80:9 83:17,23 91:9 107:19 111:19 133:12
**meaning** 50:20 124:12
**means** 80:10 90:13 111:23
**meant** 122:7
**media** 4:7
**mediation** 138:17

**memory** 21:9 37:23
**mention** 101:5
**mentioned** 63:23 81:2
**mentions** 40:17
**merits** 28:22 34:4 44:6
**metz** 1:21 4:19 5:10 141:5,24
**mhh** 1:5 4:13
**michael** 7:15
**mike** 127:13
**mind** 17:6 19:18 58:22
**minimal** 91:16
**minute** 58:3 99:16
**mischaracteri...** 139:12
**mischief** 100:6
**misrepresenta...** 123:4
**misrepresenting** 122:3,24
**misspelled** 7:20
**misstate** 126:12
**mistaken** 25:20
**mixed** 88:7
**mo** 142:14
**mold** 39:23 40:15 98:7,10 98:11,13,15,17
**money** 61:11,13 104:15 138:9
**moneys** 16:5 75:23 117:25 118:5
**monitoring** 128:14
**monthly** 113:11 113:13
**months** 60:23
**morning** 4:2 5:15
**moss** 2:18 5:3,3 7:18 9:5 11:11 11:14 12:20 13:13 15:4,8,15 16:3 17:11 18:11,25 20:22 22:2 23:21 24:3 24:22 25:8,18 26:8,14,22 27:24 28:15 29:2,6,13,18 30:12,14,25 31:25 32:9,25 34:24 35:11,21 36:8,23 37:3,9 37:18 38:8,14 38:22 39:3,6 41:5 42:2,6,24 43:22 46:2,8,17 47:6,12,23 56:13 57:22 58:8,22 59:3,5 59:11,17 61:7 62:10,17,22 63:12 64:3,18 67:11,15,23 68:22 69:11,22 70:12 71:17 72:6 73:19,22 75:3 76:19 80:3 82:14,20 83:3 85:2 86:24 88:8 90:20 92:24 93:14 94:3,12 94:17 96:24 97:7,16,24 98:8 98:18,22 100:19 101:20,25 102:14 103:10 104:12,18,22 105:10,14,16 106:17 107:13 107:19 110:6,9 112:11 114:22 118:15,22 119:2 121:8,17 122:2 122:8,11,23 123:5 124:9,16 124:24 125:18 126:16 132:3,21 132:25 133:6,12 133:23 135:7,19 136:9 137:9 139:11 142:25 144:1
**motion** 36:12,16
**motions** 36:9 142:14
**mountain** 102:6
**move** 41:9 47:22 92:18 101:17 103:16 123:4
**moved** 36:15 93:9 94:8 95:11 115:2 129:19
**moves** 105:17
**moving** 18:5 95:20 105:3 108:18
**multiple** 21:14 58:10

**n**

**n** 2:2 39:17 126:2,2,2 142:4
**n.e.** 2:16
**name** 4:17 13:9 13:24 21:24 22:3
**named** 93:15,24 93:25
**names** 22:9 42:22
**nature** 39:24
**necessary** 109:23 111:16 118:2,6 145:9
**need** 5:23 13:2 16:24 18:14 21:3 33:25 35:22 41:20 43:13 44:20 47:13 48:2 50:22 56:19 75:5 79:22 99:6

111:14
**needed** 104:6 106:7 114:7
**negates** 111:14
**negotiated** 129:21
**negotiations** 137:25
**never** 18:9 20:7 20:10 25:3,5 37:16 61:19 77:13,15 97:3,6 118:20,24
**new** 1:20,20,22 4:16,16 46:18 53:9 56:17 65:21 71:25 101:12,16,18 141:3,4,7
**nine** 74:6
**normal** 18:7 42:18,20 44:2 101:14 103:21 109:22
**normally** 28:13 29:11 41:24 42:4 43:15 61:18
**northern** 1:3 4:12
**nose** 104:16,19
**notarized** 144:10
**notary** 1:22 5:10 11:24 141:6 146:23
**noted** 64:12 140:5 145:4,5
**notes** 9:24 10:2 127:17,23 132:20,21,22 133:4,7,11,17
**notice** 1:20 55:2 122:14 126:12
**noting** 144:7
**number** 4:13 12:16 13:2,19 14:10 16:19 20:18 22:21 23:18,19 24:14 26:25 41:9 51:22,23 54:21 54:21 83:10 101:10 107:4 113:19 114:15 128:22
**numbers** 21:12 23:5,6 26:11 88:6

**o**

**o** 5:8,8 7:15,15 20:19 39:17 57:11 126:2,2,2 126:5,5
**o'connor** 1:19 2:12 4:14
**oath** 3:15 12:6 36:19,20 56:11 59:15 92:7,9,15
**object** 17:11 18:11,25 23:21 24:3,22 25:8,18 26:8,14 27:24 28:15 29:6 30:12,14,25 31:25 32:9,25 34:24 35:21 36:8 38:8 41:5 42:2 43:4 46:2 47:6 56:13 57:22 61:7 62:10,17,22 63:12 64:3,18 67:11,15,23 68:22 69:11,22 70:12 71:17 72:6 73:19 75:3 76:19 80:3 82:14,20 83:3 86:24 93:14 94:3,12,17 96:24 97:7,16 97:24 98:8,18 98:22 100:19 101:20,25 102:14 103:10 104:18,20 105:14 106:17 107:13,19 110:6 112:11 118:15 118:22 119:2 121:8,17 124:9 124:16,24 125:18 132:3,25 133:12 135:19 136:9 139:11
**objected** 135:22 136:14
**objecting** 68:18
**objection** 13:14 26:22 29:2,7,13 29:18 35:11 37:9,18 42:7 46:8,17 47:12 59:10 73:22 104:23 105:10 105:14 123:3,5
**objections** 3:9
**obligated** 30:10 123:18 124:12
**obligation** 19:22 19:24 30:22 31:11 46:7 47:5 47:11 51:5
**obligations** 31:3
**obtain** 75:16
**obvious** 30:2
**occasions** 63:14
**occurred** 91:23 99:3
**october** 133:24 134:2 137:20 142:25
**odor** 27:6,20
**odors** 40:9
**offer** 18:2 21:11 21:16 22:13 81:16,20,23 82:18 134:4,8

134:16,23
**offered** 23:13 77:13
**offhand** 29:3 57:6 89:22 134:10 137:7
**officer** 3:14,16
**offices** 1:19 144:3,10
**oh** 135:5
**okay** 5:16 6:5 13:22 15:4,9 16:10 20:17 22:10 30:21 48:4 51:14 53:13 57:14 59:21 60:18 79:3 80:15 88:14 97:20 116:5 121:17
**old** 65:10,21,21 65:23 66:4 68:9
**once** 9:11 144:10
**ones** 15:6 72:24 115:18 116:20
**online** 11:25
**onsite** 87:9
**open** 8:24
**opinion** 19:20 20:6
**opposed** 8:4,7 68:4 76:22
**option** 111:17
**order** 36:16 103:22
**ordering** 144:13
**original** 18:2 53:16,16 55:7 56:16 60:8 61:9 66:24 67:5 71:18 72:24 73:4 144:13,15
**originally** 98:2
**overall** 18:18 19:5 33:21 35:9 67:25 83:10
**overseeing** 20:25
**oversight** 20:21 23:15 24:16 25:6 26:5
**oversights** 25:4
**owes** 78:13
**own** 28:21 34:3 44:5 72:13 73:11,13 93:15 93:24 108:5,23
**owner** 104:10
**ownership** 68:24
**owns** 108:24

**p**

**p** 2:2,2 20:19 57:11
**p.m.** 99:9,12 125:22,23 126:3 126:10 140:4,5
**pacific** 1:11 4:10 5:4 10:13 10:19 13:10 16:4,11 17:2,8 19:22 20:20 22:8 24:16 28:4 30:5,9,22 33:8 33:20 38:20 39:12 41:24 42:8,19 44:14 45:6,20,22 46:5 57:19 58:4 62:15,20 66:6 66:16 67:19,20 69:17 70:4,7,18 71:23 72:21,24 73:3,20 74:2,5 74:22 75:13 77:5,13,17 78:13 87:7,11 90:13,16 96:21 97:3 98:15,25 101:16 102:9,11 104:2 105:8 106:20,22 107:11 108:25 111:18 113:13 115:20 117:19 118:14,24,25 123:17 124:12 125:6,16 130:17 131:4,22 132:7 134:23 135:17 135:21 136:6 138:18 139:8 142:19
**pacific's** 31:3,11 46:7 47:5,11 66:20 117:10 134:4,7,15 135:11
**page** 10:23 11:3 11:4,10,21 12:14,15 13:7 13:12,20,20 14:19 15:23 16:2,14 19:15 37:20 51:22,23 51:24 78:20,23 79:19 81:16 85:4,5 87:16 88:4,5,12,13,21 99:17 101:9 107:5,6,9 109:16 110:18 110:21,22 111:11 113:10 113:19 116:23 139:20 142:5 144:18 145:11 145:14,17,20,23 146:1,4,7,10,13
**pages** 145:9
**paid** 25:3,7,19 25:21,25 65:7,7 71:23 72:24 73:4 79:10 80:23 84:9,15 84:21,25 86:7 86:16,18 98:11

98:15 106:20 107:15 111:3,7 113:15 117:24 124:3,5 125:8 128:19,22 129:9 129:17,21,25 130:8,17,20,25 136:18
**painted** 114:7
**painting** 113:18 113:23
**paragraph** 15:24 16:4,16 20:12 22:21,25 23:13 24:9,13 24:15 38:20,25 39:13,16 40:17 40:22,23 41:9 43:12 45:2,3,12 45:13,15,25 48:12,25 50:10 51:21,22,23 52:11 71:8,9 78:17 88:21 99:19 101:7,9 101:12 107:4,9 109:12,13,16 110:17 111:10 111:12,12 112:6 112:17 114:15 115:16 116:23 117:3,6 119:19 119:25 120:3
**paris** 2:4,9 4:25
**parked** 41:16
**part** 11:14,16 17:15 30:7 33:5 34:7 45:9,17 67:16,24 78:8 80:4 81:24 83:8 83:9,19 90:18 96:25 98:5 100:16 109:5 111:15,21,25 112:19,20 127:24 133:2
**participated** 137:18
**participation** 39:18
**particular** 17:13 38:4 42:3 44:6 47:14 57:6
**parties** 3:5 4:6 20:24 141:15 144:13
**partner** 4:25
**parts** 19:5
**party** 53:24,25 54:10,14,14 57:20 63:25
**past** 27:17 53:11 56:17 107:15
**pause** 123:7
**pay** 16:5,7 17:2 17:18 30:5,10 30:22 31:12 33:8,12,20 35:6 36:6 38:21 39:13 45:23 47:5,7 75:13 77:5 85:11,13 101:16,18,24 102:12,17 103:11 105:8,24 107:11,14,24 109:2,4,8 110:3 118:25 120:17 123:13,19 124:12 125:6,12 125:15,16 128:18 130:7,10 139:9,13,13
**payable** 101:15
**paying** 19:16 20:21 24:16 53:21 55:6 131:16
**payment** 17:8 17:13 20:9 119:20 120:5 121:21 132:12 134:5,16,24
**payments** 16:11 129:11,18 131:19,25 132:4 132:8,14 135:12 136:6,23 138:9 138:12,13,14,19
**pays** 68:15
**pc** 1:20 2:12 4:15
**pdf** 144:7
**peachtree** 2:16
**penalty** 14:21
**pending** 36:9 42:9 43:5
**pennsylvania** 40:5
**percent** 60:18 60:23 79:6
**percentage** 63:24
**perform** 29:24
**performed** 34:23
**perils** 93:16,24 93:25 100:5
**period** 67:4 68:23 106:23
**perjury** 14:22
**permanent** 100:4 108:23
**person** 13:3,10 13:24 122:19
**personal** 12:24 49:4
**persons** 122:22
**perspective** 18:18
**pertaining** 109:10
**pertains** 34:6 43:19
**photographs** 50:18 87:5 88:25 91:17 92:5

**phrase** 27:5 74:13
**picked** 62:19
**pictures** 87:7,9 87:11
**piece** 63:10 78:15 97:9
**place** 4:5 120:23 139:3,5
**plaintiff** 4:25 18:8
**plaintiffs** 1:9 2:5 10:14,17,20 18:13,20 19:8 34:8,16 87:17 88:4,18 142:21
**plant** 95:23
**plants** 89:20 90:3 92:18,21 93:9,11 94:7,20 95:9,11,13,20 95:24 96:5 100:2
**play** 9:16 96:10
**played** 9:17
**please** 5:6 7:21 10:11,17 12:16 13:18 15:14 26:18 28:8 30:17 37:7 43:8 46:13,15 56:21 57:10 58:25 63:16 79:14 87:23 93:20 99:17 110:8 115:18 116:19 126:24 133:20 139:16 144:10 144:18 145:9,9
**plus** 79:6 83:22 83:25
**point** 9:18 35:17 37:24 62:5 65:8 76:12 88:10 123:7 126:23 129:21
**pointing** 84:7
**policy** 6:21,24 7:4 16:6,8,12 17:9,19 19:17 30:16,18,19 31:4,4,7 34:21 35:3,6,13,16,18 35:22,25 37:2,5 37:21 38:3,4,7 38:12 48:16,25 49:13,15,18,20 50:2,5,12 51:8 65:16 68:5 71:6 73:24 74:7,24 75:5,8,9 80:20 81:25 82:24 84:11 86:14 91:4 93:13,23 94:10,16 95:15 95:18 96:10,20 97:23 98:11 99:22,25 100:12 101:8 109:17 110:3 114:3 117:25 123:18
**portion** 18:6 55:5 110:2 124:11
**portioned** 132:5
**posed** 94:15
**position** 6:10 112:8,22 117:10 117:14,19 122:17 135:11
**positions** 6:12 137:4
**possible** 50:18 55:4
**potential** 45:8
**practice** 36:13 42:18
**precedes** 135:3
**predate** 113:17 131:19
**predates** 114:13 115:6 120:7 132:5
**premises** 89:6 89:25
**prepare** 9:19,22 49:3,3 51:4
**prerogative** 31:20
**present** 2:21 4:21
**presented** 18:10 26:11 28:3
**pretty** 134:19 135:15
**prevent** 40:8
**previous** 64:23 70:16
**previously** 8:18 67:7 126:6
**price** 61:9 66:25 71:18 78:3 81:3
**primary** 41:4 106:7,9 108:16 116:15
**print** 144:8
**prior** 9:12 60:16 104:10
**privilege** 136:11
**probably** 12:20
**problem** 71:2
**procedure** 145:6
**process** 27:6,15 27:19,22 30:8 33:6,9,19 36:7 91:24 119:24 120:9,10
**production** 144:20
**progressed** 62:5
**project** 20:25
**projected** 22:17
**promenade** 2:14
**proof** 34:10 119:10
**proper** 53:22 94:13
**property** 49:4,5 63:11 91:21

102:16 103:5 109:6
**proposed** 102:16
**protective** 36:16
**provide** 44:20 69:25 71:10 72:15,22 133:16
**provided** 52:24 67:9 71:20 88:25 126:13
**provides** 48:25
**providing** 45:4 77:7
**provision** 38:4 38:12 50:3 74:7 74:12,24 90:23 96:20
**provisions** 73:24 93:13
**public** 1:22 5:10 141:6 146:23
**purchase** 66:25 71:18 77:3 106:21
**purchased** 54:25 101:10 106:8,14 114:25
**purpose** 27:18 40:13 41:4,7 68:3,5 116:17 121:13 123:12
**purposes** 116:2
**pursuant** 1:20 145:6
**push** 70:24
**put** 106:9 133:7
**puts** 133:11

**q**

**qualifications** 36:18,21,24
**quality** 65:14,15 65:20
**question** 3:10 7:21 13:9 20:19 25:2 26:18 28:13,24 29:11 32:2,5 34:25 37:7 38:9 39:11 40:21 42:16,21 43:8,20,23 44:24 45:19 46:12,13,25 47:20 51:3 55:18 56:15,21 58:4 60:21 62:7 62:11,23 63:13 63:16 66:22 67:2,5 70:14,16 71:4 74:21 75:21 86:5 91:12,22 93:3 93:19,19 94:14 94:15 95:5 97:25 105:2,2 107:25 108:7 116:2,18 120:15 123:9 124:2 129:8 133:14 139:15
**questions** 6:2 18:3 20:10 25:12 43:4 98:25 120:19 122:20 126:19
**quick** 16:2
**quite** 12:21 79:12 105:20
**quote** 51:8
**quoted** 30:15
**quotes** 99:22 109:17
**quoting** 50:12

**r**

**r** 2:2 5:8,8,8 20:19 57:11 126:2,5,5,5 141:2
**raised** 59:10
**rather** 68:6
**read** 16:10 21:4 21:5 35:17 37:6 37:8,21 40:19 40:22,23 43:7,9 46:14,16 56:22 57:12 63:17,18 78:20 80:8 93:18,21 124:19 139:15,17 144:6 145:2
**reading** 50:2,11 101:8
**ready** 102:16
**real** 16:2 50:20
**really** 24:24 105:3
**reason** 19:10 29:23 31:15 32:23 61:12 108:25 109:7,9 109:13 145:13 145:16,19,22 146:3,6,9,12,15
**reasonable** 70:8 70:19 101:14 102:24 103:18 103:21 109:22
**reasons** 145:8
**reassigned** 7:8 7:12 8:11 9:11
**rebuild** 23:9,14 23:16,20,24 29:11,17 30:23 32:3,14,20 34:5 34:7,17,19 91:7 91:13,19,24 92:19 93:6,7 94:6,19,21,23 98:3 111:16 112:3 118:8,11 118:21,25 119:13 121:20 121:21,25 123:10,20,23,25 124:4 125:6 128:22 129:5,9 129:9,12,14,17 130:6,8,11,15 130:21,23,25

131:7,12,14,17 132:2,8
**rebuilding** 28:8 97:18 118:13 119:5 121:4,12 123:14 128:23 129:25
**rebuilt** 33:14 121:9 125:14,19 130:6,9,16,24
**recall** 9:9,21 10:24 11:25 17:5 21:12 22:5 25:11 27:25 29:3,21 37:14 37:19 39:20 40:3 49:11 51:19 53:8 56:14,23 58:18 60:9 66:18 73:23 89:22 90:2 92:8,13,16 97:2 102:22 106:24 107:16 109:15 114:11 133:19 136:3,12 136:16 137:7,15 137:17
**receipts** 50:17 51:15 52:9,13 52:14,15 60:8 71:13,24 72:2
**received** 61:19
**recently** 54:25
**recess** 48:7 99:10 125:23
**recollection** 37:15
**reconstruction** 15:24 16:14,18 19:12 21:2 23:12 110:17 111:16 128:21 129:3,7 131:11
**record** 4:3,6,23 21:24 37:8 43:9 46:16 48:6,9 56:22 63:18 93:21 99:9,12 122:13 125:22 126:10 139:17 140:4
**recorded** 4:8
**recording** 4:4
**records** 77:7 132:18
**reduce** 19:25 20:3,8 35:9 134:6,17,25
**reduced** 34:22 138:20 139:9
**refer** 5:18 27:6 93:22
**reference** 119:23 126:23 134:22
**references** 134:23
**referencing** 81:9
**referring** 30:17 35:3,15 78:23 84:23
**reflect** 117:10
**refresh** 21:9
**refuse** 43:20
**refused** 36:6 67:13
**refusing** 43:21
**regarding** 13:11 13:24 17:13 25:12 39:17 44:16 47:14 127:7
**regardless** 72:10 84:3 100:11 111:21 136:7
**regards** 49:2
**regional** 40:18
**regularly** 29:5 69:17
**reimbursement** 113:22
**reject** 134:4,15
**relate** 53:20 62:24 98:4
**related** 35:12 98:19,21 123:10 141:15
**relates** 28:17 35:23 37:25 94:14 105:4
**relevance** 31:17 64:25 116:20
**relevant** 115:20 115:22
**remediate** 27:3
**remediation** 14:7 27:6,7,15 27:19,22 28:3 29:24 30:7 31:16 33:6,9,18 34:6 36:6 38:19 38:25 39:14 111:10,15,20,25 112:7,18,20 119:24 120:17 120:18 125:13 125:16
**remember** 21:10 53:14 57:5,6 66:24 92:12 112:10 129:7 132:16 134:10 137:8,23 137:25 139:2
**rent** 102:16 106:18
**rental** 101:11,13 101:19 102:6,10 102:16 103:5,11 104:4,5 105:9 105:13,18,22 106:9,16,22,23 107:2,12 108:18 108:23 109:3,5 110:4 113:23

114:6,18,20,24 115:3 116:6,8 116:14
**rentals** 105:21
**rented** 105:23
**reoccurring** 40:9
**rep** 12:22
**repair** 21:2 23:8 23:19,23 25:15 29:10,14 30:5 30:10,23 31:12 31:14,19,23 32:3,8,12,18,22 33:2,16,17,19 33:21,22 34:5,6 34:10,17,19,21 34:22 35:7,8,10 36:3 37:25 41:11 90:6,7,9 90:18 91:5,18 94:24,25 98:2 111:21,23 112:2 112:7,19,21 118:3,6,17,19 119:12,15 123:19,22 124:4 125:8,16 128:23 129:8,9,10,14 129:16,20,23 130:4,9,15 131:2,22,25
**repaired** 30:6 31:16 32:13 33:3,13 116:5 117:8,11,13,20
**repairing** 118:7
**repairs** 19:21 32:16 119:20 120:5 124:13
**repeat** 7:21 26:18 39:11 44:25 46:13 56:21 63:16 70:14 75:21 86:5 114:22
**rephrase** 43:10 47:20 51:3 89:17 112:15
**replace** 48:22 48:23 53:2 56:4 56:5,12 57:3 59:24 61:3 65:13,24 68:25 115:17 116:18 117:9
**replaced** 16:25 57:25
**replacement** 48:17,20 50:21 52:25 53:17 56:9 57:8 60:5 60:11 63:4,7 64:11 65:3,8,11 65:17 67:3,10 67:18,22 68:3,6 68:12,13 69:15 70:8,19 71:10 71:20,23 72:5 72:15,22 73:25 74:2,4,6,18,19 74:22,23 77:24 78:4,6,9,11,13 81:10 107:9
**replaces** 78:15
**replacing** 50:23 50:24 60:13 66:3 96:4
**report** 9:25 43:16 89:8,12
**reported** 46:18
**reporter** 1:21 4:19 5:6 141:5 143:3
**reports** 9:19,22
**represent** 120:16
**representatives** 131:21
**represented** 115:8
**represents** 25:10
**request** 55:19 58:11,12 61:4 63:22 64:10,14 64:19 82:23 83:7 87:7,11 113:22 114:12 123:10
**requested** 124:8 144:6
**requesting** 52:12 62:5 119:20 120:4 138:2
**requests** 64:22 66:9 142:8,12
**require** 105:23
**required** 63:10
**research** 75:11 75:15 76:4,16 76:24
**resent** 121:24
**reserved** 3:10
**residence** 106:15 116:4
**resolve** 8:23 17:7,16,17,21 17:25 18:6,8,19 75:2 128:15
**resolved** 74:9 128:17
**resolving** 19:16
**respective** 3:5
**respond** 20:9 46:18
**response** 12:16 12:17 116:24
**responses** 10:13 10:20 12:7,13 142:20
**responsibilities** 8:21
**responsibility** 44:14 144:6
**responsible** 91:9 104:3
**rest** 121:2 134:9

**restoration** 41:15,19,21 43:14 44:12 45:7 77:3 87:19,21 90:14 94:25 95:7 102:18 103:20 111:24 114:14 118:20 123:6
**result** 91:16 97:17
**resumed** 126:6
**retained** 143:3
**returned** 106:22 144:12,15
**reveal** 136:10
**reverse** 87:21
**review** 8:25 9:23 15:18 57:10 66:8 73:6 89:11 91:17 110:20 123:24 126:14 127:9,18 144:7
**reviewed** 26:20 44:8 52:6 87:4 110:13 127:14
**reviewing** 21:10 22:5 24:5 53:14 127:8 131:20
**right** 11:9 14:9 21:25 22:3 24:15 49:17 51:5 52:23 54:12 55:12 59:10,11 65:15 68:20 72:9,15 72:16 77:4 81:11 83:16 85:5,12,16
**rl** 142:11
**road** 108:13 113:15 114:19 114:25 115:17 116:19
**role** 8:19 9:15 9:17
**room** 4:21
**roughly** 60:13
**rq** 142:12
**rudoshko** 1:19 4:8 5:1,15 6:1 7:1 8:1 9:1 10:1 11:1 12:1,17 13:1 14:1,15,18 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1,18 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:8 142:6,23 144:2
**rugs** 105:13,16 105:18 106:2,4 106:6,12,13,15 106:19 107:2
**rule** 145:6,7
**ruled** 36:10 62:25
**rulings** 142:11
**run** 90:7
**running** 95:23 102:22
**runs** 96:9,12

**s**

**s** 2:2 5:8 7:15,17 7:17,18,18 20:19 126:2,2,2 126:5 142:16
**sale** 55:14
**san** 2:7
**satisfactory** 18:3
**save** 93:11 95:13
**saw** 128:24
**saying** 12:11 44:5 47:16,19 56:7,11 57:16 58:24 59:5,17 61:15 67:12 69:21 97:21 102:15 110:12 129:3,6 130:17 130:20

**says** 12:15,17 20:18,23 22:24 26:4 34:21 35:6 48:25 49:19 51:7 54:20 59:24 71:10,12 73:25 74:2 76:3 80:6 83:4,17 84:17,20,21,24 85:10 86:16 99:19 109:14 110:3 113:7 114:2,5,10 117:3,12,22 120:22 121:2 134:15
**scenario** 27:9 29:8 63:2 90:5 102:23
**scenarios** 27:16
**schedule** 57:7
**scheduled** 27:23
**scope** 13:15 19:20 27:10 79:23
**scratch** 28:10 32:14 36:5
**seal** 144:12
**sealing** 3:6
**second** 11:8 20:13 28:6 71:5 81:16 110:18,18 125:3,10 129:2
**section** 30:15 35:13 78:19 89:22 111:11
**sectional** 65:25
**security** 107:8 107:17,20 108:3 108:9,12,14,19 108:21 109:2 113:11,11,14
**see** 8:23 11:6 12:15 13:20 21:8 22:23 23:2 26:2 28:2,11 35:22 50:13 51:25 60:25 62:8,21 63:4,9 64:10 66:12 69:8,12 72:4 75:5,9 76:17 77:9 79:17,20 82:21,22,23 87:6 88:18 89:12 99:23 100:8,20 104:6 107:8 108:21 109:17 110:24 113:10,20,25 115:15 116:25 117:3 128:15,21 134:9,21 139:3 139:3
**seeing** 26:23 57:5,7 60:10 90:3
**seek** 42:15 97:5 121:13,20,24
**seeking** 44:13 96:22 111:6 121:6 123:22
**seem** 45:17
**seemed** 119:4
**seen** 28:24 34:14 82:3
**selected** 27:11
**send** 11:9 144:13
**senior** 6:11,15 8:7,13 28:23 35:4 115:23
**sense** 61:4 82:12
**sent** 9:20 11:10 122:13 132:11 132:14
**sentence** 16:4 28:7 29:22 41:14 79:13 80:21 109:21 115:15 119:18 121:2 123:17 124:11 134:3 135:10
**sentences** 78:19 78:22
**separate** 11:4 11:10 24:24 81:10 96:20 98:17 138:12
**september** 136:17
**septic** 41:12,16 41:18 44:17,23 45:8,16 46:4 47:8 113:2
**services** 72:19 113:11
**set** 16:16 141:21
**sets** 80:20
**settlement** 21:11,16 22:13 81:20,23,24 82:18 83:8
**several** 44:4 55:2 73:3 98:12
**shades** 101:24 104:8 105:9
**shady** 144:21
**short** 16:22 67:4 68:23 111:17
**shorthand** 1:21 141:5
**show** 21:18 31:4 34:11 35:2,13 38:11 49:12,19 50:4 51:7 65:18 92:11 131:15
**showing** 35:18 81:24
**shows** 132:7
**shrubbery** 94:20
**shrubs** 96:10 100:2
**side** 79:21
**sides** 18:16,19 19:20

**sigh** 104:21,23
**sign** 10:24 11:23 144:6
**signature** 10:23 14:19 141:23 144:2,16 146:18
**signed** 3:13,15 11:5,22 12:11 13:7 59:15 88:2 144:10,12,15
**significant** 11:9 68:9 104:14 128:19
**similar** 28:14
**simple** 32:5,6
**sir** 57:10 81:18 99:17
**situation** 24:2 26:13,21 41:25 42:20 72:14
**situations** 28:14
**sizes** 116:16
**slade** 111:9
**slade's** 38:19,25
**smoke** 14:7 27:3 27:6,7,14,18,22 29:24 30:7 31:15 33:6,9,18 34:6 36:6 39:13 39:23 40:9,15 98:13 119:23 120:17 125:12 125:15
**sod** 90:4,8
**sofa** 54:19,20 55:11,15,22 56:2 58:14 59:25 60:2,16 61:23 65:10,13 65:21,21,23 66:4 68:9 74:4
**sold** 58:15 61:23
**solely** 59:9
**somebody** 70:25 74:15 108:24 122:6 136:8
**sorry** 13:20 20:12,15 25:4 25:23 50:8 56:24 66:15 70:17 73:12 83:23 85:3 87:15 88:5 113:3 134:12
**sort** 19:13 102:25
**sought** 121:23
**southeast** 144:18
**southern** 1:4 4:12
**speak** 12:24 31:3 90:11 101:21 105:11 107:20 120:12 122:15
**speaking** 37:3 106:4
**specific** 19:5 33:21 34:22 36:10 37:4,5 56:8 74:12 75:5 75:6 94:8 95:11 105:2
**specifically** 33:24 42:9 57:24 64:15 78:6 89:14 90:21
**speculation** 133:13
**spelled** 21:25 22:2
**spoke** 127:7
**spreadsheet** 60:9
**sprott** 20:18 22:16
**ss** 141:3
**stand** 126:7
**standard** 103:9 103:23,25 109:24 110:5
**start** 28:10 36:5 78:20 87:23 106:6 110:16
**started** 92:19 94:6,22
**starting** 32:14 46:9 88:4
**starts** 110:12
**state** 1:22 4:22 13:3,9 39:12 44:19 45:16 79:21 85:23 86:2,6,22 87:2 88:24 90:16 111:13 112:18 113:2 117:7 119:25 134:3 141:3,6
**stated** 45:11 50:3 62:23 72:11 86:18 92:9 101:3 138:18
**statement** 43:15 43:19 85:6 104:19 111:2,6 121:14 124:21 131:8 145:8
**statements** 135:18,22 136:5
**states** 1:2 4:11 12:5,6 16:3,22 20:12 24:16 29:22 41:18 43:12 45:13,13 52:6 79:4,7 85:21 90:23 123:17 145:7
**stating** 118:18 121:24
**status** 128:15 137:15,17
**stay** 36:16
**stenographica...** 141:12

**step** 56:20,20 71:19
**stipulated** 3:4,8 3:12
**storage** 138:12
**straightforward** 134:19 135:15
**street** 2:16 4:15
**strike** 8:4 17:24 68:4 71:20 83:23 85:21 106:12 113:3 137:4,16
**structure** 32:13 96:19 98:3
**structures** 97:5 97:13,15 100:4
**studs** 27:13
**subject** 13:13
**submitted** 18:4 18:20,23 19:3,8 34:9 36:18,19 52:4,7,15,16 53:16 55:3 56:6 56:10,24,25 64:11 65:9 71:24 72:3 74:14 78:11 119:14 131:4
**submitting** 77:12
**subscribed** 146:19
**substance** 145:7
**substantial** 56:16 64:12
**substantiate** 53:19 55:5
**substantiation** 60:8
**suffered** 44:3
**suggesting** 67:8
**suite** 2:15
**supervisor** 7:23
**supplied** 44:18 56:9 96:15
**supply** 66:24
**support** 18:24 19:3,9 51:16 52:18 54:2,7 57:23 67:25 71:2,13 89:2
**supporting** 54:16 61:19 64:8 69:13,19 73:10
**sure** 5:25 6:3 11:8 13:14 15:11 21:19 59:22 75:22 125:4
**surprise** 41:3 44:9
**survive** 92:21 95:25,25 96:3
**swear** 5:6
**sworn** 3:13,16 5:10 119:10 126:6 141:10
146:19
**system** 89:16,19 93:5,7 94:5,7 95:3,9 96:13,18 96:23 97:9,12 97:22 98:21 100:17,23,25 107:8,18,20 108:3,9,13,15 108:19,22 109:2

**t**

**t** 20:19,19 39:17 57:11 126:2 141:2,2 142:16
**take** 4:5 5:23 9:13 18:15 24:4 29:20 45:21 47:23 75:12 77:22,23 88:6,9 89:21 99:5 139:5
**taken** 3:17 48:7 87:9 99:10 122:17 141:8,12
**talk** 12:22 19:15 43:25 101:8,12
**talking** 11:2 17:13 20:22 22:22 24:10 28:16 33:23 39:8 45:2 46:25 47:9 49:6,16 50:20 65:20 66:3 72:23 74:17 75:17,23 77:2 78:5 84:22 85:7,18 86:13 94:21 104:14 119:19 120:4 134:11,14
**talks** 15:24 27:2 41:11 113:10
**tank** 113:2
**tcc** 23:13 78:24 79:5,15 81:12 83:9 85:5 119:14 128:21
**tcc's** 80:4 81:2 113:6
**tear** 23:13 31:18 36:5
**teardown** 23:15 23:20 25:16 111:17,22
**tearing** 119:21 121:3,7,14 123:14
**tell** 14:17 42:4 61:20 77:16 90:10 97:13 131:6
**telling** 123:12 124:19
**tells** 41:25
**ten** 55:22 56:3,5 59:20,21,24 61:23 65:10,21 65:21,23 66:4 68:9 74:5

**term** 18:18 64:24 65:4 105:21
**terms** 16:6 50:12 114:3 136:14
**test** 40:15
**testified** 5:11 26:15 126:7
**testify** 18:12 36:11 38:10 112:12
**testimony** 69:16 141:11,12 145:2 145:7
**tests** 39:23
**texas** 2:7
**thank** 5:20 11:17 12:4 13:17 99:6 122:22
**theft** 100:7
**thing** 42:25 73:9 137:23
**things** 32:4,15 34:7 39:24 138:4,5,7
**think** 7:8,9 19:20 20:24 21:16 22:2 25:9 28:16,17 31:2 32:6 35:2,16 38:5,7,9,13 40:19 43:5 44:17 47:13,18 55:18 58:9 60:21 64:21 66:9,22 74:15 78:8 79:17 83:5 83:11,21,24 84:3,8,14,17 90:13 91:11,14 92:22 95:16 96:25 97:25 99:6 108:17 110:17 120:3 123:3,18 131:24 132:12 138:9,10 138:11,17 139:12
**thinking** 112:13 112:14
**thinks** 74:22,23
**third** 53:24,25 54:10,14,14 57:20 63:25 110:18
**thorpe** 57:11
**thought** 18:13 120:9,10
**thousand** 55:22 56:3,5 59:21,24 60:2,17 61:23 74:5,7 98:12
**three** 53:17 60:2 103:2
**threw** 64:23
**throw** 65:4 138:5
**thrown** 21:13
**thumb** 104:18
**thumbing** 104:15
**time** 3:10 5:23 24:25 25:22 30:11,23 32:17 47:21,23 48:2 60:11,14 61:10 67:4 68:23 70:5 76:22 86:13 93:7 102:7 106:10,11,23 114:23 119:4 120:13 122:12 140:5 144:15
**times** 44:5 53:17 58:10 63:23 89:6 105:4
**timing** 91:11
**today** 65:12 68:11,13
**told** 97:3,6 122:14 131:16 131:24
**took** 8:19 104:10 106:13 120:23 139:3
**top** 41:16
**topic** 136:2,8
**torn** 33:14 120:6
**total** 68:10 80:4 80:7,11,14 81:2 81:4 83:19 85:17 98:3
**towards** 17:20 18:5
**toxic** 39:24
**tractor** 96:9
**traffic** 89:24 90:24 101:3
**transcribed** 141:13
**transcript** 144:7 144:13,15 145:2
**transpired** 115:24,25 132:17,19
**treated** 34:2
**treatments** 101:10 102:11 102:12,15,20,25 103:6,8 104:2,3 104:8,11 114:16 114:18,24 115:3 115:16 116:3,6 116:8,13,18
**tree** 96:9
**trees** 100:2
**trial** 3:11
**triggered** 98:4
**truck** 95:23
**trucks** 90:6
**true** 12:7 14:22 115:11
**try** 47:21 93:19 128:15
**trying** 17:20 19:7 38:9 45:20

55:24 122:5
**turn** 81:15 101:6
**twice** 84:6,9,15 111:3,7
**two** 6:18 18:15 18:19 19:20 20:21,23 21:5,6 23:5,5 24:4,5,16 24:24 25:3,6,12 26:4,11,20 32:3 32:14 34:7 60:16,17 74:9 74:14 78:19,22 83:6 132:13 138:12
**type** 41:25
**types** 69:5

**u**

**u** 5:8 126:5
**ultimately** 17:2 36:4
**under** 5:22 6:20 6:24 7:3 14:21 16:3,6,8,12 17:9 17:18 19:17 23:11 28:7 31:3 36:19,20 38:25 48:12,15,24 49:13,15,20 50:4 51:8,22 56:11 59:15 85:23 91:3 92:6 92:9,14 94:9,10 96:21 97:4,5,12 97:14,23 98:11 98:15,17 99:19 101:9 110:16 111:11 112:25 113:9 115:15 117:25 123:18
**undersigned** 145:2
**understand** 5:21 8:21 12:10 13:15 17:23 22:14 27:21 28:5 30:9,13,20 30:21 31:11 41:15 44:24 46:20,23,24 48:15 52:23 61:8 75:20,22 80:8 95:4 111:19 112:17 115:7 126:12
**understanding** 16:23 48:19 60:22 126:18
**undertook** 8:25
**uninhabitable** 103:17 109:21
**unit** 4:7
**united** 1:2 4:11
**unnecessary** 119:21 120:6 124:13
**unusual** 8:10 58:11 64:9,14 64:19
**upcharge** 53:15 54:24
**update** 9:24
**upholstered** 54:19,20 55:11 55:15,22 56:2 65:23 69:6
**use** 11:11 22:8 27:5 61:5 70:23 70:25 72:16 73:4 106:14,15 116:4,5 145:9
**used** 33:20 61:3 66:4 67:6 72:10 72:13,25 90:12 106:21 114:19 114:25 116:15 130:11
**using** 18:18 61:3 76:2 130:19
**usual** 27:14 63:22 103:8,23 103:25 109:24 110:5
**usually** 62:20 102:2 105:20

**v**

**valid** 60:21 61:12
**valuation** 75:4
**valuations** 73:13 74:8
**value** 48:22 53:18 57:7,7 64:11,24 65:5 67:3 68:7,11,14 68:15,16,20 69:3,10,15 72:11
**values** 74:14 134:11,14
**vandalism** 100:6
**variety** 138:3,5
**vehicle** 100:7,11
**vehicles** 90:24 94:2,6 95:2 100:18,23 101:5
**vehicular** 89:24 90:3,24 94:19 96:8
**vendor** 54:11,14 54:15 55:14 57:16,20 61:2,5 61:22 62:3,8,16 62:18,21 63:9,9 63:25 69:20 70:2,22 74:6 75:24 76:10,23
**vendor's** 62:21 64:7,16
**vendors** 60:24 63:3,21 69:9,23 75:15 76:21
**verification** 11:21 12:5,11 13:7
**verified** 61:25
**veritext** 4:18,20 144:10,20

**veritext.com** 144:18
**versed** 7:5
**versus** 4:10 19:16 23:8 32:3 32:13 34:5 53:17
**video** 4:4,7
**videographer** 2:22 4:2,18 5:5 48:5,8 99:8,11 125:2,4,9,21 126:9 140:2
**videotaped** 1:18
**vocal** 104:21,22
**voluntary** 117:25

**w**

**waiting** 42:13 62:12
**waived** 3:7
**wall** 106:5,5
**wally** 7:16,22 12:21 13:3 122:14
**want** 11:11,14 13:12,14 15:21 19:15 29:16 30:19,20 31:2 51:3 53:6,25 64:5 70:25 74:25 78:20 81:15 88:9 104:16,25 115:25 122:16 122:22 129:16
**wanted** 53:23 54:2 70:23 118:5 128:23
**wanting** 29:20 54:13 68:24
**wants** 57:19 61:6
**warrant** 20:4
**water** 96:14 98:10
**way** 24:7 122:23 128:17 139:6
**ways** 139:13
**we've** 86:12
**weather** 5:22
**went** 71:19 74:5 115:12 136:25 138:16,17
**whereof** 141:20
**willing** 16:7 77:5
**wimbleton** 113:19 114:16
**wind** 91:8
**window** 101:10 101:24 102:11 102:12,15,20,25 103:6,7 104:2,3 104:8,10 105:8 114:16,18,24 115:3,16 116:3 116:6,8,13,18
**windows** 116:15
**witness** 5:6,9 39:9 43:8 59:2 141:10,20 142:5 144:18
**word** 90:12 113:25
**worded** 34:19
**words** 68:12 76:2
**work** 73:15 76:11 111:15,25 119:20 120:5 124:13
**worked** 18:5
**working** 17:7,20 54:6
**write** 83:18 112:14
**writing** 136:14 138:16
**wrong** 44:23
**wrote** 134:2
**wtc** 1:20 4:15

**x**

**x** 1:6,13 74:3 142:4,16

**y**

**y** 5:8 126:5
**y'all** 104:15
**yardage** 54:23
**yeah** 19:19 61:8 109:9 134:21
**year** 53:11 56:18 65:10,21 65:21 66:4 68:9 106:13 108:18 122:17
**year's** 60:14 61:10
**years** 6:9 60:16 65:23
**york** 1:20,20,22 4:16,16 141:3,4 141:7
**young** 103:2

**z**

**z** 39:17
**zlotnik** 39:17,25 40:14,20,24
**zlotnik's** 39:18

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.