## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CHARLES GOODRICH and** | } | |
| **ALEXANDRA GOODRICH ,** | } | |
| | } | |
| **Plaintiffs** | } | |
| | } | |
| **v.** | } | **Case   No.:     2:22-cv-00021-** |
| | } | **MHH** |
| **PACIFIC INDEMNITY** | } | |
| **COMPANY,** | } | |
| | } | |
| **Defendant.** | } | |
| | } | |

## MEMORANDUM OPINION

A few months after Charles and Alexandra Goodrich insured their newly constructed house under a Pacific Indemnity Company policy, a fire damaged the house and its contents.  The Goodriches and Pacific dispute the amount Pacific owes the Goodriches under the policy for the loss.  Pacific already has paid the Goodriches more than $3,000,000.  The Goodriches contend that Pacific owes more.  The Goodriches have sued Pacific for breach of contract, bad faith failure to pay an insurance claim, interference with contractual relationship, and outrage.  (Doc. 71).  The Goodriches seek summary judgment on their breach of contract and bad faith claims.  (Docs.

102, 113).[1]  Pacific asks the Court to enter judgment in its favor on the Goodriches' claims.  (Doc. 110).

To resolve the parties' cross-motions for summary judgment, this opinion opens with a statement of the legal standard that governs summary judgment motions.  Then, consistent with that standard, the Court summarizes the evidence in the record.  Finally, the Court analyzes the evidence under the substantive law that governs the parties' arguments.

## I.

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  To demonstrate a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  FED. R. CIV. P. 56(c)(1)(A).  "The

---

[1]  In their summary judgment brief, (Doc. 113, pp. 39-40), the Goodriches adopt and incorporate by reference the filings from their first motion for summary judgment, (Docs. 31, 47-1, 59-1).

court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a motion for summary judgment, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). "A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Even if a district court doubts the veracity of the evidence, the court cannot make credibility determinations; that is the work of a factfinder. *Feliciano*, 707 F.3d at 1252 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Still, conclusory statements in a declaration cannot by themselves create a genuine issue of material fact. *See Stein*, 881 F.3d at 857 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Cross-motions for summary judgment do not alter the Rule 56 standard. *United States v. Oakley*, 744 F.2d 1553, 1555-56 (11th Cir. 1984). When

considering cross-motions for summary judgment, district courts "should be very careful in their analysis to ensure that the proper party receives the benefit of the summary judgment standard." *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 959 (11th Cir.), *cert. denied*, 144 S. Ct. 103 (2023). When parties file cross-motions for summary judgment, the district court has "three options: granting summary judgment for the plaintiff under the defendant's best case, granting summary judgment for the defendant under the plaintiff's best case, or denying both motions for summary judgment and proceeding to trial." *FCOA*, 57 F.4th at 959.

## II.

Pacific issued a Masterpiece insurance policy to the Goodriches to insure their house at 3305 Dell Road, Mountain Brook, Alabama. (Doc. 101-2; Doc. 101-5, p. 26). The policy became effective June 18, 2019, covered the period between June 18, 2019 through June 18, 2020, and covered fire loss. (Doc. 101-2, p. 7, 19). The Goodriches had a covered fire loss on November 18, 2019. (Doc. 101-4, pp. 13-14; Doc. 101-5, pp. 25-26; Doc. 106-1, p. 27).

For the November 2019 fire loss, the Masterpiece policy provides up to $3,000,000 for dwelling coverage on an extended replacement cost basis.

(Doc. 101-2, pp. 18, 22).[2]  Under the policy, extended replacement cost basis is the reconstruction cost of the insureds' house.  (Doc. 101-2, pp. 18, 30).  "'Reconstruction cost' means the lesser of the amount required at the time of loss to repair, replace, or rebuild, at the same location, [the] house or any other permanent structure, using like design, and materials and workmanship of comparable kind and quality."  (Doc. 101-2, p. 30).  Insureds must inform Pacific whether they "intend to repair, replace, or rebuild the house . . . within 180 days from the date of loss."  (Doc. 101-2, p. 34).

"In addition to covering the physical loss of [the insureds'] house," the dwelling coverage in the Goodriches' policy "provide[s] other related coverages," labelled "Extra Coverages."  (Doc. 101-2, p. 32).  Extra Coverages include coverage for additional living expenses, landscaping, and debris removal.  (Doc. 101-2, pp. 34-36).  "[E]xtra living expenses," which fall under the policy's additional living expenses coverage, means the "reasonable increase in [the insured's] normal living expenses that is necessary to maintaining [the insured's] household's usual standard of living." (Doc. 101-2, pp. 33-34).  The policy covers increases in normal living expenses from the date of loss for a "reasonable amount of time to restore

_____

[2]  On December 13, 2019, the basis for payment for a loss under the Masterpiece policy changed from extended replacement cost basis to conditional replacement cost basis.  (Doc. 101-2, p. 88).

[the] house . . . to a habitable condition," or up to two years unless Pacific agrees to extend the time.  (Doc. 101-2, p 34).  Regarding landscaping, the policy provides "up to a total of 5% of the amount of coverage for the house at which the loss occurs" for damage to landscaping caused by "fire . . . and loss caused by a vehicle or aircraft."  (Doc. 101-2, p. 35).[3]  The maximum landscaping coverage under the policy is $150,000.  (Doc. 101-2, p. 35; Doc. 101-1, p. 3, ¶ 6).  Debris removal coverage covers the reasonable expenses "up to 30% of the amount of coverage" for the house "to demolish damaged covered property" caused by a covered loss and "remove debris of the covered loss including the property that caused a covered loss."  (Doc. 101-2, p. 36).

In addition to dwelling coverage, the Masterpiece policy provides up to $1,500,000 for contents coverage and states that Pacific will pay "replacement cost" for damaged contents.  (Doc. 101-2, pp. 18, 22, 45).  The policy defines "replacement cost" as the "full cost to replace the contents without deduction for depreciation, or the amount required to repair the damage, whichever is less, up to the amount of coverage."  (Doc. 101-2, p. 45).  The policy also provides for payment of actual cash value for contents that "are obsolete or unusable for the purpose for which they were originally intended because of their age or condition."  (Doc. 101-2, p. 45).

---

[3] Certain time limits apply to extra coverage for landscaping.  (Doc. 101-2, p. 35).

Following the November 2019 fire, the Goodriches submitted dwelling, contents, and landscaping proofs of loss to Pacific, (Docs. 29-4; Doc. 29-7; Doc. 29-11), and they claimed additional living expenses because they could not live in the Dell Road house during reconstruction. (Doc. 132-8). The Goodriches' policy states that after a covered loss, the Goodriches "must prepare an inventory of damaged personal property, describing the property in full." (Doc. 101-2, p. 79). The inventory "should show in detail the amount insured under this policy and actual amount of the loss." (Doc. 101-2, p. 79). The Goodriches must "[a]ttach bills, receipts, and other documents to support [the] inventory," (Doc. 101-2, p. 79), including "repair estimates[] and other similar records," (Doc. 101-2, p. 80). Pacific had the right to examine the Goodriches under oath and to ask the Goodriches "to produce all records and documents" Pacific requested. (Doc. 101-2, p. 80). Under "Special Conditions," the policy states that the Goodriches "agree not to bring legal action" against Pacific unless the Goodriches first comply with all conditions of the policy. (Doc. 101-2, p. 80).

The day of the fire, the Goodriches contacted Pacific and contracted with Brookstone Restoration to begin demolition and clean up at the Dell Road house. (Doc. 103-15; *see* Doc. 29-1, p. 2; Doc. 101-4, pp. 35-36; Doc. 106-1, pp. 165-66). Pacific's Wally Haessig assigned the Goodriches' claim

to senior general adjuster Jeremy Elliott, and Mr. Haessig supervised Mr. Elliot's work. (Doc. 105-1, pp. 8, 10-12).[4]  The day after the fire, in an email to the Goodriches, Mr. Elliot explained the claims process. (Doc.103-8, pp. 1-2).

In December 2019, a few weeks after the fire, the Goodriches met Mr. Elliot at their house to assess the loss. (Doc. 104-1, p. 28). According to Ms. Goodrich, "the big takeaway from that meeting was that we would take the interior of the house down to the studs." (Doc. 104-1, p. 28). Ms. Goodrich wanted the house taken down to the studs and completely rebuilt because the house was "brand new" when the fire occurred, and the house suffered extensive smoke and fire damage. (Doc. 104-1, p. 30).

Ms. Goodrich enlisted her father, Charles Dauphin, to work with her through the claims process. Mr. Dauphin is a lawyer. Shortly after the December 2019 meeting with Mr. Elliott, Ms. Goodrich asked Mr. Dauphin to handle the discussions with Pacific regarding the Goodriches' insurance claim. (Doc. 104-1, pp. 28-31). Over the next weeks, much of the communication between Mr. Dauphin and Mr. Elliott concerned smoke remediation. (*See* Doc. 102-14; *see also* Doc. 101-4, pp. 101-102; Doc. 104-

---

[4] After Mr. Elliot left Pacific, senior general adjuster Jerry Rudoshko took over the Goodriches' claim. (Doc. 105-1, p. 21). Michael Koos supervised Mr. Rudoshko. (Doc. 107-1, p. 7).

11).   The Goodriches hired a smoke remediation expert, Cliff Zlotnik, to "determine the protocol for [smoke] remediation." (Doc. 101-4, p. 102).   Mr. Zlotnik charged the Goodriches $20,338.41 for his services.   (Doc. 102-3, p. 3; *see also* Doc. 29-4, p. 4).   Mr. Elliot approved a fee of $15,000 for Mr. Zlotnik's services.   Pacific paid the Goodriches $15,000; Pacific did not pay the $5,338.41 balance.   (Doc. 29-4; Doc. 101-4, p. 162; Doc. 102-3, p. 3).[5]

On behalf of the Goodriches, on January 27, 2020, Brookstone's Andrew Arrant submitted to Mr. Elliott an estimate from TCC General Contractors for $38,806.50 for demolition and framing repairs at the Dell Road house.   (Doc. 102-11; Doc. 104-10).   Based on that estimate, on January 29, 2020, Pacific issued a check to the Goodriches for $38,806.50.   (Doc. 104-10, pp. 2-3).   In March 2020, Mr. Dauphin notified Mr. Elliot that TCC had discovered additional damage to the roof of the Goodriches' house.   (Doc. 103-6).   In May 2021, the Goodriches indicated in their dwelling proof of loss that TCC's fee for demolition and framing repairs was $44,780.02.   (Doc. 29-4, p. 4).   Pacific has not paid the $5,973.52 difference between the $44,780.02 TCC demolition fee in the dwelling proof of loss and the $38,806.50 fee for

---

[5] Ms. Goodrich testified she and Mr. Goodrich hired Mr. Zlotnik because they could not find a smoke remediation expert in Birmingham.   (Doc. 101-4, pp. 121-22).   Mr. Zlotnik traveled from Pennsylvania to evaluate smoke remediation for the Goodriches' house.

demolition and framing repairs that Pacific paid in January 2020 based on TCC's initial invoice.

Early in 2020, Mr. Elliot asked Ms. Goodrich to obtain a repair estimate for the house; Mr. Elliott obtained a repair estimate too. (Doc. 105-1, pp. 93-94). In February 2020, TCC estimated that the cost to repair the Dell Road house was $1,879,262.79. TCC's estimate did not include smoke remediation or Brookstone's fee for taking the house down to the studs. (Doc. 29-12, pp. 2-5; Doc. 101-4, p. 107; Doc. 101-13, p. 2). TCC's estimate included landscaping costs at "$50,000-GUESS." (Doc. 29-12, p. 2).[6]

In February 2020, Mr. Elliot obtained an estimate for repairing the Goodriches' house from Pacific's building consultant, JS Held. JS Held estimated repair expenses of $1,464,883.20. (Doc. 103-11). The estimate

---

[6] On March 18, 2021, for purposes of the Goodriches' dwelling proof of loss, TCC adjusted its repair "Insurance Estimate" to $2,009,647.43. The adjusted estimate did not include the cost for smoke remediation. (Doc. 104-8). The estimate was for "Complete New Interior Less Garage." (Doc. 104-8, p. 1).

The March 2021 estimate did not include the $50,000 lump sum entry for landscaping from the original estimate, but the March 2021 estimate included under the heading "Sitework" prep for landscaping, demolition and installation of a craborchard, and other sitework for walkways and outdoor areas around the house for a total of approximately $50,000 (not including side porch demo and fence washing). TCC did not specify this work in the Goodriches' yard in the February 2020 repair estimate, but the estimated cost of the work in the Goodriches' yard is consistent in the February 2020 repair estimate and the March 2021 insurance estimate. (Doc. 104-8, p. 1). The sitework for landscaping, demolition and installation of a craborchard, and walkways fall under the landscaping provision in the Masterpiece policy. That provision applies to, among other things, trees, shrubs, lawns, and permanent structures related to landscaping. (Doc. 101-2, p. 35).

included "cleaning, structural drying, and deodorization;" interior demolition and reconstruction (including all doors, windows, hardware, and cabinetry); exterior reconstruction; plumbing, electrical, and HVAC, and site supervision. (Doc. 103-11, p. 2).  On April 14, 2020, Pacific advanced the Goodriches $1,400,000.00 based on JS Held's repair estimate.  (Doc. 29-4, p. 4; Doc. 105-1, pp. 145-46; Doc. 106-1, pp. 107-09).[7]

In May 2020, Mr. Dauphin advised Mr. Haessig that TCC had offered to tear down and rebuild the Dell Road house for $2,254,193.50.  (Doc. 101-13, p. 2).  Mr. Dauphin added to TCC's rebuilding estimate an architect fee of $56,354.84 for a total fee of $2,310,548.34 for rebuilding the Dell Road house. (Doc. 101-13, p. 2).  Mr. Dauphin indicated that the total fee to repair the Goodriches' house was $2,261,522.66.   This sum consisted of TCC's February 2020 repair estimate of $1,879,262.79, a $46,981.57 for architectural oversight fee, a $311,939.80 smoke remediation fee from Slade LLC, the $5,338.41 balance for Mr. Zlotnik, and an $18,000 fee for repair to the septic field at the Dell Road house.  (Doc. 101-13, p. 2).[8]  Using Mr. Dauphin's numbers, the total cost to rebuild was $49,025.68 more than the

---

[7] By May 2020, JS Held had adjusted its repair estimate to $1,524,765.84.  (Doc. 102-3, p. 2; Doc. 104-14).

[8] Slade's smoke remediation bid appears at Doc. 101-11 in the summary judgment record.

total cost to repair.  Though the Masterpiece policy provided that in the event of a loss, Pacific would pay "the lesser of the amount required at the time of loss to repair, replace, or rebuild, at the same location," Mr. Dauphin offered to "settle" the Goodriches' dwelling claim for the higher $2,310,548.34 cost to rebuild.  (Doc. 101-13, p. 2).  Mr. Dauphin stated that "the house should be demolished and rebuilt" because rebuilding was "the only complete guarantee that there [would] be no smoke odor."  (Doc. 101-13, p. 2).

In a May 15, 2020 letter to Mr. Dauphin, Ms. Moss asked whether the Goodriches planned to repair the house or demolish the house and "start from scratch."  (Doc. 29-5, p. 2; Doc. 102-3, p. 2).  Ms. Moss stated that if the Goodriches demolished the house, "there [was] no reason to perform smoke remediation," that Pacific obtained "several bids for this remediation" that were "half of Slade's bid," and that "Slade's bid [did] not seem reasonable or customary for the industry in this area."  (Doc. 29-5, p. 2; Doc. 102-3, p. 2).  Ms. Moss noted the two architect oversight fees in Mr. Dauphin's May 2020 letter to Mr. Haessig, asked if the fees were duplicate, noted that Pacific would not pay both, and asked Mr. Dauphin to provide the exact fee for the architect's work.  (Doc. 102-3, p. 2).  Ms. Moss indicated that Pacific had paid $15,000 for Mr. Zlotnik's services and that the additional $5,338.41 that Mr. Zlotnik charged the Goodriches included expenses for Mr. Zlotnik's travel

from Pennsylvania. Ms. Moss stated that the Goodriches could have hired an industrial specialist locally, or at least regionally, that the $15,000 Pacific agreed to pay was "more than reasonable and customary," and that Pacific would not pay the balance. (Doc. 102-3, p. 3). Ms. Moss stated that Pacific would pay an additional $124,765.84 on the dwelling claim. (Doc. 102-3, p. 8).[9] Ms. Moss asked Mr. Dauphin to have the Goodriches provide a sworn proof of loss and submit to an examination under oath. (Doc. 102-3, p. 8).

On June 1, 2020, in response to Ms. Moss's May 15 letter, Mr. Dauphin wrote that Pacific was being nefarious. (Doc. 102-4, p. 2). Mr. Dauphin noted that the Goodriches had asked from the outset to have their house torn down and rebuilt, but, in Mr. Dauphin's view, Pacific "chose[]" to pay the cost of repair. (Doc. 102-4, p. 3). Mr. Dauphin listed materials that Pacific believed could be reused in reconstruction and stated that Pacific should pay to replace the materials to provide materials of "comparable kind and quality," given that the house was less than six months when the fire occurred. (Doc. 102-4,

---

[9] The additional amount of $124,765.84 on the dwelling claim is the difference between the $1,400,000.00 advance based on JS Held's initial repair estimate and JS Held's adjusted repair estimate of $1,524,765.84. (Doc. 102-3, p. 2). On August 8, 2023, after the Court ordered the parties to mediate, (Doc. 121), in a letter to Mr. Dauphin, Ms. Moss stated that in reviewing Pacific's files, she discovered that "Pacific inadvertently did not make the $124,765.84 payment for the dwelling referenced in the May 15, 2020 letter, or the $50,241.19 for the architect's fee." (Doc. 131-1). Ms. Moss enclosed with the letter a check for $175,007.03. (Doc. 131-1).

pp. 3-4). He stated that the Goodriches were not asking Pacific to pay the architect's fee twice, but he did not indicate which of the two fees in his May 15 letter the Goodriches believed Pacific should pay, and he did not explain the $10,000 difference between the two fees. (Doc. 102-4, p. 4). Mr. Dauphin stated that to "rebuild the house without tearing it down," the Goodriches would have to remediate smoke and mold damage. (Doc. 102-4, p. 4). Mr. Dauphin indicated that if Pacific had wanted the Goodriches to use a remediation expert other than Mr. Zlotnik, Pacific should have proposed an alternative expert. (Doc. 102-4, p. 5). Mr. Dauphin notified Ms. Moss that the Goodriches had decided to rebuild, but he pointed out that while that decision "negate[d] the need for the remediation work," the remediation expense still was part of the cost to repair "short of a tear down." (Doc. 102-4, p. 5). Mr. Dauphin posited that the only way to "permanently remediate the source of the smoke odors" was to "tear down the house," and that "if Pacific had agreed to tear down the house initially, it would be ahead of the game financially," and the Goodriches "would be only months away from moving in. (Doc. 102-4, p. 4).

In a June 26, 2020 letter to Mr. Dauphin, Ms. Moss wrote that "Pacific [would] not pay for the tear-down and rebuilding of the Goodriches' house." (Doc. 102-5, p. 5). Ms. Moss stated that the Goodriches' house could have

been repaired, "but the insureds chose[] to demolish and replace the entire house," that the Goodriches had the right to make that choice, and that the Goodriches were not entitled to "additional monies under the policy due to their voluntary decision to go over and above what [was] necessary to repair the home." (Doc. 102-5, p. 3). Ms. Moss again asked Mr. Dauphin to explain the difference between the two architect fees in his May 15 letter. (Doc. 102-5, p. 4). Ms. Moss indicated that the Goodriches conceded that smoke remediation work was not necessary given the Goodriches' decision to demolish their house and that "Pacific [was] only obligated to pay for actual repairs, not repairs that [might] have hypothetically been necessary had the insured taken a different course of action." (Doc. 102-5, p. 4). Ms. Moss concluded that "[b]ecause there [was] no actual need for [smoke] remediation work, Pacific [was] not obligated to pay for it." (Doc. 102-5, p. 4). Though Ms. Moss maintained that Pacific was not contractually obligated to offer more than its original payment for the repair of the Goodriches' house, she stated that Pacific had "revised the original JS Held estimate upwards three times in an effort to settle the claim and satisfy the Goodriches." (Doc. 102-5, p. 4). Ms. Moss stated that "Pacific's estimate already represent[ed] numbers that [were] significantly higher than the true value of the loss." (Doc.

102-5, p. 4).  Pacific offered to pay the Goodriches $1,600,000 to settle the dwelling portion of their claim.  (Doc. 102-5, pp. 4-5).

On March 19, 2021, the Goodriches submitted a dwelling proof of loss. (Doc. 29-4; Doc. 101-4, p. 143-44).  The Goodriches stated the "Net Amount Claimed" was $2,478,302.77.  The figure included TCC's "Insurance Estimate" of $2,009,647.43, an increase of slightly more than $100,000 over TCC's February 2020 estimate; $311,939.89 for smoke remediation; just over $50,000 for an architect's project administration fee; approximately $50,000 for sitework for landscaping, rebuilding a craborchard, and walkways around the house; and nearly $26,000 for a decorator's fee.  (Doc. 29-4, pp. 2, 4).[10] The Goodriches acknowledged Pacific's payments totaling $1,453,806.50 and asserted that Pacific owed a balance of $1,024,496.27 on the dwelling claim. (Doc. 29-4, p. 2).

In a May 19, 2021 letter to Mr. Dauphin, Ms. Moss stated that Pacific would not pay for smoke remediation because there was "no need to perform smoke remediation" when the Goodriches "demolished and reconstructed" the house.  (Doc. 29-6, p. 2).  Ms. Moss wrote that in a "good faith effort to

---

[10] The Goodriches did not include in their dwelling proof of loss landscape expenses other than the approximately $50,000 for sitework.  (Doc. 29-4, p. 4).  Instead, as discussed below, they submitted a separate proof of loss for landscaping expenses that exceeded the $150,000 landscaping cap by more than $11,000.  (Doc. 29-11, pp. 2, 4).

resolve" the matter, Pacific would pay to replace the mantles, doors, hardware, cabinetry, and beams although Pacific maintained they were not damaged in the fire. Pacific also agreed to pay the builder's risk insurance. (Doc. 29-6, p. 2). Ms. Moss indicated that Pacific was "willing to pay an additional $268,303.82 for these items under the dwelling coverage." (Doc. 29-6, p. 2). Though it is not entirely clear, it appears that Pacific paid that amount.[11]

Apart from their dwelling proof of loss, the Goodriches made a claim for expenses for replacing landscaping damaged in the fire and its aftermath. (Doc. 101-4, pp. 180-81; Doc. 104-1, p. 137). Ms. Goodrich testified that sod and boxwoods outside her house "were singed," that fire trucks drove through the yard, and that construction trucks "crushed portions of [the] irrigation system," "tore up sod," and "crushed plants." (Doc. 101-4, pp. 181-82). After

---

[11]  Ms. Goodrich testified in her April 2023 deposition that Pacific owed $756,192.45 on the dwelling claim. (Doc. 101-4, p. 171). During that deposition, Mr. Dauphin acknowledged that after the Goodriches submitted their dwelling proof of loss, Pacific "paid an additional two hundred and something dollars." (Doc. 101-4, p. 176). Ms. Goodrich indicated that she received the additional payment in July 2021. (Doc. 101-4, p. 177). The difference between $1,024,496.27 and $268,303.82 produces the $756,192.45 to which Ms. Goodrich testified.

It is difficult to determine from the record the exact amounts that Pacific has paid the Goodriches. Pacific attached to its summary judgment reply brief a "Statement of Loss Summary Sheet," (Doc. 135-1, p. 2), but the Goodriches have moved to strike the document, (Doc. 137). Because the parties will have to identify at trial the payments that the Goodriches have received, at the conclusion of this opinion, the Court will order the parties to submit within three days evidence of all payments offered and accepted and offered and refused. The Court has not reviewed Pacific's "Statement of Loss Summary Sheet" for purposes of this opinion, so the Goodriches' motion to strike is moot.

the fire, the Goodriches could not operate their irrigation system, so they could not water their plants for months. (Doc. 104-1, p. 137). Ms. Goodrich had Blackjack Horticulture transplant some of the plants that were "still alive," but it was "not going well." (Doc. 104-1, pp. 137-38).

As noted, TCC included in its February 2020 estimate landscaping costs at "$50,000" but indicated that the amount was a guess. (Doc. 29-12, p. 2). In his May 2020 settlement letter to Mr. Haessig, Mr. Dauphin stated that in the initial construction of their house, the Goodriches paid Page Duke Landscape Architects and Ben Page $55,473.48 for plans and oversight and paid $215,174 for the installation of the lighting, irrigation system, and plants. (Doc. 101-13, p. 3). Mr. Dauphin wrote that the lighting and irrigation systems were inoperable and needed to be replaced and that the Goodriches might attempt to salvage "the more expensive plants" by transplanting them, but doing so would be expensive and would involve "installing a temporary irrigation system." (Doc. 101-13, p. 4). Mr. Dauphin estimated that the "cost to repair and replace these landscaping necessities exceed[ed] the policy limit of $150,000.00." (Doc. 101-13, p. 4).

In her May 15, 2020 letter to Mr. Dauphin, Ms. Moss responded that the Goodriches' "landscaping costs were included in the TCC estimate" as $50,000.00 and that the request for $150,000.00 for landscaping costs

"appear[ed] to be a duplicate charge and [would] not be paid." (Doc. 102-3, p. 5). In his June 1, 2020 letter to Ms. Moss, Mr. Dauphin responded that TCC's cost for landscaping was an estimate and that the landscaping costs were "expected to exceed $150,000.00." (Doc. 102-4, p. 5). In his June 1, 2020 letter, Mr. Dauphin did not offer to reduce TCC's repair estimate by $50,000, and he did not offer to apply a credit for the $50,000 included in TCC's February 2020 repair estimate to the Goodriches' landscaping claim.

Landscape architect Brittany Dingler obtained a bid from Greg Shaw at Southern Scape to repair the Goodriches' landscaping. (Doc. 104-2, pp. 10-11). Southern Scape's December 2020 estimate was $161,351.00 to replace the irrigation system and the damaged landscaping. (Doc. 29-11, pp. 4-5; *see* Doc. 101-4, pp. 185-86). On March 19, 2021, the Goodriches submitted a landscaping proof of loss for the maximum coverage amount of $150,000.00 and attached Southern Scape's estimate. (Doc. 29-11). In the March 19, 2021 landscaping proof of loss, the Goodriches stated: "The Gross Amount Claimed of said property at the time of loss was: $2,478,302.77. The cost of landscaping necessitated by the fire loss was not included in that amount. This Proof of Loss is for the landscaping claim." (Doc. 29-11, p. 2).

In her May 19, 2021 letter to Mr. Dauphin, with respect to landscaping Ms. Moss stated:

As we said in the May 15, 2020 letter, the insureds' landscaping costs were included in the TCC estimate, so this appear[ed] to be duplicate charge. Moreover, it [was] unclear how the fire damaged the landscaping to the extent claimed. Please advise as to the meaning of "disturbed areas." Please also advise as to the need for adjustment of irrigation and/or an irrigation allowance. Irrigation [was] located underground, and as such should not have been affected by the loss.

Finally, it [was] unclear from the Southern Scape estimate what property [was] being landscaped. [Could] you please confirm what property need[ed] the landscaping work?

Doc. 29-6, p. 4).[12]

In his July 26, 2021 letter to Ms. Moss, Mr. Dauphin responded:

Regarding damage to the landscape, Pacific representatives [] ha[d] unfettered access to Del[l] Road as the Goodriches ha[d] asked only to be given notice when a site visit was going to be made. Any such visit would have revealed the extensive damage to the landscape if anyone had bothered to look. A good deal of burn damage to the vegetation close to the house ha[d] been visible from the day of [t]he fire. A significant amount of loss was caused by vehicles that were on the property as a result of the fire. The workers regularly drove their vehicles through the yard and parked wherever a spot could be found. The irrigation system[] located underground and along the driveway was a total loss. All plants around the house [would] have to be re-planted. All of the sod [would] have to be replaced.

While the fire directly killed some of the plants, which [was] damage that should be covered under the Dwelling Cover[a]ge of the policy, the Goodriches have not taken the time to parse out which damage was caused by the fire itself and which damage

---

[12] As discussed, for purposes of its March 2021 "Insurance Estimate," TCC adjusted the information about landscaping by deleting the $50,000 lump sum landscaping estimate and inserting under the heading "Sitework" projects in the Goodriches' yard which totaled approximately $50,000, not including a porch demolition and fence washing. (Doc. 104-8, p. 1).

was caused by fire trucks, Brookstone Restoration trucks, dumpsters, or lack of irrigation.

(Doc. 29-14, pp. 2-3).[13]    The Goodriches' claim for landscaping is outstanding.[14]

For the Goodriches' contents claim, Pacific retained Enservio, a third-party vendor specializing in the adjustment of contents claims.  (Doc. 101-1, p. 6; Doc. 104-4, pp. 5, 8).  On January 14, 2020, based on Enservio's initial contents inventory and valuations, Pacific paid the Goodriches $204,463.30.  (Doc. 101-1, p. 6).  Ms. Goodrich believed that Enservio "greatly undervalued the replacement costs of many of the items."  (Doc. 102-10, p. 1).  Mr. Elliot asked Ms. Goodrich to "provide documented support regarding any content items [she] believe[d] [had] been valued incorrectly" and indicated that "Enservio could make changes as necessary once [Pacific] receive[d] support for any disputed item."  (Doc. 102-10, p. 1).

In his May 4, 2020 letter to Ms. Moss, Mr. Dauphin stated that he attached to the letter a spreadsheet from Ms. Goodrich's decorator who

---

[13] Mr. Dauphin did not provide a reference to the Masterpiece policy to support his contention that damage to plants caused by the fire at the Dell Road house should be covered under "Dwelling Cover[a]ge" rather than landscaping coverage.

[14] In a November 2020 letter to Mr. Dauphin that concerned mainly contents and living expenses, Pacific indicated that it was willing to pay $1,948.98 for "Landscape."  (Doc. 29-10, p. 5).

estimated a total of $1,225,307.66 in replacement costs for damaged and destroyed contents. (Doc. 101-13, p. 3).[15] In her May 15, 2020 letter to Mr. Dauphin, Ms. Moss asked the Goodriches to provide backup documentation for the contents described in the spreadsheet. (Doc. 102-3, p. 4). On September 11, 2020, the Goodriches submitted a contents proof of loss in which they asserted that their personal property losses exceeded the $1.5 million contents maximum by $76,501.91. (Doc. 29-7, pp. 3, 10).[16]

By November 2020, Pacific had paid a total of $298,642.16 under contents coverage. (Doc. 29-10, p. 1). In a November 6, 2020 letter to Mr. Dauphin concerning contents and additional living expense coverages, Ms. Moss wrote that Pacific was "unable to accept or reject the Proof of Loss and/or Amended Proof of Loss because it [was] inconsistent with the documentation that [had] been submitted in the report." (Doc. 29-10, p. 5). Ms. Moss stated:

> The insureds' Amended Sworn Statement in Proof of Loss with respect to contents states that "the Gross Amount claimed for lost contents is $1,576,501.91, which includes the amount that has

---

[15]  The Court cannot find in the record the original contents spreadsheet. There is a spreadsheet that contains a total contents loss amount of $1,336,273.30. (Doc. 29-7).

[16]  In a cover letter attached to the September 2020 proof of loss, Mr. Dauphin indicated that in a July 13, 2020 email that he sent to Ms. Moss, he included "a dropbox file which contained the Goodrichs' contents claim, supporting documents, and a roadmap for reviewing the documents." (Doc. 29-7. P. 1). Mr. Dauphin wrote that the Goodriches submitted their first contents proof of loss on July 20, 2020. (Doc. 29-7, p. 2). The Court has not found these materials in the record.

already been paid under the Contents coverage." Pacific has made payments totaling $298,642.16 on contents (either directly to the Goodriches or to vendors). The coverage for contents is $1,500,000, yet the Goodriches are requesting that they be paid $1,507,500. I'm not sure how [the Goodriches] reached this amount, but regardless, [Pacific does] not feel the Goodriches have met their obligations under the Policy.

(Doc. 29-10, p. 1). Ms. Moss explained that "[i]n an effort to work with the Goodriches, Pacific would pay "an additional $764,733.76" in contents coverage, consisting of $721,677.72 for replacement items, $38,825 for Magali Somers Maus, and $4,231.04 for televisions. (Doc. 29-10, p. 2). With the $298,642.16 Pacific already had paid for contents coverage, Pacific committed to a total payment of $1,063,375.92 in contents coverage.

Finally, because the Goodriches' house was uninhabitable after the fire, they rented houses in Mountain Brook, Alabama while they awaited the reconstruction of their house on Dell Road. (Doc. 101-4, pp. 40-41). Initially, the Goodriches signed a six-month lease and paid $3,500.00 per month in rent for a house on Fairway Drive. (Doc. 101-4, p. 43). Before they moved into the rental house, Ms. Goodrich had the floors cleaned and sanitized and had TCC paint the interior of the house. (Doc. 101-4, p. 45). Ms. Goodrich made other investments in the Fairway Drive rental house including $5,918.90 for curtains and window treatments. (Doc. 101-4, pp. 46-47).

In a January 20, 2020 email to Mr. Elliot, Ms. Goodrich wrote that Mr. Elliot had told her shortly after the fire that there were "no parameters" regarding the "purchase of furniture and household items" for the rental home. (Doc. 103-4). Ms. Goodrich wrote that she had asked Mr. Elliot "specifically about purchasing items from Restoration Hardware—which included rugs and lighting—and received a reimbursement check with the description "'extra living expenses.'" (Doc. 103-4). Ms. Goodrich indicated that she had "submitted more invoices for household furnishes such as rugs, lighting, window treatments (for privacy), and a washer and dryer" not as replacement content items but as additional living expenses. (Doc. 103-4). Ms. Goodrich asked Mr. Elliot to "provide the parameters [she] need[ed] to follow in purchasing items for temporary use" in the rental house. (Doc. 103-4).

In Mr. Elliot's email response on January 21, 2020, he wrote that Ms. Goodrich could "purchase temporary furniture items (living room, dining room, bedroom furniture)" because Ms. Goodrich indicated that were no suitable rental items available and that Pacific would salvage the furniture "at the end of the rental period." (Doc. 103-10). Mr. Elliot indicated that Ms. Goodrich's "recent submission included installation of light fixtures, painting of the rental unit, furniture items, television purchase and installation, window treatments[,] and content replacement such as [] bedding, sheets, and towels."

(Doc. 103-10). Mr. Elliot explained that the "$14,100 paint work and three other charges to install lighting at the rental home" were not reasonable and would not be covered under the policy. (Doc. 103-10). Mr. Elliot wrote that Pacific typically paid the "reasonable cost of window blinds if the rental unit [did] not have any" and asked that Ms. Goodrich confirm whether the rental house had "window treatments or blinds installed." (Doc. 103-10).

Ms. Goodrich testified that she and her family moved out of the Fairway Drive house in January 2020 because "[t]here were a lot of problems that made it basically unlivable for [them]." (Doc. 101-4, pp. 49-50, 56). Ms. Goodrich testified that the Fairway Drive house had mold, and the electrical wiring was not up to code. The back door did not lock. (Doc. 104-1, p. 36). Ms. Goodrich stated that the house was "dirty and smelled bad" even though she cleaned and painted it. (Doc. 101-4, p. 52).

One month earlier, through an LLC, Mr. Dauphin had bought a house on Wimbleton Drive in Mountain Brook "so that [the Goodriches] could move out of the Fairway Drive" house. (Doc. 101-4, pp. 57-58).[17] In January 2020, the Goodriches entered a 12-month lease for the Wimbleton Drive house and paid $4,500.00 per month in rent to Mr. Dauphin's LLC. (Doc. 101-4, pp. 59-

---

[17] Ms. Goodrich testified that the members of the LLC that purchased the Wimbleton Drive house were her dad; her dad's wife, Diane Paris; and her brother, Chuck Dauphin. (Doc. 101-4, p. 58).

60; Doc. 111-1). The Goodriches entered another lease for the Wimbleton Drive house for January 2021 through January 2022. The Goodriches agreed to pay Mr. Dauphin's LLC $5,500.00 per month under the 2021 lease. (Doc. 101-4, p. 75).

Ms. Goodrich painted the Wimbleton Drive house to make it "feel like home" with "familiar colors." (Doc. 104-1, pp. 41, 60). Ms. Goodrich had carpet installed on the stairs and lower level of the Wimbleton Drive house. (Doc. 101-4, p. 66). Ms. Goodrich had TCC install recessed lights to provide additional light in the living room and bedrooms. (Doc. 101-4, p. 73). TCC also renovated a bathroom and completed several upgrades at the Wimbleton Drive house and invoiced the Goodriches more than $50,000 for the work. (Doc. 29-12, pp. 6-10). Ms. Goodrich transferred the window treatments from the Fairway Drive house to the Wimbleton Drive house, (Doc. 101-4, pp. 69-70), and she hired HD Innovations to install televisions and meet the cable provider "to set up internet and cable and hook everything up," (Doc. 101-4, p. 75). Ms. Goodrich bought custom blackout shades for the bathroom and bedroom windows and custom rugs for the Wimbleton Drive rental house that "would not fit the rooms at Dell Road." (Doc. 104-1, pp. 130-32).

The Goodriches moved out of the Wimbleton Drive house at the end of January 2022, and Mr. Dauphin's LLC sold the house in the summer of 2022.

(Doc. 101-4, pp. 75, 77).  Ms. Goodrich testified that Ms. Moss told her to "do away with the ALE stuff," so Ms. Goodrich donated the window treatments when they moved out of the Wimbleton Drive house.  (Doc. 101-4, pp. 71-72).

In her May 15, 2020 letter to Mr. Dauphin, Ms. Moss wrote that the $5,918.90 expense for window treatments and hardware purchased for the Fairway Drive rental, a $4,820.04 HD Innovations invoice for removal and installation of televisions, and the $14,100 expense for painting the interior of the Fairway Drive rental were not "'reasonable increase[s] in [the Goodriches] normal living expenses that [were] necessary to maintain [their] household's usual standard of living'" and were "not payable."  (Doc. 102-3, p. 6).  Ms. Moss stated that the Goodriches' claim for $2,747.80 for installation of a security system; for $1,630 for installation of lights; and for $20,394.20 for blackout shades, window hardware, and installation fees at the Wimbleton Drive rental house were not "extra living expense[s] per the terms of the policy" because these items were "fixture[s] that [would] stay with the house." (Doc. 102-3, pp. 6-7).

In a May 18, 2020 email, Mr. Dauphin requested payment of another $100,969.90 for additional living expenses.  (Doc. 102-5, p. 1).[18]  In her June

---

[18]  The Court cannot locate Mr. Dauphin's May 18, 2020 email in the summary judgment

26, 2020 letter to Mr. Dauphin, Ms. Moss responded that the TCC invoice for $12,700 for interior painting for the Wimbleton Drive rental house was "not an extra living expense per the terms of the policy" and that the $4,773.50 and $8,010.20 expenses to alter, deliver, and install window treatments and the $9,130.00 expense for the installation of carpet and rug pads at the Wimbleton Drive house were not "'reasonable increase[s] in [the Goodriches] normal living expenses that [were] necessary to maintain [their] household's usual standard of living" but were fixtures that would stay with the house. (Doc. 102-5, pp. 2-3). Ms. Moss indicated that if the Goodriches wanted to have the Wimbleton Drive house repainted, they should have asked Mr. Dauphin, their landlord, to pay to have the house repainted. (Doc. 102-5, p. 2).

In the June 26 letter, Ms. Moss also responded to a June 9, 2020 email in which the Goodriches requested reimbursement for furniture they bought for the Wimbleton Road house. (Doc. 102-5, pp. 5-6).[19] The Goodriches sought $5,764.00 for a sofa and $5,608.00 for a chair. (Doc. 102-5, p. 6). Ms. Moss indicated that the policy covered "normal living expenses, not luxury furniture to remodel rental homes" and that the "average cost of a sofa [was]

_____

record. Ms. Moss's correspondence indicates that Pacific received the message.

[19] The Court cannot locate Mr. Dauphin's June 9, 2020 email in the summary judgment record.

approximately $1,500, and the average cost of a club chair [was] below $1,000." (Doc. 102-5, p. 6). Ms. Moss asked the Goodriches to advise if the sofa and chair would "replace furniture damaged as a result of the [fire] loss." (Doc. 102-5, p. 6). Ms. Moss explained that "extra living expenses coverage" under the policy did not cover "regular living expenses that the Goodriches would have paid on a normal, everyday basis." (Doc. 102-5, p. 5). Therefore, to be eligible for payment, a living expense had to exceed the amount the Goodriches would pay for a service at their Dell Road house. (Doc. 102-5, p. 5).

In her May 19, 2021 letter to Mr. Dauphin, Ms. Moss noted the Goodriches "testified that it took about a year and a half to build the house on Dell Road originally," so that 18 months would be a "'reasonable amount of time" for TCC to return "the house or other permanent structure to the condition it was in prior to the covered loss if [the Goodriches] newly construct[ed] [their] house.'" (Doc. 29-6, p. 4; *see* Doc. 101-4, p. 22). Ms. Moss wrote that the fire occurred on November 18, 2019, so "it would reasonably be expected that the house would be reconstructed no later than June 2021." (Doc. 29-6, p. 4). Ms. Moss indicated that Pacific would "pay extra living expenses through June 30, 2021." (Doc. 29-6, p. 4). As of May 2021, Pacific had paid the Goodriches' rental expenses through December 31,

2020, and Pacific agreed to pay another $27,000 in rent, reflecting a monthly rent amount of $4,500.00 for six months, not the increased monthly rent of $5,500.00. (Doc. 102-8, p. 4. Ms. Moss indicated that Pacific would pay $28,314.50 for the Goodriches' storage expenses and would pay utility and lawncare expenses for the Wimbleton Drive house. (Doc. 1-2-8, pp. 4-6).

In an October 4, 2021 letter to Ms. Moss, Mr. Dauphin notified Pacific that the Goodriches had authorized him to file this lawsuit. (Doc. 103-9).

### III.

### *Breach of Contract*

The Goodriches allege that Pacific breached the terms of their insurance policy by failing to pay the full reconstruction cost for their house and by failing to pay certain additional living expenses, landscaping expenses, and contents expenses. (Doc. 72, pp. 17-20, 27-28). The Goodriches and Pacific have moved for summary judgment on the Goodriches' contract claims. (Doc. 110, pp. 8-9, 21-32; Doc. 113, pp. 37-49).

To prevail on a breach of contract claim under Alabama law, plaintiffs must show the existence of a valid contract, their performance under the contract, the defendant's nonperformance, and damages resulting from the defendant's nonperformance. *Southern Med. Health Systems, Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995) (citing M*cGinney v. Jackson,* 575 So. 2d 1070,

1071-72 (Ala. 1991)).[20]  Alabama law implies a duty of good faith and fair

dealing in every contract.  *Shoney's LLC v. MAC East, LLC*, 27 So. 3d 1216,

1220, n. 5 (Ala. 2009).  Thus, when performing a contract, "neither party shall

do anything which will have the effect of destroying or injuring the rights of

the other party to receive the fruits of the contract."  *Shoney's*, 27 So. 2d at

1220, n. 5 (quoting *Sellers v. Head*, 73 So. 2d 747, 751 (1954)).

Under Alabama law, "[g]eneral rules of contract law govern an

insurance contract."  *Safeway Ins. Co. of Ala. v. Herrera*, 912 So. 2d 1140,

1143 (Ala. 2005).  Courts must enforce the express terms in an insurance

policy "if the terms are unambiguous."  *Safeway*, 912 So. 2d at 1143.

Language in a contract is unambiguous "when it leads to only one reasonable

interpretation." *Lafayette Land Acquisitions II, LLC v. Walls*, 385 So. 3d 519,

522 (Ala. 2023).  When a party contends that a term in a policy is ambiguous,

a court must ask "what a reasonably prudent person applying for insurance

would have understood the term to mean."  *Safeway*, 912 So. 2d at 1144

(internal quotations omitted).  "This means that the terms of an insurance

policy should be given a rational and practical construction."  *Porterfield v.

Audubon Indem. Co.*, 856 So. 2d 789, 799 (Ala. 2002).  Courts must construe

---

[20] The parties acknowledge that under Alabama choice of law principles, Alabama law
governs the state-law claims in this matter.

insurance policies "liberally in favor of the insured and strictly against the insurer," *Allstate Ins. Co. v. Skelton*, 675 So. 2d 377, 379-380 (Ala. 1996), and must resolve "doubt or uncertainty" as to the meaning of a contract term against the insurer that drafted the policy. *Upton v. Miss. Valley Title Ins. Co.*, 469 So. 2d 548, 555 (Ala. 1985) (internal quotation omitted).

*Count One – Failure to Pay Reconstruction Cost*

In their second amended complaint, the Goodriches assert that Pacific breached their insurance policy "by failing to pay for the full 'reconstruction cost' of the Goodrich house." (Doc. 71, p. 17, para. 69). The Goodriches allege:

> In its policy, Pacific promised to pay to the Goodriches the "reconstruction cost" of their house, which is defined as the lesser of the amount required "at the time of loss" to repair, replace or rebuild at the same location, using "like design, and materials and workmanship of comparable kind and quality."

(Doc. 71, p. 17, para. 68) (underline in second amended complaint). The Goodriches seek additional sums for reconstruction of the Dell Road house and damages for mental anguish that the Goodriches allege they have suffered. (Doc. 71, p. 17).[21]

---

[21] As of May 2022, Pacific contends that it had paid the Goodriches $1,732,910.32 on their dwelling claim. (Doc. 101-1, p. 9, ¶ 37a). Pacific has paid additional amounts under dwelling coverage since May 2022.

In their briefing, the Goodriches acknowledge that to determine the "lesser amount required at the time of loss," an insurer should compare estimates for repairing or rebuilding (or replacing) a damaged house to determine which amount is the lesser (or least). This is a rational and practical construction of the policy, *Porterfield*, 856 So. 2d at 799; it would be impossible to compare the actual cost to repair or rebuild because a homeowner can complete only one or the other.[22] Moreover, over time, actual costs may exceed the "amount required at the time of loss" to repair or rebuild a house. *Haman v. Chubb Custom Ins. Co.*, Case No. 2:18-cv-1534 (N.D. Ala. 2021, Doc. 207, pp. 30-31). Consequently, to determine whether Pacific was obligated under the Goodriches' policy to pay them the amount required to repair their house or the amount required to rebuild their house, the Court must compare the estimates the parties obtained shortly after the fire to repair the house and to rebuild it.

Initially, the Goodriches obtained only a repair estimate, and they began repair work on their house. The Goodriches first submitted to Pacific an estimate from TCC General Contractors for $38,806.50 for demolition and framing repairs, (Doc. 102-11; Doc. 104-10), and within days, Pacific issued

---

[22] Here, the Goodriches submitted their cost to repair proof of loss in March 2021, approximately eight months after TCC demolished the Dell Road house and began rebuilding it. (Doc. 29-4; Doc. 101-4, p. 133).

a check to the Goodriches for $38,806.50, (Doc. 104-10, pp. 2-3). In February 2020, TCC estimated that the cost to repair the Dell Road house was $1,879,262.79. The estimate did not include smoke remediation, demolition of the interior of the house, or an architectural oversight fee; the estimate included $50,000 for landscaping. (Doc. 29-12, pp. 2-5; Doc. 101-13, p. 2).

In May 2020, the Goodriches advised Pacific that TCC estimated that the cost to rebuild was $2,310,548.34, a sum that included an architectural oversight fee of $56,354.84. (Doc. 101-13, p. 2). As of May 2020, the Goodriches estimated the total fee to repair their house was $2,261,522.66. This sum consisted of TCC's February 2020 repair estimate of $1,879,262.79, a $46,981.57 architectural oversight fee, Slade LLC's $311,939.80 fee for smoke remediation, Mr. Zlotnik's $5,973.52 balance for smoke remediation services, and $18,000 for septic field repairs. (Doc. 101-13, p. 2). Using the Goodriches' numbers, the cost to rebuild was $49,025.68 more than the total cost to repair. Backing out the $50,000 for landscaping which does not fall under house repair coverage and adding the $15,000 that Pacific already had paid toward Mr. Zlotnik's fee, (Doc. 102-3, p. 3), the cost to rebuild may have been closer to $85,000 more than the cost to repair.[23] Either way, under the

---

[23] Though TCC's February 2020 repair estimate of $1,879,262.79 includes amounts for demolition and framing, neither party contends that the demolition and framing included in TCC's February 2020 repair estimate duplicates the amount Pacific initially paid for

Goodriches' policy, Pacific was contractually obligated to pay the cost to repair rather than the cost to rebuild because the cost to repair was the "lesser amount required at the time of loss."[24]

The main point of contention between the parties with respect to repair costs concerns the fee for smoke remediation. Other than the $15,000 it initially paid for Mr. Zlotnik's smoke remediation services, Pacific has consistently asserted that in demanding payment for smoke remediation, the Goodriches "seek a double recovery" because they seek costs for repair and for rebuilding, and smoke remediation was "not required" after the Goodriches demolished their house. (Doc. 110-1, p. 22).[25]

The record supports Pacific's assertion that the Goodriches asked Pacific to pay both costs to repair and costs to rebuild their house. As noted, in January 2020, Pacific paid the Goodriches $38,806.50 based on TCC's estimate for initial demolition and framing repairs at the Dell Road house. (Doc. 102-11; Doc. 104-10). In May 2020, through Mr. Dauphin, the

_____

demolition and framing.

[24] Pacific admitted in its answer to the second amended complaint that TCC's estimate for the cost to repair the Dell Road house was less than TCC's estimate of the cost to rebuild the house. (Doc. 72, p. 16, ¶ 44).

[25] Under the Goodriches' policy, they had until May 18, 2020 to indicate to Pacific whether they would repair or rebuild their house. (Doc. 101-2, p. 34). The Goodriches provided notice of their intent to rebuild on June 1, 2020. (Doc. 102-4, p. 5).

Goodriches indicated to Pacific that the company should pay to demolish the entire house and rebuild it and offered to settle the reconstruction claim for the cost of rebuilding the house. (Doc. 102-2, p. 1). Through Mr. Dauphin, the Goodriches argued that if Pacific had agreed soon after the fire to demolish and rebuild the house, the cost to rebuild would have been lower than the cost to repair. (Doc. 102-4, p. 4).[26] Mr. Dauphin provided in his May 2020 letter expenses for rebuilding and for repairing the Goodriches' house. When Ms. Moss asked Mr. Dauphin to clarify which expenses he sought, he did not respond. Confusion ensued, and the parties veered into conversations inconsistent with the contractual limits on Pacific's payment obligations to the Goodriches.

Nevertheless, because the estimate for the total cost to repair was less than the estimate for total cost to rebuild, absent a finding that the Goodriches breached the duties of good faith and fair dealing implied under Alabama law in their Pacific insurance policy, the Goodriches are entitled to recover the full cost to repair at the time of loss.[27] Smoke remediation costs are an element of

---

[26] Ms. Goodrich acknowledges that in her early meetings with Mr. Elliott, she indicated that Pacific should pay to demolish the house and rebuild it. (Doc. 111-3, p. 2).

[27] In evaluating the Goodriches' claim for coverage for the expense of smoke remediation, jurors may consider the Goodriches' obligation of good faith and fair dealing and determine whether, if the Goodriches were requesting payment for rebuilding costs and repair costs, those requests breached the duty of good faith and impacted the Goodriches' claim for benefits for smoke remediation expenses. Jurors may consider whether the Goodriches

the cost to repair because the Goodriches were "reasonably likely" to incur smoke remediation costs if they repaired their house. *See Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1306 (11th Cir. 2008) (the question regarding what constituted a "cost to repair" included "whether it is reasonably likely that the policy holder would incur these costs in making the repairs").

The parties dispute the Goodriches' claim of $311,939.80 for smoke remediation costs and have submitted conflicting evidence regarding the extent of the work required for smoke remediation. A jury must resolve the parties' dispute regarding the amount Pacific owes the Goodriches for the projected cost of smoke remediation if jurors decide that the Goodriches may recover for breach of contract relating to smoke remediation.[28]

---

acted in good faith when they included in their repair estimates $50,000 in landscaping expenses to supplement the $150,000 landscaping limit that the Goodriches expected to exceed, given the $215,174 they paid for the installation of the lighting, irrigation, and plants when they built the Dell Road house. (Doc. 101-13, p. 3).

[28] The Goodriches argue that Pacific breached the insurance policy when it delayed payment of the $124,765.84 difference between Pacific's $1,400,000.00 advance based on JS Held's initial repair estimate and JS Held's adjusted repair estimate of $1,524,765.84. (Doc. 113, p. 43). The Goodriches also argue that Pacific breached the insurance contract when it refused to pay $50,241.19 for the architect's fee because Pacific said it was a "duplicative cost." (Doc. 113, p. 45). When the Goodriches filed their motion for summary judgment, Pacific had not paid these sums, but the Goodriches' summary judgment motion led Pacific to discover that it "inadvertently did not make the $124,765.84 payment for the dwelling referenced in the May 15, 2020 letter, or the $50,241.19 for the architect's fee," (Doc. 131-1; Doc. 136, p. 3). Pacific has paid the Goodriches $175,007.03 as dwelling coverage for these items. (Doc. 131-1). The Goodriches cannot recover these amounts under their breach of contract claim.

The Goodriches also argue that Pacific must pay the $5,973.70 difference between TCC's first framing repair estimate and TCC's final framing repair invoice. (Doc. 113, pp. 25-26, 44-45). The Goodriches argue that TCC increased its estimate for framing repair because TCC discovered additional damage to the Goodriches' roof. (Doc. 113, p. 26). The Court has not located evidence in TCC's estimates and invoices to support this contention.

In their March 19, 2021 dwelling proof of loss, the Goodriches listed TCC's final demolition cost as $44,780.02. (Doc. 29-4, p. 4). There are two TCC invoices that post-date TCC's March 2020 communication about additional roof damage, one from April 23, 2020 and one from May 8, 2020. (Doc. 104-10, pp. 4-9). The invoices contain few details about the demolition and framing work that TCC and its subcontractor performed before TCC completely demolished the first and second floors of the Dell Road house. The May 2020 invoice contains additional fees and profit that account for the $5,973.70 the Goodriches added in their March 2021 proof of loss, but there is little in the invoice that would allow Pacific to confirm that the additional $5,973.70 relates to additional fire damage in the roof. (Doc. 104-10, pp. 7-9). There is a reference to a subcontractor's April 24 invoice for "framing burnt wood," but that fee appeared in the April 2020 invoice, and TCC's April

2020 invoice was below the nearly $39,000 Pacific paid the Goodriches in January 2020. (Doc. 104-10, pp. 6, 9). Some of the highlighted additional charges in the May 2020 invoice concern grading performed between March 31 and April 2 and porch framing for which a subcontractor invoiced TCC on April 15, 2020. (Doc. 104-10, p. 9). A jury will have to review the evidence relating to the demolition/framing that TCC performed between December 2019 and April 2020 and determine the amount, if any, the Goodriches may recover for the demolition and framing component of the cost to repair.[29]

Finally, the Goodriches seek reimbursement for $13,141.83 for HD Innovations' fee to "pre-wire and reinstall the televisions, speakers, [and] support brackets throughout the[ir] house." (Doc. 113, p. 28). On their proof of loss, the Goodriches listed the $13,141.83 HD Innovations fee, but the Court cannot find in the evidentiary record an estimate or invoice from HD Innovations to support the claim, and the Goodriches did not include this amount in the cost to repair estimates that they provided to Pacific in February 2020 and in May 2020.[30] In response to the Goodriches' dwelling proof of

[29] The Court cannot tell from the summary judgment record whether the April 2020 and May 2020 invoices from TCC were provided to Pacific with the Goodriches' March 2021 dwelling proof of loss or whether those documents were produced in discovery for the first time.

[30] It appears that the $13,141.83 amount in the dwelling proof of claim was part of a larger estimate from HD Innovations. (Doc. 29-4, p. 4) ("$13,141.83 . . . Audio/Visual Estimate (Dwelling Expenses Highlighted)").

loss, Pacific stated that the expense for installing televisions, speakers, and support brackets was "not a dwelling expense." (Doc. 102-8, p. 2). The Goodriches implicitly recognized as much by not including the expense in their 2020 cost to repair estimates, and the Goodriches have not provided evidence that would establish that the installation of televisions and supporting brackets was part of the expense to reconstruct their house. Therefore, the Goodriches cannot recover the HD Innovations fee as an element of reconstruction costs. The Court will consider the expense under the contents coverage under the policy.[31]

### Count Two – Failure to Pay Additional Living Expenses

The Goodriches acknowledge that Pacific paid many of their additional living expenses, but they contend that Pacific breached their policy when it refused to pay certain expenses and stopped paying ALEs altogether in June 2021. In addition to the $178,099.09 that Pacific paid the Goodriches for ALEs through May 2022, the Goodriches seek payment for window treatments, rugs, interior painting, furniture, lighting fixtures, a security

---

[31] When the Goodriches prepared and submitted their cost to repair estimates, they were using HD Innovations to install televisions and other equipment in their two rental houses. (Doc. 132-8). The Goodriches could have obtained an estimate from HD Innovations to include in the cost to repair estimate if they believed that the installation of televisions was a dwelling expense. As with landscaping costs, the evidence indicates that the Goodriches exceeded the cap on contents coverage, so they tried to recover some of their contents expenses under dwelling coverage.

system, and moving costs for the houses they rented while their house was being rebuilt, and they seek reimbursement for rent payments that they made after June 2021. (Doc. 101-1, p. 9, ¶ 37d; Doc. 113, pp. 30-36). Pacific asserts that many of the disputed items are not reasonable and necessary additional living expenses but instead are fixtures for the house that Mr. Dauphin bought for the Goodriches to rent and from which he benefitted financially. (Doc. 110-1, pp. 25-28).

As discussed, under the Goodriches' policy, because they could not live in their house after the fire, Pacific had to pay as "extra living expenses" the "reasonable increase in [the Goodriches'] normal living expenses that [was] necessary to maintaining [the Goodriches'] household's usual standard of living." (Doc. 101-2, pp. 33-34). Questions about reasonableness frequently are fact questions for a jury. *Simpson v. Wolf Ridge Corp.*, 486 So. 2d 418, 420 (Ala. 1986) ("[R]easonableness is normally a fact question for the jury . . . ."). But certain categories of expenses may not qualify as extra living expenses under the terms of the policy.

Costs related to interior house painting and the installation of light fixtures are not "normal living expenses." As Ms. Moss explained in her May 2020 letter to Mr. Dauphin, to qualify for payment as an ALE, the expense incurred must exceed normal living expenses and must not be an expense that

someone else ordinarily would pay. (Doc. 102-3, p. 5; *see also* Doc. 102-5, p. 1). For example, because the Goodriches had to continue to submit mortgage payments for the Dell Road house while the house was being rebuilt, rent for the house that they leased was an increase in the Goodriches' normal living expenses, such that reasonable monthly rental payments were reimbursable as ALEs. The Goodriches' monthly utility expenses were somewhat different. Because the water was turned off at their Dell Road property and because Pacific only was obligated to pay a reasonable increase in a normal living expense, for Pacific to have to contribute to payment of the Goodriches' water bill at their rental house, the Goodriches would have to demonstrate that the water bill at the rental house exceeded their average water bills at the Dell Road house, and Pacific would have to pay only the difference between the Goodriches' average water bill at the Dell Road house and a higher bill at the rental house. (*See*, *e.g.*, Doc. 102-5, p. 1). Under the policy, each normal living expense must be evaluated to determine whether the Goodriches incurred an increase in the normal – routine – expense because of the fire. House painting and lighting upgrades to a rental house are home improvements, not normal living expenses like rent and utilities. Therefore, as a matter of law, Pacific does not have to reimburse the Goodriches for

interior painting at the Fairway Drive and Wimbleton Drive rental houses or for the installation of lighting at the Wimbleton Drive house.[32]

As for window treatments, Ms. Goodrich bought curtains and window treatments for $5,918.90 from Restoration Hardware and had them installed at the Fairway Drive rental house. (Doc. 101-4, pp. 46-47). Ms. Goodrich testified that the window treatments were far below the Goodriches' standard of living and would not replace the ones for the Dell Road house. (Doc. 104-1, pp. 101-03). Pacific typically paid the reasonable cost of window blinds if a rental unit did not have blinds, but Mr. Rudoshko testified that Pacific did not pay for new curtains for a rental house as an additional living expense.

---

[32] Ms. Goodrich testified that she always painted houses when she moved into them in colors that would give her children some comfort, but she admitted that there was nothing "wrong with the paint" at the Wimbleton rental house before she repainted the walls. (Doc. 101-4, p. 61; Doc. 104-1, pp. 34, 40, 61, 105).

Under the ALE provision, if there were no property available for rent that allowed insureds to maintain their "usual standard of living," then the insureds might seek reimbursement for the expense of painting a less suitable house if a landlord refused to cover the expense. Here, accepting Ms. Goodrich's testimony that she had to rent in Mountain Brook to allow her children to stay in public school there and her testimony that there were no rental houses available in Mountain Brook in December 2019 other than the Fairway Drive house, (Doc. 104-1, pp. 40-41), had she and her family stayed in the Fairway Drive house, the Goodriches may have been able to recover the cost of repainting the Fairway Drive house. But the record demonstrates that in December 2019 when the Goodriches moved into the Fairway Drive rental house, (Doc. 101-4, p. 38), Mr. Dauphin's LLC bought the Wimbleton Drive house so that the Goodriches could move there, (Doc. 101-4, p. 58). The Goodriches repainted the Wimbleton Drive house and moved into it in January 2020. (Doc. 101-4, pp. 49, 56, 60-61). Pacific is obligated to pay only for reasonable increases in living expenses. The expense of repainting the Fairway Drive rental house for a temporary stay of 30 days or less is not reasonable. Therefore, Pacific is not responsible for that expense.

(Doc. 103-10; Doc. 107-1, pp. 101-102).  Mr. Elliot asked Ms. Goodrich whether the first rental house had window treatments or blinds.  (Doc. 103-10).  The Court cannot find evidence in the record that the Goodriches responded.  Because the Goodriches did not provide information that Pacific requested to evaluate the reasonableness of the expense for curtains for the rental house, the Goodriches did not meet a contractual prerequisite for payment of the curtain expense.  (Doc. 101-2, p. 80); *Baldwin Mut. Ins. Co. v. Adair*, 181 So. 3d 1033, 1045 (Ala. 2014).[33]

Ms. Goodrich bought custom blackout shades for the bedrooms and master bath in the Wimbleton Drive rental home.  Ms. Goodrich testified at her EUO that she had put blackout shades in her houses since 2010.  (Doc. 104-1, pp. 130-31).  These shades appear to be in addition to window treatments like blinds and curtains.[34]  Pacific did not pay for blackout shades at Wimbleton Drive rental home; Pacific did not believe those expenses were reasonable additional living expenses because the shades were fixtures that would stay with the rental house.  (Doc. 102-3, pp. 6-7; Doc. 102-5, pp. 2-3).  A jury must decide whether custom black out shades for a rental home were

---

[33] For additional discussion of this proposition of Alabama law, please see p. 50 below.

[34] "[B]lackout blinds are window coverings specifically designed to block out all light.  They are typically made from densely woven fabrics that prevent light from passing through them."  https://www.southwestexteriors.com/blog/understanding-blackout-blinds-benefits-and-when-you-need-them (last visited October 24, 2024).

a reasonable additional living expense that the Goodriches needed to maintain their usual standard of living.

With respect to area rugs for the Wimbleton Drive rental house, Mr. Elliot testified that if Ms. Goodrich normally decorated with rugs, she could buy a rug as an additional living expense for the rental house. (Doc. 105-1, p. 216). In her May 15, 2020 letter to Mr. Dauphin, Ms. Moss asked the Goodriches to advise whether the rugs purchased for the Wimbleton Drive rental house were replacement rugs for the Dell Road house. (Doc. 102-3, p. 7). In her August 2020 examination under oath, Ms. Goodrich testified that she bought custom rugs for the Wimbleton Drive rental house that she could not use at Dell Road house because the rugs would not fit the rooms at the Dell Road house. (Doc. 104-1, pp. 130-32). A jury must decide whether custom rugs for a rental home were a reasonable additional normal living expense that the Goodriches needed to maintain their usual standard of living.

Turning to furniture for the second rental house, Pacific paid for furniture from Restoration Hardware for the Goodriches' first rental house as an additional living expense because Ms. Goodrich indicated that was no suitable rental furniture available. (Doc. 103-10). The Goodriches moved the Restoration Hardware furniture to the second rental house, and the Goodriches added for the second rental house a $5,764.00 sofa and a $5,608.00, and asked

Pacific to pay for both as additional living expenses. (Doc. 102-5, p. 6). Pacific refused because Pacific believed the price for the sofa and the chair did not represent "reasonable cost for temporary furniture." (Doc. 106-1, p. 197). A jury must decide whether a $5,700 sofa and $5,600 chair for a short-term rental house were reasonable and necessary additional normal living expenses to enable the Goodriches to maintain their standard of living.

With respect to a security system at the Wimbleton Drive rental house, the Goodriches contend that Pacific should pay to install at the second rental house a security system like the system at their Dell Road house. (Doc. 113, p. 48). Ms. Goodrich testified in her August 2020 EUO that the upgrade to the ADT security system installed at the Wimbleton Drive house was wireless, and the sensors could be removed from the rental house. Ms. Goodrich acknowledged that she did not plan to move the new sensors from the Wimbleton Drive house to the Dell Road house. (Doc. 104-1, pp. 114-15). In Pacific's view, the security system upgrade at the Wimbleton Drive house did not qualify as additional living expenses because the security system was a fixture that would stay with the rental house, inuring to the benefit of the Goodriches' landlord. Pacific does not ordinarily pay for expenses typically incurred by a landlord. (Doc. 29-6, p. 6; Doc. 107-1, p. 80).

A security system is like recessed lighting; though parts of the system theoretically can be removed and used elsewhere - like furniture - a security system is a fixture for which a landlord is responsible and a home improvement from which a landlord benefits. A home security system installed in a rental house is not a reasonable normal living expense incurred by a family renting on a short-term basis. Though a reasonable increase in monthly monitoring fees for a security system at a rental house likely would be reimbursable as an ALE, fees for system upgrades installed in a rental house are not a normal living expense of insureds that qualify as a reimbursable ALE.

With respect to the $1,000.00 per month rent increase that Mr. Dauphin's LLC charged for the Wimbleton Drive house from January 2021 through June 2021, Pacific argues that the Goodriches did not explain the rent increase and did not discuss the increase with Mr. Dauphin, (Doc. 120, p. 11; *see* Doc. 108-1, pp. 74-75), but Pacific stated in its motion for summary judgment that the company "agreed to pay this increased rental expense through June 30, 2021. . . ." (Doc. 110-1, p. 16). Therefore, the parties' summary judgment arguments on this $6,000 expense are moot.

With respect to the total number of rent payments that Pacific was obligated to reimburse, under the Goodriches' policy, Pacific had to cover rent

for a "reasonable amount of time to restore [the] house . . . to a habitable condition," or up to two years unless Pacific agreed to extend the time. (Doc. 101-2, p 34). Ms. Goodrich testified that it took about a year and a half to build the house on Dell Road. (Doc. 101-4, p. 22). Because the fire occurred on November 18, 2019, consistent with the original 18-month period for construction, Pacific agreed to "pay extra living expenses through June 30, 2021." (Doc. 29-6, p. 4). In May 2020, six months after the November 2019 fire, the Goodriches decided to forego repairs and to rebuild their house on Dell Road. (Doc. 102-4, p. 4). Ms. Goodrich stated in her deposition that it took she and Mr. Goodrich awhile to reach a decision because they had not experienced a house fire before. (Doc. 101-4, p. 134). She stated in her EUO that Pacific's delayed communication regarding smoke remediation contributed to the decision she and Mr. Goodrich made to rebuild rather than repair. (Doc. 104-1, pp. 53-54).[35] During at least part of this six-month period, TCC was renovating the Wimbleton Drive house. (Doc. 29-12, pp. 6-10; Doc. 101-4, pp. 59-64). TCC demolished the Dell Road house in July

---

[35] Ms. Goodrich testified that Pacific had "kind of gone silent with regards to the plans for remediation," and the house was "rotting with mold" because it had "sat damp for six, seven months." (Doc. 108-1, p. 112). Ms. Goodrich stated that the cost to repair and the cost to rebuild were "very close," and she felt "more comfortable tearing the house down and making sure there was no lingering smoke odor . . . ." (Doc. 108-1, p. 112). Mr. Elliot testified that the Goodriches and Pacific "were just at an impasse regarding odor removal" and that the Goodriches "decided to bulldoze the house." (Doc. 105-1, p. 25).

2020 and estimated that reconstruction would be complete between August and November 2021. (Doc. 101-4, p. 133; Doc. 104-1, pp. 45, 88). TCC actually completed construction in January 2022. (Doc. 101-4, p. 133). Ms. Goodrich stated in her EUO that COVID affected TCC's ability to obtain materials and find workers. (Doc. 104-1, pp. 88-89). Mr. Haessig testified that a reasonable amount of time to reconstruct the house should include a "planning stage before the construction actually begins" and that COVID should be a factor in determining the time needed to reconstruct the house. (Doc. 106-1, pp. 193-94).

Viewing the evidence in the light most favorable to the Goodriches, jurors could find that Pacific had to factor into the reasonable amount of time to restore the Dell Road house delays caused by planning and by COVID. On the other hand, viewing the evidence in the light most favorable to Pacific, jurors could conclude that the additional six-month period beyond the 18 months for which Pacific paid ALEs was not a consequence of COVID but of the Goodriches' delay in committing to rebuild rather than repair and the Goodriches using their contractor to renovate the house that Mr. Dauphin's LLC owned before rebuilding the Dell Road house. Therefore, neither party is entitled to summary judgment on ALEs, including rent payments, from July 2021 through January 2022.

*Count Three – Failure to Pay Landscaping Expenses*

The Goodriches contend that Pacific should have paid them $150,000.00 for landscaping expenses. (Doc. 113, p. 23). Pacific argues that it is not obligated to pay these expenses because the Goodriches did not comply with their post-loss duties under the policy with respect to landscaping. (Doc. 110-1, pp. 29-32). Under Alabama law, "an insured must comply with his or her post-loss obligations" because "meeting those obligations is a precondition to any duty on the part of the insurer to make a loss payment." *Baldwin Mut. Ins. Co. v. Adair*, 181 So. 3d 1033, 1045 (Ala. 2014). In Alabama, an "insurer's obligation to pay . . . does not arise until the insured has complied with the terms of the contract with respect to submitting claims." *Nationwide Ins. Co. v. Nilsen*, 745 So. 2d 264, 267 (Ala. 1998) (citing *United Ins. Co. of Am. v. Cope*, 630 So. 2d 407, 411 (Ala. 1993)). The Goodriches' policy required them to include with their sworn proof of loss all information and documentation Pacific requested. (Doc. 101-2, p. 80).

In her August 2020 EUO, Ms. Goodrich expressed confidence that the expense for restoring landscaping would exceed the $50,000 included in TCC's repair estimate. (Doc. 104-1, p. 137; *see* Doc. 29-12, p. 2). She stated that after the fire, she could not water the plants at the Dell Road house because the irrigation system was in pieces in her yard, damaged by trucks

that drove over the yard after the fire.  Ms. Goodrich did not think that many of the plants in her yard could be salvaged.  (Doc. 104-1, p. 137).  As of the August 2020 EUO, the Goodriches had not obtained a specific estimate from a landscaping company for replacing landscaping or irrigation.  (Doc. 104-1, p. 137).[36]

The Goodriches attached to their March 2021 landscaping proof of loss Southern Scape's estimate of $161,351.00 to return the landscaping at the Dell Road house to its pre-fire condition, using a design plan from April 2019. (Doc. 29-11).  Mr. Rudoshko testified that photos of the exterior of the Dell Road house taken shortly after the fire showed minimal damage to landscape. (Doc. 107-1, p. 91).  Ms. Goodrich acknowledged in her deposition that,

---

[36] In early 2020, landscape architect Brittany Dingler with Paige Duke Landscape Architects met with Ms. Goodrich at the Dell Road house to assess the landscaping damage. (Doc. 104-2, pp. 6-8, 17). Ms. Dingler testified that construction had begun when she visited the site and that she did not see the landscaping damage "right after the fire in its exact state." (Doc. 104-2, p. 16). Ms. Dingler photographed the site, but she did not give those photographs to the Goodriches. (Doc. 104-2, pp. 14, 16). Ms. Dingler testified in her 2023 deposition that she would check to see if she could obtain copies of the photographs. (Doc. 104-2, p. 16). Ms. Dingler testified that after assessing the landscaping damage, she recommended that the Goodriches "plant everything new and start over." (Doc. 104-2, p. 9). Ms. Dingler indicated that she based her recommendation on the "fire itself," "the ash that covered the plants," and the condition of the soil "from the fire and construction." (Doc. 104-2, pp. 9-10). Ms. Dingler explained that the ash could "clog pores on plants" and "you [would not] see the stress until months or a year later." (Doc. 104-2, p. 9). She also testified that the best treatment for plants covered in ash was watering, but watering was not possible because of the construction and because the contractor had turned off the irrigation system. (Doc. 104-2, pp. 9-10, 13). The Court has not found evidence that the Goodriches provided this information to Pacific when Pacific requested additional information regarding the 2021 landscaping proof of loss.

during the claims process, Pacific asked what landscaping Southern Scape's estimate "was intended to replace." (Doc. 108-1, pp. 192-93). Mr. Rudoshko indicated that Southern Scape's estimate did not provide information regarding the extent of the landscaping damage or the location of allegedly damaged plants or shrubs and that the estimate did not include photographs or evidentiary support for the claimed landscaping damages. (Doc. 101-1, p. 6).[37] Mr. Haessig testified that Southern Scape's estimate did not identify the extent of damage to landscaping after the fire. (Doc. 106-1, p. 136). Pacific asked the Goodriches to provide additional information regarding their landscaping claim. (Doc. 29-6, p. 4; Doc. 101-4, pp. 194, 196). The Goodriches did not provide backup for the Southern Scape estimate that they submitted with their proof of claim because they selected a different landscape design and used a different company to implement the new design plan. (Doc. 101-4, pp. 196-97).

On this record, a jury will have to determine whether the information Ms. Goodrich provided in her August 2020 EUO was sufficient to meet the Goodriches' obligation to provide "all information and documentation that [Pacific] request[ed]" regarding the landscaping proof of loss, "such as the

---

[37] Ms. Dingler testified that Mr. Dauphin and Ms. Goodrich first asked her for photographs in 2023. (Doc. 104-2, pp. 1, 14-15).

cause of loss." (Doc. 101-2, p. 80). In assessing this aspect of the Goodriches' claim, jurors may consider the additional landscaping expenses that the Goodriches submitted with their dwelling proof of loss.

### Count Four – Breach of Contract - Contents

As of May 2022, Pacific had paid the Goodriches $1,091,489.81 under the contents coverage in their policy. (Doc. 101-1, p. 9, ¶ 37c). The Goodriches argue that Pacific breached the insurance contract because Pacific paid the original costs rather than replacement costs for some items in the Goodriches' contents proof of loss. (Doc. 113, p. 16). Pacific contends that the Goodriches did not comply with their post-loss duties under the policy because the Goodriches did not provide requested documentation to substantiate replacement costs. (Doc. 110-1, p. 16-19).

The Goodriches' policy required them to submit an inventory of damaged personal property that detailed the "actual amount of the loss," and they had to attach bills, receipts, and other documents to support the inventory. (Doc. 101-2, p. 79). The Goodriches also had to submit to Pacific a "signed, sworn proof of loss providing all information and documentation [Pacific] request[ed] such as the cause of loss, inventories, receipts, repair estimates, and other similar records." (Doc. 101-2, p. 80).

The Goodriches submitted to Pacific an amended contents proof of loss to which they attached a spreadsheet that Ms. Goodrich prepared. The spreadsheet indicates that the replacement costs of the Goodriches' damaged and destroyed personal property including taxes and shipping totaled $1,336,273.00. (Doc. 29-7, p. 9). In the spreadsheet, Ms. Goodrich identified the original and replacement costs for personal items damaged or lost in the fire. (Doc. 29-7; Doc. 101-4, p. 229; Doc. 104-1, p. 141). The Goodriches' decorator, Iris Thorpe, the owner of Iris & Co., helped Ms. Goodrich prepare the inventory. (Doc. 104-1, p. 142). Ms. Goodrich provided Pacific invoices from Ms. Thorpe and "additional backup documentation" regarding the original purchase price for many items, but the spreadsheet did not include the replacement cost source from which Mr. Thorpe would purchase an item. (Doc. 101-4, p. 241; Doc. 104-1, pp. 160-61; *see* Doc. 103-12). Ms. Thorpe explained in an undated letter how she arrived at the replacement costs, but the letter did not include supporting documents for the replacement costs. (Doc. 103-12, p. 55; Doc. 106-1, p. 59).[38]  Because Pacific had questions

---

[38] In her deposition, Ms. Goodrich testified that Ms. Thorpe purchased items from different stores and resold them as a decorator after adding her markup and costs for delivery and taxes. (Doc. 101-4, pp. 243-44). In her undated letter regarding replacement costs, Ms. Thorpe explained that:

> to determine the cost to replace damaged items, [she] contacted the vendors to get current pricing and shipping. For the items that [were] discontinued, [she] determined replacement cost based on the most similar item. Antiques

regarding large differences between the original cost of some items and the replacement cost, (Doc. 107-1, p. 60), Pacific asked Ms. Goodrich in her EUO to "provide backup documentation with respect to the original cost and replacement cost" for items on the spreadsheet, including documentation for fabric, upholstering, and labor costs, (Doc. 104-1, pp. 187, 190-91).[39]

Ms. Goodrich did not ask Ms. Thorpe to provide the sources for the replacement items but submitted to Pacific pictures of many of the replacement items. (Doc. 101-4, pp. 289-90). Ms. Goodrich provided to Pacific an affidavit from Ms. Thorpe in which Ms. Thorpe confirmed that the replacement costs in the spreadsheet were the amounts Ms. Thorpe would charge Ms. Goodrich for the replacement items. (Doc. 29-9; Doc. 101-4, p. 242).

---

[were] much more difficult to replace. For those, [she] referred to 1st Dibs and Chairish, both considered by designers to be industry standards. Many items were crafted by local artisans, with whom [she] consulted to determine replacement cost. It [was Ms. Thorpe's] opinion that it should take approximately 650 hours to replace all of the items, as they were carefully curated and cherished over 12 years and seven homes.

(Doc. 103-12, p. 55).

[39] Ms. Goodrich testified that the original costs of the damaged or destroyed personal property totaled $650,400.66; with tax the original costs of the items totaled $715,440.73. (Doc. 101-4, pp. 237, 270-71). Thus, the Goodriches' reported replacement costs exceeded original costs by more than $600,000. Ms. Goodrich stated in her EUO that some of the pieces of furniture on the inventory did not have an original cost because the Goodriches inherited the furniture. (Doc. 104-1, p. 187). Ms. Goodrich testified in her deposition that as of April 2023, Pacific owed $471,091.47 under the contents coverage of the policy. (Doc. 101-4, p. 225).

On this record, a jury will have to determine whether the information Ms. Thorpe provided regarding replacement costs was sufficient to substantiate the Goodriches' claim for replacement costs for the items for which Pacific paid only original costs because of lack of supporting documentation.    In evaluating the evidence, jurors may consider Mr. Rudoshko's assertion in his affidavit that Ms. Thorpe's affidavit was "woefully deficient insofar as it provide[d] none of the backup documentation required by Pacific regarding alleged replacement costs for the items listed on Iris &Co.'s estimates." (Doc. 101-1, p. 9).  Mr. Rudoshko stated that Pacific had "repeatedly requested supporting documentation in the form of receipts, invoices from vendors, or even simply details regarding the specific items to be replaced or the identity of the vendors from whom [the Goodriches] intended to purchase the items listed" in the spreadsheet.  (Doc. 101-1, p. 8). According to Mr. Rudoshko, the Goodriches did not provide the requested documentation.  (Doc. 101-1, p. 9).  Jurors also may consider Mr. Elliott's testimony that Pacific typically did not receive affidavits from vendors and that Ms. Thorpe's affidavit was "more documentation than [Pacific] normally [received] on a contents claim."  (Doc. 105-1, p. 38).  Mr. Elliot also testified

it was reasonable for Pacific to ask for the vendor's cost-plus markup to establish the replacement cost.  (Doc. 105-1, pp. 43-44).[40]

### *Bad Faith*[41]

Under Alabama law, bad faith claims take two forms:  bad faith failure to investigate and bad faith failure to pay.  *State Farm Fire & Cas. Co. v. Brechbill*, 144 So. 3d 248, 257 (Ala. 2013); *White v. State Farm Fire & Cas., Co.*, 953 So. 2d 340, 347–48 (Ala. 2006).  "Alabama courts often refer to refusal-to-pay claims as 'normal' bad-faith claims and to failure-to-investigate claims as 'abnormal' bad-faith claims."  *Walker v. Life Ins. Co. of N. Am.*, 59 F.4th 1176, 1186 (11th Cir. 2023) (citing *Brechbill*, 144 So. 3d at 256–58).  For either type of bad faith claim, a plaintiff must prove:

> (a) an insurance contract between the parties and a breach thereof by the defendant;

> (b) an intentional refusal to pay the insured's claim;

> (c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason); [and]

> (d) the insurer's actual knowledge of the absence of any legitimate or arguable reason.

---

[40] If, during the claims process, the Goodriches submitted to Pacific as part of their contents claim the HD Innovations invoice concerning television installation, then they pursue payment of the remaining balance of that invoice under their contents claim.

[41] On pages 20-27 in the first of two Count Fours in their second amended complaint, the Goodriches assert a bad faith claim regarding their dwelling proof of loss.  In Count Five, the Goodriches assert a bad faith claim regarding their contents proof of loss.  (Doc. 71, pp. 20-27, 29-31).

*Brechbill*, 144 So. 3d at 257 (quoting *National Security Fire & Casualty Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982)).  For a failure to investigate claim, a plaintiff also must prove:

> the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.  In short, plaintiff must go beyond a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for dispute.  Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim.

*Brechbill*, 144 So. 3d at 257.  "To be clear, '[r]egardless of whether the claim is a bad-faith refusal to pay or a bad-faith refusal to investigate, the tort of bad faith requires proof of the third element,'" namely "'absence of a legitimate reason for denial.'"  *Walker*, 59 F.4th at 1187 (quoting *Brechbill*, 144 So. 3d at 258).

To avoid summary judgment on a bad faith refusal to pay claim, a plaintiff's "underlying contract claim must be so strong that the plaintiff would be entitled to a preverdict judgment as a matter of law."  *Jones v. Alfa Mut. Ins. Co.*, 1 So. 3d 23, 32 (Ala. 2008) (quoting *Shelter Mut. Ins. Co. v. Barton*, 822 So. 2d 1149, 1155 (Ala. 2001)).  For a bad faith failure to investigate claim, the "material question" is whether the insurer "recklessly or intentionally failed to properly investigate" the insured's "claim or to subject

58

the results of an investigation to a cognitive evaluation." *Simmons v. Congress Life Ins. Co.*, 791 So. 2d 371, 379 (Ala. 2000).

Both failure to pay and failure investigate bad faith claims require "sufficient evidence of 'dishonest purpose' or 'breach of known duty' . . . through some motive of self-interest or ill will." *Singleton v. State Farm Fire & Cas. Co.*, 928 So. 2d 280, 283 (Ala. 2005) (quoting *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 318 (Ala. 1999)); *Brechbill*, 144 So. 3d 259 (finding that bad faith "imports a dishonest purpose"). Negligent conduct will not support a bad faith claim under Alabama law. *Gulf Atlantic Life Ins. Co. v. Barnes*, 405 So. 916, 924 (Ala. 1981) ("Bad faith, then, is not simply bad judgment or negligence.").

Here, the record contains evidence of poor communication, confusion, mistakes, and mutual distrust, but the record does not contain evidence of Pacific's dishonest purpose in investigating or resolving the Goodriches' claims. Although the Court followed the Goodriches' lead in separating their claims for purposes of evaluating their breach of contract claims, the circumstances surrounding the Goodriches' claims cannot be divorced from one another when considering the Goodriches' bad faith claims. Woven together, the facts concerning the various claims undermine the Goodriches'

bad faith claims.  The Court offers a few examples of distrust, confusion, and mistakes by way of illustration.

Distrust developed early in the parties' dealings with one another.  The November 2019 fire at the Goodriches' newly-constructed house was a devastating loss, and the Goodriches understandably preferred to rebuild rather than repair their house.  Within a few weeks of the fire, in December 2019, Ms. Goodrich enlisted her father, Mr. Dauphin, to handle the Goodriches' discussions with Pacific regarding the various coverages under the Goodriches' policy.  (Doc. 104-1, pp. 28-31).  Mr. Dauphin wore his attorney hat as he represented the Goodriches.

When Mr. Dauphin began acting as the Goodriches' attorney, he also effectively became the Goodriches' landlord.  In December 2019, through an LLC, Mr. Dauphin, his wife, and his son bought a house for the Goodriches to rent.  Within a month of moving into their first rental house on Fairway Drive, the Goodriches moved into the house Mr. Dauphin owned through the LLC.  On December 30, 2019, the Goodriches asked Pacific for a payment of just over $14,000 to repaint the Fairway Drive rental house.  (Doc. 101-4, p. 443).  Two weeks later, the Goodriches asked Pacific for a payment of $58,500 for lease payments through January 14, 2021 for the Wimbleton Drive rental house owned by Mr. Dauphin and his family.  (Doc. 101-4, p.

443).[42]  Over the next several months, the Goodriches asked Pacific for payments for painting and light installation at the Wimbleton Drive rental house that Mr. Dauphin's LLC owned.  (Doc. 103-4; Doc. 101-4, p. 444).

Mr. Dauphin's dual role as landlord and attorney was a source of concern for Pacific.  On May 15, 2020, within a month of the Goodriches asking Pacific to pay to repaint the Wimbleton Drive rental house, on behalf of Pacific, Ms. Moss wrote:

> I want to make sure I understand your relationship with the insureds and involvement in this claim. It is my understanding that you are the father of the insured, Alexandra Goodrich, and you are also representing Alexandra and Charles Goodrich as their attorney. Additionally, I understand that you bought the Wimbleton home, so you are currently the owner of the rental home that your daughter and her family are living in, and you are seeking rental payments and also seeking to be paid for upgrades to the home. Given the timing, it appears that you bought [the Wimbleton rental home] specifically for your daughter and her family to live in. I am concerned there could be an inherent conflict of interest with your involvement as the "landlord" of the home, and in particular, your request that Pacific pay for improvements to be made on the fixtures of the home.

(Doc. 102-3, p. 1).  Mr. Dauphin refused to consider Pacific's concern, responding that Pacific "insinuated that the Goodrichs, through their claims for additional living expenses, were improperly seeking to recover for

---

[42] In March 2020, two months into the lease for the Wimbleton Drive house, Pacific paid $37,000 towards the Goodriches' 12-month lease, prepaying several months of rent.  (Doc. 101-4, pp. 443, 447).

improvements to the Wimbleton rental for [his] benefit, and insisted [that he] had a conflict of interest in representing the Goodrichs." (Doc. 102-4, p. 2). Mr. Dauphin added that the Goodriches wanted "to focus on their expenses which are covered by the policy and not what Pacific ha[d] paid or what Pacific believe[d] [was] a conflict of interest between [him] and the Goodrichs." (Doc. 102-4, p. 2).

Ms. Moss's question regarding a potential conflict of interest was reasonable. Ms. Moss's question reflects legitimate concern about Mr. Dauphin's ability to advocate for payments from which he would benefit; the question is not evidence of bad faith as Mr. Dauphin's response suggests. It is evidence of growing distrust between the parties.

Poor, confusing communication also began early on. For example, based on Mr. Elliott's walkthrough of Dell Road house with Ms. Goodrich in December 2019 and based on Ms. Goodrich's request that the Dell Road house be taken down to the studs, on January 27, 2020, Brookstone, on behalf of the Goodriches, submitted to Pacific TCC's bid for just under $39,000 to demolish the house to the studs and replace the second-floor framing. (Doc. 102-11, p. 1; Doc. 103-1, p. 2; Doc. 104-10, p. 1). Pacific issued a check for the demolition and second-floor framing two days later. (Doc. 104-10, pp. 2-3). In December 2019, Mr. Elliott estimated that the demo would take one

month, and repair would take close to one year.  (Doc. 103-5).  TCC began

demo in December 2019 but did not complete demo and reframing until April

2020.  (Doc. 104-10, pp. 4-6).[43]  In March 2020, TCC notified Mr. Dauphin

and Ms. Goodrich that TCC had found more burn damage that would require

"removing a little more roofing so [TCC could] replace the rafter/decking."

(Doc. 103-6, p. 2).  Through April 23, 2020, several weeks after TCC

identified the extra work, TCC invoiced the Goodriches for $35,962.53 for

"Total cost to date on your home," an amount below the nearly $39,000 that

Pacific advanced to the Goodriches for that work.  (Doc. 104-10, pp. 4-6).  In

May 2020, TCC invoiced the Goodriches for another nearly $9,000.  (Doc.

104-10, pp. 7-9).  Neither the April 2020 invoice nor the May 2020 invoice

describes in any detail the work that TCC and its framing subcontractor

performed, and it is not clear whether the additional roof work was captured

in the April invoice, the May invoice, or some other invoice.

   Pacific mistakenly thought the Goodriches were double-dipping, asking

the company to pay $39,000 in January 2020 for TCC's demolition and

framing work and to pay another $45,000 per the March 2021 proof of loss.

---

[43] TCC was renovating the Wimbleton Drive house while the company was working on demolition at the Dell Road house.  (Doc. 29-12, pp. 6-10).

(Doc. 29-6, pp. 1-2).  The documents relating to this dispute shed light on Pacific's confusion.

| Amount | Notes |
|---|---|
| $44,780.02 | TCC - Demo |
| $20,338.41 | Cliff Zlotnik - Professional Services |
| $311,939.89 | Slade LLC - Remediation Bid |
| $2,009,647.43 | TCC - Reconstruction Estimate |
| $50,241.19 | Henry Sprott Long & Associates Architects - Project Administration Fee |
| $25,800.00 | Iris & Co. - Professional Services for Reconstruction |
| $13,141.83 | HD Innovations - Audio/Video Estimate (Dwelling Expenses Highlighted) |
| $2,414.00 | ADT - Quote to Replace Security System |
| $2,478,302.77 | TOTAL |
| | |
| -$38,806.50 | LESS Check #4708941 dated 01/29/2020 |
| -$15,000.00 | LESS Check #4773672 dated 03/02/2020 |
| -$1,400,000.00 | LESS Check #4853904 dated 04/13/2020 |
| | |
| $1,024,496.27 | **Remaining balance due** |

(Doc. 29-4, p. 4).  As this chart illustrates, the Goodriches labeled their request for a $45,000 payment "TCC – Demo."  (Doc. 29-4, p. 4).  The Goodriches did not label the $39,000 payment toward the bottom of the page "TCC – Demo," and they did not indicate that Pacific should subtract the $39,000 payment from the $45,000 assessment.  Mr. Dauphin easily could have addressed and resolved the confusion in his letters to Ms. Moss by explaining that the Goodriches sought only the difference between the $39,000 payment in January 2020 and the $45,000 loss amount in May 2021, and he could have provided information to explain the difference, but he remained silent, leaving

Ms. Moss with the impression that the Goodriches were seeking an extra-contractual double payment.

The parties' communication about an architectural oversight fee followed suit. In the May 2020 letter in which Mr. Dauphin argued that Pacific should pay to rebuild the Goodriches' house rather than pay to repair the house, Mr. Dauphin presented two fees for architectural oversight that were roughly $10,000 apart. (Doc. 102-2, p. 1). In her May 2020 response, Ms. Moss stated that she was "[u]nclear on total" architectural fee, and she asked Mr. Dauphin to "[p]lease confirm [the architect's] exact charge." (Doc. 102-3, p. 2). The request was reasonable, given the two fees that Mr. Dauphin submitted. Mr. Dauphin replied: "[t]he Goodriches have not asked that the architect's fee be paid twice." (Doc. 102-4, p. 4). Mr. Dauphin offered no other information. He did not respond to Ms. Moss's simple request that he provide the exact charge that the Goodriches wanted Pacific to pay. He did not state which of the two fees the Goodriches wanted Pacific to pay. He allowed ambiguity to persist. The Goodriches did not fulfill their obligation to respond to Pacific's request for information needed to assess their request for payment of an architect oversight fee.

These examples of confusion, poor communication, and distrust form the backdrop against which each of the Goodriches' requests for payment

rests.  There are many other examples that illustrate how miscommunication and confusion led to more of the same.  The record reflects a string of mistakes, poor communications, and concern about overreaching payment requests; the record does not contain evidence of dishonest purpose on Pacific's part or a reckless or intentional failure to investigate.[44]  As a matter of law, Pacific is entitled to judgment in its favor on the Goodriches' bad faith claims relating to failure to pay and failure to investigate.[45]

---

[44] There were two legitimate perspectives for many of the issues the parties confronted as they navigated the Goodriches' claims.  For example, the Goodriches felt strongly that their house was virtually brand new when the fire occurred, so they wanted a brand new house to replace it; they did not want to reuse doors and other materials removed from the house because the materials, if tainted with smoke, might not provide the new house that they lost.  From Pacific's perspective, the cost to reconstruct the house should be very similar to the cost the Goodriches incurred to build the house months earlier, in part because the reconstruction did not include the attached garage or the basement that was part of the original construction of the house.  Nevertheless, the Goodriches submitted repair costs that appeared to Pacific to exceed the original cost to build the Dell Road house by hundreds of thousands of dollars.  Pacific sought information to explain how the reconstruction costs appeared to escalate significantly in less than a year.  Thus, the short window of time between the initial completion of the Dell Road house and the fire that destroyed it had different implications for the Goodriches and Pacific and raised different concerns for each.  These different positions are just that – different and deeply held.  That does not make them evidence of bad faith.

[45] Because the Goodriches are not entitled to judgment in their favor as a matter of law on their breach of contract claims, their bad faith failure to pay claim necessarily fails under Alabama law.  *See Nilsen*, 745 So. 2d 264, 269 (Ala. 1998) (insured cannot sustain bad faith claim in the absence of a breach of contract); *Ex parte Alfa Mut. Ins. Co.*, 799 So. 2d 957, 962 (Ala. 2001) ("[A] breach of an insurance contract is an element of a bad-faith-refusal-to-pay claim.").

## *Intentional Interference with Contractual Relationships*

The Goodriches allege that Pacific intentionally interfered with their relationship with Brookstone by communicating with Brookstone about smoke remediation without the Goodriches' consent or approval. (Doc. 71, pp. 31-35).[46]  To prevail on a claim for wrongful interference with a business relationship, a plaintiff must establish:  "(1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage."  *White Sands Grp., L.L.C. v. PRS II, LLC*, 32 So.

---

[46] Based on Mr. Zlotnik's smoke remediation protocol, Brookstone planned "heavy soda blasting" of the entire house.  (Doc. 103-3, pp. 2-3; Doc. 103-13; Doc. 106-1, p. 154).  In a March 2020 letter to Mr. Haessig, Mr. Dauphin stated that Ms. Goodrich agreed with Brookstone to soda blast the entire house.  (Doc. 103-13, p. 2).  In March 2020 emails to Mr. Arrant, Mr. Elliot questioned why Brookstone was "soda blasting everything" on the "entire main level" when Pacific paid TCC to "replace fire damaged material and some demo" on the mail level.  (Doc. 29-3; Doc. 103-3).  Mr. Elliot stated that he agreed with soda blasting the "second level and attic" but thought that "a HEPA vacuum, wipe down, and seal" would provide sufficient odor removal on the main level and basement.  (Doc. 29-3; Doc. 103-3).  Mr. Arrant responded that Brookstone needed to soda blast "on the main level in areas that have spray foam insulation to give them a clean surface to replace it" and that there were "areas of decking and studs" with "mold and smoke damage" that needed soda blasting.  (Doc. 29-3; Doc. 103-3).  Mr. Elliot asked Mr. Arrant to "update the estimate to reflect" the areas on the main level that did not need soda blasting.  (Doc. 103-3, p. 2).  Mr. Arrant responded that he would reduce the square footage from 57,110.62 to 45,6880.50 "to remove the areas down stairs that [did not] have smoke damage or spray foam insulation" and would "send over the revised estimate with that blasting taken out."  (Doc. 103-3, p. 2).  The Goodriches were not included on the March 2020 emails between Mr. Elliot and Mr. Arrant.  (Doc. 103-3).  Because Mr. Arrant agreed with Mr. Elliot to reduce the scope of the soda blasting on the main level without the Goodriches' knowledge, the Goodriches fired Brookstone in March 2020.  (Doc. 101-4, pp. 17-18; Doc. 104-1, pp. 51-52).  The Goodriches then hired Slade LLC to perform the smoke remediation.  (Doc. 101-11; *see* Doc. 29-4, p. 4; Doc. 101-4, p. 120; Doc. 104-1, p. 52).

3d 5, 14 (Ala. 2009). A defendant is not a stranger to a business relationship if the defendant has a "beneficial or economic interest in, or control over" the relationship; if the "allegedly injured relations are inextricably a part of or dependent upon the defendant's contractual or business relations;" or if the defendant and plaintiff are "parties to a comprehensive interwoven set of contract relations." *Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So. 2d 1143, 1154 (Ala. 2003).

The evidence demonstrates that Pacific was not a stranger to the Goodriches' contractual relationship with Brookstone. Though the Goodriches hired and terminated Brookstone and controlled Brookstone's performance, the Goodriches' contract with Brookstone was "inextricably a part of" Pacific's insurance contract with the Goodriches. *See Waddell*, 875 So. 2d at 1156. The Goodriches' contract with Brookstone expressly authorized Pacific to pay Brookstone directly for the "portion of work covered by [the Goodriches'] insurance policy." (Doc. 103-15) (stating that Ms. Goodrich authorized Chubb Insurance Company "to pay Brookstone solely and directly" for work covered by the Goodriches' insurance policy).[47] Thus, Pacific is entitled to judgment on this claim as a matter of law.

---

[47] The Goodriches argue that their contract with Brookstone authorized Chubb, not Pacific, to pay Brookstone. Because Chubb and Pacific are related companies, (Doc. 101-2, p. 3), and because the parties used the company names interchangeably, the argument is not

### *Outrage*

Under Alabama law, the "tort of outrage is an extremely limited cause of action." *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000). As the Alabama Supreme Court has explained:

> It is so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context, *Whitt v. Hulsey,* 519 So.2d 901 (Ala.1987); (2) barbaric methods employed to coerce an insurance settlement, *National Sec. Fire & Cas. Co. v. Bowen,* 447 So.2d 133 (Ala.1983); and (3) egregious sexual harassment, *Busby v. Truswal Sys. Corp.,* 551 So.2d 322 (Ala.1989). *See also* Michael L. Roberts and Gregory S. Cusimano, *Alabama Tort Law,* § 23.0 (2d ed.1996). In order to recover, a plaintiff must demonstrate that the defendant's conduct '(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.' *Green Tree Acceptance, Inc. v. Standridge,* 565 So.2d 38, 44 (Ala.1990) (citing *American Road Service Co. v. Inmon* [, 394 So.2d 361 (Ala.1980)] )."

*Little v. Robinson*, 72 So. 3d 1168, 1172–73 (Ala. 2011) (quoting *Potts v. Hayes,* 771 So. 2d 462, 465 (Ala. 2000)).

The Goodriches rely on *Continental Cas. Ins. Co. v. McDonald*, 567 So. 2d 1208 (Ala. 1990), to support their argument that Pacific's conduct was outrageous. In *McDonald*, the Alabama Supreme Court held that Mr. McDonald produced sufficient evidence for a jury to find that the insurer "engaged in a deliberate effort to cause [Mr.] McDonald to suffer severe

---

persuasive.

emotion distress in order to coerce him into accepting an unreasonably low lump-sum settlement that would drastically reduce [the insurer's] liability for medical expenses." *McDonald*, 567 So. 2d at 1221. The insurer delayed payments to "doctors, hospitals, and pharmacists for unreasonable lengths of time, causing for example, hospitals to threaten collection actions against [Mr. McDonald] and a pharmacy to refuse to provide further pain medication." *McDonald*, 567 So. 2d at 1210, 1213. Mr. McDonald produced evidence from the insurer's "records and communications that its goal in dealing with him was to persuade him, or, as the jury may have found, to coerce him, to settle for a lump sum benefit" that would significantly reduce what the insurer was legally obligated to pay. *McDonald*, 567 So. 2d at 1221. The evidence in *McDonald* indicated that the insurer "knew, and took advantage of the fact that, [Mr. McDonald] was peculiarly susceptible to emotional distress because of his constant pain, his need for treatment for that pain, and his dependence on [the insurer] to obtain that treatment." *McDonald*, 567 So. 2d at 1220-21. There was "pervasive evidence . . . that [Mr.] McDonald's pain was unusually severe and rendered him especially subject to emotional distress over the continuing availability of treatment and that [the insurer] engaged in repeated conduct that brought the availability of treatment into doubt." *McDonald*, 567 So. 2d at 1220.

Unlike Mr. McDonald who produced direct evidence of his insurer's improper motive in delaying payments for medical treatment, Ms. Goodrich has not produced direct evidence of Pacific's motive in its dealings with her. Ms. Goodrich has not presented evidence that Pacific knew that she suffered from generalized anxiety disorder or that Pacific intentionally caused her severe emotional distress to compel her to settle for an amount significantly below the coverage available to the Goodriches. *See State Farm Auto. Ins. Co. v. Morris*, 612 So. 2d 440, 443 (Ala. 1993) (finding that the plaintiff could not recover damages for outrageous conduct where the plaintiff presented "no evidence that State Farm intended to cause her severe emotional distress or that State Farm had improper motives in dealing with her"). Ms. Goodrich's testimony and affidavits reflect incorrect statements, misunderstandings, and strong points of disagreement, but the evidence does not reflect conduct so outrageous, extreme, atrocious, and "utterly intolerable in a civilized society" as to constitute outrageous conduct under Alabama law. *See Am. Rd. Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1993).[48]

---

[48] The *Travelers Indem. Co. of Illinois v. Griner*, 809 So. 2d 808 (Ala. 2001), decision also is distinguishable from this case. In *Griner*, the insurer did not pay for medically required treatments "for a period of approximately five years." *Griner*, 809 So. 2d at 811. Consequently, Mr. Griner "remained depressed and in pain for an extended period without the medical necessities prescribed by his authorized physicians." *Griner*, 809 So. 2d at 811-12. Mr. Griner "became so frustrated and depressed that he discharged his attorney" and told the insurer he wanted to "settle all claims for future medical treatment for $80,000," an amount substantially below the amount that Mr. Griner potentially could have

Additionally, Ms. Goodrich's lack of psychiatric treatment, (Doc. 101-4, pp. 325-26), indicates that her emotional distress was not so severe that "no reasonable person could be expected to endure it." *American Road. Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980).

As discussed, Pacific has presented evidence sufficient for reasonable jurors to find that Pacific had an arguable basis for delaying or refusing to pay claims. Jurors ultimately may conclude that Pacific owes the Goodriches additional sums under the policy, but the parties' disagreements did not produce conduct extreme and egregious enough to constitute outrageous conduct under Alabama law. *See Garvin v. Shewbart*, 564 So. 2d 428, 431 (Ala. 1990) (finding that insurer's conduct was not outrageous where the insurer "was doing no more than [insisting] upon [its] legal rights in a permissible way) (internal quotations and citation omitted) (brackets in *Garvin*); *see also Gibbs v. Aetna Cas. & Sur. Co.*, 604 So. 2d 414, 417 (Ala.

---

recovered under his policy. *Griner*, 809 So. 2d at 812. The insurer offered $5,000 to settle the claims. *Griner*, 809 So. 2d at 812. The insurer admitted that such behavior was "wrong and intolerable in our civilized society." *Griner*, 809 So. 2d at 812.

Here, Mr. Dauphin offered a global settlement to Pacific that exceeded the amount available to the Goodriches under the policy. The Goodriches requested payments for home improvements to the rental house that their attorney owned, and the Goodriches declined to provide basic information to help Pacific understand the nature of some of their claims. Understandably, the claims process was stressful, but the record here is devoid of the sorts of one-sided pressure tactics that supported the outrage claims in *McDonald* and *Griner*.

1992) (affirming summary judgment for insurer on outrage claim where the plaintiff merely argued that insurer "denied [the] claim with no arguable reason for doing so").

On a related note, Pacific requests summary judgment regarding the Goodriches' demand in the second amended complaint for mental anguish damages on their breach of contract claims. (Doc. 110-1, pp. 40-42; *see* Doc. 71, pp.17, 19, 20, 29). Pacific argues that a breach must be egregious and render the "home virtually uninhabitable" for a plaintiff to receive mental anguish damages. (Doc. 110-1, p. 41) (citing *Baldwin v. Panetta*, 4 So. 3d 555, 568 (Ala. Civ. App. 2008)). Pacific argues that, as a matter of law, the Goodriches are not entitled to mental anguish damages on the breach of contract claims because the breaches do not involve the habitability of the Goodriches' Dell Road house. (Doc. 110-1, p. 41). The Goodriches did not address this issue in their response to Pacific's motion for summary judgment, and the Goodriches do not move for summary judgment on this issue.

In explaining Alabama law on mental anguish damages, the Eleventh Circuit has stated:

> In Alabama, "[i]t is settled that the law in this state does not permit recovery for personal injury, inconvenience, annoyance or mental anguish and suffering in an action for breach of a contract of insurance." *Vincent v. Blue Cross–Blue Shield, Inc.*, 373 So.2d 1054, 1056 (Ala. 1979). Alabama does, however, recognize a limited exception to this rule. Under Alabama law,

"[d]amages for mental anguish can be recovered. . . where the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering." *Liberty Homes, Inc. v. Epperson*, 581 So.2d 449, 454 (Ala. 1991) (quoting *F. Becker Asphaltum Roofing Co. v. Murphy*, 224 Ala. 655, 141 So. 630, 631 (1932)) . . . .

. . . The majority of the cases in which a plaintiff has been allowed to recover damages for mental anguish involved actions on "contracts for the repair or construction of a house or dwelling or the delivery of utilities thereto, where the breach affected habitability." *See, e.g.*, *Epperson*, 581 So.2d at 454; *Orkin Exterminating Co. v. Donavan*, 519 So.2d 1330 (Ala. 1988); *Lawler Mobile Homes, Inc. v. Tarver*, 492 So.2d 297 (Ala. 1986); *Alabama Power Co. v. Harmon*, 483 So.2d 386 (Ala. 1986). Because a person's home is said to be his "castle" and the "largest single individual investment the average American family will make," these contracts are "so coupled with matters of mental concern or solicitude or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering." *B & M Homes, Inc. v. Hogan*, 376 So.2d 667, 671–72 (Ala. 1979).

*Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1359 (11th Cir. 2000). "[I]t is highly foreseeable that egregious breaches of certain contracts—involving one's home ... for example—will result in significant emotional distress." *Ruiz de Molina*, 207 F.3d at 1359-60 (citing *Sexton v. St. Clair Federal Sav. Bank*, 653 So.2d 959, 962 (Ala. 1995)). "The contractual duties imposed by these contracts are so sensitive that a breach will necessarily and foreseeably result in mental anguish." *Ruiz de Molina*, 207 F.3d at 1360 (citing *Orkin Exterminating*, 519 So.2d at 1333). To recover

74

damages for mental anguish, a plaintiff must demonstrate that the breach of contract could "reasonably be seen to affect the solicitude and well-being" of the contracting party. *Orkin Exterminating*, 519 So. 2d at 1333.

Here, the contract involves insurance for a home. The Supreme Court of Alabama in *Independent Fire Ins. Co. v. Lunsford*, 621 So. 2d 977 (Ala. 1993), upheld a jury award for mental anguish damages for a breach of an insurance contract for failure to pay a claim for a damaged awning on a mobile home. *Lunsford*, 621 So. 2d at 979. The breach in *Lunsford* did not involve the habitability of the mobile home. *Lunsford*, 621 So. 2d at 979.

If the Goodriches prevail on their breach of contract claims, reasonable jurors could accept Ms. Goodrich's testimony and find that a breach by Pacific affected her solicitude and well-being concerning her family's home.[49] Accordingly, summary judgment on this issue is inappropriate.

---

[49] Ms. Goodrich testified that she was diagnosed with obsessive compulsive disorder in 2007, that she also has generalized anxiety disorder related to her OCD, and that loss of control triggers her OCD. (Doc. 101-4, pp. 309-311, 320-21). Ms. Goodrich stated that her OCD caused "obsessive thoughts" that she could not turn off. (Doc. 101-4, pp. 311-12). Ms. Goodrich testified that the "claims process was more traumatic than the fire to [her] home" and that dealing with Mr. Elliot and Ms. Moss caused her to have PTSD. (Doc. 101-4, p. 320). Ms. Goodrich testified that she had not sought treatment for her psychiatric symptoms; she spoke with Dr. Mary-Catherine Riner only to allow Ms. Riner to prepare an expert report in this case. (Doc. 101-4, pp. 325-26).

The Goodriches also claim damages for mental anguish for Mr. Goodrich in their amended complaint. (Doc. 71, p. 17). There is little discussion of Mr. Goodrich's alleged mental anguish in the parties' summary judgment briefs. Therefore, Mr. Goodriches' alleged mental anguish is an issue for a jury to resolve.

## IV.

For the reasons stated above, the Court grants Pacific's motion for summary judgment on the Goodriches' bad faith, interference with contractual relationships and outrage claims. The Court also grants Pacific's motion for summary judgment as to ALEs for interior painting of rental houses and installation of lighting and security system upgrades at the Wimbleton Drive rental house. The Goodriches' breach of contract claims for amounts that Pacific now has paid are moot. The Court denies the balance of Pacific's motion for summary judgment and denies the Goodriches' motion for summary judgment.

Because the Court did not consider the evidence that the Goodriches' challenged in their motion to strike, (Doc. 137), that motion is moot.[50]

The Court orders the parties to submit within three days a summary of all payments offered and accepted and offered and refused.

**DONE** and **ORDERED** this November 18, 2024.

*Madeline H. Haikala*

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[50] The Court mistakenly wrote in its September 30, 2024 order that it granted the motion to strike. (Doc. 140). As discussed in this opinion, the motion to strike is moot.